# **EXHIBIT A**

**BEECHER CARLSON**

Passion. Innovation. Accountability.

## MANAGEMENT AND ADMINISTRATIVE SERVICES AGREEMENT

THIS MANAGEMENT AND ADMINISTRATIVE SERVICES AGREEMENT (this "Agreement") is entered into by BEECHER CARLSON (CAYMAN) LTD. ("Beecher Carlson") doing business as a licensed captive manager in the Cayman Islands, and Sentinel Reinsurance, Ltd. ("Customer") as of October 1, 2013 ("Effective Date").

### BACKGROUND

Beecher Carlson has experience in providing consulting services with respect to risk management and captive management and administrative services. Beecher Carlson is willing to provide certain of such professional services to Customer on the terms and conditions specified in this Agreement. Customer wishes to engage Beecher Carlson to provide professional services on the terms specified in this Agreement.

Beecher Carlson and Customer agree as follows:

1. **Services**. Beecher Carlson will provide professional services to Customer (the "Professional Services"), as described on **Exhibit A**. Beecher Carlson will be an independent contractor to Customer at all times, and neither Beecher Carlson nor any employee or subcontractor of Beecher Carlson will be, or be deemed to be, an employee or agent of Customer. Beecher Carlson may provide the Professional Services at a location other than Customer's facilities. Beecher Carlson may subcontract all or any part of its obligations under this Agreement to an affiliate or third party contractor, but any such subcontracting by Beecher Carlson will not relieve Beecher Carlson of any of its obligations under this Agreement. Customer will promptly comply with any request for information or instructions in regard to insurance, reinsurance or administrative or management services, which Beecher Carlson may make in order to efficiently perform its duties hereunder.

Customer acknowledges the statutory and fiduciary obligation of Beecher Carlson to policyholders, Divisions of Insurance, various other regulators, and the Customer's reinsurers. Beecher Carlson will perform all Professional Services consistent with such statutory and fiduciary obligations. Nothing in this Agreement will be interpreted to preclude Beecher Carlson from exercising its judgment on how best to comply with such statutory or fiduciary obligations, and Beecher Carlson is expressly permitted to do so even if not specifically described in this Agreement.

2. **Professional Services Fees and Expenses**. The Professional Services will be provided at Beecher Carlson's consulting services rates as described on **Exhibit A** in accordance with the payment terms specified on **Exhibit A**. Customer will reimburse Beecher Carlson, or pay directly at Customer's option, all reasonable travel, lodging, food and other out-of-pocket expenses incurred by personnel of Beecher Carlson (including Beecher Carlson's subcontractors) in performing Professional Services for Customer. Beecher Carlson's fees do not include services of other providers including, but not limited to, program marketing and/or retail or wholesaling of insurance agents or brokers, attorneys, solicitors, actuaries, accountants (tax and audit), investment managers or custodians, reinsurers, or claim managers.

3. **Taxes**. Customer is responsible for, and will pay, any and all federal, state or local taxes (other than taxes based on Beecher Carlson's income), including sales and use taxes imposed in connection with the Professional Services provided under this Agreement, any excise taxes, and any surplus lines taxes. Beecher Carlson shall not have any responsibility to Customer, or any other party, for any taxes, fines or penalties. Customer will indemnify Beecher Carlson and hold Beecher Carlson harmless from and against any such taxes, fines or penalties and will promptly reimburse Beecher Carlson for the amount of any taxes that Beecher Carlson is required to pay as a result of Customer's failure to pay that amount.

4. **Limited Warranty and Disclaimer**. Beecher Carlson represents and warrants that all Professional Services performed by Beecher Carlson will be performed in a competent and workmanlike manner by individuals of appropriate training and experience. For example, Beecher Carlson will not have any other obligations or responsibilities to Customer, including but not limited to, any obligation or responsibility for the profitability of the business of a captive insurance company or risk retention group, the solvency of any person, or the failure of third parties (including insurers and reinsurers) to fulfill their obligations and responsibilities. It is understood and agreed that by entering into this Agreement and rendering services hereunder, Beecher Carlson is not, does not intend to be, and shall not be construed to be in any way liable as an insurer or

