**LATHAM & WATKINS LLP**
Andrew Clubok (*pro hac vice*)
Sarah Tomkowiak (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, District of Columbia 20004
Telephone: (202) 637-2200

Jeffrey E. Bjork (*pro hac vice*)
Kimberly A. Posin (*pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234

*Counsel for UBS Securities LLC and UBS*
*AG London Branch*

**BUTLER SNOW LLP**
Martin Sosland (TX Bar No. 18855645)
Candice Carson (TX Bar No. 24074006)
2911 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Telephone: (469) 680-5502

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

----------------------------------------------------------

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-SGJ11 |
| | § | |
| Debtor. | § | |
| | § | |
| UBS SECURITIES LLC AND UBS AG LONDON BRANCH, | § | Adversary Proceeding |
| | § | |
| | § | No. _____ |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Defendant. | § | |

----------------------------------------------------------

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

## <u>ORIGINAL COMPLAINT FOR INJUNCTIVE RELIEF</u>

Plaintiffs UBS Securities LLC and UBS AG London Branch (together, "<u>UBS</u>"), by their undersigned counsel, file this Original Complaint (the "<u>Complaint</u>") against defendant Highland Capital Management, L.P. ("<u>Highland</u>" or the "<u>Debtor</u>") seeking preliminary and permanent injunctive relief pursuant to section 105(a) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").  In support of the Complaint, UBS alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

## <u>PRELIMINARY STATEMENT</u>

1.      It has recently come to light that the Debtor, at the direction and with the involvement of numerous former Debtor employees, including James Dondero,[2] Scott Ellington,[3] Isaac Leventon,[4] JP Sevilla, and Matt DiOrio,[5] fraudulently transferred hundreds of millions of dollars of assets away from funds currently or previously controlled, owned, and/or managed by the Debtor to an entity jointly owned by Dondero and Ellington, in anticipation of the judgment that UBS obtained against those funds in New York state court.  These transfers began no later than 2017 and continued until at least the petition date.  In fact, UBS has been told that these transfers were only recently discovered by the Independent Board (defined below) and reported to UBS due to, at least in part, the Debtor's former employees affirmative misrepresentations.  Absent

---

[2] Upon information and belief, Dondero is the Debtor's former President and Chief Executive Officer.

[3] Upon information and belief, Ellington was formerly the Debtor's Chief Legal Officer and General Counsel until he was terminated for cause in January 2021 due to concerns that he failed to preserve documents subject to a litigation hold and was acting in concert with Dondero in a manner adverse to the Debtor's interests.

[4] Upon information and belief, Leventon was formerly the Assistant General Counsel at the Debtor since March 2011 until he was for cause terminated in January 2021 due to concerns that he failed to preserve documents subject to a litigation hold and was acting in concert with Dondero in a manner adverse to the Debtor's interests.

[5] Upon information and belief, Sevilla and DiOrio were formerly part of the Debtor's legal department until they were terminated in early 2021.

immediate intervention by this Court, there is a potential that transfers pursuant to this fraud may continue, with the potential to harm both the Debtor's estate and UBS as a creditor.

2. UBS filed an action in the Supreme Court of the State of New York (the "N.Y. State Court") in 2009 (as consolidated, the "UBS Litigation") against Highland and several funds currently or previously controlled, owned, and/or managed by the Debtor, including Highland CDO Opportunity Master Fund, L.P. ("CDO Fund"), Highland Special Opportunities Holding Company ("SOHC" and together with CDO Fund, the "Funds"), and Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat"). In March 2017, the N.Y. State Court denied motions for summary judgment filed by Highland and the Funds, entering rulings in favor of UBS and paving the way for a trial on the merits that confirmed that the Funds owe UBS over $1 billion.

