**LATHAM & WATKINS LLP**
Andrew Clubok (*pro hac vice*)
Sarah Tomkowiak (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, District of Columbia 20004
Telephone: (202) 637-2200

**BUTLER SNOW LLP**
Martin Sosland (TX Bar No. 18855645)
Candice Carson (TX Bar No. 24074006)
2911 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Telephone: (469) 680-5502

Jeffrey E. Bjork (*pro hac vice*)
Kimberly A. Posin (*pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234

*Counsel for UBS Securities LLC and UBS
AG London Branch*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

-------------------------------------------------------------

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-SGJ11 |
| | § | |
| Debtor. | § | |
| | § | |
| UBS SECURITIES LLC AND UBS AG LONDON BRANCH, | § | Adversary Proceeding |
| | § | |
| | § | No. _____ |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Defendant. | § | |

-------------------------------------------------------------

## APPENDIX OF EXHIBITS TO PLAINTIFFS' MOTION FOR A
## <u>TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

UBS Securities LLC and UBS AG London Branch (together "**UBS**"), by and through their undersigned counsel, submit this Appendix of exhibits (the "**Appendix**") to *Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction*, filed concurrently herewith. The following exhibits are attached to this Appendix:

| Ex. No. | Description | App. No. |
|---|---|---|
| A | Declaration of Sarah Tomkowiak in Support of Motion for a Temporary Restraining Order and Preliminary Injunction, and Exhibits 1 to 19 thereto | UBSTRO001-5 |
| 1 | Excerpts of Transcript of Proceedings, *In re Highland Capital Management, L.P.*, No. 19-34054-sgj (Bankr. N.D. Tex. Nov. 20, 2020) | UBSTRO006-24 |
| 2 | Excerpts of Transcript of Proceedings, *In re Highland Capital Management, L.P.*, No. 19-34054-sgj (Bankr. N.D. Tex. Feb. 2, 2021) | UBSTRO025-34 |
| 3 | Purchase Agreement between Sentinel Reinsurance, Ltd., Highland CDO Opportunity Master Fund, L.P., Highland CDO Holding Company, and Highland Special Opportunities Holdings Company, dated Aug. 7, 2017 | UBSTRO035-40 |
| 4 | Legal Liability Insurance Policy between Sentinel Reinsurance, Ltd., Highland CDO Opportunity Master Fund, L.P., Highland CDO Holding Company, and Highland Special Opportunities Holdings Company, effective August 1, 2017 | UBSTRO041-60 |
| 5 | Email from Shawn Raver to Rick Swadley, dated September 12, 2018, attaching a June 30, 2018 memorandum entitled, "Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets" as provided by the Independent Board to UBS | UBSTRO061-67 |
| 6 | Assignment Agreement between Highland CDO Opportunity Master Fund, L.P. and Sentinel Reinsurance, Ltd., dated August 7, 2017, as provided by the Independent Board to UBS | UBSTRO068-72 |
| 7 | Email from Matt DiOrio to Sean Fox, dated September 26, 2017, as provided by the Independent Board to UBS | UBSTRO073-74 |
| 8 | A spreadsheet listing the ownership interests in Sentinel Reinsurance, Ltd. as of 2017 as provided by the Independent Board to UBS | UBSTRO075-80 |
| 9 | Email from Vishal Patel to Matt DiOrio, dated May 11, 2020, as provided by the Independent Board to UBS | UBSTRO081-85 |

| Ex. No. | Description | App. No. |
|---------|-------------|----------|
| 10 | Organizational chart of Highland CDO Opportunity Fund as provided by the Independent Board to UBS | UBSTRO086-87 |
| 11 | Limited Liability Company Agreement of Highland CDO Opportunity Fund GP, LLC, dated October 19, 2020, as provided by the Independent Board to UBS | UBSTRO088-99 |
| 12 | Agreement of Limited Partnership of Highland CDO Opportunity Fund GP, L.P., dated October 19, 2020, as provided by the Independent Board to UBS | UBSTRO100-118 |
| 13 | Articles of Limited Partnership of Highland CDO Opportunity Master Fund, L.P., dated October 2005, as provided by the Independent Board to UBS | UBSTRO119-137 |
| 14 | Excerpts of Transcript of Proceedings, *In re Highland Capital Management, L.P.*, No. 19-34054-sgj and Adv. Pro. No. 20-3190-sgj (Bankr. N.D. Tex. Dec. 10, 2020) | UBSTRO138-144 |
| 15 | Excerpts of Transcript of Proceedings, *In re Highland Capital Management, L.P.*, No. 19-34054-sgj and Adv. Pro. No. 20-3190-sgj (Bankr. N.D. Tex. Jan. 8, 2021) | UBSTRO145-151 |
| 16 | Email from JP Sevilla to Scott Ellington, dated August 11, 2017, as provided by the Independent Board to UBS | UBSTRO152-154 |
| 17 | Email from David Willmore to JP Sevilla and Isaac Leventon et al., dated August 11, 2017, as provided by the Independent Board to UBS | UBSTRO155-157 |
| 18 | A document entitled "Highland Multi-Strategy Credit Fund LP, Redemptions Payable Summary, 12/31/2020," that the Independent Board provided to UBS (redacted) | UBSTRO158-159 |
| 19 | A document that purports to reflect Sentinel Reinsurance, Ltd.'s ownership structure as of 2019, that the Independent Board provided to UBS | UBSTRO160-162 |

DATED this 29th day of March, 2021.

**LATHAM & WATKINS LLP**

By */s/ Andrew Clubok*

Andrew Clubok (*pro hac vice*)
Sarah Tomkowiak (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, District of Columbia 20004
Telephone: (202) 637-2200
Email: andrew.clubok@lw.com
        sarah.tomkowiak@lw.com

and

Jeffrey E. Bjork (*pro hac vice*)
Kimberly A. Posin (*pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Email: jeff.bjork@lw.com
        kim.posin@lw.com

**BUTLER SNOW LLP**
Martin Sosland (TX Bar No. 18855645)
Candice M. Carson (TX Bar No. 24074006)
2911 Turtle Creek Boulevard, Suite 1400
Dallas, Texas 75219
Telephone: (469) 680-5502
E-mail: martin.sosland@butlersnow.com
        candice.carson@butlersnow.com

*Counsel for UBS Securities LLC and UBS
AG London Branch*

# EXHIBIT A

**LATHAM & WATKINS LLP**
Andrew Clubok (*pro hac vice*)
Sarah Tomkowiak (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, District of Columbia 20004
Telephone: (202) 637-2200

Jeffrey E. Bjork (*pro hac vice*)
Kimberly A. Posin (*pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234

*Counsel for UBS Securities LLC and UBS*
*AG London Branch*

**BUTLER SNOW LLP**
Martin Sosland (TX Bar No. 18855645)
Candice Carson (TX Bar No. 24074006)
2911 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Telephone: (469) 680-5502

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

---

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-SGJ11 |
| | § | |
| Debtor. | § | |
| | § | |
| UBS SECURITIES LLC AND UBS AG, LONDON BRANCH, | § | Adversary Proceeding |
| | § | |
| | § | No. _____ |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Defendant. | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**UBSTRO001**

## DECLARATION OF SARAH TOMKOWIAK IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

I, Sarah Tomkowiak, hereby declare under penalty of perjury as follows:

1.      I am an attorney with the law firm of Latham & Watkins LLP, counsel of record for UBS Securities LLC and UBS AG London Branch (together "UBS").

2.      I submit this declaration in support of *Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction* (the "Motion") against Highland Capital Management, L.P. ("Highland" or the "Debtor"), pursuant to section 105(a) of title 11 of the United States Code, and Rules 7001 and 7065 of the Federal Rules of Bankruptcy Procedure.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of excerpts of a November 20, 2020 hearing transcript for *In re Highland Capital Management, L.P.*, No. 19-34054-sgj (Bankr. N.D. Tex.).

4.      Attached hereto as **Exhibit 2** is a true and correct copy of excerpts of a February 2, 2021 hearing transcript for *In re Highland Capital Management, L.P.*, No. 19-34054-sgj (Bankr. N.D. Tex.).

5.      Attached hereto as **Exhibit 3** is a true and correct copy of a document dated August 7, 2017, entitled "Purchase Agreement,"[2] that the Independent Board[3] provided to UBS.

6.      Attached hereto as **Exhibit 4** is a true and correct copy of a document entitled "Legal Liability Insurance Policy," with a purported effective date of August 1, 2017, including a document attached as "Schedule A," that the Independent Board provided to UBS.

---

[2] **Exhibit 3** was provided to UBS without any document attached as "Schedule A."

[3] Capitalized terms not defined herein shall have the meaning ascribed to them in *Plaintiffs' Memorandum of Law in Support of the Motion for a Temporary Restraining Order and Preliminary Injunction*, filed contemporaneously herewith.

**UBSTRO002**

7.      Attached hereto as **Exhibit 5** is a true and correct copy of an email dated September 12, 2018, from Shawn Raver to Rick Swadley with the subject "policy", attaching a memorandum dated June 30, 2018, entitled "Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets," that the Independent Board provided to UBS.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of a document dated August 7, 2017, entitled "Assignment Agreement," that the Independent Board provided to UBS.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of an email dated September 26, 2017, from Matt DiOrio to Sean Fox with the subject "Sentinel," that the Independent Board provided to UBS.

10.      Attached hereto as **Exhibit 8** is a true and correct copy of a spreadsheet that purports to list the ownership interests in Sentinel Reinsurance, Ltd. ("Sentinel") as of 2017, that the Independent Board provided to UBS.

11.      Attached hereto as **Exhibit 9** is a true and correct copy of an email dated May 11, 2020, from Vishal Patel to Matt DiOrio with the subject "Confirmations," that the Independent Board provided to UBS.

12.      Attached hereto as **Exhibit 10** is a true and correct copy of an organizational chart of Highland CDO Opportunity Fund, that the Independent Board provided to UBS.

13.      Attached hereto as **Exhibit 11** is a true and correct copy of a document dated October 19, 2020, entitled "Limited Liability Company Agreement of Highland CDO Opportunity Fund GP, LLC," that the Independent Board provided to UBS.

14.      Attached hereto as **Exhibit 12** is a true and correct copy of a document dated October 19, 2020, entitled "Agreement of Limited Partnership of Highland CDO Opportunity Fund GP, L.P.," that the Independent Board provided to UBS.

UBSTRO003

15.     Attached hereto as **Exhibit 13** is a true and correct copy of a document dated October 2005, entitled "Articles of Limited Partnership of Highland CDO Opportunity Master Fund, L.P.," that the Independent Board provided to UBS.

16.     Attached hereto as **Exhibit 14** is a true and correct copy of excerpts of a December 10, 2020 hearing transcript for *In re Highland Capital Management, L.P.*, No. 19-34054-sgj and Adv. Pro. No. 20-3190-sgj (Bankr. N.D. Tex.).

17.     Attached hereto as **Exhibit 15** is a true and correct copy of excerpts of a January 8, 2021 hearing transcript for *In re Highland Capital Management, L.P.*, No. 19-34054-sgj and Adv. Pro. No. 20-3190-sgj (Bankr. N.D. Tex.).

18.     Attached hereto as **Exhibit 16** is a true and correct copy of an email dated August 11, 2017, from JP Sevilla to Scott Ellington with the subject "PRIVILEGED AND CONFIDENTIAL – Sentinel wiring info," that the Independent Board provided to UBS.

19.     Attached hereto as **Exhibit 17** is a true and correct copy of an email dated August 11, 2017, from David Willmore to, *inter alia*, JP Sevilla and Isaac Leventon with the subject "PRIVILEGED AND CONFIDENTIAL – Sentinel wiring info," that the Independent Board provided to UBS.

20.     Attached hereto as **Exhibit 18** is a true and correct copy of a redacted document entitled "Highland Multi-Strategy Credit Fund LP, Redemptions Payable Summary, 12/31/2020," that the Independent Board provided to UBS.

21.     Attached hereto as **Exhibit 19** is a true and correct copy of a document that purports to reflect Sentinel's ownership structure as of 2019, that the Independent Board provided to UBS.

UBSTRO004

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 29, 2021.

*/s/ Sarah Tomkowiak*
Sarah Tomkowiak
LATHAM & WATKINS LLP

5

**UBSTRO005**

# EXHIBIT 1

**UBSTRO006**

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION
 2
                                  )    Case No. 19-34054-sgj-11
 3   In Re:                       )    Chapter 11
                                  )
 4   HIGHLAND CAPITAL             )    Dallas, Texas
     MANAGEMENT, L.P.,            )    Friday, November 20, 2020
 5                                )    9:30 a.m. Docket
                                  )
 6            Debtor.             )
                                  )    - DEBTOR'S MOTION FOR PARTIAL
 7                                )    SUMMARY JUDGMENT [1214]
                                  )    - REDEEMER COMMITTEE'S MOTION
                                  )    FOR PARTIAL SUMMARY JUDGMENT
 8                                )    [1215, 1216]
                                  )    - UBS'S MOTION FOR TEMPORARY
 9                                )    ALLOWANCE OF CLAIM FOR VOTING
                                  )    PURPOSES [1338]
10   _____)

11                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
12                 UNITED STATES BANKRUPTCY JUDGE.

13   WEBEX APPEARANCES:

14   For the Debtor:            Jeffrey N. Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
15                              10100 Santa Monica Blvd.,
                                  13th Floor
16                              Los Angeles, CA  90067-4003
                                (310) 277-6910
17
     For the Debtor:            Robert J. Feinstein
18                              PACHULSKI STANG ZIEHL & JONES, LLP
                                780 Third Avenue, 34th Floor
19                              New York, NY  10017-2024
                                (212) 561-7700
20
     For UBS Securities, LLC:   Andrew Clubok
21                              Sarah A. Tomkowiak
                                LATHAM & WATKINS, LLP
22                              555 Eleventh Street, NW,
                                  Suite 1000
23                              Washington, DC  20004
                                (202) 637-2200
24

25
```

UBSTRO007

2

1   APPEARANCES, cont'd.:

2   For UBS Securities, LLC:    Kimberly A. Posin
                                LATHAM & WATKINS, LLP
3                               355 South Grand Avenue, Suite 100
                                Los Angeles, CA  90071-1560
4                               (213) 485-1234

5   For Redeemer Committee of   Terri L. Mascherin
    the Highland Crusader       Brandon J. Polcik
6   Fund:                       JENNER & BLOCK, LLP
                                353 N. Clark Street
7                               Chicago, IL  60654-3456
                                (312) 923-2799
8

9   For Redeemer Committee of   Mark B. Hankin
    the Highland Crusader       JENNER & BLOCK, LLP
    Fund:                       919 Third Avenue
10                              New York, NY  10022-3098
                                (212) 891-1600
11

12  For Redeemer Committee of   Mark A. Platt
    the Highland Crusader       FROST BROWN TODD, LLC
    Fund:                       100 Crescent Court, Suite 350
13                              Dallas, TX  75201
                                (214) 580-5852
14

15  Recorded by:                Michael F. Edmond, Sr.
                                UNITED STATES BANKRUPTCY COURT
                                1100 Commerce Street, 12th Floor
16                              Dallas, TX  75242
                                (214) 753-2062
17

18  Transcribed by:             Kathy Rehling
                                311 Paradise Cove
                                Shady Shores, TX  76208
19                              (972) 786-3063

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.

UBSTRO008

196

1  discovery, which we provided, --

2        THE COURT:  Right.

3        MR. FEINSTEIN:  Again, Mr. Clubok's timeline about

4  the discovery doesn't show all the times that we provided

5  documents, and lots and lots of them, or all the time we spent

6  doing that.  But he -- I think what he's arguing is that, back

7  in 2009 or '10 or whatever, one of those entities had $40

8  million, and where did it go?  And I think what he's I guess

9  implying is that, in addition to the $233 million of

10  transfers, that that $40 million was somehow transferred,

11  right?

12        THE COURT:  Right.

13        MR. FEINSTEIN:  So let's remember that the -- these

14  entities were the subject of eight years of litigation and

15  pulled out a ton of (inaudible) fees.  They had other

16  obligations beside an obligation to UBS.  So, again, this is a

17  fact-specific point, but this is -- this isn't pleaded in

18  their proof of claim.  It's an argument that's now come up in

19  light of the discovery that we provided.  But if we get into

20  it, we're happy to, you know, discuss whether -- these other

21  obligations that the Debtor had and where that money was

22  spent.  But it's -- it's not part of our summary judgment case

23  today.

24        THE COURT:  Okay.  That --

25        MR. FEINSTEIN:  I guess that's what I've been saying.

1          THE COURT:  That's what I'm getting at.  When you

2    argue that I should issue summary judgment that UBS cannot

3    assert any claim against the Debtor except with regard to the

4    $61 million worth of transfers -- in other words, I have to X

5    out the $172 million -- that we're just talking about a

6    summary judgment with regard to the $233 million of transfers?

7    There still may be some theoretical argument -- I say

8    theoretical; I don't know if it's good or bad -- but there

9    still may be an argument that can go to trial on whether Mr.

10   Clubok can assert $45 million worth of damages, separate and

11   apart from those transfers under his breach of good faith and

12   fair dealing argument.

13         MR. FEINSTEIN:  The breach of good faith is probably

14   the only way that this would come in, because, to be clear,

15   there's no fraudulent conveyance claim alleged with respect to

16   that $40 million.

17         THE COURT:  Right.

18         MR. FEINSTEIN:  And as I said before, Your Honor,

19   while we produced documents recently, UBS has known about this

20   for eight years, because this $40 million is referenced in the

21   -- in the expert report that was brought out today.  And as I

22   said, to the extent that the money was spent on legal fees by

23   an entity that was in eight years of litigation with UBS, that

24   should shock no one.

25       But, you know, to the extent that it's relevant at all, it

UBSTRO010

198

1  could only be to an implied covenant claim, and in that

2  regard, I just, you know, it hasn't been pled so it's kind of

3  hard to react to something that's that ephemeral.

4        THE COURT:  Okay.  All right.  Ms. Mascherin, any

5  last words from you?

6        MS. MASCHERIN:  Yes.  And Your Honor, I'll confine --

7  I'll confine my remarks now to the issue of the release.

8     With all of the argument that we heard from Mr. Clubok, I

9  didn't hear him address the definition of the word -- of the

10  broad term claims, which is the cornerstone of the releases

11  given to Highland.  And as I walked through the language with

12  Your Honor earlier this morning, claims is defined very

13  broadly, and it expressly includes contractual claims arising

14  from the Knox Agreement and/or raised in the UBS litigation.

15  And as I believe I've shown, Your Honor, that what was

16  explicitly brought within the scope of the release of

17  Highland, the implied duty claim, to the extent that UBS was

18  seeking damages for that claim (inaudible) or other relief

19  arising from the transfer of assets to Crusader or to Credit

20  Strategies.

21     Now, Mr. Clubok argued at some length about the fact that

22  the Crusader Fund and the Credit Strategies Fund got broader

23  releases than Highland got in these settlement agreements.  We

24  don't dispute that.  But we do believe the language is clear

25  that UBS released all claims for damages against Highland that

UBSTRO011

1   relate to those or arise from those transfers.

2       Highland is free to pursue the other damages relating to

3   the other alleged fraudulent transfers.  And if Highland can

4   prove other damages on its implied duty claim that have

5   nothing to do with Crusader and Credit Strategies, that's

6   fine.  But the $172 million that went to Crusader and Credit

7   Strategies, that was released.

8       Now, Mr. Clubok argues, well, it doesn't make any sense,

9   it's not commercially reasonable to reach that result because

10   the obligation of Highland, as manager of the Crusader and

11   Credit Strategies Fund, how could that possibly apply to --

12   how could the indemnity obligation possibly apply to this

13   contract claim?  Well, Your Honor, Mr. Clubok himself showed

14   you the language of that indemnity agreement, and it provides

15   Highland for indemnification for any actions taken in

16   management of the Crusader and Credit Strategies Fund.  And we

17   heard --

18           MR. CLUBOK:  Your Honor?

19           MS. MASCHERIN:  We heard --

20           MR. CLUBOK:  Your Honor, objection.  Sorry.  I just,

21   I think parol evidence excluded on one side should be excluded

22   on all sides.  I would respond to that parol evidence that was

23   brought up, and that's why I talked about it, because -- so I

24   just would object that if there's going to be parol evidence,

25   that's fine.  If there's not going to be parol evidence for

1   be drawn, there was actual fraud in March of 2009. That is

2   the -- and they had another $45 million in HFP and maybe they

3   had another $20 million in CDO, although we haven't still

4   gotten the documents so we don't know if it was even more,

5   that all is a breach of implied duty of good faith and fair

6   dealing that is very much alive, has survived summary

7   judgment, trips to the appellate court in New York. And in

8   addition to the $119 million, this is even if you subtract the

9   amounts that Crusader tells you were erased in the

10   settlements, but you add for the $119 million plus $45 million

11   plus $20 million, you know, and those then are doubled for

12   pre-judgment interest. So you're left with a claim that's

13   still roughly, doing the math, $250 million. Okay? And, you

14   know, you -- to say to -- what they would have you say is,

15   well, forget the $45 million, forget the $20 million, zero

16   value for that in 3018. Now we're in 3018. You've got the

17   $120 million. And even though you, yes, indeed, got an

18   injunction under incredibly different legal circumstances and

19   unprecedented relief from the Appellate Division in New York,

20   you know, that your claim is so weak that you also have a 30

21   percent chance of success, so we just want to arbitrarily

22   deduct, you know, a hundred percent. That's obviously not the

23   way you handled Mr. Daugherty's claim. You lopped off certain

24   things and you said, really, you know, the claims are for the

25   rest of it, that total amount of money was colorable. That's

UBSTRO013

1 | the standard under 3018.  Our claim is more than colorable.

2 |    Long ago, Mr. Travers acknowledged that we owed hundreds

3 | of millions of dollars -- from CDO and SOHC, not through HCM

4 | -- but the person who controlled HCM caused them not to pay

5 | us, in breach of implied covenant.

6 |    I understand that Mr. Feinstein doesn't like that we get

7 | to pursue that claim, but the New York Courts of Appeals have

8 | said we do, and we should be able to go to trial and seek that

9 | roughly $250 million, even if our claims for implied duty are

10 | found to be released from that release, notwithstanding

11 | (inaudible).

12 |    I appreciate Your Honor's indulgence in allowing me to

13 | finish that.

14 |        THE COURT:  One last question.  You were mentioning

15 | --

16 |        MR. CLUBOK:  Yes.

17 |        THE COURT:  -- $45 million and $20 million.  Did you

18 | mean $10 million?  What is the $20 million?

19 |        MR. CLUBOK:  I'm sorry, Your Honor.  Maybe Ms.

20 | McLaughlin can put it up here.  It was -- she's got it here.

21 | It was $23 million as of December 31st, 2009 in CDO Fund.  So

22 | we -- we don't know how much they had.  This is where -- this

23 | is where they kept the documents from us.  We don't know how

24 | much was there in February of 2009, but we certainly know

25 | that, as of December of 2009, they had $23 million.  And we've

208

1    been begging them to pay it back forever.  We know they owe us
2    $500 million.  You just saw Tom Travers -- they admitted
3    internally.  You saw a document earlier that said, Let's --
4    we know we owe it to them, but let's delay it.  Let's drag it
5    out.  Let's, you know, make them pay for it.
6        That $23 million has now dwindled apparently to such that
7    it's only about $10 million, I'm told.  There's an asset
8    that's still remaining today that's roughly $10 million.  And
9    even today, they won't cause CDO Fund, who they control
10   completely, to just turn that over to us.  They want to hold
11   that up.
12       This is all a breach of implied duty of good faith and
13   fair dealing against HCM, and that's part of what's remained
14   in our claim.
15             THE COURT:  All right.  Thank you.  All right.
16             MR. FEINSTEIN:  Your Honor, I'm going to press my
17   luck and ask you if I just can make one very, very brief
18   statement.
19             MR. CLUBOK:  I object to that --
20             THE COURT:  Yes.  I --
21             MR. CLUBOK:  -- because I did not respond in any way
22   --
23             THE COURT:  I'm really -- I'm done.
24             MR. FEINSTEIN:  Okay.
25             THE COURT:  I'm going to come back at 3:30 and give

UBSTRO015

209

1  you some rulings.  So, that's -- it's 3:04 Central Time.

2  Anyway, I hope I'm not interfering with anyone's family or

3  religious plans.  If I get out to you in the next 30 minutes,

4  hopefully you'll be good.  All right.  So I'll be back at

5  3:30.  That's 4:30 Eastern.

6         THE CLERK:  All rise.

7     (A recess ensued from 3:04 p.m. to 3:44 p.m.)

8         THE COURT:  All right.  Please be seated.  This is

9  Judge Jernigan.  I made you wait a little longer than I

10 predicted, but these are obviously not easy issues.

11    All right.  I am first going to give you my ruling on the

12 two motions for partial summary judgment on UBS Proofs of

13 Claim 190 and 191.

14    First, I'm going to dispense, given the late hour, with

15 the legal announcing of the Rule 56 summary judgment

16 standards.  We all know them very well.  They were briefed

17 very well.  I certainly reserve the right to supplement this

18 bench ruling with a more fulsome written order and judgment

19 that includes such things as the Rule 56 standards.

20    Anyway, getting to the heart of my ruling, I am going to

21 grant both the Debtor's and the Redeemer Committee's, or I

22 should say Crusader Fund's, motions for partial summary

23 judgment as follows.  This is obviously a multi-part ruling.

24    First, number one, and I think UBS has very clearly

25 conceded this, but I grant summary judgment that UBS is barred

UBSTRO016

211

1  fraudulent transfer claims as to this $172 million of

2  transfers to Crusader and Credit Strategies but not releasing

3  other theories of liability relating to those $172 million of

4  transfers, such as under a theory that the transfers amounted

5  to Highland breaching an implied covenant of good faith and

6  fair dealing or some other theory.

7      It would be absurd because UBS would not even have a

8  theory to call these transfers fraudulent transfers as to

9  Highland per se, since Highland was not a transferee, directly

10 or indirectly, on them.  So UBS had to be releasing other

11 claims and theories based on these transfers -- namely, the

12 only potential viable theory that UBS had asserted against

13 Highland at that time relating to these transfers, *i.e.*, the

14 breach of fair dealing and good faith claim.

15     It would further be absurd, in this Court's view, to think

16 that the Crusader Funds and Credit Strategies paid $70.5

17 million to UBS to settle these claims, with a risk that

18 Highland could later be sued on the very same transfers and

19 potentially come back and seek indemnity against the Crusader

20 Funds and Credit Strategies.

21     But most importantly, I emphasize, I think the clear

22 language used in the 2015 settlement agreements supports

23 summary judgment here without even going down the logic trails

24 or absurdity trails.

25     Next, I rule that UBS is barred from asserting alter ego

212

1  theories of liability against Highland, *i.e.*, that Highland

2  should have liability to UBS based on alter ego theories for

3  the liabilities of CDO Fund, SOHC, and HFP, because the theory

4  was not asserted in its proof of claim, its two proofs of

5  claim.  And I do not believe the mere broad reservation of

6  rights within those proofs of claim allowing UBS to assert any

7  number of things past the bar date, any number of things,

8  including alter ego, would preserve an alter ego theory of

9  liability past the bar date.

10      In this Court's determination, the alter ego theory of

11  liability against Highland in this context would clearly be a

12  claim as broadly defined in Section 101 of the Bankruptcy

13  Code, regardless of any New York state law jurisprudence that

14  talks of it being not a claim but instead a remedy or some

15  other kind of theory of liability.  It makes all the

16  difference when you get into the world of bankruptcy because

17  of the broad, broad, broad definition of claim in Section 101

18  of the Bankruptcy Code.

19      So these are my only rulings on the motions for partial

20  summary judgment.

21      I do not interpret the Debtor's motion -- or either

22  motion, for that matter -- to be asking the Court to rule as a

23  matter of law that UBS is precluded from asserting any damages

24  beyond the $61 million of transfers made in March 2009 to

25  Highland, Multi-Strat, and Citibank, and Highland, for

213

1   example, precluding damages relating to the $45 million that

2   HFP had in March 2009 or the $20-plus million that the CDO

3   Fund had in December 2009.

4       So I think that's the answer I got from Mr. Feinstein at

5   the end of oral argument.  But even if the Debtor was making

6   the request that the Court rule that, as a matter of law, UBS

7   cannot assert any claim against the Debtor except the claims

8   relating to the $61 million of transfers, I think that UBS has

9   shown, has put summary judgment evidence in the record that

10  there may be a fact issue here with regard to these funds.

11  They may be able to prove, have a potential theory here that

12  Highland breached the covenant of good faith and fair dealing

13  by somehow exercising control over the CDO Fund and HFP and

14  causing them to dissipate those assets and not pay them to

15  UBS.  There might be a theory there.

16      So I hope that is clear, that I'm not granting summary

17  judgment declaring that UBS is barred from asserting something

18  more than the $61 million of March 2009 transfers.

19      So that is my ruling on the motions for partial summary

20  judgment.  I'll turn now to the UBS Rule 3018(a) estimation

21  motion.  Once again, given the late hour, I'm going to

22  dispense with the flowery legal standards that apply to this

23  motion.  I reserve the right in my order to supplement with

24  more fulsome statements.

25      But I have decided that I should estimate UBS's claim for

UBSTRO019

214

1   voting purposes at the following number:  $94,761,076.  Okay.

2   So here is my math for how I get there.  Let's start with the

3   three transfers in March 2009 that have been alleged to be

4   fraudulent transfers or, you know, Highland caused to be made

5   in breach of its duty of good faith and fair dealing.  And I'm

6   talking about, obviously, the Multi-Strat entities, you know,

7   the $25,782,988 that HFP transferred in March 2009, then there

8   was $17,778,566 transferred to the Debtor, and then Citibank

9   received $17,481,808.

10      So, as we've talked about, we've talked about $61,043,362.

11  Okay.  So, obviously, I've ruled summary judgment that

12  Crusader -- transfers to Crusader and the transfer to Credit

13  Strategies are gone.  They're off the table.  So, but focusing

14  in on that $61 million, I start with the $25-plus million to

15  Multi-Strat.  I am estimating a high chance of UBS winning on

16  that, a 90-percent chance.  So, 90 percent of $25,783,300 --

17  what is the number?  $25 million.  I may have done my math

18  wrong.  I've computed it equals $23,205,008, but I think I --

19  no, no, no, no.  No, no, no.  Let me back up.  Just a minute.

20  Hang on.  (Pause.)  All right.  I think what I meant to do is

21  calculate 90 percent of $25,782,988, and my math may be wrong.

22  I've got that equals $23,205,008, but I feel like I did

23  something wrong there.  Someone can double-check my math

24  there.  Can someone -- I've left my calculator back in

25  chambers.  What's 90 percent of $25,783,343?  Hello.  You've

215

1  got a calculator over there?

2          THE CLERK:  Yeah.  What was the number?

3          THE COURT:  Okay.

4          THE CLERK:  You said $25,783,4 --

5          THE COURT:  No, no, no.  I'm sorry.  That's where I

6  went wrong, I think.  The number is should have -- not --

7  that's where I went wrong.  I should have been using

8  $25,782,988.  And I have no idea where I got that $25,783,000

9  number.  So, 90 percent of $25,782,988.

10          MR. FEINSTEIN:  My calculator says that $23.2

11  million, Your Honor.

12          THE COURT:  Okay.  Well, I guess I was right.  Okay.

13          MR. FEINSTEIN:  You were right.

14          THE COURT:  Okay.  So I'm putting a 90 percent chance

15  of winning on that, so $23.2 million.

16      And then on the transfer to the Debtor, I'm using the

17  expert report, if you will, of I think his name is Mr. Dudney,

18  UBS's own expert, where he used $8 million.  He said you

19  should adjust that number to $8 million, if I was

20  understanding correctly, because of HFP, the transferor,

21  having some percentage ownership in that.  So if I use $8

22  million, that gets us up to $31.2 million.

23      Then, with regard to Citibank, the transfer to Citibank of

24  $17,481,808, I'm giving a 20 percent chance of success on that

25  one.  I just, again, feel in my gut, you know, in my

UBSTRO021

216

 1   discretion, looking at the summary judgment evidence, I just

 2   feel in my gut there's going to be defenses to that.  So, 20

 3   percent of that would be $3,555,713.

 4        So that gets us up to roughly 31 -- excuse me, $34.76

 5   million.  So, if you assume interest, pre-judgment interest, I

 6   used $30 million there.  Again, that's imprecise.  But that

 7   gets us up to $64.76 million.

 8        Then what I did beyond that is, with regard to the summary

 9   judgment evidence thrown out that maybe there was 40 -- $45

10   million on hand at HFP in March of 2009 -- I think we're

11   talking about UBS Exhibit 25 -- and then another $23 million

12   may have been on hand at the CDO Fund, at least in December

13   2009, that's about $68 million.  And I am just assuming that

14   there might be a credible argument made as to $10 million of

15   that.  And then I'll add $10 million of interest for all of

16   these years, of pre-judgment interest.

17        And then I've plugged in another $10 million for

18   attorneys' fees, because I believe there is the ability to get

19   attorneys' fees for actual fraudulent transfers.  And I'm

20   assuming that some of these, the ones to Highland and Multi-

21   Strat, there might be credible arguments of actual fraudulent

22   transfers.  And then I have been told, I think, by Mr. Clubok

23   that you might even get attorneys' fees for breach of covenant

24   of good faith and fair dealing.

25        So, $64.761 million plus $10 million plus another $10

UBSTRO022

217

1  million plus $10 million is $94.761 million.

2      Any questions?  I know that was probably hard to follow,

3  but any questions about that estimation?

4          MR. CLUBOK:  Your Honor, the only question, and maybe

5  it's too late and that's fine, I understand your analysis, but

6  the calculation of the amount that was transferred to

7  Highland, I think even Highland had agreed in their -- that

8  the number is higher.  I think that's out of context, and if

9  that's -- if there's no chance for us to clear that up, I

10 understand.  You've made your decision.  But I do want to say

11 that I think even Highland would agree that they received more

12 than $8 million.  The footnote from (inaudible) is a little

13 bit out of context, and, you know, there was -- if you look at

14 Highland's papers in terms of their response on 3018, I think

15 they have accepted our 17, roughly $17 million number.  I

16 think that is a -- it's complicated.  But anyway, I just raise

17 that, and maybe because you've done all this math, that won't

18 affect your view, Your Honor.  Totally understand that.  But I

19 do want to say that I think that Highland even acknowledges

20 that the amount received was $17 million.  That was

21 (inaudible) by Redeemer.  I think it's misunderstood.  You

22 know, our -- a footnote from our expert report that takes the

23 full expert report out of context.

24          THE COURT:  Well, that's going to be my ruling.  And,

25 again, you know, estimation --

222

1    (Proceedings concluded at 4:12 p.m.)

2                            --oOo--

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18                         CERTIFICATE

19    I certify that the foregoing is a correct transcript to
    the best of my ability from the electronic sound recording of
20    the proceedings in the above-entitled matter.

21    **/s/ Kathy Rehling**                    **11/25/2020**

22    _____    _____
    Kathy Rehling, CETD-444                    Date
23    Certified Electronic Court Transcriber

24

25

# EXHIBIT 2

**UBSTRO025**

