**LATHAM & WATKINS LLP**
Andrew Clubok (*pro hac vice*)
Sarah Tomkowiak (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, District of Columbia 20004
Telephone: (202) 637-2200

**BUTLER SNOW LLP**
Martin Sosland (TX Bar No. 18855645)
Candice Carson (TX Bar No. 24074006)
2911 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Telephone: (469) 680-5502

Jeffrey E. Bjork (*pro hac vice*)
Kimberly A. Posin (*pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234

*Counsel for UBS Securities LLC and UBS*
*AG London Branch*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

------------------------------------------------------------

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-SGJ11 |
| | § | |
| Debtor. | § | |
| | § | |

------------------------------------------------------------

| | | |
|---|---|---|
| UBS SECURITIES LLC AND UBS AG LONDON BRANCH, | § | Adversary Proceeding |
| | § | |
| | § | No. _____ |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Defendant. | § | |

-------------------------------------------------------------

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................1

II.   FACTUAL BACKGROUND ...............................................................................6

    A.    The UBS Litigation .................................................................................6

    B.    The New Evidence ................................................................................10

    C.    UBS/Debtor Settlement ........................................................................13

    D.    Transferred Assets Under the Debtor's Control ...................................14

III.  LEGAL STANDARD ........................................................................................16

IV.   ARGUMENT .....................................................................................................17

    A.    UBS and the Estate Will Suffer Irreparable Harm Without Injunctive
           Relief .....................................................................................................18

    B.    UBS Is Likely to Succeed on the Merits...............................................20

    C.    The Equities Strongly Favor UBS ........................................................21

    D.    Injunctive Relief Serves the Public Interest.........................................22

V.    CONCLUSION...................................................................................................22

# TABLE OF AUTHORITIES

Page(s)

## CASES

*In re Caesars Entm't Operating*,
    561 B.R. 441 (Bankr. N.D. Ill. 2016) ........................................................................ 22

*In re Compton Corp.*,
    90 B.R. 798 (Bankr. N.D. Tex. 1988) ........................................................................ 17

*In re Feit & Drexler, Inc.*,
    760 F.2d 406 (2d Cir. 1985) ...................................................................................... 21

*In re FiberTower Network Servs. Corp.*,
    482 B.R. 169 (Bankr. N.D. Tex. 2012) ............................................................... *passim*

*In re Golden Plan of Cal., Inc.*,
    829 F.2d 705 (9th Cir. 1986) ..................................................................................... 16

*In re Hunt*,
    93 B.R. 484 (Bankr. N.D. Tex. 1988) ................................................................. 19, 22

*In re Lazarus Burman Assocs.*,
    161 B.R. 891 (Bankr. E.D.N.Y. 1993) ...................................................................... 22

*In re OGA Charters, LLC*,
    554 B.R. 415 (Bankr. S.D. Tex. 2016) ............................................................... 16, 22

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ............................................................................... 19, 20

*MacArthur Co. v. Johns-Manville Corp.*,
    837 F.2d 89 (2d Cir. 1988) ........................................................................................ 16

*Miss. Power & Light Co. v. United Gas Pipe Line*,
    760 F.2d 618 (5th Cir. 1985) ..................................................................................... 16

*Moore v. Consol. Edison Co. of N.Y., Inc.*,
    409 F.3d 506 (2d Cir. 2005) ...................................................................................... 17

*SAS Overseas Consultants v. Benoit*,
    No. 99-1663, 2000 WL 140611 (E.D. La. Feb. 7, 2000) ........................................... 22

*Star Satellite, Inc. v. City of Biloxi*,
    779 F.2d 1074 (5th Cir. 1986) ................................................................................... 17

## STATUTES

11 U.S.C. § 105(a) ................................................................................................................ *passim*

## RULES

Fed. R. Bankr. P. 7001 ................................................................................................ 1, 4

Fed. R. Bankr. P. 7065 ............................................................................................ 1, 4, 16

Fed. R. Civ. P. 65(b) .................................................................................................... 16

UBS Securities LLC and UBS AG London Branch (together, "UBS"), plaintiffs in the above-captioned adversary proceeding (the "Adversary Proceeding") and creditors in the above-captioned chapter 11 case ("Bankruptcy Case"), submit this memorandum of law in support of *Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction* (the "Motion") filed concurrently herewith, pursuant to section 105(a) of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 7001 and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for a temporary restraining order and preliminary injunction enjoining Highland Capital Management, L.P. ("Highland" or the "Debtor") from engaging in the Prohibited Conduct.  In support of the Motion, UBS states as follows:

## I.  INTRODUCTION

1.    It has recently come to light that the Debtor, at the direction and with the involvement of numerous former Debtor employees, including James Dondero,[1] Scott Ellington,[2] Isaac Leventon,[3] JP Sevilla, and Matt DiOrio,[4] fraudulently transferred hundreds of millions of dollars of assets away from funds currently or previously controlled, owned, and/or managed by the Debtor to an entity jointly owned by Dondero and Ellington, in anticipation of the judgment

---

[1] Dondero is the Debtor's former President and Chief Executive Officer.  Adv. Pro. No. 20-03190-sgj, Dkt. No. 3.

[2] Upon information and belief, Ellington was formerly the Debtor's Chief Legal Officer and General Counsel until he was terminated for cause in January 2021 due to concerns that he failed to preserve documents subject to a litigation hold and was acting in concert with Dondero in a manner adverse to the Debtor's interests.  *See* Dkt. No. 1814 ¶ 15 n.10.

