# EXHIBIT 4

## ASSET TRANSFER AGREEMENT

Dated as of 31 December 2019

**PARTIES:**

1. **SENTINEL REINSUANCE, LTD.**, an exempted company incorporated in the Cayman Islands whose registered office is c/o CO Services Cayman Limited, PO Box 10008, Willow House, Cricket Square, Grand Cayman KY1-1001, Cayman Islands (the "**Seller**"); and

2. **SEBASTIAN CLARKE LTD**, an exempted company incorporated in the Cayman Islands whose registered office is c/o CO Services Cayman Limited, PO Box 10008, Willow House, Cricket Square, Grand Cayman KY1-1001, Cayman Islands (the "**Purchaser**").

Words and expressions used in this Agreement shall be interpreted in accordance with Schedule 4.

**WHEREAS**, on 31 December 2019, the Seller agreed to sell certain assets to the Purchaser for the consideration and upon the terms set out in this Agreement.

**IT IS AGREED:**

### 1. SALE AND PURCHASE

1.1 The Seller shall sell, and the Purchaser shall purchase, all of the Seller's right, title and interest to, in and under the following assets with effect from Closing on the terms of this Agreement (including, in particular, clauses 1, 2 and 4):

(a) the benefit and burden of the each of position to which the Seller is a counterparty as set forth in Schedule 2 hereto (together, the "**Positions**");

(b) the Purchaser Claims; and

(c) the Asset Information,

together, the "**Assets**".

### 2. PRICE

2.1 The price for the Assets (the "**Purchase Price**") shall be the amount specified in Schedule 1 as the "Purchase Price".

2.2 On the Effective Date, the Purchaser shall pay to the Seller the Purchase Price.

Exhibit #

Deposition Exhibit #38
05/12/21 - JAT

UBSPROD020567

2.3  The Purchase Price shall be apportioned between the Assets in the proportions set out in Schedule 1 or in such other proportions as the Seller and the Purchaser may agree in writing.

2.4  The Seller and the Purchaser acknowledge and agree that they consider the Purchase Price to represent a market value price for the Assets.

### 3. CLOSING

3.1  Closing shall take place on 31 December 2019 and the settlement of the transfer of the Assets shall occur as promptly as practicable after Closing and, in any event, in accordance with clause 4.

### 4. ASSETS, CONTRACTS AND LIABILITIES

**Assets, Contracts and Liabilities to be transferred to the Purchaser**

4.1  With effect from Closing:

(a)  the Seller hereby assigns and transfers to the Purchaser the benefit of all the Seller's right, title and interest to, in and under the Assets to hold the same unto the Purchaser absolutely, and the Seller shall (to the extent required) promptly after Closing give the other parties to the Assets written notice of the assignment pursuant to this clause 4.1(a); and

(b)  the Purchaser hereby:

   (i)  assumes and agrees to discharge when due all Assumed Liabilities; and

   (ii) indemnifies the Seller against all Assumed Liabilities and any and all Costs suffered or incurred by the Seller as a result of any failure to discharge such Assumed Liabilities.

4.2  The provisions of Schedule 3 shall apply to any Purchaser Claims if and to the extent the benefit and/or the burden of such Purchaser Claims cannot effectively be assigned or transferred by the Seller to the Purchaser except by an agreement of novation or by obtaining a consent, an approval, a waiver or the like from a third party (any such agreement of novation or consent, a "**Counterparty Consent**").

4.3  The Purchaser shall use all reasonable efforts to procure that as soon as possible after Closing all Counterparty Consents are entered into in each case by all the parties thereto other than the Seller, whereupon the Seller shall execute the same.

### 5. GENERAL

5.1  **Whole Agreement.** This Agreement sets out the whole agreement between the parties in respect of the sale and purchase of the Assets and supersedes any prior agreement (whether oral or written) relating to the transactions contemplated by this Agreement. It is agreed that: (i) no party has entered into this Agreement in reliance upon any representation, warranty or undertaking of any other party which is not expressly set out or referred to in this

Agreement; (ii) all terms and conditions which are implied by law in any jurisdiction in relation to this Agreement and the transactions hereunder are excluded to the fullest extent permitted by law or, if incapable of exclusion, any right, or remedies in relation to them are irrevocably waived; and (iii) a party may claim in contract for breach of warranty under this Agreement but shall have no claim or remedy under this Agreement in respect of misrepresentation (whether negligent or otherwise, and whether made prior to, and/or in, this Agreement) or untrue statement made by the other party. This clause shall not exclude any liability for, or remedy in respect of, fraudulent misrepresentation.

5.2     **Assignment.**

(a)     Except as provided in this clause 5.2 or unless the Seller and the Purchaser specifically agree in writing (such agreement not to be unreasonably withheld or delayed), no party shall assign, transfer, charge or otherwise deal with all or any of its rights under this Agreement nor grant, declare or dispose of any right or interest therein.

