**From:** Shawn Raver <SRaver@HighlandCapital.com>
**To:** Rick Swadley <RSwadley@HighlandCapital.com>
**Subject:** RE: policy
**Date:** Wed, 12 Sep 2018 16:13:36 -0500
**Importance:** Normal
**Attachments:** Tax_Compliance_Memo_(2017)_-_Sale_of_Assets_to_Sentinel.docx

---

Mark pointed out a couple of minor drafting errors in the memo that I fixed.

**From:** Shawn Raver
**Sent:** Wednesday, September 12, 2018 3:28 PM
**To:** Rick Swadley
**Subject:** policy

Shawn E. Raver

Attorney

Highland Capital Management, L.P.

300 Crescent Court, Suite 700

Dallas, TX 75201

sraver@highlandcapital.com

(972) 419-4479

Exhibit #
Deposition Exhibit 03
4/27/20
UBSPROD4837351



## MEMORANDUM

FROM: Shawn Raver
TO: Tax Files
DATE: June 30, 2018
RE: Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets

### Facts

On March 14, 2008, UBS Securities, LLC and certain affiliates ("UBS"), Highland Capital Management, L.P. ("HCM"), Highland CDO Opportunity Master Fund, L.P. ("CDO"), and Highland Special Opportunities Holding Corporation ("SOHC") entered into a series of agreements as part of a collateralized debt obligation transaction (the "Transaction").[1] One such agreement included a Cash Warehouse Agreement.[2] The Cash Warehouse Agreement governed the parties' rights and obligations concerning the accumulation, warehousing, sale and/or liquidation of certain collateral obligations ("Collateral Obligations") in connection with the Transaction. It was UBS's obligation to accumulate and warehouse certain Collateral Obligations pursuant to the Cash Warehouse Agreement.[3]

The Engagement Letter required CDO Fund and SOHC to bear 100% of the losses experienced by the CDO Securities (51% borne by CDO Fund and 49% by SOHC).[4] In order to secure the obligations of CDO Fund and SOHC, each was required to transfer cash or certain securities as collateral.[5] In addition, upon each $100 million increment of mark to market losses on the CDO Securities, UBS could make margin calls on CDO Fund and SOHC requesting additional collateral.[6]

As the value of the warehoused assets declined, UBS began to make margin calls upon HCM, CDO Fund and SOHC.[7] The first margin call was issued on September 17, 2008 and requested $10 million from each of CDO Fund and SOHC.[8] On or about October 21, 2008, UBS issued a second margin call, again requesting $10 million from each of CDO Fund and SOHC.[9] The second margin call was satisfied by CDO Fund and SOHC posting assets with a fair market value of approximately $20 million (the assets had an aggregate notional value of $49.97

---

[1] *See* Exhibit 1 (structure chart of Highland CDO Opportunity Master Fund, L.P. and Highland Special Opportunities Holding Company).
[2] *See* Exhibit 2 (Cash Warehouse Agreement).
[3] *See* Exhibit 2, section 2(A); Exhibit 3 (Amended Answer and Counterclaims of Highland Capital Management, L.P.), paragraph 65.
[4] *Id.* at paragraph 19.
[5] *Id.* at paragraph 24.
[6] *See* Exhibit 2, section 12(C).
[7] *Id.* at paragraph 25.
[8] *See* Exhibit 5 (Letter from UBS).
[9] *See* Exhibit 6 (Letter from UBS).

1

UBSPROD4837352



million).[10] On or about November 7, 2008, UBS issued a third margin call requesting another $10 million.[11] The Defendants offered to post certain securities with a fair market value of approximately $10 million, all of which were rejected by UBS.[12]

Thereafter, UBS sued CDO and SOHC. The allegation against CDO Fund and SOHC is that each breached the Cash Warehouse Agreement and the Synthetic Warehouse Agreement. Specifically, by not bearing 100% of UBS's risk of loss under both Agreements ($157,949,885.47 of alleged losses with respect to the Cash Warehouse Agreement and $587,357,060.59 of alleged losses with respect to the Synthetic Warehouse Agreement).[13] After some initial discovery, UBS amended its complaint to add Highland Financial Partners, L.P. ("HFP") as a defendant. SOHC is a wholly-owned subsidiary of HFP. The allegation against HFP was that it was the alter ego of SOHC and therefore should be held responsible and liable for SOHC's breach of the Synthetic Warehouse Agreement and Cash Warehouse Agreement.[14]

