## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: **MARCY S. FRIEDMAN** PART __60__
_____
*Justice*

| | |
|---|---|
| UBS SECURITIES LLC, | INDEX NO. ___650097/2009___ |
| -against- | MOTION DATE _____ |
| HIGHLAND CAPITAL MANAGEMENT, L.P., et al., | MOTION SEQ. NO. __026, 027__ |

The following papers, numbered 1 to _____ were read on this motion for summary judgment.

| | |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | No (s). _____ |
| Answering Affidavits — Exhibits _____ | No (s). _____ |
| Replying Affidavits _____ | No (s). _____ |

**Cross-Motion:** ☐ Yes ☐ No

Upon the foregoing papers, it is ordered that this motion

It is hereby ORDERED that these motions for summary judgment are decided in accordance with the attached decision and order of today's date.

Dated: __3 -13 -17__ _____ , J.S.C.

**MARCY S. FRIEDMAN, J.S.C.**

1. Check one: ............................... ☐ CASE DISPOSED ☒ NON-FINAL DISPOSITION
2. Check as appropriate:.....Motion is: ☐ GRANTED ☐ DENIED ☐ GRANTED IN PART ☐ OTHER
3. Check if appropriate:.................. ☐ SETTLE ORDER ☐ SUBMIT ORDER
☐ DO NOT POST ☐ FIDUCIARY APPOINTMENT ☐ REFERENCE

**MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):**

Case 21-03020-sgj Doc 177-5 Filed 08/04/22 Entered 08/04/22 18:26:09 Page 2 of 36

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: IAS PART 60
-------------------------------------------------------------------------X
UBS SECURITIES LLC and UBS AG, LONDON BRANCH,

                       Plaintiffs,

                -against-

Index No. 650097/09

HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND
SPECIAL OPPORTUNITIES HOLDING COMPANY,
HIGHLAND CDO OPPORTUNITY MASTER FUND, L.P.,
HIGHLAND FINANCIAL PARTNERS, L.P., HIGHLAND
CREDIT STRATEGIES MASTER FUND, L.P., HIGHLAND
CRUSADER OFFSHORE PARTNERS, L.P., HIGHLAND
CREDIT OPPORTUNITIES CDO, L.P., and STRAND
ADVISORS, INC.,

                       Defendants.
-------------------------------------------------------------------------X
**FRIEDMAN, J:**

    This action arises out of a failed restructured transaction for securitization of

collateralized loan obligations (CLOs) and credit default swaps (CDSs). Plaintiffs UBS

Securities LLC (UBSS) and UBS AG, London Branch (UBS AG) (together, UBS) seek damages

of $686 million in investment losses from the following affiliated defendants: Highland Capital

Management, L.P. (Highland Capital); Highland Financial Partners, L.P. (Highland Financial);

Highland Special Opportunities Holding Company (SOHC); Highland CDO Opportunity Master

Fund, L.P. (CDO Fund); Highland Credit Strategies Master Fund, L.P. (Credit Strategies),

Highland Crusader Offshore Partners, L.P. (Crusader Fund), Highland Credit Opportunities

CDO, L.P. (Credit Opp Fund); and Strand Advisors, Inc. (Strand).[1]

    The second amended complaint (complaint) asserts causes of action for fraud against the

Fund Counterparties (first and second causes of action), breach of contract against the Fund

---

[1] SOHC and CDO Fund are referred to as the Fund Counterparties. Credit Strategies, Crusader Fund, and Credit
Opp Fund are referred to as the Affiliated Transferee defendants.

Counterparties (third and fourth causes of action), fraudulent conveyance against all defendants (fifth cause of action), tortious interference with contractual relations against the Affiliated Transferee defendants (sixth cause of action), declaratory judgment for general partner liability against Strand (seventh cause of action), and declaratory judgment for alter ego liability against Highland Financial (eighth cause of action).[2]

The instant action was consolidated with another action commenced by UBS only against Highland Capital. (UBS Secs. LLC v Highland Capital Mgt. L.P., Sup Ct, NY County, Nov. 1, 2010, Fried, J., index No. 650752/10.) The complaint in that action asserts causes of action against Highland Capital for fraud (first and second causes of action), breach of the covenant of good faith and fair dealing (third cause of action), fraudulent conveyance (fourth cause of action), and tortious interference with contractual relations (fifth cause of action).

Highland Capital, Highland Financial, Strand, and the Affiliated Transferee defendants move for summary judgment dismissing all causes of action against them. By separate motion, the Fund Counterparties seek summary judgment dismissing all causes of action against them.[3]

Factual Background

It is undisputed that the transaction at issue (Transaction), known as the Knox Warehouse, called for UBS to finance the purchase of CLOs and related CDSs and to hold them as "warehouse assets" for the benefit of Highland Capital, which was to sponsor the securitization. (Compl., ¶¶ 4, 35.) As pleaded in the complaint, Highland Capital was the

---

[2] The second and sixth causes of action are purportedly pleaded solely to preserve them for appeal.

[3] After service of the motion, UBS settled its claims in this action against defendants Credit Strategies and Crusader Fund, two of the Affiliated Transferee defendants. (See Kirkland & Ellis Letter dated Jan. 7, 2016.)

2

investment manager of Highland Financial, and these two entities allegedly owned and/or controlled the Fund Counterparties and the Affiliated Transferee defendants. (Id., ¶¶ 22, 25.) Strand was Highland Capital's general partner. (Id., ¶ 23.)  Nonparty James Dondero was the president, founder, and owner of Highland Capital, and allegedly controlled all of the Highland entities through Highland Capital. (Id., ¶¶ 22, 25.)

>    The Cash and Synthetic Warehouse Agreements

The parties' dispute arises out of the following three agreements, all of which are dated as of March 14, 2008:  an Engagement Letter, entered into between UBSS and Highland Capital (Corcoran Aff., Ex. 13); a "Synthetic Warehouse Agreement," entered into among UBS AG, the Fund Counterparties, and Highland Capital (Corcoran Aff., Ex. 14); and a "Cash Warehouse Agreement," entered into among UBSS, the Fund Counterparties, and Highland Capital (Corcoran Aff., Ex. 15).  In the Engagement Letter, UBSS agreed to act "as the financial arranger and placement agent in connection with a proposed collateralized debt obligations transaction with an anticipated aggregate issuance size of approximately U.S.$818 million in securities . . . (the 'Transaction')."  The Transaction contemplated the "formation and capitalization of a special purpose vehicle or vehicles (collectively, the 'Issuer') . . . that will acquire an investment portfolio" comprised of CLOs and CDSs that reference CLOs, to be managed by Highland Capital as "Servicer."  (Id., § 1, 3 [a].)  In the Engagement Letter, UBSS and Highland Capital "agree[d] that the CDO Fund and SOHC will in aggregate bear 100% of the risk of the Warehouse Facility in accordance with their respective Allocation Percentages (as defined in the Warehouse Documents) and otherwise in accordance with the terms of the Warehouse Documents . . . ."  (Id., § 3 [c].)

3

Section 5 (B) of the Synthetic Warehouse Agreement opens with the clause "On the Closing Date:" and provides, among other things, for compensation to UBS by the Fund Counterparties for CDS Losses.    Subsection 5 (B) (2) provides that "[a]n amount equal to the excess, if any," of CDS Losses over CDS Gains

> "shall collectively be paid by each of the CDO Fund and SOHC after notice from UBS of the amount due, by wire transfer in immediately available funds (i) on the Termination Date in the case of a Termination Date occurring on (a) March 14, 2009, (b) March 14, 2010 or (c) the Closing Date or (ii) three Business Days after the Termination Date in the case of any other Termination Date.    Such CDS Loss shall be allocated among the CDO Fund and SOHC on the basis of their respective Allocation Percentages."

