**To:** Clayton Price[cprice@beechercarlson.com]

**Cc:** Jayasekera, Ruwan[R.Jayasekera@cimoney.com.ky]; Busari, Razaak[R.Busari@cimoney.com.ky]; Inyangala, Silvanous[S.Inyangala@cimoney.com.ky]; Tom Adamczak[tadamczak@beechercarlson.com]

**From:** Dube, Sehliselo[S.Dube@cimoney.com.ky]

**Sent:** Mon 5/6/2019 3:55:53 PM Coordinated Universal Time

**Subject:** Sentinel Reinsurance, Ltd. - Final Inspection Reports

**Attachment:** Sentinel Reinsurance Ltd. - Cover Letter - Two Final Inspection Reports.pdf

**Attachment:** Sentinel Reinsurance Ltd. - Final Onsite Inspection Report - Prudential Specific Report.pdf

**Attachment:** Sentinel Reinsurance Ltd. Final Onsite Inspection Report - AML Specific Report.pdf

**Attachment:** Sentinel Reinsurance, Ltd - Acknowledgement Signature Sheet- Two reports.pdf

---

Dear Clayton,

Please find attached the cover letter, final inspection reports and acknowledgement signatures sheets for the board of directors to sign as confirmation of receipt of the attached final inspection reports for Sentinel Reinsurance, Ltd.

Thanks and Best Regards,
Sehli

**Sehliselo Dube**
Chief Analyst | Insurance Supervision Division

Cayman Islands Monetary Authority
Direct: (345) 244-1603 | Main: (345) 949-7089
Email: S.Dube@cimoney.com.ky
www.cima.ky | LinkedIn

BC SEN0000078777
11/03/21
Highly Confidential



# CAYMAN ISLANDS
# MONETARY AUTHORITY

The Directors
Sentinel Reinsurance, Ltd.
c/o Beecher Carlson Cayman, Ltd.
P.O. Box 10193
Grand Cayman KY1-1002
Cayman Islands

6 May 2019

Attention: **Mr. Clayton Price**

Ref: SD/SI/642423/2

**By Email**

Dear Sirs,

### SUBJECT: Sentinel Reinsurance, Ltd.: Final Inspection Reports

The Cayman Islands Monetary Authority (the "Authority") acknowledges receipt of Mr. Clayton Price's emails dated 19 April 2019 and 22 April 2019 in response to the Draft Inspection Reports for Sentinel Reinsurance, Ltd. (the "Licensee"). The comments have been duly noted and, where applicable, the Authority's reports amended accordingly.

The inspection was conducted pursuant to *the Monetary Authority Law (2018 Revision), the Insurance Law 2010 (as amended), the Proceeds of Crime Law (2019 Revision), and the Guidance Notes on the Prevention and Detection of Money Laundering and Terrorist Financing in the Cayman Islands, December 2017.* The On-site Inspection was carried out in order to assess the Licensee's current financial position, corporate governance structure operational structure, strategic plan, and compliance with internal policies, legislation and regulatory requirements.

The Authority has enclosed its final inspection reports, which are for the Licensee's use only, and should not be distributed to third parties without the Authority's prior written consent. The Licensee's attention is drawn to the requirements' implementation timeframes contained therein which the Licensee must strictly adhere to. In addition, the Authority requires remediation progress reports on a monthly basis to be furnished to the Authority on the **first day** of every month beginning **1 June 2019** until all the requirements have been met. Non-adherence to these timeframes may result in regulatory action being taken against the Licensee and those charged with governance. Please note that the monthly remediation progress reports and any responses to requirements should be sent to Sehliselo Dube at s.dube@cimoney.com.ky

80e Shedden Road, Elizabethan Square, P.O. Box 10052, Grand Cayman KY1-1001, CAYMAN ISLANDS
Tel: 345-949-7089 • Fax: 345-946-5611 • E-mail: ContactInsurance@cimoney.com.ky •
Web: www.cimoney.com.ky

BC SEN0000078778
11/03/21
Highly Confidential



# CAYMAN ISLANDS
## MONETARY AUTHORITY

The Authority has also attached an Acknowledgement Signature Sheet for the Board of Directors to sign confirming that they have received copies of the 6 May 2019 Final Inspection Reports. The Authority asks that the Licensee kindly return a signed copy for its records no later than close of business on **20 May 2019.**

The Authority would like to extend its thanks to the management and staff of the Licensee for their co-operation and assistance throughout the inspection.

Yours sincerely,

**Sehliselo Dube**
Chief Analyst – Insurance Division
Tel. (345) 244 - 1603
Fax. (345) 946 - 5611
Email. s.dube@cimoney.com.ky

CC. Razaak Busari, Deputy Head – Insurance Division
Silvanous Inyangala, Senior Analyst – Insurance Division

80e Shedden Road, Elizabethan Square, P.O. Box 10052, Grand Cayman KY1-1001, CAYMAN ISLANDS
Tel: 345-949-7089 • Fax: 345-946-5611 • E-mail: ContactInsurance@cimoney.com.ky •
Web: www.cimoney.com.ky

BC SEN0000078779
11/03/21
Highly Confidential



FINAL PRUDENTIAL INSPECTION REPORT FOR:

**SENTINEL REINSURANCE, LTD.**

Conducted on:

4 March 2019 to 11 March 2019


Issued on:

6 May 2019


**PREPARED BY:**

INSURANCE SUPERVISION DIVISION

This Prudential Inspection Report ("Report") and its contents are the property of the Cayman Islands Monetary Authority (the "Authority"). This Report and its contents may not be shared with any other person other than those persons named in the front of this report and the Licensee's external auditors without the prior written consent of the Cayman Islands Monetary Authority. Copyright 2019.

**TABLE OF CONTENTS**

1. EXECUTIVE SUMMARY ........................................................................3

2 THE AUTHORITY AND PURPOSE OF THE ON-SITE INSPECTION ....................................3

3 SCOPE STATEMENT ........................................................................4

4 METHOD OF ASSESSMENT ........................................................................4

5 INSPECTION FINDINGS ........................................................................5

5.1 INTRODUCTION TO FINDINGS ........................................................................5

5.2 CORPORATE GOVERNANCE ........................................................................5

5.2.1 Organization structure ........................................................................5

5.2.2 Inconsistent representations and inaccurate documentation ........................................8

5.2.3 Inadequate oversight ........................................................................11

5.2.4 Non-compliance with the CGF ........................................................................13

5.2.5 Succession planning ........................................................................14

5.2.6 Inadequate documentation of Board meeting minutes ........................................15

5.2.7 Conflicts of interest policy ........................................................................17

5.3 BUSINESS PLAN ........................................................................17

5.3.1 Insurance program ........................................................................17

5.3.2 Investment policy ........................................................................20

5.4 OUTSOURCING ........................................................................21

5.4.1 Weaknesses in the outsourcing arrangements ........................................21

5.5 RISK MANAGEMENT FRAMEWORK ("RMF") ........................................................................23

5.5.1 Deficiencies within the Licensee's RMF ........................................................................23

5.6 SOLVENCY AND ACCOUNTING POLICIES ........................................................................25

5.6.1 Investments valuation and accounting policies ........................................25

5.7 POLICIES AND PROCEDURES MANUALS ........................................................................28

5.7.1 No documented policies and procedures manuals ........................................28

6 CONCLUSION ........................................................................29

7 APPENDIX 1 –TABLE OF REQUIREMENTS ........................................................................30

8 APPENDIX 2 SUMMARY OF DOCUMENTS REVIEWED ........................................................................33

BC SEN0000078781
11/03/21
Highly Confidential

## 1. **EXECUTIVE SUMMARY**

1.1 The Cayman Islands Monetary Authority (the "Authority") conducted an on-site inspection (the "On-site Inspection") at the offices of Sentinel Reinsurance, Ltd. (the "Licensee") from 4 March 2019 to 11 March 2019.

1.2 The objective of the On-site Inspection was to assess the policies and procedures, corporate governance structure and internal control environment of the Licensee.

1.3 Results from the On-site Inspection revealed deficiencies in:
   (1) Corporate governance;
   (2) Business plan;
   (3) Outsourcing;
   (4) Risk management framework;
   (5) Solvency and accounting policies;
   (6) Nature, accessibility and retention of records; and
   (7) Internal Controls, policies and procedures.

   Please see Appendix 1 of this Report for a listing of the requirements arising from the On-site Inspection.

1.4 As a result, the Authority has concerns regarding the oversight of the Licensee's operations. The requirements cited in this Report are to be addressed urgently in order to rectify instances where the Authority has identified deficiencies of a regulatory or statutory nature. In addition, the requirements specified in this Report are intended to strengthen the policies, procedures and internal controls of the Licensee and to ensure they are operating in accordance with the regulatory framework of the Cayman Islands. The requirements also enable the directors and management of the Licensee to focus on matters warranting corrective attention.

1.5 The requirements should be implemented within the time frames specified. The Authority further requires monthly update reports from the Licensee until the requirements have been fully implemented.

## 2 **THE AUTHORITY AND PURPOSE OF THE ON-SITE INSPECTION**

2.1 The On-site Inspection was conducted in accordance with the Authority's powers and duties provided under section 6(1)(b) of *the Monetary Authority Law (2018 Revision) (the "MAL")* and section 22(1)(b) of *the Insurance Law 2010 (the "Law")*. The On-site Inspection was carried out in order to assess the Licensee's current financial position; corporate governance structure and operational structure; assess their strategic plan; and assess internal controls. In particular compliance with the following laws, regulations, rules and guidance notes was assessed:
   (1) the MAL;
   (2) the Law;
   (3) the Proceeds of Crime Law (2018 Revision) ("POCL");
   (4) the Guidance Notes on the Prevention and Detection of Money Laundering and Terrorist Financing in the Cayman Islands, December 2017 ("the AML Guidance Notes");

BC SEN0000078782
11/03/21
Highly Confidential

(5)    the Rule on Corporate Governance ("RCG");

(6)    the Statement of Guidance on Corporate Governance ("SOG CG");

(7)    the Rule on Risk Management for Insurers ("RRM");

(8)    the Statement of Guidance on Outsourcing Regulated Entities ("SOG Outsourcing");

(9)    the Rule on Internal Controls - General for all Licensees ("RIC");

(10)   the Statement of Guidance on Internal Controls – Insurance ("SOG IC");

(11)   the Statement of Guidance on Business Continuity Management All Licensees ("SOG BCM");

(12)   the Statement of Guidance on Nature, Accessibility and Retention of Records ("SOG NARR");and

(13)   the Statement of Guidance on Asset Management & Investment Strategy For Insurance Companies ("SOG AMI").

## 3    **SCOPE STATEMENT**

3.1    The objectives of the On-site Inspection were to assess the Licensee's compliance with applicable laws, regulations, rules, statement of principles of the Authority as well as compliance with its own policies, procedures, corporate governance structure, and internal control environment. Analysis of these areas allowed the Authority to gain a better understanding of the Licensee's operations, from within the Cayman Islands and to determine whether it is in compliance with the laws, regulations, rules and guidance notes set out at 2.1 above.

3.2    The On-site Inspection was not intended to be a financial audit. The Authority relies on the work of the external auditors, with respect to the fairness of the financial statements.

3.3    The On-site Inspection was conducted for regulatory purposes only.

## 4    **METHOD OF ASSESSMENT**

4.1    The On-site Inspection was conducted by reviewing the Licensee's policies and procedures to ensure consistency with the applicable laws, regulations, regulatory rules and/or statements of guidance.

4.2    The On-site Inspection included a review of items provided to the Authority by the Licensee. Please see Appendix 2 for a list of the items received and reviewed.

4.3    Additionally, interviews were conducted with the following representatives:

(1)    Mr. Clayton Price, General Manager at Beecher Carlson Cayman Ltd., 8 March 2019

(2)    Mr. Thomas Adamczak, Beecher Carlson Cayman Ltd., 7 March 2019

(3)    Mr. Damien Austin, Independent Director, Sentinel Reinsurance, Ltd., 8 March 2019

(4)    Mr. Matthew DiOrio, Executive Director, Sentinel Reinsurance, Ltd., 8 March & 12 March 2019

BC SEN0000078783
11/03/21
Highly Confidential

5    **INSPECTION FINDINGS**

5.1    **INTRODUCTION TO FINDINGS**

5.1.1    The paragraphs below detail a number of findings. The corrective actions required for each finding are classified as requirements. The requirements and corresponding priority levels cited in this report arise where there is regulatory or statutory concern.  Matters Requiring Immediate Attention ("MRIA") in the Report are structured as "High Priority" and Matters Requiring Attention ("MRA) are identified as "Medium Priority" or "Low Priority".    The requirements that are set out below must be adopted and implemented by the Licensee within the time frames specified under each requirement or if no timeframe is stipulated, within three (3) months of receipt of the final prudential inspection report. The requirements are intended to assist the Licensee in strengthening its internal controls and policies and procedures. The Authority also requires monthly update reports from the Licensee until the requirements have been fully implemented. The monthly update reports should indicate the status of the requirements, the remedial actions taken by the Licensee and the estimated completion date. If the implementation of any requirements is delayed beyond the dates stipulated in this Report, it should be brought to the attention of the Authority and highlighted in the monthly report.

5.2    **CORPORATE GOVERNANCE**

5.2.1    **Organization structure**

Finding

5.2.1.1    On May 9, 2017, the Authority approved the transfer of 91% of voting rights and 0.65% of non-voting shareholding interest (together, "change in shareholding") in the Licensee from Wyvern Management Ltd. to SAS Holdings SPV Ltd. On processing the initial application for change in shareholding, the Authority objected to the Licensee's corporate structure in a letter dated November 30, 2016 on the basis that the proposed corporate structure was too complex such that it impeded the Authority's ability to effectively carry out regulatory oversight of the Company. In the same letter of November 30, 2016 referenced above, the Authority invited the Licensee to propose and apply for approval of an updated corporate structure for the Licensee that meets the criteria set out in Section 7.1.3 of the Regulatory Policy: Criteria for Approving Changes in Ownership and Control. In a letter dated February 3, 2017, Solomon Harris, acting for the Licensee, inter alia informed the Authority that the Licensee had offered to make certain structural changes to its corporate structure with the view to achieve simplicity and transparency of ownership and control of the Licensee. Among other things proposed in the letter by Solomon Harris to the Authority was the removal of five entities from the organization structure.

