

Planet Depos®
We Make It *Happen*™

# Transcript of James Dondero

**Date:** May 10, 2021
**Case:** UBS Securities LLC, et al. -v- Highland Capital Management, L.P.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**1**

```
1        IN THE UNITED STATES BANKRUPTCY COURT
2         FOR THE NORTHERN DISTRICT OF TEXAS
3                  DALLAS DIVISION
   --------------------------------X
4   In re              : Chapter 11
5   HIGHLAND CAPITAL MANAGEMENT, L.P., Case No:
6             Debtor    : 19-34054-SGJ11
7   --------------------------------:
8   UBS SECURITIES LLC and UBS AG   : Adversary No.
9   LONDON BRANCH,     : 21-03020-sgi
10            Plaintiffs,  :
11       vs.             :
12  HIGHLAND CAPITAL MANAGEMENT, L.P. :
13            Defendant.  :
14  --------------------------------X
15
16       DEPOSITION OF JAMES DONDERO
17    APPEARING REMOTELY FROM DALLAS, TEXAS
18         MONDAY, MAY 10, 2021
19           11:00 A.M. EST
20
21
22  Job No.: 371141
23  Pages 1 - 267
24  Reported by: Adrienne Mignano, RPR
25  Appearing remotely
```

**2**

```
1       Deposition of JAMES DONDERO, held via Zoom
2   videoconferencing, pursuant to Notice, before Adrienne
3   M. Mignano, a Registered Professional Reporter and a
4   Notary Public in and for the State of New York.
```

**3**

```
1              A P P E A R A N C E S
2
3   ON BEHALF OF PLAINTIFFS:
4       ANDREW CLUBOK, ESQUIRE
5       SARAH TOMKOWIAK, ESQUIRE
6       KATHRYN GEORGE, ESQUIRE
7       LATHAM & WATKINS LLP
8       555 Eleventh Street, NW
9       Suite 1000
10      Washington, District of Columbia 20004
11      (202) 637-2200
12
13
14  ON BEHALF OF DEFENDANT-HIGHLAND CAPITAL MGMT.
15      ROBERT FEINSTEIN, ESQUIRE
16      JOHN MORRIS, ESQUIRE
17      GREGORY DEMO, ESQUIRE
18      JEFFREY POMERANTZ, ESQUIRE
19      PACHULSKI STANG ZIEHL & JONES
20      780 Third Avenue
21      34th Floor
22      New York, New York 10017
23      (212)561-7700
24
25
```

**4**

```
1           APPEARANCES (Continued)
2
3
4   ON BEHALF OF WITNESS
5       CLAY TAYLOR, ESQUIRE
6       BONDS ELLIS EPPICH SCHAFER JONES, LLP
7       420 Throckmorton Street
8       Suite 1000
9       Fort Worth, Texas 76102
10      (817)405-6900
11
12
13  ALSO PRESENT:
14  Drew Halton - Videographer
15  Jordan Collins - Remote Technician
16  Joshua Tubbs - Remote Technician
17
18
19
20
21
22
23
24
25
```

Page 5

```
1              C O N T E N T S
2
3   EXAMINATION OF JAMES DONDERO             PAGE
4   By Mr. Clubok                              8
5
6
7              E X H I B I T S
8   (Confidential- Not Attached to the Transcript)
9   DEPOSITION EXHIBIT                        PAGE
10  Exhibit 23  Subpoena                       63
11  Exhibit 24  E-mail dated May 6, 2021       66
12  Exhibit 25  Revised unaudited financial   127
13              statements
14  Exhibit 26  One-page Document identifying 163
15              entities connected to Sentinel
16  Exhibit 27  E-mail chain                  172
17  Exhibit 28  E-mail                        184
18  Exhibit 29  Document Bates stamped        204
19              HCMUBS005324
20  Exhibit 30  Document Bates numbered 5322  211
21  Exhibit 31  Letter from McKool Smith dated 231
22              October 19, 2018
23
24
25
```

Page 6

1    REMOTE TECH:  Thank you to everyone for
2  attending this proceeding remotely, which we
3  anticipate will run smoothly.  Please remember to
4  speak slowly and do your best not to talk over one
5  another.
6    Please be aware we are recording this
7  proceeding for backup purposes.  Any
8  off-the-record discussions should be had away from
9  the computer.  Please remember to mute your mic
10  for those conversations.
11    Please have your video enabled to help
12  the reporter identify who is speaking.  If you are
13  unable to connect with video and are connecting
14  via phone, please identify yourself each time
15  before speaking.
16    I apologize in advance for any
17  technical-related interruptions.  Thank you.
18    THE VIDEOGRAPHER:  Here begins Tape
19  Number 1 in the videotaped deposition of James
20  Dondero in the matter of UBS Securities LLC, et
21  al. versus Highland Capital Management LP in the
22  U.S. Bankruptcy Court, Northern District of Texas,
23  Dallas Division; Case Number 19-34054-SGJ11.
24    Today's date is May 10th, 2021.  The
25  time on the video monitor is 11:05 a.m. Eastern.

Page 7

1  The videographer today is Drew Halton,
2  representing Planet Depos.  All participants are
3  attending remotely.
4    Would counsel please voice identify
5  themselves and state whom they represent.
6    MR. CLUBOK:  On behalf of UBS, it is
7  Andrew Clubok, Sarah Tomkowiak and Kathryn George,
8  all from Latham & Watkins LLP.
9    MR. FEINSTEIN:  On behalf of the
10  defendant, Highland Capital Management, I'm Robert
11  Feinstein from Pachulski, Stang, Ziehl & Jones.
12  With me are my colleagues, Jeffrey Pomerantz, John
13  Morris and Gregory Demo.
14    MR. TAYLOR:  Clay Taylor on behalf of
15  Jim Dondero, appearing pursuant to a subpoena
16  issued to a third-party.
17    Just for purposes of a clean record, I
18  believe the case number that was identified was
19  the main bankruptcy case number rather than the
20  adversary number, and that probably needs to be
21  corrected.
22    THE VIDEOGRAPHER:  Sir, if you have
23  that available, would you mind reading that into
24  the record now?
25    MR. TAYLOR:  Certainly.

Page 8

1    THE VIDEOGRAPHER:  Thank you.
2    MR. TAYLOR:  One second, please.  Just
3  pulling it up.
4    MR. CLUBOK:  I believe it is Number
5  21-03020-SGJ.
6    MR. TAYLOR:  Thank you, Andy.
7    THE VIDEOGRAPHER:  The court reporter
8  today is Adrienne Mignano, representing Planet
9  Depos.
10    Would the reporter please swear in the
11  witness.
12  Whereupon,
13    JAMES DONDERO,
14  being first duly sworn or affirmed to testify to
15  the truth, the whole truth, and nothing but the
16  truth, was examined and testified as follows:
17    EXAMINATION BY COUNSEL FOR THE PLAINTIFF
18  BY MR. CLUBOK:
19    Q   Good morning, Mr. Dondero.
20    A   Good morning.
21    Q   Mr. Dondero, you have been deposed
22  before, correct?
23    A   Yes.
24    Q   Many times, right?
25    A   Yes.

**9**

1    Q   And you understand that in a deposition
2 we have to be careful not to talk over each other,
3 right?
4    A   **Yes.**
5    Q   If either of us -- if I find either of
6 us doing that, like if I start talking before
7 you're done answering or if you start answering
8 before I'm done talking, I may try to stop and
9 reset so the court reporter can get a clean
10 record. Do you understand that?
11    A   **Okay.**
12    Q   And so to that end, if you'd pause for
13 just a second when you think I'm done to make sure
14 I'm done, and I'll try to do the same for you,
15 that will help us make sure we don't talk over
16 each other as much as possible, okay?
17    A   **Yes.**
18    Q   And you know that if you say "uh-huh"
19 or "uh-uh" and shake your head or something like
20 that, that may not be clear on the record, and so
21 instead of doing that, you'll try to answer with
22 like "yes" or "no" as opposed to head signals or
23 "uh-huhs"; is that okay?
24    A   **Yes.**
25    Q   And if I catch you doing it, I'll just

**10**

1 say, is that a yes? I'm not trying to be rude. I
2 just want to make sure you're clear if you're
3 saying "uh-huh" or "uh-uh" or something. If it is
4 actually a "no," just tell me, no, that meant that
5 was a no. But I may follow up with you if I catch
6 you giving a nonverbal answer, okay?
7    A   **Yes.**
8    Q   And you understand you're under oath
9 and you have to tell the truth as completely and
10 accurately as possible?
11    A   **Yes.**
12    Q   And you understand if I ask you a
13 question that is capable of being answered with a
14 simple yes or no, you will do that, correct?
15    A   **Yes.**
16    Q   And by the way, if I happen to ask --
17 sometimes I find -- I have seen in these
18 transcripts where I may ask a double negative. If
19 I said, for example, it's not raining outside, and
20 you are like, no, that could be confusing. And if
21 I catch us doing that, if I see us doing that, I
22 might follow up and say, it is true that it is not
23 raining outside, right? I'm just doing that,
24 again, to make sure the record is clear as opposed
25 to unclear. Is that okay with you?

**11**

1    A   Yes.
2    Q   Any reason why you can't give fully
3 truthful, accurate answers to questions today?
4    A   **No.**
5    Q   Okay. Mr. Dondero, you used to be
6 effectively in charge of Highland Capital
7 Management until the bankruptcy, correct?
8    A   **Yes.**
9    Q   And you were also in charge of other
10 entities besides Highland Capital Management,
11 correct?
12    A   **Yes.**
13    MR. CLUBOK: Is that noise coming from
14 somewhere? I don't know if you're hearing that.
15    MR. TAYLOR: Yes, there is an emergency
16 alert that is being issued for this area for a
17 severe thunderstorm, and that was what was -- what
18 you heard in the background. So to the extent we
19 have a tornado come through, we'll have to shut it
20 down.
21    MR. CLUBOK: I think we had a tornado
22 come through one deposition before that I was
23 involved with Mr. Dondero, at least one of them, I
24 seem to recall. But --
25    THE WITNESS: It will be a sign from

**12**

1 God that you should stop.
2    MR. CLUBOK: Yeah, well, we'll take it
3 as a sign from the National Weather Service, too,
4 that we should stop.
5    So let us know, Clay, if you do get any
6 kind of notice like that that says you need to
7 take some kind of action.
8    Q   By the way, Mr. Dondero, do you have
9 anything at all in front of you as you're sitting
10 there today?
11    A   **Just the laptop.**
12    Q   Just the laptop with the video. Is
13 there anything on the laptop other than the Zoom
14 screen for this deposition?
15    A   **Nope.**
16    Q   Okay. And you understand you're not
17 allowed to refer to anything -- notes or anything,
18 assistance in answering questions, without letting
19 us know that you're doing that, correct?
20    A   **Yes.**
21    Q   Okay. Thank you.
22    So, sir, one of the other entities that
23 you -- that you're in control of is an entity
24 Called Sentinel Insurance, correct?
25    MR. TAYLOR: Objection. Form.

13

```
1      A   I wouldn't use the word "control."
2      Q   Okay.  And I think I said the wrong
3  name.  I think it is technically called Sentinel
4  Reinsurance.  Is that the name of the entity?
5      A   I don't know the official name.  It's
6  Sentinel something.
7      Q   Okay.  And what does Sentinel
8  Reinsurance do?
9      A   It's an offshore Cayman-based
10 reinsurance company.
11     Q   What does that mean?
12     A   As far as I understand, it does some
13 insurance, it does some reinsurance and it -- I
14 believe it is conforming and it is in compliance
15 with regulations regarding qualification as a
16 Cayman reinsurer and it invests its capital and
17 its premiums.
18     Q   You own part of Sentinel Reinsurance,
19 correct?
20     A   I believe I'm a beneficial holder of a
21 majority of it.
22     Q   Okay.  You're the beneficial holder of
23 the majority of Sentinel Reinsurance, correct?
24     A   Yes.
25     Q   And you have been since its founding,
```

14

```
1  correct?
2      A   I believe so.
3      Q   And, in fact, you are the beneficial
4  holder of approximately 70 percent of the economic
5  interest in Sentinel Reinsurance, correct?
6      A   I believe that's approximately correct.
7      Q   And the other beneficial holder of
8  Sentinel Reinsurance is Scott Ellington, right?
9      A   I believe so.
10     Q   And you and Scott Ellington are the
11 only two beneficial holders of the economic
12 interest in Sentinel Reinsurance, correct?
13     A   I -- I don't know.  I believe so, but I
14 don't know.
15     Q   And that's been the case since the
16 founding of Sentinel Reinsurance, to the best of
17 your knowledge, correct?
18     A   To the best of my knowledge.
19     Q   Did you invest any money in Sentinel
20 Reinsurance, invest any capital?
21     A   I believe so.
22     Q   Roughly how much?
23     A   I don't know.
24     Q   Roughly.
25     A   I don't know.  I don't remember.
```

15

```
1      Q   Was it more than $1 million?
2      A   Probably, but I don't --
3      Q   Was it more than $10 million?
4      A   I don't know.
5      Q   Was it more than $100 million?
6          MR. TAYLOR:  Andy, I'm going to ask
7  that you move on.  It's been asked and answered
8  four times now.
9      A   I really don't know, Andy.
10     Q   Was it more than $1 billion?
11     A   It was less than $1 billion, I'm sure,
12 but I don't know how much it was.
13     Q   Okay.  Was it less than $500 million?
14         MR. TAYLOR:  Objection.
15     A   Yes.
16     Q   Okay.  Was it less than $100 million?
17     A   I don't know.
18     Q   Okay.  Was it less than $250 million?
19         MR. TAYLOR:  Objection.
20     A   Was it less than -- yes.
21     Q   Okay.  Was it less than 200 million?
22     A   Yes.
23     Q   Was it less than 150 million?
24     A   Yes.
25     Q   Okay.  Was it less than 125 million?
```

16

```
1      A   Yes.
2      Q   Was it more than 50 million?
3      A   I don't know.
4      Q   Was it more than 1 million?
5      A   I don't know, Andy.
6      Q   Okay.  So fair to say -- I thought you
7  said it was probably more than a million, you
8  thought.
9          MR. TAYLOR:  Objection.  Asked and
10 answered.
11     A   Yes.
12     Q   Okay.  So is there -- so do you have
13 any ability to narrow the amount of capital you
14 invested in Sentinel Reinsurance in a range that
15 is smaller than from 1 to $125 million?
16     A   From 1 to 100 would be the range.  And
17 I don't have a basis for knowing more specifically
18 than that.
19     Q   And you have no idea within that range
20 whether it was closer to 1 million or closer to
21 100.  It's just somewhere in that range and you
22 have no further information.  Is that your
23 testimony?
24     A   Yes.
25     Q   When did you put the capital into
```

17

1  Sentinel Reinsurance?
2    **A  I don't know. A half of a dozen years**
3  **ago, I guess. I don't know.**
4    Q  Just at its founding?
5    **A  No. I think there's been other**
6  **contributions along the way also.**
7    Q  Do you have records of how much you've
8  invested into Sentinel Reinsurance?
9    **A  No, I do not.**
10    Q  You have no tax records, no records
11  with your investment, there is no record at all in
12  your control that would tell you how much you
13  invested in Sentinel Reinsurance in a closer
14  approximation than 1 to $100 million?
15    **A  I don't know. All I know is if I was a**
16  **tax reporter or if it was offshore income, or if**
17  **it was -- if it was -- however it was supposed to**
18  **be properly accounted for, I'm confident that it**
19  **was. There was no attempt to not comply with**
20  **whatever regulation or taxing was relevant.**
21    Q  Okay. But do you keep records of your
22  investments somewhere?
23    **A  I do not.**
24    Q  Does anyone keep records of your
25  investments on your benefit --

18

1      MR. CLUBOK: Strike that.
2    Q  Does anyone on your behalf keep records
3  of your investments, to your knowledge, like an
4  accountant, a tax preparer, a lawyer, a financial
5  advisor, anyone like that?
6    **A  The tax department handles all my taxes**
7  **domestically, internationally and all the relevant**
8  **compliance. My personal balance sheets or assets**
9  **handled by Melissa Schroth in my office.**
10    Q  Okay. You said the tax department
11  handles all your taxes domestically,
12  internationally and all the relevant compliance.
13  The tax department of what entity?
14    **A  They were formerly of Highland. Now**
15  **they're of -- one of the entities over here. I**
16  **don't know if it's NextPoint or SkyBridge or**
17  **whatever.**
18    Q  When you say "here," where are you
19  physically today?
20    **A  In the bank next to the -- in the**
21  **NexBank office space across the street from the**
22  **old Highland offices.**
23    Q  Do you have an office there?
24    **A  Yes.**
25    Q  What is your business address?

19

1    **A  I don't know what the address is here.**
2      THE WITNESS: Do you know what the
3  address is here?
4      Hold on one second. We'll get it for
5  you.
6      MR. TAYLOR: Well, just for purposes of
7  a clean record, I'm showing Mr. Dondero something
8  off of my calendar where I have the address
9  written down so that he can refer to it, and it's
10  just a calendar appointment from my phone.
11    **A  It's 2515 McKinney Avenue.**
12    Q  And do you have a permanent office in
13  that location?
14    **A  Yes.**
15    Q  What other entities work in the same
16  location that are in any way connected to you?
17    **A  NexBank, NextPoint and -- I don't know**
18  **how we're doing the shared services with**
19  **SkyBridge. I don't know if SkyBridge is**
20  **associated with me. So I -- but they're in the**
21  **offices here, too, at the moment. We're getting**
22  **office space -- we were expecting to stay at**
23  **Highland so it's been a bunch -- it's been a -- we**
24  **located over here -- relocated over here quickly,**
25  **but ultimately we'll spread out from here at some**

20

1  **point.**
2    Q  And you said -- you named a woman who
3  had your personal balance sheets, Melissa -- and
4  could you spell her last name.
5    **A  S-H-R-O-T-H.**
6    Q  Does she work there in the building
7  that you're in right now?
8    **A  Yes.**
9    Q  And did she previously work for
10  Highland Capital Management?
11    **A  Yes.**
12    Q  Does Scott Ellington work there?
13    **A  I haven't seen him, but I believe so.**
14    Q  When was the last time you spoke with
15  Scott Ellington?
16    **A  Last year.**
17    Q  Does Isaac Leventon work there with you
18  in that office?
19    **A  I believe so, but I haven't seen or**
20  **talked with him either.**
21    Q  When was the last time you spoke with
22  Isaac Leventon?
23    **A  Last year.**
24    Q  You mean 2020?
25    **A  Yes.**

---

**Page 21**

1    Q   Have you in any way communicated
2 directly or indirectly with Scott Ellington about
3 anything in 2021?
4         MR. FEINSTEIN:  Can I just interject
5 here for one second, please?  This is Rob
6 Feinstein.
7         So I did want to put a comment on the
8 record regarding Highland Capital Management's
9 attorney-client privilege as it pertains to this
10 deposition.  So I want to be very clear that we
11 are not waiving the privilege in regard to
12 anything with one exception, and that is the
13 matters and transactions that are discussed in the
14 Highland Capital Management motion for approval of
15 UBS settlement, and I think, in particular,
16 paragraphs 5 to 11, which set forth the facts and
17 circumstances regarding the Sentinel Reinsurance
18 insurance policy and related transactions, and as
19 to those matters, we are not asserting the
20 privilege.
21 BY MR. CLUBOK:
22    Q   Have you in any way communicated
23 directly or indirectly with Scott Ellington about
24 anything in 2021?
25    A   No.

---

**Page 22**

1    Q   Have you communicated directly or
2 indirectly with Isaac Leventon about anything in
3 2021?
4    A   No.
5    Q   Have you communicated with J.P. Sevilla
6 in 2021 about anything?
7    A   Yes.  J.P Sevilla is actively engaged
8 in a lot of Highland- and NextPoint-related
9 activities.  Or not Highland, I'm sorry.  A lot of
10 NextPoint-related activities and SkyBridge-related
11 activities.
12    Q   Does Mr. Sevilla have an office in the
13 same building you're in now?
14    A   Yes.  Not in the same floor, but in the
15 same building.
16    Q   And when was the last time you spoke
17 with Mr. Sevilla?
18    A   Last week.
19    Q   How about Matt DiOrio?  Do you speak
20 with him at all?
21    A   Infrequently.  I think I have spoken to
22 him once this year.
23    Q   When was that?
24    A   When we first moved here early March to
25 set up the shared services agreement between

---

**Page 23**

1 SkyBridge and NexBank and NextPoint.
2    Q   Have you spoken with Katie Irving at
3 all in 2021?
4    A   I have not.  I believe she is on
5 maternity leave, still.
6    Q   Have you -- when you spoke with
7 Mr. Sevilla, did you talk in any way about
8 Sentinel Reinsurance?
9    A   No.
10    Q   When was the last time you spoke to
11 anybody about Sentinel Reinsurance other than your
12 lawyers?
13    A   I haven't.  I know -- I haven't and I
14 have purposely not tried to refamiliarize myself
15 with anything there.
16    Q   When was the last time you were
17 familiar with anything --
18         MR. CLUBOK:  Strike that.
19    Q   When was the last time you spoke with
20 anybody about Sentinel Reinsurance prior to 2021?
21         MR. TAYLOR:  Objection.  Form.
22    Q   Okay.  Let me just ask, other than your
23 lawyers, who was the last person you spoke to
24 about Sentinel Reinsurance on any matter?
25    A   I can't remember specifically.  It

---

**Page 24**

1 would have been -- it would have been Scott
2 Ellington.  And I -- it would have been sometime
3 last year.  And it really would have been in the
4 context of we were trying to get a Cayman bank
5 going, and there was going to be -- there was
6 going to be some involvement, I think, from
7 Sentinel and Matt, but we didn't get the bank off
8 the ground last year.
9    Q   Is this post bankruptcy?
10    A   I don't know.  It was either post
11 bankruptcy or shortly before.
12    Q   Did you ever speak with Jim Seery about
13 Sentinel Reinsurance?
14    A   No, I did not.
15    Q   Did you ever speak with John Dubel
16 about Sentinel Reinsurance?
17    A   No, I did not.
18    Q   Did you ever speak with Judge Nelms
19 about Sentinel Reinsurance?
20    A   No, I did not.
21    Q   Did you tell any of the lawyers at the
22 Pachulski law firm anything about Sentinel
23 Reinsurance?
24    A   No, I did not.
25    Q   Have you ever told anyone at UBS

**25**

1  anything about Sentinel Reinsurance?
2      A  I do not think so.
3      Q  You have spoken with Isaac Leventon
4  about Sentinel Reinsurance in the past, correct?
5      A  No, I do not believe I have.  I
6  don't -- I didn't think Isaac was materially
7  involved with Sentinel before.
8      Q  You have spoken to J.P. Sevilla about
9  Sentinel Reinsurance, right?
10     A  No.  I -- sentinel Reinsurance is not
11 something I was intimately involved with on an
12 operating or day-to-day basis.  Ellington is the
13 only person I remember talking to Sentinel about,
14 really, ever.
15     Q  The only person you have ever spoken to
16 about Sentinel Reinsurance, as you can recall
17 sitting here today, other than your lawyers in
18 this matter, is Scott Ellington; is that correct?
19     A  Yes.
20     Q  Have you ever spoken with Matt DiOrio
21 about Sentinel Reinsurance?
22     A  No, I have not.
23     Q  Have you ever spoken with any of the
24 directors of Sentinel Reinsurance?
25     A  No, I have not.

**26**

1      Q  Have you ever made decisions on behalf
2  of Sentinel Reinsurance?
3      A  I think from time to time I gave some
4  investment advice, but that's -- that would be the
5  extent of it.
6      Q  Did you ever make decisions on behalf
7  of Sentinel Reinsurance?
8      A  Not that I can recall other than, like
9  I said, periodically giving investment advice.
10     Q  But you -- when you say you gave
11 investment advice, who did you give that advice
12 to?
13     A  Ellington.
14     Q  And that was just advice, it wasn't a
15 directive?
16     A  Correct.
17     Q  And other than -- and what was that
18 specific advice you gave, if you can recall?
19     A  I don't remember.  Just that it was,
20 you know, periodically, infrequently, no more than
21 once -- I would say once a year on average, just
22 advice if they had cash or were repositioning the
23 portfolio.
24     Q  Did you receive any documents about the
25 financial position of Sentinel Reinsurance?

**27**

1      A  No.  I don't think I ever have.
2      Q  How did you know what was in their
3  portfolio?
4      A  Ellington would tell me when they had
5  cash available.  It was really when they had cash
6  available to spend he would be looking for
7  suggestions.
8      Q  And other than Ellington coming to you
9  for suggestions about how to spend cash that
10 Sentinel Reinsurance had available, you can't
11 recall any other specific business issue that
12 Scott Ellington ever came to you with -- about
13 with respect to Sentinel Reinsurance?
14     A  Correct.
15     Q  Did you know who were the insurers that
16 Sentinel Reinsurance did business with?
17     A  No.  I mean, I know generally they did
18 some D&O insurance, I think they did some title
19 reinsurance, and they did some other policies.
20 But I don't know who specifically was on the other
21 side of those policies.
22     Q  Do you have any idea about anyone who
23 was on the other side of any policy that's ever
24 been issued by Sentinel Reinsurance?
25     A  I have a -- I mean, I have an awareness

**28**

1  of the policy that we're talking about here today,
2  but it's really just a general awareness.
3      Q  What is your general awareness about
4  the policy that you're here to talk about today?
5      A  That it's a -- my recollection is that
6  it's a $100 million, plus/minus, but I think it's
7  a $100 million face policy.  And it was done half
8  a dozen years ago, approximately.
9      Q  Who is the insured?
10     A  I don't know -- I don't know.  I
11 believe it was -- I don't know what part or which
12 entities, but I believe it was -- specifically,
13 but HFP was a holding company structure with four
14 or five different subsidiaries.  I believe it was
15 some part of that organization.
16     Q  You believe that HFP was the insured
17 under the policy that we're here to talk about
18 today?
19     MR. TAYLOR:  Objection.  Misstates
20 prior testimony.
21     A  Like I said, I didn't try and refresh
22 myself on this.  I thought it was either a
23 subsidiary or holding company or part of or all
24 of -- I don't know -- of that entity, as far as I
25 know.

---

29

1    Q    Do you know anything else about the
2  insureds under the policy other than that?
3    A    No, I do not.
4    Q    Do you know what the point of the
5  policy is?
6        MR. TAYLOR: Objection. Vague.
7    Q    Do you know what the policy is designed
8  to insure against?
9    A    I've never seen the policy. I don't
10  know the specific payout triggers and -- no, I do
11  not.
12    Q    You have no idea whatsoever, sitting
13  here today, what this policy that we're here to
14  talk about today was designed to insure against.
15  Is that your testimony?
16    A    That's correct. I have never seen it.
17  I don't know the specifics of it.
18    Q    Do you generally know what the policy
19  that we're here to talk about today was designed
20  to ensure against?
21    A    Again, just really the most general
22  sense. It was to provide, I believe, cash for
23  legal expenses and to defend against any claims, I
24  believe, that -- whatever relevant entity was the
25  beneficiary in the HFP complex, to provide them

---

30

1  with legal fees and serv- -- cash for legal fees
2  and services to defend itself or operate or -- I
3  believe that structure was winding down. And it
4  wasn't really operating as a structure. So I
5  think it was meant as a transition policy of some
6  sort, but that's all I know.
7    Q    Do you know -- so I had asked you if
8  you generally knew what the policy that we're here
9  to talk about today was designed to insure
10  against. You just gave your answer.
11        Is that the entirety of what you know
12  about what the policy was designed to insure
13  against, as you sit here today?
14        MR. TAYLOR: Objection. Asked and
15  answered.
16    A    I mean, yes. I wasn't directly
17  involved with putting the policy together in terms
18  of its terms and specifics.
19    Q    So I'm going to ask you one more time
20  very broadly. Is there anything else at all you
21  know about this policy that you haven't described?
22        MR. TAYLOR: Objection. Vague.
23    A    I mean, you can ask me some other
24  specific questions, but I know very little, but
25  there may be something else I know.

---

31

1    Q    Who paid for the policy?
2    A    I believe the beneficiary paid for the
3  policy.
4    Q    Which beneficiary?
5    A    I don't know. I don't know, whichever
6  was the beneficiary of the policy I believe paid
7  for it.
8    Q    And your testimony is that the
9  beneficiary is some part of the HFP complex, as
10  you call it?
11    A    Yes.
12    Q    And did the -- okay. And did you have
13  any --
14        MR. CLUBOK: Strike that.
15    Q    When did you first hear about this
16  policy?
17    A    I mean, at or about when it was put
18  together. I mean, you know -- yeah, at or about
19  shortly before when it was put together.
20    Q    Well, was it -- so shortly before it
21  was put together you were told about it?
22    A    Yes.
23    Q    By whom?
24    A    I'm sorry, was there a question there?
25    Q    I'm sorry, I said, "By whom?" You said

---

32

1  shortly before the policy --
2    A    Scott Ellington crafted it, and then
3  Sky -- Ellington handled getting it through
4  compliance and the insurance company in the
5  Caymans.
6    Q    Okay. So you first heard about this
7  policy from Scott Ellington, correct?
8    A    Yes.
9    Q    And everything you ever learned about
10  the policy came from Scott Ellington; is that
11  correct?
12    A    Yes.
13    Q    And you -- and Scott Ellington told you
14  that he had crafted the policy?
15    A    Again, there was a business purpose in
16  terms of the entities winding down and ceasing to
17  exist. I think they had been completely written
18  off for tax purposes and the boards weren't in
19  existence anymore, and there was no management in
20  existence anymore and there was a business purpose
21  to winding it down and crafting it as an insurance
22  policy.
23    Q    My question was much simpler. My
24  question was, is it true that Scott Ellington told
25  you that he had crafted the policy?

33

1    A   Yes.  I mean, whether it was him
2 directly or him working with reinsurance brokers
3 or him working with third parties, I don't know.
4 But he was the one that brought it to me or -- and
5 proposed the policy.
6    Q   And what did Scott tell you about why
7 he was proposing the policy?
8       MR. TAYLOR:  Objection.  Form.  Calls
9 for hearsay.
10    A   I have answered this already, but,
11 again, that there was a business purpose that I'd
12 said already in terms of it was an illiquid pool
13 of assets that was cash deficient, cash deprived
14 that needed on a longer term basis liquidity and
15 an ability to fund legal fees and orchestrate
16 legal activities.  Whether it was defensive or
17 offensive, I don't know.  But it needed
18 functionality and it needed liquidity.
19    Q   Did Scott tell you any other purpose
20 for why he was proposing the policy other than
21 what you've just described?
22       MR. TAYLOR:  Objection.  Form.
23    A   That's the purpose as I understood it
24 and remember it.
25    Q   What do you mean by "orchestrate legal

34

1 activities"?  What does that mean, as you used
2 that phrase?
3    A   Well, again, there was no staff and no
4 board left and no functioning apparatus at HFP.
5 So it had no ability to operate or, you know,
6 defend itself or coordinate legal activities or
7 operating activities or if there was any residual
8 tax issue or anything.  So the policy, like I
9 said, I believe remedied all that and provided
10 transition going forward.
11    Q   Transition to what?
12    A   Transition to going out of business or
13 ceasing to exist yet handling any residual
14 activities.
15    Q   What were the residual activities of
16 HFP at that point?
17    A   Again, I understood them just broadly
18 to be regulatory and legal and, you know, some
19 residual operating activities.  You know, when --
20 I mean, let's just take the tax thing, for
21 example.  When you declare something ultimately
22 worthless and non-operating so that the investors
23 can take a write-off, the tax authorities can
24 question that or challenge that or litigate that,
25 and then you need to be able to defend it.  And

35

1 then any -- you know, similarly, any business
2 issues or legacy issues, whether it's around --
3 you know, UBS or Citibank or Barclays or any other
4 institutions that had conflict with HFP, you know,
5 there's, you know, a chance that that stuff could
6 be active again.
7    Q   At the time the insurance policy was
8 taken out, you knew that HFP was in litigation
9 with UBS, correct?
10    A   I don't know if that's true.  I don't
11 know -- I don't remember.  I don't remember -- I
12 don't remember if the UBS litigation was active or
13 real when the policy was taken out.  It could have
14 been -- it might have been -- the UBS litigation
15 has been out there for a long time, but I don't
16 know specifically.
17    Q   You know the policy was specifically --
18       MR. CLUBOK:  Strike that.
19    Q   You know that part of the reason for
20 the policy was specifically to address the UBS
21 litigation; isn't that true?
22    A   I would rather stay with the testimony
23 that I just gave.  I understood it to be broadly
24 based to handle any residual activities on the
25 litigation or regulatory or tax side.

