

## HIGHLY CONFIDENTIAL
## SUBJECT TO PROTECTIVE ORDER
## INFORMATION REDACTED

# Transcript of Isaac D. Leventon

**Date:** July 22, 2021
**Case:** UBS Securities LLC, et al. -v- Highland Capital Management, L.P.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**Page 1**

```
1          IN THE UNITED STATES BANKRUPTCY COURT
2            FOR THE NORTHERN DISTRICT OF TEXAS
                        DALLAS DIVISION
3   In re                §
                         §
4   HIGHLAND CAPITAL      §  Chapter 11
    MANAGEMENT, L.P.,     §  Case No. 19-34054-SGJ11
5                         §
        Debtor.           §
6                         §
                         §
7   UBS SECURITIES LLC AND §
    UBS AG LONDON BRANCH,  §
8                         §
        Plaintiffs,       §
9                         §  Adversary Proceeding
    VS.                   §  No. 21-03020-sgj
10  HIGHLAND CAPITAL      §
11  MANAGEMENT, L.P.,     §
                         §
12      Defendant.        §
                         §
13
             HIGHLY CONFIDENTIAL
14       SUBJECT TO PROTECTIVE ORDER
             INFORMATION REDACTED
15
16        Videotaped Deposition of
17            ISAAC D. LEVENTON
18              Dallas, Texas
19          Thursday, July 22, 2021
20               9:55 a.m.
21
22
23  Job No.:  386785
24  Pages:  1 - 370
25  Reported by:  Micheal A. Johnson, RDR, CRR
```

**Page 2**

```
1        Deposition of ISAAC D. LEVENTON, held at
2   the location of:
3
4        Butler Snow LLP
5        2911 Turtle Creek Boulevard, Suite 1400
6        Dallas, Texas 75219
7        (469) 680-5500
8
9
10       Pursuant to Notice, before Micheal A.
11  Johnson, Registered Diplomate Reporter and
12  Certified Realtime Reporter.
```

**Page 3**

```
1                    APPEARANCES
2   ON BEHALF OF PLAINTIFFS
    UBS SECURITIES LLC AND
3   UBS AG LONDON BRANCH:
4        Andrew B. Clubok
         Sarah Tomkowiak (Via Zoom)
5        LATHAM & WATKINS LLP
         555 Eleventh Street, N.W., Suite 1000
6        Washington, D.C. 20004
         (202) 637-2200
7        andrew.clubok@lw.com
         sarah.tomkowiak@lw.com
8
         Shannon E. McLaughlin
9        LATHAM & WATKINS LLP
         885 Third Avenue
10       New York, New York 10022-4834
         (212) 906-4612
11       shannon.mclaughlin@lw.com
12
    ON BEHALF OF DEFENDANT
13  HIGHLAND CAPITAL MANAGEMENT, L.P.:
14       Robert J. Feinstein (Via Zoom)
         PACHULSKI STANG ZIEHL & JONES LLP
15       780 Third Avenue, 34th Floor
         New York, New York 10017-2024
16       (212) 561-7700
         rfeinstein@pszjlaw.com
17
18  ON BEHALF OF THE WITNESS:
19       Frances A. Smith
         ROSS & SMITH, PC
20       700 N. Pearl Street, Suite 1610
         Dallas, Texas 75201
21       (214) 377-7879
         frances.smith@judithwross.com
22
23
24
25
```

**Page 4**

```
1              APPEARANCES CONTINUED
2   ON BEHALF OF THE WITNESS:
3        Debra A. Dandeneau
         Michelle Hartmann
4        BAKER & McKENZIE, LLP
         452 Fifth Avenue
5        New York, New York 10018
         (212) 626-4875
6        debra.dandeneau@bakermckenzie.com
         michelle.hartmann@bakermckenzie.com
7
8   VIDEOGRAPHER:
9        Brian Krieger
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**5**

INDEX
ISAAC D. LEVENTON
July 22, 2021

APPEARANCES                                          3

PROCEEDINGS                                          8


EXAMINATION OF ISAAC D. LEVENTON:

BY MR. CLUBOK                                        9


ACKNOWLEDGMENT OF DEPONENT                           369

REPORTER'S CERTIFICATION                             370

**7**

PREVIOUSLY MARKED EXHIBITS

NUMBER          DESCRIPTION               PAGE

Exhibit 2       ........................  287

Exhibit 4       ........................  292

Exhibit 5       ........................  294

Exhibit 47      ........................  169

Exhibit 53      ........................  281

Exhibit 56      ........................  215

Exhibit 57      ........................  235

Exhibit 59      ........................  284

Exhibit 61      ........................  243

Exhibit 62      ........................  297

**6**

DEPOSITION EXHIBITS
ISAAC D. LEVENTON
July 22, 2021

NUMBER       DESCRIPTION                  MARKED

Exhibit 67   04/13/2017 E-mail, Isaac     196
             Leventon to Stephanie
             Vitiello
             UBSPROD4837680

Exhibit 68   05/24/2019 through 06/17/2020 274
             E-mail Chain
             UBSPROD000095 - UBSPROD000096

Exhibit 69   UBS's First Request for      301
             Production of Documents to
             Debtor Highland Capital
             Management, LP

Exhibit 70   08/06/2020 through 08/13/2020 309
             E-mail Chain
             UBSPROD1611114 -
             UBSPROD1611119

Exhibit 71   07/18/2019 through 07/16/2020 329
             E-mail Chain
             UBSPROD1754280 -
             UBSPROD1754282

Exhibit 72   08/05/2020 E-mail Chain      333
             UBSPROD1706963 -
             UBSPROD1706964

Exhibit 73   08/21/2020 E-mail Chain, with 342
             Attachment
             UBSPROD0497100 - UBSPROD0497103

Exhibit 74   01/28/2021 E-mail Chain, with 348
             Attachment
             UBSPROD1659896 -
             UBSPROD1659900

Exhibit 75   12/02/2019 E-mail Chain      361
             UBSPROD456218 - UBSPROD456219

**8**

PROCEEDINGS

THE VIDEOGRAPHER:  Here begins disk No. 1 in the videotaped deposition of Isaac Leventon.  This is in the matter regarding Highland Capital Management, LP, specifically the matter of UBS Securities, LLC and UBS AG, London Branch versus Highland Capital Management, LP.  This is in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, filed as case number 19-34054-SGJ11.

Today's date is Thursday, July 22nd, 2021.  The videographer today is Brian Krieger representing PlanetDepos.  This video deposition is taking place at Butler Snow at 2911 Turtle Creek Boulevard in Dallas, Texas.

If counsel would please identify themselves for the record and whom they represent.

MR. CLUBOK:  On behalf of UBS, Andrew Clubok of Latham & Watkins, LLP.

MS. McLAUGHLIN:  Shannon McLaughlin, also with Latham & Watkins.

MS. SMITH:  Frances Smith with Ross & Smith on behalf of Mr. Isaac Leventon.

MS. HARTMANN:  Michelle Hartmann, Baker McKenzie, on behalf of the witness as well.

9

1    MS. DANDENEAU:  Debra Dandeneau from Baker
2 McKenzie on behalf of Isaac Leventon.
3    MR. FEINSTEIN:  On the Zoom, Robert
4 Feinstein of Pachulski Stang Ziehl & Jones,
5 counsel to Highland Capital Management, LP.
6    THE VIDEOGRAPHER:  The court reporter
7 today is Micheal Johnson representing PlanetDepos.
8 If the court reporter would please swear in the
9 witness.
10    ISAAC D. LEVENTON,
11 called as a witness, having been duly sworn by a
12 Notary Public, was examined and testified as
13 follows:
14    EXAMINATION
15 BY MR. CLUBOK:
16    Q   Good morning.  Please state your full
17 name.
18    A   Isaac Daniel Leventon.
19    Q   And what's your home address?
20 <-- HIGHLY CONFIDENTIAL
21 -->
22    Q   Roughly how long have you lived there?
23    A   Since 2013 or '14.
24    Q   What's your current business address?
25    A   2515 McKinney Avenue.

10

1    Q   You are an attorney authorized to practice
2 law, correct?
3    A   Yes.
4    Q   In what states?
5    A   Texas.
6    Q   Just Texas?
7    A   I'm only barred in the state of Texas,
8 yes.
9    Q   Where did you go to college?
10    A   Emory University.
11    Q   What year did you graduate?
12    A   2001.
13    Q   What was your degree?
14    A   Political science.
15    Q   And where did you go to law school?
16    A   University of Texas School of Law.
17    Q   Where did -- when did you graduate?
18    A   2005.
19    Q   Did you do something between college and
20 law school?
21    A   Yes.
22    Q   What was that?
23    A   I worked for the Centers for Disease
24 Control.
25    Q   Did you know Dr. Fauci?

11

1    A   Not personally.
2    Q   Have you been deposed before?
3    A   Yes.
4    Q   How many times, approximately?
5    A   Over ten.
6    Q   And were all of those matters in
7 connection with your work with Highland Capital or
8 an affiliated entity?
9    MS. SMITH:  Objection, form.
10    A   I believe so.
11 BY MR. CLUBOK:
12    Q   When was the last time you were deposed,
13 roughly?
14    A   I'm trying to recall.  I believe it may
15 have been early this year.
16    Q   Have you ever served as a corporate
17 representative or as the equivalent state law
18 nomenclature?
19    A   Yes.
20    Q   Roughly many times?
21    A   Most of the depositions I gave were in a
22 corporate representative capacity.  The majority
23 of them.
24    Q   Who were you representing?
25    A   Depended on the case.

12

1    Q   Can you identify as many entities as you
2 can recall that you have served as a corporate
3 representative for in a deposition?
4    A   The last one at the beginning of this
5 year, I served as the corporate representative for
6 the plaintiffs in the lawsuit against Celtic
7 Pharma.
8    Q   Who were the plaintiffs?
9    A   You'd have to pull -- I don't recall the
10 exact names of them.  You'd have to look at the
11 style of the case, but it was all of them.
12    Q   Okay.  And in past depositions, try to
13 identify as many entities as you can recall that
14 you've served as corporate representatives for in
15 deposition.
16    A   I really don't remember.  I would have to
17 look back at the records on that.  I don't recall
18 which ones.
19    Q   You can't -- other than this deposition
20 where you served as the representative against
21 Celtic Pharma, you can't recall a single other
22 entity where you were designated as a corporate
23 representative, as you sit here today?
24    A   There was a case related to the real
25 estate fund a number of years back, but I don't

13

1 remember who I was representing as the witness in
2 that case.
3 Q So again, other than the deposition where
4 you served as the representative against the
5 Celtic Pharma, you cannot recall a single other
6 entity that you can identify where you were
7 designated as a corporate representative; is that
8 correct?
9 A First of all, it's Celtic, like -- spelled
10 like the basketball team.
11 Q Although apparently pronounced
12 differently.
13 A Correct. And now thinking about it
14 further, I represented Highland Capital
15 Management, LP, as their corporate representative
16 in the Crusader arbitration.
17 Q Other than that, can you identify any
18 other entity on whose behalf you've served as a
19 corporate representative in any testimony?
20 A No, not sitting here today.
21 Q In addition to your times being deposed as
22 a corporate representative, have you been deposed
23 in your individual capacity before today?
24 A Yes.
25 Q How many times, roughly?

14

1 A Maybe two or three.
2 Q Were those all in connection with your
3 work?
4 A Yes.
5 Q Okay. And what were the circumstances of
6 those depositions?
7 A I honestly don't remember. I honestly
8 don't recall.
9 Q You recall nothing whatsoever about the
10 two or three times that you've been deposed as an
11 individual?
12 A I really don't remember now.
13 Q You were previously -- well, strike that.
14 After law school, can you walk us through
15 your employment history, briefly?
16 A Yes. Would you like me to do so?
17 Q Yes.
18 A Okay. I went to work for a litigation
19 boutique for approximately five years here in
20 Dallas.
21 Q Named?
22 A Hartline, Dacus, Barger, Dryer & Kern.
23 We'll spell it during a break. And then in
24 September 2009, I began working at Highland
25 Capital Management, LP.

15

1 Q Had they been a client of yours before you
2 started working for them?
3 A No.
4 Q How did you come to be employed at
5 Highland Capital Management?
6 A Online application, interview.
7 Q Throughout the course of the deposition --
8 I know there's lots of different -- some of the
9 entities have longer names, some of them have
10 things like LP. If I refer to Highland Capital
11 Management throughout the rest of this deposition
12 as HCM, will you understand it to be that entity?
13 A So when you say HCM, you're referring to
14 Highland Capital Management, LP, the debtor,
15 correct?
16 Q Correct.
17 A Okay. We can make that agreement.
18 Q Okay. Thank you. And who interviewed you
19 for your job at HCM?
20 A A number of people interviewed me.
21 Q Did you have an understanding as to who
22 was the final decision-maker?
23 A No, I didn't actually.
24 Q Who interviewed you? Identify the people
25 who interviewed you.

16

1 A Michael Colvin, Andrei Dorenbaum, Patrick
2 Daugherty, John Honis, Scott Ellington, Brian
3 Collins and I believe Debbie Reynolds as well.
4 Q And what was -- and you were hired by
5 Highland Capital Management, correct?
6 A Yes.
7 Q By the way, just to be clear, I may say
8 Highland Capital Management, I may say HCM, I may
9 say the debtor. You'll understand those are all
10 interchangeable for Highland Capital Management,
11 LP, the entity that you were hired by in 2009?
12 A Okay.
13 Q Thanks. So what was the job you were
14 hired to do for HCM?
15 A I was hired as litigation counsel.
16 Q What did that mean? What were your job
17 duties as litigation counsel?
18 A To work on and manage litigation.
19 Q For whom?
20 A For HCMLP and for its other affiliates.
21 Q And did your role ever change?
22 A Yes.
23 Q When?
24 A February 2011.
25 Q How did your role change in February 2011?

17

1    A  I was promoted to assistant general
2    counsel.
3    Q  Who promoted you?
4    A  The company.
5    Q  Was there a person who you understood to
6    have made the decision?
7    A  I don't know.
8    Q  Who were you reporting to prior to your
9    promotion?
10   A  Scott Ellington.
11   Q  Did you always report to Scott Ellington
12   throughout your tenure at HCM?
13   A  Not that entire period. I believe there
14   was a brief period where I did not report to him.
15   Q  When was that?
16   A  Subsequent to my promotion but before
17   Mr. Ellington became general counsel.
18   Q  And when was that?
19   A  I think it would have been most of 2011.
20   Q  Okay.  So -- and who did you report to
21   during most of 2011?
22   A  Michael Colvin.
23   Q  And then Mr. Colvin left and Mr. Ellington
24   became general counsel?
25   A  Correct.

18

1    Q  So before that time period and then after
2    that time period, through your entire tenure at
3    HCM, you reported to Scott Ellington, correct?
4    A  Correct.
5    Q  Did your duties change when you became
6    assistant general counsel?
7    A  Yes.
8    Q  In what way?
9    A  I took on nonlitigation management-related
10   duties.
11   Q  Like what?
12   A  Corporate work, contract drafting and
13   review, and then supporting some of the business
14   units, a lot of transactional work.
15   Q  Were there other assistant general
16   counsels at the time?
17   A  I believe the answer is yes.
18   Q  Do you know who they were?
19   A  Thomas Surgent, Scott Ellington and Andrei
20   Dorenbaum.
21   Q  I see.  So the four of you were -- when
22   you were first promoted, were all assistant
23   general counsels to Mr. Colvin.  And then when
24   Mr. Colvin left, Mr. Ellington became the GC and
25   you were all -- the remaining three were assistant

19

1    general counsels to him?
2    A  I'm trying to remember the exact time
3    frame.  There were other assistant general
4    counsels at various points in time.  Those are
5    individuals I recall held that title at one point
6    in time or another.
7    Q  Okay.  So you got some additional duties
8    that you just described when you became assistant
9    general counsel, but fair to say, you were still
10   focused primarily on litigation?
11   A  Yes.
12   Q  And did your role ever change after that?
13   A  I mean, I took on additional duties and
14   responsibilities as needed.
15   Q  Did you -- and what were those?
16   A  Depended on which business unit needed
17   support and I would help them out.
18   Q  What do you mean?
19   A  I assisted the real estate team, I
20   assisted the credit analysis team and I assisted
21   the back office, accounting and operations.
22   Q  How did you assist the back office
23   accounting and operations?
24   A  I worked on audit-related matters.
25   Q  What do you mean?

20

1    A  The preparation of audits.
2    Q  Did you work on asset valuations ever?
3    A  No.
4    Q  What does the credit analysis team do?
5    A  They analyze and track and make
6    recommendations for investments in debt
7    instruments.
8    Q  And what was the assistance you provided
9    to that group?
10   A  Credit analysis -- credit agreement
11   analysis as requested.
12   Q  What does that mean?
13   A  Mean if they asked me to look at a credit
14   agreement, I would look at it and I would give
15   them my perspective on it.
16   Q  Okay.  Did you ever get a promotion after
17   2011?
18   A  I had an additional job title added, but I
19   don't think it was really a promotion.
20   Q  What was that?
21   A  I believe I had a title of managing
22   director of distress added.
23   Q  What did that title entail?
24   A  I didn't really do any work under that
25   title.

---

21

1    Q   Why did you get that title, as far as you
2  know?
3    A   It was anticipated that certain members of
4  the legal team, including myself, would be
5  assisting with distressed assets and private
6  equity.
7    Q   Starting when?
8    A   Maybe 2018.
9    Q   Who anticipated that?
10   A   Mr. Ellington informed us that we were
11 going to be asked to help out with that role.
12   Q   And -- but you never did help out with any
13 distressed assets after you got that job title?
14   A   Not really, no.
15   Q   Were you ever given the title director of
16 private equity?
17   A   Oh, that's what the title was.  Yeah.
18   Q   Okay.  Did you ever perform any functions
19 related to that title?
20   A   No, not really.
21   Q   So your job really didn't change beyond
22 what you've described, from 2011 until you left
23 HCM, correct?
24   A   We had -- depending on the needs of the
25 company, things would -- things would change and

---

22

1  you'd have different tasks, but the basic nature
2  of my role didn't change.
3    Q   How often did you communicate with
4  Mr. Dondero during the course of your employment
5  at HCM?
6    A   It really depended on when during that
7  employment.  I was there for 11 years.
8    Q   How about in the last two years prior to
9  HCM going into bankruptcy, in the -- put yourself
10 back to the two years prior to the bankruptcy,
11 roughly how often were you directly communicating
12 with Mr. Dondero?
13   A   So you're talking approximately 2017
14 through 2019?
15   Q   Yes.
16   A   I don't know.  Maybe once a month.
17   Q   And would that communication be in person
18 or be by e-mail?
19       MS. SMITH:  Objection, form.
20   A   It would depend on the communication.
21 BY MR. CLUBOK:
22   Q   How often did you speak with Mr. Dondero
23 on average in 2017 through 2019?
24   A   I really don't recall.  I would have to
25 speculate.

---

23

1    Q   Did you physically work near him?
2    A   We were in the same office facility, if
3  that's the question.
4    Q   Were you on the same floor?
5    A   The entire firm was on the same floor, so
6  yes.
7    Q   Okay.  So I take it you'd see him at least
8  on a relatively frequent basis around the office?
9        MS. SMITH:  Objection, form.
10   A   Not necessarily, no, actually.
11 BY MR. CLUBOK:
12   Q   Did you have your own office?
13   A   No.
14   Q   Did you sit out on a pod situation or what
15 was your physical layout for your workspace?
16   A   We had an open floor plan and I was
17 sitting in the open floor plan.
18   Q   Who sat near you?
19   A   When?
20   Q   In the 2017 through 2019 time frame.
21   A   I believe Jason Goldsmith sat near me.
22   Q   Anyone else?
23   A   Eric Girard.
24   Q   Anyone else?
25   A   I don't remember anyone else sitting near

---

24

1  me at that point in time, no.
2    Q   How about Scott Ellington?
3    A   He did not sit near me.
4    Q   Where did he sit?
5    A   He had an office.
6    Q   How often did you speak with Scott
7  Ellington on average during that time period?
8    A   2017 to '19?  I don't think I can give a
9  fair average estimate.  It really would depend on
10 the ebb and flow of work.
11   Q   Well, would it be on a -- can you say
12 whether it would be roughly on a daily, weekly,
13 monthly basis?
14   A   There were times when we'd speak multiple
15 times a day and there were times when I wouldn't
16 talk to him for two or three weeks.
17   Q   Who did Scott Ellington report to during
18 the time period you worked -- were -- strike that.
19       After Scott Ellington became general
20 counsel, who did he report to?
21   A   Mr. Dondero.
22   Q   Did you supervise anyone in the legal
23 department after you got your promotion to
24 assistant general counsel?
25   A   I had younger associate attorneys that

---

---

25

1 could be staffed on to matters of mine, but they
2 did not technically report to me.
3   Q  Okay. But you would direct their work in
4 some -- depending on the needs?
5   A  Depending on the tasks, yes.
6   Q  Who were they?
7   A  Stephanie Vitiello.
8   Q  Anyone else?
9   A  Lauren Thedford.
10   Q  Anybody else?
11   A  No.
12   Q  So Stephanie -- how did you pronounce --
13 how do you spell that last name?
14   A  V-i-t-i-e-l-l-o.
15   Q  She was an attorney there?
16   A  Yes.
17   Q  Does she still work at HCM?
18   A  No.
19   Q  When did she leave HCM?
20   A  I don't know exactly.
21   Q  Was she there until you left?
22   A  Yes.
23   Q  So she was still there until this year,
24 2021?
25   A  Yes.

---

26

1   Q  Where is she now in terms of employment?
2   A  She works at Skyview.
3   Q  How about Lauren? Does she work at
4 Skyview as well?
5   A  No.
6   Q  Where is she now in terms of employment,
7 if you know?
8   A  I don't.
9   Q  Did you -- during the time you were at
10 Highland, who paid your salary?
11   A  Highland Capital Management, LP.
12   Q  In the last year before the bankruptcy,
13 what was your total comp, roughly, from HCM?
14   A  I would have to go back and look. It was
15 maybe 3- or $400,000.
16   Q  And was that partially salary and
17 partially bonus?
18   A  Yes.
19   Q  What was the rough split there?
20   A  Maybe 50/50.
21   Q  And did you have any other comp, in terms
22 of equity or deferred compensation or anything
23 else like that, in the final year that you worked
24 at Highland before the bankruptcy?
25   A  I think I might have had a very small

---

27

1 amount of deferred compensation.
2   Q  And then did your compensation change
3 after the bankruptcy?
4   A  No. Well, depends on your interpretation
5 of whether it changed or not.
6   Q  Okay. In terms of dollar amounts, did
7 it --
8   A  In terms of the dollar amounts I actually
9 received, yes, it changed.
10   Q  In what -- roughly the magnitude, did you
11 get half as much, two-thirds as much, twice as
12 much?
13   A  The UCC objected to the payment of my
14 bonuses. So in the amounts that the UCC objected.
15   Q  I see. And so what was your comp last
16 year? I guess 2020 would have been the full year
17 that you were under the bankruptcy rules. What
18 was your rough total comp?
19   A  I'm not exactly sure. It would have been
20 my salary, plus not receiving the bonuses.
21   Q  And what is your compensation at your new
22 job?
23   A  Roughly flat, as compared to what I had
24 been promised at Highland.
25   Q  Meaning what? Roughly 400,000 is what you

---

28

1 expect to make this year?
2   A  I don't know the exact number, but it's
3 roughly flat, so it's whatever is reflected in the
4 accounting records.
5   Q  What accounting records?
6   A  The ones at Highland.
7   Q  So whatever is reflected in terms of what
8 you were slated to receive prebankruptcy is the
9 amount -- is the amount you're expecting to get
10 paid at your new job?
11   A  Correct.
12   Q  Did you have any other sources of income
13 other than HCM during your time there?
14   A  Yes.
15   Q  What was that?
16   A  I received a payment from NexPoint.
17   Q  Okay. What's NexPoint?
18   A  NexPoint Advisors, LP.
19   Q  And when did you receive a payment from
20 NexPoint?
21   A  May of 2020.
22   Q  For -- what was the amount of that?
23   A  It was approximately 300,000 something.
24   Q  And what was that for?
25   A  It was the deferred compensation that I

29

1 had been waiting for for three years, that the UCC
2 chose not to pay me that had vested and earned.
3    Q  I see. So NexPoint paid you deferred
4 compensation that you had been expecting to get
5 paid from HCM prior to the bankruptcy?
6    A  Correct.
7    Q  And did -- is that 300,000, did that
8 account for the total of deferred comp that you
9 believed you were due at that time?
10      MS. SMITH: Objection, form.
11      MR. CLUBOK: Sorry, what's the form
12 objection?
13      MS. SMITH: I think that's vague. He was
14 supposed to get deferred comp over multiple years.
15      MR. CLUBOK: Fair enough. Let me try --
16 thanks. Let me try to make it clearer.
17 BY MR. CLUBOK:
18    Q  When you got that -- it was a lump-sum
19 payment that you got in May of 2020?
20    A  Yes.
21    Q  Was that amount supposed to be a total of
22 all of the deferred comp that you believed you
23 were owed at that point?
24    A  I'm struggling with your question. It was
25 the amount of the deferred compensation that

30

1 was -- that I had earned and was due and payable
2 to me in May of 2020.
3    Q  Right. And without getting to whether
4 that's accurate, you believed that there was a
5 total amount of deferred comp that was due to you
6 from Highland Capital Management as of May 2020,
7 correct?
8    A  Yes.
9    Q  And the amount that NexPoint paid you
10 equalled the amount that you believed was due to
11 you from Highland Capital Management through that
12 point?
13    A  Yes.
14    Q  Okay. And did you disclose that
15 compensation to the debtor?
16    A  To the company generally? I mean, it came
17 from the HR department of the debtor. So the
18 debtor was aware of it.
19    Q  Sorry. It came from the HR department of
20 the debtor?
21    A  Yes.
22    Q  What do you mean?
23    A  Mr. Brian Collins, who was a debtor
24 employee, told me to -- that I would be receiving
25 the payment.

31

1    Q  But not from the debtor, instead from
2 NexPoint?
3    A  I don't believe we discussed where it was
4 going to come from.
5    Q  So Mr. Collins just came to you one day
6 and said you're going to be getting this money?
7    A  Yes.
8    Q  And then it showed up and it was from
9 NexPoint?
10    A  It showed up and honestly I didn't even
11 check where it came from until much later.
12    Q  When did you check?
13    A  There was a deposition earlier and -- I
14 apologize. I'm trying to remember. It had -- it
15 had something -- no, there was a deposition
16 earlier I think this year and I wasn't -- I didn't
17 know the answer and so I went back and looked.
18    Q  I see. Did you look before the deposition
19 or after?
20    A  After.
21    Q  Did you -- did you ever discuss receiving
22 that comp with anyone other than Mr. Collins?
23    A  I don't believe so, no.
24    Q  I'm setting aside your spouse if you have
25 one or significant other if you have one. But

32

1 other than that, or your lawyers?
2    A  Actually, I was about to say. The answer
3 is, yes, I did discuss it with other people and
4 that would be the attorneys sitting to the right
5 of me.
6    Q  Right. So I'm going to exclude the
7 attorneys representing you from this question or
8 if you have a spouse or even a significant other.
9    A  I have a spouse.
10    Q  That's fine. So exclude that person.
11 Other than those people, did you ever discuss
12 receiving that comp with anyone until the
13 deposition?
14    A  No.
15    Q  Not Mr. Ellington?
16    A  No.
17    Q  Not anybody else at the debtor other than
18 Mr. Collins?
19    A  No.
20    Q  Where are you currently employed?
21    A  I'm currently employed by Skyview Group.
22    Q  When did you leave HCM?
23    A  On or about January 5th, 2021.
24    Q  Why did you leave HCM?
25    A  My employment was terminated.

33

1 Q By whom?
2 A Mr. Seery.
3 Q Did he or anybody tell you why?
4 A Yes.
5 Q What did they tell you? Well, first of
6 all, who told you?
7 A Mr. Seery.
8 Q Okay. What did he say?
9 A He said I was being terminated for breach
10 of fiduciary duty, for disclosing confidential
11 information and for working against the best
12 interest of the debtor.
13 Q Did he give you any more details?
14 A I asked him for details and he refused to
15 provide them.
16 Q When you were at Highland Capital
17 Management, you had an e-mail that used the
18 hcmlp.com and HighlandCapital.com domains at
19 various points during your tenure there?
20 A Yes.
21 Q Did you have any other e-mails that you
22 used to conduct any business related to Highland
23 prior to being terminated?
24 A No.
25 Q You never got e-mail at any other address

34

1 other than ones that were hcmlp.com or
2 HighlandCapital.com that related in any way to the
3 work you did for Highland?
4 A I don't want to say it related to the work
5 I did at Highland, but I had another e-mail
6 address.
7 Q What was that?
8 A I had an e-mail address at sasmgt.com.
9 Q What's SAS MGT?
10 A SAS Management.
11 Q What is that?
12 A It was a litigation funding company.
13 Q Why did you have an e-mail address with
14 the litigation funding company called SAS?
15 A From my role at Highland, I was instructed
16 to provide services to SAS Management and I did
17 so.
18 Q Who instructed you to do that?
19 A Mr. Ellington.
20 Q And was SAS owned by Highland?
21 A Actually, I don't know who owns SAS.
22 Q Is SAS affiliated with Highland?
23 A I don't know the answer to that question.
24 Q And what services were you instructed to
25 provide to SAS Management while you were assistant

35

1 general counsel at HCM?
2 A I did due diligence and evaluated
3 litigation that SAS was considering investing in
4 as a litigation funder.
5 Q Anything else for SAS Management?
6 A That was really it.
7 Q And so did you understand that work for
8 SAS Management to be part of your job duties?
9 A It was something I was instructed to do
10 from my seat at Highland. It was a service I was
11 instructed to provide from my seat at Highland.
12 Q And you had absolutely no idea what, if
13 any, connection SAS Management had to Highland
14 when you were given these instructions?
15 A That's not my testimony.
16 Q Did you have any idea -- strike that.
17 Did you have any idea about what, if any,
18 connection SAS Management had to Highland when you
19 were given the instructions to provide services
20 for it?
21 A I knew it had some connection to
22 Mr. Ellington, but other than that, I really
23 didn't know.
24 Q What do you mean some connection to
25 Mr. Ellington?

36

1 A He had some level of authority with the
2 organization.
3 Q And you knew nothing more specific than
4 that?
5 A Not really, no.
6 Q Well, when you say not really, do you mean
7 literally you knew nothing else when you were
8 instructed to do work for SAS other than
9 Mr. Ellington had some connection to SAS and that
10 was all you knew about SAS?
11 A I mean, sitting here today, I really don't
12 recall anything else.
13 Q Do you today know anything more about
14 SAS's connection, if any, to Highland?
15 A No, I don't.
16 Q As a lawyer working for Highland, were you
17 ever asked to consider whether or not entities
18 were affiliated entities during the course of your
19 work?
20 MS. SMITH: Objection, form.
21 A That was outside of the scope of my job
22 duties. That was solely the purview of
23 Mr. Surgent in the compliance department.
24 BY MR. CLUBOK:
25 Q You said earlier that part of the work you

37

1  had to do at Highland was to do work both for
2  Highland and for Highland affiliates, right?
3  **A  Correct.**
4  Q  Did you understand SAS to be a Highland
5  affiliate when you were asked to do work for it?
6  **A  I don't remember how the compliance**
7  **department classified SAS.  I believe they**
8  **classified them as not an affiliate.**
9  Q  But my question is did you understand
10 Highland to be an affiliate when you were asked to
11 do work for SAS?
12 **A  I understood that whatever the compliance**
13 **department and Mr. Surgent's determination of what**
14 **was or wasn't an affiliate was the final**
15 **determination, and his determination, I believe,**
16 **is that it wasn't.**
17 Q  Why do you believe that?
18 **A  Because that's my recollection is that was**
19 **his determination.**
20 Q  Did he tell you that?
21 **A  I'm trying to remember if he told me that**
22 **or if his determination was told to me by somebody**
23 **else.**
24 Q  Did you specifically seek out that
25 information as to whether SAS was an affiliate of

38

1  Highland?
2  **A  I don't believe I did, no.**
3  Q  Do you have any idea, as you sit here
4  today, who owns SAS?
5  **A  I don't.**
6  Q  Do you have any idea, as you sit here
7  today, whether or not Mr. Ellington has any
8  ownership interest in SAS?
9  **A  I actually don't know.**
10 Q  Did you talk to anybody else about work
11 you were doing for SAS other than Mr. Ellington?
12 **A  Yes.**
13 Q  Who?
14 **A  Other individuals.  I guess Mr. Sevilla.**
15 Q  Who else?
16 **A  Ms. Thedford.**
17 Q  Who?
18 **A  Thedford.**
19 Q  Is that Lauren?
20 **A  Yes.**
21 Q  Okay.  Who else?
22 **A  Ms. Katie Irving.**
23 Q  Who else?
24 **A  That's who I can think of sitting here**
25 **today.**

39

1  Q  And they all assisted you in due diligence
2  work done on behalf of SAS while you were all
3  employed at Highland?
4  **A  Not necessarily, no.**
5  Q  Well, Katie Irving did, correct?
6  **A  Assisted me?  No.**
7  Q  Did Katie Irving perform work for SAS
8  while she was employed at HCM, as far as you know?
9  **A  I have a general understanding that she**
10 **did, but I don't really know what she did for that**
11 **entity or those entities.**
12 Q  Did you ever -- when was the last time you
13 performed work for SAS?
14 **A  It's been a long time.  Probably prior to**
15 **the bankruptcy sometime.**
16 Q  Did you ever disclose the existence of SAS
17 to the independent directors?
18     MR. FEINSTEIN:  Excuse me.  Andy, if I
19 could interrupt at this point.  For the record,
20 Rob Feinstein of Pachulski representing Highland
21 Capital Management.  So this seem like as good a
22 time as any to put two statements on the record on
23 behalf of the debtor that I think will help make
24 the deposition go more smoothly.
25     First, obviously, Mr. Leventon was an

40

1  in-house counsel at our client until he was
2  terminated earlier this year and that raises the
3  question which has been the subject of some
4  colloquy in prior depositions, about whether the
5  extent to which the debtor is going to invoke the
6  attorney-client privilege.
7      As we advised counsel to the witness and
8  UBS beforehand, I'll just restate on the record,
9  if we have a problem with a question, if we think
10 that we want to invoke the privilege, you'll hear
11 from us.  Otherwise, it's not our intention to
12 answer questions, as we were asked yesterday about
13 whether we're waiving the privilege or not,
14 invoking the privilege.  As I indicated yesterday,
15 there are a number of bases under which the
16 privilege may not apply to certain discussions
17 between in-house counsel and others at the
18 company.  But again, if you hear from us, you'll
19 know that we object; if you don't hear from us,
20 then you should assume that we're not objecting.
21     The other thing I'd like to address is
22 because of Mr. Leventon's role as in-house
23 counsel, the debtor as defendant in the action
24 does have quite a number of questions it would
25 like to ask, but just take -- going back to our

41

1  colloquy yesterday with Frances, as she noted,
2  this is a court-ordered deposition that was
3  noticed by UBS. So our intention today is not to
4  question the witness, to fully reserve our right
5  to seek his deposition at a later date in this
6  action, which we may or may not do, depending upon
7  the testimony that he gives today. But we do want
8  to give UBS their full day of deposition as the
9  Court ordered.
10      MR. CLUBOK: Okay.
11      MR. FEINSTEIN: Thank you.
12      MR. CLUBOK: Thank you.
13 BY MR. CLUBOK:
14  Q  Mr. Leventon, do you need me to repeat the
15 question?
16  **A  I actually don't remember what the**
17 **question was at this point.**
18  Q  I kind of don't either, so give me one
19 second here. Let's see if I can find it. Okay.
20 Ready to go.
21      Sir, did you ever disclose the existence
22 of SAS to the independent directors?
23  **A  I don't ever remember discussing that**
24 **entity with them one way or another.**
25  Q  Did you disclose the existence of SAS to

42

1  counsel for the independent directors?
2  **A  I don't recall discussing that entity with**
3  **them at any point in time, no.**
4  Q  Let's go back to your current employment.
5  You said you work for the Skyview Group?
6  **A  Yes.**
7  Q  Is that the only entity you work for
8  currently?
9  **A  No.**
10  Q  Okay. Who else do you work for besides
11 the Skyview Group?
12  **A  Skyview Legal PC.**
13  Q  What's that?
14  **A  It is a dedicated law firm that provides**
15 **services -- legal services to Skyview Group's**
16 **clients.**
17  Q  Do you work for any other entities?
18  **A  No.**
19  Q  Who pays your compensation?
20  **A  Today it's Skyview Group, but I think it's**
21 **switching over to Skyview Legal PC.**
22  Q  And do you expect that to affect your
23 total compensation?
24  **A  No.**
25  Q  Who owns Skyview Group?

43

1  **A  Mr. Ellington.**
2  Q  The sole owner?
3  **A  I don't know actually. I know he's one of**
4  **the owners.**
5  Q  Do you know any other owners of Skyview?
6  **A  Sitting here today, I do not.**
7  Q  I take it you have no equity in Skyview
8  Group?
9  **A  No.**
10  Q  Do you expect to get any equity?
11  **A  I don't know if I will or not.**
12  Q  Has that been discussed at all?
13  **A  There have been discussions but nothing**
14 **really determinative.**
15  Q  Okay. So there's been discussions where
16 it's been held out to you that it's a possibility
17 that you may one day get equity in Skyview Group,
18 correct?
19  **A  Correct.**
20  Q  And those discussions were with
21 Mr. Ellington, right?
22  **A  I don't believe they were, actually.**
23  Q  Who were they with?
24  **A  Mr. Collins.**
25  Q  And you understood Mr. Collins to be

44

1  speaking on behalf of Mr. Ellington when he had
2  these discussions, or with his authority?
3  **A  I understood him to be speaking on behalf**
4  **of the company.**
5  Q  Okay. On behalf of Skyview Group?
6  **A  Correct.**
7  Q  That's the same Mr. Collins that you said
8  is the only person you ever spoke to about getting
9  the roughly $300,000 in May of 2020 from NexPoint,
10 correct?
11  **A  Correct.**
12  Q  Was Mr. Collins working for NexPoint at
13 the time?
14      MS. SMITH: Objection, form.
15  **A  Could you clarify your question, please?**
16 BY MR. CLUBOK:
17  Q  Was Mr. Collins working for NexPoint in
18 May of 2020 when you had this discussion with him?
19      MS. SMITH: Objection, form.
20  **A  I don't know that I can answer the**
21 **question as asked. Could you rephrase it, please?**
22 BY MR. CLUBOK:
23  Q  Did you know -- well, was Mr. Collins
24 working for HCM in May of 2020, as far as you
25 know?

---

45

1    A  Yes.
2    Q  Was Mr. Collins working for NexPoint in
3  May of 2020, as far as you know?
4    A  Can you define working?  Because given the
5  situation, it has some complexities to it.  Are
6  you asking if he was employed by NexPoint?
7    Q  Yes, was he employed by NexPoint?
8    A  Not that I'm aware of.
9    Q  But he was acting on NexPoint's behalf, as
10  far as you know, in May of 2020?
11    A  Under shared services agreements, yes.
12    Q  So when he arranged for you to get paid
13  $300,000 in May of 2020, you understood him to be
14  doing that on behalf of NexPoint pursuant to the
15  shared services agreement NexPoint had with HCM at
16  the time, correct?
17    A  No.
18    Q  Okay.  But shared services agreement at
19  the time authorized Mr. Collins to act on behalf
20  of NexPoint, as far as you know?
21    A  Sorry, let me rephrase.  I disagree with
22  the premise of your prior question.  I shouldn't
23  have answered no.  I simply disagree with the
24  underlying premise.
25    Q  In what way?

---

46

1    A  At the time I received that payment, I
2  didn't know that it had come from NexPoint.
3    Q  Where did you believe it had come from at
4  the time?
5    MS. SMITH:  Andy, I'm going to object to
6  this line of questioning.  I refrained to see how
7  far you were going, but this is not within the
8  scope of the deposition.  This is supposed to be
9  about the temporary restraining order and the
10  preliminary injunction and the relationship to
11  Sentinel.  And this -- I mean, I allowed several
12  minutes of questions on this, but this doesn't
13  seem at all related and now it's also repetitive.
14  BY MR. CLUBOK:
15    Q  In May of 2020, where did you believe the
16  $300,000 was coming from?
17    A  I didn't have a belief one way or another.
18    Q  Mr. Collins just said you were going to
19  get 300,000 and you had no belief at all the
20  source of those funds?
21    A  He said you're going to get the deferred
22  compensation that your -- that you earned and that
23  you're owed and that you've been waiting for for
24  three years, but he didn't mention where it was
25  coming from and I didn't check the bank account

---

47

1  statement detail.
2    Q  Did you believe it was coming from HCM at
3  that time?
4    A  No.
5    Q  And so you knew it -- you didn't think it
6  was coming from HCM and you had no idea where it
7  was coming from until you checked after the
8  deposition you had earlier this year, correct?
9    A  I'm not saying I had no idea.  I'm saying
10  I simply didn't check or look into it at all.
11    Q  What was the idea you had about the source
12  of the funds?
13    A  I didn't have an idea.  I didn't check or
14  look, Mr. Clubok.
15    Q  Okay.  So you had no idea about the source
16  of the funds other than it was not coming from
17  HCM, when you were told you were going to get
18  roughly 300,000 in May of 2020 by Mr. Collins,
19  correct?
20    A  I didn't look one way or another.
21    Q  I didn't ask you that.  I said you had no
22  idea -- your testimony here today is you had no
23  idea about the source of the funds other than you
24  knew it was not coming from HCM, when you were
25  told you were going to get roughly $300,000 in May

---

48

1  of 2020 by Mr. Collins, correct?
2    MS. SMITH:  Objection, form.
3    A  I didn't look one way or another.
4  BY MR. CLUBOK:
5    Q  I'm not asking whether you looked.  My
6  question is -- and I'll ask it one more time.
7  When you received -- is it true -- strike that.
8    Is it true that you had no idea about the
9  source of the funds other than you knew it was not
10  coming from Highland Capital Management, when you
11  were told you were going to get roughly $300,000
12  in May of 2020 by Mr. Collins?
13    A  I didn't look one way or another.
14    Q  I'm not asking you whether you looked.
15  I'm asking you whether you had an idea.  You've
16  worked at Highland for a long time, you have
17  beliefs and ideas about how things operate.  My
18  question is, did you have an idea in your head, a
19  belief or an idea or a thought about the source of
20  the funds other than knowing they did not come
21  directly from HCM?
22    A  I don't recall having any -- having any
23  thought process at the time because I simply
24  didn't look into it.
25    Q  What are your job -- what's your job title

**49**

1 at Skyview?

2    **A  I think it's counsel.**

3    Q  Who do you report to at Skyview Group?

4    **A  It's not really clear, actually.  We're**

5 **still kind of figuring things out.**

6    Q  Who gives you directions on what to do?

7    **A  Really nobody.**

8    Q  You just have a sense of what to do

9 without anyone telling you?

10   **A  I mean, we talk internally about tasks and**

11 **we divide them up and I take the ones that I need**

12 **to do and take care of and I take care of them.**

13   Q  Is there anyone you consider to be in any

14 sort of management position above you other than

15 Mr. Ellington?

16   **A  Maybe Mr. Sevilla, but that's not really**

17 **clear.**

18   Q  What about Skyview Legal PC?  Do you have

19 a job title there?

20   **A  Yes.**

21   Q  What's that?

22   **A  Shareholder.**

23   Q  How many shareholders are there at Skyview

24 Legal PC?

25   **A  We're just forming the entity, so we**

**50**

1 **actually haven't determined that yet.**

2   Q  Has it been established already?

3   **A  It's been formed, but we haven't executed**

4 **the bylaws yet.**

5   Q  Who are the shareholders that you

6 anticipate?

7      MS. SMITH:  Objection, form.

8   **A  We really haven't figured that out yet.**

9 **BY MR. CLUBOK:**

10   Q  Well, you said that you anticipate being a

11 shareholder, right?

12   **A  Yes.**

13   Q  Has there already been anything signed to

14 make that happen or is that just something you

15 believe will happen?

16   **A  The latter.  I don't think we have**

17 **anything executed yet.**

18   Q  Other than yourself, who else do you

19 anticipate being a shareholder of Skyview

20 Legal PC, as you sit here today?

21   **A  Mr. Sevilla.**

22   Q  Who else?

23   **A  I don't know.**

24   Q  Just you and Sevilla and no one else, as

25 you sit here today?

**51**

1   **A  I'm not really sure.**

2   Q  I didn't ask if you were sure.  Do you

3 anticipate anyone else being a shareholder, as you

4 sit here today?

5      MS. SMITH:  Isaac -- excuse me.

6 Mr. Leventon, before you answer, make sure that

7 you do not divulge any attorney-client privileged

8 information with either Skyview Legal PC or in

9 your role as counsel to Skyview Group.

10   **A  There's been no determination.  I don't**

11 **have an anticipation one way or another.**

12 **BY MR. CLUBOK:**

13   Q  Do you have an anticipation of what level

14 of -- I assume as a shareholder you have some

15 equity interest?

16   **A  Correct.**

17   Q  Do you have any anticipation of roughly

18 what equity interest you will have in Skyview

19 Legal PC?

20   **A  No.**

21   Q  You don't know if it's 1 percent or

22 50 percent?

23   **A  Correct.**

24   Q  And has there been any discussion to that

25 effect?

**52**

1   **A  No.**

2   Q  So the amount of equity ownership in

3 Skyview is still to be determined, Skyview

4 Legal PC?

5   **A  Correct.**

6   Q  And you anticipate the ultimate

7 decision-maker for that will be Scott Ellington,

8 correct?

9   **A  No.**

10   Q  Who will be the ultimate decision-maker

11 for that?

12   **A  Collectively, the attorneys that will be**

13 **employed by Skyview Legal PC.**

14   Q  Whose idea was it to create Skyview

15 Legal PC?

16      MS. SMITH:  I'm going to interrupt and

17 again object.  I feel like I'm giving you a lot of

18 latitude, but this is well beyond the scope of

19 what Judge Jernigan ruled would be the scope of

20 the deposition and the topics.

21 BY MR. CLUBOK:

22   Q  Whose idea was it to create Skyview

23 Legal PC?

24   **A  I need to confer with my counsel for a**

25 **moment as to attorney-client privilege.**

53

1    Q   Okay.  We'll come back to that, then.
2        When did you start working at Skyview
3    Group?
4    **A   March 1st, 2021.**
5    Q   Unless I say otherwise, let's assume when
6    I say Skyview, we're talking about Group, the
7    entity that already exists, as opposed to the one
8    you're talking about forming that also has Skyview
9    in the name; is that okay?
10   **A   I disagree with one premise of what you**
11   **just stated.**
12   Q   What's that?
13   **A   Skyview Legal PC is a created and existing**
14   **entity.**
15   Q   So who are the current shareholders of
16   Skyview Legal PC?
17   **A   We don't have a shareholders agreement**
18   **yet.  We just have a filing with the State of**
19   **Texas that forms the entity.**
20   Q   And you didn't have to identify the owners
21   in that filing?
22   **A   I believe I'm the individual who's the**
23   **contact person with the State for that entity.**
24   Q   Okay.  Well, I'll try to say Skyview
25   Group, then, to the best of my ability.

54

1        What is your -- I take it you don't have
2    any current job duties with respect to Skyview
3    Legal PC yet?
4    **A   I do.**
5    Q   What are they?
6    **A   Providing service to -- legal service to**
7    **clients.**
8    Q   So you've already started doing that?
9    **A   Yes.**
10   Q   Who are your clients?
11   **A   I have a nondisclosure agreement with**
12   **clients that are not affiliated with Mr. Dondero**
13   **and so I am not at liberty to go into that**
14   **information at this time.**
15   Q   Okay.  Aside from clients who are not
16   affiliated in any way with Mr. Dondero or
17   Mr. Ellington, who are your clients?
18       MS. SMITH:  Objection, form.
19   **A   I would really have to think about it.**
20   **BY MR. CLUBOK:**
21   Q   Can you identify any clients who aren't
22   affiliated with Mr. Dondero or Mr. Ellington?
23   **A   Sitting here today, no.**
24   Q   Okay.  What -- did you have any role in
25   the formation of Skyview Group?

55

1    **A   No.  Well, I don't think I did, no.**
2    Q   And I apologize if I asked you this, but
3    do you know who -- sorry.  You said Mr. Ellington
4    is the 100 percent owner of Skyview Group, as far
5    as you know?
6    **A   That was not my testimony.**
7    Q   Mr. Ellington is the only owner of Skyview
8    Group that you're aware of, correct?
9    **A   He's the only one I can think of, yes.**
10   **He's the only person I can think of, yes.**
11   Q   Are you aware of any others?
12   **A   No.**
13       MS. SMITH:  Objection, form.
14   BY MR. CLUBOK:
15   Q   Okay.  Does that entity go by any other
16   name?
17   **A   It used to be called Highgate.**
18   Q   Why the switch?  Do you know?
19   **A   Marketing or branding decided to change**
20   **the name.**
21   Q   Okay.  Any other names?
22   **A   No.**
23   Q   The work address you previously provided,
24   is that the principal place of business for
25   Skyview Group?

56

1    **A   Yes.**
2    Q   How many employees does it have, roughly?
3    **A   Thirty to 40.**
4    Q   Are they almost all ex-Highland Capital
5    Management employees?
6    **A   Yes.**
7    Q   Are they all ex-HCM employees?
8    **A   No.**
9    Q   Are there any other entities that operate
10   from the same address other than Skyview Group and
11   Skyview Legal PC?
12       MS. SMITH:  Objection, form.
13   **A   Yes.**
14   **BY MR. CLUBOK:**
15   Q   What are they?
16   **A   NexBank.**
17   Q   Okay.  What else?
18   **A   NexPoint, I believe.**
19   Q   What else?
20   **A   I think that's it.**
21   Q   And do you current --
22   **A   Although there are other tenants in the**
23   **building.  I just don't know who they are.**
24   Q   What about CPCM?
25       MS. SMITH:  Objection, form.

57

1    A  CPCM is a wholly owned subsidiary of
2 Skyview Group.
3 BY MR. CLUBOK:
4    Q  Are there other wholly owned subsidiaries
5 of Skyview Group?
6    A  I don't know.
7    Q  That's the only one you know of, CPCM?
8    A  Correct.
9    Q  What is CPCM?
10    A  It is a claims holding company.
11    Q  For what kind of claims?
12    A  Claims in the debtor's bankruptcy.
13    Q  For what?
14    A  I believe mostly for employee compensation
15 that was due and payable but not paid.
16    Q  And that would include your compensation?
17    A  Yes.
18    Q  And that would be the -- roughly the same
19 amount that you received from NexPoint in May of
20 2020?
21     MS. SMITH: Objection, form.
22    A  Not necessarily, no.
23 BY MR. CLUBOK:
24    Q  Is it?
25    A  No, not necessarily, no.

58

1    Q  What's the amount of that claim with
2 respect to you?
3    A  I'd have to look at the -- I don't recall.
4    Q  Roughly. Is it --
5    A  It's whatever is in the -- I don't recall,
6 honestly.
7    Q  Did you sell your claim to CPCM?
8     MS. SMITH: Objection, form.
9    A  I assigned it to CPCM.
10 BY MR. CLUBOK:
11    Q  For what consideration?
12    A  Employment at Skyview.
13    Q  That was a condition of your employment at
14 Skyview?
15     MS. SMITH: Objection, form.
16    A  I believe that's right. I don't recall
17 exactly, but I think that's right. Maybe. I take
18 it back actually. I'm going to change my
19 testimony. I don't remember, honestly. It's
20 whatever is reflected in the documents.
21 BY MR. CLUBOK:
22    Q  You don't remember what the consideration
23 is for assigning your claim in the bankruptcy case
24 to CPCM?
25    A  I believe Skyview indicated that it would

59

1 pay me my unpaid bonus amounts.
2    Q  Did you still have unpaid bonus amounts?
3    A  Yes.
4    Q  Is that amounts from May 2020 through the
5 time of your employment, or something else?
6    A  That's one time period, but that's not all
7 of them.
8    Q  I thought you said before that in May of
9 2020, you got trued up to the amount that you
10 believed you were owed at that point?
11    A  No.
12    Q  Roughly how much more did you believe you
13 were owed in unpaid bonuses beyond what you
14 received in May 2020 from NexPoint?
15     MS. SMITH: Objection, form.
16    A  So you're using the wrong nomenclature.
17 There's bonuses and then there's deferred
18 compensation.
19 BY MR. CLUBOK:
20    Q  Okay. Roughly how much in bonuses do
21 you -- did you believe you were still owed?
22    A  As of what date?
23    Q  As of the date of your termination with
24 HCM.
25    A  I don't recall the exact number. It would

60

1 have been several hundred thousand dollars.
2    Q  When was the last time you spoke with
3 Scott Ellington?
4     MS. SMITH: Objection, form.
5    A  Three weeks ago, maybe a month.
6 BY MR. CLUBOK:
7    Q  Before he left for his vacation or since
8 he's left?
9    A  Before.
10    Q  Have you communicated with him in any way
11 since he started the vacation he's currently on?
12    A  Have I communicated with him in any way?
13 I've been -- actually, no, I haven't directly
14 communicated with him at all.
15    Q  What were you thinking about there?
16    A  I received a forward of an e-mail that he
17 wrote, but that's it.
18    Q  An e-mail to whom?
19    A  Brigid Brewer.
20    Q  And he wrote that while he was on his
21 trip?
22     MS. SMITH: Objection.
23     Make sure that you're not divulging any
24 privileged information.
25

**61**

BY MR. CLUBOK:

Q  I'm not asking for the substance. I'm asking for the timing of when you received this e-mail. When -- you received this --

A  **I didn't receive the e-mail from Mr. Ellington.**

Q  You received a forward of it?

A  **Correct.**

Q  From Brigid?

A  **Correct.**

Q  And that was dated when, roughly?

A  **I don't remember. Sometime over the last two weeks.**

Q  Okay. Other than that, have you in any way received any communications from Mr. Ellington since he left for Africa?

A  **No.**

Q  Did you ever get text messages from Mr. Ellington?

A  **Yes.**

Q  Do you have -- by the way, did you search for documents in connection with this adversary proceeding?

A  **Yes.**

Q  Where did you search?

**62**

A  **On my phone.**

Q  Where else?

A  **On my personal e-mail.**

Q  What's your personal e-mail address?

<-- HIGHLY CONFIDENTIAL -->

Q  Do you have any other personal e-mail addresses?

A  **No.**

Q  Okay. Where else did you search for documents, if anywhere?

A  **That's it.**

Q  Did you take any physical documents at all from HCM when you left or retain any that you had when you left?

A  **Yes.**

Q  What did you retain?

A  **My personnel file. So like my pay stubs and those sorts of documents.**

Q  Anything else besides your personnel file?

A  **I'm trying to remember. I think that was it. I may have picked up like some CLE materials that I hadn't read yet, but I think that was it.**

Q  Mr. Ellington, when he -- you would know the phone number that Mr. Ellington texts you from, presumably, from your phone, right?

**63**

A  **No, actually, I wouldn't. Who knows phone numbers these days.**

Q  Well, if you looked at your phone, you could identify the phone number Mr. Ellington texted you from?

A  **Probably, yes.**

Q  And Mr. Ellington uses different phones, correct?

MS. SMITH: Objection, form.

A  **I don't really know what he does.**

BY MR. CLUBOK:

Q  Well, you've gotten texts from him from different phone numbers, correct?

A  **I don't know that that's true actually. No.**

Q  Were there any documents that you identified that were responsive to the request but that you deemed to be privileged?

MS. SMITH: Objection, form.

A  **I'm going to defer to my counsel on what documents we gathered and how we handled them. If there's a privilege issue, I'm sure they can address it.**

BY MR. CLUBOK:

Q  Well, did you -- who made the decision as

**64**

to whether or not documents that you reviewed were relevant or not, you or --

A  **The counsel sitting to my right.**

Q  Did you identify documents? I mean, did you turn over your phone and have them search your phone?

A  **No.**

Q  Okay. So who did the search of your phone?

A  **I did the search.**

Q  And so did -- you were responsible for looking at your phone and seeing if there were documents responsive to our request, correct?

A  **I was responsible for locating everything that could potentially be responsive and turning it over to counsel.**

Q  I'm going to specifically ask about the search of your phone. Did anyone search your phone for responsive documents other than you?

A  **No.**

Q  Okay. So you made the sole decision when you looked at documents or text messages on your phone as to whether or not they were responsive or not?

A  **No, that is incorrect.**

**65**

1    Q   Okay.  You made the decision of which
2  documents to share with your attorneys to
3  determine whether or not they were responsive?
4    **A   I made the decision as to which documents**
5  **to provide to my attorneys for them to make the**
6  **determination as to responsiveness and/or**
7  **privilege.**
8        MR. CLUBOK:  And I think, for the record,
9  we've received zero documents from Mr. Leventon in
10  production.  Correct me if I'm wrong, Ms. Smith,
11  and I don't think we received a privilege log so
12  we're going to want to work on that.
13        MS. SMITH:  That's incorrect.  I did
14  provide a privilege log.
15        MR. CLUBOK:  Okay.  I apologize if that's
16  the case.  Ms. McLaughlin will know better than I
17  so we'll double-check that at the break.
18  BY MR. CLUBOK:
19    Q   When was the last time you spoke with
20  Mr. Sevilla?
21    **A   Maybe two weeks ago, week and a half.**
22    Q   When was the last time you spoke with
23  Mr. DiOrio?
24    **A   Yesterday.**
25    Q   Did you speak about this matter at all?

**66**

1    **A   Very briefly.**
2    Q   What did you say?
3    **A   We just exchanged basically the dates when**
4  **we were going to be deposed.**
5    Q   Anything else?
6    **A   That's pretty much it.**
7    Q   When was the last time you spoke with
8  Ms. Irving?
9    **A   It's been months.**
10    Q   Ms. Irving works at Skyview Group?
11        MS. SMITH:  Objection, form.
12    **A   Yes, but she's on maternity leave.**
13  **BY MR. CLUBOK:**
14    Q   When did she start working there?
15    **A   I don't know.**
16    Q   Did you hire her?
17    **A   Did I hire her?  No.**
18    Q   Was she ever there before she went on
19  maternity leave after her employment at HCM?
20    **A   I don't know.**
21    Q   Did you ever -- have you talked to her at
22  all since she left HCM?
23    **A   Yes.**
24    Q   Okay.  And when you spoke with her, was
25  there ever a time when you spoke with her that she

**67**

1  was working with Skyview Group but she wasn't yet
2  on maternity leave?
3        MS. SMITH:  Objection, form.
4    **A   I don't believe so.**
5  **BY MR. CLUBOK:**
6    Q   Have you spoken to her about any
7  work-related issues since she left HCM?
8    **A   No.  We just talk about her babies.**
9    Q   Okay.  How long is her maternity leave?
10        MS. SMITH:  Objection, form.
11    **A   I don't know, Mr. Clubok.**
12  **BY MR. CLUBOK:**
13    Q   Do you have a --
14    **A   Her maternity leave is whatever is**
15  **necessary and appropriate for a woman who's had**
16  **twins, and that is not a place where a man will**
17  **venture to render an opinion.**
18    Q   It depends if they're, I suppose, HR.  Is
19  Mr. Collins your HR person?
20    **A   To be clear, I'm not in HR so I would not**
21  **venture an opinion as to what is the appropriate**
22  **length of maternity leave for a woman who's had**
23  **twins.**
24    Q   Who decides that at Skyview Group?
25    **A   I don't know.**

**68**

1    Q   Is Mr. Collins in the HR group?
2    **A   I believe he's the head of HR.**
3        MR. CLUBOK:  This is probably a good time
4  to take a break if you guys want to take a break.
5        THE WITNESS:  We can keep going.
6  BY MR. CLUBOK:
7    Q   In that case, then, I'll ask you this?
8        THE WITNESS:  They want a break.
9        MS. SMITH:  I would like to take a break.
10  BY MR. CLUBOK:
11    Q   You know what?  I'm going to ask one last
12  thing to just finish this topic up and I think it
13  will then -- to really start -- to prepare for
14  this deposition, did you do anything other than
15  meet with your lawyers?
16    **A   No.**
17    Q   Did you review any documents at all in
18  anticipation of this deposition?
19    **A   No.**
20    Q   Did you look at any documents this
21  morning?
22    **A   No.**
23    Q   And roughly how long did you spend with
24  your attorneys preparing for this deposition,
25  total?

69

1    A   Maybe five or six hours.
2    Q   When was that?
3    A   Monday.
4    Q   Okay.
5        MR. CLUBOK:  That's it.  Let's take our
6   break.
7        THE VIDEOGRAPHER:  We are off the record
8   at 11:01 a.m.
9        (Recess taken from 11:01 a.m. CDT to
10  11:19 a.m. CDT)
11       THE VIDEOGRAPHER:  The time is 11:19 a.m.
12  We are back on the record.
13       MS. SMITH:  Normally the practice on these
14  depositions of nonparties is if someone else wants
15  to ask questions, then they allocate between
16  themselves the time.  And so we are presenting
17  Mr. Leventon today for his seven hours and today
18  is the day.  We had a motion to compel and a
19  motion to quash and nowhere during that time did
20  the debtor raise any indication that they needed
21  separate depositions.  We're not presenting
22  Mr. Leventon for 14 hours.  So you might want to
23  check on the break or at lunch and see.  We -- you
24  know, we objected yesterday, but we gave
25  Mr. Feinstein his time and allowed him to answer

70

1   questions and we're willing to do that again
2   today.
3        MR. CLUBOK:  Okay.  And, you know, it's --
4   I don't mind if you-all want to make your record
5   to use this time.  We won't count this as part of
6   the deposition, this dispute.
7        MS. SMITH:  That's fine.
8        MR. CLUBOK:  My -- our -- we have no view
9   on it yesterday whether, you know, we were
10  perfectly fine since we had time left to give that
11  time to the debtor.  It's between you-all to work
12  out whether -- you know, whether and when the
13  debtor gets to depose Mr. Leventon.  From our
14  perspective, but anyway, I don't know if
15  Mr. Feinstein wants to make some other comment on
16  the record, it's fine.
17       MR. FEINSTEIN:  Only briefly.  It's not
18  appropriate to debate this on the record, but I
19  would refer counsel to her very fierce statements
20  yesterday about -- she's done a 180, but we can
21  take this up off line.  Thank you.  Why don't you
22  proceed, Andy.
23       MR. CLUBOK:  Okay.  Thank you.
24  BY MR. CLUBOK:
25    Q   Sorry for that commercial interruption.

71

1   We're now returned to our regularly scheduled
2   program.
3        Mr. Leventon, you're still under oath,
4   right?
5    A   Yes, sir.
6    Q   Okay.  Sir, you were aware that UBS filed
7   litigation in 2009 against Highland's affiliated
8   entities, correct?
9    A   So aware that UBS had filed litigation
10  against Highland Capital Management and two funds
11  managed by it.
12    Q   Well, it was Highland Capital Management
13  plus CDO Fund and SOHC, as colloquial names for
14  those funds, without laying out their whole formal
15  names, correct?
16    A   Those would be the colloquial names I
17  would use, but if we want to be specific, we
18  probably should identify the entities.
19    Q   Yeah.  And there may have been a number of
20  entities and subs, but it certainly included
21  Highland CDO Opportunity Master Fund, LP, which we
22  shorthanded would refer to as CDO Fund throughout
23  the litigation; is that fair?
24    A   I believe that was the CDO Fund entity
25  that was the named defendant in that matter, yes.

72

1    Q   And also there was Highland Special
2   Opportunities Holding Company, which we routinely
3   referred to as SOHC throughout that litigation,
4   correct?
5    A   That's correct.
6    Q   And then there was also as defendant in
7   that litigation an entity called Highland
8   Financial Partners, which we often called HFP,
9   correct?
10    A   Not in 2009, no.
11    Q   Right.  But -- okay.  The litigation by --
12  certainly by 2012 included as defendants, Highland
13  Financial Partners, which we often referred to as
14  HFP?
15    A   Highland Financial Partners, LP, which we
16  would refer to as HFP, yes, was a defendant.
17    Q   And Strand was also a defendant in the
18  litigation ultimately, correct?
19    A   Strand Advisors, Inc., I believe that's
20  correct.
21    Q   Which we would shorthand by just referring
22  to often as Strand?
23    A   That may have been your practice.
24    Q   There was also an entity that was called
25  Highland Credit Opportunities CDO, LP, that we

73

1  sometimes referred to as Credit Opportunity or
2  Credit Opps, correct?
3      MS. SMITH:  Objection, form.
4      **A  I believe that's right, but I probably**
5  **would need to see the style of the case in order**
6  **to identify the exact entity because a lot of them**
7  **had very similar names.**
8  **BY MR. CLUBOK:**
9      Q  And that entity was later changed to a
10 name that we have shorthanded since as
11 Multi Strat, correct?
12     **A  Again, I would need to look at the style**
13 **of the case to match up the exact entities.**
14     Q  Okay.  But colloquially as, you know, you
15 were on this litigation for a long time --
16     **A  Yes.**
17     Q  -- we spoke many times, lots of e-mails
18 and documents and hallway conversations, including
19 during court, and fair to say that there was an
20 entity that we sometimes shorthand as Highland
21 Credit Opportunities that we've since shorthanded
22 as Multi Strat?
23     **A  That's fair to say, yes.**
24     Q  Okay.  Thanks.  Now, what role did you
25 play in managing that litigation for HCM and the

74

1  other affiliates?
2      **A  During what time period?**
3      Q  From 2009 till you were terminated?
4      **A  I didn't have a consistent role during**
5  **that entire period of time.**
6      Q  Okay.  In 2011, when you got your
7  promotion to assistant general counsel, from that
8  period for the next two years, you were the
9  primary person responsible for responding to the
10 UBS's discovery requests in that litigation,
11 correct?
12     **A  I don't think that's how I would phrase**
13 **it, no.**
14     Q  Well, who was primarily responsible for
15 responding to UBS's discovery requests in the UBS
16 litigation in or about 2011 through 2013?
17     **A  I don't know that you can identify a**
18 **single person that would have been responsible for**
19 **responding to discovery.**
20     Q  There was no person at HCM who took
21 responsibility ultimately for ensuring that
22 document requests were properly responded to;
23 that's what you're saying?
24     **A  That's not my testimony.**
25     Q  Who, to the best of your knowledge, was

75

1  the person who took responsibility that the
2  responses to UBS's discovery requests in that
3  litigation during that time period of roughly 2011
4  to 2013 were properly answered?
5      **A  Kevin Rabinowitz.**
6      Q  Who was outside counsel at the time?
7      **A  Correct.**
8      Q  Okay.  And who inside was primarily
9  responsible for managing your outside counsel to
10 ensure that they did that work properly?
11     **A  I was primarily responsible at that point**
12 **for managing the litigation from the in-house**
13 **side.**
14     Q  And did that responsibility for managing
15 the -- by the way, if I say the UBS litigation in
16 New York, will you understand that I mean this
17 case that we referred to where we've identified
18 the parties?
19     **A  Yes, but I think there were also like**
20 **three different cause numbers at some point.**
21     Q  Right.  There was different causes that
22 were all ultimately consolidated into one matter.
23 And can I collectively refer to those actions as
24 the UBS New York litigation against Highland, just
25 to -- to shorthand it?

76

1      **A  You can.  Just to be clear, there were --**
2  **before you said Highland and you meant just**
3  **Highland Capital Management, LP.  There were lots**
4  **of other entities envolved.**
5      Q  Right.  So if we call it the UBS New York
6  litigation against Highland and its affiliates,
7  you'll know what I'm referring to, correct?
8      **A  Yes.**
9      Q  And you were primarily responsible for
10 supervising that litigation from 2011 through at
11 least the bankruptcy?
12     **A  That's not correct.**
13     Q  Okay.  When were you the primary person
14 responsible for supervising that litigation,
15 during what time frame?
16     **A  I'm trying to remember exactly when I**
17 **relinquished day-to-day management, but for a**
18 **substantial period of time several years.  That**
19 **was done by Jason Vancour.**
20     Q  And that was during what period of time?
21     **A  I'm struggling to remember.  It would have**
22 **been somewhere in 2012 to '15 or so.**
23     Q  And then you resumed day-to-day
24 supervision after that?
25     **A  I don't remember if we handed it off to**

---

77

1  one other person or if I took it straight back
2  over.
3      Q   But you came to resume your role as the
4  day-to-day supervisor of that litigation prior to
5  it going to trial, correct?
6      A   Correct.
7      Q   And you were the day-to-day supervisor of
8  that litigation during the trial, correct?
9      A   Yes.
10     Q   And that was a trial that ultimately
11 resulted in a roughly $1 billion judgment against
12 two of the defendants in that case, correct?
13     A   Correct.
14     Q   And you, during that trial, came every
15 single day to court and actively directed the
16 outside counsel who were the courtroom advocates
17 for the defendants in that case, correct?
18     MS. SMITH:  Objection to form.
19     A   I mean, I don't know that I directed them,
20 but we were part of a team together that was
21 working cooperatively for the clients.
22 BY MR. CLUBOK:
23     Q   Well, did they take your direction during
24 the trial?
25     A   They took my direction sometimes and I

---

78

1  took theirs sometimes.
2      Q   Did you report daily during that trial to
3  Scott Ellington?
4      A   I don't recall if I did or not.
5      Q   Did you regularly report to Scott
6  Ellington throughout the course of that trial?
7      A   I believe that's fair to say, yes.
8      Q   Did you regularly report to anyone else
9  other than Scott Ellington about the -- how the
10 trial was going?
11     A   I don't believe so, no.
12     Q   And were you also responsible for
13 supervising the post-trial proceedings, the
14 briefing and other communications with the Court
15 in between the end of the trial and prior to the
16 decision by the Court?
17     A   I don't remember what the post-trial
18 briefing was or not.  I don't remember what the
19 post-trial briefing was.
20     Q   Was there anyone else at Highland who was
21 responsible from the in-house perspective of
22 dealing with the litigation proceedings in between
23 trial and judgment other than yourself?
24     A   Mr. Ellington would have had some role and
25 then Mr. Dondero would have been kept informed.

---

79

1      Q   By whom?
2      A   By Mr. Ellington.
3      Q   Did you ever directly inform Mr. Dondero
4  about the trial or the litigation?
5      A   I don't remember if I did or not.  I don't
6  recall.
7      Q   How do you know Mr. Ellington did that?
8      A   I only have a very general recollection
9  that he indicated that Mr. Dondero had been kept
10 apprised.
11     Q   He indicated that to you?
12     A   Correct.
13     Q   And after the trial, did you communicate,
14 in words or substance, that it was likely that UBS
15 would get a significant judgment?
16     A   I don't remember how I communicated --
17 what I communicated at that point.
18     Q   Did you have any recommendation as to
19 whether or not UBS would likely obtain a judgment
20 after sitting through the trial?
21     A   I don't recall if I did one way or
22 another.
23     Q   Did you have a belief at the time as to
24 whether UBS would likely get a judgment based on
25 what you saw at the trial?

---

80

1      A   I mean, it was -- it was pretty complex,
2  so there were a variety of different possible
3  outcomes that I was considering.
4      Q   Yeah, but you saw it coming, that there
5  would likely be a significant judgment given what
6  went on at the trial; is that fair?
7      MS. SMITH:  Objection to form.
8      A   Actually not necessarily, no.
9  BY MR. CLUBOK:
10     Q   It's true that you spoke with
11 Mr. Ellington at some point where Mr. Ellington
12 acknowledged it was likely to be a significant
13 judgment based on what happened at the trial;
14 isn't that true?
15     MS. SMITH:  Objection to form.  My
16 understanding, there's two parts to the trial.  I
17 just want to make sure what we're talking about.
18 BY MR. CLUBOK:
19     Q   Isn't it true that you had discussions
20 with Mr. Ellington at some point where, in words
21 or substance, you discussed the likelihood that
22 the outcome of the first phase of the trial would
23 be a significant judgment in UBS's favor?
24     A   So just to be clear, we're talking about
25 the Phase 1 trial that took place against SOHC and

---

---

81

1 CDO Fund, correct?
2     Q   Correct.
3     A   I don't remember if I did tell him that or
4 not. I mean, we spoke about kind of all of the
5 legal permutations of how the Court might rule.
6     Q   Right. But in words or substance, during
7 that discussion, whether you told him or he told
8 you, you discussed the likelihood that UBS was
9 going to get a meaningful judgment against
10 CDO Fund and SOHC as a result of that Phase 1
11 trial, correct?
12    A   I don't recall. I mean, we certainly
13 discussed it as a possibility, but in terms of how
14 we weighed likelihoods, I just don't remember.
15    Q   The trial did not go well for the
16 defendants, correct?
17        MS. SMITH: Objection, form.
18    A   The outcome did not go as the defendants
19 had hoped. I actually thought that our trial
20 counsel performed fairly well.
21 BY MR. CLUBOK:
22    Q   Fair enough. I'm not asking you how your
23 trial counsel performed. But in terms of the
24 facts that were revealed at trial that led to the
25 judge's decision, those were facts that were not

---

82

1 favorable generally to the positions --
2        MS. SMITH: Objection to form.
3 BY MR. CLUBOK:
4     Q   -- that the defendants had been taking,
5 correct?
6     A   I'll let the court judgment speak for
7 itself.
8     Q   Did you play any role ever in analyzing
9 whether or not Highland and its affiliates should
10 settle with UBS?
11        MS. SMITH: Objection to form.
12    A   I never -- I never analyzed whether they
13 should settle, no.
14 BY MR. CLUBOK:
15    Q   Okay. You never analyzed whether or not
16 Highland -- if I say the Highland defendants, is
17 that sufficient acceptable shorthand for all the
18 defendants in the case?
19    A   Yes.
20    Q   And all the defendants in the case were
21 either Highland or Highland affiliates, correct?
22    A   That's correct.
23    Q   Okay. So did you ever perform any
24 analysis as to whether or not the Highland
25 defendants should settle with UBS in the New York

---

83

1 litigation?
2     A   At various points in time I was asked to
3 assist in preparation kind of settlement-related
4 materials, but the actual decision-making was
5 never mine.
6     Q   Whose was it?
7     A   Ultimately, it would have been
8 Mr. Dondero's.
9     Q   Did you ever provide any advice regarding
10 the wisdom of settling the case?
11    A   I don't recall if I did or not.
12    Q   Did you ever provide any advice regarding
13 the merits of the case?
14    A   I'm certain I did that, yes.
15    Q   Who did you provide that advice to?
16    A   It would really depend on the time period.
17    Q   You said part of the job you always did
18 at -- strike that.
19        As part of the job that you did over the
20 years at Highland was due diligence on litigation,
21 correct?
22    A   That doesn't accurately reflect my
23 testimony.
24    Q   Shorthanding it, but part of the job you
25 did, for example, for SAS was due diligence on

---

84

1 litigation they were considering funding?
2     A   Well, I knew SAS was affiliated with
3 Mr. Dondero somehow. I didn't -- well, let me
4 rephrase it. I knew Mr. Dondero was involved in
5 SAS and had approved its operations in some way.
6 I didn't know how he was related to it. And so
7 from my seat at Highland, I analyzed cases that
8 SAS could potentially provide litigation funding
9 for.
10    Q   Right. And when you say analyzed, you
11 would be asked to review the matter and give your
12 opinion about the relative merits of the case?
13    A   Yes.
14    Q   And did you consider yourself to be good
15 at that job of analyzing a case and giving an
16 opinion as to the merits?
17    A   I mean, we all hope we're pretty good at
18 our jobs, don't we?
19    Q   We all hope. Did you consider yourself to
20 be good at that job?
21    A   I did it to the best of my ability. I
22 think I'm pretty good at my job generally.
23    Q   And specifically were you good at
24 analyzing the merits of litigation -- are you
25

85

1  A  Yeah.
2  Q  Do you need a break?
3  A  No.
4  Q  Are you sure?
5  A  Yeah.
6     MR. CLUBOK:  Let's go off the record.
7  A  No, we're not.  Let's keep going.
8     MR. CLUBOK:  Let's go off the record.
9     THE VIDEOGRAPHER:  We are off the record
10 at 11:39 a.m.
11    (Recess taken from 11:39 a.m. CDT to
12 11:47 a.m. CDT)
13    THE VIDEOGRAPHER:  The time is 11:47 a.m.
14 We are back on the record.
15 BY MR. CLUBOK:
16 Q  Sir, did you believe that you were good at
17 analyzing the merits of litigation?
18 A  Yes.
19 Q  And did you ever -- were you ever asked to
20 analyze the merits of the UBS New York litigation
21 against the Highland and its affiliates?
22 A  Yes.
23 Q  And did you ever give a recommendation, in
24 words or substance, that UBS was likely to
25 prevail, at least in part in that litigation?

86

1  A  I don't recall my exact recommendations,
2  but I probably did.
3  Q  And --
4  A  At least on some of the claims, but not on
5  others.
6  Q  Which claims?
7  A  I don't recall.  There were a lot of them.
8  Q  Do you recall if you gave a recommendation
9  that UBS was likely to prevail in Phase 1 against
10 SOHC and CDO Fund for the claims that were tried?
11 A  Well, it's hard to say the answer because
12 prevailing had a lot of different meanings in that
13 context.
14 Q  Let's start with liability and then we'll
15 talk about damages.  Did you ever give a
16 recommendation that UBS was likely to win on its
17 breach of contract claims against CDO Fund and
18 SOHC in Phase 1?
19 A  Yes, I did.
20 Q  And what was that recommendation?
21 A  That liability was likely to be found.
22 Q  Who did you make that to?
23 A  I don't recall.  It certainly would have
24 been -- well, I don't recall who it was.
25 Q  You said it certainly would have been?

87

1  A  No, I believe it probably was
2  Mr. Ellington and Mr. Dondero.
3  Q  Directly to Mr. Dondero?
4  A  Probably, but I can't say for certain.
5  Q  Would that have been oral or written?
6  A  I don't know.
7  Q  When did you first make that
8  recommendation?
9  A  I don't know.  It was a very lengthy
10 litigation.
11 Q  Did you ever make that recommendation
12 prior to trial?
13 A  I don't recall if I did or not.
14 Q  Well, you were going to trial on a billion
15 dollar -- yeah, strike that.
16    You were going to trial on a roughly
17 billion dollar claim including interest.  Prior to
18 stepping into the courtroom for that Phase 1
19 trial, had you made a recommendation that
20 liability was likely?
21 A  Immediately prior to stepping into trial?
22 Q  At any time prior to going to Phase 1
23 trial, did you recommend to Mr. Ellington and
24 Mr. Dondero that liability was likely to be
25 established against SOHC and CDO Fund by UBS?

88

1  A  My testimony was that I believed that I
2  probably stated to Mr. Ellington and Mr. Dondero
3  that SOHC and CDO Fund were likely to be found
4  liable on breach of contract.
5  Q  And that was before the trial?
6  A  Right.  But I don't know when exactly.
7  Q  Okay.
8  A  Some time period which was -- I mean, that
9  covers like nine years.
10 Q  Right.  But at some point summary judgment
11 was decided largely in UBS's favor, correct?
12 A  With respect to those two funds, the
13 answer is yes.  With respect to the other
14 entities, not necessarily.
15 Q  Okay.  But with respect to those two
16 funds, UBS prevailed in the summary judgment
17 briefing?
18    MS. SMITH:  Objection to form.
19 A  I know it was prepared to go to trial.  It
20 was -- there were claims going to trial.  In terms
21 of what the orders say, I'll let them speak for
22 themselves.
23 BY MR. CLUBOK:
24 Q  At any time after the summary judgment
25 decision but before trial started, did you make a

**89**

1 recommendation to Mr. Ellington and Mr. Dondero
2 that liability was likely to be established
3 against SOHC and CDO Fund?
4   **A  I really don't recall.**
5   Q  As you sit here today, you have no idea if
6 any time after summary judgment was decided
7 against SOHC and CDO Fund but before the case for
8 roughly a billion dollars was to be tried, whether
9 you made a recommendation as to your view of the
10 merits of liability?
11   **A  I'm not saying that I didn't. I'm just**
12 **saying, sitting here today, I don't remember.**
13   Q  Did you -- what was the reaction of
14 Mr. Ellington when you made the recommendation
15 prior to going to trial, that liability was likely
16 to be established against SOHC and CDO Fund?
17   **A  Well, again, when we're talking about**
18 **prior to trial, you're talking about that**
19 **nine-year time period from 2009 to 2018?**
20   In that question I was.
21   **A  Okay. We discussed the UBS case numerous**
22 **times.**
23   Q  Hold on. There was a whole nine-year
24 period. From the get-go did you make a
25 recommendation that liability was likely to be

**90**

1 established against SOHC and CDO Fund?
2   **A  What do you mean from the get-go?**
3   Q  From the beginning of the litigation?
4   **A  I wasn't employed at Highland from the**
5 **beginning of the litigation.**
6   Q  You started working on the matter in
7 roughly 2011, correct?
8   **A  That's not accurate, no.**
9   Q  When did you start working on the matter?
10   **A  Earlier than that. When I arrived in**
11 **Highland in two thousand -- late September,**
12 **October 2009 I started working on it.**
13   Q  Okay. So from the time that you started
14 work on litigation, what's the earliest time that
15 you can recall, roughly, in which you came to the
16 belief that liability would be established against
17 CDO Fund and SOHC?
18   **A  I don't recall. It would have been early**
19 **on, but I don't know exactly when.**
20   Q  Like as early as 2010?
21   **A  I don't remember.**
22   Q  Okay. But your -- when you say early on,
23 you mean roughly within the first year of working
24 on the matter, you came to the belief that
25 liability was likely to be established against

**91**

1 CDO Fund and SOHC for the breach of contract
2 claims that UBS had in the New York litigation,
3 correct?
4      MS. SMITH: Objection to form.
5   **A  That's probably fair, yes.**
6 **BY MR. CLUBOK:**
7   Q  And how long after coming to that belief
8 did it take for you to make that recommendation
9 known to Mr. Ellington and Mr. Dondero? Is that
10 something you kept to yourself for a long time or
11 did you fairly soon thereafter share that opinion
12 with Mr. Ellington and Mr. Dondero?
13   **A  So it's difficult for me to answer the**
14 **question because at the time I was a very junior**
15 **attorney. No one was really asking me for my**
16 **opinion about anything. I was responsible for**
17 **kind of the day-to-day grind of working on the**
18 **case.**
19   Q  Okay. At what point did people start
20 asking you about your opinion on the merits of the
21 case?
22   **A  I can't pinpoint exactly, but it would**
23 **have been probably after I had been at Highland**
24 **three or four years.**
25   Q  So sometime in the 2011 or 2012 time

**92**

1 frame?
2   **A  Maybe around then, maybe a little later**
3 **than that.**
4   Q  Well, was it before -- you said at some
5 point this other individual took over the
6 day-to-day management of the case. Remember that?
7   **A  Correct.**
8   Q  And prior to that, had you shared your
9 views that you had already reached from early on,
10 that SOHC and CDO Fund were likely to have
11 liability established against them for the breach
12 of contract claims that UBS had brought?
13   **A  I think I probably -- I don't exactly**
14 **recall, but I believe I probably discussed it with**
15 **Mr. Ellington.**
16   Q  What about Mr. Dondero?
17   **A  At that time I don't -- I don't remember**
18 **one way or another if I would have spoken to him.**
19 **I was still pretty junior and so I didn't**
20 **regularly converse with him.**
21   Q  Okay. But then you resumed day-to-day
22 management of the matter approximately when?
23   **A  Whenever Mr. -- well, that's what I said.**
24 **I don't recall because Mr. Vancour left and then I**
25 **don't remember if another person took over the**

93

1  case afterwards and then I took over after that
2  person left, or if I took over directly from
3  Mr. Vancour.
4      Q   Who was that person you're thinking of?
5      A   Jason Goldsmith.
6      Q   Certainly by the time Jason Goldsmith and
7  Mr. Vancour had left, you had resumed day-to-day
8  management for the UBS New York litigation against
9  Highland, correct?
10     A   Well, those were different time periods.
11  Mr. Vancour left first, Mr. Goldsmith left second.
12  So after Mr. Goldsmith's departure, I certainly
13  know -- well, after Mr. Goldsmith's departure
14  would have been when I believe I probably would
15  have picked up management.
16     Q   And that would have been before summary
17  judgment briefing?
18     A   Probably. I mean, the -- I don't know.
19     Q   And at that point, at some point you --
20  did you -- at some point you came to share your
21  views with Mr. Dondero about the likelihood that
22  liability would be established against SOHC and
23  CDO Fund for its contract claims, correct?
24     A   At some point I did discuss that with him,
25  I believe.

94

1      Q   Roughly when was that?
2      A   I don't know, sir.
3      Q   Certainly years ago, right?
4      A   Yes, it was a long time ago.
5      Q   And it was before you started working on
6  settlement options in connection with the matter,
7  correct?
8          MS. SMITH: Objection to form.
9      A   Can you clarify the question, please?
10  BY MR. CLUBOK:
11     Q   I don't know -- remember the exact words
12  you used, but you said at some point you had some
13  involvement with -- contributed to some settlement
14  analysis related to the case. I'm not trying to
15  put words in your mouth. I'm paraphrasing.
16     A   That's fair. I did contribute to a
17  settlement analysis on the case.
18     Q   Before contributing to that settlement
19  analysis, fair to say you had already conveyed
20  your views directly to Mr. Dondero that liability
21  was likely to be found in UBS's favor against SOHC
22  and CDO Fund?
23     A   I just don't remember, sir.
24     Q   How many times did you have discussions
25  with Mr. Dondero in which you expressed your view

95

1  that liability was likely to be determined against
2  CDO Fund and SOHC?
3      A   I don't recall.
4      Q   Roughly?
5      A   It would have been more than one and
6  probably less than five.
7      Q   Okay. And did Mr. Dondero push back?
8      A   I don't remember what he said on that.
9  There were so many moving parts in that case, I
10  don't know that I -- it's difficult to isolate
11  those very specific claims against those very
12  specific defendants as part of the conversation.
13     Q   Right. But the breach of contract was
14  certainly a core part of the case, right?
15     A   Yes, but there were numerous what you
16  would call core parts of the case.
17     Q   Okay. But I want to focus on the breach
18  of contract against SOHC and CDO Fund, who were
19  also referred to often as the counterparties to
20  the UBS restructured warehouse agreement.
21     A   That's fair, they were.
22     Q   Okay. And those liability claims against
23  the counterparties, with respect to those, did
24  Mr. Dondero ever push back, in words or substance,
25  about the likelihood of liability being

96

1  established?
2      A   Yes, he did.
3      Q   And what did he say?
4      A   I don't remember the specific words, but I
5  definitely remember he pushed back.
6      Q   And ultimately did he convey whether or
7  not he accepted your recommendation?
8      A   Well, the case never settled. The case
9  never settled, so I don't know what to say about
10  that.
11     Q   Yeah, but did he ever -- at the end, did
12  you come away with the impression that he accepted
13  that liability against those two entities with
14  respect to the breach of contract claims was more
15  likely than not?
16     A   I don't know that he ever accepted that,
17  no.
18     Q   Did Mr. Ellington?
19     A   I don't know if he did or not.
20     Q   Did you ever weigh in -- so we've talked
21  about liability with respect to these claims. Did
22  you ever come to an opinion about likely damages
23  that would be awarded if liability were
24  established?
25     A   I have a variety of opinions, but I don't

**97**

1 think there was one in particular that I had as
2 the most likely outcome.
3    Q   What were the -- how many likely -- did
4 you have no view, like there's three or four
5 outcomes and each were equally likely or were
6 there two outcomes that were equally likely or you
7 just had -- you couldn't -- even with your ability
8 to analyze litigation, had no idea what was going
9 to happen with damages?
10       MS. SMITH:  Objection to form.
11    A   My recollection actually was that there
12 were nine separate independent scenarios.
13 **BY MR. CLUBOK:**
14    Q   Nine?
15    A   Yes.
16    Q   And were these laid out in a document?
17    A   Yes.
18    Q   And who did you present these to?
19    A   Mr. Ellington.
20    Q   And Mr Dondero?
21    A   I don't remember if I showed it to
22 Mr. Dondero or not.
23    Q   When did you prepare that?
24    A   It would have been -- it incorporated the
25 expert reports, so it would have been subsequent

**98**

1 to the expert reports and prior to trial, but
2 where exactly, I don't know.  But the document's
3 on the debtor's system, which you can check the
4 metadata.
5    Q   What was it called?
6    A   It was an Excel spreadsheet.  I don't
7 remember what it was called.
8    Q   And do you remember -- was it the kind of
9 thing that you -- did you assign percentage
10 likelihood to each of the nine scenarios?
11    A   I don't believe I did on that sheet, no.
12    Q   Did you ever?
13    A   I don't believe -- well, I don't recall if
14 I did or not just because there were, I don't
15 know, maybe 12 different line items that went into
16 damages and then it depended on about six or seven
17 different rulings of the Court as to which one
18 would be incorporated or not.  And so it's
19 difficult to really come up with -- to say how I
20 was thinking about it at the time because you're
21 looking at, I mean, it's literally an Excel
22 matrix that was more than a screen full.
23    Q   Right.  But you're aware of -- you're
24 familiar with Monte Carlo simulations in terms of
25 the context of analyzing litigation outcomes?

**99**

1    A   I'm familiar with that, yes.
2    Q   And you're certainly familiar with the
3 process of looking at different scenarios and
4 coming up with an expected range of outcomes in
5 terms --
6    A   Yes.
7    Q   Did you ever, in words or substance, come
8 up with an expected likely range of outcomes for
9 damages in connection with the breach of contract
10 claims?
11    A   I don't think I did, no.
12    Q   And did you ever, in words or substance,
13 convey anything about your views on the relative
14 likelihood of one scenario versus another in terms
15 of damages?
16    A   I just generally -- I may have, but I
17 don't recall having done so.
18    Q   And did you ever, in words or substance,
19 have a belief that likely it would be damages in
20 the hundreds of millions of range or more?
21    A   Those were certainly possible scenarios,
22 but I don't recall doing a probability analysis as
23 to whether they were the most likely scenarios.
24    Q   Yeah, but whether or not you did a formal
25 probability analysis, fair to say that you and

**100**

1 Mr. Ellington at various times discussed the
2 general likelihood that the damages in the case
3 were likely to be in excess of $100 million?
4    A   We certainly discussed it as a
5 possibility.  I don't know that we agreed that it
6 was a probability.
7    Q   Well, Mr. Ellington conveyed to you, in
8 words or substance, that he believed it was more
9 likely than not that ultimately damages in excess
10 of $100 million would be awarded in UBS's favor
11 with respect to the breach of contract claims
12 against SOHC and CDO Fund, correct?
13    A   He may have.  I don't recall if he did or
14 not.
15    Q   And did you ever convey, in words or
16 substance, to anyone, that you believed it was
17 more likely than not that the damages that would
18 be awarded in UBS's favor with respect to the
19 breach of contract claims against SOHC and
20 CDO Fund would likely be in excess of $100
21 million?
22    A   I very well might have, but I don't recall
23 having done so.
24    Q   You certainly believed that prior to the
25 trial, correct?

---

101

1    A  I don't think that's fair to say, no.  I
2  thought we actually had really good arguments on
3  the synthetic warehouse.
4    Q  Okay.  So you believe -- so you said you
5  were good at your job, but you believed it was
6  more likely than not that the ultimate damages
7  would be less than $100 million total?
8    A  I didn't say that, Counselor.  Your
9  question was whether or not I believed in the
10  arguments we were making and I did, which would
11  have knocked damages well below 100 million.
12    Q  No, I never asked you about the -- whether
13  you believed in the arguments.  That was a concept
14  you introduced.  I'm looking at the transcript.
15  Let me ask the question again.
16      Taking into account the argument you're
17  making and the argument UBS was making and your
18  ability to analyze litigation, take all of that
19  and the work you did on the case, everything that
20  you had done, fair to say that at some point prior
21  to trial, you came to the belief that it was more
22  likely than not that damages in excess of
23  $100 million would be awarded in UBS's favor with
24  respect to the breach of contract claims against
25  CDO Fund and SOHC?

---

102

1    A  I don't recall having had that thought.
2    Q  So prior to trial was it your belief that
3  it was more likely than not that the total
4  damages -- well, strike that.
5      You've said that you believed that
6  liability would be established.  That you agree
7  prior to trial you believed was more likely than
8  not based on the work you had done, correct?
9    A  To be specific, I believed that liability
10  was more likely than not to be proven against
11  CDO Fund and SOHC on the breach of contract
12  claims.
13    Q  Right.  And --
14    A  Which were the ones tried in Phase 1.
15    Q  Right.  And what was tried in Phase 1 was
16  the liability and the damages with respect to
17  those claims, correct?
18    A  Yes.
19    Q  Okay.  So prior to trial was it your
20  belief that it was more likely than not that
21  despite liability being likely, the total damages
22  would be less than $100 million?
23    A  I just don't recall which way -- what my
24  risk analysis was at the time, but I do remember
25  having a great deal of faith in certain arguments,

---

103

1  including but not limited to the synthetic
2  warehouse agreement argument, which would have
3  dropped damages below $100 million.
4    Q  That's not true, is it?  Even if you had
5  won the synthetic warehouse agreement, the total
6  damages still would have been in excess of
7  100 million, unless you won some other theories;
8  isn't that true?
9      MS. SMITH:  Objection to form.
10    A  That may be your testimony, sir.
11  BY MR. CLUBOK:
12    Q  Well, the damages on the nonsynthetic
13  warehouse that were claimed in the case were well
14  in excess of $100 million, correct?
15    A  I'm sorry, Mr. Clubok.  I'm not in a
16  position to debate the merits of the case that we
17  tried together.  I'm just recalling the
18  arguments -- that we had arguments that would
19  knock it down below 100 million.  And among those
20  arguments were the synthetic warehouse agreement
21  arguments.
22    Q  Okay.  I didn't ask you to debate the
23  merits.  Again, you're -- please don't introduce
24  concepts that I didn't ask.  My simple question is
25  the damages that were claimed on the cash

---

104

1  warehouse were well in excess of $100 million;
2  isn't that true?
3    A  Yes, assuming that UBS won all of its
4  arguments on the cash warehouse and lost on the
5  synthetic, I think that -- my recollection is it
6  may have been above 100 million.  I honestly don't
7  remember.
8    Q  Okay.  And again, you -- as you sit here
9  today, your testimony is even though you remember
10  believing and giving the advice on liability, you
11  don't remember if you had any belief as to whether
12  it was more likely than not that total damages
13  would be above or below $100 million prior to the
14  Phase 1 trial?
15    A  That's correct, because the damages issue
16  was fundamentally a series of math problems that
17  were determined by experts, and so I don't know
18  that I necessarily had a conclusion about those.
19    Q  You don't know if you did or you don't
20  remember if you did?
21    A  I just don't remember if I did.
22    Q  Okay.  Were you ever asked by anyone to
23  run that analysis or to give your opinion on what
24  the likely damages would be, given your belief
25  that liability was likely to be established?

---

**105**

1    **A  I would have to speculate if I did or not.**

2    Q  I'm not asking you to speculate. Do you

3 remember ever being asked by anyone to give your

4 opinion on what the likely damages would be, given

5 your stated opinion to Mr. Ellington and

6 Mr. Dondero that likely -- liability was likely to

7 be established?

8    **A  I just don't recall.**

9    Q  Well, did anyone give an opinion on

10 damages that you were aware of?

11    **A  On a probability weighted basis, I don't**

12 **remember if they did, no.**

13    Q  Did any of your outside -- were any of

14 your outside counsel ever asked to give their

15 opinion as to whether or not damages -- strike

16 that.

17    Were any of your outside counsel ever

18 asked to give their opinion as to what the likely

19 damages would be in connection with the breach of

20 contract claims against CDO Fund and SOHC?

21    MS. SMITH: Objection to form.

22    **A  I don't remember if they were or not.**

23 BY MR. CLUBOK:

24    Q  Do you remember them ever giving any such

25 opinion, whether they were asked to or not?

---

**106**

1    MS. SMITH: Objection to form.

2    **A  I don't. It's been a long time,**

3 **Mr. Clubok. I don't recall.**

4 **BY MR. CLUBOK:**

5    Q  Did you ever, in words or substance, give

6 any recommendation in terms of whether the case

7 should be settled or a particular amount it should

8 be settled for?

9    **A  I think I made recommendations that it**

10 **should be settled, but I don't know that I made**

11 **any recommendations as to the amounts.**

12    Q  Who did you recommend the case should be

13 settled to?

14    **A  Mr. Ellington.**

15    Q  Anybody else?

16    **A  I believe that would have been it.**

17    Q  How many times roughly did you tell

18 Mr. Ellington this case should be settled?

19    **A  I don't recall. It would have been a**

20 **number of times at various different points over**

21 **various years.**

22    Q  And that's because of your continued view

23 from early on that liability was likely to be

24 established at least against SOHC and CDO Funds

25 for the breach of contract claims, correct?

---

**107**

1    **A  I don't know that that was necessarily the**

2 **basis.**

3    Q  What was?

4    **A  It was a big case with big claims and**

5 **going to trial inevitably has risks and it's**

6 **better to limit those risks to some sort of**

7 **negotiated amount than to roll the dice at trial.**

8    Q  And you didn't take into account, when you

9 gave that recommendation, your views on liability,

10 you set those aside in making that settlement

11 recommendation?

12    MS. SMITH: Objection to form.

13    **A  I'm certain that was a factor I**

14 **considered, but your point -- your question, I**

15 **believe, was something slightly different.**

16 **BY MR. CLUBOK:**

17    Q  Okay. But certainly one of the factors

18 that led you to repeatedly recommend settlement

19 was your belief that liability was likely to be

20 established, at least with respect to the contract

21 claims against SOHC and CDO Fund, correct?

22    **A  I don't remember if that was an essential**

23 **motivating factor in my recommendation or not.**

24    Q  Okay. So you, as you sit here today,

25 don't know if your belief in liability played any

---

**108**

1 role in recommending the case should be settled?

2    **A  That's not my testimony.**

3    Q  My question -- that was your testimony,

4 actually. That was like literally exactly your

5 testimony. You said I don't remember if it was an

6 essential motivating factor. Okay. Was it any

7 factor in your recommendation? Did it factor into

8 your recommendation in some way your views on

9 liability?

10    **A  Yes.**

11    Q  Okay. But you don't know if it was an

12 essential factor on your views of settlement,

13 correct?

14    **A  That's correct.**

15    Q  Do you think, as a general matter, the

16 likelihood of legal liability being established

17 should be an essential factor in determining

18 whether to settle a matter?

19    **A  If you're asking for a general comment,**

20 **decontextualized from the actual facts of the UBS**

21 **case, yes, but I don't think that general**

22 **statement applies to the UBS case.**

23    Q  As a lawyer advising a company who comes

24 to the belief that liability is likely to be

25 established, don't you think you have a

109

1  responsibility to say, in words or substance,
2  because we have liability here or likely have
3  liability here, we should meet our legal
4  obligations, at least through settlement, if we
5  can?
6      MS. SMITH: Objection to form.
7    **A  I'm sorry, Counselor. I'm not going to**
8  **sit here and come up with how I would render legal**
9  **advice generally.**
10 **BY MR. CLUBOK:**
11   Q  Well, when you say that you believe that
12 liability would likely be established, fair to say
13 that you believed that SOHC and CDO Fund had
14 contractual obligations that had been breached to
15 UBS, correct?
16   **A  I believe they would be found in breach of**
17 **contract.**
18   Q  Okay. Do you believe that it's
19 appropriate for a lawyer to advise their client to
20 abide by the terms of its contract?
21     MS. SMITH: Objection to form.
22   **A  As a general proposition -- I'm sorry.**
23 **I'm not going to be able to give general**
24 **testimony. If you'd like to ask me about a**
25 **specific situation, I'm happy to address that.**

110

1  **BY MR. CLUBOK:**
2    Q  Well, do you believe that it was
3  appropriate for you to advise those responsible
4  for SOHC and CDO Fund that they had contractual
5  obligations that they were in breach of?
6    **A  Did I believe I was obligated to inform --**
7  **I mean, we had -- I had discussed, as I said,**
8  **liability and probability of liability on those**
9  **specific claims of those specific defendants with**
10 **both Mr. Ellington and Mr. Dondero at various**
11 **points in time.**
12   Q  Did you ever, in words or substance,
13 advise those responsible for managing SOHC and CDO
14 Fund's affairs that they should abide by the
15 contractual obligations you came to believe they
16 owed?
17     MS. SMITH: Objection to form.
18   **A  I'm going to disagree with the premise of**
19 **your question, sir.**
20 **BY MR. CLUBOK:**
21   Q  What's the premise you disagree with?
22   **A  I don't know that there necessarily was**
23 **anyone generally responsible for the -- those two**
24 **entities, save potentially Mr. Dondero at the top**
25 **of the organization.**

111

1    Q  Okay. Mr. Dondero was the sole director
2  of SOHC at the time, correct?
3    **A  I think that's right, yes.**
4    Q  So -- did you ever -- did you think it
5  was -- so Mr. Dondero controlled SOHC during the
6  pendency of the litigation, at least until he was
7  displaced in the bankruptcy, correct?
8    **A  You can -- you can add -- I'm not going to**
9  **adopt the word control. He was a director of --**
10 **he was the sole director of SOHC. That's a fact.**
11   Q  Okay. And did you believe it was your
12 responsibility to ever advise Mr. Dondero that he
13 should cause SOHC to live up to the contractual
14 obligations you came to believe that they had owed
15 UBS?
16   **A  That would be a business decision and**
17 **Mr. Dondero could make it if he wanted to.**
18   Q  Did you believe it was your responsibility
19 to ever advise Mr. Dondero that he should live up
20 to the contractual obligations you believed that
21 SOHC owed to UBS?
22     MS. SMITH: Objection to form.
23   **A  Again, my only advice, sir, was that I**
24 **believed liability was more likely than not to be**
25 **found. I didn't talk about obligations and**

112

1  **expectations and that he needed to do anything.**
2  **My legal advice was solely with respect to the**
3  **probability of outcome on those two claims.**
4  **BY MR. CLUBOK:**
5    Q  Is that a no to my question?
6    **A  Your question assumes statements I did not**
7  **make.**
8    Q  No, it doesn't assume anything. I'm going
9  to ask it again and I'm going to ask you to listen
10 carefully to my question.
11   **A  Okay.**
12   Q  Did you believe it was your responsibility
13 to ever advise Mr. Dondero that he should live up
14 to the contractual obligations that SOHC owed to
15 UBS?
16   **A  I disagree with the premise of the**
17 **question.**
18   Q  What premise do you disagree with?
19   **A  That there are contractual obligations**
20 **that SOHC and CDO Fund necessarily owed to UBS.**
21   Q  You believed it was more likely than not
22 that a court would determine that they had
23 contractual obligations that they owed to UBS that
24 they were in breach of, correct?
25   **A  Yes.**

113

1    Q   Okay.  Did you ever believe it was your
2  responsibility to advise Mr. Dondero that he
3  should cause SOHC to live up to those contractual
4  obligations?
5    **A   Again, my responsibility was to do the**
6  **legal analysis, not to tell people how to run**
7  **their business.**
8    Q   So that's a no to my question?
9    **A   Well, no, I disagreed with the underlying**
10  **premise of your question and that was my response,**
11  **sir.**
12    Q   My question is, did you ever believe it
13  was your responsibility to advise Mr. Dondero that
14  he should cause SOHC to live up to the contractual
15  obligations you came to believe a court would
16  determine that SOHC and CDO Fund owed to UBS that
17  they were in breach of?
18    **A   Right.  And my testimony was that I**
19  **disagreed with the premise of that question.**
20    Q   No, I changed the question.  Okay.  So now
21  I changed the question to address your premise
22  issue and you agreed with all these premises.
23  I've got it in writing here, so I'm going to ask
24  the question one more time and ask you to listen
25  to this question.

114

1       Did you ever believe it was your
2  responsibility to advise Mr. Dondero that he
3  should cause SOHC and CDO Fund to live up to the
4  contractual obligations you had come to believe a
5  court would determine they owed to UBS?
6    **A   Well, it was first that a court was more**
7  **likely than not to determine.  No, I don't believe**
8  **it was my obligation to tell him to fulfill**
9  **contractual obligations or cause those entities to**
10  **fulfill contractual obligations.**
11    Q   Was there anyone at Highland that you're
12  aware of who you understood to have that role to
13  advise Mr. Dondero to fulfill contractual
14  obligations?
15    MS. SMITH:  Objection to form.
16    **A   Since it's -- no, I don't know that I**
17  **would have had a thought process about that one**
18  **way or another.**
19  **BY MR. CLUBOK:**
20    Q   So let's talk about the role you did play
21  in connection with settlement analysis for the UBS
22  New York litigation.  Can you describe, in as much
23  detail as possible, what your role was, if any?
24    **A   I don't specifically remember what role I**
25  **played in settlement analysis.**

115

1    Q   Your testimony here under oath is that you
2  don't remember anything at all about a role you
3  played in connection with any settlement analysis
4  of the UBS litigation in New York against Highland
5  and its affiliates?
6    **A   That was not my testimony.**
7    Q   Okay.  What do you remember, with as much
8  specificity as possible, about the role you played
9  in connection with any settlement analysis of the
10  New York UBS litigation against Highland and its
11  affiliates?
12    **A   I know that Highland considered settlement**
13  **at numerous time periods and it would have been my**
14  **role to kind of gather the underlying documents**
15  **and facts to support settlement proposals.**
16    Q   Okay.  Any other role that you ever
17  remember playing in connection with any settlement
18  analysis of the New York UBS litigation against
19  Highland and its affiliates other than gathering
20  documents and facts to support settlement
21  proposals?
22    **A   I don't recall.**
23    Q   Did you continue to play any role in
24  connection with the settlement analysis after the
25  bankruptcy?

116

1    **A   I believe -- as -- let me see how I can**
2  **say this properly.  I believe the answer is no.  I**
3  **may have had some ancillary or occasional touch on**
4  **that process, but largely the answer is no.**
5    Q   You were aware that there were settlement
6  discussions, including court-ordered mediation, in
7  connection with UBS's claims in the bankruptcy,
8  correct?
9    **A   Yes.**
10    Q   And you're aware that those settlement
11  discussions at times also included potential
12  settlement of the remaining claims in the New York
13  litigation against the entities that are outside
14  the bankruptcy, like CDO Fund and SOHC?
15    **A   Actually, no, that was -- I don't recall**
16  **that ever being disclosed to me.**
17    Q   Do you recall there ever being any
18  discussion, in words or substance, that there was
19  potential settlement regarding UBS in its claims
20  against Multi Strat?
21    **A   And when we say settlement, we're talking**
22  **about like a cash payment for Multi Strat to UBS**
23  **in exchange for a release?  Or are we talking**
24  **about like the May 2020 settlement, partial**
25  **settlement, whatever you want to call that thing?**

117

1    Q   Right.  We're talking about -- there was a
2  May 2020 agreement regarding the sale of certain
3  assets and how the proceeds would be preserved.  I
4  want to take that out of the equation.
5    A   Okay.
6    Q   So we're talking about payments or
7  consideration by Multi Strat to UBS with respect
8  to the claims that were pending in the New York
9  litigation.
10    MS. SMITH:  Objection to form.
11    A   No, I -- so I had had an accident in early
12  January of 2020.  By the time I got back from
13  leave of absence in April or May, largely I had
14  just kind of become a task attorney at that point
15  and Pachulski was running things.
16  BY MR. CLUBOK:
17    Q   Were you ever tasked by Pachulski after
18  April -- after -- strike that.
19      When did you come back after your
20  accident, roughly?
21    A   It was a slow return.  I came back
22  part-time in April, and I think I was fully back
23  in May.
24    Q   Okay.  After returning to your active
25  employment following your accident in April or May

118

1  of 2020, were you ever tasked with any work in
2  connection with the UBS claim?
3    A   Yes.
4    Q   What were you tasked with?
5    A   I was tasked with assisting Pachulski in
6  analysis and drafting of the claim objection.
7    Q   Who tasked you with that?
8    A   Mr. Seery.
9    Q   Directly?
10    A   Yes.
11    Q   He told you that he needed assistance in
12  analyzing UBS's claim and helping draft the claim
13  objection, correct?
14    A   He told me to assist Pachulski in that
15  process.
16    Q   I see.  And who specifically at Pachulski
17  did you assist in that process?
18    A   It was a team of lawyers, but primarily
19  led by Mr. Feinstein.
20    Q   Anyone else?
21    A   His entire team.  Elissa Wagner, I believe
22  was an associate, John Morris had some involvement
23  at various points in time, Greg Demo had
24  involvement at certain points in time.  I don't
25  remember who the other lawyers were at Pachulski,

119

1  but it was a large number.
2    Q   And so you reviewed and gave comments
3  throughout the process of objecting to the UBS
4  claims?
5    A   Yes.
6    Q   And were there any other tasks that you
7  were given ever in connection with the UBS claim
8  by Mr. Seery or by the Pachulski firm?
9    A   Not really, no.
10    Q   Not really, or no?
11    A   Sit -- I'm -- I would say -- yeah, I would
12  say no.  I worked on the claim objection as my
13  role with respect to UBS.
14    Q   How about on the summary judgment?
15    A   I call that part of the claim objection
16  because it's part of the same process.
17    Q   Okay.
18    A   So also there was a lift stay motion.  I
19  was involved in that.  So really it -- let me
20  rephrase it.  I was involved in what I'm going to
21  call the litigating part.  So the adversarial
22  pleadings between the debtor and UBS with respect
23  to how the Court should rule on the claim.
24    Q   And you were responsible for all of that
25  up until the time the parties reached a

120

1  settlement?
2    MS. SMITH:  Objection to form.
3    A   I didn't say I was responsible, no.
4  BY MR. CLUBOK:
5    Q   I'm sorry.  You had tasks assigned to you
6  in connection with the litigation between UBS and
7  the debtor up until the time that those entities
8  reached a settlement agreement?
9    A   No, that's not accurate.
10    Q   Okay.  When did you -- when was the last
11  time you were assigned a task in connection with
12  the UBS litigation against the debtor?
13    A   Probably would have been responding to
14  certain discovery that UBS propounded in advance
15  of summary judgment.
16    Q   That was the last time you were given any
17  kind of task, that you can recall?
18    A   The last time I can recall, yes.  Largely,
19  Pachulski took it over and if they asked me to do
20  something, I would, but I was mostly kept out of
21  that process.
22    Q   And who asked you to help respond to
23  discovery requests that UBS had propounded in
24  advance of summary judgment?
25    A   I believe it was Greg Demo.

---

**121**

1    Q   And did you provide complete assistance to
2  Mr. Demo in responding to the UBS discovery
3  request to the best of your ability?
4    **A   I provided assistance to Mr. Demo in**
5  **response to the tasks that he had given me, yes.**
6    Q   Did you believe that you were providing
7  complete assistance to Mr. Demo in responding to
8  the UBS discovery requests to the best of your
9  ability?
10       MS. SMITH:  Objection to form.
11   **A   So I disagree with the premise of your**
12 **question because I was given specific tasks and I**
13 **did those specific tasks.**
14 **BY MR. CLUBOK:**
15   Q   Do you believe that in connection with the
16 tasks that Mr. Demo assigned you, you performed
17 those tasks to the very best of your ability?
18   **A   Yes.**
19   Q   And do you believe that you were totally
20 candid with Mr. Demo in the course of performing
21 those tasks that you were assigned with respect to
22 the discovery requests for UBS?
23       MS. SMITH:  Objection to form.
24   **A   With respect to those tasks, yes.**
25

---

**122**

1  BY MR. CLUBOK:
2    Q   Were there any tasks that you were not
3  completely candid with Mr. Demo about?
4        MS. SMITH:  Objection to form.
5    **A   No.  I'm being very specific.  With**
6  **respect to the tasks that I had with respect to**
7  **the discovery in UBS, I believe I was candid with**
8  **Mr. Demo.**
9  **BY MR. CLUBOK:**
10   Q   Was there ever a time you were less than
11 candid with Mr. Demo?
12       MS. SMITH:  Objection to form.
13   **A   In response to a question that he had or**
14 **just generally volunteering lots of information to**
15 **him?**
16 **BY MR. CLUBOK:**
17   Q   Well, let's start with --
18   **A   I don't -- I'm sorry, I don't understand**
19 **the question, sir.**
20   Q   You don't understand the question as to
21 whether or not you were ever less than candid with
22 Mr. Demo?
23       MS. SMITH:  Objection to form.
24   **A   Did I ever not tell him the truth?  No, I**
25 **didn't ever not tell him the truth.**

---

**123**

1  BY MR. CLUBOK:
2    Q   You never affirmatively made misstatements
3  to him as far as you can recall, correct?
4    **A   As far as I can recall, I never made a**
5  **misstatement to Mr. Demo.**
6    Q   And same thing with respect to all of the
7  lawyers at the Pachulski firm?
8        MS. SMITH:  Objection to form.
9    **A   To the best of my recollection, I never**
10 **made an affirmative misstatement to any of them.**
11 **BY MR. CLUBOK:**
12   Q   Did you ever make an affirmative
13 misstatement to any of the independent directors?
14   **A   None that I can recall.**
15   Q   But you certainly -- there's certainly
16 information that you did not volunteer in
17 connection with your work with them; is that fair?
18       MS. SMITH:  Objection to form.
19   **A   I don't believe that's how I would**
20 **characterize it, sir, no.**
21 **BY MR. CLUBOK:**
22   Q   Well, there's information that you had
23 that may have been relevant to the tasks you were
24 performing that you chose not to volunteer.  Fair?
25       MS. SMITH:  Objection to form.

---

**124**

1    **A   Relevant to the tasks I was performing?**
2  **No, I don't know that that's necessarily true.**
3  **BY MR. CLUBOK:**
4    Q   Relevant to the UBS litigation with
5  Highland.  Strike that.
6        MS. SMITH:  Objection, form.
7  BY MR. CLUBOK:
8    Q   Let me ask this question again.  There was
9  certainly information that you had that was
10 relevant to the UBS litigation with the debtor
11 that you chose not to volunteer, correct?
12   **A   No.**
13       MS. SMITH:  Objection to form.
14   **A   Actually, I don't think that's right at**
15 **all.  No, I don't believe that's correct.**
16 **BY MR. CLUBOK:**
17   Q   You were specifically asked to identify
18 information about the assets of CDO Fund and SOHC,
19 correct?
20   **A   That wasn't the exact task, no.**
21   Q   At some point you were made aware that UBS
22 was seeking information about the assets of
23 CDO Fund and SOHC, correct?
24   **A   Yes.**
25   Q   And you were aware that UBS was seeking

125

1 information not just about the current -- or the
2 then current assets of those entities, but the
3 historical information about those entities going
4 back to the beginning of 2009?
5 **A I was aware that UBS sought that**
6 **information, yes.**
7 Q And you were aware that the Pachulski firm
8 believed they had an obligation -- or strike that.
9 Did the debtor or its lawyers ever make it
10 clear to you that they intended to provide that
11 information to the very best of their ability?
12 **A So we had fairly detailed conversations**
13 **about what we were going to do in response to that**
14 **discovery. I don't know that there was ever a**
15 **discussion of -- well, I remember we had fairly --**
16 **we had pretty detailed conversations about how to**
17 **try to figure out how to respond to that**
18 **discovery.**
19 Q Who's the we in that sentence?
20 **A It was me and Mr. Demo.**
21 Q That's it?
22 **A John Morris may have been involved, but I**
23 **believe it was primarily Mr. Demo.**
24 Q Anybody else?
25 **A No one else that I can recall sitting here**

126

1 **today.**
2 Q And did you convey this discussion to
3 anyone, like, for example, someone in the team, to
4 assist you with this work or to Mr. Ellington, to
5 apprise him of it or Mr. Dondero? Did you ever
6 after having that discussion with Mr. Demo or
7 those extensive discussions, ever convey, in words
8 or substance, those discussions to anybody?
9 **A I conveyed to Mr. Ellington the tasks that**
10 **I had been assigned and what I was doing to**
11 **fulfill those tasks.**
12 Q Anyone else?
13 MS. SMITH: Objection to form.
14 **A Stephanie Vitiello assisted in gathering**
15 **some of the documents, although I don't remember**
16 **if it was in response to UBS or not. There were a**
17 **lot of document requests at the time.**
18 **BY MR. CLUBOK:**
19 Q Is there anyone else that you can recall
20 conveying the substance of the extensive
21 conversations you had with Mr. Demo about
22 responding to the UBS requests?
23 **A No.**
24 Q And did Mr. Ellington give you any
25 instructions in any way about how to perform those

127

1 tasks?
2 **A I don't believe -- in terms of what he --**
3 **of what we were supposed to be gathering for them,**
4 **no, I don't believe he did.**
5 Q Okay. So did you convey to Mr. Ellington,
6 in words or substance, that one of the important
7 things that UBS -- well, strike that.
8 Did Mr. Demo make it clear to you that one
9 of the very important things that -- strike that.
10 Did Mr. Demo make it clear to you that UBS
11 had conveyed that it put a high level of
12 importance behind the request for identifying the
13 assets of SOHC and CDO Fund?
14 MS. SMITH: Objection to form.
15 **A That wasn't exactly the task I was given.**
16 **I'm struggling to recall exactly what we said UBS**
17 **wanted, but that ultimately was not -- the task I**
18 **was given was something more specific.**
19 **BY MR. CLUBOK:**
20 Q What was that?
21 **A To link up the assets that were in the**
22 **funds in May of 2009 and answer the question what**
23 **happened to those assets and where are they today.**
24 Q And you believed that the only task you
25 had in connection with identification of assets

128

1 was to answer that very specific question?
2 **A It was -- in terms of past assets? That's**
3 **probably right. That was the defined task.**
4 Q Okay. And in terms of current assets,
5 were you also asked, in words or substance, to
6 help identify the full breadth of the current
7 assets held by CDO Fund and SOHC?
8 **A I don't remember if I was or not. I would**
9 **have to look at the -- I don't remember.**
10 Q You understood that UBS was trying to
11 obtain information about the current assets of
12 CDO Fund and SOHC, correct?
13 **A Yes.**
14 Q And also HFP?
15 **A Yes.**
16 Q Okay. And did you provide all material
17 information relating to the assets held by
18 CDO Fund, SOHC and HFP from March of 2009 through
19 the present?
20 MS. SMITH: Objection to form.
21 **A I don't know. We provided a lot of**
22 **documents, so the documents will speak for**
23 **themselves.**
24 **BY MR. CLUBOK:**
25 Q Did you endeavor to provide all material

---

129

1  information that you were aware of relating to the
2  assets held by CDO Fund, SOHC and HFP from March
3  of 2009 through the present in response to the
4  detailed discussions you had with Mr. Demo?
5     A  No.  There were certain documents that
6  were separately held, like e-mails, and so we
7  didn't touch the e-mails.
8     Q  What do you mean?
9     A  So there was a motion to compel by the UCC
10  in July of 2020.  And so all of the e-mail
11  communications were at that point separated out
12  and sent to Meta-e for contract review.  And so
13  that e-mail process was part of a very long
14  conversation -- a long series of conversations and
15  process with Sidley.  And so once those e-mails
16  went over to Meta-e, I didn't really address them.
17  They were a separate data set that were being
18  handled separately.
19     Q  Did you make it clear to Mr. Demo that you
20  were -- that you did not consider any review of
21  those e-mails to be part of your --
22     A  Absolutely.
23     Q  Okay.  And did Mr. Demo say that other
24  people would deal with that, those e-mails and the
25  information, if any, that was relevant to the

---

130

1  asset information that UBS was seeking?
2     A  I don't recall if he did or not.  I
3  remember John Morris was the person at Pachulski
4  responsible for that part of the process and what
5  conversations happened between Mr. Demo and
6  Mr. Morris, I don't know.
7     Q  Well, did anyone convey to you, in words
8  or substance, that other people would be handling,
9  reviewing those e-mails that were being housed by
10  Meta-e for responsiveness to the information about
11  the assets of SOHC, CDO Fund and HFP that UBS was
12  requesting?
13     MS. SMITH:  Objection, form.
14     A  The conversation simply was, all right,
15  the e-mails are separate, Isaac, you don't need to
16  look at those or worry about those, they're being
17  handled separately.
18  BY MR. CLUBOK:
19     Q  But other than those e-mails, you were
20  responsible for getting any other material
21  information you had about the assets of CDO Fund,
22  SOHC and HFP dating back to March 2009?
23     A  So there's one exception to that.
24     Q  Yes.
25     A  I told Mr. Demo that I was not going to be

---

131

1  looking for documents for HFP.
2     Q  Why did you do that?
3     A  Because the process of figuring out what
4  had happened to the CDO Fund and SOHC assets had
5  been a lengthy task, and I told Mr. Demo that
6  unless I got positive instructions from them to
7  the contrary, that I didn't want to have to repeat
8  that task for HFP and he agreed with that.
9     Q  Is that because you-all agreed that -- is
10  that because you said -- sorry.  You guys decided
11  you just didn't want to do it or you thought it
12  was unnecessary because you had already gathered
13  information in the course of looking for SOHC's
14  assets?
15     A  I don't remember what -- I don't remember
16  if the basis was that we'll just stand on our
17  objections or if it's not necessary for UBS's
18  motion for summary judgment.  Because the
19  fundamental point was UBS was asking for --
20  Pachulski and I agreed that UBS was asking for
21  documents it didn't need, but the reason it was
22  asking for documents it didn't need was for the
23  purposes of preventing the Court from going
24  forward with the summary judgment on the claims
25  against the debtor.  And so there was a discussion

---

132

1  of what are the documents we need to give them,
2  how hard is it to get, and then what are we --
3  between, you know, kind of the balance of the
4  burden and the requests and, you know, how much
5  you want to show the Court that you've produced
6  these documents, even though they're completely
7  irrelevant to the claims at bar.  I mean, that's a
8  balancing test that counsel goes through all the
9  time.
10     Q  You told Mr. Demo that the total value of
11  assets at SOHC and HFP from the time period of
12  March 2009 through the present was totally
13  irrelevant to our claims against the debtor?
14     MS. SMITH:  Objection to form.
15     A  I don't know that that was the
16  conversation.  The conclusion was that we weren't
17  going to look for the HFP documents.
18  BY MR. CLUBOK:
19     Q  Okay.  You introduced this concept of
20  total irrelevancy.  Did you, in words or
21  substance, discuss with Mr. Demo that asset
22  information about CDO Fund, SOHC and HFP was
23  totally irrelevant against the claims of the
24  debtor?
25     MS. SMITH:  Objection to form.

---

133

1    A  I believe the conversation was UBS -- UBS
2  has had ten years to seek whatever discovery it
3  wants and it didn't need these documents until a
4  month before summary judgment. And so the
5  discussion was that that request for documents
6  immediately before summary judgment was an attempt
7  to delay summary judgment.
8  BY MR. CLUBOK:
9    Q  Yeah, the question -- I asked the question
10 about relevancy. Regardless of whether --
11 whatever your views are, these arguments you want
12 to make about --
13   A  To be clear, these aren't my arguments,
14 sir. This is Pachulski's position they were
15 conveying to me.
16   Q  I see. So Pachulski conveyed -- did they
17 convey to you, then, that it was unnecessary to
18 obtain all of the asset information from HFP from
19 March 2009 to the present, in words or substance?
20   A  There was a conclusion that we weren't
21 going to. I don't remember if there was a
22 discussion, the use of the word necessary or not,
23 but ultimately we didn't decide to.
24   Q  So Pachulski -- Mr. Demo specifically
25 conveyed to you that they had concluded it was

134

1  unnecessary to try to trace the assets of HFP from
2  March 2009 to the present?
3    A  Again, you're introducing the word
4  necessary, which I'm not prepared to adopt. I can
5  just say the conclusion from Mr. Demo was that we
6  weren't going to do that at that time.
7    Q  Okay. Mr. Demo conveyed to you that the
8  debtor had concluded it was not going to try to
9  identify the assets of HFP from March 2009 to the
10 present to provide to UBS, correct?
11   A  Can you repeat that question? It had a
12 lot in it.
13   Q  Did Mr. Demo convey to you that the debtor
14 had concluded it was not going to try to identify
15 the assets of HFP from March 2009 to the present
16 in order to provide that information to UBS?
17   A  I think that's probably a fair
18 characterization.
19   Q  Okay. Well, we may come back to HFP. But
20 with respect to SOHC and CDO Fund, did Mr. Demo
21 convey, in words or substance, that it was
22 necessary to as best as possible identify the
23 assets of SOHC and CDO Fund from March 2009 to the
24 present for purposes of providing that information
25 to UBS?

135

1    A  Ultimately that was not the task that he
2  concluded I should undertake.
3    Q  That's not my -- we'll get to the task
4  that he gave you. But did he convey, in words or
5  substance, that the debtor was going to use its
6  best efforts to identify the assets of SOHC and
7  CDO Fund from March 2009 to the present for
8  purposes of providing that information to UBS?
9      MS. SMITH: Objection to form.
10   A  At some point in the process, that may
11 have been his statement, but that wasn't the
12 conclusion after we had gone through numerous
13 discussions.
14 BY MR. CLUBOK:
15   Q  What was the conclusion?
16   A  The conclusion was that my task was to
17 locate the assets that were in the production to
18 UBS as of May 2009 and identify what had happened
19 to those assets.
20   Q  And did you have -- setting aside the
21 e-mails that you were specifically told others
22 would be reviewing, did you have any other
23 information about assets of SOHC or CDO Fund from
24 March 2009 to the present that you did not share
25 with Mr. Demo?

136

1    A  From March 2009 through the present, yes,
2  I did have some other information I did not share
3  with him.
4    Q  And that was material information about
5  the value of assets of those two funds between
6  March 2009 through the present, correct?
7      MS. SMITH: Objection to form.
8    A  Material information about the value of
9  assets? I don't really think that's right, no.
10 BY MR. CLUBOK:
11   Q  Well, you said you had other -- well,
12 material should be assumed. If you had
13 information that an asset was named Highland CDO
14 Opportunity Fund, LLP versus LP, I'm not talking
15 about that. I'm talking about material
16 information. So let me ask the question again.
17     I said -- you said from March 2009 to the
18 present, you had some other information about the
19 assets of SOHC or CDO Fund that you did not share
20 with Mr. Demo, correct?
21   A  Yes.
22   Q  And when you say some information, do you
23 mean material information about those assets?
24   A  Material information over that entire time
25 period, probably, yes.

137

1   Q   But was --
2   A   Hold on. Apologies, sir, let me finish
3   the answer. Material information about that
4   entire time period, yes. Material information
5   about the task I was assigned, no.
6   Q   Understood. And what was the material
7   information you had about the assets of SOHC and
8   CDO Fund from the period March 2009 through the
9   present that you chose not to share with
10  Pachulski?
11      MS. SMITH: Objection to form.
12  A   So I'm going to put the word material to
13  the side, sir. So if you want to just re-ask the
14  question, because that's a judgment call and I'll
15  let the Court make that decision.
16  BY MR. CLUBOK:
17  Q   You're a lawyer.
18  A   I am.
19  Q   So I'm using -- with your lawyer hat on,
20  did you believe you had any material information
21  about the assets of SOHC and CDO Fund from the
22  period March 2009 through the present that you
23  chose not to share with Pachulski?
24      MS. SMITH: Objection to form.
25  A   I'm not going to perform -- sir, I'm not

138

1   prepared to perform legal analysis on the fly, but
2   if you'd like to ask me for objective facts, I'm
3   happy to provide those to you.
4   BY MR. CLUBOK:
5   Q   We'll come back to that. But what was the
6   information you had about the assets of SOHC and
7   CDO Fund from March 2009 to the present that you
8   chose not to provide to the Pachulski firm?
9       MS. SMITH: Objection to form.
10  A   I knew that there had been a transaction
11  in 2017 sometime with respect to an
12  after-the-event insurance policy with Sentinel.
13  BY MR. CLUBOK:
14  Q   Anything else?
15  A   Is there anything else? There may have
16  been other things, but I just didn't look into
17  them really.
18  Q   And you made a conscious decision not to
19  share anything about the transaction in 2017
20  involving Sentinel insurance with the Pachulski
21  firm, correct?
22      MS. SMITH: Objection to form.
23  A   It wasn't relevant to the task I was
24  undertaking.
25

139

1   BY MR. CLUBOK:
2   Q   Did you make a conscious decision not to
3   share that information with the Pachulski firm?
4       MS. SMITH: Objection to form.
5   A   I made a conscious decision that it wasn't
6   relevant to the task I was undertaking.
7   BY MR. CLUBOK:
8   Q   Did you ever share that information with
9   Mr. Seery?
10  A   No, but we rarely spoke.
11  Q   Did you share that information or cause it
12  to be shared with any of the directors?
13  A   I almost never spoke to the other two
14  directors, or even directly ever communicated with
15  them hardly ever.
16  Q   Did you communicate through any means,
17  e-mail, smoke signals, text messages, whatever,
18  the information about the 2017 transaction
19  involving CDO Fund and SOHC assets to any
20  independent director or lawyer of the debtor?
21  A   No. It wasn't relevant to the task I was
22  working on.
23  Q   Did you discuss that transaction with
24  anybody else at any point during the pendency of
25  the bankruptcy?

140

1       MS. SMITH: Objection to form.
2   A   Yes.
3   BY MR. CLUBOK:
4   Q   Who did you discuss it with?
5   A   Beecher Carlson.
6   Q   Who is Beecher Carlson?
7   A   They're the underwriter for Sentinel on
8   the insurance policy.
9   Q   And there's an insurance policy?
10  A   Yes.
11  Q   And who is that insurance -- who is the
12  insured on that insurance policy?
13  A   Certain of the defendants in the UBS case.
14  Q   Including CDO Fund and SOHC?
15  A   I believe that's probably right, but I'd
16  have to have my recollection refreshed.
17  Q   And you understood that insurance policy
18  is an asset of the CDO Fund and SOHC, correct?
19  A   No.
20  Q   What do you think it is?
21  A   I don't know how to -- it's however
22  accountants would classify it, but, no, I don't
23  believe it's an asset. The accountants didn't
24  classify it as an asset was my understanding. I
25  don't think insurance policies show up on balance

141

1  sheets.
2  Q  There were assets exchanged for that
3  insurance policy in 2017, correct?
4  A  That's my understanding, yes.
5  Q  What was the rough value of those assets
6  that were exchanged?
7  A  I don't know.
8  Q  You have no idea?
9  A  No.
10  Q  Did you ever know?
11  A  No, I don't believe I did.
12  Q  You never had any idea about the rough
13  total value of the assets exchanged in 2017 for
14  the insurance policy that you've called the ATE
15  policy from Sentinel?
16     MS. SMITH: Objection to form.
17  A  No, I wasn't really involved in that.
18  BY MR. CLUBOK:
19  Q  You weren't involved in what?
20  A  The drafting of the policy or the process
21  of getting it implemented.
22  Q  You weren't involved at all in the
23  drafting of the policy?
24  A  No.
25  Q  You weren't involved at all in the process

142

1  of getting the insurance policy implemented; is
2  that correct?
3  A  I had one role and it was a limited one.
4  Q  What was that?
5  A  It was to share information with Beecher
6  Carlson as the underwriter about the underlying
7  litigation.
8  Q  And that was the only role you ever had
9  that in any way was connected to the insurance
10  policy issued by Sentinel?
11  A  That's the only one I can ever recall,
12  yes.
13  Q  And what information did you share with
14  Beecher Carlson as the underwriter, about the
15  underlying litigation?
16  A  Pleadings --
17  Q  Anything else?
18  A  -- for the most part.  The appellate
19  rulings of the New York appellate division.
20  Q  Anything else?
21  A  When the February 2020 judgment came down,
22  I believe I shared that with them.
23  Q  So as soon as the judgment came down
24  regarding -- strike that.
25     As soon as the roughly billion dollar

143

1  judgment came down, you shared that with Beecher
2  Carlson?
3     MS. SMITH: Objection to form.
4  A  I shared it with them.  I don't remember
5  if it was immediately because you have to remember
6  at this time I was in recovery at home.  So I
7  think I provided it to them kind of as quickly as
8  possible, given my limitations at the time.
9  BY MR. CLUBOK:
10  Q  Why did you provide it to Beecher Carlson
11  as quickly as possible?
12  A  Because it's a -- the judgment against the
13  insureds would be a fact that you should inform
14  the underwriter.
15  Q  When you say Beecher Carlson is the
16  underwriter, what do you mean?  They underwrote
17  the policy?
18  A  No, sorry, that's the wrong term.  Oh,
19  man.  I forget their exact role.  They're -- maybe
20  they're more like an auditor.
21  Q  For Sentinel?
22     MS. SMITH: Objection to form.
23  A  Well, that's the thing.  For the policy.
24  My understanding is that you had to have kind of
25  an external third party looking at the policy, but

144

1  I don't remember exactly.  There's the right word
2  for what their role was and I apologize.  It's
3  just slipping my mind right now.
4  BY MR. CLUBOK:
5  Q  Okay.  And other than providing
6  information -- and by the way, is the first time
7  you provided information to Beecher Carlson after
8  the policy was put into place?
9  A  No.
10  Q  So you started providing information to
11  Beecher Carlson prior to the execution of the
12  policy?
13  A  My recollection is that I had one
14  conversation with Beecher Carlson in advance of
15  the execution of the policy.
16  Q  Who at Beecher Carlson?
17  A  I don't know.
18  Q  And what was the substance of that one
19  conversation?
20  A  To essentially give the entire background
21  of the litigation.
22  Q  At that point did you give your opinion
23  that liability was likely to be established
24  against CDO Fund and SOHC, in words or substance?
25  A  I -- it was one conversation about

145

1  45 minutes four years ago. I really don't
2  remember what we said.
3      Q  Do you recall ever providing, in advance
4  of the policy, your opinion that liability was
5  likely to be established?
6      MS. SMITH: Objection to form.
7      A  I don't recall.
8  BY MR. CLUBOK:
9      Q  Do you recall ever telling Beecher Carlson
10  before or after the policy but prior to the
11  judgment, that you had formed an opinion that
12  liability was likely to be established against
13  CDO Fund and SOHC with respect to the breach of
14  contract claims?
15      A  I don't recall. Largely it was providing
16  Beecher Carlson with information and letting them
17  make their determination.
18      Q  Did you ever provide them with that
19  information, the view you had with respect to
20  liability?
21      A  I don't recall if I did. Mostly I
22  provided them objective data, like pleadings,
23  orders of the Court, those sorts of materials.
24      Q  Are you saying you have no idea if you
25  provided this information or are you saying you

146

1  don't recall doing it and therefore you probably
2  didn't do it?
3      A  Well, I'm saying neither. What I'm saying
4  is I don't remember one way or another.
5      Q  Okay. And other than providing
6  information to Beecher Carlson, did you have any
7  other role in any way with the insurance policy
8  issued by Sentinel with respect to the UBS
9  litigation?
10      A  No, not that I recall.
11      Q  Did you have any role at all in the
12  process by which it was decided to pursue
13  obtaining this policy?
14      MS. SMITH: Objection to form.
15      A  I don't believe that I was involved in
16  that process really.
17  BY MR. CLUBOK:
18      Q  Who made the decision -- by the way, you
19  called it an after-the-event policy?
20      A  Yeah. Sorry. I need to sneeze, but I'll
21  try to push through it.
22      Q  Okay. You let us know if you need a
23  break. As I've said many times, please tell us if
24  you need a break.
25      A  Just a sneeze on this one.

147

1      Q  You called it an after-the-event policy.
2  Was it also sometimes shorthanded by ATE policy?
3      A  Yes, that's what after the event stands
4  for. It's a fairly standard industry product
5  that's very common, particularly in the UK and
6  other common law jurisdictions. So it's a fairly
7  matured industry.
8      Q  Okay. And did you have any role -- or
9  sorry, who made the decision to obtain an ATE
10  policy with respect to the UBS litigation in
11  New York?
12      A  My understanding is that Mr. Dondero made
13  that decision.
14      Q  What's that understanding based on?
15      A  I believe that was communicated to me by
16  Mr. Ellington.
17      Q  When?
18      A  Back around the time, probably right after
19  the policy was implemented.
20      Q  Okay. So after it was implemented was the
21  first time you heard that Mr. Dondero had made the
22  decision to implement the ATE policy?
23      MS. SMITH: Objection to form.
24      MR. CLUBOK: Sorry, what's the form
25  objection?

148

1      MS. SMITH: I'm sorry, I just
2  misunderstood the question.
3      MR. CLUBOK: Okay. I'll rephrase it.
4  Sorry.
5  BY MR. CLUBOK:
6      Q  Are you saying that after the ATE
7  insurance policy went into effect was the first
8  time you heard that Mr. Dondero had made the
9  decision to enter into that ATE policy?
10      A  I'm trying to recall, but I think that's
11  right.
12      Q  And do you know -- did anyone ever ask
13  your opinion as to whether or not it was a good
14  idea to do this?
15      A  I certainly don't recall -- let me
16  rephrase. I don't recall that ever happening. I
17  don't believe it did happen.
18      Q  Were you ever in any way involved with
19  weighing the pros and cons of entering into the
20  ATE policy prior to it being entered into?
21      A  In or around -- you know, for the policy
22  that got implemented, no.
23      Q  For any ATE policy?
24      A  I think there had been contemplation of an
25  ATE policy earlier in that year as a settlement

---

149

1  mechanism, but that's the only other thing I can
2  remember.
3     Q   Were you involved in that?
4     A   I believe it was part of a settlement
5  analysis that I contributed to.  Or that I was
6  involved in.
7     Q   And so as part of that settlement
8  analysis, you assessed the pros and cons of
9  entering into an ATE policy?
10    A   I don't remember if I did or not.  I
11  remember that term showed up during that time in
12  those considerations.
13    Q   But you're not linking that work you did
14  to the actual entering into the ATE policy?
15    A   No, they're two completely separate
16  processes.
17    Q   Why?
18    A   Well, one was essentially a mechanism for
19  funding a settlement which, you know, basically
20  in -- like essentially like you have a settlement
21  agreement already done and signed and this is how
22  you're going to fund it.
23    Q   Okay.
24    A   That's not what the August 2017
25  transaction was.

---

150

1     Q   What was the August 2017 transaction?
2     A   I'm not going to -- I don't know that I
3  have a good characterization for it.  I wasn't
4  really involved in it, but it wasn't that.
5     Q   What was it, as far as you know?
6     A   It was a purchase of an after-the-event
7  insurance policy.
8     Q   To do what?
9     A   I don't know what the purpose was.  I
10  wasn't really involved.
11    Q   You have no idea what the purpose of the
12  after-the-event insurance policy was?
13    A   I don't know.
14    Q   Did you ever see it?
15    A   I remember seeing one page of it one time.
16    Q   When was that?
17    A   We were doing one of our annual update
18  calls with Beecher Carlson and I think I asked
19  on -- can we -- can someone confirm for me who the
20  insureds are so I can make sure to link the
21  developments for the defendants who are the insureds
22  that are named, and so I saw one page of the
23  insurance policy at that point that listed who the
24  insureds were.
25    Q   Did you ever disclose the existence of

---

151

1  this policy to any of the independent directors?
2     A   I never discussed it with them one way or
3  another.
4     Q   Did you ever disclose the existence of
5  this policy to any lawyer representing the debtor?
6     A   I never discussed it with them one way or
7  another.
8     Q   Did you discuss this policy with any other
9  human being other than Beecher Carlson since the
10  time that bankruptcy started?
11        MS. SMITH:  Objection to form.
12    A   Yes.
13  BY MR. CLUBOK:
14    Q   Who?
15    A   Matt DiOrio.
16    Q   When?
17    A   He was the one who usually would set up
18  the calls with Beecher Carlson.
19    Q   And anyone else at all?  Any other human
20  being that you discussed this policy with since
21  the bankruptcy?
22    A   I had discussed it at one point with
23  Mr. Ellington.
24    Q   When?
25    A   July sometime maybe.

---

152

1     Q   Of what year?
2     A   2020.  My apologies.
3     Q   Anyone else at all?
4     A   Not that I recall.
5     Q   Okay.
6        MR. CLUBOK:  Let's take a break.
7        THE VIDEOGRAPHER:  We are off the record
8  at 1:04 p.m.
9        (Recess taken from 1:04 p.m. CDT to
10  2:12 p.m. CDT)
11        THE VIDEOGRAPHER:  The time is 2:12 p.m.
12  We are back on the record.
13  BY MR. CLUBOK:
14    Q   Mr. Ellington [sic] --
15    A   No.
16    Q   Sorry.  Mr. -- strike that.
17        Mr. Leventon, you said you discussed the
18  ATE policy with Mr. Ellington in approximately
19  July 2020, correct?
20    A   I believe that was my testimony, yes.
21    Q   What was the reason for that conversation?
22    A   We were discussing the discovery task that
23  I had been placed on by -- or maybe it was August
24  then.  The discovery task that I had been placed
25  on by Pachulski and I was checking with

153

1  Mr. Ellington because he had been talking to
2  Mr. Seery a lot and I wanted to see if there was
3  anything I should be aware of.
4      Q  And did you discuss with Mr. Ellington
5  whether or not you should disclose the ATE policy
6  as part of the task you were assigned?
7      A  We discussed whether it was relevant to
8  the task that I had been assigned and
9  Mr. Ellington stated that he didn't believe that
10 it was relevant to the task I was working on.
11     Q  You asked Mr. Ellington whether or not --
12 in words or substance, you asked Mr. Ellington
13 whether you should disclose the policy to
14 Mr. Seery and the debtor's counsel?
15     MS. SMITH:  Objection, form.
16 BY MR. CLUBOK:
17     Q  Correct?
18     A  That's not my testimony, no.
19     Q  Isn't it true that, in words or substance,
20 you asked Mr. Ellington whether you should
21 disclose the policy to Mr. Seery and the debtor's
22 counsel?
23     MS. SMITH:  Objection, form.
24     A  That's not what our conversation was, no.
25

154

1  BY MR. CLUBOK:
2      Q  Did you, in words or substance, ever ask
3  Mr. Ellington whether you should disclose the
4  policy?
5      A  To whom?
6      Q  To the debtor or their counsel.
7      A  So the conversation was, is the policy
8  relevant to the task I'm working on, and the
9  answer, Mr. Ellington said he didn't believe that
10 it was and therefore didn't need to be included as
11 materials in part of that task.  And then I asked,
12 you know, you've been in conversations with
13 Mr. Seery, I don't talk to Mr. Seery hardly ever,
14 so is there any other thing that -- any other --
15 anything else that I should know or any other
16 reason, you know, outside of my task that I should
17 include it in the materials and Scott said no.
18     Q  Who initiated this conversation?
19     A  I don't recall.  I take it back.  I
20 probably initiated it, I think.
21     Q  Why?
22     A  Because I wanted to understand if there
23 had been kind of -- if there were separate
24 contexts and conversations with Mr. Seery that I
25 had not been privy to that would make the ATE

155

1  policy relevant to the task I was working on.  But
2  I just hadn't been privy to those conversations so
3  I was checking.
4      Q  Did you offer your view to Mr. Ellington
5  as to whether or not you should disclose the ATE
6  policy to Mr. Seery and debtor's counsel?
7      A  I don't remember if I offered an opinion
8  to Mr. Ellington.  I think it was more focused on
9  here's the task that I'm working on, is this
10 relevant to that task.
11     Q  And he just said no, without any
12 explanation or did he give you an explanation for
13 his thinking?
14     A  I don't remember -- I don't remember what
15 he said in that conversation.  I remember the
16 conclusion, but I also had asked -- another part
17 of the conversation was, you've been talking to
18 Seery, I haven't, so do -- you know, is this
19 something I need to introduce or something that I
20 need to interject into the task I'm working on.
21     Q  Why did you think it might be something
22 that would appropriately be interjected into the
23 task?
24     A  Well, that wasn't my testimony.  My
25 testimony is it was a thing to consider.

156

1      Q  Did you think that it might be something
2  that would be appropriate to, as you say,
3  interject into the task?
4      A  It would depend on the context.  From the
5  face of the task, probably not; but if there was
6  further context based on Mr. Ellington's
7  conversations with Mr. Seery that I didn't have,
8  then I wanted to find out if that context existed.
9      Q  You knew that it was an urgent request
10 from UBS to identify the total assets and history
11 of the assets in CDO Fund/SOHC, correct?
12     MS. SMITH:  Objection, assumes facts not
13 in evidence.
14     A  I don't know what you mean by urgent, sir.
15 BY MR. CLUBOK:
16     Q  You were specifically advised that there
17 was an urgent request, or words to that effect,
18 from UBS for the debtor to identify the total
19 assets and history of the assets in CDO Fund and
20 SOHC; isn't that true?
21     MS. SMITH:  Objection, form.
22     A  I don't recall if the word urgent was
23 used.
24 BY MR. CLUBOK:
25     Q  Whether the exact word urgent or high

157

1  priority or very important, was there any --
2  anything like that that conveyed to you the
3  importance of this task?
4     A  I believe it was conveyed to me that UBS
5  thought the task was very important, but I don't
6  know that that's necessarily what Pachulski's
7  position was.
8     Q  Was it ever conveyed to you that it was a
9  high priority task for you to assist in
10 identifying all the assets and the history of the
11 assets for SOHC and CDO Fund?
12    A  No.
13    MS. SMITH:  Objection, form.
14    A  Not that I recall.  And it's certainly not
15 the task ultimately that I was given.
16 BY MR. CLUBOK:
17    Q  Was it ever conveyed to you that the
18 debtor had a high priority task for itself to
19 identify the assets and history of the assets for
20 SOHC and CDO Fund?
21    A  Not that I recall and that's certainly not
22 at the end of kind of the iterative discussion
23 process with Mr. Demo what I was tasked with
24 doing.
25    Q  You said -- earlier, I was asking you

158

1  about the ATE policy that was ultimately entered
2  into.  Remember that discussion?
3     A  Yes.
4     Q  I think you said that you only saw one
5  page of it one time; is that right?
6     A  That's right.
7     Q  Who showed you that one page?
8     A  JP Sevilla.
9     Q  And how?
10    A  On his computer screen.
11    Q  Oh, he let you look at one page on his
12 computer screen and other than that, you never saw
13 the ATE policy as it was -- after it was actually
14 executed?
15    MS. SMITH:  Objection to form.
16    A  I don't know that --
17 BY MR. CLUBOK:
18    Q  Strike that.  Let me ask the question
19 again.
20    Mr. Sevilla showed you one page from the
21 ATE policy on his computer screen, correct?
22    A  Yes.
23    Q  And other than that one page that
24 Mr. Sevilla showed you, you never saw the executed
25 ATE policy, correct?

159

1     A  That's correct.
2     Q  Did you ever -- did you see a draft of the
3  ATE policy before it was executed?
4     A  No, not that I recall.  I don't -- no, I
5  don't believe I ever saw a draft.
6     Q  Did you see an unsigned version of the ATE
7  policy?
8     A  I don't believe I ever saw an unsigned
9  copy of the ATE policy.
10    Q  Okay.  So I'm trying to -- I'm going to
11 try to ask this as broadly as possible, and if you
12 don't understand the question, I'll repeat it.
13 But are you basically -- are you saying that other
14 than this one page that Mr. Sevilla showed you on
15 his computer screen, you never saw any part of the
16 ATE policy, whether it was executed or unexecuted,
17 correct?
18    A  To the best of my recollection, that's
19 correct.
20    Q  Did you ever try to see a copy of the ATE
21 policy in connection with your work at Highland?
22    A  I never asked to see a copy of the ATE
23 policy that I recall.
24    Q  When -- roughly when did Mr. Sevilla show
25 you this one page from the ATE policy?

160

1     A  We were going into an update call with
2  Beecher Carlson and I looked at it for about
3  30 seconds and then continued on to the call.  It
4  would have been sometime in 2018 or '19 probably.
5     Q  Did it seem curious to you that you were
6  only allowed to see one page from the ATE policy?
7     MS. SMITH:  Objection to form.
8     A  I disagree with the premise of the
9  question, sir.
10 BY MR. CLUBOK:
11    Q  Okay.
12    MR. CLUBOK:  Let's go off the record.
13    THE VIDEOGRAPHER:  We are off the record
14 at 2:21 p.m.
15    (Recess taken from 2:21 p.m. CDT to
16 2:22 p.m. CDT)
17    THE VIDEOGRAPHER:  2:22 p.m., back on the
18 record.
19 BY MR. CLUBOK:
20    Q  Did it seem unusual to you that
21 Mr. Sevilla just showed you a page on his computer
22 screen as opposed to sending you the policy so you
23 could see it yourself?
24    MS. SMITH:  Objection to form.
25    A  Under the circumstances, it wasn't unusual

161

1  in the slightest.
2  **BY MR. CLUBOK:**
3      Q   What were the circumstances?
4      A   We were about to have a call with Beecher
5  Carlson.  I was going to give an update on the
6  litigation.  I wanted to see the actual on the
7  page who the insureds were so I could match it up
8  with who the defendants were.
9      Q   I see.
10     A   I saw a single page that had the listed
11  insureds, I looked at that page for anywhere from
12  15 to 20 seconds while I was on my way walking to
13  a conference room to have the call.
14     Q   Did you see who the -- did you know who
15  the insurer was for the policy?
16     A   I knew it was Sentinel, but the exact name
17  of the Sentinel entity, I don't.
18     Q   How did you come to know that Sentinel was
19  the insurer for the policy?
20         MS. SMITH:  Objection to form.
21     A   I don't remember.
22         MR. CLUBOK:  Sorry, what was the form
23  objection there?
24         MS. SMITH:  Well, there's more than one
25  Sentinel entity and you said, how did you come to

162

1  know that Sentinel was the insurer.
2          MR. CLUBOK:  Okay.  Thank you.
3  BY MR. CLUBOK:
4      Q   I'll use the term Sentinel with the
5  understanding that it is -- there's many different
6  related entities that are called Sentinel perhaps
7  and we'll just talk generally like we sometimes
8  talk Highland generally about Sentinel; is that
9  okay?
10     A   I don't actually know what any of the --
11  what the Sentinel entities are.  I just kind of
12  know generally the name Sentinel.
13     Q   Yeah.  Colloquially you call the insurer
14  Sentinel, whether it's Sentinel something
15  something sub or Sentinel something something?
16     A   Yeah, I know there were at least a couple
17  of entities, but --
18     Q   Okay.
19     A   -- where the roles were, I just don't
20  know.
21     Q   Okay.  I'm not asking you to comment on
22  that by saying what Sentinel -- your understanding
23  of Sentinel did or didn't do.  Okay?
24     A   Okay.
25     Q   Okay.  So with that understanding, how did

163

1  you learn that Sentinel was the insurer for the
2  ATE policy?
3      A   I don't recall how I learned, but it would
4  have been sometime around the time of the
5  transaction in August 2017.
6      Q   That's -- okay.  But it was contemplated
7  for at least a couple months prior to that that
8  Sentinel would be the insurer for an ATE policy,
9  correct?
10         MS. SMITH:  Objection, assumes facts not
11  in evidence.
12     A   I don't know that that's right.  I don't
13  recall that.
14  **BY MR. CLUBOK:**
15     Q   You specifically at one point contemplated
16  that Sentinel would be the insurer for the ATE
17  policy; isn't that true?
18         MS. SMITH:  Objection, form.
19     A   I disagree with one of the premises of
20  your question.  I'm happy to explain.
21  **BY MR. CLUBOK:**
22     Q   Yeah.
23     A   So if you're talking about what was
24  contemplated in April of 2017, that was a
25  completely different transaction than what was

164

1  done in August of 2017.  And so whatever role
2  Sentinel was going to play in April was a
3  different transaction than what happened in
4  August.
5      Q   We'll talk about the differences
6  between -- the supposed differences between the
7  transactions.  But certainly in April, you
8  contemplated that Sentinel would write an ATE
9  policy for the benefit of the Highland affiliates
10  that were involved in the New York litigation,
11  correct?
12         MS. SMITH:  Objection to form.
13     A   I don't recall exactly what the proposal
14  was.
15  **BY MR. CLUBOK:**
16     Q   Isn't it true that at some point you
17  contemplated Sentinel would write an ATE policy
18  for the benefit of the Highland affiliates?
19         MS. SMITH:  Objection, form.
20     A   I don't remember what the proposal was.
21  **BY MR. CLUBOK:**
22     Q   Do you -- and you don't remember ever
23  contemplating that Sentinel would write an ATE
24  policy; is that your testimony under oath?
25     A   That's not what I said, sir.

165

1    Q   Okay. Well, then, answer my question as
2   opposed to a question you want to answer. Isn't
3   it true that at some point you contemplated
4   Sentinel would write an ATE policy for the benefit
5   of the Highland affiliates involved in the
6   New York UBS litigation?
7    A   I can -- I knew that Sentinel -- it was
8   contemplated that Sentinel would write an ATE
9   policy related to the UBS litigation, but who the
10  insureds were going to be and for whose benefit
11  that was going to be, I don't remember that
12  proposition at all.
13   Q   And why do you claim the transaction that
14  was being contemplated in April of 2017 was
15  entirely different than the transaction that was
16  consummated in August of 2017?
17   A   Because in April of 2017, what was
18  discussed then, and frankly didn't get very far,
19  was the idea of essentially getting into a
20  settlement agreement or getting to a number with
21  UBS for settlement and having an ATE policy serve
22  as kind of the funding mechanism for that
23  settlement. Two thousand -- August 2017 was --
24  there was no settlement with UBS in service of
25  which the ATE policy would serve as a funding

166

1   mechanism. So that's why they're two different
2   transactions.
3    Q   Did the August -- so the actual ATE policy
4   that was entered into, did it provide for the
5   funding of a future settlement with UBS?
6    A   I don't know what the policy said. I've
7   never seen it.
8    Q   You've never seen the ATE policy that was
9   actually executed?
10   A   No, sir, other than that one page.
11   Q   That was a bit of a double negative, so
12  I'm going to ask it again. It's my fault because
13  I asked a negative and then you said no, sir.
14   A   Fair enough.
15   Q   You're saying it's true that you never
16  saw -- strike that.
17      It's true that you have to this day never
18  seen the entire ATE policy that was actually
19  executed, correct?
20   A   It is true that to this day the only time
21  I've ever seen any part of the ATE policy was the
22  one page that I saw on Mr. Sevilla's screen for
23  about 15 to 20 seconds back in 2018 or '19.
24   Q   All right. And you're sure about that?
25   A   Yes, I am, sir.

167

1    Q   Okay. Did you ever talk about the ATE
2   policy other -- about the -- strike that.
3       Did you ever talk about what the ATE
4   policy does for the insureds even if you didn't
5   see it?
6    A   I don't recall those conversations. I'm
7   not sure that I did.
8    Q   So you don't know the terms, fair to say,
9   of the ATE policy other than the name of the
10  insureds, correct?
11   A   Correct. And even today I don't remember
12  what those names were. I just saw them on the
13  screen that one time.
14   Q   So when you said with such certainty a
15  little bit ago under oath that the actual ATE
16  policy is entirely different than what you were
17  contemplating in April of 2017, that's not based
18  on actually knowing what the ATE policy actually
19  does?
20      MS. SMITH: Objection to form.
21  BY MR. CLUBOK:
22   Q   Fair to say?
23   A   I disagree with a premise of your
24  question. I'm happy to explain why.
25   Q   Please. Thank you.

168

1    A   The April proposed transaction, my
2   understanding of it -- or recollection to the
3   extent that I do, was that that was supposed to be
4   essentially part of a single process in which we'd
5   already gotten to a number with UBS and we'd
6   agreed on a settlement and were negotiating a
7   settlement agreement.
8       In August of 2017, there was no such
9   settlement agreement with UBS. And so kind of by
10  definition, they can't be the same thing.
11  Regardless of the terms of the ultimate policy in
12  August of 2017, it was a different transaction.
13   Q   But you don't know if the things that were
14  contemplated by the policy -- strike that.
15      As you sit here today, you don't know if
16  the -- well, strike that.
17      In April of 2017, you identified pros and
18  cons of entering into what was then a contemplated
19  ATE transaction, correct?
20   A   I don't recall if I did or not, sir.
21   Q   You certainly reviewed the pros and cons
22  of entering into a contemplated ATE transaction in
23  approximately April 2017, correct?
24      MS. SMITH: Objection, assumes facts not
25  in evidence.

169

1    A  Can you restate the question, sir?
2  BY MR. CLUBOK:
3    Q  You reviewed an identification of the
4  potential benefits of entering into the
5  contemplated ATE transaction in approximately
6  April 2017, correct?
7      MS. SMITH:  Objection to form.
8    A  I remember it was a concept around that
9  time, but -- that there would be an ATE policy to
10  fund a potential settlement, but I really don't
11  remember much more than that.
12  BY MR. CLUBOK:
13    Q  Well, you remember that somebody had laid
14  out the potential benefits of doing that, correct?
15    A  Actually, I don't.
16    Q  Did you have any role in identifying the
17  potential benefits of entering into an ATE
18  transaction at any point?
19    A  Not that I recall, but if you would like
20  to show me a document, I'm happy to have my
21  recollection refreshed.
22    Q  Okay.  Let's hand you what's been marked
23  as Exhibit 47.  Exhibit 47 is an e-mail from you,
24  Isaac Leventon, to JP Sevilla with a subject UBS
25  Settlement Structure (9.pptx), and it's dated

170

1  April 19th, 2017.  And it attaches a document
2  called UBS_Settlement_Structure_9.pptx.
3      Do you see that?
4    A  Yes.
5    Q  And page 1 of Exhibit 47 is the cover
6  e-mail that has no substance in it, other than
7  what I just described, and the remaining pages are
8  the attachments.  Do you see that?
9    A  I do, yes.
10    Q  Now, the first page of the attachment says
11  Settlement Analysis, UBS versus, and has the
12  Highland logo, correct?
13    A  It does.
14    Q  And then the first page talks about what
15  happens:  If Highland does not settle.  And then
16  the second page says:  Taxes:  If Highland Wins...
17  it Loses.  Third page says:  If Highland does not
18  settle:  UBS Appeals.  Et cetera, et cetera.
19      Do you see that?
20    A  I'm reviewing the document.
21      (Witness reviews document.)
22      MS. SMITH:  While he's looking at this,
23  Andy, is this a complete copy of the exhibit?
24  Because it -- there's an odd Appendix 1 on the
25  last page.

171

1      MR. CLUBOK:  Yes, this is the complete
2  copy of this attachment.  Appendix 1 was sent in a
3  separate e-mail, which we'll get to.
4      MS. SMITH:  Okay.
5      MR. CLUBOK:  When they sent this
6  PowerPoint, they just had a placeholder for
7  Appendix 1, apparently, at least as far as we can
8  tell.
9    A  I've reviewed the document, sir.
10  BY MR. CLUBOK:
11    Q  Okay.  Did you draft this document?
12    A  I don't know if I did or not.
13    Q  Do you recognize it?
14    A  I know I've seen it before.  I have no
15  reason to dispute that I didn't receive it -- or
16  send it, I should say.
17    Q  You didn't just receive it --
18    A  I said or send it, I should say.
19    Q  Okay.  And you played some role in
20  drafting this document at least, correct?
21    A  I don't remember if I did or not, sir.
22  But the metadata will answer that question kind of
23  easily.
24    Q  Isn't it true that you drafted this
25  document together with Stephanie Vitiello?

172

1      MS. SMITH:  Objection, assumes facts not
2  in evidence.
3    A  If that's what the metadata says, I don't
4  dispute it, but I don't know or recall, I should
5  say.
6  BY MR. CLUBOK:
7    Q  Who -- do you recall being asked to draft
8  a presentation like this?
9    A  I don't remember, sir.
10    Q  You're looking at this document now and it
11  doesn't ring any bell as to the origin of this
12  document?
13      MS. SMITH:  Objection, form.
14    A  Like I said, I don't remember if I drafted
15  this document or not, but the metadata will answer
16  the question affirmatively.
17  BY MR. CLUBOK:
18    Q  We would need the metadata to answer that
19  question given your lack of recollection, correct?
20    A  You would need the debtor to provide you
21  with that metadata.
22    Q  What did you do with this presentation
23  other than send it to Mr. Sevilla?
24    A  I don't recall.  But again, if I sent it
25  to someone else, it would be in the debtor's

173

1  documents.
2  Q  The second page of the attachment gives a
3  bottom line that there's no upside to going to
4  trial in either the UBS or the Citi matter,
5  correct?
6  A  Correct.
7  Q  Did you -- did Highland go to trial in the
8  Citi matter?
9  A  No.
10  Q  What happened in that matter?
11  A  It settled.
12  Q  For how much?
13  A  It was more than 500,000, but I think less
14  than a million.
15  Q  Okay.  And when?
16  A  Oh, wow.  2018 or '19 sometime.
17  Q  Okay.  So sometime after this presentation
18  was sent in April of 2017, correct?
19  A  Correct.
20  Q  And is that Citi matter totally settled,
21  done?
22  A  Yes.
23  Q  And it was settled for something less than
24  a million dollars?
25  A  That's my recollection.

174

1  Q  Okay.  So the -- and the UBS case
2  meanwhile at this time was -- you knew that the
3  potential liability was over a billion dollars,
4  right?
5  A  I knew that UBS was alleging over a
6  billion dollars in damages against the
7  counterparty funds and it also alleged some quasi
8  contractual claims for that liability against HCM
9  itself.
10  Q  In fact, you knew that HCM faced potential
11  liability to backstop HFP and CDO Fund for up to
12  $1.2 billion; isn't that true?
13     MS. SMITH:  Objection to form.
14  A  I knew that was UBS's argument.  I didn't
15  necessarily agree with it.
16  BY MR. CLUBOK:
17  Q  Right.  But you certainly were aware that
18  Highland was facing a clawback of $9 million and
19  liability to backstop HFP and CDO Fund for up to
20  $1.2 billion, correct?
21     MS. SMITH:  Objection to form.
22  A  I was aware of that that was a possible worst
23  case scenario.  I didn't necessarily agree that it
24  was probable or that UBS's arguments in support of
25  that position were valid.

175

1  BY MR. CLUBOK:
2  Q  At one point you specifically estimated
3  the liability in excess of hundreds of millions of
4  dollars -- strike that.
5     At one point you, for purposes of a
6  solvency analysis, estimated the liability at
7  being well in excess of $100 million, correct?
8     MS. SMITH:  Objection to form.
9  A  I don't recall what you're talking about,
10  but if you want to show me a document to refresh
11  my recollection, I'm happy to look at it.
12  BY MR. CLUBOK:
13  Q  Do you -- as you sit here today, are you
14  able to deny that you did that?
15  A  I can neither confirm nor deny it, sir.  I
16  just don't know what you're talking about.
17  Q  So you -- okay.  Getting back to this.
18  You believed in April of 2017, that if UBS were to
19  win, Highland would lose all of the assets in HFP
20  and CDO Fund, correct?
21     MS. SMITH:  Objection to form.  This is
22  not necessarily what he believes.
23     MR. CLUBOK:  Okay.  Ms. Smith, I have not
24  said anything about your speaking objections.
25  Things like assumes facts not in evidence, saying

176

1  that comment you made there, I tried to ignore it,
2  because it goes beyond what you're allowed to say
3  in this proceeding.  You say objection to form and
4  nothing else unless you want to -- unless you have
5  a privilege to assert.  So please do not make any
6  further speaking objections.
7  BY MR. CLUBOK:
8  Q  Mr. Leventon, isn't it true that in April
9  of 2017, you believed that if UBS wins, Highland
10  would lose all the assets in HFP/CDO Fund?
11  A  I believed that that was one of the
12  worst-case scenarios that was possible, yes.
13  Q  And you believe that the HFP assets at
14  that time in April of 2017, included an
15  approximately $32 million note payable from the
16  donor advised fund or the DAF, correct?
17  A  It does say that HFP assets include
18  32 million of DAF note payable.
19  Q  And that DAF refers to a DAF that was
20  established by Mr. Dondero?
21  A  I don't necessarily believe that's
22  correct, no.
23  Q  Who was the DAF established by?
24  A  I don't know specifically, but I believe
25  it was the debtor itself.

---

177

1    Q   Okay.  The debtor, though, was 80 percent
2   owned by Mr. Dondero, right?
3    A   I actually don't know.
4        MS. SMITH:  Objection to form.
5   BY MR. CLUBOK:
6    Q   You don't know the ownership of -- prior
7   to bankruptcy, did you know the ownership interest
8   of Mr. Dondero and HCM?
9    A   Immediately prior to bankruptcy, I think I
10  did because we had to know that type of
11  information for kind of first day schedules, but
12  prior to that, no.
13   Q   Did you know -- because it came up many
14  times in the litigation with UBS and HCM, that
15  Mr. Dondero's stake in HCM in this time frame was
16  approximately 80 percent?
17       MS. SMITH:  Objection.  I'm concerned that
18  he has confidentiality issues when you're talking
19  about things that happened in the course of
20  settlement or mediation.
21       MR. CLUBOK:  No, no.  This was in public
22  documents upon public documents upon public
23  documents, it was used in open court, it was said
24  in the trial.  This is nothing confidential at
25  all.

---

178

1   BY MR. CLUBOK:
2    Q   Isn't it true, sir, that in 2017,
3   Mr. Dondero's stake in HCM was approximately
4   80 percent?
5    A   I don't know.
6    Q   Okay.
7    A   It -- I don't know.
8    Q   You knew at the time of trial that
9   Mr. Dondero's stake was identified as being
10  approximately 80 percent; isn't that true?
11   A   The reason I'm qualifying it is because I
12  know that there were some transaction that reduced
13  his interest from whatever it was down to a much,
14  much smaller percentage.  I just don't remember
15  exactly when that transaction took place.
16   Q   Okay.  And that transaction you're
17  referring to was a transfer to trusts or something
18  that he still had the beneficial ownership in,
19  correct?
20   A   No, that's not correct.
21   Q   Mr. Dondero had the vast majority of the
22  economic interest in Highland Capital Management
23  during the time frame that you wrote this memo;
24  isn't that true?
25       MS. SMITH:  Objection, form.

---

179

1    A   Sir, my testimony is I know that there was
2   some transaction that would have reduced
3   Mr. Dondero's economic interest and the documents
4   will speak for themselves as to exactly when that
5   transaction took place.  I just -- I don't know
6   exactly when it took place.
7   BY MR. CLUBOK:
8    Q   Okay.
9    A   And I wasn't involved in that transaction
10  either.
11   Q   All right.  The DAF was considered an
12  affiliated entity to Highland Capital Management,
13  correct?
14   A   The compliance department via Mr. Surgent
15  determined that the DAF was not -- I don't
16  believe -- I think it determined it wasn't an
17  affiliate.
18   Q   You believed that if Highland didn't
19  settle, it was facing years of fraudulent transfer
20  claims throughout the Highland structure, correct?
21       MS. SMITH:  Objection, form.
22   A   I believe that that was a possible
23  worst-case scenario.
24  BY MR. CLUBOK:
25   Q   By the way, you don't use anywhere on this

---

180

1   document that you sent to Mr. Sevilla possible
2   worst-case scenario to qualify what happens if UBS
3   wins, correct?
4        MS. SMITH:  Objection to form.
5    A   No, these are -- if you read the document,
6   these are the kind of two extremes.
7   BY MR. CLUBOK:
8    Q   I understand.
9    A   If UBS wins or if Highland wins.
10   Q   Okay.  But you don't say anywhere this is
11  possible worst-case scenario or otherwise qualify
12  it in this analysis, correct?
13   A   It doesn't say that on that page.
14   Q   On the other hand, that if Highland were
15  to win, you understood that that would result in
16  over $50 million in tax liability to Mr. Dondero
17  personally, correct?
18       MS. SMITH:  Objection to form.
19   A   I don't think that's right.  That's not
20  what it says here.
21  BY MR. CLUBOK:
22   Q   If you can turn -- but it refers to
23  Slide 3.  Do you see that?
24   A   Yes.
25   Q   And do you see where it says that:  Taxes:

181

1  If Highland wins... it Loses?
2  **A  I do see that and it does say -- I was**
3  **looking at the second page of the presentation.**
4  **Looking at the third page, it does say Mr. Dondero**
5  **would have to pay approximately $50 million in**
6  **taxes.**
7  Q  Yeah.  So you understood -- and by the
8  way, all the other people who would have suffered
9  tax consequences if Highland were to win would
10  have had a litigation claim for mismanagement
11  against HCM and Dondero, correct?
12  **A  They could have asserted that claim.  It**
13  **was -- I mean, my job was to identify risk.  That**
14  **was a risk I identified.**
15  Q  And you also understood at the time, that
16  Dondero was the decision-maker for Highland
17  Financial Partners, correct?
18  **A  I believe that's right.**
19  Q  And getting back to Mr. Dondero's --
20  consequences to Mr. Dondero, if Highland were to
21  win completely at trial, that would mean that
22  Mr. Dondero personally would have a $50 million
23  tax hit, correct?
24  **A  That's what this says.**
25  Q  And that was your understanding at the

182

1  time, right?
2  **A  I would say that is what had been**
3  **represented to me by the tax department and it is**
4  **nonincumbent on a nontax person to second-guess**
5  **what the tax department says is going to happen in**
6  **a given situation.**
7  Q  Sure.  And it was -- you had also
8  discussed that with Mr. Ellington too, that there
9  would be significant tax consequences for
10  Mr. Dondero if Highland were to defeat UBS and
11  therefore HFP were to be solvent, correct?
12  **A  We had discussed the consequences to**
13  **Dondero, but also to all of the other HFP limited**
14  **partners.**
15  Q  Right.  But the specific consequences to
16  Dondero -- economic consequences dwarfed all the
17  others, correct?
18  **A  Well, this isn't --**
19  MS. SMITH:  Objection to form.
20  **A  This isn't all the limited partners in**
21  **HFP.  There were -- almost every Wall Street bank**
22  **you could think of had a significant interest in**
23  **HFP and would have been in the same situation as**
24  **the people listed on Slide 3.**
25

183

1  BY MR. CLUBOK:
2  Q  Okay.  But you -- again, my question was
3  just about Mr. Dondero, not all the other major
4  banks and Wall Street.  So getting back to my
5  question.  You had specifically discussed with
6  Mr. Ellington that there would be significant tax
7  consequences for Mr. Dondero if Highland were to
8  defeat UBS in the litigation with respect to the
9  claims against HFP, correct?
10  **A  Well, I'm disagreeing with the word**
11  **specifically, because we discussed that among**
12  **numerous other potential parties that would have**
13  **significant tax consequences, not just the ones on**
14  **this page.**
15  Q  I didn't say exclusively, I said
16  specifically.  I'm not using the word exclusively.
17  I'm using the word specifically.  You specifically
18  identified that there would be a $50 million plus
19  tax hit to Mr. Dondero, correct?
20  **A  I don't remember if I drafted this**
21  **document or not, but this document specifically**
22  **lists a $50 million potential tax liability for**
23  **Mr. Dondero.**
24  Q  So you were aware of that specifically
25  with respect to Mr. Dondero, correct?

184

1  **A  I would have been aware of that and the**
2  **variety of other parties, yes.**
3  MR. CLUBOK:  Move to strike.
4  BY MR. CLUBOK:
5  Q  I'm not asking about those.  I'm going to
6  get to what you were aware about the other
7  parties.  So with respect to Mr. Dondero, though,
8  fair to say that you and Mr. Ellington, amongst
9  other conversations about the tax consequences of
10  HFP prevailing, specifically discussed that would
11  mean more than a $50 million hit to Mr. Dondero,
12  correct?
13  **A  We discussed that among the parties that**
14  **would suffer significant tax consequences,**
15  **Mr. Dondero was one of them and that the tax**
16  **department had advised us that his exposure was**
17  **approximately $50 million.**
18  Q  Okay.  Thank you.  Now, by the way, that's
19  because HFP had been insolvent or been declared
20  insolvent prior to this time, correct?
21  **A  I believe that's correct.**
22  Q  And HFP, in fact, was insolvent going back
23  to prior to the time you joined Highland Capital
24  Management in 2009, correct?
25  **A  That's correct.**

185

1    Q   And it's also the case that you had
2   determined -- strike that. I say you.
3        It's also the case that HCM had determined
4   that CDO Fund was insolvent, correct?
5    **A   I think that's fair, yes.**
6    Q   And they had made that determination prior
7   to April of 2017, correct?
8    **A   Yes.**
9    Q   And SOHC was just -- SOHC just was a
10  wholly owned sub of HFP. So SOHC was also
11  insolvent dating back to prior to when you joined
12  HCM, correct?
13       MS. SMITH: Objection, form.
14   **A   I don't know the answer to that question**
15  **because I don't remember if there was an**
16  **insolvency analysis on SOHC.**
17  **BY MR. CLUBOK:**
18   Q   There was no separate -- you're not aware
19  of a separate insolvency analysis specific to SOHC
20  as opposed to it being part of the consolidated
21  group that included HFP, correct?
22   **A   I remember that there was a letter that**
23  **went out to HFP investors that said HFP is**
24  **insolvent and that that was approximately January**
25  **of 2009, but it didn't mention SOHC and there was**

186

1   no separate equivalent letter for SOHC.
2    Q   Okay. Well, there are no investors to
3   SOHC. SOHC is just a wholly owned sub of HFP,
4   correct?
5    **A   HFP is SOHC's sole investor, yes.**
6    Q   Okay. And as of at least January 2009,
7   HFP was insolvent, correct?
8    **A   Yes.**
9    Q   And also as of January 2009, CDO Fund was
10  insolvent?
11   **A   I believe that CDO Fund's letter went out**
12  **to its investors closer to like March of 2009, so**
13  **it would have been that time period. Now, from an**
14  **accounting perspective when exactly were they**
15  **insolvent, I don't know.**
16   Q   Okay.
17   **A   But from a legal perspective when did we**
18  **give notice to -- or when -- let me rephrase,**
19  **sorry. When did Highland give notice to the**
20  **investors in those respective entities, those are**
21  **the documents I've seen and that I remember.**
22   Q   Okay. So CDO Fund was insolvent at or
23  prior to March of 2009, correct?
24   **A   It stated to its investors, I think in**
25  **March of 2009 that it was insolvent.**

187

1    Q   Well, was it truthful?
2    **A   I assume so. I have no idea actually.**
3    Q   Do you have any reason to believe that
4   CDO Fund was not insolvent as of March 2009?
5    **A   No.**
6    Q   Do you have any reason to believe that HFP
7   was not insolvent as of January 2009?
8    **A   No. Those are accounting determinations**
9    **and the accountant's determinations on those**
10  **issues are final.**
11   Q   But the concern in layman's terms or
12  colloquial terms was that if HFP were to defeat
13  UBS at trial, that insolvency determination might
14  have to in some measure reversed, thus
15  generating tax liability; is that correct, in --
16       MS. SMITH: Objection, form.
17  BY MR. CLUBOK:
18   Q   -- in a rough approximation without being
19  technical?
20   **A   It's partially correct.**
21   Q   What's partially not correct?
22   **A   Well, I think it -- at that time it was**
23  **both -- for HFP, it was just UBS. For CDO Fund,**
24  **it was UBS and Citibank, I think.**
25   Q   But the Citibank -- was that the million

188

1   dollar liability -- or the matter to Citibank that
2   was ultimately settled for less than a million
3   dollars?
4    **A   Yes.**
5    Q   I see. So CDO Fund -- I guess I don't
6   understand.
7    **A   Let's back up and do this again.**
8    Q   Sure. With respect to HFP --
9    **A   Okay.**
10   Q   -- the concern was that if it were to
11  defeat UBS at trial and be able to retain some of
12  the assets it held, the insolvency determination
13  could be reversed to some degree thus generating
14  the tax liability, correct?
15   **A   I believe that's a fair description**
16  **without sitting here today and being a tax expert.**
17   Q   And there was a similar concern with
18  respect to the CDO insolvency determination, if
19  somehow CDO were to fully prevail against UBS and
20  be able to retain the assets?
21   **A   Again, that's partially correct with**
22  **respect to CDO Fund.**
23   Q   Well, you're saying that that was also a
24  potential concern with respect to Citi in addition
25  to that being true with respect to UBS, correct?

189

1    A  I think for Citi -- let me -- sorry, let
2  me rephrase.  For CDO Fund, the insolvency would
3  be reversed if it successfully defeated both UBS
4  and Citibank.
5    Q  Right.  Right.  So it -- CDO Fund would
6  have had to win both in order to have insolvency
7  analysis reversed?
8    A  As of this time period, that's correct.
9    Q  Right.
10    A  Please let me know when we hit a break.
11    Q  Oh, we can take a break if you want.
12    A  You sure?
13    Q  Of course.
14    A  I wanted to let you finish your series of
15  questions.
16    Q  I like to give people breaks within reason
17  whenever they ask.  You've been good about that.
18    THE VIDEOGRAPHER:  We are off the record
19  at 2:57 p.m.
20    (Recess taken from 2:57 p.m. CDT to
21  3:06 p.m. CDT)
22    THE VIDEOGRAPHER:  The time is 3:06 p.m.
23  We are back on the record.
24  BY MR. CLUBOK:
25    Q  Going back to page 2, one of the things

190

1  that was contemplated if UBS wins is that Highland
2  could face years of fraudulent transfer claims
3  throughout the Highland structure, correct?
4    A  That was one of the things that was
5  contemplated, yes.
6    Q  And fraudulent -- there were fraudulent
7  transfers claims in the New York litigation,
8  right, in addition to breach of contract claims we
9  talked about?
10    A  Yes.
11    Q  When this -- and by the way, this
12  settlement analysis ends with a proposal -- a
13  seven-step proposal, right?
14    A  It does appear to have a proposed
15  settlement structure summary.
16    Q  As far as you know, was any analysis done
17  of this seven-step proposal to determine whether
18  it would constitute a fraudulent transfer?
19    A  Well, I guess that assumes -- that assumes
20  facts that I disagree with, and I can explain why.
21    Q  My question is this:  There was a --
22  there's a settlement analysis that includes a
23  seven-step proposal for consideration, right?
24    A  Yes.
25    Q  And was there any analysis done about that

191

1  seven-step proposal to determine whether it could
2  possibly be considered to be a fraudulent
3  transfer?
4    A  In the context, I don't believe that would
5  have made any sense to conduct --
6    Q  Is that a no to my question?
7    A  -- that analysis.  Well, it's a -- it
8  would have been counterintuitive and non --
9  illogical to kind of perform that analysis in
10  conjunction with this proposal because this was
11  supposed to be a proposal for a settlement with
12  UBS.
13    Q  And what you testified before under oath
14  was that the thinking was that there would be a
15  settlement first with a number and then you'd go
16  out and get an ATE policy to fund that settlement.
17  I'm paraphrasing a little, but that's the way
18  you've described it several times today, correct?
19    A  Essentially that you would be on the
20  precipice of settlement, that you would be close
21  enough that it was worth going out and getting
22  funding for what ultimately would be the
23  settlement.
24    Q  But in your -- the way you described it
25  earlier today, you would already know the amount

192

1  of the settlement prior to getting the ATE policy,
2  correct?
3    A  Maybe that was a slight overstatement.  I
4  should have said approximate amount.
5    Q  Okay.  You'd know the approximate amount?
6    A  Right.
7    Q  And what was the approximate amount that
8  was being contemplated in terms of settling with
9  UBS when this proposal was being considered?
10    A  I don't know because all the settlement
11  conversations were -- as far as I was aware, were
12  between yourself and Mr. Ellington.
13    Q  What did you understand the approximate
14  amount of settlement that was being contemplated?
15    A  I didn't have an understanding.
16  Mr. Ellington did not share that information with
17  me.
18    Q  You had no idea if it was 1 million or
19  $100 million?
20    A  I didn't.
21    Q  And did you ever come to have any
22  understanding at all of a magnitude of a potential
23  settlement with UBS?
24    A  Yes.
25    Q  Okay.  When was that?

193

1    A   There was a proposed settlement with UBS
2  for I want to say 72.5 million that was drafted
3  but never executed.  I want to say that was in
4  2014 or '15 sometime.  That's when I had an
5  understanding of a magnitude of potential
6  settlements with UBS.
7    Q   Okay.  And that settlement after -- you
8  understood that that settlement wasn't executed,
9  although there was a settlement with two of the
10 defendants, namely Crusader and Credit Strategies,
11 correct?
12   A   Those were subsequent separate settlement
13 agreements is my understanding.
14   Q   Okay.
15   A   That there was a proposed -- I'll call it
16 global settlement, which was all of the claims
17 filed by UBS against all of the defendants, that
18 was drafted but never fully executed and then
19 there were separate executed settlements between
20 UBS and Crusader on the one hand and UBS and
21 Credit Strategies on the other.
22   Q   And that was all in the 2014-2015 time
23 frame, correct?
24   A   I think it was primarily 2015.
25   Q   Okay.  After that point, did you ever

194

1  again hear about any magnitude of a potential
2  settlement with UBS?
3    A   No, not that I recall.
4    Q   When you were involved with this
5  settlement analysis, was there any number being
6  contemplated for a total amount that would be used
7  to settle with UBS?
8    A   I wasn't contemplating any amount and I
9  don't know what other people were or were not
10 contemplating.
11   Q   Well, let's look at the document further
12 and see if it's here.  You see on -- let's start,
13 though, with Slide 6.  Slide 6 says:  If Highland
14 Settles...
15     You see that?
16   A   Yes.
17   Q   And under -- and this is assuming the
18 proposal that's going to be laid out step by step
19 later in the presentation, correct?
20   A   I'm sorry, say that again.
21   Q   This -- if Highland settles and all these
22 things that would happen, this assumes that the
23 seven-step proposal that's laid out later in the
24 presentation goes into effect, correct?
25   A   I think that's -- I apologize.  I'm

195

1  struggling with the question, but I -- this is --
2  this is the summary, I guess, of the potential
3  outcomes if the settlement process is completed.
4    Q   If the settlement process that's laid out
5  in this presentation is completed?
6    A   Yes.
7    Q   Okay.  And the first -- one thing that
8  would happen is that Sentinel would then control
9  HFP/CDO Fund assets, correct?
10   A   That's what this says, yes.
11   Q   And it was believed that it was currently
12 a total of about $94 million, right?
13   A   That's what the document says.  I have no
14 independent recollection of that information.
15   Q   Who determined that the assets were worth
16 approximately $94 million at this time?
17   A   I don't know.  It would have been someone
18 in the accounting department most likely.
19   Q   Did they do that at your direction?
20   A   I don't remember that.
21   Q   Do you see at the very last page of this
22 document it says Appendix 1 and it's blank?
23   A   I do see that, yes.
24   Q   And Ms. Smith asked before if we had a
25 complete document here and I had said I believe

196

1  that Appendix 1 was sent separately from this
2  e-mail.  And I'm going to hand you what we'll mark
3  as Exhibit 67.
4      (Deposition Exhibit 67 marked for
5  identification.)
6  BY MR. CLUBOK:
7    Q   Exhibit 67 is an e-mail from you to
8  Stephanie Vitiello, dated April 13th, 2017, that
9  is -- got a subject UBS Settlement Assets.xlxs and
10 it's got an attachment, which is the second page
11 of Exhibit 67.  And you'll note on the fist page
12 in the cover e-mail it says, Appendix 1.  Do you
13 see that?
14   A   I do.
15   Q   And if you turn to the second page, you
16 see there is a list of assets with the bottom --
17 in the middle towards the bottom it says, Total
18 Assets 94,057,547.  Do you see that?
19   A   I'm sorry, say that one more time, please.
20   Q   Do you see where there's a subtotal -- or
21 there's a total of all the total assets and a
22 black bar towards the bottom of the page?  Do you
23 see that?
24   A   The gross assets?
25   Q   Yeah.

---

197

1    A  Okay.

2    Q  The gross assets total, according to this,

3  about $94 million. Do you see that?

4    A  I do see that, yes.

5    Q  And this document on page 1 is identified

6  as Appendix 1, and you can see at the end of

7  Exhibit 47, it's a reference to Appendix 1 and the

8  94 million matches up with page 6. Do you see all

9  that?

10    A  I do see that, yes.

11    Q  And Stephanie Vitiello was a woman that

12  you said worked with you sometimes on various

13  matters?

14    A  She's an attorney who worked with me, yes.

15    Q  Yeah. And the question is, did you -- who

16  would you have gone to to generate Appendix 1 that

17  you were sending to Stephanie Vitiello on

18  April 13th, 2017?

19        MS. SMITH:  Objection, form.

20    A  I don't know specifically. It would have

21  been someone in the accounting department I would

22  guess.

23  BY MR. CLUBOK:

24    Q  And that is your e-mail address, right, on

25  Exhibit 67?

---

198

1    A  67 or 47?

2    Q  67. The Appendix 1.

3    A  Sorry, I was looking at the wrong one.

4  Say that -- let's have a clean record. Why don't

5  you repeat your question one more time.

6    Q  Sure. Exhibit 67 is an e-mail from you to

7  Stephanie Vitiello attaching what becomes

8  Appendix 1 for the settlement analysis that's

9  reflected in Exhibit 47, correct?

10    A  I don't have any independent recollection,

11  but that's what this appears to be.

12    Q  By the way, I will represent to you that

13  we got a native file of Exhibit 67, this Excel

14  spreadsheet. And if we need to, we will, but I

15  will tell you for the record that that 94 million

16  appears to be the function of an error in the

17  calculation and it seems to have -- that

18  94,057,547 I'll just represent to you and we can

19  put the Excel spreadsheet up at some point if

20  necessary, it's the total for all the assets

21  above, not including the cash. So when you add

22  the cash in there, it gets up to something more

23  like 98 or 99 million.

24    A  Okay.

25    Q  That's my understanding. We can pull up

---

199

1  the Excel spreadsheet. I just don't want to keep

2  talking about this knowing that I think there's an

3  error in the formula. It's just like somebody,

4  you know, an Excel, like they didn't add the last

5  line in or something like that, so I believe this

6  total, which looks like it totals everything, is

7  really just totalling everything except for the

8  cash, just so you know.

9    A  Okay. I'll -- I won't re-create the math

10  here. That's certainly a possibility.

11    Q  And we can do that. We can -- we'll have

12  the Excel thing if we want to do it later. We'll

13  show it to you, but I just want to make that

14  clear. I'm not trying to -- it looks like, for

15  what it's worth, I take it you never -- you never

16  knew about that potential error, until I just

17  mentioned it, right?

18    A  I'm kind of embarrassed that there's an

19  error in a Highland document that --

20    Q  Well, it's Excel. I could -- bottom line

21  is, I presume that you would have just relied on

22  the Excel, you know, calculation to assume that

23  the right number is 94, whether or not there's an

24  error.

25    A  Sir, I honestly don't recall, but I do

---

200

1  believe that it -- first of all, I'm not saying --

2  again, you're saying you and I'm not sure that I

3  drafted this document that's attached to

4  Exhibit 47. But it does appear that whoever

5  drafted it included the number from document 67.

6    Q  Right. Fair enough. And whoever put

7  together that Excel spreadsheet, I'm not asking

8  you to -- I'll represent to you that it appears

9  there was an error, which you can look at at

10  your -- at the time and just -- I take it -- I

11  only bring this up because I take it you never --

12  no one ever brought this potential error to your

13  attention until now?

14    A  I don't remember this document and I don't

15  remember any mention of an error.

16    Q  Okay. That's fine.

17        So turning back, then, to the document.

18  When it says Sentinel contents, that's why when I

19  say currently 94, let's just agree that it was

20  intended to be the total of Appendix 1 regardless

21  of whether there's an error or not; is that fair?

22        MS. SMITH:  Objection to form.

23    A  Sir, because I don't have any independent

24  recollection of this, I can only say that your

25  analysis of the documents seems to be a fair one,

201

1  but I'm not saying that's what happened.  It just
2  happens to be something that might have been what
3  happened.
4  BY MR. CLUBOK:
5      Q  Okay.  Thanks for that clarification.
6          In any event, whether it's 94 or 98, that
7  doesn't change the point that's being made in
8  No. 1, which is if Highland settles, Sentinel
9  would control the HFP/CDO Fund assets?
10     A  Which page are you on, sir?
11     Q  Back to page 6.  So if Highland were to
12 settle under the proposal that's being
13 contemplated in this document, Sentinel would then
14 control the HFP/CDO Fund assets referenced in --
15 at least in Appendix 1?
16     A  That's what this document says.
17     Q  And the contemplation was that Sentinel
18 and Highland Capital Management could then use
19 those assets that had originated at HFP and
20 CDO Fund to generate cash to pay a UBS settlement,
21 a Citi settlement and outstanding legal fees,
22 correct?
23     A  That is what this says.
24     Q  And you have no reason to believe that you
25 had a different understanding than what was in

202

1  this document at the time, as you sit here today,
2  correct?
3      A  I don't remember it so I don't remember if
4  I had a different belief or not at the time.
5      Q  Okay.  And then -- and then another
6  benefit is that it says HCMLP's $50 million tax
7  liability would be avoided.  Do you see that?
8      A  It does.
9      Q  It doesn't say Jim Dondero's $50 million
10 plus tax liability.  You see that?
11     A  Yeah, I -- it doesn't, but I think you're
12 conflating two issues.
13     Q  How so?
14     A  Well, it's a limited partnership.  So the
15 liability would be at HCMLP and it would flow
16 through to the limited partners.
17     Q  But the only limited partners at HCM at
18 that time -- or the only significant limited
19 partners at HCM at that time were Jim Dondero and
20 Mark Okada, right?
21     MS. SMITH:  Objection, form.
22     A  First of all, I don't remember who the
23 significant limited partners were.  I've already
24 told you that, depending on what time period it
25 is, but your -- I'm -- here, ask the question

203

1  again because the problem is we're so off base
2  that I'm being -- I'm confused as to how to answer
3  the question.
4  BY MR. CLUBOK:
5      Q  Well, it's your document, so I'm asking --
6      MS. SMITH:  Objection, form.
7  BY MR. CLUBOK:
8      Q  It's a document that you sent to
9  Mr. Sevilla, correct?
10     A  It is a document that I attached to an
11 e-mail to Mr. Sevilla, yes.
12     Q  And with no -- with no further
13 explanation, you just sent this document to
14 Mr. Sevilla?
15     A  In Exhibit 47, I just sent the document to
16 Mr. Sevilla.
17     Q  Okay.  And you at one point in the
18 document -- at one point -- strike that.
19         At one point the document refers to
20 Dondero's tax liability as 50 million plus and
21 here it talks about HCMLP's $50 million plus tax
22 liability.  You see that?
23     A  The document refers to Dondero's potential
24 tax liability of $50 million plus and HCMLP's tax
25 liability of $50 million plus.

204

1      Q  Right.  And I guess if you go back to --
2      A  Oh, actually, I answered that question
3  wrong.  There's going to be part of my testimony
4  I'll need to correct.
5      Q  Sorry, what --
6      A  Because I messed up.
7      Q  Go ahead and correct it now, then.  As
8  they say, by the way, deposition testimony is not
9  a take home exam, so please correct it now if you
10 can.
11     A  So whoever owned HCMLP would be completely
12 irrelevant to the tax liability.  It's tax
13 liability associated with HFP, not HCMLP.
14     Q  Right.  It's owners of HFP?
15     A  Right.  But that means that ownership of
16 HCMLP is not relevant to this inquiry.
17     Q  Unless you're treating the economic
18 interest of HCMLP interchangeably with Mr. Dondero
19 and a few other limited partners, correct?
20     MS. SMITH:  Objection, form.
21     A  That's -- no, that's completely incorrect,
22 sir.
23 BY MR. CLUBOK:
24     Q  All right.  Let's just continue with the
25 document here, though.  It says:  Residual assets

205

1  (up to $50 million) stay at Sentinel.
2      Do you see that?
3  **A  I do.**
4      Q  Now, that's residual assets after using
5  the assets to generate cash to pay the UBS
6  settlement.  Do you see?
7      MS. SMITH:  Objection, form.
8  **A  It is bullet point 3 below bullet point 2.**
9  **BY MR. CLUBOK:**
10     Q  Sorry, bullet point 4 below bullet
11 point 2?
12 **A  Yes, you're right, bullet point 4, below**
13 **bullet point 2.**
14     Q  And fair to say, then, that the
15 contemplation here is that the total settlements
16 in outstanding legal fees would total something
17 approximately $44 million over what's being
18 contemplated on page 6 here?
19     MS. SMITH:  Objection, form.
20 **A  That's not really accurate, sir.**
21 **BY MR. CLUBOK:**
22     Q  Why not?
23 **A  Because bullet point 4 says up to**
24 **$50 million.**
25     Q  Up to 50 million.  Okay.  So it's

206

1  contemplated that the total settlement of the
2  claims against UBS, Citi -- strike that.
3      It's contemplated the total settlement of
4  the claims brought by UBS and Citi along with
5  outstanding legal fees associated with those
6  claims would be at least $40 million and -- plus
7  more, up to another $50 million; is that fair?
8  **A  I -- I mean, I guess if that's how you**
9  **want to describe the document, sir.  But since I**
10 **don't remember the document, I really have nothing**
11 **to add other than what's on the page.**
12     Q  So turning to page 8, it summarizes the
13 UBS Settlement:  Structure Summary.  Do you see
14 that?
15 **A  I do.**
16     Q  And Step 1 actually is that HFP and
17 CDO Fund buy the $100 million ATE policy from
18 Sentinel.  Do you see that?
19 **A  I do.**
20     Q  That's the very first thing contemplated
21 before even negotiating a settlement amount with
22 UBS, according to this document that you sent
23 Mr. Sevilla, right?
24 **A  That's correct.**
25     Q  And indeed if you think about it, wouldn't

207

1  it be pretty curious to negotiate a settlement
2  amount and then buy an insurance policy if you
3  already know exactly what the settlement amount
4  is?
5      MS. SMITH:  Objection.
6  **BY MR. CLUBOK:**
7      Q  Doesn't that seem curious to you if it was
8  that way?
9      MS. SMITH:  Objection, form.
10 **BY MR. CLUBOK:**
11     Q  Instead of the way it's laid out here?
12 **A  Not necessarily, no.**
13     Q  Seems perfectly appropriate to you -- you
14 said before that ATE policies are standard issue
15 or something -- some comment like that.  You
16 remember that?
17 **A  It's a matured industry.  It's fairly**
18 **commonly used in a variety of different**
19 **jurisdictions.**
20     Q  And is it fairly commonly used after a
21 settlement amount has been negotiated to then come
22 up with an ATE policy to fund a known settlement
23 amount?
24 **A  I don't know.  I don't know the ATE**
25 **industry that well to be able to say one way or**

208

1  another, sir.
2      Q  Well, you said under oath that it's
3  commonly used, or words to that effect, and my
4  question is do you really have any idea whether
5  it's commonly used in that way, specifically after
6  a settlement amount has been already negotiated?
7  **A  I don't know one way or another.**
8      Q  Do you know one way or the other whether
9  the way the ATE policy that was ultimately bought
10 in this case comports with the common use of ATE
11 policies the way you used that phrase earlier
12 today?
13 **A  I've never seen the ATE policy that was**
14 **executed in August 2017, so I don't know one way**
15 **or another.**
16     Q  Did you have access to that policy if you
17 had wanted to see it?
18 **A  I think I did at one point.**
19     Q  At what point?
20 **A  I think it was e-mailed to me at one**
21 **point.**
22     Q  Sorry, it was e-mailed to you?
23 **A  I think that's right.**
24     Q  You said you never had it.
25 **A  No, I said I never looked at it, sir.**

209

1  There's a difference.
2    Q  It was e-mailed to you and you never --
3  why was it e-mailed to you?
4    A  I don't recall.  I would have to -- I
5  would have to look.  I don't remember.
6    Q  Did you just remember that it was e-mailed
7  to you?  Because I asked you many times earlier
8  today if you ever saw the policy.  When I asked
9  you those questions, did you remember that it had
10 been e-mailed to you but just didn't mention that?
11   A  I've never seen the policy, sir.  That
12 is -- that is true.
13   Q  Understood.  But when I asked you those
14 questions earlier today, did you remember that it
15 was e-mailed to you, or did something since I
16 asked those questions refresh your recollection?
17   A  I'd have to think about it.  I'm sorry.
18   Q  I would like you to think about that.  I
19 asked you many times earlier in this deposition
20 just within the last couple hours in many
21 different ways whether you had ever seen the
22 policy.  What I'd like to know is when I was
23 asking those questions and you were giving
24 answers, did you know, like you just volunteered
25 now, that it had been e-mailed to you or did

210

1  something happen since I asked you those questions
2  to refresh your recollection on that subject?
3      MS. SMITH:  Objection, form.
4    A  I'd have to think about it, Mr. Clubok.
5  We could take a break, but I don't -- I don't
6  know.
7  BY MR. CLUBOK:
8    Q  I'd like you to think about it and give
9  the answer.  I've asked you a question.  You don't
10 take a break in between a question and answer, as
11 you know.
12   A  Fair enough.
13   Q  So I asked you those questions earlier
14 today about whether you'd ever seen the insurance
15 policy and in a number of different ways you said
16 absolutely not, except for the one page that was
17 shown to you on the screen.  And my question to
18 you is, when I was asking you those questions, did
19 you remember that it had been e-mailed to you even
20 if you didn't look at it?
21   A  I don't --
22      MS. SMITH:  Objection to form.
23   A  I don't think that was something I was
24 thinking about when you asked me those questions
25 because I was answering the question you asked,

211

1  had I seen it and I haven't, other than the page.
2  BY MR. CLUBOK:
3    Q  Has anything happened since I asked you
4  those questions to refresh your recollection that
5  you actually were e-mailed a copy of that policy?
6    A  I'd have to think about it.  I don't know.
7    Q  I'm asking you that question.
8    A  I know and I'm thinking --
9    Q  It's only been about an hour.  Did
10 something happen since I asked those questions
11 that refreshed your recollection that you actually
12 had been e-mailed a copy of that policy; anything
13 at all?
14      MS. SMITH:  Objection to form.
15   A  I'd have to think about it, Mr. Clubok.  I
16 don't --
17 BY MR. CLUBOK:
18   Q  Think about it.
19   A  Okay.
20   Q  Did anything happen since I asked you
21 those questions to refresh your recollection that,
22 in fact, you had been e-mailed a copy of that
23 policy?
24   A  I'm not sure.  I'd need to think about it
25 further.

212

1    Q  Did your lawyer show you anything at all
2  that refreshed your recollection?
3    A  No.
4    Q  Did your lawyer say anything to you in any
5  way that refreshed your recollection?
6      MS. SMITH:  Objection, privileged.
7    A  I'm not going to talk about what my lawyer
8  said to me.
9  BY MR. CLUBOK:
10   Q  Did you speak to anyone at all?
11   A  The only people I have conversed with
12 today are my wife and my attorneys.
13   Q  Did you review anything in --
14   A  No, sir.
15   Q  And what caused you to suddenly remember
16 and say that you had been e-mailed a copy of that
17 policy?
18   A  I've given you my testimony, sir.
19   Q  What caused you to suddenly think of that;
20 do you know?  Or is your answer you have no idea?
21   A  I mean, I think my answer is that I have
22 nothing to say that's not potentially subject to
23 privilege.
24   Q  So there was something that occurred that
25 caused you to refresh your recollection about

213

1 being e-mailed that document but you can't say
2 because of privilege; is that what you're saying?
3     MS. SMITH: Objection, form.
4     **A  I'm not going to -- I've given you my**
5 **testimony, sir.**
6 **BY MR. CLUBOK:**
7     Q  Why were you e-mailed a copy of the
8 policy?
9     **A  I don't recall.**
10    MS. SMITH: Can we go off the record for
11 one second?
12    MR. CLUBOK: Sure.
13    THE VIDEOGRAPHER: Off the -- off the
14 record at 3:34 p.m.
15    (Recess taken from 3:34 p.m. CDT to
16 3:42 p.m. CDT)
17    THE VIDEOGRAPHER: The time is 3:42 p.m.
18 We are back on the record.
19 BY MR. CLUBOK:
20    Q  So earlier today I asked you if you ever
21 tried to see a copy of the ATE policy in
22 connection with your work at Highland and you said
23 I never asked to see a copy of the ATE policy that
24 I recall.  Do you remember that?
25    **A  Yes.**

214

1     Q  And at the time I asked you that question,
2 were you thinking that you had asked to get a copy
3 of it but not to see a copy of it?  Is that a
4 distinction you were drawing in your mind when you
5 answered that question?
6     **A  I don't think so.  I was actually**
7 **answering the question that you asked, which was**
8 **did I ever ask to see a policy copy and I never**
9 **did.**
10    Q  And when I asked you that question did you
11 remember that you had asked for a copy of the
12 policy?
13    **A  When I was answering that question, I**
14 **don't believe so.  I think I was answering the**
15 **question in front of me.**
16    Q  So what's caused you now -- by the way,
17 did you ever ask for a copy of the document?
18    **A  I don't recall, but if you'd like to show**
19 **me a document to refresh my recollection, I may**
20 **have.**
21    Q  Okay.  So I earlier asked you if you had
22 access to it, you said you did have access.  Did
23 you ever ask for a copy of the policy?
24    **A  I don't remember.**
25    Q  I'm going to hand you what's been

215

1 previously marked as Exhibit 56.  This is an
2 e-mail from you -- sorry, from JP Sevilla to you,
3 attaching the ATE policy in response to an e-mail
4 that you sent on October 25, 2017, at 3:23 p.m.
5 with the subject:  UBS ATE Policy, and a note that
6 says:  Will you please send me a copy of the final
7 executed insurance agreement?
8     Do you see that?
9     **A  I do.**
10    Q  Why did you ask Mr. Sevilla to send you a
11 copy of the final executed insurance agreement
12 that you called the UBS ATE policy?
13    **A  I don't recall.**
14    Q  Did you --
15    MS. SMITH: Objection, form.
16 BY MR. CLUBOK:
17    Q  Did you recall that you had asked for this
18 policy before I just showed you this document?
19    **A  Actually, I don't remember this e-mail at**
20 **all.**
21    Q  And what did you do when you got the
22 policy?  You just got it and didn't look at it?
23    **A  Actually I don't even want to look at it**
24 **now.  I haven't seen it before.**
25    Q  Well, I would like you to look at it, and

216

1 you asked Mr. Sevilla for the policy, correct?
2     **A  That's what this appears to say, yes.**
3     Q  That's your e-mail to Mr. Sevilla, right?
4     **A  Yes.**
5     Q  ILeventon@HighlandCapital.com was you in
6 October 2017, right?
7     **A  Yes.**
8     Q  Okay.  And let's look at the document.
9 Your testimony is that you got this -- you made a
10 point of asking Mr. Sevilla for it, you got it and
11 then you never looked at it?
12    **A  Correct.**
13    Q  Why?
14    **A  I don't remember, sir.**
15    Q  Why did you want it?
16    **A  I don't remember, sir.**
17    Q  What did you do with it?
18    **A  I don't remember, sir.**
19    Q  And you didn't even remember asking for it
20 until I just showed you this document, correct?
21    **A  I didn't remember asking Mr. Sevilla for**
22 **it, no.**
23    Q  Do you consider yourself to have a good
24 memory?
25    **A  You know, I literally send and received**

---

217

1 probably 10,000 e-mails over this time period. I
2 think I have a decent memory.
3    Q  You send and received 10,000 e-mails over
4 what time period?
5    A  I mean, if you're talking about over a
6 four-year period, five-year period, thousands of
7 e-mails. I didn't remember this one.
8    Q  Did you read thousands of documents over
9 that time period?
10   A  Possibly.
11   Q  So it's possible that you forgot you had
12 read the ATE policy?
13   A  No. I am certain that the only part of
14 the ATE policy I ever read was just the one page.
15   Q  Why? Why did you -- why did you refuse to
16 read the policy?
17       MS. SMITH:  Objection to form.
18   A  Refuse is not accurate.
19 BY MR. CLUBOK:
20   Q  You obtained a copy of it, but you made a
21 point of not looking at it or opening the
22 document?
23       MS. SMITH:  Objection to form.
24   A  That's not accurate, sir.
25

---

218

1 BY MR. CLUBOK:
2    Q  What's unaccurate about that statement?
3    A  I don't ever remember consciously thinking
4 I better not look at this. I don't -- but I
5 certainly know that I didn't look at it.
6    Q  Well, let's open it up and take a look at
7 it. You certainly have looked at the page -- the
8 last page of the legal liability insurance policy
9 is the signature page. Do you see that?
10   A  I do.
11   Q  And do you see that it was signed on
12 behalf of Sentinel Reinsurance by someone named
13 Andrew Dean, director?
14   A  I see that, yes.
15   Q  Do you know who Andrew Dean is?
16   A  I don't.
17   Q  Do you know who negotiated the policy on
18 behalf of Sentinel Reinsurance?
19   A  No, sir, I don't.
20   Q  Okay. Do you see there where it lists the
21 insureds under the policy?
22   A  I do.
23   Q  And do you see it lists Highland CDO
24 Opportunity Master Fund, LP?
25   A  Yes.

---

219

1    Q  That's the entity that we often commonly
2 referred to as CDO Fund in the UBS New York
3 litigation, right?
4    A  I think that's right.
5    Q  And Mr. Dondero had authority to sign on
6 behalf of CDO Fund at this time?
7    A  I suppose he did. It appears that he
8 signed on behalf of that entity.
9    Q  And also on behalf of CDO Hold Co and
10 SOHC, correct?
11   A  Appears that he signed on behalf of all of
12 those entities, yes.
13   Q  And CDO Hold Co and SOHC were both subs of
14 Highland Financial Partners, correct?
15   A  They were both owned by Highland Financial
16 Partners, yes.
17   Q  Who negotiated this policy on behalf of
18 CDO Opportunity Master Fund?
19   A  I don't know.
20   Q  Who negotiated this policy on behalf of
21 Highland CDO Hold Co?
22   A  I have no idea.
23   Q  So who negotiated this policy on behalf of
24 SOHC?
25   A  I don't know.

---

220

1    Q  You understood, though, that -- strike
2 that.
3       Was this the page you looked at on
4 Mr. Sevilla's computer to tell you that the -- who
5 the insureds were?
6    A  I don't think so, no.
7    Q  So flip back to page 17. It says page 17
8 of 16. Do you see that? And I guess they ended
9 the policy at 16 and then they added 17 and 18 on
10 top.
11   A  Gosh.
12   Q  I don't know if that's --
13   A  Yeah.
14   Q  Or they added 17 and then they added a
15 signature page that's 16 but with signatures. Do
16 you see that?
17   A  I do.
18   Q  Maybe that's a Cayman convention. I don't
19 know. I haven't seen that before.
20       Is this schedule on what's marked as
21 page 17 of 16, or Bates label ending in 90, 91 of
22 Exhibit 56, is that the page that you looked at on
23 Mr. Sevilla's computer?
24   A  It might have been.
25   Q  Certainly -- did you know that the ATE

---

---

221

1 policy was for $100 million?
2 **A I don't think I did, no.**
3 Q Well, that matches up exactly with the
4 settlement structure that you had proposed in
5 which HFP and CDO Fund would buy a $100 million
6 ATE policy from Sentinel, right?
7 MS. SMITH: Objection, form.
8 BY MR. CLUBOK:
9 Q Strike that. Let me ask it again.
10 In Exhibit 47, you passed on a settlement
11 proposal that contemplated HFP and CDO Fund buying
12 a $100 million ATE policy from Sentinel. Do you
13 see that?
14 **A Where are you, sir?**
15 Q Back to page 8.
16 **A Of which document?**
17 Q 47.
18 **A I see the page.**
19 Q And remember, Exhibit 47 was the
20 settlement analysis that was conducted in April of
21 2017 that you claimed was for an entirely separate
22 transaction than the executed ATE policy, correct?
23 MS. SMITH: Objection to form.
24 **A Can you rephrase the question? I'm sorry,**
25 **I got lost in all of the advocacy of that one.**

---

222

1 BY MR. CLUBOK:
2 Q There was work done in April of 2017
3 that's at least in part reflected by Exhibit 47,
4 regarding a potential settlement structure with
5 UBS, correct?
6 **A There was a potential settlement structure**
7 **with UBS contemplated in April of 2017.**
8 Q And as part of that, there was a
9 transaction that you've testified about today that
10 was being considered, correct?
11 **A There is the consideration of purchasing**
12 **an ATE policy.**
13 Q And you said, I'm paraphrasing, that the
14 April proposed transaction or contemplated
15 transaction was entirely different from what
16 actually happened when an ATE policy was purchased
17 in August of 2017, correct?
18 MS. SMITH: Objection, form.
19 **A Whatever my testimony was, it will speak**
20 **for itself.**
21 BY MR. CLUBOK:
22 Q Am I getting the gist of your testimony
23 correct, that you said the April proposed
24 transaction was entirely different from the actual
25 consummated August transaction?

---

223

1 **A The settlement proposal in April was**
2 **different than the ATE policy purchased in August.**
3 Q I believe you said, in words or substance,
4 the transaction contemplated in April of 2017 was
5 entirely different than the purchased ATE policy
6 in August of 2017?
7 **A What I'm --**
8 Q Is that correct?
9 **A What I'm testifying is to, sir, the**
10 **contemplated settlement process, which is what's**
11 **discussed in this document, is different than the**
12 **ATE policy that was purchased in August of 2017.**
13 Q Okay. But part of that settlement process
14 was the purchase of an ATE policy that was very
15 close to what ultimately was purchased in August
16 of 2017, correct?
17 MS. SMITH: Objection, form.
18 **A Honestly, I'm seeing this document -- the**
19 **ATE policy for the first time.**
20 BY MR. CLUBOK:
21 Q Okay. So you have -- but in your proposal
22 that was being considered in April of 2017, as
23 part of it, it was HFP and CDO Fund would buy a
24 $100 million ATE policy from Sentinel, correct?
25 MS. SMITH: Objection, form.

---

224

1 **A The document states that HFP and CDO Fund**
2 **would buy a $100 million ATE policy from Sentinel**
3 **as the first of what ultimately were seven steps**
4 **in a settlement process.**
5 BY MR. CLUBOK:
6 Q Right. But the purchase of the policy
7 would be from HFP and CDO Fund. Yes?
8 **A Yes.**
9 Q And it would be a $100 million ATE policy
10 from Sentinel Reinsurance, right?
11 **A From Sentinel, yes.**
12 Q And the premium would be all of the assets
13 in HFP and CDO Fund, correct?
14 **A Right. That's what it says on the page.**
15 Q Okay. And what actually happened is --
16 pursuant to the legal liability insurance policy
17 that you asked for a copy of in October 25th,
18 2017, is that Sentinel Reinsurance issued a policy
19 to SOHC -- sorry, to CDO Fund and two subsidiaries
20 of HFP, correct?
21 **A Which page are you on, sir?**
22 MS. SMITH: Objection, form.
23 BY MR. CLUBOK:
24 Q I'm on the schedule which is marked as
25 page 17 of 16, that you believe you had reviewed

---

225

1 on Mr. Sevilla's computer, and it's fair to say
2 that there was a $100 million ATE policy purchased
3 by HFP and CDO Fund from Sentinel in August of
4 2017?
5        MS. SMITH:  Objection, form.
6    **A   To clarify my earlier testimony, the only**
7 **thing I did was I looked at who the insureds were**
8 **on this page. That's all I cared about. I don't**
9 **even remember looking at the rest of the page.**
10 **BY MR. CLUBOK:**
11   Q   You knew that the insureds were HFP and
12 CDO Fund, correct?
13        MS. SMITH:  Objection, form.
14   **A   I apparently had to confirm that the**
15 **insureds were Highland CDO Opportunity Master**
16 **Fund, LP, Highland CDO Holding Company and**
17 **Highland Special Opportunities Holding Company.**
18 **That's why I looked at this page.**
19 **BY MR. CLUBOK:**
20   Q   Right.  And that matches up with the
21 contemplation from your April document, that
22 shorthand, HFP/CDO fund would buy a $100 million
23 ATE policy from Sentinel, correct?
24        MS. SMITH:  Objection, form.
25   **A   I don't really know that it does, no.**

226

1 **BY MR. CLUBOK:**
2   Q   You're sitting here -- now that you're
3 looking at these, you claim that the Step 1
4 HFP/CDO Fund buy a $100 million ATE policy from
5 Sentinel, using all the assets in HFP and CDO Fund
6 doesn't match up with the actual purchase of a
7 $100 million ATE policy from Sentinel as reflected
8 in Exhibit 56?
9        MS. SMITH:  Objection, form.
10   **A   The documents speak for themselves.  I'm**
11 **looking at one document I didn't even remember and**
12 **know that I've drafted and another document I've**
13 **never seen.**
14 **BY MR. CLUBOK:**
15   Q   Yeah.  The documents do speak for
16 themselves.  I want -- but I asked you for your
17 testimony earlier.  And we have a record of what
18 you said.
19   **A   Okay.**
20   Q   And what you said about how separate these
21 transactions were.  I'm not trying to quote the
22 exact words, but we've got pages of transcript
23 from earlier today about exactly what you said
24 under oath.
25        And my question now is, as you sit here,

227

1 do you say that the transaction that was
2 contemplated in Step 1 of the UBS settlement
3 structure reflected in Exhibit 47 is totally
4 different than the actual ATE policy that was
5 purchased a couple months later?  Is that your
6 testimony under oath, yes or no?
7        MS. SMITH:  Objection, form.
8   **A   I can't give you that testimony one way or**
9 **another. I'm seeing that ATE policy for the first**
10 **time.**
11 **BY MR. CLUBOK:**
12   Q   Okay.  So as you sit here today, fair to
13 say that you can't say how closely the actual ATE
14 policy matches up with what was contemplated as
15 part of the proposed UBS settlement structure
16 reflected in Exhibit 47; is that fair?
17   **A   I disagree with one of the premises of**
18 **your question, and I'm happy to explain.**
19   Q   Yeah.
20   **A   The April settlement proposal was a series**
21 **of steps, but they were all part of a single**
22 **proposal. I don't know that we can pull one of**
23 **them out and characterize it as something that**
24 **happened later or didn't happen later. It's a**
25 **single process with multiple steps.**

228

1   Q   Okay.
2        MR. CLUBOK:  I'm going to move to strike
3 as nonresponsive.
4 **BY MR. CLUBOK:**
5   Q   I just want you to focus on my question
6 and please don't make points about things I'm not
7 asking you.
8        Step 1 of the proposed settlement
9 structure that is reflected in Exhibit 47 is
10 substantially similar as what actually occurred
11 with the purchase of the ATE policy in August.
12 True or not true, or you can't -- you don't know?
13        MS. SMITH:  Objection, form.
14   **A   I'm just seeing the ATE policy for the**
15 **first time today and frankly haven't even had a**
16 **chance to review the whole document. And I also**
17 **wouldn't pull one step out of the April proposal**
18 **and characterize it. So I don't believe I can**
19 **answer your question as asked.**
20 **BY MR. CLUBOK:**
21   Q   The reason you can't answer -- I am asking
22 you, if you could, to compare Step 1, which says:
23 HFP/CDO Fund buy a $100 million ATE policy from
24 Sentinel, using a premium of all the assets in
25 CDO Fund to what actually happens in August.

229

1 And I want to know if that -- what was
2 contemplated as Step 1 is substantially the same
3 as what occurred in August, or if you believe it
4 was not substantially the same or if you don't
5 know because you don't know enough about the
6 details of what happened in August to make that
7 comparison? That's the only question I'm asking
8 you. Can you please answer that question?
9     MS. SMITH: Objection, asked and answered.
10    A  I've given you my testimony, sir.
11 BY MR. CLUBOK:
12   Q  My question is, was Step 1, as
13 contemplated in Exhibit 47, substantially the same
14 as what actually occurred in August, or do you not
15 know about the -- enough about the August
16 transaction to say one way or the other?
17    A  I've given you my --
18    MS. SMITH: Objection, asked and answered.
19    A  I've given you my testimony, sir.
20 BY MR. CLUBOK:
21   Q  My question is, as con -- I have a right
22 to ask this question. This is cross-examination.
23 And I'm going to ask the Court for more time with
24 you if we don't get an answer to this question.
25 It's very simple, without saying you've answered

230

1 it. You just listen to my question and please try
2 to answer this question, regardless of whether you
3 believe you've answered this question or not.
4     Step 1, that's identified on page 8 of the
5 presentation attached as part of Exhibit 47,
6 describes the purchase of a $100 million ATE
7 policy from Sentinel by HFP and CDO Fund using as
8 the premium all of the assets in HFP and CDO Fund.
9     And my question is, is that Step 1 the
10 same as what ultimately occurred substantially in
11 August of 2017, or do you believe it is not
12 substantially the same or do you not know enough
13 about the August transaction to answer that
14 particular question?
15    A  My response to the question was that I did
16 not believe I could answer the question as phrased
17 and I gave you the reasons I did not believe I
18 could answer the question as phrased. That was my
19 testimony. And that is still my testimony in
20 response to the same question, sir.
21    MR. CLUBOK: Move to strike as
22 nonresponsive. We'll mark this document.
23 BY MR. CLUBOK:
24   Q  We're going to call you back. It's not
25 acceptable to this court for any witness to keep

231

1 doing what you're doing, which is just claim
2 you've answered a question instead of just
3 answering the question, even if you believe I've
4 asked it twice. I hope your attorneys --
5     MS. SMITH: Objection.
6 BY MR. CLUBOK:
7   Q  -- tell you not to do that but we're going
8 to move on and we'll reserve that.
9    A  Let me give you a full answer. I disagree
10 with the premise of your question, sir, and I
11 cannot answer it as asked.
12   Q  In August of 2017, did HFP and CDO Fund
13 buy a $100 million ATE policy from Sentinel using
14 all of the assets in HFP and CDO Fund?
15    A  I don't know.
16   Q  Did anyone ever tell you whether or not
17 that occurred?
18    A  I don't remember ever being told that.
19   Q  Did you know that the purchase of the
20 ATE policy in 2017 was made using assets of HFP
21 and CDO Fund?
22    MS. SMITH: Objection, form.
23    A  I don't think I can really answer the
24 question as asked.
25

232

1 BY MR. CLUBOK:
2   Q  Why not?
3    A  I didn't -- well, let me rephrase. I
4 didn't know what assets went over.
5   Q  Did you believe -- you knew that there was
6 an ATE policy that had been purchased, right?
7    A  Yes.
8   Q  And you knew who the insureds were, right?
9    A  Yes.
10   Q  And did you know that some or all of the
11 purchase was made using assets from the CDO Fund
12 and HFP?
13    A  I didn't know what the consideration was
14 for the policy.
15   Q  You knew, though, that as of April 2017,
16 as part of the settlement structure laid out, the
17 contemplation was that the entire consideration
18 for the ATE policy that was being considered as
19 part of that analysis would come from HFP and
20 CDO Fund, correct?
21    MS. SMITH: Objection, form.
22    A  What I was aware of was in April 2017, it
23 was contemplated that Sentinel and HMLP can use
24 HFP and CDO Fund assets to generate cash to pay
25 UBS, Citi and outstanding legal bills.

233

1    MR. CLUBOK: Move to strike as
2  nonresponsive.
3  BY MR. CLUBOK:
4    Q  You knew that in April 2017 as part of the
5  settlement structure, Step 1 was the purchase of
6  an ATE policy for HFP and CDO Fund with the entire
7  consideration for that purchase coming from assets
8  in HFP and CDO Fund, correct?
9    MS. SMITH: Objection, form.
10   **A  I can characterize what's on the page,**
11 **which is HFP and CDO Fund would buy a $100 million**
12 **ATE policy from Sentinel and the ATE premium,**
13 **apparently, was going to be all the assets in HFP**
14 **and CDO Fund.**
15 **BY MR. CLUBOK:**
16   Q  And there's no other consideration that
17 you're aware of that was being contemplated to pay
18 for the ATE policy that was part of the proposal
19 being discussed in April 2017, correct?
20   **A  I don't remember --**
21   MS. SMITH: Objection, form.
22   THE WITNESS: Sorry.
23   **A  I don't remember the proposal from**
24 **April 2017, so I can't add or subtract from what's**
25 **on the page.**

234

1  BY MR. CLUBOK:
2    Q  My -- please listen to my question. As
3  you sit here today, you are not aware of any other
4  consideration that was being contemplated to pay
5  for the ATE policy that was being discussed in
6  April 2017 other than the assets from the HFP and
7  CDO Fund, correct?
8    **A  Sitting here today, I don't remember one**
9  **way or another, sir.**
10   Q  So you are not aware of any other
11 consideration that was being contemplated,
12 correct?
13   MS. SMITH: Objection, form.
14 BY MR. CLUBOK:
15   Q  As you sit here today?
16   **A  As I sit here today, yes.**
17   Q  Okay.
18   **A  Was I ever aware, I don't know.**
19   Q  I didn't ask if you were ever aware. I'm
20 going to ask you for the rest of this deposition,
21 in order to avoid me needing to seek more time,
22 that you please listen to the question I ask and
23 answer the question I ask and not one that you
24 make up. I didn't ask you if you ever were aware.
25 I said as you sit here today, are you aware.

235

1  Okay. So please try hard to listen to my
2  questions the rest of the way and just answer the
3  questions I ask and not questions you decide to
4  answer. Okay?
5    MS. SMITH: Andy, I think this might be a
6  good time for a break.
7  BY MR. CLUBOK:
8    Q  Do you need a break, Mr. Leventon?
9    **A  I believe I do.**
10   Q  Then we will take a break.
11   THE VIDEOGRAPHER: We are off the record
12 at 4:07 p.m.
13   (Recess taken from 4:07 p.m. CDT to
14 4:17 p.m. CDT)
15   THE VIDEOGRAPHER: The time is 4:17 p.m.
16 We are back on the record.
17 BY MR. CLUBOK:
18   Q  Sir, did you ever send the insurance
19 policy to anybody?
20   **A  I don't remember if I did or not.**
21   Q  Who's Chris Dunn?
22   **A  Chris was an accountant at Highland.  I**
23 **think a junior fund accountant.**
24   Q  I'm going to hand you what's been marked
25 as Exhibit 57. It's a cover e-mail from you

236

1  attaching the UBS_ATE.PDF, dated October 26, 2017.
2  Do you see that?
3    **A  Hold on one moment, please.  I do see**
4  **that, yes.**
5    Q  And this is an instance of you forwarding
6  the UBS after-the-event policy to Chris Dunn on
7  October 26, 2017, correct?
8    **A  Yes.**
9    Q  And you tell -- you don't -- you tell
10 Mr. Dunn: Please label all communications related
11 to this project as Privileged as all documents are
12 being drafted at the request of the Legal Team.
13   Do you see that?
14   **A  I do.**
15   Q  What documents did you request Mr. Dunn
16 draft in connection with this ATE policy?
17   MS. SMITH: Objection, form.
18   **A  I never requested Mr. Dunn draft any**
19 **documents in connection with the ATE policy.**
20 **BY MR. CLUBOK:**
21   Q  What did you request Mr. Dunn do in
22 connection with the ATE policy?
23   **A  I don't recall.  I don't recall if I**
24 **requested him to do anything with it.**
25   Q  Well, you talk about this project. You

237

1 refer to this project. Do you see?
2 **A I do.**
3 Q What's this project that you're referring
4 to?
5 **A I mean, I can speculate, but I don't**
6 **recall.**
7 Q Give your best educated guess.
8 **A Something having to do with the UBS**
9 **ATE policy.**
10 Q You know nothing beyond that?
11 **A I don't.**
12 Q Do you have any educated assumption about
13 what this was beyond that it had something to do
14 with the UBS ATE policy?
15 **A When you say this, you're talking about**
16 **the e-mail to Mr. Dunn?**
17 Q I'm talking about the project you
18 reference, as if he knows what you're talking
19 about when you send this policy to Mr. Dunn.
20 **A I mean, I don't have a recollection, I**
21 **guess. I'm trying to figure out if I have an**
22 **educated guess. I mean, there were a number of**
23 **things that could have referenced.**
24 Q Mr. Leventon, in the course of this
25 deposition, you understand you have an obligation

238

1 to affirmatively tell the truth, right?
2 **A Yes.**
3 Q Do you understand as part of that
4 obligation, you also can't intentionally omit
5 information that is necessary to make a statement
6 you're saying the complete truth?
7 MS. SMITH: Objection.
8 BY MR. CLUBOK:
9 Q Do you have that understanding?
10 MS. SMITH: Objection.
11 **A I'm going to testify fully and truthfully**
12 **to the best of my ability.**
13 **BY MR. CLUBOK:**
14 Q When you're answering questions in this
15 deposition, do you understand that you have an
16 obligation not to omit information that is
17 necessary to make statements you are making true?
18 MS. SMITH: Objection. Mr. Clubok, you're
19 badgering him now.
20 **A I'll accept my counsel's instructions on**
21 **how to conduct a deposition.**
22 **BY MR. CLUBOK:**
23 Q I'm asking your understanding of when
24 you're trying to answer these questions, you know
25 that you're not supposed to affirmatively lie.

239

1 you also understand that you have to
2 affirmatively -- do you believe when you're
3 answering these questions, I just want to
4 understand what your -- your process when you're
5 answering questions, do you believe you have an
6 obligation not to omit intentionally information
7 that is necessary to make the statements you say
8 fully true?
9 **A I mean, I answer the questions fully and**
10 **truthfully. That's what I can say, sir.**
11 Q Yeah. My question is in the -- when you
12 do that, do you believe, as you sit here today,
13 that you have an obligation not to omit
14 information that's necessary to make a statement
15 that you have made fully true?
16 MS. SMITH: Objection. You've already
17 asked him that and he's answered. You're
18 badgering him now.
19 MR. CLUBOK: The record's going to show
20 he's not answered this question and I think it's
21 an important question for the judge to know and I
22 think it's a perfectly fair --
23 MS. SMITH: You're testifying now.
24 MR. CLUBOK: So are you. We're not
25 supposed to -- you should limit yourself to

240

1 objection to form and I should limit myself, so
2 I'm going to ask my question again and I'm going
3 to try not to take the bait of this argument. I
4 agree with you, it's inappropriate.
5 BY MR. CLUBOK:
6 Q Mr. Leventon, when you are answering these
7 questions, do you believe you have an obligation
8 not to intentionally omit material information
9 that's necessary to make one of your answers
10 completely truthful?
11 **A I have to fully and truthfully answer a**
12 **question, but I am not obligated to answer a**
13 **question I haven't been asked, is my understanding**
14 **of the rules.**
15 Q And do you believe you're allowed to
16 intentionally omit material information that might
17 be necessary to make an answer you give completely
18 true?
19 MS. SMITH: Objection, form.
20 BY MR. CLUBOK:
21 Q Yes or no?
22 **A I'm not allowed to omit information that**
23 **would make an answer to a question asked true, but**
24 **I don't believe I have an obligation to educate**
25 **the questioning lawyer with respect to questions**

241

1 they haven't asked.
2 Q Okay. So with respect to this e-mail that
3 relates -- that references this project, do you
4 know anything else at all about what this project
5 may have been other than it relates somehow to the
6 UBS after-the-event policy that was purchased by
7 HFP and CDO Fund?
8 A My answer previously was that I don't
9 recall, but that I was prepared to give my
10 educated guess.
11 Q Okay. And that guess is?
12 A It had something to do with the audits
13 being run by the accounting team, where you would
14 do some sort of risk analysis, potentially, in
15 order to determine if something goes into an audit
16 or not.
17 Q When did you first become aware of
18 Sentinel Reinsurance?
19 A I knew there was a reinsurance company in
20 the Cayman Islands in 2013 sometime, but I don't
21 recall if I knew the name or not.
22 Q Did you know who owned Sentinel when you
23 were talking about potentially having CDO Fund and
24 HFP buy an ATE policy in April of 2017?
25 A I mean, I knew it was somehow associated

242

1 with Mr. Dondero and Mr. Ellington, but I didn't
2 know who owned it.
3 Q Did you know that those two had beneficial
4 economic interests in Sentinel?
5 A I don't know -- I didn't know that then
6 and I don't believe I know that now.
7 Q You were never provided any information
8 showing the beneficial ownership of Sentinel
9 during that time frame; is that what you're
10 testifying to?
11 MS. SMITH: Objection, form.
12 A I don't recall ever seeing the beneficial
13 ownership of Sentinel.
14 BY MR. CLUBOK:
15 Q Did you know that -- did you ever come to
16 believe that Sentinel was an affiliated investor?
17 MS. SMITH: Objection, form.
18 A It would have been whatever Mr. Surgent
19 and the compliance department determined and I
20 believe his determination is that it wasn't an
21 affiliated investor.
22 BY MR. CLUBOK:
23 Q Why?
24 MS. SMITH: Objection, form.
25 A Because I believe I either spoke to him

243

1 about it directly or was told by somebody that
2 that was his determination.
3 BY MR. CLUBOK:
4 Q I'm going to hand you what's been marked
5 as Exhibit 61. It's an e-mail chain, the top one
6 being an e-mail from Scott Ellington to you
7 copying JP Sevilla. Here's a color version if it
8 helps you. That's the official marked one, but
9 there's a color version if --
10 A I'm going to put the marked version into
11 the pile and I'm going to look at the color
12 version.
13 Q This is the last few pages of that.
14 A Is this --
15 MS. SMITH: Shannon, could I have a copy
16 of the color version also?
17 MR. CLUBOK: I'm going to suggest that we
18 agree that we can swap in the color version for
19 Exhibit 61 if that's okay with you? Is that all
20 right, Ms. Smith?
21 MS. SMITH: That works for me. Well, I
22 can't tell if it's the same.
23 MR. CLUBOK: It's the same. We're
24 representing it's the same. We printed it out
25 with a color copier instead of the black-and-white

244

1 version we had yesterday.
2 MS. SMITH: Okay.
3 MR. CLUBOK: So we'll work on that with
4 the court reporter to --
5 MS. SMITH: So you're tossing the old --
6 (Simultaneous discussion interrupted by
7 reporter.)
8 MR. CLUBOK: We'll do that off the record
9 at the end to replace the version 61 that's in
10 black and white with a color version.
11 BY MR. CLUBOK:
12 Q And we've got a color version for
13 Mr. Leventon in front of him just for ease of use.
14 Do you see that there was a file that was
15 circulated amongst a number of people, with
16 Sentinel being presented as an affiliated investor
17 in Multi Strat. Do you see that?
18 A I'm sorry, say that one more time, please.
19 Q There is a document that was being
20 circulated in December of 2017, and on the first
21 page it identifies Sentinel (from Highland
22 CDO Fund) as an affiliated investor in what was
23 called Credit Opps and later became known as
24 Multi Strat.
25 MS. SMITH: Objection, form.

---

245

1    A  I see on Bates number 020562 toward the
2 bottom, an e-mail from Mr. Taylor Colbert to Trey
3 Parker, copying a bunch of people, stating:  As
4 discussed, please see the updated file with
5 Sentinel being presented as an affiliated
6 investor.
7 BY MR. CLUBOK:
8    Q  And if you look at the attachment, the
9 first page, you can see where it identifies
10 Credit Opps Investors by NAV, Sentinel Re Holdings
11 is included, along with the others that are not
12 shaded to reflect being affiliated investors.
13       MS. SMITH:  Objection, form.
14 BY MR. CLUBOK:
15    Q  Do you see that?
16    A  Sorry, sir, give me a moment, please.
17 This isn't completely straightforward.
18       (Witness reviews document.)
19    A  Okay.  I see that there's nothing on
20 nonaffiliated master for Sentinel Re Holdings,
21 Ltd.
22 BY MR. CLUBOK:
23    Q  What?
24    A  On one, two, three, four -- fifth column
25 over, top of the first page on the attachment,

---

246

1 it -- there are percentages of non-affiliated
2 master and it does not have an entry for Sentinel.
3    Q  Right.  So Sentinel is identified as
4 having some interest in the master and some
5 interest in the offshore, and like other entities,
6 for example, HCMLP and Mark Okada and Dugaboy,
7 they are listed as being affiliated as opposed to
8 non-affiliated in connection with Credit Opps,
9 correct?
10       MS. SMITH:  Objection, form.
11    A  I think that's probably fair, yes.
12 BY MR. CLUBOK:
13    Q  And this document gets forwarded to
14 Thomas Surgent who in turn forwards this to Scott
15 Ellington saying, let's discuss.  Do you see that?
16    A  I don't mean to quibble with you, but
17 Mr. Surgent appears to have been one of the
18 initial people copied on Mr. Colbert's e-mail at
19 5:50 p.m. on December 1 and then Mr. Surgent
20 forwards that to Mr. Ellington.
21    Q  Okay.  If you look down to Mr. Colbert's
22 original e-mail December 1st, 2017, Mr. Surgent is
23 not copied, correct?
24    A  I'm looking at this for the first time and
25 that apparently is correct.

---

247

1    Q  Okay.  So as I said, this document gets
2 forwarded apparently to Mr. Surgent, who in turn
3 forwards it to Scott Ellington with a statement,
4 let's discuss.  Do you see that?
5    A  I guess that's right.
6    Q  And --
7    A  Maybe.
8    Q  -- Mr. Ellington in turn forwards it to
9 you and JP Sevilla and says:  See below and
10 attached and please call me tomorrow on this, from
11 his iPhone.  Do you see that?
12    A  I do.
13    Q  Do you remember him calling you about
14 this?
15    A  No, I do not.
16       MS. SMITH:  Objection, form.
17       MR. CLUBOK:  What is the objection form on
18 that question?
19       MS. SMITH:  This says please call me
20 tomorrow on this and you asked do you remember if
21 he called you.
22       MR. CLUBOK:  Right.  What is the form
23 objection?
24       MS. SMITH:  I thought you were asking it
25 backwards.

---

248

1       MR. CLUBOK:  Okay.
2 BY MR. CLUBOK:
3    Q  Do you remember Mr. Ellington calling you
4 about this?
5    A  No.
6    Q  Do you remember ever discussing
7 Multi Strat's cash projections on or about
8 December of 2017?
9    A  No.
10    Q  Do you recall ever discussing whether
11 Sentinel was an affiliated investor in connection
12 with its investment of Multi Strat in December of
13 2017?
14    A  I don't specifically recall December 2017,
15 but I do know that at some point the compliance
16 department via Mr. Surgent made the determination
17 that it was not an affiliated investor.
18    Q  Why do you know that?
19    A  I believe my testimony was I either -- I
20 don't remember if I spoke to Mr. Surgent about it
21 directly or heard from somebody indirectly that
22 that had been Mr. Surgent's determination.
23    Q  And do you know the basis that that
24 determination was supposedly made on?
25    A  I don't.  It would be the purview of the

249

1  compliance department to make those calls.
2  Q  Do you see on the attachment where it says
3  Sentinel (from Highland CDO Fund)?  Do you see
4  that?
5  **A  Yes.**
6  Q  And fair to say that the interest in
7  Sentinel had been owned by CDO Fund prior to the
8  purchase of the ATE policy?
9  **A  I'm sorry, can you say that one more time,**
10 **please?**
11 Q  Yeah.  The interest that's referenced here
12 from Sentinel had been an interest that was owned
13 by the Highland CDO Fund until the purchase of the
14 ATE policy in August of 2017?
15 **A  I don't actually know what assets were**
16 **involved in that ATE policy, but it would -- it**
17 **would be a fair assumption.**
18 Q  You certainly know that there was assets
19 in Sentinel that were being held by CDO Fund when
20 you were doing your April 2017 analysis, correct?
21 **A  Say that one more time, please.**
22 Q  You knew that in April of 2017, when you
23 were doing the analysis about a transaction that
24 included the purchase of an ATE policy from
25 Sentinel, that at that time CDO Fund had an

250

1  interest in Credit Opportunities which later
2  became known as Multi Strat, correct?
3  **A  I saw the e-mail that showed that schedule**
4  **of assets, and I think Multi Strat is on there,**
5  **but I don't have an independent recollection of**
6  **that ownership.**
7  Q  Right.  But Exhibit 67 --
8  **A  Hold on one second, please.  Hold on.  I**
9  **don't have --**
10 Q  Exhibit 67 is a one-page document.
11 **A  Sorry, I don't have Exhibit 67 in front of**
12 **me for some reason.**
13 Q  Well, Exhibit 67 is a one-page document
14 that was Appendix 1 --
15 **A  Sorry, it got attached.  I found it.**
16 Q  If you look at the second page of
17 Exhibit 67, these were assets that were being held
18 by CDO Fund and HFP that had been identified to
19 you in April of 2017 when it was contemplated that
20 these assets could be used to purchase an
21 ATE policy from Sentinel, correct?
22 MS. SMITH:  Objection, form.
23 **A  Yes.  And as I told you after looking at**
24 **this document, it appears that the Highland Credit**
25 **Opportunities CDO Ltd./LP units are on here.**

251

1  **BY MR. CLUBOK:**
2  Q  So in April of 2017, you know that
3  CDO Fund had ownership interest in the entity that
4  was then called Credit Opps that later became
5  known as Multi Strat, correct?
6  **A  I certainly had this schedule.  I don't**
7  **remember focusing on it particularly, but I know I**
8  **had it.**
9  Q  Okay.  And you know that by the end of the
10 year, CDO Funds' interest in Credit
11 Opportunities/Multi Strat came to be owned by
12 Sentinel pursuant to this schedule attached to
13 Exhibit 61, correct?
14 MS. SMITH:  Objection, form.
15 **A  Hold on.  This is the -- that was in the**
16 **attachment that was sent to me.**
17 **BY MR. CLUBOK:**
18 Q  So that's a yes?
19 **A  I'm not meaning to quibble about -- I know**
20 **I received these documents.  I have no dispute**
21 **about that.  I just don't have a recollection of**
22 **looking at them, comparing them and noticing that**
23 **particular point, as we're doing today.**
24 Q  Okay.  But you were provided information,
25 whether you studied it or not, by the end of 2017

252

1  that showed that the interest CDO Fund had had in
2  Credit Opportunities/Multi Strat from earlier in
3  the year had now come to be owned by Sentinel,
4  correct?
5  **A  That's what this line says for the**
6  **offshore feeder.**
7  Q  And that's a line in a document that was
8  provided to you by the end of the year 2017,
9  correct?
10 **A  I mean, now that I'm comparing these for**
11 **the first time, I mean, this is a -- they don't**
12 **match.  They don't match.**
13 Q  Right.  The dollar amounts don't match
14 exactly.
15 **A  No, the entities don't match.**
16 Q  Oh, the entities don't match.
17 **A  No.  The entities don't match.**
18 Q  Oh.  Are you claiming that the interest
19 that Credit Opps/Multi Strat had in Sentinel did
20 not come from CDO Fund?
21 MS. SMITH:  Objection, form.
22 **A  I'm not saying that, sir.  I'm making an**
23 **observation of fact that Highland Credit**
24 **Opportunities Fund, Ltd., on Exhibit --**
25 **whatever -- 61, is a different entity than**

253

1  Highland Credit Opportunities CDO, Ltd., which was
2  colloquially known as the MVCDO and was a wholly
3  owned subsidiary of the master fund and they don't
4  match.
5  BY MR. CLUBOK:
6     Q  Sir --
7     A  I'm not making a dispute about
8  transactions.  I'm pointing out -- I mean as you
9  pointed out to me that there was a math error, I'm
10  pointing out to you there's an error.
11     Q  Well, there may or may not be an error in
12  the names used, but fair to say that you knew in
13  April of 2017 that CDO Fund had roughly
14  $24 million of LP units in what was then known as
15  Credit Strategies, correct?
16     A  In some level of Credit Strategies, but
17  they're not matching up, correct.
18     Q  Okay.  And you also received
19  information -- you also -- strike that -- knew
20  that there was a plan being proposed in April that
21  would have had an ATE policy with a $100 million
22  face value purchased by CDO Fund and HFP for all
23  of the assets in those two funds from Sentinel,
24  correct?
25        MS. SMITH:  Objection, form.

254

1     A  I was aware that what was in that
2  presentation is what was in the presentation, that
3  it was a $100 million ATE policy, I believe, in
4  exchange for all the assets.  Whatever it says
5  there is the answer.
6  BY MR. CLUBOK:
7     Q  And then you were advised at the end of
8  December -- strike that.
9        You were advised at the end of 2017 that
10  Sentinel (from Highland CDO Fund) had some
11  interest in one of the Credit Opportunities funds,
12  correct?
13     A  I was advised that Sentinel had -- well, I
14  don't know advised.  I was sent a document that
15  included a lot of information, but amongst it
16  included the line that there was 28 million in
17  offshore NAV that was transferred to Sentinel from
18  Highland CDO Fund.
19     Q  Okay.  And did you ever follow up on that
20  issue with anyone at any time after that?
21     A  I don't recall if I did, and the
22  determination as to what was or wasn't an
23  affiliate was not my decision or purview.
24     Q  Did you ever tell Mr. Seery or anyone else
25  affiliated with the debtor, that CDO Fund had once

255

1  owned an interest in Multi Strat but that it had
2  been transferred to Sentinel?
3        MS. SMITH:  Objection to form.
4     A  We discussed that they had at one point
5  owned an interest in Multi Strat, but I don't --
6  there was a problem with that interest.
7  BY MR. CLUBOK:
8     Q  What did you say specifically -- well,
9  first of all, who's the we in that sentence?
10     A  Sorry, if you'll read my testimony back.
11     Q  You said we discussed.
12     A  Mr. -- oh, gosh.  It was either me and
13  Mr. Demo or me and Mr. Seery.  I think it was me
14  and Mr. Demo.
15     Q  You and Mr. Demo discussed what on this
16  subject?
17     A  That there had been -- that there had been
18  an interest in the Credit Opportunities fund
19  structure or fund entities that had been owned by
20  CDO Fund.
21     Q  And did you ever in any way, to Mr. Demo
22  or Mr. Seery or any other lawyer for the debtor or
23  independent director, convey that that interest
24  that CDO Fund had had in Multi Strat was
25  transferred to Sentinel?

256

1     A  Yes.
2     Q  When did you tell them that?
3     A  Mr. Surgent was at all times aware of
4  that.  He had been intimately involved in the
5  transaction and he was deputy general counsel for
6  the debtor and senior to me in the legal team.  I
7  technically reported to Mr. Ellington, but
8  Mr. Surgent often would task me with things as
9  well and I had to follow his instructions.
10     Q  Sorry, let's set aside Mr. Surgent for the
11  moment.  Did you ever tell Mr. Demo or any other
12  lawyer at the Pachulski law firm, that the
13  interest that CDO Fund had had in Multi Strat was
14  transferred to Sentinel?
15     A  I believe what I told Mr. Demo was that I
16  wasn't sure what happened to that interest.
17     Q  But, in fact, you knew that that interest
18  had been transferred to Sentinel pursuant to this
19  document that we've just reviewed, correct?
20        MS. SMITH:  Objection, form.
21     A  Actually based on the discrepancy I just
22  showed you, which actually was something I
23  originally became aware of back in August of 2020
24  or maybe September, I don't actually know that
25  that was an effective transfer.

257

1  BY MR. CLUBOK:
2  Q  You don't know if there actually has been
3  an effective transfer from CDO Fund to Sentinel;
4  is that correct?
5  A  Well, it -- the problem is --
6  Q  I just want an answer to my question.  As
7  you sit here today, you don't know if there
8  actually has been an effective transfer of CDO's
9  interest in Multi Strat to Sentinel, correct?
10  A  The answer is I don't know and I also
11  think that that question assumes certain facts
12  that I can't confirm or agree with.
13  Q  Like what?
14  A  Like the problem I ran into was if you
15  have an accounting entry that shows that a fund
16  owns -- let's just round it -- we'll call it
17  24 million; is that fair?  We'll just call the
18  CDO Fund interest that --
19  Q  For purpose of this discussion you can
20  call it 24 million for ease of --
21  A  Okay.
22  Q  Whether it's 24 or 28.
23  A  Twenty-four or 28, I'm not --
24  (Simultaneous discussion interrupted by
25  reporter.)

258

1  A  So if you have one accounting sheet that
2  shows one asset and one accounting sheet that
3  shows that after it was transferred it's a
4  completely different asset, then you have a
5  problem.  Which then raises the question, did you
6  own what you think you owned and did you actually
7  transfer something you owned?  I mean, it's kind
8  of like -- it's like any other security that would
9  be issued.  Like if you own shares of UBS
10  Securities USA, LLC, and then you sell them and
11  someone on their balance sheet reflects US AG
12  stock, then what just happened?
13  BY MR. CLUBOK:
14  Q  I see.  And, in fact, for example, you
15  know that -- you -- based on the analysis you did,
16  you determined that CDO Fund still has ownership
17  of an entity that's been loosely called
18  Greenbriar, perhaps because of a faulty
19  transaction?
20  A  That is a different situation.
21  Q  Okay.  With respect to CDO Fund and
22  Multi Strat, you believe that CDO Fund may still
23  retain whatever interest it had in Multi Strat
24  that you were aware of in April of 2017 because of
25  perhaps an incorrect book entry; is that what

259

1  you're saying?
2  A  It may or may not.
3  Q  Okay.
4  A  But it -- that interest may not exist, is
5  another possibility.
6  Q  Okay.  And then -- and you identified this
7  issue at some point?
8  A  Yes, absolutely.
9  Q  While you were still working for the
10  debtor?
11  A  Yes.
12  Q  And did you fully describe this issue to
13  Mr. Demo or another lawyer at the Pachulski firm?
14  MS. SMITH:  Objection, form.
15  A  I discussed this at length with Mr. Demo.
16  BY MR. CLUBOK:
17  Q  And did you explain to Mr. Demo that there
18  had been -- when you say discussed it at length,
19  did you ever, in words or substance, say something
20  that reflected that there was some effort, whether
21  or not it had been successful, to transfer
22  interest in Credit Strat from Highland CDO Fund to
23  Sentinel?
24  A  We discussed --
25  Q  That's a yes-or-no question.

260

1  A  The issue of Sentinel did not come up in
2  our conversations.
3  Q  So when you claim that you discussed at
4  length this potential problem with identifying
5  whether CDO Fund, in fact, owned an interest in
6  Multi Strat, you never thought to raise the issue
7  of whether or not CDO Fund had effectuated a
8  proper transfer of that interest if it had one, to
9  Sentinel, correct?
10  A  I got stuck in an earlier stage in the
11  analysis and so Sentinel didn't come up.
12  Q  You never raised it affirmatively,
13  correct?
14  A  We never got to that point in the inquiry.
15  So no.
16  Q  You never mentioned that in order to
17  figure out what interest, if any, CDO Fund had in
18  Multi Strat, you might need to look at Sentinel's
19  books, correct?
20  A  No, I wouldn't care what Sentinel's books
21  said.
22  Q  You never mentioned that in order to
23  figure out what interest, if any, CDO Fund had in
24  Multi Strat, you might need to look at what
25  Highland's books reflected in terms of transfers

261

1 from Highland CDO Fund to Sentinel, correct?
2 **A We didn't say Sentinel in particular, but**
3 **we did talk about any transfers, yes.**
4 Q But you definitely didn't say Sentinel,
5 which was the transfer that you were aware at
6 least had been contemplated and at least in one
7 place reflected as having had occurred?
8 MS. SMITH: Objection, form.
9 BY MR. CLUBOK:
10 Q I'll break that up into two questions.
11 You knew that it was contemplated that
12 there would be a transfer of CDO Fund's interest
13 in Credit Strat to Sentinel, but you never
14 affirmatively raised that with Mr. Demo or any
15 other lawyer at Pachulski, correct?
16 MS. SMITH: Objection, form.
17 **A I don't remember being aware of that at**
18 **the time and it wasn't pertinent to the task that**
19 **I was working on, which was the asset trade.**
20 **BY MR. CLUBOK:**
21 Q Sir, you knew that it had been
22 contemplated based on the work you did in April of
23 2017, that to purchase an ATE policy, CDO Fund
24 might use as part of the consideration whatever
25 interest it had in Multi Strat, correct?

262

1 **A I can affirmatively state that in August**
2 **of 2020, I was not thinking about an e-mail from**
3 **April of 2017.**
4 MR. CLUBOK: Move to strike as
5 nonresponsive.
6 BY MR. CLUBOK:
7 Q I didn't ask you that. I just said you
8 knew based on the work you had done in April 2017,
9 that CDO Fund had been contemplating using its
10 interest in Multi Strat to partially fund the
11 purchase of an ATE policy, correct?
12 **A Sir, it was one of many assets on a**
13 **schedule, and I just don't remember thinking about**
14 **that asset in -- I don't remember thinking of that**
15 **asset from that schedule in April of 2017 back**
16 **in -- whenever we were, August of 2020.**
17 Q You knew it was contemplated that CDO Fund
18 would transfer all of its assets to Sentinel as
19 part of the consideration for what was then
20 contemplated to be an ATE policy. You knew that
21 for sure, right?
22 **A Apparently in April 2017, I did, yes.**
23 Q And you knew that there had been an
24 ATE policy purchased, correct?
25 **A Yes.**

263

1 Q And you knew that there was a schedule
2 that showed Sentinel having interest in
3 Multi Strat (from Highland CDO Fund), correct?
4 **A In December I think that's fair -- sorry,**
5 **December 2017. I think that's fair.**
6 Q And you even -- when you were tasked with
7 helping trace the assets of CDO Fund and HFP, you
8 even talked to Mr. Ellington, in words or
9 substance, about whether or not you should mention
10 Sentinel, correct?
11 **A Correct.**
12 Q And you never did once mention Sentinel to
13 anyone at the Pachulski law firm in the course of
14 doing the task you were given with respect to
15 tracing the assets of CDO Fund and SOHC, correct?
16 Correct?
17 **A It was not relevant to the task, so, no, I**
18 **didn't.**
19 Q I'm going to hand you what's been marked
20 as Deposition Exhibit No. 2. I don't want you to
21 spend time reading it. I just want to -- in fact,
22 before I hand it to you, I just want to ask you.
23 Did you know there was a purchase agreement that
24 was executed on or about the same time as the
25 ATE policy was executed?

264

1 **A I think I knew that there was such an**
2 **agreement, but I've never seen it.**
3 Q You've never seen it before today and that
4 you're sure about, right?
5 **A Yes.**
6 Q Did you ever ask for a copy of it?
7 **A Not that I'm aware of.**
8 Q Were you ever sent a copy of it?
9 **A Not that I'm aware of.**
10 Q Okay. You knew -- you specifically were
11 involved with authorizing payments from Sentinel
12 for legal fees associated with the UBS litigation
13 in New York, correct?
14 **A Say that one more time, please.**
15 Q You were involved with authorizing
16 payments to be made from Sentinel for legal fees
17 associated with the UBS litigation in New York,
18 correct?
19 **A Yes.**
20 Q In fact, you directed Sentinel to make
21 certain payments to lawyers and vendors associated
22 with the legal work done in New York against UBS,
23 correct?
24 **A I don't want to say I directed them to.**
25 **I'll say we requested that they do so.**

265

1    Q   And in every single instance, they
2 followed your request for payment of legal fees
3 associated with the New York litigation against
4 UBS, correct?
5    **A   I can't say --**
6        MS. SMITH:  Objection to form.
7    **A   I can't say every single time, but I think**
8 **pretty much every time, if not every.**
9 **BY MR. CLUBOK:**
10    Q   You can't, as you sit here today, identify
11 a single time where they did not follow your
12 directions in terms of paying legal fees or costs
13 associated with the litigation pending in
14 New York, correct?
15        MS. SMITH:  Objection, form.
16    **A   Sitting here today, I'm not aware of any**
17 **time that they refused to pay requested legal**
18 **fees.**
19        MR. CLUBOK:  What was your form objection?
20        MS. SMITH:  You said direction and he said
21 he didn't direct.  He said he requested.
22 BY MR. CLUBOK:
23    Q   In every single time that you requested
24 Sentinel pay any legal fees or costs associated
25 with the New York litigation, they abided by that

266

1 request, as best as you recall sitting here today,
2 correct?
3    **A   Again, I don't remember every single**
4 **instance, but I don't remember any time that they**
5 **didn't do it.**
6    Q   Who told you that you could make requests
7 directly to Sentinel and expect that they would
8 carry them out with respect to legal fees
9 associated with the New York litigation?
10    **A   It was my understanding that that was**
11 **something contemplated in the ATE policy, was that**
12 **Sentinel would pay legal invoices.**
13    Q   How did you know that if you never saw the
14 ATE policy?
15    **A   I don't remember who told me, but somebody**
16 **did.**
17    Q   Who?
18    **A   I don't remember.  It would have been**
19 **Mr. Sevilla or Mr. DiOrio, most likely.**
20    Q   Did they tell you anything else about the
21 policy, other than that they would pay all legal fees
22 associated with the New York litigation?
23    **A   Maybe they told me other things, but this**
24 **particular subject would have come up because I**
25 **was the person in charge of processing legal fees**

267

1 at Highland.
2    Q   Did you ever request that anyone consider
3 whether or not a ATE policy that was related to a
4 judgment would be considered to be an asset of the
5 beneficiary of that policy?  Let me ask that
6 again.
7        If there's an ATE policy -- and by the
8 way, that after the event, what was the event
9 that's referenced in the ATE policy?
10    **A   I haven't read the policy, sir.**
11    Q   Did you have -- they told you that legal
12 fees were part of the policy.  Did they tell you
13 that a settlement be an event that would be
14 impacted by the policy?
15    **A   Well, those are two slightly different**
16 **questions.  Can we break them into two, please?**
17    Q   Did anyone, in words or substance, tell
18 you if there was a settlement in the UBS
19 litigation, that a Sentinel policy could be used
20 to pay the settlement?
21    **A   I believe that was my understanding, yes.**
22    Q   And who gave you that understanding?
23    **A   I don't recall exactly, but it would have**
24 **been probably Mr. Ellington or Mr. Sevilla.**
25    Q   When?

268

1    **A   I don't know.**
2    Q   Before the bankruptcy?
3    **A   Yes.**
4    Q   And at any point during the bankruptcy,
5 did you ever tell the independent directors or any
6 of the lawyers at the Pachulski firm that there
7 was this source of funds available to help settle
8 the litigation between UBS and the defendants in
9 the New York litigation?
10    **A   I don't know that I ever spoke to the**
11 **Pachulski firm about settlement of the New York**
12 **litigation.**
13    Q   Did you ever volunteer that there was an
14 insurance policy available that could be used to
15 satisfy the judgment in the New York litigation?
16    **A   I don't believe I ever spoke to Pachulski**
17 **about satisfaction of the judgment in New York or**
18 **settlement of the New York litigation.**
19    Q   So is that a no to my question?
20    **A   That's right.**
21    Q   And you understood also from Mr. Sevilla
22 or Mr. Ellington that the after-the-event policy
23 could be used to satisfy a judgment in addition to
24 satisfying settlement or legal fees in connection
25 with the New York litigation, correct?

269

1    A   I don't know that that's something we ever
2  discussed, but it would be logical.  But I don't
3  recall ever discussing that point.
4    Q   You never suggested, in words or
5  substance, that either the independent directors
6  or the Pachulski lawyers should look into whether
7  the Sentinel after-the-event policy could be used
8  to help satisfy the judgment that was entered
9  against CDO Fund and SOHC, correct?
10   A   We never discussed settlement or
11  satisfaction of a judgment against those two
12  entities, whether the insurance policy or from any
13  other source of funds.
14   Q   So that's a yes to my question, correct?
15     MS. SMITH:  Objection, form.
16  BY MR. CLUBOK:
17   Q   I would just like you to try to answer my
18  question.  You gave me a broader answer, which is
19  interesting, but I'm not going to ask you to do
20  that and I am going to ask for my time if you
21  don't just -- make me ask these questions again.
22  So please answer the question I asked.
23     MS. SMITH:  Andy, the questions are so
24  long and they're multiple declarative sentences,
25  followed by comma, correct.  That's the --

270

1      MR. CLUBOK:  Okay.  I'm going to ask --
2      MS. SMITH:  It gets confusing.
3      MR. CLUBOK:  You didn't even object on
4  form.
5      MS. SMITH:  Objection, form.
6      MR. CLUBOK:  It's too late after I asked
7  the question.  So with no form objection, I ask
8  the following question and I'm going to ask
9  Mr. Leventon to answer this question.
10   A   Okay.
11  BY MR. CLUBOK:
12   Q   Isn't it true that you never suggested, in
13  words or substance, to either the independent
14  directors or any of the Pachulski lawyers that
15  they should look into whether the Sentinel
16  ATE policy could be used to help satisfy the
17  judgment that had been entered against CDO Fund
18  and SOHC?
19   A   My answer is I disagree with the premise
20  of the question.  I can explain why.  It's the
21  explanation I just gave.
22   Q   I don't want you to explain why.  I want
23  to say, did you ever suggest, in words or
24  substance, to either the directors or the
25  Pachulski lawyers that the ATE policy could

271

1  possibly be used to help satisfy the billion
2  dollar judgment?
3    A   That question assumes -- I don't want to
4  make an assumes facts not in evidence objection
5  for myself, but that's what I'm saying.  It
6  assumes things that didn't happen and I told you
7  the thing that didn't happen.
8    Q   Yeah, I understand you want to tell me
9  that you never discussed anything about the
10  judgment, but I'm asking you a narrower question.
11  And it's very simple and you've spent -- wasted
12  five minutes and I'm going to add to my time at
13  least, and I just want to know.
14     Fair to say that you never suggested, in
15  words or substance, to the directors or to the
16  Pachulski lawyers, that they should look into
17  whether the Sentinel ATE policy could be used to
18  satisfy the judgment that UBS had obtained against
19  CDO Fund and SOHC, correct?
20   A   And my --
21     MS. SMITH:  Objection, form.
22   A   And my answer is that assumes that I spoke
23  to the Pachulski firm or the independent directors
24  about satisfaction of the judgment or
25  settlement --

272

1  BY MR. CLUBOK:
2    Q   It doesn't --
3    A   -- which it didn't.
4    Q   It doesn't assume that at all.  I never
5  assumed that.  In fact, I assumed you didn't.  It
6  assumes the opposite.  So I'm not asking you to
7  quibble with me about what supposedly is assumed
8  or not.  I just want you to answer a question.
9      My question is, you never volunteered to
10  the independent directors or to any lawyer at the
11  Pachulski firm that they should look into whether
12  or not the Sentinel ATE policy could be used to
13  satisfy the billion dollar judgment that had been
14  discussed during the course of the bankruptcy,
15  correct?
16   A   That was never a conversation that we had.
17   Q   You certainly discussed with others at
18  Highland during the bankruptcy, the possibility of
19  settling or satisfying the judgment in the
20  New York litigation, correct?
21     MS. SMITH:  Objection to form.
22   A   I don't know that I did.
23  BY MR. CLUBOK:
24   Q   Well --
25   A   I thought that action was stayed.

273

1    Q   You -- did you ever communicate with
2  anyone about the possibility that the ATE policy
3  could be used to satisfy the judgment that had
4  been entered in the New York litigation after the
5  bankruptcy?
6    **A   I don't know if I did or not. I don't**
7  **remember.**
8    Q   In fact, you specifically engaged in
9  analysis for Sentinel's auditors about the
10 potential impact of the judgment in the New York
11 litigation on the ATE policy, didn't you?
12   **A   I believe I spoke to Beecher Carlson at**
13 **some point about the impact of the judgment on the**
14 **policy.**
15   Q   And you never told the independent
16 directors that you were having those discussions,
17 correct?
18   **A   It wouldn't have come up ever, so, no, we**
19 **never had those conversations.**
20   Q   And you never told the Pachulski lawyers
21 that you were having discussions with the auditors
22 for the Sentinel policy about the potential impact
23 of the judgment on the policy, correct?
24   **A   It would never have come up with the**
25 **Pachulski lawyers, so, no, we didn't have those**

274

1  **conversations.**
2    Q   In fact, you specifically analyzed
3  different outcomes and assigned percentages to
4  settlement and to other scenarios to try to
5  calculate the potential liability for Sentinel in
6  connection with the New York litigation; isn't
7  that true?
8    **A   I don't recall that.**
9    Q   I'm going to hand you what we're going to
10 mark as Exhibit 68.
11      (Deposition Exhibit 68 marked for
12 identification.)
13 BY MR. CLUBOK:
14   Q   Exhibit 68 is a two-page document
15 Bates-labeled 95 and 96. This is a document
16 that's an e-mail chain beginning at the very first
17 e-mail, May 24th, 2019, from Lawrence Kemp to you
18 and then it picks up June 16, 2020, from Lawrence
19 Kemp to you and you respond. Do you see that?
20   **A   I do.**
21   Q   And here it looks like there is a request
22 for an update on what happened with respect to the
23 New York litigation, correct?
24   **A   Yes.**
25   Q   And this analysis that's reflected in the

275

1  chart is clearly after the judgment because it
2  refers to the Phase 1 decision, correct?
3    **A   Well, it -- it refers to the -- yes, the**
4  **Phase 1 decision from November.**
5    Q   Right. And that's this -- the decision
6  that led to the so-called billion dollar judgment,
7  correct?
8    **A   That's correct.**
9       MS. SMITH: Objection, form.
10 BY MR. CLUBOK:
11   Q   And there's a number of expected payouts
12 from Sentinel as a result of that judgment. Do
13 you see that?
14   **A   I see Mr. Kemp's chart, yes.**
15   Q   And it appears that this -- he sends you
16 this chart and he asked you if the actuarial
17 identification of lightly -- likely outcomes are
18 reasonable. Do you see that?
19   **A   Yes.**
20   Q   And they've got one possibility of
21 settlement where the Sentinel -- and this is all
22 expected payouts by Sentinel that are being
23 assessed, correct?
24      MS. SMITH: Objection, form.
25   **A   I believe that's right, yes.**

276

1       MR. CLUBOK: What's the form objection to
2  that question?
3       MS. SMITH: It doesn't say that they're
4  the expected payouts for Sentinel.
5       MR. CLUBOK: That's why I asked the
6  question. But in any event.
7  BY MR. CLUBOK:
8    Q   This was a question for you to affirm
9  whether they were reasonable estimates for
10 potential payouts by Sentinel because of its
11 ATE policy. Is that what you understood this to
12 be?
13   **A   I think that's right, yes.**
14   Q   And one possibility that you agreed was a
15 50 percent probability is that the plaintiff, that
16 is UBS, would pursue recovery exclusively through
17 bankruptcy proceedings. Do you see that?
18   **A   I see where it says that, yes.**
19   Q   And if that were to happen, you told them
20 to expect that Sentinel would pay zero. Do you
21 see that?
22   **A   I didn't tell him to expect that. This is**
23 **the assumptions he's giving me.**
24   Q   You agreed that it was a reasonable
25 assumption that there was a 50 percent chance that

277

1 UBS would pursue its recovery against the insureds
2 under the ATE policy exclusively through the
3 bankruptcy proceedings and therefore there would
4 be zero paid out from the ATE policy, correct?
5 **A I didn't -- I agreed with Mr. Kemp's**
6 **analysis -- or I didn't change it.**
7 Q You agreed that it was a reasonable
8 assumption?
9 **A Yes.**
10 Q And you also agreed that if the Phase 1
11 decision were affirmed, then the expected payout
12 would be $91 million from the ATE policy, correct?
13 **A That's what that says, yes.**
14 Q And you said there was a reasonable
15 assumption that there would only be a 20 percent
16 chance of that, correct?
17 **A That's not exactly right. Because it's**
18 **total probabilities, so it's not isolating just**
19 **the probability of success on the appeal.**
20 Q But the total -- okay. I see. You
21 thought there was a 50 percent chance that we
22 wouldn't even -- that UBS wouldn't even bother to
23 continue the litigation but instead would settle
24 the case or pursue recovery just through the
25 bankruptcy proceeding?

278

1 **A I mean, in terms of the 20 percent, the**
2 **20 percent is in terms of the total outcome. I'm**
3 **not saying that the appeal is only 20 percent.**
4 **Like that UBS has an 80 percent chance of losing**
5 **its appeal, that's not what I thought this said.**
6 Q Okay. Because at the time you thought it
7 was nearly certain -- or certainly extremely
8 likely that UBS's judgment would be affirmed if it
9 was even appealed, correct?
10 **A Honestly, I don't remember.**
11 Q Well, you --
12 **A I still remember that we -- we thought we**
13 **had really good textual arguments on the synthetic**
14 **warehouse.**
15 Q But you actually believed from day one
16 that UBS was likely to win on liability, right?
17 **A Which is a wholly separate issue, yes.**
18 Q And you had done analysis -- and by the
19 way, you also knew from the trial, way before the
20 judgment, that you had lost all of your arguments
21 about offsetting the damages due to hedging
22 because the Court ruled from the bench on that
23 during the trial, right?
24 **A The Court made a ruling on hedging during**
25 **the trial, yes.**

279

1 Q Right. So you at one point had a bunch of
2 settlement -- sorry. At one point you had a bunch
3 of damages outcomes that included scenarios
4 involving winning on hedging, but by the time the
5 trial was done, you knew that that was not going
6 to happen, correct?
7 **A I know the scenarios incorporated hedging.**
8 **I would have to go back and look at what they**
9 **said. But certainly by the end of trial, we would**
10 **have -- excuse me. Certainly by the end of the**
11 **trial, we would have known that the Court -- the**
12 **trial court had ruled against us on hedging.**
13 Q And the -- anyway, back to this. Did you
14 ever -- when you're responding to Mr. Kemp, did
15 you inform Mr. Seery in any way, directly or
16 indirectly, through the chain of command about
17 this analysis and the potential payout from the
18 ATE policy with respect to the New York
19 litigation?
20 **A Mr. Surgent would have been aware of the**
21 **potential payout, but other than that, I don't**
22 **know if there's anyone else. And Mr. Ellington**
23 **would have been, but I mean that's my whole --**
24 **that's my chain of command.**
25 Q Did you inform Mr. Surgent about this

280

1 analysis you were doing in June of 2020?
2 **A No, but he was aware of the ATE policy and**
3 **what it covered.**
4 Q Again, then, it's not the question at all
5 that I asked you. You've just volunteered --
6 somehow you find it okay to volunteer information
7 about Mr. Surgent, but you never volunteered
8 anything about the ATE policy in the whole time
9 you worked for Mr. Seery.
10 MS. SMITH: Objection, badgering.
11 BY MR. CLUBOK:
12 Q My question to you, without -- and I'm
13 asking you not to volunteer information that's not
14 responsive to this question, is did you ever
15 inform Mr. Seery in any way directly or indirectly
16 through the chain of the command about the
17 analysis and potential payout under the ATE policy
18 that's reflected in Exhibit 68?
19 **A I don't believe that I ever discussed**
20 **Exhibit 68 with Mr. Seery.**
21 MS. SMITH: Andy, is now a good time for a
22 break?
23 MR. CLUBOK: I'm going to finish up one
24 more thing here.
25

281

1  BY MR. CLUBOK:
2      Q  Did you tell anyone else in the
3  organization other than Mr. Seery or the debtor's
4  outside counsel, the Pachulski firm, about this
5  analysis that you had performed or that you had
6  blessed?
7      A  I believe -- without characterizing
8  whether it's been performed or blessed, the
9  document will speak for itself, but I believe that
10  Mr. DiOrio was aware of this analysis.
11      Q  Why do you believe that?
12      A  Because he was the person who was in
13  charge of the -- coordinating the Sentinel audit.
14      Q  Who made Mr. DiOrio aware of this?
15      A  I believe it would have been me.
16      Q  Who else did you make aware of this other
17  than Mr. DiOrio and obviously Mr. Kemp?
18      A  This specific analysis, I don't know that
19  I discussed it with anyone else.
20      Q  Did you?
21      A  Not that I recall.
22      Q  I'm going to hand you what's been marked
23  as Exhibit 53. Exhibit 53 is an e-mail dated
24  June 16th, 2020 in which you forward this analysis
25  to Mr. DiOrio, Mr. Sevilla and Katie Irving. Do

282

1  you see that?
2      A  Yes. I remembered forwarding it to
3  Mr. DiOrio. I forgot who I CC'd, which was
4  Mr. Sevilla and Ms. Irving.
5      Q  And you did not -- you forwarded it to
6  those three individuals but not to Greg Demo,
7  correct?
8      A  A Greg Demo is not on this e-mail.
9      Q  And you did not forward it to
10  Mr. Feinstein or Mr. Morris at the Pachulski firm,
11  correct?
12      A  That's correct.
13      Q  And you did not forward it to Mr. Nelms or
14  Mr. Dubel or Mr. Seery, correct?
15      A  No -- nobody is on this e-mail except for
16  the people on this e-mail.
17      Q  Is there any other way that you
18  communicated this information that you chose to
19  share with Mr. DiOrio, Mr. Sevilla and
20  Ms. Irving -- is there any other way that you
21  believe you ever tried to communicate this
22  information that you chose to share with
23  Mr. DiOrio, Mr. Sevilla and Ms. Irving that's
24  reflected in Exhibit 68 with anybody at all who
25  you expected to share the information with the

283

1  independent directors or with their outside
2  counsel?
3      MS. SMITH:  Objection, form.
4      A  I only remembered sharing it with
5  Mr. DiOrio. So I can't say that I expected this
6  information to be -- that I recall expecting this
7  information to be shared with the independent
8  directors.
9  BY MR. CLUBOK:
10      Q  Did you bring this to Mr. Surgent's
11  attention in 2020?
12      A  This document? Not that I recall.
13      Q  How about this analysis or anything about
14  this subject in 2020?
15      A  This analysis, no. Anything about this
16  subject, I would have to think about further.
17      Q  This analysis clearly -- the people you
18  sent this e-mail to, you expected them to all know
19  about the ATE policy, right?
20      A  They all did know about the ATE policy.
21      Q  And you discussed this analysis also with
22  Mr. Ellington at some point?
23      A  I don't know that I did.
24      Q  But you certainly never mentioned the
25  ATE policy again to Mr. Surgent at any point after

284

1  the time the debtor declared bankruptcy, correct?
2      A  I don't know if we talked about it or not.
3  I don't remember.
4      Q  As you sit here today, you can't recall
5  ever reminding Mr. Surgent about the ATE policy
6  after the bankruptcy commenced, correct?
7      A  Sitting here today, I can't remember that
8  conversation having taken place.
9      MR. CLUBOK:  Okay. Let's take a break.
10      THE VIDEOGRAPHER:  The time is 5:20 p.m.
11  We are off the record.
12      (Recess taken from 5:20 p.m. CDT to
13  5:39 p.m. CDT)
14      THE VIDEOGRAPHER:  The time is 5:39 p.m.
15  We are back on the record.
16  BY MR. CLUBOK:
17      Q  We're turning to Exhibit 59. Exhibit 59
18  is an e-mail chain with the top e-mail dated
19  August 11th, 2017, from Carter Chism, C-h-i-s-m,
20  to Mr. Patel, P-a-t-e-l, attaching a document
21  that's called CDO Fund and HFP Balance Sheets at
22  8/7/17. It's an Excel sheet that's attached as
23  part of Exhibit 59. Do you see that?
24      A  I do.
25      MS. SMITH:  And like yesterday, Shannon,

285

1 is this the full exhibit of the Excel?
2     MR. CLUBOK: It's the same document that
3 was used yesterday, Exhibit 59. It was marked
4 yesterday, I believe.
5 BY MR. CLUBOK:
6     Q So for Exhibit 59, we're going to turn to
7 page 3, which is the first, working backwards
8 e-mail in the chain.
9     A Can you -- will you give me the Bates
10 number?
11     Q It ends with 85.
12     A Okay. Got it.
13     Q And the Bates label ending in 85 is where
14 the e-mail starts, and it starts with Mr. Stoops
15 sending an e-mail to a number of people, including
16 yourself. Do you see that?
17     A I do, yes.
18     Q And the e-mail says, Jeremy, who is the
19 first person on the To line, you are the third
20 person on the To line, says: Jeremy, Please send
21 custodial admin details for the following entities
22 to JP Sevilla and Isaac (copied).
23     That Isaac is you, correct?
24     A Yes.
25     Q And they asked for custodial admin details

286

1 for Highland Financial Partners, we've called HFP;
2 CDO Hold Co, which is a sub of HFP, correct?
3     A Yes.
4     Q Highland Financial Corp., which is another
5 sub of HFP at the time, correct?
6     A I think so, but I'm not 100 percent sure.
7     Q And then SOHC, which was a sub of HFP at
8 the time, right?
9     A Yes.
10     Q Then the CDO Master Fund and two of its
11 subsidiaries or affiliates, correct?
12     A Those look like the feeder funds.
13     Q Okay. The feeder funds. But there are
14 basically four HFP entities, the first four names
15 that I mentioned, and then there are three
16 CDO Fund entities, correct?
17     A Yes.
18     Q And he says he included those feeder funds
19 for CDO just in case there's any cash held at
20 these entities. Do you see that?
21     A I do see where he says that, yes.
22     Q And this is all part of the purchase of
23 the ATE policy in August of 2017, correct?
24     A That's what it appears to be.
25     Q And it's clear from reading this that the

287

1 goal was to transfer all of the assets out of HFP
2 and CDO Fund to Sentinel to purchase the
3 $100 million ATE policy in August of 2017,
4 correct?
5     A I don't know that it's clear from this
6 document per se, but I did know that, you know,
7 substantially all of the assets were going to
8 be -- were included in the ATE policy.
9     Q And the attachment, which has a number of
10 different worksheets including the first one which
11 says CDO Opportunity Master Fund, LP, Combined
12 Assets and Liabilities, and then another document
13 that says Highland Financial Partners, LP,
14 Combined Assets and Liabilities, show that, the
15 assets and liabilities of those two respective
16 entities, correct?
17     A Yes. But I don't know that those -- well,
18 I know they were attached to -- this was attached
19 to the top-level e-mail and that's what it shows.
20     Q Right. And one question I have is --
21 well, first of all, there's a schedule that was
22 constructed in connection with the purchase
23 agreement. The purchase agreement is Exhibit 2
24 and I believe you said you've never seen it. I'm
25 going to give you a copy of it just to confirm

288

1 that that's true. This was Exhibit 2. It's a
2 Purchase Agreement dated August 7th, 2017.
3     A Mr. Clubok, are we done with 59?
4     Q No.
5     A Should I put it up or keep it --
6     Q I want you to keep it up because I'm going
7 to ask you to compare something.
8     A Got it. Okay.
9     Q There's a purchase agreement that was
10 dated as of August 7th, 2017, and you said before
11 you believe -- you thought you had never seen
12 this. Looking at it now, do you want to change
13 your answer or do you still believe you've never
14 seen this?
15     A No, I don't think I've ever seen this.
16     Q Okay. Well, what about Schedule A, which
17 is somewhat like that Appendix 1, but it's got
18 different assets listed and in some cases
19 different values. Have you ever seen Schedule A
20 before?
21     A No, I haven't.
22     Q Okay. And so I take it you don't know
23 whether or not the asset information reflected in
24 Exhibit 59 was what was used to populate
25 Schedule A of Exhibit 2?

289

1    A   No. I don't think I've seen either of
2  these two things before.
3    Q   Okay. Do you -- why were you part of this
4  whole chain? What was your role in this part of
5  the transaction? And in particular, if you know,
6  why did Mr. Stoops specifically ask for the
7  details to be sent to both you and Mr. Sevilla?
8    A   I mean, I don't know what was in
9  Mr. Stoops's mind, but I can speculate.
10   Q   What did you understand your role to be at
11  the time in connection with this information that
12  was forwarded to you?
13   A   My best guess as to why I was involved in
14  this process is because I was the guy in charge of
15  the legal bills. And so it would have been
16  relevant to payment of the legal wires that you
17  see on the first page of this exhibit.
18   Q   And so all of those payments were made
19  prior to the transfers?
20   A   I don't know.
21   Q   Do you know whether or not there was any
22  effort to satisfy the liabilities of CDO Fund and
23  SOHC -- sorry, strike that.
24       Do you know whether there was any effort
25  to satisfy the liabilities of CDO Fund and HFP

290

1  prior to transferring all of these assets to
2  Sentinel in 2017?
3    A   I don't know.
4    Q   Do you know at that time whether or not
5  there was any estimation that was being made at
6  either of these two entities for amounts that
7  could be due to UBS in connection with the
8  litigation?
9    A   To the best of my recollection, accounting
10  had taken UBS's initial complaint and the number
11  identified in the initial complaint and then just
12  rolled that number forward year over year.
13   Q   And indeed UBS ultimately collected
14  roughly the amount plus interest that was in its
15  initial complaint pursuant -- or strike that.
16       UBS was awarded as part of Phase 1,
17  roughly the amounts that it had identified in its
18  initial complaint plus PJI, correct?
19   A   That's not exactly right.
20   Q   Why not?
21   A   So the initial complaint was for
22  $746 million in principal, and to the best of my
23  recollection the judgment principal amount was
24  something like 530. I know, we're talking about
25  enormous numbers where it kind of doesn't matter

291

1  maybe what the difference is, but they weren't
2  exactly the same.
3    Q   Fair enough. But at some point UBS had
4  either amended its complaint or submitted expert
5  reports that reflected the roughly $500 million in
6  principal liability that was ultimately awarded;
7  is that true?
8    A   I know the number went down, but I don't
9  remember exactly how it matched up to the final
10  judgment because there were a lot of toggles that
11  went on with the expert reports.
12   Q   Right. But let's say within 20 percent
13  the amount that UBS was seeking as of 2017
14  pursuant to its expert reports was the amount that
15  was ultimately awarded; fair to say?
16   A   Sitting here today, I don't know the
17  answer to that. They were big numbers. I mean,
18  there's no dispute they were big numbers, but I
19  don't remember exactly what they were, if it was
20  20 percent, 30 percent, 10 percent.
21   Q   Okay. Certainly you knew that UBS was
22  seeking at least $500 million plus interest as of
23  this date of this transfer, correct?
24   A   As of August 2017, I think that I knew
25  that UBS was seeking $500 million or so.

292

1    Q   And the whole aim of this transfer was to
2  create an -- or to purchase an ATE policy with
3  respect to that UBS litigation that was pending in
4  New York, correct?
5    A   The August 2017 transaction was the
6  purchase of an ATE policy relative to the UBS
7  state court action.
8    Q   Okay. I'm going to turn to Exhibit 4
9  which is a document dated August 11th, 2017, that
10  you are also on the to line. There's a whole host
11  of people.
12   A   Do I keep or do I throw?
13   Q   You can put it in front of me.
14   A   No, these?
15   Q   You can set it aside. Take a look at
16  Exhibit 4, please. Exhibit 4 is an e-mail from
17  David Willmore to a host of people, including
18  yourself, Mr. Chism, Ms. Irving, Mr. Sevilla,
19  copying Mr. Surgent, Mr. Stoops and others and its
20  subject is Sentinel Wiring Info. Do you see that?
21   A   Yes.
22   Q   And it -- in an e-mail below, it
23  references instructions to wire cash from all the
24  HFP Funds and all the CDO Funds to Sentinel,
25  correct?

293

1    A  That's what Mr. Chism says in his e-mail.
2    Q  And those two wire transfers totaled
3  roughly $10 million, according to Mr. Willmore's
4  e-mail, correct?
5    A  Yes.
6    Q  Well, I should say CDO Funds cash totaled
7  about $10 million, according to Mr. Willmore,
8  correct?
9    A  I don't honestly know if -- I mean,
10  reading this, Mr. Willmore says there are two
11  wires that are CDO Fund wires, which wouldn't
12  include HFP. Sitting here today, I have no idea
13  whether there were two of them.
14    Q  Does it ring a bell --
15    A  That's what it says.
16    Q  Does it ring a bell that the total amount
17  of cash including the HFP cash was closer to
18  $11 million or so?
19    A  No. No.
20    Q  But fair to say you understood on
21  August 2017, that all of the cash in CDO Fund and
22  HFP was being wired to Sentinel, correct?
23    A  Apparently I did.
24    Q  And do you know what was the consideration
25  for that cash at the time?

294

1    A  I knew that it was in consideration of the
2  ATE policy.
3    Q  Did you know how the value of the
4  ATE policy compared the total transfers that were
5  being made at the time?
6    A  No, I did not.
7    Q  Did you know whether it was for equivalent
8  value?
9    A  I didn't know what the assets were so I
10  couldn't comment one way or another.
11    Q  Turning to Exhibit 5, this is a separate
12  e-mail from Mr. Stoops that responds to Carter
13  Chism's e-mails. And you can see Mr. Stoops says:
14  All cash has been sent. Working on DTC
15  securities. Still waiting on delivery
16  instructions for physicals from Legal.
17    You see that?
18    A  I do.
19    Q  Was Mr. Stoops the one responsible for
20  transferring the HFP cash?
21    A  I don't know.
22    Q  Did Mr. Stoops have a role in connection
23  with HFP at the time?
24    A  Yes.
25    Q  Okay. So looking at these two documents,

295

1  does it ring a bell that Mr. Willmore was
2  responsible for transferring CDO Fund cash and
3  Mr. Stoops was responsible for transferring HFP
4  cash?
5    A  I can infer that from the document and it
6  wouldn't surprise me, but I don't know.
7    Q  Did you at any point ever mention to
8  Mr. Seery or to the Pachulski lawyers that all
9  this cash had been transferred out of CDO Fund and
10  HFP to Sentinel just in 2017, a little over
11  two years before the bankruptcy?
12    A  To the best of my recollection, neither
13  myself nor any of the other individuals mentioned
14  it to him.
15    Q  Did you think that you personally as a
16  lawyer who was working for the debtor had a
17  fiduciary obligation to the debtor at the time?
18    A  I believe you do, yes.
19    Q  Did you have a fiduciary obligation to
20  ensure that the debtor -- strike that.
21    From January 2020 forward, is it fair to
22  say that there were independent directors who were
23  in charge of the debtor?
24    A  Yes.
25    Q  And you understood you ultimately reported

296

1  up to them?
2    A  That's fair to say.
3    Q  And you understood that you had a
4  fiduciary duty to ensure that they were made aware
5  of all material information necessary to carry out
6  their jobs?
7    A  I'm not sure how -- I'm not sure how
8  the -- that I had -- say that one more time. That
9  I had a fiduciary duty to make them aware of all
10  facts that they needed for their job?
11    Q  Yeah. Did you believe as part of the
12  fiduciary duties that you understood you owed the
13  debtor, that you had an obligation to the best of
14  your ability to make sure that Mr. Seery and the
15  other directors were apprised of any material
16  information that you reasonably believed would be
17  necessary for them to do their jobs in managing
18  the estate?
19    A  No. My understanding -- I understood my
20  job was to do the tasks that I was assigned.
21    Q  There was a number of times after this
22  transfer in August 2017, where questions arose
23  about the transfers that were supposed to have
24  been made, correct?
25    A  Sorry, I really don't --

297

1      MS. SMITH: Objection, form.
2   **A  I don't understand the question as asked.**
3   **BY MR. CLUBOK:**
4      Q  So in August 2017, you were copied on
5   these documents that purported to show there had
6   been transfers made from CDO Fund and HFP to
7   Sentinel Reinsurance, correct?
8   **A  Yes.**
9      Q  And over the next couple of years, did you
10  come to learn that there were questions about
11  whether those transfers had properly been
12  effectuated?
13  **A  I didn't really get involved in that until**
14  **mid -- like kind of third quarter of 2020.**
15     Q  Well, you were asked about information
16  relating to the transfers as early as February of
17  2019, weren't you?
18  **A  I was? Okay. I don't recall that.**
19     Q  I'm going to share with you what's been
20  marked as Exhibit 62. Exhibit 62 has an e-mail
21  chain that begins with Ernest Ramos of BNY Mellon
22  reaching out to Carter Chism about custody
23  invoices.
24  **A  I apologize. Where are you, sir?**
25     Q  The very last e-mail in the chain working

298

1   backwards. If you turn to the page that's
2   Bates-labeled 39 at the end.
3   **A  Give me a moment to review it.**
4      MS. SMITH: Is this the complete e-mail?
5      MR. CLUBOK: This is the e-mail that was
6   marked as Exhibit 62 yesterday that I presume is
7   the complete e-mail.
8      MS. SMITH: In the middle it says: See
9   column M for approved action, and I don't see
10  anything with column M.
11     MR. CLUBOK: What page are you on?
12     MS. SMITH: 9039.
13     MR. CLUBOK: Yeah. Well, I don't know.
14  Sometimes the top -- yeah. There was originally
15  attachments, but on this particular version of the
16  document, I don't believe it included the
17  attachments. But in any event, yeah -- -- look,
18  as I stated, the first e-mail refers to attached
19  invoices. Obviously those attached invoices
20  aren't included as part of this document, just the
21  cover e-mail. And then Carter Chism talks about
22  column M presumably in the attached invoices. If
23  I could just focus the questions I want to ask of
24  Mr. Leventon.
25

299

1   **BY MR. CLUBOK:**
2      Q  Sir, do you remember this exchange? And
3   in particular I want to point your attention to
4   the first page that's Bates-labeled 35 of
5   Exhibit 62 where you --
6   **A  Go ahead.**
7      Q  Where you are specifically e-mailing
8   Carter Chism to say that: CDO Fund is and has
9   been insolvent since the financial crisis of 2009.
10     Do you see that?
11  **A  I do see that, yes.**
12     Q  And then in response, Carter Chism says:
13  Thinking about this further, I believe the
14  CDO Opps fund was included in the transfer to
15  Sentinel.
16     Do you see that?
17  **A  I do.**
18     Q  And this is an e-mail that you and
19  Mr. Sevilla and Mr. DiOrio and Clifford Stoops are
20  all copied on, correct?
21  **A  Yes.**
22     Q  So this is another reminder that there had
23  been this transfer to Sentinel, right?
24  **A  I suppose, yes.**
25     Q  Okay. Now, your e-mail to Carter Chism

300

1   says: Jason, CDO Fund and has been insolvent.
2      Do you see that?
3   **A  Yes.**
4      Q  Did you mean to send that e-mail to Jason
5   Martinez?
6   **A  No.**
7      Q  Why did you say Jason?
8   **A  I was suggesting -- I don't recall**
9   **exactly, but I know what my practice was and I**
10  **think I was suggesting language to Mr. Chism that**
11  **he could use to go back to Mr. Martinez.**
12     Q  I see. So you -- this is a draft e-mail
13  of what you were suggesting that Mr. Chism could
14  send to Jason Martinez in response to the question
15  that he asked, correct?
16  **A  Correct.**
17     Q  And when you say that CDO Fund is and has
18  been insolvent since the financial crisis, you
19  weren't going to tell him that CDO Fund actually
20  had some assets in August of 2017, correct?
21     MS. SMITH: Objection, form.
22  **A  I mean, I don't know that I was going to**
23  **mention it in this communication, but Bank of**
24  **New York Mellon was actually the bank for those**
25  **funds that was directly involved in apparently the**

301

1  transfers, as I'm noticing from the earlier
2  exhibits. So they certainly knew about it.
3  BY MR. CLUBOK:
4    Q  Do you know what Sebastian Clarke is?
5    A  Who?
6    Q  Have you ever heard of an entity called
7  Sebastian Clarke?
8    A  No, sir.
9    Q  Are you aware of Sentinel ever
10 transferring assets to an entity called Sebastian
11 Clarke?
12   A  I'm sorry, sir, I don't know that name.
13   Q  You've never heard that name before ever?
14   A  Candidly, I thought it was a person when
15 you first asked it.
16   Q  Okay. I'm going to hand you what we're
17 going to mark as Exhibit 69.
18     (Deposition Exhibit 69 marked for
19 identification.)
20 BY MR. CLUBOK:
21   Q  It is a copy of UBS's First Request for
22 Production of Documents to Debtor Highland Capital
23 Management, dated September 28th, 2020. Do you
24 see that?
25   A  Yes.

302

1    Q  So were you -- you were partially
2  responsible for helping respond to this discovery
3  request; is that true?
4    A  I was part of a team of people
5  responsible.
6    Q  Did you review this request carefully?
7    A  I don't know about carefully, but I
8  certainly reviewed it.
9    Q  Would it have been your practice to review
10 a document request like this carefully?
11   A  I definitely reviewed it and understood
12 its contents. I don't know what carefully means,
13 but I definitely reviewed it and knew what it
14 said.
15   Q  And at the time you reviewed this, you had
16 the ability to obtain the asset information
17 about -- from CDO Fund, SOHC and HFP, correct?
18   A  That's a really hard question to answer.
19 Not exactly. Not really.
20   Q  Well, who would have had information about
21 CDO Fund in September of 2020 who was still
22 working for the debtor?
23   A  So that's the problem, is I don't think
24 there was an accountant who was responsible for
25 CDO Fund at that point.

303

1    Q  Was there -- so was Mr. Willmore still
2  there?
3    A  Mr. Willmore was no longer employed by the
4  debtor.
5    Q  Who was Mr. Willmore employed by at that
6  time?
7    A  He was employed -- well, I don't know who
8  exactly he was employed by, but he started to work
9  for some NexPoint affiliate and didn't work on any
10 further Highland stuff.
11   Q  Okay. Did you inquire of Mr. Willmore as
12 to where you would go to find the CDO Fund asset
13 information?
14   A  I think I did actually.
15   Q  And what did he tell you?
16   A  He generally pointed me to some accounting
17 drives on the G drive.
18   Q  Well, you certainly had an e-mail that
19 talked about how all of CDO Fund's assets had been
20 moved to Sentinel in approximately August of 2017,
21 correct? Actually, you had many e-mails that
22 reflected that in your inbox, correct?
23   A  I mean, as I previously stated, the
24 e-mails were separate from the production process
25 that I was involved in and that was agreed to with

304

1  Pachulski, and all of those e-mails were actually
2  sitting at Meta-e and were accessible by
3  Pachulski.
4    Q  Right. But you personally had access to
5  information about transfers from CDO Fund to
6  Sentinel at the time you reviewed this document
7  request that were be marked as Exhibit 69, correct?
8    A  In the e-mails, yes.
9    Q  And you knew that that information existed
10 in the e-mails, whether you chose to look at them
11 or not at the time, right?
12     MS. SMITH: Objection to form.
13   A  I knew that information was in the e-mails
14 that had been sent to Meta-e.
15 BY MR. CLUBOK:
16   Q  And did you specifically tell anyone at
17 the Pachulski firm that there is information about
18 what happened to CDO Fund's assets in August of
19 2017, available in the e-mails that were sitting
20 at Meta-e?
21   A  No, the e-mails were carved out completely
22 from the process I was involved in.
23   Q  Same answer with respect to HFP's assets,
24 including SOHC's assets, correct?
25   A  Everything that was in the e-mails I did

305

1  not look at as part of this response. And I
2  understand from Mr. Morris was that he told you
3  that we weren't going to be looking through
4  e-mails in response to these requests because that
5  was being handled separately.
6    Q  Mr. Morris told you that he told me,
7  Andrew Clubok, that?
8    A  That's --
9    Q  That's what you're claiming?
10   A  That's what I recall, is that it was
11  agreed that the e-mails would be separate.
12   Q  Mr. Morris told you that he had an
13  agreement with me, Andrew Clubok, that they didn't
14  have to search the e-mails for information
15  relating to CDO Fund and HFP's assets?
16   A  That -- it may not have been an agreement
17  per se, but it was -- essentially Mr. Morris and
18  Mr. Demo told me not to worry about the e-mails
19  and they would take care of it.
20   Q  And did you tell Mr. -- when they told you
21  that, did you say, hey, but there's this transfer
22  that occurred in 2017 that will show you exactly
23  what assets were there at CDO Fund and HFP as of
24  August 2017? Did you say anything like that to
25  them, in words or substance, when they told you

306

1  we've got somebody else reviewing the e-mails?
2    A  No.
3    Q  And by the way, you were told by Mr. Demo
4  that it was a high priority item to get the asset
5  information for CDO Fund and SOHC and HFP,
6  correct?
7    A  He may have said that at one point, but
8  then we had additional iterations as to how we
9  were going to respond and ultimately I was tasked
10  with tracing the -- I can't remember if it was
11  March or May of 2009, I think it was May of 2009
12  through -- but those assets and explain where they
13  were today.
14   Q  If you look at Exhibit 69, you see that
15  the request included -- and for No. 8, it was:
16  All Documents pertaining to the assets and
17  liabilities of HFP, CDO Fund, and SOHC, including,
18  but not limited to -- and then it lists a number
19  of subcategories. Do you see that?
20   A  I do.
21   Q  And did you review that request carefully
22  to see what was being requested in terms of assets
23  and liabilities of HFP, CDO Fund and SOHC?
24   A  Yes.
25   Q  And did you, in words or substance --

307

1  okay. There isn't a single request in here that
2  caused you to mention to the Pachulski firm or
3  Mr. Seery or the other directors, hey, there's all
4  this information about the assets that were held
5  at HFP and CDO Fund and SOHC as of August 2017, if
6  we just go look at that time period when the
7  assets were all transferred to Sentinel. Nothing
8  caused you --
9      MS. SMITH:  Objection, form.
10   A  You mean in the e-mails, that that
11  information was sitting in the e-mails?
12  BY MR. CLUBOK:
13   Q  That that information was available
14  anywhere.
15   A  The only place that I know that it was
16  available was the e-mails and that was, again,
17  carved out of what I was looking at. But I
18  understand that these issues were being looked at
19  by whomever was reviewing the e-mails.
20   Q  Did you think you had any kind of
21  fiduciary obligation to affirmatively tell the
22  debtor counsel that it wasn't just a treasure hunt
23  or a needle in the haystack hunt in those e-mails,
24  but that specifically in August of 2017 if they
25  focused on your e-mails and Mr. Sevilla's and a

308

1  few others that we've seen today, they could find
2  all the information they were looking for?
3    A  At that point I was a task lawyer with
4  what Pachulski was telling me, so if it was in the
5  e-mails, frankly, I just ignored it because they
6  had them and I knew that they were focused on
7  these issues as well.
8    Q  And even though you knew they were in the
9  e-mails, you ignored them?
10     MS. SMITH:  Objection to form.
11   A  See, let me rephrase. I don't know that
12  I, sitting here today, knew that all these
13  e-mails -- let me rephrase.
14   I don't know that in September 2020 I knew
15  that all those e-mails existed from 2017, but to
16  the extent they existed, they had been sitting
17  with Pachulski from the end of July.
18     THE WITNESS:  Did they turn off the heat?
19     MS. SMITH:  Yes, they turned off the air.
20     THE WITNESS:  Okay.
21     MS. DANDENEAU:  Wonder if we should open
22  the door. Would that be better?
23     THE WITNESS:  I think that might mess with
24  the acoustics.
25     MS. DANDENEAU:  What?

309

1    THE WITNESS:  I think that might mess with
2  the acoustics.  No, it won't?  Maybe.
3  BY MR. CLUBOK:
4    Q  I'm going to --
5    MR. CLUBOK:  Keep this here.  Let's go to
6  this document.
7  BY MR. CLUBOK:
8    Q  I'm going to hand you what's been marked
9  as Exhibit No. 70.
10    (Deposition Exhibit 70 marked for
11  identification.)
12  BY MR. CLUBOK:
13    Q  It's an e-mail chain and I'm going to ask
14  you to start on the page that's Bates labeled --
15  ends with a 17.  Turn -- second-to-last page -- or
16  third-to-last page.  You can see there's an e-mail
17  from James Romey at DSI to you, copying Greg Demo
18  and Seery.
19    **A  Sorry, this is hard to read.  If you'll**
20  **give me a moment.**
21    Q  Right.  You're at the page that ends in
22  Bates number 117, right?
23    MS. SMITH:  Let him read the whole thing,
24  please.
25    **A  I'm going to review the document.**

310

1    MR. CLUBOK:  In that case, let's go off
2  the record.
3    THE VIDEOGRAPHER:  We are off the record
4  at 6:16 p.m.
5    (Recess taken from 6:16 p.m. CDT to
6  6:19 p.m. CDT)
7    THE VIDEOGRAPHER:  The time is 6:19 p.m.
8  We are back on the record.
9  BY MR. CLUBOK:
10    Q  Sir, turning to the page in Exhibit 70
11  that is -- ends with 17, do you see where there's
12  an e-mail from James Romey to you saying:  Before
13  we give anything to UBS today, we need to track
14  down what the Highland Credit Opportunities CDO
15  Ltd. partnership interest in MSCF means and how
16  it's accounted for on MSCF's books, i.e., whether
17  it's part of the existing redemption group, or how
18  it has any remaining interest in the fund.  Or if
19  I'm misunderstanding something, please let me know
20  ASAP.
21    You see that?
22    **A  Yes.**
23    Q  And MSCF refers to Multi Strat, correct?
24    **A  I think that means the Multi Strat Credit**
25  **Fund.  I'm just not sure which level it would be**

311

1  specifically.
2    Q  Okay.  But it's basically talking about --
3  okay.  There's questions and it says that there
4  may be confusions over the name and David Klos
5  asks for you to chime in and they're trying to
6  figure out, you know, ownership, I guess, in
7  Multi Strat Credit Fund, correct?  And in
8  particular Greg Demo chimes in and says, beginning
9  at the bottom of page 16:  The confusion we're
10  having is that there's an asset shown on the
11  worksheets that we got from Isaac that says
12  Highland CDO Opportunity Master Fund has a
13  $21.5 million limited partnership interest in
14  MVCDO.
15    Do you see that?
16    **A  Yes.**
17    Q  And Greg goes on to say, so the issue you
18  raise is exactly the issue we're trying to figure
19  out.  Going off the org chart, I thought this
20  entity was 100 percent owned by MSCF.  We're
21  trying to figure out what the $26 million asset on
22  CDO Fund's books means and whether it's a direct
23  interest in MCVDO [sic] and LP interest in MSCF or
24  redemption interest.  I haven't seen Highland CDO
25  Opportunity Master Fund listed as either an LP or

312

1  as one of the redeemers.
2    Do you see that?
3    **A  Actually I lost you while you were**
4  **reading, but I will take your word for it that you**
5  **read it right.**
6    Q  I paraphrased it slightly and skipped what
7  I thought was not every word.
8    **A  Okay.**
9    Q  But the gist of this is --
10    **A  Could you tell me -- sorry, I don't know**
11  **where we are in the document.**
12    Q  The gist of what Greg is asking --
13    **A  Sorry, which e-mail from Greg?**
14    Q  There's an e-mail from Greg at the bottom
15  of the page that ends in 16 --
16    **A  Okay.  I'm there.**
17    Q  -- that is to you and other people --
18    **A  Yes.**
19    Q  -- copying Seery --
20    **A  Yes.**
21    Q  -- and says they're having confusion over
22  assets shown on worksheets they got from Isaac,
23  that's you, about CDO Fund's interest in
24  Multi Strat, correct?
25    **A  That's what it says.**

313

1  Q  And you say:  Dave -- and I assume you're
2  referring to Dave Klos -- I will call you to
3  figure this out.
4     Do you see that?
5  **A  Yes.**
6  Q  And then James then follows up and says,
7  are you guys available for a call at 6 p.m.
8  Eastern for a status check, on the same day.  And
9  by the way, it says importance high.
10    Do you see that?
11 **A  I do.**
12 Q  And Greg says he's going to circulate a
13 dial-in, and you then jump in and say:  Guys, I
14 don't think this is a prerequisite to delivering
15 materials to UBS in satisfaction of their
16 concerns.  I am prepping the documents set for
17 delivery tomorrow.  Dave has not worked on this,
18 so I will just call Greg and James.  However, this
19 is the current status.
20    Do you see that?
21 **A  I do.**
22 Q  And then Scott says:  Isaac and me were
23 instructed by Jim Seery to get this UBS
24 deliverable handled.  I was on the phone with -- I
25 was just on the phone with Isaac when the e-mail

314

1  came through.  Don't see how this is urgent.
2  Especially relative to UBS request.  We will get
3  to this when it is a priority.
4     Do you see that?
5  **A  I do.**
6  Q  And Greg jumps in and says:  Scott and
7  Isaac, I spoke to Jim about this issue this
8  morning.  It is a high priority at this point and
9  we need to do what we can to push it to
10 conclusion.  I understand that it's going to take
11 some work.
12    Do you see that?
13 **A  Yes.**
14 Q  And then Scott writes a fairly lengthy
15 e-mail that begins by saying:  I don't think
16 there's a need for a call and I can tell you where
17 we are currently.
18    Do you see that?
19 **A  Yes.**
20 Q  And that's an e-mail that he copies you
21 on, along with Mr. Seery, James Romey and
22 David Klos.
23 **A  Yes.**
24 Q  And Greg Demo.
25 **A  Yes.**

315

1  Q  And he says basically, this is really hard
2  and we can't find more information about what
3  you're asking.
4     MS. SMITH:  Objection, form.
5  BY MR. CLUBOK:
6  Q  Is that the impression that he conveys
7  from when you read this document?
8     MS. SMITH:  Objection, form.
9  **A  I'll let the document speak for itself.**
10 **The impression that I got at the time was that he**
11 **was butting heads with Mr. Demo.**
12 **BY MR. CLUBOK:**
13 Q  That's the only impression you got from
14 this exchange, that he's butting heads with
15 Mr. Demo?
16 **A  That's the primary impression that I got.**
17 Q  Did you get the impression from this
18 document that Mr. Seery, who was the CEO of
19 Highland, had made it clear to you and to
20 Mr. Ellington that these requests were, in fact, a
21 high priority, notwithstanding what
22 Mr. Ellington's views were or your views were?
23    MS. SMITH:  Objection, form.
24 BY MR. CLUBOK:
25 Q  Okay.  Let me just ask it very simply.

316

1  Did you get the impression from this e-mail
2  exchange that's reflected in Exhibit 70, that
3  notwithstanding what you and Mr. Ellington may
4  have thought about the priority level of these
5  requests, Mr. Seery definitely believed it was a
6  high priority to respond to these requests from
7  UBS?
8     MS. SMITH:  Objection, form.
9  **A  Well, I didn't really know what the answer**
10 **was because I wasn't speaking to Mr. Seery, but**
11 **Greg was saying that Mr. Seery needed one thing**
12 **and Scott's saying, no, he doesn't and I was not**
13 **involved in either of those conversations and then**
14 **it was just going to be me and Dave trying to**
15 **figure things out.**
16 **BY MR. CLUBOK:**
17 Q  My simple question to you is, did you,
18 from reading this back and forth, have the
19 impression that Mr. Seery believed that this was a
20 high priority for you to respond to regardless of
21 what Mr. Ellington or what you believed?
22    MS. SMITH:  Objection, form.
23 **A  So I wasn't sure, because Mr. Ellington**
24 **conveyed essentially that -- I mean, to get the**
25 **deliverable handled, but I don't know that this**

---

317

1  one outstanding item was the most important thing
2  in the deliverable. And then Greg thought that
3  this one outstanding item was the most important
4  thing in the deliverable and I didn't speak to
5  Mr. Seery either way to confirm who was right.
6  BY MR. CLUBOK:
7      Q  Well, wait a second. You were instructed
8  by Mr. Seery to get this UBS deliverable handled,
9  weren't you?
10     A  Yes.
11     Q  And Mr. Seery made it clear to you
12  personally in that call that this was a priority,
13  didn't he?
14     A  This deliverable, yes. But this one
15  specific item that was holding up the deliverable,
16  I don't remember that.
17     Q  All right. You then read Mr. Seery
18  telling your -- or telling this group including --
19  sorry.
20         You read Mr. Ellington's -- strike that.
21  Let me start over.
22         You read Mr. Ellington's e-mail to
23  Mr. Seery and to others in which he says that
24  there are ghost funds such as these target
25  entities, and by target entities he means

---

318

1  CDO Fund, HFP and SOHC, correct?
2      A  I can assume that's what he means, but I
3  don't know.
4      Q  And he talks about how the ghost funds
5  don't have directors, custodians, administrators,
6  bank accounts and no one knows -- no one knows
7  what they truly retain. Do you see that?
8      A  I do.
9      Q  And he claims that UBS is aware of the
10  situation because he's personally discussed it
11  with Andy Clubok, that's me, several dozen times,
12  including as recently as this year, right?
13     A  He does say that.
14     Q  And did you know that Mr. Ellington had
15  represented to me that these were ghost funds and
16  there was no way really as a practical matter to
17  figure out how much assets they had or when they
18  last had assets or words to that effect?
19     A  I wasn't privy to your conversations.
20     Q  Did you -- did Mr. Ellington ever tell
21  you, in words or substance, that he had conveyed
22  that information to UBS other than what's here in
23  Exhibit 70?
24     A  I don't recall him ever doing that.
25     Q  Okay. He then said, the project is a

---

319

1  Herculean task. Do you see?
2      A  He does.
3      Q  And he says:  Isaac and myself have spent
4  in excess of 100 hours trying to piece together
5  everything we can to create a true and accurate
6  document-based record of what happened with these
7  target entities.
8         Correct?
9      A  Yes.
10     Q  As part of that -- and by the way, was
11  that a true statement when you read it, in your
12  mind, that you had gone through a Herculean task
13  to do everything you could to create a true and
14  accurate document-based record of what happened to
15  HFP, CDO Fund and SOHC?
16     A  I think a more fair characterization is we
17  had put a substantial amount of effort into
18  tracing the May 2009 assets against -- well,
19  figuring out what happened to the May 2009 assets.
20     Q  My question to you is not that question.
21  So I want you to answer my question.
22         Is it true that you and Mr. Ellington
23  did -- had done everything you could to create a
24  true and accurate document-based record of what
25  happened with HFP, SOHC and CDO Fund as of

---

320

1  August 15th, 2020?
2         MS. SMITH:  Objection, form.
3      A  I think that was a slight
4  mischaracterization of the work that we were
5  doing, which was tracing the assets.
6  BY MR. CLUBOK:
7      Q  Did you --
8      A  And that we had done a lot of work.
9         MR. CLUBOK:  Move to strike as
10  nonresponsive.
11     A  Sorry, I was addressing the Herculean task
12  portion of it.
13  BY MR. CLUBOK:
14     Q  Okay. Well, I'm asking you whether it was
15  true as Mr. Ellington reported to Mr. Seery and
16  others, that as of August 15th, 2020, you were --
17  you had spent 100 hours trying to piece together
18  everything you could to create a true and accurate
19  document-based record of what happened with HFP,
20  SOHC and CDO Fund?
21     A  I think his statement was not precise, and
22  I believe that what I stated was a more precise
23  characterization of what he was saying.
24     Q  Did you make any effort to correct his
25  statement to this audience?

321

1    A  I never responded to this e-mail and I
2  wasn't going to get involved in a -- what I viewed
3  to be essentially a butting of heads between
4  Mr. Ellington and Pachulski.
5    Q  At the time did you think it was accurate
6  that you had been doing everything you could to
7  create a true and accurate document-based record
8  of what had happened with HFP, SOHC and CDO Funds?
9    A  That was not what I had been tasked with
10  doing.  I had been tasked with the other thing
11  that I've already described.
12    Q  So is the answer to my question no?
13    A  No, I didn't because that wasn't my task.
14    Q  Is the answer to my question no?
15    A  I said no, because that's not what I was
16  tasked with doing.
17    Q  Are you saying --
18    MS. SMITH:  Objection to form.
19  BY MR. CLUBOK:
20    Q  You're saying that you had not done
21  everything you could to create or to try to create
22  a true and accurate document-based record of what
23  happened with HFP, SOHC and CDO Fund as of the
24  date of this e-mail, correct?
25    A  Well, I tried to do everything I could and

322

1  I put a lot of effort into tracing the May 2009
2  assets and identifying what happened -- where they
3  were today.  I put a lot of effort into that.
4    Q  But you very -- you had not -- okay.
5    MR. CLUBOK:  Move to strike as
6  nonresponsive.
7  BY MR. CLUBOK:
8    Q  I just want you to answer my question and
9  we are going to add more time to this dep if you
10  don't answer my question.  Was Mr. Ellington's
11  statement that you and he together had tried to do
12  everything you could to create a true and accurate
13  document-based record of what had happened with
14  HFP, SOHC and CDO Fund?
15    MS. SMITH:  Objection, form.
16    A  The problem is that's a paraphrase of what
17  Mr. Ellington said here and I'm happy to point out
18  where, frankly, I disagree with Mr. Ellington on
19  this.
20  BY MR. CLUBOK:
21    Q  But did you point out to anyone on this
22  e-mail chain in any communication, how you
23  disagreed with what Mr. Ellington was saying in
24  this e-mail that you read?
25    A  I think I did actually, yes.

323

1    Q  To whom?
2    A  So Mr. Demo knew exactly what I was
3  working on, as did -- well, I take it back.  I
4  don't know if DSI knew what I was working on.  But
5  Mr. Demo knew exactly what I was working on and I
6  never represented to him, or anybody that I
7  remember, maybe I did, but I just -- I don't
8  remember having that conversation of I'm going to
9  do a forensic audit of the funds.
10    Instead, it was, I'm going to identify
11  what did they have as of this date, which has
12  already been produced to UBS and show UBS what
13  happened to those assets.
14    Q  You've said that you and -- he says that
15  you and he were speaking literally daily about
16  this.  Do you see that?
17    A  Yes.
18    Q  Is that true, that you were speaking daily
19  about responding to UBS's document request with
20  respect to the assets?
21    A  This is the -- before the document
22  request.
23    Q  Okay.  This was with respect to -- this is
24  before the formal document request.
25    A  I don't know how to respond to that, sir.

324

1  It's before the request for production that are
2  marked as Exhibit 69.
3    Q  Okay.  But it -- you knew at the time of
4  August 15, 2020, that UBS had requested all
5  information relating to the assets of HFP,
6  CDO Fund and SOHC, correct?
7    A  I don't know that I ever saw UBS requests
8  that -- whenever these informal requests were that
9  predated the request for --
10    Q  I didn't ask you if you ever saw them.  I
11  said, did you know, prior to the formal requests
12  that were marked as Exhibit 69, that UBS had
13  requested all information related to the assets,
14  both current and historical, for SOHC, CDO Fund
15  and HFP?
16    A  I knew that UBS certainly was asking for a
17  lot of information, but in terms of exactly how
18  you phrased it just now, I don't remember that
19  part.  But UBS was certainly asking for a lot of
20  information and then that's what me and Mr. Demo
21  spoke about, is to kind of how to satisfy that.
22    Q  Was this -- Mr. Ellington says that a
23  large majority of your efforts were based on
24  educated guess work, but at the time, you and he
25  both knew that all the assets that CDO Fund and

325

1  HFP had, had been attempted to be transferred to
2  Sentinel in 2017, correct?
3      MS. SMITH:  Objection, form.
4      A  With respect to the assets that had been
5  sitting in those SOHC and CDO Fund in May of 2009,
6  most of those weren't the subject of the 2017
7  transfer and there was a lot of -- educated guess
8  work is probably not the right way to say it.  We
9  were gathering as many documents as we could to
10 try to figure out what had happened to those
11 assets.
12 BY MR. CLUBOK:
13     Q  At the time Mr. Ellington made the
14 statement about an educated guess, you knew that
15 all the assets that CDO Fund and HFP had had been
16 attempted to be transferred to Sentinel in 2017,
17 correct?
18     MS. SMITH:  Objection to form.
19     A  I knew that substantially all of the
20 assets they had in August of 2017 had been
21 transferred in August of 2017, but that's not
22 necessarily the same as what was there in 2009.
23 BY MR. CLUBOK:
24     Q  I didn't ask you about that yet.
25     MR. CLUBOK:  I'm going to move to strike

326

1  that part as nonresponsive.
2  BY MR. CLUBOK:
3      Q  I'm going to again ask you, hopefully try
4  to answer my question so we can finish this close
5  to on time.
6      A  Okay.
7      Q  I didn't say a word about 2009 yet.  I may
8  move to that, but I want a clean answer to my
9  question.
10     When Mr. Ellington wrote this e-mail
11 that's reflected on the first page of Exhibit 70,
12 you knew at the time and he knew at the time that
13 substantially all of the assets of HFP and
14 CDO Fund had been transferred to an entity that he
15 partially owned in August of 2017, correct?
16     MS. SMITH:  Objection, form.
17     A  I can't give you a clean answer to that
18 question, sir.  There are -- if you want to break
19 it up into parts, I'm happy to address it.
20 BY MR. CLUBOK:
21     Q  Okay.  At the time Mr. Ellington wrote the
22 e-mail that's reflected on the first page of
23 Exhibit 70, you knew that substantially all of the
24 assets of HFP and CDO Fund had been attempted to
25 be transferred to Sentinel in August of 2017,

327

1  correct?
2      A  I knew that the assets -- substantially
3  all of the assets that they had owned in August of
4  2017 had been transferred in -- or attempted to be
5  transferred in 2017.
6      Q  And Mr. Ellington knew that too, correct,
7  when he wrote this e-mail?
8      A  Mr. Ellington and Mr. Klos knew that,
9  both.
10     Q  Okay.  And also you knew that Sentinel --
11 you knew in August 2020, that Sentinel was at
12 least partially owned by Mr. Ellington, correct?
13     A  I actually didn't know that, no.
14     Q  Okay.  But Mr. Ellington certainly knew
15 that at the time, correct?
16     MS. SMITH:  Objection, form.
17     A  You'll have to ask Mr. Ellington what he
18 knows.  I don't -- I don't know that Mr. Ellington
19 owns any part of Sentinel.  I know he's related to
20 it in some way, but I don't know if he owns it.
21 BY MR. CLUBOK:
22     Q  Oh, you don't know if Mr. -- you don't
23 know, sitting here today, if Mr. Ellington has any
24 economic interest, direct or indirect, in
25 Sentinel?

328

1      A  No.
2      Q  But you do know that Mr. Dondero has an
3  economic interest in Sentinel?
4      A  So it's similar to SAS, right.  I knew
5  that Mr. Dondero and Mr. Ellington had some
6  involvement with that entity.  I didn't know
7  exactly what the structure or ownership was.  I
8  knew that they had, essentially, involvement in
9  authority with respect to those entities.
10     Q  You do know that Mr. Dondero has an
11 economic interest in Sentinel, correct?
12     A  Actually, I don't.
13     Q  Okay.  Do you know if Mr. Surgent was made
14 aware that Mr. Dondero and Mr. Ellington had an
15 economic interest in Sentinel when he supposedly
16 made the determination that they were not
17 affiliates -- strike that.
18     Do you know whether or not Mr. Surgent
19 knew about Mr. Dondero and Mr. Ellington's
20 economic interest in Sentinel when he supposedly
21 made the determination you claim he made with
22 respect to Sentinel's status as an affiliate or
23 not an affiliate of Highland Capital?
24     MS. SMITH:  Objection to form.
25     A  I don't know if they have an economic

329

1  interest and I don't know what the content of
2  those conversations were, but I do know
3  Mr. Surgent's determination.
4  BY MR. CLUBOK:
5  Q  Okay. But you don't know if he knew the
6  economic ownership interest that Mr. Dondero or
7  Mr. Ellington may or may not have had in Sentinel
8  at the time he was supposedly asked to make that
9  determination, correct?
10 A  I don't know what he knew one way or
11 another.
12 Q  I'm going to hand you what's been marked
13 as Exhibit 71.
14    (Deposition Exhibit 71 marked for
15 identification.)
16 BY MR. CLUBOK:
17 Q  It's an e-mail from Mike Throckmorton to
18 you, copying David Klos and also to Chris Rice.
19 It's actually an e-mail exchange, I should say,
20 that begins with Chris Rice sending to you a
21 balance of roughly 363 million in the claims
22 account for CDO Opportunity Master as of
23 12/31/2018, and it goes back and forth here. Do
24 you see that?
25 A  Yes.

330

1  Q  And you ultimately say that the CDO Fund
2  number should be about 530 million which accounts
3  for the accrued interest, correct, on the first
4  page?
5  A  I think that was reflective of the
6  judgment that had been handed down by the Court.
7  Q  Right. So you knew as of -- obviously
8  knew as of July 16, 2020, that CDO Fund had a
9  judgment against it totaling approximately
10 $530 million including interest, correct?
11 A  Yes.
12 Q  And you asked why they were doing
13 financials for CDO Fund and you were told it was
14 for tax purposes, correct?
15 A  Where did I ask that?
16 Q  In the -- your e-mail on page -- the first
17 page of Exhibit 71.
18    MS. SMITH: Review the exhibit.
19 BY MR. CLUBOK:
20 Q  Look at the first page. Do you see where
21 it says -- where you give the fund number, and
22 then you say: However, more generally, why are we
23 doing financials for CDO Fund at all?
24 A  Yes, I see that.
25 Q  Why did you ask that question?

331

1  A  Well, because for years, CDO Fund didn't
2  have any financials and so it just struck me as
3  unusual that they were doing anything with that
4  fund. It was very -- it was strange to me so I
5  asked.
6  Q  And are these people, Mike Throckmorton
7  and Chris Rice who are copied on this exchange,
8  people that you went to when you were tasked with
9  helping to identify historical information about
10 the assets of CDO Fund?
11 A  Throckmorton, I think yes. Rice, I don't
12 remember.
13 Q  Did you direct Mr. Seery or Pachulski to
14 these people for assistance?
15 A  Well, they were asking questions of
16 Mr. Klos, and Mr. Throckmorton responded to
17 Mr. Klos. So that wasn't my chain of command.
18 Q  I'm going to -- so turning back, though,
19 to Exhibit 70, which is dated August 15, 2020.
20 You say at that time you didn't know -- did you
21 know at that time that UBS was asking for all
22 information relating to the assets, both current
23 and historical, for HFP, SOHC and CDO Fund?
24    MS. SMITH: Objection, form.
25 A  I think my prior testimony is that I knew

332

1  UBS wanted a lot of information, but that exact
2  characterization I don't know. I don't remember.
3  BY MR. CLUBOK:
4  Q  In words or substance, you knew that the
5  gist of what UBS had been looking for for at least
6  weeks, if not months prior to this, was
7  information about the assets that CDO Fund, SOHC
8  and HFP had both then and historically since 2009;
9  isn't that true?
10    MS. SMITH: Objection. He answered that
11 he didn't remember.
12 A  I mean, I --
13    MR. CLUBOK: Move to -- look, I -- please
14 don't start making speaking objections just
15 because it's getting late.
16 BY MR. CLUBOK:
17 Q  I'm asking you a slightly different
18 question and I'm saying, didn't you understand, as
19 of August 15, 2020, that the gist of requests that
20 UBS had made at least weeks before, if not months
21 before, was to get whatever information was
22 available about the assets of CDO Fund, HFP and
23 SOHC, both currently and historically since 2009;
24 isn't that true?
25 A  I knew -- I knew UBS was asking for a lot

---

**333**

1 of information about what happened to the assets
2 in those funds and then we went through an
3 iterative process between myself and Mr. Demo to
4 determine what it was that we were going to send,
5 but I -- I don't recall ever seeing UBS's
6 requests. Really I was getting my tasking orders
7 from Pachulski.
8    Q  Okay. I'm going to hand you what's been
9 marked as Exhibit 72.
10       (Deposition Exhibit 72 marked for
11 identification.)
12 BY MR. CLUBOK:
13    Q  It's an e-mail from ten days earlier,
14 August 5th, 2020, from you to Jim Seery, copying
15 Brad Sharp, James Romey, David Klos, and the
16 subject is UBS Supplemental Information Request.
17 Do you see that?
18    A  I do.
19    Q  And this -- UBS had made information
20 requests and then they had made supplemental
21 information requests, and this is all before the
22 more formal document requests that we previously
23 reviewed, correct?
24    MS. SMITH:  Please let him review the
25 document.

---

**334**

1    A  I see that it says supplemental
2 information request. I was not interfacing with
3 UBS on these requests. I don't even remember
4 being sent them.
5 BY MR. CLUBOK:
6    Q  That's not my question. Let's listen to
7 my question, please, and answer my question.
8 Isn't it true that UBS had made information
9 requests and supplemental information requests
10 with respect to the assets of HFP, CDO Fund and
11 SOHC all before the more formal document requests
12 that we reviewed earlier today?
13    A  I don't have any personal knowledge of
14 those.
15    Q  Okay. But on August 5th, 2020, you
16 were -- in response to an e-mail from James Seery,
17 the subject being, RE:  UBS Supplemental
18 Information Request, you respond:  UBS's current
19 requests for information exceed what it was
20 entitled to under the Special Master Discovery
21 Order (attached).
22       Do you see that?
23    A  I do.
24    Q  You said:  UBS is asking for documents
25 from 12/31/07 through 12/31/19.

---

**335**

1    Q  Do you see that?
2    A  Yes.
3    Q  And so when you gave this answer, did you
4 know what the current requests were? When you
5 wrote this e-mail, at that -- even if you don't
6 remember now, this is almost a year ago, but at
7 the time, had you reviewed UBS's then current
8 request for information when you advised Mr. Seery
9 that they supposedly exceeded what UBS was
10 entitled to under the special master order?
11    A  I apparently knew that you were asking for
12 documents from 12/31/07 through 12/31/19.
13    Q  Did you know what the current requests for
14 information were at that time when you wrote this
15 e-mail, yes or no?
16    A  I don't recall if I did one way or
17 another.
18    Q  Okay. And you go on to say:  HFP and
19 CDO Fund informed their investors that they had
20 zero net asset values.
21       Do you see that?
22    A  Yes.
23    Q  And then you say you've been tracking the
24 assets through on SOHC and CDO Fund. Do you see
25 that?

---

**336**

1    A  Right. That was the task that they had
2 put me on, was to track the assets from May of '09
3 forward.
4    Q  Well, you talk about -- well, first of
5 all, every single asset that it -- had been there
6 in May of '09 that was still there in August 17th,
7 you knew exactly what had had happened to those
8 assets, right?
9    MS. SMITH:  Objection to form.
10    A  Actually, I didn't.
11 BY MR. CLUBOK:
12    Q  Well, you knew that any assets that were
13 there in May of 2009 that were still there in
14 August of 2017, had been transferred, pursuant to
15 that e-mail that you were copied on, to Sentinel
16 for consideration for the ATE policy, didn't you?
17    A  There were only two such assets and I
18 researched extensively what happened to both of
19 those assets. And so I don't necessarily agree
20 that they were effectively transferred by the
21 ATE policy -- whatever -- whatever it is that
22 people did, it didn't work, I think.
23    Q  What were those two assets that you're
24 talking about?
25    A  The NV -- well, sorry, let me rephrase.

337

1  The interest in Multi Strat, at whichever level it
2  existed and the records are inconsistent on that,
3  and that creates another problem because at one
4  level, equity interest got extinguished --
5      Q  We'll come to that.
6      A  -- and then Greenbriar --
7      Q  So you had extensively researched
8  CDO Fund's interest in Multi Strat and Greenbriar
9  and you came to the conclusion that those assets
10 had not been properly transferred to Sentinel as
11 part of the August 2017 transaction, correct?
12     A  Can we break it up into a Greenbriar
13 question and a Multi Strat question?  Would that
14 be possible?
15     Q  Sure.  With respect to Greenbriar, you
16 concluded that Greenbriar's -- the assets that
17 CDO Fund held in Greenbriar had never been
18 transferred to Sentinel, correct?
19     A  I concluded that the -- so I was tracking
20 title of assets, and the title of what were
21 preference 2 shares issued by Greenbriar never
22 left CDO Fund's possession.  And so this -- when I
23 say I was tracking assets, I was tracking title to
24 assets.  That's what this whole process was, was
25 tracking basically if it's -- if you have to

338

1  deliver them to UBS tomorrow, how do you do that,
2  who do you call.  And that's why title was the
3  important inquiry that I was being asked.
4      Q  So with respect to Greenbriar, the title to
5  the assets were never transferred to Sentinel from
6  CDO Fund, correct?
7      A  As far as I'm aware, the title -- as far
8  as my research showed, the title to the Greenbriar
9  Class 2 preference shares were never transferred
10 from CDO Fund to Sentinel.
11     Q  And are still to this day, as far as you
12 know -- or at least as of the time you left
13 Highland, owned by CDO Fund, correct?
14     A  They're titled to CDO Fund.  I believe
15 that's the right answer.
16     Q  Okay.  And with respect to the assets in
17 Multi Strat, you believed, at least as of the time
18 you left Highland, that the title to those
19 assets -- that there had been -- strike that.
20     That CDO Fund had not transferred any
21 interest that it may have had in Multi Strat to
22 Sentinel, correct?
23     A  Well, I actually wasn't sure, and to this
24 day I'm not sure.  And I actually highlighted in
25 green on the chart that I was making for Mr. Demo

339

1  and said this one I can't tell you, this one I
2  don't know about.
3      Q  Not sure what?  Not sure whether or not
4  they were transferred to Sentinel?  That's my only
5  question.  I want to know if you're saying that
6  you were not sure one way or the other whether
7  CDO Fund's interest in Multi Strat, if any, were
8  ever transferred to Sentinel.  Were you either
9  sure they weren't or were you sure they were or
10 were you not sure?
11     MS. SMITH:  Objection, form.
12     A  I was not sure, and I can explain why.
13 BY MR. CLUBOK:
14     Q  I didn't ask for that.  So you thought
15 there was -- based on all the research you did,
16 you thought there was some chance that some assets
17 that CDO Fund held in Multi Strat had been
18 transferred to Sentinel but you were not sure; is
19 that correct?
20     A  That was one of the possibilities.
21     Q  And did you ever say that possibility, in
22 words or substance, to Greg Demo?
23     A  I didn't give him any of the
24 possibilities, I just told him I can't figure out
25 what's going on with this asset.

340

1      Q  But you didn't tell him that one of the
2  reasons you couldn't figure it out is because
3  there was a possibility that that asset had been
4  transferred to Sentinel?  You didn't say that in
5  words or substance to Greg Demo, correct?
6      A  That actually wasn't one of the reasons I
7  couldn't tell.  That wasn't one of the reasons I
8  didn't know.
9      Q  You did not tell Mr. Demo that there was
10 some possibility that assets that were held by
11 CDO Fund had been transferred -- strike that.
12     You never told anyone at the Pachulski
13 firm that assets that CDO Fund held with respect
14 to Multi Strat may have been transferred to
15 Sentinel, correct?
16     A  That's correct.
17     Q  Why not?
18     A  So I'm at the point where -- well, let me
19 rephrase.  In my research I arrived at at least a
20 preliminary conclusion, that that asset had been
21 extinguished back in 2011.
22     Q  Did you share that conclusion with
23 Mr. Demo?
24     A  I told him that that was a concern of mine
25 and that I was still trying to track it down and I

341

1  told him that was my preliminary conclusion.
2      Q   When did you tell him that?
3      A   It was around this time period.
4      Q   When?
5      A   It was in August of 2020.
6      Q   And did you tell him to share that
7  information with UBS?
8      A   I didn't give him any instructions on what
9  to share with UBS one way or another.
10     Q   Did you advise ever affirmatively that
11  they should not share that information with UBS?
12         MS. SMITH:  Objection, form.
13     A   I don't remember -- I don't remember if we
14  talked about it.  I do remember that I was
15  concerned that if we didn't have the answer, that
16  was going to create more -- that if we gave a
17  partial -- well, let me start over.
18         I was concerned that if we told them -- if
19  we told you where we were, that was going to
20  create more problems because we had uncertainty
21  and that was not an easy thing to say.
22  BY MR. CLUBOK:
23     Q   My question is did you ever affirmatively
24  advise them not to share information about
25  CDO Fund's possible ownership interest in

342

1  Multi Strat with UBS?
2      A   I don't remember one way or another.
3      Q   Let's mark a document as Exhibit 73.
4          (Deposition Exhibit 73 marked for
5  identification.)
6  BY MR. CLUBOK:
7      Q   I'm going to mark an e-mail from you to
8  Mr. Seery, dated August 21st, as Exhibit 73.  And
9  it's got an attachment that says Screenshot:
10  WSO_Trade_No.9684001.pdf.  We'll have the cover
11  e-mail and the two-page attachment marked
12  collectively as Exhibit 73.
13         And at the bottom of this e-mail chain,
14  you say to Jim Seery, copying Scott Ellington and
15  Greg Demo and James Romey, that here's a revised
16  package of UBS documents without mention of
17  Multi Strat.
18         MS. SMITH:  Can you read that?
19  BY MR. CLUBOK:
20     Q   Do you see that?
21     A   Yes.
22     Q   And you at the top of the e-mail say:
23  All - I do -- and in all caps, underlined -- NOT
24  want to include this in the UBS package until we
25  discuss, but please see attached showing the

343

1  Multi Strat position being written off.
2          Do you see that?
3      A   I do.
4      Q   And if you look, you can see then on the
5  first page of the attachment that write-off
6  occurred August 11th, 2017.  Do you see that?
7      A   I do see that's what it says.
8      Q   And you recall, of course, in your
9  Appendix 1, there was an amount identified for
10  CDO Fund's interest in Multi Strat as of April
11  2017, right?
12         MS. SMITH:  Objection, form.  What are you
13  referring to on the exhibit?
14         MR. CLUBOK:  Let me restate the question.
15  BY MR. CLUBOK:
16     Q   You know that August 11, 2017, was the
17  date that the transfers of substantially all of
18  CDO Fund's assets were made to Sentinel?
19     A   I knew that it took place in August of
20  2017.  I didn't know the exact date, but yes.
21     Q   Right.  So you directed Mr. Seery and
22  Mr. Ellington -- sorry, you directed Mr. Seery and
23  Mr. Demo on an attached that showed the
24  Multi Strat position being written off on
25  August 11th, 2017, right?

344

1      A   I see that.
2      Q   And did you also affirmatively say, oh,
3  and by the way, that was the time when
4  substantially all of CDO Fund's assets, including
5  any interest it may have had in Multi Strat, were
6  attempted to be transferred to Sentinel?  Did you
7  say that, in words or substance, in any way to
8  Mr. Seery or Mr. Demo in connection with the
9  statement directing them to the attached that
10  showed the Multi Strat position being written off?
11         MS. SMITH:  Objection, form.
12     A   At -- I did not mention Sentinel in the
13  context of these documents.  I was still
14  researching why the financial records showed what
15  they showed.
16  BY MR. CLUBOK:
17     Q   Well, but you're still researching why the
18  records showed a write-off on the exact day in
19  August of 2017 when you had been told that all the
20  assets of CDO Fund were supposed to be transferred
21  to Sentinel for an after-the-event insurance
22  policy, correct?
23         MS. SMITH:  Objection, form.
24     A   My concern is that that write-off should
25  have actually taken place much, much earlier.

345

1 BY MR. CLUBOK:
2    Q  I understand what you're saying now, but
3 the fact is you did know that that write-off that
4 you referred them to was the date that all of the
5 assets of CDO Fund were supposed to be transferred
6 to Sentinel, correct?
7       MS. SMITH:  Objection, form.
8    A  I knew that the ATE transfer had taken
9 place on or about August 2017.
10 BY MR. CLUBOK:
11   Q  And when you referred them to this
12 document that showed a write-off for this asset
13 related to Multi Strat as of that date, you failed
14 to mention that, correct?
15       MS. SMITH:  Objection, form.
16   A  I did not mention that.
17       MR. CLUBOK:  Let's go off the record.
18       MS. SMITH:  Good.  Because I need to take
19 a break.
20       THE VIDEOGRAPHER:  We are off the record
21 at 7:04 p.m.
22       (Recess taken from 7:04 p.m. CDT to
23 7:25 p.m. CDT)
24       THE VIDEOGRAPHER:  The time is 7:25 p.m.
25 We are back on the record.

346

1 BY MR. CLUBOK:
2    Q  Mr. Leventon, referring back to
3 Exhibit 73, this was the cover sheet e-mail on the
4 first page that -- in which you said you did not
5 want to include certain information in the UBS
6 package until you discussed, and then you referred
7 Mr. Seery and Mr. Demo and Mr. Romey, copying
8 Scott Ellington, to the attachments showing the
9 Multi Strat position being written off in August
10 of 2017.  Do you see that?
11   A  Sorry, I'm losing a little focus.  I think
12 what you represented is what the document says.
13   Q  Right.
14   A  Yeah.
15   Q  And so we looked at the first attachment
16 to Exhibit 73, but I want to refer you to the
17 second attachment to Exhibit 73, which you --
18 which according to the attachments is a WSO Trade
19 No. 9684001.  Do you see that?
20   A  Yes.
21   Q  And that shows -- what is this document?
22   A  So this is what's called a WSO trade
23 ticket.
24   Q  And this document reflects the fact that
25 the interest in Multi Strat for CDO Fund was

347

1 supposedly traded and settled August 11th, 2017,
2 correct?
3    A  It shows that it was written off on that
4 date.  Any entry in WSO generates a "trade ticket"
5 even if it's not technically a trade.
6    Q  But, in fact, it says, Trade Type, Sell,
7 on the document, correct?
8    A  It says sell because it's -- well, because
9 it's coming from the perspective of Highland
10 CDO Fund.  So, yes, that's what it says.
11   Q  Then it says the counterparty is just a
12 write-off, supposedly, pursuant to this document,
13 right?
14   A  It does say that.
15   Q  But, in fact, following August 11th, 2017,
16 Sentinel appeared as a significant redeemer in
17 Multi Strat; isn't that true?
18   A  I'm sorry, after which date, sir?
19   Q  Following -- after -- at some point after
20 August of 2017, Multi Strat started showing up as
21 one of the significant redeemers in the interest
22 in Multi Strat, correct?
23       MS. SMITH:  Objection, form.
24   A  I'm sorry, you lost me, sir.
25       MR. CLUBOK:  Beg your pardon?

348

1       MS. SMITH:  Objection, form.
2 BY MR. CLUBOK:
3    Q  At some point after August of 2017,
4 Sentinel shows up on a list of redeemers with
5 respect to the Multi Strat partnership, correct?
6    A  At some point Sentinel does show up as a
7 redeemer from Multi Strat.
8    Q  And I'm going to hand you what's been
9 marked as Exhibit 74, which is a two-page cover
10 e-mail with an attachment that says Request for
11 Redemption of Shares, that purports to be with
12 respect to an entity called Sentinel Reinsurance
13 to Highland Multi Strategy Credit Fund.
14       (Deposition Exhibit 74 marked for
15 identification.)
16 BY MR. CLUBOK:
17   Q  Do you see Exhibit 74?  Do you see
18 Exhibit 74, sir?
19   A  Yes.  I haven't had a chance to review it
20 yet.
21   Q  Well, I just want to ask you something
22 simple.  If you look at the request for redemption
23 of shares for Sentinel Reinsurance, have you ever
24 seen this request before today, as far as you
25 know?

349

1     A  I don't recall ever having seen this
2  before.
3     Q  Did you know that Sentinel Reinsurance was
4  listed as a redeemer with respect to Multi Strat?
5     A  I think I did, yes.
6     Q  And did you ever, in words or substance,
7  convey any issues that you might have had with
8  respect to Sentinel's supposed stake in
9  Multi Strat based on any of the work you did?
10    A  I'm sorry, I don't understand that
11 question, sir.
12    Q  Did you ever talk to either the directors
13 or the Pachulski firm about Sentinel's redemption
14 interest in Multi Strat?
15    A  I know that there were extensive
16 discussions about redeemers in that fund, but I
17 don't remember if there was a specific discussion
18 about Sentinel.
19    Q  Did you ever mention, in words or
20 substance, that Sentinel had some connection to
21 Jim Dondero or Scott Ellington, to either the
22 directors or the Pachulski firm?
23    A  I never spoke to them about it one way or
24 another.
25    Q  And did you ever -- in the course of that

350

1  research you did with respect to CDP Fund's
2  interest, if any, in Multi Strat, to the extent
3  that they were -- one of the conclusions you came
4  to was that they may have been extinguished in
5  2011 or '12?
6     A  Yes.
7     Q  How were they extinguished?  By a sale?
8  By them just disappearing?  By redemption?  How?
9     A  Restructuring.
10    Q  What do you mean?
11    A  So if the interests were -- if the limited
12 partnership interest was at the level that we
13 colloquially called MVCDO, my understanding was
14 that MVCDO had issued notes prior to the financial
15 crisis and then it went through a restructuring
16 transaction sometime in 2011, where the notes
17 essentially wiped out the equity holders and then
18 noteholders became the new equity of MVCDO and
19 then, I think, they had to be essentially redeemed
20 out in cash over time.
21    Q  Who redeemed out the cash interest in
22 Multi Strat?
23    A  The noteholders.
24    Q  Who were they?
25    A  Third-party investors.  I don't remember

351

1  who they are, but they weren't affiliated with
2  Highland or Dondero or anybody in any way.
3     Q  So you're saying based on the research
4  you've done, any interest that Sentinel believes
5  they obtained in August of 2017 from CDO Fund in
6  Multi Strat is nonexistent?
7     A  That was my preliminary conclusion.
8     Q  And did you share that specific conclusion
9  with Mr. Demo?
10    A  The conclusion I shared with him was that
11 I thought that those interests may have been wiped
12 out in 2011 and that that was my preliminary
13 conclusion.
14    Q  And did you ever tell anyone at Sentinel
15 that that's the conclusion you reached, that what
16 they have on their books as a redemption interest
17 is really worthless as far as you believe?
18    A  I don't generally talk to any -- I'm
19 trying to -- I don't want to say at Sentinel
20 because that's characterizing what people's roles
21 are, but I do remember at one point telling
22 Mr. DiOrio this may not exist.
23    Q  When was that?
24    A  You may not own this.
25    Q  When did you tell Mr. DiOrio that?

352

1     A  Would have been August or September 2020.
2     Q  Around the time you were tasked with
3  tracking down what happened with CDO Fund's
4  assets?
5     A  Yes.
6     Q  And so you -- why did you go to Mr. DiOrio
7  to share this belief you had with respect to
8  Sentinel's interest or lack thereof in
9  Multi Strat?  Why Mr. DiOrio, of all the people
10 you could have told?
11    A  I believe he was on the board of Sentinel.
12    Q  You knew he was a director at the time of
13 Sentinel, right?
14    A  Actually, I didn't.  I knew he was -- had
15 day-to-day responsibility kind of for Sentinel,
16 but I don't actually know he was a director.
17    Q  You just imagined right now when you said
18 you knew he was on the board?
19    A  Well, I know today that he was on the
20 board.
21    Q  How do you know today?
22    A  Really through this discovery and lawsuit
23 process.
24    Q  Who told you?
25    A  I don't recall.  I may have gotten it from

353

1  Mr. DiOrio, I may have gotten it from counsel who
2  got it from Mr. DiOrio.
3      Q  So you've spoken with Mr. DiOrio about
4  this process?
5      A  About this deposition?
6      Q  About this litigation -- this adversary
7  proceeding.
8          MS. SMITH:  Objection to form.
9      A  No, what I said was I either found out
10  that he was a director -- it wasn't -- I mean, I
11  either found out that he was a director from him
12  or I found out from outside counsel.
13  BY MR. CLUBOK:
14      Q  You spoke --
15          MS. SMITH:  Objection, I don't want him to
16  reveal privileged information.
17  BY MR. CLUBOK:
18      Q  I'm not asking about what you found out
19  from your lawyers.  But you have spoken with
20  Mr. DiOrio about this -- about the subject of this
21  adversary proceeding, correct?
22      A  I'm trying to parse out -- well, I'm
23  trying to parse out what conversations I would
24  have had with him -- I mean, really, the
25  conversations I would have had with him, if any,

354

1  would have been including our lawyers.
2      Q  You had a conversation with Mr. DiOrio
3  with your lawyers present?
4      A  I honestly don't remember, sir.  I don't
5  remember how I found out.  It was one of those two
6  ways.
7      Q  Did you have any conversations with any
8  other witnesses with your lawyers present about
9  the subject matter of this adversary proceeding?
10      A  We spoke about motions that were pending.
11      Q  Did you talk about the substance of this
12  adversary proceeding with other individuals
13  involved in this proceeding in your lawyers -- in
14  one group meeting?
15      A  No.  We would have -- our group meetings
16  would have addressed pending procedural motions.
17      Q  Okay.  But Mr. DiOrio at some point during
18  one of those group meetings disclosed that he was
19  a director of Sentinel?
20      A  Again, I don't recall if he disclosed that
21  or if I was told that by my outside counsel.
22      Q  But back -- so back in 2017 -- sorry, back
23  in 2020, you didn't know he was the director, you
24  just understood he had day-to-day responsibility
25  for Sentinel at the Highland organization?

355

1      A  That's right.
2      Q  And so you went to him -- he didn't -- did
3  he task you with reporting to him your views about
4  Sentinel's redemption interest in Multi Strat?
5      A  No.
6      Q  But you affirmatively made the choice to
7  go tell him that, you thought that was information
8  that was important for him to know, correct?
9      A  I decided to tell him.
10      Q  And you didn't make a similar decision to
11  tell Mr. Seery or the Pachulski lawyers about that
12  subject at the time, correct?
13      A  I did tell them the same thing at the
14  time.
15      Q  No, you didn't tell them that Sentinel's
16  interest -- redemption interest in Multi Strat
17  might be worthless, like you told Mr. DiOrio,
18  correct?
19          MS. SMITH:  Objection to form.
20      A  We -- I don't think we ever talked about
21  Sentinel's redemption interest.
22  BY MR. CLUBOK:
23      Q  Right.  So you told Mr. DiOrio that the
24  interest that Sentinel believed it had purchased
25  from CDO Fund that was on the books as a

356

1  redemption interest might be worthless in your
2  view, or words to that effect, correct?
3      A  I think that's fair.
4      Q  But you didn't tell that same information
5  to Mr. Seery or any of the Pachulski lawyers,
6  correct?
7      A  I think I more talked about --
8      Q  Is that yes or no?  I didn't ask what you
9  more talked about.
10      A  Fair enough.
11      Q  I just want to ask about this.
12      A  I didn't talk about Sentinel at all with
13  the Pachulski lawyers.
14      Q  Even though you affirmatively went to
15  Mr. DiOrio to tell him that, correct?  Correct?
16      A  I did not speak to the Pachulski lawyers
17  about Sentinel, that I recall.
18      Q  Okay.  Getting back to subject we talked
19  about earlier today -- oh, you said you had
20  discussions with Mr. DiOrio about the ATE policy.
21  You said there were two people you've ever spoken
22  to about it, Mr. DiOrio and Mr. Ellington, right?
23      A  That's not 100 percent accurate.
24      Q  Okay.  What is -- why is that not
25  accurate?

357

1    A   I mean, I had already spoken to
2  Mr. Sevilla about the ATE policy.
3    Q   Okay.  But Mr. DiOrio, what, if anything,
4  did you talk to him about with respect to the
5  ATE policy, other than this subject?
6    A   On an annual basis, we would talk to
7  Beecher Carlson and he would set up those
8  conversations.
9    Q   On an annual basis, meaning 2017, 2018,
10 2019 and 2020?
11   A   I think that's right, yes.
12   Q   How about 2021, before you were
13 terminated?
14   A   I don't think so.
15   Q   Who is responsible for speaking to Beecher
16 Carlson in 2021 about the policy?
17   A   I don't know.  Not me.
18   Q   Did you ever suggest to anyone, in words
19 or substance, that they should make a claim on a
20 policy once you learned about the judgment in the
21 New York litigation?
22   A   I don't remember if I spoke -- if I did,
23 it would have been with Mr. Ellington.
24   Q   And did you suggest, in words or
25 substance, that Mr. Ellington should cause a claim

358

1  to be made on the ATE policy?
2    A   I may have.  I just don't remember.
3    Q   You don't remember at all whether you did
4  or didn't?
5       MS. SMITH:  Objection, form.
6  BY MR. CLUBOK:
7    Q   That's what you're saying?
8    A   That's correct.
9    Q   Did you believe that he should -- strike
10 that.
11      Did you believe that a claim should have
12 been made on the ATE policy at any point while you
13 were still employed with Highland?
14   A   I don't know that I came to a view one way
15 or another.
16   Q   You might have, but you just don't know if
17 you did or you didn't?
18   A   I don't remember -- I might have.  I don't
19 remember.
20   Q   And did you ever share any view about
21 whether a claim should be made on the policy with
22 any of the independent directors or with the
23 Pachulski lawyers?
24   A   No.
25   Q   Prior to April -- prior to the transaction

359

1  that was being contemplated that we talked about
2  in April of 2017, you know the settlement that had
3  the first step be purchase a $100 million
4  ATE policy from Sentinel using substantially all
5  of the assets of CDO Fund, HFP -- remember that
6  discussion?
7    A   I remember we had a discussion around a
8  document from April of 2017 related to settlement
9  analysis.
10   Q   Prior to that contemplated transaction,
11 was there another potential transaction that would
12 have resulted in a settlement whereby there would
13 be some new company established that would
14 purchase claims from UBS as part of a settlement
15 structure that you were involved in helping draft?
16   A   That would buy claims from UBS?
17   Q   Yeah.  That as part of a settlement would
18 result in some new company in the Caymans
19 purchasing claims from UBS and then settling those
20 claims with the funds so that the funds would end
21 up still insolvent to avoid the tax liability?  Is
22 that a concept that you ever were involved in
23 discussing with anyone?
24   A   Not that I recall.
25   Q   Anyone ever raise the fact that the -- all

360

1  these ideas of transferring assets were
2  potentially illegal efforts to avoid taxes?
3       MS. SMITH:  Objection to form.
4  BY MR. CLUBOK:
5    Q   Did anyone ever raise that possibility in
6  any of the discussions you had?
7    A   No, no one ever said anything like that.
8    Q   Okay.  And I believe this may be the last
9  topic, I think.  You -- we asked you earlier about
10 Skyview Legal PC.  Asked you about whose idea it
11 was to start it.  Can you answer that question
12 now?
13   A   Yes.  It was -- the idea for it came from
14 a gentleman by the name of Jim McCormack, who
15 is -- was a legal ethics counsel that we retained.
16   Q   Why?
17   A   Skyview Group wanted to determine if it
18 was providing legal services.  And if it was
19 providing legal services, if that was appropriate
20 under its current structure or whether or not it
21 needed to essentially create an affiliated law
22 firm or a dedicated law firm in order to avoid
23 unauthorized practice of law issues.
24   Q   Okay.  And you're the sole director at
25 this point of Skyview Legal PC?

361

1    A   I am, I think.  We just formed it like a
2 couple weeks ago.
3    Q   Okay.  And then I do have one last
4 document that my colleague handed me that I'm
5 going to just ask you about, and that's
6 Exhibit 75.
7        (Deposition Exhibit 75 marked for
8 identification.)
9 BY MR. CLUBOK:
10   Q   It's one -- it's a double-sided,
11 single-page document that reflects an e-mail
12 exchange that starts with an e-mail from me to
13 Scott Ellington, copying some other counsel, which
14 is then forwarded to you and Scott Ellington and
15 Scott Ellington confirms approved.
16       MS. SMITH:  What number are we on?
17       MR. CLUBOK:  75.  Thank you.
18       MS. SMITH:  I missed 74.
19       MR. CLUBOK:  Exhibit 75.
20 BY MR. CLUBOK:
21   Q   And this is an e-mail chain that is from
22 December 2nd, 2019, the subject, Confirmation of
23 our understanding.  And I asked Mr. Ellington to
24 respond confirmed if you agree that it reflects
25 our discussion.  And the first item is that we

362

1 were going to tell the Court that we are committed
2 to having good faith settlement discussions, and
3 we asked the Court to hold the opinion and the
4 attached judgment, the form of which we have
5 already agreed to and advised her of such during
6 our call, for another ten business days from today
7 with the possibility we'll extend further as
8 needed.
9        Do you see that?
10   A   I do.
11   Q   So you were aware that the Court had
12 already made a decision awarding roughly a billion
13 dollars in damages, at least as of December 2nd,
14 2019, although that had not yet been made public,
15 correct?
16   A   Correct.
17   Q   And we agreed also that we were going to
18 tell the Court that we planned to enter into the
19 attached stipulation, which was an agreed upon
20 request for relief from automatic stay, correct?
21   A   Are you talking about bullet point 2?
22   Q   Yeah.  If a settlement could be resolved,
23 the parties were going to jointly request relief
24 from automatic stay according to this
25 understanding, correct?

363

1    A   I think that's a fair -- I'm just reading
2 bullet point 2, but that sounds like a fair
3 characterization of that bullet point.
4    Q   Okay.  And Scott -- Angela Somers sends an
5 e-mail to you and Scott Ellington, asking to
6 confirm that you've agreed to the terms below
7 since we were not involved in these discussions
8 and we assumed you've worked with bankruptcy
9 counsel on the stay relief and possible claim.
10       Do you see that?
11   A   Yes.
12   Q   And then Mr. Ellington writes back, yes,
13 approved, in response to that question from
14 Ms. Somers.  Do you see that?
15   A   Yes.
16   Q   Was that truthful what Mr. Ellington said
17 in that e-mail?
18       MS. SMITH:  Objection, form.
19 BY MR. CLUBOK:
20   Q   As far as you knew at the time?
21   A   That he had agreed to the terms below?
22   Q   Yes.
23   A   I had no idea.  I wasn't involved in those
24 conversations between you and Mr. Ellington.
25   Q   Did you know whether he had worked with

364

1 bankruptcy counsel on the stay relief and possible
2 claim?
3    A   I didn't know one way or another.
4    Q   Did you ask him whether or not what he
5 said was true on this e-mail that you were copied
6 on, or that was actually sent to you by Angela?
7    A   No, I never asked him if his statement was
8 true or false.
9    Q   Did you follow up at all?
10   A   I saw no reason to follow up, so no, I
11 didn't.
12   Q   As part of the good-faith settlement
13 discussions, do you know whether or not
14 Mr. Ellington ever disclosed that there was a
15 after-the-event insurance policy that could be
16 used to satisfy a judgment in the New York
17 litigation?
18       MS. SMITH:  Objection to form.
19   A   I wasn't part of Mr. Ellington's
20 conversations with you.  I don't know.
21 BY MR. CLUBOK:
22   Q   But you knew at the time that there was an
23 ATE policy that could be used to satisfy the
24 judgment that was about to be made public,
25 correct?

---

365

1    A  I knew of the existence of the ATE policy,
2  yes.
3    Q  Did you make any effort to disclose that
4  to UBS?
5        MS. SMITH:  Objection, form.
6    A  I didn't -- I didn't talk to -- the only
7  person that would be UBS would be you and I didn't
8  talk do you about this.
9  BY MR. CLUBOK:
10   Q  So you made no effort to disclose in any
11 way to UBS through counsel that there was an
12 ATE policy from Sentinel that could be invoked to
13 pay up to roughly $91 million or more with respect
14 to the judgment in the New York litigation,
15 correct?
16       MS. SMITH:  Objection, form.
17   A  I never -- I'm sorry, I got lost in who
18 all the people were that I didn't speak to.
19 BY MR. CLUBOK:
20   Q  Okay.  This is my last question, so I just
21 want to -- I'll try to say this as simply as
22 possible.  I'll break it down.
23   A  Okay.
24   Q  You knew as of December 2nd, 2019, that
25 the Court was about to enter judgment of roughly a

---

366

1  billion dollars, correct?
2    A  Yes.
3    Q  And you knew that there was an ATE policy
4  that could be used to satisfy that judgment or to
5  settle the remaining claims, correct?
6    A  I knew about the ATE policy and that it
7  could be used to pay UBS some amounts.
8    Q  And you knew that the amount was roughly
9  $100 million, maybe minus the legal fees that you
10 had already authorized to be paid, correct?
11   A  I don't think I knew the exact amount, no.
12   Q  But you knew it was in the neighborhood of
13 $100 million at the time?
14   A  My recollection is somewhere between 80
15 and 100, but I wasn't sure where.  It was clearly
16 a big number.
17   Q  Okay.  You understood that there was
18 roughly 80 to $100 million of insurance money
19 available to either satisfy the judgment or to
20 settle the claims that were the subject of the
21 judgment in the New York litigation, correct?
22   A  Can you repeat that one more time?  Sorry,
23 the sun literally was right in my eyes.
24   Q  That is totally fine.  This is really it.
25   A  I'm not trying to play games.  The sun was

---

367

1  in my face.
2    Q  I totally understand.
3      Sir, in December of 2019, you understood
4  that there was roughly 80 to $100 million of
5  insurance money available to the defendants in the
6  New York litigation to either satisfy the judgment
7  or settle the claims, correct?
8    A  I knew that there was 80 to $100 million
9  of insurance on the after-the-event policy with
10 Sentinel so that, yeah, probably could be used to
11 settle or pay some amounts to UBS.
12   Q  And did you ever, you ever cause that
13 information to be transferred or communicated --
14 sorry.  Did you ever cause that information to be
15 communicated to UBS in any way?
16       MS. SMITH:  Objection, form.
17   A  I did not -- I didn't -- did I cause that
18 information to be communicated to UBS?  I didn't
19 instruct people what to tell UBS; they instructed
20 me.  So, no, I -- we never -- that never came up.
21 BY MR. CLUBOK:
22   Q  And you knew at the time, that UBS was a
23 creditor in the restructuring, correct?
24   A  You mean in the Highland bankruptcy?
25   Q  Sorry.  You knew at the time that UBS was

---

368

1  a creditor in the Highland bankruptcy, correct?
2    A  Yes.
3        MR. CLUBOK:  That's all I have.  Thank
4  you.
5        THE VIDEOGRAPHER:  This concludes the
6  videotaped deposition of Isaac Leventon.  The time
7  is 7:52 p.m.  We are off the record.
8        (Deposition concluded at 7:52 p.m. CDT)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

369

1    ACKNOWLEDGMENT OF DEPONENT
2    I, ISAAC D. LEVENTON, do hereby
3    acknowledge that I have read and examined the
4    foregoing testimony, and the same is a true,
5    correct and complete transcription of the
6    testimony given by me and any corrections appear
7    on the attached Errata sheet signed by me.
8
9
10   _____    _____
11   (DATE)        (SIGNATURE)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

370

1    REPORTER'S CERTIFICATION
2    I, Micheal A. Johnson, the officer before
3    whom the foregoing deposition was taken, do hereby
4    certify that the foregoing transcript is a true
5    and correct record of the testimony given; that
6    said testimony was taken by me stenographically
7    and thereafter reduced to typewriting under my
8    direction; that reading and signing was requested;
9    and that I am neither counsel for, related to, nor
10   employed by any of the parties to this case and
11   have no interest, financial or otherwise, in its
12   outcome.
13   IN WITNESS WHEREOF, I have hereunto set my
14   hand this 27th day of July, 2021.
15
16
17   _____
18   MICHEAL A. JOHNSON, RDR, CRR
19   NOTARY PUBLIC IN AND FOR
20   THE STATE OF TEXAS
21
22
23
24
25