reinsurer of risks underwritten or assumed by any captive insurance company or risk retention group, or as a guarantor of any of their obligations. Customer acknowledges and agrees that Beecher Carlson will not provide any tax or investment advice, and that Customer is responsible for all tax and investment decisions. THE WARRANTY SPECIFIED IN THE PRECEDING SENTENCE IS EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES. EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION 4, BEECHER CARLSON SPECIFICALLY DISCLAIMS ANY OTHER WARRANTY WITH REGARD TO THE PROFESSIONAL SERVICES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. In the event of a breach of Beecher Carlson's warranty with respect to the Professional Services, Beecher Carlson will, as the sole and exclusive remedy for the breach, promptly re-perform the Professional Services in a manner that substantially conforms to the warranty and, if Beecher Carlson is unable to cure the breach in a reasonable period of time, Customer may terminate this Agreement effective upon written notice subject to Section 7.

5. **Limitation of Liability; Indemnification**.

   (A) OTHER THAN WITH RESPECT TO ITS GROSS NEGLIGENCE OR INTENTIONAL MISCONDUCT, IN NO EVENT WILL BEECHER CARLSON BE LIABLE TO CUSTOMER OR ANY OTHER PERSON OR ENTITY FOR ANY CONSEQUENTIAL, INDIRECT, SPECIAL, OR INCIDENTAL DAMAGES, INCLUDING LOSS OF PROFITS, REVENUE, DATA OR USE, INCURRED BY CUSTOMER OR ANY THIRD-PARTY, EVEN IF BEECHER CARLSON HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH POTENTIAL LOSS OR DAMAGE.

   (B) **Indemnification**. Customer will indemnify and hold Beecher Carlson its directors, officers, employees, and agents harmless (including reasonable outside attorney's fees) from and against any and all claims, suits, or proceedings arising from or involving the acts, errors or omissions of the Customer or its breach of any representation or warranty herein or any term or condition of this Agreement, or arising from or involving Beecher Carlson's performance under this Agreement unless due to Beecher Carlson's error or omission or breach of any representation or warranty herein or any term or condition of this Agreement. Beecher Carlson will indemnify and hold Customer, its directors, officers, employees and agents harmless (including reasonable outside attorneys' fees) from and against any and all claims, suits, or proceedings arising from or involving the acts, errors or omissions of Beecher Carlson or its breach of any representation or warranty herein or any term or condition of this Agreement. This general indemnification is predicated on a) the indemnified party notifying the indemnifying party promptly in writing of the claim; (b) the indemnifying party having sole control of the defense and all related settlement negotiations; and (c) the indemnified party providing the indemnifying party with all necessary assistance, information and authority to perform the above.

   (C) **Director and Officer Indemnification.** If representatives of Beecher Carlson are asked to serve as officers or directors, whether appointed, elected, and/or designated pursuant to this Agreement or the Professional Services performed hereunder, as well as their agents, employees, and/or representatives, Customer will indemnify and hold such parties harmless (including reasonable outside attorney's fees) from and against any and all claims, suits, or proceedings arising from or involving such person's capacity as an officer or director (excluding liability for dishonesty, fraud, or breach of any fiduciary duty as finally determined by a court of law).

6. **Confidentiality.**

To the extent consistent with performances of Beecher Carlson's duties under this Agreement, Beecher Carlson and Customer agree to hold in confidence Confidential Information (defined below). Customer acknowledges, however, that Beecher Carlson will disclose Confidential Information as reasonably required in the ordinary course of performing the Services to insurance companies and other insurance intermediaries. "Confidential Information" means all information (and all documents and other tangible items which record information, whether on paper, in computer readable format or otherwise) relating to the disclosing party's business (including without limitation business plans, manner of doing business, business results or prospects), proposals, recommendations, marketing plans, reports, any of which (i) at the time in question is either protectable as a trade secret or is otherwise of a confidential nature (and is known or should reasonably be known by receiving party as being of a confidential nature) and (ii) has been made known to or is otherwise learned by receiving party as a result of the relationship under this Agreement. Confidential Information will not include any information, documents or tangible items which (i) are a matter of general public knowledge other than as a result of a disclosure by receiving party, (ii) are now in possession of receiving party as evidenced by receiving party's existing written records, or (iii) are hereafter received by receiving party on a non-confidential basis from another source who is not, to receiving party's knowledge, bound by confidential or fiduciary obligations to disclosing party or otherwise prohibited from transmitting the same to