3. The Independent Board now has informed UBS that it recently discovered that at least as of August 2017, just months after those rulings were issued in favor of UBS, and in advance of the impending trial, Highland was fraudulently transferring (or attempting to fraudulently transfer) ownership of all or substantially all of the Funds' hundreds of millions of dollars' of assets (the "Transferred Assets") to Sentinel Reinsurance, Ltd. ("Sentinel")—*a Cayman Islands entity that Dondero and Ellington owned and controlled*—for a fraction of the supposed total face value of the assets (the "Fraudulent Transfers"). Upon information and belief, the Transferred Assets included, among other assets: (i) a redemption interest in Multi-Strat (the "Sentinel Redemption") and (ii) assets held by CDO Fund related to Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd., Eastland CLO Ltd., Grayson CLO Ltd., Valhalla CLO Ltd., and Governance Re, Ltd., including cash payments related to those assets (collectively, the "CDO Fund Assets").

4.      Highland and the Funds, acting through Dondero, Ellington, Leventon, Sevilla, DiOrio, and other Highland employees, fraudulently (or, at a bare minimum, in breach of their implied duty of good faith and fair dealing) transferred these assets pursuant to a so-called purchase agreement (the "Purchase Agreement"), purportedly to satisfy a $25,000,000 premium on a $100,000,000 legal liability insurance policy issued by Sentinel (the "Insurance Policy"). This policy was supposedly intended to insure against an adverse judgment in the UBS Litigation, notwithstanding that the Transferred Assets were worth more than both the premium and the policy limit. Neither the Insurance Policy nor the Transferred Assets were ever disclosed to UBS in connection with the UBS Litigation, including after UBS obtained a $1 billion judgment against the Funds in the UBS Litigation. Nor was the Insurance Policy disclosed in the course of the Debtor's bankruptcy proceedings as an asset of the Funds, even though the Debtor had confirmed that it had previously produced all information within its possession sufficient to identify all available assets of the Funds. Upon information and belief, these Fraudulent Transfers continued at least until the Debtor filed its bankruptcy petition, and it is possible that Sentinel and/or its transferees are still be receiving cash payments from accounts the Debtor owns or controls pursuant to certain interests underlying the Fraudulent Transfers.

5.      The Debtor and UBS had reached a settlement in principle of UBS's claims against the Debtor (the "Settlement"). In light of these revelations, the Debtor and UBS have agreed that they need to revisit their agreement and are working together to try to finalize an agreement that could be submitted in the near future for this Court's approval. As part of any such Settlement, UBS would presumably release the Debtor from at least some part of what otherwise would be significant potential liability for the actions it took while still controlled by Dondero (and that it continued to take post-petition, albeit apparently without the knowledge of the Independent

Board). In exchange, the Debtor would be expected to assist UBS to collect its judgment against the Funds, including by assisting UBS to investigate and pursue claims related to the Fraudulent Transfers. Such a Settlement would be in the best interests of the estate and all other unsecured creditors, but it will be insufficient and undermined if UBS's ability to collect its judgment against the Funds is further compromised.

6. UBS has therefore commenced this adversary proceeding to enjoin and temporarily restrict the Debtor from making or allowing funds under its management or control (including, but not limited to, Multi-Strat and CDO Fund) to make any payments or further transfers to Sentinel or any of its affiliates (the "Sentinel Entities") or any transferees of the Sentinel Entities consisting of, resulting from, or relating to the Transferred Assets pending a decision of a court of competent jurisdiction as to whether the Transferred Assets were fraudulently transferred to or for the benefit of Sentinel, Dondero, Ellington, and/or any of their affiliates or as part of a fraudulent transfer scheme (the "Prohibited Conduct").[6]

7. UBS is currently aware of at least two types of such assets that, upon information and belief, were part of the Fraudulent Transfers and remain in the Debtor's control: the Sentinel Redemption and the CDO Fund Assets. As to the first and as explained below, Multi-Strat is currently restricted from making any redemption payments pursuant to a prior settlement agreement entered into with UBS in May 2020. The restrictions on redemption payments, however, would be lifted under a Settlement between UBS and the Debtor. Upon information and belief, the Debtor would thereafter allow Multi-Strat to make payments to its redeemers, which