```
1                IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
2                            DALLAS DIVISION

3                                  )     Case No. 19-34054-sgj-11
      In Re:                       )     Chapter 11
4                                  )
      HIGHLAND CAPITAL             )     Dallas, Texas
5     MANAGEMENT, L.P.,            )     Tuesday, February 2, 2021
                                   )     9:30 a.m. Docket
6           Debtor.               )
                                   )     CONFIRMATION HEARING [1808]
7                                  )     AGREED MOTION TO ASSUME [1624]
      _____)

8                       TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
9                   UNITED STATES BANKRUPTCY JUDGE.

10    WEBEX APPEARANCES:

11    For the Debtor:          Jeffrey Nathan Pomerantz
                               PACHULSKI STANG ZIEHL & JONES, LLP
12                             10100 Santa Monica Blvd.,
                                 13th Floor
13                             Los Angeles, CA  90067-4003
                               (310) 277-6910
14
      For the Debtor:          John A. Morris
15                             Gregory V. Demo
                               PACHULSKI STANG ZIEHL & JONES, LLP
16                             780 Third Avenue, 34th Floor
                               New York, NY  10017-2024
17                             (212) 561-7700

18    For the Debtor:          Ira D. Kharasch
                               PACHULSKI STANG ZIEHL & JONES, LLP
19                             10100 Santa Monica Blvd.,
                                 13th Floor
20                             Los Angeles, CA  90067-4003
                               (310) 277-6910
21
      For the Official Committee  Matthew A. Clemente
22    of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                                   One South Dearborn Street
23                                 Chicago, IL  60603
                                   (312) 853-7539
24