[3] Upon information and belief, Leventon was formerly the Assistant General Counsel at the Debtor since March 2011 until he was terminated for cause in January 2021 due to concerns that he failed to preserve documents subject to a litigation hold and was acting in concert with Dondero in a manner adverse to the Debtor's interests.  *See id.*

[4] Upon information and belief, Sevilla and DiOrio were formerly part of the Debtor's legal department until they were terminated in early 2021.

that UBS obtained against those funds in New York state court.[5] These transfers began no later than 2017 and continued until at least the petition date. In fact, UBS has been told that these transfers were only recently discovered by the Independent Board (defined below) and reported to UBS due to, at least in part, the Debtor's former employees affirmative misrepresentations. Absent immediate intervention by this Court, there is a potential that transfers pursuant to this fraud may continue, with the potential to harm both the Debtor's estate and UBS as a creditor.

2.     As this Court knows, UBS filed an action in the Supreme Court of the State of New York (the "N.Y. State Court") in 2009 (as consolidated, the "UBS Litigation") against Highland and several funds currently or previously controlled, owned, and/or managed by the Debtor, including Highland CDO Opportunity Master Fund, L.P. ("CDO Fund"), Highland Special Opportunities Holding Company ("SOHC" and together with CDO Fund, the "Funds"), and Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat"). In March 2017, the N.Y. State Court denied motions for summary judgment filed by Highland and the Funds, entering rulings in favor of UBS and paving the way for a trial on the merits that confirmed that the Funds owe UBS over $1 billion.

3.     The Independent Board now has informed UBS that it recently discovered that at least as of August 2017, just months after those rulings were issued in favor of UBS, and in advance of the impending trial, Highland was fraudulently transferring (or attempting to fraudulently transfer) ownership of all or substantially all of the Funds' hundreds of millions of dollars' of assets (the "Transferred Assets") to Sentinel Reinsurance, Ltd. ("Sentinel")—*a Cayman Islands entity that Dondero and Ellington owned and controlled*—for a fraction of the supposed total

---

[5] Even if these transfers were not fraudulent, they were, at a bare minimum in breach of Highland's implied covenant of good faith and fair dealing because by hiding, and then transferring, the Transferred Assets, Highland interfered with UBS's contractual right to recover such value from the Funds. *See infra* Section II.A.

face value of the assets (the "<u>Fraudulent Transfers</u>").  Upon information and belief, the Transferred

Assets included, among other assets: (i) a redemption interest in Multi-Strat (the "<u>Sentinel</u>

<u>Redemption</u>") and (ii) assets held by CDO Fund related to Greenbriar CLO Ltd., Greenbriar CLO

Corp., Aberdeen Loan Funding Ltd., Eastland CLO Ltd., Grayson CLO Ltd., Valhalla CLO Ltd.,

and Governance Re, Ltd., including cash payments related to those assets (collectively, the "<u>CDO</u>

<u>Fund Assets</u>").

4.        Highland and the Funds, acting through Dondero,[6] Ellington, Leventon, Sevilla,

DiOrio, and other Highland employees, fraudulently (or, at a bare minimum, in breach of their

implied duty of good faith and fair dealing) transferred these assets pursuant to a so-called purchase

agreement (the "<u>Purchase Agreement</u>"), purportedly to satisfy a $25,000,000 premium on a

$100,000,000 legal liability insurance policy issued by Sentinel (the "<u>Insurance Policy</u>").  This

policy was supposedly intended to insure against an adverse judgment in the UBS Litigation,

notwithstanding that the Transferred Assets were worth more than both the premium and the policy

limit.  Neither the Insurance Policy nor the Transferred Assets were ever disclosed to UBS in

connection with the UBS Litigation, including after UBS obtained a $1 billion judgment against

the Funds in the UBS Litigation.  Nor was the Insurance Policy disclosed in the course of the

Debtor's bankruptcy proceedings as an asset of the Funds, even though the Debtor had confirmed

that it had previously produced all information within its possession sufficient to identify all

available assets of the Funds.[7]  Upon information and belief, these Fraudulent Transfers continued

---

[6] This Court has already entered a restraining order and injunction against Dondero prohibiting him from, among other things, "interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, [and] disposition of assets owned, controlled, or managed by the Debtor."  Adv. Pro. No. 20-03190-sgj, Dkt. No. 59.

[7] As set forth below in Sections II.A-B, it appears that the Independent Board and its counsel were misled by former employees of the Debtor who, presumably at Dondero's direction, repeatedly claimed that the Funds' assets had been disposed of long before 2017 and never identified the Insurance Policy.

at least until the Debtor filed for bankruptcy, and it is possible that Sentinel and/or its transferees are still be receiving cash payments from accounts the Debtor owns or controls pursuant to certain interests underlying the Fraudulent Transfers.

5.      As this Court is aware, the Debtor and UBS had reached a settlement in principle of UBS's claims against the Debtor (the "Settlement").  In light of these shocking revelations, the Debtor and UBS have agreed that they need to revisit their agreement and are working together to try to finalize an agreement that could be submitted in the near future for this Court's approval. As part of any such Settlement, UBS would presumably release the Debtor from at least some part of what otherwise would be significant potential liability for the actions it took while still controlled by Dondero (and that it continued to take post-petition, albeit apparently without the knowledge of the Independent Board).  In exchange, the Debtor would be expected to assist UBS to collect its judgment against the Funds, including by assisting UBS to investigate and pursue claims related to the Fraudulent Transfers.  Such a Settlement would be in the best interests of the estate and all other unsecured creditors, but it will be insufficient and undermined if UBS's ability to collect its judgment against the Funds is further compromised.

6.      Pursuant to section 105(a) of the Bankruptcy Code, and Rules 7001 and 7065 of the Bankruptcy Rules, UBS now moves to enjoin and temporarily restrict the Debtor from making or allowing funds under its management or control (including, but not limited to, Multi-Strat and CDO Fund) to make any payments or further transfers to Sentinel or any of its affiliates (the "Sentinel Entities") or any transferees of the Sentinel Entities consisting of, resulting from, or relating to the Transferred Assets pending a decision of a court of competent jurisdiction as to whether the Transferred Assets were fraudulently transferred to or for the benefit of Sentinel, Dondero, Ellington and/or any of their affiliates or as part of a fraudulent transfer scheme

(the "Prohibited Conduct").[8] UBS has conferred with the Debtor, and the Debtor does not object to the injunctive relief UBS seeks herein.