(b)     The Purchaser may assign or charge its rights under this Agreement for the purpose of securing any debt or capital markets financing or refinancing from time to time made available to the Purchaser or any member of its Group.

5.3     **Waiver.** No failure or delay by any party in exercising any right or remedy provided by law or under this Agreement shall impair such right or remedy or operate or be construed as a waiver or variation of it or preclude it or its exercise at any subsequent time and no single or partial exercise of any such right or remedy shall preclude any further exercise of it or the exercise of any other remedy.

5.4     **Further Assurance.** The Seller and the Purchaser shall, for a period of six months from the Effective Date, at the Purchaser's cost perform (or procure the performance of) all further acts and things, and execute and deliver (or procure the execution and delivery of) such further documents, as may be required by law or be necessary to implement and give effect to this Agreement.

5.5     **Counterparts.** This Agreement may be executed in any number of counterparts, and by each party on separate counterparts. Each counterpart is an original, but all counterparts shall together constitute one and the same instrument. Delivery of an executed counterpart signature page of this Agreement by e-mail (PDF) or telecopy shall be as effective as delivery of a manually executed counterpart of this Agreement.

5.6     **Variation.** No amendment of this Agreement shall be valid unless it is in writing and signed by or on behalf of each of the parties to it. Subject to the foregoing, the parties may by written agreement on or prior to the Effective Date make such amendments to this Agreement as they may agree to either add assets to or remove assets from the scope of this Agreement.

5.7     **Invalidity.** Each of the provisions of this Agreement is severable. If any provision is held to be or becomes invalid or unenforceable in any respect under the laws of any jurisdiction it shall have no effect in that respect and the parties shall use all reasonable endeavours to replace it by a valid and enforceable substitute provision the effect of which is as close to the intended effect as possible.

5.8     **Third Party Rights.** A person who is not a party to this Agreement shall have no right under the Contract (Rights of Third Parties) Law, 2014 to enforce any of its terms.

5.9 **Governing Law.** This Agreement and any non-contractual obligations arising out of or in connection with this Agreement shall be governed by, and interpreted in accordance with, Cayman Islands law.

5.10 **Jurisdiction.** The Cayman Islands courts shall have exclusive jurisdiction in relation to all disputes arising out of or in connection with this Agreement (including claims for set-off and counterclaims), including disputes arising out of or in connection with: (i) the creation, validity, effect, interpretation, performance or non-performance of, or the legal relationships established by, this Agreement; and (ii) any non-contractual obligations arising out of or in connection with this Agreement. For such purposes each party irrevocably submits to the jurisdiction of the Cayman Islands courts.

UBSPROD020570

## SCHEDULE 1

## PURCHASE PRICE

| Asset | Purchase Price (US$) |
|---|---|
| (a) the benefit and burden of the Positions | 1.00 |
| (b) Purchaser Claims | 1.00 |
| (c) Asset Information | 1.00 |
| **Purchase Price from Purchaser to Seller (clause 2)** | 3.00 |

UBSPROD020571

## SCHEDULE 2

### ASSETS

| ISIN/CUSIP | NAME | Acquired | Par/Face |
|---|---|---|---|
| US3624682098 | GSC ABS CDO 2006-4U LT CUM PFD 144A | 8/11/2017 | 16,000 |
| US5431742056 | LONGSTREET CDO I LTD PFD 144A | 8/11/2017 | 4,570 |
| US43009L2034 | HIGHLAND FINL PARTNERS LP | 8/11/2017 | 615,733 |
| US43009L9898 | HIGHLAND FINL PARTNERS LP NPV | 8/11/2017 | 3,000,000 |
| US69763NAD30 | PAM CAP FDG LP 0.0 01MAY13 144A | 8/11/2017 | 48,500,000 |
| N/A | Dugaboy Investment Trust Promissory Note | 8/11/2017 | 2,399,996 |
| N/A | CLO Hold Co, Ltd. Promissory Note | 8/11/2017 | 32,801,593 |
| US925331AA89 | VERTICAL ABS CDO 2 0.0 09MAY46 | 8/11/2017 | 11,000,000 |
| USG44392AF82 | HIGHLAND PARK C 4.93867 | 8/11/2017 | 17,000,000 |
| KY009A1KXYH6 | ABERDEEN LN FDG LTD PFD | 8/11/2017 | 12,000,000 |

## SCHEDULE 3

## PURCHASER CLAIMS

1. The provisions of this Schedule 3 shall apply to any Purchaser Claims if and to the extent that a Counterparty Consent is required in relation to a Purchaser Claim as specified in clause 4.2.

2. The Purchaser shall use all reasonable efforts, at its own cost, to obtain any Counterparty Consent as soon as possible after Closing. The Purchaser shall provide any information reasonably requested for that purpose by the person, firm or company concerned.