To reduce risk surrounding the UBS litigation, CDO and SOHC acquired a Legal Liability Insurance Policy (the "Policy") from Sentinel Reinsurance, Ltd. ("Insurer"). In consideration for a premium payment of $25,000,000, the Insurer agreed to indemnify the Insured (defined below) in respect of any legal liability up to a $100,000,000 limit if either: (a) a court in the UBS litigation makes an order of liability regarding the UBS litigation against the Insured, or (b) the UBS litigation is settled on terms that provide for a payment by the Insured to UBS. The collective "Insured" under the Policy consists of CDO, SOHC and Highland CDO Holding Company.

On _____, 2017, [Sentinel Holdings Ltd. ("Sentinel")] paid $25,000,000 to acquire certain assets (the "Assets") of the following entities: (a) CDO, (b) Highland CDO Opportunity Fund, Ltd. ("CDO Offshore"), (c) Highland CDO Holding Company ("CDO Holdco"), (d) SOHC, (e) Highland Financial Corporation ("HFC"), and (f) Highland Financial Partners, L.P. ("HFP") (the "Transaction"). CDO, CDO Offshore, CDO Holdco, SOHC, HFC and HFP are individually referred to herein as a "Seller Entity" and collectively referred to herein as the "Seller Entities." A full listing of the Assets by each Seller Entity, plus the fair market value of each Asset on the date of Transaction, is set forth on Schedule A.

The aggregate purchase price paid by Sentinel for the Assets was $25,000,000. The aggregate fair market value of the assets on the date of the Transaction was $105,647,679. The document effectuating the Transaction did not allocate the purchase price among the Assets acquired by Sentinel. The Seller Entities intend to allocate the purchase price among the Assets sold as follows:

A) First, to the full balance of all cash acquired;[15] and

---

[10] *See* Exhibit 7 (Second Amended Complaint), paragraph 92.
[11] *See* Exhibit 8 (Letter from UBS); Exhibit 4, paragraph 27.
[12] *See* Exhibit 4, paragraph 27.
[13] *Id* at paragraphs 32, 35.
[14] *See* Exhibit 7, paragraph 194.
[15] The total cash held by the Seller Entities was $11,073,331 as of the Transaction date.

UBSPROD4837353



B) Then, pro rata among the remaining Assets based on their respective fair market value.

### Questions Presented

Will the form of the Transactions between Sentinel (and affiliates) and the Seller Entities, including the allocation of the gross proceeds and the Policy, be respected for federal income tax purposes?

### Short Answer

The Transaction should be respected for federal income tax purposes. That is, the form of the Transaction and the allocation of the gross proceeds among the Assets should be respected. Further, the Policy should be respected as a legitimate legal liability insurance policy and the Seller Entities who pay the premium for such Policy should receive a deduction.

### Legal Discussion

*Tax Consequences of Transaction.*

A transaction which is entered solely for the purpose of obtaining tax benefits and which are without economic substance are considered shams for federal income tax purposes and will not be given effect.[16] The economic substance of a transaction, not its form, is controlling.[17] A transaction is a "sham in substance" if "the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits."[18] For example, the Tax Court found a purported purchase of real property a sham, after taking into consideration the absence of indicia of arm's-length dealing, drastically inflated sales prices, and a complete disregard of contractual terms.[19] "[W]here … there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax independent considerations, and is not shaped by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation."[20]

The IRS may attempt to characterize the Transaction as a "sham." The focus of this argument would be on the fact the Seller Entities sold assets with a fair market value of $105,647,679 for a purchase price of $25,000,000. And this was done solely to fund the $25,000,000 premium required by the Policy. The obvious question would be why sell all the Assets if all was required was $25,000,000. For example, the Seller Entities held over $11 million

---

[16] *Knetsch v. United States*, 364 U.S. 361 (1960); *Falsetti v. Commissioner*, 85 T.C. 332 (1985).
[17] *Gregory v. Helvering*, 293 U.S. 465 (1935).
[18] *Falsetti*, 85 T.C. at 347.
[19] *Id.*
[20] *Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84 (1978); *see also Holladay v. Commissioner*, 649 F.2d 1176, 1179 (5th Cir. 1981) (existence of a tax benefit from a transaction does not automatically mean it is a sham so long as it is imbued with tax-independent considerations).