Section 5 (B) (2) defines CDS Losses as follows:

> "(x) the sum of (1) the aggregate Floating Amount payments and Physical Settlement Amount payments made by UBS with respect to all of the Credit Default Swaps as to which a Floating Amount Event or a Credit Event occurred under the terms thereof, *plus* (2) the aggregate amount of Net Hedging Payments made by UBS with respect to all Hedging Transactions related to the Credit Default Swaps, *plus* (3) the aggregate Replacement Losses determined with respect to all of the Credit Default Swaps and the related Hedging Transactions that were terminated or novated or as to which the exposure was retained by UBS, in each case upon the designation of the Reference Obligation relating to such Credit Default Swap as an Ineligible Security (such amount in this clause (x), the 'CDS Losses') . . . ."

(emphasis in original.)    Ineligible Security is defined as:    "any Reference Obligation in the CDS Portfolio which has become ineligible for sale to the Issuer on the Closing Date as a result of the failure of such Reference Obligation to conform to the Eligibility Criteria as it exists at such time of determination. . . ."    (Synthetic Warehouse Agreement, Ex. A-2.)    This definition further states:    "Each of the following is an 'Ineligible Security':    a Defaulted Security, a Designated Security and a Written Down Security."    (Id.)    Closing Date is defined as "the date

4

of the closing of the Transaction and the issuance of the CDO Securities." (Id., Ex. A-1.)

Section 5 of the Synthetic Warehouse Agreement further provides: "To the extent the Closing Date fails to occur, allocation of CDS Losses, CDS Gains and any other amounts payable hereunder will be determined in accordance with the provisions of Section 6 hereof." Section 6 (C), in turn, provides:

> "To the extent there are any CDS Losses, the CDO Fund and SOHC shall collectively be responsible for 100% of any such CDS Losses. Such CDS Losses shall be allocated between the CDO Fund and SOHC on the basis of their respective Allocation Percentages. Each of the CDO Fund and SOHC shall, after notice of the amount due from UBS, remit such amounts by wire transfer in immediately available funds to UBS within three Business Days after the Termination Date."

The Cash Warehouse Agreement, section 5 (A), provides that, in the event that "the Closing Date fails to occur on or prior to the Termination Date, . . . UBS shall be authorized (but not required) to sell each Collateral Obligation then in the Warehouse Account in accordance with the Liquidation Procedures." This section further provides: "Following the completion of such liquidation of the Collateral Obligations, any Aggregate Collateral Loss shall be allocated to the CDO Fund and to SOHC on the basis of their respective Allocation Percentages" and shall be paid to UBS.

UBS Margin Calls and Termination of Agreements

Section 12 (C) of the Synthetic Warehouse Agreement required the Fund Counterparties to transfer an additional deposit of $10 million in cash or eligible securities into a "Deposit Account" in the event that the "Deposit Threshold Exposure Amount is greater than or equal to U.S. $100,000,000." On September 16, 2008, UBS made a "margin call" under section 12 (C) of the Synthetic Warehouse Agreement, demanding additional collateral of $10 million from

5

each of the Fund Counterparties. (Compl., ¶ 77.) The Fund Counterparties satisfied this margin call on September 19, 2008. (Id., ¶ 79.) On October 21, 2008 UBS made a second margin call under section 12 (C) of the Synthetic Warehouse agreement, which the Fund Counterparties satisfied on October 24 by posting assets with a notional value of $49.97 million. (Id., ¶¶ 90, 91.) On November 7, 2008, UBS made a third margin call. Highland Capital and the Fund Counterparties allegedly offered to post various securities to satisfy this margin call. (Id., ¶ 94-95.) On November 13, UBS rejected the securities and requested cash or cash equivalent collateral. (Id., ¶ 96.)

On December 3, 2008, UBS terminated the parties' agreements based on the Fund Counterparties' failure to post the requested collateral. (Id., ¶¶ 99-100.) Shortly thereafter, UBS demanded payment for its losses under the Cash and Synthetic Warehouse Agreements. (Id., ¶¶ 103, 105.) On January 5, 2009, UBS notified Highland Capital and the Fund Counterparties of the failure to pay UBS's losses, and commenced unwinding the warehouse facility. (Id., ¶ 106.) On January 16, 2009, UBS conducted an auction of the warehoused assets, as contemplated under the parties' agreements, and on March 19, 2009, UBS notified Highland Capital and the Fund Counterparties of UBS's final accounting, and asserted that these entities owed UBS $686,853,290.26. (Id., ¶¶ 106-107.)[4]

---

[4] The parties' claims and the procedural history of this action and two related actions are further discussed in several previous decisions of the Appellate Division and of this court, familiarity with which is presumed. (See UBS Secs. LLC v Highland Capital Mgt., L.P., 93 AD3d 489 [1st Dept 2012]; 86 AD3d 469 [1st Dept 2011]; 70 AD3d 526 [1st Dept 2010]; 42 Misc 3d 580 [Sup Ct, NY County 2013]; 30 Misc 3d 1230 [A], 2011 NY Slip Op 50297 [U] [Sup Ct, NY County 2011]; 25 Misc 3d 1243 [A], 2009 NY Slip Op 52565 [U] [Sup Ct, NY County 2009].) To the extent that additional facts are necessary to resolve the instant motions, they are discussed in the legal analysis that follows.

6

FILED: NEW YORK COUNTY CLERK 03/24/2017 02:22 PM INDEX NO. 650097/2009

NYSCEF DOC. NO. 411 Case 21-03020-sgj Doc 177-5 Filed 08/04/22 Entered 08/04/22 18:26:09 Page 8 of 36 RECEIVED NYSCEF: 03/24/2017

I.    SOHC and CDO Fund's Summary Judgment Motion (mot seq 027)

The Fund Counterparties seek summary judgment dismissing all of the causes of action of the complaint, on four principal grounds:   UBS cannot show that it suffered any damages. UBS committed prior material breaches of the parties' Agreements that excused the Fund Counterparties' performance. UBS did not justifiably rely on any misrepresentation that would support its fraud claim.   UBS's claim against them as fraudulent transferors must be dismissed because New York does not recognize such a claim.

Limitation of Liability and UBS's Damages

The Fund Counterparties argue that UBS suffered no damages with respect to the Credit Default Swaps, which accounted for most of the warehoused assets.   This argument is based upon defendants' interpretation of "CDS Losses," as defined in section 5 (B) (2) (x) of the Synthetic Warehouse Agreement.   In particular, defendants argue that this definition "largely limited compensation [with respect to Credit Default Swaps] to realized losses"; that "an unrealized loss could become a 'CDS Loss' only 'upon the designation of the Reference Obligation relating to such Credit Default Swap as an Ineligible Security'"; and that UBS's failure to designate any such Obligation as an Ineligible Security precludes it from recovering damages.   (Fund Counterparties' Memo. In Supp. at 12-13.)

It is well settled that "agreements are construed in accord with the parties' intent," and a "written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."   (Greenfield v Philles Records, 98 NY2d 562, 569 [2002].)   The court's "aim is a practical interpretation of the expressions of the parties to the end that there be a 'realization of [their] reasonable expectations.'"   (Brown Bros. Elec. Contrs.,

7

Inc. v Beam Constr. Corp., 41 NY2d 397, 400 [1977] [internal citation omitted]; Matter of
Lipper Holdings, LLC v Trident Holdings, LLC, 1 AD3d 170, 171 [1st Dept 2003] [a "contract
should not be interpreted to produce a result that is absurd, commercially unreasonable or
contrary to the reasonable expectations of the parties" [internal citations omitted].)   "A contract
is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger
of misconception in the purport of the [agreement] itself, and concerning which there is no
reasonable basis for a difference of opinion.'"   (Greenfield, 98 NY2d at 569 [internal citation
omitted].)   It is further settled that "[e]xtrinsic evidence of the parties' intent may be considered
only if the agreement is ambiguous, which is an issue of law for the courts to decide."   (Id.)

It is undisputed that the Warehouse Agreements were terminated prior to securitization
and therefore prior to a Closing Date.   As provided in section 5 of the Synthetic Warehouse
Agreement (quoted supra at 5), section 6 governs the determination of CDS Losses in the event a
closing fails to occur.   Thus, the issue is whether any CDS Losses arose under section 6.