The entities that were to be removed from the organization structure included: Nimitz, Ltd, Patton Ltd., Elderflower Ltd., Brave Holdings Ltd. and Sentinel Re Holdings Ltd. The removal of the five entities was expected to eliminate three layers of ownership levels from the organization structure. In an email communication to Solomon Harris, Beecher Carlson and those charged with the Licensee's governance, dated July 14, 2017, the Authority reiterated the fact that the approval of the change in shareholding granted on May 9, 2017 had been based in part on the Authority's belief that the restructuring plan submitted to the Authority on February 3, 2017 would be implemented immediately. As per the organization structure provided to the Authority as part of the information requested for the purpose of the onsite inspection, the said five entities are still part of the Licensee's organization structure. During an interview with those charged with the Licensee's governance, the Authority  was informed that the Licensee had decided to hold off the reorganization detailed above on the account of changes in the tax laws of United States of America whose impact on the entity could not be

BC SEN0000078784
11/03/21
Highly Confidential

ascertained immediately. The Authority considers this explanation to be untruthful as the changes in the tax laws of the United States of America took effect in December 2017 whereas the Licensee was expected to have effected the changes in its organization structure in or about May 2017. In any case, there was no communication to the Authority in relation to the Licensee's decision to retain the organization structure that was explicitly objected to by the Authority.

This gives an impression that the information provided to the Authority at the time of application for approval of the change in shareholding was either factually inaccurate or intentionally misleading or the Licensee has deliberately refused to comply with the Authority's requirement that the Licensee's organization structure be simplified. It further reflects adversely on the level of honesty, integrity, reputation and general probity of those charged with governance in executing their duties.

Conclusion:

5.2.1.2 The Licensee is in breach of Section 8 (1)(a) of the Law for failure to conduct business in accordance of the information supplied in the application for the change in shareholding of the Licensee and as approved by the Authority, and for failing to operate according to the organization structure as approved by the Authority.

In the annual returns filing for the year ended December 31, 2017, the Licensee breached Section 9 (1)(d) of the Law by misrepresenting to the Authority that the information set out in the application for the licence and as modified by subsequent changes approved by the Authority, remained correct.

In addition, the Licensee is in breach of Sections 5.6.1 (a) and (b) of the RCG for failure by those charged with governance to ensure that the Authority is promptly notified of significant matters affecting the Licensee, and for the failure to ensure that the business of the Licensee is conducted in compliance with the laws and other requirements in force in the Cayman Islands.

Further, the Licensee is in breach of Section 5.13.2 of the RCG for the failure of those charged with governance to develop, implement and maintain systems and controls to ensure promotion of appropriate, timely and effective communications with the Authority by the Licensee.

Requirement (High Priority – MRIA):

5.2.1.3 The authority requires the Licensee to immediately remove the following entities from its organizational structure: Nimitz, Ltd, Patton Ltd., Elderflower Ltd., Brave Holdings Ltd. and Sentinel Re Holdings Ltd. and provide the Authority with a written confirmation that the five entities have been removed from the organizational structure of the Licensee.

In addition, the Authority requires the Licensee to provide the Authority with a written commitment that on an ongoing basis the Licensee will communicate with the Authority in an open, honest and cooperative manner, including but not limited to promptly notifying the Authority of breaches of requirements and expected standards of behavior and material changes in a timely manner.

The above written confirmations must be presented to the Authority within **one month** from the date of the Final Inspection Report.

In addition, the Authority, pursuant to Section 23(1) of the Law, is directing that the Licensee must **cease and desist** from transacting any insurance business until such a time that the Authority has satisfied itself that the Licensee has complied with the above requirements.

BC SEN0000078785
11/03/21
Highly Confidential

### Management comment

5.2.1.4 The Licensee acknowledges receipt of correspondence from the Authority of July 14, 2017 and May 9, 2017 regarding the approval of the restructuring plan, which was not completed.

On behalf of the Licensee, as of April 18, 2019, we have filed for the merger of (i) Nimitz, Ltd. with and into Montage Holdings, Ltd., (ii) Anthem, Ltd. with and into Mainspring, Ltd., and (iii) Patton, Ltd. with and into Mainspring, Ltd. Each such merger has an effective date of April 18, 2019. By operation of law, from the effective date, the separate corporate existence of each of Nimitz, Ltd., Anthem, Ltd. and Patton, Ltd. will cease and they will each have been removed from the ownership structure.

As of April 18, 2019, we have instructed KPMG to act as the voluntary liquidator of each of Elderflower Ltd. and Brave Holdings Ltd. and expect those liquidations to commence imminently. We have been advised that the liquidations will proceed in the ordinary manner and along the timelines provided in the Companies Law. As such, we are expecting the filing of the liquidator's final return with the Registrar of Companies approximately 60 days from the date hereof and, in any event, prior to June 30, 2019.

We propose removing Sentinel Re Holdings Ltd. from the structure by merging it with and into Sentinel Reinsurance Ltd. In order to effect this merger, we will require the consent of the Authority. If you are agreeable to this method of removal of Sentinel Re Holdings Ltd., we will formally approach you for such consent in a form capable of filing with the Registrar of Companies as part of the merger filing.

Upon completion of the liquidations and the proposed merger in respect of Sentinel Re Holdings Ltd., we will have removed all of the requested entities, along with Anthem, Ltd., from the ownership structure of the group.

There was certainly no intention on the part of the Licensee to mislead or be untruthful with our intentions. The honesty, integrity, reputation, and general probity of those charged with governance is of significant importance and the Licensee will ensure it conveys those qualities on any future dealings with the Authority.

The Licensee notes the breaches committed. We have removed Nimitz, Ltd., Patton, Ltd. and Anthem, Ltd. from the group as of April 18, 2019 and we expect to complete the reorganization per the steps and timeline as noted above.

The Licensee acknowledges the Authority's request and thus provide this written commitment that on an ongoing basis, the Licensee and its representatives, will communicate with the Authority in an open, honest, and cooperative manner, including but not limited to promptly notifying the Authority of breaches of requirements and expected standards of behavior and material changes in a timely manner.

### Authority's response

5.2.1.5 The Authority acknowledges the Licensee's comments above and reiterates that the Licensee must provide the Authority with **monthly** updates on the progress of restructuring the Licensee's group. Regarding the merger of Sentinel Re Holdings Ltd. with and into Sentinel Reinsurance Ltd., the Authority requires that the Licensee makes a formal application for approval of the merger to the Authority **immediately**. The application will be considered based on the merit of the information provided to the Authority alongside the application. Further, pursuant to Section 23(1) of the Law, the Licensee must **cease and desist** from transacting any insurance business until such a time that the Authority has satisfied itself that the Licensee has effected the changes described above.

BC SEN0000078786
11/03/21
Highly Confidential

## 5.2.2 **Inconsistent representations and inaccurate documentation**

<u>Finding</u>

5.2.2.1 From the review of the Licensee's Corporate Governance Framework ("CGF"), the Authority noted the following factual inaccuracies and inconsistencies:

a) The Risk Management Framework ("RMG") and the CGF, both dated December 17, 2018, state the date of incorporation of the Licensee as January 23, 2013. In a separate and unrelated instance, the Authority also noted that the actuarial report dated July 13, 2018 ("the actuarial report") also inaccurately made reference to the date of incorporation of the Licensee as March 1, 2014. In fact, the Licensee was incorporated on December 10, 2012.

b) In addition, the CGF states that the Licensee does not have a directors' remuneration policy on the basis that the Licensee's directors are not compensated for their services. The Authority noted that the Licensee has two independent directors. The independent directors are contractually engaged through service level agreements that stipulate among other things the directors' remuneration.

c) The CGF states in part that "*The Board believes there is no current relationship between any Director and the Company that would be construed to prevent any Board member from being designated as independent.*" Considering that the Licensee's Board comprises two executive directors, this assertion is conceptually inaccurate. The assertion appears to confuse the concept of independence and that of objectivity. It is the Authority's position that objectivity does not equal independence. And whereas the Authority does not set forth to determine the directors' objectivity in dispensing their duties to the Licensee, the Authority acknowledges that by virtue of their positions as executive directors, such directors are precluded from designation as independent.

d) Also, the CGF references to the Insurance (Amendment) Law, 2017 as the law that defines the statutory obligations of the Licensee. In fact, the legal regime applicable to the Licensee is enshrined in the Insurance Law, 2010 as amended.

e) In the introductory remarks, the actuarial report asserts that the Licensee is owned by SAS Asset Recovery, Ltd. and its affiliated entities (collectively "SAS"). SAS is not part of the Licensee's organization structure.

f) The Licensee's audited financial statements and actuarial report for the year ended December 31, 2017 state that the Licensee provides D&O coverage to SAS Asset Recovery Structure and its subsidiaries ("SAS"). As per the Licensee's business plan, the Licensee was approved to provide D&O coverage to entities within the SAS Asset Recovery structure/ Sentinel structure. According to the Authority's records, SAS and Sentinel Structures are not in the same organization structure. The following entities which are part of the Sentinel Structure have D&O policies issued by the Licensee; Montage Holdings, Ltd., Greystone IV Ltd., Kind Holdings Ltd., Brave Holdings Ltd., Loyal Holdings L.P., Anthem Ltd., Mainspring Ltd., HAL Holdings L.P., Nimitz Ltd., Patton Ltd. There is a clear contradiction between the information on the business plan and that on the audited financial statements and actuarial report for the year ended December 31, 2017.

g) Furthermore, while describing the Licensee's coverage lines, retention limits and policy triggers, the Licensee's actuary stated in the actuarial report that on August 1, 2017, the Licensee wrote an after the event ("ATE") policy for a related entity in relation to a lawsuit that was filed against the related entity in 2009. The policy has an aggregate limit of $91 million. The trial date for the case had been set for September 2017, but has been placed

BC SEN0000078787
11/03/21
Highly Confidential

on hold indefinitely. During an interview with those charged with the Licensee's governance, the Authority was informed that the case has never been indefinitely postponed. In fact the Authority was informed that the case had been scheduled for mentioning on September 2018, which happened, and further updates regarding the case had been provided by the Supreme Court of the State of New York in December 2018. During an interview with Crowe Horwath Cayman Ltd. (the "auditor"), the Licensee's auditor for the year ended December 31, 2017, the auditor informed the Authority that at the time of preparation of the Licensee's financial statements for the year ended December 31, 2017, the Licensee's lawyers familiar with the legal case to which the ATE policy relates gave the auditors assurance that the legal case was expected to be concluded within two years from the date of inception of the ATE policy. Those charged with governance could not establish immediately the source of the actuary's information and under what circumstances the actuary could have made such an assertion.

h) Moreover, the schedule of all policies issued by the Licensee provided to the Authority as part of the documents requested for the purpose of the onsite inspection stated the aggregate limit for the ATE coverage as US$100 million; the correct limit of liability for the ATE cover is US$91 million.

The inaccuracies described above are indicative of hastily compiled documents without thorough consideration of purpose and internal consistency. Or else, those charged with the Licensee's governance have failed in their duty to review and approve the Licensee's policies and procedures to ensure quality and accuracy. It also gives the impression that those charged with the Licensee's governance accept reports produced by third parties without thoroughly reviewing such reports for accuracy and reasonableness of the basis for conclusions.

Conclusion:

5.2.2.2 The Licensee is not in compliance with Section 4.6 of the SOG NARR for failure to make reasonable effort to maintain complete and up-to-date records.

Furthermore, the Licensee is not in compliance with Section 4.7 of the SOG NARR which requires that for an entity to accept and rely on records supplied by a third party, such records must be or be capable of being reconciled with records held by the entity. The actuarial report falls short of this requirement.

In addition, the Licensee is out of compliance with Section 5.11 of the SOG CG for failure to develop, implement and maintain a remuneration policy for those charged with governance.

Requirement (High Priority – MRIA):

5.2.2.3 Within **three months** following the date of the Final Inspection Report, the Authority requires the Licensee to appropriately amend its CGF and RMF to correct the inaccuracies listed above and to ensure that it is compliant with SOG CG and the RRMI respectively.

Further, the Authority requires the Licensee, through those charged with governance, to provide the Authority with a written commitment that on an ongoing basis, they will sufficiently review reports generated by third party service providers to ensure that such reports can be reconciled to the records of the Licensee and that matters of fact contained in such reports are accurate while matters of belief are reasonable.

Also, the Authority requires the Licensee to develop, implement and maintain internal controls to ensure accurate recording of all policyholder information, including details about the policies written such as premiums and limits of liability etc.

Page 9 of 35

BC SEN0000078788
11/03/21
Highly Confidential

In addition, the Authority requires the Licensee to develop, implement and maintain a remuneration policy in conformity with Section 5.11 of the SOG CG.

Copies of the internal controls policies and procedures and the remuneration policy should be provided to the Authority within **three months** following the date of the Final Inspection Report.

<u>Management comments</u>
5.2.2.4

a) The Licensee acknowledges the inaccuracies within its Risk Management Framework (RMF), its Corporate Governance Framework (CGF), and the actuarial report regarding the incorporation date of the Licensee and has made appropriate corrections to be approved and accepted at the next Board meeting.

b) The Authority has accurately reflected that the two independent directors are not directly compensated by the Licensee for their services as they are employees of their director services firms: Mr. Jan Neveril of Compass OFM Limited and Mr. Damian Austin of International Management Services Ltd. The copies of the directorship services agreements were provided to the Authority via its web portal prior to the onsite inspection. The Licensee acknowledges that it does not have a "directors' remuneration policy and will develop, implement and maintain a remuneration policy for those charged with governance in accordance with Section 5.11 of the SOG CG.

c) The Licensee acknowledges and agrees with the Authority's comment regarding the independence of the executive directors and is correcting the statement in the CGF.

d) The Licensee acknowledges the inaccuracy within CGF of the legal regime and has made the appropriate correction to be approved and accepted at its next Board meeting.

e) The Licensee acknowledges the inaccuracy within the actuarial report regarding the structure and has requested the appropriate correction within the actuary's 2018 report.

f) The Licensee acknowledges the Authority's comment related to the confusion pertaining to the Sentinel Structure versus the SAS Structure as both are different, although affiliated under common ownership. Going forward, the Licensee will ensure it scrutinizes the descriptions related to its business within the actuarial report, audited financial statements, and any other third party reports, to ensure accuracy.

g) The Licensee acknowledges the language describing the matter covered by the ATE policy was inaccurate and has requested the appropriate correction within the actuary's 2018 report.

h) The Licensee acknowledges that the schedule of all policies issued by the Licensee provided to the Authority as part of the documents requested was an outdated version. The Licensee also recognizes that the Authority has previously received schedules accurately reflecting all policies issued by the Licensee as part of the current business plan provided to the Authority as part of the documents requested on January 31, 2019 as well as with the 2017 Annual Filing.

The Licensee recognizes its need to update and maintain current and accurate records. Those charged with governance as well as the insurance manager are tasked with reviewing all third party records and reports to ensure they meet the requirements of Sections 4.6 and 4.7 of the SOG NARR. As noted in 5.2.2.1 b above, the Licensee will develop a remuneration policy for the independent directors.