36

1    Q   Did you know at the time the policy was
2 taken out whether or not, in some part, it was
3 directed specifically to address the UBS
4 litigation?
5    A   I don't know.
6    Q   You don't know if you knew or you
7 didn't know at the time?
8    A   I don't know.  I don't recall it
9 being -- I don't recall it being specifically to
10 UBS so I -- I don't recall that so I don't want to
11 say that.
12    Q   Was there ever any analysis done to
13 indicate how the policy could fit into the
14 strategy for dealing with UBS in its litigation?
15    A   Not that I saw.
16    Q   Did Mr. Ellington ever tell you in any
17 words or substance how the policy could be used in
18 connection with dealing with the UBS litigation?
19       MR. TAYLOR:  Objection.  Calls for
20 hearsay.
21    A   Again, my general understanding was to
22 provide liquidity and capability to wind down
23 legal issues that -- I believe, and the way it was
24 characterized in my memory is that none of the
25 legal issues were viewed as material.  They were

37

1  viewed as normal course resolutions of an entity
2  that was going out of business. So it wasn't --
3  it wasn't in anticipation or because of one
4  particular thing. It was to handle liquidity and
5  functionality issues that the dead entity had.
6      Q   That wasn't my question. My question
7  is, did Mr. Ellington ever tell you in words or
8  substance how the policy could be used
9  specifically in connection with dealing with the
10 UBS litigation?
11         MR. TAYLOR: Same objection. Calls for
12 hearsay.
13     A   The answer is no. Or no, not -- I
14 don't remember -- I have no recollection of it
15 being -- of him having any specific comments or
16 thoughts regarding the handling of the UBS
17 litigation via the policy.
18     Q   Did Mr. Ellington, at or around the
19 time the policy was being taken out, talk to you
20 about a strategy for settling the UBS litigation?
21         MR. TAYLOR: Hold on. Before you
22 answer that, is Mr. Ellington an attorney at all?
23         THE WITNESS: He is.
24         MR. TAYLOR: So I'm going to have to
25 ask that he not disclose -- first of all, it calls

38

1  for hearsay, and, second of all, it invades the
2  attorney-client privilege and I'm instructing him
3  not to answer.
4          MR. CLUBOK: Hold on a second. I
5  believe --
6      Q   Mr. Dondero, Mr. Ellington at the time
7  was the general counsel of Highland Capital
8  Management, correct?
9      A   Yes.
10         MR. CLUBOK: And the privilege, I
11 believe, belongs to Highland Capital Management,
12 who is here being represented by Mr. Feinstein.
13         Mr. Feinstein --
14         MR. FEINSTEIN: Right. And we are not
15 asserting it as to conversations that in-house
16 counsel had with anyone on this topic.
17         MR. TAYLOR: And just so I'm clear, did
18 Mr. Ellington have any other roles as counsel for
19 you in any other capacity in non-Highland Capital,
20 other than as a debtor? Did he advise you in any
21 of your other roles for --
22         THE WITNESS: I mean, yeah, he has
23 helped out on a lot of different things. Yes.
24         MR. TAYLOR: So the record is clear,
25 was Mr. Ellington under the shared services

39

1  agreement? For instance, would he help you in
2  your role as one of the advisors or for Sentinel
3  Reinsurance and give those entities counsel also?
4          THE WITNESS: I mean, yeah. I mean,
5  besides working for various entities, he did give
6  me legal advice often, too.
7          MR. TAYLOR: So, Andy, based upon that,
8  we've got to assert the privilege. I don't know
9  exactly all of the roles Mr. Ellington may have
10 been filling, but if he was filling other types of
11 roles under a shared services agreement or other,
12 that advice could have been to other clients, some
13 of which are not Highland Capital entity ones, and
14 he can't answer those questions.
15         MR. CLUBOK: Okay. Hold on a second
16 here.
17     Q   Mr. Dondero, did Mr. Ellington ever
18 give legal advice to Sentinel Reinsurance, as far
19 as you know?
20     A   I'm sure he did, actually. I mean, I
21 think that was part of his role and function in
22 Sentinel.
23     Q   You think as part of his role and
24 function in Sentinel, he was an attorney in
25 addition to a part owner, giving legal advice to

40

1  Sentinel Reinsurance, a Cayman-based company; is
2  that correct?
3      A   Yes.
4      Q   And did you ever receive any legal
5  advice from Scott Ellington that was specifically
6  directed at Sentinel Reinsurance, as far as you
7  know?
8      A   I did not receive it, no. I mean,
9  yeah, no, I don't have specific awareness.
10     Q   Okay. So this particular
11 conversation -- when Mr. Ellington came to you and
12 said, we're going to -- came to you to talk to you
13 about the policy, he was not speaking to you as a
14 representative of Sentinel Reinsurance, correct?
15     A   I don't know. I can't say because --
16     Q   Well, let me ask it slightly
17 differently. When you considered -- you approved
18 the policy, correct?
19     A   Yeah, I approved of him moving forward
20 with the policy, yes.
21     Q   And did you approve on behalf of
22 Sentinel Reinsurance with Mr. Ellington moving
23 forward with the policy?
24     A   No. He just -- he ran it by me as a
25 solution and a business idea.

41

1    Q   Okay.  And he ran that by you -- okay.
2         So as a solution as a business idea --
3    so as a solution as a business idea, did
4    Mr. Ellington tell you in words or substance that
5    the policy would assist in a strategy for settling
6    the UBS litigation?
7         MR. TAYLOR:  Objection.  Calls for
8    hearsay.  And just because something is a business
9    solution doesn't mean it doesn't have legal
10   aspects, Andy.  So, again, we have the
11   attorney-client privilege.
12        MR. CLUBOK:  And, specifically,
13   Mr. Taylor, what's the attorney-client privilege
14   that you are claiming?  In what capacity was
15   Mr. Ellington acting as an attorney and in what
16   capacity is Mr. Dondero receiving statements from
17   him that is causing you to assert the privilege on
18   this particular line of questioning?
19        MR. TAYLOR:  So it's my understanding,
20   and Mr. Dondero can correct me if I'm wrong, that
21   Mr. Ellington under the shared services agreement
22   not only provided legal services directly to
23   Highland Capital Management but also to other
24   subsidiaries that are not owned nor controlled by
25   Highland Capital as we sit here today, and I am

42

1    merely asking that Mr. Dondero carefully consider
2    whether any of those services were legal services
3    directed to non-Highland Capital Management
4    entities.  That is it.
5         I don't know exactly what might or
6    might not have been said.  First of all, it calls
7    for hearsay, but, second of all, to the extent
8    that there was any legal advice rendered to any
9    non-Highland Capital Management entity that is not
10   controlled by Highland Capital today, I believe
11   you have to assert the attorney-client privilege,
12   Andy.
13        MR. CLUBOK:  Okay.  So two things.
14   First of all, just generally speaking, I'm going
15   to ask you to stop making hearsay objections.  You
16   know those are preserved.  You don't have to make
17   them at a deposition.  In fact, you're not allowed
18   to under the federal rules.  So I'm just going to
19   ask you to stop continually making hearsay
20   objections, please.  Those objections, as you know
21   well, are preserved.  You make form and foundation
22   objections, other than privilege.
23        Second of all, with respect to the
24   privilege, I am asking you for -- you cannot name
25   a specific entity that you are asserting that

43

1    Mr. Ellington was acting on behalf of and that you
2    have the right to instruct Mr. Dondero not to
3    answer.  That's what I want to get to.  I'm
4    looking at this realtime.  I don't see any
5    specific entities mentioned.  You are just saying
6    you assume that or you generally think that may be
7    and et cetera.
8         MR. TAYLOR:  It could be Sentinel
9    Reinsurance, Andy.
10        MR. CLUBOK:  Sentinel Reinsurance -- he
11   just said that he was not accepting -- he was not
12   acting on behalf of Sentinel Reinsurance when
13   Mr. Ellington gave him this suggestion.
14        Do you represent Sentinel Reinsurance?
15        MR. TAYLOR:  I do not, but I can't let
16   my client waive their privilege.
17        MR. CLUBOK:  Okay.
18    Q   Did you -- Mr. Dondero, did you -- by
19   the way, Mr. Dondero, what are you looking at
20   right now?
21    **A   My thumbnails.**
22    Q   No, you weren't looking at your
23   thumbnails.  Is that it?  You weren't --
24        MR. TAYLOR:  Andy --
25    **A   I was looking at my thumbnails.**

44

1         MR. TAYLOR:  -- I can represent to you
2    he is not holding anything in his hands,
3    electronic, paper or otherwise.
4         MR. CLUBOK:  Mr. Dondero -- Mr. Dondero
5    has already testified that he received no legal
6    advice on behalf of Sentinel Reinsurance from
7    Scott Ellington.  So do you have any others that
8    you are claiming other than Sentinel Reinsurance
9    that Mr. Ellington supposedly gave advice on
10   behalf of in this conversation that I was asking
11   Mr. Dondero about, that you're instructing on
12   their behalf Mr. Dondero not to answer?
13        MR. TAYLOR:  I'm just representing
14   Mr. Dondero individually.  There could be other
15   entities.  I believe there's three different
16   entities to whom you directed litigation hold
17   letters.  I'm not representing those, but to the
18   extent any of those other two -- one of them had
19   the name Sentinel in them and one did not.
20        To the extent that any of those
21   entities received legal advice from Mr. Ellington
22   and that was legal advice, he can't answer to
23   those entities either.  He can't waive their
24   privilege.
25        MR. CLUBOK:  Okay.  What entity -- name

45

1  an entity other than -- are you asserting a
2  privilege on behalf of Sentinel Reinsurance even
3  in light of what Mr. Dondero has testified under
4  oath? Yes or no?
5      MR. TAYLOR: I'm asking him to consider
6  that he cannot waive those privileges on behalf of
7  those entities.
8      MR. CLUBOK: Okay. You're asking him
9  to consider. You're not -- are you instructing
10 him not to answer on behalf of Sentinel
11 Reinsurance? I just -- you did before.
12     MR. TAYLOR: It's impossible to answer,
13 Andy, because I don't know exactly what was told
14 to him. I don't know --
15     MR. CLUBOK: Are you instructing him
16 not to answer, Clay?
17     MR. TAYLOR: I'm instructing him not to
18 answer if he got any legal advice on behalf of any
19 of those entities.
20     MR. CLUBOK: Okay. All right.
21     Q  So I'm going to go back to my question
22 then, Mr. Dondero.
23     Well, first of all, you didn't get
24 legal advice on behalf of Sentinel Reinsurance in
25 this conversation with Scott Ellington about

46

1  establishing the policy, correct?
2      **A  Did I get -- I'm sorry, did I get legal**
3  **advice from Scott Ellington regarding --**
4      Q  Was he acting as your lawyer with
5  respect to Sentinel Reinsurance or was he acting
6  as your lawyer with respect to Highland Capital
7  and the other funds?
8      **A  I mean, I think he's always wearing**
9  **multiple legal hats.**
10     Q  Did you think at the time he broached
11 this policy with you he was wearing a legal hat
12 with respect to Sentinel Reinsurance?
13     **A  Yes, and with regard to Highland also.**
14     Q  You think -- so you were -- were you --
15 you were receiving legal advice from Scott
16 Ellington in your capacity as a majority owner of
17 Sentinel Reinsurance when he first broached you
18 about this policy?
19     **A  I think he was wearing a hat -- a legal**
20 **hat from a Sentinel perspective in terms of**
21 **structuring and understanding the policy, in order**
22 **to achieve the business purpose that he was trying**
23 **to achieve, that he then had to run through**
24 **Highland compliance.**
25     Q  So wait a second. Was there a shared

47

1  services agreement with Sentinel Reinsurance and
2  any other Highland entity?
3      **A  I don't know. I don't know if there**
4  **was a formal one there. There were formal shared**
5  **services agreements and then there were informal**
6  **shared services agreements.**
7      Q  Are you aware, sitting here today, of
8  any formal shared services agreements with
9  Sentinel Reinsurance and any other Highland
10 entity?
11     **A  I don't know.**
12     Q  You don't know if you are aware or, as
13 you sit here today, it's true that you're not
14 aware of any such shared services agreement
15 between Sentinel Reinsurance and Highland; isn't
16 that true?
17     **A  I -- I don't know, meaning I don't have**
18 **awareness, but I'm -- and I don't want that to**
19 **imply that there is or isn't one. I don't know.**
20     Q  So getting back to Mr. Ellington, when
21 he first broached you -- so I want to understand
22 this. He broached you. At that time you were the
23 president of Highland Capital Management, correct?
24     **A  Yes.**
25     Q  And you were the sole director of --

48

1      MR. CLUBOK: Strike that.
2      Q  You were in control of what was left of
3  Highland Financial Partners and its subsidiaries,
4  correct?
5      **A  I don't know if it was me or Highland,**
6  **but we were trying to take a leadership role in**
7  **winding that entity down.**
8      Q  You, Jim Dondero, were the decision
9  maker for what was left of Highland Financial
10 Partners and its subsidiaries at the time
11 Mr. Ellington approached you about this insurance
12 policy, correct?
13     **A  Generally.**
14     Q  And when Mr. Ellington talked to you
15 about this insurance policy, you say he was
16 wearing many legal hats. Was one of the legal
17 hats he was wearing, to your knowledge, as a legal
18 advisor to Sentinel reinsurance?
19     **A  I believe so.**
20     Q  And was one of the legal hats that he
21 was wearing when he approached you about the
22 insurance policy as a legal advisor to Highland
23 Capital Management?
24     **A  I believe so.**
25     Q  And was one of the legal hats that

49

1  Mr. Ellington was wearing when he approached you
2  about this insurance policy was as a legal advisor
3  to Highland Financial Partners?
4      A  I believe so.
5      Q  And was one of the legal hats that
6  Mr. Ellington was wearing when he approached you
7  with respect to this insurance policy was as a
8  legal advisor to all of Highland Financial
9  Partners subsidiaries?
10     A  I -- I believe so.
11     Q  And was one of the legal hats that
12 Mr. Ellington was wearing when he approached you
13 with respect to the insurance policy a legal
14 advisor to Highland CDO Fund and its subsidiaries?
15     A  I -- I don't know if that was relevant
16 or if I had any -- I don't know if that was
17 relevant -- we've had a lot of names that are
18 similar.  I'm not even sure what fund that is, per
19 se, but I don't remember that one specifically.
20     MR. CLUBOK:  By the way, just for the
21 record, I know it is hard to -- in the rough --
22 this is CD -- as in David -- O Fund, CDO Fund.
23     THE WITNESS:  Okay.  Yeah, I --
24     MR. CLUBOK:  I think the court reporter
25 heard me say CEO Fund, or at least that's the way

50

1  it came out on the rough.
2      Q  So I just -- I want to make sure that
3  you know, Jim, I'm saying Highland CDO Fund.  Have
4  you heard of that?
5      A  Yeah, I don't remember what fund that
6  is.
7      Q  Are you aware that UBS obtained a
8  judgment against two funds that you formerly were
9  involved with?
10     A  Are you talking about the recent
11 judgment?
12     Q  Yes, the recent judgment.
13     A  Yes.
14     Q  And who was that judgment against, do
15 you know?
16     A  I do not.
17     Q  Do you have any idea who are the
18 parties that are responsible for the
19 billion-dollar judgment that UBS obtained?
20     A  I do not.
21     Q  Getting back to Mr. Ellington, I will
22 say that, at a bare minimum, if this conversation
23 was privileged, it was a joint privilege and we
24 have a representative of Highland Capital
25 Management here, who have said they are not

51

1  asserting the privilege.  So I'm going to ask the
2  question, given the record that we have just heard
3  one more time and ask, did Scott Ellington, in
4  words or substance, ever mention dealing with UBS
5  as one of the business reasons for entering into
6  the insurance policy that we're here to discuss?
7      MR. TAYLOR:  And, Andy, I'm going to
8  make my objection but tell Mr. Dondero it's the
9  same objection, attorney-client privilege, but
10 subject thereto, given the foundation you laid,
11 that you can answer subject to my objection.
12     A  Okay.  I'd like to get -- can I have an
13 uninterrupted 30-second moment to describe
14 contextually and answer your question in a way
15 that I think connects everything together?  If I
16 can go on --
17     Q  You can do that.  I may go back and ask
18 my question again if you don't answer it, but go
19 ahead.
20     A  Okay.
21     We filed in October '19.  In August of
22 '19, Ellington and I believed we had a handshake
23 agreement with UBS to settle all outstanding
24 issues and get back to most favored nation status
25 instead of our real estate group, that has been

52

1  growing aggressively and would have nice business
2  reasons to do business with UBS -- instead of both
3  firms not doing business together, we believed we
4  had a handshake agreement with UBS that, Andy, you
5  were involved in.  And we believed that that
6  agreement was for 7 million of cash and 10 million
7  of future business.
8      And it wasn't that we thought those
9  monies were for justified damages to UBS for
10 whatever cases were outstanding in the past
11 because we truly believed we had paid for releases
12 from UBS twice.  We felt like we had paid
13 120 million in securities in 2008 or 2009, and
14 then we felt via the 2015 Redeemer settlement --
15 Redeemer and Credit Strat settlement of 72 million
16 or $77 million, we felt like we had paid for the
17 same releases from UBS twice, and we believed that
18 we had no liabilities whatsoever with UBS, and we
19 believed that the ongoing litigation was just a
20 cloud over the firm's doing business, and it was
21 worth us paying $7 million of cash and 10 million
22 of future business to put it behind us.
23     So our frame of mind in August of
24 2019 -- our frame of mind, meaning my frame of
25 mind and Ellington's frame of mind -- was that the

53

1    UBS claims were de minimis, but it was worth
2    paying seven of cash and ten million of future
3    business to put it behind us.
4          The case had been dormant for an
5    extended period of time. And when I say "an
6    extended period of time," it would be in the years
7    prior to 2019, incorporating when this reinsurance
8    policy was done at Sentinel. So the reinsurance
9    policy, when it was done at Sentinel, was done to
10   wrap up the HFP issues in aggregate, including all
11   legal, regulatory, compliance, tax, operating
12   issues, et cetera.
13         It wasn't done in anticipation of or
14   trying to circumvent or prepare for some big UBS
15   judgment because at that period of time, we truly,
16   and, I think, UBS truly thought that their claims
17   were zero or de minimis because as recently as
18   August of 2019 we had a handshake agreement to
19   settle them for 7 million in cash and 10 million
20   of future business, which is de minimis in the
21   overall scheme of things and de minimis relative
22   to HFP or the Sentinel policy, et cetera.
23         So that's my overall testimony on the
24   subject, and I don't know much more beyond that.
25   Q    Okay. Let me go back to the question I

54

1    asked you and then we'll cover some of the things
2    you just said.
3          So, first of all, you're talking about
4    October of -- you said, "October of '19 we filed."
5    You mean you filed for bankruptcy in October of
6    '19?
7    A    Highland filed, I think, on
8    October 16th of 2019.
9    Q    Okay. You -- Highland Capital
10   Management filed for bankruptcy on October 16th,
11   2019, correct?
12   A    Correct.
13   Q    And you claim that in August of 2019,
14   just a few months before that, there was a
15   handshake deal with UBS to settle all outstanding
16   matters. Is that your claim?
17   A    Yes.
18   Q    And have you seen any documents that
19   support that claim?
20        MR. TAYLOR: Objection. Form.
21        MR. CLUBOK: Withdrawn.
22   Q    Have you seen any documents that
23   reflect that supposed handshake agreement?
24   A    No, I have not.
25   Q    Are you aware of any documents in the

55

1    world that reflect that supposed handshake
2    agreement?
3    A    You know, Andy, I believe -- I know I
4    heard it from Seery or from UCC -- or not UCC --
5    from independent board members or from the
6    mediators last year, that there was a point in
7    time where you admitted that there was a handshake
8    agreement, but -- on those numbers at that time,
9    but that was then and this is now, and now you
10   guys have a different view and you also have a New
11   York action.
12         And I -- so I don't have -- I don't
13   have anything written that's been put in front of
14   me, but I do believe there are people who will say
15   that you admitted that occurred. You were
16   involved with the Indian guy who came over from
17   London. You were involved with the meetings with
18   Ellington. I -- but I don't have anything in
19   writing to support it.
20   Q    My question is, are you aware of any
21   document in the world that reflects the supposed
22   handshake agreement from August of 2019 that you
23   just described?
24   A    I do not. I do not have such a paper.
25   Q    Are you aware of any such documents in

56

1    the world, even if you don't have them, that
2    reflect the supposed handshake agreement from
3    August of 2019 that you just described?
4    A    I do not. I do not have them and I do
5    not have awareness of them.
6    Q    Now, you claim -- now, you claim that
7    Jim Seery told you that there had been an
8    agreement from August of 2019?
9    A    No, no, no. And I'm not sure it was
10   Seery or somebody else under --
11   Q    Let's start with Jim Seery, okay. You
12   said that -- so did Jim Seery, in words or
13   substance, ever tell you that there was a
14   handshake agreement in August of 2019 along the
15   lines that you've just described?
16   A    It was -- my recollection is it was
17   either Jim Seery or somebody else on the
18   independent board --
19   Q    Okay.
20   A    -- said that subsequent, meaning in --
21   sometime in 2020, around the arbitration or
22   mediation, I believe, that you admitted to people
23   or to the arbitrators that there was an agreement
24   in principle but it hadn't been finalized or
25   documented, but that was then and this is now.

---

**57**

1    Q   Okay.  The other independent board
2  members were John Dubel and Judge Russ Nelms; is
3  that right?
4    A   Yes.
5    Q   So it's your testimony that either Jim
6  Seery or John Dubel or Russell Nelms told you that
7  there had been a handshake deal in August of 2019
8  along the lines of what you've just described.  Is
9  that your testimony?
10    A   Yes.
11    Q   And you can't remember which of those
12  three supposedly told you this, correct?
13    A   Correct.
14    Q   Okay.  Now, other than the supposed
15  conversation between one of these three directors
16  about this supposed deal, had you ever heard of
17  that supposed handshake deal before that time?
18    A   Well, from Scott Ellington, who
19  negotiated with you and the guy from London.
20    Q   Okay.  So Scott Ellington told you that
21  there was a handshake deal in August of 2019
22  whereby you would pay $7 million and $10 million
23  of additional business to resolve all the claims
24  that UBS had against Highland and the affiliated
25  funds?  Is that your testimony?

**58**

1    A   Yes, correct.
2    Q   And did Mr. -- when did Mr. Ellington
3  tell you this?
4    A   At or about when he came back from the
5  meeting with you and the guy from India -- or you
6  and the Indian guy from London.
7    Q   And this was in August of 2019?
8    A   Yes.
9    Q   And did Mr. Ellington give you any more
10  specifics about this supposed handshake deal?
11    A   Those were the primary business points
12  I remember.  I don't remember others.
13    Q   Did Mr. Ellington tell you who shook
14  hands on this deal, supposedly?
15    A   I don't know the name of the Indian
16  guy, but I know -- we do have the calendar
17  meetings that you attended, he attended, the
18  Indian guy attended, you know, et cetera, but I
19  don't know his name off the top of my head.
20    Q   Sorry, you have calendar meetings?
21  Where?
22    A   No, no, I mean, they were orchestrated
23  meetings, Andy.  I mean, you, Scott, the guy from
24  UBS from -- I think he was from London.  I don't
25  remember whether you had the meeting in New York

**59**

1  or London, but we do have calendar documentation
2  of you guys' meeting, I'm sure we do.
3    Q   And --
4    A   Andy, listen, I know I can't enforce a
5  handshake agreement.  You know, my life would be
6  easier and we would have a nice residual value to
7  Highland if I could force the handshake agreement
8  to be reality.  I know I can't force it, but what
9  I'm trying to just lay the ground work of is that
10  we never viewed the UBS claims -- prior to you
11  getting the judgment out of the judge in New York,
12  we never viewed the UBS claims as material or
13  significant until then.
14    Q   Well, prior to then, you knew that if
15  UBS were to win its case, the consequences for
16  Highland could be catastrophic, correct?
17    A   No, we never viewed them as a material,
18  legitimate claim.  We believe we had paid for the
19  releases twice before.  I don't know what happened
20  in New York, and I haven't looked at the case.  I
21  don't know what she actually awarded.  I don't
22  know if we were properly represented or if it was
23  done.  I don't know if it's appealable.  I don't
24  know what the New York Circuits represents.
25        But I'm just saying that prior to that

**60**

1  judgment coming around, we did not believe, and I
2  don't believe you believed either in August of '19
3  that the UBS claims were material up until that
4  point.  But congratulations on getting a big award
5  out of New York.
6    Q   Your testimony is that prior to the
7  time the judgment was awarded, you never believed
8  there was any possibility of UBS obtaining more
9  than, say, $7 million in total from its lawsuit
10  that was pending in New York; is that correct?
11    A   That's right, 7, 10, 5, 20, I mean,
12  something de minimis, something nominal, you
13  know -- I mean, there's always a risk that it --
14  you know, just like, you know, we -- Highland went
15  into bankruptcy and there were 110 million of
16  claims that have now ballooned to 300, you know.
17  So, you know, things can always go awry, but yes,
18  that was our opinion.
19    Q   So your opinion was there was never a
20  realistic possibility of the total liability in
21  connection with the UBS legal action in New York
22  ever being more than, say, 10 or $20 million,
23  correct?
24    A   We thought it was something that --
25  like any other potential or lingering claim from

61

1  UBS or Barclays or from Citibank or from
2  regulators or from tax authorities, you know, we
3  thought they were all normal course of business
4  that would be resolved for not material amounts of
5  money, correct.
6      Q   And when you say "we," who is the "we"
7  in that sentence?  Are you speaking on behalf of
8  Highland Capital Management, are you speaking on
9  behalf of Sentinel Reinsurance or on behalf of HFP
10 or all of the above?
11     A   All of the above.  And I think that was
12 Ellington's view also, and that's why it made
13 sense to transition an otherwise dead entity via
14 the insurance policy.
15     Q   What is the insurance -- okay.  So
16 getting back to my original question, what, if
17 anything, did Mr. Ellington ever tell you, at the
18 time the insurance policy was being considered,
19 with respect to how it would impact the UBS
20 litigation?
21     A   I mean, like I said, there wasn't -- it
22 wasn't a specific concern regarding UBS.  It was
23 to handle the transition of an otherwise dead
24 entity that was illiquid that still had operating
25 issues without a board and without any management

62

1  team and without any way to pay anybody.  It was a
2  way to transition all issues, but it wasn't
3  anything specific to UBS that I recall at the
4  time.
5      Q   Okay.  So when you -- and we jumped --
6  you jumped ahead and started talking about August
7  '19, but the policy was taken out, you know,
8  approximately four years or so ago.  So let's say
9  2017.
10     A   Okay.
11     Q   Back in 2017, you're saying, the policy
12 was not in any way specifically directed at UBS,
13 correct?
14     A   Correct.
15     Q   Okay.  And the policy back in 2017 was
16 not issued with the UBS litigation in mind,
17 correct?
18     A   Yes, that's correct.
19     Q   And in -- and Mr. Ellington never
20 raised how the policy could impact the UBS
21 litigation when he gave you the business reasons
22 for taking out the policy, correct?
23     A   Correct.
24         MR. CLUBOK:  I think this might be a
25 good time to take a break, if you want one.  If

63

1  you don't, I'll continue going.  So it's up to
2  you.
3          THE WITNESS:  You know what, I have --
4  at 11:30 I need half an hour.  I have got a
5  half-hour meeting I can't move.
6          MR. CLUBOK:  Okay.  If that's the case,
7  then let's keep going for another 11 minutes.
8          THE WITNESS:  Yes.
9          MR. CLUBOK:  Okay.  Let's continue
10 going, then.
11         Is that okay, Clay?
12         MR. TAYLOR:  Yes.
13         THE WITNESS:  Yes.
14         MR. CLUBOK:  Okay.
15         So -- we're going to just -- I just
16 want to show you a copy of the subpoena we issued
17 for your testimony today.
18         If you could put that up, and I believe
19 we'll mark it as Exhibit 23.
20         (Deposition Exhibit 23 marked for
21 identification.)
22         REMOTE TECH:  Pardon me, Counsel, which
23 tab is that?
24         MR. CLUBOK:  It was something
25 Ms. George just sent you, probably the last thing

64

1  she sent you, two documents.  One is the subpoena
2  and one is Mr. Dondero's response via counsel.
3          REMOTE TECH:  Please stand by.
4          MR. TAYLOR:  Andy, why are we -- just
5  for my curiosity, why are we starting with 23?
6          MR. CLUBOK:  Because we're
7  continuing -- we've already marked some exhibits
8  in this action.  So, you'll see, we'll go through
9  Exhibits 1 and 2 and 3 later, but they have
10 already been marked in previous depositions.
11         MR. TAYLOR:  Okay.
12         MR. CLUBOK:  We're just -- we're trying
13 to keep one set instead of starting every
14 deposition over at 1, which gets very confusing.
15 Then you have, like, ten Exhibit 1s.
16         MR. TAYLOR:  Understood.  Thank you.
17         MR. CLUBOK:  Sure.
18     Q   So here is Exhibit 23.  This is Exhibit
19 23 for this action.  And Exhibit 23 is a copy of
20 the Subpoena to Produce Documents, Information, or
21 Objects or to Permit Inspection of Premises in a
22 Bankruptcy Case.  Do you see that?
23     A   Yes.
24     Q   And have you seen that subpoena before
25 today?

---

**65**

1    A    I believe so.

2    Q    And if I could have control of it,

3  Jordan.

4        REMOTE TECH:  One moment, please.

5        All right.  Sir, I've given you

6  control.  If you could just click on your screen.

7  BY MR. CLUBOK:

8    Q    And so you say you believe you have

9  seen this Exhibit 23.  Are you sure you have seen

10  it?

11    A    I think it was stapled to -- wasn't it

12  part of everything else that was sent over?  But

13  this is what covers discovery requests, right?

14    Q    Correct.

15    A    Yeah.

16    Q    And, in particular, there was an

17  attachment or a page that I have got on the screen

18  now.  It starts with Roman numeral III.  It says,

19  "Documents to be produced."

20    A    Yes.

21    Q    And did you review Roman numeral III

22  and the 12 categories of documents that you were

23  under subpoena to produce?

24    A    Yes.

25    Q    And did you make an effort to locate

---

**66**

1  documents responsive to that subpoena?

2    A    Yes.

3        MR. CLUBOK:  And we're going to put up

4  what we're going to mark as Exhibit 24.  It is a

5  response that we received to the subpoena last

6  week.

7        REMOTE TECH:  Please stand by.

8        (Deposition Exhibit 24 marked for

9  identification.)

10    Q    It is a May 6th, 2021 e-mail from

11  Schafer to Clubok.

12        MR. TAYLOR:  We're not seeing that,

13  Andy.

14        MR. CLUBOK:  It will just take a

15  second.  I think Jordan is putting it up.  There's

16  a little bit of a lag with this process.  I'm not

17  seeing it either, for what it's worth.

18        REMOTE TECH:  Counsel, I apologize.  I

19  have to get this downloaded real quick.

20        MR. CLUBOK:  No problem.  Take your

21  time.  I was just explaining to Clay.

22        MR. TAYLOR:  Andy, for planning

23  purposes while we wait, do you have any idea how

24  late you're thinking, how many hours more you

25  need?

---

**67**

1        MR. CLUBOK:  No.  I'll have to -- I'll

2  assess during the break and see if I can get an

3  estimate.  We have another break that we have to

4  take, too.  What time is the hear- -- is there a

5  hearing still set for today?

6        MR. TAYLOR:  1:30, and yes.

7        MR. CLUBOK:  Is that substantive or

8  just a call?

9        MR. TAYLOR:  We just have to dial in,

10  but both of us have to be there, both he and I.

11        MR. CLUBOK:  I'm just saying, it's

12  supposed to be a short meeting, I take it?

13        MR. TAYLOR:  Actually, I think it might

14  be a little more substantive, but I'm not sure.

15  It's a docket call and we do have a motion for

16  continuance which will be argued.  So I'm just not

17  sure how long it's going to take, 30 minutes to an

18  hour, my guesstimate.

19        MR. CLUBOK:  Okay.

20        If I can have the control too, Jordan,

21  please.