receiving party. In the event that Beecher Carlson or Customer become legally compelled to disclose any of the Confidential Information, they shall provide the other party with prompt notice so that such party may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. In the event that such protective order or other remedy is not obtained, or that the other party waives compliance with the provisions of the Agreement, such party may disclose such information as is necessary or advisable to comply with the legal process.

7. **Term and Termination**.

The term of this Agreement will begin on the Effective date and will continue until this Agreement has been terminated in accordance with this Section 7. Either Beecher Carlson or Customer may terminate this Agreement upon sixty (60) days written notice to the other party; however, such termination will not relieve Customer from its obligation to pay any and all Professional Services fees and expenses and any other fees and expenses that are owed by Customer under this Agreement, including Customer's obligation to pay all fees and expenses for services rendered and work completed on deliverables through the effective date of termination. Beecher Carlson will cooperate at Customer's expense to facilitate an orderly transition to Customer's new provider, provided that Beecher Carlson will not perform any Professional Services after the Effective Date of termination absent a separate written agreement to do so, including provisions for additional compensation. Upon payment of all monies owing to Beecher Carlson, Beecher Carlson will deliver all books and records to the Customer which were prepared and maintained by Beecher Carlson on behalf of the Customer no later than 60 (60) days from the effective date of termination. Beecher Carlson has the right to retain copies of such materials.

8. **Dispute Resolution**. The parties will first attempt to amicably resolve among themselves any and all disputes, claims or controversies arising out of or in any way connected with or arising from this Agreement, its negotiation, performance, breach, enforcement, existence or validity, any failure of the parties to reach agreement with respect to matters provided for in this Agreement and all matters of dispute relating to the rights and obligations of the parties. In the event any such issues cannot be amicably resolved within thirty days of the issue being raised to an executive of each party, even if only one of the parties declares that there is a difference, such issue will be referred to and finally settled by private and confidential binding arbitration held in the Cayman Islands and governed by Cayman Islands law; provided, however, that the parties retain the right to seek judicial assistance: (a) to compel arbitration; (b) to obtain interim measures of protection pending arbitration; and (c) to enforce any decision of the arbitrator(s), including the final award, subject to Section 9.1. Either party may exercise its rights under this Section 8 by serving on the other a written demand for arbitration. The arbitration shall be conducted under the Commercial Arbitration Rules of the American Arbitration Association by one or more arbitrators appointed in accordance with said rules.

9. **Miscellaneous Provisions**.

   9.1 **Choice of Law; Venue**. This Agreement is governed by the laws of the Cayman Islands, without reference to such state's choice of law provisions. Each party hereby consents to the jurisdiction of any federal or state court within such state.

   9.2 **Notices**. All notices, communications and deliveries under this Agreement must be made in writing and be signed by the party making the same, must specify the Section under this Agreement pursuant to which it is given or being made (if applicable), and will be given or made to the respective representatives specified below. Notice to Beecher Carlson and Customer should be addressed as set forth on **Exhibit A**.

   9.3 **Severability; No Waiver**. If any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions of this Agreement will remain in full force and effect. The waiver by either Party of any default or breach of this Agreement will not constitute a waiver of any other or subsequent default or breach.

   9.4 **No Assignment**. Customer may not assign or sublicense its rights or obligations under this Agreement without the prior express written consent of Beecher Carlson. Such consent shall be at Beecher Carlson's sole discretion, and any purported assignment in violation of this Section 9.4 will be null and void and of no force or effect.

   9.5 **Force Majeure**. Neither party will be held responsible for any delay or failure in performance (other than payment obligations) to the extent that such delay or failure is caused by fire, flood, explosion, war, strike, terrorist attack, embargo, government regulation, civil or military authority, act of God, acts or omissions of carriers or other similar causes beyond its control.