---

[6] Although UBS understands that the Debtor either already has submitted, or will soon submit, a claim on the Insurance Policy on behalf of CDO Fund, the relief sought herein is still necessary even if Sentinel pays the proceeds under the Insurance Policy. Although payment of the "insurance" proceeds may affect the calculus, questions still abound as to why the Funds, at the direction and involvement of Highland employees, would transfer assets worth multiple times the premium amount for coverage far less than the value of the Transferred Assets to an entity owned by Dondero and Ellington. The injunctive relief will ensure that the affected parties have time to obtain answers to those and other related questions.

includes Sentinel. Additionally, upon information and belief, CDO Fund (and the Debtor, as its general partner), still has control over the CDO Fund Assets, which were earmarked for transfer to Sentinel under the Purchase Agreement as part of the Fraudulent Transfers[7] but were never actually transferred to Sentinel and remain under CDO Fund's control at Bank of New York.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.   This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

9.      Pursuant to Rule 7008 of the Bankruptcy Rules, UBS consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     This adversary proceeding is commenced pursuant to Bankruptcy Rules 7001 and 7065 and Bankruptcy Code section 105(a).

## THE PARTIES

### Plaintiffs

12.     Plaintiff UBS AG London Branch is a banking corporation organized under the laws of Switzerland with its principal place of business at 5 Broadgate, London, EC2M 2QS, United Kingdom.

---

[7] Upon information and belief, the assets related to Greenbriar CLO Corp., Eastland CLO Ltd, and Grayson CLO Ltd were not transferred pursuant to the Purchase Agreement but were nonetheless transferred to Sentinel from CDO Fund but remain in CDO Fund's control.

13. Plaintiff UBS Securities LLC is a limited liability company organized under the laws of Delaware with its principal place of business at 1285 Avenue of the Americas, New York, New York 10019.

14. Plaintiffs are creditors of the Debtor in the above-captioned bankruptcy proceeding (the "Bankruptcy Case").

**The Debtor**

15. The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

16. Upon information and belief, the Debtor is a registered investment adviser that manages Multi-Strat and holds, directly or indirectly, approximately 58.6% of the limited partnership interests of Multi-Strat. In addition, upon information and belief, the Debtor owns Multi-Strat's general partner, Highland Multi Strategy Credit Fund GP, L.P.

17. Upon information and belief, the Debtor has full ownership and control over Highland CDO Opportunity GP, LLC, which in turn is the sole general partner of (and has full control over the actions of) Highland CDO Opportunity Fund GP, L.P. Upon information and belief, Highland CDO Opportunity Fund GP, L.P., in turn, is the sole general partner of (and has full control over the actions of) CDO Fund.

**CASE BACKGROUND**

**Bankruptcy Petition**

18. On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS).

19.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee"), including UBS as a member.

20.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Bankruptcy Case to this Court.  Dkt. No. 186.

21.     The Debtor has continued to operate and manage its business as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee or examiner has been appointed in this Bankruptcy Case.

## STATEMENT OF FACTS

### The UBS Litigation

22.     UBS filed the UBS Litigation in February 2009 alleging, *inter alia,* that the Funds collectively owed over $500 million to UBS under certain contracts.  UBS subsequently initiated a second action against Highland for breach of the implied covenant of good faith and fair dealing and fraudulent conveyances, among other causes of action.  UBS also amended its complaint to add, among other entities, Highland Financial Partners, L.P. ("HFP") as a defendant.  SOHC is a wholly-owned subsidiary of HFP, and UBS alleged that HFP was the alter ego of SOHC and therefore should be liable for SOHC's misconduct.