25
```

2

APPEARANCES, cont'd.:

| | |
|---|---|
| For Redeemer Committee of the Highland Crusader Fund: | Terri L. Mascherin<br>JENNER & BLOCK, LLP<br>353 N. Clark Street<br>Chicago, IL 60654-3456<br>(312) 923-2799 |
| For Acis Capital Management GP, LLC: | Rakhee V. Patel<br>WINSTEAD, P.C.<br>2728 N. Harwood Street, Suite 500<br>Dallas, TX 75201<br>(214) 745-5250 |
| For UBS Securities, LLC: | Andrew Clubok<br>LATHAM & WATKINS, LLP<br>555 Eleventh Street, NW,<br>  Suite 1000<br>Washington, DC 20004<br>(202) 637-2200 |
| For Patrick Daugherty: | Jason Patrick Kathman<br>PRONSKE & KATHMAN, P.C.<br>2701 Dallas Parkway, Suite 590<br>Plano, TX 75093<br>(214) 658-6500 |
| For HarbourVest, et al.: | Erica S. Weisgerber<br>DEBEVOISE & PLIMPTON, LLP<br>919 Third Avenue<br>New York, NY 10022<br>(212) 909-6000 |
| For James Dondero: | Clay M. Taylor<br>John Y. Bonds, III<br>D. Michael Lynn<br>Bryan C. Assink<br>BONDS ELLIS EPPICH SCHAFER<br>  JONES, LLP<br>420 Throckmorton Street,<br>  Suite 1000<br>Fort Worth, TX 76102<br>(817) 405-6900 |
| For Get Good Trust and Dugaboy Investment Trust: | Douglas S. Draper<br>HELLER, DRAPER & HORN, LLC<br>650 Poydras Street, Suite 2500<br>New Orleans, LA 70130<br>(504) 299-3300 |

UBSTRO027

3

APPEARANCES, cont'd.:

| | |
|---|---|
| For Certain Funds and Advisors: | Davor Rukavina<br>Julian Vasek<br>MUNSCH, HARDT, KOPF & HARR<br>500 N. Akard Street, Suite 3800<br>Dallas, TX 75201-6659<br>(214) 855-7587 |
| For Certain Funds and Advisors: | A. Lee Hogewood, III<br>K&L GATES, LLP<br>4350 Lassiter at North Hills<br>  Avenue, Suite 300<br>Raleigh, NC 27609<br>(919) 743-7306 |
| For the NexPoint Parties: | Lauren K. Drawhorn<br>WICK PHILLIPS<br>3131 McKinney Avenue, Suite 100<br>Dallas, TX 75204<br>(214) 692-6200 |
| For Scott Ellington, Isaac Leventon, Thomas Surgent, and Frank Waterhouse: | Frances A. Smith<br>ROSS & SMITH, P.C.<br>Plaza of the Americas<br>700 N. Pearl Street, Suite 1610<br>Dallas, TX 75201<br>(214) 593-4976 |
| For Scott Ellington, Isaac Leventon, Thomas Surgent, and Frank Waterhouse: | Debra A. Dandeneau<br>BAKER & MCKENZIE, LLP<br>452 Fifth Avenue<br>New York, NY 10018<br>(212) 626-4875 |
| For CLO Holdco, Ltd.: | John J. Kane<br>KANE RUSSELL COLEMAN LOGAN, P.C.<br>901 Main Street, Suite 5200<br>Dallas, TX 75202<br>(214) 777-4261 |
| For Davis Deadman, Todd Travers, and Paul Kauffman: | Jason Patrick Kathman<br>PRONSKE & KATHMAN, P.C.<br>2701 Dallas Parkway, Suite 590<br>Plano, TX 75093<br>(214) 658-6500 |

UBSTRO028

4

1    APPEARANCES, cont'd.:

2    For the United States          David G. Adams
     of America (IRS):              U.S. STATES DEPARTMENT OF JUSTICE,
3                                      TAX DIVISION
                                    717 N. Harwood Street, Suite 400
4                                   Dallas, TX  75201
                                    (214) 880-2432
5
     For Highland CLO Funding,      Rebecca Matsumura
6    Ltd.:                          KING & SPALDING, LLP
                                    500 West 2nd Street, Suite 1800
7                                   Austin, TX  78701
                                    (512) 457-2024
8
     For Crescent TC                Michael S. Held
9    Investors:                     JACKSON WALKER, LLP
                                    2323 Ross Avenue, Suite 600
10                                  Dallas, TX  75201
                                    (214) 953-5859
11
     For the Issuer Group:          Amy K. Anderson
12                                  JONES WALKER, LLP
                                    811 Main Street, Suite 2900
13                                  Houston, TX  77002
                                    (713) 437-1866
14
     Recorded by:                   Michael F. Edmond, Sr.
15                                  UNITED STATES BANKRUPTCY COURT
                                    1100 Commerce Street, 12th Floor
16                                  Dallas, TX  75242
                                    (214) 753-2062
17
     Transcribed by:                Kathy Rehling
18                                  311 Paradise Cove
                                    Shady Shores, TX  76208
19                                  (972) 786-3063

20

21

22

23

24        Proceedings recorded by electronic sound recording;
             transcript produced by transcription service.
25

UBSTRO029

13

1    As Your Honor is well aware, this case started in December

2  in -- October 2019, was transferred to Your Honor's court in

3  December 2019, and has been pending for approximately 15

4  months.

5    On January 9, 2020, I stood before Your Honor seeking the

6  approval of the independent board of directors of Strand, the

7  general partner of the Debtor, pursuant to a heavily-

8  negotiated agreement with the Committee.  And as the Court has

9  remarked on occasions throughout the case, the economic

10 stakeholders in this case believed that the installation of a

11 new board consisting of highly-qualified restructuring

12 professionals and a bankruptcy judge, a former bankruptcy

13 judge, was far more attractive than the alternative, which was

14 appointment of a trustee.  And upon approval of the

15 settlement, members of the board -- principally, Mr. Seery --

16 testified that one of the board's goals was to change the

17 culture of litigation that plagued Highland in the decade

18 before filing and threatened to embroil the Debtor in

19 continued litigation if changes were not made.

20   And as Your Honor is well aware, the last 14 months have

21 not been easy.  The board took its role as an independent

22 fiduciary extremely seriously, much to the consternation of

23 the Committee at times, and more recently, to the

24 consternation of Mr. Dondero and his affiliated entities.

25   And what has the Debtor, under the leadership of the

1   board, been able to accomplish during this case?  The answer

2   is a lot more than many parties believed when the board was

3   installed.

4        The Debtor reached a settlement with the Redeemer

5   Committee, resolving disputes that had been litigated for many

6   years, in many forums, and that resulted in an arbitration

7   award that was the catalyst for the bankruptcy filing.

8        Participating in a court-ordered mediation at the end of

9   August 2020 and September, the Debtor reached agreement with

10  Acis and Josh Terry.  The Court is all too familiar with the

11  years of disputes between the Debtor and Acis and Josh Terry,

12  which spanned arbitration proceedings and an extremely

13  combative Chapter 11 that Your Honor presided over.

14       The Debtor next reached an agreement with HarbourVest

15  regarding their assertion of over $300 million of claims

16  against the estate.  The HarbourVest litigation stemmed from

17  its investment in the Acis CLOs and would have resulted in

18  complex, fact-intensive litigation which would have forced the

19  Court to revisit many of the issues addressed in the Acis

20  case.

21       And perhaps most significantly, Your Honor, the Debtor was

22  able to resolve disputes with UBS, disputes which took the

23  most time of any claim in this case, through a contested stay

24  relief motion, a hotly-contested summary judgment motion, and

25  a Rule 3018 motion.

UBSTRO031

15

1    While the Debtor and UBS hoped to file a 9019 motion prior

2  to the commencement of the hearing, they were not able to do

3  so.  However, I am now in a position to disclose to the Court

4  the terms of the settlement, which is the subject of

5  documentation acceptable to the Debtor and UBS.  The

6  settlement provides for, among other things, the following

7  terms:

8    UBS will receive a $50 million Class 8 general unsecured

9  claim against the Debtor.

10    UBS will receive a $25 million Class 9 subordinated

11  general unsecured claim against the Debtor.

12    UBS will receive a cash payment of $18.5 million from

13  Multi-Strat, which was a defendant and the subject of

14  fraudulent transfer claims.

15    The Debtor will use reasonable efforts to assist UBS to

16  collect its Phase I judgment against CDL Fund and assets CDL

17  Fund may have.

18    The parties will also agree to mutual and general

19  releases, subject to agreed carve-outs.

20    And, of course, the parties will not be bound until the

21  Court approves the settlement pursuant to a 9019 motion we

22  would hope to get on file shortly.

23    I am also pleased to let the Court know -- breaking news

24  -- that this morning we reached an agreement to settle Patrick

25  Daugherty's claims.  I would now like to, at the request of

UBSTRO032

16

1  Mr. Kathman, read into the record the Patrick Daugherty

2  settlement.

3      Under the Patrick Daugherty settlement, Mr. Daugherty will

4  receive a $750,000 cash payment on the effective date.  He

5  will receive an $8.25 million general unsecured claim, and he

6  will receive a $2.75 million Class 9 subordinated claim.

7      The settlement of all claims against the Debtor and its

8  affiliates -- and affiliates will be defined in the documents

9  -- with the exception of the tax claim against the Debtor, Mr.

10 Dondero, and Mr. Okada -- and for the avoidance of doubt,

11 except as I describe below, nothing in the settlement is

12 intended to affect any pending litigation Mr. Daugherty has

13 against Mr. Dondero, Scott Ellington, Isaac Leventon, Marc

14 Katz, Michael Hurst, and Hunton Andrew Kurth.

15     Mr. Daugherty will release the Debtor and its affiliates

16 and current employees for all claims and causes of action,

17 except for the agreements I identify below, and dismiss all

18 current employees as to pending actions.  We believe this only

19 applies to Thomas Surgent and no other employee is implicated.

20     Mr. Surgent and other employees, including but not limited

21 to David Klos, Frank Waterhouse, Brian Collins, Lucy Bannon,

22 and Matt Diorio, will receive releases similar to the covenant

23 in Paragraph 1D of the Acis settlement agreement, which

24 essentially provided the release would go away if they

25 assisted anyone in pursuing claims against Mr. Daugherty.

293

1  at Docket Entry 1877.  And Mr. Morris, you can try to get in

2  7O the old-fashioned way if you want to.

3          MR. MORRIS:  Yeah, I'll deal with 7O and the very

4  limited number of other objections at the beginning of

5  tomorrow's hearing.

6          THE COURT:  All right.

7     (Debtor's Exhibits 7F through 7Q, with the exception of

8  7O, are received into evidence.)

9          THE COURT:  So we will reconvene at 9:30 Central time

10 tomorrow.  I think we're going to hear from the Aon, the D&O

11 broker, Mr. Tauber; is that correct?

12         MR. MORRIS:  That's right.  And that should be

13 shorter than even Mr. Dubel.

14         THE COURT:  All right.  Well, we will see you at 9:30

15 in the morning.  We are in recess.

16         MR. MORRIS:  Thank you so much.

17         THE CLERK:  All rise.

18    (Proceedings concluded at 5:09 p.m.)

19                        --oOo--

20                      CERTIFICATE

21    I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22 above-entitled matter.

23  **/s/ Kathy Rehling**                    **02/04/2021**

24 _____     _____

   Kathy Rehling, CETD-444                   Date
25 Certified Electronic Court Transcriber

UBSTRO034

# EXHIBIT 3

UBSTRO035

## PURCHASE AGREEMENT

This Purchase Agreement (the "*Agreement*") dated as of August 7, 2017 (the "*Effective Date*"), is entered into by and among Sentinel Reinsurance, Ltd. ("*Purchaser*") and each of Highland CDO Opportunity Master Fund, L.P., Highland CDO Holding Company and Highland Special Opportunities Holdings Company (together, "*Sellers*").

### RECITALS

WHEREAS, Sellers are each party in a lawsuit styled UBS Securities LLC and UBS AG, London Branch, v. Highland Capital Management, L.P., Highland Special Opportunities Holding Company, Highland Financial Partners, L.P., Highland CDO Opportunity Master Fund, L.P., Highland Credit Opportunities CDO, L.P., and Strand Advisors, Inc., Cause No. 650097/2009 (the "*Lawsuit*");

WHEREAS, Sellers desire to purchase a Legal Liability Insurance Policy relating to Sellers' potential liability in the Lawsuit in form substantially as set forth in Exhibit A hereto (the "*Policy*"); and

WHEREAS, Purchaser is an insurance company that is able to provide Sellers insurance coverage pursuant to the terms of the requested Policy, and Purchaser desires to provide Policy coverage to Sellers pursuant to the terms herein and therein.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement, the parties hereto agree as follows:

1.     Payment of Premium. Purchaser agrees to accept the assets listed in Schedule A hereto as 100% payment of the Premium, including any as yet unpaid or contingent financial proceeds or other benefits related thereto, with the explicit undertaking that if anything of value is received by the Sellers, such cash or other item of value shall be held in trust for the Purchaser and promptly remitted thereto (the "*Transferred Interests*"). Sellers undertake that immediately following signing this Agreement, they will each take all such steps and execute all such documents to vest legal and beneficial ownership free from liens or encumbrances (as hereinafter defined) in all the Transferred Interests in the Purchaser.

2.     Entire Agreement.  This Agreement and the Schedule and Exhibit attached hereto embody the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter.

3.     Amendments and Waivers.  This Agreement may be amended only by an agreement in writing signed by each party hereto, and no waiver or compliance with any provision or condition hereof and no consent provided for herein shall be effective unless evidenced by an instrument in writing duly executed by the party hereto sought to be charged with such waiver or consent.

4.     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall be one and the same document.

5.     Headings.  The headings contained in this Agreement are for convenience only and do not constitute a part of this Agreement.

6.     Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

**UBSTRO036**

7.    <u>Governing Law</u>. This Agreement shall be governed by, and construed and interpreted in accordance with the substantive laws of the Cayman Islands without giving effect to any conflict of laws rule or principle thereof that might result in the application of the laws of another jurisdiction, and the courts of the Cayman Islands shall have exclusive jurisdiction to determine any dispute.

8.    <u>Further Assurances</u>. Each party to this Agreement hereby covenants and agrees, without the necessity of any further consideration, to execute and deliver any and all further documents and to perform such other acts as may be necessary to carry out the intent and purposes of this Agreement and to consummate the transactions contemplated hereby.

*[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]*

UBSTRO037

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the date first written above.

**SELLER**

**Highland CDO Opportunity Master Fund, L.P.**
By:   Highland CDO Opportunity Fund GP, L.P., its general partner
By:   Highland CDO Opportunity GP, LLC, its general partner
By:   Highland Capital Management, L.P., its sole member
By:   Strand Advisors, Inc., its general partner

By: _____
Name:   James Dondero
Title:   President


**Highland CDO Opportunity Fund, Ltd.**

By: _____
Name:   James Dondero
Title:   Director


**Highland CDO Holding Company**

By: _____
Name:   James Dondero
Title:   Director


**Highland Special Opportunities Holdings Company**

By: _____
Name:   James Dondero
Title:   Director

**Highland Financial Corp.**

By: _____
Name: James Dondero
Title: President

**Highland Financial Partnership, L.P.**

By: _____
Name: James Dondero
Title: Chief Executive Officer

UBSTRO039

**PURCHASER**

SENTINEL REINSURANCE, LTD.

By:_____
Name:_____Andrew Dean_____
Title:    Director

UBSTRO040

# EXHIBIT 4

UBSTRO041

# Legal Liability Insurance Policy

00753351-1

UBSTRO042

# 1.   Our agreement in general

## 1.1   Parties to this agreement

This **policy** is between the **insured** and the **insurer** as declared in the **schedule**.  This document, together with its **schedule** and any attached endorsements is the **policy** which sets out this insurance. It is a legal contract so please read all of it carefully.

## 1.2   Words in bold

Words in bold typeface used in this **policy** document, other than in the headings, have specific meanings attached to them as set out in the General definitions and interpretation.

## 1.3   Policy Structure

1.3.1   Each **insured section** sets out the scope of the main coverage and the circumstances in which the **insurer's** liability to the **insured** is limited or may be excluded.  Further, each **insured section** sets out other terms and conditions relevant to that **insured section**. The cover provided by each **insured section** is only operative if a **limit of indemnity** is shown in the **schedule**.  Where the **limit of indemnity** in respect of any item in the **schedule** is shown as 'n/a', 'not applicable' or 'not insured' then no cover applies for that item. Where the **insured** comprises more than one person, the **limit of indemnity** for all **claims** made by all persons comprising the **insured** shall apply but as there is no sub-limit of indemnity in relation to each individual person, one or more of those persons will not receive payment of a **claim** if the limit of indemnity has already been met as a result of the payment of other **claims**.

1.3.2   Additional clauses set out terms, exclusions or limitations that may apply to more than one **insured section**.

1.3.3   The following general terms apply to each **insured section**, clauses and endorsements:

   a)   General exclusions and limitations
   b)   Duties in the event of a claim or potential claim;
   c)   General terms and conditions; and
   d)   General definitions and interpretation.

## 1.4   Policy period and premium

1.4.1   This **policy** will provide insurance as described herein for the **period of insurance** provided the **premium** (and **deposit premium** if applicable) and other charges are paid to and accepted by the **insurer** on or before the payment date shown in the **schedule**. Taxes, levies and other relevant fiscal charges are payable in addition to the **premium**. The **premium** is deemed paid and accepted by the **insurer** on receipt by the **insurer** or the intermediary appointed to place this insurance with the **insurer**.

1.4.2   If any **premium** (or **deposit premium** if applicable) is not paid and accepted by the **insurer** on or before its payment date as set out in this **policy** then the **insurer** may, in its sole discretion, give written notice to the **insured** at its address shown in the **schedule** cancelling this **policy** from seven (7) days after the date of service of the notice of cancellation. Cancellation will be prevented from taking effect and the **policy** will continue

UBSTRO043

in force if the outstanding **premium** (or **deposit premium** if applicable) is paid and accepted before cancellation takes effect. Without prejudice to other forms of service, notice of cancellation is deemed served on the fifth (5ᵗʰ) day after being posted if sent by pre-paid airmail letter properly addressed.

1.4.3   In consideration of the payment of the **premium** (and **deposit premium** if applicable) by the **insured** to the **insurer** the **insurer** agrees to provide the insurance as described in 'Legal liability' **insured section**.

## 2.   Insured section – Legal liability

### 2.1    Legal liability cover

The **insurer** agrees to indemnify the **insured** in respect of any **legal liability** occurring during the **period of insurance** up to and including but not exceeding the **limit of indemnity** provided that either:

2.1.1   the **court** (or any appellate court to which the **court's** judgment in the **legal action** is appealed) makes an order of liability relating to the **legal action** against the **insured**; or

2.1.2   the **legal action** is (with the prior written agreement of the **insured**, the **appointed representative** and the **insurer**) settled on terms that provide for payment by the **insured** to the **opponent**.

## 3.   General exclusions and limitations

This **policy** excludes and the **insurer** shall not be liable to indemnify the **insured** in any of the following circumstances:

### 3.1    Absence of the insurer's prior consent

where the **insurer's** written consent has not been obtained pursuant to the 'Written consent' clause below;

### 3.2    Failure to notify

where the **insured** has failed to notify the **insurer** pursuant to the 'Claim notification' clause below;

### 3.3    Insured's conduct

3.3.1   where the **legal action** is settled or the court makes an order of liability relating to the legal action against the **insured** as a result of the dishonesty of the **insured**; or

3.3.2   where the **insured** fails to act in accordance with the advice of the **appointed representative** or to provide full instructions promptly to the **appointed representative** or to co–operate with the **appointed representative** or to comply with any order made by the **court** or any **court** rule;

### 3.4    Failure to mitigate

where **legal liability** is incurred or increased as a result of a failure on part of the **insured** or the **appointed representative** to mitigate such a liability;

UBSTRO044

**3.5 Non-disclosure**

where the **insured** or the **appointed representative** has failed to disclose material facts;

**3.6 Unnecessary costs because of delay etc.**

where the **opponent's costs** arise from

3.6.1 any unreasonable delay or negligence or wilful act or omission by the **insured** or the **appointed representative**;

3.6.2 any unreasonable failure on part of the **insured** or the **appointed representative** to attend a hearing or other appointment;

**3.7 Amended pleadings**

Where **legal liability** is incurred or increased as a result of any unreasonable amendment to the **insured's** pleadings or any failure to comply with any court directions, pre-action protocols or any other rule, regulation or statutory provision;

**3.8 Fraud**

where the **insured** or the **appointed representative** has made any fraudulent, false or misleading representation;

**3.9 Legal action outside the territorial limits**

where **legal liability** is incurred or increased as a result of the **legal action** being pursued, issued, brought or transferred outside the **territorial limits**;

**3.10 Non-contribution**

where but for the existence of this **policy** the **insured** would be entitled to indemnity under another insurance policy;

**3.11 Quote disclosed prior to inception of the policy**

where the existence of any offer of insurance made by the **insurer** to the **insured** in respect of the **legal action** was disclosed to any third party other than those third parties to whom the **insurer** has offered its consent for such quote to be disclosed;

**3.12 Sums due under other policies of insurance**

where any premium has fallen due to be paid by the **insured** to the **insurer** pursuant to the terms of any other policy of insurance issued by the **insurer** to the **insured** but remains unpaid (whether in full or in part) at the date of a **claim** under this **policy**.

## 4. Other terms and conditions relating to cover

**4.1 Set-off**

In the event that a **claim** is made under this **policy** and the **insured** has obtained a **recovery** in the **legal action** then the **insurer** shall only be liable to indemnify the **insured** for the net sum (if any) after deduction of the amount of the **recovery.** This is irrespective of whether or not payment is actually made to the **insured.**

**4.2 Appeal**

UBSTRO045

4.2.1 In the event that the **legal action** is subject to **appeal** then at the end of the appeal's process this **policy** will be construed as if the **court** had reached the same decision as the appellate court.

4.2.2 In the event that any sums of money are paid by the **insurer** pursuant to the terms of this **policy** and the judgment of the **court** is amended following an **appeal** (such that the **insurer** would not have made the payment had the amended judgment been the judgment of the **court**) then the **insured** shall reimburse the **insurer** for any such sums of money already paid together with interest at 2% above the United States Dollar prime lending rate in the Cayman Islands from time to time.

## 5. Conduct of the legal action

### 5.1 Written consent

The **insured** must obtain, and irrevocably instructs the **appointed representative** to obtain, written consent from the **insurer** prior to:

5.1.1 the settlement of the **legal action** in the **opponent's** favour;

5.1.2 the rejection (whether explicitly or by conduct) of an **opponent's** offer to settle the **legal action**;

5.1.3 the rejection of any offer of alternative dispute resolution (including mediation) from the **opponent**;

5.1.4 any change of the **appointed representative**.

The **insurer** will not unreasonably withhold consent to the **insured** taking any of the steps referred to in this clause and will, in making a decision as to whether to provide consent pursuant to this clause, consider whether a reasonably prudent uninsured litigant would pursue the course of action for which the **insurer's** consent is sought.

### 5.2 Notification

The **insured** must notify, and irrevocably instructs the **appointed representative** to notify, the **insurer** immediately:

5.2.1 on receipt of any offer of settlement of the **legal action**;

5.2.2 on receipt of any offer of alternative dispute resolution (including mediation) from the **opponent**;

5.2.3 in the event of any development in the **legal action** material to the prospects of succeeding in the **legal action**;

5.2.4 if the **insured** is no longer more likely than not to succeed in the **legal action**, assuming that it is determined at trial; and

5.2.5 after any period of 6 months during which there has been no requirement to request the **insurer's** consent or notify the **insurer** in order to confirm the current status of the **legal action**.

### 5.3 Monies to be held on account

UBSTRO046

The **insured** irrevocably instructs the **appointed representative** to hold any monies (whether costs, interest or damages) received from the **opponent** until the **premium** is paid in full, any **claim** under this **policy** has been submitted and all terms and conditions of this **policy** have been fully complied with.

**5.4    Co-operation by the insured and appointed representative**

The **insured** must:

5.4.1    provide, and instruct the **appointed representative** to provide, the **insurer** with full and prompt co–operation to include providing such **information** as is requested by the **insurer** from time to time; and

5.4.2    co-operate, and instruct the **appointed representative** to co-operate, with any request by the **insurer** to audit **information** pursuant to the 'Audit' clause.

**5.5    Prosecution of the legal action**

The **insured** agrees to:

5.5.1    prosecute the **legal action** promptly;

5.5.2    provide any instructions to the **appointed representative** as are necessary or desirable in order to prosecute the **legal action** in the best manner;

5.5.3    act as a reasonably prudent uninsured litigant with the objective of achieving the best outcome in the **legal action** (and any subsequent costs assessment proceedings); and

5.5.4    comply with any order of the **court** and any **court** rules and in all respects conduct the **legal action** in a reasonable manner in order to minimise costs.

**5.6    Territorial limits**

The **insured** agrees to prosecute the **legal action** in the **court** within the **territorial limits** and warrants that the **legal action** will be governed by the laws of the **territorial limits**.

# 6.    Bond

**6.1    Payment under bond forms part of indemnity**

In the event that the **insurer** is obliged to make any payment pursuant to the terms of a **bond** issued in conjunction with this **policy** then such payment shall contribute to and form part of the indemnity provided by this **policy** and shall erode both the **limit of indemnity** stated in the **schedule**.

**6.2    Recovery of sums paid pursuant to bond**

In the event that the **insurer** makes any payment whatsoever pursuant to the terms of a **bond** in circumstances in which the **insurer** would not have been obliged to make such payment pursuant to the terms of this **policy** then the **insured** shall indemnify the **insurer** in respect of such payment and the **insurer** shall be entitled to recover such payment from the **insured**.

# 7.    Duties in the event of a claim or potential claim

The due observance and fulfilment of the provisions of 'Claim notification' and 'Insured's duties and insurer's rights' are condition precedents to the **insurer's** liability for any **claim**

UBSTRO047

under this **policy**. The 'Termination by the insurer' clause sets out the consequences of a failure to comply with conditions precedent or **policy** provisions.

### 7.1 Claim notification

7.1.1 The **insured** shall give the **insurer** written notice as soon as practicable of any **claim** or any circumstance which might reasonably be expected to give rise to a **claim**.

7.1.2 Notice to the **insurer** of a **claim** under this policy must be given to the claims notification address specified in the **schedule**.

### 7.2 Insured's duties and insurer's rights

7.2.1 A **claim** form must be completed with full particulars.

7.2.2 The **insured** shall provide to the **insurer** and the **appointed representative** all **information** and, in addition, shall provide all necessary assistance (notwithstanding the right for the **insurer** to audit pursuant to the 'Audit' clause) to enable the **insurer** or its agents to investigate and/or defend any **claim** under this **policy** and/or to enable the **insurer** to determine its liability under this **policy**.

7.2.3 Neither the **insured** nor its **appointed representative** shall make any admission with respect to liability in relation to the **legal action** or attempt to settle **the legal action** without the **insurer's** prior written consent.

7.2.4 The **insured** will promptly provide the **insurer** with full details of **legal liability** and shall, if requested by the **insurer**, have such **legal liability** assessed by the appropriate body.

7.2.5 The **insurer** will be entitled (but not obliged) to conduct any costs assessment or review and the **insured** will provide (and hereby gives irrevocable instructions to the **appointed representative** to provide) such assistance as the **insurer** requires.

### 7.3 Subrogated claims

In the event of the **insurer** making any payment under this **policy**:

7.3.1 the **insurer** shall be subrogated to all the **insured's** rights or causes of action related to or arising out of the **legal action** against any other party to the extent that these rights or causes of action are pertinent to a loss being suffered by the **insured** and the **insured** undertakes to provide the **insurer** with all assistance which may be required to pursue these rights; and

7.3.2 any entitlement to a recovery from the **opponent** by the exercise of such rights or otherwise will, until received, be set off against any **claim** comprised of **legal liability** and when received be applied, in order of priority, to repay and extinguish any payment made by the **insurer** under this **policy**, any **insurer's** costs, any interest due on such payment and costs and finally any **insured's** losses.

## 8. General terms and conditions

### 8.1 Audit

UBSTRO048

The **insurer** has the right to audit all **information** within the possession or control of the **insured** or the **appointed representative** whether held in physical or electronic format.

### 8.2 Applicable law

This **policy** will be governed by and interpreted in accordance with the laws of the Cayman Islands and subject to the exclusive jurisdiction of the courts in the Cayman Islands.

### 8.3 Assignment

Assignment of interest under this **policy** will not bind the **insurer** unless and until the **insurer's** written consent is endorsed hereon.

### 8.4 Confidentiality

The **insurer** agrees that any **information** given by the **insured** or the **appointed representative** is received in confidence and will not be disclosed to any other party.

### 8.5 The Contracts (Rights of Third Parties) Law, 2014

This insurance does not confer or create any right enforceable under the Contracts (Rights of Third Parties) Law, 2014 of the Cayman Islands or any amending or subsequent legislation by any person who is not named as the **insured** and both the **insurer** and **insured** may amend, cancel or lapse this insurance without giving notice to, or requiring the consent of, any other third party.

### 8.6 Disclosure

8.6.1 The **insurer** will follow appropriate security procedures in the storage and disclosure of data provided by the insured or its appointed representative to prevent unauthorised access or loss of such data. The **insurer** may find it necessary to pass such data to other firms or businesses that supply products and services associated with this **policy**.

The **insurer** collects non-public personal information about the **insured** from the following sources:

a.      information the **insurer** receives from the **insured** on applications or other forms;

b.      information about the **insured's** transactions with the **insurer**, its subsidiary, parent and/or other group companies or others;

c.      information the **insurer** receives from consumer reporting agencies.

8.6.2 The **insurer** does not disclose any non-public personal information relating to the **insured** to anyone except as is necessary in order to provide its products or services to the **insured** or otherwise as it is required or permitted by law (e.g. a subpoena, fraud investigation, regulatory reporting, etc.).

8.6.3 Further, by accessing and updating various databases, the **insurer** may share information with other firms and public bodies, including the police, in order to substantiate information and prevent or detect fraud. If false or inaccurate information is provided and fraud is suspected, this fact will be recorded and the information will be available to other organisations that have access to the databases. Details of databases accessed or contributed to are available on request.

UBSTRO049

### 8.7 Dispute resolution

8.7.1 Any matters in dispute between the **insurer** and the **insured** arising out of or in connection with this insurance will be referred to a mediator to be agreed by the **insurer** and the **insured** within ten (10) working days of a written notice served on one of them by the other of them requesting such an agreement. If a mediator is not agreed then either the **insurer** or the **insured** may apply to the Centre for Effective Dispute Resolution ('CEDR') for the appointment of a mediator. The **insurer** and the **insured** agree to share equally the costs of CEDR and of the mediator and that the reference of the dispute to mediation will be conducted in confidence.

8.7.2 The **insurer** and the **insured** agree to perform their respective continuing obligations under this insurance, if any, while the dispute is resolved unless the nature of the dispute prevents such continued performance of those obligations.

8.7.3 If any such dispute is not resolved by mediation or the **insurer** and the **insured**

8.7.4 cannot agree upon the appointment of a mediator or the form that the mediation will take, the dispute will be referred by either of them to courts, subject to the law and jurisdiction set down in the 'Applicable law' clause above.

### 8.8 Observance

8.8.1 The due observance and fulfilment of the provisions of this **policy** insofar as they may relate to anything to be done or complied with by the **insured**, and are not described in the **policy** as conditions precedent, will be a condition of this **policy**. Any waiver by the **insurer** of any provision will not prevent the **insurer** from relying on such term or condition or condition precedent in the future.

8.8.2 Further, where an indemnity is provided to any other party, the **insured** will arrange for each party to comply with the terms, conditions and conditions precedent of this insurance so far as they can apply provided always that the other party complies with the terms of 'Duties in the event of a claim or potential claim'.

8.8.3 In the event of a breach of any condition in the **policy**, and without prejudice to any of the **insurer's** other rights, the **insurer** may reject or reduce **claims** connected with the breach providing the **insurer** can demonstrate some prejudice.

8.8.4 In the event of a breach of any condition precedent in the **policy** and without prejudice to any of the **insurer's** other rights, the **insurer** may reject or reduce **claims** connected with the breach and continue the **policy** on such terms as the **insurer** may determine and, if any payment on account of any such **claim** has already been made, the **insured** will repay forthwith all payments on account to the **insurer**.

### 8.9 Payment of premium

The **insured** agrees to pay the **premium** stated in the **schedule** on the **due date** as specified in the **schedule**. If the insurer agrees that some or all of the premium may be satisfied otherwise than in cash (e.g. by the transfer by the **insured** to the **insurer** of an investment portfolio), the **insured** shall take all necessary steps to satisfy the **insurer's** due diligence requirements in relation to the assets proposed to be transferred and that

UBSTRO050

their net realisable value is equal to or greater than the **premium** or that part of the **premium** which is to be satisfied otherwise than in cash. If the **insurer** agrees to accept such assets in satisfaction of all or part of the **premium**, the insured shall on the **due date** ensure that the insurer becomes the beneficial owner of such assets, free from any charge, lien or encumbrance.

8.9.1    Taxes, levies and other relevant fiscal charges are payable in addition to the **premium** Where there is more than one **insured**, each **insured** shall be jointly and severally liable for the **premium**.

8.9.2    Should the **premium** (or any part thereof) remain unpaid after seven (7) days after the **due date** then interest shall accrue on the **premium** (or the unpaid part) at a rate of 2% (two percent) above the United States Dollar prime lending rate in the Cayman Islands as calculated at the time of the **due date** until the actual date of payment.

## 8.10    Records

The **insurer** may hold documents relating to this insurance and any **claims** under it in electronic form and may destroy the originals. An electronic copy of any such document will be admissible in evidence to the same extent as, and carry the same weight as, the original.

## 8.11    Rights surviving end of period of insurance

All rights and obligations on the part of the **insured** and the **insurer** pursuant to this **policy** shall continue until such time as the **insured's** and the **insurer's** liabilities under this **policy** have been finally determined.

## 8.12    Termination by the insured

The **insured** may terminate this **policy** at any time whereupon the **premium** (if unpaid) becomes immediately payable and the **insurer** will not be liable for any **claim** under this **policy**. Where the **insured** comprises more than one person, this termination right may only be exercised if each such person consents in writing.

## 8.13    Termination by the insurer

8.13.1    The **insurer** may terminate this **policy** immediately:

a.      if the **insured**, or where the **insured** comprises more than one person, any such person,fails to observe all the terms and conditions of this **policy** including, for the avoidance of doubt, the terms relating to the payment of the **premium**;

b.      if the **insured**, or where the **insured** comprises more than one person, any such person, becomes bankrupt or insolvent during the **period of insurance.** The **insured** or any such person shall be deemed insolvent upon the appointment of a liquidator in circumstances where it is insolvent.

8.13.2    In the event of termination by the **insurer** then the **insurer** will not be liable for any **claim** under this **policy**.

UBSTRO051

## 9. General definitions and interpretation

The following words will have the same meaning attached each time they appear in this **policy** in bold type-face, whether with a capital first letter or not.

Where the context so admits or requires, words importing the singular will include the plural and vice versa and words importing the masculine will import the feminine and the neuter. References to 'person' will be construed so as to include any individual, company, partnership, or any other legal entity. References to a statute will be construed to include all its amendments or replacements. All headings within the **policy** are included for convenience only and will not form part of this **policy**.

### 9.1 Appeal

Appeal means an appeal against the judgment of the **court** to any appellate court.

### 9.2 Appointed representative

Appointed representative means a firm of attorneys which has been accepted by the **insurer** to act for the **insured** in accordance with the terms of this **policy**.

### 9.3 Bond

Bond means any deed of indemnity issued by the **insurer** in respect of the **legal action** for the purpose of providing security for costs in the **legal action** on behalf of the **insured.**

### 9.4 Claim

Claim means a request by the **insured** under the terms of this **policy** for payment in respect of **legal liability**. Any claim or series of claims arising out of the same **legal action** shall be regarded as one claim.

### 9.5 Court

Court means any judge, arbitrator or any other tribunal that hears the **legal action** at first instance within the **territorial limits.**

### 9.6 Deposit premium

Deposit premium means the amount, if any, specified as deposit premium in the **schedule**.

### 9.7 Due date

Due date means the date for payment of the premium as specified in the **schedule**.

### 9.8 Information

Information means any information within the possession control or knowledge of the **insured** or the **appointed representative**, both before and after the inception of this **policy**, that is relevant to or relates to the **legal action**, whether privileged or not (which privilege the **insured** irrevocably waives), and extends to the **appointed representative's** file on the **insured's legal action**.

### 9.9 Insured

UBSTRO052

### 8.14 Sanction limitation and exclusion clause

The **insurer** shall not provide cover nor be liable to pay any **claim** or provide any benefit hereunder to the extent that the provision of such cover, payment of such **claim** or provision of such benefit would expose the **insurer** or any member of the **insurer's** group to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of any jurisdiction.

### 8.15 Joint and several obligations

Where the **insured** comprises two or more persons, all duties and obligations of such persons under this **policy** shall be joint and several.

UBSTRO053

Insured means the person or persons named in the **schedule** as declared to and accepted by the **insurer** and where the **insured** comprises more than one person, the expression **insured** where used in this **policy** shall be construed, unless the context otherwise requires, so as to refer to each person named as the **insured** in the **schedule**.

**9.10      Insured section**

Insured section means all or any individually numbered sections of this **policy** that forms part of the insurance contract but only if stated as 'insured section' in the heading to the section.

**9.11      Insurer**

Insurer means the party specified as insurer in the **schedule** and any other subscribing insurers.

**9.12      Legal action**

Legal action means the action described in the **schedule**.

**9.13      Legal liability**

Legal liability means either:-

9.13.1 the aggregate of (a) the total sum (including any opponent's costs) ordered by the **court** (or any appellate court to which the **court's** judgment in the **legal action** is **appealed**) to be paid by the **insured** to the **opponent** in the **legal action** and (b) **own costs**; or

9.13.2    the aggregate of (a) the total sum (including any opponent's costs) to be paid by the **insured** to the **opponent** pursuant to a settlement of the **legal action** reached between the **insured** and the **opponent** (with the prior written agreement of the **insured**, the **appointed representative** and the **insurer**) and (b) **own costs**.

**9.14      Limit of indemnity**

Limit of indemnity means:

9.14.1    the amount stated in the **schedule** which is the maximum amount of the **insurer's** liability under this **policy** regardless of the number of:

a.    **insureds** or other insured parties;

b.    persons or organisations bringing claims or suits; or

c.    claims against the **insured** or series of claims against the **insured** or claims or series of claims made by the **insured**;

UBSTRO054

9.14.2 where a limit of indemnity is stated in the **schedule** as in the aggregate, that aggregate is the maximum the **insurer** will pay for all insured events during the **period of insurance**;

where indemnity may be provided under two (2) or more **insured sections** of this **policy**, then the combined single limit stated in the **schedule** is the maximum the **insurer** will pay for any insured event to which such **insured sections** apply in combination.

### 9.15 Opponent

Opponent means the party or parties who are named in the **schedule** and with whom the **insured** is in dispute in the **legal action**.

### 9.16 Opponent's costs

Opponent's costs mean all costs and expenses that have been reasonably incurred by the **opponent** in the **legal action**.

### 9.17 Own costs

Own costs means all costs and expenses of the Representative and other service providers in the normal course, including related tax, which are incurred during the conduct of the legal action on behalf of the insured.

### 9.18 Period of insurance

Period of insurance means the period which commences from the date shown on the **schedule** and ceases upon the occurrence of any of the following events:

9.18.1 the **legal action** is concluded by a final judgment or order of the **court** (or any appellate court to which the **court's** judgment in the **legal action** is **appealed**) which also deals finally with the amount of any costs payable by the parties to the **legal action**;

9.18.2 the **legal action** is settled on terms which also deals with the amount of any costs payable by the parties to the **legal action**;

9.18.3 the **legal action** is transferred outside of the **territorial limits**;

9.18.4 the retainer between the **insured** and the **appointed representative** ceases; or

9.18.5 this **policy** is terminated or cancelled in accordance with the terms and conditions of the **policy**.

### 9.19 Policy

Policy means this document, the **schedule** (including any **schedules** issued in substitution) and any endorsements attaching to this document or the **schedule** that will be considered part of the legal contract and any word or expression in bold type face on any of these documents will bear the specific meaning stated in these definitions.

### 9.20 Premium

Premium means the amount specified as premium in the **schedule**.

UBSTRO055

### 9.21    Recovery

Recovery means any sum (inclusive of costs) ordered by the **court** or any appellate court to be paid by the **opponent** to the **insured** in the **legal action** or any amount (inclusive of costs) agreed to be paid by the **opponent** to the **insured** in settlement of the **legal action** (irrespective of whether or not payment is actually made).

### 9.22    Schedule

Schedule means the document titled schedule that includes the name and address of the **insured**, the premium and other variables to this **policy** (including endorsement clauses) and is incorporated in this **policy** and accepted by the **insured**. Schedules may be re-issued from time to time where each successor overrides the earlier document.

### 9.23    Territorial limits

Territorial limits means the territory or territories specified in the **schedule**.

UBSTRO056

INSURER:

Sentinel Reinsurance, Ltd.

By: _____
Name:
Title:      Andrew Dean
            Director

INSUREDS:

**Highland CDO Opportunity Master Fund, L.P.**
By:   Highland CDO Opportunity Fund GP, L.P., its general partner
By:   Highland CDO Opportunity GP, LLC, its general partner
By:   Highland Capital Management, L.P., its sole member
By:   Strand Advisors, Inc., its general partner

By:
Name:   James Dondero
Title:   President

**Highland CDO Holding Company**

By:
Name:   James Dondero
Title:   Director

**Highland Special Opportunities Holdings Company**

By:
Name:   James Dondero
Title:   Director

UBSTRO057

**SCHEDULE**

| | |
|---|---|
| **Insurer:** | Sentinel Reinsurance, Ltd. |
| **Insured:** | - Highland CDO Opportunity Master Fund, LP<br>- Highland CDO Holding Company; and<br>- Highland Special Opportunities Holding Company |
| **Appointed Representative:** | Paul Lackey<br>Lackey Hershman, LLP<br>3102 Oak Lawn Avenue<br>Suite 777<br>Dallas, Texas 75219 |
| **Date of commencement of Period of Insurance:** | August 1, 2017 |
| **Legal Action:** | UBS Securities LLC and UBS AG, London Branch, v. Highland Capital Management, L.P., Highland Special Opportunities Holding Company, Highland Financial Partners, L.P., Highland CDO Opportunity Master Fund, L.P., Highland Credit Opportunities CDO, L.P., and Strand Advisors, Inc., Cause No. 650097/2009 |
| **Court:** | Supreme Court of the State of New York, County of New York |
| **Opponent:** | UBS Securities LLC and UBS AG, London Branch |
| **Territorial Limits:** | State of New York |
| **Limit of Indemnity:** | US$100,000,000 (One Hundred Million United States Dollars) in aggregate |
| **Payment Date for Premium:** | August 31, 2017 |
| **Premium:** | US$25,000,000 (Twenty Five Million United States Dollars) |

UBSTRO058

<u>SCHEDULE A</u>

**HIGHLAND CDO OPPORTUTNITY MASTER FUND, L.P.**

| ISIN | Description | Traded Shares/Par |
|---|---|---|
| KY009A1KXYH6 | ABERDEEN LN FDG LTD PFD | 12,000,000.00 |
| KY84427P2029 | SOUTHFORK CLO LTD CUM PFD 144A | 10,000.00 |
| KYG829101032 | SOUTHFORK CLO LTD PFD | 9,000.00 |
| US00306M3007 | ABERDEEN LN FDG LTD PFD | 5,000.00 |
| US3624682098 | GSC ABS CDO 2006-4U LT CUM PFD 144A | 16,000.00 |
| US39364P2011 | GREENBRIAR CLO LTD PFD 144A | 16,250.00 |
| US43009L2034 | HIGHLAND FINL PARTNERS LP | 615,733.00 |
| US43009L9898 | HIGHLAND FINL PARTNERS LP NPV | 3,000,000.00 |
| US5431742056 | LONGSTREET CDO I LTD PFD 144A | 3,000.00 |
| US65340G2057 | NEXPOINT C COM USD0.001 (POST REV S) | 100.00 |
| US69763NAD30 | PAM CAP FDG LP 0.0 01MAY13 144A | 48,500,000.00 |
|  | FRN | 42,868,390.80 |
| US8729623038 | TOUSA INC 8.0 PFD 144A | 1,337.00 |
| US91914QAA40 | VALHALLA CLO LTD 0.0 01AUG23 | 6,000,000.00 |
|  | 144A | 6,000,000.00 |
| US925331AA89 | VERTICAL ABS CDO 2 0.0 09MAY46 | 6,000,000.00 |
|  | 144A | 6,000,000.00 |
| N/A | HIGHLAND CREDIT OPPORTUNITIES CDO LTD. PARTNERSHIP INTEREST | 24,313.00 |
|  | $2,157,088 PROMISSORY NOTE (GOVERNANCE RE, LTD. AS MAKER) AND CASH OF $539,272 – RE: NEXPOINT MULTIFAMILY CAPITAL TRUST INTEREST | 269,636.00 |
| N/A | NEXPOINT REAL ESTATE STRAT – Z | 97,257.00 |
| N/A | HIGHLAND GEMINI PROGRAM (POLLUX) | 65,314.00 |
|  | $2,399,996 PROMISSORY NOTE (THE DUGABOY INVESTMENT TRUST AS MAKER) AND CASH | |
| N/A | OF $599,999 – RE: SURVIOS INTEREST | 2,999,995.00 |
| BCC0MVTX4 | CAMBR 5X FLOATING – 12/2045 | 19,350,000.00 |
| N/A | CASH | $7,779,722.00 |

**HIGHLAND CDO OPPORTUTNITY FUND, LTD.**

| ISIN | Description | Traded Shares/Par |
|---|---|---|
| N/A | CASH | $2,349,436.00 |

UBSTRO059

## HIGHLAND CDO HOLDINGS COMPANY

| ISIN | Description | Traded Shares/Par |
|------|-------------|-------------------|
| US404185AD22 | HFT REAL EST 3.33867 25NOV51 | 750,000.00 |
| | 144A F | 750,000.00 |
| US65340G2057 | NEXPOINT C COM USD0.001 (POST REV S) | 165,395.00 |
| US65341D1028 | NEXPOINT R COM USD0.001 'WI' | 220,527.00 |
| US86280AAE73 | STRATFORD CL 3.16956 01NOV21 | 300,000.00 |