7. UBS is currently aware of at least two types of such assets that, upon information and belief, were part of the Fraudulent Transfers and remain in the Debtor's control: the Sentinel Redemption and the CDO Fund Assets. As to the first and as explained below, Multi-Strat is currently restricted from making any redemption payments pursuant to a prior settlement agreement entered into with UBS in May 2020. The restrictions on redemption payments, however, would be lifted under a Settlement between UBS and the Debtor. Upon information and belief, the Debtor would thereafter allow Multi-Strat to make payments to its redeemers, which includes Sentinel. Additionally, upon information and belief, CDO Fund (and the Debtor, as its general partner), still has control over the CDO Fund Assets, which were earmarked for transfer to Sentinel under the Purchase Agreement as part of the Fraudulent Transfers[9] but were never actually transferred to Sentinel and remain under CDO Fund's control at Bank of New York.

8. The Debtor must be enjoined from further perpetuating the Fraudulent Transfers by allowing any payments or further transfers consisting of, resulting from, or relating to the Transferred Assets (including but not limited to paying the Sentinel Redemption and/or transferring any of the CDO Fund Assets) to any Sentinel Entity or any other transferees pending investigation and a decision of a court of competent jurisdiction as to whether Sentinel's interests

---

[8] Although UBS understands that the Debtor either already has submitted, or will soon submit a claim on the Insurance Policy on behalf of CDO Fund, the relief sought herein is still necessary even if Sentinel pays the proceeds under the Insurance Policy. Although payment of the "insurance" proceeds may affect the calculus, questions still abound as to why the Funds, at the direction and involvement of Highland employees, would transfer assets worth multiple times the premium amount for coverage far less than the value of the Transferred Assets to an entity owned by Dondero and Ellington. The injunctive relief will ensure that the affected parties have time to obtain answers to those and other related questions.

[9] Upon information and belief, the assets related to Greenbriar CLO Corp., Eastland CLO Ltd, and Grayson CLO Ltd were not transferred pursuant to the Purchase Agreement but were nonetheless transferred to Sentinel from CDO Fund but remain in CDO Fund's control.

therein were part of the fraudulently Transferred Assets or as part of a fraudulent scheme and whether UBS should be entitled to possess such assets in light of its judgment against the Funds.

9. For the reasons below, the Motion should be granted.

## II. FACTUAL BACKGROUND

### A. The UBS Litigation

10. UBS filed the UBS Litigation in February 2009 alleging, *inter alia,* that the Funds collectively owed over $500 million to UBS under certain contracts. Dkt. No. 644 ¶ 13.[10] UBS subsequently initiated a second action against Highland for breach of the implied covenant of good faith and fair dealing and fraudulent conveyances, among other causes of action. *Id.* UBS also amended its complaint to add, among other entities, Highland Financial Partners, L.P. ("HFP") as a defendant. *Id.* SOHC is a wholly-owned subsidiary of HFP, and UBS alleged that HFP was the alter ego of SOHC and therefore should be liable for SOHC's misconduct. *See id.* ¶ 12.

11. In March 2017, the N.Y. State Court denied motions for summary judgment filed by Highland and the Funds, in favor of UBS. Dkt. No. 1105 at 13–14. That court then bifurcated the UBS Litigation into two phases of trial: "Phase I" to decide UBS's breach of contract claims against the Funds and Highland's counterclaims against UBS, and "Phase II" to decide all remaining claims, including those against Highland and Multi-Strat. Dkt. No. 644 ¶ 16. After a 13-day trial in July 2018, the N.Y. State Court entered judgment in UBS's favor for the claims against the Funds and on Highland's counterclaims. *Id.* ¶ 17. The N.Y. State Court held CDO Fund liable to UBS for $530,378,477.72 and SOHC liable to UBS for $509,579,321.73 and entered judgments in favor of UBS accordingly (the "Phase I Judgment"). *Id.* Neither of the Funds has satisfied any portion of the Phase I Judgment against them to date. And interest has continued to

---

[10] "Dkt. No." refers to docket entries in the Bankruptcy Case.

accrue (and will continue to do so) at the rate of approximately $128,000 per day, which has added roughly $55 million to UBS's recovery through today's date.

12.     Highland filed for bankruptcy on October 16, 2019, before a trial could be held on UBS's Phase II claims.  *See* Dkt. No. 1.  UBS's claims against Highland were automatically stayed, and this Court denied UBS's motion to lift the stay to proceed with Phase II in the N.Y. State Court.  Dkt. No. 765.  Pursuant to a "corporate governance" settlement approved by the Court, an independent board of directors (the "Independent Board") at Strand Advisors, Inc., the Debtor's general partner, was created with sole authority to oversee the Debtor's operations, management of its assets, and its bankruptcy proceeding.  Dkt. No. 339.

13.     On June 26, 2020, UBS timely filed proofs of claim asserting unsecured claims against the Debtor for damages from (i) the Debtor's breach of the implied covenant of good faith and fair dealing for its efforts to impair UBS's contractual right to collect from the Funds, and (ii) the Debtor's role in directing fraudulent conveyances that occurred after the commencement of the UBS Litigation, as well as for further damages, prejudgment interest, and attorneys' fees. *See* Proof of Claim Nos. 190, 191.  Specifically, UBS claimed that Highland devised and executed a strategy to interfere with UBS's contractual right to recovery and prevented the Funds (and HFP) from turning over any of their assets to UBS in satisfaction of their debt.  And in March 2009, Highland orchestrated the transfer of approximately $233 million in assets away from the Funds— and out of UBS's reach.  *Id.* at Addendum ¶¶ 17–18.  The claims further alleged that Highland improperly prevented the Funds from turning over any other assets that were held by the Funds (or HFP) after the March 2009 transfers.  *Id.*  Information about such assets, and the circumstances of their disposition, remained unknown to UBS, rendering UBS unable to determine the exact amount

of its damages resulting from Highland's continued breach of the implied covenant. Dkt. No. 1345-10.