3. Until such Counterparty Consent has been obtained:

(a) the Purchaser's obligation to use all reasonable efforts to obtain that Counterparty Consent shall continue;

(b) the transfer of that Purchaser Claim (to the extent that a Counterparty Consent is required) shall not take effect and the Seller shall from Closing hold it on trust for the Purchaser and account for and pay or deliver to the Purchaser (as soon as reasonably practicable after receipt) any moneys, goods and other benefits which it receives after Closing to the extent that they relate to such Purchaser Claim net of any taxation suffered thereon; and

(c) the Seller shall from Closing give such reasonable assistance to the Purchaser (at the Purchaser's written request and sole expense) as is necessary to enable the Purchaser to enforce the Seller's rights under the relevant Purchaser Claim, provided that:

   (i) the Seller shall not be obliged to make any payment (in money or money's worth) under this paragraph (c) unless the Purchaser has first paid it the amount concerned nor shall it be obliged to become involved in any legal action; and

   (ii) the Purchaser shall not agree to any amendment or waiver of those rights under the relevant Purchaser Claim (which continue to be rights of the Seller) without prior written approval of the Seller.

4. If any Counterparty Consent is not obtained within twelve months after Closing or is refused and the procedure set out in this Schedule does not enable the benefit of the relevant Purchaser Claim to be enjoyed in all material respects by the Purchaser after Closing, then the Seller and the Purchaser shall use reasonable efforts to achieve an alternative solution by which the Purchaser shall receive the benefit of the relevant Purchaser Claim and assume the associated obligations (provided that the Seller shall not be obliged to make any commitment, incur any liability or make any payment for that purpose).

## SCHEDULE 4

### DEFINITIONS AND INTERPRETATION

1. In this Agreement, the following words and expressions shall have the following meanings:

"**Asset Information**" means all documents, data, records and other information in respect of which the Seller has a right to transfer possession to the Purchaser to the extent that such information relates exclusively to the Assets set out in clause 1.1(a) to (b);

"**Assets**" has the meaning given in clause 1.1;

"**Assumed Liabilities**" means all liabilities, duties and obligations of every description whether deriving from contract, common law, statute or otherwise, whether present or future, actual or contingent or ascertained or unascertained and whether owed or incurred severally or jointly or as principal or surety of the Seller to the extent that they relate to the Assets (excluding any tax for which the Seller is liable in respect of any of the Assets);

"**Closing**" means closing of the sale and purchase of the Assets in accordance with the provisions of this Agreement which shall take place on 31 December 2019;

"**Costs**" means losses, damages, costs (including reasonable legal costs) and expenses (including taxation), in each case of any nature whatsoever;

"**Counterparty Consent**" has the meaning given in clause 4.2;

"**Effective Date**" means the date on which the Assets are effectively transferred from the Seller to the Purchaser in accordance with the terms of this Agreement;

"**Purchaser Claims**" means the benefit of all rights and claims of the Seller relating to the Assets whether arising on, prior to or after Closing (including all amounts which are not otherwise transferred under this Agreement but excluding rights and claims to the extent that they relate to taxation);

"**Purchase Price**" has the meaning given in clause 2.1;

2. In this Agreement, unless the context otherwise requires:

(a) references to a person include any individual, firm, body corporate (wherever incorporated), government, state or agency of a state or any joint venture, association, partnership, works council or employee representative body (whether or not having separate legal personality);

(b) headings do not affect the interpretation of this Agreement; the singular shall include the plural and vice versa; and references to one gender include all genders;

(c) references to any Cayman Islands legal term or concept shall, in respect of any jurisdiction other than Cayman Islands, be construed as references to the term or concept which most nearly corresponds to it in that jurisdiction;

(d) references to United States Dollars, US$ or $ are references to the lawful currency from time to time of United States of America;

(e) references to any agreement are to that agreement as from time to time amended, supplemented, varied, assigned or transferred; and

(f) any phrase introduced by the terms including, include, in particular or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms.

3. References to any legislation or law or to any provision thereof shall include references to any such law as it may, after the date hereof, from time to time, be amended, supplemented or re-enacted, any reference to any statutory provision shall include any subordinate legislation made from time to time under that provision, and any reference to law generally shall include any law applicable to the relevant party, including statutory and common law.

4. The Schedules comprise schedules to this Agreement and form part of this Agreement.

5. Where there is any inconsistency between the definitions set out in this Schedule and the definitions set out in any clause or any other Schedule, then, for the purposes of construing such clause or Schedule, the definitions set out in such clause or Schedule shall prevail.

UBSPROD020575

## SIGNATURE

This Agreement is signed by duly authorised representatives of the parties:

_[signature]_
_____
Sentinel Reinsurance, Ltd.
By: Matthew Diorio
Director

_____
Sebastian Clarke Ltd
By: Summit Management Limited
Director
By: _____
Its: Authorised Signatory

UBSPROD020576