3

HIGHLAND CAPITAL

in cash, marketable securities with a value of approximately $9 million, and a $32 million note that is secured by over $200 million in assets held by the debtor.

However, the Transaction is imbued with business purposes. The Policy provides the Insureds with indemnification for the first $100,000,000 of any judgment or settlement with respect to the UBS litigation. While the sales price for the Assets was substantially below their aggregate fair market value, there may not have been a market for the sale of only a portion of the Assets. Further, finding a buyer for all their Assets will allow the Seller Entities to wind down much quicker once the UBS litigation is concluded. Finally, there is no tax rule that would re-characterize a transaction that may amount to a bad business decision by one party in a transaction amongst unrelated parties.

Another potential theory the IRS could invoke to re-characterize the Transaction is a substance over form argument. In this argument, the IRS would likely argue that in substance the transaction was not a sale of assets followed by the purchase of the Policy. Rather, the Seller Entities sold the Assets in exchange for the $100,000,000 indemnification from Insurer with respect to the UBS litigation. That is, the gross proceeds for the Assets is $100,000,000 and there is no premium payment.

While courts exult substance over form, the form of a transaction is not ignored and courts review several factors to determine if the form of a transaction should govern.[21] Agreements that are intended to have economic substance, as opposed to mere tax avoidance, should be given effect for tax purposes.[22] The first factor investigates whether there is a legitimate non-tax business reason for the form of the transaction (i.e., were the parties motivated at least in part by reasons other than taxes). Second, courts look to whether the agreements at issue have non-tax economic substance.[23] This has been construed to determine whether there was a change in the economic interests of the relevant parties.[24] A third factor is the relationship of the parties to the agreement. Are they independent of each and did they deal at arm's length?[25] Finally, courts assess whether or not the parties disregarded the form of the agreement.[26]

It is clear the Transaction had economic substance as it allowed CDO and SOHC to obtain legal liability insurance with respect to the UBS litigation. CDO and SOHC are at significant risk of being held liable to UBS. Furthermore, the transaction no doubt changes the economic interests of the parties involved. There is a transfer of assets and acquisition of an insurance policy that provides $100,000,000 of liability protection. In addition, Sentinel is not related to the Seller Entities and each side to the Transaction was independent of the other. There are no facts to indicate the Transaction was not the result of arm's length negotiations. Finally, the parties to the Transaction have not in any way disregarded the form of the Transaction. Based on the foregoing,

---

[21] Newman v. Commissioner, 902 F.2d 159 (2nd Cir. 1990).
[22] Frank Lyon Co. v. U.S., at 583-84.
[23] Id. at 583.
[24] Rosenfeld v. Commissioner, 706 F.2d 1277, 1282 (2nd Cir. 1983).
[25] Frank Lyon Co. v. U.S., at 580.
[26] Id. at 582-83.

4

UBSPROD4837355



the form of the Transaction should be respected for federal income tax purposes and not re-characterized in any manner.

### *Will the Allocation by the Seller Entities be Respected?*

Code section 1060 should not apply to the allocation of the $25,000,000 among the Assets. Code section 1060 sets forth specific rules for allocating the purchase price to an "applicable asset acquisition." An "applicable asset acquisition" is an active trade or business that includes active and substantial management and operational functions that the taxpayer performs itself, not through independent contractors.[27] Alternatively, even if the "active trade or business" requirement is not met, a group of assets is a trade or business if its "character is such that goodwill or going concern value could under any circumstances attach to such group."[28] Under either test, the Assets sold by the Seller Entities should not constitute an "applicable asset acquisition." Further, the holding of land, stock, securities, or other properties for investment does not constitute an active conduct of a trade or business.[29] Accordingly, Sentinel and the Seller Entities will not be required to use the residual method to allocate the purchase price pursuant to Code section 1060.

Free from the specific requirements of Code section 1060, the purchase price allocation used by the Seller Entities (as described above) should be respected for federal income tax purposes.

---

[27] Treas. Reg. § 1.355-3(b)(2)(iii).
[28] Treas. Reg. § 1.1060-1(b)(2)(i).
[29] Treas. Reg. § 1.335-3(b)(2)(iv).

UBSPROD4837356