The definition of CDS Losses specifies three separate components of such Losses:
(1) "aggregate Floating Amount payments and Physical Settlement Amount payments made by
UBS"; (2) "aggregate amount of Net Hedging Payments made by UBS"; and (3) "aggregate
Replacement Losses."   (Synthetic Warehouse Agreement, § 5 [B] [2] [x] [quoted in full, supra
at 4.)   The requirement that a Reference Obligation be designated an Ineligible Security is set
forth in the last clause of subdivision (3) of the definition of CDS Losses.   Subdivision (3)
concerns the Replacement Losses component of CDS Losses.   The inclusion of the Ineligible
Security designation requirement in subdivision (3) unambiguously requires compliance with
that requirement in order to claim Replacement Losses, as a component of CDS Losses, under

8

section 5 of the Synthetic Warehouse Agreement.

As attested by Phillip Braner, Managing Director of Structured Products for Highland Capital and previous Chief Operating Officer of Highland Financial, "[t]he UBS-affiliated entities . . . did not designate any of the credit default swaps held in the synthetic warehouse as ineligible securities." (Braner Aff., ¶¶ 1-2.) The Fund Counterparties contend that UBS is therefore barred from claiming Replacement Losses under section 6 of the Synthetic Warehouse Agreement. In support of this contention, they claim that CDS Losses are calculated in the same manner under both sections 5 and 6, because section 6 uses the defined term CDS Losses from section 5.

In arguing that UBS did not sustain any damages, however, the Fund Counterparties do not claim merely that UBS failed to designate Ineligible Securities pursuant to section 5 (B) (2) (x). Rather, they argue that the Synthetic Warehouse Agreement "expressly limited damages to realized losses" and that "[t]he designation of such securities as 'Ineligible' in order to recover unrealized market losses, is clearly required by the definition of 'CDS Losses.'" (Fund Counterparties' Memo. In Supp. at 4, 13.)[5]

The definition of CDS Losses does not by its terms distinguish between realized and unrealized losses and, indeed, does not use those terms. Although the Fund Counterparties

---

[5] The Fund Counterparties at times state, without qualification, that under the Synthetic Warehouse Agreement, the Fund Counterparties "were responsible for realized losses, but not unrealized losses." (Fund Counterparties' Memo. In Supp. at 16; see also id. at 4, 6, 15.) At other times, they acknowledge that unrealized losses are recoverable against them under the Synthetic Warehouse Agreement, but only upon the designation of an Ineligible Security. (Id. at 13.)

The Fund Counterparties also argue that while the Synthetic Warehouse Agreement made them liable only for "actual, realized losses on documented CDS assets" (Fund Counterparties' Memo. In Supp. at 6), they were liable for "market losses on cash assets" under the Cash Warehouse Agreement. (Id. at 6, 15.)

Case 21-03020-sgj Doc 177-5 Filed 08/04/22  Entered 08/04/22 18:26:09  Page 11 of 36

assert that the terms of the Synthetic Warehouse Agreement are unambiguous (Fund

Counterparties' Reply Memo. at 3), they resort to parol evidence from their expert to support

their claim that, under the Synthetic Warehouse Agreement, in order for unrealized losses to be

included within the definition of CDS Losses, UBS must designate Ineligible Securities.

(Corcoron Aff., Exs. 39, 39-A [Aff. of Adam Warren, ¶ 5; Warren Expert Report at 15].)

In response, UBS does not dispute that it did not designate Ineligible Securities. Rather,

it argues that "securities can only be designated 'Ineligible' if and when the Knox Warehouse is

securitized and sold to the market on a Closing Date."    (UBS Memo. In Opp. at 8.)    UBS

asserts that where, as here, the Agreement was terminated prior to securitization, the Ineligible

designation "could not have been required for UBS to recover losses because UBS could not

have done so [i.e., could not have made the Ineligible designation] under the clear contractual

terms."    (Id. [emphasis in original].)    According to UBS, "[t]his is why the contract expressly

distinguishes the calculation of CDS Losses upon securitization and Closing (in which case

Ineligible Securities must be designated as such and removed from the securitization pool) from

the calculation of CDS Losses if the agreement is terminated before securitization (in which case

securities cannot be designated Ineligible, and the Fund Counterparties are responsible for all

Replacement Losses, including unrealized losses, on the CDS assets)."    (Id. at 8-9.)

UBS's contention that securities could only have been designated Ineligible in the event

of a closing appears to be highly questionable.    As discussed above, Ineligible Security is

defined to mean "any Reference Obligation in the CDS Portfolio which has become ineligible for

sale to the Issuer on the Closing Date. . . ."    (Synthetic Warehouse Agreement, Ex. A-2.)    Other

provisions of the Synthetic Warehouse Agreement address designation of Ineligible Securities

10

prior to Closing.    Thus, section 5 (A) provides for the Servicer to "notify UBS promptly if at

any time during the term of this Agreement it becomes aware that a Reference Obligation or the

related Credit Default Swap does not conform to the Eligibility Criteria."    This section then sets

forth procedures for UBS to designate Reference Obligations as Ineligible Securities.    In the

event UBS terminates the related CDSs or retains exposure, section (A) also sets forth

procedures for UBS to calculate Replacement Loss and Replacement Gain "following the

designation of such Reference Obligations as Ineligible Securities or otherwise pursuant to

Section 6. . . ."

The court nevertheless concludes that the Fund Counterparties do not on this record

demonstrate as a matter of law that, under these circumstances in which the Agreement was

terminated without a closing having occurred, the Synthetic Warehouse Agreement

unambiguously provides that the Fund Counterparties are responsible for unrealized losses only

upon designation of the Reference Obligations relating to the CDSs as Ineligible Securities.

The parties submit sharply conflicting expert reports on the items to be included in

calculating UBS's damages, including the propriety of including unrealized losses in calculating

CDS Losses.    (See Corcoran Aff., Ex. 39 A [Report of Defs.' Expert Adam Warren]; Corcoran

Aff., Ex. 33 [Report of UBS's Expert Louis Dudney].)    To the extent that the determination of

UBS's damages will involve assessment of the credibility of the parties' experts, the

determination is not properly made on a motion for summary judgment.    (See generally Bradley

v Soundview Healthcenter, 4 AD3d 194, 194 [1st Dept 2004] ["Conflicting expert affidavits raise

issues of fact and credibility that cannot be resolved on a motion for summary judgment"];

accord Manswell v Montefiore Med. Ctr., 144 AD3d 564 [1st Dept 2016].)

11

Case 21-03020-sgj Doc 177-5 Filed 08/04/22   Entered 08/04/22 18:26:09   Page 13 of 36

Significantly also, the Synthetic Warehouse Agreement contains separate provisions—

sections 5 and 6, respectively—for calculation of CDS Losses at closing and in the event closing

does not occur.    Section 5 expressly provides:    "To the extent the Closing Date fails to occur,

allocation of CDS Losses, CDS Gains and any other amounts payable hereunder will be

determined in accordance with the provisions of Section 6 hereof."    Section 6, however,

employs the defined term for CDS Losses from section 5.    On this record, it is unclear whether

it is reasonably possible, consistent with settled precepts of contract interpretation, to read

section 6 so that it is not rendered meaningless.    (See generally Beal Sav. Bank v Sommer, 8

NY3d 318, 324-25 [2007].)[6] Put another way, it is unclear what independent purpose section 6

serves if the calculation of CDS Losses is the same as that under section 5.