The Licensee will within three months of the date of the Final Inspection Report, amend its CGF and RMF to correct inaccuracies as listed in 5.2.2.1 and ensure it is complaint with the SOG CG and RRMI, respectively. The Board of Directors, being those charged with corporate governance, will provide the Authority a written commitment that on an ongoing basis they will sufficiently review reports generated by third party service providers to ensure that such

BC SEN0000078789
11/03/21
Highly Confidential

reports resonate to the records of the Licensee and that matters of fact contained in such reports are accurate while matters of belief are reasonable. The Licensee will develop, implement and maintain internal controls to ensure accurate recording of all policyholder information including details about the policies written, including premiums and limits of liability. As noted in 5.2.2.2, the Licensee will develop and maintain a remuneration policy in conformity with Section 5.11 of the SOG CG. Copies of these internal controls and procedures will be provided to the Authority within three months of the date of the Final Inspection Report.

Authority's response

5.2.2.5 The Authority acknowledges the Licensee's comments above and expects the Licensee to comply with the requirements stated at paragraph 5.2.2.3 within the timelines therein.

### 5.2.3   Inadequate oversight

Finding:

5.2.3.1 From the review of Board meeting minutes and other documentation provided to the Authority and interviews with those charged with the Licensee's governance during the onsite inspection, the Authority noted the following inadequacies relating to the oversight of the affairs and operations of the Licensee:

a) On various instances, those charged with governance stated that they relied heavily on the insurance manager for various functions of the Licensee. On some instances, some of the directors did not appear to know the product lines the Company provided; in some cases some directors were oblivious of the fact that the Licensee provided P&I cover in addition to the D&O and ATE covers. Instead of standing as an independent force overseeing the activities of management with rigor and professional skepticism, the board appears to be relegated to a passive affiliate of management.

b) The Licensee's CGF does not specify the minimum number of times the directors are expected to meet and deliberate on the affairs of the Licensee. During interviews with those charged with governance of the Licensee, the Authority was informed that the corporate culture of the group to which the Licensee belongs is such that matters are handled on an ad hoc basis and that preference is not given to structured approaches. Also, those charged with the Licensee's governance, informed the Authority that the directors were under the impression that they were required to meet semi-annually. From interviews with the insurance manager, the Authority was informed that the infrequent nature of the Licensee's Board meetings was in part due to unavailability of information relating to valuation of the Licensee's investments which is necessary for the preparation of financial records for the directors to review.   Although the directors stated that they were under the impression that they should be meeting semi-annually, the Authority was provided with Board meeting minutes for only one meeting per year from 2016 to 2018.

c) Further, for the times when they have held board meetings, those charged with governance were provided with board information packets including financial records of the Licensee and other updates on the affairs of the Licensee less than one week in advance of the meetings. Viewed in the context of infrequent intervals of the board meetings and the directors' hands-off approach to management of the Licensee's operations, it is the Authority's position that those charged with the Licensee's governance are not demonstrating that they are dedicating sufficient time to the affairs of the Licensee.

BC SEN0000078790
11/03/21
Highly Confidential

d) As per the Authority's records, the Licensee changed its auditor in the year 2016. From the review of the Board meeting minutes, the Authority did not obtain any evidence of the Board approving the change of auditor.

e) Interviews with those charged with governance revealed that the Licensee has not established a compliance team or alternative mechanism for compliance with a direct reporting channel to the Board. Board meeting minutes do not reveal any material discussions at board level regarding compliance.

Conclusion:

5.2.3.2 The Licensee is in breach of Section 8.1(g) on the Law for failure to maintain an effective system of governance.

The Licensee is in breach of Section 5.1.1 of the RCG for failure to establish, implement, and maintain a corporate governance framework which provides for sound and prudent management and oversight of the insurer's business.

Further, the Licensee is not in compliance with Section 5.4 (g) of the SOG CG for failure to establish an appropriately skilled compliance committee or person to report directly and regularly to the board on all compliance matters relating to the Licensee.

Requirement (High Priority – MRIA):

5.2.3.3 Within **two months** from the date of the Final Inspection Report, the Authority requires the Licensee to review and amend the CGF in accordance with the SOG CG. The Authority expects the updated CGF among other things to:

i. clearly define and document the roles and responsibilities allocated to the Board and Management in a manner that clearly promotes an appropriate separation of the oversight function from management responsibilities.

ii. establish a framework for the Board to oversee management and to set appropriate quantifiable performance standards for management and ensure that management is managing the affairs of the Licensee in accordance with the strategies and policies set by the Board.

iii. clearly define the minimum frequency of Board meetings to deliberate the affairs of the Licensee including how much time in advance of the meeting should the Board members be provided the agenda and other related materials and information to be considered during the meeting.

iv. In addition, no later than **two months** following the date of the Final Inspection Report, the Authority requires the Licensee to establish an appropriately skilled compliance committee or person to report directly and regularly to the board on all compliance matters relating to the Licensee and to ensure that there is proper documentation of discussions surrounding compliance.

Management comments

5.2.3.4

a.) The Licensee acknowledges the Authority's comments regarding the Board's reliance on the Insurance Manager for many functions and roles. This is due to the Board, as currently constituted, is still relatively new to the Licensee. The Licensee affirms that going forward, the Board will be more actively involved with all facets of governance.

b.) The Licensee has never established a requirement or an expectation of two board meetings per year. As the Licensee redrafts the CGF, consideration will be given to specifying the minimum number of times per year the directors are expected to meet and deliberate on the affairs of the Licensee.

c.) As the Directors are regularly involved with the regular day to day activities of the Licensee (approving all invoices, releasing all payments, involved in all matters related to investments and insurance, signing all policies, etc.), providing board meeting materials

BC SEN0000078791
11/03/21
Highly Confidential

within one week of the board meeting is not a concern and the information contained within is certainly not surprising or new. As a result, the Licensee disagrees with the Authority's position that those charged with governance are not demonstrating that they are dedicating sufficient time to the affairs of the Licensee.

d.) Although the Licensee's board minutes did not reflect discussion of the change in auditor for the 2016 year, the Board was fully aware and approved the change via the director's signing of the auditor engagement letter.

e.) Recognizing the Licensee (although licensed as a Class B (iii)), is currently only insuring related parties within its Financial Group and the same Ultimate Beneficial Ownership hence the Licensee is actually operating as a Class B (i) with a common risk management program. Therefore the nature being proportional to its scope, the Licensee does not believe a "compliance team" is warranted. The Licensee does, however, accept the Authority's direction to assign the compliance responsibilities to a designated director to provide a direct channel to the Board and will make such appointment to fulfill the obligations as set forth in Section 5.4 (g) of the SOG CG.

The Licensee accepts the Authority's direction and will establish, implement, and maintain a corporate governance framework to provide for sound and prudent management and oversight of its business to comply with Section 5.1.1 of the RCG.

Within two months from the date of the Final Inspection Report, the Licensee will review and amend its CGF in accordance with the SOG and as noted in 5.2.2.2 above and incorporate the Authority's recommendations in 5.2.3.3 i), ii), iii), and iv.

Authority's response

5.2.3.5 The Authority reiterates its position that those charged with the Licensee's governance are required to dedicate demonstrable sufficient amounts of time to the affairs of the Licensee. In so doing, those charged with governance are expected to distinguish their responsibilities at strategic level from those at the tactical and operational levels of the Licensee. Therefore, the Authority maintains its position that within **two months** from the date of this report, the Authority requires the Licensee to review and amend the CGF as detailed in the requirement at paragraph 5.2.3.3. In addition, no later than **two months** following the date of this report, the Authority requires the Licensee to confirm the identity of the director that is responsible for the compliance matters of the Licensee. Further, on a continuous basis, the Authority requires the Licensee to demonstrate that the director responsible for the compliance matters of the Licensee is sufficiently acquainted and that he/she reports regularly on such matters to those charged with the Licensee's governance in connection therewith.

## 5.2.4    **Non-compliance with the CGF**

Finding:

5.2.4.1 From the review of the Licensee's CGF and other documents provided to the Authority for the purpose of the Onsite Inspection, the Authority noted the following areas of non-compliance with the Licensee's own CGF:

a) The Licensee's CGF states that the independence of those charged with governance will be reviewed annually by the board of directors. There was no evidence in the board meeting minutes of such review being done.

b) The Licensee's CGF states that the Board believes it is appropriate to periodically review its own effectiveness, including its corporate governance policies and practices. The Licensee's CGF contemplates such a review to occur on an annual basis. From the interviews with those charged with the Licensee's governance and the review of Board meeting minutes, there was no evidence of such reviews being done.

c) As per the Licensee's CGF, the Board reviews the Licensee's strategic plan and financial performance annually. From the review of the Board meeting minutes, there was no

BC SEN0000078792
11/03/21
Highly Confidential

evidence of the Board discussing the financial performance of the Licensee for the years 2016, 2017 and 2018.

Conclusion:

5.2.4.2 The Licensee is in breach of Section 5.1.1 of the RCG for failure to implement its own established corporate governance framework to enable those charged with governance to provide sound and prudent oversight of the Licensee's business. Furthermore, the Licensee is in breach of Section 5.6.2 of the RCG for failure to undertake self-assessments of its performance and governance practices to enable the Board to remedy any deficiencies identified.

Requirement (High Priority – MRIA):

5.2.4.3 Within **one month** from the date of the Final Inspection report, the Board should develop, implement and maintain guidelines for assessing its own effectiveness with regards achieving the Licensee's objectives. The guidelines should be documented and a copy provided to the Authority. The Board should provide the Authority with a written commitment that going forward, the Board will adhere to the guidelines described in this paragraph.

Management response

5.2.4.4

    a.) Although the minutes did not reflect a discussion regarding independence, a discussion did take place to draft a conflict of interest policy and circulate for approval. The policy was finalized and approved via unanimous written consent in January 2019.

    b.) The Licensee will implement a process as part of its corporate governance policies and procedures for its board members to conduct a self-assessment periodically (i.e. annually at its AGM) to review board members' effectiveness.

    c.) Although the Board has reviewed the Licensee's strategic plan and financial performance at its board meetings, there was no documentation in the minutes. The Licensee will ensure that these discussions are held annually as well as ensure the discussions are documented within the board meeting minutes.

    To be in compliance with Sections 5.1.1 and 5.6.2 of the RCG, the Licensee will ensure the sound and prudent oversight of its business and the Board will undertake self-assessments of its performance and governance practices on an annual basis.

    Within one month's time of receipt of the Final Inspection Report, the Board will develop, implement and maintain guidelines for assessing its own effectiveness and documentation. A copy of the document will be provided to the Authority accompanied by a written commitment that going forward the Board will adhere to these guidelines.

Authority's response

5.2.4.5 The Authority has noted the comments by management and requires the Licensee to comply with the requirements and within the timelines stated in paragraph 5.2.4.3.

5.2.5 **Succession planning**

Finding:

5.2.5.1 The Licensee has a board comprising of four directors. Of the four directors, only one director has direct insurance business expertise and experience. However, the Authority observed that the Licensee's CGF does not only lack a criteria for appointment of directors and balancing of skills and experience on the Board, but it also does not entail a succession plan for those currently serving as directors. Should the single director with insurance industry experience be incapacitated, the Board will not have sufficient expertise to adequately provide oversight of management and the Licensee's affairs.

BC SEN0000078793
11/03/21
Highly Confidential

Conclusion

5.2.5.2 The Licensee is not in compliance with Section 5.3.1 of the SOG CG for failure to clearly define the composition and structure of its Board. In addition the Licensee is in breach of Section 5.4.1 (f) of the Rule on CG for failure to establish a succession plan for directors.

Requirement (Medium Priority – MRA):

5.2.5.3 The Licensee is required to review and approve a CGF that is in conformity with the Rule on CG and the SOG CG. A copy of the revised CGF should be provided to the Authority within **three months** following the date of the Final Inspection Report.

Management response

5.2.5.4 The Licensee's board is composed of four directors, however the Licensee has two, not one, directors with direct insurance business expertise and experience, Jan Neveril and Damien Austin, rendering the statement inaccurate that Licensee would be left with insufficient expertise to adequately provide oversight of management and the licensee's affairs. Furthermore, the Licensee has contracted with the firms Compass OFM and International Management Services to provide the directors with direct insurance business expertise and experience, so should one of the directors with insurance industry experience become incapacitated, it will be incumbent upon Compass OFM or International Management Services to replace the incapacitated director.

As described in 5.2.5.1 above, the Licensee does not fully believe it is out of compliance with Section 5.3.1 of the SOG CG. The Licensee does, however, acknowledge that a more clearly defined successorship plan should be adopted to comply with section 5.4.1 (f) of the Rule on CG.

The Licensee acknowledges the authority's requirement to review and approve a CGF that is in conformity with the Rule on CG and the SOG CG and to be provided to the Authority within three months following the date of the Final Inspection Report.

Authority's response

5.2.5.5 The assertion that Mr. Jan Neveril has direct insurance experience does not appear accurate on two fronts; first, the fact that the Licensee has only one director with direct insurance experience was confirmed during interviews with those charged with the Licensee's governance. It would therefore appear contradictory for management to state otherwise. And second, Mr. Jan Neveril's curriculum vitae filed with the Authority as part of the application for approval as director of the licensee does not bring out his direct experience in the insurance industry. The Authority therefore reiterates its position that the Licensee must comply with the requirement and within the timelines stated in paragraph 5.2.5.3.

5.2.6 **Inadequate documentation of Board meeting minutes**

Finding:

5.2.6.1 The meeting minutes by those charged with governance are inadequately documented. The details of the matters discussed, and resolutions reached are scanty. For example, the meeting minutes by the members of the Licensee's Advisory Committee for the meetings conducted in 2017 and 2018 do not contain any details beyond a list of what appears to be the items that were on the agenda.

In addition, the Authority noted that unanimous written resolutions of the board since October 27, 2014 were all approved on August 4, 2016. It is not clear why board resolutions for multiple successive periods remained unapproved for so long.

In some instances, the board meeting minutes referenced attachments which were said to form part of the meeting minutes, but such attachments were not included with the meeting minutes.

BC SEN0000078794
11/03/21
Highly Confidential

Conclusion

5.2.6.2   The Licensee is in breach of Section 5.8.4 of the RCG for failure to fully record, accurately and clearly all material decisions and considerations taken during board meetings. Furthermore, the Licensee is in breach of Section 5.8.5 (a) of the RCG for failure to properly maintain records of meetings including the agenda items and circulated documents.

Requirement (High Priority – MRIA):

5.2.6.3   Within **one month** of the date of the Final Inspection Report, the Licensee is required to provide written confirmation that going forward meeting minutes will be documented in detail capturing material decisions and considerations taken during board meetings. In addition, meeting agendas and pertinent documentation will be saved with the corresponding meeting minutes.

Management response

5.2.6.4   Although the Licensee agrees that the Board meeting discussion could be better documented within the board meeting minutes, the minutes are far from considered "scanty." However, the Licensee's Advisory Committee minutes are agreed to be "scanty." The Licensee acknowledges that future Advisory Committee meetings will have more detailed minutes accurately depicting the nature of the discussions.

The Licensee acknowledges that the unanimous written resolutions from October 27, 2014 through August 4, 2016 were reviewed, discussed and approved at a meeting of the directors on August 4, 2016. However, given the nature of the resolutions being "Unanimous", the resolutions were hardly unapproved. In fact, given the resolutions were executed by all then current board members, there is no need for further approval as the unanimous written resolutions stand on their own.