22        Thank you.

23    Q    Mr. Dondero, I've got up here an e-mail

24  from Roland Schafer to Andrew Clubok and Katie

25  George, copying Clay Taylor and Bryan Assink, with

---

**68**

1  the subject, "Dondero Subpoena."

2        Have you seen this document before?

3    A    Yes.

4    Q    And it's been marked as Exhibit 24.  In

5  Exhibit 24 Mr. Schafer says that they have

6  completed their "search of the e-mail/documents to

7  which we have access.  Keep in mind that

8  Mr. Dondero was exclusively on the HCMLP e-mail

9  until December 30th, 2020."  He now has a NexBank

10  e-mail account and beginning in late March 2021 he

11  moved to NextPoint e-mail.  Or he had a NexBank

12  e-mail account, I should say, in the beginning of

13  late March 2021.  And he said that the only

14  documents are communications between yourself and

15  his law firm, and that's it, that in any way are

16  responsive to the subpoena request we issued.

17        I'm paraphrasing, but that's the gist

18  of what it said, correct?

19    A    Yes.

20    Q    And is that the case, that you have

21  absolutely no access to or control over or ability

22  to obtain any document that is in any way

23  responsive to Exhibit number 23 other than

24  communications with your attorneys?

25    A    That is correct.

69

1    MR. CLUBOK: Okay. Let's see. Thank
2 you. Jordan, we can take that off the screen.
3 Okay.
4    Q    Let me just see if I can do a couple
5 more quick things here before your 12:30.
6    Other than this --
7    MR. CLUBOK: Well, strike that.
8    Q    Other than the insurance policy that's
9 the subject of this litigation that we have been
10 talking about, I think you said that you
11 understood that Sentinel had issued policies such
12 as D&O insurance and title reinsurance, correct?
13    A    Yes.
14    Q    For the D&O insurance, who were the
15 insureds that you are aware of that Sentinel
16 Reinsurance issued policies for?
17    A    I mean, some of them were completely
18 third party. I think some of them were the back
19 end of related D&O insurance, you know, where
20 somebody like an Aon or somebody would take the
21 first, would take 60 percent of premium, would be
22 the face of the premium, and take the first X
23 dollars of loss, and then Sentinel would take the
24 back half. Or maybe it was the reverse, where
25 Sentinel would take the first piece of the loss

70

1 and Aon would take the back piece. But it was
2 splitting -- it was splitting policies with some
3 major carriers.
4    Q    Sorry. So when you use that phrase
5 "completely third party," using that phrase, would
6 you say that Sentinel Reinsurance is a completely
7 third-party entity?
8    A    No -- is it completely third party, no.
9 But to be a bona fide reinsurer in Cayman, Cayman
10 doesn't want reinsurance companies or banks to be
11 captive or not be legitimately in the insurance or
12 banking business. So you have to have a portfolio
13 or a certain amount of legitimate insurance and
14 reinsurance from a variety of players.
15    Q    Okay. But Sentinel Re is an affiliate
16 of yours, correct?
17    A    Affiliate in terms of similar
18 ownership, I guess, you know.
19    Q    If I just asked you generically, it's
20 Sentinel Re third-party -- how did you use the
21 phrase? I'm sorry. If I said is Sentinel Re a
22 completely third-party entity to you, Jim Dondero,
23 you would say no, that's not true, correct?
24    A    Well, I would say there is the
25 beneficial ownership that we have spoken of, but

71

1 I'm just saying as far as business or policies
2 that Sentinel issued or was part of, there were --
3 there were multiple types.
4    Q    Right. But to be clear, Sentinel Re is
5 affiliated with you, Jim Dondero, correct?
6    A    If you define affiliate as similar
7 ownership, then yes, yeah.
8    Q    Okay. And Sentinel Re did issue
9 policies to other entities that have overlapping
10 ownership with you, correct?
11    A    Correct.
12    Q    And what were those entities that
13 Sentinel Re issued policies to that you were in
14 some way connected to?
15    A    Like I said, I believe they did some
16 D&O insurance splitting on some of the private
17 equity companies in the portfolio.
18    Q    Like what?
19    A    I don't remember, and I don't know
20 which ones they did, but I remember that was a
21 business line or a business purpose for a few
22 years.
23    Q    Is there any entity that you can name
24 here today that Sentinel Reinsurance issued a
25 policy to that you have some beneficial interest

72

1 in?
2    A    You'll have to ask Scott. Scott
3 Ellington is the right person to ask.
4    Q    How about you? As you sit here today,
5 are you aware of even a single entity that you can
6 think of -- are you claiming that you don't know a
7 single entity that Sentinel Re issued a policy to
8 that you have a beneficial ownership in?
9    A    No, I don't remember. I don't remember
10 specifically.
11    Q    Do you know what proportion of Sentinel
12 Re's business was issuing policies to entities
13 that had some sort of connection to you?
14    A    I do not.
15    Q    Okay. Well, look, it's 11:30. I will
16 say, we weren't told about this break. We also
17 obviously weren't told we were going to start a
18 half hour late. So we're going to -- it's going
19 to end up becoming a long day at a minimum. When
20 is the meeting?
21    MR. CLUBOK: Let's go off the record.
22    THE VIDEOGRAPHER: Off record. 12:31.
23    (A recess was taken.)
24    THE VIDEOGRAPHER: On record. 1:11.
25

73

1  BY MR. CLUBOK:
2      Q   Okay, Mr. Dondero, Mr. Ellington --
3  we've talked a little bit about what Mr. Ellington
4  told you about the insurance policy that was
5  ultimately issued by Sentinel Reinsurance that is
6  the subject of today's discussion.  Do you
7  remember that discussion before our break?
8      A   Yes.
9      Q   Okay.  At the time you signed -- first
10 of all, did you know that the --
11     MR. CLUBOK:  Strike that.
12     Q   Did you know the policy limit of that
13 policy that you signed off on?
14     MR. CLUBOK:  Strike that.  Let me say
15 that more clearly.
16     Q   With respect to the Sentinel
17 Reinsurance policy that Mr. Ellington spoke to you
18 about in 2017 and that you approved, did you know
19 the policy limits when you approved it?
20     A   Just in a most general sense that it
21 was approximately 100 million.  I don't know if
22 there were different amounts set for different
23 items or occurrences.  I just remember the policy
24 being around 100 million bucks.
25     Q   And when did you -- how did you learn

74

1  that the policy was $100 million?
2      A   I just remember the policy was -- there
3  is really only -- it took lots of twists and
4  turns, I believe, to get it through compliance and
5  get it through the reinsurer.  I just remember
6  there was a lot of back-and-forth, but I remember
7  generally the policy was targeted to be around
8  100 million.
9      Q   How did you learn that the policy was
10 $100 million?  Did you learn it by reading it --
11 reading the policy?  Did you learn it because
12 Mr. Ellington told you?  Did you learn because
13 compliance said something to you?  How did you
14 learn that the policy was $100 million?
15     A   From Scott Ellington.  You know, he
16 handled the interactions with compliance and the
17 reinsurer.  I don't believe I ever saw the policy,
18 nor was I involved in any of the conversations
19 with the reinsurer or the -- or Highland
20 compliance, that I remember.
21     Q   But you approved the policy, correct?
22     A   I approved the -- yes.
23     Q   And prior to approving the policy, did
24 you read it?
25     A   No.  I'm not -- I don't think it would

75

1  have been natural for me even to sign the policy,
2  but if I did, I did not read it or have any
3  specific knowledge of what it covered or didn't
4  cover.
5      Q   Did you sign the policy?
6      A   I don't believe so.  I have no
7  recollection of that.
8      Q   And you have no recollection of ever
9  actually reading the policy, correct?
10     A   Correct.
11     Q   Do you have a recollection of reading
12 any ancillary documents of the policy itself, like
13 any related documents that were about the policy
14 or connected to the policy in some way?
15     A   No.
16     Q   At the time Sentinel Re issued the
17 $100 million policy that you approved, what was
18 the largest policy they had previously issued?
19     A   I have no idea.
20     Q   Had they ever previously issued a
21 policy anywhere in the same magnitude as the
22 policy that's at issue here today?
23     A   I believe they have done multiple
24 policies in the millions and tens of millions, but
25 I don't know the specifics.

76

1      Q   Can you name one policy that they had
2  done in the tens of millions prior to the policy
3  that's at issue that we have been discussing
4  today?
5      A   I wouldn't have specific knowledge.
6      Q   Well, you said you believed they've
7  done multiple policies in the millions and tens of
8  millions.  Did you just make that up, or is that
9  based on something specific?
10     A   Well, like I said, I believe they did
11 some large title policy sharings that --
12     Q   You're saying under oath that you
13 believe they had previously issued a policy that
14 was at least $10 million prior to issuing the one
15 that we have been discussing today?
16     MR. TAYLOR:  Object to the form of the
17 question.  Okay.
18     A   I don't know if --
19     Q   Let me ask it again.
20     Sir, are you testifying that you
21 believe that Sentinel Reinsurance had previously
22 issued a policy that was at least $10 million
23 prior to issuing the policy that we have been
24 discussing today?
25     A   Okay.  I don't know if it's prior or

77

1 subsequent, but I know -- I don't know.  I believe
2 they have, on some of the big title insurance,
3 like there was a big $65 million title insurance
4 policy that they split with somebody.  I don't
5 know if it was before or after.  But my belief is
6 they have or continue to do things in the millions
7 and tens of millions of dollars.
8      Q   I want you to focus on my question.  I
9 want you to -- there was a time when you approved
10 the issuance of this $100 million policy, correct?
11     A   Yes.
12     Q   And it was not a title insurance
13 policy, right?
14     A   Correct.
15     Q   It was a judgment insurance policy,
16 correct?
17     A   I don't know what it covered and what
18 it didn't cover.
19     Q   Well, a $100 million policy covered a
20 lot more than expected legal fees, correct?
21     A   I believe it covered legal outcomes
22 also, but --
23     Q   Okay.  So in addition to covering legal
24 fees, it also was intended to cover against
25 judgments that would be entered against the

78

1 insureds, correct?
2      A   If you say so.  Again, I don't have
3 specific knowledge.
4      Q   No, I want to know what you say under
5 oath.
6          So you approved this policy and when
7 you approved it, and you knew it was $100 million,
8 did you understand that part of the policy was as
9 judgment insurance in case the insureds lost at
10 trial?
11     A   I did not have that specific
12 understanding.
13     Q   Did you understand that part of the
14 $100 million policy's purpose was to pay for any
15 legal liability of the insureds who paid for the
16 policy?
17     A   I didn't have that specific knowledge.
18 And a word like "any" would be something I would
19 not have any knowledge of.  And these insurance --
20 any type of insurance and reinsurance things has
21 specifics around what's covered, what's not, what
22 entities, what has to be done in order to collect
23 or not collect.  And I'm not even saying all this
24 from a Sentinel perspective.
25          I'm just saying from my awarenesses of

79

1 having gotten and underwritten significant
2 insurance in a lot of other companies and a lot of
3 other places, it's a -- there's a lot of specifics
4 and a lot of highly negotiated parts to it, in
5 insurance in general, and I have no awareness of
6 what this policy covered, didn't cover, under what
7 circumstances, et cetera.
8      Q   At the time that you approved the
9 $100 million insurance policy, did you understand
10 that part of what was covered by the policy was
11 legal liability of HFP and its subsidiaries?
12     A   I didn't have specific knowledge of
13 what was covered but an understanding that there
14 was some coverage of liability or outcomes.
15     Q   Okay.  You understood that some of
16 the -- the $100 million policy was not just for
17 legal fees and expenses, but it was also for some
18 liability or potential liability in litigation
19 with the insureds, correct?
20     A   Yes, and that's about as far as it
21 goes.
22     Q   And did you have any idea whatsoever,
23 when you approved the policy, as to what would be
24 the circumstances whereby that payment obligation
25 for legal liability would be triggered?

80

1      A   I have no idea.
2      Q   Did you have any idea whatsoever, at
3 the time that you approved the $100 million
4 insurance policy, that a trigger of coverage under
5 the policy would be legal liability of CDO Fund or
6 SOHC to UBS?
7      A   I have no idea.  I had no idea then and
8 I have no idea now what's covered, what's the
9 triggers, and if it's -- if there's a bona fide
10 amount due or not.  I have no idea.
11     Q   What was the amount paid for the
12 policy?
13         MR. CLUBOK:  Strike that.
14     Q   The amount paid for a policy is often
15 called a premium, right?
16     A   Yes.
17     Q   You are familiar with the term
18 "premium" in connection with an insurance policy,
19 right?
20     A   Yes.
21     Q   Okay.  What was the premium on this
22 $100 million insurance policy that you approved?
23     A   I -- I don't know -- I've heard -- you
24 know what, I don't know how the -- what I do know
25 at the time is the illiquid assets were 70 or

81

1  80 million bucks.  That's what I do know at that
2  time.  I do remember that.
3        How they were accounted for or how much
4  of it was premium, how much of it was other
5  consideration or whatever, I don't know what
6  the -- I don't know what the split or the
7  breakdown was.
8     Q   Okay.  We'll come back to that answer,
9  but, first, I want to start with the question I
10 asked you, which is, what was the premium on the
11 $100 million insurance policy that you approved?
12    A   I don't know.
13    Q   So you started to say in your answer,
14 "I've heard," and then you caught yourself.  What
15 had you heard in connection with this question I
16 asked?
17    A   I was remembering back, and, again,
18 this took lots of twists and turns, and I don't
19 even have a basis for saying "I heard."  There
20 was -- there was -- I don't even have a basis
21 for -- it was a matter of trying to bridge the
22 illiquid assets to some liquidity and have some of
23 it be called a premium and some of it be called
24 something else.  But I don't even know what -- I
25 don't even know what else or if it was all called

82

1  premium.  The policy took twists and turns through
2  the regulators and compliance.  I don't know what
3  the final structure of the policy was other than
4  it was ultimately about $100 million of coverage.
5     Q   And these twists and turns that you say
6  it took, is the entirety of your information about
7  that from Scott Ellington?
8     A   Yes.  And -- but I wasn't involved in
9  the twists and turns.  At the time this wasn't
10 that big of a deal.  It was something that was
11 just trying to help transition a dead entity.
12    Q   Sorry, but you said there were twists
13 and turns.  How did you know that there were
14 twists and turns?
15    A   I just know there were.  I mean,
16 because what they were trying to do, they had to
17 get it through both the regulators and Highland's
18 compliance department, so I -- there's always
19 give-and-take on their independent views of what's
20 the risk, what's the business purpose, what's a
21 fair structure, et cetera, et cetera.  So that's
22 what I mean by "twists and turns."
23    Q   Yeah, but you say you just know there
24 were twists and turns.  You mean you were just
25 imagining it or guessing or because there always

83

1  are twists and turns, or you specifically know
2  there were twists and turns connected with this
3  insurance policy?
4     A   There are always twists and turns, and
5  especially if we're on both sides of a
6  transaction, there's heightened compliance
7  scrutiny and then there's also heightened
8  regulatory scrutiny.  So there's -- A, there's
9  always twists and turns, and there's definitely
10 always significant twists and turns if we're
11 involved on both sides of it.
12    Q   And in this case you were involved on
13 both sides of it, correct?
14    A   Yes.
15    Q   And, as a result, you had to get
16 your -- you had to disclose that involvement on
17 both sides to your compliance people in order to
18 get it approved?
19    A   Yes.
20    Q   And who did you disclose that to in
21 compliance?
22    A   I wasn't directly involved, but I know
23 Scott Ellington worked closely with Thomas Surgent
24 on it.
25    Q   And who was Thomas Surgent at that --

84

1        MR. CLUBOK:  Or strike that.
2     Q   What did Thomas Surgent do at that
3  time?
4     A   He was our chief compliance officer.
5     Q   And how do you know that Scott
6  Ellington worked closely with Thomas Surgent to
7  get approval for this transaction with the
8  insurance policy in 2017?
9     A   He told me.  And ultimately he had -- I
10 know he had to get Tom Surgent's sign-off on it,
11 which I believe he did.
12    Q   And you said, "He told me."  Do you
13 mean Scott Ellington told you?
14    A   Yes.
15    Q   And you -- how do you know that Scott
16 Ellington had to get Tom Surgent's sign-off on
17 this policy being issued?
18    A   I can say unilaterally for at least the
19 last 15 years we've never done a transaction that
20 we were on both sides of, that didn't have
21 compliance sign off.
22    Q   Okay.  So your absolute policy at
23 Highland Capital is for any transaction where you
24 have a connection to both sides of the
25 transaction, "you" meaning Jim Dondero, you always

---

85

1   get compliance approval, correct?
2      **A   Yes.**
3      Q   And is that a policy that Scott
4   Ellington knows about?
5      **A   Yes.**
6      Q   Is that a policy that Thomas Surgent
7   knows about?
8      **A   Yes.  It's an industry -- it's a**
9   **post-2008 Sarbanes or Dodd-Frank mandate.  Chief**
10  **compliance officers have the personal liability of**
11  **a C-suite executive starting in '08 in financial**
12  **firms.**
13     Q   I see.  So if Thomas Surgent did not --
14         MR. CLUBOK:  Strike that.
15     Q   If Thomas Surgent -- well, you had to
16  get Thomas Surgent's approval because you, Jim
17  Dondero, had beneficial ownership interest on both
18  sides of the transaction, correct?
19     **A   Not because of -- more of control, not**
20  **benefi- -- beneficial ownership on the Sentinel**
21  **side.  You have control on both sides, but, yes,**
22  **it was appropriate to get compliance approval,**
23  **which I'm certain we did.  I can't imagine -- I**
24  **can't imagine there is any transaction where, any**
25  **transaction over the last 15 years that would**

---

86

1   **involve affiliated entities that did not have**
2   **compliance approval.**
3      Q   And in this situation Sentinel Re
4   insurance would have been an affiliated entity,
5   using the phrase the way you just used it,
6   correct?
7      **A   Yes.**
8      Q   And HFP and its subsidiaries would have
9   been affiliated entities, using the phrase the way
10  you just described it, correct?
11     **A   Yes.**
12     Q   Is it your responsibility to ensure
13  that compliance measures are adhered to?
14     **A   Yes.  I mean, it's every professional**
15  **in the organization's responsibility, as part of**
16  **the annual compliance review, to run appropriate**
17  **things through compliance.  But I would say under**
18  **an abundance of caution, the organization is**
19  **pretty well trained that anything that's close**
20  **goes through compliance.**
21     Q   Okay.  But you never spoke with
22  Mr. Surgent directly about this transaction,
23  correct?
24     **A   Correct.  Scott Ellington was the**
25  **person on this transaction.**

---

87

1      Q   How would Mr. Surgent have learned that
2   Sentinel Reinsurance was an affiliated entity?
3      **A   He would have known as part of Scott**
4   **Ellington's presentation to him proposing the**
5   **transaction.**
6      Q   What presentation are you talking
7   about?
8      **A   Compliance builds -- they definitely**
9   **have folders and documentation on any transaction**
10  **that they -- especially any significant**
11  **transaction that they approve.  They have to keep**
12  **written documentation for the regulators.**
13     Q   Sorry, but have you seen a presentation
14  that Scott Ellington prepared to describe the
15  transaction that he would have shared with
16  Mr. Surgent?
17     **A   I have not seen it.**
18     Q   Have you seen any presentation that
19  Scott Ellington ever prepared related to this
20  transaction?
21     **A   I have not.**
22     Q   Did Mr. Ellington -- did -- were you
23  ever --
24         MR. CLUBOK:  Strike that.
25     Q   How often do people use PowerPoints

---

88

1   with you back in this time period to describe
2   transactions or make it easier to follow them?
3      **A   Often.**
4      Q   Why?
5      **A   I mean, just often.  I mean, there's**
6   **process for investment underwriting, there's**
7   **process for trade execution, there's process for**
8   **investment monitoring and tracking.  Most of those**
9   **are documentation, you know, based.  And there is**
10  **process and procedures around compliance also, and**
11  **those are generally documentation based also.**
12     Q   Would you have received a presentation
13  for every major transaction that one of the
14  affiliated entities did during this time period?
15     **A   Not on the compliance side.  I'm not**
16  **directly involved in compliance.  On most -- on**
17  **most significant investments, generally I would be**
18  **in an investment committee or aware or be**
19  **presented with something, yes.**
20     Q   And so it would be highly unusual for
21  you not to be presented with a PowerPoint, or the
22  like, sort of presentation if there was a
23  significant transaction being contemplated with
24  one of the affiliated entities at that time,
25  correct?

---

---

**89**

1    MR. TAYLOR:  Objection to form.
2    **A    If there was a significant investment**
3    **being made, you know, per se, but, again, that**
4    **wasn't the case in what we're talking about.  And**
5    **I didn't see a PowerPoint on the insurance -- on**
6    **the insurance product overall.**
7    Q    Well, you mentioned before that you
8    heard that there were 70 to 80 million dollars in
9    illiquid assets?
10   **A    Correct.**
11   Q    And was it your understanding that all
12   of those assets were transferred to Sentinel
13   Reinsurance?
14   **A    I believe that was part of the policy**
15   **or part of the premium, and, again, part of the**
16   **transition to, you know, provide liquidity and**
17   **some functionality.**
18   Q    And did you understand that in addition
19   to illiquid assets there were also liquid assets
20   that were transferred to Sentinel Reinsurance as
21   part of the premium?
22   **A    I don't remember that.  I remember it**
23   **being almost entirely illiquid assets.**
24   Q    Were there any -- was there any cash
25   that was transferred as part of the premium

---

**90**

1    payments?
2    **A    I don't believe there was anything**
3    **liquid or cash other than a de minimis amount.**
4    **That's my recollection.  But I never saw a**
5    **reconciliation or a true-up.  But it was never**
6    **described to me as anything other than a**
7    **preponderance of illiquid assets.**
8    Q    What would a de minimis amount -- when
9    you say "de minimis," you're -- in the past, I've
10   learned that your view of de minimis is different
11   than lots of people's view.  So when you say
12   "de minimis," do you mean less than 1 million,
13   less than 10 million, less than 100 million?
14   What's de minimus to you in this context?
15   **A    I would guess that there would be less**
16   **than 10 percent of any kind of liquid or cash**
17   **assets.  That would be my guess.  That would be**
18   **10 percent or -- well, less than 10 percent.**
19   Q    Okay.  But if it was $10 million in
20   cash, you would consider that to be de minimis?
21   **A    I was kind of using 10 percent as a**
22   **cutoff.  It was 7 or 8 -- 7 or 8 or less of cash**
23   **or illiquid assets is what I would have expected.**
24   Q    Sorry.  You said, "It was 7 or 8 less
25   of cash or illiquid is what I would have

---

**91**

1    expected."  Sorry --
2    **A    Less than 7 or 8 of liquid assets or**
3    **cash is what I would have expected.  I would --**
4    **when I say "preponderance," I would have guessed**
5    **that 90 percent, or I would have expected**
6    **90 percent or more was illiquid.**
7    Q    Sorry.  So do you believe that it was
8    approximately 7 or 8 million dollars in liquid
9    assets that was transferred as part of this?
10   **A    No, I'm saying I don't know, but you**
11   **were asking me my expectation of de minimis, and I**
12   **would say that I would have thought that the cash**
13   **and the liquid portion of the portfolio would have**
14   **been 10 percent or less.**
15   Q    Okay.  So if the liquid portion was
16   more than 10 percent, that's above what you call
17   de minimis in a transaction like this, correct?
18   **A    Yeah, I mean, you're asking my**
19   **expectations, but I don't have specific awareness.**
20   Q    Okay.  Did you -- so getting back to
21   Mr. Surgent, how would he have known that this was
22   an affiliated transaction?
23   **A    He would have known from the**
24   **presentation, but he also has a high degree of**
25   **awareness of our corporate structures and our**

---

**92**

1    **various entities, and it would have been part of**
2    **his analysis and decision-making process.  He**
3    **wouldn't have approved it without knowing the**
4    **details and the counterparties.**
5    Q    And when compliance approves
6    transactions like this, is there a formal process
7    they go to?  Is there a way that that approval is
8    reflected?  Is there a form they fill out?  Is
9    there a, you know, group of people they have to
10   copy?  Anything like that?
11       MR. TAYLOR:  Objection to the form.
12   **A    I don't know the -- there is some**
13   **formality to the process, but I don't know what it**
14   **is.**
15   Q    Did you ever see an approval by
16   Mr. Surgent --
17   **A    No.**
18   Q    -- of this projection?
19   **A    I have not.**
20   Q    Okay.  So we got off on a little
21   tangent here, but are you aware of Sentinel Re
22   ever issuing any other judgment insurance policy
23   in its history?
24   **A    I -- I don't know, but I know it's**
25   **considered some, and I know it's fought claims,**

93

1  you know, but I don't know for sure.
2     Q   Do you know -- by the way, I've called
3  it a judgment insurance policy.  Have you heard of
4  a phrase called "after the event," or "ATE"
5  policy?
6     A   Yeah, I mean, like I said, I know
7  people sell claims and judgments, and after -- I
8  mean, I have heard the term, yes.
9     Q   Okay.  Would you describe this policy
10 as an after the event policy?
11    A   No.
12    Q   Why not?
13    A   I mean, for all the reasons we talked
14 about earlier.  We viewed all the residual issues
15 at HFP to be things that would be handled in due
16 course and they needed liquidity and legal help or
17 coordination.  And the thought was, over an
18 extended period of time, things would be resolved
19 in normal course of business for not gigantic
20 amounts of issue.
21    Q   Right, but the insurance policy that
22 you approved, I think you previously agreed it was
23 a -- it could be called a judgment insurance
24 policy, correct?
25    A   I mean, I think I resisted naming it

94

1  that because I viewed it as much more than that,
2  but that it did have any liability component to
3  it, but I don't believe that that was the primary
4  purpose.
5     Q   But you would agree that the policy was
6  a legal liability insurance policy, correct?
7     A   No, I don't want to say that.
8     Q   I'm not asking if you want to say that.
9  I'm asking if it's true.  It's true that this
10 policy that you approved for -- with a
11 $100 million potential value was a legal liability
12 insurance policy, correct?
13    A   I'm saying my recollection is that it
14 had a component of that to it, but that was not
15 the full extent of it or the business purpose of
16 it, per se.
17    Q   You're saying the main business purpose
18 of this insurance policy was to be something other
19 than a legal liability insurance policy; is that
20 correct?
21        Sorry, that question got garbled.
22    A   Yeah, there was --
23    Q   Jim, I'm sorry, let me ask it again
24 because that question got garbled a little bit the
25 way I said it.

95

1        Are you saying that the main business
2  purpose of this insurance policy was to do
3  something other than act as a legal liability
4  insurance policy?
5     A   Yes.
6     Q   And what is that other thing, or what
7  is the other function of this policy other than
8  being a legal liability insurance policy?
9     A   To transition the residual legal, tax,
10 authority, organizational responsibilities and
11 issues over an extended period of time faced by a
12 dead entity that had been unwound as worthless for
13 tax purposes and wasn't functioning in and of
14 itself.
15    Q   Could you be any more specific than
16 that in terms of the purpose of this policy other
17 than to serve as a legal liability insurance
18 policy?
19    A   I just said it, and I've said it, like,
20 five times, so I'm not going to say that again.
21 But for transition issues on residual legal,
22 regulatory, tax, operating issues and that -- but
23 there was a liability component to it also.  But
24 the expectation was that the liability stuff would
25 resolve itself over time, you know, partly with

96

1  legal fees and partly with maybe some settlements,
2  partly with, you know, time lapse on statute of
3  limitations, you know, who knows.
4        And then but what also happens too is
5  things that you don't know or don't expect at the
6  time you put a transition policy like this in
7  place, there are things you don't know that end up
8  coming up later, like -- you know, like whatever,
9  like HarbourVest in the Highland case wasn't
10 something that was known or thought about when
11 filed.
12    Q   Did this policy cover the HarbourVest
13 case?
14    A   I'm sorry, I got off on a tangent.  I
15 don't think HarbourVest is related to what we're
16 talking about today.
17    Q   Okay.  So I want to talk about things
18 that are related what we're talking about, and I
19 want to know very specifically -- let's take it --
20 just ask it again clearly.
21        You're saying -- would you agree the
22 main purpose of this policy was to serve as a
23 legal liability insurance policy?  Would you agree
24 with that?
25    A   No.  I believe it was a component of

97

1  it.

2      Q    Okay.  And so you have testified that
3  the main point of issuing this insurance policy
4  was to assist in the transition of HFP.  Is that a
5  fair characterization of what you said?

6      **A    Yes.**

7      Q    And specifically how?  How would this
8  policy help -- how was it intended that this
9  policy would help HFP transition other than by
10  being available to satisfy the legal liability HFP
11  might have with respect to the UBS claims?

12     **A    Again, because it would handle the**
13  **ongoing issues of an offshore Cayman entity that**
14  **wasn't functioning but had a tail of legal,**
15  **regulatory, tax, operating issues, some of which**
16  **were known and some of which were unknown.  And it**
17  **didn't have liquidity or staff to handle it on its**
18  **own, and Sentinel would be providing that**
19  **functionality.**

20     Q    Sorry, how?  How exactly?  What
21  specifically was anticipated when you signed off
22  on this policy that Sentinel would ever do other
23  than cover legal liability with respect to the UBS
24  claim?

25     **A    It would manage all the things I just**

98

1  **talked about as transition items.**

2      Q    What do you mean, "manage"?  Like
3  Sentinel was going to bring people over to manage,
4  Sentinel was going to pay for something?  What was
5  the specific thing that Sentinel was signing up to
6  do under this policy other than satisfy legal
7  liability to UBS for its litigation in New York?

8      **A    Again, the UBS litigation in New York**
9  **wasn't viewed as likely or material at the time.**
10 **We went over that earlier.  But let's say -- okay.**
11 **HFP --**

12     Q    Wait, wait, sorry.  Just to be clear
13  here, you're saying at the time this policy was
14  taken out there was no expectation of any material
15  legal liability for any of your affiliated
16  entities as a result of the UBS litigation,
17  correct?

18     **A    Correct. I said it four times earlier.**

19     Q    I understand.  So getting back to the
20  policy, so -- but by the way, would you agree that
21  the policy was intended to cover the UBS
22  litigation liability on the off chance, from your
23  perspective, that there should be liability?

24     **A    Again, it was a secondary not a main**
25  **driver.  The business purpose was for transition.**

99

1      Q    No, I understand.  I'm going to come
2  back to the main purpose, but as a secondary
3  purpose, in your view, you would agree that the
4  insurance policy, when it was taken out, was
5  intended to cover legal liability to UBS for any
6  of the affiliated entities that signed on to the
7  policy on the off chance that such liability
8  arose, correct?

9      **A    Not particularly, but for all legal**
10 **liability issues in general.  You have to**
11 **remember, there were big residual issues with**
12 **Barclays.  There was big residual issues with**
13 **Citibank.  There were aggressive worthlessness**
14 **deductions taken by some of the investors in there**
15 **that could have created a tax audit or regulatory**
16 **issues -- not regulatory issues so much as tax**
17 **issues with the IRS.**

18     **And so it was meant to cover all those**
19 **things and address all those things if the**
20 **residual, dormant, dead HFP entity were attacked**
21 **by anybody.**

22     Q    I'm going to come back to the other
23  things, okay, and I want to -- you've said a bunch
24  of other things that you claim the policy was
25  intended to, but one of the things that the policy

100

1  was intended to cover when you approved it was any
2  legal liability of HFP or its affiliates to UBS in
3  connection with the New York litigation, correct?

4      **A    As long as we use the words "one of the**
5  **things," not the main thing, not the primary thing**
6  **not the focus of our attention at that point in**
7  **time.  As long as it's just included among the**
8  **litany of other residual things that HFP was**
9  **dealing with, yes.  But I resist putting any --**
10 **and I won't put any clarifier on it that makes it**
11 **seem like it was a main point of contention**
12 **because we absolutely, at the time, viewed the --**
13 **all the way up through August of '19 viewed UBS as**
14 **not significant and not a material risk.**

15     Q    Yes, you've testified to that.  So you
16  say that this policy was not taken out with a
17  specific eye to UBS, correct?

18     **A    Yes.**

19     Q    And you say that the main point of this
20  legal liability insurance policy was not to cover
21  liability to UBS, correct?