**BEECHER CARLSON**
Passion. Innovation. Accountability.

**9.6** **Effect of This Agreement.** This Agreement constitutes the complete understanding between the parties with respect to the terms and conditions set forth in this Agreement and supersedes all previous written or oral agreements and representations. The terms and conditions of this Agreement will control over any terms and conditions in any solicitation, request for proposal, proposal, purchase order, acknowledgment or other written form, including any purchase order or other acknowledgement issued after the Effective Date which has not been signed by Beecher Carlson. This Agreement may be modified only in a writing that expressly references this Agreement and is executed by both parties to this Agreement. This Agreement may be executed in several counterparts, all of which taken together will constitute one single Agreement between the Parties.

**9.7** **Interpretation of Agreement.** The following rules of interpretation must be applied in interpreting this Agreement: (1) the section and subsection headings used in this Agreement are for reference and convenience only, and will not enter into the interpretation of this Agreement, (2) all references to Sections and Exhibits are to Sections in this Agreement and Exhibits to this Agreement, as the case may be, (3) the provisions of the Exhibits are incorporated in this Agreement, and (4) as used in this Agreement, the term "including" will always be deemed to mean "including without limitation."

**9.8** **Survival.** The provisions of Sections 2, 3, 4, 5, 6, 7, 8, and 9 will survive and continue in full force and effect notwithstanding the termination or expiration of this Agreement.

Agreed and Accepted:

**BEECHER CARLSON (CAYMAN) LTD**

By: _[signature]_

_Jason Flaxbeard_

_Director_

**CUSTOMER**

By: _[signature]_

_Kobi Dorenbush_

_Director_

BEECHER CARLSON

Passion. Innovation. Accountability.

# EXHIBIT A
## To
## MANAGEMENT AND ADMINISTRATIVE SERVICES AGREEMENT

**1. DESCRIPTION OF SERVICES**

(A) Customer hereby requests Beecher Carlson to provide Professional Services as described below. Any substantial change in the scope of the Professional Services to be provided will require a separate written agreement.

BASIC SERVICES. Beecher Carlson shall maintain a sufficiently staffed office so as to enable it to provide the following administrative and management services for Sentinel Reinsurance, Ltd. ("Sentinel"):

a. Maintain copies of such records, ledgers and books of account as will constitute a complete and current record of the financial condition of Sentinel, in accordance with established accounting principles applicable to the business of insurance and reinsurance, as directed by **Sentinel**'s Directors and Officers;

b. Prepare comprehensive quarterly financial statements including profit and loss and balance sheet statements and information with respect to Sentinel, as may be required by law or requested by Sentinel through Highland Capital;

c. Maintain policies of insurance, contracts of reinsurance, binders, endorsements and other insurance or reinsurance documents related to the business of Sentinel as directed by Sentinel;

d. Execute binders of insurance and reinsurance, policies, endorsements and contracts of insurance and reinsurance issued by Sentinel as directed by Sentinel;

e. Coordinate and attend Sentinel's **Annual Meeting**;

f. Facilitate the investment of available funds in accordance with written instructions from Sentinel through Highland Capital;

g. In conjunction with Sentinel's auditor and attorney, monitor and advise the Directors and Officers of Sentinel regarding legal and regulatory requirements applicable to the Cayman Islands, and assist Sentinel in complying with such requirements;

h. Process such premium and loss funds on reinsurance agreements as may be required;

i. Negotiate with third parties for the provision of such other services to Sentinel that Sentinel specifically requests;

j. Make withdrawals from time to time in accordance with written authorization procedures established by Sentinel from any bank account or accounts established by Sentinel in order to pay in a timely manner, the necessary, reasonable and proper expenses of Sentinel. Such expenses shall include, but are not limited to:

  i. claim payments;
  ii. Beecher Carlson management fees to be paid pursuant to this Agreement;
  iii. banking services fees;
  iv. fees of the Secretary of Sentinel;
  v. fees of the firm of auditors or chartered accountant of Sentinel;
  vi. fees and taxes to appropriate regulatory authorities of the Cayman Islands;
  vii. communication costs;
  viii. travel and entertainment costs incurred by officers of Sentinel; and
  ix. other necessary expenses.