23.     In March 2017, the N.Y. State Court denied motions for summary judgment filed by Highland and the Funds, in favor of UBS.  That court then bifurcated the UBS Litigation into two phases of trial:  "Phase I" to decide UBS's breach of contract claims against the Funds and Highland's counterclaims against UBS and "Phase II" to decide all remaining claims, including those against Highland and Multi-Strat.  After a 13-day trial in July 2018, the N.Y. State Court entered judgment in UBS's favor for the claims against the Funds and on Highland's counterclaims.  The N.Y. State Court held CDO Fund liable to UBS for $530,378,477.72 and

SOHC liable to UBS for $509,579,321.73 and entered judgments in favor of UBS accordingly (the "Phase I Judgment"). Neither of the Funds has satisfied any portion of the Phase I Judgment against them to date. And interest has continued to accrue (and will continue to do so) at the rate of approximately $128,000 per day, which, upon information and belief, has added roughly $55 million to UBS's recovery through today's date.

24. Highland filed for bankruptcy on October 16, 2019, before a trial could be held on UBS's Phase II claims. UBS's claims against Highland were automatically stayed, and this Court denied UBS's motion to lift the stay to proceed with Phase II in the N.Y. State Court. Pursuant to a "corporate governance" settlement approved by the Court, an independent board of directors (the "Independent Board") at Strand Advisors, Inc., the Debtor's general partner, was created with sole authority to oversee the Debtor's operations, management of its assets, and its bankruptcy proceeding.

25. On June 26, 2020, UBS timely filed proofs of claim asserting unsecured claims against the Debtor for damages from (i) the Debtor's breach of the implied covenant of good faith and fair dealing for its efforts to impair UBS's contractual right to collect from the Funds, and (ii) the Debtor's role in directing fraudulent conveyances that occurred after the commencement of the UBS Litigation, as well as for further damages, prejudgment interest, and attorneys' fees. Specifically, UBS claimed that Highland devised and executed a strategy to interfere with UBS's contractual right to recovery and prevented the Funds (and HFP) from turning over any of their assets to UBS in satisfaction of their debt. And in March 2009, Highland orchestrated the transfer of approximately $233 million in assets away from the Funds—and out of UBS's reach. The claims further alleged that Highland improperly prevented the Funds from turning over any other assets that were held by the Funds (or HFP) after the March 2009 transfers. Information about

such assets, and the circumstances of their disposition, remained unknown to UBS, rendering UBS unable to determine the exact amount of its damages resulting from Highland's continued breach of the implied covenant.

26. In the months leading up to and following the submission of UBS's proofs of claim, UBS made multiple information requests to the Debtor relating to the Funds' assets as of February 2009 (when UBS's original complaint was filed in N.Y. State Court) and any subsequent transfer or dissipation of those assets. The Debtor and Independent Board repeatedly told UBS that the requested documentation was limited and/or did not exist. Upon information and belief, the Independent Board tasked Leventon and Ellington with the collection of relevant documents and information in response to UBS's requests. From that position, upon information and belief, Ellington and Leventon withheld documents and information about the Fraudulent Transfers from the Independent Board and UBS that would have provided evidence of the value of assets held by the Funds at relevant points in time, as well as the scope and magnitude of the Debtor's breaches of the implied covenant. Upon information and belief, the individuals involved in the Fraudulent Transfers, including but not limited to Ellington, Leventon, and DiOrio, intentionally misled and lied to the Independent Board and their counsel about the Fraudulent Transfers, including as recently as this year.

27. In October 2020, the Debtor moved for partial summary judgment on certain of UBS's claims against the Debtor for fraudulent conveyance and breach of the implied covenant of good faith and fair dealing. UBS opposed that motion, including on the ground that the Debtor had failed to respond to UBS's discovery requests that sought information critical to UBS's position. Concurrently with its opposition to the Debtor's motion for partial summary judgment,

UBS filed a motion under Bankruptcy Rule 3018 (the "3018 Motion") requesting an estimation of its claims for voting purposes.