| | 144A F | 300,000.00 |
| USG44392AF82 | HIGHLAND PARK C 4.93867 | 17,000,000.00 |
| | 25NOV51 FRN | 24,076,296.18 |
| N/A | PROMISSORY NOTE – CLO HOLDCO, LTD. AS MAKER – 12/23/2025 | $32,801,593.00 |
| N/A | CASH | $539,641.00 |
| N/A | DIVIDENDS RECEIVABLE – HIGHLAND CAPITAL MANAGEMENT, LP | $136,598.00 |

## HIGHLAND SPECIAL OPPORTUNITIES HOLDINGS COMPANY

| ISIN | Description | Traded Shares/Par |
|------|-------------|-------------------|
| US247126AC93 | DELPHI CORP DEL 7.125 01MAY29 | 1,500,000.00 |
| US247126AD76 | DELPHI CORP DEL 6.55 15JUN06 USD | 3,000,000.00 |
| US5431742056 | LONGSTREET CDO I LTD PFD 144A | 1,570.00 |
| US8729623038 | TOUSA INC 8.0 PFD 144A | 5,349.00 |
| US925331AA89 | VERTICAL ABS CDO 2 0.0 09MAY46 | 5,000,000.00 |
| | 144A | 5,000,000.00 |
| N/A | CASH | $295,136.00 |

## HIGHLAND FINANCIAL CORP.

| ISIN | Description | Traded Shares/Par |
|------|-------------|-------------------|
| N/A | CASH | $80,144.00 |
| N/A | TAX REFUND RECEIVABLE – HIGHLAND CAPITAL MANAGEMENT, LP | $477,637.00 |

## HIGHLAND FINANCIAL PARTNERS, L.P.

| ISIN | Description | Traded Shares/Par |
|------|-------------|-------------------|
| N/A | CASH | $29,252.00 |

UBSTRO060

# EXHIBIT 5

UBSTRO061

**From:** Shawn Raver <SRaver@HighlandCapital.com>
**To:** Rick Swadley <RSwadley@HighlandCapital.com>
**Subject:** RE: policy
**Date:** Wed, 12 Sep 2018 16:13:36 -0500
**Importance:** Normal
**Attachments:** Tax_Compliance_Memo_(2017)_-_Sale_of_Assets_to_Sentinel.docx

---

Mark pointed out a couple of minor drafting errors in the memo that I fixed.

---

**From:** Shawn Raver
**Sent:** Wednesday, September 12, 2018 3:28 PM
**To:** Rick Swadley
**Subject:** policy

Shawn E. Raver

Attorney

Highland Capital Management, L.P.

300 Crescent Court, Suite 700

Dallas, TX 75201

sraver@highlandcapital.com

(972) 419-4479

UBSTRO062



## MEMORANDUM

| | |
|---|---|
| FROM: | Shawn Raver |
| TO: | Tax Files |
| DATE: | June 30, 2018 |
| RE: | Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets |

### Facts

On March 14, 2008, UBS Securities, LLC and certain affiliates ("UBS"), Highland Capital Management, L.P. ("HCM"), Highland CDO Opportunity Master Fund, L.P. ("CDO"), and Highland Special Opportunities Holding Corporation ("SOHC") entered into a series of agreements as part of a collateralized debt obligation transaction (the "Transaction").[1] One such agreement included a Cash Warehouse Agreement.[2] The Cash Warehouse Agreement governed the parties' rights and obligations concerning the accumulation, warehousing, sale and/or liquidation of certain collateral obligations ("Collateral Obligations") in connection with the Transaction. It was UBS's obligation to accumulate and warehouse certain Collateral Obligations pursuant to the Cash Warehouse Agreement.[3]

The Engagement Letter required CDO Fund and SOHC to bear 100% of the losses experienced by the CDO Securities (51% borne by CDO Fund and 49% by SOHC).[4] In order to secure the obligations of CDO Fund and SOHC, each was required to transfer cash or certain securities as collateral.[5] In addition, upon each $100 million increment of mark to market losses on the CDO Securities, UBS could make margin calls on CDO Fund and SOHC requesting additional collateral.[6]

As the value of the warehoused assets declined, UBS began to make margin calls upon HCM, CDO Fund and SOHC.[7] The first margin call was issued on September 17, 2008 and requested $10 million from each of CDO Fund and SOHC.[8] On or about October 21, 2008, UBS issued a second margin call, again requesting $10 million from each of CDO Fund and SOHC.[9] The second margin call was satisfied by CDO Fund and SOHC posting assets with a fair market value of approximately $20 million (the assets had an aggregate notional value of $49.97

---

[1] See Exhibit 1 (structure chart of Highland CDO Opportunity Master Fund, L.P. and Highland Special Opportunities Holding Company).
[2] See Exhibit 2 (Cash Warehouse Agreement)
[3] See Exhibit 2, section 2(A); Exhibit 3 (Amended Answer and Counterclaims of Highland Capital Management, L.P.), paragraph 65.
[4] Id. at paragraph 19.
[5] Id. at paragraph 24.
[6] See Exhibit 2, section 12(C).
[7] Id. at paragraph 25.
[8] See Exhibit 5 (Letter from UBS).
[9] See Exhibit 6 (Letter from UBS).

1

UBSTRO063



million).[10] On or about November 7, 2008, UBS issued a third margin call requesting another $10 million.[11] The Defendants offered to post certain securities with a fair market value of approximately $10 million, all of which were rejected by UBS.[12]

Thereafter, UBS sued CDO and SOHC. The allegation against CDO Fund and SOHC is that each breached the Cash Warehouse Agreement and the Synthetic Warehouse Agreement. Specifically, by not bearing 100% of UBS's risk of loss under both Agreements ($157,949,885.47 of alleged losses with respect to the Cash Warehouse Agreement and $587,357,060.59 of alleged losses with respect to the Synthetic Warehouse Agreement).[13] After some initial discovery, UBS amended its complaint to add Highland Financial Partners, L.P. ("HFP") as a defendant. SOHC is a wholly-owned subsidiary of HFP. The allegation against HFP was that it was the alter ego of SOHC and therefore should be held responsible and liable for SOHC's breach of the Synthetic Warehouse Agreement and Cash Warehouse Agreement.[14]

To reduce risk surrounding the UBS litigation, CDO and SOHC acquired a Legal Liability Insurance Policy (the "Policy") from Sentinel Reinsurance, Ltd. ("Insurer"). In consideration for a premium payment of $25,000,000, the Insurer agreed to indemnify the Insured (defined below) in respect of any legal liability up to a $100,000,000 limit if either: (a) a court in the UBS litigation makes an order of liability regarding the UBS litigation against the Insured, or (b) the UBS litigation is settled on terms that provide for a payment by the Insured to UBS. The collective "Insured" under the Policy consists of CDO, SOHC and Highland CDO Holding Company,

On _____, 2017, [Sentinel Holdings Ltd. ("Sentinel")] paid $25,000,000 to acquire certain assets (the "Assets") of the following entities: (a) CDO, (b) Highland CDO Opportunity Fund, Ltd. ("CDO Offshore"), (c) Highland CDO Holding Company ("CDO Holdco"), (d) SOHC, (e) Highland Financial Corporation ("HFC"), and (f) Highland Financial Partners, L.P. ("HFP") (the "Transaction"). CDO, CDO Offshore, CDO Holdco, SOHC, HFC and HFP are individually referred to herein as a "Seller Entity" and collectively referred to herein as the "Seller Entities." A full listing of the Assets by each Seller Entity, plus the fair market value of each Asset on the date of Transaction, is set forth on Schedule A.

The aggregate purchase price paid by Sentinel for the Assets was $25,000,000. The aggregate fair market value of the assets on the date of the Transaction was $105,647,679. The document effectuating the Transaction did not allocate the purchase price among the Assets acquired by Sentinel. The Seller Entities intend to allocate the purchase price among the Assets sold as follows:

A) First, to the full balance of all cash acquired;[15] and

---

[10] See Exhibit 7 (Second Amended Complaint), paragraph 92.
[11] See Exhibit 8 (Letter from UBS); Exhibit 4, paragraph 27.
[12] See Exhibit 4, paragraph 27.
[13] Id at paragraphs 32, 35.
[14] See Exhibit 7, paragraph 194.
[15] The total cash held by the Seller Entities was $11,073,331 as of the Transaction date.

2

UBSTRO064



B) Then, pro rata among the remaining Assets based on their respective fair market value.

## Questions Presented

Will the form of the Transactions between Sentinel (and affiliates) and the Seller Entities, including the allocation of the gross proceeds and the Policy, be respected for federal income tax purposes?

## Short Answer

The Transaction should be respected for federal income tax purposes. That is, the form of the Transaction and the allocation of the gross proceeds among the Assets should be respected. Further, the Policy should be respected as a legitimate legal liability insurance policy and the Seller Entities who pay the premium for such Policy should receive a deduction.

## Legal Discussion

*Tax Consequences of Transaction.*

A transaction which is entered solely for the purpose of obtaining tax benefits and which are without economic substance are considered shams for federal income tax purposes and will not be given effect.[16] The economic substance of a transaction, not its form, is controlling.[17] A transaction is a "sham in substance" if "the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits."[18] For example, the Tax Court found a purported purchase of real property a sham, after taking into consideration the absence of indicia of arm's-length dealing, drastically inflated sales prices, and a complete disregard of contractual terms.[19] "[W]here … there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax independent considerations, and is not shaped by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation."[20]

The IRS may attempt to characterize the Transaction as a "sham." The focus of this argument would be on the fact the Seller Entities sold assets with a fair market value of $105,647,679 for a purchase price of $25,000,000. And this was done solely to fund the $25,000,000 premium required by the Policy. The obvious question would be why sell all the Assets if all was required was $25,000,000. For example, the Seller Entities held over $11 million

---

[16] *Knetsch v. United States*, 364 U.S. 361 (1960); *Falsetti v. Commissioner*, 85 T.C. 332 (1985).

[17] *Gregory v. Helvering*, 293 U.S. 465 (1935).

[18] *Falsetti*, 85 T.C. at 347.

[19] *Id.*

[20] *Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84 (1978); *see also Holladay v. Commissioner*, 649 F.2d 1176, 1179 (5th Cir. 1981) (existence of a tax benefit from a transaction does not automatically mean it is a sham so long as it is imbued with tax-independent considerations).

3

UBSTRO065

# HIGHLAND H CAPITAL
Management, L.P.

in cash, marketable securities with a value of approximately $9 million, and a $32 million note that is secured by over $200 million in assets held by the debtor.

However, the Transaction is imbued with business purposes. The Policy provides the Insureds with indemnification for the first $100,000,000 of any judgment or settlement with respect to the UBS litigation. While the sales price for the Assets was substantially below their aggregate fair market value, there may not have been a market for the sale of only a portion of the Assets. Further, finding a buyer for all their Assets will allow the Seller Entities to wind down much quicker once the UBS litigation is concluded. Finally, there is no tax rule that would re-characterize a transaction that may amount to a bad business decision by one party in a transaction amongst unrelated parties.

Another potential theory the IRS could invoke to re-characterize the Transaction is a substance over form argument. In this argument, the IRS would likely argue that in substance the transaction was not a sale of assets followed by the purchase of the Policy. Rather, the Seller Entities sold the Assets in exchange for the $100,000,000 indemnification from Insurer with respect to the UBS litigation. That is, the gross proceeds for the Assets is $100,000,000 and there is no premium payment.

While courts exult substance over form, the form of a transaction is not ignored and courts review several factors to determine if the form of a transaction should govern.[21] Agreements that are intended to have economic substance, as opposed to mere tax avoidance, should be given effect for tax purposes.[22] The first factor investigates whether there is a legitimate non-tax business reason for the form of the transaction (*i.e.*, were the parties motivated at least in part by reasons other than taxes). Second, courts look to whether the agreements at issue have non-tax economic substance.[23] This has been construed to determine whether there was a change in the economic interests of the relevant parties.[24] A third factor is the relationship of the parties to the agreement. Are they independent of each and did they deal at arm's length?[25] Finally, courts assess whether or not the parties disregarded the form of the agreement.[26]

It is clear the Transaction had economic substance as it allowed CDO and SOHC to obtain legal liability insurance with respect to the UBS litigation. CDO and SOHC are at significant risk of being held liable to UBS. Furthermore, the transaction no doubt changes the economic interests of the parties involved. There is a transfer of assets and acquisition of an insurance policy that provides $100,000,000 of liability protection. In addition, Sentinel is not related to the Seller Entities and each side to the Transaction was independent of the other. There are no facts to indicate the Transaction was not the result of arm's length negotiations. Finally, the parties to the Transaction have not in any way disregarded the form of the Transaction. Based on the foregoing,

---

[21] *Newman v. Commissioner*, 902 F.2d 159 (2nd Cir. 1990).
[22] *Frank Lyon Co. v. U.S.*, at 583-84.
[23] *Id.* at 583.
[24] *Rosenfeld v. Commissioner*, 706 F.2d 1277, 1282 (2nd Cir. 1983).
[25] *Frank Lyon Co. v. U.S.*, at 580.
[26] *Id.* at 582-83.

4

UBSTRO066

HIGHLAND **H** CAPITAL
Management, L.P.

the form of the Transaction should be respected for federal income tax purposes and not re-characterized in any manner.

***Will the Allocation by the Seller Entities be Respected?***

Code section 1060 should not apply to the allocation of the $25,000,000 among the Assets. Code section 1060 sets forth specific rules for allocating the purchase price to an "applicable asset acquisition." An "applicable asset acquisition" is an active trade or business that includes active and substantial management and operational functions that the taxpayer performs itself, not through independent contractors.[27] Alternatively, even if the "active trade or business" requirement is not met, a group of assets is a trade or business if its "character is such that goodwill or going concern value could under any circumstances attach to such group."[28] Under either test, the Assets sold by the Seller Entities should not constitute an "applicable asset acquisition." Further, the holding of land, stock, securities, or other properties for investment does not constitute an active conduct of a trade or business.[29] Accordingly, Sentinel and the Seller Entities will not be required to use the residual method to allocate the purchase price pursuant to Code section 1060.

Free from the specific requirements of Code section 1060, the purchase price allocation used by the Seller Entities (as described above) should be respected for federal income tax purposes.

---

[27] Treas. Reg. § 1.355-3(b)(2)(iii).
[28] Treas. Reg. § 1.1060-1(b)(2)(i).
[29] Treas. Reg. § 1.335-3(b)(2)(iv).

5

UBSTRO067

# EXHIBIT 6

**UBSTRO068**

## ASSIGNMENT AGREEMENT

THIS ASSIGNMENT AGREEMENT (this "*Assignment*") is entered into to be effective as of August 7, 2017 (the "*Effective Date*") by and between Highland CDO Opportunity Master Fund, L.P. (the "*Assignor*"), and Sentinel Reinsurance Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "*Assignee*" and together with Assignor, the "*Parties*").

WHEREAS, the Parties are party to the Asset Purchase Agreement dated as of the Effective Date ("*Asset Purchase Agreement*");

WHEREAS, in connection with the Asset Purchase Agreement, Assignor has agreed to convey to Assignee the promissory notes attached hereto as Exhibits A & B, including the cash component of the Purchase Price set forth in the related asset purchase agreement underlying such promissory notes (the "*Transferred Assets*"); and

WHEREAS, the Assignor now desires to transfer the Transferred Assets to the Assignee, and Assignee has agreed to accept such Tranferred Assets;

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the applicable conditions set forth herein, the parties hereto each agrees as follows:

Section 1.    Assignment.    Effective as of the Effective Date, the Assignor hereby transfers, conveys and assigns all right, title and interest in the Transferred Assets to the Assignee, and the Assignee hereby accepts and assumes the Transferred Assets.

Section 2.    Successors and Assigns.    This Assignment shall be binding upon, and shall inure to the benefit of and be enforceable by, the parties named herein and their respective members, shareholders, directors, officers, employees, agents, representatives, advisors, successors, predecessors and assigns, and all other persons or entities claiming by, through or under any of them. No party may assign either this Assignment or any of its rights or interests hereunder, nor delegate any of its obligations hereunder, without the prior written consent of the other party (which consent shall not be unreasonably withheld, conditioned or delayed), and any attempt to make any such transfer, assignment or delegation without such consent shall be null and void.

Section 3.    Governing Law.    This Agreement shall be governed by, and construed and interpreted in accordance with the substantive laws of the Cayman Islands without giving effect to any conflict of laws rule or principle thereof that might result in the application of the laws of another jurisdiction, and the courts of the Cayman Islands shall have exclusive jurisdiction to determine any dispute.

Section 4.    Severability.    Any term or provision of this Assignment which is invalid or unenforceable shall be ineffective only to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining terms and provisions

HCMUBS000866

UBSTRO069

of this Assignment or affecting the validity or enforceability of any of the terms or provisions of this Assignment in any other jurisdiction.

Section 5.    Headings.    The article and section headings contained in this Assignment are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Assignment.

Section 6.    Counterparts.    This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

Section 7.    Further Assurances.    Each of the Assignor and the Assignee shall, at all times, and from time to time, upon the request of the other party, do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, all such further acts and documents as may be required to consummate the transactions and transfers contemplated in this Assignment as they are herein contemplated.    Each party herein shall, and shall use its commercially reasonable efforts to assure that any necessary third party shall, execute and deliver such documents and do such other acts and things as the other party may reasonably require for the purpose of giving to that other party the full benefit of all the provisions of this Assignment, and as may be reasonably required to complete the transfers and transactions contemplated in this Assignment.

*[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]*

2

HCMUBS000867

**UBSTRO070**

IN WITNESS WHEREOF, the parties herein have caused this Assignment to be duly executed by their respective authorized officers as of the Effective Date.

**ASSIGNOR:**

**Highland CDO Opportunity Master Fund, L.P.**
By: Highland CDO Opportunity Fund GP, L.P., its general partner
By: Highland CDO Opportunity GP, LLC, its general partner
By: Highland Capital Management, L.P., its sole member
By: Strand Advisors, Inc., its general partner

By:_____
Name:_____
Title:_____

**ASSIGNEE:**

**SENTINEL REINSURANCE, LTD.**

By:_____
Name:_____
Title: Director

HCMUBS000869

**UBSTRO072**

# EXHIBIT 7

UBSTRO073

**From:** Matt DiOrio <MDiOrio@HighlandCapital.com>
**To:** Sean Fox <SFox@HighlandCapital.com>
**Subject:** RE: Sentinel
**Date:** Tue, 26 Sep 2017 09:04:03 -0500
**Importance:** Normal

---

I think he just wants to gain a better understanding of how the CLO's that were moved to Sentinel are marked. If you are cool with it, I'll send him your contact info and let him reach out to schedule. I just did not want to blindside you.

---

**From:** Sean Fox
**Sent:** Tuesday, September 26, 2017 9:01 AM
**To:** Matt DiOrio
**Subject:** RE: Sentinel

Sure, I have time. Do you have any color on the nature of questions?

---

**From:** Matt DiOrio
**Sent:** Tuesday, September 26, 2017 8:57 AM
**To:** Sean Fox <SFox@HighlandCapital.com>
**Subject:** Sentinel

Hi Sean,

Would you have time to hop on a call either today or tomorrow with Tom Adamczak at Beecher Carlson? I don't think it will take very long they just have a few quick questions for you.

Thanks

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

# EXHIBIT 8

**UBSTRO075**

**From:** "Bowen, Daniel" <dbowen@seic.com>
**To:** "JSevilla@HighlandCapital.com" <JSevilla@HighlandCapital.com>
**Cc:** SEI-IS-Highland <SEI-IS-Highland@seic.com>
**Subject:** RE: Highland Multi Strat - Transfer
**Date:** Tue, 29 Aug 2017 21:18:25 +0000
**Attachments:** BO_Info_-_Sentinel_Re_Holdings_Ltd.zip
**Inline-Images:** image001.jpg

---

Hi JP,

Please see the attached Beneficial Ownership information for Sentinel Re Holdings Ltd.

Thank you,

**Dan Bowen**

Investor Services

**SEI** New ways. New answers.
1 Freedom Valley Drive, Oaks, PA 19456 **T** 610-676-3888 **F** 484-676-3888 www.seic.com

Disclaimer:

This e-mail and any files transmitted with it are confidential and intended solely for the use of the recipient(s) to whom they are addressed, even if addressed incorrectly. If you are not the intended recipient you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this by mistake and delete this e-mail from your system. SEI may archive and review outgoing and incoming email and may produce any email at the request of regulators.

**From:** JSevilla@HighlandCapital.com [mailto:JSevilla@HighlandCapital.com]
**Sent:** Tuesday, August 29, 2017 5:05 PM
**To:** Bowen, Daniel; SEI-IS-Highland
**Subject:** RE: Highland Multi Strat - Transfer

Just beneficial owner please. Thanks.

---

**From:** Bowen, Daniel [mailto:dbowen@seic.com]
**Sent:** Tuesday, August 29, 2017 4:04 PM
**To:** JP Sevilla <JSevilla@HighlandCapital.com>; SEI-IS-Highland <SEI-IS-Highland@seic.com>
**Subject:** RE: Highland Multi Strat - Transfer

Hi JP,

Can you please confirm if you would like us to pass along the Beneficial Owner information we have on file for Sentinel Re Holdings Ltd, or all AML we have on file for that investor?

Thank you,

**Dan Bowen**

Investor Services

UBSTRO076

**SEI** New ways. New answers.
1 Freedom Valley Drive, Oaks, PA 19456 **T** 610-676-3888 **F** 484-676-3888 www.seic.com

Disclaimer:

This e-mail and any files transmitted with it are confidential and intended solely for the use of the recipient(s) to whom they are addressed, even if addressed incorrectly. If you are not the intended recipient you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this by mistake and delete this e-mail from your system. SEI may archive and review outgoing and incoming email and may produce any email at the request of regulators.

---

**From:** JSevilla@HighlandCapital.com [mailto:JSevilla@HighlandCapital.com]
**Sent:** Tuesday, August 29, 2017 4:55 PM
**To:** Bowen, Daniel; SEI-IS-Highland
**Subject:** RE: Highland Multi Strat - Transfer

Please note that you already have the items I've highlighted in yellow – Sentinel Re Holdings is a limited partner in the fund already, and Sentinel Reinsurance, Ltd. is 100% owned by Sentinel Re Holdings. On that note – can you please provide me with the KYC for Sentinel Re Holdings that was provided in such respect?

Please book the transfer Aug 11.

---

**From:** Bowen, Daniel [mailto:dbowen@seic.com]
**Sent:** Tuesday, August 29, 2017 3:52 PM
**To:** JP Sevilla <JSevilla@HighlandCapital.com>; SEI-IS-Highland <SEI-IS-Highland@seic.com>
**Subject:** RE: Highland Multi Strat - Transfer

Hi JP,

We are in the process of reviewing the attached and still require additional documentation. Can you please provide:

- TIN/EIN
- Physical & mailing address
- List of Beneficial Owners with 25% or more interest (additional AML required)
- Authorized Signers list
- Applicable tax form (W8/W9)
- Copy of Articles of Incorporation OR Three years of financial statements OR Certificate of Good Standing OR Banking Reference

For up to 3 authorized signers:
- Name
- Physical & Mailing address (if different)
- Date of Birth
- TIN or other Govt ID number
- Passport OR Drivers License OR Other government issued photo ID OR Birth Certificate

Additionally, it appears the trade date listed on the transfer doc is August 11. Generally transfers are booked as of the first of the month. Can you confirm if we should note August 11?

Thank you,

**Dan Bowen**

Investor Services

**SEI** New ways. New answers.

1 Freedom Valley Drive, Oaks, PA 19456 **T** 610-676-3888 **F** 484-676-3888 www.seic.com

Disclaimer:

This e-mail and any files transmitted with it are confidential and intended solely for the use of the recipient(s) to whom they are addressed, even if addressed incorrectly. If you are not the intended recipient you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this by mistake and delete this e-mail from your system. SEI may archive and review outgoing and incoming email and may produce any email at the request of regulators.

**From:** JSevilla@HighlandCapital.com [mailto:JSevilla@HighlandCapital.com]
**Sent:** Monday, August 28, 2017 10:01 AM
**To:** SEI-IS-Highland
**Subject:** Highland Multi Strat - Transfer

SEI – please see transfer documents attached for multi strat fund. Please let me know if you have any questions. Thank you.

**J.P. SEVILLA** | ASSISTANT GENERAL COUNSEL



300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.628.4169 | C: 917.434.0323 | F: 972.628.4147

JSevilla@hcmlp.com | www.hcmlp.com

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

**UBSTRO078**

| Fund | Investor | Entity Type | | AS |
|---|---|---|---|---|
| Multi Strat Cred Fund LP | Sentinel Reinsurance, Ltd | Corporation | ROC #273767 | |

| % | Beneficial Owner | Entity Type | TIN | Address |
|---|---|---|---|---|
| 70% | Patton, Ltd. | Partnership | MC-273686 | PO Box 309 Ugland House, George Town Grand Cayman, Cayman Islands KY1-1104 |
| 30% | Nimitz, Ltd. | Partnership | MC-273656 | PO Box 309 Ugland House, George Town Grand Cayman, Cayman Islands KY1-1104 |

| Patton, Ltd | 84.11% BO | | | |
|---|---|---|---|---|
| | Mainspring Ltd | Corporation | | PO Box 309 Ugland House, George Town Grand Cayman, Cayman Islands KY1-1104 |
| | 99% BO | | | |
| | Loyal Holdings LP | Partnership | | PO Box 309 Ugland House, George Town Grand Cayman, Cayman Islands KY1-1104 |
| | 100% BO | | | |
| | James Dondero | Individual | 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 | 3807 Miramar Dallas, TX 75205 |

UBSTRO079

| Nimitz, Ltd | 100% BO | | | | |
|---|---|---|---|---|---|
| | Montage Holdings, Ltd | Corporation | | PO Box 309 Ugland House, George Town Grand Cayman, Cayman Islands KY1-1104 | |
| | 100% BO | | | | |
| | HAL Holdings LP | Partnership | | PO Box 309 Ugland House, George Town Grand Cayman, Cayman Islands KY1-1104 | Nathan Smith |
| | 99% BO | | | | |
| | Elderflower Ltd | Corporation | 98-1201041 | PO Box 309 Ugland House, George Town Grand Cayman, Cayman Islands KY1-1104 | Scott Ellington |
| | 100% BO | | | | |
| | Scott Ellington | Individual | 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 | 2525 N. Pearl St #1202 Dallas, TX 75201 | |

# EXHIBIT 9

UBSTRO081

**From:** Vishal Patel <VPatel@HighlandCapital.com>
**To:** 'Matt DiOrio' <mdiorio@sasmgt.com>
**Subject:** RE: Confirmations
**Date:** Mon, 11 May 2020 15:18:16 -0500
**Importance:** Normal
**Embedded:** RE:_Sentinel_Re_-_Confirmation
**Inline-Images:** image001.jpg

---

Attached is what I sent.

**VISHAL PATEL | DIRECTOR OF OPERATIONS**



300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.419.6292 | F: 972.628.4147

VPATEL@hcmlp.com | www.hcmlp.com

---

**From:** Matt DiOrio
**Sent:** Monday, May 11, 2020 3:03 PM
**To:** Vishal Patel
**Subject:** Confirmations

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

**UBSTRO082**

**From:** "Vishal Patel" <VPatel@HighlandCapital.com>
**To:** "'Kemp, Lawrence'" <Lawrence.Kemp@crowe.com>
**Cc:** "'Alli Devins'" <ADevins@beechercarlson.com>, "'Tom Adamczak'" <tadamczak@beechercarlson.com>
**Subject:** RE: Sentinel Re - Confirmation
**Date:** Mon, 11 May 2020 20:16:37 -0000
**Importance:** Normal
**Attachments:** SEN_2019_Alternative_Investment_Confirmatino_-_Highland.pdf
**Inline-Images:** image001.jpg

Hi Lawrence,

Please see attached position confirmations.

Thank you,

**VISHAL PATEL | DIRECTOR OF OPERATIONS**



300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.419.6292 | F: 972.628.4147

VPATEL@hcmlp.com | www.hcmlp.com

---

**From:** Kemp, Lawrence
**Sent:** Friday, May 8, 2020 10:12 AM
**To:** Vishal Patel
**Cc:** Alli Devins ; Tom Adamczak
**Subject:** Sentinel Re - Confirmation

Hi Vishal

Hope all is well and you're keeping safe.

I'm the manager working on the audit engagement of Sentinel Re this year.

As part of our audit, we ask various counter-parties to confirm a number of balances in the financial statements.

With this in mind, please find attached above our audit confirmation request for the year ended December 31, 2019.

If you could respond directly to myself, that would be very much appreciated.

Thanks a lot for your help with the above

Lawrence

Lawrence Kemp, ACA

Crowe Cayman Ltd.

**UBSTRO083**

Office: 1-345-814-2420 | Cell: 1-345-922-8337

lawrence.kemp@crowe.com

www.crowe.com/ky

This email message is from Crowe LLP or one of its subsidiaries and may contain privileged or confidential information or other information exempt from disclosure under applicable law. If you are not the intended recipient, please notify the sender by reply email immediately and delete this message without reading further or forwarding to others. This email is not intended to be a contract or other legally binding obligation, and any tax advice expressed in this email should not be construed as a formal tax opinion unless expressly stated. Visit www.crowe.com/disclosure for more information about Crowe LLP and its subsidiaries.

**UBSTRO084**



Highland Capital Management
200 Crescent Ct, Suite 700
Dallas, TX 75201
972-628-4100

Friday, May 8, 2020

Crowe Cayman Ltd.
Centralized Audit Services Team
Attn: Lawrence Kemp

Dear Mr. Kemp,

In my capacity as Director Of Operations at Highland Capital Management, I can confirm management's assertions of existence and ownership of the following securities by Sentinel Reinsurance:

| Security | Shares/Face Value |
|---|---|
| Aberdeen Loan Funding Ltd | 5,000 |
| Eastland CLO Ltd. | 4,000 |
| Grayson CLO Ltd. | 5,000 |
| Greenbriar CLO Ltd. | 16,250 |
| Valhalla CLO Ltd. | 6,000,000 |
| Governance Re Ltd. Promissory Note | 1,436,763 |

Sincerely,

Vishal Patel
Director Of Operations – Authorized Signatory

**Page 1 of 1**

**UBSTRO085**

# EXHIBIT 10

UBSTRO086



## HIGHLAND CDO OPPORTUNITY FUND

**Highland Capital Management, L.P.**
(Delaware limited partnership)

100%

**Highland CDO Opportunity GP, LLC**
(Delaware LLC)

LP

Special Limited Partner

Voting Shares

GP

**Highland CDO Opportunity Fund GP, L.P.**
(Delaware limited partnership)

**Various limited partners**

**Various non-voting shareholders**

GP

GP

**Highland CDO Opportunity Fund, L.P.**
(Delaware limited partnership)
**(domestic feeder)**

**Highland CDO Opportunity Fund, Ltd.**
(Bermuda corporation)
**(offshore feeder)**

LP

LP

**Highland CDO Opportunity Master Fund, L.P.**
(Bermuda limited partnership)
**(Master Fund)**

UBSTRO087

# EXHIBIT 11

**UBSTRO088**

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## HIGHLAND CDO OPPORTUNITY GP, LLC

### (A Delaware Limited Liability Company)

THE MEMBERSHIP INTEREST REFERENCED HEREIN HAS BEEN ACQUIRED FOR INVESTMENT AND HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS. WITHOUT REGISTRATION, THIS SECURITY MAY NOT BE SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED AT ANY TIME WHATSOEVER, EXCEPT ON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE MEMBER OF THE COMPANY THAT REGISTRATION IS NOT REQUIRED FOR THE TRANSFER, OR THE SUBMISSION TO THE MEMBER OF THE COMPANY OF OTHER EVIDENCE SATISFACTORY TO THE MEMBER TO THE EFFECT THAT ANY TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS OR ANY RULE OR REGULATIONS PROMULGATED THEREUNDER.

D-DAL_1383671_1

UBSTRO089

LIMITED LIABILITY COMPANY AGREEMENT

OF

HIGHLAND CDO OPPORTUNITY GP, LLC

(A Delaware Limited Liability Company)

TABLE OF CONTENTS

Page

ARTICLE 1    DEFINITIONS ........................................................................................................1
  1.1.    Definitions ......................................................................................................1
  1.2.    Other Definitional Provisions .......................................................................3

ARTICLE 2    FORMATION ..........................................................................................................3
  2.1.    Name and Formation .....................................................................................3
  2.2.    Principal Place of Business ...........................................................................3
  2.3.    Registered Office and Agent .........................................................................4
  2.4.    Duration .........................................................................................................4
  2.5.    Purposes and Powers .....................................................................................4
  2.6.    Foreign Qualification ....................................................................................4

ARTICLE 3    RIGHTS, DUTIES AND MEETING OF THE MEMBER ......................................5
  3.1.    Management ...................................................................................................5
  3.2.    Place of Meetings ..........................................................................................5
  3.3.    Annual and Special Meetings .......................................................................5
  3.4.    Actions Without a Meeting ...........................................................................6
  3.5.    Number ..........................................................................................................6
  3.6.    Officers ..........................................................................................................6

ARTICLE 4    CAPITALIZATION ................................................................................................7
  4.1.    Capital Contributions ....................................................................................7
  4.2.    Withdrawal or Reduction of Capital Contributions ......................................8
  4.3.    Liability of the Member .................................................................................8

ARTICLE 5    DISTRIBUTIONS ...................................................................................................8
  5.1.    Distributions ..................................................................................................8
  5.2.    Limitation Upon Distribution ........................................................................9

ARTICLE 6    BOOKS AND ACCOUNTS ....................................................................................9
  6.1.    Records and Reports .....................................................................................9
  6.2.    Returns and Other Elections .........................................................................9

ARTICLE 7    DISSOLUTION AND TERMINATION ................................................................10
  7.1.    Dissolution ..................................................................................................10
  7.2.    Distribution of Assets Upon Dissolution ...................................................11
  7.3.    Certificate of Cancellation ..........................................................................11

ARTICLE 8    TRANSFERS OF MEMBERSHIP INTERESTS ..................................................12

D-DAL_1383671_1

i

UBSTRO090

ARTICLE 9    MISCELLANEOUS PROVISIONS ........................................................................12
    9.1.    Application of Delaware Law ..............................................................................12
    9.2.    Headings and Sections ........................................................................................12
    9.3.    Amendments ........................................................................................................13
    9.4.    Number and Gender ............................................................................................13
    9.5.    Binding Effect .....................................................................................................13

Attachment:   Exhibit A

UBSTRO091

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## HIGHLAND CDO OPPORTUNITY GP, LLC

### (A Delaware Limited Liability Company)

THIS LIMITED LIABILITY COMPANY AGREEMENT, dated the ___19th___ day of October, 2005, is hereby duly adopted as the limited liability company agreement of Highland CDO Opportunity GP, LLC, a Delaware limited liability company, by the sole Member.

## ARTICLE 1

## DEFINITIONS

1.1.   **Definitions**.  The following terms used in this Agreement shall have the following meanings (unless otherwise expressly provided herein):

"*Act*" means the Delaware Limited Liability Company Act, as the same may be amended from time to time.

"*Agreement*" means this Limited Liability Company Agreement of the Company as originally adopted and as amended from time to time.

"*Business Day*" means a day other than a Saturday, Sunday or other day that is a nationally recognized holiday.

"*Capital Contribution*" means any contribution to the capital of the Company in cash or property by the Member whenever made.

"*Certificate*" means the Certificate of Formation of the Company.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Company*" means Highland CDO Opportunity GP, LLC, a Delaware limited liability company.

"*Fiscal Year*" means the Company's fiscal year, which shall be the calendar year.

"*Member*" means Highland Capital Management, L.P., a Delaware limited partnership.

"*Membership Interest*" means the entire equity interest of the Member in the Company and all rights and liabilities associated therewith including, without limitation, rights to distributions (liquidating or otherwise) and allocations.

"*Person*" means a natural person or any corporation, limited liability company, partnership, limited partnership, joint venture, trust, estate, governmental entity or other entity.

UBSTRO092

1.2. **Other Definitional Provisions.** All terms used in this Agreement that are not defined in this Article 1 have the meanings contained elsewhere in this Agreement.

## ARTICLE 2

## FORMATION

2.1. **Name and Formation.** The name of the Company is "Highland CDO Opportunity GP, LLC." All business of the Company must be conducted in that name or in one or more other names that comply with applicable law and that are selected by the Member from time to time. The Company was formed as a limited liability company upon the issuance of the Certificate of Formation to the Company from the Secretary of State of the State of Delaware, pursuant to the Act.

2.2. **Principal Place of Business.** The principal office and place of business of the Company are set forth on Exhibit A. The Company may locate its place of business and principal office at any other place or places as the Member may from time to time deem necessary or advisable.

2.3. **Registered Office and Agent.** The registered office and registered agent of the Company shall be the registered office and registered agent named in the Certificate and set forth on Exhibit A. The Company may change the registered office and registered agent as the Member may from time to time deem necessary or advisable.

2.4. **Duration.** The period of duration of the Company is perpetual from the date its Certificate was filed with the Secretary of State of Delaware, unless the Company is earlier dissolved in accordance with either the provisions of this Agreement or the Act.

2.5. **Purposes and Powers.** The purpose for which the Company is organized is to transact any or all lawful business for which limited liability companies may be organized under the Act. The Company shall have any and all powers that are necessary or desirable to carry out the purposes and business of the Company, to the extent the same may be legally exercised by limited liability companies under the Act. The Company shall carry out the foregoing activities pursuant to the arrangements set forth in the Certificate of the Company and this Agreement.

2.6. **Foreign Qualification.** The Member shall cause the Company to comply, to the extent legally possible, with all requirements necessary to qualify the Company as a foreign limited liability company in each jurisdiction in which the Company conducts business. To the extent required by law or as the Member determines is otherwise advisable, the Member shall execute, acknowledge, swear to and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue and terminate the Company as a foreign limited liability company in all jurisdictions in which the Company conducts business.

## ARTICLE 3

## RIGHTS, DUTIES AND MEETINGS OF THE MEMBER

3.1. **Management.** The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under, its Member.

D-DAL_1383671_1                                          2

UBSTRO093

3.2.    **Place of Meetings**.  All meetings of the Member shall be held at the principal office of the Company or at such other place within or without the State of Delaware as may be determined by the Member and set forth in the respective notice or waivers of notice of such meeting.

3.3.    **Annual and Special Meetings**.  The annual and special meetings of the Member for the transaction of such business as may properly come before the meeting shall be held at such time and date as shall be designated by the Member from time to time.

3.4.    **Actions Without a Meeting.**  Notwithstanding any provision contained in this Article 3, all actions of the Member provided for herein may be taken by written consent without a meeting.  Any such action that may be taken by the Member without a meeting shall be effective only if the consent is in writing, sets forth the action so taken, and is signed by the Member.

3.5.    **Number**.  There shall be only one (1) Member of the Company, that being Highland Capital Management, L.P., its successor or assignee.

3.6.    **Officers.**  The Member may, from time to time, designate one or more Persons to be officers of the Company.  No officer need be a Member.  Any officers so designated shall have such authority and perform such duties as the Member may, from time to time, delegate to them.  The Member may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer.  Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or until such Person shall resign or shall have been removed in the manner hereinafter provided.  Any number of offices may be held by the same Person.  The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Member.  Any officer may be removed as such, either with or without cause, by the Member whenever in the Member's judgment the best interests of the Company will be served thereby.  Any vacancy occurring in any office of the Company may be filled by the Member.

### ARTICLE 4

### CAPITALIZATION

4.1.    **Capital Contributions**.

(a)    The Member has contributed cash or property to the Company in the amount set forth as the Capital Contribution of such Member on Exhibit A.  Such cash or property shall be the Capital Contribution of the Member and, in connection with such contribution, the Member shall receive its Membership Interest.

(b)    If at any time the Member determines that the Company has insufficient funds to carry out the purposes of the Company, the Member may make additional Capital Contributions.

(c)    The Member shall not be paid interest on any Capital Contribution.

4.2.    **Withdrawal or Reduction of Capital Contributions.**

(a)    The Member shall not receive out of the Company's property any part of its Capital Contribution until all liabilities of the Company have been paid or there remains property of the Company sufficient to pay such liabilities.

D-DAL_1383671_1                                    3

UBSTRO094

(b)     Except as may be otherwise specifically provided in this Agreement, the Member shall have the right to withdraw all or any part of its Capital Contribution.

4.3.    **Liability of the Member.**  The Member shall not be liable for the debts, liabilities or obligations of the Company beyond its Capital Contributions.  The Member shall not be required to contribute to the capital of, or to loan any funds to, the Company.

## ARTICLE 5

### DISTRIBUTIONS

5.1.    **Distributions.**  Subject to <u>Section 5.2</u>, the Company shall make all distributions at such times as determined by the Member.

5.2.    **Limitation Upon Distribution.**  No distribution shall be declared and paid unless, if after the distribution is made, the value of assets of the Company would exceed the liabilities of the Company, except liabilities to the Member on account of its Capital Contributions.

## ARTICLE 6

### BOOKS AND ACCOUNTS

6.1.    **Records and Reports.**  At the expense of the Company, the Member shall maintain records and accounts of all operations and expenditures of the Company.

6.2.    **Returns and Other Elections**.  The Member shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business.  Copies of such returns, or pertinent information therefrom, shall be furnished to the Member as soon as practicable after the end of each Fiscal Year.  All elections permitted to be made by the Company under federal or state laws shall be made by the Member.

## ARTICLE 7

### DISSOLUTION AND TERMINATION

7.1.    **Dissolution**.

(a)     The Company shall be dissolved upon the first of the following to occur:

(i)      Upon the election to dissolve the Company by the Member;

(ii)     Upon the death, retirement, resignation, expulsion, bankruptcy, legal incapacity or dissolution of the Member, or the occurrence of any other event that terminates the continued membership of the Member; or

(iii)    The entry of a decree of judicial dissolution under the Act.

UBSTRO095

(b)     Upon dissolution of the Company, the business and affairs of the Company shall terminate, and the assets of the Company shall be liquidated under this Article 7.

(c)     Dissolution of the Company shall be effective as of the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until there has been a winding up of the Company's business and affairs, and the assets of the Company have been distributed as provided in Section 7.2.

(d)     Upon dissolution of the Company, the Member may cause any part or all of the assets of the Company to be sold in such manner as the Member shall determine in an effort to obtain the best prices for such assets; provided, however that the Member may distribute assets of the Company in kind to the Member to the extent practicable.

7.2.    **Distribution of Assets Upon Dissolution**.  In settling accounts after dissolution, the assets of the Company shall be paid in the following order:

(a)     First, to creditors, in the order of priority as provided by applicable law, except those to the Member on account of its Capital Contributions; and

(b)     Second, any remainder shall be distributed to the Member.

7.3.    **Certificate of Cancellation.**  When all liabilities and obligations of the Company have been paid or discharged, or adequate provision has been made therefor, and all of the remaining property and assets of the Company have been distributed to the Member according to its respective rights and interests, the Certificate of Cancellation shall be executed on behalf of the Company by the Member and shall be filed with the Secretary of State of the State of Delaware, and the Member shall execute, acknowledge and file any and all other instruments necessary or appropriate to reflect the dissolution and termination of the Company.

## ARTICLE 8

### TRANSFERS OF MEMBERSHIP INTERESTS

The Member may sell, assign or otherwise transfer all or any portion of the its Membership Interest at any time to any Person as long as such transfer would not result in a violation of applicable law, including U.S. federal or state securities laws.

## ARTICLE 9

### MISCELLANEOUS PROVISIONS

9.1.    **Application of Delaware Law.**  This Agreement and the application or interpretation hereof, shall be governed exclusively by the laws of the State of Delaware, and specifically the Act.

9.2.    **Headings and Sections.**  The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof.  Unless the context requires otherwise, all references in this Agreement to Sections or Articles shall be deemed to mean and refer to Sections or Articles of this Agreement.

D-DAL_1383671_1

5

UBSTRO096

9.3.    **Amendments**.

(a)    This Agreement may be amended, supplemented or restated only upon the written consent of the Member.

(b)    Upon obtaining the approval of any amendment to the Certificate, the Member shall cause Certificate of Amendment in accordance with the Act to be prepared, and such Certificate of Amendment shall be executed by the Member and shall be filed in accordance with the Act.

9.4.    **Number and Gender**.  Where the context so indicates, the masculine shall include the feminine, the neuter shall include the masculine and feminine, and the singular shall include the plural.

9.5.    **Binding Effect**.  Except as herein otherwise provided to the contrary, this Agreement shall be binding upon and inure to the benefit of the Member, its distributees, heirs, legal representatives, executors, administrators, successors and assigns.

*Remainder of Page Intentionally Left Blank.*
*Signature Pages To Follow.*

D-DAL_1383671_1                                              6

UBSTRO097

The undersigned, being the sole Member, does hereby ratify, confirm and approve the adoption of this Agreement as the limited liability company agreement of the Company, and does hereby assume and agree to be bound by and to perform all of the terms and provisions set forth in this Agreement on this ___ _19TH_ day of October, 2005.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
a Delaware limited partnership

By:    Strand Advisors, Inc.,
       a Delaware corporation,
       its General Partner

By:    _____

       James Dondero,
       President

D-DAL_1383671_1

UBSTRO098

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**HIGHLAND CDO OPPORTUNITY GP, LLC**

**(A Delaware Limited Liability Company)**

<u>EXHIBIT A</u>

| | | |
|---|---|---|
| 1. | Name of Company: | Highland CDO Opportunity GP, LLC |
| 2. | Address of Company: | 13455 Noel Road<br>Suite 1300<br>Two Galleria Tower<br>Dallas, Texas 75240 |
| 3. | Telephone Number of Company: | 972.628.4100 |
| 4. | Facsimile Number of Company: | 972.628.4147 |
| 5. | Registered Agent and Registered Office: | The Corporation Trust Company<br>1209 Orange Street<br>Wilmington, Delaware 19801 |
| 6. | Member: | |

a. Name of Member: Highland Capital Management, L.P.

Address: 13455 Noel Road
Suite 1300
Two Galleria Tower
Dallas, Texas 75240

Telephone Number: 972.628.4100

Facsimile Number: 972.628.4147

Capital Contribution: $_____

Date Became Member: October _19_, 2005

D-DAL_1383671_1

A-1

**UBSTRO099**

# EXHIBIT 12

UBSTRO100

# AGREEMENT OF LIMITED PARTNERSHIP

## OF

## HIGHLAND CDO OPPORTUNITY FUND GP, L.P.

### (A Delaware Limited Partnership)

THE INTERESTS REPRESENTED BY THIS INSTRUMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS. WITHOUT REGISTRATION, THESE INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED AT ANY TIME WHATSOEVER, EXCEPT ON DELIVERY TO THE PARTNERSHIP OF AN OPINION OF COUNSEL SATISFACTORY TO THE GENERAL PARTNER OF THE PARTNERSHIP THAT REGISTRATION IS NOT REQUIRED FOR THE TRANSFER, OR THE SUBMISSION TO THE GENERAL PARTNER OF THE PARTNERSHIP OF OTHER EVIDENCE SATISFACTORY TO THE GENERAL PARTNER TO THE EFFECT THAT ANY TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS OR ANY RULE OR REGULATIONS PROMULGATED THEREUNDER. ADDITIONALLY, ANY SALE OR OTHER TRANSFER OF THESE INTERESTS IS SUBJECT TO CERTAIN RESTRICTIONS THAT ARE SET FORTH IN THE AGREEMENT OF LIMITED PARTNERSHIP OF THE PARTNERSHIP.

UBSTRO101

# AGREEMENT OF LIMITED PARTNERSHIP

## OF

## HIGHLAND CDO OPPORTUNITY FUND GP, L.P.

### (A Delaware Limited Partnership)

### TABLE OF CONTENTS

Page

ARTICLE 1    GENERAL ...........................................................................................1
    1.1.    Formation ...................................................................................1