14.     In the months leading up to and following the submission of UBS's proofs of claim, UBS made multiple information requests to the Debtor relating to the Funds' assets as of February 2009 (when UBS's original complaint was filed in N.Y. State Court) and any subsequent transfer or dissipation of those assets. Dkt. No. 1345-10. The Debtor and Independent Board repeatedly told UBS that the requested documentation was limited and/or did not exist. *See id.* ¶ 18. Upon information and belief, the Independent Board tasked Leventon and Ellington with the collection of relevant documents and information in response to UBS's requests. From that position, upon information and belief, Ellington and Leventon withheld documents and information about the Fraudulent Transfers from the Independent Board and UBS that would have provided evidence of the value of assets held by the Funds at relevant points in time, as well as the scope and magnitude of the Debtor's breaches of the implied covenant. *See, e.g.*, Tomkowiak Decl.[11] Exs. 16-17 (August 2017 emails involving Ellington and Leventon that evidence efforts to "wire cash from all HFP funds and all CDO funds" to Sentinel, including over $10 million of cash from CDO Fund). Upon information and belief, the individuals involved in the Fraudulent Transfers, including but not limited to Ellington, Leventon, and DiOrio, intentionally misled and lied to the Independent Board and their counsel about the Fraudulent Transfers, including as recently as this year.

15.     In October 2020, the Debtor moved for partial summary judgment on certain of UBS's claims against the Debtor for fraudulent conveyance and breach of the implied covenant of

---

[11] All exhibits are attached to the *Declaration of Sarah Tomkowiak in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction* (the "<u>Tomkowiak Decl.</u>"), filed concurrently herewith.

good faith and fair dealing. Dkt. No. 1180. UBS opposed that motion, including on the ground that the Debtor had failed to respond to UBS's discovery requests that sought information critical to UBS's position. Dkt. Nos. 1337, 1341. Concurrently with its opposition to the Debtor's motion for partial summary judgment, UBS filed a motion under Bankruptcy Rule 3018 (the "3018 Motion") requesting an estimation of its claims for voting purposes. Dkt Nos. 1338, 1342.

16. In advance of a hearing on the foregoing motions, the Debtor represented that the Funds and HFP presently held assets collectively worth only about $10 million, and that whatever other assets they previously held had been dissipated long ago (including purportedly for "legal fees") and without any available documentation verifying when and how they were actually spent. *See* Tomkowiak Decl. Ex. 1 (Nov. 20, 2020 Hr'g Tr.) at 197:18-198:3, 207:19-208:11; Dkt. No. 1345-10 ¶ 20. The Debtor also represented that Multi-Strat's "economic ownership is held predominantly by former third-party limited partners" which represent "89.6% of the true economic ownership of" Multi-Strat. Dkt. No. 1590 ¶ 10.

17. After a hearing to address both the Debtor's partial summary judgment motion and UBS's 3018 Motion, the Court estimated UBS's claims, for voting purposes, in the amount of $94,761,076. Dkt. No. 1518. In so ruling, the Court held that, among other things, the Debtor could be liable for breach of the implied covenant related to the value of the additional undisclosed assets at the Funds and HFP after February 2009 that were never paid in satisfaction of the Funds' debt to UBS. Tomkowiak Decl. Ex. 1 (Nov. 20, 2020 Hr'g Tr.) at 212:21-213:15. Taking the Debtor at its word and based on the limited evidence available to UBS and presented to the Court by UBS at that time, the Court estimated UBS's breach of the implied covenant claim to be $10 million and added an additional $10 million in estimated prejudgment interest on that amount. *Id.* at 216:13-16. Given that the Debtor's former employees and agents withheld critical evidence

supportive of UBS's implied covenant claim from UBS—including through outright lies—UBS respectfully submits that its claim exceeds that estimate by at least $105 million (the purported tax value of the assets still held at the Funds in 2017 prior to the Fraudulent Transfers), and perhaps by as much as several hundred million dollars (the documented face value of the assets that were still held by the Funds in 2017 prior to the Fraudulent Transfers), plus prejudgment interest, attorneys' fees, and punitive damages.

## B. **The New Evidence**

18. Relying on the information then known, as of early January 2021, UBS and the Debtor reached a Settlement in principle of UBS's proofs of claim and certain of the Phase II claims, which the parties disclosed to the Court during the February 2, 2021 hearing to confirm the Debtor's chapter 11 plan of reorganization. Tomkowiak Decl. Ex. 2 (Feb. 2, 2021 Hr'g Tr.) at 14:21-15:22. While continuing to negotiate the terms of the Settlement, in mid-February 2021, the Independent Board shared with UBS previously undisclosed facts and documents that revealed shocking additional facts relevant to UBS's claims in this proceeding and its ability to collect its Phase I Judgment against the Funds and pursue its Phase II claims.

19. Those documents show that at least as of August 7, 2017, the Funds, with substantial involvement and assistance from certain employees of the Debtor, purported to "sell" the Transferred Assets (documented by Debtor employees, at the time, as having a face value of over $300,000,000 and a fair market value of over $105,000,000), which included all or substantially all the assets then remaining at the Funds and certain related entities, to Sentinel under the Purchase Agreement. Tomkowiak Decl. Ex. 3 (Purchase Agreement without Schedule A); *Id.* Ex. 4 (Insurance Policy including Schedule A to the Purchase Agreement, which lists the Transferred Assets).