The parties must also address whether, in construing the Synthetic Warehouse

Agreement, the court should read that Agreement together with the contemporaneous

Engagement Letter and Cash Warehouse Agreement.    (See Brax Capital Group, LLC v

WinWin Gaming, Inc., 83 AD3d 591, 592 [1st Dept 2011] [contemporaneous documents

governing the same transaction should generally be read together]; Gulf Ins. Co. v Transatlantic

Reins. Co., 69 AD3d 71, 81 [1st Dept 2009] [same].)    For example, the parties must address

whether the differing terms of the Cash Warehouse Agreement regarding the Fund

---

[6] As held in Beal, a court presented with a contractual interpretation issue should "construe the [contract] so as to give full meaning and effect to the material provisions.    A reading of the contract should not render any portion meaningless.    Further, a contract should be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose."    (8 NY3d at 325-325 [internal quotation marks and citations omitted]. )

12

Counterparties' liability in the event of failure to close are relevant to, or instructive regarding,

the interpretation of the definition of CDS Losses in the Synthetic Warehouse Agreement.

In sum, the court cannot find as a matter of law on this record that UBS is not entitled to

recover unrealized losses.  Determination as to whether the Synthetic Warehouse Agreement is

ambiguous in this regard must await further clarification by the parties at trial.[7]

The court turns to the Fund Counterparties' further contentions that UBS received

hedging gains of approximately $128 million following the Fund Counterparties' alleged

December 2008 breach, and that, if these gains are offset against any losses, UBS sustained no

damages.  (Fund Counterparties' Memo. In Supp. at 6-7, 19.)[8]      Determination of the effect of

UBS's hedging on its damages claim can only be determined on a record that is fully factually

---

[7] UBS relies on what it characterizes as defendants' "contemporaneous business records" showing that "the parties
intended and expected that unrealized CDS losses would be included in Defendants' liability in the event of
Termination." (UBS Memo. In Opp. at 9.)  These documents include the following:  "Cash Forecast" from
September 2008, showing a "Transaction Amount" of "(50,000,000)" on March 20, 2009, which was noted to be
"[b]ased on total unrealized losses of $100mm" (Landis Aff., Ex. 27); SOHC's Income Statement, which noted a
"[c]hange in unrealized losses of $(53.9)m" (id., Ex. 28 at 3.)  In addition, UBS submits a document titled "Review
Knox Transaction and contract ammendment [sic] (Interim Audit Procedures)," prepared by Highland Financial's
accountant for the period ending March 31, 2008.  (Id., Ex. 29.)  This document contained a statement that
"[u]nrealized gains/losses are included in the warehouse economics that are absorbed by SOHC and CDO Fund."
(Id. at PWC-HCM00011538.)  It further stated that, "[i]f the transaction does not take place (i.e. CDO securities are
not issued), then CDO Fund and SOHC will share economics (both gain and loss) of the warehouse period based on
a 51% (CDO Fund) and 49% (SOHC) split."  (Id. at PWC-HCM00011539.)
    The court declines to consider this evidence prior to determination of whether the Synthetic Warehouse
Agreement is ambiguous as to the Fund Counterparties' liability for unrealized losses related to CDSs.  (See
generally Greenfield, 98 NY2d at 569.)

[8] Although the Fund Counterparties contend that unrealized losses are not recoverable, they calculate realized
losses of approximately $20-21 million.  (Fund Counterparties' Memo. In Supp. at 16.)

developed as to the types of hedging transactions as well as the relationship between the Fund Counterparties' alleged breaches, the losses on the warehouse assets, and the gains on the hedges. Moreover, as noted above, the parties submit sharply conflicting expert reports on the items to be included in calculating UBS's damages.   These reports dispute not only the Fund Counterparties' liability for unrealized losses, but also the extent of required offsets, including offsets for UBS's hedging gains.   (See Corcoran Aff., Ex. 39 A [Report of Defs.' Expert Adam Warren]; Corcoran Aff., Ex. 33 [Report of UBS's Expert Louis Dudney].)   To the extent that expert testimony is required on the offset issue, its assessment will require credibility determinations that are not properly made on this motion.

The branch of the Fund Counterparties' motion for summary judgment, based on UBS's inability to prove damages, will accordingly be denied.

### Prior Material Breaches by UBS

The Fund Counterparties argue that, prior to their alleged breach, UBS had already breached the parties' agreements by, among other things, miscalculating losses using "undocumented 'Dummy Swaps'" to inflate losses and "refusing to pay CDS Gains."   (Fund Counterparties' Memo. In Supp. at 22.)   The Fund Counterparties claim that UBS also recorded changes in exposure attributable to swaps involving Lehman Brothers, even after Lehman Brothers' bankruptcy filing caused the CDS agreements to terminate.   (Id. at 22-23.) According to the Fund Counterparties, these improper calculations ultimately resulted in unfounded margin calls by UBS, and UBS's premature termination of the parties' agreements when the Fund Counterparties failed to satisfy the third margin call.   (Id. at 23.)   The Fund Counterparties claim that these breaches by UBS were material and excused the Fund

14

Counterparties' performance under the parties' agreements (id. at 19-20), thereby warranting dismissal of UBS's third and fourth causes of action for breach of the Cash and Synthetic Warehouse Agreements, respectively.

A material breach of a contract may excuse a non-breaching party's performance. (See Grace v Nappa, 46 NY2d 560, 567 [1979].) The court assumes, without deciding, that this doctrine is applicable under these circumstances in which defendants did not repudiate the contract—an issue the parties have not addressed. The court holds, however, that the Fund Counterparties fail to make a prima facie showing that UBS's conduct was impermissible under the Warehouse Agreements. As discussed above, the parties submit conflicting affidavits and evidence concerning the propriety of UBS's damages calculation, which resulted in the underlying margin calls. With each party "cast[ing] the other party in the role of the primary contract offender," issues of fact preclude summary judgment. (See Boston Concessions Group, Inc. v Criterion Ctr. Corp., 200 AD2d 543, 545 [1st Dept 1994]; W. E. Blume, Inc. v City of New York, 78 AD2d 608, 608 [1st Dept 1980].) Moreover, a factual issue exists as to whether any breach was material. (See generally Garofalo Elec. Co. Inc. v New York Univ., 300 AD2d 186, 189 [1st Dept 2002] ["The question of whether there has been substantial performance—or a breach—is to be determined, whenever there is any doubt, by the trier of fact"]; WILJEFF, LLC v United Realty Mgt. Corp., 82 AD3d 1616, 1617 [4th Dept 2011] ["Generally, the question whether a breach is material is for the finder of fact," unless "the evidence concerning the materiality is clear and substantially uncontradicted" (internal quotation marks and citation omitted)].) Accordingly, the branch of the Fund Counterparties' motion for summary judgment, based upon UBS's purported prior material breaches, will also be denied.

15

UBS's Reliance Upon Omissions or Misrepresentations

The Fund Counterparties also seek dismissal of UBS's first and second causes of action for fraud, on the ground that UBS cannot establish the justifiable reliance element of a fraud claim.

"The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." (Eurycleia Partners, LP v Seward & Kissel, LLP, 12 NY3d 553, 559 [2009]; Lama Holding Co. v Smith Barney, 88 NY2d 413, 421 [1996].) A fraud claim must be pleaded with particularity pursuant to CPLR 3016 (b).

In New York, sophisticated parties have an affirmative duty to protect themselves from misrepresentations made in arm's length business transactions by undertaking a reasonable investigation of the details of the transactions. (ACA Fin. Guar. Corp. v Goldman, Sachs & Co., 25 NY3d 1043, 1044 [2015] [ACA]; DDJ Mgt., LLC v Rhone Group L.L.C., 15 NY3d 147, 154 [2010] [DDJ].) "Moreover, 'when the party to whom a misrepresentation is made has hints of its falsity, a heightened degree of diligence is required of it. It cannot reasonably rely on such representations without making additional inquiry to determine their accuracy.'" (ACA, 25 NY3d at 1044-1045, quoting Centro Empresarial Cempresa S.A. v America Movil, S.A.B. de C.V., 17 NY3d 269, 279 [2011] [Centro].) Thus, where a plaintiff is aware that it has not been provided with financial information to which it is entitled, its duty to perform a "heightened degree of diligence" is triggered. (ACA, 25 NY3d at 1045 [internal quotation marks and citations omitted].) As the Court of Appeals has emphasized, "the question of what constitutes reasonable reliance is not generally a question to be resolved as a matter of law on a motion to

16

dismiss." (ACA, 25 NY3d at 1045; DDJ, 15 NY3d at 155 ["The question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive" (internal quotation marks and citation omitted)].)