The Licensee acknowledges that certain minutes may not have included referenced attachments as part of the final minutes and with the plan to update and maintain current and accurate records, will ensure this deficiencies is not repeated.

The Licensee acknowledges the Authority's conclusion that all decisions and considerations discussed in the board meetings could be better documented. However, the Licensee disagrees that it is in breach of Section 5.8.5(a) of the RCG for failure to properly maintain records of meetings such as the agenda items and circulated documents. Attached as Exhibit 1, please find copies of emails providing both notice and agenda of meeting as well as board meeting materials.

The Licensee acknowledges the Authority's request and thus provide this written confirmation that going forward, meeting minutes will be documented in detail capturing material decisions and considerations taken during board meetings. In addition, meeting agendas and pertinent documentation will be saved with the corresponding meeting minutes.

Authority's response

5.2.6.5   When documents are provided to the Authority, it is the Authority's position that such documents constitute the entirety of the documents. Where reference is made to other documents, it is the duty of the Licensee to make such other referenced document available. In the course of the inspection, the Licensee did not make the item noted in paragraph 5.2.6.3 available alongside the minutes of the Board. The Authority reiterates its position this amounts to failure to maintain proper records of meetings which is a breach of Section 5.8.5 (a) of the RCG.

BC SEN0000078795
11/03/21
Highly Confidential

### 5.2.7 Conflicts of interest policy

Finding

5.2.7.1 Through the review of the documents provided for the purpose of the on-site inspection, there were no documented policies and procedures in relation to the declaration of conflicts of interest by the board or senior management. Furthermore, on review of the board meeting minutes, the Authority did not reveal evidence of the declaration of conflicts of interest by board members during board meetings. Interviews held with those charged with governance revealed that there was no conflicts of interest policy in place and that there had been no declaration of conflicts of interest by board members during board meeting.

Conclusion

5.2.7.2 The Licensee is in breach of Section 5.10 of the RCF for failure to establish, document and implement a conflict of interest policy.

Requirement (High Priority – MRIA):

5.2.7.3 Within **one month** from the date of the Final Inspection Report, the Licensee is required establish and document a conflicts of interest policy. The Authority should be provided with a copy of the Licensee's conflicts of interest policy.

Management response

5.2.7.4 The Licensee acknowledges that the board meeting minutes did not reveal evidence of the declaration of conflicts of interest by directors during the meeting, however the discussion was made to draft a formal conflicts of interest policy which was finalized and approved via unanimous written consent in January 2019 Formal conflicts of interest declarations were disclosed by each director after approval of the policy.

Furthermore, on behalf of the Authority, Ms. S. Dube acknowledged receipt of the Licensee's Conflict of Interest Policy and Conflict of Interest Statements that had been signed by the four Board members as provided by Mr. Tom Adamczak on March 5th, 2019.

Authority's response

5.2.7.5 Upon review of the documents provided by Mr. Tom Adamczak by e-mail dated March 4, 2019, the Authority found that the document labeled as a "Conflict of Interest Policy" was in fact a bank conflicts of interest declaration template and the second attachment was a signed copy of the same. There was no conflicts of interest policy included in the e-mail. Therefore, the statement that Ms. Sehliselo Dube was provided with a conflicts of interest policy at any time during the course of the inspection is factually inaccurate. It is imperative that the Licensee distinguishes between a conflicts of interest statement/declaration and a conflicts of interest policy. The Authority reiterates its position that the Licensee is expected to comply with the requirements as detailed in paragraph 5.2.7.4 within the timelines stipulated therein.

## 5.3 BUSINESS PLAN

### 5.3.1 Insurance program

Finding

5.3.1.1 As per the updated business plan provided to the Authority for the purpose of the onsite inspection, the Licensee was approved to write directors and officers liability ("D&O"), Industry Loss Warranty Catastrophe Excess of Loss ("ILW"), and ATE coverages. Currently, the Licensee issues D&O and ATE policies only. The Authority noted the following violations of the Licensee's business plan regarding the Licensee's insurance programs:

a) At the point of approval of the current ATE cover, the Licensee represented to the Authority that it initially expected to write up to 10 policies per year at an average premium of $500,000 per policy. As per the Audited financial statements for year ended December 31, 2017 ("the financial statements"), the Licensee has only written one ATE policy at a premium of US$59 million. Those charged with governance could not explain how a product line that was initially intended to generate circa US$5 million per year from ten policies ended up generating US$59 million from only one policy. As per the financial

BC SEN0000078796
11/03/21
Highly Confidential

statements, the ATE cover accounts for US$59 million of the US$60 million written; being 98% of the business transacted that year. This gives the impression that deliberately misleading information in terms of the number and magnitude of expected transactions relating to the ATE coverage was provided to the Authority at the time of approval; only for the single transaction in that line of business to be ballooned a hundred and eighteen (118) times after approval.

b) Based on the D&O policies that were provided to the Authority as part of the on-site inspection process, the Authority noted that part one of the "D&O" policies covers Professional Indemnity and Fidelity ( collectively "P&I") and part two of the "D&O" policies covers D&O. This is inconsistent with both the information presented to the Authority at licensing and the Licensee's approved business plan. During interviews with the Authority, the Licensee's management, stated that they were not aware that P&I coverage was included in the D&O policies. The Authority considers the nature of the risk involved in P&I cover to be significantly different from that involved in the D&O and ATE covers and as such P&I covers are a separate line of business.

During separate interviews, those charged with governance of the Licensee revealed that the Licensee relies heavily on the insurance manager including drafting of the policy wording and reviewing issued policies. On the other hand, from the interviews with the insurance manager, the Authority was informed that those charged with governance were responsible for underwriting including policy wording. The Authority could therefore not establish who was responsible for the underwriting process of the Licensee; an indicator of a significant lapse in the Licensee's internal controls and processes.

c) Also the D&O policy does not name the insurer, the ATE policy makes reference to a claims notification address as shown on the policy schedule; there is no such address indicated on the policy schedule. All the endorsements on the ATE policy are undated and the date they were executed is not indicated. The insuring clause on the D&O policies under item (iv) of the P&I cover references to proposal forms. In an e-mail correspondence dated March 15, 2019, the Insurance Manager confirmed that no such proposal forms are completed by the policyholders.

<u>Conclusion</u>

5.3.1.2 The Licensee is in breach of Section 8 (1) (a) of the Law for failure to carry out insurance business only in accordance with the information given in its approved license application and business plan and for amending its business plan without prior written approval of the Authority.

<u>Requirement (High Priority – MRIA):</u>

5.3.1.3 Within **two weeks** from the date of the Final Inspection Report, the Licensee is required to apply to the Authority for amendment to the Licensee's business plan to reflect the actual lines of business underwritten by the Licensee; including expected number of ATE policies per year together with the attendant average premiums per ATE policy. The approval of the business plan is at the Authority's discretion.

Within **two weeks** from the date of the Final Inspection Report, the Authority requires those charged with governance of the Licensee to provide the Authority with a detailed description of the economic substance and business purpose of the ATE cover. The Description must among other things include the circumstances leading to the amendment of the cover's premium from US$25 million to US$68.3 million and then to US$59.3 million while maintaining the same coverage limit.

The Authority requires that the Licensee provides the Authority with a written confirmation that the Licensee has developed and implemented and has instituted procedures to maintain a system of proper controls to ensure sufficient periodic review of the Licensee's business plan to ensure that at all times the business plan reflects the true operations of the Licensee as

BC SEN0000078797
11/03/21
Highly Confidential

approved by the Authority. A copy of the internal control policies and procedures must be provided to the Authority within **two months** from the date of the Final Onsite Inspection.

Management response

5.3.1.4

a.) The Licensee acknowledges the current and only ATE policy issued to date is much larger than the initial estimate of what was to be written. The business plan approved by the Authority on March 21, 2016, stated the initial expectation was to write up to ten policies per year at an average premium of $500,000 per policy, however, and this is the key, "if more cases are presented which the company wishes to pursue, it expects to do so, so long as all regulatory and internal capital and surplus and investment policy requirements are met – capital will be contributed if necessary." The approval from the Authority was not presumed to be contingent upon never exceeding the estimates in the business plan. All requirements including capital contributions, minimum cash considerations, and investment compliance, have all been met. The fact is that the current ATE policy with the higher premium was never contemplated from the beginning, but rather presented itself as a business opportunity after the fact. The initial intent was true and to say that the Authority was deliberately mislead is incorrect.

b.) The Licensee acknowledges that the D&O policies have always contained both D&O as well as PI coverage. Furthermore it is customary, especially with Lloyds, for D&O policies to also have PI as well. This was not meant to be a circumvention, simply an oversight. The Licensee acknowledges the oversight in its original filing with the Authority seeking approval on D&O coverage and sincerely apologized for this oversight.

c.) The Licensee acknowledges these deficiencies within the policies and is currently updating our policy forms to ensure accurate information is included on future issued policies. Beecher Carlson Cayman, Ltd will conduct either a Lexis/Nexis check/World-Check or Google and document in the Licensee's files representing that such check has been conducted on the proposed insureds prior to issuance of future policies

The Licensee acknowledges the need to file an amended business plan for its current insurance business which will be done within two weeks from the date of the Final Inspection Report. The Licensee will not carry out any future transactions requiring the approval of the Authority without first seeking approval from the Authority.

The Licensee acknowledges the need to file an amended business plan for its current insurance business which will be done within two weeks from the date of the Final Inspection Report.

Those charged with governance of the Licensee will provide to the Authority within two weeks of the date of the Final Inspection Report, a detailed description of the economic substance and business purpose of the ATE coverage, which shall include the circumstances leading to the ATE policy endorsements.

The Licensee will, within two months from date of the Final Inspection Report, confirm they have developed, implemented, and instituted procedures to maintain a system of proper controls to ensure sufficient review of the Licensee's business plan to ensure at all times the business plan reflects the true operations as approved by the Authority.

Authority's response

5.3.1.5 The Authority has noted management's response and expects the Licensee to meet the requirements as detailed in paragraph 5.3.1.3 within the timeline specified therein.

BC SEN0000078798
11/03/21
Highly Confidential

### 5.3.2 Investment policy

Finding

5.3.2.1 The Licensee's investment policy limits the investment in alternative investments to a range of from 0% to 50% of the total portfolio. It also limits investment in equity securities to a range of from 0% to 50% of the total portfolio. As per the audited financial statements as at December 31, 2017, the Licensee held approximately US$98 million in investments and cash and cash equivalents. Of the US$98 million, approximately US$69 million was invested in alternative investment; accounting for circa 70% of the Licensee's total portfolio. This is a deviation from the Licensee's own investment portfolio without obtaining approval from the Authority. In addition, the investment policy states that the Licensee can maintain 0% to 100% of its investments in the form of cash and cash equivalents. It further states that cash and equivalents must be maintained at a minimum of US$100,000. This is a contradiction because by maintaining a minimum of US$100,000 in cash and cash equivalents, then it is not possible keep a range of 0% to 100%. The above matters raise concerns as to whether those charged with governance ever reviewed this investment policy statement and the Licensee's investment portfolio to satisfy themselves that management was operating within the expected confines.

Conclusion:

5.3.2.2 The Licensee is in breach of Section 8 (1)(a) of the Law for failure to carry on business in accordance to its approved business plan as it relates to the level of investments held as alternative investments.

Requirement (High Priority – MRIA):

5.3.2.3 The Licensee is required to immediately rebalance its investment portfolio such that it is compliant with the Licensee's investment policy approved by the Authority. Within **one month** from the date of the Final Inspection Report, the Licensee is required to provide the Authority with a written confirmation together with supporting documentation that the Licensee's investment portfolio has been rebalanced to comply with the Authority's approved investment policy. Furthermore, the Authority requires the Licensee to commit in writing that on an ongoing basis the Licensee will monitor its investment portfolio on a sufficiently regular basis to ensure the portfolio is compliant with its investment policy as approved by the Authority.

Management comment

5.3.2.4 The Licensee agrees with the Authority that according to its investment policy, the Licensee may invest in alternative investments to a range of from 0% to 50% of the total portfolio as well as investing in equity securities to a range of from 0% to 50% of the total portfolio. However, the Licensee respectfully disagrees with the Authority's statement that it has deviated from its own investment policy, as approved by the Authority on October 4, 2018. As stated in section 3.3 of the Authority-approved investment policy, CLOs are classified within the category of "fixed income." As such, the approximately $31 million of CLOs are not included with alternative and equity investments for purposes of calculating investment policy compliance. The investment policy, as part of the business plan filed with the Authority, had previously been approved by the Authority on November 15, 2013 and also included CLO's classified within the "fixed income" category. The fact is that there now appears to be a differing view on classification of CLOs, and if the Authority would prefer the Licensee to use the Authority's current definitions for investment classification, the Licensee will comply. If any rebalancing of the portfolio is required, it would occur within a reasonable period of time so as to not force the sale of investments with an adverse result on their return.

Furthermore, the licensee agrees with the Authority that according to its investment policy, cash must be maintained at a minimum of $100,000 while keeping within a range of from 0% to 100% of the total portfolio. This is not viewed by the Licensee as being contradictory as it is possible with investible assets of $100 million and cash of the minimum required $100,000 to be at .1%, which when rounded is essentially 0% of the portfolio.

Page **20** of 35

BC SEN0000078799
11/03/21
Highly Confidential

The investment policy was discussed and revised by the Board as evidenced by the unanimous written consent signed by all directors on September 8, 2018 and attached here as Exhibit 2.

For reasons outlined above in 5.3.2.1, the Licensee respectfully disagrees with the Authority's position that the Licensee is in breach of Section 8 (1)(a) of the Law for failure to carry on business in accordance to its approved business plan as it relates to the level of investments held as alternative investments, as the Licensee is operating in accordance with the investment policy as approved by the Authority on October 4, 2018.

Furthermore as a matter of conservatism, the Licensee included within its investment policy, a provision that cash will be maintained to a level at least equal to the carried loss reserves. This ultra-conservative measure was done for the purpose of being able to invest excess assets as the Licensee sees fit under the rest of the investment policy. Considering the loss reserve provision, the investment policy is very conservative and should not be over-looked!

Authority's response

5.3.2.5 As per the Insurance (Capital And Solvency)(Classes B, C And D Insurers) Regulations (2018 Revision) CLO's would be classified as "Class 8" being an investment in "Other Loans". On the other hand, ordinary debt instruments would be classified higher. To lump together CLOs with other fixed income instruments is definitely misleading in terms of the level of risk involved. The Authority has not changed its philosophy regarding the classification of such instruments. By all intent and purposes, CLOs are alternative investments. In addition, regarding management's comment on the proportion of cash and cash equivalents as a percentage of investments, the Authority does not make its assessments based on hypotheticals. The Authority expects that documents that guide the Licensee's decisions should be written precisely and such documents should not lend themselves to ambiguous language capable of multiple interpretations. The Authority therefore expects the Licensee to comply with the requirements as stated in paragraph 5.3.2.3.