22     **A    Correct.**

23     Q    We'll come back to that.  We'll come
24  back to the other purpose of the policy, but I
25  just want to focus on it is the case, though, that

101

1  you would agree that at least one of what you say
2  are many purposes of this insurance policy was to
3  cover any legal liability of HFP or its affiliates
4  to UBS in connection with the New York litigation,
5  correct?
6      MR. TAYLOR: Andy, this has been asked
7  and answered numerous, numerous times at this
8  point.
9      MR. CLUBOK: Then it's a simple yes.
10 Then I would like a simple yes to this question,
11 Clay. It should be real simple. I'll ask the
12 question again, and I have never gotten a simple
13 yes. I've gotten a lot of stuff that the judge
14 doesn't like. So I'm going to ask Mr. Dondero, as
15 he said at the beginning, that he'd say yes if it
16 was a simple answer, and so I'm going to ask the
17 question one more time and then I'll move on.
18     Q  Even though I understand you say that
19 there were other purposes of this insurance
20 policy, you agree that at least one purpose of the
21 insurance policy that you approved, that we have
22 been talking about today, was to cover any legal
23 liability of HFP or its affiliates to UBS in
24 connection with the New York litigation, correct?
25     MR. TAYLOR: I'm just going to object

102

1  to the form.
2      **A  Okay, Andy, I can't say yes because of**
3  **what you threw in there on the clarifiers at the**
4  **end that I don't know the answers to. I don't**
5  **know what the terms and conditions and trigger**
6  **points and I don't know which entities of HFP are**
7  **included in the policy or not included in the**
8  **policy. I don't know. But the general purpose**
9  **was to cover whatever legal disputes and**
10 **resolutions HFP would be subject to. I mean --**
11     MR. CLUBOK: Okay, Clay, that's why the
12 question has not been asked and answered. Every
13 time I've asked it, there has been a different
14 qualification. I'm going to explore this until I
15 get a direct answer, okay? I'm going to ask you
16 not to keep objecting "asked and answered." I
17 will show that clip to the judge, and it's -- I
18 can't stop Mr. Dondero from qualifying things, but
19 I'm allowed to keep asking until I get an answer
20 to my question.
21     MR. TAYLOR: Andy, here is just
22 something for your consideration. You keep on
23 throwing in the word "any" --
24     MR. CLUBOK: I understand. I've asked
25 different questions, and I'm getting closer to

103

1  what I think Mr. Dondero is fighting on, so I'm
2  going to try to keep being more and more specific.
3      Q  Mr. Dondero, would you agree that at
4  least one purpose of the $100 million insurance
5  policy that you approved was to cover liability to
6  UBS in connection with the New York litigation on
7  behalf of HFP and its affiliates?
8      **A  Yes.**
9      Q  Thank you. Okay.
10     Now, let's talk about the other
11 purposes of the policy. Are you saying that the
12 policy also covered any losses that HFP or its
13 affiliates might suffer to Barclays after the
14 issuance of the policy?
15     **A  Again, I haven't seen it, but my belief**
16 **was that it was -- the business purpose was**
17 **that -- for it to be broad based for things known**
18 **and unknown and include a variety of tax and/or**
19 **legal dispute counterparties.**
20     Q  But you specifically said Barclays.
21 That's why -- I didn't -- that came from you, as
22 an example. And I don't know if you're just
23 making that up as an example or if you're saying
24 that you specifically, when you approved it,
25 understood the policy to cover potential liability

104

1  with Barclays. And that's what I'm trying to get
2  at. I'm going to ask -- you threw out different
3  names, and I'm trying to just see if you were just
4  throwing those out up against the wall or if you
5  were actually saying, I recall that those were
6  things the policy was intended to cover.
7      So let me -- with that in mind, I'll
8  just ask you. When you signed off on this
9  $100 million insurance policy, did you believe
10 that it would cover liability that HFP or its
11 affiliates might face to Barclays in the future?
12     **A  Yes, to any claim known and unknown. I**
13 **mean, that -- the history of Highland over the**
14 **last 15 years is resolution of a dispute is not**
15 **necessarily as much resolution as we thought it**
16 **was. You know, like I said, UBS -- we thought we**
17 **had them settled in '08 and then we paid again in**
18 **2015, and you're back again, right? And then**
19 **Redeemer, we settled with them in 2015, all kinds**
20 **of accolades and whatever, and then they came back**
21 **to us with arbitration and award and forced us**
22 **into bankruptcy on the same issues, you know.**
23     **So it's -- the settlements that we had**
24 **with Barclays, the settlements that we had with**
25 **Citibank all could have potentially come back**

105

1 similarly because their settlements touched HFP
2 also, just like your guy's settlements touched
3 HFP.
4      Q   I'm going to ask you to please listen
5 to the questions I ask and answer the questions
6 that I ask, if you can.
7           Are you saying that when you signed off
8 on this $100 million insurance policy, you
9 believed that it would cover any liability from
10 any source against HFP going forward, known or
11 unknown?
12      A   That was my belief that it was -- the
13 business purpose was primarily, yes, a transition
14 policy.
15      Q   And so, from the time that you signed
16 this policy through today, if HFP or any of its
17 affiliates have any legal liability, your
18 expectation is that it would be covered by this
19 $100 million policy, correct?
20      A   I didn't sign the policy, and the
21 insurance policy, whatever it says, it says, and
22 who it covers under what circumstances it will
23 cover or dispute, but I don't know the specifics.
24      Q   Okay.  Mr. Dondero, so first of all --
25      A   The answer is I don't know.  If you

106

1 don't like my clarifier, then my answer is I don't
2 know.
3      Q   Well, my questions have been from the
4 beginning, when you signed off -- first of all,
5 you claim you didn't sign the policy, right?
6      A   I don't believe I did, no.
7      Q   Okay.  But you at least know that you
8 signed off on the policy.  You authorized it to be
9 signed, correct?
10      A   Yes.
11      Q   Okay.  And when you authorized the
12 signing of a policy for $100 million and the
13 transfer of roughly that amount or more in assets
14 from other affiliated entities --
15           MR. TAYLOR:  Object to that
16 characterization of the evidence.
17      Q   Okay.  Well, would you agree that over
18 $100 million in fair market value was transferred
19 to Sentinel Re in consideration for this policy?
20      A   My recollection is it was between 70
21 and 80.
22      Q   You said before -- you think the total
23 fair market value of the assets transferred to
24 Sentinel Reinsurance for this policy was between
25 70 and 80 million dollars?

107

1      A   That's my recollection.
2      Q   And that's -- did you ever look at the
3 assets that were transferred?
4      A   No.
5      Q   Did you ever review the fair market
6 value of the assets that were transferred to buy
7 this policy?
8      A   No.  That is how it was presented to
9 me, that it was 70 or 80 million of fair market
10 value.
11      Q   Presented to you by Scott Ellington?
12      A   Yes.
13      Q   Okay.  And when you approved that
14 transaction -- I'm trying to figure out what you
15 believed you were buying with all those assets
16 that you were moving from one affiliated entity to
17 another, okay.  And by the way, was it an arm's
18 length transaction?
19      A   Yeah, I -- ultimately getting it
20 through compliance and the regulators, I think
21 that's one of the standards that compliance and
22 the regulators use, is that it's a
23 market-structured -- a market-level transaction.
24 That's the whole purpose of compliance when you
25 have affiliated entities.

108

1      Q   Did you make any effort to ensure that
2 it was an arm's length transaction or the
3 equivalent of an arm's length transaction?
4      A   No.  Again, that would have been the
5 responsibility of compliance and the regulators.
6      Q   Did you ever do a market test to see
7 what the fair market value of the assets were?
8      A   I did not, but I'm very comfortable
9 organizationally the fair market values at any
10 point in time are accurate and that's been proven
11 for 15 years.
12      Q   Sorry, the fair market values that
13 Highland retains on its books are accurate?
14      A   Very accurate.  They are robustly
15 tested, verified, generally third parties.  They
16 are documented.  I'm very comfortable our fair
17 market values on liquid, less liquid, and illiquid
18 securities, whatever buckets 1, 2 and 3, are
19 accurate.
20      Q   So if the documents --
21           MR. CLUBOK:  Strike that.
22      Q   So where would we go to find documents
23 that reflect the fair market values of the assets
24 that were transferred at the time of the
25 transfers?

---

**109**

1      A    That would all be at Highland.
2      Q    Where?
3      A    We keep detailed valuation records
4   going back 20 years.
5      Q    In what system?
6      A    I don't know.
7      Q    Who would know?
8      A    I don't think Highland could be
9   compliant as a registered investment advisor and
10  not be able to produce those to you.
11     Q    Who would be able to most easily get
12  those documents, if they are still there, if you
13  know?
14     A    DSI is functioning as the back office
15  of Highland, as far as I understand it.
16     Q    And there would have been fair market
17  values for each of the assets that were
18  transferred to pay for the insurance policy?
19     A    Yes.
20     Q    And we could rely on those fair market
21  values in the Highland books if we wanted to know
22  the fair market value of the assets that were
23  transferred?
24     A    I believe so.
25     Q    So when you -- getting back to what you

---

**110**

1   knew at the time, you approved this transaction.
2      A    Right.
3      Q    Did you believe that you were
4   purchasing liability insurance for all known and
5   unknown claims of Highland Financial Partner and
6   its subsidiaries?
7          MR. TAYLOR:  Objection to the form of
8   the question.
9      A    I didn't have specific knowledge beyond
10  that it was a transition policy to cover -- to
11  provide the liquidity and the management necessary
12  to deal with the conflicts and then probably net
13  of those amounts to provide some amounts of
14  liability insurance given certain circumstances or
15  certain events.
16     Q    Did you believe that you were buying
17  liability insurance with respect to the Barclays
18  claims that were known or unknown at the time?
19     A    Generally, yes.
20     Q    Did you believe you were buying legal
21  liability insurance with respect to the Citibank
22  claims against HFP and its subsidiaries that were
23  known or unknown at the time?
24     A    Generally, yes.
25     Q    Did you believe you were buying legal

---

**111**

1   liability with respect to other entities other
2   than UBS, Barclays, Citibank that we have not
3   specifically mentioned?
4      A    Yeah, or tax authorities or -- yes.  I
5   mean, that just -- that was part and parcel of it,
6   but, again, the terms of the payouts and the -- I
7   have no knowledge of.  And I don't know if they
8   are specifically addressed or ignored.  I don't
9   know how UBS is handled in the policy.  I do not
10  have detailed knowledge on the specifics.
11     Q    When was the last time you thought
12  about the policy before you got the -- before you
13  heard about this adversary proceeding?
14     A    I hadn't thought about it at all.  I
15  wasn't even sure the New York action applied,
16  honestly.
17     Q    Other than legal liability for either
18  attorneys' fees or bad outcomes of litigation, you
19  have repeatedly used a phrase about "liquidity for
20  transition."  I'm trying to understand,
21  specifically under what circumstances did you
22  think Sentinel Re would ever pay money to handle
23  something that was not lawyer fees or legal
24  liability under this policy?
25     A    Well, lawyers' fees, essentially, you

---

**112**

1   know, any other operating or regulatory costs or
2   defenses, and then bona fide settlements and then,
3   you know, but -- Andy, I know you know the
4   insurance world.  Bona fide settlements are --
5   bona fide settlements are getting paid on a
6   more -- that's a whole industry subset of its own,
7   you know.
8      Q    We'll come back to that.  What do you
9   mean by "operating or regulatory costs"?  What
10  does that mean?
11     A    If there's any regulatory costs for
12  operating in the Caymans, if there is any, like I
13  said, tax questions on -- or challenges on the
14  worthlessness deduction when HFP was unwound, I --
15  you know, all those kinds of things.
16     Q    You believe that this policy you're
17  buying would pay for costs associated with
18  challenges to the worthless tax deduction that you
19  took when HFP was declared insolvent?
20     A    Again, I believe there was a transition
21  policy.  That's how it was presented to me.
22     Q    Are you saying that you believe the
23  policy that you approved buying, that we have been
24  discussing today, was expected to pay costs
25  associated with challenges to the worthless tax

113

1 deduction that you took when HFP was declared
2 insolvent?
3    A   Yes.
4    Q   And did Sentinel Re ever pay any costs
5 associated with that worthless tax deduction that
6 you took?
7    A   I do not know.  The administering of
8 the policy and the payment of expenses and legal
9 fees, Scott Ellington would have an awareness of
10 that.  I do not.
11    Q   By the way, that worthless tax
12 deduction provided a significant tax benefit to
13 you personally, correct?
14    A   I don't know.  I wasn't a majority
15 owner in HFP.  "A significant tax" -- it was a
16 complete wipeout economically, and there was
17 some -- but those are bona fide -- the
18 worthlessness deduction for a dead entity is a
19 bona fide -- it's a bona fide tax deduction, it's
20 a bona fide policy.  But a lot of times the IRS
21 questions it.  It doesn't mean that it was in any
22 way inappropriate.
23    Q   But if UBS had lost its litigation
24 against HFP and its subsidiaries, that worthless
25 tax deduction would have had to be reversed,

114

1 correct?
2    A   I have no knowledge or awareness of
3 that.
4    Q   You were told specifically that there
5 would be a significant tax liability for you and
6 others if HFP and its subsidiaries were to prevail
7 in the New York litigation against UBS; isn't that
8 true?
9    A   I don't remember that at all.
10    Q   You remember that you were on the hook
11 for over $50 million personally if that worthless
12 tax deduction was overturned by the IRS, correct?
13    MR. TAYLOR:  Objection to the form.
14    A   I have no specific knowledge on any of
15 this, Andy.
16    Q   I should say --
17    A   You can refresh --
18    Q   -- you remember that you were on the
19 hook for over $50 million personally if the
20 worthless tax deduction was disallowed by the IRS,
21 correct?
22    MR. TAYLOR:  Objection.  Lack of
23 foundation and calls for speculation.
24    A   I don't have a -- you can try and
25 refresh me on it, but I have no recollection of

115

1 that.
2    Q   You remember that you were -- maybe
3 without knowing the specific numbers, you remember
4 you faced significant consequences if the
5 worthless tax deduction you took in connection
6 with HFP was disallowed by the IRS, correct?
7    MR. TAYLOR:  Same objections.
8    A   Yeah, I have no awareness of that,
9 Andy.  And, listen, the way I understand worthless
10 deductions is it's really a declaration at a time
11 and point that the entity is worthless and no
12 longer exists, okay, as a functioning entity.  If
13 the tax authorities overturn that position, it
14 doesn't mean you never get that tax deduction for
15 the loss that's occurred.  It just means you get
16 it later.
17    So it's not -- it's a timing issue more
18 than anything else.  And, again, it's in no way
19 improper, but I don't remember it being a decision
20 variable as you're describing it.
21    Q   You knew that everyone who was
22 potentially going to be impacted, if the worthless
23 tax deduction was disallowed, would potentially
24 have a claim directly against you as the decision
25 maker of HFP; is that true?

116

1    A   No, that's not true.
2    Q   Scott Ellington repeatedly warned you
3 that there would be significant tax consequences
4 if the worthless tax deduction were to be
5 disallowed by the IRS, correct?
6    MR. TAYLOR:  Object to the form of the
7 question.
8    A   I don't remember that, Andy.  And just
9 because you're a tax partner doesn't make you
10 liable.  You do things in good faith, and it ends
11 up being a timing issue and the IRS delays the
12 deduction.  That doesn't necessarily -- that
13 doesn't necessarily create any liability.
14    Q   Scott Ellington repeatedly warned you
15 that if HFP were to win the litigation against
16 UBS, there would be significant tax consequences,
17 correct?
18    MR. TAYLOR:  Object to the form of the
19 question.
20    A   I don't remember any of that, Andy.
21    Q   Scott Ellington tried to get you to
22 settle the UBS case many times, right?
23    A   I -- I mean, again, I remember the
24 August '19 stuff.  I don't remember many times
25 before that.  I don't remember a bid ask before

117

1  that.
2      Q   Is the DAF -- the DAF is a
3  donor-advised fund?
4      A   Yes.
5      Q   And it's a charitable fund that you
6  established?
7      A   Yes.
8      Q   Roughly how much does it have in assets
9  right now?
10     MR. TAYLOR:  Andy, that's not at all an
11  appropriate line of questioning, and he does not
12  have to answer it.
13     MR. CLUBOK:  It is, and I'll link it up
14  here in a second.
15     Q   It certainly has -- well, let me put it
16  this way:  You know that HFP and CDO Fund
17  collectively had a $32 million note payable from
18  DAF that it transferred to Sentinel as part of
19  purchasing the insurance policy; isn't that true?
20     A   I believe there is a note in there from
21  the DAF of 32 millionish, but I don't remember how
22  it got there.
23     Q   And did the DAF have enough money to
24  pay that $32 million?
25     A   It doesn't have the liquidity, but it

118

1  has more than 100 million in assets at this point.
2      Q   Okay.  The DAF has more than
3  $100 million in assets.  Has it made any payments
4  on this $32 million note?
5      A   I do not know.
6      Q   Who owns the $32 million note now?
7      A   I do not know.
8      Q   It was held by HFP and CDO Fund
9  previously, correct?
10     MR. CLUBOK:  Strike that.
11     Q   It was held by either HFP or CDO Fund
12  prior to the Sentinel Reinsurance policy purchase,
13  correct?
14     A   I believe so.
15     Q   And you understand that it was
16  transferred to Sentinel Reinsurance as part of the
17  insurance policy, correct?
18     A   It would make sense that that would
19  have been part of the illiquid securities or
20  illiquid asset bucket.
21     Q   And you know it has been transferred
22  since, right?
23     A   I don't have -- I don't have the
24  specific knowledge to be helpful here, Andy.  I
25  don't know.

119

1      Q   Well, do you know who the DAF owes that
2  $32 million to today?
3      A   No, I do not.
4      Q   You have no clue whatsoever as to
5  where -- as to who is the current holder of that
6  $32 million note; is that correct?
7      A   I do not.  I'm willing to be refreshed,
8  but I don't know.  I don't remember.
9      Q   Who is responsible for making payments
10  on behalf of the DAF of that $32 million note?
11     A   The -- I don't know, the DAF trustee, I
12  guess.
13     Q   Who is the DAF trustee?
14     A   Grant Scott.
15     Q   And does Grant Scott have full
16  authority to pay off that $32 million note?
17     A   I believe ultimately.
18     Q   Do you have any say in the matter?
19     A   I think we're investment advisor for
20  the DAF.
21     Q   Who is "we" in that sentence?
22     A   I believe -- that's a good question.
23  Probably Sky -- probably SkyBridge, I'm guessing,
24  has a shared services asset management agreement
25  with the DAF, replacing what used to be done by

120

1  Highland.
2      Q   When was that?
3      A   That started when everybody moved --
4  well, Seery terminated all the agreements, I
5  think, at the end of February.  When everybody
6  moved over here at the end of February or March,
7  the bank and the DAF and other entities redid
8  their shared services agreements with SkyBridge.
9      Q   And you control SkyBridge, correct?
10     A   No, I do not.
11     Q   What ownership do you have in
12  SkyBridge?
13     A   I believe at the moment it's zero and
14  we're trying to figure out how best to construct
15  the ownership there.
16     Q   Who owns SkyBridge?
17     A   The employees at the moment.
18     Q   Which employees?
19     A   I don't know.  We're doing an
20  organizational restructure analysis of how that
21  entity should be held.  And I haven't seen the
22  final recommendation yet.
23     Q   Who is controlling SkyBridge today?
24     A   I -- I don't know.  I don't know how
25  much of it is -- it's some combination of Frank

121

1  Waterhouse and -- some combination of Frank
2  Waterhouse, J.P., probably Isaac and Ellington,
3  but I don't want to say for sure Isaac and
4  Ellington because I don't know.
5      Q   And you are saying that you have no say
6  whatsoever in SkyBridge as of today?
7      A   Other than as a client, I'm not an
8  owner.
9      Q   What do you mean, "other than as a
10 client"?
11     A   Well, other than as -- I'm the chairman
12 of NexBank and NexBank is a client, and I'm the
13 president of NextPoint and NextPoint is a client.
14     Q   Does SkyBridge have full authority to
15 make a decision as to whether and if or when the
16 DAF pays off the $32 million note that used to be
17 held by HFP and CDO Fund?
18     A   I don't know.  I don't know -- I don't
19 know where the responsibilities begin and end on
20 the asset management agreement.
21     Q   So this is a long detour from when I
22 first asked you about Sentinel and whether they
23 had ever issued any other legal liability
24 insurance policies or after -- let me ask it this
25 way:  I will represent to you that this policy has

122

1  sometimes been called a legal liability insurance
2  policy, sometimes it has been called an after the
3  event policy, sometimes it's been called a
4  judgment insurance policy.
5          I'm going to say other than this policy
6  that we have been discussing today, has Sentinel
7  Reinsurance ever issued any policy that you would
8  characterize as a legal liability insurance
9  policy, an after the event policy or a judgment
10 insurance policy?
11     A   I don't know.
12     Q   When you authorized the issuance --
13         MR. TAYLOR:  Andy, can you come to a
14 logical stopping point?  We're going to have to
15 hop off here really soon and get relogged in to
16 the court system.
17         MR. CLUBOK:  Yeah, that's fine.  I'll
18 go no more than about five minutes or so and I'll
19 find a logical stopping and we'll take a break,
20 maybe five or ten, but not ten to eleven -- five
21 to seven, or less.
22     Q   Mr. Dondero, when you authorized the
23 issuance of this policy for $100 million, at that
24 time in your head, were you aware of Sentinel
25 Reinsurance ever previously issuing any policy at

123

1  all for legal liability insurance, after the event
2  insurance or judgment insurance?
3      A   I know they evaluated a lot of the
4  policies.  I didn't have knowledge of the specific
5  alternative policy that was done like this.  I did
6  not.
7      Q   And did you know they had ever
8  evaluated a legal liability insurance policy, an
9  after the event policy or a judgment insurance
10 policy prior to the time they issued this
11 $100 million policy that you authorized?
12     A   Yes, I believe they have and they do to
13 this day.
14     Q   Okay, but I didn't ask you about this
15 day.  Stay with me on the questions.  It's back in
16 2017.  When you approved the policy, name one
17 policy that they had ever evaluated that was a
18 legal liability policy, an after the event policy
19 or a judgment insurance policy prior to the time
20 that they issued this $100 million policy that you
21 authorized in August 2017?
22     A   I wouldn't have specific knowledge, but
23 I believe they were -- or they did evaluate
24 others.
25     Q   Based on what?

124

1      A   Their high awareness of this kind of
2  policy, how to structure it, how to get it through
3  the regulators, how to get it through compliance,
4  et cetera.  Because I think they had reviewed and
5  looked at numerous other policies that were like
6  this policy.
7      Q   But as far as you know, they never
8  issued one like this policy before then, correct?
9      A   I don't know.
10     Q   And as far as you know, you're unaware
11 of them ever actually issuing a policy like this
12 one prior to this policy being issued, correct?
13     A   Correct.  I don't have specific
14 awareness.
15     Q   And you before had said that you
16 believe there had been a title insurance policy of
17 up to $65 million that was issued that at least
18 they had some role in.  Are you saying that that
19 was before August '17, that $65 million title
20 insurance policy you mentioned before?  Or do you
21 know?
22     A   I don't remember the dates, but it --
23 it was -- it was on or around that time because it
24 was -- it was a significant number of years ago.
25     Q   What was the premium for that

**125**

1  $65 million title insurance policy roughly?
2  **A  I don't know.  A few million -- a**
3  **couple few million bucks.  Oh, no, wait a minute.**
4  **I'm sorry.  Excuse me.  Let me -- it was a**
5  **$65 million premium.  It was on the Cheniere**
6  **facility in Houston.  It was a**
7  **multi-billion-dollar title policy on their**
8  **$12 billion facility outside Houston.  The premium**
9  **was 65 million, and we shared in some of the**
10  **premium with some other reinsurance companies, but**
11  **the gross amount was in the billions.**
12  Q  Roughly how much of the 65 million
13  premium went to Sentinel Reinsurance, roughly?
14  **A  I don't know.  But for each dollar of**
15  **premium, it was probably 20 times as much title**
16  **insurance face.**
17  Q  Okay.  But what was the face of the
18  title insurance that Sentinel Reinsurance issued?
19  I'm not asking what all the other insurers or
20  reinsurers --
21  **A  I don't know.**
22  Q  My original question to you was, prior
23  to issuing this $100 million face value policy,
24  were you aware of any other policy that Sentinel
25  Re had issued with a liability of at least

**126**

1  10 million?  You mentioned the 65 one, but now
2  you're saying you don't really know how much of it
3  was Sentinel Re.  So I'm just asking you to be --
4  to name any policy that you actually are aware of,
5  or tell us that you're not really aware of any,
6  that were for more than $10 million that Sentinel
7  Re had issued prior to issuing this $100 million
8  policy that you approved in August of 2017.
9  **A  I'm going to stay with the Cheniere**
10  **title policy as my answer, but I don't know the**
11  **specifics.**
12  Q  And you have no idea how much of that
13  Cheniere title policy was on Sentinel Re's hands,
14  correct?
15  **A  Correct.**
16  Q  And do you know that that was issued
17  prior to August 2017?
18  **A  I believe on or about, but I don't know**
19  **the dates.**
20  Q  Is there any other example you can
21  think of that even might be a policy that would be
22  10 million or more than Sentinel Re has ever
23  issued other than potentially its involvement in
24  the Cheniere title insurance?
25  **A  I -- no, I wasn't involved enough in**

**127**

1  the day-to-day to know.
2  MR. CLUBOK:  Okay.  Let's go ahead and
3  take our break now.  Let's convene five minutes
4  after the Court breaks.  Does that work, Clay?
5  MR. TAYLOR:  Sure.  Let's go off the
6  record.
7  MR. CLUBOK:  Oh, sure.
8  THE VIDEOGRAPHER:  Off record.  2:22.
9  (A recess was taken.)
10  THE VIDEOGRAPHER:  On record.  4:35.
11  (Deposition Exhibit 25 marked for
12  identification.)
13  BY MR. CLUBOK:
14  Q  Mr. Dondero, we're about to show you a
15  document that's been marked as Exhibit 25.  It is
16  a document that has got "Sentinel Reinsurance,
17  LTD" at the top, and it's a cover letter that
18  says, "Via e-mail" and attaches -- what the cover
19  e-mail says are "the revised unaudited financial
20  statements of Sentinel Reinsurance as of, and for
21  the year ended, December 31, 2016."
22  MR. TAYLOR:  We can't see that.
23  MR. CLUBOK:  I understand.  We're going
24  to make it more accessible here, hopefully.  Okay.
25  Q  Can you see the first page now of

**128**

1  Exhibit 25?
2  **A  Yes.**
3  Q  And Exhibit 25 is a document.  It's
4  entitled "Sentinel Reinsurance LTD."  It's a
5  letter that on its face says was sent via e-mail
6  to Mr. J.P. Sevilla at SAS Asset Recovery Limited
7  from Peter Kranz, CPA, at Beecher Carlson
8  Insurance Services, LLC, as Manager for Sentinel
9  Reinsurance, Limited.
10  Do you see that?
11  **A  Yes.**
12  Q  Now, first of all, you know who J.P.
13  Sevilla is, right?
14  **A  Yes.**
15  Q  In August 2017 he worked at Highland
16  Capital Management?
17  **A  Yes.**
18  Q  And he wore several hats, I take it,
19  for different entities?
20  **A  Yes.**
21  Q  And one of them was for an entity
22  called SAS Asset Recovery Limited?
23  **A  I can't say for sure whether he worked**
24  **there or not or was just providing services.  I**
25  **don't know.**

129

1  Q   Was there a shared services agreement
2  between SAS Asset Recovery Limited and Highland
3  Capital Management?
4      A   Yes. I mean, it might not have been
5  formal but either informal or formal, but it was
6  one of the entities that I believe Highland
7  provided services for.
8      Q   Do you have an ownership stake in SAS
9  Asset Recovery Limited?
10     A   I don't believe so.
11     Q   What is SAS Asset Recovery Limited?
12     A   I think they primarily do litigation
13 financing. Litigation financing, litigation joint
14 venture stuff around the -- around the world.
15     Q   Who owns SAS Asset Recovery Limited?
16 Or who is the beneficial owner of it, I should
17 say.
18     A   I don't know.
19     Q   You have no idea whatsoever as you sit
20 here today?
21     A   Yes, that's correct.
22     Q   Isn't it true that --
23     A   I would -- let me just say that it's
24 something you could put on the list for us to get
25 you that information, if it's appropriate for us

130

1  to get you that information, but I don't know the
2  answer.
3      Q   Who would know the answer?
4      A   I don't know, but I would find out.
5      Q   You have absolutely no idea who has any
6  ownership interest in SAS Capital -- SAS Asset
7  Recovery Limited; is that what you're saying?
8      A   Correct. It was a complex structure,
9  and I don't remember how it shook out at the end
10 of the day. But like I said, I'm not being
11 evasive. If it's -- you know, give us some time.
12 If it's appropriate for us to give you the answer,
13 we can get the answer. I just don't know.
14     Q   Did you ever have any control over SAS
15 Asset Recovery Limited in any way?
16     A   I don't believe so. I don't know
17 throughout its history, but I don't believe so.
18     Q   Was Scott Ellington a beneficial owner
19 of SAS Asset Recovery Limited?
20     MR. TAYLOR:  Objection. Form.
21     A   I don't know.
22     Q   Why would SAS Asset Recovery Limited
23 have been getting the unaudited financial
24 statements of Sentinel Reinsurance?
25     A   I don't know. I don't know if

131

1  that's -- like I was saying, I don't know if he's
2  representing SAS. I don't know if it's -- I don't
3  know what SAS -- I don't know what Sentinel's
4  relationship or shared services with SAS is. I
5  don't know if Sentinel owns a piece of SAS. I
6  don't know the ownership structure and I don't
7  know what hat J.P. is wearing when he's, you know,
8  part of this correspondence.
9      Q   Were the activities of SAS Asset
10 Recovery Limited known to those at Highland
11 Capital Management?
12     A   They would be known to Scott Ellington.
13 I don't know who else besides Scott Ellington
14 would know the cases that SAS was involved in.
15     Q   How do you know that Scott Ellington
16 would know about SAS Asset Recovery?
17     A   It was one of the entities he was
18 responsible for.
19     Q   How do you know that?
20     A   I -- I just know it.
21     Q   You were -- did you know when SAS was
22 set up?
23     A   No.
24     Q   So do you know anything else about SAS
25 Asset Recovery other than Scott Ellington was

132

1  involved in it and it was a litigation funder, as
2  far as you know?
3      A   Yeah, I mean, that's really all I know
4  about it.
5      Q   Did you ever receive the financial
6  statements of Sentinel Reinsurance?
7      A   No. I'm curious what -- when you flip
8  the page, I'm curious what it's going to say. But
9  this was early -- earlier on, I guess.
10     Q   So -- all right. Let's flip the page.
11 The second page of Exhibit 25 is the table of
12 contents. The next page, which is also Bates
13 labeled, ending with the digits 1069, is the
14 Sentinel Reinsurance, Limited, Management
15 Discussion and Analysis, dated December 31st,
16 2016, or, I suppose, as of December 31st, 2016.
17     MR. TAYLOR:  Andy, could you blow that
18 up a little? It's a little bit hard for us to see
19 here.
20     Q   Can you see it, Jim?
21     A   It's tough. My vision is not so good
22 either.
23     Q   Is that better?
24     A   That's better, yeah.
25     Q   Okay. And you can see that it says

133

1  that "For the 12 months ended December 31st, 2016
2  and 2015, Sentinel Reinsurance, Limited had pretax
3  income of $4.2 million and $5.1 million,
4  respectively." Do you see that?
5  **A  Yep.**
6  Q  Did you know that Sentinel Insurance's
7  pretax income for the years 2016 and 2015 were
8  approximately a little over 4 million and a little
9  over 5 million, respectively?
10 **A  I did not.**
11 Q  It says the capital and surplus at the
12 end of 2016 was about 17.6 million. Do you see
13 that?
14 **A  Yes.**
15 Q  Did you know that?
16 **A  No, I did not.**
17 Q  Did you have any idea about the income
18 or capital and surplus levels at Sentinel
19 Reinsurance ever?
20 **A  No.**
21 Q  Do you have somebody in your life who
22 would manage an investment like Sentinel
23 Reinsurance, Limited for you, that you had a
24 70 percent stake in?
25 **A  Scott Ellington.**

134

1  Q  Okay. It's entirely Scott Ellington
2  who's responsible for managing Sentinel
3  Reinsurance and monitoring it?
4  **A  Yes.**
5  Q  And he's always had that role since its
6  founding?
7  **A  Yes.**
8  Q  And is there any one else at all you
9  know that's involved in Sentinel Reinsurance,
10 Limited, other than Scott Ellington?
11 **A  Not that I'm aware of. If there is, he**
12 **would know.**
13 Q  Did Scott Ellington ever report
14 anything about the financials of Sentinel
15 Reinsurance to you in any way?
16 **A  I mean, sometimes he would verbally**
17 **talk about it, but -- you know, like the**
18 **transaction we were discussing earlier. But other**
19 **than that, there wasn't a formal reporting process**
20 **or -- or I wasn't in the loop on documentation**
21 **such as this.**
22 Q  Did you ever in your life see a
23 document that referred to Sentinel Reinsurance,
24 Limited?
25 **A  I don't believe so.**

135

1  Q  When you approved the $100 million
2  policy in August 2017, did you know what the
3  balance sheet of Sentinel Reinsurance, Limited
4  showed?
5  **A  No.**
6  Q  You can see from this document that it
7  reports that as of the end of 2016, the cash and
8  investments totaled $5.9 million.
9  **A  Yes.**
10 Q  And you see that there was unearned
11 premiums of about 1.2 million as of the end of the
12 year 2016, right?
13 **A  Yes.**
14 Q  Were you aware of any of that
15 information when you signed off on the
16 $100 million insurance policy that has been the
17 subject of today's discussion?
18 **A  No.**
19 Q  Did you -- I'm flipping the next page,
20 which says, "Sentinel Reinsurance, Limited,
21 Financial Statements" as of December 31st, 2016.
22 And then on the next page -- I'll scroll down a
23 little so you can see it more easily -- it shows
24 the balance sheets as of December 2016 and
25 December 2015. Do you see that?