BEECHER CARLSON
Passion. Innovation. Accountability.

l. Provide a Principal and Home Office for Sentinel in the Cayman Islands and maintain such records of Sentinel in compliance with the rules, regulations, and other requirements of the Cayman Islands Monetary Authority.

m. Receive, review, reconcile, and account for monthly cession statements, unearned premium and loss reserves calculations, and loss run reconciliation to disbursements.

n. Review and account for the disbursement of all moneys from Sentinel in accordance with Board of Directors ("Board") resolutions or authorization from appropriate Sentinel officials, including payment of the Director's fees.

o. Review and account for all investment activities based on information provided by the investment manager and/or custodian.

p. With Sentinel, coordinate the provision of the necessary data for the use by Sentinel's actuaries, and coordinate and schedule actuarial reviews and analyses necessary for Sentinel's operation as an insurance company.

q. Provide the necessary data for the use by Sentinel's independent auditors, and coordinate and schedule the annual audit.

r. Submit all required filings to regulators.

s. Monitor compliance with the insurance law, regulations and filing requirements of the Cayman Islands.

t. Represent Sentinel during periodic examinations conducted by the Cayman Islands Monetary Authority.

u. Maintain primary communication channels between Sentinel and the Cayman Islands Monetary Authority.

Beecher Carlson's activities under this Agreement shall be subject at all times to the general supervision and specific directions of the Directors and Officers of Sentinel, or their designees, as well as the laws and regulations applicable to insurance managers in the Cayman Islands.

(B) SERVICES NOT INCLUDED. This Agreement contemplates that the Beecher Carlson will not be responsible for duties other than the BASIC SERVICES listed above in paragraph (A). Specifically, Beecher Carlson will not be responsible for other captive and/or risk management services including, but not limited to, the following: initial organization and implementation services of captive entity (i.e., setting up bank accounts, investment RFP's, etc.), negotiation of primary insurance, or reinsurance arrangements; setting rates or underwriting guidelines; claims handling; reinsurance reporting; investment banking; actuarial review or analysis; independent audited financial statements; tax advice or assistance; legal advice or assistance; rate and form filings; and/or other services not specifically listed in paragraph (A).

2. **PROFESSIONAL SERVICES FEES**

For BASIC SERVICES performed under Paragraph 1 (A) of this Exhibit (A), Customer will pay Beecher Carlson at an annual rate of THIRTY FIVE THOUSAND DOLLARS (US $35,000) for the first year of this Agreement and subject to annual adjustment as described below ("Basic Fee"). The Basic Fee is payable in US Dollars in equal quarterly installments beginning on the Effective Date. The Basic Fee is subject to annual review. If the parties cannot reach agreement on the Basic Fee increase, this Agreement may be terminated in accordance with Section 7 of the Agreement. Upon termination of this Agreement, Beecher Carlson will retain all quarterly payments paid and/or payable prior to the effective date of termination, as well as an appropriately prorated portion of the quarterly payment attributable to the quarter during which termination becomes effective.

BEECHER CARLSON

Passion. Innovation. Accountability.

The Basic Fee will be charged quarterly and due in advance. Fees payable for any other Professional Services and related out-of-pocket expenses must be paid within thirty (30) days following Customer's receipt of an invoice from Beecher Carlson. Any fees not paid when due will be subject to interest at a rate of one percent (1%) per month, from the due date until paid in full.

If the Customer desires Beecher Carlson to perform other services outside the scope of the BASIC SERVICES listed in paragraph (A), or if Beecher Carlson is required to redesign, negotiate, place, or review new reinsurance programs for existing or new books of business and/or policyholders, or new associated service provider contracts, Customer will be responsible for paying such additional compensation on a time and materials basis at **Beecher Carlson's then current rates and fees**. The current rate structure is listed below and is subject to change from time to time:

| Consulting Resource | Rate per Hour |
|---|---|
| SVP and above | $300 |
| VP | $250 |
| Other Professional Staff | $200 |

### 3. NOTICES

Notices to Beecher Carlson should be addressed as follows:

> Beecher Carlson Cayman Ltd
> P.O. Box 31910
> 2nd Floor, Ansbacher House
> 20 Genesis Close
> George Town, Cayman Islands, KY1-1208
> Telephone:   345.949.5055
> Facsimile:   345.946.7628

Notices to Customer should be addressed as follows:

> Company:
> Address:
>
>
> Attention:
> Telephone:
> Facsimile:



Passion. Innovation. Accountability.