28.     In advance of a hearing on the foregoing motions, the Debtor represented that the Funds and HFP presently held assets collectively worth only about $10 million, and that whatever other assets they previously held had been dissipated long ago (including purportedly for "legal fees") and without any available documentation verifying when and how they were actually spent. The Debtor also represented that Multi-Strat's economic ownership was held predominantly by former third-party limited partners.

29.     After a hearing to address both the Debtor's partial summary judgment motion and UBS's 3018 Motion, the Court estimated UBS's claims, for voting purposes, in the amount of $94,761,076. In so ruling, the Court held that, among other things, the Debtor could be liable for breach of the implied covenant related to the value of the additional undisclosed assets at the Funds and HFP after February 2009 that were never paid in satisfaction of the Funds' debt to UBS. Taking the Debtor at its word and based on the limited evidence available to UBS and presented to the Court by UBS at that time, the Court estimated UBS's breach of the implied covenant claim to be $10 million and added an additional $10 million in estimated prejudgment interest on that amount. Given that the Debtor's former employees and agents withheld critical evidence supportive of UBS's implied covenant claim from UBS—including through outright lies—UBS respectfully submits that its claim exceeds that estimate by at least $105 million (the purported tax value of the assets still held at the Funds in 2017 prior to the Fraudulent Transfers), and perhaps by as much as several hundred million dollars (the documented face value of the assets that were still held by the Funds in 2017 prior to the Fraudulent Transfers), plus prejudgment interest, attorneys' fees, and punitive damages.

**The New Evidence**

30.     Relying on the information then known, as of early January 2021, UBS and the Debtor reached a Settlement in principle of UBS's proofs of claim and certain of the Phase II claims, which the parties disclosed to the Court during the February 2, 2021 hearing to confirm the Debtor's chapter 11 plan of reorganization.  While continuing to negotiate the terms of the Settlement, in mid-February 2021, the Independent Board shared with UBS previously undisclosed facts and documents that revealed shocking additional facts relevant to UBS's claims in this proceeding and its ability to collect its Phase I Judgment against the Funds and pursue its Phase II claims.

31.     Those documents show that at least as of August 7, 2017, the Funds, with substantial involvement and assistance from certain employees of the Debtor, purported to "sell" the Transferred Assets (documented by Debtor employees, at the time, as having a face value of over $300,000,000 and a fair market value of over $105,000,000), which, upon information and belief, included all or substantially all the assets then remaining at the Funds and certain related entities, to Sentinel under the Purchase Agreement.

32.     Upon information and belief, Sentinel accepted the Transferred Assets purportedly as payment for a $25,000,000 premium on the Insurance Policy, despite the fact that the value of the Transferred Assets far exceeded that premium.  Under the Insurance Policy, Sentinel agreed to indemnify the Funds for any legal liability up to a $100,000,000 limit if either: (i) a court made an order of liability in the UBS Litigation against the Funds, or (ii) the UBS Litigation was settled on terms that provided for a repayment by the Funds to UBS.

33.     Upon information and belief, the Funds began the Fraudulent Transfers to Sentinel no later than 2017 pursuant to the purported Purchase Agreement and continued to attempt to

convey the Transferred Assets to Sentinel at least until the Debtor filed for bankruptcy. It is possible that Sentinel and/or its transferees are still be receiving cash payments from accounts the Debtor owns or controls pursuant to certain interests underlying the Fraudulent Transfers.

34. Upon information and belief, Dondero, Ellington, Leventon, Sevilla, and DiOrio were heavily involved in the Fraudulent Transfers. Indeed, these individuals were the authors or recipients of countless emails about the transfers, Dondero signed the Insurance Policy and Purchase Agreement on behalf of Highland and the Funds, and Sentinel is owned and controlled by entities that are, in turn, owned by Dondero and Ellington. In addition, upon information and belief, DiOrio is currently one of three directors of Sentinel.