    1.2.    Name and Certificate .................................................................1
    1.3.    Office and Agent ........................................................................2
    1.4.    Term ...........................................................................................2
    1.5.    Purposes .....................................................................................2
    1.6.    Limits .........................................................................................2

ARTICLE 2    DEFINITIONS .......................................................................................3
    2.1.    Definitions .................................................................................3
    2.2.    Other Definitions ........................................................................8

ARTICLE 3    CONTRIBUTIONS AND INTERESTS ...................................................8
    3.1.    Identification ..............................................................................8
    3.2.    Additional Capital Contributions ...............................................8
    3.3.    Loans ..........................................................................................9
    3.4.    Limitation on Liability ...............................................................9

ARTICLE 4    DISTRIBUTIONS AND ALLOCATIONS ...............................................9
    4.1.    Distributions of Net Cash Flow ..................................................9
    4.2.    Allocation of Taxable Items .......................................................10
    4.3.    Regulatory Compliance ..............................................................10

ARTICLE 5    STATUS OF LIMITED PARTNERS .......................................................10
    5.1.    General ........................................................................................10
    5.2.    Limitation on Liability ...............................................................10
    5.3.    Bankruptcy; Death .....................................................................11

ARTICLE 6    MANAGEMENT .....................................................................................11
    6.1.    Rights .........................................................................................11
    6.2.    Duties .........................................................................................12
    6.3.    Compensation and Reimbursement .............................................12
    6.4.    Agreements with Affiliates .........................................................12
    6.5.    Indemnification ..........................................................................12
    6.6.    Appointment and Replacement ...................................................13
    6.7.    Approval and Meetings ...............................................................13
    6.8.    Execution of Documents .............................................................15

UBSTRO102

ARTICLE 7      BOOKS AND ACCOUNTS ................................................................ 15
   7.1.      Books and Records ........................................................................ 15
   7.2.      Reports ........................................................................................... 16
   7.3.      Tax Returns and Other Elections .................................................. 16
   7.4.      Depositories .................................................................................. 17

ARTICLE 8      ADMISSION OF NEW PARTNERS; TRANSFER OF INTERESTS .......... 17
   8.1.      Admission of New Partners ........................................................... 17
   8.2.      Transfers ........................................................................................ 18
   8.3.      Substitute Partner .......................................................................... 18
   8.4.      Assignee's Rights .......................................................................... 19
   8.5.      Tax Matters .................................................................................... 19

ARTICLE 9      DISSOLUTION .............................................................................. 20
   9.1.      Causes ............................................................................................ 20
   9.2.      Reconstitution ............................................................................... 21
   9.3.      Interim Manager ............................................................................ 21

ARTICLE 10     WINDING UP AND TERMINATION ................................................ 21
   10.1.     General ........................................................................................... 21
   10.2.     Liquidation ..................................................................................... 21
   10.3.     Creation of Reserves ..................................................................... 21
   10.4.     Final Accounting ........................................................................... 21

ARTICLE 11     MISCELLANEOUS ........................................................................ 21
   11.1.     Notices ........................................................................................... 21
   11.2.     Interpretation ................................................................................. 21
   11.3.     Terms ............................................................................................. 21
   11.4.     Amendment .................................................................................... 21
   11.5.     Severability .................................................................................... 21
   11.6.     No Third-Party Beneficiary .......................................................... 21
   11.7.     Sole and Absolute Discretion ....................................................... 21
   11.8.     Binding Effect ............................................................................... 21
   11.9.     Complete Agreement ..................................................................... 21
   11.10.    Title to Partnership Property ......................................................... 21
   11.11.    Reliance on Authority of Persons Signing Agreement .................. 21
   11.12.    Other Business ............................................................................... 21
   11.13.    Partition Rights .............................................................................. 21
   11.14.    Agreement in Counterparts ............................................................ 21

Attachment:   Exhibit A

UBSTRO103

## AGREEMENT OF LIMITED PARTNERSHIP

### OF

## HIGHLAND CDO OPPORTUNITY FUND GP, L.P.

THIS AGREEMENT OF LIMITED PARTNERSHIP (this "*Agreement*") is made as of the 19TH day of October, 2005, by and among Highland CDO Opportunity GP, LLC, a Delaware limited liability company (the "*General Partner*"), and those Persons (hereinafter defined) who execute this Agreement as limited partners (collectively, the "*Limited Partners*"), and they together hereby form a limited partnership (the "*Partnership*") pursuant to the Act (hereinafter defined).

### ARTICLE 1

### GENERAL

1.1.    Formation.  The Partners hereby form the Partnership pursuant to the Act.  Except as otherwise provided in this Agreement, the rights and liabilities of the Partners are governed by the Act.

1.2.    Name and Certificate.  The name of the Partnership is "Highland CDO Opportunity Fund GP, L.P."  The General Partner shall promptly cause to be prepared and filed  the Certificate to satisfy the requirements of the Act, and any assumed name certificates required by Applicable Laws.

1.3.    Office and Agent.  The registered agent, registered office and principal place of business of the Partnership are set forth on Exhibit A.  The registered agent, registered office or principal place of business may be changed by the General Partner after the General Partner delivers a written notice about such change to the Partners.

1.4.    Term.  The Partnership shall be formed as a limited partnership on the date that the Certificate is filed with the Secretary of State of the State of Delaware and shall continue until terminated pursuant to this Agreement.

1.5.    Purposes.  The purpose for which the Partnership is organized is to transact any or all lawful business for which limited partnerships may be organized under the Act.  The Partnership shall have any and all powers that are necessary or desirable to carry out the purposes and business of the Partnership, to the extent the same may be legally exercised by limited partnerships under the Act.  The Partnership shall carry out the foregoing activities pursuant to the arrangements set forth in the Certificate and this Agreement.

1.6.    Limits.  The relationship between and among the Partners is limited to the carrying on of the business of the Partnership in accordance with this Agreement.  That relationship shall be construed and deemed to be a limited partnership for the sole and limited purpose of carrying on that business.  This Agreement does not create a general partnership between the parties or authorize any party to act as general agent for any other party.

D-DAL_1383680_1

UBSTRO104

## ARTICLE 2

## DEFINITIONS

2.1. <u>Definitions</u>. In this Agreement, the following terms, unless the context otherwise requires, have the meanings indicated:

"*Accountant*" means the certified public accountant or firm of certified public accountants, if any, selected by the General Partner to perform accounting functions on behalf of the Partnership.

"*Act*" means the Delaware Revised Limited Partnership Act, as amended from time to time (or any corresponding provisions of succeeding law).

"*Agreement*" means this Agreement of Limited Partnership, as amended, from time to time. Words, such as "herein," "hereinafter," "hereof," "hereto," and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires.

"*Applicable Laws*" means any applicable law, statute, ordinance, rule, regulation, decision, order, or determination of any governmental authority.

"*Approval of the Partners*" or "*Approved by the Partners*" means the affirmative approval, determined under <u>Section 6.7</u>, of Partners then entitled to vote who hold in the aggregate more than fifty percent (50%) of the Percentage Interests.

"*Assignee*" means a transferee of all or any portion of a Partner's or any other transferor's Interest.

"*Bankruptcy*" means, for any Partner, that Partner's taking or acquiescing in the taking of an action seeking relief under, or advantage of, any applicable debtor relief, liquidation, receivership, conservatorship, bankruptcy, moratorium, rearrangement, insolvency, reorganization, or similar law affecting the rights or remedies of creditors generally, as in effect from time to time.

"*Business Day*" means a day other than a Saturday, Sunday or other day that is a nationally recognized holiday.

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate*" means the certificate of limited partnership of the Partnership.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"*Fiscal Year*" means the Partnership's fiscal year, which shall be the calendar year.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Interest*" means, with respect to any Partner, such Partner's ownership interest in the Partnership.

D-DAL_1383680_1　　　　　　　　　　　　2

UBSTRO105

"*IRS Regulations*" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Maximum Lawful Rate*" means the maximum, lawful, non-usurious rate that may be charged, collected or received on a particular loan under Applicable Laws.

"*Net Cash Flow*" means all cash flow, receipts and revenues generated by the Partnership minus amounts necessary for (i) Operating Expenses, (ii) a reserve fund for future Operating Expenses, (iii) debt service of the Partnership or (iv) any other expenses of the Partnership.

"*Operating Expenses*" means the costs, expenses, or charges incurred by the Partnership, including, without limitation, management fees or salaries, professional fees, wages, all other expenses incurred in the day-to-day operation of any business similar to the business of the Partnership and any fees or expenses paid in accordance with Section 6.3.

"*Partner Loans*" has the meaning set forth in Section 3.3.

"*Partners*" means all General Partners and all Limited Partners, where no distinction is required by the context in which the term is used herein.

"*Percentage Interest*" means, with respect to any Partner, the "Percentage Interest" set forth for that Partner on Exhibit A, as adjusted from time to time as provided in this Agreement.

"*Person*" means any corporation, limited liability company, partnership, joint venture, co-tenancy, trust or any other legal entity or natural person, whether or not a party to this Agreement.

"*Prime Rate*" means, at any time, the rate of interest per annum stated at that time in The Wall Street Journal (or any successor publication thereto) as the base rate on corporate loans for at least seventy-five percent (75%) of the thirty (30) largest banks in the United States.

"*Property*" means all the assets of the Partnership.

"*Pro Rata*" means the ratio determined by dividing the Percentage Interests of Partners to whom a particular provision of this Agreement is stated to apply by the aggregate of the Percentage Interests of all Partners to whom that provision is stated to apply.

"*Substitute Partner*" has the meaning set forth in Section 8.3.

"*Transfer*," or derivations thereof, of an Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of an Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

2.2.    Other Definitions.  All terms used in this Agreement that are not defined in this Article 2 have the meanings contained elsewhere in this Agreement.

D-DAL_1383680_1                                                3

UBSTRO106

## ARTICLE 3

### CONTRIBUTIONS AND INTERESTS

3.1.    <u>Identification</u>.  The name, address, initial Capital Contribution and Percentage Interest of each Partner are set forth on <u>Exhibit A</u>.

3.2.    <u>Additional Capital Contributions</u>.  At any time the General Partner determines that additional funds are required to operate the Partnership, the General Partner may request that the Partners make additional Capital Contributions; *provided, however*, unless additional Capital Contributions are Approved by the Partners, the Partners shall not be obligated to make any additional Capital Contributions.  If so approved, the General Partner shall promptly notify all Partners, and the Partners Pro Rata shall make such Capital Contributions.

3.3.    <u>Loans</u>.  If the General Partner makes a request for loans, the Partners, Pro Rata or as they may otherwise agree, may make a loan or loans to the Partnership.  The amount of any such loan or advance (the "*Partner Loans*") shall not be deemed an increase in the Capital Contributions of the Partner that makes such loan or entitle that lending Partner to any increase in its Percentage Interest.  Unless otherwise Approved by the Partners, any Partner Loan (i) shall bear interest at the lower of (A) the Prime Rate plus two percent (2.0%) per annum or (B) the Maximum Lawful Rate, which interest is payable on the first day of each month, (ii) shall have a term of three (3) years, and (iii) shall be recourse to the Partnership but not to any Partner.

3.4.    <u>Limitation on Liability</u>.  Except as otherwise provided in this Agreement, no Limited Partner shall be liable for the debts, liabilities, contracts or any other obligations of the Partnership.  Except as otherwise provided herein, a Limited Partner shall be liable to make only any additional Capital Contributions required in this Agreement and shall not be required to lend any funds to the Partnership.

## ARTICLE 4

### DISTRIBUTIONS AND ALLOCATIONS

4.1.    <u>Distributions of Net Cash Flow</u>.  When the General Partner so directs, the Partnership shall make distributions to the Partners Pro Rata.

4.2.    <u>Allocation of Taxable Items</u>.  All profits, losses and taxable items shall be allocated to the Partners Pro Rata.

4.3.    <u>Regulatory Compliance</u>.  The Partners shall exercise the utmost good faith in cooperating to amend this Agreement to effect the changes, if any, recommended by the professional tax advisers of the Partnership to cause compliance with Code Section 704(b) and the IRS Regulations promulgated thereunder.

## ARTICLE 5

### STATUS OF LIMITED PARTNERS

5.1.    <u>General</u>.  Each Limited Partner has all of the rights, and is afforded the status, of a limited partner under the Act.  No Limited Partner shall participate in the management or control of the

UBSTRO107

business of the Partnership, transact any business for the Partnership, or have any power to act for or bind the Partnership.

5.2.    Limitation on Liability.  No Limited Partner has any personal liability whatsoever, whether to the Partnership, the General Partner or any creditor of the Partnership, for the debts, expenses, liabilities, or obligations of the Partnership (but each Partner does have personal liability for its obligations under Article 3), unless that Limited Partner otherwise agrees in a separate writing with a third party creditor of the Partnership.

5.3.    Bankruptcy; Death.  None of the Bankruptcy, death, disability, or declaration of incompetence of a Limited Partner shall cause a dissolution of the Partnership.  However, the rights of that Limited Partner to share in the profits and losses of the Partnership and to receive distributions of the funds of the Partnership shall, on the happening of one of these events, devolve on that estate, legal representative, or successors in interest, as the case may be, of that Limited Partner subject to the terms and conditions of this Agreement.  The estate, representative, or successors in interest of that Limited Partner are liable for all of the unsatisfied obligations, if any, of that Limited Partner.  However, the estate, representative, or successors in interest may become a limited partner in the Partnership only with the consent of the General Partner and in accordance with Section 8.3.

## ARTICLE 6

## MANAGEMENT

6.1.    Rights.  The General Partner shall have the exclusive right, power and authority to take any action on behalf of the Partnership, other than actions specifically restricted herein.

6.2.    Duties.  The General Partner shall manage and control the Partnership and its business and affairs in accordance with the standards of the industry, and shall use reasonable, good faith efforts to carry out the business of the Partnership.  The General Partner shall devote itself to the business of the Partnership to the extent required to carry out the business of the Partnership, but shall not be precluded from being involved in other businesses or activities.  The General Partner shall perform its duties under this Agreement with ordinary prudence and in a manner characteristic of a businessman in similar circumstances.

6.3.    Compensation and Reimbursement.  The General Partner shall not be reimbursed for its overhead allocable to the business of the Partnership; provided, however, the General Partner shall be reimbursed by the Partnership for any and all reasonable out-of-pocket expenses, fees and costs incurred in connection with the organization, business and affairs of the Partnership.

6.4.    Agreements with Affiliates.  The General Partner may execute on behalf of the Partnership contracts or agreements with affiliates of the General Partner so long as the contracts or agreements are on a fair market, arm's-length, competitive basis and are Approved by the Partners.

6.5.    Indemnification.  The General Partner shall be indemnified and held harmless by the Partnership, including advancement of expenses, but only to the extent that the assets of the Partnership are sufficient therefor, from and against all claims, liabilities, and expenses arising out of any management of the affairs of the Partnership, but excluding those caused by the gross negligence or willful misconduct of the General Partner, subject to all limitations and requirements imposed by the Act.  These indemnification rights are in addition to any rights that the General Partner may have against third parties.  THE AGREEMENT SET FORTH IN THIS SECTION IS AN INDEMNITY BY THE PARTNERSHIP INDEMNIFYING THE GENERAL PARTNER AGAINST ITS OWN NEGLIGENCE.

UBSTRO108

THE GENERAL PARTNER WOULD NOT HAVE ENTERED THIS AGREEMENT IF THIS PROVISION WAS NOT INCLUDED IN THE AGREEMENT.

6.6. <u>Appointment and Replacement</u>. Each General Partner shall serve in such capacity unless and until replaced pursuant to this Agreement. In the event of the death, liquidation, dissolution, Bankruptcy, withdrawal, or disability of any Person herein or hereafter named as General Partner, the Limited Partners shall appoint a successor General Partner who must be Approved by the Partners, excluding in such computation the Interest(s) of the then General Partner.

6.7. <u>Approval and Meetings</u>.

(a) Actions and decisions requiring Approval of the Partners may be authorized or made either by vote of the required Partners taken at a meeting of the required Partners or by written consent of same without a meeting. For the purpose of determining the Partners entitled to vote on, or to vote at, any meeting of the Partners or on a request for written consent, the record date for any such determination shall be the day before a General Partner delivers notice of the meeting or its request for written consent.

(b) The General Partner may call a meeting to obtain Approval of the Partners for an action or decision under this Agreement by delivering to the other Partners notice of the time and purpose of the meeting at least seven (7) days before the day of the meeting. Each meeting of Partners shall be conducted by the General Partner. Meetings may be held by telephone conference and participation by a Partner in a meeting by telephone conference shall constitute presence of that Partner.

(c) The General Partner may propose that actions or decisions requiring Approval of the Partners be approved by written consent of the required Partners in lieu of a meeting by delivering to the required Partners notice of the proposal of the General Partner. The written consent of a Partner to that proposal may be evidenced by its signature on a counterpart of the proposal or by a separate writing (including a facsimile, telegram, etc.) that identifies the proposal with reasonable specificity and states that it consents to that proposal. For purposes of obtaining a written consent, the General Partner may require the response of the requisite Partners within a specified time (the "***Response Date***") provided the Response Date is not less than five (5) days from the date of the notice.

6.8. <u>Execution of Documents</u>. All Partners shall, on the request of the General Partner, promptly execute all documents and instruments necessary or helpful in carrying out actions of the Partnership that have been properly authorized.

## ARTICLE 7

## BOOKS AND ACCOUNTS

7.1. <u>Books and Records</u>.

(a) The books and records of the Partnership shall, at the cost and expense of the Partnership, be kept or caused to be kept at the principal place of business of the Partnership, and shall be available for inspection by any Partner. The books and records shall be kept on the basis of a calendar year, shall reflect all transactions of the Partnership, shall be appropriate and adequate for conducting the business of the Partnership and shall otherwise be in accordance with generally accepted accounting principles and procedures applied in a consistent manner. The Partnership shall initially use the method of accounting chosen by the Accountant with the approval of the General Partner. The General Partner shall maintain the records required to be kept pursuant to Section 7.1(b).

UBSTRO109

(b)     At a minimum, the Partnership shall keep at its principal place of business the following records:

(i)     A current list that states:  (A) the name and mailing address of each Partner and (B) the Percentage Interest owned by each Partner;

(ii)     Copies of the federal, state and local information or income tax returns for each of the Partnership's six (6) most recent tax years (or such shorter period that the Partnership has been in existence);

(iii)     A copy of the Certificate and this Agreement, all amendments or restatements thereof, and executed copies of any powers of attorney;

(iv)     Correct and complete books and records of account of the Partnership; and

(v)     Any other books, records or documents required by this Agreement or other Applicable Law.

7.2.    <u>Reports</u>.  At the expense of the Partnership, the General Partner shall maintain records and accounts of all operations and expenditures of the Partnership and submit annual reports regarding same to each Partner.

7.3.    <u>Tax Returns and Other Elections</u>.  The Partners intend for the Partnership to be treated, for federal, state, and municipal income and franchise tax purposes, as a partnership. The General Partner shall prepare, or cause the Accountant to prepare, all federal, state and local income and other tax returns that the Partnership is required to file and shall furnish a copy of each Partner's IRS Form K-1 and any other information that any Partner reasonably requests relating thereto, as soon as practicable after the end of the Fiscal Year.  All elections permitted to be made by the Partnership under federal or state laws shall be made by the General Partner.

7.4.    <u>Depositories</u>.  One or more accounts may be maintained for the Partnership at any commercial financial institution or depository chosen by the General Partner.  The funds of the Partnership shall not be commingled with the funds of any other Person unless otherwise Approved by the Partners.  Checks may be drawn on the account or accounts of the Partnership only for the purposes of the Partnership and shall be signed by a duly authorized officer of the General Partner or such other Persons as designated by the General Partner.

## ARTICLE 8

## ADMISSION OF NEW PARTNERS; TRANSFER OF INTERESTS

8.1.    <u>Admission of New Partners</u>.  New Partners may be admitted to the Partnership upon the terms and conditions determined by the General Partner.

8.2.    <u>Transfers</u>. Notwithstanding any other provision of this Agreement, no Partner may Transfer in any manner whatsoever all or any part of its Interest unless (i) such Partner has fully complied with the provisions of this <u>Section 8.2</u> for the Transfer, (ii) after giving effect thereto, such Transfer would not otherwise terminate the Partnership for the purposes of Code Section 708 or cause the Partnership to be classified as other than a partnership for United States federal income tax purposes, and

UBSTRO110

(iii) such Transfer would not result in a violation of applicable law, including U.S. federal or state securities laws, or any term or condition of this Agreement.

(a)    Transfers by the General Partner.  The General Partner may Transfer its Interest only upon the Approval of the Partners.

(b)    Transfers by a Limited Partner.  Each Limited Partner may sell, assign or otherwise Transfer all or any portion of its Interest only with the consent of the General Partner.

8.3.    Substitute Partner.  No Assignee shall have the right to become a substitute Partner (a "*Substitute Partner*") upon Transfer of any Interest to it unless all the following conditions are satisfied:

(a)    The Partner and the Assignee shall have executed and acknowledged such other instruments and taken such other action as the General Partner shall deem reasonably necessary or desirable to effect such substitution, including, without limitation, appropriate amendment to this Agreement;

(b)    The conditions set forth in Section 8.2 shall have been satisfied, and, if requested by the General Partner, the Partner or the Assignee shall have obtained an opinion of counsel satisfactory to the General Partner (which counsel may be a staff attorney employed by the Partner) as to the legal matters set forth therein; and

(c)    The Partner or the Assignee shall have paid to the Partnership such amount of money as is sufficient to cover all expenses incurred by or on behalf of the Partnership in connection with such substitution.

8.4.    Assignee's Rights.

(a)    Unless an Assignee becomes a Substitute Partner in accordance with the provisions of Section 8.3, it shall not be entitled to any of the rights (including voting rights) granted to a Partner hereunder or under the Act, other than the right to receive the share of distributions and any other items attributable to a Partner's Interest to which its assignor would otherwise be entitled.

(b)    Any Partner that Transfers all of its Interest shall cease to be a Partner.

8.5.    Tax Matters.  On the Transfer of all or part of an Interest, at the request of the transferee of the Interest, the General Partner may cause the Partnership to elect, pursuant to Code Section 754 to adjust the tax basis of the properties of the Partnership as provided by Code Sections 734 and 743.

# ARTICLE 9

## DISSOLUTION

9.1.    Causes.  The Partnership shall be dissolved on the first to occur of any of the following events, and each Partner hereby expressly waives any right that it might otherwise have to dissolve the Partnership:

(a)    The Bankruptcy death, disability, declaration of incompetence or any other occurrence that would legally disqualify the last remaining General Partner from acting under this Agreement;

D-DAL_1383680_1                                    8

(b)     The retirement, resignation, or withdrawal from the Partnership by the last remaining General Partner;

(c)     The execution by all the Partners of an instrument dissolving the Partnership; or

(d)     An event requiring such action under the Act.

Nothing contained in this Section 9.1 is intended to grant to a Partner the right to dissolve the Partnership at will (by retirement, resignation, withdrawal or otherwise), or to exonerate a Partner from liability to the Partnership and the remaining Partners if that Partner dissolves the Partnership at will. A dissolution at will of the Partnership is in contravention of this Agreement for purposes of the Act or any successor statute.

9.2.     Reconstitution.  If dissolution of the Partnership results from the occurrence of an event described in Section 9.1(a) or Section 9.1(b), then the Partnership may be reconstituted and its business continued pursuant to the Act.  If a reconstitution is completed, an appropriate amendment to this Agreement and, if necessary, to the Certificate shall be executed and, in the case of the Certificate, if necessary, appropriately filed of record.  The rights of the remaining Partners after reconstitution, and the rights and liabilities of any Partner wrongfully dissolving the Partnership in contravention of this Agreement, shall be as provided for under the laws of the State of Delaware.

9.3.     Interim Manager.  If the Partnership is dissolved as a result of an event described in Section 9.1(a) or Section 9.1(b), the Limited Partners, by the Approval of the Limited Partners, may appoint an interim manager of the Partnership, who shall have and may exercise all the rights, powers and duties of the General Partner under this Agreement, until (i) the new General Partner is elected pursuant to Section 6.6, if the Partnership is reconstituted pursuant to Section 9.2, or (ii) a liquidator is appointed pursuant to Section 10.1, if the Partnership is not reconstituted.

## ARTICLE 10

## WINDING UP AND TERMINATION

10.1.     General.

(a)     Selection of Liquidator.  If the Partnership is dissolved as a result of an event described in Section 9.1(a) or Section 9.1(b) and is not reconstituted, then the Limited Partners, by the Approval of the Limited Partners, shall, subject to Section 10.1(b), select a party to begin to wind up the affairs of the Partnership and to liquidate and sell its assets, all pursuant to the Act.  If the Partnership is dissolved pursuant to Section 9.1(c) or Section 9.1(d), the General Partner shall begin to wind up the affairs of the Partnership and to liquidate and sell its assets, all pursuant to the Act.  The party or parties actually conducting the liquidation in accordance with the foregoing sentences are herein referred to as the "*Liquidator*."

(b)     Duties; Qualifications.  The Liquidator (if other than a General Partner) shall have sufficient business expertise and competence to conduct the winding up and termination of the Partnership and, in the course thereof, to cause the Partnership to perform any existing or future Partnership contractual obligations.  The Liquidator shall determine the time, manner and terms of any sale or sales of Property in liquidation, having due regard to the activity and condition of the relevant market and general financial and economic conditions.

D-DAL_1383680_1                                   9

UBSTRO112

(c)    <u>Compensation</u>.  The Liquidator is entitled to receive reasonable compensation for its services, as agreed upon by the Liquidator and the General Partner, if any, and as Approved by the Partners.

(d)    <u>Amendment to Certificate</u>.  At the request of a Liquidator who is not a General Partner, the Certificate shall be amended as permitted by the Act.

(e)    <u>Resignation, Removal, Succession</u>.  The Liquidator may resign at any time by giving fifteen (15) days' prior written notice and may be removed at any time, with or without cause, by written notice of removal Approved by the Partners.  On the death, dissolution, removal or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all the rights, powers and duties of the original Liquidator) will, within thirty (30) days thereafter, be Approved by the Partners, evidenced by written appointment and acceptance.  The right to appoint a successor substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under this Agreement, and every reference herein to the Liquidator refers also to any successor or substituted Liquidator appointed in the manner herein provided. The Liquidator has and may exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred by this Agreement upon the General Partner to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties and functions.  The Liquidator is not liable as a General Partner hereunder to the Limited Partners or to third-party creditors.

10.2.   <u>Liquidation</u>.  In the course of the winding up and termination of the business and affairs of the Partnership, its assets (other than cash) shall be sold, its liabilities and obligations to creditors and all expenses incurred in its liquidation shall be paid, and all resulting taxable items shall be allocated as provided in <u>Section 4.2</u>.  All Property shall be sold on liquidation of the Partnership, and no Property shall be distributed in kind to the Partners, unless it is distributed in proportion to the amounts that each Partner is due under this <u>Section 10.2</u>.  Thereafter, the net proceeds from those sales (after deducting all selling costs and expenses in connection therewith), together with (at the expiration of the one-year period referred to in <u>Section 10.3</u>) the balance in the reserve account referred to in <u>Section 10.3</u>, shall be distributed among the Partners Pro Rata.

The Liquidator shall use all reasonable efforts to effect complete liquidation of the Partnership within one year after the date on which the Partnership is dissolved.  Each holder of an Interest shall look solely to the assets of the Partnership for all distributions and shall have no recourse therefor (on dissolution or otherwise) against the Partnership or the other Partners.  On the completion of the liquidation of the Partnership and the distribution of all funds of the Partnership, the Partnership shall terminate, and the Liquidator shall have the authority to execute and record all documents required to effectuate the dissolution and termination of the Partnership.  Distributions pursuant to this <u>Section 10.2</u> may be made to a trust established for the benefit of the Partners for the purposes of liquidating the Property, collecting amounts owed to the Partnership, and paying contingent or unforeseen liabilities or obligations of the Partnership.

10.3.   <u>Creation of Reserves</u>.  After making payment or provision for payment of all fixed and determinable debts and liabilities of the Partnership and all expenses of liquidation, the Liquidator may set up, for a period not to exceed one (1) year after the date of dissolution, the cash reserves that the Liquidator deems reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership.

UBSTRO113

10.4. <u>Final Accounting</u>. Within a reasonable time following the completion of the liquidation, the Liquidator shall supply to the Partners a statement that shall set forth (i) the assets and the liabilities of the Partnership as of the date of complete liquidation, (ii) the distributions to each Partner pursuant to <u>Section 10.2</u>, and (iii) the amount retained as reserves by the Liquidator pursuant to <u>Section 10.3</u>.

## ARTICLE 11

### MISCELLANEOUS

11.1. <u>Notices</u>.

(a)     Any notice, notification, demand or request provided or permitted to be given under this Agreement must be in writing and shall have been deemed to have been properly given, unless explicitly stated otherwise, if sent by (i) FedEx or other comparable overnight courier, (ii) registered or certified mail, postage prepaid, return receipt requested, or (iii) facsimile during normal business hours to the place of business of the recipient.

(b)     For purposes of all notices, the addresses and facsimile numbers of the Partners are set forth on <u>Exhibit A</u>.

(c)     All notices, notifications, demands or requests so given shall be deemed given and received (i) if sent via FedEx or overnight courier, the next Business Day after being delivered; (ii) if sent via registered or certified mail, three (3) days after being deposited in the mail; or (iii) if sent via facsimile, the next Business Day after being faxed.

11.2. <u>Interpretation</u>. The construction and validity of this Agreement and the rights and obligations of the respective parties hereunder shall be governed by, and interpreted and enforced in accordance with, the laws of the State of Delaware.

11.3. <u>Terms</u>. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the Person or Persons may in the context require. Any reference to the Code or other statutes or laws shall include all amendments, modifications, or replacements of the specific sections and provisions concerned.

11.4. <u>Amendment</u>. This Agreement may not be amended, altered or modified except by an instrument in writing signed by all of the Partners (or the duly-authorized agent of any party), excluding each Partner who has transferred its entire interest in the Partnership to an Assignee.

11.5. <u>Severability</u>. If any provision of this Agreement or any application of such provision to any Person or circumstances shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other Persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

11.6. <u>No Third-Party Beneficiary</u>. This Agreement is made solely and specifically between and for the benefit of the parties hereto and their respective successors and assigns, subject to the expressed provisions hereof relating to successors and assigns. No other Person has any rights, interest, or claims hereunder or is or will be entitled to any benefits under or on account of this Agreement as a third-party beneficiary or otherwise unless specifically provided in this Agreement.

UBSTRO114

11.7. <u>Sole and Absolute Discretion</u>. Except as otherwise provided in this Agreement, all actions that any General Partner may take and all determinations that any General Partner may make pursuant to this Agreement may be taken and made at the sole and absolute discretion of that General Partner.

11.8. <u>Binding Effect</u>. Subject to the provisions of this Agreement relating to transferability, this Agreement shall be binding upon and inure to the benefit of the parties signatory hereto, and their respective distributees, successors and assigns.

11.9. <u>Complete Agreement</u>. This Agreement constitutes the complete and exclusive statement of the agreement between the Partners and replaces and supersedes all prior agreements, except for any agreement executed contemporaneously herewith by and among the Partners or any of them contemporaneously herewith. This Agreement supersedes all written and oral statements, and no representation, statement, condition, or warranty not contained in this Agreement shall be binding on the Partners or have any force or effect whatsoever. No Partner has rendered any services to, or on behalf of, any other Partner or the Partnership, and no Partner shall have any rights with respect to any services that might be alleged to have been rendered.

11.10. <u>Title to Partnership Property</u>. To the extent that Property is held in the name of a Partner, the Property shall be deemed held by that Partner as agent and nominee for and on behalf of the Partnership. Any other property acquired by or standing in the name of any Partner shall be conclusively presumed not to be Property, unless an instrument in writing, signed by such Partner, shall specify to the contrary.

11.11. <u>Reliance on Authority of Persons Signing Agreement</u>. If a Partner is a Person other than a natural person, the Partnership (i) is not required to determine the authority of the Person signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such Person; (ii) is not required to see to the application or distribution of proceeds paid or credited to Persons signing this Agreement on behalf of such entity; (iii) is entitled to rely on the authority of the Person signing this Agreement with respect to the giving of consent on behalf of such entity in connection with any matter for which consent is permitted or required under this Agreement; and (iv) is entitled to rely on the authority of any general partner, joint venturer, manager, co- or successor trustee, or president or vice president (as the case may be), of any such entity the same as if such Person were the Person originally signing this Agreement on behalf of such entity.

11.12. <u>Other Business</u>. Each Partner may be engaged in a business or businesses other than that of the Partnership and may acquire properties for its own account or jointly with others or in any other capacity without being accountable or liable to the Partnership for the breach of any fiduciary obligation. These activities may be organized for purposes of engaging in activities similar to the activities of the Partnership, even if in competition with the Partnership, and the Partnership shall not have any rights in and to such independent ventures or the income or profits derived therefrom.

11.13. <u>Partition Rights</u>. No Partner shall have the right to the partition of any Property or to take any action or initiate or prosecute any judicial proceeding for the partition, or the partition and sale, of any Property.

11.14. <u>Agreement in Counterparts</u>. This Agreement may be executed in several counterparts, and all so executed shall constitute one Agreement, binding on all of the parties hereto, notwithstanding that all the parties are not signatories to the original or the same counterpart.

*Remainder of Page Intentionally Left Blank.*
*Signature Page(s) Follows.*

UBSTRO115

IN WITNESS WHEREOF, this Agreement is effective as of the day and year first above written.

GENERAL PARTNER:

**HIGHLAND CDO OPPORTUNITY GP, LLC,**
a Delaware limited liability company

By:    Highland Capital Management, L.P.,
a Delaware limited partnership
its sole Member

By:    Strand Advisors, Inc.,
a Delaware corporation,
its General Partner

By:    _____
James Dondero,
President

LIMITED PARTNER:

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
a Delaware limited partnership

By:    Strand Advisors, Inc.,
a Delaware corporation,
its General Partner

By:    _____
James Dondero,
President

D-DAL_1383680_1

**UBSTRO116**

**AGREEMENT OF LIMITED PARTNERSHIP**

OF

**HIGHLAND CDO OPPORTUNITY FUND GP, L.P.**

**(A Delaware Limited Partnership)**

EXHIBIT A

| | | |
|---|---|---|
| 1. | Name of Partnership: | Highland CDO Opportunity Fund GP, L.P. |
| 2. | Address, and Telephone and Facsimile Numbers of Principal Office: | 13455 Noel Road<br>Suite 1300<br>Two Galleria Tower<br>Dallas, Texas 75240<br><br>Telephone:    972.628.4100<br>Facsimile:    972.628.4147 |
| 3. | Registered Agent and Office: | The Corporation Trust Company<br>1209 Orange Street<br>Wilmington, Delaware 19801 |
| 4. | General Partner: | |
| | Name: | Highland CDO Opportunity GP, LLC |
| | Mailing Address, and Telephone and Facsimile Numbers: | 13455 Noel Road<br>Suite 1300<br>Two Galleria Tower<br>Dallas, Texas 75240<br><br>Telephone:    972.628.4100<br>Facsimile:    972.628.4147 |
| | Initial Capital Contribution: | $ _____ |
| | Percentage Interest: | 1% |
| | Time of or Events Requiring Additional Contribution(s): | As provided in the Agreement |
| | Effective Date Became Partner: | October _19_, 2005 |

D-DAL_1383680_1

A-1

UBSTRO117

5.      Limited Partner:

       Name:                                                                    Highland Capital Management, L.P.

       Mailing Address, and Telephone
       and Facsimile Numbers:                                    13455 Noel Road
                                                     Suite 1300
                                                    Two Galleria Tower
                                                    Dallas, Texas 75240

                                                    Telephone:     972.628.4100
                                                    Facsimile:      972.628.4147

       Initial Capital Contribution:                            $ _____

       Percentage Interest:                                        99%

       Time of or Events Requiring
       Additional Contribution(s):                            As provided in the Agreement

       Effective Date Became Partner:                    October _19_, 2005

UBSTRO118

# EXHIBIT 13

UBSTRO119

**Highland CDO Opportunity Master Fund, L.P.**


**Articles of Limited Partnership**

UBSTRO120

# HIGHLAND CDO OPPORTUNITY MASTER FUND, L.P.

## ARTICLES OF LIMITED PARTNERSHIP

## TABLE OF CONTENTS

Article 1.  Definitions ..................................................................................................................1
Article 2.  Organization..............................................................................................................4
   §2.1.Formation of Fund ...........................................................................................................4
   §2.2.Name ..................................................................................................................................4
   §2.3.Principal Place of Business.................................................................................................4
   §2.4.Registered Representative and Registered Office...............................................................4
   §2.5.Purposes and Powers..........................................................................................................4
   §2.6.Term ...................................................................................................................................5
Article 3.  Capital Contributions; Admission of Partners............................................................5
   §3.1.Issuance of Limited Partnership Interests ..........................................................................5
   §3.2.Contributions of Limited Partners; Admission of Additional Limited Partners...............5
   §3.3.Contributions by General Partner .......................................................................................5
   §3.4.Form and Timing of Contributions ....................................................................................5
Article 4.  Capital Accounts; Allocations ...................................................................................6
   §4.1.Opening Capital Accounts..................................................................................................6
   §4.2.Closing Capital Accounts ...................................................................................................6
Article 5.  Records and Accounting; Reports ..............................................................................6
   §5.1.Records and Accounting.....................................................................................................6
   §5.2.Accounting Period; Accounting Methods...........................................................................6
   §5.3.Net Asset Value (NAV) .....................................................................................................6
   §5.4.Valuation of Assets............................................................................................................7
   §5.5.Tax Returns, Withholding................................................................................................. 8
Article 6.  Withdrawals and Distributions .................................................................................. 8
   §6.1.Withdrawals from Capital Accounts.................................................................................. 8
   §6.2.Effect of Complete Withdrawal......................................................................................... 9
   §6.3.Distributions....................................................................................................................... 9
   §6.4.Limitations; Form of Distributions .................................................................................... 9
Article 7.  Management............................................................................................................... 9
   §7.1.Authority of the General Partner........................................................................................ 9
   §7.2.Activities of General Partner and Affiliates; Interested Partners.......................................10
   §7.3.Delegation of the General Partner's Authority ..................................................................10
   §7.4.Expenses ...........................................................................................................................10
   §7.5.Advisory and Consulting Services.....................................................................................10
   §7.6.Exculpation .......................................................................................................................10
   §7.7.Indemnification .................................................................................................................11
   §7.8.Reliance by Third Parties ..................................................................................................11
   §7.9.Registration of Assets .......................................................................................................11
   §7.10.Withdrawal of General Partner .......................................................................................11

1

UBSTRO121

Article 8. Rights and Obligations of the Limited Partners................................................12
   §8.1.In General.........................................................................................................12
   §8.2.Dissolution, Bankruptcy, or Incapacity of Limited Partner ............................12
Article 9. Dissolution and Termination of the Fund .......................................................12
   §9.1.Dissolution.......................................................................................................12
   §9.2.Liquidation and Distribution...........................................................................12
   §9.3.Termination......................................................................................................12
Article 10. Miscellaneous ...............................................................................................13
   §10.1.Appointment of General Partner as Attorney-in-Fact....................................13
   §10.2.Signatures; Amendments ..............................................................................13
   §10.3.Notices and Addresses ..................................................................................13