20.    Sentinel accepted the Transferred Assets purportedly as payment for a $25,000,000 premium on the Insurance Policy, despite the fact that the value of the Transferred Assets far exceeded that premium.  *Id.* Exs. 4-5.  Under the Insurance Policy, Sentinel agreed to indemnify the Funds for any legal liability up to a $100,000,000 limit if either: (i) a court made an order of liability in the UBS Litigation against the Funds, or (ii) the UBS Litigation was settled on terms that provided for a repayment by the Funds to UBS.  *Id.* Ex. 4.

21.    The Funds began the Fraudulent Transfers to Sentinel no later than 2017 pursuant to the purported Purchase Agreement and, according to the Independent Board, continued to attempt to convey the Transferred Assets to Sentinel at least until the Debtor filed for bankruptcy. It is possible that Sentinel and/or its transferees are still be receiving cash payments from accounts the Debtor owns or controls pursuant to certain interests underlying the Fraudulent Transfers.

22.    Dondero, Ellington, Leventon, Sevilla, and DiOrio were heavily involved in the Fraudulent Transfers.  Indeed, upon information and belief, these individuals were the authors or recipients of countless emails about the transfers, Dondero signed the Insurance Policy and Purchase Agreement on behalf of Highland and the Funds, and Sentinel is owned and controlled by entities that are, in turn, owned by Dondero and Ellington.[12]  Tomkowiak Decl. Ex. 6 (August 7, 2017 Assignment Agreement assigning assets to Sentinel from CDO Fund in which Dondero signs on behalf of CDO Fund and Sentinel); *Id.* Ex. 7 (September 26, 2017 email from Matt DiOrio regarding "how the CLO's that were moved to Sentinel were marked"); *Id.* Ex. 16 (August 11, 2017 email from Sevilla to Ellington forwarding instructions "to wire cash from all HFP funds and all CDO funds" to Sentinel); *Id.* Ex. 17 (August 11, 2017 email to Sevilla and Leventon, among

---

[12] As of at least 2017, Dondero controlled Patton, Ltd., which owned 70 percent of Sentinel.  Tomkowiak Decl. Ex. 8. As of at least 2017, Ellington controlled Nimitz, Ltd., which owned the remaining 30 percent of Sentinel.  *Id.*; *see also* Ex. 19.

others, noting that Debtor employees "entered wires to move all of CDO Fund's cash to Sentinel" in two wires "one for $7,779,721.60 and one for $2,349,436.20"). In addition, upon information and belief, DiOrio is currently one of three directors of Sentinel.

23. Neither the Debtor nor any party under the Highland umbrella ever informed UBS of the existence of the Insurance Policy, the Purchase Agreement, the Transferred Assets, or the Fraudulent Transfers, despite multiple opportunities in which it would have been appropriate and obligated to do so during this Bankruptcy Case. The Independent Board has represented to UBS that it did not discover the Fraudulent Transfers or Insurance Policy until the Independent Board had identified and investigated an asset as being still held by CDO Fund—a CLO known as "Greenbriar," which the parties now know to be one of the assets that was purportedly "sold" pursuant to the Purchase Agreement. During this investigation, upon information and belief, the Independent Board uncovered documentation about the Fraudulent Transfers, as well as a trove of correspondence revealing that Dondero, Ellington, Leventon, Sevilla, DiOrio, and various Debtor employees were involved in the Fraudulent Transfers, in what appears to have been a targeted effort to frustrate UBS's ability to collect on any judgment in the UBS Litigation. Indeed, upon information and belief, when the Independent Board asked at least Leventon, Ellington, and DiOrio about the Transferred Assets, the individuals feigned ignorance and lied about their knowledge of the Fraudulent Transfers.

24. The Independent Board preliminarily shared some of these facts with UBS in mid-February 2021, while the Debtor and UBS were working on documenting the terms of their Settlement. Since then, the Independent Board has continued to investigate the relevant facts and it (and UBS) is still learning new facts regarding the Fraudulent Transfers to this day.

C.    **UBS/Debtor Settlement**

25.    The actions of the Debtor's employees and agents, both pre- and post-petition, lend further support to UBS's claims against the Debtor, at least up to the value of the Transferred Assets (at least $105,000,000 and possibly up to over $300,000,000) plus prejudgment interest, attorneys' fees, and punitive damages.  But, in recognition that it is—as this Court has repeatedly made clear—time to resolve litigation with the Debtor in light of its new leadership, UBS has continued to work with the Debtor to try to go forward with a Settlement that will provide for an agreed-upon allowed claim and otherwise release UBS's claims against the Debtor.  But only so long as doing so does not in any way compromise UBS's ability to continue to pursue its claims against the non-Debtor entities and/or the former employees who perpetuated the fraud and/or remain responsible for the outstanding Phase I Judgment.

26.    In exchange for UBS's release of its fraudulent transfer and implied covenant claims against the Debtor, the Debtor would be expected to help UBS pursue satisfaction of the Phase I Judgment against the Funds by taking certain actions, including, without limitation: (i) taking actions reasonably designed to recover the Insurance Proceeds or to return the Transferred Assets to the Funds to (partially) satisfy the Phase I Judgment; (ii) cooperating with UBS and participating (as applicable) in the investigation or prosecution of claims related to the Purchase Agreement, Insurance Policy, or Transferred Assets; and (iii) otherwise using reasonable efforts to assist UBS to collect its Phase I Judgment against the Funds and HFP and assets the Funds and/or HFP may own, or have a claim to under applicable law.[13]

---

[13] The anticipated Settlement is in near-final form and the parties hope to finalize and file it in the near term.  However, the Settlement remains subject to definitive documentation and the description of the terms thereof is qualified by such documentation and this Court's approval of the Settlement.