In support of their contention that UBS cannot prove justifiable reliance, the Fund Counterparties argue that UBS assessed their credit rating as "D3, the lowest available rating for a party not already in default, when it entered into the Restructured Transaction." (Fund Counterparties' Memo. In Supp. at 24, 3, citing, e.g., Corcoran Aff., Ex. 7 [Dep. of UBS's David Bawden at 163, 256 [characterizing Fund Counterparties as "weak counterparties"].) According to the Fund Counterparties, "UBS mandated a hedging strategy and the booking of a full reserve as conditions for internal approval, because it did not deem the Fund Counterparties as being capable of paying what UBS believed it would be owed upon execution of the contracts." (Fund Counterparties' Memo. In Supp. at 24, 3, citing, e.g., Corcoran Aff., Ex. 11 [Dep. of Michael Threadgold at 55] [conditioning approval on "appropriate hedging for counterparty risk"].) The Fund Counterparties conclude that, because UBS knew of their financial strength (or lack thereof), UBS could not have justifiably relied upon any misrepresentations or omissions regarding their creditworthiness or assets. (Fund Counterparties' Memo. In Supp. at 24.)

In opposing the Fund Counterparties' motion, UBS submits the affidavit of a former employee who was a member of the UBS team that worked on the Highland Capital engagement, stating that Highland Capital's Philip Braner explained that Highland Capital "could (was willing to) exercise its control over the various Highland-affiliated funds to move assets between and among the affiliated funds, thereby making assets available to UBS from Highland-affiliated

17

funds other than the Fund Counterparties." (Landis Aff., Ex. 58 [Aff. of Timothy LeRoux, ¶¶ 46, 47.) UBS also relies on the testimony of various employees as to their reliance upon the Fund Counterparties' misrepresentations concerning their finances and assets when deciding whether to enter into the Warehouse Agreements. (See e.g. Landis Aff., Ex. 58 [Aff. of Timothy LeRoux, ¶¶ 5-6, 12-20, 30-48] [attesting, among other things, to alleged misrepresentations as to the Fund Counterparties' ownership of assets posted as initial restructuring collateral]; id., Ex. 59 [Dep. of Peter Chudy at 126-127]; id., Ex. 60 [Dep. of David Bawden at 227-228]; id., Ex. 61 [Dep. of Steve Marotta at 55-56] [depositions of UBS employees arguably supporting inference of reliance on financial information provided to UBS by defendants].)[9]  The reasonableness of that reliance is not subject to summary disposition, as it requires development of the factual record as to the information provided to UBS and assessment of the UBS employees' review of the information.

The branch of the Fund Counterparties' motion for summary judgment dismissing UBS's fraud claims will accordingly be denied.

### Fraudulent Conveyance & Fraudulent Transferor Claims

The Fund Counterparties argue that because UBS suffered no damages it is therefore not a creditor with standing to assert a fraudulent conveyance claim. (Fund Counterparties' Memo. In Supp. at 25.) Given this court's finding that factual issues exist concerning the extent of UBS's damages, this basis for dismissal of the claim must fail.

---

[9] This court advisedly uses the word "arguably." Plaintiff and defendants support their factual claims on the instant motions with selected excerpts of deposition testimony, generally without describing the positions of the deponents and without the surrounding context. The meaning and import of the testimony therefore cannot be adequately evaluated on this record.

18

The Fund Counterparties further argue that New York does not recognize a cause of action for fraudulent conveyance against an alleged fraudulent transferor. (Id.) The Fund Counterparties' reliance on Federal Deposit Ins. Corp. v Porco (75 NY2d 840, 842 [1990]), in support of this argument, is misplaced. There, the Court held that the Debtor and Creditor Law "cannot fairly be read as creating a remedy against nontransferees who . . . are not alleged to have dominion or control over [the debtor's] assets or to have benefited in any way from the conveyance." In the instant action, in contrast, UBS does not allege that the Fund Counterparties assisted another debtor in transferring property but, rather, that "cash and assets" were transferred from Highland Financial, SOHC's alter ego, or from the Fund Counterparties themselves. (Complaint, ¶¶ 168, 18.) The Fund Counterparties do not cite any authority that a fraudulent conveyance claim is not maintainable under these circumstances.

## II.    Motion of Highland Capital, Highland Financial, Crusader Fund, Credit Strategies, Credit Opp Fund, and Strand for Summary Judgment (mot seq 026)

Highland Capital, Highland Financial, Strand, and the Affiliated Transferee defendants (together, moving defendants) seek summary judgment dismissing all of the causes of action asserted against them.[10]   UBS pleads claims, in the fifth cause of action of the complaint, against all moving defendants for fraudulent conveyance.   In addition, UBS seeks to hold Highland Financial liable, under the eighth cause of action, as SOHC's alter ego, for SOHC's alleged fraudulent conveyances and breaches of the Warehouse Agreements.

UBS claims that, as a result of its first margin call in September 2008, the Highland entities began commingling assets to generate short-term liquidity for the Fund Counterparties.

---

[10] As noted above, this motion was brought before UBS settled its claims against Credit Strategies and Crusader Fund.

19

(Id., ¶ 80.)    The complaint alleges that, in the fall of 2008, Highland Capital caused Highland
Financial to take on additional debt in exchange for cash-generating assets that were to be used
by SOHC to satisfy obligations that SOHC had to nonparty Barclays Bank.    (Compl., ¶ 82.)    In
September 2008, Highland Financial acquired $321 million in "risky" CLO assets and life
settlement insurance contracts from the Affiliated Transferee defendants in exchange for senior
secured notes in a principal amount of $316 million with a maturity date of 2018.    (Id., ¶ 83.)
This note offering (the September 2008 Note Offering) required Highland Financial to make
amortized quarterly payments of $15 million to the Affiliated Transferee defendants, starting in
February 2009.    (Id.)    Highland Financial was also required to transfer a security interest to the
Affiliated Transferee defendants in the shares of two wholly owned subsidiaries into which
Highland Financial transferred the newly acquired assets. (Id.)

In October 2008, Highland Capital allegedly proposed, and Highland Financial
undertook, an additional note offering on the same terms as the September 2008 Note Offering,
with Highland Financial issuing an additional $55,488,000 of secured notes, also due in 2018, to
Crusader Fund.    This note offering (the October 2008 Note Offering) brought Highland
Financial's debt obligation to the Affiliated Transferee defendants to approximately $371
million.    (Id., ¶ 85.)    UBS claims that the granting of these security interests and related asset
transfers constituted fraudulent conveyances, and made it impossible for the Fund Counterparties
and Highland Financial to satisfy their obligations to UBS.    (Id, ¶¶ 84, 85.)

UBS maintains that, at the time of the September and October 2008 Note Offerings
(together, Fall 2008 Note Offerings), Highland Financial, as SOHC's alter ego, owed UBS
hundreds of millions of dollars that it could not pay.    (Id., ¶ 84.)    Highland Capital allegedly

20

caused "Highland Financial and SOHC to use the assets that they acquired to pay down a substantial portion of SOHC's debt to Barclays [Bank] to the detriment of UBS."   (Id., ¶ 86.) These payments to Barclays Bank were made at a time when SOHC and Highland Financial were allegedly insolvent or within the zone of insolvency, and constituted fraudulent conveyances.   (Id., ¶ 88.)   UBS also claims that CDO Fund used the notes it received to satisfy obligations to Citibank, NA at a time when CDO Fund was insolvent, thereby also making a fraudulent conveyance.   (Id., ¶ 89.)