## 5.4    OUTSOURCING

### 5.4.1    Weaknesses in the outsourcing arrangements

Finding:

5.4.1.1 From the review of the documents provided to the Authority for the purpose of the Onsite Inspection, the Authority noted the following areas of weakness regarding the Licensee's outsourced arrangements:

a) The Licensee has outsourced management and other key services to third parties. The CGF requires those charged with the Licensee's governance to maintain oversight of the functions carried out by each service provider at all times. Those charged with governance are required to conduct regular (not less than annual) reviews of the services provided by each such service provider. Review of documents provided for the purpose of the onsite inspection and interviews held with the Licensee did not reveal evidence of such reviews being conducted.

b) The Licensee does not have in place a sufficient outsourcing policy commensurate to nature, scale and complexity of its operations. Some aspects of the Licensee's outsourcing are referenced in the CGF. In the instances where reference is made to the outsourcing aspects of the Licensee in the CGF, the details are mere duplications of the Authority's *Statement of Guidance: Outsourcing Regulated Entities* as opposed to a thought-out policy tailored to the peculiar circumstances of the Licensee.

c) The Licensee has no contingency plan in place to guard against unexpected instances of the parties to which it has outsourced significant functions being unable to deliver.

BC SEN0000078800
11/03/21
Highly Confidential

d) On December 8, 2017, the Licensee engaged Valuation Research Corporation ("VRC") to undertake valuation of certain investments held by the Licensee. The Authority was not provided with any evidence of due diligence performed on VRC prior to engagement. During interviews with those charged with the Licensee's governance, the Authority was informed that the engagement was based on a referral from the Insurance Manager. Further, the Insurance Manager informed the Authority that they had only known VRC through referral from the Licensee's auditor.

Conclusion

5.4.1.2 Considering the above listed weaknesses regarding the Licensee's outsourced arrangements, the Authority has determined that:

a) The Licensee is not in compliance with Section 7.1 c), d), e) of the SOG Outsourcing for failure to:

i. establish and document an adequate risk management framework, systems, policies and processes to assess, control and monitor its material outsourcing arrangements;

ii. establish clear responsibility for monitoring the conduct of the service providers for outsourced material functions or activities and for the delivery of respective reports to the Board;

iii. establish feasible contingency plans in the event that the outsourcing fails.

b) Furthermore, the Licensee is not in compliance with Section 8.1 of SOG Outsourcing for failure to:

i. perform, document and maintain records of due diligence assessment of VCR prior to outsourcing valuation services them. Such assessment is essential to determining that the service provider is fit and proper and can effectively perform the outsourced function, and that high ethical and professional standards are upheld by the third party.

ii. regularly, at least annually, perform, document and maintain records of due diligence assessment of all third party service providers.

Requirement (Medium Priority – MRIA):

5.4.1.3 The Authority requires the Licensee to update its outsourcing policy in accordance with the SOG Outsourcing. The revised policy should address but not limited to the following; contingency plans in the event outsourcing fails and responsibility for and frequency of monitoring effectiveness of the outsourced service providers. A copy of the revised outsourcing policy should be submitted to the Authority within **three months** from the date of the Final Inspection Report.

Also, the Authority requires the Licensee to immediately conduct an assessment of the outsourced service providers of material outsourcing functions and provide a copy of the assessment results to the Authority within **three months** from the date of the Final Inspection Report.

Management comments

5.4.1.4 The Licensee acknowledges the Authority's comments related to its outsourcing policy and with respect of the Licensee's due diligence related to outsourcing arrangements. The Licensee is currently working to expeditiously resolve to satisfy the Authority's recommendations and requests.

a.) The Licensee will update its Outsourcing policy in accordance with the SOG outsourcing to include contingency plans in the event the outsourcing fails and responsibility for the frequency of monitoring of the outsourced service providers. Within three months of the date of the Final Inspection Report, a copy of the report will be provided to the Authority. The Licensee will also immediately undertake an assessment of its outsourced service providers of material outsourced functions and provide a copy of the assessment results to the Authority within three months of the date of the Final Inspection Report.

BC SEN0000078801
11/03/21
Highly Confidential

b.) The Licensee acknowledges that an Outsourcing policy will be developed and implemented to comply with Sections 7.1 c), d), e) and 8.1 of the SOG Outsourcing and as recommended by the authority in 5.4.1.2 a) i, ii and iii, and b) i and ii.

As noted above, the Licensee will provide a copy of the policy to the Authority within three months of the Final Inspection Report. The Licensee will also conduct an assessment of its outsourced providers of material outsourced functions and provide a copy of the assessment results to the Authority within three months from the Final Inspection Report.

Authority's response

5.4.1.5 The Authority has noted management's comments and expects the Licensee to comply with the requirements stated at paragraph 5.4.1.3 within the timelines therein.

## 5.5    RISK MANAGEMENT FRAMEWORK ("RMF")

### 5.5.1    Deficiencies within the Licensee's RMF

Finding:

5.5.1.1 A review of the Licensee's RMF revealed the following deficiencies:

    i. Credit Risk

The RMF identifies Credit Risk as a significant risk that the Company is exposed to due to its investment in Collateralized Loan Obligations. The RMF indicates that the impact of the credit risk due to potential subsequent impairment of the value of the investments is mitigated by the significant interest and distributions received each quarter. Furthermore, the RMF states that Licensee is well-capitalized such that credit loss-related impairments would not be expected to have a significant impact on the Licensee. The Authority does not consider this to address the risk.

    ii. Insurance Risk

The Licensee's RMF identifies the primary components of underwriting risk as: (a) the risk of underpricing (premiums) and (b) the risk of adverse development of losses from expected ultimate losses (including the risk of under-reserving). The RMF states that the Licensee mitigates the risk of underpricing of premiums, through annual reviews of the Licensee's historical loss experience in development of any given year's premium pricing and then periodically, validates the Licensee's premium pricing against the cost of placing such coverage in the traditional insurance market. The Authority noted that the Licensee has not reported any claims from inception to date. The Authority therefore questions how it possible to use historical loss development as a basis for premium pricing when there is no loss history.

    iii. Investment risk

The RMF identifies investment risk as one of the significant risks to which the Licensee is exposed. It further asserts that the investment risk is sufficiently mitigated through compliance with the investment policy. It is the Authority's position that compliance with the Licensee's investment policy does not sufficiently mitigate and control the Licensee's investment risk. As detailed in the preceding paragraphs the Licensee does not comply with its own investment policy and in the event it were to comply, the investment policy allows the Company to invest 100% in one class of assets which will still expose the Company to concentration risk.

The RMF states that on a regular basis, the Licensee will monitor the Portfolio's compliance with the Investment Policy and will ensure the asset allocations are appropriate given liquidity needs, investment returns and market conditions. In addition, as per the RMF, the Licensee is expected to periodically produce and distribute to the board of directors a report detailing the trading activity, investment performance, risk attributes and

BC SEN0000078802
11/03/21
Highly Confidential

compliance of the investment portfolio with the investment policy. The Authority was not provided with any evidence of such reviews being conducted. In addition, the Authority noted that a minimum interval for reviews to be conducted has not been established. From the interviews with those charged with governance, the directors did not appear to understand the Authority's expectations regarding the characteristics of the various classes of investments. For instance, those charged with governance appeared misguided that CLOs were fixed income investments instead of alternative investments.

iv. Compliance risk

The RMF also identifies compliance risk as considered a material risk attendant to the Licensee. The RMF further proposes that this risk is mitigated and controlled by compliance with the Licensee's various guidelines, procedures, and controls and continuous monitoring by the Board and Management as well as communications with the Authority. The Authority does not consider this as adequate mitigation against compliance risk. As a matter of fact, on multiple instances the Authority has found the Licensee not to have policies and procedures in place and where they exist, the Authority has found such policies and procedures wanting.

v. Operational risk

The Licensee's RMF states that most of the Licensee's operational matters are outsourced and that the Board and Management have discussed the procedures and controls in place for the key service providers with those services providers; the Board is satisfied that the operational controls in place with such service providers are adequate to mitigate the limited operational risk inherent in the Licensee's captive insurance business. The Authority was not provided with any evidence of review of the effectiveness of the parties to which various functions have been outsourced by those charged with governance.

The above matters cast significant doubt as to whether those charged with governance really understand the nature of the risks attendant to the Licensee and whether they have capacity to develop, implement and maintain a system of internal controls sufficient to mitigate such risk.

Conclusion

5.5.1.2 The Licensee is in breach of Section 5.1.1 of the RRM for failure to establish and implement a RMF that adequately identifies and properly measures, assesses and monitors sources of risks that could have a material impact on the Licensee's operations.

The Licensee is in breach of Section 5.1.3 c) of the RRM for failure to establish a RMF that clearly identifies managerial responsibilities and controls, designed to ensure that the policies and procedures established for risk management are adhered to at all times.

The Licensee is in breach of section 5.3.4 of the RRM for failure to include within its established RMF a "feedback loop" to enable the board and senior management to take appropriate action in response to the changes in the risk profile of the Licensee. The meeting minutes provided by the Licensee for the purposes of the inspection did not reveal any discussions surrounding the risk management framework and how decisions made by the board and senior management are implemented and how their effects monitored to determine whether they are in fact appropriate.

The Licensee is not compliant with Section 7.3 of the SOG AMIS for failure to produce and maintain investment activity reports. Furthermore, the Licensee is not in compliance with its own established RMF as it relates to the distribution of reports detailing trading activity, investment performance, risk attributes and compliance of the investment portfolio with the investment policy, to its board.

BC SEN0000078803
11/03/21
Highly Confidential

Requirement (Medium Priority – MRA):

5.5.1.3 Within **three months** from the date of the Final Inspection report, the Licensee is required to review and approve its RMF in conformity with the RRMF. Among the salient features details of such a RMF should include but not limited to measures that adequately mitigate the identified risks attendant to the Licensee having regard to the nature, scale and complexity of the Licensee's operations. A copy of the updated RMF should be submitted to the Authority within three months from the date of the Final Inspection Report.

The Licensee is required to undertake a comprehensive review of its RMF and provide the Authority with the results of such review within **three months** from the date of the Final Inspection Report.

Within **three months** from the date of the Final Inspection Report, those charged with corporate governance should provide the Authority with a written commitment that on an on-going basis they will conduct periodic reviews of the Licensee's RMF to ensure that it adequately contemplates the risks faced by the Licensee at all times and such review to be documented and records maintained.

Management comments

5.5.1.4 The Licensee acknowledges the Authority's comments regarding the RMF and is working to revise the RMF to be in accordance with the requirements.

The Licensee, however, respectfully disagrees with the comments regarding investment risk and pertaining to the Licensee being out of compliance with its own investment policy.

The Licensee acknowledges the Authority's comments regarding its breach of the RRM and is working to revise the RMF to be in accordance with the requirements.

The Licensee also acknowledges the Authority's comment regarding compliance with Section 7.3 of the SOG AMIS. Going forward, the Licensee notes that Mr. DiOrio will be tasked with producing and disseminating investment activity reports for the board to review and discuss periodically, but not less than at least annually.

Authority's response

5.5.1.5 The Authority has noted the management's comments. However the Authority maintains its position that compliance with the Licensee's investment policy does not sufficiently mitigate and control the Licensee's investment risk. As detailed in the preceding paragraphs, the Licensee does not comply with its own investment policy and in the event it were to comply, the investment policy allows the Company to invest 100% in one class of assets which will still expose the Company to concentration risk. The Authority therefore expects the Licensee to comply with the requirements stated at paragraph 5.5.1.3 within the timelines stated therein.

## 5.6 SOLVENCY AND ACCOUNTING POLICIES

### 5.6.1 Investments valuation and accounting policies

Finding

5.6.1.1 Upon review of the audited financial statements of the Licensee as at December 31, 2017, the Authority noted the following:

a) Cumulatively, as per the audited financial statements for the year ended December 31, 2017, approximately US$41 million in investments could not be valued. The Licensee's equity as at December 31, 2017 is approximately US$39.4 million. A review of the management letter issued by the Licensee's auditors indicated that the Auditors could find sufficient appropriate evidence as to independently confirm the value of the investments. Those charged with governance could not immediately explain why necessary information could not be accessed by the Licensee's auditors to enable them independently confirm

BC SEN0000078804
11/03/21
Highly Confidential

the valuation of the investments. In the event that the unvalued investments were to be declared worthless, the Licensee would be rendered insolvent.

b) The ATE policy has the inception date of August 1, 2017 but has no definite expiration date. During an interview with those charged with governance, the Authority was informed that the policy covers two years. The director's assertion is not consistent with the definition of the "period of insurance" as stated under Section 9.18 of the ATE policy as follows:

*Period of insurance means the period which commences from the date shown on the schedule and ceases upon the occurrence of any of the following events:*

- *the legal action is concluded by a final judgment or order of the court (or any appellate court to which the court's judgment in the legal action is appealed) which also deals finally with the amount of any costs payable by the parties to the legal action;*
- *the legal action is settled on terms which also deals with the amount of any costs payable by the parties to the legal action;*
- *the legal action is transferred outside of the territorial limits;*
- *the retainer between the insured and the appointed representative ceases; or*
- *this policy is terminated or cancelled in accordance with the terms and conditions of the policy.*

It is clear from the ATE policy wording that the director's assertion that the ATE policy is for a two year period is contradictory. In addition, as per the accounting policies detailed in the audited financial statements for the year ended December 31, 2017, premiums written are recognized as earned on a pro-rata basis over the term of the policies. Based on the ATE policy definition of "period of insurance" it is the Authority's position that it is not possible to allocate policy premiums over an undefined policy period.

The above matters cast significant doubt on the existence and valuation of the above mentioned investments. In addition, it casts doubt on the reasonableness of the Licensee in determining the method of accounting for the premiums relating to the ATE coverage.

<u>Conclusion</u>
5.6.1.2 The Licensee is in breach of Section 9(1) of the Law for filing with the Authority, as part of the Licensee's annual returns, financial statements that do not conform to an internationally recognized accounting framework; impeding the Authority's ability to assess the Licensee's financial soundness.

<u>Requirement (Medium Priority – MRA):</u>
5.6.1.3 The Authority requires that Licensee to undertake valuation of all its investments and maintain record of the valuation including but not limited to the method of valuation, inputs in the valuation model and the assumptions made in the valuation process. The valuation of the investments must be verified by the Licensee's auditor as part of the audit process for the financial statements for year ended December 31, 2018 and the resultant financial statements filed with the Authority in a timely manner. In addition, the financial statements for the period ended December 31, 2018 must reflect an amended and reasonable accounting policy for the premiums relating to the ATE cover.