136

1  **A  Yep.**
2  Q  And do you see where it says
3  "Shareholders' Total Equity," and breaks it down
4  from contributed surplus, unrealized loss,
5  et cetera, and then Total Shareholders' Equity.
6  Do you see that?
7  **A  Yes.**
8  Q  Does that in any way help you remember
9  roughly how much you invested in Sentinel
10 Reinsurance that narrows the range from 1 to
11 200 -- sorry, from 1 to 125 million dollars, as
12 you previously testified?
13 **A  I -- is that -- is that what you're**
14 **asking me, is 20 or 30 million dollars between 1**
15 **and 100?  Yeah, but I didn't know these numbers**
16 **specifically.**
17 Q  No, I previously asked you how much you
18 invested in Sentinel Reinsurance, and you said you
19 didn't really know other than it was somewhere in
20 the range of 1 to 125 million dollars. And I'm
21 wondering if, by looking at this balance sheet, it
22 in any way refreshes your recollection or allows
23 you to better narrow the range of how much you
24 invested in Sentinel Reinsurance.
25 **A  I don't -- was it started in this year?**

137

1  Was it started in '15?  I mean, I don't know when
2  exactly it started, but it's looking like there
3  was -- it looks like it was worth 20-odd million
4  dollars.  I don't understand the dividend lines,
5  though.  I will say that.  I don't remember ever
6  getting a dividend out of Sentinel.
7      Q   Would you have records to show whether
8  or not you ever received a dividend from Sentinel?
9      A   I mean, I would know if I did.  I don't
10 know if Sentinel was part of a holding company or
11 something.  Maybe there's a holding company above
12 this.  But I can say for sure -- I can say for
13 sure I never received 70 percent of 11.5 or 4.0.
14     Q   Are you still unable to narrow down how
15 much you invested in Sentinel Reinsurance to
16 anything more definite than somewhere between
17 1 and 125 million dollars?
18     A   I don't have a recollection.  Based on
19 these financials, I would say it's more likely
20 between 1 and 50.  I would say that.
21     Q   Okay.  I'm flipping to the next page,
22 and it shows the income statements for 2016 and
23 2015.  Have you ever seen this before?
24     A   No.
25     Q   Did you have any knowledge of even

138

1  directionally or approximately the amount of
2  income that Sentinel Reinsurance generated in 2016
3  and 2015?
4      A   No.
5      Q   I'm showing you the next page, which is
6  marked "Sentinel Reinsurance, Limited, Statements
7  of Cash Flow" for the periods of 2016 and 2015,
8  and it shows "Net income," "Cash Flows from
9  Investing Activities," and "Cash Flows from
10 Financing Activities."  Do you see that?
11     A   Yep.
12     Q   And do you see where it shows cash
13 balances as well?
14     A   Yes.
15     Q   And here it refers to significant
16 dividends paid in 2016.
17     A   Yep.
18     Q   And then it says, "Contributed
19 surplus."  Do you have any idea what that refers
20 to?
21     A   I don't know.
22     Q   The next page says, "Sentinel
23 Reinsurance, Limited, Supplemental Schedules" as
24 of December 31st, 2016.  And the next page shows
25 "Prepaid Expenses and Other Liabilities."  Do you

139

1  see that?
2      A   Yep.
3      Q   Any of this ring a bell at all?
4      A   Nope.
5      Q   But you would expect Scott Ellington
6  would know all about this?
7      A   Yes.
8      Q   And there is no other human being that
9  you can identify who you would expect to know
10 about this?
11     A   No.  Yeah, but again, you know, to the
12 extent that Scott needed help or access to other
13 people, he would know.
14     Q   Do you know who Andrew Dean is?
15     A   No.
16     Q   I'm flipping through the pages here to
17 the page titled "Summary of All Units," and it
18 says, "Underwriting Income," "Premiums written"
19 and "Change in unearned premiums."  Do you see
20 that?
21     A   Yes.
22     Q   And do you see that it says
23 "Inception-to-Date," the total premiums written
24 were $6.2 million as of the end of the year 2016,
25 correct?

140

1      A   Yes.
2      Q   And do you remember previous -- and
3  then it says there's unearned premiums of
4  $1.228 million.  Do you see that?
5      A   Yes.
6      Q   So does this information change your
7  view as to whether or not Sentinel Reinsurance had
8  ever issued a policy for more than -- a single
9  policy for more than $10 million prior to August
10 of 2017?
11     A   Well, I mean, we only go through end of
12 '16 here.  I don't know how rapid the growth was
13 in '17, but it was -- you know, it's clearly --
14 it's clearly a start-up but it's on a significant
15 trajectory, with the desire probably to have even
16 greater trajectory.  So I -- you know, so maybe
17 the bigger policies came later.
18         But, anyway, I -- like I said, I wasn't
19 involved in the day-to-day.  I don't have
20 awareness, exactly.
21     Q   Okay.  But in 2017, in approximately
22 August, you authorized an insurance policy with a
23 face value of $100 million, correct?
24     A   Right.  But I'm sure a premium value of
25 much less than 100, right?

141

1    Q   What was the premium value of the
2  policy that had the $100 million liability,
3  roughly?
4    A   I don't know.
5    Q   Didn't you previously say you thought
6  it was 70 to 80 million dollars in illiquid
7  assets?
8    A   No.  I said the amount of illiquid
9  assets were 70 to 80, but I don't know what the
10 premium structure was, like how much of the net 70
11 or 80 was premium.  Or -- or, you know, you'd
12 mentioned 110 of asset value, which I never heard
13 before, but maybe the 110 less the premium is how
14 it got to 75 or 80.  You know, I don't know the --
15 I don't know the structure of the policy.
16   Q   Why would 70 or 80 million dollars of
17 assets be transferred to Sentinel Reinsurance in
18 connection with the policy other than for a
19 premium payment?
20   A   I don't know.  I mean, that's what I'm
21 saying.  It's -- but the premiums can take
22 different forms, where it's like a first-year
23 premium or future premiums, you know, whatever,
24 you can segment the premiums.  Again, I just -- I
25 don't know the structure of the policy, Andy.  I

142

1  don't know the structure.
2    Q   Who decided how much premium would be
3  paid for the $100 million face value policy?
4    A   That would have been the process
5  Ellington went through with compliance and with
6  the regulators on what was fair and appropriate
7  for the risk and then what was comparable to
8  third-party transactions.
9    Q   Did Mr. Ellington do a market check
10 against third-party transactions in deciding how
11 much premium to pay for the $100 million face
12 value policy?
13   A   I'm sure -- I'm sure that was part of
14 his process and approval in his back-and-forth.
15 I'm sure it was.  But I don't have specific
16 awareness.
17   Q   Is that because he told you that's what
18 he did?
19   A   It's -- that would have been, I would
20 have thought, the starting point -- the logical
21 starting point for discussions with compliance and
22 the regulators, but I don't have awareness.
23   Q   So you assumed that Mr. Ellington must
24 have done a third-party check on the amounts of
25 premium that had to be paid --

143

1    A   Yes.
2    Q   -- to justify the $100 million policy?
3    A   Yes.
4    Q   But you've made no effort to confirm
5  that he did that; is that true?
6    A   Other than talking with my lawyers.
7  Like I said, I haven't prepared or refreshed on
8  the history here.
9    Q   Well, as you sit here today, do you
10 recall making any effort to ensure that
11 Mr. Ellington did any sort of market task to
12 ensure that the amount of premium paid for the
13 $100 million policy was consistent with what a
14 third-party transaction would have required?
15   A   Not that I recall at this point.
16   Q   Who negotiated on behalf of Highland
17 Financial Partners and its subsidiaries in setting
18 the amount that would be paid for the $100 million
19 insurance policy?
20   A   Scott Ellington.
21   Q   Who negotiated on behalf of Sentinel
22 Reinsurance in that transaction?
23   A   You know what, before I say Scott
24 Ellington, I -- well, compliance -- I don't know.
25 All I know is, like I said, we had to go through

144

1  compliance, I know we had to work it through the
2  regulators also.  And when you're on both sides of
3  the transaction, the scrutiny is higher, but I
4  don't know if -- sometimes organizationally
5  compliance will require somebody to be
6  representing one party and somebody to be
7  representing the other party just to make sure
8  there is some separation.  And although Scott
9  Ellington coordinated the overall transaction, I
10 don't know if there was somebody separate
11 representing one side or the other or if he
12 represented both.  I don't know, so I shouldn't
13 speculate, but -- but he was the overall architect
14 of the transaction.
15   Q   Did Scott Ellington represent all the
16 other parties to the insurance policy other than
17 HFP and its subsidiaries and Sentinel Reinsurance,
18 as far as you know?
19   A   "Other parties."  I don't know if there
20 were other parties to the core of the transaction.
21 There might have been approvals from some other
22 parties if you're saying there was a DAF note or
23 something else.  But I believe if there was any
24 other parties involved, they would have their
25 own -- their approval would be separate.  I

145

1  just -- I can't say for sure Ellington represented
2  both HFP and Sentinel.  I can't say for sure.
3      Q   You were requested to provide advice
4  about the assets of Sentinel Reinsurance and
5  what -- how to best maximize their value, correct?
6      A   Yes -- or, yeah, it would be on the
7  asset side I would get queried periodically on
8  what to invest in.
9      Q   Okay.  I'm going to flip ahead a few
10  pages of this Exhibit 25 to a page that says,
11  "Sentinel Reinsurance, Limited, Supporting
12  Schedules," as of December 31st, 2016.
13      A   Sure.
14      Q   And then the next page has some assets.
15  I'm going to blow this up a little bit.  There
16  are, it says here, "Sentinel Reinsurance, Limited,
17  Detailed Investment Schedule," as of
18  December 31st, 2016, and there are four CLOs
19  listed on this page, which is Bates labeled with
20  1081 as the last four digits.  Do you see that?
21      A   Yes.
22      Q   And the first one is an asset called
23  "Grayson CLO LTD 144A."  Do you see that?
24      A   Yes.
25      Q   Do you know what that asset is, Grayson

146

1  CLO LTD 144A?
2      A   I think that was an old CLO that we did
3  in the early 2000 period, and -- yes, that's what
4  it looks like.
5      Q   And it said as of that date it had a
6  value of $1.7 million.  Do you see that?
7      A   Yep.
8      Q   And it had a -- do you know if that
9  asset was ever monetized?
10      A   I have no idea.
11      Q   Do you know if Sentinel Reinsurance
12  still holds that asset today?
13      A   I have no idea.
14      Q   Do you have any idea if it was ever
15  sold?
16      A   No.
17      Q   Would an asset like that generate cash?
18      A   It would depend on the year.
19  Generally, yes.
20      Q   Do you know if any cash has been
21  generated in connection with the Grayson CLO
22  Limited 144A asset?
23      A   Over its life, for sure, but at any
24  given year or any given moment, I don't know.
25  They generally pay quarterly, but sometimes they

147

1  fall in arrears when the economy weakens and cash
2  is diverted, but generally they pay -- generally
3  they pay flows or dividends.
4      Q   Is the Grayson CLO Limited 144A, is
5  that a collection of corporate loans or
6  securitized corporate loans?
7      A   Yes.
8      Q   And what does the 144A refer to, do you
9  know?
10      A   144A private placement.
11      Q   What does that mean to you?
12      A   That it's a private placement.  It's
13  not a public bond.  It's issued under the 144A
14  private placement exemption the SEC has.
15      Q   Do you know how much cash over time
16  Sentinel Reinsurance collected with respect to
17  this asset?
18      A   No idea.
19      Q   Do you know how much they paid for this
20  asset?
21      A   No idea.
22      Q   Do you know where they got this asset?
23      A   No idea.
24      Q   There are -- there is another asset
25  here called "Greenbriar CLO LTD" that has a market

148

1  value of 1.4.  Do you see that?
2      A   Yes.
3      Q   Do you know anything about that asset?
4      A   No.  I would say for all four listed, I
5  would give you the exact same answers.  And I
6  don't know where they came from.  They generally
7  produce cash flow, but I don't know in any given
8  particular year, and I couldn't even begin to
9  estimate how much cash over its life, and I don't
10  know where it came from.
11      Q   You have heard of the Greenbriar CLO
12  Limited asset recently, haven't you?  You've
13  discussed that recently?
14      A   Was that the asset that Seery promised
15  to help give to UBS?  Was that that asset?
16      Q   Well, you heard about an asset called
17  Greenbriar that I believe you offered to provide
18  to UBS in one of your settlement proposals and
19  that is -- also been mentioned in connection with
20  the UBS settlement with Highland.  Does that ring
21  a bell?
22      A   Yes.  Yeah, that is -- it may not be
23  that Greenbriar, I mean, or it may not be that
24  piece, because I think the piece you guys were
25  talking about was larger, but it's essentially the

149

1  same security.

2  Q  The same security.  And that security
3  that you had offered previously to either turn
4  over or pay the value to as part of a proposed
5  settlement, is that currently being held by CDO
6  Fund?

7  A  I don't know where it's being held.  I
8  think -- I don't know.  I don't know where --
9  it's -- I think the only reason why it was the
10 only asset hanging around is I think it couldn't
11 be transferred directly, and so I think it might
12 have been transferred indirectly versus a
13 participation letter.  I don't know its history or
14 where it is exactly.

15 Q  Sorry, it couldn't be transferred from
16 whom to whom?

17 A  It was going to be transferred at some
18 point, somewhere, at some time, and it just -- it
19 couldn't be transferred directly so I think it was
20 transferred indirectly via a participation letter.
21 That was my recollection on why the Greenbriar was
22 still sitting somewhere, wherever that was.

23 Q  What's a participation letter, as you
24 used that term?

25 A  It's like if you didn't want to sell me

150

1  your house and go through the change of ownership
2  record, redoing a mortgage, whatever, but if you
3  signed a participation letter with me that over
4  the next five years, whatever appreciation of the
5  house would go to me and I would pay the expenses
6  of the mortgage for the next five years, where
7  we're essentially transferring the
8  responsibilities of ownership and you net the
9  differences in flows and price at some later date.

10      That's what I thought.  That's
11 typically what our participation letter is and
12 that's what I thought was involved in the
13 Greenbriar, but I'm not sure.

14 Q  Who told you that?

15 A  Scott Ellington, I believe.

16 Q  When did he tell you that?

17 A  I don't know, years ago.  Like I said,
18 I think there was always -- there was always some
19 issue with Greenbriar and transferability, I
20 believe.

21 Q  Did you ever see the supposed
22 participation letter?

23 A  No.

24 Q  Did you tell Jim Seery there was a
25 participation letter that affected the Greenbriar

151

1  asset?

2  A  I don't believe I ever talked to Seery
3  about Greenbriar at all.

4  Q  Did you tell any of the directors that
5  the Greenbriar asset was subject to a
6  participation letter?

7  A  No, I don't think I discussed it with
8  any of them.

9  Q  Did you discuss that with any of the
10 lawyers at the Pachulski firm?

11 A  No.

12 Q  Who was the participate- -- who was the
13 counterparty in that participation letter?

14 A  I don't know.

15 Q  If there --

16 A  If one exists, Scott Ellington will be
17 your person on that.

18 Q  Anybody else in the world you can think
19 of who would know anything about it, other than
20 Scott Ellington?

21 A  No.

22 Q  This is the last page I'm turning to
23 now of Exhibit 25.  It's a page entitled "Sentinel
24 Reinsurance, Limited, Intercompany Receivables" as
25 of December 31, 2016.  Do you see that?

152

1  A  Yes.

2  Q  And there's relatively small sums that
3  date from November 24th, 2014 through, it looks
4  like, July of 2016, the total about $114,000.  Do
5  you know anything about this?

6  A  No.

7  Q  And then it lists some entities at the
8  bottom, Nimitz, Ltd.; Patton, Ltd.  Do you know
9  what those entities are?

10 A  No.

11 Q  Do you know what SS Holdings is?

12 A  Nope.

13 Q  Given this balance sheet -- and I'm
14 going to go back.  And I realize this is as of
15 December 2016, but this is being sent -- you can
16 see it's -- going back to the first page, it's
17 being sent August 16, 2017.  That was around the
18 time that Sentinel entered into this $100 million
19 policy that you approved, correct?

20 A  Yes.

21 Q  And given the information here about
22 the balance sheet -- and I'm going to go back to
23 the balance sheet page, which ends with Bates
24 number 1071 -- how could Sentinel Reinsurance have
25 ever made good on a $100 million insurance policy,

153

1 given its balance sheet as of December 2016?
2         MR. TAYLOR: I'm going to object to the
3 form.
4     **A   Without going over in detail the policy**
5 **itself, you couldn't make a negative judgment. So**
6 **what you have here is two years of very good**
7 **profitability, very good dividend history, very**
8 **good earnings history, very good accretion of**
9 **value. Without knowing the policy itself, the --**
10 **no insurance company underwrites a policy that**
11 **they believe has a chance of paying out**
12 **immediately at full value with no premiums**
13 **received, you know, so there's -- depending upon**
14 **the policy structure, there's premiums, there's**
15 **cushion, there's whatever, and then there's a**
16 **probability associated with the payout and there's**
17 **a timing estimate associated with the payout.**
18         **You can't make a -- I don't believe.**
19 **You can't make a judgment from this to say what**
20 **would or wouldn't be a good, plausible investment**
21 **from here.**
22     Q   Do you know -- did you endeavor to make
23 any assessment about the timing of potential
24 payments or the likelihood of payments under the
25 policy or the timing of the premiums or anything

154

1 like that before you approved the insurance
2 policy?
3     **A   That -- that general underwriting and**
4 **structuring would have been the process that**
5 **Ellington underwent to make it arm's length and to**
6 **also make it compliant with compliance and the**
7 **regulators.**
8     Q   And Ellington would have had to go
9 through that both with your internal compliance
10 and in some form or fashion to submit to the
11 regulators; is that correct?
12     **A   Yes.**
13     Q   And do you know -- and the records
14 showing that that occurred, if they did -- if it
15 did occur, would it still exist at Highland?
16     **A   Yes. It -- it occurred, and it was an**
17 **extensive multi-month process, and there was a lot**
18 **of back-and-forth.**
19     Q   How do you know that?
20     **A   Because people would talk about it --**
21     Q   What people?
22     **A   -- oh, they're still working on this,**
23 **they are still going with that, compliance needs**
24 **this, the regulators want that, they don't**
25 **understand this, you know, whatever, we're trying**

155

1 **to make this clear. We're going to have to**
2 **renegotiate that or renego- -- but it was -- it**
3 **was an extensive process. It wasn't -- it was**
4 **not -- it was not a one-week process. It was a**
5 **multiple-month process. I do remember that. It**
6 **wasn't easy.**
7     Q   You've testified many times today that
8 Scott Ellington was your sole source of
9 information, and only oral, about anything having
10 to do with Sentinel, but you just said that many
11 people were involved in this process.
12     **A   Well, just in the office, people**
13 **reporting -- it was primarily -- it was**
14 **probably -- it was primarily Surgent and just**
15 **people reporting to him were all running around**
16 **for months going back and forth with Ellington and**
17 **his group, you know.**
18     Q   Sorry, Surgent -- Thomas Surgent, who
19 was then the chief of compliance?
20     **A   Yes.**
21     Q   He spent many months analyzing this
22 transaction?
23     **A   Yes. The back-and-forth with Ellington**
24 **and, like I said, also the offshore regulators,**
25 **also.**

156

1     Q   Okay. But let's stick with the people
2 at Highland. So Thomas Surgent went back and
3 forth with Ellington many times over several
4 months?
5     **A   Yes.**
6     Q   And you said many people working with
7 him. Who specifically worked with Thomas Surgent
8 assisting in this effort?
9     **A   See, that's a -- I mean, his area had**
10 **people buzzing on this and different people, I**
11 **think, sticking their fingers in and whatever, but**
12 **I -- beyond the general buzz of his areas and then**
13 **to a lesser extent Ellington's area -- I think**
14 **Ellington was largely handling it for his area.**
15 **But there was a lot of activity. There was a lot**
16 **of -- there was a lot of back-and-forth.**
17     Q   Who specifically other than Tom
18 Surgent?
19     **A   I don't know who they were accessing,**
20 **and I don't want to speculate on who on their**
21 **teams were working with them. But Ellington and**
22 **Surgent were both knee-deep in it.**
23     Q   And did you talk to Surgent at any
24 point while he was knee-deep in efforts to examine
25 the propriety of this $100 million policy?

157

1    A   No.  I mean, I -- no.  He's very
2  capable, very thoughtful.  He's a smart -- he's a
3  smart man.  He is smart financially even though
4  his background is more on the legal side.  He
5  didn't need my help.  And, plus, on these kinds of
6  things, it's compliance versus the businessperson.
7  It's better if I don't get involved.
8    Q   Is Scott Ellington trustworthy, in your
9  opinion?
10   A   Yes.
11   Q   Is he honest?
12   A   Yes.  I think you know that too.
13   Q   Do you absolutely trust him to handle
14 this honestly and appropriately?
15   A   Yes.  I mean, and like I said, when I
16 look at the dividend thing there, those are large
17 dividends, and I'm telling you, I didn't get any.
18 So, you know, but I don't sit here -- I don't sit
19 here worried about the fact that the money was
20 absconded with.  I know there's probably a holding
21 company or a funding of some other subsidiary or
22 something.  I know there is an explanation to it.
23 I trust there is an explanation to it, but I don't
24 know what it is.
25   Q   Is Thomas Surgent trustworthy?

158

1    A   Yes.  I -- honestly, my experience with
2  him over the years is that he was very
3  trustworthy.  I think he is one of the half dozen
4  people whose career has been ruined or corrupted,
5  corrupted by Seery in the whole process, and, you
6  know, whatever.  I think he is more distant and
7  less focused and less interested.  But I still
8  think he is -- even though I think he is in a very
9  difficult situation at the moment, I think he is a
10 trustworthy person.
11   Q   Is Thomas Surgent honest, in your view?
12   A   Yes.  Although, again, I just have to
13 draw a distinction from -- I haven't talked to him
14 in over a year, and he has been very
15 discombobulated by the bankruptcy process.  He was
16 the one who was negotiating with Redeemer for the
17 three weeks before we filed when Mashrum jerked
18 him on the 50 million at 7:00 a.m. in the morning
19 in Delaware.  And so I'm not sure he's recovered
20 from that, let alone -- you know, Seery used to
21 work for the estate up until about June, and since
22 then, he has been working for the creditors for --
23 largely for his own payday.  And I think he has
24 been disappointed by that also.
25   Q   Sorry, who has been disappointed?

159

1    A   Thomas.  Thomas.  I think he's -- this
2  bankruptcy process and the way people behave in
3  bankruptcy I think has disappointed him.
4    Q   What makes you say that if you haven't
5  talked to him?
6    A   Well, I just -- from other people who
7  do talk to him.
8    Q   Who?
9    A   Well, the guys -- there are still a
10 bunch of guys here that talk to him.
11   Q   Who?
12   A   Does it matter?  I -- you know.
13   Q   Yeah.  Who did you hear that from that
14 Thomas Surgent feels this way?
15   A   You know what, I -- let me think about
16 it, I'll get back to you.  Let me think on it.
17   Q   No, you just said that you have heard
18 these things that Thomas Surgent is feeling.  Who
19 did you hear that from?
20   A   Yeah, let me think.  It's one of a
21 couple people.  Let me boil it down and I'll get
22 back to you.
23   Q   Who?
24   A   I'll get back to you.  I can't remember
25 exactly who.

160

1    Q   Depositions aren't take-home exams.  So
2  as you sit here today --
3    A   Okay, but I'm just going to tell -- I'm
4  just going to leave you, then, with I don't
5  remember.
6    Q   Who were you thinking said that when
7  you said it?  Who were the two candidates?
8        MR. TAYLOR:  Objection.  Form.
9    A   I --
10   Q   Who are the two candidates in your mind
11 that might have been the ones who told you that
12 Thomas Surgent was unhappy?
13   A   I'm not going to go there, Andy.
14       MR. TAYLOR:  Andy, he doesn't have to
15 speculate.
16   A   I'm going to leave it at -- I'm going
17 to leave it at I don't remember or I'll get back
18 to you, if you want.
19   Q   You said you would get back to me.  Who
20 were the two names that you were thinking of when
21 you said that there are people who still talk to
22 Surgent?
23   A   Like I said, I don't want to spec- --
24 it might be three names.  I need to chew on it
25 some more and think about it but at the moment, I

161

1  don't remember.
2      Q   You really have to answer to the best
3  of your ability.  So who are the names you were
4  thinking of?
5          MR. TAYLOR:  Andy, he doesn't have to
6  speculate.  He says he can't remember.  He doesn't
7  have to speculate.
8      Q   Well, you testified that somebody told
9  you something -- well, you testified about what
10 Mr. Surgent feels, and you have not spoken to him
11 in over a year, correct?
12     A   That's right.  And so think about it.
13 It was, you know, multiple people giving multiple
14 tidbits.  I don't want to -- I don't want to
15 speculate or jump to a conclusion.  I'll think
16 about it some more, but I can't remember or
17 attribute it exactly to one person at this moment.
18     Q   You said there were people who speak to
19 Thomas Surgent still.  Who are they?
20     A   Well, I mean, it's most -- most
21 everybody in senior management still speaks to him
22 so ...
23     Q   Who?
24     A   I mean, just most everybody in senior
25 management still --

162

1      Q   What are their names?
2      A   -- speak to him.
3          You know, you can look up the org
4  chart, Andy.  I'm not -- I don't want to speculate
5  or point to anybody in particular at this point.
6  You know, and really, really part of the reason,
7  too, as I was thinking before -- before I would
8  speculate or attribute it to one person, I was
9  going through it in my mind, like, okay, how much
10 of it is my perception, maybe being a little
11 sensitive to everything he's been through, and
12 then how much of it is did someone truly say, and
13 then how much did maybe somebody else put their
14 own spin on it.
15         And I just don't want -- I don't want
16 to go down the --
17     Q   As you sit here today, you can't
18 identify a single person who has told you anything
19 about how Thomas Surgent feels in 2021; is that
20 correct?
21     A   That's correct.  It would be best to
22 talk to him about it.  And, you know, you can --
23 it would be best to talk to him.
24     Q   And as you sit here today, you can't
25 think of one person -- you can't identify one

163

1  person by name who has ever told you anything
2  about how Thomas Surgent feels about the
3  bankruptcy, correct?
4      A   Correct.
5      Q   So you have no basis for the assumption
6  that Thomas Surgent feels a certain way about the
7  bankruptcy as you sit here today, correct?
8      A   That's -- that's what I was beginning
9  to realize as I was saying it, that I might be
10 overlaying too much of my -- too much of my own
11 views or too much of other people's just general
12 views or just too much -- I might be reading into
13 too much or connecting too many dots.  So I don't
14 want to go any further down this conjecture.
15     Q   Okay.  Let's close this document,
16 please, and let's open up the next document that's
17 behind Tab 6.  It will be marked as Exhibit 26.
18         (Deposition Exhibit 26 marked for
19 identification.)
20     Q   Exhibit 26, when it gets put up on the
21 screen, will be a one-page document that
22 identifies entities that are connected to Sentinel
23 Reinsurance.  And here we go.  We have it up here.
24         First of all, it says that "Multi Strat
25 Credit Fund" -- it identifies Multi Strat Credit

164

1  Fund, and it says, "Investor, Sentinel
2  Reinsurance."  Do you see that?
3      A   Yes.
4      Q   What does that mean?
5      A   I've never seen this -- I've never seen
6  this page before.  Or I've never seen this paper
7  before.
8          MR. TAYLOR:  You don't have to
9  speculate.
10     Q   Well, do you know whether or not
11 Sentinel Reinsurance, Limited is an investor in
12 Multi Strat Credit Fund LP?
13     A   I don't know.
14     Q   In fact, you have seen recently
15 documents that show you that Sentinel Reinsurance
16 is a redeemer in Multi Strat; isn't that true?
17     A   I'm trying to -- what documents have I
18 seen?  And I'm willing to be refreshed on that.
19 Yeah, I'm willing to be refreshed on that.
20     Q   You are aware, as you sit here today,
21 that Sentinel Reinsurance is a redeemer in Multi
22 Strat, correct?
23     A   Okay, I'm willing to be refreshed.
24 That sounds -- that sounds plausible, potentially
25 familiar.  If -- do you have a redeemer listing

165

1 you could show me that Multi Strat is?
2     Q   We'll get to that, but I just -- you're
3 a 70 percent owner of Sentinel Reinsurance and
4 there has been a lot of discussion in the last few
5 months about Multi Strat and the redemption and
6 potential settlements.  And it's fair to say that
7 you are aware that Sentinel Reinsurance is a --
8 one of the redeemers of Multi Strat Credit Fund,
9 correct?
10         MR. TAYLOR:  He's answered that, and he
11 said he is willing to be --
12         MR. CLUBOK:  That's okay.  It's okay.
13         MR. TAYLOR:  -- refreshed.
14         MR. CLUBOK:  You don't need to have a
15 speaking objection.
16     Q   But Mr. Dondero, it's correct that over
17 the last few months you have seen information that
18 demonstrates to you that Sentinel Reinsurance is a
19 redeemer in Multi Strat Credit Fund, correct?
20         MR. TAYLOR:  Objection as to the form
21 and it's been asked and answered.
22     **A   I'm willing to be refreshed.  And that**
23 **sounds, like I said, plausible and possible.**
24     Q   It's not just plausible and possible.
25 As you sit here today, you know that Sentinel

166

1 Reinsurance is one of the redeemers in
2 Multi-Strat; isn't that true?
3     **A   Yeah, I'm trying to remember.  It's**
4 **like they were an investor.  Did they redeem, or**
5 **are they a separate, you know, non-redeemed**
6 **investor, or is some of it split -- I'm willing to**
7 **be educated.  I just can't remember the form of**
8 **their investment.**
9     Q   Okay.  And on this document that's been
10 marked as Exhibit 26 it talks about Patton,
11 Limited being a 70 percent beneficial owner.  Do
12 you see that?
13     **A   Yes.**
14     Q   Is it true that Patton, Limited is an
15 entity that you have the beneficial ownership
16 interest in?
17     **A   Well, I think I mentioned earlier I**
18 **know that I'm a 70 percent beneficial owner of**
19 **Sentinel.  I never knew the name of the entity,**
20 **and if you're telling me the entity is Patton,**
21 **Limited, and it does resemble 70 percent, I --**
22 **okay, I'm willing to be educated on that, but I**
23 **didn't know the name before, but I still don't**
24 **know the name now.**
25     Q   Okay.  Do you know that Nimitz, Limited

167

1 is an entity that Scott Ellington is the
2 beneficial owner of?
3     **A   Yeah, I mean, it looks like it.  And in**
4 **the detail -- the detail below looks like those**
5 **are the names of the entities that have the**
6 **beneficial ownership.  That's what this appears to**
7 **be.**
8     Q   So as you sit here today, you have no
9 reason to dispute the fact that you own an entity
10 called Patton, Limited that, in turn, is a
11 70 percent beneficial owner of Sentinel
12 Reinsurance; is that correct?
13     **A   I have no reason to know otherwise.  I**
14 **have no reason to dispute that.**
15     Q   And you have no reason to dispute that
16 Scott Ellington is the beneficial owner of Nimitz,
17 which, in turn, is a 30 percent beneficial owner
18 in Sentinel Reinsurance, correct?
19     **A   Correct.**
20     Q   Let's -- did you tell anyone at
21 Highland Capital Management ever that you were a
22 70 percent owner in Sentinel Reinsurance other
23 than Scott Ellington?
24     **A   Not that I -- not that I remember, not**
25 **that I recall.**

168

1     Q   Do you know what Mainspring, Limited
2 is?
3     **A   No.  I'm willing to be educated, but**
4 **no, I don't.**
5     Q   Why didn't you tell anyone connected
6 with Highland, other than Scott Ellington, that
7 you were a 70 percent beneficial owner in Sentinel
8 Reinsurance?
9     **A   It never came up or no one ever asked.**
10     Q   When you approved the $100 million
11 insurance policy, did you ever make an effort to
12 ensure that Thomas Surgent knew that you were a
13 70 percent beneficial owner in Sentinel
14 Reinsurance?
15     **A   I'm 100 percent certain that Thomas, in**
16 **his team in his process, knew that.**
17     Q   How?
18     **A   He would have -- he would have never**
19 **proved it otherwise, and, again, he was asked to**
20 **prove it because it was two entities related,**
21 **controlled -- whatever the thresholds are for**
22 **properly running something through compliance that**
23 **Ellington was doing, there's no way you would get**
24 **through compliance without disclosing fulsomely,**
25 **completely and transparently what the overlaps**

169

1 were.
2    Q  You're assuming all that because that's
3 the only way it could have been done properly,
4 correct?
5    A  It's the only way it would have been
6 done at all.
7    Q  Okay. But you didn't see that
8 disclosure, you don't have any firsthand knowledge
9 of that disclosure occurring, you know nothing
10 about that supposed disclosure other than what
11 you're assuming happened, correct?
12    A  Yeah, but again, if you go back to
13 Dodd-Frank and the personal liability put in for
14 chief compliance officers and the elevation of
15 chief compliance officers to the C-suite, it would
16 be a -- to do it haphazardly or to do it without
17 doing that or knowing that would be a violation of
18 compliance and regulations, and he would
19 knowingly -- he would be knowingly putting himself
20 in harm's way or liability if he were to do it
21 without understanding and knowing the players.
22    Q  And so would you. You would also have
23 that same liability under Dodd-Frank that you just
24 described that Mr. Surgent would have, given your
25 road, correct?