## ADDENDUM NUMBER 1

## TO

## MANAGEMENT AND ADMINISTRATIVE SERVICES AGREEMENT

THIS ADDENDUM NUMBER 1 TO THE MANAGEMENT AND ADMINISTRATIVE SERVICES AGREEMENT (this "Agreement", originally effective October 1, 2013), entered into by **BEECHER CARLSON (CAYMAN) LTD.** ("Beecher Carlson"), doing business as a licensed captive manager in the Cayman Islands, and Sentinel Reinsurance, Ltd. ("Customer"), is effective as of July 1, 2014 ("Effective Date").

The terms of the agreement in effect on the original effective date are hereby amended as follows:

1. Exhibit A, Section 2, 1st paragraph, "Professional Service Fees" is hereby amended to read:

    For BASIC SERVICES performed under Paragraph 1 (A) of this Exhibit (A), Customer will pay Beecher Carlson at an annual rate of FORTY-FIVE THOUSAND DOLLARS (US $45,000) [up to 250 hours, hours over 250 will be charged at a rate of $225 per hour] for the first year of this Agreement and subject to annual adjustment as described below ("Basic Fee"). The Basic Fee is payable in US Dollars in equal quarterly installments beginning on the Effective Date. The Basic Fee is subject to annual review. If the parties cannot reach agreement on the Basic Fee adjustment, this Agreement may be terminated in accordance with Section 7 of the Agreement. Upon termination of this Agreement, Beecher Carlson will retain all quarterly payments paid and/or payable prior to the effective date of termination, as well as an appropriately prorated portion of the quarterly payment attributable to the quarter during which termination becomes effective.

2. All other terms of this agreement remain unchanged.

Agreed and Accepted:

**BEECHER CARLSON**

By: _____

Jason Flaxbeard, ACA, CPCU
Director

**SENTINEL REINSURANCE, LTD.**

By: _____

Kobi Dorenbush
Director



## ADDENDUM NUMBER 2

### TO

### MANAGEMENT AND ADMINISTRATIVE SERVICES AGREEMENT

THIS ADDENDUM NUMBER 2 TO THE MANAGEMENT AND ADMINISTRATIVE SERVICES AGREEMENT (this "Agreement", originally effective October 1, 2013 and as amended), entered into by **BEECHER CARLSON (CAYMAN) LTD.** ("Beecher Carlson"), doing business as a licensed captive manager in the Cayman Islands, and Sentinel Reinsurance, Ltd. ("Customer"), is effective as of January 1, 2015 ("Effective Date").

The terms of the agreement in effect on the original effective date are hereby amended as follows:

1. Exhibit A, Section 2, 1st paragraph, "Professional Service Fees" is hereby amended to read:

   For BASIC SERVICES performed under Paragraph 1 (A) of this Exhibit (A), Customer will pay Beecher Carlson at an annual rate of SIXTY THOUSAND DOLLARS (US $60,000) [including basic accounting services for Nimitz, Patton, Sentinel Re Holdings and SS Holdings] for the first year of this Agreement and subject to annual adjustment as described below ("Basic Fee"). The Basic Fee is payable in US Dollars in equal quarterly installments beginning on the Effective Date. The Basic Fee is subject to annual review. If the parties cannot reach agreement on the Basic Fee adjustment, this Agreement may be terminated in accordance with Section 7 of the Agreement. Upon termination of this Agreement, Beecher Carlson will retain all quarterly payments paid and/or payable prior to the effective date of termination, as well as an appropriately prorated portion of the quarterly payment attributable to the quarter during which termination becomes effective.

2. All other terms of this agreement remain unchanged.

Agreed and Accepted:

**BEECHER CARLSON**

By: _____

Jason Flaxbeard, ACA, CPCU
Director

**SENTINEL REINSURANCE, LTD.**

By: _____

Kobi Dorenbush
Director