35. Neither the Debtor nor any party under the Highland umbrella ever informed UBS of the existence of the Insurance Policy, the Purchase Agreement, the Transferred Assets, or the Fraudulent Transfers, despite multiple opportunities in which it would have been appropriate and obligated to do so during this Bankruptcy Case. The Independent Board has represented to UBS that it did not discover the Fraudulent Transfers or Insurance Policy until the Independent Board had identified and investigated an asset as being still held by CDO Fund—a CLO known as "Greenbriar," which the parties now know to be one of the assets that was purportedly "sold" pursuant to the Purchase Agreement. Upon information and belief, during this investigation the Independent Board uncovered documentation about the Fraudulent Transfers, as well as a trove of correspondence revealing that Dondero, Ellington, Leventon, Sevilla, DiOrio, and various Debtor employees were involved in the Fraudulent Transfers, in what appears to have been a targeted effort to frustrate UBS's ability to collect on any judgment in the UBS Litigation. Indeed, upon information and belief, when the Independent Board asked at least Leventon, Ellington, and

DiOrio about the Transferred Assets, these individuals feigned ignorance and lied about their knowledge of the Fraudulent Transfers.

36.     The Independent Board preliminarily shared some of these facts with UBS in mid-February 2021, while the Debtor and UBS were working on documenting the terms of their Settlement.  Since then, the Independent Board has continued to investigate the relevant facts and it (and UBS) is still learning new facts regarding the Fraudulent Transfers to this day.

**UBS/Debtor Settlement**

37.     The actions of the Debtor's employees and agents, both pre- and post-petition, lend further support to UBS's claims against the Debtor, at least up to the value of the Transferred Assets (at least $105,000,000 and possibly up to over $300,000,000) plus prejudgment interest, attorneys' fees, and punitive damages.  But, in recognition that it is—as this Court has repeatedly made clear—time to resolve litigation with the Debtor in light of its new leadership, UBS has continued to work with the Debtor to try to go forward with a Settlement that will provide for an agreed-upon allowed claim and otherwise release UBS's claims against the Debtor.  But only so long as doing so does not in any way compromise UBS's ability to continue to pursue its claims against the non-Debtor entities and/or the former employees who perpetuated the fraud and/or remain responsible for the outstanding Phase I Judgment.

38.     In exchange for UBS's release of its fraudulent transfer and implied covenant claims against the Debtor, the Debtor would be expected to help UBS pursue satisfaction of the Phase I Judgment against the Funds by taking certain actions, including, without limitation: (i) taking actions reasonably designed to recover the Insurance Proceeds or to return the Transferred Assets to the Funds to (partially) satisfy the Phase I Judgment; (ii) cooperating with UBS and participating (as applicable) in the investigation or prosecution of claims related to the

Purchase Agreement, Insurance Policy, or Transferred Assets; and (iii) otherwise using reasonable efforts to assist UBS to collect its Phase I Judgment against the Funds and HFP and assets the Funds and/or HFP may own, or have a claim to under applicable law.[8]

**Transferred Assets Under the Debtor's Control**

39.     Upon information and belief, the Debtor currently has control over certain assets related to the Fraudulent Transfers:  the CDO Fund Assets and a Multi-Strat redemption interest. As to the former and upon information and belief, the Debtor, through CDO Fund, still has control over the CDO Fund Assets located in accounts at Bank of New York, notwithstanding that the assets were purportedly "sold" to Sentinel pursuant to the Purchase Agreement.  Upon information and belief, the Debtor has full ownership and control over Highland CDO Opportunity GP, LLC, which in turn is the sole general partner of (and thus has full control over the actions of) Highland CDO Opportunity Fund GP, L.P.  Highland CDO Opportunity Fund GP, L.P., in turn, is the sole general partner of (and thus has full control over the actions of) CDO Fund.  As a result, upon information and belief, the Debtor has control over the actions of CDO Fund and whether CDO Fund transfers the CDO Fund Assets to Sentinel pursuant to the Purchase Agreement, including making cash payments pursuant to those assets.  If the CDO Fund Assets were transferred to Sentinel, the Debtor would have an obligation to spend estate resources to retrieve the assets for UBS under the proposed Settlement (or, in the absence of a settlement, face the threat of continued potential direct liability for the role the Debtor played in causing such transfers).