   §10.4.Governing Law ..............................................................................................13
   §10.5.Successors and Assigns..................................................................................13
   §10.6.Counterparts...................................................................................................13
   §10.7.Modifications To Be In Writing......................................................................13
   §10.8.Interpretation.................................................................................................14
   §10.9.Validity And Severability ..............................................................................14
   §10.10.Statutory References ....................................................................................14
   §10.11.Partition Action ...........................................................................................14

UBSTRO122

# HIGHLAND CDO OPPORTUNITY MASTER FUND, L.P.

## ARTICLES OF LIMITED PARTNERSHIP

THESE ARTICLES OF LIMITED PARTNERSHIP (the "Articles") are made effective as of October __, 2005, among Highland CDO Opportunity Fund GP, L.P. a Delaware limited partnership, as General Partner, and those persons who have executed a counterpart of these Articles or otherwise agree in writing to be bound hereby as Limited Partners.

### Article 1  Definitions

When used in these Articles, the following terms have the following meanings:

§ 1.1   "Accountants" -- such firm of independent certified public accountants as shall be engaged from time to time by the General Partner.

§ 1.2   "Accounting Period" -- has the meaning set forth in §5.2.

§ 1.3   "Acts" -- means the Limited Partnership Act of 1981 of Bermuda and the Exempted Partnerships Act of 1992 of Bermuda, in each case as amended from time to time, together with any regulations made pursuant thereto or thereunder.

§ 1.4   "Additional Limited Partner" -- means any person admitted to the Fund as a Limited Partner on or after the effective date of these Articles pursuant to §3.2(b).

§ 1.5   "Affiliate" -- means with respect to the specified Person: (a) any Person that directly or indirectly through one or more intermediaries controls, alone or through an affiliated group, is controlled by, or is under common control with, the specified Person, (b) any Person that is an officer, director, partner or trustee of, or serves in a similar capacity with respect to, the specified Person (or an Affiliate of the specified Person) or of which the specified Person is an officer, director, partner or trustee, or with respect to which the specified Person serves in a similar capacity, (c) any Person that, directly or indirectly, is the beneficial owner of 10% or more of any class of equity securities of, or otherwise has a substantial beneficial interest in, the specified Person or of which the specified Person is directly or indirectly the owner of 10% or more of any class of equity securities or in which the specified Person has a substantial beneficial interest, or (d) any relative or spouse of the specified Person.

§ 1.6   "Articles" -- means these Articles of Limited Partnership, as amended from time to time.

§ 1.7   "Bankruptcy" -- means, with respect to a Person: (i) the commencement against him of a proceeding for any relief under any bankruptcy or insolvency law, or any law relating to the relief of debtors, readjustment of indebtedness, reorganization, arrangement, composition, or extension of debts, provided the proceeding shall not have been dismissed, nullified, stayed (but only so long as the stay shall continue in force), or otherwise rendered ineffective within 90 days after the commencement of the proceeding; (ii) the commencement by the Person of a proceeding for any relief under any such law; (iii) a decree or order of a court of competent jurisdiction for the appointment of a receiver, liquidator, or trustee or assignee in bankruptcy or insolvency of the Person or of a substantial part of his property, or for the winding up or liquidation of his affairs, which decree or order remains in force undischarged and unstayed for 90 days; or (iv) a general assignment by the Person for the benefit of creditors or the

3

UBSTRO123

admission by him in writing of his inability to pay his debts generally as they become due.

§ 1.8 "Capital Contributions" -- means, with respect to any Partner as of any date, the total amount of money and the fair market value of property he has contributed to the Fund (including, in the case of an assignee or Substitute Partner, contributions made by any prior holder of the Interest held by him as of such date). § 1.9 "Closing Capital Account" -- has the meaning set forth in §4.2.

§ 1.10 "Code" -- means the Internal Revenue Code of 1986 of the United States of America, as from time to time amended, or any successor thereto.

§ 1.11 "Collateral Interest" -- means a collateralized, asset-backed or similar security; any collateral supporting, backing or underlying such a security; any other security; or real property or an interest therein.

§ 1.12 "Company Act" – means the Investment Company Act of 1940, as amended.

§ 1.13 "Disability" -- means, with respect to a Person, a state or condition of incapacitated legal disability or, through illness, age or other cause, an inability to give reasoned consideration to financial matters.

§ 1.14 "Event of Withdrawal" -- means, with respect to the General Partner, the cessation of its status as a Partner as a result of death, dissolution, removal, Bankruptcy, incapacity, complete withdrawal, or any other reason, other than the dissolution of the Fund, or any other event requiring the withdrawal of the General Partner under the Act.

§ 1.15 "Financial Interest" -- means any note, share, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

§ 1.16 "Fiscal Year" -- means the calendar year. (The Fund's first Fiscal Year shall start when the Fund begins operating and end on the succeeding December 31. The Fund's last Fiscal Year shall end when the Fund dissolves and terminates.)

§ 1.17 "Fund" -- means the exempted, limited partnership formed pursuant to these Articles, the existence of which will commence upon registration with the Registrar of Companies in Bermuda of the Certificates in accordance with the provisions of the Acts.

§ 1.18 "Fund Percentage" -- means, with respect to each Partner for an Accounting Period, his Opening Capital Account for the Accounting Period, divided by the sum of the Opening Capital Accounts of all Partners for that Accounting Period. The sum of the Fund Percentages shall equal 100%.

§ 1.19 "General Partner" -- means Highland CDO Opportunity Fund GP, L.P., a Delaware limited partnership, or any successor thereto.

§ 1.20 "Interest" -- means the entire ownership interest of a Partner in the Fund at any time, including his right to any benefit to which he may be entitled under these Articles and the Act, together

-2-

UBSTRO124

with his obligations to comply with any term of these Articles. Reference to the holders of a majority or specified percentage in Interest of the Limited Partners means Limited Partners whose Fund Percentages represent more than 50% (in the case of a majority in Interest) or the specified percentage (in other cases) of the Fund Percentages of all Limited Partners. Reference to a Limited Partnership or General Partnership Interest means the Interest of a Limited Partner or General Partner, as the case may be.

§ 1.21 "Legal Counsel" -- means such legal counsel as shall be engaged from time to time by the General Partner for the Fund.

§ 1.22 "Limited Partner" -- means, as of any date, any or all of the Persons who have been admitted as and continue to be limited partners of the Fund as of such date.

§ 1.23 "may" -- when referring to an act or decision to be made by the General Partner means that the General Partner shall make or refrain from making the act or decision in its sole and absolute discretion.

§ 1.24 "Certificates" -- means the Certificate of Particulars of Limited Partnership and the Certificate of Particulars of Exempted Partnership registered with the Registrar of Companies of Bermuda, as originally framed or as amended from time to time.

§ 1.25 "Net Asset Value"("NAV") -- has the meaning set forth in §5.3.

§ 1.26 "Opening Capital Account" -- has the meaning set forth in §4.1.

§ 1.27 "Partner" -- means as of any particular time any Person who is at that time a General Partner or Limited Partner.

§ 1.28 "Person" -- means any natural person, company, corporation, firm, joint venture, partnership, trust, unincorporated organization, government, or any department, political subdivision or agency of a government.

§ 1.29 "Property" -- means any real or personal property, or any interest therein.

§ 1.30 "Pro Rata" -- means according to the Fund Percentage of each Partner.

§ 1.31 "Securities Act" -- means the Securities Act of 1933 of the United States of America, as amended.

§ 1.32 "Subscription Agreement" -- means, with respect to a Limited Partner, the Subscription Agreement of that Limited Partner.

§ 1.33 "Substitute Partner" -- means a Person to whom an Interest has been assigned and who has been admitted to the Fund as a General Partner ("Substitute General Partner") or Limited Partner ("Substitute Limited Partner") under these Articles.

§ 1.34 "Treasury Regulations" -- means the regulations promulgated by the United States Department of the Treasury with respect to a section of the Code, whether in proposed, temporary or final form, as from time to time amended, or any successors thereto.

§ 1.35 "Valuation Date" -- means, with respect to any Accounting Period, the last business day of the Accounting Period.

§ 1.36 "Withdrawal Notice" -- means a notice required to be delivered by a Limited Partner

UBSTRO125

who desires to withdraw under §6.1 (a).

§ 1.37 "Withdrawing Partner" -- means any Partner who voluntarily makes a withdrawal from his Capital Account under §6.1.

**Article 2  Organization**

§2.1   Formation of Fund.   The parties hereby agree to form Highland CDO Opportunity Master Fund, L.P. pursuant to the Acts and these Articles.   The Fund shall commence upon the registration with the Registrar of Companies in Bermuda of the Certificates. The parties hereby agree to execute or cause to be executed all such documents, and to do or cause to be done all such filings and other acts, appropriate to comply with the applicable laws of any jurisdiction in which the Fund conducts business.

§ 2.2   Name.   The business of the Fund shall be conducted under the name "Highland CDO Opportunity Master Fund, L.P.," or under such other name as the General Partner may determine, subject always to compliance with the applicable provisions of the Acts.   Upon any change of name of the Fund, supplemental Certificates will be registered with the Registrar of Companies in accordance with the Acts.

§ 2.3   Principal Place of Business.   The Fund's principal place of business is c/o JPMorgan Tranaut Fund Administration Limited, Magnolia House Building, 1st Floor,119 Front Street, Hamilton HM 12 Bermuda. The General Partner may on written notice to the Partners change the location of the Fund's principal place of business, or establish additional places of business.

§ 2.4   Registered Representative and Registered Office.   The registered representative of the Fund for the purposes of the Acts shall be MQ Services Ltd, Chancery Hall, 52 Reid Street, Hamilton HM 12, Bermuda and the Fund's registered office in Bermuda shall be c/o M Q Services Ltd, Chancery Hall, 52 Reid Street, Hamilton HM 12, Bermuda.

§ 2.5   Purposes and Powers.   The Fund is organized for the purpose of seeking current return and appreciation through investments in securities.   In furtherance thereof, the Fund is authorized to: (a) organize one or more joint ventures, partnerships (limited or general), corporations, or other entities, and invest in other partnerships (as a general or limited partner), corporations, or other entities; (b) purchase, hold, sell, write, exchange, transfer, pledge, and otherwise invest and trade in any financial interest, whether within or without the United States; (c) exercise all rights, powers, privileges, and other incidents of ownership or possession with respect to any financial interest or other Fund asset; (d) acquire a long or short position in any financial interest, and make purchases or sales increasing, decreasing, or liquidating that position or changing from a long to a short position or vice versa; (e) acquire financial interests which may not be resold in the absence of an effective registration statement relating thereto under the Securities Act or under an exemption from such registration requirements, and to hold such financial interests for investment; (f) invest or deposit Fund monies, pending investment or distribution to Partners, in one or more checking or savings accounts, money market mutual funds, or other taxable or nontaxable investments; (g) acquire any financial interest on margin; borrow or raise moneys and obtain letters of credit; issue, accept, endorse, and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures, and other negotiable or nonnegotiable instruments and evidences of indebtedness (including promissory notes or other evidences of indebtedness which pay interest measured by reference to Fund profits or to any index); and secure the payment of such or other obligations of the Fund by mortgage upon, or hypothecation or pledge of, all or part of the property of the Fund; (h) enter into custodian agreements with banks or securities brokerage firms (whether or not affiliated with the Fund or the General Partner), open, maintain, and close bank and brokerage accounts, and draw checks or other orders for the payment of money or the delivery of instruments; (i) delegate to

-4-

**UBSTRO126**

the General Partner the discretion to authorize one or more persons the authority to manage Fund accounts; (j) engage independent attorneys, accountants, advisors, consultants, or such other persons as the General Partner may deem appropriate in its sole and absolute discretion; (k) maintain for the conduct of Fund affairs one or more offices and in connection therewith rent or acquire space and engage personnel; and (l) enter into, make and perform, all contracts and other undertakings, and engage in all other activities and transactions, as the General Partner may deem appropriate for carrying out the purposes of the Fund.

§ 2.6    <u>Term</u>. Subject to §9.3 the Fund is established for an indefinite term.

**Article 3  Capital Contributions; Admission of Partners**

§ 3.1    <u>Issuance of Limited Partnership Interests</u>. Subject to §3.2, the Fund is authorized to offer, issue, and sell Interests in such manner as the General Partner may determine. Subject to the requirements of the second sentence of § 10.2(b), upon an appropriate amendment to these Articles, the General Partner may authorize the Fund to issue one or more classes of Interests, which classes may be subject to different levels of fees or different investment strategies, or which may differ from one another in any other manner.

§ 3.2    <u>Contributions of Limited Partners; Admission of Additional Limited Partners</u>.

(a)    The Limited Partners have at the date of these Articles agreed to contribute $12,000 between them to the capital of the Fund. The General Partner shall maintain a register of partnership interests setting forth the name, address, amount and date of Capital Contributions of each Partner, and the amounts and dates of any payment representing a return of any part of each Partner's Capital Contribution. Copies of the register of partnership interests shall at all times be maintained at the registered office and the principal place of business of the Fund or at such other place(s) as the General Partner may determine.

(b)    Subject to §3.1, the General Partner shall (i) allow Partners to make additional Capital Contributions to the Fund on a daily basis, and (ii) upon making an amendment to these Articles, admit one or more Additional Limited Partners, effective at any time selected by the General Partner. The admission of Additional Limited Partners shall not require the consent of the Limited Partners. Each Additional Limited Partner shall execute an appropriate counterpart to these Articles or otherwise agree in writing to be bound by the terms hereof. The admission of an Additional Limited Partner shall not dissolve the Fund. Except as expressly provided herein, no Partner shall be required to make any additional Capital Contribution to the Fund.

§ 3.3    <u>Contributions by General Partner</u>. The General Partner is not required to make any Capital Contribution to the Fund.

§ 3.4    <u>Form and Timing of Contributions</u>. All amounts to be contributed by a Limited Partner shall be paid in immediately available funds or marketable securities acceptable to the General Partner at the office of the Fund or at such other location as may be specified by the General Partner on the day prescribed by the General Partner in any written notice delivered to the Limited Partner.

-5-

UBSTRO127

The Fund may pay the contributing Limited Partner (or the General Partner may credit to his Opening Capital Account) interest on any Capital Contribution received by the Fund from the Limited Partner prior to the effective date of the Capital Contribution, computed for the period from the date the funds received are available to the Fund to the effective date. Any interest paid, if any, shall be treated as a Fund expense for the Accounting Period in which the interest is paid or credited. If the Fund receives a Capital Contribution from a Limited Partner after the effective date of the Capital Contribution, the General Partner may charge the Opening Capital Account of the contributing Limited Partner (or, require the contributing Limited Partner to pay) interest for the period from the effective date of his Capital Contribution to the date the funds received are available to the Fund. Any interest charged to (or paid by) the contributing Partner shall be credited to the Opening Capital Accounts of all the Partners in proportion to their respective Fund Percentages. All interest required to be paid or charged under this Section will be at a floating rate as may be determined by the General Partner.

**Article 4 Capital Accounts; Allocations**

§ 4.1    Opening Capital Accounts.  An Opening Capital Account shall be established for each Partner on the Fund's books as of the beginning of each Accounting Period, for each separate Capital Contribution of the Partner. The Opening Capital Account as of the beginning of the Accounting Period in which the Partner is admitted shall be his Capital Contribution as of that date. The Opening Capital Account as of the beginning of each subsequent Accounting Period shall be his Closing Capital Account for the immediately preceding Accounting Period (determined under §4.2), decreased by the amount of any withdrawals made by the Partner effective as of the end of the preceding Accounting Period.

§ 4.2    Closing Capital Accounts.  A Closing Capital Account shall be established on the Fund's books for each Partner as of the end of each Accounting Period. Its amount shall be determined by adjusting the Opening Capital Account of the Partner by crediting or debiting (as the case may be) any increase or decrease in the Fund NAV for the Accounting Period Pro Rata to the individual Opening Capital Accounts of all Partners.

**Article 5 Records and Accounting; Reports**

§ 5.1    Records and Accounting.  The General Partner shall maintain records and books of account of the business of the Fund at the Fund's principal office or at such other place as the General Partner determines. Each Partner or its duly authorized representative may reasonably inspect and copy (at its expense) those books and records. However, a Limited Partner shall not disclose (and will require its representatives to forbear from disclosing) to third parties any information of a proprietary nature obtained in the inspection.

§ 5.2    Accounting Period; Accounting Methods.  An Accounting Period shall (i) begin on the day after the close of the preceding Accounting Period and (ii) end on the earlier of the close of the Fiscal Year, the effective date of any withdrawal by a Partner under §6.1, or the day preceding the effective date of any Capital Contribution.

(a)    The Fund shall keep its books and records in accordance with these Articles, under the accrual method of accounting and, as to matters not specifically covered herein, in accordance with generally accepted accounting principles. All matters concerning accounting practices not specifically and expressly provided for herein shall be determined by the General Partner in good faith. Such determination shall be final and conclusive as to all the Partners.

§ 5.3    Net Asset Value (NAV).  The Fund's NAV shall be determined as of each Valuation Date. For purposes of these Articles, the increases and decreases in NAV for each Accounting Period shall be measured by reference to the NAV of the Fund as of the Valuation Date for that Accounting

-6-

Period and as of the Valuation Date for the preceding Accounting Period. The Fund NAV as of any Valuation Date means the value of the Fund's assets (determined under §5.4) minus its liabilities, determined as of the close of business on that Valuation Date. For this purpose:

(a)     The Fund's assets as of any date shall be deemed to include: (i) all cash on hand or on deposit, including any interest accrued thereon; (ii) all bills, demand notes, and accounts receivable; (iii) all instruments owned or contracted for by the Fund; (iv) all stock dividends, cash dividends, and cash distributions receivable by the Fund; (v) all interest accrued on any interest-bearing securities except to the extent that the same is included or reflected in the valuation of such security; (vi) unamortized organization expenses and similar costs; (vii) all interests in other partnerships, trusts, mutual funds, and other entities; and (viii) all other assets of every kind and nature, including prepaid expenses.

(b)     The liabilities of the Fund as of any date shall include: (i) all outstanding loans, bills and accounts payable; (ii) accrued or payable expenses; (iii) the current market value of all short sale obligations; and (iv) all other liabilities.

(c)     For purposes of determining the Fund's liabilities, the General Partner may treat estimates of expenses that are incurred on a regular or recurring basis over yearly or other periods as accruing in equal proportions over the period.

(d)     The General Partner may establish such reserves for unknown or unfixed liabilities or contingencies as it may determine. It may treat any liability or expenditure which becomes fixed or is incurred in an Accounting Period subsequent to the Accounting Period to which the liability or expenditure relates as either (i) arising in the Accounting Period in which the liability becomes fixed or the expenditure is made or (ii) arising in the prior Accounting Period. In that case the liability or expenditure shall be charged to Persons who were Partners during that prior Accounting Period (whether or not the Persons are Partners during the Accounting Period in which the liability is fixed or the expenditure is incurred) Pro Rata for that prior Accounting Period. Pursuant to §8.1, the Fund may collect amounts previously distributed to those Persons.

§ 5.4   Valuation of Assets. For all purposes of these Articles, including the determination of NAV and the value of Capital Accounts, the assets of the Fund shall be valued as follows:

(a)     no value will be assigned to goodwill;

(b)     all accrued debts and liabilities will be treated as liabilities, including but not limited to, all fees payable to the General Partner which have been earned but not yet paid, the value of any fees earned in prior years as to which the General Partner has made an election for deferred payment, including any appreciation or depreciation thereof since deferral, any allowance for the Fund's estimated annual audit and legal fees and other operating expenses and any contingencies for which reserves are determined to be required;

(c)     securities and instruments which are listed or quoted on a securities or other exchange market (including the National Association of Securities Dealers National Market System), other than securities and instruments which are in the form of put or call options, shall be valued at their last sales prices on the date of determination, or, if no sales occurred on such date, at the mean between the "bid" and "asked" prices on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 business days prior to the date of such determination, at the value reasonably assigned to such securities and instruments by the General Partner;

-7-

UBSTRO129

(d)    securities and instruments which are in the form of put and call options and are listed or quoted on a securities or other exchange or market shall be valued at the mean between the "bid" and "asked" prices on the date of determination, or if no such prices were quoted on such date, at the mean between the "bid" and "asked" prices on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 business days prior to the date of such determination, at the value reasonably assigned to such securities and instruments by the General Partner;

(e)    securities and instruments which are not listed or quoted on a securities or other market shall be valued at the mean between the "bid" and "asked" prices on the date of determination, or if no such prices were quoted on such date, on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 business days prior to the date of such determination, at the value reasonably assigned to such securities and instruments by the General Partner;

(f)    securities and instruments which are in the form of put and call options and are not listed or quoted on a securities, commodities or futures exchange or market shall be valued at their parity value, except when the General Partner has reasonably assigned some other value to such securities and instruments;

(g)    the value of any shares of stock held by the Fund in an investment company which is, or which is similar to those companies which are, registered as investment companies under the Company Act, shall be valued in accordance with the manner in which such shares are valued by such investment company; provided, however, that the General Partner may make such adjustments in such valuation as the Fund may from time to time consider appropriate; and

(h)    all other assets and liabilities of the Fund shall be valued in the manner determined by the General Partner of the Fund to reflect their market value.

§ 5.5   Tax Returns, Withholding.  As soon as reasonably practicable after the end of each Fiscal Year, the General Partner shall cause to be delivered to each Person who was a Partner during the Fiscal Year such tax information and schedules as shall be necessary for his preparation of its tax returns.

### Article 6  Withdrawals and Distributions

§6.1   Withdrawals from Capital Accounts

(a)    A Partner may withdraw, as of the end of any month, his entire Capital Account or any portion thereof by giving at least 15 days' prior written notice (the "Withdrawal Notice") to the General Partner. The General Partner may suspend the right to withdraw capital if it determines in its discretion that the withdrawal would adversely affect the other Partners.

(b)    A Withdrawing Partner shall be entitled to receive an amount equal to the lesser of the amount set forth in his Withdrawal Notice or his Closing Capital Account for the Accounting Period in which the withdrawal is effective. Except to the extent provided elsewhere herein, the Fund shall to the extent practicable distribute all of the amount or estimated amount withdrawn pursuant to this §6.1 within 30 business days of the effective date of the withdrawal. The General Partner may postpone the payment of withdrawal proceeds if it determines in its discretion that the payment would adversely affect

-8-

UBSTRO130

the other Partners.

(c)    If the Fund is unable to value investments or effect withdrawals from entities in which the Fund invests ("Illiquid Investments") as of the effective date of any withdrawal by a Limited Partner, the General Partner may defer valuation of that Limited Partner's Fund Percentage for the Illiquid Investments until the corresponding funds are received by the Fund and available for distribution to the withdrawing Limited Partner, who shall be treated as having a continuing interest in the Illiquid Investments. As soon as the Fund liquidates its interest in, or receives any distributions with respect to, the Illiquid Investments, it shall promptly remit the amounts received and allocable to the withdrawing Limited Partner to it.

§ 6.2    Effect of Complete Withdrawal. A Limited Partner who elects or is required to make a complete withdrawal from its Capital Account shall continue as a Limited Partner after the date of its Withdrawal Notice until the effective date thereof (as provided in §6.1). However, it shall have no further right to exercise any of the powers conferred herein or under the laws of any jurisdiction purporting by statute to grant express rights to a limited partner of a limited partnership. Nevertheless, all allocations of increases or decreases in the NAV of the Fund attributable to the Interest of the Withdrawing Partner, and any distributions made with respect thereto, shall be made to it through the effective date of its withdrawal (but it shall have no right to NAV increases or decreases occurring after the effective date of withdrawal, or to distributions declared after that date). The Interest shall not thereafter be included in calculating the Interests of the Partners necessary to take action hereunder. Upon the Withdrawing Partner's receipt of the distributions required to be made in retirement of its Interest, it shall have no further rights hereunder. The withdrawal of a Limited Partner shall not dissolve the Fund and the remaining Partners shall continue the Fund pursuant hereto.

§ 6.3    Distributions. The General Partner may at any time cause the Fund to make a distribution to the Partners of such amount as the General Partner may determine. Such distributions shall be made to the Partners Pro Rata according to their Fund Percentages for the Accounting Period in which the distributions are made.

§ 6.4    Limitations; Form of Distributions. No Partner shall be entitled to receive any distribution or make any withdrawal except as provided in this Article 6 or in §9.2. All distributions made pursuant to §§6.1(b), (c) or 6.3 may be made in cash, marketable securities, or any combination thereof, as the General Partner may determine in its sole and absolute discretion.

**Article 7 Management**

§ 7.1    Authority of the General Partner. The management and operation of the Fund shall be vested exclusively in the General Partner. It shall have the authority and power on behalf and in the name of the Fund to perform all acts and enter into and perform all contracts and other undertakings which it may deem appropriate to the Fund's purposes. Notwithstanding the foregoing, the General Partner shall not without the unanimous consent of all the Limited Partners: (i) do any act in contravention of these Articles; (ii) do any act which would make it impossible to carry on the ordinary business of the Fund; (iii) enter a judgment against the Fund; (iv) possess Fund property, or assign its rights in specific Fund property, for other than a Fund purpose; (v) admit a person as a general partner, unless the right so to do is given in these Articles; or (vi) continue the business with Fund property on the death, retirement, bankruptcy or incapacity of a general partner, unless the right so to do is given in these Articles. The General Partner may waive any provision of this Agreement as to any Partner.

-9-

UBSTRO131

§ 7.2 <u>Activities of General Partner and Affiliates; Interested Partners</u>

(a)     The General Partner or any Affiliate thereof shall not be required to devote full time or any material proportion of its time to the Fund. However, the General Partner hereby agrees to use its best efforts in connection with the Fund's purposes and objectives and to devote thereto such of its time and activity during normal business days and hours as it may deem appropriate for the management of the Fund's affairs. However, nothing in this Section shall preclude the General Partner or any Affiliate thereof from: (i) acting, consistent with the foregoing, as a director, stockholder, officer, or employee of any corporation, a trustee of any trust, a partner of any other partnership, or an administrative official of any other business or governmental entity, regardless of whether the Fund invests in or has dealings with the entity; (ii) receiving compensation for services rendered thereto, or participating in profits derived from investments in, any such entity; or (iii) from investing in any Financial Interest or other property for his account.

(b)     The fact that the General Partner, a Limited Partner, or an Affiliate thereof directly or indirectly owns an interest in, has any right to receive any payment with respect to, or is otherwise connected with any Person with which the Fund has dealings, including the right to receive the payment of advisory and management fees, brokerage fees, profit shares and other amounts, shall not preclude such dealings or make them void or voidable. Neither the Fund nor any Partner shall have any rights in or to such dealings or any payments or profits derived therefrom. Without limiting the foregoing, the General Partner or Affiliate thereof shall have the right to participate, directly or indirectly, in the fees payable by the Fund to investment advisers retained by the Fund, and may serve as an operator of or adviser to any entity in which the Fund may invest and receive a share of the profits of such entity or fees therefrom. Neither the General Partner nor any Affiliate thereof shall be obligated to present any particular investment opportunity to the Fund even if it is of a character which, if presented, could be taken by the Fund, and they shall have the right to take for their own account (individually, as trustee or general partner, or on behalf of any client) or to recommend to other individuals or entities any such particular investment opportunity. The General Partner and any Affiliate thereof may receive any "soft dollar" benefit in relation to the Fund, including benefits outside the "safe harbor" of Section 28(e) of the U.S. Securities Exchange Act of 1934.

(c)     Nothing herein shall prohibit any Partner or Affiliate thereof from buying or selling any Financial Interest for his own account, including any Financial Interest of the type held by the Fund.

§ 7.3     <u>Delegation of the General Partner's Authority</u>. The General Partner may delegate all or any of its authority hereunder and may appoint, employ, contract or otherwise deal with any Person not being a Limited Partner for the transaction of the business of the Fund.

§ 7.4     <u>Expenses</u>. The Fund shall pay such costs and expenses as the General Partner may determine, including but not limited to : (i) brokerage commissions and other costs of executing transactions; (ii) interest expense; (iii) insurance expense; (iv) legal, accounting, auditing, and tax preparation expenses; (v) custody fees; and (vi) computer services.

§ 7.5     <u>Advisory and Consulting Services</u>. The General Partner may enter into agreements with one or more Persons not being a Limited Partner (including Affiliates of the General Partner) to serve as investment advisers or consultants to the Fund on a discretionary or non-discretionary basis and upon such other terms as the General Partner may determine in its sole and absolute discretion.

§ 7.6     <u>Exculpation</u>. The General Partner shall not be liable to the Fund or any other Partner for: (i) any claims, costs, expenses, damages or losses arising out of the performance of its duties under these Articles other than those directly attributable to its own gross negligence or intentional misconduct; (ii)

-10-

UBSTRO132

failure to obtain the lowest brokerage commissions rates, or to combine or arrange orders so as to obtain the lowest brokerage commission rates with respect to any transaction on behalf of the Fund, or for failure to recapture, directly or indirectly, any brokerage commissions for the benefit of the Fund; or (iii) claims, costs, expenses, damages or losses due to circumstances beyond its control, including the bankruptcy, insolvency or suspension of normal business activities of any bank, brokerage firm or transfer agent holding assets of the Fund, or due to the gross negligence or intentional misconduct of any manager with whom the Fund invests, any Affiliate of any entity in which the Fund invests, or any employee, broker or other agent of the Fund or the General Partner.

The General Partner and any Affiliate or employee of the General Partner shall be entitled to rely on the advice of Legal Counsel, the Accountants, or other independent experts experienced in the matter at issue. Any act or omission of any General Partner, Affiliate, or employee pursuant to such advice shall in no event subject the Person to liability to the Fund or any Partner.

No exculpation shall be permitted in respect of the Fund for any violation of U.S. federal or state securities law or any other intentional or criminal wrongdoing.

§ 7.7    Indemnification.    To the maximum extent permitted by law, the Fund shall indemnify any Person, including the General Partner or any of its Affiliates, employees, stockholders, members or partners who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including any action by or in the right of the Fund) by reason of any acts, omissions or alleged acts or omissions by such Person on behalf of the Fund, against expenses for which such Person has not otherwise been reimbursed (including attorneys' fees, judgments, fines and amounts paid in settlement) actually and reasonably incurred in connection with such action, suit or proceeding, so long as such act or omission was not done as a result of intentional misconduct or gross negligence or, with respect to any criminal action or proceeding, such Person had no reasonable cause to believe its conduct was unlawful. The satisfaction of any indemnification shall be from and limited to Fund assets. No Limited Partner shall have any personal liability on account thereof.

§ 7.8    Reliance by Third Parties.    No Person shall be required to inquire into the authority of the General Partner to bind the Fund.    Persons dealing with the Fund shall be entitled to rely on a certification by the General Partner as to the authority of any other person to act on the Fund's behalf in any matter.

§ 7.9    Registration of Assets.    Any assets owned by the Fund may be registered in the name of the Fund, a nominee, or a "street name." Any corporation, brokerage firm or transfer agent called upon to transfer any assets to or from the name of the Fund shall be entitled to rely upon instructions or assignments signed or purporting to be signed by the General Partner or its agents without inquiry as to the authority of the person signing or purporting to sign or as to the validity of any transfer to or from the name of the Fund.

§ 7.10    Withdrawal of General Partner.

(a)    The General Partner may make a complete withdrawal from the Fund with 90 days' prior written notice to all Limited Partners.

(b)    Upon the occurrence of an Event of Withdrawal with respect to the General Partner, the Fund shall dissolve, unless before or immediately upon the occurrence of any such event the Limited Partners elect to continue the Fund business and designate a successor General Partner. If the Fund is so continued, the withdrawing General Partner: (i) shall be and remain liable for all obligations and

-11-

liabilities incurred by it as a General Partner during its membership in the Fund; (ii) shall be free of any obligations or liability incurred on account of the activities of the Fund from and after the time it ceased to be a General Partner; and (iii) shall be entitled to receive (A) any expense reimbursement, or other amounts due and owing to it at the date of withdrawal plus (B) its Closing Capital Account as of the close of the Accounting Period in which the Event of Withdrawal is effective. The appointment of a successor General Partner shall be made in accordance with the Acts.

**Article 8 Rights and Obligations of the Limited Partners§ 8.1    In General.**

(a)    A Limited Partner, as such, will not be personally liable for any debt, liability, contract or other obligation of the Fund. He will be liable only to make any Capital Contribution specified in his Subscription Agreement and in Schedule 1 hereto. He will not be required to lend any funds to the Fund or, after his Capital Contribution is paid, to make any further Capital Contribution to the Fund. In accordance with the Acts, a Limited Partner may under certain circumstances be required to return to the Fund, for the benefit of Fund creditors, amounts previously distributed to him as a return of capital. In addition, the General Partner may require a Limited Partner to return to the Fund amounts previously distributed to him to the extent of his share of any liabilities arising out of events occurring in any Accounting Period in which he was a Partner (determined in accordance with his Fund Percentage for such Accounting Period).

(b)    The General Partner shall have no personal liability for the repayment of the Capital Contributions of any Limited Partner.

(c)    No Limited Partner may take part in the management or control of the business of the Fund, transact any business for the Fund, or have any authority to sign for or bind the Fund.

§ 8.2    Dissolution, Bankruptcy, or Incapacity of Limited Partner. If a Limited Partner or Assignee is dissolved, is adjudged incompetent, or is subject to Bankruptcy, its duly appointed and qualified legal representative shall succeed to its Interest upon furnishing the General Partner satisfactory evidence of the representative's appointment and authority, subject to the General Partner's authority to require the representative to withdraw from the Fund.

**Article 9 Dissolution and Termination of the Fund**

§ 9.1    Dissolution. The Fund shall dissolve and wind up its affairs on the earliest to occur of: (a) an Event of Withdrawal of the General Partner under §7.10 where no successor General Partner is selected; (b) the affirmative vote of all of the Limited Partners; (c) an event which makes it unlawful for the Fund business to be continued; or (d) any other event which, under the Acts, requires the Fund's dissolution and the winding up of its business and affairs.

§ 9.2    Liquidation and Distribution.

(a)    Upon the dissolution of the Fund, the General Partner (or if the dissolution is caused by dissolution or Bankruptcy of the General Partner, the remaining general partners, if any, or, if there is no remaining General Partner, a Person selected by a majority in Interest of the Limited Partners) shall act as liquidator and shall wind up the Fund's affairs. The expenses of liquidation shall be paid by the Fund. Reserves may be created in the discretion of the liquidator for paying contingencies. The expenses of liquidation shall include fair compensation for services rendered to the Fund by any person (including the General Partner), as well as a reasonable allocation of indirect overhead expenses of the General Partner or any non-Partner (including any Affiliate of the General Partner) who performs administrative services for the Fund (including salaries of accounting, secretarial, and clerical personnel, office rent, utilities, and other office expenses), to the extent such expenses are attributable to the liquidation.

(b)    The Fund's net assets, after satisfaction of its liabilities and expenses (including liquidation expenses) shall be applied in the following manner and order: (i) payment and discharge on a pro rata basis of the claims of all creditors who are not Partners; and (ii) distribution of the remaining assets to the Partners in proportion to their Closing Capital Accounts for the Accounting Period in which

-12-

UBSTRO134

termination under §9.3 takes place, without distinction between the General Partner and Limited Partners.

§ 9.3    Termination. Each Partner shall be furnished a statement prepared by the Accountants, setting forth the Fund's assets and liabilities as of the date of dissolution. Upon compliance with the distribution plan in §9.2, the Limited Partners shall cease to be such, and the General Partner or the liquidation trustee shall execute, acknowledge, and cause to be filed a certification of cancellation of the Fund. Upon completion of the dissolution, winding up, liquidation and distribution of the liquidation proceeds, the Fund shall terminate.

**Article 10 Miscellaneous**

§ 10.1    Appointment of General Partner as Attorney-in-Fact.

(a)    By executing these Articles, each Partner irrevocably constitutes and appoints the General Partner its true and lawful attorney-in-fact with full power and authority in its name, place and stead to execute, acknowledge, deliver, swear to, file and record at the appropriate public offices the Certificates and such other documents as may be necessary or appropriate to carry out these Articles.

(b)    The foregoing appointment shall be deemed a power coupled with an interest, since each Partner will be relying upon the power of the General Partner to act as contemplated by these Articles in any filing and other action by it on behalf of the Fund.

§ 10.2    Signatures; Amendments.

(a)    Each Partner shall become a party hereto by signing such number of counterpart signature pages to these Articles or such other instrument or instruments, and in such manner, as the General Partner may determine. However, no such counterpart or instrument shall be binding until it shall have been accepted by the General Partner. Each party agrees to execute or cause to be executed all such documents, and to do or cause to be done all such filings and other acts necessary as the General Partner may require, to comply with the applicable laws of any jurisdiction in which the Fund conducts business.

(b)    These Articles may be amended from time to time by the General Partner with the written consent of the holders of a majority in Interest of the Limited Partners. However, without the consent of the Partners to be adversely affected by the amendment, these Articles may not be amended under this subsection (b) so as to: (i) convert a Limited Partner's Interest into a General Partner's Interest; (ii) modify the limited liability of a Limited Partner; or (iii) alter the Interest of a Partner in the NAV of or distributions from the Fund.

§ 10.3    Notices and Addresses. All notices required to be given under these Articles shall be in writing and shall be mailed by certified or registered mail, hand delivered, or delivered by next business day courier. Any notice to be sent to the Fund shall be mailed to the principal place of business of the Fund or to such other address as the General Partner may specify in a notice sent to all Partners. All notices to Partners shall be mailed or delivered to them at the addresses the Partner may notify the Fund of in writing (initially, the Partner's Subscription Agreement). Notices shall be effective on the date three days after the date of mailing or, if hand delivered by next day business courier, on the date of delivery.

§ 10.4    Governing Law. These Articles are governed by and are to be construed in accordance with the laws of Bermuda without regard to conflict of laws principles. Notwithstanding any other provision of these Articles, no action may be taken under these Articles unless such action is taken in compliance with the provisions of Bermuda law.

§ 10.5    Successors and Assigns. These Articles shall be binding upon and inure to the benefit of the Partners, indemnities hereunder, and their respective legal representatives, permitted successors and assigns.

UBSTRO135

§ 10.6  <u>Counterparts</u>.  These Articles may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one instrument.

§ 10.7  <u>Modifications To Be In Writing</u>.  These Articles constitute the entire understanding of the parties hereto.  No amendment, modification or alteration will be binding unless the same be in writing and adopted in accordance with §10.2.

§ 10.8  <u>Interpretation</u>.  The use of the feminine, masculine or neuter genders herein shall be deemed to include each other gender.  The use of either the singular or the plural includes the other unless the context clearly requires otherwise.  The captions are inserted for convenience of reference only and shall not affect the construction of these Articles.

§ 10.9  <u>Validity And Severability</u>.  If any provision herein is held invalid or unenforceable, such decision shall not affect the validity or enforceability of any other provision hereof, all of which other provisions shall remain in full force and effect.

§ 10.10  <u>Statutory References</u>.  Each reference herein to a particular statute or regulation, or a provision thereof, shall be deemed to refer to such statute, regulation, or provision, or to any similar or superseding statute, regulation, or provision as is from time to time in effect.

§ 10.11  <u>Partition Action</u>.  Each party hereto irrevocably waives any right which it may have to maintain an action for partition with respect to property of the Fund.

IN WITNESS WHEREOF, the undersigned have executed these Articles of Limited Partnership as of the date first above written.


**GENERAL PARTNER:**

Highland CDO Opportunity Fund GP, L.P.


By:  Highland CDO Opportunity GP, LLC, its General Partner


    By:  Highland Capital Management, L.P., its Sole Member


        By:    Strand Advisors, Inc., its General partner

        By:   _____
             James Dondero,
             President


**LIMITED PARTNERS:**

Highland CDO Opportunity Fund, L.P.

By:  Highland CDO Opportunity Fund GP, L.P., its general partner

By:  Highland CDO Opportunity GP, LLC, its General Partner

-14-

UBSTRO136

By: Highland Capital Management, L.P., its Sole Member

    By:    Strand Advisors, Inc., its General partner

    By:    _____

            James Dondero,
            President

Highland CDO Opportunity Fund, Ltd.
  By:  _____
      James Dondero
      Director

UBSTRO137

# EXHIBIT 14

UBSTRO138

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                  FOR THE NORTHERN DISTRICT OF TEXAS
                             DALLAS DIVISION
 2
                                   )    Case No. 19-34054-sgj-11
 3    In Re:                        )    Chapter 11
                                    )
 4    HIGHLAND CAPITAL              )    Dallas, Texas
      MANAGEMENT, L.P.,             )    December 10, 2020
 5                                  )    9:30 a.m. Docket
                                    )
 6          Debtor.                 )
      _____ )
                                    )
 7    HIGHLAND CAPITAL              )    Adversary Proceeding 20-3190-sgj
      MANAGEMENT, L.P.,             )
 8                                  )
                                    )
 9          Plaintiff,              )    - MOTION FOR PRELIMINARY
                                    )      INJUNCTION
10    v.                            )    - MOTION FOR TEMPORARY
                                    )      RESTRAINING ORDER
      JAMES D. DONDERO,             )
11                                  )
                                    )
12          Defendant.             )
      _____ )

13                      TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
14                  UNITED STATES BANKRUPTCY JUDGE.

15    WEBEX/TELEPHONIC APPEARANCES:

16    For the Plaintiff:        Jeffrey N. Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
17                              10100 Santa Monica Blvd.,
                                  13th Floor
18                              Los Angeles, CA  90067-4003
                                (310) 277-6910
19
      For the Plaintiff:        John A. Morris
20                              PACHULSKI STANG ZIEHL & JONES, LLP
                                780 Third Avenue, 34th Floor
21                              New York, NY  10017-2024
                                (212) 561-7700
22
      For the Official Committee Matthew A. Clemente
23    of Unsecured Creditors:   SIDLEY AUSTIN, LLP
                                One South Dearborn
24                              Chicago, IL  60603
                                (312) 853-7539
25
```