## D. Transferred Assets Under the Debtor's Control

27. The Debtor currently has control over certain assets related to the Fraudulent Transfers: the CDO Fund Assets and a Multi-Strat redemption interest. As to the former and upon information and belief, the Debtor, through CDO Fund, still has control over the CDO Fund Assets located in accounts at Bank of New York, notwithstanding that the assets were purportedly "sold" to Sentinel pursuant to the Purchase Agreement. Tomkowiak Decl. Ex. 9 (email to DiOrio attaching a letter to "confirm [CDO Fund's] assertions of existence and ownership of the following securities by Sentinel Reinsurance," listing the CDO Fund Assets). The Debtor has full ownership and control over Highland CDO Opportunity GP, LLC, which in turn is the sole general partner of (and thus has full control over the actions of) Highland CDO Opportunity Fund GP, L.P. *Id.* Exs. 10-12. Highland CDO Opportunity Fund GP, L.P., in turn, is the sole general partner of (and thus has full control over the actions of) CDO Fund. *Id.* Ex. 13. As a result, the Debtor has control over the actions of CDO Fund and whether CDO Fund transfers the CDO Fund Assets to Sentinel pursuant to the Purchase Agreement, including making cash payments pursuant to those assets. If the CDO Fund Assets were transferred to Sentinel, the Debtor would have an obligation to spend estate resources to retrieve the assets for UBS under the proposed Settlement (or, in the absence of a settlement, face the threat of continued potential direct liability for the role the Debtor played in causing such transfers).

28. In addition, upon information and belief, the Sentinel Redemption was part of the Fraudulent Transfers from CDO Fund to Sentinel. *Id.* Ex. 4 (listing as a transferred asset a Highland Credit Opportunities CDO Ltd. partnership interest). The Debtor is a registered investment adviser that manages Multi-Strat and holds, directly or indirectly, approximately 58.6% of the limited partnership interests of Multi-Strat. Dkt. No. 1590 ¶ 10. In addition, the Debtor

owns Multi-Strat's general partner (Highland Multi Strategy Credit Fund GP, L.P.). *Id*. ¶ 9. As a result, the Debtor controls Multi-Strat's redemption payments.

29. At this time, Multi-Strat is restricted from making redemption payments pursuant to a separate settlement agreement with UBS, but that will change upon effectiveness of the contemplated Settlement between the Debtor and UBS. On May 11, 2020, UBS and Multi-Strat, among others (collectively, the "May Settlement Parties"), entered into a Settlement Agreement pursuant to which the May Settlement Parties agreed to the allocation of the proceeds of certain sales of assets held by Multi-Strat, including escrowing a portion of such funds, and certain restrictions on distributions by Multi-Strat. Dkt. No. 1590 ¶¶ 16-17. This included a restriction on Multi-Strat making redemption payments to those holding a redemption interest. *Id*.

30. Upon effectiveness of the contemplated Settlement between the Debtor and UBS, the Debtor, through Multi-Strat, will no longer be restricted from making redemption payments. Upon information and belief, unless the Debtor is prohibited from doing so, the Debtor expects to have Multi-Strat begin to pay the Multi-Strat redeemers shortly after these restrictions are lifted, including Sentinel. *Id*; Tomkowiak Decl. Ex. 18 (listing Multi-Strat redemption payables, including an approximate $32.9 million payable owed to Sentinel).[14] But the Sentinel Redemption amount is an asset that should have been maintained by CDO Fund and used to pay the contractual obligations that are reflected in the Phase I Judgment UBS holds against CDO Fund. And like with the CDO Fund Assets, if the Sentinel Redemption is paid to Sentinel, the Debtor would have

---

[14] Upon information and belief, the approximate $32.9 million is composed of the interest in Multi-Strat CDO Fund fraudulently transferred to Sentinel (worth approximately $21.4 million) and separate interests in Multi-Strat the Debtor transferred to Sentinel (worth approximately $11.5 million) under circumstances generally unknown to UBS. Far from a third-party redeemer, the Sentinel Redemption accounts for nearly 37 percent of Multi-Strat's redemption payables. *See id.*

an obligation to spend estate resources to retrieve the payment for UBS under the proposed Settlement.

### III.  LEGAL STANDARD

31.  Bankruptcy Code section 105(a) authorizes bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate" to carry out the provisions of the Code.  *In re FiberTower Network Servs. Corp.*, 482 B.R. 169, 182 (Bankr. N.D. Tex. 2012) (quoting 11 U.S.C. § 105(a)); *see also In re OGA Charters, LLC*, 554 B.R. 415, 424 (Bankr. S.D. Tex. 2016) ("The Court may issue injunctions as part of its equitable powers, pursuant to 11 U.S.C. § 105.").  In other words, courts have broad authority to take actions necessary to "protect the integrity of the bankrupt[cy] estate" and to "enjoin actions that 'might impede the reorganization process.'"  *FiberTower*, 482 B.R. at 182 (first citation omitted) (quoting *In re Golden Plan of Cal., Inc.*, 829 F.2d 705, 713 (9th Cir. 1986) and *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93 (2d Cir. 1988)).  "A preliminary injunction seeks to 'prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.'"  *OGA Charters*, 554 B.R. at 424 (quoting *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985)).

32.  Injunctive relief is warranted under section 105(a) where the movant shows: (i) irreparable injury in the absence of injunctive relief; (ii) a likelihood that it will prevail on the merits; (iii) that the balance of the equities favor the movant; and (iv) that the injunction would serve the public interest.  *OGA Charters*, 554 B.R. at 424; *see also* Tomkowiak Decl. Ex. 14 (Adv. Pro. No. 20-3190-sgj, Dec. 10, 2020 Hr'g. Tr.) at 28:16-25.

33.  A temporary restraining order should be granted pending a hearing for a preliminary injunction where "immediate and irreparable injury, loss, or damage will result to the movant."  *See* Fed. R. Bankr. P. 7065 (incorporating by reference Fed. R. Civ. P. 65(b)).  Issuing an injunction is within the broad discretion of the court.  *See In re Compton Corp.*, 90 B.R. 798,

16

806 (Bankr. N.D. Tex. 1988) ("It is . . . clear that the issuance of an injunction is, as a general matter, within the discretion of the court."); *see also Star Satellite, Inc. v. City of Biloxi*, 779 F.2d 1074, 1079 (5th Cir. 1986) (noting that the decision to issue an injunction is subject to "considerable" discretion in the district court); *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 511 (2d Cir. 2005) ("The district court has wide discretion in determining whether to grant a preliminary injunction, and this Court reviews the district court's determination only for abuse of discretion.").