UBS further claims that in December 2008, after UBS terminated the restructured Transaction, Highland Capital ensured that Highland Financial and SOHC were insolvent by transferring assets to the Affiliated Transferee defendants, and then sought to hide these conveyances by tying them to the cancellation of the notes issued in the Fall 2008 Note Offerings.   (Id., ¶¶ 108-109.)

UBS commenced the instant action on February 24, 2009.   According to the complaint, on March 17, 2009, Highland Capital caused SOHC's parent and alleged alter ego, Highland Financial, to transfer all of its and SOHC's assets to Highland Capital and the Affiliated Transferee defendants.   These assets were allegedly valued at $239 million and included assets of two of Highland Financial's subsidiaries that had no obligations to the Affiliated Transferee defendants.   (Id., ¶ 111.)   As a result of the transfer, these funds were unavailable to SOHC to satisfy the debt owed to UBS under the parties' agreements.   (Id., ¶ 113.)   UBS refers to this transfer as the "March 2009 Fraudulent Conveyance."   (Id., ¶ 111.)

Moving defendants sharply dispute that the transfer of assets in March 2009 was a fraudulent conveyance.   In an affidavit submitted by moving defendants, Phillip Braner states

that toward the end of 2008, the assets that secured the notes issued in fall 2008 were subject to significant credit downgrades. According to Mr. Braner, these downgrades had a negative impact on the cash flows available to Highland Financial as dividends, and the decreased cash flows made it unlikely that Highland Financial would be able to meet its debt service obligations under the notes, or its obligation to pay premiums on the life settlement contracts it had acquired. (Braner Aff., ¶ 13.) As a result, Highland Financial assertedly approved the unwinding of the notes to relieve it of these obligations (id.), and "transferred the collateral securing the Secured Notes back to the Funds." (Moving Defs.' Memo. In Supp. at 5.) Mr. Braner claims that the decision to unwind the notes was not related to debts owed by SOHC. (Braner Aff., ¶ 13.)

The Fall 2008 notes were terminated and the collateral was transferred pursuant to a "Termination, Settlement and Release Agreement," dated March 20, 2009, between Highland Financial, HFP Asset Funding II, Ltd., and HFP Asset Funding III, Ltd., as Issuers, and various Noteholders, including Credit Strategies, Crusader Fund, a successor to the note purchased by Credit Opp Fund, and Highland Capital. (Landis Aff., Ex. 65.) Moving defendants refer to the March 2009 transaction as the March 2009 Note Termination. (Moving Defs.' Memo. In Supp. at 5.)

Moving defendants argue that UBS's inability to establish damages precludes any claims against them. They further argue that UBS cannot establish Highland Financial's alter ego liability and that, in any event, the March 2009 Note Termination was not a fraudulent conveyance. Finally, they contend that UBS's claim against Highland Capital for breach of the covenant of good faith and fair dealing is without merit.

Lack of Damages

22

In support of their claim that UBS cannot establish damages, moving defendants rely on the Fund Counterparties' damages argument.   As the Fund Counterparties' motion for summary judgment based on lack of damages has been denied, moving defendants' argument likewise fails.

Alter Ego Liability

Moving defendants argue that because claims arising before the commencement of this action on February 24, 2009 are barred by res judicata, the only remaining claim against them is based on the March 2009 Note Termination—a transaction that involved SOHC's shareholder, Highland Financial, not SOHC itself.   Moving defendants further argue that because UBS cannot establish that Highland Financial is SOHC's alter ego, the fraudulent conveyance claim involving this Note Termination must be dismissed.   (Moving Defs.' Memo. In Supp. at 11-12, 16.)

The standards for liability under an alter ego or veil piercing theory are well settled:

> ". . . [P]iercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury.
> While complete domination of the corporation is the key to piercing the corporate veil, especially when the owners use the corporation as a mere device to further their personal rather than the corporate business, such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required.   The party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene."

(Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 135, 141-142 [1993]

23

Case 21-03020-sgj Doc 177-5 Filed 08/04/22   Entered 08/04/22 18:26:09   Page 25 of 36

[internal citations omitted].)

As a threshold matter, the court notes that the Appellate Division determined that UBS's substantially similar allegations in an earlier complaint in this action were sufficient to plead a claim for alter ego liability.   (UBS Secs. LLC, 93 AD3d at 490.)   This court previously held that UBS's alter ego claim in the second amended complaint in this action is based on substantially similar allegations to those upheld by the Appellate Division.   These allegations include not only general allegations as to Highland Capital's commingling of the Highland entities' funds and disregard of corporate formalities, but also Highland Capital's pre-February 2009 conduct, in connection with the Fall 2008 Note Offerings, in causing Highland Financial to acquire Credit Strategies' and Crusader's assets, which were later the subject of the alleged March 2009 fraudulent conveyance.   (UBS Secs. LLC, 42 Misc 3d at 587-588.)

Moving defendants contend that UBS's alter ego claim is barred by res judicata based on the Appellate Division's decision in this and a subsequent related action, holding that UBS's claims against Highland Capital were barred by res judicata to the extent they "implicate events alleged to have taken place before the filing of the original complaint" (i.e., the filing on February 24, 2009 of the complaint in the instant action). (UBS Secs. LLC, 86 AD 3d at 474; see Moving Defs.' Memo. In Supp. at 9-10.)   Moving defendants also rely on a subsequent decision of the Appellate Division which dismissed claims for fraudulent conveyance "arising before February 2009" against Highland Financial and other Highland entities, on the ground that these entities were in privity with Highland Capital.   (UBS Secs. LLC, 93 AD3d at 490.)

Citing these decisions, moving defendants assert that the March 2009 Note Termination is the only alleged wrongdoing on which the fraudulent conveyance claim can be based.

24

(Moving Defs.' Memo. In Supp. at 11.)    They also assert that UBS cannot establish that Highland Financial is SOHC's alter ego because "the only allegations UBS makes regarding the relationship between HFP and SOHC concern events alleged to have occurred before February 24, 2009."    (Id. at 12, 12 n 55 [citing UBS's allegations as to pre-February 2009 encumbrances and commingling of Highland entities' assets].)

This court previously rejected the contention, advanced by moving defendants here, that UBS cannot rely on events or conduct occurring before February 2009 to support its alter ego and fraudulent conveyance claims.    As held in the prior decision, the Appellate Division decisions preclude any fraudulent conveyance claims arising before February 24, 2009.    They therefore preclude UBS from recovering for any alleged fraudulent conveyances made before that date.    However, proof of pre-February 24, 2009 transfers, and of other conduct involving the operation of the Highland entities, is not prohibited to the extent necessary to prove UBS's claims for post-February 24, 2009 fraudulent conveyances, which are maintainable under the Appellate Division decisions on an alter ego theory.    (UBS Secs. LLC, 42 Misc 3d at 587.) The court adheres to this decision here.[11]

In upholding UBS's alter ego claim, the court also rejects moving defendants' contention that "UBS was not harmed by any alleged fraud of SOHC caused by HFP's purported domination, because . . . UBS did not rely on any alleged misrepresentations by SOHC." (Moving Defs.' Memo. In Supp. at 16.)    This contention rests, in turn, on moving defendants' claim that UBS "assumed the risk of doing business with the Fund Counterparties," and

---

[11] It is noted that moving defendants' briefing on these motions was largely completed before issuance of the decision.

"bargained for SOHC as a counterparty with its eyes wide open as to SOHC's lack of creditworthiness." (Id. at 17-18.) Moving defendants fails to establish this claim as a matter of law, for the reasons discussed above in connection with the Fund Counterparties' motion. (See supra at 16-18.)