BC SEN0000078805
11/03/21
Highly Confidential

Management comments

5.6.1.4

a.) The Licensee acknowledges that the audit opinion for its 2017 audited financial statements was qualified for a number of valuations that could not be verified by the auditors. The majority of those securities were valued at zero by the Licensee on account of them being worthless, so there is zero risk of the securities being overvalued. There was only one investment for which the auditors could obtain evidence to value the security differently than the Licensee had. Contrary to the statement made by the Authority, this security was actually valued approximately $6.7 million higher by the auditors. The Licensee disagreed with the approach of the auditors to value the security higher and chose to have the additional valuation qualification in the audit report rather than post an adjustment management felt to be misleading of the value. Regardless, if the adjustment were posted, the surplus position would be even higher than the amount reported in the audited financial statements with only $6 million in unvalued investments, further illustrating the point held to by the Licensee that it is far from insolvent. The approach taken by the Licensee with its financial reporting, was to be more conservative so as to not overstate income or surplus.

b) The ATE policy is intentionally silent regarding a definitive expiration date. This is due to the fact that the risk period is unknown for this type of coverage. As opposed to a liability policy that is renewed on an annual basis, the ATE policy covers the unfavorable outcome of a specific litigated matter. As there is no way to know when the outcome will be reached (whether by judgement, settlement, etc.), we researched accounting issues and consulted with accounting experts in order to determine an appropriate accounting period for earning the premium. In the end the estimated risk period (determined to be 24 months), based on the information known at the inception of the policy, was determined to be the appropriate accounting period over which to earn the premium. The difference between "policy period" and "accounting period", should not be confused, for the policy period will continue until such a time as noted in the policy language. So the response by those charged with governance was correct, it was merely describing the accounting period.

If anything, the financial statements need to be modified to reflect an accounting policy that describes that the ATE premium would be earned on a pro-rata basis over originally determined risk period. The current statement in the 2017 audited financial statements is however correct, as it relates to the D&O policies.

The Licensee respectfully disagrees with the Authority's statement that it has issued financial statements that do not conform to an internationally recognized accounting framework as the financial statements are prepared in accordance with accounting principles generally accepted in the United States of America.

The Licensee does not agree with the Authority that all of the Licensee's assets need to undertake a valuation, especially as this would cause a delay in the financial audit being completed in a timely manner, but also given the difficulty with which to value certain assets. However, the Licensee is willing to work with the Authority to agree on specific investments, which are in excess of its loss reserves, that the Authority requires the Licensee to obtain valuation on.

Authority's response

5.6.1.5 From the telephone interview with Mr. Shane L. Newell of Valuation Research Corporation, the Authority was informed that the Licensee's investments that could not be valued were unlikely to recover any value. This is contradictory to the management's assertion above.

Further, the Authority disagrees with management's assertion that the Authority maybe confusing the concept of policy period and that of accounting period. The Authority reiterates its position that in estimating the accounting period over which to allocate premiums from the ATE coverage, the Licensee has to be reasonable. The reasonability test is generally based on

BC SEN0000078806
11/03/21
Highly Confidential

how closely the determined accounting period approximates the policy period. With an indefinite policy period, the reasonableness of the accounting period cannot be assessed.

The authority therefore maintains its position that the Licensee must comply with the requirements stated at paragraph 5.6.1.3.

## 5.7 POLICIES AND PROCEDURES MANUALS

### 5.7.1 No documented policies and procedures manuals

Finding:

5.7.1.1 Interviews with the Licensee's management revealed that the Licensee has not implemented and maintained operating policies and procedures manuals commensurate to the nature, scale and complexity of its operations. The Authority could therefore not establish the Licensee's internal processes and procedures for carrying out significant functions including but not limited to underwriting, claims process etc. In the absence of such operating policies and procedure manuals, it is not possible to effectively segregate incompatible functions and assign roles and responsibilities within the Licensee. As an example, the Authority could not establish who is responsible for the completion of proposal forms even though the D&O insurance policies written by the Licensee made reference to such proposal forms. Interviews with those charged with governance revealed that the Licensee's directors are under the impression that the proposal forms are the responsibility of management; management informed the Authority that there are no proposal forms completed as part of the underwriting process.

Conclusion:

5.7.1.2 The Licensee is in breach of Section 4.1, 4.2, and 4.3 of the RIC for failing to establish, implement and maintain internal controls, strategies, policies and procedures appropriate for the nature, scale and complexity of its operations.

Requirement (Low Priority – MRA):

5.7.1.3 The Licensee is required to establish written operating policies and procedures commensurate to the nature, scale and complexity of its operations. The policies and procedures adopted by the Licensee should be submitted to the Authority **within six months** from the date of the Final Inspection Report.

Management comments

5.7.1.4 The Licensee agrees to establish written operating policies and procedures commensurate to the nature, scale and complexity of its operations to comply with Sections 4.1, 4.2 and 4.3 of the RIC. A copy will be submitted to the Authority within six months from the date of the Final Inspection Report.

The Licensee agrees to establish written operating policies and procedures commensurate to the nature, scale and complexity of its operations to comply with Sections 4.1, 4.2 and 4.3 of the RIC. A copy will be submitted to the Authority within six months from the date of the Final Inspection Report.

The Licensee agrees to establish written operating policies and procedures commensurate to the nature, scale and complexity of its operations to comply with Sections 4.1, 4.2 and 4.3 of the RIC. A copy will be submitted to the Authority within six months from the date of the Final Inspection Report.

The Licensee agrees to establish written operating policies and procedures commensurate to the nature, scale and complexity of its operations to comply with Sections 4.1, 4.2 and 4.3 of the RIC. A copy will be submitted to the Authority within six months from the date of the Final Inspection Report.

Authority's response

The Authority has noted the management's comments and expects the Licensee to comply with the requirements stated at paragraph 5.7.1.3.

BC SEN0000078807
11/03/21
Highly Confidential

6 **<u>CONCLUSION</u>**

6.1 As detailed in the preceding paragraphs, 14 MRIAs and 7 MRAs were generated from the On-site Inspection's findings, based on the review of the documentation provided and the interviews conducted.

6.2 The requirements as noted in this Report are instances where the Authority has identified deficiencies of a regulatory or statutory nature and may result in a formal directive being issued by the Authority for corrective actions. The requirements as noted are intended to assist management in its efforts to strengthen the policies, procedures and internal controls of the Licensee and to ensure it is operating in accordance with the regulatory framework of the Cayman Islands. In the event they are not rectified within the specified timeframe, it may result in the Authority taking enforcement action.

BC SEN0000078808
11/03/21
Highly Confidential

7    **Appendix 1 –Table of Requirements**

7.1    The below Table sets out the requirements from the On-Site Inspection.

| Sentinel Reinsurance, Ltd. |
|---|
| |

The Authority requires that:

1.  The Licensee immediately removes the following entities from its organizational structure: Nimitz, Ltd., Patton Ltd., Elderflower Ltd., Brave Holdings Ltd. and Sentinel Re Holdings Ltd. In addition, the Authority requires that the Licensee provides the Authority with written commitment that on an ongoing basis the Licensee will communicate the Authority in an open, honest and cooperative manner, including but not limited to promptly notifying the Authority of breaches of requirements and expected standards of behavior and material changes in a timely manner. The written confirmation that the above requirements have been met must be presented to the Authority **within one month** from the date of the Final Inspection Report.  The Authority directs, pursuant to Section 23(1) of the Law, that the Licensee must **cease and desist** from transacting any insurance business until such a time that the Authority has satisfied itself that the Licensee has complied with the above requirements.

2.  Within **three months** following the date of the Final Inspection Report the Licensee appropriately amends its CGF and RMF to correct the inaccuracies on these documents and to ensure that it is compliant with SOG CG and the RRMI respectively.

3.  Within **three months** following the date of the Final Inspection Report the Licensee provides the Authority with a written commitment that on an ongoing basis, the Licensee will sufficiently review reports generated by third party service providers to ensure that such reports can be reconciled to the records of the Licensee and that matters of fact contained in such reports are accurate while matters of belief are reasonable.

4.  The Licensee develops, implements and maintains internal controls to ensure accurate recording of all policyholder information, including details about the policies written such as premiums and limits of liability etc. and that copies of the internal controls policies and procedures be provided to the Authority **within three months** following the date of the Final Inspection Report.

5.  The Licensee  develops, implements and maintains a remuneration policy in conformity with Section 5.11 of the SOG CG and that copies of the remuneration policy be provided to the Authority within three months following the date of the Final Inspection Report.

6.  **Within two months** from the date of the Final Inspection Report, the Licensee reviews and amends its CGF in accordance with the SOG CG. The Authority expects the updated CGF among other things to:

    i.    clearly define and document the roles and responsibilities allocated to the Board and Management in manner that clearly promotes an appropriate separation of the oversight function from management responsibilities.

    ii.   establish a framework for the Board to oversee management and to set appropriate quantifiable performance standards for management and ensure that management is managing the affairs of the Licensee in accordance with the strategies and policies set by the Board.

    iii.  clearly define the minimum frequency of Board meetings to deliberate the affairs of

BC SEN0000078809
11/03/21
Highly Confidential

the Licensee including how much time in advance of the meeting should the Board members be provided the agenda and other related materials and information to be considered during the meeting.

iv. In addition, no later than **two months** following the date of the Final Inspection Report, the Authority requires the Licensee to establish an appropriately skilled compliance committee or person to report directly and regularly to the board on all compliance matters relating to the Licensee and to ensure that there is proper documentation of discussions surrounding compliance.

7. **Within one month** from the date of the Final Inspection report, the Board develops implements and maintains guidelines for assessing its own effectiveness with regards achieving the Licensee's objectives. The guidelines should be documented and a copy provided to the Authority. In addition the Board should provide the Authority with a written commitment that going forward; the Board will adhere to the guidelines described in this paragraph.

8. The Licensee reviews and approves a CGF that is in conformity with the Rule on CG and the SOG CG. A copy of the revised CGF should be provided to the Authority **within three months** following the date of the Final Inspection report.

9. **Within one month** of the date of the Final Inspection Report, the Licensee provides written confirmation that going forward meeting minutes will be documented in detail capturing material decisions and considerations taken during board meetings and that meeting agendas and pertinent documentation will be saved with the corresponding meeting minutes.

10. **Within one month** from the date of the Final Inspection Report, the Licensee establishes and documents a conflicts of interest policy and a copy of the Licensee's conflicts of interest policy provided to the Authority.

11. Within two weeks from the date of the Final Inspection Report, the Licensee applies to the Authority for approval, at the Authority's discretion, for amendment to the Licensee's business plan to reflect the actual lines of business underwritten by the Licensee; including expected number of ATE policies per year together with the attendant average premiums per ATE policy.

12. **Within two weeks** from the date of the Final Inspection Report, the Authority requires those charged with governance of the Licensee to provide the Authority with a detailed description of the economic substance and business purpose of the ATE cover. The Description must among other things include the circumstances leading to the amendment of the cover's premium from US$25 million to US$68.3 million and then to US$59.3 million while maintaining the same coverage limit.

13. **Within two months** the date of the Final Onsite Inspection the Licensee provides the Authority with a written confirmation that the Licensee has developed and implemented and has instituted procedures to maintain a system of proper controls to ensure sufficient periodic review of the Licensee's business plan and to ensure that at all times the business plan reflects the true operations of the Licensee as approved by the Authority; and to provide a copy of the internal control policies and procedures to the Authority.

14. The Licensee immediately rebalances its investment portfolio such that it is compliant with the Licensee's investment policy approved by the Authority. **Within one month** from the date of the Final Inspection Report, the Licensee is required to provide the

BC SEN0000078810
11/03/21
Highly Confidential

| Sentinel Reinsurance, Ltd. |
| --- |
|  |

Authority with a written confirmation together with supporting documentation that the Licensee's investment portfolio has been rebalanced to comply with the Authority's approved investment policy. Furthermore, the Authority requires the Licensee to commit in writing that on an ongoing basis the Licensee will monitor its investment portfolio on a sufficiently regular basis to ensure the portfolio is compliant with its investment policy as approved by the Authority.

15. The Licensee to update its outsourcing policy in accordance with the SOG Outsourcing. The revised policy should address but not limited to the following; contingency plans in the event outsourcing fails and responsibility for and frequency of monitoring effectiveness of the outsourced service providers. A copy of the revised outsourcing policy should be submitted to the Authority within **three months** from the date of the Final Inspection Report.

16. The Licensee is required to immediately conduct an assessment of the outsourced service providers of material outsourced functions and provide a copy of the assessment results to the Authority within **three months** from the date of the Final Inspection Report.

17. **Within three months** from the date of the Final Inspection Report, the Licensee reviews and approves its RMF in conformity with the RRMF. Among the salient features details of such a RMF should include but not limited to measures that adequately mitigate the identified risks attendant to the Licensee having regard to the nature, scale and complexity of the Licensee's operations. A copy of the updated RMF should be submitted to the Authority **within three months** from the date of the Final Inspection Report.

18. The Licensee undertakes a comprehensive review of its RMF and provides the Authority with the results of such review **within three months** from the date of the Final Inspection Report.

19. **Within three months** from the date of the Final Inspection Report, those charged with corporate governance provide the Authority with a written commitment that on an on-going basis they will conduct periodic reviews of the Licensee's RMF to ensure that it adequately contemplates the risks faced by the Licensee at all times and such review to be documented and records maintained.

20. The Licensee undertakes valuation of all its investments and maintains records of the valuation including but not limited to the method of valuation, inputs in the valuation model and the assumptions made in the valuation process. The valuation of the investments must be verified by the Licensee's auditor as part of the audit process for the financial statements for year ended December 31, 2018 and the resultant financial statements filed with the Authority in a timely manner. In addition, the financial statements for the period ended December 31, 2018 must reflect an amended and reasonable accounting policy for the premiums relating to the ATE cover.

21. The Licensee establishes written operating policies and procedures commensurate to the nature, scale and complexity of its operations. The policies and procedures adopted by the Licensee should be submitted to the Authority **within six months** from the date of the Final Inspection Report.