170

1    A  That's right. That's why I don't do it
2 without doing it correctly.
3    Q  So if you didn't ensure that it was
4 known that Sentinel Reinsurance was an affiliated
5 entity, there would be a big problem, correct?
6    A  Well, yeah, I mean -- yes, I guess,
7 yes, but there is no reason why it would have
8 been -- if it was going to be obfuscated, it
9 wouldn't have been pushed through compliance. It
10 was pushed through compliance because we were
11 being correctly transparent about it.
12    Q  And that responsibility for ensuring
13 that it was known that Sentinel Reinsurance was an
14 affiliated entity also fell to Scott Ellington in
15 addition to you and Mr. Surgent, correct?
16    A  Yes.
17    Q  And if Mr. Ellington obfuscated the
18 fact that Sentinel Reinsurance was an affiliated
19 entity, that would be a big problem, right?
20    A  Yes. But you're missing the point. If
21 they -- if Ellington was going to do an insurance
22 policy with Aon or Chubb or some third party, he
23 could have done it unilaterally in 10 minutes
24 without ever mentioning a word of it to
25 compliance. If he was going to obfuscate the

171

1 ownership or the control of Sentinel, he would
2 have never run it through compliance. The only
3 reason to take a transaction like this through
4 compliance is because you're being honest and
5 forthright about the overlap.
6    Q  And if you didn't run it through
7 compliance honestly and forthrightly, that would
8 be a huge problem, correct?
9    A  If he didn't run it through compliance
10 at all, yes.
11    Q  And if he didn't fully disclose to
12 compliance the nature of the affiliation of
13 Sentinel Reinsurance, that would be a huge
14 problem, correct?
15    A  Yeah, but it goes back to my testimony
16 that I don't think that would be possible.
17    Q  Understood. But you have not seen any
18 documents -- you have never seen a document, not a
19 single document that shows Mr. Surgent and the
20 compliance team being made aware that Sentinel
21 Reinsurance was an affiliated entity; is that
22 correct?
23    A  Yes. I wasn't involved in the process.
24 But, again, it's not plausible to go to compliance
25 and say, I have a transaction you need to approve

172

1 because there's overlap, but I'm not going to tell
2 you what the overlap is. Sign off on it. There
3 is just no chance of that happening.
4    Q  If Mr. Ellington had not done that,
5 that would be a huge problem, correct?
6    A  Yeah, there would have to be some facts
7 and circumstances that I don't understand.
8    Q  Okay, let's look at -- let's look at
9 Tab 7A. Tab 7A is an exhibit that will be marked
10 as Exhibit 27.
11      (Deposition Exhibit 27 marked for
12 identification.)
13    Q  It will take a minute to -- oh, that
14 was fast.
15      Let me try to make it a little bit more
16 sized properly so you can see it, hopefully.
17      Exhibit 27 is an e-mail from you at
18 your JDondero@HighlandCapital.com e-mail address
19 to Tim Cournoyer, also at a HighlandCapital.com --
20    A  Yes.
21    Q  -- address; Subject: Re: Consent of
22 Managers - SeaOne Holdings LLC, dated January
23 2019.
24      Do you see that?
25    A  Yes.

173

1 Q   Who is Tim Cournoyer?
2 A   He is one of the -- he was one of the
3 internal lawyers at Highland on the corporate
4 side, generally, who didn't come over to the new
5 entities over here but still works for Seery at
6 Highland.
7 Q   Is he honest?
8 A   I don't know Tim as well.  I don't
9 know -- I can't -- I don't have -- I don't know
10 him as well to have a strong opinion.
11 Q   Okay.  And in this e-mail at the top of
12 the chain you say, "Yes, I approve waiver and
13 moving forward." Do you see that?
14 A   Yes.
15 Q   Do you remember this exchange?
16 A   Not specifically, but I can be -- can
17 you enlarge this a little bit?  I can be
18 refreshed, I believe.
19 Q   Yeah, I'm going to enlarge the e-mail
20 that immediately precedes that to which you're
21 responding to.  And the e-mail that you say, "Yes,
22 I approve waiver and moving forward" is a response
23 to an e-mail that Mr. Cournoyer -- how do you
24 pronounce that name?
25 A   Cournin (phonetic) I think is how you

174

1 pronounce it.
2 Q   How?
3 A   Cournin.  I would have said Tim
4 Cournin.
5 Q   Cournin with an "N"?
6 A   Yes.
7 Q   So the O-Y-E-R is silent?
8 A   Yeah, I think so.
9 Q   Okay.  The person that you call Tim
10 Cournin sent you an e-mail at 7:10 p.m. on
11 January 29th, and it looks like you respond that
12 same day, although the time stamp is curious.
13 Maybe it's a time zone issue.  But in any event,
14 Mr. Cournin, as you say, said, "Jim, I reviewed
15 the documents that were sent over and left two
16 voice mails with Brian Brantley at the Company but
17 have not heard back."
18     And he goes on to explain how "Each of
19 Dugaboy and Sentinel have a preemptive right to
20 participate in the new offering."  And he said,
21 "Please confirm that you are okay waiving the
22 right to participate in this round.  If you
23 approve, please confirm," and he "will work with
24 Tara/Sue/Melissa to use your e-signature for the
25 Board resolutions and to obtain Sentinel's and

175

1 Dugaboy's signature."
2     And in response to that you say you
3 approve the waiver and are moving forward.
4 Q   Do you see that?
5 A   Yes.
6 Q   Do you remember this transaction?
7 A   Yes.  I mean, generally, yes.
8 Q   Describe what you know about it.
9 A   SeaOne was a venture capital
10 investment.  The former CEO of EOG had come up
11 with a more creative way to ship natural gas
12 around the world using -- essentially making a
13 radiator out of a 42-inch pipeline.  It's much
14 better, it's much more efficient, much cheaper
15 than LNG, but it's taking two or three times as
16 long, as everybody expected, to get any kind of
17 industry buy-in, so they were frequently doing
18 additional capital raises.  Some of them were
19 offensive and some of them were defensive.
20     We were an early investor -- an earlier
21 investor in SeaOne so we had the ability to
22 participate in rights offerings or block any
23 defensive rights offerings.  We just had some
24 shareholder protections as an earlier investor.
25     And what this back-and-forth here is,

176

1 you know, to allow the additional financing to
2 occur at the company, we had to waive some of our
3 rights.
4 Q   Okay.  And you were the decision maker
5 for Dugaboy's decision to participate in the new
6 offering?
7 A   Yeah, I want to be careful here.  You
8 know, Dugaboy has its own trustee.  Sentinel has
9 its own management.  But I was on the board of
10 SeaOne, and I was the resident expert as far as
11 SeaOne was concerned.  So for decisions involving
12 the credit, people would rely on my expertise as
13 regarding SeaOne.
14     And that's what -- that's what Tim is
15 asking for at the bottom of the letter with the
16 underline, you know, so I'll go forward, you know,
17 and make that specific recommendation to the
18 various funds that own it.  And he was just going
19 through the mechanisms, the signature mechanisms.
20 Q   You don't say you're going to make a
21 recommendation to the various funds.  You say you
22 approve the waiver and moving forward.  Do you see
23 that?
24 A   Yes.
25 Q   So you didn't have to go check with

177

1  anyone. You just had the authority to approve the
2  waiver on behalf of both Sentinel and Dugaboy,
3  correct?
4     **A   No, I'm not saying that. I approved**
5  **the waiver and the concept of the waiver, but,**
6  **again, I'm acting as the investment professional**
7  **on this particular investment. It doesn't give me**
8  **carte blanche on the funds that they're in -- that**
9  **those investments are in.**
10    Q   I didn't ask that. My question is,
11 specifically with this transaction, you believed
12 that you had the authority to approve the waiver
13 of the right to participate in that new offering
14 on behalf of both Sentinel and Dugaboy, correct?
15    **A   No. I approve, meaning I agree. You**
16 **know, that's why I always use "I approve" -- from**
17 **board positions or from senior lead, because it**
18 **says I approve or I agree with the waiver. But to**
19 **the extent that it's investment advice and there**
20 **is no reason for a trustee to second-guess me,**
21 **they would trust my investment advice, and that's**
22 **what Tim is parlaying to the funds themselves at**
23 **the bottom of the thing there, but just because I**
24 **approve of the waiver doesn't give me broad**
25 **authority at independent entities.**

178

1     Q   Right, but you didn't -- you just
2  responded to Tim's e-mail. You didn't check with
3  anyone before responding. Correct?
4     **A   Well --**
5     Q   Let me break this up. You have never
6  spoken to a director of Sentinel, as far as you
7  know, correct?
8     **A   That's -- that's correct.**
9     Q   So you didn't check in with the
10 directors of Sentinel before you told Tim that you
11 were okay waiving the right to participate in this
12 round on behalf of Sentinel, correct?
13    **A   That's correct. But that's typical.**
14 **If you're the investment manager -- like we were**
15 **saying before, we do portfolios of bank loans.**
16 **Companies need amendments all the time. That**
17 **would be part of the normal investment process.**
18 **We wouldn't call separate accounts or managements**
19 **at CalPERS to tell them, you know, we were**
20 **approving an amendment at Caesar's or Toys-R-Us or**
21 **something.**
22    MR. CLUBOK: So move to strike
23 everything after "that's correct".
24    Q   My simple question to you is, for this
25 transaction, you had the right to approve it

179

1  without checking with the Sentinel directors;
2  isn't that true?
3     MR. TAYLOR: Objection. Form.
4     **A   I have no comment on that. I was just**
5  **approving the company's -- the reasonableness of**
6  **the company's amendment request.**
7     Q   I'm going down the e-mail chain here,
8  and it started with, it looks like, an e-mail from
9  Bart Baker of SeaOne Holdings to you that sought a
10 consent of managers for SeaOne Holdings related to
11 the continuation of the capital raise of that
12 company, and they asked you to sign the signature
13 page. Do you see that?
14    **A   Yes.**
15    Q   And you then forwarded that to Tim --
16    **A   Cournin.**
17    Q   -- Tim Cournin, as you call him, right?
18    **A   Yes.**
19    Q   And Tim said he reviewed the documents
20 and he left voice mails with Brian Brantley and
21 then he explained the transaction and he notes
22 about these preemptive rights that Dugaboy and
23 Sentinel have, and asked you to confirm that you
24 were okay waiving the rights to participate in
25 this round on behalf of Sentinel and Dugaboy,

180

1  correct?
2     **A   Yes, overall. And you can see I --**
3  **again, I'm approving it in general from a business**
4  **perspective. That's what it says, "Yes, I approve**
5  **the waiver and moving forward."**
6     Q   Okay. And you made that statement
7  without checking in with any director of Sentinel,
8  correct?
9     MR. TAYLOR: Objection. Asked and
10 answered.
11    **A   Yeah, correct. I didn't talk to any of**
12 **the -- I didn't, nor would I have, in normal**
13 **course, expected to for any accounts that we**
14 **manage.**
15    Q   And you didn't speak to anyone at
16 Dugaboy either before telling Tim that you
17 approved of the waiver on behalf of Dugaboy,
18 correct?
19    **A   That's correct.**
20    Q   And by the way, previously you said
21 that in addition to satisfying internal
22 compliance, you also had to satisfy regulators for
23 the insurance policy that was issued?
24    **A   Yes.**
25    Q   What specific regulators are you

181

1  talking about?
2      A  The Cayman reinsurance regulators do
3  some of the analysis and underwriting that you
4  were speaking of earlier in terms of making sure
5  the structure, the potential paths, and the
6  premiums and the assumptions and the probabilities
7  are reasonable also, especially if it is an
8  outsized policy for a company or if the company is
9  in a high-growth state, which Sentinel was.  And
10  so that's why I know Ellington was in
11  contemporaneous discussions with them at the same
12  time he was getting the transaction through
13  compliance.
14      Q  So, first of all, this was an outsized
15  policy, given Sentinel Re's history, correct?
16      A  I mean, it's outsized or larger than
17  what they had done historically.
18      Q  And, second of all, Sentinel Re, based
19  on the financial statements, we showed was not in
20  the high growth, but they were actually
21  contracting 2016 as compared to 2015; isn't that
22  right?
23      A  No.  No, they were growing on all
24  measures.  Their capital just shrunk because of
25  the dividends.

182

1      Q  Well, their pretax income was shrinking
2  from 2016 versus 2015, right?
3      A  Okay, all right.  Yes, okay.
4      Q  And their balance sheet shrunk between
5  2016 as compared to 2015, right?
6      A  Okay, yes, but they are still in the
7  high growth mode.
8      Q  What was one measure that they were
9  growing in in 2016 compared to 2015 if it's not
10  balance sheet, income, capital?  Name one measure
11  that causes you to say that they were high growth?
12      A  There's an effort in futzpah, footnote
13  on page 7.
14      MR. TAYLOR:  Andy, if you're going to
15  ask him about a document, I would ask that you put
16  it up in front of him.
17      Q  There was a footnote on page 7 of what
18  document?
19      A  I'm joking.  I'm joking, Andy.  I said
20  it was an effort in futzpah, chutzpah, footnote on
21  page 7.  But no, I mean, it was -- that was the
22  ambition and that was the plan.  If it hit a lull
23  in 2016, it looks like they were making up for it
24  in growth in 2017.
25      Q  When you say "it looks like they were

183

1  making up for it in growth," you're basing that
2  solely on the fact that this $100 million policy
3  was issued and no other information that you have,
4  correct?
5      A  I haven't seen the financials for '17
6  or '18, so I don't know what else they were doing.
7      Q  Well, you just said, "it looks like
8  they were making up for it in growth in 2017."
9      A  Well, yeah, based on -- based on what
10  you have been telling me, the policy was done in
11  August of '17 and it was a larger policy.
12      Q  When you say "it looks like they were
13  making up for their lack of growth in 2016,"
14  you're solely basing that on the issuance of this
15  $100 million policy and nothing else that you're
16  aware of as you sit here today, correct?
17      A  That's right.  I haven't seen the '17
18  or the '18 or '19 or '20 financials.
19      Q  Okay.  But you have seen financials
20  that show you they contracted from 2016 as
21  compared to 2015, correct?
22      A  Yes.
23      MR. CLUBOK:  Let's put up Exhibit --
24  the document that is behind Tab 8.  It will be
25  marked as Exhibit 28.

184

1      (Deposition Exhibit 28 marked for
2  identification.)
3      Q  This document, when it gets up, is an
4  e-mail from Katie Irving to Sam Dawson, Dylan
5  Wiltermuth, copy J.P. Sevilla and Matt DiOrio;
6  Subject:  Entity restructure - Sentinel, and it's
7  dated April 10th, 2019.
8      I'll show you the top of that document
9  so you can see that.  Do you see all that at the
10  top of Exhibit 28?
11      A  Yes.
12      Q  Okay.  I'm going to skip the e-mail
13  part, but I just want to -- there is an attachment
14  here that says "SAS" and "Sentinel Final Structure
15  as of 9 April 2019, a PowerPoint."  And that
16  attachment, I'm flipping down, it's a -- the first
17  attachment, which is the structure -- "Offshore
18  Fund Structure" of SAS, is on the page that ends
19  Bates labeled 3125 of Exhibit 28.
20      Do you see that?
21      A  Yes.
22      Q  And I'm going to try to make it so it's
23  as easy as possible to read.  First of all, this
24  is an SAS structure not Sentinel, SAS.  And do you
25  see where it talks about "USP1," "four USPs" and

185

1  then "USP2" on the right?
2  **A  Yes.**
3  Q  Fair to say that you are one of these
4  USPs?
5  **A  No, it's not fair to say.  I have no**
6  **idea.**
7  Q  You have no idea.  Okay.
8  Do you recognize any of the names on
9  this org chart for SAS structure as of April 9,
10  2019?
11  **A  No, I do not.**
12  Q  Have you ever heard of Sebastian
13  Clarke, Limited?
14  **A  No.**
15  Q  Did you know that Matt DiOrio was a
16  director of Sentinel Reinsurance?
17  **A  I did not.**
18  Q  Did you ever speak with Matt DiOrio
19  about Sentinel Reinsurance?
20  **A  No.**
21  Q  Did you -- did you ever speak to Matt
22  DiOrio in the last two years?
23  **A  I spoke to him a month ago.  He was the**
24  **point person on some of the shared services**
25  **agreements with the bank, and so I was working**

186

1  **with him on those.**
2  Q  Is he working with you at your new
3  venture?
4  **A  He is at -- yeah, he works at whatever**
5  **it's called, SkyBridge, SkyGate, whatever,**
6  **whatever it's called.**
7  Q  So he has an office in the same
8  building, although on a different floor, than the
9  building you're sitting in today?
10  **A  Yes.**
11  Q  Have you ever talked to Matt DiOrio
12  about SAS?
13  **A  No.**
14  Q  I'm going to turn to the next page.
15  The next page in this document, Exhibit 28, is
16  another chart, and this is for the Sentinel
17  structure as of April 9, 2019.  Do you see that?
18  **A  Yes.**
19  Q  Now, here you are USP2, correct?
20  **A  I've never seen this before.  I don't**
21  **know if you can make that statement just from --**
22  **the Patton, Limited, I guess, is the same Patton**
23  **on the other page, but I don't know how that**
24  **connects to USP2.**
25  Q  Well, when you go down USP2, down this

187

1  chart, you get to where it says "70 percent" value
2  for Sentinel Re at the bottom?
3  **A  Yes.**
4  Q  And USP1 goes down, and there is
5  30 percent value.  Do you see that?
6  **A  Yep.**
7  Q  And fair to say that under this chart
8  Mr. Ellington is USP1 and you are USP2?
9  **A  I don't know, and I haven't seen this**
10  **before.**
11  Q  Are there any other U.S. partners
12  invested in Sentinel, other than you and
13  Mr. Ellington, to your knowledge?
14  **A  I've never seen this before.  I don't**
15  **have an awareness of this, that even USP means**
16  **U.S. partner.**
17  Q  Okay.  But you are -- you do have an
18  awareness that Patton was an entity that you owned
19  70 percent of Sentinel Re through, correct?
20  MR. TAYLOR:  Objection.  Form.
21  **A  If that's the same Patton as the one**
22  **that we saw in the Sentinel structure.**
23  Q  Okay.  And you're saying, as you sit
24  here today, you believe you have no relationship
25  whatsoever with SAS?

188

1  **A  This is the first time I've seen**
2  **this -- can you go back to the page before for a**
3  **second?**
4  (Witness reviewing document.)
5  **A  Even looking at this, I can't figure**
6  **this out.  Do we get these exhibits as part of the**
7  **deposition?**
8  Q  I don't know.  Why do you ask?
9  **A  I'd like to spend more time looking at**
10  **this.**
11  Q  Well, as you sit here today, are you
12  aware -- are you testifying that as far as you
13  know, you have no connection whatsoever to SAS?
14  **A  I mean, that's how I understood it,**
15  **which is it looks like this was the older**
16  **structure.  I mean, I'm trying to -- I'm trying to**
17  **figure this out and it's --**
18  Q  How do you know it is the older
19  structure?
20  **A  Well, because that's how it was**
21  **presented and that's as of '19, and you have got a**
22  **proposed structure a page later, right?**
23  Q  Oh, no, no, this is "SAS Structure" and
24  the next page is "Sentinel Structure."
25  **A  Right, but isn't the next structure a**

189

1 combination of the two or no?
2    Q    No. It's -- well, yes, it looks
3 like -- ah, it look like SAS Holdings is involved
4 somehow in Sentinel. Actually, now that you
5 mention it, it looks like SAS Holdings is somehow
6 connected. Does any of that ring a bell with you?
7    A    No, none of this rings a bell. I
8 didn't know it was restructured, and I can't make
9 heads of tails out of the prior restructuring.
10 But hold on a second. So in a day or two when we
11 get the deposition transcript, aren't the exhibits
12 included or no?
13       MR. TAYLOR: They are.
14       THE WITNESS: They are. Okay, good.
15 All right.
16    Q    It may be.
17    A    Yeah, Clay is saying they are. I just
18 want to be able to look at this in more detail
19 then.
20       MR. TAYLOR: Andy, is this a Highland
21 Capital document?
22       MR. CLUBOK: It is a Highland Capital
23 document produced by Highland Capital, Bates
24 labeled.
25    Q    So as you sit here today, having seen

190

1 this, as far as you know, you're not aware of any
2 connection you had with SAS; is that correct?
3    A    I thought the ownership of SAS was --
4 didn't flow through to Scott and I. I thought
5 there was some fee, some profitability sharing
6 potentially, but I thought the ownership was owned
7 by some -- to avoid operating a business offshore,
8 sometimes I think there's charitable entities and
9 stuff that are the owner for name purposes, and
10 that's how I thought SAS was structured, where if
11 there -- it would be possible to get some
12 incentives or compensation out of it but that the
13 ownership wasn't with Scott and I. That was my
14 memory, but, you know --
15    Q    Okay. But you believe that you had
16 some economic interest in SAS; is that correct?
17    A    You know, potentially, you know, but --
18 I mean, but as far as I know, there hadn't been a
19 lot of realizations there.
20    Q    Have you ever received any economic
21 benefit from SAS, as far as you know?
22    A    No, I have not.
23    Q    Has Scott Ellington, as far as you
24 know?
25    A    As far as I know, no.

191

1    Q    By the way, on the chart for Sentinel,
2 it shows that you have a 70 percent value, but it
3 says 91 percent vote. Do you see that?
4    A    Yes.
5    Q    Do you know why you have a greater
6 voting share than your economic benefit in
7 Sentinel as it's set forth in this chart?
8    A    No. Like I said, that's why I can't
9 make heads or tails of this. Like I can't --
10 like, look a little further right, where it's
11 99 percent of value, 1 percent of the vote. I
12 can't -- I can't seem to add up the value numbers
13 or the vote numbers. I must be missing something.
14 I couldn't do it on this chart or the other chart.
15 That's why I would like to review them in more
16 detail.
17    Q    Yeah, but as you sit here today, are
18 you aware generally that you have a greater voting
19 interest in Sentinel than you do an economic
20 interest?
21    A    No, I would have guessed it was 70/30
22 for both.
23    Q    Was there a law firm that helped you
24 set up Sentinel Reinsurance, that you're aware of?
25    A    I do not know.

192

1    Q    Was there ever an analysis done, to
2 your knowledge, of how much Sentinel Reinsurance
3 would owe if UBS's trial court decision was
4 upheld?
5       MR. TAYLOR: I'm just going to object
6 to form.
7    A    I don't know.
8    Q    Do you know how much total payout there
9 has been from the insurance policy for any of the
10 purposes that you said that the policy was set up
11 for?
12    A    I do not know.
13       MR. CLUBOK: I think this is a good
14 time to take a break.
15       MR. TAYLOR: That's good. So we have
16 to take another one at 6:00. Let's go off the
17 record.
18       THE VIDEOGRAPHER: Off record. 6:03.
19       (A recess was taken.)
20       THE VIDEOGRAPHER: On record. 6:24.
21 BY MR. CLUBOK:
22    Q    Mr. Dondero, we're going to show you
23 what's previously been marked as Exhibit 1. It is
24 an e-mail from Isaac Leventon to Chris Dunn,
25 D-U-N-N, dated October 26, 2017, with an

---

193

1  attachment called UBS_ATE.PDF.
2      Do you see that?
3      A  Yes.
4      Q  And Mr. Leventon said -- first of all,
5  who is Chris Dunn?
6      A  I believe he is one of the accountants
7  who used to work at Highland.
8      Q  Okay.  And does he work with you now?
9      A  I don't believe so.  I don't recognize
10  that name.
11      Q  And Mr. Leventon says to Mr. Dunn --
12  "Subject:  UBS - PRIVILEGED."  Do you see that?
13      A  Yes.
14      Q  And he says, "Please see attached.
15  Please label all communications related to this
16  project as Privileged as all documents are being
17  requested of the Legal Team."
18      Do you see that?
19      A  Yes.
20      Q  And just scrolling down, there's
21  nothing else in the cover e-mail, and I'm going to
22  show -- and I take it you have never seen this
23  e-mail before?
24      A  No.  No, I have not.
25      Q  Okay.  So I'm going to show you the

---

194

1  attachment and see if it refreshes your
2  recollection.  Let me get this a little bit
3  smaller here.
4          This is a document -- the attachment is
5  the legal liability insurance policy that we have
6  been talking about today.  This is the first page
7  of it, where it's called "Legal Liability
8  Insurance Policy" in blue letters on the first
9  page.
10      Do you see that?
11      A  Yes.
12      Q  And I want to go -- I'm going to go
13  through some of the policy with you.  I'm going to
14  flip first to the very end, the last page, the
15  signature page.  And do you see where it says
16  "Insurer:  Sentinel Reinsurance, Limited," and it
17  says, "Andrew Dean, Director"?
18      A  Yep.
19      Q  And then do you see where it says
20  "Insureds," and the first insured is Highland CDO
21  Opportunity Master Fund, LP.  And it says that you
22  are signing on behalf of CDO Opportunity Master
23  Fund by CDO Opportunity Fund, by CDO Opportunity
24  GP, by Highland Capital Management and by Strand
25  Advisors.

---

195

1      Do you see that?
2      A  Yes.
3      Q  And that's your signature, correct?
4      A  Yeah, or my assistant's, it looks like.
5  It is either my signature or my assistant's.
6      Q  Well, it's an authorized signature by
7  you, correct?
8      A  Yes.
9      Q  And that's on behalf of one of the
10  insureds, Highland CDO Opportunity Master Fund,
11  LP, correct?
12      A  Yeah.  Do you want me to read the
13  signature lines?  You'll need to zoom in for me.
14  But whoever it's signed for, it's signed for, I
15  guess.
16      Q  Okay.  And it's also signed on behalf
17  of Highland CDO Hold Company, correct?
18      A  Highland CDO Holding Company, yes.
19      Q  And again, you signed on behalf of
20  Highland CDO Holding Company as another one of the
21  insureds under the policy, correct?
22      A  I don't know what the involvement is of
23  the different entities, if they're all the insured
24  or they're just somehow -- somehow involved in the
25  agreement, but yes, I'm signing for those various

---

196

1  different funds.
2      Q  Well, so you sign this document on
3  behalf of Highland CDO Opportunity Master Fund,
4  LP, correct?
5      A  Yes.
6      Q  And you sign this document on behalf of
7  Highland CDO Holding Company, correct?
8      A  Yes.
9      Q  And you sign on behalf of Highland
10  Special Opportunities Holding Company, correct?
11      A  Yes.
12      Q  And you were the sole director of SOHC
13  at the time, right?
14      A  I -- I -- probably.  I don't know.
15      Q  And you were the sole director of
16  Highland CDO Holding Company at the time, correct?
17      A  I don't know.
18      Q  Do you know -- can you name another
19  director of Highland CDO Holding Company?
20      A  No.
21      Q  And you were -- it says you were
22  president.  Is that president of Highland CDO
23  Opportunity Master Fund, LP?
24      A  I don't know.
25      Q  Or is it president of Strand Advisors?