40.     In addition, upon information and belief, the Sentinel Redemption was part of the Fraudulent Transfers from CDO Fund to Sentinel.  The Debtor is a registered investment adviser

---

[8] The anticipated Settlement is in near-final form and the parties hope to finalize and file it in the near term.  However, the Settlement remains subject to definitive documentation and the description of the terms thereof is qualified by such documentation and this Court's approval of the Settlement.

that manages Multi-Strat and holds, directly or indirectly, approximately 58.6% of the limited partnership interests of Multi-Strat.  In addition, the Debtor owns Multi-Strat's general partner (Highland Multi Strategy Credit Fund GP, L.P.).  As a result, the Debtor controls Multi-Strat's redemption payments.

41.    At this time, Multi-Strat is restricted from making redemption payments pursuant to a separate settlement agreement with UBS, but that will change upon effectiveness of the contemplated Settlement between the Debtor and UBS.  On May 11, 2020, UBS and Multi-Strat, among others (collectively, the "May Settlement Parties"), entered into a Settlement Agreement pursuant to which the May Settlement Parties agreed to the allocation of the proceeds of certain sales of assets held by Multi-Strat, including escrowing a portion of such funds, and certain restrictions on distributions by Multi-Strat.  This included a restriction on Multi-Strat making redemption payments to those holding a redemption interest.

42.    Upon effectiveness of the contemplated Settlement between the Debtor and UBS, the Debtor, through Multi-Strat, will no longer be restricted from making redemption payments.  Upon information and belief, unless the Debtor is prohibited from doing so, the Debtor expects to have Multi-Strat begin to pay the Multi-Strat redeemers shortly after these restrictions are lifted, including Sentinel.  But the Sentinel Redemption amount[9] is an asset that should have been maintained by CDO Fund and used to pay the contractual obligations that are reflected in the Phase I Judgment UBS holds against CDO Fund.  And like with the CDO Fund Assets, if the Sentinel

---

[9] Upon information and belief, the redemption payable from Multi-Strat to Sentinel is currently valued at approximately $32.9 million.  This is composed of the interest in Multi-Strat CDO Fund fraudulently transferred to Sentinel (worth approximately $21.4 million) and separate interests in Multi-Strat the Debtor transferred to Sentinel (worth approximately $11.5 million) under circumstances generally unknown to UBS.  Far from a third-party redeemer, upon information and belief, the Sentinel Redemption accounts for nearly 37 percent of Multi-Strat's redemption payables.

Redemption is paid to Sentinel, the Debtor would have an obligation to spend estate resources to retrieve the payment for UBS under the proposed Settlement.

## CLAIM FOR RELIEF

### (For Injunctive Relief -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7065)

43.     UBS repeats and realleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

44.     UBS seeks, pursuant to Bankruptcy Code section 105(a) and Bankruptcy Rule 7065, a preliminary and permanent injunction enjoining the Debtor from engaging in the Prohibited Conduct.

45.     Bankruptcy Code section 105(a) authorizes the Court to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. §105(a).

46.     Bankruptcy Rule 7065 incorporates by reference Rule 65 of the Federal Rules of Civil Procedure and authorizes the Court to issue injunctive relief in adversary proceedings.