2

```
1    APPEARANCES, cont'd.:

2    For the Defendant:          D. Michael Lynn
                                 John Y. Bonds, III
3                                BONDS ELLIS EPPICH SCHAFER JONES,
                                   LLP
4                                420 Throckmorton Street,
                                   Suite 1000
5                                Fort Worth, TX  76102-5304
                                 (817) 405-6903
6
     For the NexPoint Parties:  James A. Wright, III
7                                K&L GATES
                                 State Street Financial Center
8                                One Lincoln Street
                                 Boston, MA  02111
9                                (617) 261-3193

10   For the CLOs/Issuer Group:  James E. Bain
                                 JONES WALKER, LLP
11                               811 Main Street, Suite 2900
                                 Houston, TX  77002
12                               (713) 437-1820

13   Recorded by:                Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
14                               1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
15                               (214) 753-2062

16   Transcribed by:             Kathy Rehling
                                 311 Paradise Cove
17                               Shady Shores, TX  76208
                                 (972) 786-3063
18

19

20

21

22

23

24
            Proceedings recorded by electronic sound recording;
25             transcript produced by transcription service.
```

27

```
 1    to hearing about -- and I think they would have a fiduciary
 2    duty -- to hear about a pot plan that might be more favorable
 3    than what's on the table right now.  But Mr. Morris, have I
 4    put words into your mouth?  Isn't that exactly what you were
 5    saying?
 6         MR. MORRIS:  That is exactly right, Your Honor.  And
 7    if you look, I think there's a footnote there that expressly
 8    provides -- gives Mr. Dondero the right --
 9         THE COURT:  Okay.
10         MR. MORRIS:  -- confirms his right to do exactly what
11    you just described.
12      (Echoing.)
13         THE COURT:  Okay.  Thank you for that.  And I should
14    say exclusivity is still in place, right?  We don't -- I mean,
15    I'm not inviting him to file a plan right now in violation of
16    the exclusivity provisions, but I'm just saying discussions
17    among lawyers, I think, are not only not prohibited but
18    encouraged here.
19      And then, last, otherwise violating Section 362 of the
20    Bankruptcy Code.  Okay, the sky is blue.  That is obviously
21    not problematic.
22      Okay.  So the next paragraph, James Dondero is further
23    temporarily enjoined and restrained from causing, encouraging,
24    or conspiring with any entity owned or controlled by him
25    and/or any person or entity acting on his behalf from directly
```