34.     For the reasons below, UBS satisfies the standard for injunctive relief against the Debtor.

## IV.     ARGUMENT

35.     Injunctive relief is necessary to prevent further imminent and irreparable harm similar to or resulting from the Fraudulent Transfers. Through the requested injunctive relief, UBS seeks to enjoin the Debtor from allowing the further transfer or dissolution of certain of the fraudulently Transferred Assets—the Sentinel Redemption payment and the CDO Fund Assets. Allowing otherwise would harm both the Debtor's estate and UBS as a creditor by, *inter alia*: (i)  putting such assets further out of UBS's reach to satisfy the Phase I Judgment; (ii) significantly increasing the resources the Debtor must spend to fulfill its contemplated obligations under the Settlement to recover those assets and assist UBS in its claims related to the Fraudulent Transfers; (iii) hindering or preventing the Debtor from complying with its anticipated obligations under the Settlement and giving rise to damages for breach of such obligations at the expense of all other unsecured creditors of the Debtor; and/or (iv) making it less likely that UBS would be willing to settle its claims against the Debtor. Indeed, if the Debtor were to allow the Sentinel Redemption payment or CDO Fund Assets to be transferred to Sentinel—assets purportedly "owed" to Sentinel solely because of the fraudulent Purchase Agreement—the Debtor would have to expend

substantial estate resources to undo its own actions pursuant to the proposed Settlement. This is precisely why the Debtor does not oppose this injunctive relief.

36. UBS is likely to succeed on the merits because this type of relief is the kind that the Court has the power to grant, the Debtor does not oppose this relief, and the relief is important to allow UBS and the Debtor to recover, to the maximum extent possible, the value of the fraudulently Transferred Assets.

37. The equities strongly (if not exclusively) favor UBS. The irreparable harm that would occur if Debtor were to allow the transfer to Sentinel or its affiliates of the Sentinel Redemption payment or the CDO Fund Assets greatly outweighs any inconvenience that would result from temporarily preventing the payment of millions of dollars to a Dondero-controlled entity while it is determined these assets were fraudulently obtained and those assets are rightfully owed to UBS.

38. Finally, granting injunctive relief serves the public interest because it will facilitate reorganization of the Debtor's estate through the successful execution of the Debtor's anticipated obligations under the Settlement without unnecessary expense, thereby benefitting the estate's other unsecured creditors.

A. **UBS and the Estate Will Suffer Irreparable Harm Without Injunctive Relief**

39. Through the requested injunctive relief, UBS seeks to prevent the further transfer or dissolution of the Transferred Assets by enjoining the Debtor from allowing the payment of the Sentinel Redemption or transfer of the CDO Fund Assets to Sentinel.

40. In the bankruptcy context, "irreparable harm" refers to either "irreparable harm to the interest of a creditor or irreparable harm to the bankruptcy estate," including "from disruption of th[e] Courts' exclusive authority to effectively manage the[] cases." *In re Hunt*, 93 B.R. 484,

495 (Bankr. N.D. Tex. 1988) (citations omitted).  Moreover, "the mere fact that economic damages

may be available does not always mean that a remedy at law is 'adequate.'"  *Janvey v. Alguire*,

647 F.3d 585, 599-600 (5th Cir. 2011) (noting that the "dissipation of the assets that are the subject

of this suit . . . would impair the Court's ability to grant an effective remedy").

41.     Here, without injunctive relief, UBS, a significant general unsecured creditor of the

Debtor, will face imminent and irreparable harm that cannot be adequately remedied.  UBS has a

legal right to the Sentinel Redemption and the CDO Fund Assets.  But if the Court does not enjoin

movement of these assets to Sentinel, UBS's ability to collect on its Phase I Judgment would be

significantly impeded.  The harm is thus not merely "speculative, theoretical, or remote," but

imminent and irreparable.  *FiberTower*, 482 B.R. at 187.

42.     The Settlement contemplates an obligation by the Debtor to assist UBS in

(i) collecting UBS's Phase I Judgment against the Funds; and (ii) investigating and pursuing claims

for the Fraudulent Transfers.  The Court's issuance of an injunction will facilitate the Debtor's

ability to fulfill its anticipated obligations with efficiency and limited expense.  An injunction will

stop the Debtor from allowing the payment of the Sentinel Redemption and transfer of the CDO

Fund Assets, and thereby save the Debtor from having to immediately turn around and seek to

recover the very same assets pursuant to its contemplated Settlement obligations.

43.     Alternatively, if the Debtor is unable to fulfill its anticipated Settlement obligations,

UBS expects that the damages resulting from the Debtor's breach of the Settlement would be

substantial.  Claims related to the Fraudulent Transfers have a potential value of at least

$105,000,000 and as much as over $300,000,000 plus prejudgment interest.  Employees and agents

of the Debtor were significantly involved in orchestrating the Fraudulent Transfers, but UBS has

agreed in principle to forgo these claims against the Debtor in exchange for (in addition to the

other anticipated Settlement provisions) the Debtor's agreement to help UBS collect the Phase I Judgment and investigate and pursue claims for the Fraudulent Transfers.  If the requested injunctive relief makes it possible for the Debtor to fulfill these anticipated Settlement obligations, UBS's willingness to forego significant additional recovery directly from the Debtor would avoid a substantial, detrimental impact on the recovery of the Debtor's other general unsecured creditors.