Favour Mind Ltd. v Pacific Shores, Inc. (2004 WL 97649, 2004 US Dist LEXIS 637 [SD NY 2004]), on which moving defendants rely, is not to the contrary. There, the Court applied the doctrine that "[w]here a party is aware of the risks of dealing with a corporation, that party has assumed the risk of such dealings." (2004 WL 97649, at * 7.) The Court rejected the plaintiff's alter ego claim, based on the findings that the plaintiff knew, when it decided to do business with the defendant, of the defendant's poor credit ranking, its losses, and its limited initial capital investment; that the plaintiff continued to do business with the defendant after issues arose regarding payment of bills; and that there was no evidence that the plaintiff "ever had any reasonable expectation that [the party sought to be held] would be personally liable for payment." (Id.) Here, in contrast, as discussed above (supra at 16-18), factual issues exist as to the extent to which UBS assigned value to the Fund Counterparties and concluded that they had the ability to meet obligations upon a default, and as to the reasonableness of UBS's reliance on information provided to it by the Highland entities in connection with the Transaction.

Moreover, a factual issue exists on this record as to whether SOHC, through Highland Financial as alter ego, perpetrated a wrong against UBS. UBS submits evidence that Highland Financial and SOHC engaged in various transfers, shifting funds from SOHC to other Highland entities. (See e.g. Landis Aff., Ex. 26 [Dep. of Highland Financial's Todd Travers at 182, acknowledging that Highland Financial and SOHC were treated interchangeably for purposes of

26

borrowing money or repaying debts]; Landis Aff., Ex. 87 at PWC-HCM00017088 [accounting

report for Highland Financial, stating that "sales activity in SOHC is driven by cash needs at [the

Highland Financial] level for the closing of new CDOs"]; Landis Aff., Ex. 88 [Dep. of Gene

McQwown at 446-447, stating that, at the time of the September 2008 Notes Offering, Highland

Financial was undercapitalized and that it would not have been possible to issue these notes on

the same terms with unaffiliated entities].) As discussed above (supra at 17-18), Highland

Capital's Braner also allegedly made representations to UBS regarding Highland Capital's

willingness to make assets available from various Highland entities to satisfy the Fund

Counterparties' obligations. Evaluation of this testimonial evidence involves credibility

determinations, which are not properly made on a motion for summary judgment.

Moving defendants next argue that "over the life of the Restructured Transaction . . . ,

[Highland Financial] contributed more to SOHC than it received from SOHC," and therefore that

"[t]he net balance of these transactions was to UBS' benefit, not detriment." (Moving Defs.'

Memo. In Supp. at 18; Aff. of Clifford Stoops [Highland Capital's Chief Accounting Officer and

Highland Financial's Interim Chief Financial Officer], ¶ 5.) However, as set forth in UBS's

expert report, UBS disputes moving defendants' methodology for reviewing transfers, claiming

that defendants improperly considered the transfers at an "aggregate, net level rather than

analyzing individual transfers at the transactional level and separately evaluating whether fair

consideration was exchanged." (Landis Aff., Ex. 36 [Report of Louis Dudney at 23-24].) The

parties also dispute whether cash transfers and loan repayments by SOHC to Highland Capital

and Highland Financial in fact exceeded Highland Financial's contributions to SOHC. (See

UBS's Memo. In Opp. at 17.)

27

Moving defendants thus fail to demonstrate as a matter of law that Highland Financial is not the alter ego of SOHC.

Fraudulent Conveyance

Moving defendants seek dismissal of UBS's constructive fraudulent conveyance claim on the ground that the March 2009 Note Termination was made for "fair consideration" under section 273 of the Debtor and Creditor Law, and was therefore not a fraudulent conveyance. (Moving Defs.' Memo. In Supp. at 19.)    Specifically, they argue that the underlying notes were "secured debt" (id. at 20-23), and that the March 2009 Note Termination "repaid antecedent secured debt to non-insiders," and therefore constituted fair consideration under New York law. (Id. at 23.)    They also argue that, even if certain Affiliated Transferee defendants were "insiders," the payments to these noteholders were for fair consideration because the payments "satisfied secured debt."    (Id. at 24.)

Moving defendants fail to demonstrate entitlement to judgment as a matter of law with respect to UBS's allegations of constructive fraud.   Debtor and Creditor Law (DCL) sections 273, 273-a, 274, and 275, which govern constructive fraud, all require a showing that fair consideration was lacking.

Under section 272 of the DCL:

> "Fair consideration is given for property, or obligation,
>
> a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
>
> b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained."

28

Case 21-03020-sgj Doc 177-5 Filed 08/04/22 Entered 08/04/22 18:26:09 Page 30 of 36

As the Court of Appeals has explained, "[i]t is well settled that an evaluation of whether fair

consideration is given for property under Debtor and Creditor Law § 272 must be determined

upon the facts and circumstances of each particular case." (Commodity Futures Trading Commn.

v Walsh, 17 NY3d 162, 175 [2011] [internal quotation marks and citation omitted].)   "Good

faith is required of both the transferor and the transferee, and it is lacking when there is a failure

to deal honestly, fairly, and openly.   Transfers to a controlling shareholder, officer or director of

an insolvent corporation are deemed to be lacking in good faith and are presumptively

fraudulent."   (Matter of CIT Group/Commercial Servs., Inc. v 160-09 Jamaica Ave. Ltd.

Partnership, 25 AD3d 301, 303 [1st Dept 2006] [internal quotation marks and citations omitted].)

Here, the parties dispute whether the transfers were made to "insiders," and, therefore,

whether the "presumptively fraudulent" standard was triggered.   (Moving Defs.' Memo. In

Supp. at 23-24; UBS's Memo. In Opp. at 19-20.)   According to Mr. Braner, CDO Fund and

Crusader Fund held 9.71% and 9.07% limited partner interests in Highland Financial,

respectively, at the time of the Fall 2008 Note Offerings.   (Braner Aff., ¶ 5.)   Mr. Braner also

admitted that Highland Capital held a 20.96% limited partner interest in Highland Financial, and

Highland Capital's president, James Dondero (Dondero), held a 0.15% limited partner interest in

Highland Financial.   (Id., ¶ 8; Landis Aff., Ex. 103 [chart showing ownership interests in

Highland entities].)   UBS submits deposition testimony and an ownership chart prepared by

defendants, showing that Mr. Dondero also owned approximately 70% of Highland Capital.

(Landis Aff., Ex. 78 [Dondero Dep. at 15-16]; id., Ex. 136 [Dep. of Mark Okada at 9-10]; id.,

Ex. 137 [chart entitled "Highland Equity Ownership"].)   Moreover, UBS submits an "Amended

and Restated Management Agreement," and several "Investment Management Agreements,"

29

Case 21-03020-sgj Doc 177-5 Filed 08/04/22 Entered 08/04/22 18:26:09 Page 31 of 36

executed by the Highland defendants, by which Highland Capital was designated "Manager" of Highland Financial, SOHC, CDO Fund, Crusader Fund, Credit Strategies, and Credit Opp Fund, with discretion and authority to manage the assets and operations of these entities. (Landis Aff., Exs. 81, 105-108.)

In addition, Mr. Dondero signed the original "Note Purchase Agreement," dated September 26, 2008, on behalf of Highland Capital, CDO Fund, the Affiliated Transferee defendants and Highland Capital as their sole member, Strand, and HFP Asset Funding II and III, Ltd. (Stoops Aff., Ex. 42.) UBS also relies on the "Termination, Settlement and Release Agreement," discussed above, which effectuated the March 20, 2009 Note Termination by extinguishing the parties' obligations under the fall 2008 notes and transferring the assets back to the noteholders. The Agreement was signed by Mr. Dondero on behalf of Highland Financial, Highland Capital, HFP Asset Funding II and III, Ltd., CDO Fund, Credit Strategies, Crusader Fund, "Highland Credit Opportunities CDO, Ltd.," and Strand, among other entities.[12] (Id., Ex. 44; Landis Aff., Ex. 26 [Dep. of Todd Travers at 228-229, stating that Mr. Dondero negotiated on behalf of all parties to the Note Purchase Agreement with respect to the retirement of the notes].)