BC SEN0000078811
11/03/21
Highly Confidential

8    **Appendix 2 Summary of Documents Reviewed**

8.1    The below Table sets out the items of the Licensee reviewed as part of the On-site Inspection:

| Sentinel Reinsurance, Ltd. | |
|---|---|
| **Document Title** | **Date Received** |
| 1.  Notarized Organization Chart | 31 January 2019 |
| 2.  Register of Director and Officers | 31 January 2019 |
| 3.  Unaudited Financial Statements | 31 January 2019 |
| 4.  Consolidated Trial Balance | 31 January 2019 |
| 5.  Inception-to-Date Policy Summary | 31 January 2019 |
| 6.  Updated Business Plan | 31 January 2019 |
| 7.  Corporate Governance Framework | 31 January 2019 |
| 8.  Board of Director Minutes – Changes in Directors 171208 | 31 January 2019 |
| 9.  Board of Director Minutes 141027 | 31 January 2019 |
| 10. Board of Director Minutes 151110 | 31 January 2019 |
| 11. Board of Director Minutes 160804 | 31 January 2019 |
| 12. Conflicts of Interest Policy | 31 January 2019 |
| 13. Beecher Carlson SOC1 Bridge Letter as of 1.18.2019 | 31 January 2019 |
| 14. Beecher Carlson AML CFT KYC Manual Dec 2018 | 31 January 2019 |
| 15. Beecher Carlson SOC1 Report 2018 | 31 January 2019 |
| 16. Beecher Carlson Data Retention Policy | 31 January 2019 |
| 17. Complaints Procedure BC Cayman | 31 January 2019 |
| 18. Outsourced Service Providers | 31 January 2019 |
| 19. Agreement between BC Cayman and BC Insurance Services LLC. | 31 January 2019 |
| 20. Risk International Actuarial Engagement Letter | 31 January 2019 |

BC SEN0000078812
11/03/21
Highly Confidential

| | |
|---|---|
| 21. IMS Director Service Agreement | 31 January 2019 |
| 22. Compass OFM Director  Service Agreement | 31 January 2019 |
| 23. VRC Portfolio Valuation Engagement Letter | 31 January 2019 |
| 24. VRC Non-disclosure Agreement | 31 January 2019 |
| 25. CIBC Custody Agreement | 31 January 2019 |
| 26. Solomon Harris Terms of Engagement Letter | 31 January 2019 |
| 27. Beecher Carlson Captive Management Agreement | 31 January 2019 |
| 28. Bank Account Listing | 31 January 2019 |
| 29. CIBC Appointment of Bankers and Mandate to Bank International Corporate Banking | 31 January 2019 |
| 30. Beecher Carlson Catastrophe Preparedness and Recovery Plan | 31 January 2019 |
| 31. Risk Management Framework | 31 January 2019 |
| 32. Management Letter | 31 January 2019 |
| 33. ISA 260 Letter | 31 January 2019 |
| 34. Audited Financial Statements | 31 January 2019 |
| 35. Actuarial Report FINAL | 31 January 2019 |
| 36. AML Certificate Training Logs (2017 & 2018) | 31 January 2019 |
| 37. AML Training Certificates for BC employees | 31 January 2019 |
| 38. Beecher Carlson AML Training Index | 31 January 2019 |
| 39. Director Resolutions- zip file | 4 March 2019 |
| 40. Signed Conflict of Interest | 4 March 2019 |
| 41. ATE Policy endorsements | 11 March 2019 |
| 42. CIBC Signature Card | 4 March 2019 |
| 43. ISQ | 31 January 2019 |
| 44. D&O Policy documents 2015-2016, zip file | 4 March 2019 |

BC SEN0000078813
11/03/21
Highly Confidential

| | |
|---|---|
| 45. D&O policy documents 2014-2015; 2016-2018, zip file | 4 March 2019 |
| 46. ATE Policy document 2017-2019 | 4 March 2019 |
| 47. Revised Organizational Chart | 27 February 2019 |
| 48. SARS Log | 11 March 2019 |

BC SEN0000078814
11/03/21
Highly Confidential



FINAL AML/CFT AND SANCTIONS INSPECTION REPORT FOR:

**SENTINEL REINSURANCE, LTD.**

Conducted on:

4 March 2019 to 11 March 2019

Issued on:

6 May 2019

**PREPARED BY:**

INSURANCE SUPERVISION DIVISION

This AML/CFT and Sanctions Inspection Report ("Report") and its contents are the property of the Cayman Islands Monetary Authority (the "Authority"). This Report and its contents may not be shared with any other person other than those persons named in the front of this report and the Licensee's external auditors without the prior written consent of the Cayman Islands Monetary Authority. Copyright 2019.

BC SEN0000078815
11/03/21
Highly Confidential

**TABLE OF CONTENTS**

1. EXECUTIVE SUMMARY...............................................................3

2 THE AUTHORITY AND PURPOSE OF THE ON-SITE INSPECTION ............................3

3 SCOPE STATEMENT ...............................................................4

4 METHOD OF ASSESSMENT .........................................................4

5 INSPECTION FINDINGS ...........................................................4

5.1 INTRODUCTION TO FINDINGS .....................................................4

5.2 AML FINDINGS .................................................................5

5.2.1 Source of Funds ...........................................................5

5.2.2 Due Diligence/ KYC ........................................................9

6 CONCLUSION ...................................................................10

7 APPENDIX 1 –TABLE OF REQUIREMENTS ............................................10

8 APPENDIX 2 –SUMMARY OF DOCUMENTS REVIEWED ...................................11

BC SEN0000078816
11/03/21
Highly Confidential

# 1. EXECUTIVE SUMMARY

1.1 The Cayman Islands Monetary Authority (the "Authority") conducted an on-site inspection (the "On-site Inspection") at the offices of Sentinel Reinsurance, Ltd. (the "Licensee") from 4 March 2019 to 11 March 2019.

1.2 The objective of the On-site Inspection was to assess the AML/CFT and Sanctions internal control systems, policies and procedures and any other applicable AML/CFT and Sanctions risk areas.

1.3 Results from the On-site Inspection revealed deficiencies in:
   (1) On-going monitoring of clients;
   (2) Risk rating of clients; and
   (3) Establishment of source of funds for premium payments.

   Please see the Appendix 1 of this Report for a listing of the requirements arising from the On-site Inspection.

1.4 The requirements cited in this Report are to be addressed urgently in order to rectify instances where the Authority has identified deficiencies of a regulatory or statutory nature. In addition, the requirements specified in this Report are intended to strengthen the policies, procedures and internal controls of the Licensee and to ensure they are operating in accordance with the regulatory framework of the Cayman Islands. The requirements also enable the directors and management of the Licensee to focus on matters warranting corrective attention.

1.5 The requirements should be implemented within the time frames specified. The Authority further requires monthly update reports from the Licensee until the requirements have been fully implemented.

# 2 THE AUTHORITY AND PURPOSE OF THE ON-SITE INSPECTION

2.1 The On-site Inspection was conducted in accordance with the Authority's powers and duties provided under section 6(1)(b) of the Monetary Authority Law (2018 Revision) (the "MAL") and section 22(1)(b) of *the Insurance Law 2010 (the "Law")*. The On-site Inspection was carried out in order to assess the Licensee's AML/CFT and Sanctions internal control systems, policies and procedures and any other applicable AML/CFT and Sanctions risk areas. In particular compliance with the following laws, regulations, rules and guidance notes was assessed:
   (1) the MAL;
   (2) the Law;
   (3) the Guidance Notes on the Prevention and Detection of Money Laundering and Terrorist Financing in the Cayman Islands, December 2017 (the "AML Guidance Notes"); and
   (4) the Proceeds of Crime Law, (2019 Revision) ("POCL")

BC SEN0000078817
11/03/21
Highly Confidential

3    **SCOPE STATEMENT**

3.1    The objectives of the On-site Inspection were to assess the Licensee's AML/CFT and Sanctions internal control systems, policies and procedures and any other applicable AML/CFT and Sanctions risk areas. Analysis of these areas allowed the Authority to gain a better understanding of the Licensee's operations, from within the Cayman Islands and to determine whether it is in compliance with the laws, regulations, rules and guidance notes set out at 2.1 above.

3.2    The On-site Inspection was not intended to be a financial audit. The Authority relies on the work of the external auditors, with respect to the fairness of the financial statements.

3.3    The On-site Inspection was conducted for regulatory purposes only.

4    **METHOD OF ASSESSMENT**

4.1    The On-site Inspection was conducted by reviewing the Licensee's policies and procedures to ensure consistency with the applicable laws, regulations, regulatory rules and/or statements of guidance.

4.2    The On-site Inspection included a review of items provided to the Authority by the Licensee. Please see Appendix 2 for a list of the items received and reviewed.

4.3    Additionally, interviews were conducted with the following representatives:

(1)    Mr. Clayton Price, General Manager at Beecher Carlson Cayman Ltd., 8 March 2019
(2)    Mr. Thomas Adamczak, Beecher Carlson Cayman Ltd., 7 March 2019
(3)    Mr. Damien Austin, Independent Director, Sentinel Reinsurance, Ltd., 8 March 2019
(4)    Mr. Matthew DiOrio, Executive Director, Sentinel Reinsurance, Ltd., 8 March and 12 March 2019

5    **INSPECTION FINDINGS**

5.1    **INTRODUCTION TO FINDINGS**

5.1.1    The paragraphs below detail a number of findings. The corrective actions required for each finding are classified as requirements. The requirements and corresponding priority levels cited in this report arise where there is regulatory or statutory concern. Matters Requiring Immediate Attention ("MRIA") in the Report are structured as "High Priority" and Matters Requiring Attention ("MRA) are identified as "Medium Priority" or "Low Priority". The requirements that are set out below must be adopted and implemented by the Licensee within the time frames specified under each requirement or if no timeframe is stipulated, within three (3) months of receipt of the final inspection report. The requirements are intended to assist the Licensee in strengthening its internal controls and policies and procedures. The Authority also requires monthly update report from the Licensee until the requirements have been fully implemented. The monthly update report should indicate the status of the requirements, the remedial actions taken by the Licensee and the estimated completion date. If the implementation of any requirements is delayed beyond the dates stipulated in this Report, it should be brought to the attention of the Authority and highlighted in the monthly report.

BC SEN0000078818
11/03/21
Highly Confidential

## 5.2    AML FINDINGS

### 5.2.1    Source of Funds

Finding

5.2.1.1  On August 1, 2017, the Licensee entered into an insurance contract to provide ATE cover to Highland CDO Opportunity Master Fund, LP, Highland CDO Holding Company and Highland Special Opportunities Holding Company; all affiliates of SAS Asset Recovery. The premium for the coverage was initially set at US$25 million with an indemnity limit of US$100 million. Subsequently an undated endorsement was effected adjusting the premium for the coverage to US$68.3 million consisting of US$11 million in cash, US$1.8 million in miscellaneous receivables and US$55.5 million in investment portfolio. Further, subsequently, another undated endorsement was effected reducing the premium for the coverage and the indemnity limit to US$59.3 million and US$91 million respectively. US$9 million was set aside as prepaid fund to cover risk mitigation costs including but limited to legal defense costs for a then ongoing case. Those charged with governance could not explain why the premium was adjusted from US$25 million to US$68.3 million without a commensurate adjustment to the indemnity limit provided or why the initial pricing for the policy was subsequently deemed not sufficient.

The US$68.3 million stemming from the transaction described above increased the Licensee's investment portfolio from US$12 million as December 31, 2016 to US$86 million as at December 31, 2017. Included in the US$86 million is approximately US$37 million being funds invested in Highland Multi-Strategy Credit Fund, Ltd., a hedge fund affiliated to Highland Capital Management, L.P. The US$37 million is part of the US$55.5 million transferred to the Licensee in part fulfilment of the premium payment for the ATE cover. The audit opinion on the financial statements for the year ended December 31, 2017, was qualified partly on the basis that the investment in Highland Multi-Strategy Credit Fund, Ltd. could not be valued. Those charged with the Licensee's governance, could not explain the basis upon which the investments had been valued on or about August 1, 2017 for the purpose of premium settlement. Also, they could not explain the reason why the information that was relied on to value the investments for the purpose of premium settlement could not be readily provided to the auditors upon request considering that the policy inception and the financial statements audit were only a few months apart.

In addition, those charged with governance could not explain where the ownership in the US$68.3 million in investments and cash vested prior to being transferred to the Licensee for settlement of the ATE coverage premium.

The above matters cast significant doubt on the economic substance and business purpose of the transactions relating to the ATE coverage.

Conclusion:

5.2.1.2  The Licensee is not compliant with Section 1(c)(3) of the AML Guidance Notes for failure to demonstrate understanding of the source of funds and for failure to explain the ownership of the premium prior to being transferred to the Licensee for settlement of the ATE coverage premium.

BC SEN0000078819
11/03/21
Highly Confidential

Requirement (High Priority – MRIA):

5.2.1.3 **Within two weeks** from the date of the Final Inspection Report, the Authority requires the Licensee to provide the Authority with a written explanation of the ownership of the US$68.3 million used in settlement of the ATE policy premiums prior to being transferred to the Licensee. The explanation should be supported by evidence of ownership of the investments and cash prior to transfer to the Licensee and the basis of valuation at the point of transferring the assets to the Licensee.

Management comments

5.2.1.4 At the time the ATE policy was drafted, premium had been established at $25 million based on a pricing study conducted by the Licensee's actuary. The insureds did not have sufficient cash to pay the $25 million in premium without having to dispose of certain investments held. It was determined that as consideration for the premium receivable, the insureds would transfer all assets: cash, securities, and miscellaneous receivables, to the Licensee. The market value of the assets transferred was unknown at the time of transfer, but could potentially exceed the $25 million of receivable owed on the ATE policy. The decision to accept the assets as full payment of premium receivable was largely due to the nature of the securities. As there exists a limited market for the securities, the need for a quick sale would be considered a distressed sale and would likely result in a below market return for the securities. From the Licensee's standpoint, they could in turn, hold the securities and find a more optimal time to dispose of the securities, such that the proceeds would more accurately reflect a market return. As the value of the total assets received was unknown, the policy premium was finalized at $25 million. The Licensee, on the recommendation of the Insurance Manager, Beecher Carlson, would engage an independent investment valuation expert should the ATE policy be executed and the investments be transferred.

Once the assets were transferred to the Licensee, Valuation Research Corp (VRC) was engaged to value the assets. The CLOs were determined to be assets with value that neither generated its own Net Asset Value (NAV), nor were traded on a stock exchange. The remaining transferred assets were determined to be worthless and would be carried at $0 on the Licensee's books. Once valuations were completed, the final value of the transferred assets was determined to be approximately $68.3 million, which was higher than the original $25 million ATE premium. Financial statements had initially been prepared assuming and transferred asset value in excess or below the original $25 million of premium would be recorded as a gain or loss on the transaction in the Licensee's books. It was at the recommendation of the auditors that the proper way to record the transfer was to record the premium for the full value of the transferred assets and correspondingly amend the policy.

Premium was being earned over the appropriate risk period with IBNR being accrued over the same period toward the actuarially determined ultimate loss pick. During testing of the loss activity, the auditors raised the issue of needing to record the full actuarially determined ultimate loss up front, instead of over the appropriate risk period. This was due to the fact that there had been payments made on the ATE policy related to defense of the litigated matter, and under GAAP, payment of claims expenses triggered the "loss event", requiring the full loss to be recognized. During discussions with the client, it came into light that the ATE coverage is to provide protection against an unfavorable outcome of a particular litigated matter and any payments made prior to that outcome (settlement, decision, etc.), are simply risk-mitigation costs (costs incurred to prevent a loss event). As

BC SEN0000078820
11/03/21
Highly Confidential

a result, the estimated risk mitigation costs were removed from the indemnity limit and recorded separately as Pre-funded Risk Mitigation costs. The policy was subsequently amended to reflect this adjustment.