197

```
1      A   I don't know.
2      Q   Were you president of Strand Advisors
3  at that time?
4      A   Yes, I would have been.  Yeah, if it
5  had a president, yes.
6      Q   In August of 2017, did you have
7  authority to sign a document like this on behalf
8  of Strand Advisors?
9      A   I assume so.
10      Q   And in August of 2017, did you have
11  authority to sign a document like this on behalf
12  of Highland Capital Management?
13      A   I assume so.
14      Q   In August 2017 did you have authority
15  to sign a document like this on behalf of Highland
16  CDO Opportunity GP, LLC?
17      A   I believe so.
18      Q   In August of 2017 did you have
19  authority to sign the insurance policy on behalf
20  of Highland CDO Opportunity Fund GP?
21      A   I believe so.
22      Q   In August of 2017 did you have the
23  authority to sign the insurance policy on behalf
24  of Highland CDO Opportunity Master Fund, LP?
25      A   I believe so.
```

198

```
1      Q   In August of 2017 did you have the
2  authority to sign on behalf of Highland CDO
3  Holding Company?
4      A   I believe so.
5      Q   And fair to say that in August of 2017
6  you had the authority to sign off on this
7  insurance policy on behalf of Highland Special
8  Opportunities Holding Company, correct?
9      A   I believe so.
10      Q   And before you signed off on this
11  $100 million insurance policy, did you take care
12  to familiarize yourself with the terms of it?
13      A   No.
14      Q   Did you have a fiduciary duty at the
15  time to Highland Special Opportunities Holding
16  Company when you signed this policy?
17      A   I -- fiduciary -- as a registered
18  investment advisor, I assume -- I assume we did.
19  I don't know -- to the extent the fund doesn't
20  exist anymore, I -- I don't know the answer.  Let
21  me just say that.
22      Q   Well, when you acted in August 2017 on
23  behalf of SOHC, which is the shorthand for Special
24  Opportunities Holding Company, did you believe
25  that you had fiduciary duties you had to consider
```

199

```
1  when making the decision to sign on SOHC's behalf?
2      A   I don't know.  I don't remember.
3      Q   Did you believe at the time you signed
4  this document you had fiduciary duties to Highland
5  CDO Holding Company?
6      A   I don't know.  I don't remember.
7      Q   At the time you signed this document,
8  did you have fiduciary duties to Highland CDO
9  Opportunity Master Fund that you took into account
10  before you signed it?
11      A   I don't know.  I don't remember.
12      Q   Do you believe that you had any -- in
13  August of 2017 the UBS litigation was still going
14  on, correct?
15      A   I think I testified I believe it was
16  dormant.
17      Q   Well, in fact, in August of 2017 UBS
18  had just defeated Highland and the other
19  defendants' motion for summary judgment; isn't
20  that true?
21      A   Like I said, I don't know.  My belief
22  was it was dormant.
23      Q   Did you believe that you had any
24  fiduciary duties to consider to UBS, as a
25  potential creditor of SOHC and CDO Fund, when you
```

200

```
1  signed this document in August of 2017?
2          MR. TAYLOR:  Objection.  Form.
3      Q   Okay.  I'm going to break it down.  In
4  August of 2017, did you believe that you owed any
5  fiduciary duties at all to UBS as a creditor or
6  potential creditor of Highland Special
7  Opportunities Holding Company?
8      A   I -- I do not -- I do not believe or
9  recall believing that I had any fiduciary
10  responsibility to UBS.
11      Q   With respect to its status as a
12  creditor or potential creditor of SOHC, correct?
13      A   Yes.
14      Q   And the same answer for Highland CDO
15  Opportunity Master Fund?
16      A   Yes.
17      Q   Same answer for Highland Financial
18  Partners?
19      A   Yes.
20      Q   You now know, sitting here today, that
21  a Court has found that SOHC and CDO Fund
22  collectively owe to UBS over $500 million, plus
23  interest, at the time this insurance policy was
24  signed, correct?
25      A   No, I don't know that.
```

**201**

1    Q   Well, you know that there has been a
2  judgment after a trial that found SOHC and CDO
3  Fund liable to UBS for over $500 million, plus
4  accumulated interest, since 2009, correct?
5    **A   I don't know the specifics of the**
6  **award, but generally I know there is a significant**
7  **award.**
8    Q   Well, you know generally that the award
9  today totals roughly a billion dollars or more,
10  correct?
11       MR. TAYLOR: Objection. Form.
12    **A   Again, I don't know the mix, I don't**
13  **know the specifics. You mentioned a minute ago a**
14  **total to 550, and then you said it was a billion.**
15  **So I don't know -- I don't know the details and**
16  **the specifics.**
17    Q   Okay. Let's make it very simple. As
18  you sit here today, you know that there is a
19  pending judgment against SOHC and CDO Fund for a
20  total of over a billion dollars, including
21  interest, correct?
22    **A   I -- I don't know. And I don't know**
23  **if -- a pending judgment, I don't know if it's**
24  **appealable, I don't know if it is being appealed.**
25  **I have no idea.**

**202**

1    Q   You have absolutely no idea if there is
2  an outstanding judgment right now against SOHC and
3  CDO Fund for approximately a billion dollars in
4  favor of UBS? That's your testimony?
5    **A   You said a minute ago a pending**
6  **judgment. Now you're saying it's a judgment. I**
7  **have no idea what the legal status is.**
8    Q   Do you know that there was a judgment
9  entered against SOHC and CDO Fund for over a
10  billion dollars, including interest, in favor of
11  UBS in connection with the New York litigation?
12    **A   I don't know the specifics. I don't**
13  **know the specific counterparties.**
14    Q   Do you know? So is that a no to my
15  question?
16    **A   Yes. I don't know.**
17    Q   Have you made any effort to consider
18  whether or not SOHC owes any money currently to
19  UBS?
20    **A   I have not.**
21    Q   Have you made any effort to consider
22  whether currently CDO Fund owes any money to UBS?
23    **A   I have not.**
24    Q   Have you ever taken any steps to try to
25  satisfy any judgment against SOHC or CDO Fund that

**203**

1  is in favor of UBS?
2    **A   I have not.**
3    Q   Do you feel you currently owe any
4  fiduciary duties to UBS in your capacity as
5  director of SOHC?
6       MR. TAYLOR: Objection. Assumes facts
7  not in evidence.
8       MR. CLUBOK: Okay. Strike that.
9  Restate that.
10    Q   I take it you have recently resigned
11  your position as director of SOHC?
12    **A   I believe so.**
13    Q   That was done just within the last week
14  or so?
15    **A   I believe so.**
16    Q   Prior to resigning as director of SOHC,
17  did you ever consider that you had fiduciary
18  duties owed to UBS in connection with the judgment
19  entered against SOHC on behalf of UBS?
20    **A   I -- I don't recall.**
21    Q   Are you currently a director of
22  Highland's -- sorry.
23       Do you currently have any role in
24  Highland CDO Opportunity Master Fund?
25    **A   I don't know.**

**204**

1       MR. CLUBOK: We're going to mark as an
2  exhibit the document that is Bates labeled
3  HCMUBS005324, and that will be, I think,
4  Exhibit 29.
5       That must be right. Whoops, sorry, no,
6  this is the wrong document.
7       Sorry. We'll find the document here in
8  a second. I'm trying to find the letter that you
9  recently sent to the lawyers representing the
10  debtor in which you tendered your resignation.
11       I think, Alan, you may have pulled the
12  wrong number. Let's try this again. It's
13  HCMUBS005324.
14       It should be a letter. There we go.
15  Thank you. Sorry, maybe I missaw it or something
16  if you had it before.
17    Q   Anyway, let's take a look at this.
18  This is a letter dated --
19       MR. CLUBOK: And we're going to make
20  this one Exhibit 29, correct?
21       Yes. Perfect.
22       (Deposition Exhibit 29 marked for
23  identification.)
24    Q   Exhibit 29 is a letter dated April 28,
25  2021 from Bonds Ellis to Mr. James Seery, care of

205

1  Jeffrey Pomerantz. Do you see that?
2      A  Yes.
3      Q  And it's "RE:  Resignation of James
4  Dondero from Defendant Entities in UBS, et al.
5  versus HCMLP, et al., Index No. 650097/2009 (N.Y.
6  Sup. Ct.)" Correct?
7      A  Yes.
8      Q  Have you seen this letter before?
9      A  It was prepared by counsel.  I have
10 seen it.
11     Q  And it was signed by Mr. Clay Taylor,
12 who is representing you here today, correct?
13     A  Yes.
14     Q  And you saw it after it was complete
15 and either before or after it was sent to the --
16 Mr. Seery?
17     A  Yes.
18     Q  And you authorized this letter to go
19 out under your --
20     MR. CLUBOK:  Strike that.
21     Q  You authorized this letter to go out?
22     A  Yes.
23     Q  And in the letter you, in addition to
24 Mr. Taylor, are describing a number of things.  He
25 says that you are hereby immediately resigning

206

1  from "alleged director position(s) at HFP and SOHC
2  and/or any other officer positions at those
3  entities."
4      Do you see that?
5      A  Yes.
6      Q  Now, before you sent this letter, did
7  you believe that you were a director in SOHC?
8      A  No.
9      Q  When did you -- but you used to be a
10 director at SOHC, correct?
11     A  Many years ago.
12     Q  Well, you certainly were a director in
13 SOHC when you signed on their behalf in August of
14 2017 for the insurance policy, correct?
15     A  Yes.
16     Q  So when did you stop being a director
17 of SOHC?
18     A  I mean, prior to 2017 it had been
19 inactive for a number of years, and, again, my
20 view and recollection is the insurance policy was
21 to transition and wrap up the dissolution, so to
22 speak, responsibly.
23     Q  When did you stop being a director of
24 SOHC, to the best of your knowledge?
25     A  For all intents and purposes -- I don't

207

1  want to -- it was sometime 2017 or earlier, you
2  know, essentially.
3      Q  Sorry, you believe that you were no
4  longer a director of SOHC earlier than 2017?
5      A  You know what, it's -- I don't want to
6  agree with that terminology.  I just want to say
7  that the entity was not functioning normally or
8  routinely as far as corporate governance was
9  concerned, and I was probably the last surviving
10 director who tried to wrap it up responsibly with
11 the 2017 policy.
12     Q  Okay.  You were the only director ever
13 in the history of SOHC; isn't that true?
14     A  I don't know.  HFP had numerous
15 directors originally --
16     Q  I didn't ask you about HFP, okay?  In
17 the interest of time here, I would like you to
18 answer the questions that I ask.  You were the
19 sole director of SOHC from its inception, correct?
20     A  I don't know.
21     Q  When you signed in August of 2017, did
22 you believe you were still the director of SOHC?
23     A  Yes.
24     Q  Did you check with any other -- or were
25 you aware of any other directors in the world of

208

1  SOHC other than yourself at that time?
2      A  I don't know.  I didn't check.  I don't
3  remember.
4      Q  Okay.  So as far as you knew, you were
5  the sole director of SOHC in August 2017, correct?
6      A  No.  I didn't know is my testimony.
7      Q  Okay.  You didn't check to see if there
8  were other directors when you signed on behalf of
9  SOHC; is that correct?
10     A  Correct.
11     Q  And were you still a director of SOHC
12 in August 2017 when you signed that insurance
13 policy?
14     MR. TAYLOR:  Objection.  Asked and
15 answered.
16     A  I believe so.
17     Q  Okay.  And when -- and you resigned in
18 this letter that you sent -- or that Mr. Taylor
19 sent -- April 28, 2021, correct?
20     A  Yes.
21     Q  And so fair to say you were a director
22 of SOHC for August 2017 until this resignation
23 letter, as far as you know, correct?
24     MR. TAYLOR:  Objection.  Form.
25     A  I -- maybe in formality, but I can't

209

1  remember doing a single activity between 2017 and
2  today on behalf of SOHC.
3     Q   Who directed SOHC's litigation strategy
4  in 2018 and 2019?
5     A   I believe Scott Ellington.
6     Q   Who was ultimately responsible for
7  SOHC, as far as you knew, during those years?
8     A   Ultimately Scott Ellington through
9  Sentinel.
10    Q   You're saying Sentinel was responsible
11 for SOHC starting in August 2017 going forward?
12    A   My general understanding is that the
13 Sentinel policy took over the transition
14 responsibilities for SOHC, meaning the legal
15 strategies or any other legal issues that cropped
16 up or any tax issues.  So if you're talking about
17 the period between the policy and today, I would
18 have guessed that Sentinel was handling them.
19    Q   Who was able to make the decision as to
20 whether or not to settle the litigation with UBS
21 on behalf of SOHC after August of 2017, as far as
22 you knew?
23    A   That would have been Scott Ellington.
24    Q   Did you have any role at all in the
25 decision of whether or not SOHC would settle after

210

1  August of 2017?
2     A   Until the -- I had never -- you asked
3  me this earlier today.  I had never heard of other
4  UBS settlement offers until the August of '19
5  settlement.
6     Q   Did you have any authority to decide
7  whether or not SOHC would settle between August of
8  2017 and that time of the bankruptcy?
9     A   I don't know.  Because I haven't read
10 the insurance policy, I don't know where
11 responsibilities begin and end between SOHC and
12 Sentinel.
13    Q   Did you ever hear about any settlement
14 demands from UBS in between August 2017 and the
15 time that you filed for bankruptcy?
16    A   So --
17        MR. TAYLOR:  To the extent that that
18 asks for him to invade the attorney-client
19 privilege, I don't believe -- but subject to
20 Highland Capital's counsel potentially saying
21 they've waived that, I'm going instruct him not to
22 answer.  I understood that to be further than what
23 they waived.
24        MR. CLUBOK:  Mr. Dondero has already
25 testified about alleged settlement offers in

211

1  connection with the UBS litigation.  So even if
2  Mr. Feinstein didn't have a problem with it, this
3  has already been waived.  But I assume,
4  Mr. Feinstein, you don't have a problem with this
5  line of questioning?
6        MR. FEINSTEIN:  I don't, to the extent
7  that there is some question about whether SAS was
8  involved in the decision making.  And, as we said,
9  our waiver extends to Sentinel- and SAS-related
10 matters.
11        MR. CLUBOK:  Okay.
12    Q   So Mr. Dondero, again, my question is,
13 did you ever hear about any settlement demands
14 from UBS in between August 2017 and the time you
15 filed for bankruptcy?
16    A   I did not hear of any.
17        MR. CLUBOK:  The next document I want
18 to put up is the responsive letter that was sent
19 in response to Exhibit 29.  That's going to be
20 Bates number 5322.  And that will be marked as
21 Exhibit 30.
22        (Deposition Exhibit 30 marked for
23 identification.)
24    Q   Exhibit 30 is a letter sent via e-mail
25 from Jeffrey Pomerantz to your lawyer, Clay

212

1  Taylor, dated May 7, 2021.  Do you see that?
2     A   Uh-huh.
3     Q   Is that a yes?
4     A   Yes.  I see that.
5     Q   And it's the same Re line, the same
6  "Resignation of James Dondero from the Defendant
7  Entities" in the New York UBS litigation, correct?
8     A   Yes.
9     Q   Have you seen a copy of this letter
10 before today?
11    A   Yes.
12    Q   Okay.  And without reading all of it,
13 I'm going to briefly summarize.  Mr. Pomerantz
14 says he's in receipt of the letter where James
15 Dondero resigned from his positions in connection
16 with HFP and SOHC, and then he notes that you're
17 also, at least as of the time of writing this
18 letter, "a director of Highland CDO Opportunity
19 Fund, the Bermuda feeder fund for the Highland CDO
20 Opportunity Fund," also called "the CDO Fund,"
21 collectively.  And he asks to confirm immediately
22 whether you are "resigning from HCDOF and all
23 other subsidiaries of HCDOF as well."  And I
24 believe, as far as I know, there has never been a
25 formal response to that.

213

1    But my question is, as you sit here
2 today, are you a director of Highland CDO
3 Opportunity Fund?
4        MR. TAYLOR: Objection. Form.
5    **A   I don't know, and -- I don't know. And**
6 **when I got this letter, I wasn't sure of its**
7 **relevance relative to the insurance policy. I**
8 **didn't remember Bermuda entities being relevant to**
9 **the HFP structure.**
10    Q   Okay. Well, are you resigning from CDO
11 Fund if you are currently a director?
12        MR. TAYLOR: Objection as to the form
13 of the question.
14    **A   I don't know. I mean, we were going to**
15 **look into it on whether I was a director and we**
16 **were going to look into it if it had any relevance**
17 **or -- any relevance or effect on the rest of it,**
18 **and we hadn't decided yet.**
19    Q   Well, do you know that CDO Fund is one
20 of the defendants in the New York litigation?
21    **A   Is it one of the entities that was**
22 **found guilty or owing money?**
23    Q   Yes.
24    **A   Okay. I didn't know that. So we**
25 **need -- we needed to look into that.**

214

1    Q   Okay. I take it you made no effort to
2 try to satisfy any portion of the judgment that
3 was entered against CDO Fund on behalf of UBS?
4    **A   I don't believe so.**
5    Q   And do you have any idea right now if
6 you have any responsibility for CDO Fund, either
7 as a director, an officer, owner or anything like
8 that?
9    **A   I don't know.**
10    Q   When was the last time you did -- you
11 took any actions with respect to CDO Fund?
12    **A   Not that I can remember at this moment.**
13 **None that I can remember at this moment.**
14    Q   When do you -- well, when do you intend
15 to decide whether or not you are going to resign
16 from being a director of CDO Fund?
17    **A   I don't know. Soon, I would imagine.**
18    Q   Okay. Well, please let us know if you
19 intend to resign from CDO Fund.
20        Let's go back to Exhibit 1. This is
21 the insurance policy. We're back on this last
22 page, and you can see here there is CDO Fund that
23 you signed on behalf of as one of the insureds.
24 Do you see that?
25    **A   I'm sorry, my eyes are so bad, but**

215

1 the -- see, I didn't see any -- do you see any
2 Ltd. -- any Bermuda funds here? I just didn't see
3 it at first glance.
4    Q   I don't know. It would have to be
5 Ltd.?
6    **A   See, I wasn't sure that any of these**
7 **impacted Bermuda.**
8    Q   Well, in -- okay.
9        How is CDO Opportunity Master Fund
10 connected to CDO Fund that says Ltd. on it?
11    **A   I have no idea.**
12    Q   Previously you said that you didn't
13 remember signing the insurance policy, correct?
14    **A   Correct.**
15    Q   Does seeing this now refresh your
16 recollection that you did sign the insurance
17 policy on behalf of three different entities?
18    **A   No, not really.**
19    Q   But you authorized your signature on
20 this policy, correct?
21    **A   Correct.**
22    Q   And before you authorized the policy --
23        MR. CLUBOK: Well, strike that.
24    Q   So when you authorized it, you knew you
25 were authorizing it not just on behalf of SOHC or

216

1 CDO Holding Company, but also on behalf of
2 Highland CDO Opportunity Master Fund, LP, correct?
3    **A   Again, I delegated and entrusted it to**
4 **Scott Ellington and his team.**
5    Q   So is that a yes?
6    **A   No. I didn't know. I delegated it to**
7 **him. I didn't -- I didn't review the signature**
8 **lines and the appropriateness of the signature**
9 **lines individually or in aggregate. I trusted him**
10 **to have the appropriate signature lines for what**
11 **he was trying to accomplish.**
12    Q   Going back to the first page here of
13 the insurance policy, it's called the "Legal
14 Liability Insurance Policy," correct?
15    **A   It appears so, yes.**
16    Q   And on the first page, 1.1 -- and I'm
17 going to expand it so you can read it -- it says,
18 "This policy is between the insured and the
19 insurer as declared in the schedule. The
20 document, together with its schedule and any
21 attached endorsements, is the policy which sets
22 out this insurance. It is a legal contract so
23 please read all of it carefully."
24        Do you see that?
25    **A   Yes.**

217

1    THE WITNESS:  You know, guys, listen, I
2 got to jump on this call.  I will make it as
3 quickly as possible, hopefully less than a half an
4 hour.  Okay?
5    MR. CLUBOK:  Okay.  We'll be here at
6 6:30.  Let's go off the record.
7    THE VIDEOGRAPHER:  Off the record.
8 6:59.
9    (A recess was taken.)
10    THE VIDEOGRAPHER:  On record.  7:39.
11 BY MR. CLUBOK:
12    Q    Let's go back to Exhibit 1.
13    Exhibit 1 was the e-mail from Isaac
14 Leventon claiming privilege and attaching a copy
15 of this insurance policy that we have been talking
16 about, correct?
17    A    Yes.
18    Q    So in 1.1 it said that because it's a
19 legal contract, you should "please read all of it
20 carefully."  Did you read all of this carefully,
21 ever?
22    A    No.
23    Q    It says the "policy is between the
24 insured and the insurer as declared in the
25 schedule."  Let's go look at the schedule, which

218

1 is towards the back of the document, I think right
2 before the signature page.  And the schedule for
3 the insurance policy says the insurer is Sentinel
4 Reinsurance, Limited.  That was your
5 understanding, correct?
6    A    Yes.
7    Q    And then it says the "Insured," and it
8 lists three entities, "Highland CDO Opportunity
9 Master Fund, LP," "Highland CDO Holding Company"
10 and "Highland Special Opportunities Holding
11 Company."
12    Do you see that?
13    A    Yes.
14    Q    Does this refresh your recollection
15 that there were three insureds specifically
16 identified in the policy?
17    A    Okay, yeah.  I didn't know, but yeah,
18 that seems to say it.
19    Q    You're claiming that you never knew
20 before today that all three of those entities were
21 listed as the insureds?
22    A    Correct.
23    Q    Appointed representative is Paul
24 Lackey.  Do you see that?
25    A    Yes.

219

1    Q    Do you -- is he still the appointed
2 representative for this insurance policy, as far
3 as you know?
4    A    I don't -- I don't know.  I don't know
5 if it's been changed.  He doesn't work -- Lackey
6 Hershman doesn't exist anymore.  It merged with
7 another firm.
8    Q    What firm?
9    A    You know what, actually, I think I
10 misspoke.  I don't think they merged.  I think a
11 firm called Stinson took four or five of the
12 partners into their firm.
13    Q    Including Paul Lackey?
14    A    Yes.
15    Q    Did you fire Mr. Lackey from all the
16 representation he had of your various entities?
17    A    No, I don't -- no, I don't believe so.
18    Q    You had Mr. Lackey replaced as the
19 person in charge of the litigation of the UBS
20 case, correct?
21    A    Yes.  Yeah, so we -- yes, we use
22 them -- they ran into a lot of personal midlife
23 issues, a couple of partners, and so we started
24 replacing them on a lot of things.
25    Q    In other words, you fired them from

220

1 most of the cases they were working on for you,
2 correct?
3    A    From -- yes, from a bunch of them.
4    Q    And you don't know if you've appointed
5 another representative to replace Mr. Lackey in
6 connection with this insurance policy?
7    A    I don't know.
8    Q    Do you see where it says "Date of
9 commencement of the Period of Insurance" is
10 August 1st, 2017?
11    A    Yes.
12    Q    And later on it lists the payment date
13 for the premium as August 31st, 2017, correct?
14    A    Yes.
15    Q    And that's consistent with your
16 recollection that you were approving this policy
17 in approximately August of 2017, correct?
18    A    Yes.
19    Q    And then do you see where it says
20 "Legal Action"?
21    A    Yes.
22    Q    And it specifically identifies "UBS
23 Securities LLC and UBS AG, London Branch versus
24 Highland Capital Management, LP; Highland Special
25 Opportunities Holding Company; Highland Financial

221

1 Partners, LP; Highland CDO Opportunity Master
2 Fund, LP; Highland Credit Opportunities CDO, LP;
3 and Strand Advisors, Inc., Cause Number
4 650097/2009."
5       Do you see that?
6    A   Yes.
7    Q   That's the only legal action identified
8 in this schedule to this insurance policy,
9 correct?
10   A   The only one identified on this page,
11 yes.
12   Q   Well, the previous page -- I'll go to
13 the previous page so you can see it. The previous
14 page was page 16 of 16 that had a blank signature
15 page after the end of the policy terms. Do you
16 see that?
17   A   Yep.
18   Q   And then there is the schedule, and
19 then the next page after the schedule is the
20 signed signature page. Do you see that?
21   A   Yep.
22   Q   Okay. So are you aware of any other
23 schedule to this policy other than the one that
24 identifies only the UBS litigation as the legal
25 action?

222

1    A   I'm not aware of anything else.
2    Q   And it specifically says the opponent
3 is UBS Securities LLC and UBS AG, London Branch,
4 right?
5    A   Yes.
6    Q   It says the limit of indemnity is
7 $100 million in the aggregate, correct?
8    A   Yes.
9    Q   And you had remembered it was a
10 $100 million insurance policy, correct?
11   A   Yes.
12   Q   Then it says the premium is
13 $25 million, right?
14   A   Yes.
15   Q   Now, fair to say this policy is
16 directed at potential liability in connection with
17 the UBS litigation that's been pending in New York
18 since 2009, correct?
19   A   I'm sorry, repeat that, please.
20   Q   Fair to say that this insurance policy
21 is specifically directed at potential liability
22 arising out of the UBS litigation that's been
23 pending in New York since 2009?
24   A   I'm going to stay consistent with my
25 testimony that I have said all day that I

223

1 understood this to be a transitional policy. That
2 was the original intent and how it was described
3 to me. If it ended up taking twists and turns and
4 being more focused, I wasn't aware of. And then I
5 see it's only UBS on the schedule -- on the known
6 schedule addendum here. But I haven't seen this
7 before. I haven't looked through it. We haven't
8 gone through the other pages. Whether or not it
9 references other litigation or tax -- potential
10 tax or other litigation stuff, I don't know. So I
11 can't -- I can't say that this is the only thing
12 it represents. I don't know.
13   Q   Right. But as you sit here today, you
14 have no basis to say that this policy is directed
15 at anything other than UBS other than your pure
16 speculation or wish, correct?
17   A   Well, as it was described to me, but
18 also, we haven't gone over the rest of the
19 document. And just maybe this was the only action
20 that was known at the time. I -- I --
21   Q   Right. And --
22   A   If you want to ask me about the four
23 corners of this document, it says what it says,
24 and you're right, it says -- that's the only legal
25 action it says, but I can't -- I can't comment on

224

1 the rest of the policy.
2    Q   That wasn't my question, to ask you to
3 comment. We're going to go through the policy,
4 but that's not what I asked you. So please listen
5 carefully to my question.
6       As you sit here right now, you have no
7 basis to say that this policy is directed at
8 anything other than the UBS litigation other than
9 pure speculation or a wish on your part, correct?
10      MR. TAYLOR: Objection. Misstates his
11 prior testimony.
12   A   Yeah, I wouldn't say a wish. That's
13 how it was described to me historically. That's
14 what I remember.
15   Q   Described to you by Scott Ellington.
16   A   Yes.
17   Q   And you're saying that Scott Ellington
18 said that this policy would cover something beyond
19 the UBS litigation, correct?
20   A   Yes, I believe that was -- yes, that's
21 what I remember, and I think that was the original
22 intent.
23   Q   Yeah, but when you signed it, did
24 you --
25      MR. CLUBOK: Strike that.

225

1    Q    You think it was the original intent,
2  in fact, for the policy to not even have a main
3  purpose as the UBS litigation but to have
4  something else, as you previously have stated,
5  right?
6    **A    Yeah, like I said, to provide**
7  **transition and windup for the HFP funds and**
8  **subsidiaries.**
9    Q    Yeah, but as you sit here today, other
10  than what Mr. Ellington supposedly told you, you
11  have no basis to support your statement that this
12  policy was directed at anything other than the UBS
13  litigation and potential liability related
14  thereto, correct?
15    MR. TAYLOR:  Objection to the form of
16  the question.
17    **A    I don't have other knowledge of other**
18  **cases addressed by this insurance.**
19    Q    Okay.  And we're going to go to the
20  first page again of the policy, and picking up
21  where we left off, we now know the policy is
22  between the insured and the insurer as declared in
23  the schedule, and that -- we've already covered
24  what the schedule says, correct?
25    **A    Yep.**

226

1    Q    So then it says words in bold have
2  specific meanings.  Then it says the "Policy
3  Structure," and I'm going to make it a little bit
4  bigger here.
5    It says, "Each insured section sets out
6  the scope of the main coverage and the
7  circumstances in which the insurer's liability to
8  the insured is limited or may be excluded.
9  Further, each insured section," and that's --
10  "insured section" is in bold, "sets out other
11  terms and conditions relevant to that insured
12  section.  The cover provided by each insured
13  section is only operative if a limit of indemnity
14  is shown in the schedule.  Where the limit of
15  indemnity in respect of any item in the schedule
16  is shown as 'n/a,' 'not applicable' or 'not
17  insured,' then no cover applies for that item.
18  Where the insured comprises more than one person,
19  the limit of indemnity for all claims made by all
20  persons comprising the insured shall apply, but as
21  there is no sublimit of indemnity in relation to
22  each individual person, one or more of those
23  persons will not receive payment of a claim if the
24  limit of indemnity has already been met as a
25  result of the payment of other claims."

227

1    Do you see that?
2    **A    Yes.**
3    Q    Now, do you know enough to have a
4  general sense of what that means to you?  Is that
5  gibberish to you or do you have an
6  understanding --
7    **A    I mean, I think what it's -- I -- it's**
8  **not gibberish, but what it's really saying, I**
9  **think, is there's offsets for legal fees, there's**
10  **offsets for other expenses and other indemnities**
11  **or assets -- I -- yeah, you know what, I don't**
12  **understand.  I would need -- I would need an**
13  **actuary or whoever decides these things to explain**
14  **it to me.**
15    Q    Okay.  So then we move on.  1.32 just
16  says that there is additional -- whoops,
17  "Additional clauses set out terms, exclusions or
18  limitations that may apply to more than one
19  insured section."  And it says, "The following
20  general terms apply to each insured section."  And
21  it lists general exclusions and limitations,
22  duties, general terms, and general definitions.
23    Then in the next section, sorry, it
24  says the "Policy period and premium."  It says,
25  "The policy will provide insurance for a period of

228

1  insurance provided the premium and other charges
2  are paid."  And the premium is $25 million,
3  correct?
4    **A    That's what it said on the schedule,**
5  **yes.**
6    Q    Okay.  We're going to skip down to
7  "Insured section," where it says, "Legal
8  liability," and under "Insured section - Legal
9  liability," it says, "The insurer agrees to
10  indemnify the insured in respect of any legal
11  liability occurring during the period of insurance
12  up to and including but not exceeding the limit of
13  indemnity provided that either the Court (or any
14  appellate court to which the Court's judgment in
15  the legal action is appealed) makes an order of
16  liability relating to the legal action against the
17  insured; or the legal action is (with the prior
18  written agreement of the insured, the appointed
19  representative and the insurer) settled on terms
20  that provide for payment by the insured to the
21  opponent."
22    Do you see that?
23    **A    Yes.**
24    Q    And when it talks about the legal
25  action, that's a -- "legal action" is a bold

229

1  phrase, correct?
2      A   Yes.
3      Q   And on the schedule that we looked at
4  before, which I'm going to skip back to, the legal
5  action lists the UBS legal action and nothing
6  else, correct?
7      A   Yes.
8      Q   So, do you know if a claim has ever
9  been made under this policy?
10     A   I have no idea.
11     Q   Do you know if there has been any
12 payments authorized under this policy?
13     A   I have no idea.
14     Q   You say you have no idea.  Isn't it
15 true you have authorized payments under this
16 policy before?
17     A   I'm willing to be refreshed.  Do you
18 mean payment of legal fees or -- I'm willing to be
19 refreshed.
20     Q   Yeah, have you authorized payment of
21 legal fees pursuant to this policy?
22     A   I don't remember.  I mean, it sounds
23 logical, but I don't remember.
24     Q   And you have no idea if a claim has
25 ever been made under this policy?

230

1      A   I have no idea.
2      Q   You know that this policy on its face
3  applies to legal liability in connection with the
4  UBS litigation in New York, correct?
5      A   Generally, I guess, or maybe that's
6  what you mean by "on its face."  But whether and
7  how a claim is paid or whether it's bona fide, you
8  know, there's a whole cottage industry that
9  develops up around that.  We --
10     Q   Have you made any -- oh, sorry.  You
11 can continue.
12     A   No, I was just going to say we've tried
13 to collect on insurance before too and it's not
14 easy.
15     Q   Insurance companies don't make it easy
16 sometimes, correct?
17     A   That's right.
18     Q   And is that Sentinel Re's policy, to
19 not make it easy for someone to collect on a
20 premium -- on a policy?
21     MR. TAYLOR:  Objection to the form of
22 the question.
23     A   No, I'm not making a comment.  I'm just
24 saying, especially on a large policy, the
25 insurance company, I think, is always going to

231

1  make sure it's a bona fide claim.
2      Q   When you authorized this policy, did
3  you expect that it could be difficult to collect
4  under the terms of the policy, given what you have
5  said about insurance companies?
6      A   I don't remember having any thoughts on
7  that subject.
8      Q   How much total legal fees have been
9  paid out pursuant to this policy?
10     A   I have no idea.
11     MR. CLUBOK:  We're going to turn to
12 what's been -- what's behind Tab number 3, and I
13 believe it is Exhibit number --
14     REMOTE TECH:  That would be 31.
15     MR. CLUBOK:  31.  Thank you.
16     (Deposition Exhibit 31 marked for
17 identification.)
18 Q   We are going to turn to Exhibit 31,
19 which is a letter from McKool Smith dated
20 October 19th, 2018, from Gary Cruciani to Jim
21 Dondero.
22     Now, do you -- you recall the UBS trial
23 occurred in late summer of 20-- or in the summer
24 of 2018, correct?
25     A   Okay.

232

1      Q   Did you pay attention to the trial when
2  it was going on?
3      A   No.
4      Q   Did you ever get a report of how the
5  trial went after it was concluded?
6      A   Not that I remember.
7      Q   But you got a report when the decision
8  was handed down by the judge awarding over a
9  billion dollars, including interest, correct?
10     A   You mean the more recent case?  Is that
11 what you're -- the 2020 case?
12     Q   It was in the end of 2019, I believe.
13 In November of 2019 there was a decision issued in
14 that case, right after you had gone into
15 bankruptcy, a few weeks later, in which a decision
16 was handed down awarding over a billion dollars,
17 including interest.
18     Do you remember that?
19     A   Yes.
20     Q   And before that decision was handed
21 down but after the case was tried, so when people
22 didn't know what the result was, Mr. Cruciani
23 wrote to you and asked you to pay the legal fees
24 that had been incurred from trying the case.  Do
25 you remember that?