47.     In the absence of injunctive relief, UBS and the Debtor will be irreparably harmed because without injunctive relief, upon information and belief, the Debtor will engage in the Prohibited Conduct, thereby harming both the Debtor's estate and UBS as a creditor by, *inter alia*: (i) putting the Transferred Assets further out of UBS's reach to satisfy the Phase I Judgment; (ii) significantly increasing the resources the Debtor must spend to fulfill its contemplated obligations under the Settlement to recover those assets and assist UBS in its claims related to the Fraudulent Transfers; (iii) hindering or preventing the Debtor from complying with its anticipated obligations under the Settlement and giving rise to damages for breach of such obligations at the expense of all other unsecured creditors of the Debtor; and/or (iv) making it less likely that UBS

would be willing to settle its claims against the Debtor. Indeed, if the Debtor were to allow the Sentinel Redemption payment or CDO Fund Assets to be transferred to Sentinel—assets purportedly "owed" to Sentinel solely because of the fraudulent Purchase Agreement—the Debtor would have to expend substantial estate resources to undo its own actions pursuant to the proposed Settlement.

48.     The fraud described herein is embodied in written agreements and communications and is without any justification; UBS is therefore likely to prevail on its claim for injunctive relief. Indeed, the Debtor does not object to the relief UBS seeks.

49.     The equities strongly (if not exclusively) favor UBS. The irreparable harm that would occur if the Debtor were to allow the transfer to Sentinel or its affiliates of the Sentinel Redemption payment or the CDO Fund Assets greatly outweighs any inconvenience that would result from temporarily preventing the payment of millions of dollars to a Dondero-controlled entity while it is determined if these assets were fraudulently obtained and those assets are rightfully owed to UBS.

50.     Injunctive relief would serve the public interest because it will facilitate reorganization of the Debtor's estate through the successful execution of the Debtor's anticipated obligations under the Settlement without unnecessary expense, thereby benefitting the estate's other unsecured creditors.

51.     Based on the foregoing, UBS requests that the Court preliminarily and permanently enjoin the Debtor from engaging in the Prohibited Conduct.

## **PRAYER**

WHEREFORE, UBS prays for judgment as follows:

a. For a preliminary injunction enjoining the Debtor from engaging in the Prohibited Conduct;

b. For a permanent injunction enjoining the Debtor from engaging in the Prohibited Conduct; and

c. For such other and further relief as this Court deems just and proper.

Dated: March 29, 2021.

Respectfully submitted,

*/s/ Andrew Clubok*

**LATHAM & WATKINS LLP**
Andrew Clubok (*pro hac vice*)
Sarah Tomkowiak (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, District of Columbia 20004
Telephone: (202) 637-2200
Email: andrew.clubok@lw.com
        sarah.tomkowiak@lw.com

and

Jeffrey E. Bjork (*pro hac vice*)
Kimberly A. Posin (*pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Email: jeff.bjork@lw.com
        kim.posin@lw.com

**BUTLER SNOW LLP**
Martin Sosland (TX Bar No. 18855645)
Candice M. Carson (TX Bar No. 24074006)
2911 Turtle Creek Boulevard, Suite 1400
Dallas, Texas 75219
Telephone: (469) 680-5502
E-mail: martin.sosland@butlersnow.com
        candice.carson@butlersnow.com

*Counsel for UBS Securities LLC and UBS AG London Branch*

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>UBS Securities LLC and UBS AG London Branch | DEFENDANTS<br>Highland Capital Management, L.P. |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Andrew Clubok, Latham & Watkins LLP, 555 Eleventh St., NW, Ste 1000, Washington, DC 20004; (202) 637-2200<br>Martin A. Sosland, Butler Snow LLP, 2911 Turtle Creek Blvd., Ste 1400, Dallas, TX 75219 (469) 680-5502 | **ATTORNEYS** (If Known)<br>Jeffrey N. Pomerantz, Pachulski Stang Ziehl & Jones LLP - Debtor<br>Melissa S. Hayward, Hayward & Associates PLLC - Debtor |
| **PARTY** (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor ☐ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☒ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☐ Other<br>☐ Trustee |

CAUSE OF ACTION (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES

INVOLVED) Injunctive relief pursuant to 11 U.S.C. 105(a) and Fed. R. Bankr. P. 7001 and 7065.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☒ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ |
| Other Relief Sought | |

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>19-34054-SGJ11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>March 29, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Martin A. Sosland | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.