UBSTRO141

28

1  or indirectly engaging in any prohibited conduct.

2       You know, I don't -- I understand that indirectly, you

3  know, there might be some concern about the ambiguity, but it

4  looks like to me just sort of a catchall, okay, to the extent

5  we didn't explicitly say it in the preceding paragraph, we

6  don't want Dondero causing some employee of an affiliate he

7  controls to do exactly what Dondero himself is prohibited from

8  doing.

9       I don't think it's ambiguous.  And if it is, if someone

10 runs in here, he's violated Paragraph 3 of the TRO, well,

11 obviously we would have a contested hearing where I'm not

12 going to hold him in contempt of court unless I've got an

13 evidentiary showing that would convince me of that.

14      So, I guess, on balance, I'm overruling the objections and

15 I am granting the TRO.

16      And just to be clear, I'll make a record that bankruptcy

17 courts certainly under Section 105 can issue a TRO, and courts

18 are usually bound by the traditional factors of Rule 65 --

19 that is, looking at has there been a showing of immediate and

20 irreparable harm?  Is there a probability of success on the

21 merits that the Debtor will be entitled to this when we have a

22 later more fulsome hearing on the preliminary injunction

23 request?  Would the balance of equities favor the Movant

24 Debtor here?  And would the injunction serve the public

25 interest?

UBSTRO142

29

1        I find from the evidence, the declaration of Mr. Seery,

2   and the supporting documents, that all four prongs for a TRO

3   are met here, so I am ordering it.

4        A couple of remaining things.  We'll come back on January

5   4th to consider whether extension of this relief in a

6   preliminary injunction is appropriate.  I don't have at my

7   fingertips the time of day where it's set on the 4th.  Is it

8   -- I think that's the Monday after the New Year's Day holiday.

9   So I'm guessing we're set at 1:30.

10       Traci, if you're out there, can you confirm it's 1:30 on

11  January 4th?

12       Okay.  I'm not hearing a response from her.  But Nate,

13  maybe you can double-check that.

14       (Echoing.)

15       All right.  Well, let's talk a minute about what is going

16  to happen next week.

17       Mr. Bonds, I set -- okay, back on November -- please take

18  your phone off mute when I am talking.  Or put it on mute when

19  I'm talking, please.

20       On November 19th, you filed the motion, basically -- I

21  can't remember the wording of it -- but something like wanting

22  to change the protocol for non-ordinary-course sales of

23  assets.  And you asked for an emergency hearing, and I denied

24  that.  And I was very concerned that it looked like an attempt

25  to renegotiate the January protocol order that the Committee

UBSTRO143

57

1  Court next Wednesday, he needs to testify.  And if NexPoint,

2  through whoever their decision-maker is, is wanting to urge a

3  position to the Court, they need a human being to testify.

4  And I'll hear Seery and I'll hear Dondero and I'll hear

5  whoever that person is, and that's what's going to matter, you

6  know, most to me.  Yeah, we have some legal issues, certainly,

7  but I like to hear business people explain things, no offense

8  to the lawyers.  But it's always very helpful to hear the

9  business people in addition to the lawyers.  All right.  So,

10  Mr. Morris, you're going to upload that TRO for me.

11          MR. MORRIS:  Yes, Your Honor.

12          THE COURT:  Mr. Wright, you can upload your order

13  setting your motion for hearing next Wednesday at 1:30.  And I

14  think we have our game plan for now.  Anything else?  All

15  right.  We're adjourned.

16          THE CLERK:  All rise.

17      (Proceedings concluded at 11:33 a.m.)

18                      --oOo--

19

20                   CERTIFICATE

21      I certify that the foregoing is a correct transcript to
   the best of my ability from the electronic sound recording of
22  the proceedings in the above-entitled matter.

23   **/s/ Kathy Rehling**                        **12/11/2020**

24  _____      _____

   Kathy Rehling, CETD-444                       Date
25  Certified Electronic Court Transcriber

UBSTRO144

# EXHIBIT 15

UBSTRO145

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION
 2
                                    )    Case No. 19-34054-sgj-11
 3   In Re:                         )    Chapter 11
                                    )
 4   HIGHLAND CAPITAL              )    Dallas, Texas
     MANAGEMENT, L.P.,              )    Friday, January 8, 2021
 5                                  )    9:30 a.m. Docket
            Debtor.                 )
 6   _____ )
                                    )
 7   HIGHLAND CAPITAL              )    Adversary Proceeding 20-3190-sgj
     MANAGEMENT, L.P.,              )
 8                                  )
            Plaintiff,              )    PRELIMINARY INJUNCTION
 9                                  )    HEARING [#2]
     v.                             )
10                                  )
     JAMES D. DONDERO,              )
11                                  )
            Defendant.              )
12   _____ )

13                      TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
14                  UNITED STATES BANKRUPTCY JUDGE.

15   WEBEX/TELEPHONIC APPEARANCES:

16   For the Debtor/Plaintiff:   Jeffrey N. Pomerantz
                                 PACHULSKI STANG ZIEHL & JONES, LLP
17                               10100 Santa Monica Blvd.,
                                  13th Floor
18                               Los Angeles, CA  90067-4003
                                 (310) 277-6910
19
     For the Debtor/Plaintiff:   John A. Morris
20                               PACHULSKI STANG ZIEHL & JONES, LLP
                                 780 Third Avenue, 34th Floor
21                               New York, NY  10017-2024
                                 (212) 561-7700
22

23

24

25
```

2

1    APPEARANCES, cont'd.:

2    For James Dondero,        D. Michael Lynn
     Defendant:               John Y. Bonds, III
3                             Bryan C. Assink
                              BONDS ELLIS EPPICH SCHAFER
4                               JONES, LLP
                              420 Throckmorton Street,
5                               Suite 1000
                              Fort Worth, TX  76102
6                             (817) 405-6900

7    For the Official Committee Matthew A. Clemente
     of Unsecured Creditors:   SIDLEY AUSTIN, LLP
8                              One South Dearborn Street
                               Chicago, IL  60603
9                              (312) 853-7539

10   For the Funds and         Davor Rukavina
     Advisors:                 MUNSCH HARDT KOPF & HARR, P.C.
11                             500 N. Akard Street, Suite 3800
                               Dallas, TX  75201-6659
12                             (214) 855-7554

13   For Certain Employees:    Frances A. Smith
                               ROSS & SMITH, P.C.
14                             Plaza of the Americas
                               700 N. Pearl Street, Suite 1610
15                             Dallas, TX  75201
                               (214) 593-4976
16
     Recorded by:              Michael F. Edmond, Sr.
17                             UNITED STATES BANKRUPTCY COURT
                               1100 Commerce Street, 12th Floor
18                             Dallas, TX  75242
                               (214) 753-2062
19
     Transcribed by:           Kathy Rehling
20                             311 Paradise Cove
                               Shady Shores, TX  76208
21                             (972) 786-3063

22

23

24
             Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.

UBSTRO147

164

1  to make sure you didn't wander off to take a bathroom break or

2  anything.  So, again, I have a whole lot to say here today.

3      First, I'm going to rule on the motion.  The Court does

4  find there is sufficient compelling evidence to grant a

5  preliminary injunction that is completely consistent with the

6  prior TRO.  Okay?  So, specifically, the Court today is going

7  to continue to prevent Mr. Dondero from (a) communicating in

8  any way, directly or indirectly, with any of the Debtor's

9  board members -- I think that's really Strand board members --

10 unless Mr. Dondero's counsel and counsel for the Debtor are

11 included.  Okay.  I'm saying those words slowly and carefully.

12 There is no bar on Mr. Dondero talking to the board about a

13 pot plan or anything else in the universe Mr. Dondero wants to

14 talk to them about.  There's just a preclusion from him doing

15 it without his counsel and the Debtor's counsel present.

16 Okay?

17     I did that before and I'm doing it now because I've seen

18 concerning evidence that some communications to Mr. Seery and

19 others had an intimidating tone, a threatening tone one or two

20 times, an interfering tone.  So, guess what, we're just going

21 to have lawyers involved if any more conversations happen.

22 Okay.

23     So (b) the preliminary injunction, just as the TRO did, is

24 going to prevent Mr. Dondero from making any threats of any

25 nature against the Debtor or any of its directors, officers,

165

1   employees, professionals, or agents.  Okay.  It's almost

2   embarrassing having to say that or order that with regard to

3   such an accomplished and sophisticated person, but, you know,

4   I saw the evidence.  I've got to do what I've got to do.  You

5   know, words in a text like, Don't do it, this is your last

6   warning, and some of the other things, that has a threatening

7   tone, so I'm going to order this.

8       Third, the preliminary injunction will prevent Mr. Dondero

9   from communicating with any of the Debtor's employees except

10  as it specifically relates to shared services provided to

11  affiliates owned or controlled by Mr. Dondero.

12      Now, I'm going to elaborate in a couple of ways here.  I

13  think in closing argument there was a suggestion that he can't

14  even talk to his friend, Mr. Ellington, about anything.  Well,

15  I heard today that Mr. Ellington and Mr. Leventon are no

16  longer employees of the Debtor, so actually that's not an

17  issue.  But while this is very restrictive, while this

18  prevents Mr. Dondero from engaging in small talk with Debtor

19  employees about the weather or the football game or whatever,

20  it's regrettable, but I feel like I'm forced to order this

21  now, because, again, the communications that were put in the

22  record.  Okay?  We just can't take any chances, as far as I'm

23  concerned, with regard to there being potential interference

24  with the Debtor's operations that might be harmful or contrary

25  to creditors' interests.

UBSTRO149

1    Fourth, the preliminary injunction, just like the TRO,

2  will prevent Mr. Dondero from interfering with or otherwise

3  impeding the Debtor's business, including but not limited to

4  the Debtor's decisions concerning its operations, management,

5  treatment of claims, disposition of assets owned or controlled

6  by the Debtor, and pursuit of any plan or alternative to the

7  plan.

8    Now, I understand the argument that this is pretty broad

9  and might be, I don't know, subject to some disputes regarding

10  was it interference, did it impede the Debtor's business or

11  not?  You know what, if you follow the other prongs of the

12  preliminary injunction, that you don't talk to the board

13  without your counsel, Mr. Dondero, and the Debtor's counsel,

14  and you don't talk to Debtor's employees except with regard to

15  matters pertaining to the shared services agreement, and,

16  bottom line, if you just run everything by your attorneys,

17  you'll be okay.  We won't have this ambiguous, vague,

18  problematic territory.

19    Fifth, I will go ahead and, for good measure, belts and

20  suspenders, whatever you want to call it, prevent Mr. Dondero

21  from otherwise violating Section 362(a) of the Bankruptcy

22  Code.

23    Now, I read the response filed at 9:30 last night by Mr.

24  Dondero's counsel.  It's a good response.  It makes legal

25  arguments about that being, you know, it just being too vague.

204

1        MR. BONDS:  Thank you, Your Honor.

2     (Proceedings concluded at 4:09 p.m.)

3                    --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18                    CERTIFICATE

19     I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
20  above-entitled matter.

21   **/s/ Kathy Rehling**                          **01/11/2021**

22  _____     _____

Kathy Rehling, CETD-444                        Date
23  Certified Electronic Court Transcriber

24

25

# EXHIBIT 16

UBSTRO152

**From:** JP Sevilla <JSevilla@HighlandCapital.com>
**To:** Scott Ellington <SEllington@HighlandCapital.com>
**Subject:** Fwd: PRIVILEGED AND CONFIDENTIAL - Sentinel wiring info
**Date:** Fri, 11 Aug 2017 13:17:06 -0500
**Importance:** Normal
**Inline-Images:** image001.jpg

---

FYI

Begin forwarded message:

**From:** "Carter Chism" <CChism@HighlandCapital.com>
**To:** "Katie Irving" <KIrving@HighlandCapital.com>, "JP Sevilla" <JSevilla@HighlandCapital.com>, "Isaac Leventon" <ILeventon@HighlandCapital.com>
**Cc:** "Thomas Surgent" <TSurgent@HighlandCapital.com>, "Clifford Stoops" <CStoops@HighlandCapital.com>, "Frank Waterhouse" <FWaterhouse@HighlandCapital.com>, "David Willmore" <DWillmore@HighlandCapital.com>, "Chris Dunn" <CDunn@HighlandCapital.com>
**Subject: PRIVILEGED AND CONFIDENTIAL - Sentinel wiring info**

Please confirm this serves as instruction to wire cash from all HFP funds and all CDO funds to the account listed in the instructions below.

---

**From:** Katie Irving
**Sent:** Friday, August 11, 2017 10:48 AM
**To:** Carter Chism <CChism@HighlandCapital.com>
**Cc:** JP Sevilla <JSevilla@HighlandCapital.com>
**Subject:** Sentinel wiring info

Sentinel wiring instructions for cash arising from transaction are below, thank you.

**Beneficiary Bank:** Bank of New York Mellon

**Address:** One Wall Street, New York, NY 10286

**ABA #** 021 000 018

**SWIFT:** IRVTUS3N

**Account Name:** MaplesFS Limited

**Account Number:** 890-0527-242

**Ref: FFC: Sentinel Reinsurance Ltd., 676670**

KATIE IRVING, CPA | DIRECTOR, BUSINESS DEVELOPMENT



300 Crescent Court | Suite 700 | Dallas, Texas 75201

D: 972.419.2566 | O: 972.628.4100 | F: 972.628.4147

KIrving@hcmlp.com | www.hcmlp.com

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

HCMUBS000467

**UBSTRO154**

# EXHIBIT 17

**UBSTRO155**

**From:** David Willmore <DWillmore@HighlandCapital.com>
**To:** Carter Chism <CChism@HighlandCapital.com>, Katie Irving
<KIrving@HighlandCapital.com>, JP Sevilla <JSevilla@HighlandCapital.com>, Isaac
Leventon <ILeventon@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>, Clifford Stoops
<CStoops@HighlandCapital.com>, Frank Waterhouse
<FWaterhouse@HighlandCapital.com>, Chris Dunn <CDunn@HighlandCapital.com>,
Jeremy Ringheimer <JRingheimer@HighlandCapital.com>
**Subject:** RE: PRIVILEGED AND CONFIDENTIAL - Sentinel wiring info
**Date:** Fri, 11 Aug 2017 14:35:31 -0500
**Importance:** Normal
**Inline-Images:** image001.jpg

---

FYI, I've entered wires to move all of CDO Fund's cash to Sentinel. There were two wires, one for
$7,779,721.60 and one for $2,349,436.20.

**DAVID E. WILLMORE, CPA | SENIOR MANAGER, FUND ANALYSIS**

O: 972.419.6298 | C: 801.900.1494

---

**From:** Carter Chism
**Sent:** Friday, August 11, 2017 12:46 PM
**To:** Katie Irving ; JP Sevilla ; Isaac Leventon
**Cc:** Thomas Surgent ; Clifford Stoops ; Frank Waterhouse ; David Willmore ; Chris Dunn
**Subject:** PRIVILEGED AND CONFIDENTIAL - Sentinel wiring info

Please confirm this serves as instruction to wire cash from all HFP funds and all CDO funds to the account
listed in the instructions below.

---

**From:** Katie Irving
**Sent:** Friday, August 11, 2017 10:48 AM
**To:** Carter Chism <CChism@HighlandCapital.com>
**Cc:** JP Sevilla <JSevilla@HighlandCapital.com>
**Subject:** Sentinel wiring info

Sentinel wiring instructions for cash arising from transaction are below, thank you.

**Beneficiary Bank:** Bank of New York Mellon

**Address:** One Wall Street, New York, NY10286

**ABA #** 021 000 018

**SWIFT:** IRVTUS3N

**Account Name:** MaplesFS Limited

**Account Number:** 890-0527-242

**Ref: FFC: Sentinel Reinsurance Ltd., 676670**

**KATIE IRVING, CPA |** DIRECTOR, BUSINESS DEVELOPMENT



300 Crescent Court | Suite 700 | Dallas, Texas 75201

D: 972.419.2566 | O: 972.628.4100 | F: 972.628.4147

KIrving@hcmlp.com | www.hcmlp.com

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

# EXHIBIT 18

UBSTRO158

**Highland Multi Strategy Credit Fund LP**
**Redemptions Payable Summary**
**12/31/2020**

| Investor | Redemption Payable |
|---|---|
| Class C Series 2 - REDACTED | $ 14,367,673.22 |
| Class C Series 3 - REDACTED | 7,785,920.76 |
| Class C Series 4 - REDACTED | 4,016,446.61 |
| Class C Series 5 - REDACTED | 11,502,382.42 |
| Class C Series 6 - REDACTED | 7,314,818.84 |
| Class A Series 6 - REDACTED | 2,533,767.33 |
| Class B Series 1 - REDACTED | 1,465,373.78 |
| Class A Series 1 - REDACTED | 293,246.03 |
| Class C Series 6 - REDACTED | 3,449,644.52 |
| Class B Series 1NE REDACTED | (234.48) |
| REDACTED | 4,056,171.06 |
| Highland Multi-Strategy Credit Fund, Ltd. - Series A Shares - REDACTED | (4,644.72) |
| Highland Multi Strategy Credit Fund, Ltd. - Series A Shares - Sentinel | 32,823,423.50 |
| | $ 89,603,988.87 |

UBSTRO159

# EXHIBIT 19

UBSTRO160



DRAFT – FOR PRELIMINARY DISCUSSION PURPOSES ONLY

UBSTRO161



UBSTRO162