**B.**     **UBS Is Likely to Succeed on the Merits**

44.     To satisfy the likelihood of success element, the movant need only present their "prima facie case," but need not show that he is certain to win.  *Janvey*, 647 F.3d at 595 (citation omitted).  Moreover, the relevant "merits" question here is not whether UBS is likely to prevail on appeal, but "whether this [C]ourt is authorized and likely to grant the requested relief." *FiberTower*, 482 B.R. at 183-84.

45.     Here, as discussed above, the Court can and should grant UBS's requested relief. *See* 11 U.S.C. § 105(a) (authorizing the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]").  Indeed, this Court previously granted injunctive relief because "[w]e just can't take any chances . . . with regard to there being potential interference with the Debtor's operations that might be harmful or contrary to creditors' interests."  Tomkowiak Decl. Ex. 15 (Adv. Pro. No. 20-3190-sgj, Jan. 8, 2021 Hr'g Tr.) at 165:22-25.

46.     The same is true here.  UBS seeks to enjoin conduct that would "be harmful or contrary to" UBS's interests and further Dondero's (among others') fraud.  Allowing the payment of the Sentinel Redemption or transfer of the CDO Fund Assets to Sentinel would inevitably lead to an unnecessary and substantial depletion of the estate's resources in one of two ways:  either (i) the Debtor will be obliged to retrieve the Transferred Assets pursuant to the Debtor's anticipated

Settlement obligations; or (ii) if the Debtor was unable to fulfill the anticipated Settlement obligations, UBS would likely have substantial damages for breach of the Settlement at the expense of all other unsecured creditors.  Thus the injunctive relief would protect the integrity of the Debtor's bankruptcy estate, precisely the type of relief contemplated by the Court's broad powers to grant injunctive relief under section 105.  *See FiberTower*, 482 B.R. at 182.  Indeed, the Debtor agrees with and stipulates to the relief UBS seeks.

47.      Moreover, there can be no credible dispute that the Fraudulent Transfers were, in fact, fraudulent.  The Purchase Agreement—signed by Dondero on behalf of the Funds—transferred hundreds of millions of dollars' worth of assets to an entity he controlled with Ellington, purportedly in exchange for a spurious insurance policy, worth much less than the Transferred Assets, and that has never previously been invoked to pay the Funds' adjudicated damages to UBS (or even disclosed to UBS as a source from which to satisfy partially the Phase I Judgment).

## C.    The Equities Strongly Favor UBS

48.      The balance of the equities also decisively falls in UBS's favor.  Without injunctive relief, UBS and the Debtor's estate will face imminent and irreparable harm.  *See supra* at Section IV.A.  By contrast, no equities favor denying injunctive relief, as temporarily enjoining any payment of the Sentinel Redemption or transfer of the CDO Fund Assets while a court determines if they were part of the Fraudulent Transfers will cause little, if any, inconvenience.

49.      It is also not premature to freeze any further transfer or disposition of these assets at this stage.  Such relief is within the Court's equitable powers under section 105(a) of the Bankruptcy Code.  *See In re Feit & Drexler, Inc.*, 760 F.2d 406, 415-16 (2d Cir. 1985) (granting

an asset freezing injunction under the Court's powers under section 105(a) where necessary to protect the interests of creditors).

**D.      Injunctive Relief Serves the Public Interest**

50.      The injunctive relief UBS seeks will "facilitate reorganization" and thus "serve the public interest." *FiberTower*, 482 B.R. at 189 (citing *SAS Overseas Consultants v. Benoit*, No. 99-1663, 2000 WL 140611, at *5 (E.D. La. Feb. 7, 2000); *In re Lazarus Burman Assocs.*, 161 B.R. 891, 901 (Bankr. E.D.N.Y. 1993)).  The injunctive relief will not only stop irreparable harm to UBS, but will also serve the public interest by facilitating the Debtor's anticipated obligations under the Settlement with UBS at minimal expense to the estate.  *See supra* at Section IV.A; *OGA Charters*, 554 B.R. at 426 ("In bankruptcy, the public policy is to have an orderly administration of the debtor's assets via their bankruptcy estate, such that the debtor may be able to gain a fresh start, by satisfying valid claims against the estate."); *see also Hunt*, 93 B.R. at 497 ("Chapter 11 expresses the public interest of preserving the going-concern values of businesses, protecting jobs, ensuring the equal treatment of and payment of creditors, and if possible saving something for the equity holders.").  Indeed, public policy strongly favors successful settlement of disputes in bankruptcy as such resolution is one of the Bankruptcy Code's central objectives.  *See In re Caesars Entm't Operating*, 561 B.R. 441, 445-46 (Bankr. N.D. Ill. 2016) (noting that successful resolution of disputes in bankruptcy is one of the Bankruptcy Code's central objectives and public policy favors settlement generally and approving an injunction that gave the parties a "clear shot at negotiating an overall settlement" (citation omitted)).

**V.      CONCLUSION**

WHEREFORE, UBS respectfully requests that the Court grant the Motion and enter an Order in the form attached to the Motion as Exhibit A and grant such further relief as the Court deems just and proper.

Dated: March 29, 2021

Respectfully submitted,

/s/ Andrew Clubok

**LATHAM & WATKINS LLP**
Andrew Clubok (*pro hac vice*)
Sarah Tomkowiak (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, District of Columbia 20004
Telephone: (202) 637-2200
Email: andrew.clubok@lw.com
        sarah.tomkowiak@lw.com

and

Jeffrey E. Bjork (*pro hac vice*)
Kimberly A. Posin (*pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Email: jeff.bjork@lw.com
        kim.posin@lw.com

**BUTLER SNOW LLP**
Martin Sosland (TX Bar No. 18855645)
Candice M. Carson (TX Bar No. 24074006)
2911 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Telephone: (469) 680-5502
E-mail: martin.sosland@butlersnow.com
        candice.carson@butlersnow.com

*Counsel for UBS Securities LLC and UBS
AG London Branch*