On this record, moving defendants fail to demonstrate as a matter of law that the termination of the fall 2008 notes repaid debt to "non-insiders." At a minimum, whether Mr. Dondero, through Highland Capital, managed and controlled Highland Financial, the Fund Counterparties, and the Affiliated Transferee defendants, thereby placing himself, Highland

---

[12] If Highland Credit Opportunities CDO, Ltd. is in fact the same entity as Highland Credit Opportunities CDO, L.P., Mr. Dondero would have signed on behalf of all Affiliated Transferee defendants.

30

Capital, and Highland Financial on "both sides" of the Fall 2008 Note Offerings and the March

2009 Note Termination, raises a factual issue as to whether the transaction "was effected in good

faith." (See Farm Stores, Inc. v School Feeding Corp., 102 AD2d 249, 254 [2d Dept 1984], affd

in part 64 NY2d 1065 [1985] [rejecting argument that shareholder was an "outside lender" with

no control, where "he exercised his influence as a shareholder in decisions which directly

affected his investments," and it was "undisputed that [he] gave his consent to all distributions of

funds collected . . . , including those distributions challenged as fraudulent"];

PalmOne, Inc. v R.C.S. Computer Experience, L.L.C., 15 Misc 3d 1127 [A], 2007 NY Slip Op

50873 [U], *7 [Sup Ct, NY County 2007] [finding that factual issue existed concerning

transferee's good faith, where "transferee [was] controlled by a person who is also an insider of,

and/or has control over, the transferor"].)

Moving defendants rely upon Matter of Dreier LLP v Westford Asset Mgt. LLC (462 BR

474 [Bankr SD NY 2011]) in support of their argument that "transfers to a group of affiliated

funds, their agents, and managers for the repayment of principal investment could not be a

fraudulent conveyance because they were not insiders." (Moving Defs.' Memo. In Supp. at 23.)

However, Dreier LLP involved investments by a third-party group of affiliated hedge funds in a

Ponzi scheme by the principal of Dreier LLP. (462 BR at 479.) Here, in contrast, the transfers

were made by an affiliated transferor to affiliated transferees, and therefore raise issues, which

are not resolved on this record, as to the "good faith" of the transferees. (See id. at 488.)

Moving defendants further argue that, even if the noteholders were insiders, the transfers

were for fair consideration because they repaid secured debt. (Moving Defs.' Memo. In Supp.

at 24.) In support of this argument, moving defendants rely upon Matter of Northstar Dev.

31

Corp. v Buchheit (465 BR 6 [Bankr WD NY 2012]), in which the Court applied the New York Debtor and Creditor Law. The Court held that this law "allows the avoidance of preferential transfers to directors, officers and shareholders of insolvent corporations." (Id. at 13, quoting Farm Stores, Inc. v School Feeding Corp., 102 AD2d at 254.) The Court further explained: "As a general rule, however, no preference occurs upon the payment of a secured debt. For a preference to arise, a creditor must realize some improvement in position." (Id. at 13-14.)

In Matter of Northstar Dev. Corp., the Court held that payment to discharge mortgages held by an insider of the debtor satisfied the good faith element of fair consideration, for purposes of a constructive fraud claim under the Debtor and Creditor Law. (Id. at 14-15.) In the instant action, the parties dispute whether the March 2009 Note Termination involved secured debt. Even assuming that a security interest was created, the Highland entities initiated the disputed transaction only five to six months before terminating it. In Matter of Northstar Dev. Corp., in contrast, the secured debt was created many years before the disputed transaction by which it was discharged.

Although the fraudulent conveyance claim here arose upon the March 2009 Note Termination, the Fall 2008 Note Offerings are integrally related. Assessment of the fraudulent conveyance claim will therefore require factual development of the record as to the circumstances under which the Fall 2008 Note Offerings were made. Even in the face of a claim by a transferee that it was a secured creditor, a court considering a constructive fraud claim must evaluate whether the transfer was made for fair consideration—that is, for a fair equivalent and in good faith. (See e.g. Farm Stores, 102 AD2d at 251-252 [finding transfers fraudulent even though transferees contended "that they were secured investing or lending shareholder-

32

creditors"]; Northpark Assoc., L.P. v S.H.C. Mergers, Inc., 8 AD3d 642, 643-644 [2d Dept 2004] [finding question of fact as to whether transfer by the defendant judgment debtor to defendant's parent company and sole shareholder was made in good faith, although parent company contended that it was a secured creditor and that the transfer was made in payment of an antecedent debt].) On this record, moving defendants do not demonstrate as a matter of law that the good faith element of a constructive fraud claim cannot be satisfied.

Finally, moving defendants argue that UBS cannot establish a fraudulent conveyance claim based on actual fraud. (Moving Defs.' Reply Memo. at 6-9.) Even assuming that the court may entertain this argument, which was made for the first time on the reply (but see Ritt v Lenox Hill Hosp., 182 AD2d 560, 562 [1st Dept 1982]), moving defendants fail to demonstrate as a matter of law that UBS cannot establish that Highland Financial acted with actual intent to defraud in effectuating the March 2009 Note Termination. The assertion of Highland Capital's Braner that the Termination was made for legitimate business reasons (see Braner Aff., ¶ 13) must be evaluated on a fully developed record.

The branch of moving defendants' motion for summary judgment dismissing UBS's fraudulent conveyance claims will accordingly be denied.

### Good Faith and Fair Dealing

Highland Capital seeks summary judgment dismissing UBS's claim for breach of the covenant of good faith and fair dealing (third cause of action), asserted in the action under Index Number 650752/10. This claim is based upon allegations that Highland Capital used its control over the Fund Counterparties to orchestrate the transfer of Highland Financial's assets to Highland Capital and the Affiliated Transferee defendants, as part of the March 2009 Note

33

Termination.   (Complaint under Index Number 650752/10, ¶¶ 158-166; UBS's Memo. In Opp. at 7-8, 25.)

Highland Capital argues that it cannot be liable for this conduct unless Highland Financial is the alter ego of SOHC.   As moving defendants' motion for summary judgment dismissing UBS's alter ego claim has been denied, this basis for dismissal of the implied covenant claim fails.

Highland Capital also argues that UBS terminated the parties' agreements months before the acts that allegedly breached the covenant of good faith and fair dealing, thereby ending Highland Capital's obligations.   The court agrees.   The implied covenant of good faith and fair dealing "embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract,'" and it "encompass[es] 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'"   (511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 153 [2002] [internal citations omitted].)

Here, UBS concedes that it terminated the parties' agreements in December 2008 (Compl., ¶ 99), and its cause of action is based upon the March 2009 Note Termination several months later.   UBS cannot state a claim for breach of the implied obligation of good faith absent an existing contract.   (See e.g. Levine v Yokell, 258 AD2d 296, 296-297 [1st Dept 1999]; American-European Art Assocs., Inc. v Trend Galleries, Inc., 227 AD2d 170, 171 [1st Dept 1996] Lakeville Pace Mech., Inc. v Elmar Realty Corp., 276 AD2d 673, 676 [2d Dept 2000]; Beninati v Federal Deposit Ins. Corp., 55 F Supp 2d 141, 149 [ED NY 1999] [implied duty of good faith and fair dealing does not "extend beyond the termination of the contract"].)

34

Highland Capital's motion for summary judgment dismissing UBS's third cause of action for breach of the covenant of good faith and fair dealing, in the pleading under Index Number 650752/10, will therefore be granted.

It is accordingly hereby

ORDERED that the motion for summary judgment of defendants Highland Capital Management, L.P., Highland Financial Partners, L.P., Highland Credit Opportunities CDO, L.P., and Strand Advisors, Inc. (motion sequence number 026) is granted to the extent that the third cause of action in the complaint under Index Number 650752/10 is dismissed, and the motion is otherwise denied; and it is further

ORDERED that the motion for summary judgment of defendants Highland Special Opportunities Holding Company and Highland CDO Opportunity Master Fund, L.P. (motion sequence number 027) is denied.

This constitutes the decision and order of the court.

Dated: New York, New York
March 13, 2017

ENTER:

_Marcy Friedman_

MARCY FRIEDMAN, J.S.C.

35