Initial pricing was not deemed to be insufficient though any of these transactions. Discussions were held with the actuary to determine if this posed any problems from the standpoint of risk transfer and it was determined that there still was a sufficient chance of a full limit loss.

## Highland Multi-Strategy Credit Fund, Ltd

Highland Multi-Strategy Credit Fund, Ltd. (the Fund) is a security held by the Licensee, a portion of which was transferred in as premium on the ATE policy. As part of the inter-workings of the Fund, once the Licensee took ownership of the Fund shares, the expense rate tied to the shares went from one of no fees assessed, one that charges fees. In the process, the shares were essentially revalued at $1000 per share NAV with the corresponding change in value increasing the number shares held. This resulted in no net change to the Licensee's holding value. What it did do though, was cause the holdings to have a lower NAV than all other shares within the Fund. This caused a disconnect as the auditors, in their valuation testing utilizing the audited financial statements of the Fund, calculated a holding to the Licensee of an amount approximately $6.7 million higher than the Licensee's actual holding. As the Licensee believes its holding is correct (while conservatively lower than the auditor's calculation), chose not to post an adjustment to artificially inflate the value. The result was part of the qualification to the auditor's report for valuation.

As explained above, the basis for the valuation of the transferred assets on or about August 1, 2017 is due to valuations obtained from VRC for investments that neither generate their own NAV, nor are traded on a stock exchange. As the Fund generates its own NAV, it was not one the securities valued by VRC.

Furthermore, the information relied on by the Licensee to value the holdings of the securities transferred to the Licensee as settlement of premium receivable, including the Fund, were provided to the auditors. The auditors were unable to rely on the information as their calculation utilizing the audited financial statements of the Fund yielded a materially different result, albeit a much larger result.

## Prior ownership of transferred assets

The entire portfolio of assets, consisting of cash, securities, and miscellaneous receivables transferred to the Licensee in lieu of cash for payment of premiums, were previously owned by Highland CDO Opportunity Master Fund, L.P.; Highland CDO Opportunity Fund, Ltd.; Highland CDO Holdings Company; Highland Special Opportunities Holding Company; Highland Financial Corp.; and Highland Financial Partners, L.P. (the ATE Insureds).

We will provide a formal response regarding the ownership of the assets prior to transfer to the Licensee as well as provide documents supporting that ownership.

The Licensee acknowledges that it had not undertaken documenting the ownership of premiums prior to being transferred to the Licensee for settlement of the ATE program. Furthermore the Licensee does not agree that it is out of compliance with Section 1(c)(3) of the AML Guidance Notes as the policyholder is within a common Financial Group as the insured is controlled by an individual who is also an ultimate beneficial owner of the

BC SEN0000078821
11/03/21
Highly Confidential

Licensee. Furthermore it should be noted that the premium was for a policy that is not Long Term business being general insurance. Additionally, the insurance manager has reviewed the payment transaction with a view of whether any triggers exist for a SARs report and has filed that "no suspicious activities have occurred" with the insurance manager's AMLRO (ref item 28, page 10 of the Draft AML/CFT and Sanctions Inspection Report). However, for the embracement of best practices, the insurance manager of the Licensee in future will conduct reviews such as Lexis/Nexis and maintain such documentation of these reviews on the policyholders on file.

The Licensee will within two weeks from the date of the Final Inspection Report, provide to the Authority, a written explanation of the ownership of the $68.3 million used as settlement of the ATE policy premiums which will be supported by evidence of ownership of the cash and investments prior to transfer to the Licensee, as well as the basis of the valuation at the point of transfer to the Licensee.

<u>Authority's response</u>

5.2.1.4   On April 4, 2019, the Authority held a telephone interview with Mr. Jason D. Stubbs of Risk International; the Licensee's actuary. During the interview, Mr. Stubbs informed the Authority that he was not involved in the determination of premium pricing for the Licensee to any extent at all, but rather his role was limited to technical reserving. He added that his involvement arose after premium decisions had been finalized by the Licensee. The Authority notes with concern that the management's assertion that the ATE policy premium of US$25 million was established based on a pricing study conducted by the Licensee's actuary contradicts the actuary's position.

As per management's assertion above, apart from CLOs, all other assets transferred to the Licensee in settlement of the ATE policy premium were worthless. From the audited financial statements as at December 31, 2017, the investments balance carried forward as at December 31, 2016 was approximately US$13 million of which approximately US$6.5 million were CLOs. As at December 31, 2017, the CLOs were valued at a fair market value of approximately US$31 million being the opening balance plus those transferred to the Licensee during the year. From the statement of cash flows for the year ended December 31, 2017, there were no significant disposals of investments during the year 2017. It therefore follows that the total value of the investments transferred to the Licensee in settlement of the premiums for the ATE policy was approximately US$24.5 million being the approximately US$31 million in CLOs as at the December 31, 2017 less the approximately US$6.5 million opening balance. It therefore puzzles the Authority, what accounts for the difference between the approximately US$13 million of investments at the end of the year 2016 and the approximately US$86.6 million worth of investments carried at the end of the year 2017 if only approximately US$24.5 million worth of investments was transferred to the Licensee during the year?

In addition, in any case, to amend an insurance policy to artificially inflate the premium amount to equal the value of the investments transferred to the Licensee without any justifiable business purpose and economic substance is at the very least questionable.

Further, the Authority maintains its position that within **two weeks** from the date of the this report, the Authority requires the Licensee to provide the Authority with a written explanation of the ownership of the US$68.3 million used in settlement of the ATE policy premiums prior to being transferred to the Licensee. The explanation should be supported

BC SEN0000078822
11/03/21
Highly Confidential

by evidence of ownership of the investments and cash prior to transfer to the Licensee and the basis of valuation at the point of transferring the assets to the Licensee.

## 5.2.2    Due Diligence/ KYC

Findings:

5.2.2.1    From interviews with management and those charged with the Licensee's governance, the Authority was informed that the Licensee relies on the AML Compliance procedures of the Insurance Manager, Beecher Carlson Cayman Ltd. The Insurance manager's AML Compliance Manual states that an assessment of clients for the risk of money laundering will be performed before a client relationship is established and on an ongoing basis throughout the relationship. The Insurance Manager's AML Compliance Manual further states that all clients are assigned a risk rating and the frequency of the review of the clients' risk rating is dependent on the risk rating assigned with normal risk clients reviewed every two years and higher risk clients annually. From the interviews conducted with the Insurance Manager, the Authority was informed that no such risk rating reviews have been performed by the Insurance Manager on the Licensee's policyholders and that no on-going monitoring of the Licensee's policyholders is ever done.

In addition, whereas the Insurance Manager's AML Compliance Manual asserts that the Insurance Manager uses a risk-based approach, the Authority was not provided with any documented risk assessment process applied during client acceptance. All policyholders are classified as "Low Risk" without any documented rationale.

Conclusion

5.2.2.2    The Licensee is not in compliance with Section 3(A)(1) of the AML Guidance Notes for failure to develop/adopt, implement and maintain a commensurate risk-based approach to client onboarding and ongoing monitoring sufficient to ensure that AML/CFT risk are identified and adequately mitigated.

Requirement (High Priority – MRIA)

5.2.2.3    **Within three months** from the date of the Final Inspection Report, the Authority requires the Licensee to develop, implement and establish procedures to maintain a risk-based approach to AML/CFT risk rating of the Licensee's policyholders and ongoing monitoring thereafter. A copy of the AML/CFT risk rating framework should be provided to Authority **within three months** from the date of the Final Inspection Report. All the Licensee's policyholders must be risk-rated, and the results of the risk-rating process provided to the Authority **within six months** from the date of the Final Inspection Report.

Management response

5.2.2.4    The Licensee acknowledges the Authority's finding and will update the RMF to include a rational for the risk based rating process.

The Licensee acknowledges that it is not in compliance with Section 3(A)(1) of the AML Guidance Notes and will take appropriate action to ensure that it is.

The Licensee will within three months from issuance of the Final Inspection Report develop, implement, and establish, as part of its RMF, a scoring process as a risk based approach to AML/CFT risk rating of the Licensee's policyholders. A copy of the AML/CFT risk rating framework will be provided to the Authority within three months from the date of the Final Inspection Report and all policyholders will be risk rated, documenting the results of the risk rating process, which will be provided to the Authority within six months from the date of the Final Inspection Report. As noted above, Licensee wishes for the Authority to take note that all current policyholders are within the same Financial Group as the Licensee with the same Ultimate Beneficial Owner as the Licensee.

Authority's response

5.2.2.5    The Authority has noted management's response and expects the Licensee to comply with the requirements stated at paragraph 5.2.2.3 within the timelines stated therein.

BC SEN0000078823
11/03/21
Highly Confidential

6      **CONCLUSION**

6.1    As detailed in the preceding paragraphs, two (2) MRIAs were generated from the On-site Inspection's findings, based on the review of the documentation provided and the interviews conducted.

6.2    The requirements as noted in this Report are instances where the Authority has identified deficiencies of a regulatory or statutory nature and may result in a formal directive being issued by the Authority for corrective actions. The requirements as noted are intended to assist management in its efforts to strengthen the policies, procedures and internal controls of the Licensee and to ensure it is operating in accordance with the regulatory framework of the Cayman Islands. In the event they are not rectified within the specified timeframe, it may result in the Authority taking enforcement action.

7      **Appendix 1 –Table of Requirements**

7.1    The below Table sets out the requirements from the On-Site Inspection.

| Name of Licensee |
|---|
| |
| The Authority requires that:<br><br>1. **Within two weeks** from the date of the Final Inspection Report, the Licensee provides the Authority with a written explanation of the ownership of the US$68.3 million used in settlement of the ATE policy premiums prior to being transferred to the Licensee. The explanation should be supported by evidence of ownership of the investments and cash prior to transfer to the Licensee and the basis of valuation at the point of transferring the assets to the Licensee.<br><br>2. **Within three months** from the date of the Final Inspection Report, the Authority requires the Licensee to develop, implement and establish procedures to maintain a risk-based approach to AML/CFT risk rating of the Licensee's policyholders and ongoing monitoring thereafter. A copy of the AML/CFT risk rating framework should be provided to Authority **within three months** from the date of the Final Inspection Report. All the Licensee's policyholders must be risk-rated, and the results of the risk-rating process provided to the Authority **within six months** from the date of the Final Inspection Report. |

BC SEN0000078824
11/03/21
Highly Confidential

8      **Appendix 2 –Summary of Documents Reviewed**

8.1    The below Table sets out the items of the Licensee reviewed as part of the On-site Inspection:

| Sentinel Reinsurance, Ltd. | |
|---|---|
| **Document Title** | **Date Received** |
| 1.  Notarized Organization Chart | 31 January 2019 |
| 2.  Register of Director and Officers | 31 January 2019 |
| 3.  Unaudited Financial Statements | 31 January 2019 |
| 4.  Consolidated Trial Balance | 31 January 2019 |
| 5.  Inception-to-Date Policy Summary | 31 January 2019 |
| 6.  Updated Business Plan | 31 January 2019 |
| 7.  Corporate Governance Framework | 31 January 2019 |
| 8.  Board of Director Minutes – Changes in Directors 171208 | 31 January 2019 |
| 9.  Board of Director Minutes 141027 | 31 January 2019 |
| 10. Board of Director Minutes 151110 | 31 January 2019 |
| 11. Board of Director Minutes 160804 | 31 January 2019 |
| 12. Conflicts of Interest Policy | 31 January 2019 |
| 13. Beecher Carlson SOC1 Bridge Letter as of 1.18.2019 | 31 January 2019 |
| 14. Beecher Carlson AML CFT KYC Manual Dec 2018 | 31 January 2019 |
| 15. Beecher Carlson SOC1 Report 2018 | 31 January 2019 |
| 16. Beecher Carlson Data Retention Policy | 31 January 2019 |
| 17. Complaints Procedure BC Cayman | 31 January 2019 |
| 18. Outsourced Service Providers | 31 January 2019 |
| 19. Agreement between BC Cayman and BC Insurance Services LLC. | 31 January 2019 |
| 20. Risk International Actuarial Engagement Letter | 31 January 2019 |

BC SEN0000078825
11/03/21
Highly Confidential

| | |
|---|---|
| 1. IMS Director Service Agreement | 31 January 2019 |
| 2. Compass OFM Director Service Agreement | 31 January 2019 |
| 3. VRC Portfolio Valuation Engagement Letter | 31 January 2019 |
| 4. VRC Non-disclosure Agreement | 31 January 2019 |
| 5. CIBC Custody Agreement | 31 January 2019 |
| 6. Solomon Harris Terms of Engagement Letter | 31 January 2019 |
| 7. Beecher Carlson Captive Management Agreement | 31 January 2019 |
| 8. Bank Account Listing | 31 January 2019 |
| 9. CIBC Appointment of Bankers and Mandate to Bank International Corporate Banking | 31 January 2019 |
| 10. Beecher Carlson Catastrophe Preparedness and Recovery Plan | 31 January 2019 |
| 11. Risk Management Framework | 31 January 2019 |
| 12. Management Letter | 31 January 2019 |
| 13. ISA 260 Letter | 31 January 2019 |
| 14. Audited Financial Statements | 31 January 2019 |
| 15. Actuarial Report FINAL | 31 January 2019 |
| 16. AML Certificate Training Logs (2017 & 2018) | 31 January 2019 |
| 17. AML Training Certificates for BC employees | 31 January 2019 |
| 18. Beecher Carlson AML Training Index | 31 January 2019 |
| 19. Director Resolutions- zip file | 4 March 2019 |
| 20. Signed Conflict of Interest | 4 March 2019 |
| 21. ATE Policy endorsements | 11 March 2019 |
| 22. CIBC Signature Card | 4 March 2019 |
| 23. ISQ | 31 January 2019 |
| 24. D&O Policy documents 2015-2016, zip file | 4 March 2019 |

BC SEN0000078826
11/03/21
Highly Confidential

| | |
|---|---|
| 25. D&O policy documents 2014-2015; 2016-2018, zip file | 4 March 2019 |
| 26. ATE Policy document 2017-2019 | 4 March 2019 |
| 27. Revised Organizational Chart | 27 February 2019 |
| 28. SARS Log | 11 March 2019 |

BC SEN0000078827
11/03/21
Highly Confidential



**CAYMAN ISLANDS MONETARY AUTHORITY**
**INSURANCE SUPERVISION DIVISION**

**Acknowledgement Signature Sheet**

We, the undersigned members of the Board of Sentinel Reinsurance, Ltd. acknowledge that we have received copies of the May 2019 Final Inspection Reports which resulted from the inspection conducted in or during 4 March 2019 to 11 March 2019 and that we have been given an opportunity to ask questions related to the inspection**:**

| Name | Position on the Board of Directors | Signature | Date |
|---|---|---|---|
| **Matthew DiOrio** | Director | | |
| **Dilip Massand** | Director | | |
| **Damien Austin** | Director | | |
| **Jan Neveril** | Director | | |

**BC SEN0000078828**
**11/03/21**
**Highly Confidential**