233

1   A   I do not remember, but refresh me.  I'm
2   okay.
3   Q   Okay.  So I'm showing you Exhibit 31,
4   and it lists a number of different actions.  It
5   says, "Re:  Redeemer Committee versus Highland
6   Capital, the Delaware Action."
7   A   Yeah.
8   Q   Then "Redeemer Committee versus
9   Highland Capital, the Crusader Arbitration."  Then
10   it lists the UBS case, which they call "the UBS
11   Case," in New York.  Then they list the case of
12   Highland versus Acis, which they call "the
13   Terry/162 case" -- or "Terry/162nd Case."  And
14   then they list the case against Alvarez and
15   Marsal, which they call "the A&M Case."
16       Do you see that?
17   A   Yes.
18   Q   The letter that's been marked as
19   Exhibit 31 from Gary Cruciani of McKool Smith
20   references five separate actions.
21       Do you see that?
22   A   Yes.
23   Q   And Mr. Cruciani says to you,
24   "Mr. Dondero, With regard to the fees and expenses
25   that McKool Smith has incurred in the

234

1   above-referenced cases, and has billed to Highland
2   Capital Management, LP and its affiliates
3   (collectively, 'Highland'), Highland agrees to pay
4   amounts according to the following schedule
5   towards the balances owed by Highland.  The
6   Payment Schedule will apply toward the invoiced
7   balances but shall not be in satisfaction of the
8   entire amounts.  Payments made pursuant to the
9   Payment Schedule will be without waiver or
10   prejudice to the entitlement to payment on
11   remaining unpaid balances" and Highland's right to
12   contest it, et cetera.
13       And then there is a payment schedule
14   which says that Highland will pay McKool Smith
15   $2 million by October 31st, 2018, another
16   $2 million by November 30th, 2018, and a third
17   $2 million by December 31st, 2018.
18       Do you see that?
19   A   Yes.
20   Q   And a little bit farther down it says,
21   "Agreed on behalf of Highland Capital Management,
22   LP by Strand Advisors, its general partner," and
23   it's signed by you.
24       Do you see that?
25   A   Yes.

235

1   Q   Do you remember negotiating this
2   payment schedule with Mr. Cruciani?
3   A   Not specifically.
4   Q   Mr. Cruciani was a lawyer that you
5   hired to help you in these five cases that he
6   identifies in the Re line in Exhibit 31, right?
7   A   Yes.
8   Q   And did you think Mr. Cruciani did a
9   good job for you?
10   A   It depends matter by matter.  I think
11   they know they were weak on the Acis matter, but
12   that might have been Jernigan related.
13   Q   How about the UBS case?
14   A   I don't have an opinion.  I don't
15   remember.
16   Q   Okay.  But you -- when Mr. Cruciani
17   sent you this letter, the schedule had already
18   been agreed upon and he is just sending this to
19   confirm it, correct?
20   A   That's right.  It would have been
21   negotiated by Ellington and the legal team.  I
22   didn't -- I just signed it.
23   Q   But you signed off on this schedule
24   that would pay him approximately $6 million
25   between October 31st, 2018 and December 31st, 2018

236

1   for those five cases that he notes at the top of
2   Exhibit 31, correct?
3   A   Yes.
4   Q   And then you -- there's a note.  It
5   looks like it might have been a Post-it Note that
6   got copied that says "50/50 Sentinel."  Do you see
7   that?
8   A   Yes.
9   Q   Is that your handwriting?
10   A   No.
11   Q   Do you know whose it is?
12   A   No.
13   Q   Did you ever direct Sentinel to take
14   responsibility for some of this payment schedule
15   that you agreed to in Exhibit 31 with
16   Mr. Cruciani?
17   A   No.  I wouldn't have been the one that
18   decided legal fee allocations.
19   Q   Now, how much of that $6 million was as
20   a result of the UBS case as opposed to all the
21   other cases?  Any idea?
22   A   No idea.
23   Q   Any idea, rough percentage?  Is it half
24   the amount?  Is it two thirds of the amount?  Is
25   it --

237

```
1    A  No idea.
2    Q  -- 10 percent?
3    A  No idea.
4    Q  Any clue?
5    A  No idea.
6    Q  Did you ever make any effort to find
7  out?
8    A  No.  It's not -- it wasn't my job to
9  allocate legal fees between, you know, items.
10   Q  Do you know if Sentinel ever paid for
11 part of the legal fees that McKool Smith agreed to
12 under this payment schedule in Exhibit 31?
13   A  If it was allocated, it would have
14 paid.  I know McKool -- I know we did pay McKool
15 according to that schedule.
16   Q  What do you mean, "if it was
17 allocated"?  What does that mean?
18   A  Well, I'm just saying whoever did the
19 accounting in legal or accounting, if they said
20 X percent was going to be paid by one entity and
21 Y percent was going to get paid by another and
22 Z percent was going to get paid by another, they
23 would have kept to that schedule.  And I know
24 McKool Smith was paid the monies outlined here.
25   Q  And who would have had the respons- --
```

238

```
1  who would have had the authority to tell Sentinel
2  they've got to pay a certain allocation of these
3  fees?
4    A  Whoever was doing legal fee expense
5  allocations at the time.
6    Q  Who was that?
7    A  It would have been somebody in -- it
8  would have either been Ellington or somebody on
9  his team.
10   Q  The policy, though -- of these five
11 actions that are identified here, the only one
12 that's covered by the policy is the UBS case,
13 correct?
14     MR. TAYLOR:  Objection to the form of
15 the question.
16   A  Okay.  Yeah, I -- yes, I can see UBS
17 only referenced in the third of the five.
18   Q  My question is, is it the case that --
19     MR. CLUBOK:  Strike that.
20   Q  There are five matters listed here on
21 Exhibit 31 that Mr. Cruciani is asking for legal
22 fees and you're agreeing to pay a total of
23 $6 million to, correct?
24   A  Right.
25   Q  And of those five, the only one that is
```

239

```
1  covered by the insurance policy that we have been
2  talking about today is the UBS case, correct?
3    A  Yes.
4    Q  Do you know if Isaac Leventon had
5  authority to authorize payments from Sentinel Re
6  to pay for legal fees or costs associated with the
7  UBS litigation?
8    A  I don't know.
9    Q  Would Scott Ellington know?  Or would
10 you expect Scott Ellington to know, I should say?
11   A  Yes.
12   Q  Would J.P. Sevilla have anything to do
13 with arranging for Sentinel Re to pay legal fees
14 or expenses associated with the UBS litigation, as
15 far as you know?
16   A  I don't know.
17   Q  Would you expect Scott Ellington to be
18 aware of whether or not Isaac Leventon and J.P.
19 Sevilla had that authority?
20   A  Yes, I believe Scott would know.
21   Q  Do you know your legal team stayed at
22 the Four Seasons for the UBS litigation?
23   A  No, I did not know that.
24   Q  Did they deserve to stay at the Four
25 Seasons?
```

240

```
1    A  You know, not based on results to date.
2    Q  Okay.  Let's look at the document
3  behind Exhibit -- I'm sorry, behind Tab 12, which
4  has previously been marked as Exhibit 2.
5      MR. TAYLOR:  While we're waiting for
6  that to pull up, can I get a time check, please?
7  And I'm going to have, like, five minutes of
8  questions at the end.
9      THE VIDEOGRAPHER:  Yes, sir.  We're at
10 5 hours and 9 minutes.
11     MR. TAYLOR:  Thank you.
12     MR. CLUBOK:  Plenty of time.
13     THE WITNESS:  You heard me?
14     MR. CLUBOK:  For what it's worth, I
15 don't think I'll use all that time, Jim, but we'll
16 keep plugging away.  We're making good headway
17 now.  Although I reserve the right to respond and
18 ask more questions after I hear what Clay has to
19 say.  So I'll save a little bit of time for that.
20   Q  This is -- I'm looking at what's been
21 marked as Exhibit 2.  And I'm going to show you
22 first the signature page.  And do you see where it
23 says "Seller, Highland CDO Opportunity Master
24 Fund, by," several entities and ultimately signed
25 by you as president of Strand Advisors?
```

241

1    A    Yep.

2    Q    Is that your signature?

3    A    Yep.

4    Q    And did you have authority to sign on

5    behalf of those entities that are listed there

6    under "Seller"?

7    A    I believe so.

8    Q    And same thing with -- is that also

9    your signature for Highland CDO Opportunity Fund,

10   Limited and Highland CDO Holding Company on this

11   same document?

12   A    Yes.

13   Q    And you had authority to sign on behalf

14   of those entities as well?

15   A    I believe so.

16   Q    And then it's also got Highland Special

17   Opportunities Holding Company.  Same thing?  You

18   had authority to sign on behalf of that entity at

19   the time?

20   A    I believe so.

21   Q    And then it continues with some other

22   entities on this document, including Highland

23   Financial Corp.  Do you see that?

24   A    Yep.

25   Q    Did you have authority to sign on

242

1    behalf of Highland Financial Corp. at this time?

2    A    I believe so.

3    Q    And same thing with Highland Financial

4    Partnership, or HFP?

5    A    I believe so.

6    Q    So you signed on behalf of all these

7    different entities as the seller for this purchase

8    agreement.  Do you see that?

9    A    Yes.

10   Q    And then the purchaser was an entity --

11   was Sentinel Reinsurance.  Do you see that?

12   A    Yes.

13   Q    And it was signed by Andrew Dean,

14   right?

15   A    Yes.

16   Q    Did you ever talk to Andrew Dean about

17   this agreement?

18   A    No.

19   Q    Have you ever met Andrew Dean?

20   A    I don't believe so.

21   Q    Have you ever spoken with Andrew Dean?

22   A    Not that I can recall.

23   Q    Going back to the beginning, this

24   purchase agreement was dated August 7th, 2017, and

25   it was "entered into by and among Sentinel

243

1    Reinsurance and each of Highland CDO Opportunity

2    Master Fund, LP; Highland CDO Holding Company and

3    Highland Special Opportunities Holding Company

4    (together, 'Sellers')."

5        Do you see that?

6    A    Yes.

7    Q    Now, that's what it says up there.  And

8    then it says that "Sellers are each a party in a

9    lawsuit styled UBS Securities LLC and UBS AG,

10   London Branch versus Highland Capital Management,"

11   et cetera.  And that's defined as the "Lawsuit."

12   Do you see that?

13   A    Yes.

14   Q    And it says, "Whereas, Sellers desire

15   to purchase a Legal Liability Insurance Policy

16   relating to Sellers' potential liability in the

17   Lawsuit" -- capital L, Lawsuit -- "in form

18   substantially as set forth in Exhibit A hereto

19   (the 'Policy')."

20       Do you see that?

21   A    Yep.

22   Q    Now, does that mention anything about

23   any other litigation?

24   A    No.

25   Q    Does it mention anything about

244

1    transition services of any kind?

2    A    No.

3    Q    Does it mention anything about dealing

4    with regulators or dealing with the IRS or dealing

5    with taxes or anything else like that?

6    A    No.

7    Q    The only reason given for purchasing

8    the legal liability insurance policy is related to

9    the Highland affiliated entities' potential

10   liability in the UBS lawsuit, correct?

11   A    Yes.

12   Q    And the purchaser under this agreement

13   is an insurance company that is able to provide

14   the sellers insurance coverage pursuant to the

15   terms of the requested policy.  Do you see that?

16   A    Yes.

17   Q    And the policy you understand is the

18   one we have been talking about today, correct?

19   A    Yes.

20   Q    And then it talks about a payment of

21   premium, and it says the "Purchaser," which is

22   Sentinel Reinsurance, "agrees to accept the assets

23   listed in Schedule A as 100 percent payment of the

24   Premium" -- capital P -- "including any as yet

25   unpaid or contingent financial proceeds or other

245

1    benefits related thereto."
2        Do you see that?
3    A    Yes.
4    Q    And, remember, the premium was supposed
5    to be $25 million, correct?
6    A    Yes.
7    Q    Then it says this is the entire
8    agreement.  It says you can only amend it in
9    writing.  It says you can execute in counterparts.
10   It says the governing law is the Cayman Islands.
11   And then it says, "Further Assurances," the
12   parties agree to do the other things necessary to
13   execute this agreement.  Do you see that?
14   A    Yes.
15   Q    And before you signed on behalf of all
16   these entities, did you make any effort to figure
17   out what you were signing?
18   A    No, not beyond that.  It was all tied
19   together, I guess.
20   Q    All tied together with the insurance
21   policy issuance, correct?
22   A    Yes.
23   Q    And it referenced a schedule of what
24   was being purchased, and I'm going to scroll down
25   in the document to the page that's entitled

246

1    "Schedule A" of Exhibit 2, and this is -- it will
2    be probably a little bit hard to read.  I'm going
3    to scroll down part of the time so we can keep it
4    large enough for you to read it on the screen.
5    But I can change the size if you want to see the
6    whole thing.  I'll change the size briefly so you
7    can see the whole page and then I'll make it
8    smaller so you can -- or make it bigger so you can
9    read it more carefully on the screen.
10       So Schedule A has two pages, and it
11   lists a series of assets.  Do you see that?
12   A    Yes.
13   Q    And these were the assets that this
14   purchase agreement specifically said are being
15   transferred from the various Highland affiliates
16   as satisfaction of the $25 million premium for the
17   insurance policy, correct?
18   A    Yes.  Yes.
19   Q    Let me ask you about some of these
20   assets.  Do you know what "Aberdeen LN FDG LTD
21   PFD" is?
22   A    Yeah, some of these are old CLO pieces.
23   Q    Okay.  Do you know specifically -- I
24   asked you about the first one, the Aberdeen
25   entity --

247

1        MR. CLUBOK:  Or strike that.
2    Q    The Aberdeen asset.  Do you recognize
3    that asset?
4    A    I just -- I recognize the name.  It's
5    an old CLO.
6    Q    Do you know what the fair market value
7    was at the time it was transferred as part of
8    the --
9    A    No.
10   Q    -- sales option, the $25 million
11   premium for the insurance policy?
12   A    No.
13   Q    Did you make any effort to figure out
14   the fair market value of the Aberdeen asset at the
15   time it was transferred?
16   A    No.
17   Q    How about the Southfork CLO?  Same
18   answer?
19   A    Yes.
20   Q    Same answer for the -- well, there's
21   another Aberdeen asset.  It looks like it's the
22   same one, although it's a different ISIN number.
23   What does the ISIN number mean?  Is that like a
24   CUSIP number?
25   A    Yeah, it's an identification number for

248

1    things that aren't CUSIP eligible, I think.
2    Q    If there's different ISINs for the two
3    different Aberdeens, does that mean they're
4    different tranches or something?  Or why would
5    there be different ISINs for the two different
6    Aberdeen assets?
7    A    That's what I would guess, but I don't
8    know.
9    Q    Okay.  Do you -- so I'm going to go
10   from the assets from Aberdeen down to Greenbriar.
11   So the first six assets listed here, fair to say
12   you have no idea what their fair market values
13   were at the time of the transfer?
14   A    Correct.
15   Q    And you made no effort to find that
16   out, correct?
17   A    Correct.
18   Q    And then there's two line entries for
19   Highland Financial Partners LP and Highland
20   Financial Partners LP NPV.  Do you know what that
21   refers to?
22   A    No.
23   Q    Would those be interests in Highland
24   Financial Partners?
25   A    I don't know.

249

1    Q  Okay. Do you have any idea what the
2  fair market value of those interests were at that
3  time?
4    A  No.
5    Q  How about Longstreet CDO or NexPoint
6  C COM? Any idea of the fair market value of those
7  assets?
8    A  Nope.
9    Q  Pam Cap FDG LP? Does that ring a bell?
10    A  That was one of our -- that was in '98.
11  That was one of our first large CLOs. I think
12  that was 1998.
13    Q  Any idea what it was worth at the time
14  of this transfer?
15    A  Cents. Cents on the dollar.
16    Q  How about -- what's FRN?
17    A  I don't know. Floating rate note, I'm
18  guessing. I don't know.
19    Q  What's a floating rate note?
20    A  Sometimes CLO tranches are referred to
21  as floating rate notes.
22    Q  Okay. Any idea what the fair market
23  value of that floating rate note would have been
24  at the time of this transfer?
25    A  I don't know which tranche it is. It

250

1  says -- is that 0 point -- I don't know. I think
2  it is the equity tranche, but I don't -- I don't
3  know.
4    Q  How come there is no ISIN next to FRN?
5    A  I don't know.
6    Q  Any idea how the value of that asset
7  would compare with the par value?
8    A  I have no idea.
9    Q  Tousa Inc.? Any idea about that one?
10    A  No.
11    Q  Valhalla or Vertical? Any idea about
12  those assets, what they were or how much they were
13  worth at the time of the transfer?
14    A  No idea. Those are CLOs, but I
15  don't -- I mean, I don't know what Vertical is.
16  That wasn't one of our deals. Valhalla was one of
17  our old deals.
18    Q  Was it -- did it lose value before it
19  closed?
20    A  I have no idea.
21    Q  Then we get to Highland Credit
22  Opportunities CDO Limited Partnership Interest.
23  Do you see that?
24    A  Yes.
25    Q  Now, Highland Credit Opportunities is

251

1  an entity that's now called Multi Strat, correct?
2    A  I don't know.
3    Q  Do you know if Highland Credit
4  Opportunities changed its name at some point to
5  Multi Strat?
6    A  I don't know. I've heard that
7  recently, but I don't know that to be true.
8    Q  Well, do you know if Highland Credit
9  Opportunities ever changed its name?
10    A  I don't know. I mean, I'm willing to
11  be educated, but I don't know.
12    Q  You've heard of the entity that I've
13  shorthand called Multi Strat, right?
14    A  Yes.
15    Q  Was Multi Strat always called Multi
16  Strat?
17    A  I -- we tried to clean up a lot of
18  funds that were small, and, you know, we tried to
19  aggregate assets and strategies after the '08
20  crisis, but I don't remember all of the name
21  changes.
22    Q  Okay. By the way, I should have
23  mentioned that all the assets I'm talking about
24  now on Schedule A of Exhibit 2 are under a big
25  bold, heading, "Highland CDO Opportunity Master

252

1  Fund, LP." Do you see that?
2    A  Yes.
3    Q  And there's other entities that have
4  assets, but we'll get to those in a minute. I'm
5  just going to continue through the CDO -- Highland
6  CDO Opportunity Master Fund, LP assets.
7      And did you know that Highland CDO
8  Opportunity Master Fund at one point had an
9  interest in Highland Credit Opportunities?
10    A  I don't know.
11    Q  Look, you -- you've offered settlements
12  in this case that relate to interest in Multi
13  Strat, correct?
14    A  Yeah, but that wasn't because of this.
15    Q  I understand, but just to get the names
16  straight, you know that Multi Strat was once that
17  entity that -- without getting all the acronyms at
18  the end exactly right -- was loosely called
19  Highland Credit Opportunities or Highland Credit
20  Opps, right?
21    A  See, that's what I don't know. I mean,
22  we have offered settlements out of Multi Strat
23  before, but it's because of the life settlements,
24  not because of this.
25    Q  No, no, but I'm saying -- I'm just

253

1  talking about the name. You know -- you have
2  recently -- you recently caused people at Highland
3  to get you the redeemers from Multi Strat, and
4  fair to say that when you did that, you knew that
5  what is now called Multi Strat used to be called
6  an entity that was known as Highland Credit
7  Opportunities; isn't that true?
8      A  I don't remember.
9          MR. TAYLOR: Andy, that's been asked
10 and answered, like, five times now, in a row.
11     Q  So continuing on the Schedule A, the
12 Highland CDO Opportunity Master Fund assets that
13 were transferred to Sentinel Reinsurance for
14 satisfaction, in part, of the $25 million premium,
15 do you see there is an entry for "NexPoint Real
16 Estate Strat -Z"?
17     A  Yes.
18     Q  Do you know what that's worth?
19     A  Nope. No, I do not.
20     Q  Then there's a Highland Gemini Program
21 $2.4 million promissory note from the Dugaboy
22 trust as maker and cash of 599,000.
23         Do you see that?
24     A  Yes.
25     Q  Now, you know what the cash was worth.

254

1  The cash was worth $599,999, correct?
2      A  Yes.
3      Q  So that's not -- that would be a very
4  liquid asset that was held at CDO Opportunity
5  Master Fund prior to the transfer to pay for the
6  premium, correct?
7      A  I don't know.
8      Q  You don't know if cash is liquid?
9      A  No, I know cash is liquid. I don't
10 know if that was used to pay the premium. I don't
11 know.
12     Q  Oh. Well, this is -- what we're
13 looking at here on Exhibit 2 is the purchase
14 agreement, and it says that the "Purchaser agrees
15 to accept the assets listed in Schedule A hereto
16 as 100 percent payment of the premium." It is the
17 document you signed on behalf of all of these
18 different entities.
19         Do you see that under "1. Payment of
20 Premium" in this purchase agreement which has been
21 marked as Exhibit 2?
22     A  Yes, I see that.
23     Q  Okay. And it says that "Purchaser" --
24 that's Sentinel Reinsurance -- "agrees to accept
25 the assets listed in Schedule A hereto as

255

1  100 percent payment of the Premium," which was
2  $25 million, correct?
3      A  Yes.
4      Q  Okay. So going back to Schedule A, all
5  of these assets together on Schedule A were to
6  satisfy the $25 million premium for the insurance
7  policy we have been talking about today, right?
8      A  Yes.
9      Q  And part of that was $599,000 in cash
10 from Highland CDO Opportunity Master Fund, right?
11     A  Yes.
12     Q  And that $599,000 in cash would have
13 been a liquid asset that was being transferred as
14 partial payment of the premium, correct?
15     A  Yes.
16     Q  And how about that $2.4 million
17 promissory note from Dugaboy Investment Trust?
18 Did Dugaboy pay that note, satisfy that note?
19     A  Yes.
20     Q  So -- and Dugaboy -- do you know if
21 Dugaboy is not going to make good on that note?
22     A  I don't know.
23     Q  Has Dugaboy made good on that note?
24     A  I don't know.
25     Q  Do you have any basis to believe that

256

1  they have some excuse for not making good on that
2  note, as you sit here today?
3      A  I do not.
4      Q  So you would expect that 2.4 million to
5  be worth $2.4 million?
6      A  I don't know. I don't know the terms
7  of it. I don't know the -- I don't know the
8  terms, the tenor. I don't know -- I don't know.
9      Q  Okay. What's Cambridge 5 times
10 FLOATING?
11     A  I do not know.
12     Q  No idea what that asset refers to?
13     A  It's not one of our old CLOs. I don't
14 know what it is.
15     Q  Okay. And then you see there's "Cash,"
16 and there's another 7.8 -- nearly $7.8 million in
17 cash in addition to the 600,000 previously
18 discussed, right?
19     A  Yep. Sure.
20     Q  So that's a total of about $8.4 million
21 in cash from CDO Opportunity Master Fund as
22 partial payment of the $25 million premium, right?
23     A  Yes.
24     Q  And that 8.4 million is completely
25 liquid, right?

257

1    A   Yes.
2    Q   So when Highland CDO Opportunity Master
3  Fund had $8.4 million in cash and it gave it to
4  Sentinel for about a third of the premium, was
5  that making that 8.4 million more liquid or less
6  liquid?
7    A   I --
8    Q   Was CDO Opportunity Master Fund more or
9  less liquid after this transfer of all of its
10 assets plus $8.5 million in cash?
11        MR. TAYLOR:  Objection to the form.
12   A   I -- I --
13   Q   Yeah, sorry.  To be clear, it's
14 approximately $8.4 million in cash.  Was CDO
15 Opportunity Master Fund more or less liquid after
16 transferring all of these assets listed on
17 Schedule A, including the roughly $8.4 million in
18 cash?
19   A   I don't -- I don't know.  I don't know
20 what the payables -- I don't know what the legal
21 fees were that were accrued.  I don't -- you don't
22 know enough of what else is happening at the CDO
23 Master Fund or the rest of HFP.  I mean, it could
24 have $10 million of legal expenses.  I just don't
25 know.

258

1    Q   As you sit here today, are you aware of
2  any such legal expenses that CDO Fund transferred
3  to Sentinel Re?
4    A   No, I don't.  But to the extent that we
5  don't, we don't know whether the cash is spoken
6  for or not.
7    Q   Okay.  By the way, the Highland CDO
8  Opportunity Fund has another 2.3 million in cash.
9  Do you see that?
10   A   Yes.
11   Q   So now the total cash that's being
12 transferred to Sentinel Re is over 10 and a half
13 million dollars, right?
14   A   Yes.
15   Q   So that's higher than the threshold
16 above which you said it would be material as part
17 of this transaction, correct?
18   A   I -- obviously, this transaction
19 changed a lot.  This transaction does not, you
20 know, correspond with my recollection.
21   Q   Right.  But you would agree that the
22 fact that there is at least 10 and a half million
23 dollars in cash being transferred as partial
24 payment of a $25 million premium reflects the fact
25 that cash was a very material part of the payment

259

1  for the premium, correct?
2    A   No, I -- Andy, I can't say that, and I
3  won't say that because we don't know what
4  outstanding bills might have been due.  I mean, I
5  doubt they were 30 million of legal expenses, but
6  if we don't know what they are -- let's say they
7  were 30 million of legal expenses.  Then there is
8  no cash going over, right?
9    Q   Okay.  You have no idea, as you sit
10 here today, if it would -- that 30 million is a
11 number you just made up out of thin air; isn't
12 that true?
13   A   Well, yeah, but you made up that
14 there's zero legal expenses.
15   Q   No, I haven't said that yet.  And I'm
16 not going to get into an argument with you, but
17 that 30 million hypothetical legal fees is a
18 number you made out of totally thin air, correct?
19   A   Correct.
20   Q   What, roughly, were the legal fees then
21 owed by CDO Fund in August of 2017?
22   A   I have no idea so I don't want to
23 speculate.
24   Q   You previously said that the litigation
25 had been dormant for a while in August of 2017;

260

1  isn't that right?
2    A   But you -- you helped refresh me that
3  it wasn't dormant and there was some significant
4  legal expenses due to McKool and other people,
5  right, so I -- I don't know if it was -- I thought
6  it had been dormant for a number of years.  I was
7  wrong.  Like I said, I didn't refresh myself on
8  this case before the depo so ...
9    Q   You're not aware of any legal fees that
10 were owed as of the time of this insurance policy,
11 as you sit here today; is that true?
12   A   I have no awareness, correct, of
13 whether there were zero or 30 million or
14 10 million or 5 million.
15   Q   Well, you have no basis -- you know
16 they weren't 30 million, right?
17   A   I think you -- you charged UBS
18 45 million.  I mean, they could have been.  Right?
19 I mean, the last time we saw -- the last time we
20 saw Latham's bills to UBS, it was 42 or
21 44 million, right?
22   Q   You know, as you sit here today, that
23 you never paid your lawyers anything like
24 $30 million for the UBS litigation; isn't that
25 true?

261

1    A    I don't know.

2    Q    Well, do you think in good faith, under

3  oath, that you paid your lawyers something like

4  $30 million for the UBS litigation?

5    A    **I'm saying, Andy, I have no idea. I**

6  **think there's been -- I think we've over the years**

7  **had three or four different law firms working on**

8  **UBS. I don't know what they totaled.**

9    Q    Okay. Let's continue with what was

10 transferred for the insurance policy pursuant to

11 Schedule A.

12        We now have an entity called "Highland

13 CDO Holdings Company." Do you see that?

14   **A    Uh-huh.**

15   Q    Is that a yes?

16   **A    Yes.**

17   Q    And did that entity -- that's a

18 subsidiary of Highland Financial Partners?

19   **A    I don't know.**

20   Q    Was -- okay.

21        Well, you see that there's a number of

22 assets transferred. Fair to say you have no idea

23 about the value of "HFT Real Estate," the first

24 asset?

25   **A    Correct.**

262

1    Q    Or the second asset -- the NexPoint

2  assets, you have no idea what the value of those

3  were at the time of this transfer?

4    **A    Correct.**

5    Q    Same with the -- how about the Highland

6  Park C 4.93867 asset?

7    **A    Correct.**

8    Q    What about the 25 November 51 -- or

9  25NOV51 FRN? Do you know what that was worth?

10   **A    No.**

11   Q    How about a promissory note from CLO

12 Holdco of $32 million? Do you know what that is

13 all about?

14   **A    Nope.**

15   Q    Do you know if that is a note that CLO

16 Holdco is capable of paying off?

17   **A    I don't know. I don't know who CLO**

18 **Holdco is. Is that the Bermuda entity that we**

19 **were talking about earlier? I don't know.**

20   Q    Oh, you know what, my colleague has

21 noted to me that I missed another cash asset of

22 539,000 that's right here. So let's just make

23 sure we've totaled up all the cash that was

24 transferred. It looks like it was 2.3 million,

25 plus 7.7, is a little over 10 million, plus about

263

1  600,000, plus another $539,000, for a total of

2  over $11 million just on the first page of

3  Schedule A, correct?

4    **A    Yes.**

5    Q    And then on the second page we can see

6  there is another 539,000 of cash that's being

7  transferred from Highland CDO Holdings Company,

8  right?

9    **A    Yep.**

10   Q    And then there is another $300,000 in

11 cash from Highland Special Opportunities Holding

12 Company, right?

13   **A    Yes.**

14   Q    And there is another $80,000 in cash

15 from Highland Financial Corp.?

16   **A    Yep.**

17   Q    And a tax fund receivable?

18   **A    Yep.**

19        THE WITNESS: Hey, Andy, I'm going to

20 have to put a break on this. I'm getting tired.

21 We can revisit tomorrow but --

22        MR. CLUBOK: Okay. You want to revisit

23 tomorrow, huh?

24        Let's go off the record.

25        THE VIDEOGRAPHER: Off record. 8:35.

264

1        (A recess was taken.)

2        THE VIDEOGRAPHER: On record, 8:40.

3        MR. CLUBOK: At Mr. Dondero's request,

4  we have agreed to continue the deposition

5  Wednesday morning at 8:30 Central Time, sharp.

6  Mr. Taylor has an appointment he has got to leave

7  for at about 10:15, but we only have a little less

8  than an hour and a half left on the record of my

9  time, and however much time Mr. Taylor has used,

10 so we should be able to get that done.

11        But we're agreeing that we're going to

12 start on the nose at 8:30, meaning people will be

13 in their seats a few minutes before with all the

14 technical issues resolved so that we can get

15 started right at 8:30, correct?

16        MR. TAYLOR: I fully intend on being in

17 my seat then. I can't promise everything, but

18 yes.

19        MR. CLUBOK: And that's correct,

20 Mr. Dondero?

21        THE WITNESS: Yes, I'll be there.

22        MR. CLUBOK: And you understand that

23 you will not speak to anybody about the substance

24 of this deposition between now and then,

25 correct --

265

1    THE WITNESS:  Yep.
2    MR. CLUBOK:  -- or review any other
3 documents related the deposition unless we ask you
4 to through your lawyer?
5    THE WITNESS:  Yep.
6    MR. CLUBOK:  Okay.  Let's go off the
7 record.
8    THE VIDEOGRAPHER:  The time is
9 8:41 p.m. This suspends today's deposition of
10 James Dondero.  We're off the record.
11    THE COURT REPORTER:  Counsel, are you
12 ordering a copy of the transcript?
13    MS. GEORGE:  Yes, we will take a rough
14 and a five-day expedite for the final.
15    MR. FEINSTEIN:  Yes, we would like a
16 copy, regular delivery, with a rough to
17 rfeinstein@pszjlaw.com.
18    MR. TAYLOR:  We would like a copy,
19 regular delivery, and a rough to
20 clay.taylor@bondsellis.com.
21    (Time noted: 8:42 p.m.)
22
23
24
25

266

1    ACKNOWLEDGMENT OF DEPONENT
2
3    I, JAMES DONDERO, do hereby acknowledge
4 that I have read and examined the foregoing
5 testimony, and the same is a true, correct and
6 complete transcription of the testimony given by
7 me and any corrections appear on the attached
8 Errata sheet signed by me.
9
10 _____   _____
11    (Date)         (Signature)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

267

1    CERTIFICATE OF REPORTER - NOTARY PUBLIC
2    I, ADRIENNE MIGNANO, the officer before
3 whom the foregoing deposition was taken, do hereby
4 certify that the foregoing transcript is a true
5 and correct record of the testimony given; that
6 said testimony was taken by me and thereafter
7 reduced to typewriting under my direction; that
8 reading and signing was requested; and that I am
9 neither counsel for, related to, nor employed by
10 any of the parties to this case and have no
11 interest, financial or otherwise, in its outcome.
12    IN WITNESS WHEREOF, I have hereunto set
13 my hand and affixed my notarial seal this 13th day
14 of MAY, 2021.
15 My Commission Expires: June 2022.
16
17
18 _____
19 Adrienne Mignano
20
21
22
23
24
25