

**Planet Depos**®
We Make It *Happen*™

<p style="color:darkred"><strong>HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
INFORMATION REDACTED</strong></p>

# Transcript of Matthew T. DiOrio

**Date:** July 23, 2021
**Case:** UBS Securities LLC, et al. -v- Highland Capital Management, L.P.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

---

**Page 1**

```
 1        IN THE UNITED STATES BANKRUPTCY COURT
 2         FOR THE NORTHERN DISTRICT OF TEXAS
                    DALLAS DIVISION
 3    In re                §
                           §
 4    HIGHLAND CAPITAL      §  Chapter 11
      MANAGEMENT, L.P.,     §  Case No. 19-34054-SGJ11
 5                          §
          Debtor.           §
 6                          §
                           §
 7    UBS SECURITIES LLC AND §
      UBS AG LONDON BRANCH, §
 8                          §
          Plaintiffs,       §
 9                          §  Adversary Proceeding
      VS.                    §  No. 21-03020-sgj
10                          §
      HIGHLAND CAPITAL      §
11    MANAGEMENT, L.P.,     §
                           §
12        Defendant.        §

13
               HIGHLY CONFIDENTIAL
14         SUBJECT TO PROTECTIVE ORDER
              INFORMATION REDACTED
15

16        Videotaped Deposition of

17          MATTHEW T. DiORIO

18            Dallas, Texas

19        Friday, July 23, 2021

20             9:44 a.m.

21

22

23  Job No.: 386790

24  Pages: 1 - 346

25  Reported by: Micheal A. Johnson, RDR, CRR
```

**Page 2**

```
 1        Deposition of MATTHEW T. DiORIO, held at
 2    the location of:
 3
 4            Butler Snow LLP
 5            2911 Turtle Creek Boulevard, Suite 1400
 6            Dallas, Texas 75219
 7            (469) 680-5500
 8
 9
10        Pursuant to Notice, before Micheal A.
11    Johnson, Registered Diplomate Reporter and
12    Certified Realtime Reporter.
```

**Page 3**

```
 1              APPEARANCES
 2    ON BEHALF OF PLAINTIFFS
      UBS SECURITIES LLC AND
 3    UBS AG LONDON BRANCH:
 4        Sarah Tomkowiak
          LATHAM & WATKINS LLP
 5        555 Eleventh Street, N.W., Suite 1000
          Washington, D.C. 20004
 6        (202) 637-2200
          sarah.tomkowiak@lw.com
 7
          Shannon E. McLaughlin
 8        LATHAM & WATKINS LLP
          885 Third Avenue
 9        New York, New York 10022-4834
          (212) 906-4612
10        shannon.mclaughlin@lw.com
11    ON BEHALF OF DEFENDANT
12    HIGHLAND CAPITAL MANAGEMENT, L.P.:
13        Robert J. Feinstein (Via Zoom)
          PACHULSKI STANG ZIEHL & JONES LLP
14        780 Third Avenue, 34th Floor
          New York, New York 10017-2024
15        (212) 561-7700
          rfeinstein@pszjlaw.com
16
17    ON BEHALF OF THE WITNESS:
18        Frances A. Smith
          ROSS & SMITH, PC
19        700 N. Pearl Street, Suite 1610
          Dallas, Texas 75201
20        (214) 377-7879
          frances.smith@judithwross.com
21
22        Debra A. Dandeneau
          Michelle Hartmann
23        BAKER & McKENZIE, LLP
          452 Fifth Avenue
24        New York, New York 10018
          (212) 626-4875
25        debra.dandeneau@bakermckenzie.com
          michelle.hartmann@bakermckenzie.com
```

**Page 4**

```
 1          APPEARANCES CONTINUED
 2    VIDEOGRAPHER:
 3        Brian Krieger
```

**5**

INDEX
MATTHEW T. DiORIO
July 23, 2021

APPEARANCES                                      3

PROCEEDINGS                                      9

EXAMINATION OF MATTHEW T. DiORIO:

      BY MS. TOMKOWIAK                          10

ACKNOWLEDGMENT OF DEPONENT                      345

REPORTER'S CERTIFICATION                        346

**7**

DEPOSITION EXHIBITS
MATTHEW T. DiORIO
July 23, 2021

NUMBER          DESCRIPTION          MARKED

Exhibit 85   01/21/2021 through 02/11/2021   323
             E-mail Chain
             HCMUBS004470 - HCMUBS004489

**6**

DEPOSITION EXHIBITS
MATTHEW T. DiORIO
July 23, 2021

NUMBER          DESCRIPTION          MARKED

Exhibit 76   Private Bank Interest           92
             Checking Statement
             UBSPROD020580

Exhibit 77   Scott Ellington Schedule of    109
             Certain Cash and Investments
             and Accounts' Compilation
             Report, October 31, 2018
             UBSPROD4837357 -
             UBSPROD4837359

Exhibit 78   Resignation Letter of Matt      165
             DiOrio
             MD_000043

Exhibit 79   12/08/2017 Letter, Parag        258
             Patel to Andrew Dean, with
             Attachment
             UBSPROD020606 - UBSPROD020611

Exhibit 80   07/11/2018 E-mail Chain         263
             UBSPROD2752260 -
             UBSPROD2752266

Exhibit 81   Color Copy of Schedule A        263
             UBSPROD2752264 -
             UBSPROD2752265

Exhibit 82   01/28/2021 E-mail Chain, with   274
             Attachment
             UBSPROD1659896 -
             UBSPROD1659900

Exhibit 83   Power of Attorney to Transfer   291
             Bonds or Shares
             UBSPROD020577 - UBSPROD20578

Exhibit 84   08/06/2019 E-mail, Katie        296
             Irving to Lauren Baker, with
             Attachment
             UBSPROD2572283 -
             UBSPROD1461192

**8**

PREVIOUSLY MARKED EXHIBITS

NUMBER          DESCRIPTION          PAGE

Exhibit 2    .........................   229

Exhibit 3    .........................   269

Exhibit 26   .........................   121

Exhibit 28   .........................   128

Exhibit 38   .........................   252

Exhibit 48   .........................   114

Exhibit 53   .........................   167

Exhibit 58   .........................   181

Exhibit 61   .........................   281

Exhibit 65   .........................   343

9

1      PROCEEDINGS
2      THE VIDEOGRAPHER: Here begins disk No. 1
3  in the videotaped deposition of Matthew DiOrio.
4  This is in regards to the Highland Capital
5  Management, LP. It is in the matter of UBS
6  Securities LLC and UBS AG, London Branch versus
7  Highland Capital Management, LP. This is in the
8  United States Bankruptcy Court for the Northern
9  District of Texas, Dallas Division, filed as case
10 number 19-34054-SGJ11.
11      Today's date is Friday, July 23rd, 2021.
12 Our time on the video monitor is 9:44 a.m. The
13 videographer today is Brian Krieger representing
14 PlanetDepos. This video deposition is taking
15 place at Butler Snow at 2911 Turtle Creek
16 Boulevard in Dallas, Texas.
17      If counsel would please identify
18 themselves for the record and whom they represent.
19      MS. SMITH: Frances Smith with Ross &
20 Smith PC on behalf of the witness, Matt DiOrio.
21      MS. HARTMANN: Michelle Hartmann of Baker
22 McKenzie, also on behalf of the witness.
23      MS. DANDENEAU: Debra Dandeneau from Baker
24 McKenzie, also on behalf of the witness.
25      MS. McLAUGHLIN: Shannon McLaughlin with

10

1  Latham & Watkins on behalf of UBS.
2      MS. TOMKOWIAK: Sarah Tomkowiak with
3  Latham & Watkins on behalf of UBS.
4      MR. FEINSTEIN: On the Zoom, Robert
5  Feinstein, Pachulski Stang Ziehl & Jones, counsel
6  for defendant, Highland Capital Management, LP.
7      THE VIDEOGRAPHER: The court reporter
8  today is Micheal Johnson also representing
9  PlanetDepos. If the court would please swear in
10 the witness.
11      MATTHEW T. DiORIO,
12 called as a witness, having been duly sworn by a
13 Notary Public, was examined and testified as
14 follows:
15      EXAMINATION
16 BY MS. TOMKOWIAK:
17      Q  Mr. DiOrio, can you please state your full
18 name for the record.
19      A  Matthew Thomas DiOrio.
20      Q  Where do you live?
21      A  In Dallas.
22      Q  Can you please state your address.
23 <-- HIGHLY CONFIDENTIAL
24 -->
25      Q  Have you ever been deposed before?

11

1      A  No.
2      Q  Okay. So just a couple of ground rules.
3  I'm sure your counsel has gone over this with you,
4  but most importantly, let's try not to talk over
5  each other today and if you don't understand a
6  question that I've asked, please ask me to clarify
7  it. Otherwise, I'm going to assume that you do
8  understand the question that I've asked. Is that
9  fair?
10      A  Yes.
11      Q  Okay. Do you understand that you're
12 testifying here today under oath?
13      A  I do.
14      Q  What did you do to prepare for today's
15 deposition?
16      A  I met with counsel. They kind of laid out
17 what this would be like, the setup and everything.
18 That was about it.
19      Q  And when you say counsel, do you mean the
20 individuals in this room?
21      A  Yes.
22      Q  How many times did you meet?
23      A  Once or twice.
24      Q  For how long?
25      A  We met last Friday for most of the day.

12

1      Q  Was that all?
2      A  Yes.
3      Q  And without telling me what you looked at,
4  did you look at any documents?
5      A  No. It was mainly conversational.
6      Q  You're not a lawyer, right?
7      A  That's correct.
8      Q  Okay. Do you have any professional
9  licenses?
10      A  No.
11      Q  Where are you currently employed?
12      A  Skyview Group.
13      Q  What does Skyview Group do?
14      A  Provides kind of back and middle office
15 services to financial services companies, banks,
16 that sort of thing.
17      Q  Who hired you?
18      A  Who hired me?
19      Q  Uh-huh.
20      A  Skyview Group.
21      Q  Who at Skyview Group hired you?
22      A  I'm not sure who was on my employment
23 letter, but...
24      Q  Well, is there an individual who reached
25 out to you to -- how did you come to work for

13

1  Skyview?
2  **A  A lot of the former Highland employees**
3  **like myself were sent offer letters, I believe by**
4  **Brian Collins, who's the HR manager.**
5  Q  Okay.  And so you were sent an offer
6  letter?
7  **A  That's correct.**
8  Q  Okay.  Do you recall when that was?
9  **A  Early March, late February.  I don't know**
10 **the exact date.**
11 Q  Okay.  And what is your title at Skyview?
12 **A  Managing director.**
13 Q  What are your responsibilities as managing
14 director?
15 **A  I've been taking on a variety of projects**
16 **for one of our bank clients, and then I'm helping**
17 **find us office space, for example, at the moment.**
18 Q  Do you have an office now?
19 **A  No.**
20 Q  Okay.  You don't -- okay.  So Skyview
21 doesn't have any physical office space right now?
22 **A  No.**
23 Q  Okay.  And when did you start working
24 there?
25 **A  Early March.  I'm not sure of the date.**

14

1  Q  Who do you report to?
2  **A  JP Sevilla, I guess.**
3  Q  Do you know who he reports to?
4  **A  Scott Ellington.**
5  Q  Mr. Sevilla is a lawyer, right?
6  **A  Yes.**
7  Q  Is there a reason that you report to him,
8  or do you know?
9  **A  I sat in the legal group at Highland and**
10 **that's kind of where they put me at Skyview.**
11 Q  Who owns Skyview?
12 **A  I believe Scott Ellington.**
13 Q  What's your compensation at Skyview?
14 **A  Base salary or bonus or --**
15 Q  Both.  Total compensation.
16 **A  It will be about $400,000 this year.**
17 Q  How does that compare to your salary at
18 Highland?
19 **A  About the same.  I get a base salary**
20 **raise, but everything else has been flat.**
21 Q  And you said that you currently don't have
22 office space.  Are you currently working out of
23 NexPoint's office space?
24 **A  No.**
25 Q  No.  Okay.  What if I want to send mail to

15

1  Skyview, how would I send it?
2  **A  I actually don't know.**
3  Q  Okay.  What if I wanted to call Skyview,
4  is there a number I could call?
5  **A  You'd have to call the person directly**
6  **that you wanted to speak to.**
7  Q  Would it go to your cell phone?
8  **A  Probably.  If you were looking for me,**
9  **yeah.**
10 Q  You said that you were working for a
11 particular client.  Is that client affiliated with
12 Highland in any way?
13    MS. SMITH:  Objection, form.
14 **A  We have confidentiality agreements with**
15 **our clients.  I'm not entirely sure if I can**
16 **answer that.**
17 **BY MS. TOMKOWIAK:**
18 Q  Well, this is a -- first of all, this
19 proceeding itself can be designated confidential.
20 You'll have an opportunity to review the
21 transcript.  In any event, I'm not asking for the
22 name of the client, I'm just asking you if they're
23 affiliated in any way with Highland.
24 **A  I don't believe so.**
25 Q  Okay.  Do you work with any clients that

16

1  are affiliated with Mr. Dondero?
2  **A  Yes.**
3  Q  And what about Mr. Ellington?  Do you work
4  with any clients who are affiliated with
5  Mr. Ellington?
6  **A  No.  I mean, he owns the company that I**
7  **work for.**
8  Q  Right.
9  **A  But other than that, no.**
10 Q  Do you know if Mr. Ellington's the sole
11 owner of that company?
12    MS. SMITH:  Objection, form.
13 **A  I believe he is at the moment.**
14 **BY MS. TOMKOWIAK:**
15 Q  Do you believe that's going to change?
16 **A  It's supposed to at some point.**
17 Q  How is it supposed to change?
18 **A  Employees that were hired from Highland**
19 **are supposed to at some point receive some sort of**
20 **equity grant.**
21 Q  Do you --
22    MS. SMITH:  Objection, form.  I'm going to
23 object to the relevance of this line of
24 questioning as it's not in accordance with the
25 orders of the Court on the -- it's supposed to be

17

1 related to the temporary restraining order -- or
2 the motion for temporary restraining order and
3 motion for preliminary injunction, as I've done
4 the last two days. And it's not within the scope
5 of the judge's ruling when she said we can talk
6 about Sentinel and what it's all related to.
7 BY MS. TOMKOWIAK:
8    Q  Is the legal name of Skyview, Highgate; do
9 you know?
10    MS. SMITH: Objection, form.
11    A  It's not Highgate.
12 BY MS. TOMKOWIAK:
13    Q  It's not?
14    A  No.
15    Q  Do you know what the legal name is?
16    A  It's Highgate Consulting Group, Inc., dba
17 Skyview Group.
18    Q  Does Skyview have any subsidiaries?
19    MS. SMITH: Objection, form.
20    A  I don't know the answer to that.
21 BY MS. TOMKOWIAK:
22    Q  What about an entity called CPCM? Do you
23 know what that is?
24    A  I've heard the name.
25    Q  Do you know what it is?

18

1    MS. SMITH: Objection, form.
2    A  Something to do with employment claims.
3 BY MS. TOMKOWIAK:
4    Q  Okay. And, in fact, you assigned your
5 claim in the bankruptcy matter to CPCM, right?
6    A  I think that's right.
7    MS. SMITH: Objection, form.
8 BY MS. TOMKOWIAK:
9    Q  Do you know what consideration you
10 received for that claim?
11    MS. SMITH: Objection, form.
12    A  Employment at Skyview.
13 BY MS. TOMKOWIAK:
14    Q  Okay. So assigning your claim to CPCM was
15 a condition of your employment at Skyview?
16    A  That's my understanding.
17    Q  Do you know what the amount of that claim
18 was with respect to you?
19    A  I don't.
20    MS. SMITH: Objection, form.
21    A  I don't.
22 BY MS. TOMKOWIAK:
23    Q  Do you have any other current employers?
24    A  No.
25    Q  Do you have any other sources of income?

19

1    A  No.
2    Q  Do you currently sit on the board of any
3 companies?
4    A  Yes.
5    Q  What companies?
6    A  GLA Resorts Holdings, LLC. It's a
7 Delaware company.
8    Q  Any others?
9    A  No.
10    Q  What does GAL [sic] Resorts Holdings do?
11    A  It's GLA.
12    Q  I'm sorry, what?
13    A  GLA.
14    Q  GLA. Thank you. What does that do?
15    A  It owns a piece of property in the west
16 end of Grand Bahamas that it's in the process of
17 trying to sell.
18    Q  Does it have any operations?
19    A  Just trying to sell the property.
20    Q  Does anybody else sit on the board of that
21 company?
22    A  Yes.
23    Q  Who?
24    A  Scott Ellington.
25    Q  Anybody else?

20

1    A  A gentleman by the name of Mark Rechan.
2    Q  Can you spell that?
3    A  M-a-r-k R-e-c-h-a-n.
4    Q  Anybody else?
5    A  That's it.
6    Q  How long have you served as a director
7 for -- can I call it GLA?
8    A  Yes.
9    MS. SMITH: Objection, form.
10    A  I was appointed in November of 2019.
11 BY MS. TOMKOWIAK:
12    Q  How did you come to sit on the board of
13 that entity?
14    MS. SMITH: Objection, form.
15    A  Highland appointed me.
16 BY MS. TOMKOWIAK:
17    Q  Is it owned by Highland?
18    A  Partially.
19    Q  Who else owns GLA?
20    MS. SMITH: Objection as to form.
21    A  It's owned by -- I think there are about
22 50 partners all-in in the ownership structure.
23 BY MS. TOMKOWIAK:
24    Q  Do you know who specifically from Highland
25 appointed you?

---

**21**

1    MS. SMITH: Objection as to form.
2    **A   I don't know who specifically appointed**
3    **me.**
4    **BY MS. TOMKOWIAK:**
5    Q   Have you ever served as a managing member
6    of an LLC?
7    **A   I'm not sure.**
8    Q   Why aren't you sure?
9    **A   I'm just -- I'm not sure.**
10   Q   Like, do you have a management position at
11   an LLC and you're just not sure if it's a managing
12   member, or why aren't you sure?
13   **A   Yeah, I'm not sure if anything I've ever**
14   **done would be considered managing member**
15   **specifically.**
16   Q   So that's not a term that you've used to
17   describe your own role?
18   **A   No, not that I recall.**
19   Q   How long have you known Scott Ellington?
20   **A   Ten, 11 years.**
21   Q   How did you meet?
22   **A   Through a friend.**
23   Q   What friend?
24   **A   What's his name?**
25   Q   Yeah.

---

**22**

1    **A   Matt Okolita.**
2    Q   And other than Skyview, have you ever done
3    work for any other companies owned by
4    Mr. Ellington?
5    MS. SMITH: Objection, form.
6    **A   Owned how? What do you mean by owned?**
7    **BY MS. TOMKOWIAK:**
8    Q   Owned in any way, directly, indirectly,
9    partly, wholly owned in any way.
10   **A   I believe I have.**
11   Q   Okay. And what are those companies or
12   entities?
13   **A   Sentinel Reinsurance.**
14   Q   Okay. Anything else?
15   **A   SAS Asset Recovery.**
16   Q   Anything else? Just give a verbal answer
17   just so we have a clear record.
18   **A   Oh, no, not that I'm aware of.**
19   Q   Okay. And what's your understanding of
20   how Mr. Ellington owns Sentinel Reinsurance?
21   **A   I just know generally. I heard in court**
22   **it's a split between he and Mr. Dondero.**
23   Q   Okay. And you heard that from whom?
24   **A   It was said in, I believe the complaint**
25   **that we were allowed to review.**

---

**23**

1    Q   Okay. So prior to receiving that
2    complaint, you had no idea that Mr. Ellington
3    owned part of Sentinel Reinsurance?
4    **A   I assumed, but I never knew one way or the**
5    **other.**
6    Q   Why did you assume?
7    **A   Why did I assume that he owned it?**
8    Q   Yeah.
9    **A   That's just what I had heard, but I never**
10   **saw any specific documentation that said he owns**
11   **XYZ or whatever. That's what I meant.**
12   Q   And when you say that's just what I heard,
13   who did you hear that from?
14   **A   I don't specifically remember.**
15   Q   Do you recall when you heard that?
16   **A   I don't.**
17   Q   Was it -- well, let me ask you. How -- in
18   what capacity did you do work for Sentinel
19   Reinsurance?
20   **A   I was a director.**
21   Q   Okay. So did you hear that Mr. Ellington
22   was an owner in Sentinel Reinsurance before or
23   after you became a director?
24   **A   Not entirely sure. Maybe around the same**
25   **time.**

---

**24**

1    Q   And did you understand at that same time
2    that Mr. Dondero was also an owner of Sentinel?
3    **A   I had an idea.**
4    Q   How did you have an idea?
5    **A   Well, I was appointed by -- Mr. Ellington**
6    **told me I was going on the board and then I just**
7    **knew that he had some sort of arrangement with**
8    **Jim.**
9    Q   Some sort of arrangement with Jim, meaning
10   some type of ownership arrangement with Jim?
11   **A   That was my understanding.**
12   Q   Okay. Did Mr. Ellington tell you that?
13   **A   I don't recall.**
14   Q   Okay. So you came to an understanding
15   that Mr. Ellington and Mr. Dondero had some type
16   of ownership arrangement with respect to Sentinel
17   around the time that you became a director; is
18   that fair?
19   **A   Sounds right.**
20   Q   Do you recall when you became a director
21   of Sentinel?
22   **A   I think it was September of 2017. I don't**
23   **recall the exact date.**
24   Q   Okay. And we'll come back to that, but
25   you said Mr. Ellington appointed you; is that

25

1  right?
2  **A  Well, he told me I was going on the board.**
3  Q  He told you you were going on the board.
4  **A  Asked if I wanted to serve, I guess would**
5  **be a better phrasing.**
6  Q  Okay.  And you agreed to?
7  **A  That's right.**
8  Q  Okay.  Was that a condition of your
9  employment at Highland?
10  **A  I don't believe so.**
11  Q  Do you do any work for Mr. Ellington in
12  his personal capacity?
13  **A  At times.**
14  Q  What type of work?
15  **A  He has a -- I pay rent on his warehouse**
16  **space that he has.**
17  Q  Anything else?
18  **A  No.**
19  Q  Do you manage any of his finances?
20  **A  No.**
21  Q  Why do you pay rent on his warehouse?
22  **A  He asked me to take care of it.**
23  Q  Do you do that -- are you compensated for
24  that?
25  **A  No.**

26

1  Q  Do you perform any type of investment
2  services for Mr. Ellington?
3  **A  No.**
4  Q  Are you familiar with an entity called
5  TT3 Partners?
6  **A  Yes.**
7  Q  Okay.  And that's an LLC, right?
8  **A  That's correct.**
9  Q  Okay.  And I know you said earlier you
10  would not use this term, but -- so you're not a
11  managing member of TT3 Partners, LLC?
12  **A  I don't know, honestly.**
13  Q  You don't know.  Did you form that
14  company?
15  **A  I believe so.**
16  Q  Okay.  So you formed the company but
17  you're not sure what your title is?
18  **A  That's right.**
19  Q  Did you prepare the formation
20  documentation?
21  MS. SMITH:  Objection, form.
22  **A  I don't honestly know if I did or not.**
23  **BY MS. TOMKOWIAK:**
24  Q  So who would have done that?
25  **A  Possibly --**

27

1  MS. SMITH:  Objection, form.
2  **A  -- Sarah Goldsmith.**
3  **BY MS. TOMKOWIAK:**
4  Q  Who is Sarah Goldsmith?
5  **A  She was the legal group admin at Highland**
6  **Capital.**
7  Q  What is TT3 Partners?
8  MS. SMITH:  Objection, form.
9  **A  It's a company I joined with a friend to**
10  **make an investment in a venture capital fund.**
11  **BY MS. TOMKOWIAK:**
12  Q  What friend?
13  MS. SMITH:  Objection, form.
14  **A  Matt Okolita.**
15  **BY MS. TOMKOWIAK:**
16  Q  That's the person you said introduced you
17  to Mr. Ellington?
18  **A  Yes.**
19  Q  How do you know Mr. Okolita?
20  **A  I went to high school with him.**
21  Q  And what venture capital fund are you
22  investing in?
23  MS. SMITH:  Objection, form.
24  **A  I'd have to look for the exact name.  I**
25  **think it's Preface something, Preface Ventures or**

28

1  **something like that.**
2  **BY MS. TOMKOWIAK:**
3  Q  And why would Ms. Goldsmith have prepared
4  those paperwork?
5  MS. SMITH:  Objection, form.
6  **A  Because she knew how to do it.**
7  **BY MS. TOMKOWIAK:**
8  Q  Okay.  So was that done in her capacity as
9  a Highland employee?
10  **A  I don't know.**
11  Q  Well, did you ask her to prepare that
12  paperwork?
13  **A  If she did it, I would have asked her,**
14  **yes.**
15  Q  Okay.  And if you would have asked her,
16  would you be asking her as a personal favor or in
17  her capacity as some employee of some entity?
18  MS. SMITH:  Objection, form.
19  **A  I wouldn't have thought about that either**
20  **way.**
21  **BY MS. TOMKOWIAK:**
22  Q  Okay.  Did you pay her to do that?
23  MS. SMITH:  Objection, form.
24  **A  I don't believe so.  Or if I -- sorry.  If**
25  **I -- if she did it, I don't -- I wouldn't have**

29

1  paid her, no.
2  **BY MS. TOMKOWIAK:**
3    Q   Okay.  So -- just to be clear, so you --
4  do you recall that you filed papers with the
5  Secretary of State of Texas to form TT3 Partners?
6      MS. SMITH:  Objection, form.
7    **A   I'm sure that happened, yeah.**
8  **BY MS. TOMKOWIAK:**
9    Q   Okay.  But you don't know who prepared
10 those papers?
11   **A   Right.  I don't recall.**
12   Q   Okay.  That was in October of 2020; is
13 that right?
14     MS. SMITH:  Objection, form.
15   **A   Sounds right.**
16 **BY MS. TOMKOWIAK:**
17   Q   Did Mr. Okolita previously work at
18 Highland?
19   **A   He did.**
20   Q   Do you know when?
21   **A   It was -- I don't know the exact dates.  I**
22 **think he left around 2010 or '11.**
23   Q   Do you know why he left?
24   **A   I believe to take another job.**
25   Q   Do you know where he works today?

30

1    **A   Yes.**
2    Q   Where?
3    **A   Greyline Partners or Greyline Solutions or**
4  **Greyline something.**
5    Q   What is Greyline?
6    **A   It's a -- I think it's a consulting**
7  **company in the financial services industry.**
8    Q   Is it Greyline or Greystone, if you know?
9    **A   It would be Greyline.**
10   Q   Greyline.  Okay.  Is Greyline affiliated
11 at all with Highland?
12   **A   Not to my knowledge.**
13   Q   Is Greyline affiliated with Mr. Ellington?
14   **A   Not to my knowledge.**
15   Q   Is Greyline affiliated with Mr. Dondero?
16   **A   Not to my knowledge.**
17   Q   Do you provide any services to Greyline?
18   **A   No.**
19     MS. SMITH:  Objection, form.
20 BY MS. TOMKOWIAK:
21   Q   So before you worked at -- you came to
22 work at Skyview, you were employed by Highland
23 Capital Management, right?
24   **A   That's correct.**
25   Q   Okay.  And if I refer to them today as

31

1  Highland or HCM, you'll understand that I mean
2  Highland Capital Management?
3    **A   I think so.**
4    Q   Okay.  And when did -- were you employed
5  by Highland?
6    **A   Again, I don't remember the exact date,**
7  **but March of 2017.**
8    Q   And how did you come to start working at
9  Highland?
10   **A   I'm not sure I understand.  What do you**
11 **mean?**
12   Q   How did you come to work at Highland?  Did
13 you fill out an application?  Did somebody call
14 you?  How did you come to start working there?
15   **A   I was hired by Mr. Ellington.**
16   Q   Did you apply?
17   **A   I'm sure I filled out an application.**
18   Q   Did he invite you to fill out an
19 application?
20   **A   I believe I would have had to as a**
21 **condition of being employed.**
22   Q   Okay.  But did you approach him or did he
23 approach you?
24     MS. SMITH:  Objection, form.
25   **A   I'm not entirely sure.  I don't really**

32

1  remember.
2  **BY MS. TOMKOWIAK:**
3    Q   So at some point it just came up with
4  Mr. Ellington that you should apply to work at
5  Highland?
6      MS. SMITH:  Objection, form.
7    **A   At some point.**
8  **BY MS. TOMKOWIAK:**
9    Q   At some point do you recall in proximity
10 to when you actually started working there in
11 March 2017?
12   **A   My best guess would be I was in grad**
13 **school at the time and a group of my fellow**
14 **students were -- there's these things called MBA+**
15 **projects in my program, where you go seek someone**
16 **out in a different industry and get experience**
17 **doing a different project, and our MBA+ project**
18 **was with Highland via Mr. Ellington.  So I assume**
19 **our work there had something to do with it.**
20   Q   Did you know Mr. Ellington before that
21 MBA+ project?
22   **A   Yes.**
23   Q   Was it your idea to do your project with
24 Highland?
25   **A   A if it -- probably.  Yeah, no one else knew**

33

1 anyone at Highland, so it was probably my idea.
2   Q  Where did you go to grad school?
3   A  UT, University of Texas.
4   Q  So was Highland your first job after grad
5 school?
6   A  I graduated in May, but I started in
7 March, so I was just wrapping up.
8   Q  And where -- were you working while you
9 were in grad school?
10   A  A company called Constellation Brands.
11   Q  What does Constellation Brands do?
12     MS. SMITH: Objection, form.
13   A  What's its business, its industry?
14 BY MS. TOMKOWIAK:
15   Q  Uh-huh.
16   A  It's in the alcohol industry.
17   Q  Okay. And what was your role there?
18   A  I worked in the beer division as a -- I
19 guess -- I think my title was analysis manager.
20   Q  What does an analysis manager do?
21   A  Made a lot of --
22   Q  What did you do as an analysis manager?
23   A  Made a lot of spreadsheets and financial
24 modeling.
25   Q  Financial modeling for what?

34

1   A  Different scenarios that would come up in
2 the, I guess, beer sales process, any promotions,
3 potential sales, that sort of thing.
4   Q  Okay. What's your graduate degree in? Is
5 it an MBA?
6   A  It's an MBA, yes.
7   Q  Do you have any specific focus?
8   A  No, no concentration.
9   Q  Where did you work before Constellation
10 Brands?
11     MS. SMITH: Objection, form.
12   A  Sorry. It's been a while. I think my
13 last job was at Dean Foods.
14 BY MS. TOMKOWIAK:
15   Q  Okay. I'm sorry, like approximately what
16 period of time did you work for Constellation
17 Brands?
18     MS. SMITH: Objection, form.
19   A  It was, I think, the three years prior.
20 So '14 to '17, three years.
21 BY MS. TOMKOWIAK:
22   Q  Okay. And then you said you worked at
23 Dean Foods before that, for approximately how
24 long?
25   A  I think a couple years.

35

1   Q  What was your title when you first started
2 working at HCM?
3   A  Director, I believe.
4   Q  Were you in a particular department?
5   A  It was just -- it was my title in -- it
6 was just director.
7   Q  Okay. Did you sit in the legal
8 department? I think you said that.
9   A  Yes, I did.
10   Q  Do you know why you sat in the legal
11 department, given that you didn't have a law
12 degree?
13   A  No.
14   Q  Do you know who assigned you to sit in the
15 legal department?
16   A  I assume Mr. Ellington.
17   Q  Going back to Mr. Ellington for a second.
18 You mentioned that he was also an owner in some
19 manner of SAS Asset Recovery. Do you know how he
20 owned that company?
21   A  I don't.
22   Q  Okay. When you started working at HCM,
23 who did you report to?
24   A  Mr. Ellington.
25   Q  Anybody else?

36

1   A  Not when I first started, no.
2   Q  And as a director sitting in the legal
3 department, what were your responsibilities?
4   A  I worked on -- responsibilities with
5 respect to what?
6   Q  With respect to, let's start with
7 Highland.
8   A  I worked on some distressed investments
9 where they would need, you know, financial
10 modeling-type stuff.
11   Q  Anything else?
12   A  Not at the -- not when I started, no.
13   Q  Were there other nonlawyers who sat in the
14 legal department?
15   A  Yes.
16   Q  Who was that?
17   A  Helen Kim, who was a paralegal, and Katie
18 Irving.
19   Q  Was Ms. Irving a CPA?
20   A  I believe she's a CPA, yes.
21   Q  And were you given any reason why you were
22 sitting in the legal department?
23   A  No.
24   Q  Did you -- where was your office or desk?
25   A  In the legal department. I sat at a

37

1   table.  It's an open floor plan.
2      Q  So I've heard.  Did anybody report to you?
3      A  No.
4      Q  Okay.  And did you stay in the legal
5   department your entire time at HCM?
6      A  Sort of.
7      Q  What do you mean by that?
8      A  Eventually private equity -- the private
9   equity group moved into the legal department which
10  I worked for, so technically it still fell under
11  the legal umbrella, I guess.  But my function
12  changed to mainly private equity starting in 2019.
13     Q  Were you still a director?
14     A  In 2019, yes.
15     Q  Did that title change at any point in
16  time?
17     A  Yes.  Yes.  Excuse me.
18     Q  No worries.  When did it change?
19     A  Early 2020.
20     Q  What did it change to?
21     A  Managing director.
22     Q  So that was a promotion?
23     A  In name, I guess.
24     Q  And anything else?
25     A  No.

38

1      Q  Same compensation?
2      A  That's correct.
3      Q  You may have said this, but did you report
4   to Mr. Ellington the entire time that you were
5   employed at Highland?
6      A  Until private equity matters rolled up to
7   JP Sevilla and Tim Cournoyer.  They were made
8   co-heads of private equity.
9      Q  So would you say that in 2019 you reported
10  to Tim and JP?
11     A  On private equity matters.
12     Q  And then did you continue to also report
13  to Mr. Ellington on other matters?
14     A  On distressed matters.
15     Q  Were you ever told that the work that you
16  were doing was considered to be attorney-client
17  privileged in any way?
18     A  What specific work?
19     Q  Any of the work that you were doing,
20  either for the distressed investments or the
21  private equity stuff.
22     A  Not that I recall.
23     Q  When you came to work for the private
24  equity side, did anybody report to you?
25     A  No.

39

1      Q  And were you managing director until you
2   were terminated from Highland?
3      A  Yes.
4      Q  When did you leave Highland?
5      A  I don't remember the exact date, but a day
6   before everyone else.
7      Q  So in early February 2020?
8      A  Mid, late February maybe, but
9   February 2020 -- 2021, excuse me.
10     Q  Okay.  And you were terminated; is that
11  right?
12     A  That's correct.
13     Q  Who terminated you?
14     A  Jim Seery.
15     Q  Did Mr. Seery tell you why you were being
16  terminated?
17     A  He said performance issues.
18     Q  Did he say anything besides performance
19  issues?
20     A  No.
21     Q  Did you ask him what he meant by
22  performance issues?
23     A  I didn't.
24     Q  You didn't want to know what performance
25  issues were -- had led to your termination?

40

1         MS. SMITH:  Objection, form.
2      A  I was curious, but I wasn't going to say
3   anything.
4   BY MS. TOMKOWIAK:
5      Q  Why not?
6      A  Didn't seem to be a productive next step
7   in the conversation.
8      Q  You said a day before everybody else.  Who
9   were you referring to by everybody else?
10     A  There was -- as part of the -- as I
11  understand it anyway, as part of the bankruptcy,
12  several -- or many of the Highland employees were
13  terminated on the last -- I think the last day of
14  February or the last weekday in February.  And I
15  say a day before because Mr. Seery mentioned when
16  he was terminating me that I know it's a day
17  before everyone else.
18     Q  So I just want to make sure I understood
19  the pronouns.  He mentioned that when he was
20  terminating you that he knew it was a day before
21  everybody else?
22     A  Uh-huh.
23     Q  Okay.  Sorry, what do you -- so he let you
24  know that he was terminating you a day before he
25  was terminating other people?

41

1    A  I think it was public at that point or
2  known by the employees that their last day was
3  whatever the day was.
4    Q  Had you been told prior to that
5  conversation with Mr. Seery that you would be
6  included in the groups of -- the group of
7  employees that were being terminated?
8      MS. SMITH:  Objection to form.
9    A  I assumed I was.
10 BY MS. TOMKOWIAK:
11   Q  Why?
12   A  No one asked me to stay, at the debtor.
13   Q  So you thought that unless you were asked
14 to stay, you would be terminated?
15   A  That was my assumption.
16   Q  So you weren't surprised when you were
17 terminated?
18     MS. SMITH:  Objection, form.
19   A  I was very surprised when I was
20 terminated.
21 BY MS. TOMKOWIAK:
22   Q  Okay.  Why?
23   A  Because it was for some sort of cause, and
24 I was just expecting to be let go as part of the
25 bankruptcy, like everyone else.

42

1    Q  So it was your understanding that
2  everybody else who was fired in February 2021 was
3  let go because of the bankruptcy?
4    A  Yes.
5    Q  Okay.  And you believe that you were let
6  go for cause and that was unique to you?
7    A  Yes.
8    Q  Did you come to that understanding on your
9  own?
10   A  I was the only one in the room when I was
11 fired.  No one else was a part of that, so that
12 was my assumption.
13   Q  You and Mr. Seery?
14   A  He was on the phone.
15   Q  Oh, he was on the phone.  So you were at
16 Highland's office?
17   A  I was at the Highland office, that's
18 correct.
19   Q  And he was on the phone?
20   A  That's correct.
21   Q  Okay.  Were you expecting his call?
22   A  No.
23   Q  Was that your last day in the office?
24   A  I was walked out shortly thereafter.
25   Q  Did you have a chance to clean out your

43

1  desk?
2    A  Yeah.
3    Q  You did?
4    A  I did.
5    Q  All right.  And what -- did you take
6  anything with you?
7    A  Just papers and whatever I had there,
8  under the supervision of a DSI employee.
9    Q  Did you leave any files there?
10   A  There was -- I didn't take everything on
11 my desk, so I assume, yeah.
12   Q  What did you take?
13   A  Personal stuff, that I thought was
14 personal.  Again, it was kind of a high-pressure
15 stressful situation.  I was just grabbing stuff
16 and leaving, while the guy was standing there.
17   Q  Did Mr. Seery tell you you needed to leave
18 immediately?
19   A  Yes.  Or if he didn't, one of the DSI guys
20 who was in the room did.
21   Q  And just so I understand, so you -- you
22 said there was an open floor plan.  So when you
23 say the room, were you --
24   A  I was called into the Bois d'Arc
25 conference room.

44

1    Q  Okay.  Who called you into there?
2    A  James Romey from DSI.
3    Q  So Mr. -- were you finished?
4    A  He had another guy with him, but I don't
5  know his name.
6    Q  So they called you into the Bois d'Arc
7  conference room and said -- and said what?
8    A  They came to my desk and said, not
9  verbatim obviously, but Mr. Seery or Jim wants to
10 speak to you, he's on the phone in the conference
11 room.
12   Q  Okay.  So then you went into the
13 conference room and that's where you had your
14 conversation with Mr. Seery?
15   A  That's correct.
16   Q  Do you recall approximately how long that
17 lasted?
18   A  Couple minutes.
19   Q  And again, other than performance issues,
20 you don't recall Mr. Seery saying -- giving you
21 any other reason for why you were being let go?
22   A  Not specific reasons, no.  He read some --
23 I assume it's a standard letting-you-go letter and
24 then I said, may I ask why, and he said,
25 performance issues and I said nothing further.

---

**45**

1  Q  And after you hung up the phone, did
2  somebody from DSI come back into the room?
3  A  They were in the room the entire time.
4  Q  Okay.  So you were in the room with two
5  individuals from DSI?
6  A  That's correct.
7  Q  And they -- what did they say to you after
8  that?
9  A  Not much.  Just that I had to get my stuff
10  and get out of there.
11  Q  Did you have a computer that was given to
12  you by Highland?
13  A  I did.
14  Q  And what did you do with that?
15  A  I left it on my desk.
16  Q  Did you have a phone that was given to you
17  by Highland?
18  A  No.
19  Q  Did you have any other technology devices
20  that were provided to you by Highland?
21  A  At that time?
22  Q  At the time that you were terminated,
23  yeah.
24  A  No, just the laptop.
25  Q  Okay.  And are you -- did you qualify your

---

**46**

1  answer because you had other devices previously
2  during your employment at Highland?
3  A  I had a tablet at one point before I got
4  the laptop, but never -- never multiple devices at
5  the same time.  That is why I asked.
6  Q  Understood.  Have you done any work for
7  Highland -- any entity affiliated with Highland
8  since your separation?
9    MS. SMITH:  Objection, form.
10  A  I was allowed to stay on the board of the
11  GLA Resorts Holdings that I mentioned, which I
12  still sit on.
13  BY MS. TOMKOWIAK:
14  Q  And when you say that you were allowed,
15  was that -- did you have like a specific
16  conversation with somebody about that?
17  A  I did, via e-mail.
18  Q  With who?
19  A  I e-mailed Jim Seery and Thomas Surgent
20  asking to stay on the board.
21  Q  What did they say?
22  A  They allowed me to stay on the board.
23  Q  Did they say why?
24  A  Not specifically.
25  Q  Did they say why generally?

---

**47**

1  A  Just -- in my e-mail to them, I said that
2  we were in the process of selling the underlying
3  property that I mentioned earlier and that it
4  wouldn't make sense to put someone else in at this
5  point due to all the work we had done just to
6  get -- and when I say put someone else, replace me
7  on the board.  And they said that I would be
8  allowed to continue and just to keep them updated,
9  after I was terminated.
10  Q  Have you kept them updated?
11  A  Yes.
12  Q  I think you said this earlier, but you
13  still haven't sold that property, right?  By you,
14  I mean GLA.
15  A  It's under a purchase and sale agreement.
16  It has not closed yes.
17  Q  You also stayed on the board of Sentinel
18  after you were terminated, right?
19  A  Correct.
20  Q  Did you discuss that with anybody?
21    MS. SMITH:  Objection, form.
22  A  No, not that I recall.
23  BY MS. TOMKOWIAK:
24  Q  So you reached out to Mr. Seery to ask if
25  you could stay on the board of GLA, but you did

---

**48**

1  not have a similar outreach with respect to
2  Sentinel?
3  A  That's correct.
4  Q  Or outreach to anybody else of that
5  nature?
6  A  Not that I recall.
7  Q  Does Skyview have any contract with
8  Highland to provide shared services?
9  A  I believe so.
10  Q  Do you know generally what the nature of
11  those services are?
12  A  I believe it's IT related and I think
13  there's a tax and accounting function, possibly
14  HR.  Other than that, I'm not sure.  I don't know the
15  specifics of the actual contract.
16  Q  When you were at Highland, were you -- did
17  all of your compensation come from Highland
18  itself?
19  A  That's my understanding.
20  Q  So you didn't receive a paycheck or wire
21  transfer from any entity other than Highland?
22  A  Correct.
23  Q  What about as a director of Sentinel?  Did
24  you receive any compensation for that?
25  A  No.

---

**49**

1    Q   And what about for the work that you did
2   at SAS Asset Recovery?  Did you receive any
3   compensation for that?
4    **A   No.**
5    Q   Since leaving Highland, have you had any
6   communications with Mr. Dondero?
7    **A   Yes.**
8    Q   What communications have you had with him?
9    **A   I met him for the first time in March --**
10  **or spoke to him for the first time in March of**
11  **this year.**
12   Q   What do you mean by for the first time?
13   **A   I had never spoken to him prior in my time**
14  **at Highland.**
15   Q   So you worked at Highland for almost
16  four years and never spoke to Mr. Dondero during
17  that time?
18   **A   That's correct.**
19   Q   And are you making some distinction there
20  in terms of like speaking to him face-to-face?
21   **A   I make no distinctions.  I've never -- I**
22  **never spoke to him.**
23   Q   Never spoke to him by e-mail?  Never had a
24  phone conversation with him?
25   **A   Never.**

---

**50**

1    Q   Does that strike you as weird?
2    **A   Not particularly.**
3    Q   What about Mr. Ellington?  Since leaving
4   Highland, have you -- you know what, actually,
5   before we get to that, so you said you met him for
6   the first time in March of this year and can you
7   tell me about that meeting?
8       MS. SMITH:  Objection, form.
9    **A   We were reviewing a pitch deck.**
10  **BY MS. TOMKOWIAK:**
11   Q   Was this before or -- well, this would be
12  after you left Highland, right?
13   **A   Yes.**
14   Q   Yeah.  Okay.  And so a pitch deck for
15  what?
16      MS. SMITH:  Objection, form.
17   **A   Services that Skyview may provide to**
18  **entities that he may control.**
19  **BY MS. TOMKOWIAK:**
20   Q   Okay.  So were you pitching to him?
21      MS. SMITH:  Objection, form.
22   **A   No, I was not.**
23  **BY MS. TOMKOWIAK:**
24   Q   So then can you help me understand the
25  pitch deck.  Were you putting this together?  Like

---

**51**

1   were you working on it collaboratively with
2   Mr. Dondero?
3       MS. SMITH:  Objection, form.
4    **A   No, I put a pitch deck -- or our group put**
5   **a pitch deck together for, again, services.  I'm**
6   **not sure if I can name -- I'm trying not -- I'm**
7   **not trying to be evasive.  I'm not sure I can name**
8   **the actual businesses.**
9   **BY MS. TOMKOWIAK:**
10   Q   Well, without naming the businesses, I'm
11  just trying to understand who's pitching to who.
12  So are you saying that your group -- sorry, that
13  was a fast thing.
14      Are you saying that your group at Skyview
15  put together a pitch deck to provide services to
16  entities that are affiliated with Mr. Dondero?
17      MS. SMITH:  Objection, form.
18   **A   That's correct.  He's a client of Skyview.**
19  **Or his businesses are.**
20  **BY MS. TOMKOWIAK:**
21   Q   And so you met with him to review the
22  pitch deck but not to give the actual pitch?
23   **A   That's right.**
24   Q   Was anybody else at that meeting?
25   **A   No.**

---

**52**

1    Q   Why were you the person who met with
2   Mr. Dondero?
3    **A   Because I was building the PowerPoint**
4   **presentation.**
5    Q   So did you discuss the substance of the
6   deck?
7       MS. SMITH:  Objection, form.
8    **A   The substance of the deck?**
9   **BY MS. TOMKOWIAK:**
10   Q   Yeah.
11   **A   I suppose so.**
12   Q   Okay.  Did you ever actually pitch for the
13  work?
14      MS. SMITH:  Objection, form.
15   **A   To Mr. Dondero?**
16  **BY MS. TOMKOWIAK:**
17   Q   Yeah.
18   **A   No.**
19   Q   So were you already hired by Mr. Dondero
20  at the time that you were reviewing this pitch
21  book?
22   **A   Was I hired by Mr. Dondero?**
23      MS. SMITH:  Objection, form.
24  BY MS. TOMKOWIAK:
25   Q   Was Skyview hired -- already hired by

---

53

1  Mr. Dondero at the time you met to review this
2  deck?
3  **A  Not with respect to this particular**
4  **business, no.**
5  Q  After you met with Mr. Dondero, did -- was
6  Skyview hired by Mr. Dondero to do that work?
7  MS. SMITH: Objection, form.
8  **A  Several months later, yes.**
9  **BY MS. TOMKOWIAK:**
10  Q  Approximately when?
11  MS. SMITH: Objection, form.
12  **A  Between March and June, a couple months**
13  **after. I don't know the exact date. Again, not**
14  **trying to be evasive.**
15  **BY MS. TOMKOWIAK:**
16  Q  Since leaving Highland, have you had any
17  other communications with Mr. Dondero?
18  **A  No.**
19  Q  So when he reached out to hire Skyview,
20  did he reach out to you?
21  **A  No. That was -- I had nothing to do with**
22  **any of that.**
23  Q  Do you know who he reached out to?
24  **A  I assume JP Sevilla, Brian Collins, Frank**
25  **Waterhouse, the kind of top guys.**

54

1  Q  So how did you come to learn that Skyview
2  had been hired for that work?
3  **A  Well, I was part of the -- I built the**
4  **deck, so they said -- I was told that we were**
5  **hired.**
6  Q  You were told by one of your colleagues at
7  Skyview?
8  **A  That's right.**
9  Q  Do you remember who?
10  **A  It was probably on a group e-mail. I**
11  **don't know. I don't know specifically.**
12  Q  You don't know specifically or you just
13  don't recall?
14  **A  What's the difference here? I don't**
15  **recall. I don't know specifically who delivered**
16  **that message.**
17  Q  Since leaving Highland, have you had any
18  communications with Mr. Ellington?
19  **A  Yes.**
20  MS. SMITH: Objection, form.
21  BY MS. TOMKOWIAK:
22  Q  Okay. What type of communications?
23  MS. SMITH: Objection, form.
24  **A  We've spoken on the phone.**
25  **BY MS. TOMKOWIAK:**

55

1  Q  How many times?
2  **A  I have no idea. I've seen him in person.**
3  Q  Hundreds of times?
4  MS. SMITH: Objection, form.
5  **A  Hundreds? No. Wouldn't be that much.**
6  **BY MS. TOMKOWIAK:**
7  Q  Okay. Dozens?
8  **A  Probably less.**
9  Q  And have those communications related to
10  your work at Skyview?
11  **A  Small percentage probably.**
12  Q  Okay. And what else have you talked to
13  him about?
14  MS. SMITH: Objection, form.
15  **A  My kids, you know, friendly personal-type**
16  **stuff.**
17  **BY MS. TOMKOWIAK:**
18  Q  So you're -- a small percentage of those
19  conversations were about work and a much larger
20  percentage of those conversations were more
21  personal or social in nature?
22  **A  That's right.**
23  Q  And you said you've seen him in person.
24  What was the nature of that in-person
25  communication?

56

1  MS. SMITH: Objection, form.
2  **A  We've had lunch a couple times.**
3  **BY MS. TOMKOWIAK:**
4  Q  Anything else?
5  **A  Not really that I can recall, no.**
6  Q  Have you had any communications with
7  Mr. Ellington while he's been on his vacation in
8  Africa?
9  MS. SMITH: Objection, form.
10  **A  A brief e-mail.**
11  **BY MS. TOMKOWIAK:**
12  Q  Do you recall when that was?
13  **A  Late June, early July. Several weeks ago.**
14  Q  Anything else?
15  **A  No.**
16  Q  Have you spoken with Mr. Ellington about
17  this deposition?
18  **A  No.**
19  Q  Have you spoken with Mr. Ellington about
20  this matter more generally?
21  **A  When? Can you be -- specify which time --**
22  **or what time frame?**
23  Q  At any time after you left Highland.
24  **A  No.**
25  Q  While at Highland, did you speak with

57

1 Mr. Ellington about topics relevant to this
2 matter?
3     MS. SMITH: Objection, form.
4   A I think early on, when I -- like late '17
5 probably, early '18.
6 BY MS. TOMKOWIAK:
7   Q What did you talk about?
8   A What did I talk about with respect to --
9   Q With respect to the topics that are
10 relevant to this matter.
11   A Can you be more specific, please?
12   Q What were you thinking of when you said
13 that?
14   A Do you mean in respect to UBS; something
15 else?
16   Q UBS, Sentinel.
17     MS. SMITH: Objection, form.
18   A I was, I believe, given a high-level kind
19 of summary of the case way back when, due to being
20 on the board of Sentinel and having involvement.
21 BY MS. TOMKOWIAK:
22   Q Okay. We will come back to that. Let's
23 see. Since leaving Highland, have you had any
24 communications with Mr. Leventon?
25   A Yes.

58

1   Q What types of communications?
2   A Similar to Mr. Ellington, a mix of
3 personal and professional. Isaac is a friend of
4 mine.
5   Q And does he work at Skyview?
6   A He does.
7   Q What percentage of those conversations
8 have been personal versus professional?
9     MS. SMITH: Objection, form.
10   A A low percentage of professional, a high
11 percentage of personal. Isaac likes to talk about
12 World War II history and I don't, so I listen to
13 that a lot.
14 BY MS. TOMKOWIAK:
15   Q Have you seen Mr. Leventon in person?
16   A I have.
17   Q How many times?
18   A I don't know.
19   Q Approximately?
20     MS. SMITH: Objection, form.
21   A Ten.
22 BY MS. TOMKOWIAK:
23   Q And have those all been for personal
24 reasons?
25   A No, generally in our temporary office

59

1 space.
2   Q So where is your temporary office space?
3   A It's at the NexBank building in uptown.
4   Q Okay. So when I asked you about if you're
5 working at NexPoint, your answer was no because
6 you're actually working at NexBank?
7   A That's right.
8     MS. SMITH: Objection, form.
9 BY MS. TOMKOWIAK:
10   Q Okay. And so you've seen Mr. Leventon in
11 person in those offices?
12   A That's correct.
13   Q Okay. Have you seen Mr. Ellington in
14 person in those offices?
15   A Once maybe.
16   Q Have you spoken with Mr. Leventon about
17 this deposition?
18   A Only in the context of logistics, as I've
19 never been deposed before. I just generally asked
20 how it goes.
21   Q What did he say?
22   A Lawyers on two sides of the table, camera
23 up front. He said it's tiring.
24   Q That's pretty accurate.
25   A So far seems to be.

60

1   Q Other than that, have you had any other
2 communications with Mr. Leventon about the subject
3 matter of this -- about the subject matter of this
4 proceeding?
5   A Since leaving Highland, is that the time
6 frame?
7   Q Yes.
8   A No.
9   Q What about Mr. Sevilla? You said that you
10 report to him at Skyview; is that right?
11   A That's correct.
12   Q Okay. So I assume you've had
13 communications with him prior to leaving -- I'm
14 sorry, after leaving Highland?
15   A That's correct.
16   Q And have the nature of those
17 communications also been both professional and
18 personal?
19   A Yeah, probably 50/50.
20   Q Have you seen him in person?
21   A Almost every day.
22   Q At the temporary office?
23   A (Nods head.)
24   Q Just a verbal --
25   A Yes, sorry. Correct. Sorry.

**61**

1    Q  Mr. Leventon should have told you that.
2    **A  The one thing he left out.**
3    Q  Yes.  Need verbal answers.
4        And have you had any communications with
5    Mr. Sevilla about the subject matter of this
6    proceeding?
7    **A  No.**
8    Q  Have you had any communications with
9    Mr. Sevilla about today's deposition?
10   **A  No.**
11   Q  What about Ms. Lucas, formerly Katie
12   Irving?  Have you had any communications with her
13   since you left Highland?
14   **A  Yes.**
15   Q  What types of communications?
16   **A  I check in every two or three weeks to see**
17   **how her kids are doing, how she's doing.  Again,**
18   **she's a friend, as JP is as well.**
19   Q  Did you know Mr. Leventon prior to working
20   at Highland?
21   **A  I met him on our consulting project during**
22   **my MBA that I mentioned before.**
23   Q  Did you know Mr. Sevilla prior to working
24   at Highland?
25   **A  Same.**

**62**

1    Q  Did you know Ms. Irving prior to working
2    at Highland?
3    **A  Same.  Same working group.**
4    Q  So you met all of them during your MBA+
5    project?
6    **A  Yeah.**
7    Q  Do you know when Ms. Lucas is coming back
8    from maternity leave?
9    **A  I don't.**
10       MS. SMITH:  Objection, form.
11   BY MS. TOMKOWIAK:
12   Q  Have you had any other communications --
13   strike that.
14       Have you had any communications with
15   anybody who currently works at Highland since you
16   left Highland?
17   **A  I believe I exchanged a few texts with**
18   **Tim Cournoyer.**
19   Q  Anybody else?
20   **A  I don't believe so.**
21   Q  What did you text Tim Cournoyer about?
22   **A  I think just, hey, how are you doing type**
23   **stuff.  Tim was a friend as well.**
24   Q  And you said nobody else?
25   **A  No.  And I ran into Tim at a grocery store**

**63**

1    **also, if that counts.**
2    Q  While working at Highland, you had e-mail
3    addresses that used the HighlandCapital.com and
4    hcmlp.com domains; is that right?
5    **A  I think so.**
6    Q  Can you think of any other e-mail
7    addresses that you used while you were employed at
8    Highland?
9    **A  Yes.**
10   Q  What are those?
11   **A  It was an SAS Management e-mail.**
12   Q  And anything else?
13   **A  That's it.**
14   Q  Did you ever use your personal e-mail
15   address in connection with your work at Highland?
16   **A  No.  Not that I recall.**
17   Q  What is your personal e-mail address?
18   **A  What is my e-mail address?**
19   Q  Uh-huh.
20   <-- HIGHLY CONFIDENTIAL -->
21   Q  What is SAS Management?
22   **A  It was an asset recovery/litigation**
23   **funding business.**
24   Q  Do you know what SAS stands for?
25   **A  I don't.**

**64**

1    Q  Do you have any guesses?
2        MS. SMITH:  Objection, form.
3    **A  I don't.**
4    **BY MS. TOMKOWIAK:**
5    Q  Did you ever ask?
6    **A  I didn't.**
7    Q  Why did you have an e-mail address at SAS
8    Management?
9    **A  I provided service to SAS Management.**
10   Q  Was that in your capacity as a Highland
11   employee?
12   **A  I never really thought about it.  I'm not**
13   **sure.**
14   Q  Did you receive compensation from SAS
15   Management?
16   **A  No.**
17   Q  How much time did you spend working on
18   matters for SAS?
19   **A  On what time frame?**
20   Q  Well, let's start from when you first
21   started at Highland.  How much of your time did
22   you spend working on SAS matters?
23   **A  Twenty-five percent, maybe.**
24   Q  Did that change over time?
25   **A  It got less and less.**

65

1    Q   And by February 2021, how much time were
2   you spending on SAS matters?
3    A   Zero.
4    Q   What types of services did you provide for
5   SAS?
6    A   I did -- I performed a lot of due
7   diligence on potential cases, investments,
8   whatever you want to call it, financial modeling,
9   different scenarios, different outcomes.
10   Q   Who asked you to work on that?
11   A   Mr. Ellington.
12   Q   Anybody else?
13   A   No. Not that I recall.
14   Q   Does -- did SAS have an office?
15   A   In -- where?
16   Q   Anywhere.
17   A   I think there's office space in Cayman,
18  Cayman Islands.
19   Q   Did you ever go there?
20   A   To the Cayman Islands?
21   Q   Uh-huh.
22   A   Yes.
23   Q   Did you ever go to SAS's office in the
24  Caymans?
25   A   Yeah, once.

66

1    Q   Did SAS have any employees that worked
2   full-time at the office in the Cayman Islands?
3    A   I don't believe so.
4    Q   When you went there, was there anybody
5   else there?
6    A   Not the day I was there.
7    Q   What about the day before you were there?
8    A   I have no idea.
9        MS. SMITH:  Objection, form.
10   A   I wasn't there.
11  BY MS. TOMKOWIAK:
12   Q   Okay. So you were just -- it was just you
13  in the office alone that day?
14   A   I'm sure I was with Mr. Ellington.
15   Q   Oh, okay. So it was you and Mr. Ellington
16  in the office that day?
17   A   Sorry. I thought you meant people there
18  work -- like there working already when we showed
19  up.
20   Q   Do you recall approximately when that was?
21   A   Sometime maybe late 2017, early 2018. I
22  don't know exactly.
23   Q   Did Mr. Ellington ask you to come with him
24  to the Cayman Islands?
25   A   Yes, he would have.

67

1    Q   And what was the purpose of that trip?
2    A   We did business development-type stuff.
3    Q   What type of business development?
4    A   Meeting with attorneys, meeting with
5   potential people -- or potential clients who could
6   use the services that SAS would provide.
7    Q   Was your -- were these business
8   development-type stuff solely related to SAS
9   Management or SAS -- if I say SAS, can we agree
10  that means SAS Asset Recovery, SAS Management, the
11  SAS structure, or would you prefer that it's a
12  specific entity?
13   A   I can agree to that, yeah.
14   Q   Okay. So were the -- was the business
15  development that you and Mr. Ellington were doing
16  in the Cayman Islands solely related to SAS?
17   A   Yes.
18   Q   And it wasn't on behalf of Highland?
19   A   I don't know.
20   Q   Who paid for that trip?
21   A   I have no idea.
22   Q   Did you pay for that trip?
23   A   I did not, no.
24   Q   How long were you there?
25   A   I don't know.

68

1    Q   A week?
2    A   Probably less.
3    Q   A few days?
4    A   Sounds about right.
5    Q   Do you recall which attorneys you met
6   with?
7    A   I don't.
8    Q   Did you get any new business as a result
9   of that trip?
10   A   I want to say no, I don't believe so.
11   Q   Where did you stay?
12   A   At a house.
13   Q   Who owned that house, if you know?
14   A   I don't know.
15   Q   Did Mr. Ellington own that house?
16   A   I don't believe so.
17   Q   Was it a private house?
18   A   What do you mean?
19   Q   Well, it wasn't a hotel. Was it a hotel?
20   A   It was a house at a hotel, if that makes
21  sense.
22   Q   It does make sense. That's kind of what I
23  was getting at. So it was a residence affiliated
24  with a hotel property?
25   A   Correct.

---

69

1    Q   Okay.  And so you don't know one way or
2   the other if Mr. Ellington owns that house?
3    A   I don't believe he owns the house.
4    Q   You don't believe he owns the house.  Was
5   that your only trip to the Cayman Islands?
6    A   In --
7    Q   During the time that you worked at
8   Highland.
9    A   No.
10   Q   When else did you travel to the Cayman
11  Islands?
12   A   I don't know specific dates, but we'd go
13  one or two times a year probably.
14   Q   Were those -- and when you say we, do you
15  mean you and Mr. Ellington?
16   A   Yeah.  Sorry.
17   Q   Were those trips always for SAS?
18   A   Not always.
19   Q   What were the other purposes of those
20  trips?
21   A   There was -- we had -- we had to go meet
22  with CIMA, the Cayman Islands Monetary Authority,
23  on behalf of Sentinel Reinsurance.
24   Q   Any other purposes?
25   A   Yes.  We were exploring a -- launching a

---

70

1   potential bank -- or potentially launching a bank,
2   excuse me, and we met with a different department
3   at the Cayman Islands Monetary Authority with
4   respect to that project.
5    Q   Did you ever launch that bank?
6    A   We did not.
7    Q   Why not?
8       MS. SMITH:  Objection, form.
9    A   I don't entirely know the reason why it
10  never got off the ground.
11  BY MS. TOMKOWIAK:
12   Q   Do you partially know?
13      MS. SMITH:  Objection, form.
14   A   I don't.  It wouldn't have been my
15  decision to go forward or stop.
16  BY MS. TOMKOWIAK:
17   Q   When you met with CIMA, was that a
18  mandatory meeting?  Let me ask a better question.
19      What was the purpose of your meeting with
20  CIMA?
21   A   Which meetings?
22   Q   How many different types of meetings did
23  you have with CIMA?
24   A   Well, I said we went and met on behalf of
25  Sentinel Reinsurance.

---

71

1    Q   Those are the ones I'm interested in.
2    A   And then we met on behalf of the bank --
3   or with the banking division on exploring that
4   bank project.  That's why I'm specifying.
5    Q   Understood.  So with respect to Sentinel,
6   what was the purpose of those meetings?
7    A   CIMA performs inspections, routine
8   inspections every five years, as I understand it,
9   on at least insurance companies that operate in
10  Cayman.  That was a part of that inspection.
11   Q   But you said during your four-year period,
12  you went once or twice a year to the Cayman
13  Islands.  So how many -- how many times did you
14  meet with CIMA with respect to Sentinel?
15   A   I believe twice.
16   Q   Other than routine inspections, was there
17  any other purpose of those meetings?
18   A   With CIMA?
19   Q   Uh-huh.
20   A   No.  It was all related to the inspection.
21   Q   Why did you go to those meetings?
22   A   Why did I attend the meetings?  I was a
23  director at Sentinel.
24   Q   You weren't the only director, right?
25   A   That's correct.

---

72

1    Q   Did the other directors attend?
2    A   One of them attended in person.
3    Q   Did the other directors live in the Cayman
4   Islands?
5    A   Yes.  I don't know if full-time, but they
6   lived down there.  They're European guys.  I don't
7   know how much time they spend in Europe.
8    Q   Did CIMA require a director to attend?
9    A   I actually don't know.
10   Q   Did Mr. Ellington ask you to attend?
11   A   Yes.  We went together.
12   Q   And why did Mr. Ellington go?
13   A   I don't know.
14   Q   Was that in his role as an owner of
15  Sentinel?
16      MS. SMITH:  Objection, form.
17   A   You'd have to ask him why he attended.
18  I'm not entirely sure.
19  BY MS. TOMKOWIAK:
20   Q   So you didn't ask him why he was attending
21  the meeting with CIMA on behalf of Sentinel?
22      MS. SMITH:  Objection, form.
23   A   No, I didn't.
24  BY MS. TOMKOWIAK:
25   Q   You didn't say, hey -- you never asked him

73

1   what his role was at those meetings?
2       MS. SMITH:  Objection, form.
3     A  No.
4   BY MS. TOMKOWIAK:
5     Q  Did CIMA ask why he was there?
6     A  Not that I recall.
7     Q  What did they ask about during those
8   meetings?
9     A  We reviewed the inspection report, chatted
10  about the business.
11    Q  What about the business?
12    A  Just day-to-day, what -- you know, again,
13  it's a -- every five years they kind of look under
14  the hood and see if the companies that operate in
15  the Caymans actually have a presence there or that
16  sort of thing and are meeting the governance
17  requirements, that sort of thing.
18    Q  And what I'm trying to understand about
19  every five years is that you said you went twice
20  in a four-year period.  So was there some other
21  purpose besides this routine five-year inspection?
22    A  No.  We went when we got the initial
23  report, if I remember correctly, around the -- or
24  a draft report, to discuss it with them and then
25  the company had a few housekeeping things to clean

74

1   up and we went back and just spoke to them again
2   and said this is what we did, are you guys happy.
3     Q  What were the housekeeping things to clean
4   up?
5     A  For example, we had one board meeting one
6   year, we were supposed to have two, that sort of
7   thing.  So we had to appoint one of the directors
8   as, I think it was an anti-money laundering
9   officer as a requirement and I think it was a
10  newer requirement that maybe had come up in the
11  last five years, so we just basically assigned one
12  of the board members that role.  Or one of the
13  directors, excuse me, that role, stuff like that.
14    Q  So you identified two issues.  So you were
15  supposed to have two board meetings a year and you
16  were only having one?
17    A  I think so.
18    Q  And then another issue was this anti-money
19  laundering officer as a requirement?
20    A  Yeah.  And I think it was a regulatory
21  change that had come up at some point in the
22  five years between inspections.  It's my
23  understanding anyway.
24    Q  Do you recall any other issues that you
25  had to clean up for CIMA?

75

1     A  No, not that I recall.
2     Q  When, approximately, was the date of the
3   first report?
4       MS. SMITH:  Objection, form.
5     A  I think it was early 2019 maybe.
6   BY MS. TOMKOWIAK:
7     Q  And then you and Mr. Ellington went to
8   meet with CIMA shortly after that?
9     A  I don't remember the timing, but
10  subsequent to the report at some point.
11    Q  When was the date of the final report?
12    A  Later in the year at some point.  I'm not
13  entirely sure.
14    Q  To the best of your recollection, later in
15  2019?
16    A  Yeah.  That sounds right.
17    Q  Did you and Mr. Ellington -- was your
18  second meeting after that second -- the final
19  report?
20    A  I believe it was before.
21    Q  Okay.  So you had, to the best of your
22  recollection, two trips to the Cayman Islands in
23  2019 to meet with CIMA to review their inspection
24  of Sentinel?
25    A  That sounds right.

76

1     Q  And did CIMA ask Mr. Ellington why he was
2   there?
3     A  Not that I recall.
4     Q  Did CIMA need to know for purposes of its
5   inspection who the owners of Sentinel were?
6       MS. SMITH:  Objection, form.
7     A  I don't know.
8   BY MS. TOMKOWIAK:
9     Q  Did you need to know that as a director of
10  Sentinel?
11    A  I don't know.
12    Q  So you were comfortable being the director
13  of a company without knowing who owned it?
14      MS. SMITH:  Objection, form.
15    A  Yeah, I was put on -- I was put on the
16  board as a director -- or made a director, excuse
17  me, and I did my job.  I didn't really question
18  what was going on, who ultimately owned anything.
19  BY MS. TOMKOWIAK:
20    Q  What do you mean by anything?
21      MS. SMITH:  Objection, form.
22    A  I mean I was doing my job in the context
23  of what had to be done as a director.  I did not
24  really stop to think about who owned what or how.
25  BY MS. TOMKOWIAK:

---

77

1    Q   Okay.  So it was completely irrelevant to
2   you who owned Sentinel?
3        MS. SMITH:  Objection, form.
4    A   Kind of.
5   BY MS. TOMKOWIAK:
6    Q   You could do your job without knowing who
7   owned Sentinel?
8    A   I could.
9    Q   You could satisfy all of your fiduciary
10  duties to Sentinel --
11       MS. SMITH:  Objection.
12  BY MS. TOMKOWIAK:
13   Q   -- as you understood them without knowing
14  who Sentinel's owners were?
15       MS. SMITH:  Objection, form.
16   A   I'm not an attorney.  I don't know what
17  satisfies all points under fiduciary duty.  But I
18  think if I'm looking out in the best interest of
19  the company as a director, which I was, then
20  ultimately that inures to the benefit of whoever
21  owns it.
22  BY MS. TOMKOWIAK:
23   Q   So did you believe as a director -- not an
24  as attorney because I understand you're not an
25  attorney, but as a director, did you have an

---

78

1   understanding of what your fiduciary duties were?
2        MS. SMITH:  Objection, form.
3    A   Not particularly.  Again, I'm not an
4   attorney.  I did my job the best I could to what I
5   thought was the benefit of the company, which is
6   my very high-level understanding of fiduciary
7   duty.
8   BY MS. TOMKOWIAK:
9    Q   Did Sentinel have attorneys?
10   A   On staff?
11   Q   That represented it.
12   A   For -- at times, when necessary.
13   Q   And none of those attorneys explained to
14  you what your fiduciary duties were as a director?
15       MS. SMITH:  Objection, form and privilege
16  what he discussed with the attorneys for Sentinel.
17       THE WITNESS:  Do I have to answer that?
18       MS. TOMKOWIAK:  Are you instructing him
19  not to answer that question?
20       MS. SMITH:  Not to answer it if you have
21  to divulge privileged information.
22   A   I think it's safe to say that I've never
23  had that conversation with an attorney about what
24  my fiduciary duty was as a director of Sentinel.
25  BY MS. TOMKOWIAK:

---

79

1    Q   Did you have a conversation with anybody
2   at any time during which you were a director at
3   Sentinel about what your fiduciary duties were?
4    A   Not that I recall.
5    Q   And you said that you were working for the
6   best interest of the company; is that right?
7    A   Yeah, I believe so.
8    Q   And who did you understand the company to
9   be?
10   A   Sentinel Reinsurance --
11   Q   Right.
12   A   -- was the company that I was a director
13  of, so that's the company I'm referring to.
14   Q   And you didn't understand that company to
15  be comprised of any particular people?
16       MS. SMITH:  Objection, form.
17   A   Again, like I said before, I assumed there
18  was some ownership between Mr. Ellington and
19  Mr. Dondero, but I don't know how or what, other
20  than what I read in the -- I think it was a
21  complaint or said in court or something.
22  BY MS. TOMKOWIAK:
23   Q   Did you know if Sentinel Reinsurance had
24  any shareholders?
25       MS. SMITH:  Objection, form.

---

80

1    A   I assume it does.  I don't know who the
2   shareholders are.
3   BY MS. TOMKOWIAK:
4    Q   And during -- and you never learned who
5   the shareholders were, if any, at any point while
6   you were a director of Sentinel?
7        MS. SMITH:  Objection, form.
8    A   Not that I recall.
9   BY MS. TOMKOWIAK:
10   Q   Did you ask any questions about Sentinel
11  before you agreed to be a director?
12   A   I asked what it was, what sort of business
13  it was in, products it provided, what the
14  day-to-day responsibilities would be.
15   Q   And what did they tell you -- well, who
16  did you ask?
17   A   I would have asked JP Sevilla.
18   Q   You would have -- did Mr. Sevilla ask you
19  to be a director?
20   A   No.
21   Q   So why did you ask him?
22   A   Because in the -- my understanding was
23  that he handled kind of day-to-day stuff for
24  Sentinel if it came up, which at -- my
25  understanding at the time was there was not much

---

**81**

1  going on day to day.  So that was passed off to
2  me.
3       MS. TOMKOWIAK:  Let's take a break.
4       THE VIDEOGRAPHER:  We are off the record
5  at 10:55 a.m.
6       (Recess taken from 10:55 a.m. CDT to
7  11:22 a.m. CDT)
8       THE VIDEOGRAPHER:  The time is 11:22 a.m.
9  We are back on the record.
10 BY MS. TOMKOWIAK:
11  Q  Mr. DiOrio, I understand that you recalled
12 another conversation that you had with Mr. Dondero
13 after you left Highland; is that right?
14  A  That's correct.
15  Q  Tell me about that conversation.
16  A  He -- his admin asked me to come down to
17 his -- or come to his office and he asked me
18 where -- if I had heard from Mr. Ellington.  It
19 was very brief.
20  Q  When did that take place?
21  A  Earlier this week.
22  Q  Earlier this week?
23  A  I think so.
24  Q  What day?
25  A  Monday or Tuesday.

---

**82**

1  Q  Who is Mr. Dondero's admin?
2  A  Her name is Tara.
3  Q  Tara what?
4  A  Was Loiben at Highland, but I think she
5  got married since.  I'm not sure.
6  Q  But Tara is his current assistant?
7  A  One of.  I think he has a couple.
8  Q  When you say Mr. Dondero's office, which
9  office?
10  A  His office on -- at the NexBank, I guess
11 corporate office.
12  Q  So is that the same office building where
13 you're currently working?
14  A  It's the same building we're temporarily
15 in, yes.  Different floor.
16  Q  So when you went to his office, you just
17 went to a different floor?
18  A  Yes, that's right.
19  Q  So you were already in the office that
20 day?
21  A  Yes.
22  Q  And you said that he wanted to know -- I
23 don't want to put words in your mouth -- if you
24 had heard from Mr. Ellington?
25  A  That's correct.

---

**83**

1  Q  Why did he want to know if you had heard
2  from Mr. Ellington?
3       MS. SMITH:  Objection, form.
4  A  Not entirely sure, but he must -- I don't
5  know.
6  BY MS. TOMKOWIAK:
7  Q  Did he say why he wanted to know if you
8  had heard from Mr. Ellington?
9  A  Because I don't think anyone's heard from
10 Mr. Ellington since he's been gone, or in several
11 weeks anyway.
12  Q  Okay.  So did you -- what was your
13 response?
14  A  I told him I would try to contact him.
15  Q  Did you try to contact him?
16  A  I did.
17  Q  How?
18  A  I sent an e-mail and a text message.
19  Q  Did you receive an e-mail back?
20  A  I did not.
21  Q  Did you receive a text back?
22  A  I did not.
23  Q  Have you talked to anybody else about
24 whether they've been able to reach Mr. Ellington?
25  A  Not specifically.  It sounds like no one's

---

**84**

1  heard from him in a few weeks.
2  Q  Did Mr. Dondero say anything else during
3  that conversation?
4  A  No.
5  Q  Did he tell you why he was trying to get
6  in touch with Mr. Ellington?
7       MS. SMITH:  Objection, form.
8  A  Just that he hadn't heard from him.
9  BY MS. TOMKOWIAK:
10  Q  And then I understand that you also --
11 right.  And the last time that you heard from
12 Mr. Ellington was the e-mail that you received
13 from him you said a few weeks ago?
14  A  Yeah.
15  Q  And then I understand that you also
16 recalled another e-mail address that you used
17 while at Highland; is that right?
18  A  Yes, that's correct.
19  Q  What is that?
20  A  It was mdiorio@ -- I think it was
21 ogventures.com.
22  Q  What is OG Ventures?
23  A  Mr. Ellington had a -- had a couple of
24 investments in oil and gas that predated my time
25 and I was tasked with monitoring, ultimately

---

85

1 selling one of them.
2    Q  Was that -- did you receive compensation
3 for that separate from the compensation that you
4 received from Highland?
5    A  No.
6    Q  Okay.  Did you do that work out of your
7 Highland office?
8    A  Partly probably.
9    Q  How did you know while at Highland which
10 e-mail address to use?
11    A  For -- what do you mean?
12    Q  For anything.  Like if you were sending an
13 e-mail, how did you choose which one to use?
14    A  Well, the OG one, for example, I barely
15 used.  But generally if it was SAS-related items,
16 offshore, I guess, another way I think of it, I'd
17 use that.  Everything else I would use Highland
18 for distressed and private equity stuff.
19    Q  What about with respect to Sentinel?
20 Which e-mail address would you use?
21    A  SAS.
22    Q  What is the relationship between Sentinel
23 and SAS?
24    A  I don't believe there is one.
25    Q  Then why would you use your SAS e-mail

86

1 account for your work with Sentinel?
2    A  I never had a -- there's no Sentinel
3 e-mail addresses.
4    Q  Why not use your Highland e-mail address?
5    A  Because I -- again, I think of it as kind
6 of offshore, onshore-type stuff and that just fell
7 into the offshore bucket since it was Cayman
8 based.
9    Q  So to your knowledge, there is no
10 relationship at all between Sentinel and SAS?
11    A  Not to my knowledge.
12    Q  Sentinel is not owned directly or
13 indirectly in any way by SAS, to your knowledge?
14       MS. SMITH:  Objection, form.
15    A  Not to my knowledge.
16 BY MS. TOMKOWIAK:
17    Q  Sentinel didn't provide any insurance
18 services to any SAS companies, to your knowledge?
19    A  It used to.
20    Q  Okay.  And you just don't consider that to
21 be a relationship between Sentinel and SAS?
22    A  I would think it's more of a -- define
23 relationship, I guess.  I was thinking more they
24 were a client -- those entities would be
25 considered clients.  When I think relationship,

87

1    I'm thinking org chart-type stuff.
2    Q  So you were aware that Sentinel provided
3 insurance services to SAS entities?
4       MS. SMITH:  Objection, form.
5    A  In the past, yes.
6 BY MS. TOMKOWIAK:
7    Q  Do you recall what time frame?
8    A  My recollection is it ended at the end of
9 2017.
10    Q  Did Sentinel have any other clients?
11    A  I'm not sure.  What time -- sorry, what
12 time frame?
13    Q  Well, after that ended in 2017, did
14 Sentinel provide insurance coverage to any other
15 clients?
16    A  Yes.
17    Q  Okay.  Any other non-Highland affiliated
18 clients?
19       MS. SMITH:  Objection, form.
20    A  No, I don't believe so.
21 BY MS. TOMKOWIAK:
22    Q  A few follow-up questions to the topics we
23 were discussing before the break.
24       Does -- did Sentinel have an office?
25    A  Not that I'm aware of.

88

1    Q  And you mentioned attorneys on staff.  Did
2 Sentinel have staff?
3    A  Not that I'm aware of.
4    Q  So if Sentinel needed to have paperwork
5 submitted, who would do it?
6    A  What type -- paperwork?  What do you mean?
7    Q  Like if Sentinel needed to submit a report
8 to CIMA, who would do that?
9    A  It would be -- it depends, I guess.
10 Sentinel would retain counsel if it was that sort
11 of matter.  It has auditors, it has -- you know,
12 it's regulated by CIMA.  There's a lot of
13 different, I guess, agencies that would touch it,
14 or businesses.
15    Q  Sorry, were you done?
16    A  Yes.
17    Q  So all of -- all of those are third
18 parties, so auditors, accountants, lawyers.  Did
19 Sentinel have anybody who was just employed by
20 Sentinel?
21    A  No.  Sorry, to back up.  It has a
22 registered office where it receives mail, but no
23 physical office.  I don't think I asked you to
24 specify, but I'm just clarifying.
25    Q  Did any Highland employees ever do any

89

1 work for Sentinel?
2  **A  Yes.**
3  Q  Which ones?
4  **A  At what time?**
5  Q  At any time during 2017 to 2021.
6  **A  Yes, I think a good number of Highland**
7  **employees.**
8  Q  Which ones?
9  **A  Do you want -- I don't know the specifics**
10 **of time spent, anything like that.  Do you just**
11 **want names?**
12 Q  I just want their names right now.
13 **A  Okay.  In some form or fashion,**
14 **JP Sevilla, Katie Irving, Isaac Leventon,**
15 **Dave Klos, Lauren Thedford, Thomas Surgent,**
16 **Carter Chism.  I think -- that's all I can really**
17 **think of at the moment.**
18 Q  And when you say did work for Sentinel, do
19 you mean their work touched upon Sentinel or they
20 actually took actions on Sentinel's behalf?
21    MS. SMITH:  Objection, form.
22 **A  A mix of both, I think.  Also Stetson**
23 **Clark.  Sorry.  Forgot a name.**
24 BY MS. TOMKOWIAK:
25 Q  Who was that?

90

1  **A  Stetson Clark, like the hat.**
2  Q  Gotcha.  And you mentioned reports that
3  you received from CIMA.  Where would those reports
4  be kept?
5  **A  I believe Sentinel's counsel -- or**
6  **third-party counsel, I guess, whatever you --**
7  Q  External counsel?
8  **A  Thank you.**
9  Q  Which counsel?
10 **A  Carey Olsen.**
11 Q  Any other counsel?
12 **A  That would have that report?**
13 Q  Uh-huh.
14 **A  No.**
15 Q  What about Beecher Carlson?  Would they
16 have a copy of those reports?
17 **A  Probably.**
18 Q  What was Beecher -- can I just say
19 Beecher?
20 **A  You can.**
21 Q  What was Beecher's role with respect to
22 Sentinel?
23 **A  Beecher was the insurance manager and also**
24 **as part of that function, they would prepare**
25 **financial statements, facilitated expenses being**

91

1  **paid, advised on, you know, anything -- anything**
2  **insurance-related.**
3  Q  What about Maples?  What was their role?
4  **A  When?**
5  Q  Any time during the 2017 to 2021 time
6  frame.
7  **A  Well, prior to my coming on board, I'm not**
8  **sure what they did.  But when I came on board,**
9  **there were two directors -- the two directors that**
10 **were on the board, excuse me, were from Maples.  I**
11 **assume in the past that's what they did, but I**
12 **can't say for sure.**
13 Q  Do you know when Sentinel was formed?
14 **A  I believe 2012 or '13.  I don't -- again,**
15 **I don't know the exact date.**
16 Q  What was Mr. Ellington's economic interest
17 in SAS?
18    MS. SMITH:  Objection, form.
19 **A  I'm not entirely sure.**
20 BY MS. TOMKOWIAK:
21 Q  Do you know if he had one?
22 **A  I would assume so.**
23 Q  Do you know if he received monetary
24 payments from SAS?
25 **A  I don't.**

92

1    MS. TOMKOWIAK:  I am handing the court
2  reporter what we will mark as Exhibit 76.
3    (Deposition Exhibit 76 marked for
4  identification.)
5  BY MS. TOMKOWIAK:
6  Q  Mr. DiOrio, can you take a look at
7  Exhibit 76 and take a few minutes if you'd like
8  and then let me know when you're ready.
9    MS. SMITH:  I would just like to raise one
10 objection, that the account number is not redacted
11 on here.  So before this goes into the record, I
12 want to make sure that account number gets
13 redacted except for the last four digits.
14    MS. TOMKOWIAK:  We can do that, Counsel.
15 **A  Are there -- should there be other pages I**
16 **need to see on this or is it's -- it's 4 of 5.**
17 **That's the reason I asked.**
18 BY MS. TOMKOWIAK:
19 Q  Okay.  Well, yeah, we can -- we can get
20 into that.  Have you had a chance to look it over?
21 This is the only page that I have.
22 **A  Oh, okay.  I was just reading at the top**
23 **that it's 4 of 5.  That's the only reason I'm**
24 **asking.**
25 Q  That's a fair question.

93

1    A  Give me one more second.  Sorry.
2    Q  No worries.
3        (Witness reviews document.)
4    A  Okay.
5  BY MS. TOMKOWIAK:
6    Q  Mr. DiOrio, have you seen this document
7  before?
8        MS. SMITH:  Objection.  This is not the
9  complete document.  It's pages 4 of 5.
10 BY MS. TOMKOWIAK:
11   Q  Okay.  Have you seen this document before?
12   A  I don't believe I've seen this page
13 before, no.
14   Q  Do you know why it was found on your desk
15 at Highland earlier this year?
16   A  I have no idea.
17   Q  No idea.  So to your knowledge, you
18 have -- you did not have a copy of Mr. Ellington's
19 private bank interest checking account statement?
20       MS. SMITH:  Objection, form.
21   A  If it was on my desk -- I genuinely have
22 no recollection of ever seeing this.
23 BY MS. TOMKOWIAK:
24   Q  Did you ever receive checking statements
25 from Mr. Ellington?

94

1        MS. SMITH:  Objection, form.
2    A  I don't recall ever seeing his personal
3  checking, no.
4  BY MS. TOMKOWIAK:
5    Q  In any of the work that you did for
6  Mr. Ellington in his personal capacity, would you
7  have had reason to look at his personal checking
8  account?
9    A  No.
10   Q  If you look at this statement, you'll see
11 that on October 3rd, October 16th and
12 October 24th, there are what look to be payments
13 from SAS Asset Recovery Ltd.  Do you see that?
14   A  I see them, yes.
15   Q  Do you have any knowledge of why
16 Mr. Ellington would be receiving payments from SAS
17 Asset Recovery?
18       MS. SMITH:  Objection, form.
19   A  I don't.
20 BY MS. TOMKOWIAK:
21   Q  Did you know that Mr. Ellington received
22 hundreds of thousands of dollars from SAS Asset
23 Recovery?
24       MS. SMITH:  Objection, form.
25   A  Again, I don't have access to his personal

95

1  checking account.
2  BY MS. TOMKOWIAK:
3    Q  Did you ever receive payments from SAS
4  Asset Recovery Ltd.?
5    A  I don't believe so.
6    Q  You don't believe so?
7    A  No.  I don't believe I did, no.
8    Q  Who else had access to your desk at
9  Highland?
10       MS. SMITH:  Objection, form.
11   A  To my physical desk?
12 BY MS. TOMKOWIAK:
13   Q  Uh-huh.
14   A  I mean, it's an open floor plan.  Nothing
15 was locked up, but I generally think that no one
16 bothered with it.
17   Q  Okay.  You can set that aside.
18       What's your general understanding of the
19 litigation between Highland and UBS that -- in
20 New York State court?
21       MS. SMITH:  Objection, form.
22   A  I understand it's about a decade's old
23 dispute about some sort of warehouse facility, but
24 that's about all I know.
25

96

1  BY MS. TOMKOWIAK:
2    Q  When did you first obtain that
3  understanding?
4    A  Probably around the time I came on to
5  the -- sometime after I came on to the board at
6  Sentinel -- or was appointed director, excuse me.
7    Q  So sometime around September 2017?
8    A  Probably after that.
9    Q  Is there any formal piece of paper
10 appointing you to the board of Sentinel?
11   A  There would be.  I don't have one.  But if
12 I remember correctly, there was a letter issued by
13 CIMA just confirming that the appointment was
14 accepted.
15   Q  Do you know who would have a copy of that?
16   A  Probably Carey Olsen.
17   Q  How did you come to have that
18 understanding of the UBS litigation?
19   A  I don't recall specifically, but I think
20 once I kind of figured out what I had to do as a
21 director and I knew that the policy was in place,
22 I said what's the underlying issue, but it was --
23 I tried reading it once, but honestly it was a
24 little above my head.
25   Q  You tried reading what?

**97**

1    A  Some court document at some point.  I
2  don't know if it was a complaint or what, but I
3  didn't make it all the way through.
4    Q  And you said that you knew a policy was in
5  place.  So you're referring to the policy that
6  Sentinel had issued to cover legal liability to
7  UBS in connection with that litigation?
8        MS. SMITH:  Objection, form.
9    A  Yes.
10 BY MS. TOMKOWIAK:
11   Q  Are you aware there was a trial in that
12 matter in July of 2018?
13   A  Yes.
14   Q  And did you ever hear anybody in the legal
15 department at Highland express a view as to
16 whether UBS was likely to prevail in that case?
17   A  Not that I recall.
18   Q  Did you ever form a view?
19   A  Again, it was a little above my head.  I
20 had no idea.
21   Q  Did you hear the legal people discussing
22 that case in the legal department?
23   A  Not specifically with me, but it's an open
24 floor plan.  Isaac talks on the phone a lot to
25 lawyers, so I'm sure I heard something.

**98**

1    Q  Were you aware that the defendants in that
2  case were potentially going to be liable for over
3  a billion dollars?
4        MS. SMITH:  Objection, form.
5        And be careful here.  Don't disclose any
6  privileged information.
7        MS. TOMKOWIAK:  Well, do you mean that he
8  learned from any of Highland's lawyers?
9        MS. SMITH:  I guess I need to go on the
10 record with my normal agreement with
11 Mr. Feinstein, that Mr. DiOrio can answer
12 questions regarding what lawyers at Highland or
13 outside counsel may or may not have told him in
14 his capacity at Highland without waiving
15 privilege.
16       MR. FEINSTEIN:  I don't know if we have an
17 agreement, but certainly if I find that there's a
18 question as to which we want to assert
19 attorney-client privilege, you will hear me
20 object.  I did not object to the last question so
21 the witness can answer.
22       MS. SMITH:  Just wanted to make sure the
23 rules apply to all the deposition -- each
24 deposition individually.
25   A  Would you mind restating the question,

**99**

1  please?
2  BY MS. TOMKOWIAK:
3    Q  Were you aware that the defendants in that
4  case were potentially going to be liable for over
5  a billion dollars?
6        MS. SMITH:  Objection, form.
7    A  Was I aware when?
8  BY MS. TOMKOWIAK:
9    Q  When -- at any point in time.
10       MS. SMITH:  Objection, form.
11   A  I came to learn that.
12 BY MS. TOMKOWIAK:
13   Q  When did you come to learn that?
14   A  I think at some -- after the Phase 1 trial
15 was over.
16   Q  So just to pin that down, was it after the
17 trial or after the judgment?
18   A  I don't recall.
19   Q  So did you recall hearing before UBS won a
20 $1 billion, approximate, judgment, that they might
21 be liable, that the defendants in that case might
22 be liable for a billion dollars?
23       MS. SMITH:  Objection, form.
24   A  I can't say.  I don't recall when, if it
25 was before or after.

**100**

1  BY MS. TOMKOWIAK:
2    Q  Okay.  So when you first joined the board
3  of Sentinel, did you ask anybody what the
4  potential liability to UBS was?
5    A  Possibly.
6    Q  You just don't recall?
7    A  I don't specifically recall.  I don't
8  recall that conversation specifically.
9    Q  And you didn't think that that was
10 relative to your -- to the policy?
11       MS. SMITH:  Objection, form.
12   A  The policy had a limit, so I think the
13 understanding was that the -- that was the most
14 the company would have to pay under the -- you
15 know, if the policy satisfied whatever.
16 BY MS. TOMKOWIAK:
17   Q  Do you recall what the policy limit was?
18   A  The policy limit's $91 million.
19   Q  You believe it was $91 million?
20   A  Yes.
21   Q  And do you recall anybody forming a view
22 at any -- strike that.
23       Do you recall anybody expressing a view at
24 any point in time that the defendant's potential
25 liability in the case would be greater than

101

1  $100 million?
2      MS. SMITH:  Objection, form.
3  A  I don't recall.
4  BY MS. TOMKOWIAK:
5  Q  Did you ask anybody whether Sentinel, the
6  company that you were a director of, was likely to
7  be on the hook for $91 million?
8      MS. SMITH:  Objection, form.
9  A  Well, I think by issuing the policy, the
10  company was potentially on the hook for
11  $91 million.  So my assumption was any judgment
12  could probably be above that, yeah.  But I just
13  don't remember specific -- I don't remember the
14  billion dollar number until I heard the billion
15  dollar number after the -- around the first
16  judgment or the trial or whatever it was.
17  BY MS. TOMKOWIAK:
18  Q  Okay.  But you believed as -- you believed
19  that Sentinel was -- would potentially pay out up
20  to $91 million to UBS?
21      MS. SMITH:  Objection to form.
22  A  That's correct.
23  BY MS. TOMKOWIAK:
24  Q  Do you know whether anyone at Highland put
25  together any analysis of potential damages to UBS?

102

1  A  Not specifically.
2  Q  In your capacity as a director of
3  Sentinel, did you ask for any of that type of
4  analysis?
5  A  Any settlement analysis?
6  Q  Any damages analysis.
7  A  Damages analysis.  No.  I don't recall
8  doing that.
9  Q  Did you ask for any settlement analysis?
10  A  We came to -- one was kind of provided at
11  the end of each year by working with an actuary.
12  They would kind of fill out a table, basically --
13  an actuarial table to see probabilities of, you
14  know, multiple outcomes.
15  Q  Who was the actuary?
16  A  His name was Jason Stubbs, I believe.
17  Q  Who hired him?
18  A  He would have been a referral from Beecher
19  Carlson, I believe.
20  Q  When you joined Sentinel as a director,
21  had he already been hired?
22  A  I don't know if he had done any work in
23  the past on Sentinel's prior business.  I don't
24  know.
25  Q  You weren't involved in hiring him?

103

1  A  I don't remember if he was there or
2  Beecher -- sorry.  I remember being involved with
3  speaking to him.  I don't know if he was hired to
4  do anything prior to my being appointed on the
5  board.  Does that make sense?
6  Q  It does.
7  A  Sorry.
8  Q  Do you know whether anybody at Highland
9  was given the opportunity to review the analysis
10  that you received from Mr. Stubbs?
11      MS. SMITH:  Objection, form.
12  A  It would be in kind of an annual meeting.
13  Isaac Leventon and myself and Beecher Carlson
14  would get on the phone with Mr. Stubbs, and Isaac
15  would talk about the potential outcomes, give him
16  basically the in-house lawyer's view of the case
17  and then he would do whatever actuaries do from
18  there.
19  BY MS. TOMKOWIAK:
20  Q  Were you the only director that
21  participated in those phone calls?
22  A  Yes.
23  Q  Why?
24  A  The other two independent directors
25  weren't day to day.  They would see the result and

104

1  have the rights to -- or the ability to set a new
2  meeting and follow up if they had questions,
3  but...
4  Q  You weren't an independent director,
5  right?
6  A  I guess not.
7      MS. SMITH:  Objection, form.  Sorry.
8  Objection, form.  I wasn't quick enough there.
9  BY MS. TOMKOWIAK:
10  Q  Did anybody ever tell you that you were
11  not an independent director?
12  A  No.
13  Q  So you just came to that conclusion
14  yourself?
15  A  I don't know the specific -- the
16  classification, if I was classified as an
17  independent director, director, managing director.
18  I never thought of it.
19  Q  Okay.  Because you mentioned the other
20  independent directors, and so I didn't know if you
21  were drawing a distinction between them as
22  independent directors and you as an inside
23  director?
24  A  The reason I say that is because they're
25  professional directors, that's their job and

105

1  they're just referred to as independent directors.
2  For example, the guy on our board could serve on a
3  hundred boards. They don't do day-to-day
4  generally type stuff. So they're just referred to
5  as independent directors.
6  Q  Was this the first board that you had ever
7  served on?
8  A  I believe so.
9  Q  Do you know why you were asked to serve on
10 the Sentinel board?
11 A  Not particularly.
12 Q  Did you have any experience with insurance
13 prior to serving on the Sentinel board?
14 A  No, I don't. I didn't.
15 Q  So you said that you were aware that there
16 was a trial in the UBS litigation in July 2018,
17 correct?
18 A  Correct.
19 Q  And then at some point in time, you became
20 aware that UBS won a $1 billion judgment against
21 the Highland funds in that matter?
22 A  Yes.
23 Q  Okay. And you don't know exactly when you
24 became aware of that?
25 A  I can't say for certain.

107

1  A  No, not -- at what point in time?
2  BY MS. TOMKOWIAK:
3  Q  Prior to the bankruptcy.
4  A  No.
5  Q  What about prior to your termination from
6  Highland?
7  MS. SMITH: Objection, form.
8  A  I don't believe so.
9  BY MS. TOMKOWIAK:
10 Q  Did that surprise you?
11 A  That a claim was not made?
12 Q  Yeah.
13 A  Not particularly.
14 Q  Why not?
15 A  It was my understanding that there was
16 still a Phase 2 to the trial, so -- and I thought
17 everything had been kind of stayed, due to the
18 bankruptcy, so it seemed like it was just in a
19 holding pattern to me.
20 Q  Did you expect a claim to be made on the
21 policy in the future?
22 A  At some point.
23 Q  Did you discuss that possibility with the
24 other Sentinel directors?
25 A  Yeah. They were aware of it.

106

1  Q  Was it prior to Highland going into
2  bankruptcy?
3  A  Probably.
4  Q  How did you become aware of that judgment?
5  A  I genuinely don't know. I don't remember.
6  Q  Did somebody at Highland tell you?
7  A  Probably. Of the judgment?
8  Q  Uh-huh.
9  A  Yeah, probably.
10 Q  But you just don't recall who?
11 A  It may have come up during the actuary
12 meeting, you know, that would have happened in
13 Decemberish of that year, or '19, I guess. So
14 probably around that time I think is a safe bet.
15 Q  Were your auditors aware of the
16 judgment -- I'm sorry, let me be specific. Were
17 Sentinel's auditors aware of that judgment?
18 A  Yes.
19 Q  Did you make them aware?
20 A  I don't know if it was myself or Beecher
21 Carlson, but they would have been made aware
22 during the audit process.
23 Q  And did the insureds make a claim on the
24 policy after that judgment was entered?
25 MS. SMITH: Objection, form.

108

1  MS. SMITH: Objection. Don't get into
2  privileged conversations with the other directors.
3  BY MS. TOMKOWIAK:
4  Q  Okay. I mean, did -- how were they aware
5  of it?
6  A  I believe I would have told them once I
7  became aware of it.
8  Q  Okay. To your knowledge, did Mr. Dondero
9  or Mr. Ellington make any investment in Sentinel?
10 MS. SMITH: Objection, form.
11 A  Can you repeat the question? I'm sorry.
12 BY MS. TOMKOWIAK:
13 Q  To your knowledge, did -- let's break them
14 up. Did Mr. Dondero make any investment in
15 Sentinel?
16 A  I don't know specifically. When the
17 company started up, it had -- I assume it was
18 capitalized in some form or fashion, but I don't
19 know who or how.
20 Q  Same question for Mr. Ellington. Do you
21 know if he made any capital contribution to
22 Sentinel?
23 A  It would be the same answer. I don't
24 know.
25 Q  You assume that he did?

---

109

1    MS. SMITH: Objection, form.
2    **A  Do I assume that Mr. Ellington did?**
3    **BY MS. TOMKOWIAK:**
4    Q  Yes.
5    **A  I don't know.**
6    Q  You don't know.
7    MS. TOMKOWIAK: I am handing the court
8    reporter what we will mark as Exhibit 77.
9    (Deposition Exhibit 77 marked for
10   identification.)
11   BY MS. TOMKOWIAK:
12   Q  Take a couple of minutes to look at that
13   as well and let me know when you're ready.
14   (Witness reviews document.)
15   BY MS. TOMKOWIAK:
16   Q  Have you seen this document before?
17   **A  Yes.**
18   Q  When have you seen it?
19   **A  I mean, probably around the time it was**
20   **issued.**
21   Q  And why did you see it?
22   **A  This was prepared as part of our**
23   **contemplated bank application that I mentioned**
24   **earlier. Part of the process is the person who**
25   **would ultimately own the bank license needed to**

---

110

1    **provide, among other things, a statement of net**
2    **worth.**
3    Q  And so to your recollection, Mr. Ellington
4    provided this to you in connection with that bank
5    application?
6    MS. SMITH: Objection, form.
7    **A  He provided this statement to me?**
8    **BY MS. TOMKOWIAK:**
9    Q  Yes.
10   **A  I believe I provided -- gathered some of**
11   **this info, sent it to the accounting firm and they**
12   **would have sent it back.**
13   Q  Okay. So if -- do you believe that's why
14   this document would have -- was also on your desk
15   at Highland?
16   MS. SMITH: Objection, form.
17   **A  Probably.**
18   **BY MS. TOMKOWIAK:**
19   Q  Does that refresh your mind at all as to
20   whether Mr. -- as to why you also had a copy of
21   Mr. Ellington's personal checking account
22   statement?
23   MS. SMITH: Objection, form.
24   **A  That seems to track. I just don't**
25   **remember seeing that particular --**

---

111

1    **BY MS. TOMKOWIAK:**
2    Q  Understood. But thinking about it now,
3    would it possibly have been part of that same bank
4    application?
5    **A  Possibly.**
6    Q  And if you look at this statement of
7    assets, do you see the line where it says
8    investment in Sentinel Reinsurance Ltd.?
9    **A  Yes.**
10   Q  And it says 11,803,954?
11   **A  Uh-huh.**
12   Q  Were you aware at the time that you
13   received this statement that Mr. Ellington had a
14   $11.8 million investment in Sentinel?
15   **A  If I remember correctly -- are you**
16   **characterizing investment as cash invested in the**
17   **business or just -- how are you characterizing --**
18   **or how should I characterize investment here?**
19   Q  Well, all I have to go by is this line,
20   investment in Sentinel reinsurance. So do you
21   know how he invested $11.8 million in Sentinel?
22   **A  If I remember correctly, it would have**
23   **been not capital contributed, but whatever the**
24   **shareholder equity line was on the balance sheet,**
25   **it would have been some percentage of that, not --**

---

112

1    **not he invested $11.8 million. Does that make**
2    **sense?**
3    Q  To my lawyer brain, slightly. So you're
4    saying that Mr. Ellington -- again, I'm not an
5    accounting expert, but I think the distinction
6    you're trying to make is that Mr. Ellington did
7    not contribute $11.8 million of cash to Sentinel;
8    is that right?
9    **A  That's my understanding. I don't know if**
10   **he ever contributed a dollar, a million dollars, I**
11   **don't know. But that's how this number would have**
12   **been calculated.**
13   Q  Okay. But you knew -- when were you
14   putting together the application for this bank?
15   **A  During, I think, 2018, prior to October.**
16   Q  Okay. So you at least knew at that time
17   that Mr. Ellington had some financial interest in
18   Sentinel?
19   **A  That was my understanding.**
20   Q  And if I understood you correctly, some
21   type of equity in Sentinel?
22   **A  Yes.**
23   Q  As a shareholder?
24   MS. SMITH: Objection, form.
25   **A  Again, I don't know if it's in a**

113

1　shareholder or in a personal capacity. I don't
2　know.
3　BY MS. TOMKOWIAK:
4　　Q　You just mentioned the shareholder equity
5　line of the balance sheet is why I asked.
6　　A　Right. But I don't know -- yes. Sorry.
7　Yes, as a shareholder.
8　　Q　Okay. Did you actually -- and by you, I
9　don't mean you personally, but you said -- you
10　said you didn't know why your application for the
11　bank was not approved. Is that a fair
12　characterization of your testimony?
13　　A　That's not what I said.
14　　Q　Yeah, what did you say?
15　　A　I don't know why the project didn't move
16　forward.
17　　Q　Do you know whether an application was
18　made?
19　　A　I don't know.
20　　Q　So you compiled this information, but you
21　don't recall if you ever actually submitted it to
22　anyone?
23　　　MS. SMITH: Objection, form.
24　　A　I didn't personally submit it to anyone.
25

114

1　BY MS. TOMKOWIAK:
2　　Q　And you don't personally know if somebody
3　else submitted it to anyone?
4　　A　Right. I can't be sure.
5　　Q　You don't recall discussing with
6　Mr. Ellington whether or not he was -- he had
7　submitted the information to anyone?
8　　A　There were a few items that he was
9　responsible for collecting, personal
10　recommendations, again, it was part of the
11　application process, and we passed everything off
12　to him and from there, I don't know.
13　　Q　So you don't know if he submitted the
14　application and it was denied?
15　　A　I don't know --
16　　　MS. SMITH: Objection, form.
17　　A　I don't know that.
18　BY MS. TOMKOWIAK:
19　　Q　I am handing you what has been previously
20　marked as Exhibit 48.
21　　　MS. TOMKOWIAK: Counsel, do you have your
22　copies?
23　　　MS. HARTMANN: If you have one more, we'd
24　appreciate it. Actually, we can share.
25　　　MS. TOMKOWIAK: Let me see if we can find

115

1　one.
2　　　MS. HARTMANN: That's okay. Shannon
3　already gave me that yesterday.
4　　　THE WITNESS: Can I start reviewing?
5　　　MS. SMITH: Yeah.
6　BY MS. TOMKOWIAK:
7　　Q　Yeah, please do.
8　　　(Witness reviews document.)
9　BY MS. TOMKOWIAK:
10　　Q　Let me know when you're ready. Take your
11　time.
12　　A　Is it best if I review the whole thing or
13　specific pages?
14　　Q　Well, my first question is have you ever
15　seen this document before?
16　　A　I have not.
17　　　MS. SMITH: You need to review the whole
18　thing.
19　　　THE WITNESS: Okay.
20　　A　I have not.
21　BY MS. TOMKOWIAK:
22　　Q　As a general matter today, you can take
23　the time that you need to review documents as much
24　or as -- all of them as you would like. If
25　they're very lengthy, I will direct you to

116

1　specific pages, but if you need to read more of
2　the document to answer the question, just let me
3　know.
4　　A　Okay. Fair. Thank you.
5　　　(Witness reviews document.)
6　　A　Okay.
7　BY MS. TOMKOWIAK:
8　　Q　Have you ever seen this document before?
9　　A　I have not.
10　　Q　Do you know why a copy of it was found on
11　your desk at Highland?
12　　A　I do not.
13　　Q　Do you know whether people were in the
14　business of randomly placing documents on your
15　desk at Highland?
16　　　MS. SMITH: Objection, form.
17　　A　I don't.
18　BY MS. TOMKOWIAK:
19　　Q　Did you share your desk with anyone at
20　Highland?
21　　　MS. SMITH: Objection, form.
22　　A　I shared a file cabinet space with JP
23　because we sat next to each other, but not my
24　desk.

---

**117**

1  BY MS. TOMKOWIAK:
2      Q   Are you familiar at all with the
3  settlement analysis set forth in this document,
4  despite the fact that you haven't seen the
5  document itself before?
6      A   Not this detailed, but I think I have a
7  general understanding of what a settlement would
8  have looked like.
9      Q   What is that -- where did that general
10 understanding come from?
11     A   It was part of the actuarial table that we
12 would see at the end of the year.  Settlement, I
13 think was a possibility, one of the potential
14 outcomes.
15     Q   So if you could go turn to page Bates
16 ending in 5311.  I'm sorry, when I say Bates
17 number, do you know what I mean?
18     A   I don't.  I apologize.
19     Q   That's okay.  That lengthy number at the
20 bottom.
21     A   Yeah.
22     Q   It's Slide 8, Bates number ending 5311.
23 It's just a lawyer term for how we stamp the
24 documents.
25     A   Got it.

---

**118**

1      Q   Appreciating that you've never seen this
2  document, have you ever seen a summary of how --
3  of the structure of a settlement with UBS like
4  this?
5      A   Not like this, no.  Like I said, my
6  understanding was just generally settle for X or Y
7  or Z or for whatever.
8      Q   So at the time you became a director of
9  Sentinel, did you understand that the Sentinel
10 policy was one step in a potential settlement
11 structure with UBS?
12         MS. SMITH:  Objection to form.
13     A   I didn't understand -- I don't think so.
14 BY MS. TOMKOWIAK:
15     Q   Did anybody convey to you that the policy
16 had been purchased from Sentinel in order to
17 facilitate a settlement with UBS?
18         MS. SMITH:  Objection, form.
19     A   My understanding was the policy was
20 purchased because the funds couldn't afford to
21 defend themselves or -- long term or something
22 like that.
23 BY MS. TOMKOWIAK:
24     Q   What do you mean by something like that?
25     A   That the funds may not have been able to

---

**119**

1  defend themselves through the length of whatever
2  potential future litigation was on the horizon.
3      Q   Okay.  And that the funds might not have
4  enough money to cover the potential damages to
5  UBS?
6         MS. SMITH:  Objection, form.
7      A   I think so.  I'm not entirely sure.  Could
8  you repeat?  Sorry.
9  BY MS. TOMKOWIAK:
10     Q   Sure.  That the funds might not have
11 enough money to cover their potential damages to
12 UBS?
13         MS. SMITH:  Objection, form.
14     A   Right, yes.  And I believe that's the
15 purpose of the policy.
16 BY MS. TOMKOWIAK:
17     Q   Okay.  If you look at the last page of
18 this presentation, does the list of assets here in
19 Appendix 1 look familiar to you?
20     A   Some, yeah.  Most.
21     Q   How are you familiar with these?
22     A   This looks like a list of assets used to
23 pay for the ATE policy.
24     Q   When did you come to learn that there
25 was -- that these assets were used to pay for the

---

**120**

1  ATE policy?
2      A   At some point after I was appointed as
3  director.
4      Q   Who would be able to tell me whether
5  Sentinel owns each of these assets today?
6      A   I would be able to.
7      Q   You would?
8      A   Uh-huh.
9      Q   Okay.
10     A   Not -- the ones I'm familiar with.  Sorry.
11 Some of these I've never seen before.
12     Q   Okay.  Are you able to -- I can go one by
13 one, or can you identify on this list which of
14 these assets you believe Sentinel still owns
15 today?
16     A   Yes.  Here, let's try to -- I'll tell you
17 the ones --
18         MS. SMITH:  You can use that if you need
19 to.
20         THE WITNESS:  Thank you.
21     A   And again, I can't give you a blanket
22 answer because I don't -- some of these I've never
23 seen.  They may be known as something else or
24 whatever, but I --
25

121

1  BY MS. TOMKOWIAK:
2  Q  I understand.
3  **A  Maybe it's best to go one by one.  I don't**
4  **want to draw this out, but I can't give you a good**
5  **answer.**
6  Q  Okay.  How about -- well, I have another
7  list that looks similar to this and I think it
8  would be better for us to use that list to go
9  through that analysis, so let's do it --
10  **A  Okay.**
11  Q  -- in a little bit.  Okay.  You can set
12  that aside.
13  I'm handing you what has been previously
14  marked in this case as Exhibit 26.
15  MS. TOMKOWIAK:  Do you have that?
16  MS. SMITH:  I do.
17  MS. TOMKOWIAK:  It is the beneficial owner
18  chart we have been looking at with the Social
19  Security names redacted -- numbers redacted.
20  MS. SMITH:  Oh, that one page?
21  MS. TOMKOWIAK:  Yeah.
22  BY MS. TOMKOWIAK:
23  Q  Mr. DiOrio, have you ever seen this
24  before?
25  **A  This particular document, no.**

122

1  Q  Have you ever seen a document that sets
2  forth the structure of Sentinel like this?
3  **A  Not like this.**
4  Q  So at any -- at no point in time during
5  the time that you were a director of Sentinel did
6  you know that Sentinel was owned 70/30 by entities
7  called Patten and Nimitz?
8  MS. SMITH:  Objection, form.
9  **A  I had a general understanding, again, of**
10  **the split, 70/30 split, I guess, but I've heard**
11  **the names Patten and Nimitz, but I don't -- I**
12  **can't -- other than that, I can't really speak to**
13  **it.**
14  BY MS. TOMKOWIAK:
15  Q  And you had that general understanding at
16  some point in time while you were a director of
17  Sentinel?
18  **A  I believe so.**
19  Q  And you said that you had heard of Patten
20  and Nimitz.  Who did you hear that from?
21  **A  I had heard the names and I'm sure at some**
22  **point if it was on an org chart -- I've never seen**
23  **it laid out like this, is what I was getting at.**
24  Q  And did you hear at some point in time
25  that Mr. Dondero owned Patten?

123

1  MS. SMITH:  Objection, form.
2  **A  I don't believe so.  I don't know.**
3  BY MS. TOMKOWIAK:
4  Q  And did you hear at any point in time that
5  Mr. Ellington was the sole owner of Nimitz?
6  MS. SMITH:  Objection, form.
7  **A  I don't recall.  I know it seems like it**
8  **says that here, but I don't recall hearing one way**
9  **or the other.**
10  BY MS. TOMKOWIAK:
11  Q  So you recall hearing about Patten and
12  Nimitz, but you didn't ask any questions about who
13  owned those two entities?
14  MS. SMITH:  Objection, form.
15  **A  Correct.  As I remember, it would have**
16  **been more like a PowerPoint-type org chart and I**
17  **think these were one layer on a long, larger**
18  **structure is my understanding.  So I didn't**
19  **specifically ask about who owned which of these.**
20  BY MS. TOMKOWIAK:
21  Q  I think you said you had a general
22  knowledge that Mr. Ellington owned Sentinel in
23  some way; is that right?
24  **A  Uh-huh.**
25  Q  And you didn't ask which of these entities

124

1  related to Mr. Ellington?
2  MS. SMITH:  Objection, form.
3  **A  Probably not.**
4  BY MS. TOMKOWIAK:
5  Q  Did you consider Sentinel to be affiliated
6  with Highland?
7  MS. SMITH:  Objection, form.
8  **A  I believe -- no, I believed it was not**
9  **affiliated direct -- with HCMLP?**
10  BY MS. TOMKOWIAK:
11  Q  Yes.
12  **A  Yeah.  I believed it was not affiliated.**
13  Q  What was the basis for that belief?
14  **A  That it was a separate stand-alone**
15  **business based in Cayman.  Now, I don't know the**
16  **legal definition of -- if there's a legal lawyer**
17  **term for affiliate or not affiliate, that's going**
18  **to be beyond me.**
19  Q  Okay.  Did anybody ever tell you that
20  Sentinel and Highland were not affiliated?
21  **A  Yes, I believe at some point I was told**
22  **that.**
23  Q  When were you told that?
24  **A  At some point while I was a director.  I**
25  **don't remember specifically when, but obviously**

125

1  after my involvement with Sentinel.
2     Q   Who told you that?
3     A   I think it was -- I don't remember who
4  specifically said that, but Sentinel showed up on
5  a list in compliance of affiliates for owning one
6  of the assets that was on its balance sheet and I
7  remember there was a big to-do about someone made
8  a mistake and it was not an affiliate.
9     Q   What was the big to-do?
10    A   Again, I don't understand it.  It was to
11 get it -- make sure it was classified as a
12 nonaffiliate as it always had been.  Someone
13 changed it at some point on a spreadsheet, the
14 classification, as I understand it.
15    Q   Why was it a big deal if it was classified
16 as an affiliate entity?
17    A   That, I don't know.
18    Q   What efforts did you make to separate out
19 the work that you were doing in your capacity as a
20 director for Sentinel from the work that you were
21 doing in your capacity as a Highland employee?
22       MS. SMITH:  Objection, form.
23    A   They didn't -- the work I did for Highland
24 and the work I did for Sentinel didn't really
25 overlap, in my opinion.  In other words, the

126

1  distressed private equity stuff had nothing to do
2  with Sentinel and vice versa.
3  BY MS. TOMKOWIAK:
4     Q   Well, did you do any of your work for
5  Sentinel from the Highland office?
6     A   Yes.
7     Q   Did you use your Highland phone?
8     A   I don't have a Highland phone.
9     Q   Did you make phone calls regarding
10 Sentinel matters while you were at the Highland
11 office?
12    A   Yes.
13    Q   Did you -- did you have e-mail
14 correspondence regarding Sentinel matters while
15 you were working at the Highland office?
16    A   Yes.
17    Q   Did you ever ask anybody to be compensated
18 for the time that you were spending on Sentinel
19 matters?
20    A   No.
21    Q   Did Highland pay for your trips to the
22 Cayman Islands on behalf of Sentinel?
23       MS. SMITH:  Objection, form.
24    A   I don't believe so.  I doubt it.
25

127

1  BY MS. TOMKOWIAK:
2     Q   Did you pay for those trips?
3     A   Personally?
4     Q   Yes.
5     A   No.
6     Q   Did Sentinel pay for those trips?
7     A   If -- they would have paid if it was
8  Sentinel related, yes.
9     Q   And how do you know that?
10    A   I would have had to submit expenses.
11    Q   So when you went on those trips, who did
12 you submit those expenses to?
13    A   So the process in general for expenses --
14 this may help for other stuff.  Any expense that
15 came through Sentinel would be sent to Beecher
16 Carlson with an invoice in detail and all that
17 stuff.  They would load it into the banking
18 system.  The -- never me, because the other two
19 directors would approve it.  They would ask
20 questions, like what's this for, who's -- all that
21 stuff.  Once they got comfortable with the
22 expense, they would approve it in the banking
23 system and it would go back to Beecher Carlson and
24 then they would release wires or payment or
25 whatever from there.  So it was like a three-step

128

1  process.  All I would do is submit expenses.
2     Q   So the other -- so the independent
3  directors had to approve your expenses?
4     A   Every penny, yes.
5     Q   What is the -- you said there was like a
6  list in compliance of affiliates.  What -- have
7  you ever seen that list?
8     A   No.  I think -- I don't know if it was a
9  specific general list of affiliates.  This was
10 with respect to shares that Sentinel owned and I
11 think it was classified as an affiliate on the
12 spreadsheet, if that makes sense.  It wasn't a
13 giant list of affiliates, nonaffiliates or
14 whatever.
15    Q   Was it a list of investors in Multi Strat?
16 Does that sound familiar?
17    A   It wouldn't have been Multi Strat.  It was
18 something to do with real estate, if I remember
19 right.
20    Q   I am handing you what's been previously
21 marked as Exhibit 28.  You can set that other
22 exhibit to the side.
23       MS. SMITH:  Do we have that one already?
24       MS. TOMKOWIAK:  You should.
25

129

1  BY MS. TOMKOWIAK:
2  Q  Let me know when you're ready, Mr. DiOrio.
3     (Witness reviews document.)
4  A  Okay.
5  BY MS. TOMKOWIAK:
6  Q  Do you recall this e-mail chain?
7  A  Not particularly, but it's ringing a bell.
8  Q  Do you recall the issues described in the
9  e-mail chain?
10 A  Some.
11 Q  Okay.  So earlier you mentioned that in
12 2019, CIMA raised certain issues.  In this e-mail,
13 it looks like CIMA is asking that the Sentinel
14 structure be simplified.  Do you recall CIMA
15 raising that issue?
16 A  Yes.
17 Q  What do you recall about that?
18 A  There was a company that sat above -- let
19 me see if it's in here actually.  Okay.  Yeah.
20 My -- the rest of it I kind of heard.  The one
21 specific to Sentinel that I remember was the
22 Sentinel Re Holdings.
23 Q  Are you looking at the last page of this?
24 A  I am.  Sorry.
25 Q  That's okay.

130

1  A  3126, the --
2  Q  The Bates number.  Got it.
3  A  Bates number.  There you go.  Yeah.  And I
4  remember Sentinel had to -- or that entity had to
5  be merged into Sentinel Reinsurance, Ltd.  If I
6  remember right, CIMA said the structure was not as
7  simple as it could be.
8  Q  Do you know why that was an issue for
9  CIMA?
10 A  I don't.
11 Q  And do you recall if, in fact, Sentinel Re
12 Holdings was merged out of existence around this
13 time?
14    MS. SMITH:  Objection, form.
15 A  It was at some point.
16 BY MS. TOMKOWIAK:
17 Q  Do you know whether Patten and Nimitz were
18 also merged out of existence at that time?
19    MS. SMITH:  Objection, form.
20 A  That, I don't know.  My involvement would
21 have been Sentinel Re Holdings down, if that makes
22 sense.
23 BY MS. TOMKOWIAK:
24 Q  So you just don't recall one way or the
25 other?

131

1  A  If they're asking -- if it's contemplated
2  in this e-mail that CIMA is telling -- or
3  demanding this to happen, I'm sure it did.  I just
4  can't for sure say that it actually -- with
5  respect to Nimitz and Patten.  I know Sentinel Re
6  Holdings was merged.
7  Q  So after they were merged, do you know who
8  owned Sentinel Reinsurance?
9  A  I would assume the bones of this structure
10 survived whatever was -- you know, with the two
11 sides.  So I assume the ownership didn't change,
12 ultimately.
13 Q  So you would assume that ultimately USP1,
14 SAS Holdings and USP2 owned Sentinel Reinsurance?
15    MS. SMITH:  Objection, form.
16 A  I think ultimately if you follow it all
17 the way down, yeah, I think so.
18 BY MS. TOMKOWIAK:
19 Q  Do you know who USP1 is?
20 A  I think it's probably Mr. Ellington.
21 Q  What about USP2?
22 A  I would say it's Mr. Dondero.
23 Q  And I think earlier we talked about the
24 relationship between SAS and Sentinel.  Do you
25 agree, looking at this chart, that it appears that

132

1  SAS owns Sentinel in some manner?
2     MS. SMITH:  Objection, form.
3  A  Can you direct me to where you're looking
4  specifically on here?
5  BY MS. TOMKOWIAK:
6  Q  Sure.  I'm looking at the top line, that
7  rectangle box that says SAS Holdings, SVP -- I'm
8  sorry, SPV Ltd.
9  A  It looks from here like, yeah, the -- I
10 guess if you follow it all the way down, SAS
11 Holdings SPV Ltd. is a 1 percent value owner
12 ultimately -- of how Holdings, which, you know,
13 follow the thing down.  I don't think this is an
14 up-to-date org chart.  Just seeing Sentinel Re
15 Holdings on here, I guess would tell me that.  I
16 don't know about above that.
17 Q  Do you know whether it's an accurate chart
18 as of April 9th, 2018?
19    MS. SMITH:  Objection, form.
20 A  If it says it, I'm sure it is or I'm sure
21 it was.
22 BY MS. TOMKOWIAK:
23 Q  Looking at the -- looking at the last
24 page, do you know what SeaOne (US) means?
25 A  That particular entity, no, but -- I don't

133

1  know if it's even -- are we considering that an
2  entity on here?
3      Q  Do you know what it is?
4      A  SeaOne is an investment held at
5  SS Holdings, that predated my time at Sentinel.  I
6  believe the investment was made in 2014ish.
7      Q  SS Holdings is a wholly owned sub of
8  Sentinel Reinsurance, right?
9          MS. SMITH:  Objection, form.
10     A  I think so.
11  BY MS. TOMKOWIAK:
12     Q  Do you know whether Sentinel, through
13  SS Holdings, still has an investment in SeaOne, at
14  least as of June when you resigned from the board
15  of Sentinel?
16     A  As far as I know, yeah.
17     Q  Do you know whether that's a profitable
18  investment?
19     A  I know it's -- well, it's largely
20  illiquid, so no money has been made so profitable,
21  I don't know if I would characterize it as that.
22     Q  What do you mean by illiquid?  Do you know
23  how Sentinel through SS Holdings is invested in
24  SeaOne?
25     A  I don't know what -- the details of the

134

1  original transaction.  Again, that was way before
2  my time.  But Sentinel had a third-party valuation
3  done on it at some point during my time --
4      Q  Do you know what --
5      A  -- to ascertain the value.  But you know,
6  again, third party.
7      Q  Do you know what the third party concluded
8  was the value of that investment?
9      A  This was pre-COVID and this is -- who
10  knows what happened to it after that, I haven't
11  seen anything, but it was about $45 million, give
12  or take.
13     Q  Pre-COVID, so early 2020?
14     A  Would have been a valuation done for the
15  2019 audit.  So it would have been as of year-end
16  12/31/19.
17     Q  And if you look at the Offshore Fund
18  Structure, which is the chart before that.
19     A  Okay.
20     Q  There's an entity in the lower right-hand
21  corner called Sebastian Clarke.  It's not the very
22  last one to the bottom right, but one over.
23     A  I see it.
24     Q  Do you know what that is?
25     A  I know the name.  I don't know what its

135

1  purpose -- you know, what it was set up for.
2      Q  Do you know if it has operations?
3      A  I don't know -- I don't know if it has
4  operations.
5      Q  How do you know the name?
6      A  As part of the CIMA cleanup inspection,
7  all that good stuff, Sentinel was carrying some --
8  some of the assets from that list that we looked
9  at prior that were deemed worthless, but again
10  they all came over.  We are were instructed --
11  Sentinel was instructed to remove those from its
12  balance sheet because they were worthless and it
13  was resulting in a qualification on the audit.  So
14  the assets were all sold to Sebastian Clarke for a
15  dollar, just to warehouse them off Sentinel's
16  books.
17     Q  So did CIMA ask Sentinel to remove those
18  from its balance sheet?
19     A  CIMA instructed -- or dictated to Sentinel
20  that it was no longer to submit an audit with a
21  qualification.  Do you know what that means?
22  Generally?
23     Q  You mean a qualified audit?
24     A  Yes.
25     Q  Yeah.

136

1      A  And that was one of the things that was
2  leading to the qualified audit.  So indirectly
3  CIMA said get rid of these and then the audit was
4  clean last year, or unqualified.
5      Q  Unqualified in 2020?
6      A  For the 2019 financials.
7      Q  2019.  Do you know whether the 2020 audit
8  has been completed?
9      A  It has not.
10         MS. SMITH:  Is now a good time for a
11  break?
12         MS. TOMKOWIAK:  Give me just one minute to
13  see if I'm done with that Sebastian Clarke thing.
14  Just a few more follow-up questions on that.
15  BY MS. TOMKOWIAK:
16     Q  What does it mean that the assets were
17  deemed worthless?
18     A  A lot of the -- or a number of the assets
19  that were still sitting on the -- that list
20  basically sent the balance sheets of the insured
21  funds, were crisis era instruments that no longer
22  had -- was my understanding had no value.  Like
23  you would see on there there's some zeros next to
24  them and they just were worthless and were never
25  going to have value again.

137

```
1    Q  Do you know who deemed them worthless?
2    A  There were -- Highland marks, internal
3  valuation at Highland, and we sent -- Sentinel
4  sent all this information -- what we had over to
5  this third-party valuation firm and some of them
6  they said there wasn't even enough information
7  because they were so old to say that they're
8  worthless.  And then you can look some of them up
9  on Bloomberg and they're worthless.
10   Q  So it's your understanding that at the
11 time that they were transferred to Sentinel, some
12 of the assets were already worthless?
13   MS. SMITH:  Objection, form.
14   A  That's correct.
15   MS. TOMKOWIAK:  Yes, now is a good time
16 for a break.
17   THE VIDEOGRAPHER:  We are off the record
18 at 12:33 p.m.
19   (Recess taken from 12:33 p.m. CDT to
20 1:27 p.m. CDT)
21   THE VIDEOGRAPHER:  The time is 1:27 p.m.
22 We are back on the record.
23 BY MS. TOMKOWIAK:
24   Q  So, Mr. DiOrio, this morning we were
25 talking a little bit about your role as a director
```

138

```
1  of Sentinel and you said you believed you were
2  appointed to be a director of Sentinel in
3  September 2017?
4    A  That's correct.
5    Q  And you don't have any more precise
6  recollection when in September?
7    A  I don't know the exact date.
8    Q  And you said Mr. Ellington asked you to be
9  on the board of Sentinel; is that right?
10   A  Yes.
11   Q  Anybody else?
12   A  No, not that I recall.
13   Q  Did you replace a director on the board?
14   A  I don't know if I directly replaced
15 anyone, but I was appointed along with a gentleman
16 by the name of Dilip Massand.  And I think as I
17 mentioned before, Maples, there were two directors
18 from Maples.
19   Q  Who were the two directors from Maples at
20 the time you joined the board?
21   A  One was named Lesley Thompson.  I think
22 the other was named Andrew something, Dean maybe.
23   Q  So I'm trying to understand the
24 composition of the board because I've seen
25 documents indicating that Lesley replaced
```

139

```
1  Mr. Dean.  Am I wrong about that?
2    A  I don't know.
3    Q  Okay.  What about Mr. Christopher Watler?
4  Was he a director when you joined the board?
5    A  What was the name?
6    Q  Christopher Watler?
7    A  I don't believe I've ever heard that name.
8    Q  You've never heard that name?
9    A  I don't think so.  It's not ringing a
10 bell.
11   Q  He -- okay.  So when you were on the board
12 of Sentinel, he wasn't a director?
13   A  If he was, I never spoke to him or met
14 with him.
15   Q  So to the best of your recollection, when
16 you joined the board, Ms. Thompson and Mr. Dean
17 were on the board and then Dilip Massand joined at
18 the same time you did?
19   A  Yeah.  I know for sure Lesley was.  I
20 don't know if she replaced Andrew Dean.  I think
21 that's his name.  I'm not sure.
22   Q  Okay.
23   A  I just remember the only person I spoke to
24 that I can recall was Lesley Thompson.
25   Q  She worked at Maples?
```

140

```
1    A  Yes.
2    Q  Dilip, where did he work?
3    A  He was based in the Middle East.  He
4  provided service to SAS.
5    Q  And why was he asked to join the board?
6    A  You'd have to ask Mr. Ellington.  I don't
7  know.
8    Q  What role did he play on the board?
9    A  Same as me, just a board -- a director.
10   Q  Did you have any interactions with him?
11   A  I did, yeah.
12   Q  Do you know how long he stayed on the
13 board?
14   A  I believe we were appointed around the
15 same time.  I want to say early 2020 he might have
16 come off.
17   Q  Do you know why?
18   A  He resigned.
19   Q  Do you know why?
20   A  I think he was exploring other
21 opportunities and no longer wanted to serve.
22   Q  Did he tell you why he was resigning from
23 the board?
24   A  No, not directly, that I recall.
25   Q  Did anybody else tell you why Mr. Massand
```

141

1 was resigning from the board?
2   **A  No, not that I recall.**
3   Q  Was SAS entitled to appoint someone to the
4 board?
5     MS. SMITH: Objection, form.
6   **A  I don't know.**
7 **BY MS. TOMKOWIAK:**
8   Q  So you don't know if SAS had some right to
9 have a representative sit on the Sentinel board?
10   **A  Not to my knowledge.**
11   Q  Did Mr. Massand work at Highland ever?
12   **A  I don't know.**
13   Q  You don't know?
14   **A  Huh-uh.**
15   Q  Did Ms. Thompson and Mr. Dean, do you know
16 if they were on the board the entire time that you
17 were on the board?
18     MS. SMITH: Objection, form.
19   **A  They were not.**
20 **BY MS. TOMKOWIAK:**
21   Q  When did they come off the board?
22   **A  I believe sometime in the fall of 2017.**
23   Q  And is that with respect to both
24 Ms. Thompson and Mr. Dean?
25   **A  Again, I'm not sure as to the status of**

142

1 **Mr. Dean. When you said she replaced him, I never**
2 **heard that before, so I can't speak to that.**
3   Q  But you believe that Ms. Thompson came off
4 the board in 2017?
5   **A  At some point.**
6   Q  So in 2018, who were the directors of
7 Sentinel?
8   **A  Was myself, Dilip Massand and then around**
9 **whatever time Ms. Thompson left, two new -- two**
10 **independent directors were also appointed to the**
11 **Sentinel board.**
12   Q  And what are their names?
13   **A  Jan Neveril is one, J-a-n N-e-v-e-r-i-l,**
14 **and the other gentleman is named Damien Austin.**
15   Q  So Mr. Neveril and Mr. Austin joined the
16 board when Ms. Thompson left?
17   **A  I would assume around the same time, yeah.**
18   Q  Do you know who appointed them to the
19 board?
20   **A  I remember, I think myself and Mr. Sevilla**
21 **interviewed a few perspective board members.**
22   Q  How were those candidates identified?
23   **A  Referrals. I'm not entirely sure from**
24 **who.**
25   Q  You don't know who referred them to you?

143

1   **A  I don't. I don't remember.**
2   Q  You don't know, or you don't remember?
3 And the distinction there being you never knew or
4 you knew but, as you sit here today, you don't
5 recall?
6   **A  The latter.**
7   Q  As you sit here today, you don't recall?
8   **A  Yes.**
9   Q  And both of those individuals worked at
10 Maples as well, correct?
11   **A  That's incorrect.**
12   Q  Where did they work?
13   **A  Mr. Neveril worked at a firm -- works, as**
14 **far as I know still at a firm called Compass,**
15 **based in Cayman.**
16   Q  Compass like the compass?
17   **A  Yeah.**
18   Q  Okay.
19   **A  And Mr. Austin worked at a firm called**
20 **IMS, also based in Cayman.**
21   Q  Do you know if Sentinel was required to
22 have a certain number of individuals sit on its
23 board from the Cayman Islands?
24   **A  A certain number from the Cayman Islands**
25 **specifically?**

144

1   Q  Yes.
2   **A  That, I don't know.**
3   Q  Do you know if there were any requirements
4 with respect to the Sentinel board in terms of who
5 had to sit on it or how many directors it had?
6   **A  The only -- my understanding is that a**
7 **minimum of two at all times.**
8   Q  Do you know if that came from some type of
9 regulation or some type of governing document that
10 was specific to Sentinel?
11     MS. SMITH: Objection, form.
12   **A  I don't know.**
13 **BY MS. TOMKOWIAK:**
14   Q  Where did you get that understanding from?
15   **A  I had heard it over the years or at some**
16 **point, that we can't have less than two directors,**
17 **probably from an attorney at some point.**
18   Q  You don't recall who?
19   **A  No.**
20   Q  Are you aware that Mr. Neveril resigned
21 from the board in June of this year?
22   **A  Yes.**
23   Q  And are you aware that Mr. Austin resigned
24 from the board in June of this year?
25   **A  Yes.**

145

1  Q  Do you understand why Mr. Neveril resigned
2  from the board?
3  **A  Specific reasons why?  I don't know.**
4  Q  Do you have a general understanding of why
5  Mr. Neveril resigned from the board?
6  **A  I'd rather not speculate as to his**
7  **motives.  I don't know.**
8  Q  Well, did he tell you why he resigned from
9  the board?
10  **A  No.**
11  Q  Did anybody else tell you why Mr. Neveril
12  resigned from the board?
13  **A  Not that I recall.**
14  Q  Okay.  Do you have any basis at all to
15  know why Mr. Neveril resigned from the board?
16      MS. SMITH:  Objection.  I'm going to
17  caution you not to disclose confidential
18  information among the board members.
19  **A  I don't know.**
20      MS. SMITH:  Privileged -- I'm sorry,
21  privileged information.
22      MS. TOMKOWIAK:  Sorry, what's the
23  privilege?
24      MS. SMITH:  If you spoke to an attorney
25  for Sentinel, that would be privileged.

146

1  BY MS. TOMKOWIAK:
2  Q  Okay.  So without revealing any
3  communications that you had with -- the substance
4  with any attorneys who represented Sentinel,
5  setting that aside, do you have any other
6  understanding of why Mr. Neveril resigned from the
7  board?
8      MS. SMITH:  Or with your -- excuse me.
9  Objection as to form.  Or if you have any
10  privilege with your own attorneys for you
11  individually or attorneys for Sentinel.
12  **A  I don't know.**
13  **BY MS. TOMKOWIAK:**
14  Q  What about with respect to Mr. Austin?
15  **A  I don't know.**
16  Q  He didn't tell you why he was resigning?
17  **A  Not that I recall.**
18  Q  And nobody else told you why he was
19  resigning?
20  **A  Not that I recall.**
21  Q  Do you have term limits on the Sentinel
22  board?
23  **A  I've never heard that.  I don't know one**
24  **way or the other, but -- I don't know.**
25  Q  Are you aware that they resigned on the

147

1  same day?
2  **A  That sounds -- sure.**
3  Q  Do you know why they did that?
4  **A  I don't.**
5  Q  Did you receive a resignation letter from
6  either of them?
7  **A  I don't know.**
8  Q  Was anything happening at Sentinel at this
9  time that would cause them to resign?
10  **A  I think there was a reconstitution of the**
11  **board.  I was also resigning at some point.**
12  Q  Anything else?
13  **A  Not that I can think of.  Excuse me.  Not**
14  **that I can think of.**
15  Q  Do you know who replaced Mr. Neveril and
16  Mr. Austin?
17  **A  Yes, I do.**
18  Q  Who is that?
19  **A  A gentleman named Wade Kenny or Kenny or**
20  **Kenny.  And then a gentleman named Casey McDonald.**
21  Q  Do you know how they were appointed?
22  **A  What do you mean, how they were appointed?**
23  Q  Who appointed them; do you know?
24  **A  I think that may be privileged.**
25  Q  Well, just who appointed them?  Was it the

148

1  Sentinel board?  Was it you?  Was it -- who
2  appointed them as directors of Sentinel?
3      MS. SMITH:  Objection, form.
4      MS. HARTMANN:  And if you have a question
5  on privilege, you can talk to us about it.
6  **A  Yeah, can I ask them?**
7  **BY MS. TOMKOWIAK:**
8  Q  Sure.  Yeah, can we just be -- really sure
9  break to talk about the privilege issue.  I mean,
10  I'm just asking for a person.
11  **A  I understand.**
12  Q  Yeah.
13      THE VIDEOGRAPHER:  Off the record at
14  1:39 p.m.
15      (Recess taken from 1:39 p.m. CDT to
16  1:41 p.m. CDT)
17      THE VIDEOGRAPHER:  1:41 p.m., back on the
18  record.
19      MS. SMITH:  I'm going to caution my
20  witness not to divulge any conversations that he
21  had with counsel that is privileged.  I did not
22  realize until he said I heard from counsel, that
23  the information that he had previously shared
24  regarding the referrals was learned from
25  conversations with outside counsel for Sentinel at

149

1  the time.
2      MS. TOMKOWIAK: Okay. But -- okay. Well,
3  let me ask my question.
4  BY MS. TOMKOWIAK:
5    Q  So who appointed Mr. -- I'm sorry. Let me
6  go back to my questions.
7      Do you know who appointed Mr. Kenny to the
8  board?
9    A  He was referred by counsel and his
10  appointment was approved by CIMA.
11   Q  Okay. And what about Mr. McDonald?
12   A  It was the same. Referred by counsel,
13  approved by CIMA.
14   Q  What counsel?
15   A  Sentinel's counsel.
16   Q  Is that Carey Olsen? Attorneys at Carey
17  Olsen? I'm just trying to understand. Seems to
18  me that Sentinel has hired multiple external
19  counsel. So which counsel?
20   A  It was --
21      MS. SMITH: Objection, privileged.
22  BY MS. TOMKOWIAK:
23   Q  Which law firm made the referral?
24      MS. HARTMANN: You can answer.
25      MS. SMITH: You can answer that question.

150

1    A  Collas Crill.
2  BY MS. TOMKOWIAK:
3    Q  Collas Crill. Okay. Did you do any work
4  with Mr. Kenny and Mr. McDonald in your capacity
5  as a Sentinel director, in between the time that
6  they were appointed and you resigned?
7    A  Work -- can you -- sorry, can you be more
8  specific what you mean?
9    Q  I mean, did you have any interactions with
10  them in your mutual capacities as Sentinel
11  directors between June 2nd when they were
12  appointed and June 25th when you resigned?
13   A  Between June -- sorry, between June 22nd
14  and June 25th?
15   Q  Between when they were appointed and you
16  resigned.
17      MS. SMITH: Objection.
18      I'm going to caution you not to divulge
19  confidential information about board member
20  discussions.
21      MS. TOMKOWIAK: I'm sorry, that's not --
22  are you saying something different than privileged
23  information?
24      MS. SMITH: He's a member of a board of
25  the company. They may have confidential

151

1  information.
2      MS. TOMKOWIAK: But that's --
3      MS. SMITH: You can answer her yes-or-no
4  question.
5    A  Yes.
6  BY MS. TOMKOWIAK:
7    Q  Okay. What type of interactions did you
8  have?
9    A  I would characterize it as onboarding for
10  them for the new directors.
11   Q  Okay. Did you have a meeting with them?
12   A  A phone call.
13   Q  Phone call. Just one phone call?
14   A  In that time frame, I think, yes.
15   Q  Okay. Have there been phone calls since
16  then?
17   A  No.
18   Q  Have you had any communications with
19  Mr. Kenny or Mr. McDonald since your resignation
20  from the board?
21   A  I don't believe so.
22   Q  Okay. Did you discuss with Mr. Kenny or
23  Mr. McDonald the Sentinel policy?
24      MS. SMITH: Objection, form.
25   A  They are aware of the policy, yes.

152

1  BY MS. TOMKOWIAK:
2    Q  Okay. And what did you discuss?
3      MS. SMITH: Objection, form.
4      If there were any lawyers present on the
5  phone calls, then it could be privileged.
6    A  Then it was privileged, I believe.
7  BY MS. TOMKOWIAK:
8    Q  So you had a phone call with Mr. Neveril
9  and Mr. McDonald during which counsel was present
10  on the phone; is that what you're saying?
11   A  No, not Mr. Neveril.
12   Q  Okay. So you had a conversation with --
13  okay. So then, I'm sorry, Mr. Kenny and
14  Mr. McDonald?
15   A  That's correct.
16   Q  And attorneys were on the phone?
17   A  Correct.
18   Q  Okay. And outside of that phone
19  conversation, did you have any other
20  communications with Mr. Kenny or Mr. McDonald,
21  first, prior to your resignation from the board?
22      MS. SMITH: Objection to form. If there
23  was counsel present at the conversations, then
24  it's privileged.
25      MS. TOMKOWIAK: I'm just asking if. If.

153

1  BY MS. TOMKOWIAK:
2    Q  If you had any communications with those
3  two individuals other than the phone call you
4  already told me about --
5    A  Right.
6    Q  -- before you resigned from the board?
7    A  With counsel present, yes.
8    Q  Okay.  How many other conversations?
9    A  One that I can recall.
10   Q  And were both Mr. Kenny and Mr. McDonald
11 present?
12   A  Yes.
13   Q  Okay.  So before you resigned from the
14 board of Sentinel, you had two conversations with
15 Mr. Kenny and Mr. McDonald on the phone and
16 counsel from Collas Crill was on the phone as
17 well?
18   A  That's right.
19   Q  Okay.  Did you provide Mr. Kenny or
20 Mr. McDonald with any documents?
21   A  I don't believe so.
22   Q  Do you know anything else about their
23 onboarding process?
24      MS. SMITH:  Objection to form.
25   A  Nothing other than what I was involved

154

1  with.
2  BY MS. TOMKOWIAK:
3    Q  And you were only involved with those two
4  phone calls?
5    A  As best as I can remember, yeah.
6    Q  What about e-mails?  Did you have any
7  e-mail communication with either of them?
8    A  Some.  None that wasn't privileged.
9    Q  And by saying that, because you're not a
10 lawyer, so I'm trying to figure out how you made
11 that determination.  Are you saying that all of
12 the communications that you had with Mr. Kenny and
13 Mr. McDonald, there were lawyers included on those
14 e-mails?
15   A  That's right.
16   Q  And you were seeking advice from those
17 attorneys on those e-mails?
18      MS. SMITH:  Objection to form.
19   A  I don't -- I don't recall the nature of
20 the e-mail with respect to counsel.
21 BY MS. TOMKOWIAK:
22   Q  Did you discuss with Mr. Kenny or
23 Mr. McDonald that a claim had been made on the
24 policy?
25      MS. SMITH:  Objection to form.

155

1    A  They're aware a claim had been made, yes.
2  BY MS. TOMKOWIAK:
3    Q  Did you make them aware?
4      MS. SMITH:  Objection to form.
5    A  I'm not sure who made them aware.
6  BY MS. TOMKOWIAK:
7    Q  Okay.  What about Mr. Neveril or
8  Mr. Austin?  Were either of those individuals
9  aware that a claim had been made on the policy
10 before they resigned from the board?
11      MS. SMITH:  I'm going to caution you not
12 to divulge any privileged information.
13   A  Yes, they were.
14 BY MS. TOMKOWIAK:
15   Q  Were you aware before you resigned from
16 the board, that a claim had been made on the
17 policy?
18      MS. SMITH:  I'm going to caution you not
19 to divulge any privileged information.
20   A  Yes.
21 BY MS. TOMKOWIAK:
22   Q  Did you receive a copy of that claim?
23      MS. SMITH:  I'm going to caution you not
24 to divulge any privileged information.
25   A  I received a claim letter, yes.

156

1  BY MS. TOMKOWIAK:
2    Q  Did you take any actions -- and I'm not
3  interested in the substance of your conversations
4  with your attorneys, but when you received that
5  claim letter, what did you do with it?
6      MS. SMITH:  I'm going to caution you not
7  to divulge any privileged information.
8    A  I forwarded it to counsel.
9  BY MS. TOMKOWIAK:
10   Q  Did you do anything else?
11   A  Not that I recall.
12   Q  Did you discuss it with your -- the other
13 directors on the board outside of the presence of
14 counsel?
15   A  No.
16   Q  Did you discuss it with anybody at
17 Highland?
18   A  No.
19   Q  Did you discuss it with anybody at SAS?
20   A  Not that I recall.
21   Q  Did you discuss it with Mr. Ellington?
22   A  Not that I recall.
23   Q  Did you discuss it with Mr. Dondero?
24   A  Not that I recall.
25   Q  Other than forwarding it to counsel, did

157

1  you do anything else with a claim on the policy in
2  your capacity as a director of Sentinel?
3  **A  No, not that I can recall.**
4  Q  Did you send it to Beecher Carlson?
5  MS. SMITH:  Objection.
6  I'm going to caution you not to divulge
7  any privileged information.
8  **A  I don't remember e-mailing to Beecher**
9  **Carlson, no.**
10 **BY MS. TOMKOWIAK:**
11 Q  Was it your understanding before you left
12 Sentinel that the claim was being evaluated?
13 MS. SMITH:  Objection.
14 I'm going to caution you not to divulge
15 any privileged information.
16 **A  It's my understanding.**
17 **BY MS. TOMKOWIAK:**
18 Q  Who at Sentinel would be in charge of
19 making coverage decisions?  Let me back up.
20 Who -- if a claim was made on an insurance
21 policy that Sentinel wrote, who would be in charge
22 of evaluating that claim?
23 **A  I believe the board.**
24 Q  So during the time that you were a
25 director of Sentinel, were you ever asked to

158

1  evaluate a claim that was made on a policy that
2  Sentinel wrote?
3  **A  No, I was not.**
4  Q  So during the time that you were a
5  director at Sentinel, were any claims made on any
6  policies that Sentinel wrote?
7  **A  Just the one you referenced earlier.**
8  Q  Do you know approximately how many
9  policies Sentinel wrote?
10 **A  At what point in time?**
11 Q  At the -- during the time you were a
12 director.
13 **A  Which specific time, time frame?**
14 Q  Well, you weren't able to tell me exactly
15 when you became a director, so whatever date that
16 was in September 2017?
17 MS. SMITH:  Objection to form.
18 **A  Okay.**
19 **BY MS. TOMKOWIAK:**
20 Q  Whatever date that was.
21 **A  Yeah.**
22 MS. TOMKOWIAK:  Counsel, I -- which one of
23 you is objecting?
24 MS. SMITH:  Me.
25 MS. HARTMANN:  I didn't say anything.

159

1  MS. TOMKOWIAK:  Well, it sounded like
2  there was a chorus of objections.
3  **BY MS. TOMKOWIAK:**
4  Q  Okay.  So whenever you became a director
5  of Sentinel till when you resigned from being a
6  director of Sentinel --
7  **A  Yes.**
8  Q  -- that's the time frame I'm talking
9  about.
10 **A  Okay.  And can you repeat the question?**
11 Q  Sure.  Do you know how many -- do you know
12 approximately how many policies Sentinel wrote?
13 **A  I don't know the number.**
14 Q  Was it more than the -- more than one?
15 **A  Yes.**
16 Q  Other than the ATE policy that we've
17 talked about today, do you know whether Sentinel
18 wrote any other ATE policies?
19 MS. SMITH:  Objection to form.
20 **A  Not that I'm aware of.**
21 **BY MS. TOMKOWIAK:**
22 Q  Do you know what an ATE policy is?
23 **A  I do.**
24 Q  What is it?
25 **A  It stands for after-the-event policy.  An**

160

1  **uninsured pays a premium in exchange for coverage**
2  **for -- that's based on the result of an event, not**
3  **specific to any -- I believe it's pretty broad**
4  **what you can write, as far as policies go.**
5  Q  How much time would you say that you spent
6  on Sentinel matters on a monthly basis?
7  **A  It depends on the month.**
8  Q  What about on a yearly basis?
9  **A  The percentage of my time?  Is that what**
10 **you -- sorry, is that what you asked?**
11 Q  It could be a percentage, it could be
12 hours, however you would best describe how much
13 time you spent working as a director of Sentinel.
14 **A  Average for the year, probably, I don't**
15 **know, couple hours a week, three or four hours a**
16 **week.**
17 Q  What types of actions did the board -- the
18 Sentinel board need to approve?
19 **A  Anything that the company did.**
20 Q  I don't mean this to sound snarky, but
21 surely not like writing $5 -- like was there some
22 threshold or you're saying any action that the
23 Sentinel board needed to do?
24 MS. SMITH:  Objection to form.
25 **A  Yeah, that's what I'm saying.**

161

**BY MS. TOMKOWIAK:**

Q   Okay.  So there was no -- there was nothing that specified that for a transaction over this particular limit, the board needs to approve, there was no materiality threshold whatsoever?

**A   If there was, I wasn't aware of it.  And like I said earlier, down to the penny, everything would go through the directors.**

Q   And so when you say the board needed to approve, was that just referring to the independent directors or was your approval also needed?

MS. SMITH:  Objection to form.

**A   I had no approval authority that I'm aware of.  Everything was sent to the other two independent directors.**

**BY MS. TOMKOWIAK:**

Q   Was that true with respect to -- was that all matters, not just financial matters but anything that needed to be approved was sent to the two other directors?

**A   Yes.**

Q   Did the board have regular meetings?

**A   Well, as I mentioned earlier, we had one annual meeting the first year and then I believe**

162

**after that, CIMA instructed us we needed to have more.  So two was generally the goal.**

Q   And by the first year, so do you mean that in 2017, to the best of your memory, you had one meeting?

**A   We may have had the 2017 meeting in early '18, because there was transition with the board.  I don't remember the exact date.**

Q   Did anybody take minutes at those meetings?

**A   Beecher Carlson.**

Q   So if we wanted to ask somebody for minutes of those meetings, that's who would have them?

**A   I believe so.**

Q   Did the board ever act by written consent?

MS. SMITH:  I'm going to caution you not to divulge privileged information.

**A   I'm not sure what you mean by that either.**

**BY MS. TOMKOWIAK:**

Q   Well, then, maybe you didn't do it, but did the board ever -- instead of meeting, did the board ever take an action by just signing something in writing?

**A   I don't recall.**

163

Q   Did you take notes during your meetings?

**A   Probably not very many, if any.  There's usually a presentation by Beecher that was up on the screen.**

Q   Were you provided with your own copy of that presentation?

**A   I don't recall.  Probably, if I asked.  They probably sent it.  I just don't know for sure.**

Q   So you just don't recall if they sent you a copy of the presentation by e-mail?

**A   I don't.**

Q   Do you recall if they printed out hard copies for you to have at the meeting?

**A   They were all -- they were never in person, the meetings.**

Q   Okay.  Great.  That was my next question.  So all of the meetings took place by phone?

**A   That's correct.**

Q   Of -- well, who attended the meetings?

**A   I would attend, Mr. Massand when he was on the board would attend via phone, Beecher Carlson ran the meetings, and then the other two directors would attend via phone.  They were in Cayman, so they may have called in from the same place, but**

164

that's who would attend.

Q   If you were meeting by phone, then can you just explain how there was a presentation on the screen?  What do you mean by that?

**A   Like a Zoom-type meeting, where you can share screen, I guess.**

Q   So your meetings were by videoconference, then?

**A   I think so.  Or they would send a presentation.  Again, I'm not entirely sure.  Like a Teams meeting you can just click on and everything shows up.**

Q   Okay.  And so again, you don't recall if they sent you an actual copy of the presentation or if it was just somehow shared with you via some type of web platform?

**A   Right.**

Q   And you don't recall if you took notes or not?

**A   I don't.**

Q   If you did take notes, where would those notes be now?

**A   I have no idea.**

Q   Did you have any regular practice with respect to notes?

165

1    A  I had a few notebooks over the years.
2    Q  And what would you do with them?
3    A  I would -- it's one of those like reusable
4  ones to take the insert out and put it somewhere.
5  I never, ever remember going back and looking at
6  an old notebook.
7    Q  Would you throw them away?
8    A  I don't know what happened to them.
9    Q  I'm handing you what we will mark as
10  Exhibit 78.
11      (Deposition Exhibit 78 marked for
12  identification.)
13  BY MS. TOMKOWIAK:
14    Q  Mr. DiOrio, is this the resignation letter
15  that you submitted to the Sentinel Reinsurance?
16    A  It looks like it, yes.
17    Q  Is that your signature?
18    A  That is my signature.
19    Q  You say, Dear Sirs.  Who did you mean by
20  that?
21    A  The two newly appointed directors.
22    Q  Mr. Kenny and Mr. McDonald?
23    A  That's right.
24    Q  Why did you resign from the board?
25    A  On advice of counsel.

166

1    Q  Any other reason?
2    A  No.
3    Q  On advice of your personal counsel?
4      MS. SMITH:  Objection.
5      I'm going to caution you not to divulge
6  any privileged information.
7  BY MS. TOMKOWIAK:
8    Q  Just which attorney?
9    A  On advice of my attorneys here today.
10    Q  Okay.  And you agree that you -- your
11  resignation took effect June 25th, 2021, as it
12  says here?
13      MS. SMITH:  Objection, form.
14    A  I believe that's right.
15  BY MS. TOMKOWIAK:
16    Q  Did anybody other than your counsel
17  suggest that you resign?
18    A  No.
19    Q  Did you ask anybody other than your
20  counsel if you should resign?
21    A  Not that I recall.
22    Q  Did you communicate your resignation to
23  anybody but Mr. Kenny and Mr. McDonald?
24      MS. SMITH:  Objection.
25      I'm going to caution you not to divulge

167

1  any privileged information.
2    A  I believe this letter was sent to the two
3  directors you mentioned, probably Collas Crill as
4  well.
5  BY MS. TOMKOWIAK:
6    Q  Do you know whether anybody has replaced
7  you on the board?
8    A  I don't.
9      MS. TOMKOWIAK:  Counsel, we're going to
10  look at Exhibit 53 next, if you want to try to
11  find that.
12  BY MS. TOMKOWIAK:
13    Q  Mr. DiOrio, I'm handing you what we have
14  previously marked as Exhibit 53 in this case.  If
15  you can take a few minutes to look at that and let
16  me know when you're ready.
17      (Witness reviews document.)
18    A  Okay.  I have reviewed it.
19  BY MS. TOMKOWIAK:
20    Q  Earlier this morning we talked about the
21  settlement analysis that Mr. -- I believe his name
22  is Stubbs, the actuary would provide to Sentinel
23  Reinsurance regarding the UBS litigation.  Do you
24  remember that conversation?
25    A  Yes.

168

1      MS. SMITH:  Objection, form.
2  BY MS. TOMKOWIAK:
3    Q  And does this e-mail chain reflect the
4  type of analysis that you mentioned?
5    A  I believe it does, yes.
6    Q  Is there some different type of analysis
7  that you were thinking about this morning when you
8  talked about the analysis that the actuary would
9  provide?
10    A  No.  There was one actuarial analysis.
11    Q  I'm looking at the chart here on the first
12  page of this e-mail.  So Mr. Kemp, that's your
13  auditor, right, at -- not your, that was
14  Sentinel's auditor at Crowe Cayman; is that right?
15    Q  At the time, yes.
16    Q  At the time.  And he's writing to
17  Mr. Leventon and he says that:  The actuary has
18  provided the following table with the likely
19  outcomes of the case.
20      Do you understand that to mean the UBS
21  case?
22    A  Yes, I do.
23    Q  And then:  Per your report, you have
24  agreed that these estimates are reasonable.
25      Is it your understanding that Mr. Leventon

169

1  would be required to review the actuary's report
2  and provide his assessment as to whether these
3  estimates were reasonable?
4      A  Required by who?
5      Q  Required by Sentinel.
6          MS. SMITH:  Objection to form.
7      A  He was never -- he was never required to
8  do anything, but he knew the case so he would
9  opine on the potential -- any updates with the
10 trial, all that stuff.
11 BY MS. TOMKOWIAK:
12     Q  During your time on the Sentinel board,
13 did you have regular communications with
14 Highland's counsel regarding the UBS litigation?
15     A  About once a year.
16     Q  What type of format?  Was that like a
17 formal meeting or informally?
18     A  It was generally around the time that we
19 had to meet with the actuary.
20     Q  And was that the -- would the full board
21 meet with UBS?  I'm sorry, would the full board
22 meet with Highland's counsel?
23     A  No.
24     Q  Just you?
25     A  Myself, generally a representative from

170

1  Beecher Carlson, Mr. Stubbs and Mr. Leventon.
2      Q  Anybody else?
3      A  Not that I recall.
4      Q  Mr. Ellington?
5      A  No.
6      Q  Mr. Dondero?
7      A  No.
8      Q  And what did you discuss during those
9  meetings?
10         MS. SMITH:  I'm going to caution you not
11 to divulge any privileged information.
12     A  It was just generally any update on the
13 litigation, the trial and kind of Mr. Leventon's
14 thoughts on likely outcomes.
15 BY MS. TOMKOWIAK:
16     Q  Why did Sentinel want to be kept up to
17 date on the trial?
18     A  You have to -- this actuarial analysis has
19 to be done by -- mandated by CIMA, as part of the
20 year-end audit.
21     Q  Did you report on those meetings, did you
22 go back and report to the independent directors
23 what you discussed with Mr. Leventon and Beecher
24 Carlson at those meetings?
25     A  Yes.  They would see the work product

171

1  afterwards and they reviewed -- they would review
2  the report and if they had questions, they were
3  allowed to reach out to Mr. Stubbs and whoever.
4      Q  And on this chart here it says Expected
5  Payout in the column to the right.  Do you see
6  that?
7      A  I do.
8      Q  And that was referring to Sentinel's
9  expected payout, right?
10     A  That's right.
11     Q  And if you go -- middle of the chart, it
12 says:  Outcome, Phase 1 decision affirmed.
13         You understand that to mean the Phase 1
14 decision in the UBS trial in state court?
15     A  Yes.
16     Q  Plaintiff awarded substantial portion of
17 Synthetic Warehouse Losses, and there's a
18 probability, 20 percent, and expected payout, 91.
19         What do you understand that to mean?
20     A  Which part, the percentage or the 91?
21     Q  The 91.
22     A  That was the full limit of the policy.
23     Q  So if UBS was awarded a substantial
24 portion of its losses, you expected that Sentinel
25 would pay out the full amount of its policy?

172

1          MS. SMITH:  Objection to form.
2      A  That's what this says, yeah.
3  BY MS. TOMKOWIAK:
4      Q  Did you agree with this?
5      A  With the probabilities or --
6      Q  No, with the conclusion.
7      A  Yeah.  It was always -- there was always a
8  chance that the full policy would pay out, yes.
9      Q  Were you aware that UBS made multiple
10 payment demand letters to the insureds under the
11 fund after they obtained the $1 billion judgment
12 in the case?
13     A  The 1 million --
14     Q  One -- if I said 1 million, I misspoke.
15 Sorry, the $1 billion judgment in the case.
16     A  Sorry.  I wanted to make sure we're
17 talking about the same thing.  I was not aware of
18 that, no.
19     Q  Do you know who drafted the ATE policy?
20     A  I don't.
21     Q  Was it already in place by the time you
22 became a director of Sentinel?
23     A  Yes.
24     Q  Do you know who negotiated the policy on
25 behalf of Sentinel?

173

1   A  I don't.
2   Q  Do you know who negotiated the policy on
3  behalf of the insureds?
4   A  I don't.
5   Q  Do you know what diligence Sentinel did
6  before the policy was entered into?
7       MS. SMITH:  Objection to form.
8   A  I don't.
9  BY MS. TOMKOWIAK:
10   Q  Did you ask when you became a director?
11   A  Did I ask what diligence had been done?
12   Q  Yes.
13   A  No, it was already in place, so I didn't
14  think to -- think to look back like that.
15   Q  After becoming a director and prior to the
16  actual trial, did anybody at Highland tell you
17  that they had concluded that the insureds were
18  likely to be found liable to UBS?
19       MS. SMITH:  Objection to form.
20   A  I don't recall specifically.  Again, I
21  think it's always -- was always a chance.
22  BY MS. TOMKOWIAK:
23   Q  All right.  But there's a difference
24  between always a chance and more likely than not.
25  So you don't recall anybody saying that it was

174

1  more likely than not that UBS would win the trial?
2   A  No.
3   Q  If somebody had reached that conclusion at
4  trial, would you have wanted to know that in your
5  capacity as a director of Sentinel?
6       MS. SMITH:  Objection to form.
7   A  I guess it would be good information to
8  have.
9  BY MS. TOMKOWIAK:
10   Q  Did you ever ask anybody to give you an
11  opinion on that?
12   A  No.
13       MS. SMITH:  Objection to form.
14  BY MS. TOMKOWIAK:
15   Q  Given Sentinel's potential obligation,
16  would you have expected that Sentinel would have
17  been invited to participate in any settlement
18  discussions between the parties in the UBS case?
19       MS. SMITH:  Objection to form.
20   A  I have no idea.  I was not involved in any
21  settlement discussions with UBS.
22  BY MS. TOMKOWIAK:
23   Q  Given Sentinel's potential obligation to
24  fund any settlement, would you have expected that
25  Sentinel would need to approve any settlement

175

1  between the parties?
2       MS. SMITH:  Objection to form.
3   A  I don't believe so.
4  BY MS. TOMKOWIAK:
5   Q  You don't believe so?
6   A  I don't believe Sentinel had the right to
7  approve any settlement.
8   Q  So you believe that the insureds could
9  have settled the UBS matter for any amount that
10  they wanted to and then required Sentinel to pay
11  that amount to UBS on their behalf?
12       MS. SMITH:  Objection to form.
13   A  I'm not following.  I'm sorry.
14  BY MS. TOMKOWIAK:
15   Q  So you believe -- so there were -- there
16  were funds that were insured under the policy,
17  right?
18   A  That's correct.
19   Q  And they were defendants in the UBS
20  litigation?
21   A  That's correct.
22   Q  And you believe that they could have gone
23  to UBS, settled the matter for any amount that
24  they wanted to and then asked Sentinel to pay that
25  to UBS?

176

1       MS. SMITH:  Objection to form, calls for a
2  legal conclusion.
3   A  Yeah, I can't -- I can't make that
4  conclusion.  I don't know.
5  BY MS. TOMKOWIAK:
6   Q  That's not -- I'm not asking you for a
7  legal conclusion because you're not a lawyer.  I'm
8  asking for you as a director of Sentinel, was it
9  your understanding that the insureds under the
10  policy did not need Sentinel's approvement for a
11  settlement?
12   A  That's right.
13       MS. SMITH:  Objection to form.
14  BY MS. TOMKOWIAK:
15   Q  So they could have settled the matter with
16  UBS, gone to Sentinel and say, hey, we settled
17  this matter for $50, pay UBS $50, and that would
18  have been okay?
19       MS. SMITH:  Objection to form.
20   A  I follow now.  And, yes, I think that
21  would have been okay.
22  BY MS. TOMKOWIAK:
23   Q  Is your answer qualified at all by the
24  limits of the policy or are you --
25   A  Well, sure.  It wouldn't be anything

---

**177**

1 above -- you couldn't settle for more than the
2 policy was for and expect Sentinel to pay anything
3 above that.
4    Q  But if they had settled for policy limits
5 or less, they would have had a reasonable
6 expectation that Sentinel would pay that?
7       MS. SMITH: Objection to form.
8    A  I believe so.
9 BY MS. TOMKOWIAK:
10    Q  You received a subpoena to produce
11 documents in connection with this matter, right?
12    A  That's correct.
13    Q  What did you do to identify documents
14 responsive to that subpoena?
15    A  I searched my e-mails.
16    Q  Which e-mails?
17    A  Wait, no, I didn't. I was thinking
18 Highland. I didn't have my Highland e-mail
19 anymore. I searched my personal e-mail. I
20 searched the papers I took from my desk when I
21 left and that was about all I had.
22    Q  What about your SAS Management e-mail?
23    A  I no longer had access to it.
24    Q  Did you check to see if you had access to
25 it?

**178**

1    A  It popped up as logged out of my phone one
2 day and I could never get back in.
3    Q  Do you have a personal computer?
4    A  I do not.
5    Q  Did you check your phone?
6    A  I did.
7    Q  Did you check your text messages?
8    A  I did.
9    Q  Did you look to see if you still had your
10 notebooks?
11    A  I did.
12    Q  Okay.
13    A  I have one notebook that I still use today
14 and there was nothing in there Sentinel related.
15    Q  Okay. When you searched your e-mail, did
16 you use search terms or how did you try to find
17 documents responsive to the subpoena?
18    A  I used search terms and then just kind of
19 scanned to see if anything might have fallen
20 through.
21    Q  So you made the decision whether or not
22 something -- a document was responsive to the
23 subpoena?
24    A  No. Everything I found I sent to counsel.
25    Q  Got it. And just to clarify, everything

**179**

1 you found -- everything that found that hit upon a
2 search term or everything you found that you
3 thought might be responsive?
4    A  Both.
5    Q  What search terms did you use?
6    A  Sentinel, reinsurance. I think that was
7 about it.
8    Q  In your capacity as a director of
9 Sentinel, was there a particular place that you
10 kept documents related to Sentinel?
11    A  Like papers or actual electronic
12 documents? What do you mean?
13    Q  Let's start with paper. So did you have a
14 particular filing cabinet or shelf or drawer or
15 anything like that that you had for Sentinel
16 papers?
17    A  No. My desk was, you know, relatively
18 messy. Sometimes I would leave stuff on my desk,
19 but I generally didn't save much in the way of
20 Sentinel-related documents.
21    Q  What about electronically? Did you have a
22 specific folder or place that you would keep
23 Sentinel documents?
24    A  I did.
25    Q  Where was that?

**180**

1    A  It was on my computer.
2    Q  On your Highland computer?
3    A  It was, yeah.
4    Q  Was that on -- where was the folder?
5    A  There was a folder on my desktop of -- I
6 had a tablet that was stolen out of my car in
7 September of 2020, along with a notebook and a box
8 of wine. And from then on, I -- yeah, there
9 wasn't much going on Sentinel related, so I don't
10 know that I had anything on my -- the new computer
11 I got. And I have a few documents on my current
12 computer that I produced to counsel.
13    Q  A box of wine or a case of wine?
14    A  Box, two bottles. Just came in the mail.
15    Q  Gotcha. And the folder that was on your
16 tablet that was stolen, that was something that
17 was only on the hard drive?
18    A  Yes.
19    Q  Okay. So it wasn't backed up somewhere in
20 the --
21    A  I saved -- bad habit. I save everything
22 on my desktop generally.
23    Q  And to your knowledge that wasn't backed
24 up anywhere on Highland's servers?
25    A  I don't think so.

---

181

1    Q   What about in your Highland e-mail?  Did
2  you have a folder for Sentinel?
3    **A   I don't believe so.**
4    Q   What about in your SAS e-mail?  Did you
5  have a folder for Sentinel?
6    **A   I don't think so.  I don't really file**
7  **much.**
8    Q   I'm handing you what we have previously
9  marked as Exhibit 58.
10   **A   Do you want me to review the whole thing?**
11   Q   You can if you want to, but this is one of
12 the documents that you provided to us, right?
13   **A   Yeah.**
14   Q   Okay.  Are you familiar with it?
15   **A   I know what it is, yes.**
16   Q   I'm going to let your attorney find her
17 copy if she would like to, before I ask you other
18 questions about it.
19   **A   May I run to the restroom real quick**
20 **before we do this?  Is that okay?  Sorry.**
21   Q   Yeah.  Take a break.
22   **A   Sorry.**
23   Q   That's okay.
24      THE VIDEOGRAPHER:  Off the record at
25 2:20 p.m.

---

182

1       (Recess taken from 2:20 p.m. CDT to
2  2:36 p.m. CDT)
3       THE VIDEOGRAPHER:  The time is 2:36 p.m.
4  We are back on the record.
5  BY MS. TOMKOWIAK:
6    Q   Before we get to that exhibit, I have a
7  few follow-up questions on some of the things that
8  we were talking about before the break.  You said
9  earlier that Mr. Sevilla had some role in the
10 day-to-day with Sentinel.  What was that role?
11   **A   I think it was kind of an unofficial --**
12 **like he was the point person, I guess, for things**
13 **that had to happen with Sentinel.  I don't know**
14 **exactly what, but --**
15   Q   Do you know how he got that role?
16   **A   I think he was -- he helped with the**
17 **formation, as I understand it.  He was part of the**
18 **team.**
19   Q   Do you know who asked him to do that?
20   **A   I don't.**
21   Q   Before you resigned from the Sentinel
22 board, did you tell Mr. Ellington that you were
23 going to do it?
24   **A   I don't recall if I told him or not.**
25   Q   Did you tell him afterwards?

---

183

1    **A   I don't think so.**
2    Q   I don't want to know any conversations
3  with counsel, but other than that, do you know if
4  Mr. Ellington is aware that you have resigned from
5  the board of Sentinel?
6    **A   I don't know.**
7    Q   Were the other Sentinel directors
8  compensated for the work that they did with
9  Sentinel?
10   **A   Yes.**
11   Q   Do you know how much?
12   **A   Each -- I think they were each paid about**
13 **$10,000 a year.**
14   Q   Did you --
15   **A   Give or take.  It's in that ballpark.**
16   Q   Did you ever ask to be compensated for
17 your work as a director at Sentinel?
18   **A   No.**
19   Q   Why not?
20   **A   Never thought to.**
21   Q   And I think you said this, but I want to
22 be clear.  In the time that you were a director at
23 Sentinel, the claim that was made on the
24 ATE policy with respect to the UBS litigation was
25 the only claim made on a Sentinel insurance policy

---

184

1  that you're aware of?
2    **A   That's correct.**
3    Q   So if you look at Exhibit 58.  This is a
4  document that you found when you were searching
5  through your files; is that right?
6    **A   I believe so.**
7    Q   Was this a hard copy or an electronic
8  copy?
9    **A   I believe an electronic copy.**
10   Q   So you had it in your e-mail?
11   **A   I think so.**
12   Q   And this is the policy that we've been
13 talking about today, right?
14   **A   I believe it is, yes.**
15   Q   Okay.  Again, you're not aware of any
16 other policy that Sentinel wrote that relates to
17 the UBS litigation, right?
18   **A   No, but I haven't looked at every single**
19 **page so far, but I believe it is, yeah.**
20   Q   Why don't you take a minute to look at it
21 because I'd like to know if you believe that this
22 is a full and complete version of the ATE policy
23 with all of the endorsements that you are aware
24 of.
25   **A   Okay.**

185

1      (Witness reviews document.)
2    **A   Okay.**
3  **BY MS. TOMKOWIAK:**
4    Q   Is this a full and complete version of the
5  ATE policy?
6    **A   To the best of my knowledge, it is.**
7    Q   Are you aware of any other endorsements to
8  this policy?
9    **A   I'm not.**
10    Q   And you -- I asked you if you found this
11 in your e-mail and you said you believe so.  Was
12 there a cover e-mail?  Was this an attachment to
13 an e-mail?
14      MS. SMITH:  Objection.
15      I'm going to caution you not to divulge
16 any privileged communications with counsel.
17    **A   It was an attachment.**
18 **BY MS. TOMKOWIAK:**
19    Q   Okay.  Did you provide the cover e-mail to
20 your counsel?
21    **A   What do you mean by cover e-mail?**
22    Q   Well, if it was an attachment to an
23 e-mail, did you provide the e-mail and the
24 attachment to your counsel?
25    **A   Did I send the -- like did I write the**

186

1  e-mail, in other words?
2    Q   No.  So when I think of a cover e-mail, if
3  I send my colleague this document as an attachment
4  to an e-mail, then the e-mail sending it to my
5  colleague would be the cover e-mail.  So when you
6  went -- if you found this in your e-mails, was
7  this attached to a particular e-mail
8  communication?
9      MS. SMITH:  Objection.
10      I'm going to caution you not to divulge
11 privileged information.
12      We did provide a privilege log.
13 BY MS. TOMKOWIAK:
14    Q   Let me ask it this way.  When you went
15 through your e-mails and you identified
16 responsive -- potentially responsive materials,
17 did you separate e-mails from attachments or did
18 you just give everything to your attorneys?
19    **A   I provided everything to counsel.**
20    Q   Okay.  I believe you testified earlier
21 that you don't know who drafted this policy?
22    **A   Yeah, that's correct.**
23    Q   And if you look at the schedule, which I
24 believe is on page 18 -- no, I'm wrong.  I'm way
25 off.  That must have been a note from a different

187

1  outline.  Page 26.
2    **A   Bates 26?**
3    Q   Yes.
4    **A   Okay.  I'm there.**
5    Q   You're with the lingo now.
6    **A   I'm getting there.**
7    Q   So this schedule it says:  Date of
8  commencement of Period of Insurance, August 1st,
9  2017?
10    **A   That's what it says.**
11    Q   What is your understanding of the status
12 of the UBS litigation as of August 1st, 2017?
13      MS. SMITH:  Objection to form.
14    **A   This would be -- I wasn't really aware of**
15 **it in August of 2017.**
16 **BY MS. TOMKOWIAK:**
17    Q   Did you have -- you said you sat in the
18 legal department, right?
19    **A   That's right.**
20    Q   Okay.  Were you generally aware that
21 Highland was engaged in litigation with UBS in
22 August 2017?
23    **A   I don't recall, but Highland was engaged**
24 **in litigation with a lot of people.  So you'd hear**
25 **a lot of different cases, I guess.**

188

1    Q   The UBS litigation was one of the biggest
2  ones, but you don't recall that being discussed
3  particularly within the Highland legal department?
4      MS. SMITH:  Objection to form.
5    **A   I don't have any specific recollections of**
6  **UBS being discussed in August of 2017.**
7  **BY MS. TOMKOWIAK:**
8    Q   Do you recall when the first -- when is
9  the first time you have a specific recollection of
10 the UBS litigation being discussed?
11    **A   I think after I was appointed to the board**
12 **or I came on the board --**
13    Q   How soon --
14    **A   -- of Sentinel.**
15    Q   I'm sorry.  Were you done?
16    **A   The board of Sentinel, sorry.**
17    Q   How soon after you came on the board of
18 Sentinel were you provided with a copy of this
19 policy?
20    **A   I don't know specific dates.  I'm going**
21 **to -- yeah, I don't know.**
22    Q   Do you believe it was shortly thereafter?
23 Months thereafter?
24    **A   I would say within a few months.**
25    Q   Who provided you with a copy of the

189

1  policy?
2    A  Probably -- I don't know, actually.
3    Q  Was it somebody at Highland?
4    A  It probably would have been Beecher
5  Carlson.
6    Q  Do you remember the context in which you
7  were being -- in which you were provided with a
8  copy of the policy?
9    A  I think when I came on board, I was
10  provided several documents from Beecher at some
11  point about what the company is, what it does,
12  that sort of thing, the operations, the financial
13  statements.
14    Q  If I wanted to find Sentinel's financial
15  statements through the present, who would I ask?
16    A  The last -- like last completed set of
17  financials was last year, so Beecher Carlson would
18  probably --
19    Q  Beecher Carlson is the one who would keep
20  those?
21    A  That's right.
22    Q  Okay.  And the legal action listed here,
23  it's a very long caption, but you understand that
24  to be the litigation between UBS and the Highland
25  entities listed here, in New York State court?

190

1    A  As best -- yeah, that's my understanding.
2    Q  And the Court says Supreme Court of the
3  State of New York, County of New York?
4    A  That's right.
5    Q  And there's three funds here that are
6  listed as the insureds, right?
7    A  That's right.
8    Q  And that's consistent with your
9  understanding of which entities were insured under
10  this policy?
11    A  That's right.
12    Q  And the Limit of Indemnity is 100 million.
13  Do you see that?
14    A  I do.
15    Q  Do you know how that legal liability --
16  I'm sorry.  Do you know how that limit of
17  indemnity was selected?
18      MS. SMITH:  Objection to form.
19    A  I don't.  I wasn't involved with the
20  transaction.
21  BY MS. TOMKOWIAK:
22    Q  Do you know who made that decision?
23      MS. SMITH:  Objection to form.
24    A  I don't.
25

191

1  BY MS. TOMKOWIAK:
2    Q  Do you know if Sentinel had any other
3  policies that provided anywhere close to
4  $100 million in coverage?
5    A  I don't know.
6    Q  Can you think of any, sitting here today?
7    A  I can't think of any.
8    Q  Do you think in your capacity as a
9  director of Sentinel if there was another
10  insurance policy that had $100 million coverage,
11  you would be aware of it?
12    A  Probably.
13    Q  More likely than not?
14    A  More likely than not, yes.
15    Q  And do you see the Premium is $25 million?
16    A  I do.
17    Q  Do you know who determined that?
18    A  I do not.
19    Q  And on the insurance page to the left --
20  I'm sorry, on the signature page to the left.
21    A  Yes.
22    Q  That's Mr. Dondero's signature on behalf
23  of the insureds; is that right?
24    A  It appears to be.
25    Q  And I see that it says Andrew Dean,

192

1  director.  Do you know whether, in fact, that's
2  Mr. Dean's signature?
3    A  I don't know whether or not it is, but...
4    Q  I take it you have no reason to believe
5  it's not, but you don't know?
6    A  I have no reason to believe it's not, no.
7    Q  Okay.  Is that your signature?  I mean,
8  I'm sorry, is that your handwriting, writing in
9  the date at the top?
10      MS. SMITH:  Objection to form.
11    A  No, it's not.
12  BY MS. TOMKOWIAK:
13    Q  Do you know whose it is?
14    A  I don't.
15    Q  And do you know the significance of this
16  Cayman Islands stamp at the bottom?
17    A  Just what it says.  It's a government
18  stamp, but nothing further.
19    Q  Do you know if this policy was mailed to
20  someone specifically in the Caymans?
21      MS. SMITH:  Objection to form.
22    A  I know it was ultimately approved by CIMA,
23  but I'm not sure if that came via paper copy,
24  electronic copy.
25

193

1 BY MS. TOMKOWIAK:
2    Q  So do you believe that this stamp is from
3 CIMA?
4       MS. SMITH:  Objection to form.
5    A  I don't know.
6 BY MS. TOMKOWIAK:
7    Q  And that's all I'm trying to understand.
8 You don't know what this means?
9    A  I've never seen that stamp before.  I
10 don't know what it means.
11   Q  Well, other than on this document that you
12 have, you mean you've never seen this stamp
13 outside of this document?
14   A  This stamp doesn't look like anything I've
15 ever seen anywhere before, is all I'm saying.
16   Q  Okay.  So you don't recall seeing it at
17 the time that you got this policy?
18   A  I wasn't -- like when I received a copy of
19 the policy?
20   Q  Yeah.
21   A  I'm sure it was on there, but...
22   Q  There's no question in your mind that this
23 policy was meant to provide the insureds with
24 coverage in the event that they incurred liability
25 to UBS in the New York State court action, right?

194

1       MS. SMITH:  Objection to form.
2    A  Would you mind rephrasing?
3 BY MS. TOMKOWIAK:
4    Q  Is there something that you didn't
5 understand about the question?
6    A  It was more of a statement than a
7 question, to me.
8    Q  Okay.  I'm asking you if you -- was there
9 any question in your mind that this policy was
10 meant to provide the funds listed as the insureds
11 with insurance coverage in the event that they
12 incurred liability to UBS?
13   A  There was --
14      MS. SMITH:  Objection to form.
15   A  No.  It's a real policy, if that's what
16 you're asking.
17 BY MS. TOMKOWIAK:
18   Q  If you look at the Endorsement No. 1,
19 which is Bates 27.
20   A  Yes.
21   Q  Do you know when this endorsement --
22 there's no date on it.  Do you know when this
23 endorsement was added to the policy?
24   A  This would have been part of -- I don't
25 know exactly when, but would have come up during

195

1 this 2017 year-end audit, so early 2018 or first
2 half of 2018.
3    Q  And how did it -- how would it have come
4 up in the audit?
5    A  The assets that were transferred over --
6 or as part of the ATE policy, needed to be valued
7 by a third party to perform the valuations.
8 Again, this is -- I think the auditors demanded
9 it, possibly Beecher as well.  But when the
10 third-party valuations came back, they were higher
11 than 25 million, so the premium was adjusted
12 accordingly.
13   Q  Who made the decision to adjust the
14 premium?
15   A  It would have been between Beecher Carlson
16 and the auditors.  Beecher prepares the financial
17 statements.
18   Q  Did the insureds provide any additional
19 consideration in the form of assets or cash, to
20 account for the increased premium?
21   A  No.  The -- no.
22   Q  Do you recall who did the valuation?
23   A  The third-party valuation was a company
24 called Valuation Research Corp. or corporation,
25 VRC we refer to them as.

196

1    Q  Did you receive a copy of that valuation?
2    A  I would have, yeah.
3    Q  Is that something that you looked for to
4 respond to the subpoena?
5    A  It would have been in my SAS e-mail that I
6 no longer have access to.
7       THE REPORTER:  Repeat that.
8    A  It would have been in my SAS e-mail that I
9 no longer have access to.  Excuse me.  They would
10 have been.  There are multiple valuations from
11 multiple securities.
12 BY MS. TOMKOWIAK:
13   Q  When you say there are multiple
14 valuations, was there -- were they in a single
15 report?  Did you receive multiple reports?
16   A  There was a report for each security.
17   Q  Do you recall approximately how many
18 reports you received?
19   A  Maybe tenish.
20   Q  Okay.  So to the best of your knowledge,
21 this endorsement would have been executed sometime
22 in early 2018; is that what you're saying?
23   A  I would think so.
24   Q  And to the best of your recollection,
25 Ms. Thompson was authorized to sign on Sentinel's

197

1  behalf at this time?
2      MS. SMITH:  Objection, form, calls for a
3  legal conclusion.
4      A  If she were still on the board, then yes.
5  BY MS. TOMKOWIAK:
6      Q  Okay.  And you just don't recall when
7  Ms. Thompson was on the board?
8      A  I don't remember when she resigned from
9  the board.
10     Q  Do you know why she resigned from the
11  board?
12     A  I don't.
13     Q  So she didn't tell you?
14     A  I don't remember being given a reason.
15     Q  Did you think Ms. Thompson was good at her
16  job?
17     A  In my limited interactions, yeah, she was
18  competent.
19     Q  It says here that the premium received
20  consists of cash of 11 million and change, and
21  then miscellaneous receivables of 1.75 million,
22  approximately.  Do you know what the miscellaneous
23  receivables refers to?
24     A  I don't remember anything adding up to
25  that number.  The only one I do remember was a

198

1  receivable from the IRS, an income tax receivable,
2  and that was approximately a half a million
3  dollars.
4      Q  Do you know if Sentinel ever received
5  that?
6      A  Not in full but in part, yes.
7      Q  Approximately how much of the half a
8  million did it receive?
9      A  430, 25, 30 grand.
10     Q  Was that because the IRS didn't refund as
11  much as was expected?
12     A  I honestly don't know.  It had been on the
13  books, as I understood it, for quite some time.
14  The books of whatever fund it came from.  I'm not
15  sure which one it sat on.
16     Q  Okay.  Yeah, and I was just trying to
17  understand if you knew if that -- if that was
18  because the fund received less than it expected or
19  the fund paid Sentinel less than Sentinel expected
20  to be paid?
21     A  Oh, it had nothing to do with -- it was
22  just an asset that was transferred over as part of
23  the payment for the policy.  Whatever -- the IRS
24  issue would have been with whatever fund it sat
25  on.

199

1      Q  And then with respect to the investment
2  portfolio of 55.5, approximately, we'll look at
3  the specific assets, but generally what do you
4  recall that investment portfolio consisted of?
5      A  It consisted of some CLO positions.
6  Sentinel already had several CLO positions from
7  several years prior so they were already on the
8  balance sheet.  But there was some new CLOs.
9  There were some publicly traded equities, stocks
10  and an interest in Multi Strat, Highland
11  Multi Strat, I would assume as part of this
12  number.
13     Q  So as part of the assets that were paid to
14  satisfy the premium, you understood that there was
15  an interest in Multi Strat that had some value
16  that would be included in this investment
17  portfolio?
18     A  I would assume it's part of the investment
19  portfolio number, yeah.
20     Q  It says here that all other terms and
21  conditions remain unchanged.
22      Do you take that to mean that, for
23  example, the limit of indemnity was not changed?
24      MS. SMITH:  Objection to form.
25     A  At that time, yes.

200

1  BY MS. TOMKOWIAK:
2      Q  Did you -- were you personally involved in
3  this endorsement; do you know?
4      A  I would have been involved in the audit
5  and facilitating the valuations that would have
6  led to this endorsement.
7      Q  Do you know who drafted this endorsement?
8      A  I do not.
9      Q  Do you know -- even if you don't know the
10  person, do you know if it was someone at Beecher
11  Carlson, for example?
12     A  I'm not entirely sure.
13     Q  Would you have reviewed it before
14  Ms. Thompson signed it?
15     A  I would have been aware of what was
16  happening, yes.
17     Q  But would you have reviewed this
18  endorsement specifically?
19     A  The actual letter?  Possibly.
20     Q  Do you recall doing so?
21     A  Again, I know these numbers, I'm aware of
22  these numbers.  I don't specifically recall
23  reviewing this exact document.
24     Q  So if the premium has increased by
25  approximately 150 percent, why would the amount of

201

1 coverage stay the same?
2 **A I don't know.**
3 Q Did you ask?
4 **A I'm sure it came up, but for insurance**
5 **matters like that, we generally rely on Beecher,**
6 **the insurance manager. So if they didn't say the**
7 **policy had to go up or the limit went up, then it**
8 **wouldn't have gone up.**
9 Q Do you know if the insureds asked for
10 increased coverage based on the increased policy
11 amount -- I'm sorry, premium amount?
12 **A Not that I'm aware of.**
13 Q Do you know why this is not signed by any
14 of the insureds?
15 **A I don't know.**
16 Q Does it seem to you like it should be?
17 MS. SMITH: Objection, form, calls for a
18 legal conclusion.
19 **A I'm not sure.**
20 **BY MS. TOMKOWIAK:**
21 Q Do you know whether or not they agreed to
22 this?
23 **A The insureds?**
24 Q Yes.
25 **A I don't know whether or not they agreed.**

202

1 Q Do you know whether they had to agree?
2 MS. SMITH: Objection, form.
3 **A I don't know.**
4 **BY MS. TOMKOWIAK:**
5 Q With respect to the second endorsement,
6 are you familiar with that one?
7 **A Yes, I am.**
8 Q This one is also undated. Do you know
9 approximately when this one would have been
10 entered into?
11 **A I would assume around the same time as**
12 **Endorsement No. 1.**
13 Q Why would you say that?
14 **A They're related.**
15 Q Do you know why there's, then, two
16 endorsements instead of just one?
17 **A I don't know why it's broken out, no.**
18 Q Okay. And why do you say that they were
19 related?
20 **A Because it has to do with the premium**
21 **that -- from Endorsement 1, that had obviously**
22 **changed from the original premium in the policy.**
23 **That's why I would say they're related.**
24 Q So do you recall what led to Endorsement
25 No. 2?

203

1 **A Not specifically. Again, I think it came**
2 **up during an audit and I think Beecher -- since**
3 **there was some cash that came over with the policy**
4 **that was earmarked for litigation expense, they**
5 **decided to enter it on the balance sheet like**
6 **this, where -- they call it risk mitigation.**
7 Q So to you risk mitigation meant legal
8 expense?
9 MS. SMITH: Objection to form.
10 **A It was a newly created line on the balance**
11 **sheet specifically to cover all litigation-related**
12 **costs for the insureds.**
13 **BY MS. TOMKOWIAK:**
14 Q You said that there was some cash that
15 came over the policy that was earmarked for
16 litigation expense. Who earmarked it?
17 **A Again, I believe it was a suggestion by**
18 **Beecher Carlson, to move this cash to a certain**
19 **bucket on the balance sheet.**
20 Q So Beecher Carlson decided that with
21 respect to all of the assets that were used to pay
22 the premium on the policy, they would, I'm just
23 using your word, earmark 9 million of it to pay
24 litigation expenses?
25 MS. SMITH: Objection to form.

204

1 **A That's my understanding. Could have been**
2 **with input from the auditor. I don't know, but...**
3 **BY MS. TOMKOWIAK:**
4 Q So why did that reduce the premium?
5 **A My understanding is that that cash amount**
6 **was taken away from -- or whatever the amount --**
7 **the $9 million reduced the coverage because part**
8 **of the premium was being used -- was being spent**
9 **by the insurance company to cover the costs, so it**
10 **would reduce the -- dollar for dollar reduce the**
11 **limit of the policy.**
12 Q Well, so the original policy was $25 --
13 sorry. That would be a great policy. $25 million
14 premium, right?
15 **A Uh-huh.**
16 Q For $100 million worth of coverage?
17 **A That's right.**
18 Q You agree with me that's not dollar for
19 dollar, right?
20 **A What's not dollar for dollar?**
21 Q You're not paying $1 for every $1 of
22 coverage, right?
23 **A Right. That's not what I said before.**
24 Q Okay. Then help me explain. Because what
25 I took you to say is that because part of the

---

**205**

1  premium, $9 million of the premium was being used
2  to cover costs.
3  **A  Right.**
4      Q  And that coverage amount was going to be
5  reduced dollar by dollar also by $9 million.
6  **A  Right.**
7      Q  So I don't understand why that would be
8  appropriate?
9      MS. SMITH:  Objection to form.
10  **A  My understanding is that since the policy**
11  **wasn't paid for all cash; in other words, whatever**
12  **the original 25 million, ideally you'd accept**
13  **payment in cash for the premium.  But since the**
14  **funds did not have the cash, all their assets were**
15  **illiquid, junk, not junk, whatever, were**
16  **contributed as payment for the policy.**
17      **The cash portion of that -- I believe it's**
18  **a condition of the policy, but that the insurance**
19  **company had to pay the ongoing legal expenses for**
20  **the insureds.  So it wouldn't accept cash, spend**
21  **the cash on their legal expenses and then not**
22  **reduce the coverage.  Otherwise, I think you're**
23  **getting an extra -- extra dollar's worth of**
24  **coverage you didn't pay for is my understanding,**
25  **my interpretation of it.**

**206**

1  BY MS. TOMKOWIAK:
2      Q  Is that -- what's that interpretation
3  based on?
4      **A  Just my experience working through this**
5  **and whenever it happened with the audit and all**
6  **the valuations came in.**
7      Q  So the -- there were other assets that
8  were valued by a third party of having -- let's
9  see.  There was 1.75 in miscellaneous receivables,
10  55.5 in an investment portfolio.  So wasn't that
11  already more than enough to cover the initial
12  premium?
13      MS. SMITH:  Objection to form.
14  **A  I think this is specific to actual cash,**
15  **not the other assets that were part of the policy,**
16  **if that makes sense.**
17  BY MS. TOMKOWIAK:
18      Q  Actually, it doesn't to me.  I mean, so
19  Sentinel did not require $25 million of cash to be
20  paid in order to issue this policy, right?
21      MS. SMITH:  Objection to form.
22  **A  I don't know what it required at the time,**
23  **but looking back, I know that the funds did not**
24  **have $25 million in cash to pay for it.**
25

**207**

1  BY MS. TOMKOWIAK:
2      Q  And that Sentinel issued the policy
3  regardless?
4  **A  That's correct, in exchange for this**
5  **basket of securities.**
6      Q  Just so I'm clear, this -- and this does
7  not mean that at this point in time the insureds
8  paid an additional $9 million?
9  **A  That's correct.**
10      Q  It says here that:  The insurer will have
11  sole responsibility to settle all risk mitigation
12  costs with respect to legal action.
13      Do you know what that means?
14      MS. SMITH:  Objection, form.
15  **A  My understanding is that the insurer would**
16  **pay for ongoing costs associated with trial,**
17  **settlement, whatever.**
18  BY MS. TOMKOWIAK:
19      Q  So does that mean if those costs exceeded
20  $9 million, that Sentinel was still on the hook
21  for them?
22  **A  Yes.  My understanding.**
23      Q  Do you know how much of that $9 million
24  was paid out during the course of time when you
25  were a director?

**208**

1  **A  Most, if not all.  There might be, I don't**
2  **know, a million bucks left or so.  I don't know**
3  **exactly, but most of it was spent.**
4      Q  Were you personally involved in dispensing
5  money to cover legal fees?
6  **A  It would have undergone the same procedure**
7  **I outlined earlier, where I'd submit it to Beecher**
8  **Carlson, they would send it to the directors,**
9  **directors would approve or not approve, ask**
10  **questions, whatever, and send it back to Beecher**
11  **and then they would release the wires.**
12      Q  Okay.  So, for example, McKool Smith was
13  one of the attorneys in that litigation, so they
14  would send an invoice to you; is that right?
15  **A  I would receive them from Isaac generally.**
16      Q  Okay.  So attorneys would send it to
17  Isaac, Isaac would send it to you, you would send
18  it to Beecher, Beecher would send it to the
19  independent directors, they would sign off or not
20  and then how did counsel get paid?
21  **A  They would have -- I assume a wire.  Yeah.**
22      Q  Do you know how many bank accounts
23  Sentinel has?
24  **A  One, to my knowledge.**
25      Q  At what bank?

209

1    A  It's at CIBC, Cayman.
2    Q  Is that where all of the cash was kept?
3    A  Yes.
4    Q  Do you know whether there were any
5  litigation expenses or fees that Sentinel denied?
6    A  I don't remember any being denied, no.
7    Q  Do you know who would review those for
8  reasonableness?
9    A  Well, Isaac would review any legal bill
10  that came into Highland generally, generally
11  speaking is my understanding, and then he'd send
12  it to me.  Again, I'd send it to Beecher.  The
13  directors generally had questions about is this
14  correct, is this market, whatever, and then from
15  there if they approved, which they did generally,
16  it would -- then it would get paid.
17    Q  We discussed earlier that the outcome of
18  the trial in the New York State action was a
19  judgment in favor of UBS for over a billion
20  dollars, right?
21    MS. SMITH:  Objection to form.
22    A  That's right.
23  BY MS. TOMKOWIAK:
24    Q  And I asked you if the insureds made a
25  claim on the policy after that judgment and you

210

1  said that you weren't aware; is that fair?
2    A  Well, they -- the insureds -- one of the
3  insureds made a claim this spring, but in the
4  interim in between whenever that was issued and
5  now, there was no claim that I saw.
6    Q  Do you recall any discussion internally at
7  Highland about whether a claim would be made on
8  the policy before it was made in the spring of
9  this year?
10    A  No.  My only real discussions again were
11  as part of this actuarial -- about the case
12  where -- about this actuarial update with Isaac at
13  the end of the year.
14    Q  So did you ever discuss with Mr. Leventon
15  whether or not Highland -- the Highland funds were
16  going to make a claim on the Sentinel policy?
17    A  No.
18    Q  Did you ever suggest to him that they
19  should?
20    A  I don't think so.
21    Q  Why not?
22    A  I don't know that it was my place to
23  suggest anyone make a claim or not make a claim
24  with respect to the policy.
25    Q  Did you ever suggest to Mr. Ellington that

211

1  the funds should make a claim on the policy?
2    A  I don't think so.
3    Q  Why not?
4    A  Same reason.
5    Q  So you were a Highland employee at the
6  same time that you were a Sentinel director,
7  right?
8    MS. SMITH:  Objection, form.
9    A  Yeah, for the most part.
10  BY MS. TOMKOWIAK:
11    Q  Did you think that presented any
12  particular conflict of interest for you?
13    MS. SMITH:  Objection to form.
14    A  I didn't, no.
15  BY MS. TOMKOWIAK:
16    Q  Why not?
17    A  I was just, you know, doing what I was
18  asked to do.  I had no involvement in any sort of
19  settlement talks, policy talks with Highland and
20  UBS, anything like that.
21    Q  Did anybody instruct you to keep the
22  Sentinel policy a secret?
23    A  No.
24    Q  Did anybody instruct you that if -- at
25  Highland, that if a claim was made on the policy,

212

1  to let them know?
2    A  No.
3    Q  If the insureds had made a claim on the
4  policy in 2019 after the judgment in the UBS
5  trial, would you agree that Sentinel would have
6  had a duty to assess that claim at that time?
7    MS. SMITH:  Objection to form.
8    A  To assess it, yes, if a claim was made.
9  BY MS. TOMKOWIAK:
10    Q  Did you think it was strange that no one
11  made a claim on the policy after they had a
12  $1 billion judgment entered against them?
13    MS. SMITH:  Objection to form.
14    A  My understanding was that it was -- there
15  was always going to be a Phase 2 to the trial and
16  that possibly appeal something down the line, so
17  it wasn't strange to me, no.
18  BY MS. TOMKOWIAK:
19    Q  Do you understand that after Highland
20  filed for bankruptcy, the litigation in that case
21  was stayed?
22    MS. SMITH:  Objection to form.
23    A  Yes.
24  BY MS. TOMKOWIAK:
25    Q  And do you understand that after Highland

213

1  was put into bankruptcy, that an independent board
2  of directors was put into place at Highland?
3      A   Yes.
4      Q   And that occurred around January 2020; is
5  that right?
6      A   That sounds right.
7      Q   Can you identify who those board members
8  are?
9      A   Jim Seery, a gentleman named, I think Russ
10  Nelms and John -- John something. I don't -- the
11  third gentleman's name escapes me unfortunately.
12  John Dubel. John Dubel. Sorry. Getting there.
13      Q   Did you have -- did you have any
14  interaction with any of those board members?
15      MS. SMITH:  Objection to form.
16      A   At what point in time?
17  BY MS. TOMKOWIAK:
18      Q   After they became -- between the time that
19  they became appointed in approximately
20  January 2020, to the time that you left Highland
21  in approximately February of 2021.
22      A   Very little.
23      Q   What do you mean by very little?
24      A   I mean, I met Nelms and I believe Seery.
25  I don't know that I ever actually -- I met Dubel

214

1  as well. Had one meeting about private equity
2  portfolio companies with, I believe Dubel in
3  person and that was the last I believe I ever
4  spoke to him. Never spoke to Mr. Nelms after the
5  one time I met him. And I've only spoken to
6  Mr. Seery prior to when we -- when he terminated
7  me, once or twice about private equity.
8      Q   What about counsel for the independent
9  board, the individuals at Pachulski? Did you have
10  any interaction with them?
11      A   Initially I was asked to source D&O
12  coverage for the independent board, a task passed
13  to me I think by Mr. Sevilla and I did that. I
14  got a quote and handed it off, and then a few of
15  them came over I, think it was Mr. Pomerantz had
16  the piece of paper in his hand and said who did
17  this and I said I did. And he threw it on my desk
18  and said we don't need it. They were finding
19  coverage elsewhere so...
20      Q   So the -- I'm sorry, what was the piece of
21  paper in his hand?
22      A   It was a quote, like a D&O insurance
23  quote, something along those lines.
24      Q   Did you have any other interactions with
25  anybody at the -- at their firm?

215

1      A   Not for the remainder of the year, I
2  think. It was 2020, yeah. So I received an
3  e-mail from Greg Demo at the end of the year or
4  early 2021, I don't remember, and that was, I
5  think the only time I -- I don't think in the
6  interim I had any interactions at all.
7      Q   Were you aware that the independent board
8  was negotiating a settlement with UBS?
9      A   I assumed they were negotiating
10  settlements with any and all creditors of
11  Highland. So UBS would fall under that I guess.
12      Q   At any time between January 2020 and your
13  departure from Highland, did you disclose to any
14  members of the independent board that you were
15  aware of an insurance policy that would provide
16  for $100 million of coverage in connection with
17  the UBS litigation?
18      MS. SMITH:  Objection.
19      A   No.
20  BY MS. TOMKOWIAK:
21      Q   Why not?
22      A   Like I said, I had no involvement with any
23  settlement discussions. I barely spoke to the
24  board members at Pachulski. It was not my place,
25  not my -- I was busy with private equity stuff.

216

1      Q   So you assumed that they were trying to
2  settle claims with all creditors including UBS,
3  right?
4      A   That's right.
5      Q   But you didn't think it was relevant to
6  mention, hey, there might be $100 million worth of
7  insurance coverage available to you to help settle
8  that claim?
9      MS. SMITH:  Objection to form.
10      A   I wouldn't be involved with any of the
11  settlement discussions. Whoever was most likely
12  would have known.
13  BY MS. TOMKOWIAK:
14      Q   Most likely would have known of what?
15      A   The policy.
16      Q   Do you know who was involved in those
17  settlement discussions?
18      A   Not specifically.
19      Q   Do you think Mr. Ellington was involved?
20      A   I'm sure on some level he was, yeah.
21      Q   Do you think Mr. Leventon was involved?
22      A   Possibly.
23      Q   Do you think Mr. Dondero was involved?
24      MS. SMITH:  Objection to form.
25      A   I believe he was removed shortly

217

1  thereafter -- or shortly after the board was
2  appointed, so I doubt it.
3  BY MS. TOMKOWIAK:
4    Q  Mr. Ellington was aware of the ATE policy,
5  right?
6      MS. SMITH:  Objection to form.
7    A  Yes.
8  BY MS. TOMKOWIAK:
9    Q  So did you assume that he would tell the
10 independent board, hey, we might have $100 million
11 worth of insurance coverage to help us settle with
12 UBS?
13     MS. SMITH:  Objection to form.
14   A  I didn't assume anything.  That wasn't my
15 place.
16 BY MS. TOMKOWIAK:
17   Q  Did you talk to Mr. Ellington about that?
18   A  I don't recall doing that.
19   Q  Did you ask him if he intended to inform
20 the independent board about the ATE policy?
21   A  I don't think so.
22   Q  You don't think so because you don't
23 remember?
24   A  I don't think that's a question I would
25 have asked him.

218

1    Q  Okay.  But you don't recall if you did one
2  way or the other?
3    A  That's right.
4    Q  Sitting here today, do you think that's
5  relevant information?
6      MS. SMITH:  Objection to form.
7    A  Relevant to who?
8  BY MS. TOMKOWIAK:
9    Q  Relevant to the independent board
10 attempting to settle litigation with UBS.
11     MS. SMITH:  Objection to form.
12   A  I suppose.
13 BY MS. TOMKOWIAK:
14   Q  Well, that was -- the whole purpose of the
15 policy, as we discussed, was to provide the funds
16 with coverage in connection with the UBS claim,
17 right?
18   A  That's correct.
19   Q  Anytime between January 2020 and your
20 departure from Highland in February 2021, did you
21 have discussions with anybody about the Sentinel
22 policy?
23   A  Anybody?
24   Q  Anybody.
25   A  In the entire world?

219

1    Q  In the entire world.
2      MS. SMITH:  Objection to form.
3  BY MS. TOMKOWIAK:
4    Q  I mean, is that a long list of people?
5    A  No, but it's -- we were talking about
6  Highland specifically.  So can you repeat the
7  question?
8    Q  Sure.  At any time between January 2020
9  and your departure from Highland in February 2021,
10 did you have discussions with anybody about the
11 Sentinel policy?
12     MS. SMITH:  Objection to form.
13     And you do not have to divulge privileged
14 conversations.
15   A  I'm sure I spoke with the other board
16 members a time or two about the Highland
17 bankruptcy in general.
18 BY MS. TOMKOWIAK:
19   Q  Anybody else?
20   A  I don't think so.
21   Q  What about Beecher Carlson?
22   A  Discuss this specific policy?  We probably
23 didn't -- we generally discussed more financial
24 statement-type stuff, like expenses being paid.
25 We didn't really chat much about the actual

220

1  policy, which I believe was your question, right?
2    Q  It was.  What about your auditors at
3  Crowe?  I think by that time they were just Crowe.
4    A  Yeah.  I don't believe I've ever directly
5  spoken to them about the policy.
6    Q  So when I say spoken to, are you drawing
7  some distinction between having a face-to-face
8  conversation?
9    A  No, communicated with.
10   Q  Okay.  And I believe the actuary, and this
11 is not meant to be a trick, but I believe the
12 actuary analysis that we looked at was in the time
13 period.  Are you saying that's not about the
14 policy?
15   A  It's about -- well, I guess it is, yeah.
16 That's fair.
17   Q  Okay.  So you would have also talked about
18 the policy with at least Mr. Leventon and the
19 actuary?
20   A  Right.
21   Q  And the auditors.  Anybody else?
22   A  Not that I can think of.
23   Q  What about with Mr. Ellington?
24   A  Doubtful.
25   Q  Why is it doubtful?

221

1    A   Was just not a topic that ever really came
2  up.
3    Q   What about with Mr. Sevilla?
4    A   Same thing, probably no discussions.
5    Q   What about with Ms. Irving?
6    A   Probably not.
7    Q   Why not?
8    A   Again, it's just not a topic that was
9  discussed very often.
10    Q   What did you discuss with the board
11  members about the Sentinel policy in that time
12  frame?
13        MS. SMITH: Objection, form -- oh,
14  objection, privileged.  Sorry.
15    A   Again, I'm not sure if I can divulge the
16  actual conversations I would have had with the
17  other board members.
18  BY MS. TOMKOWIAK:
19    Q   I'm asking for your communications with
20  board members.  If it's confidential, then I would
21  like an answer to that question.  It's not -- I'm
22  not asking you about conversations with you and
23  board members and counsels, but just with you and
24  board members.
25    A   They would check in generally for a

222

1  high-level how is the bankruptcy going.
2    Q   And what did you tell them?
3        MS. SMITH: Objection.
4        If counsel was present, you don't need to
5  divulge communications with counsel.
6        THE WITNESS: Right.
7    A   Generally that it was going slow and
8  seemed to be no end in sight was my general
9  feeling on the bankruptcy.
10  BY MS. TOMKOWIAK:
11    Q   Did you discuss the UBS claim?
12    A   Not specifically that I remember.
13    Q   The Sentinel -- the other Sentinel board
14  members weren't interested in the status of the
15  UBS claims in the bankruptcy?
16    A   They were --
17        MS. SMITH: Objection to form.
18    A   They were aware that the proceedings had
19  been stayed, as you mentioned before, so it was
20  kind of a holding pattern with respect to that.
21  BY MS. TOMKOWIAK:
22    Q   During this period of time, did you set up
23  a call between yourself, Beecher and Mr. Leventon?
24    A   Which period of time?
25    Q   The January 2020 to February 2021 period

223

1  of time.
2    A   Probably.
3    Q   Do you recall what that was about?
4    A   The only calls I would have arranged with
5  those people would have been with regards to the
6  actuarial analysis.
7    Q   Do you recall when the first time is that
8  you saw that policy?
9    A   Like I said before, probably after I came
10  on board in September of '17 and before the end of
11  the year.
12    Q   And you would have seen it without the
13  attachments, based on your testimony today about
14  when those were -- I'm sorry, the endorsements,
15  based on your testimony today about when those
16  were added?
17    A   I think so.
18    Q   So you would have seen some earlier
19  version of that insurance policy without the
20  endorsements?
21        MS. SMITH: Objection to form.
22    A   I would assume it was the policy just
23  without the two endorsements, yeah.
24  BY MS. TOMKOWIAK:
25    Q   Okay.  You can set that aside.

224

1        MS. TOMKOWIAK: Can we take a break,
2  please.
3        THE VIDEOGRAPHER: We are off the record
4  at 3:26 p.m.
5        (Recess taken from 3:26 p.m. CDT to
6  3:50 p.m. CDT)
7        THE VIDEOGRAPHER: The time is 3:50 p.m.
8  We are back on the record.
9  BY MS. TOMKOWIAK:
10    Q   Mr. DiOrio, have you had any contact with
11  Sentinel since you resigned?
12    A   I don't believe so.
13    Q   What do you mean you don't believe so?
14    A   I don't believe I have.
15    Q   Can you recall any contact you've had with
16  Sentinel since you resigned?
17    A   No.
18    Q   Do you recall testifying earlier to
19  meetings that you would have with Mr. Leventon and
20  Beecher Carlson to discuss the status of the UBS
21  litigation?
22    A   Yes.
23    Q   And during those meetings, what did you
24  discuss?
25    A   The actuarial table that we looked at

225

1 earlier, just possible outcomes for the UBS
2 matter.
3   Q  Did you discuss the funds' litigation
4 strategy at all?
5   A  No, I don't believe so.
6   Q  Okay.  Did you discuss, for example, what
7 defenses were available to the funds with respect
8 to UBS's claims?
9   A  I don't believe so.
10   Q  Did you ask Mr. Leventon how the funds
11 planned to defend against UBS's claims?
12   A  I think, as I said before, I had a very,
13 very high-level understanding of the case itself,
14 so I wouldn't -- it would be a waste of both of
15 our times for me to ask legal strategy.  I just
16 don't know.
17   Q  And the insurer wasn't interested in
18 understanding how the insureds were defending
19 against the claims in the case?
20     MS. SMITH:  Objection, form.
21   A  There were no attorneys on staff at the
22 insurer.  Just relied upon that litigation was
23 being managed properly.
24 BY MS. TOMKOWIAK:
25   Q  Was there anything that Sentinel asked the

226

1 insureds to provide that it didn't receive?
2   A  Not that I recall.
3   Q  If Sentinel needed to contact the
4 insureds, who did they contact?
5   A  I don't know that there was a contact
6 person at the insureds.
7   Q  So you had -- so Sentinel had no way to
8 contact the insureds?
9     MS. SMITH:  Objection to form.
10   A  The insureds directly?
11 BY MS. TOMKOWIAK:
12   Q  Yes.
13   A  I don't know.
14   Q  So if Sentinel wanted to talk to CDO Fund
15 about something, you don't know who Sentinel would
16 have reached out to?
17   A  Not at CDO Fund specifically, no.  There
18 was nothing to talk to the insureds about as --
19 was my understanding.
20   Q  I'm not sure I understand that.  So the
21 insurer, Sentinel, had nothing to talk to the
22 insureds about during the four-year period of time
23 in which you were a director?
24   A  Right.  The insurer received, you know,
25 periodic updates in the form of these actuarial

227

1 tables.  And other than that, once the policy was
2 paid for, there was not much to be done, is my
3 understanding.
4   Q  Did you understand that Mr. Leventon
5 represented the insureds?
6     MS. SMITH:  Objection to form.
7   A  I don't know that.  I don't know.
8 BY MS. TOMKOWIAK:
9   Q  Did you understand that he was a
10 representative of the insureds?
11     MS. SMITH:  Objection to form.
12   A  I don't know if he was a representative of
13 the insureds or not.
14 BY MS. TOMKOWIAK:
15   Q  In the insurance policy that we looked at,
16 the representative of the insureds is listed as
17 Paul Lackey.  Do you know who that is?
18   A  I've heard the name --
19     MS. SMITH:  Objection to form.
20   A  I've heard the name before.
21 BY MS. TOMKOWIAK:
22   Q  Did you ever have any communications with
23 Mr. Lackey during the time that you were a
24 director at Sentinel?
25   A  I've never met Mr. Lackey.

228

1   Q  Okay.  So I take it you've had no -- I
2 just want to be really precise.  So you've never
3 met him.  Did you have any other types of
4 communications with Mr. Lackey?
5   A  No.
6   Q  You said that you relied on the fact that
7 litigation was being managed properly; is that
8 right?
9   A  (Nods head.)
10   Q  Okay.  And so Sentinel left case
11 management entirely at the discretion of the
12 insureds; is that right?
13     MS. SMITH:  Objection, form.
14   A  Sentinel was responsible for paying
15 ongoing legal fees.  And as I said, there was no
16 one on -- there were no attorneys on staff to
17 analyze the legal strategy.
18 BY MS. TOMKOWIAK:
19   Q  Well, setting aside whether or not there
20 were any attorneys, I just want to be clear, that
21 with respect to litigation strategy and case
22 management, that was -- discretion was given to
23 the insureds to manage that on their own, right?
24     MS. SMITH:  Objection to form.
25   A  I suppose so.

229

1 BY MS. TOMKOWIAK:
2   Q  Did you feel, as a director of Sentinel,
3 that you were adequately informed of the status of
4 the litigation?
5   A  I did, yes.
6   Q  I want to try one more time to nail down
7 when you became aware of the $1 billion judgment.
8 Do you think that you were aware of that judgment
9 by January of 2020?
10   A  I can't say for sure. I think I said
11 late '19 or early '20, so that would fall in that
12 time frame.
13   Q  I'm handing you what has been previously
14 marked as Exhibit 2.
15     MS. TOMKOWIAK:  Counsel, do you have that?
16     MS. HARTMANN:  I don't think I do.
17     MS. SMITH:  I got it.
18     MS. DANDENEAU:  Yes, we have.
19     MS. HARTMANN:  Okay.
20 BY MS. TOMKOWIAK:
21   Q  You can take your time to look through
22 that as well and let me know when you're ready.
23   A  Okay.
24     (Witness reviews document.)
25   A  Okay.

230

1 BY MS. TOMKOWIAK:
2   Q  Have you seen this document before?
3   A  I believe so.
4   Q  Is this the Purchase Agreement that
5 transferred the assets to Sentinel to pay the
6 premium on the ATE policy that we just discussed?
7     MS. SMITH:  Objection to form.
8   A  It looks like it.
9 BY MS. TOMKOWIAK:
10   Q  And do you see on the first page it lists
11 three Highland entities as the sellers, at the
12 top?
13   A  Yes.
14   Q  And do you understand that those are the
15 insured entities under the ATE policy?
16   A  Yes.
17   Q  And in Section 1, Payment of Premium, it
18 says:  Purchaser agrees to accept the assets
19 listed in Schedule A hereto as 100 percent payment
20 of the Premium -- and then I am going to omit the
21 rest of the sentence.
22     Do you agree that Sentinel accepted the
23 assets listed in the schedule hereto as
24 100 percent payment of the premium on the
25 ATE policy?

231

1   A  Again, I was not involved in the
2 transaction, but I believe so.
3   Q  If you turn to Schedule A.
4   A  First page?
5   Q  Yes.  There are three sellers listed in
6 the preamble that we just looked at, but there's
7 more than three entities that are selling assets
8 here, right?
9     MS. SMITH:  Objection to form.
10   A  It appears so, yes.
11 BY MS. TOMKOWIAK:
12   Q  Do you know why that was the case?
13   A  I don't.
14   Q  Do you know if these entities received any
15 consideration for any of these assets beyond the
16 ATE policy?
17   A  I don't.
18   Q  Do you know who negotiated this document
19 for Sentinel?
20   A  I do not.
21   Q  Do you know who drafted this document?
22   A  I do not.
23   Q  Do you know who negotiated this document
24 on behalf of the sellers?
25   A  I do not.

232

1   Q  Do you know whether Sentinel did any
2 diligence on the assets listed in Schedule A prior
3 to accepting them as 100 percent payment of the
4 premium?
5   A  I do not know.
6   Q  Did anybody ever tell you that Sentinel
7 did?
8   A  Did diligence prior to?
9   Q  Accepting these assets as payment.
10     MS. SMITH:  Objection.
11     Do not divulge any confidential
12 communications with counsel.
13   A  I don't remember one way or the other
14 having that conversation, no.
15 BY MS. TOMKOWIAK:
16   Q  So earlier -- well, first of all, do you
17 know if Sentinel actually took custody of all of
18 the assets listed here in Schedule A?
19     MS. SMITH:  Objection to form.
20   A  Most of them.
21 BY MS. TOMKOWIAK:
22   Q  So I would like to go through each of the
23 assets and understand whether you know if Sentinel
24 actually took custody of the asset and whether you
25 still holds the asset as of the

233

1  date that you resigned.  Okay?
2  **A  As of June 25th?**
3  Q  Correct.
4  **A  Okay.**
5  Q  Unless you have any more recent knowledge,
6  but you --
7  **A  No, I just wanted to be clear that's the**
8  **date.**
9  Q  So with respect to the Aberdeen asset, do
10 you know whether Sentinel took custody of that
11 asset?
12 **A  That one in particular, I don't believe**
13 **so.**
14 Q  Why not?
15 **A  I don't recall, but I just -- I know that**
16 **that one was not part of -- it's not on Sentinel's**
17 **balance sheet.  I'm not entirely sure why.**
18 Q  And -- well, then I suppose Sentinel would
19 not have had -- still had it as of June 25th,
20 2021, if it never had it?
21 **A  Right.**
22 Q  Right.  Okay.  What about with respect to
23 the Southfork CLO?
24 **A  Yes.**
25 Q  Yes, they took custody?

234

1  **A  Yes.**
2  Q  Do you know whether they still own that
3  asset today?
4  **A  As -- yeah.**
5  Q  Let's --
6     MS. SMITH:  Objection to form.
7  **A  All my answers will be as of June 25th.**
8  **Can we agree there?**
9  **BY MS. TOMKOWIAK:**
10 Q  Yes.
11 **A  Okay.  Yes.**
12 Q  That sounds great.  What about with
13 respect to the next Southfork CLO?
14 **A  Yes.**
15 Q  Yes, they took custody and, yes, they
16 still own it?
17 **A  That's right.**
18    MS. SMITH:  That's a two-part answer.
19    THE WITNESS:  Okay.
20 BY MS. TOMKOWIAK:
21 Q  Yes.  What about with respect to the next
22 Aberdeen asset?
23 **A  Yes to custody, yes to ownership.**
24 Q  What about with respect to GC -- GSC ABS
25 CDO?

235

1  **A  That was one of the worthless assets that**
2  **was, I think sold to Sebastian Clarke for a**
3  **dollar.**
4  Q  So they took custody of it and then it was
5  sold to Sebastian Clarke?
6  **A  I believe so.**
7  Q  What about the Greenbriar CLO?
8  **A  There was an issue with the registration**
9  **of that, but it is I believe on Sentinel's balance**
10 **sheet.**
11 Q  Does that mean that the issue with the
12 registration was fixed?
13 **A  It's not fixed, as far as I know.**
14 Q  So it's on Sentinel's balance sheet, but
15 as far as you know that asset was never actually
16 transferred to Sentinel?
17 **A  It was a paper certificate that I think**
18 **got lost in the mail or something.  I don't know,**
19 **but it -- it's probably still registered to CDO**
20 **Opportunity Master Fund, LP, or whatever is listed**
21 **here.**
22 Q  How did you come to learn that, unless it
23 was through counsel?
24 **A  How did I come to learn?**
25 Q  That -- this issue with the paper

236

1  certificate being lost.
2  **A  There was issues with several.  No one**
3  **really works with paper certificates anymore.**
4  **These things are very old.  I think they're all**
5  **like mid-2005, '6, '7ish.  And some of them, you**
6  **know, lost in the mail or someone didn't have**
7  **them, something like that.  So I don't believe**
8  **this particular one ever arrived at Sentinel's**
9  **custody account.**
10 Q  That's helpful, but how did you come to
11 learn that?  Like did somebody else at -- did one
12 of your directors tell you that or how did you
13 learn that?
14 **A  No, I think it -- we would have found out**
15 **when it never arrived at the custody account.**
16 Q  Would that have been in connection with
17 your audit, Sentinel's audit?
18 **A  I don't know.**
19 Q  What about with respect to Highland
20 Financial Partners, LP?
21 **A  Both of those interests I believe were**
22 **deemed worthless.  I don't know if it was included**
23 **in -- it might have been written off, in all**
24 **honestly.  We had a valuation done on it -- or**
25 **Sentinel had a valuation performed on it to say it**

237

1 was worthless a couple years ago, so it may have
2 just been written off rather than moved.
3 Q What about Longstreet CDO?
4 A I believe that's part of the worthless
5 basket sold to Sebastian Clarke for a dollar.
6 Q NexPoint, what about that one?
7 A I don't know what that is.
8 Q Okay. What about the Pam -- I don't know
9 if I'm saying this right, but Pam Cap LP?
10 A Another worthless asset.
11 Q Do you know what that asset is?
12 A Pam Cap?
13 Q Yeah.
14 A No idea.
15 Q What about Tousa, Inc.?
16 A Same answer for Tousa.
17 Q That you don't know what it is or that it
18 was worthless?
19 A Sorry, that it was worthless. I believe
20 Tousa at some point in the past went through a
21 bankruptcy.
22 Q How about the Valhalla CLO?
23 A Yes to ownership, yes to still has it.
24 Q So yes to custody, yes to ownership?
25 A Yes.

238

1 Q Okay. What about the Vertical ABS CDO?
2 A Another worthless one.
3 Q Highland Credit Opportunities CDO, Ltd.,
4 partnership interest?
5 A That's actually wound up -- that's
6 Multi Strat -- Highland Multi Strat.
7 Q So that is -- the partnership interest
8 referenced here is the partnership interest in
9 Multi Strat?
10 A Correct.
11 Q And Sentinel took custody of that? Took
12 custody might be the wrong word with respect to
13 that, but it -- that interest was transferred or
14 assigned to Sentinel?
15 A Yes, that interest added to existing
16 interest that Sentinel already had from years
17 prior in Multi Strat and then subsequent to this
18 transaction, Sentinel invested further into
19 Multi Strat at the end of 2017.
20 Q Was that through Sentinel Reinsurance or
21 some other Sentinel entity?
22 A It was through -- which one? Sorry. Was
23 this --
24 Q At the end of 2017.
25 A I believe it was through Sentinel

239

1 Reinsurance, Ltd.
2 Q Which Sentinel entity, if you recall,
3 already had an interest in Multi Strat prior to
4 this?
5 A It may have been Sentinel Re Holdings,
6 that entity that was merged in. I'm not entirely
7 sure, but all of that interest, now it all sits in
8 Sentinel Reinsurance, Ltd.
9 Q And that was not deemed worthless, right?
10 A Correct.
11 Q Do you know whether Sentinel still has it
12 as of June 25th?
13 A Its interest in Multi Strat?
14 Q Yes.
15 A Sentinel elected to redeem out of
16 Multi Strat. It has not been paid anything. It
17 is, as I understand it, behind a list of other
18 redeemers in that fund.
19 Q Do you know who sent -- well, did Sentinel
20 send a redemption letter?
21 A Yes.
22 Q Did you send that or did somebody else
23 from Sentinel send that?
24 A I'm not entirely sure who sent it, but I
25 would have -- as with any other investment

240

1 decisions, I would have offered it to the board
2 and they agree or don't agree. To the independent
3 directors, excuse me, the other two.
4 Q So at Sentinel you were responsible for
5 investment decisions?
6 A Yes.
7 Q Tell me about that. What did that
8 responsibility entail?
9 A Not much. It was very inactive. But as
10 part of the conditions of the ATE policy, CIMA
11 mandated that Sentinel keep cash in equal to its
12 loss reserves, which is what you see on this
13 actuarial table. So the premium was earned over
14 two years and every quarter there was a milestone
15 where Sentinel's cash balance had to increase.
16 And once Sentinel -- once the requirement was more
17 cash than Sentinel had and it would have to sell
18 something to make -- just to generate cash to keep
19 up with those loss reserves.
20 Q When you say that the premium was earned
21 over two years, do you mean as a matter of
22 accounting, like that's how it was spread out?
23 A That's right.
24 Q Do you recall what the milestones were
25 every quarter?

241

1    A   The actual cash numbers?
2    Q   Yes.
3    A   I don't.  It built up to the -- whatever
4  the loss reserve number was and it's generally
5  been around that 24, $25 million.
6    Q   That was going to be my next question.  So
7  do you recall what the loss reserve was?
8    A   It's -- yeah.  The last -- well, I guess
9  in 2019, it was 25 million, or 25.3 million.
10   Q   And just for the record, can you identify
11 which exhibit you're looking at?
12   A   Bates 118, Exhibit 53.
13   Q   So that 25.3, I think it says million at
14 the bottom of that table --
15   A   That's right.
16   Q   -- that's the amount of Sentinel's loss
17 reserves as of that date?
18   A   That's right.
19   Q   Do you recall whether the milestones were
20 some type of lock step?  Like did they increase by
21 the same percentage or dollar amount each quarter
22 or did it vary?
23   A   I think it was -- I think it was evenly --
24 you know, whenever we start -- wherever Sentinel
25 started and had to get to over those two years,

242

1  the only variable would be if the loss reserve
2  number changed in the interim, which it did but
3  not materially so.  I think it was just a step up,
4  if that makes sense, to get from wherever Sentinel
5  started to that 24, $25 million number, whatever
6  it was.
7    Q   So as part of your responsibility for
8  making investment decisions, were you responsible
9  for deciding whether or not Sentinel needed to
10 sell an asset to generate cash?
11       MS. SMITH:  Objection, form.
12   A   CIMA decided for Sentinel.  In other
13 words, we -- if we -- Sentinel wanted to stay in
14 compliance, it had to sell something or sell
15 assets over the course of that -- those two years.
16 BY MS. TOMKOWIAK:
17   Q   Would CIMA identify the specific asset?
18   A   They just said get your cash balance up.
19   Q   And then were you responsible for
20 identifying how to get the cash balance up?
21       MS. SMITH:  Objection to form.
22   A   I would propose what I thought was best
23 and submit it to the other two directors and then
24 they would say yes or no.
25

243

1  BY MS. TOMKOWIAK:
2    Q   How did you make that proposal?
3    A   Probably via SAS e-mail.
4    Q   How did you decide what to propose?
5    A   There were very few liquid assets on
6  Sentinel's balance sheet; in other words, easy to
7  generate cash.  So we -- I started with the --
8  they were publicly traded equities that can be
9  sold and generate cash quickly.  So that's kind of
10 where we started.
11   Q   Were any of your proposals rejected?
12   A   I don't believe so.
13   Q   Have any of the assets that we've
14 discussed, I take it none of them were sold to
15 generate cash?
16       MS. SMITH:  Objection to form.
17   A   None that we've discussed so far.
18 BY MS. TOMKOWIAK:
19   Q   Okay.  As we go, if there is an asset that
20 you sold and you generated for cash, I would like
21 to know, but I'll try to ask that specifically if
22 I think that one would potentially qualify for
23 that.
24       Is there anything else that you did as
25 part of your responsibility to make investment

244

1  decisions for Sentinel?
2    A   No.  Like I said, it was very inactive
3  with respect to investments, trading, whatever you
4  want to call it.
5    Q   All right.  So for the next one, the 2.1
6  promissory note from Governance Re and cash from
7  the NexPoint Multifamily Capital Trust Interest.
8    A   Yes to custody; yes, Sentinel still holds.
9  It has been paid down.
10   Q   Do you know what the note has been paid
11 down to?
12   A   There's approximately $750,000 left.
13   Q   Governance Re is another insurance company
14 that provided insurance services to Highland; is
15 that right?
16   A   It's an insurance company.  I don't know
17 where it provides service.
18   Q   You don't know who its clients are?
19   A   I don't.
20   Q   Do you know who owns Governance Re?
21   A   I don't.
22   Q   Do you know if it's affiliated with
23 Highland?
24   A   I don't.
25   Q   Okay.  What about the NexPoint Real Estate

---

245

1  Strategy Z?
2  **A   That has been -- yes, Sentinel still holds**
3  **its position, partially -- has been partially sold**
4  **off to generate cash.**
5  Q   Would Sentinel receive any types of
6  distributions relating to this particular
7  investment?
8  **A   Yeah, that paid a dividend.**
9  Q   Do you recall approximately how often?
10  **A   I think -- I believe quarterly.**
11  Q   Do you recall approximately how much?
12  **A   I don't.  I don't.**
13  Q   Do you know approximately how much of it
14  was sold off to generate cash?
15  **A   If I remember correctly, this -- these**
16  **97,000 shares were -- you know, the value**
17  **obviously changes month to month, but it was a**
18  **little under $2 million.  I believe Sentinel has**
19  **redeemed out approximately two-thirds of that.  So**
20  **there's, call it, 6, 700 grand left, last I saw.**
21  **Hadn't seen a statement in a while.**
22  Q   What about the Highland Gemini Program, I
23  guess one is that -- yeah, that's separate from
24  the next one.  So what about the Highland Gemini
25  Program?

---

246

1  **A   I don't know really what that is.  That**
2  **sounds like it would have been one of the**
3  **worthless ones.**
4  Q   Okay.  And then the 2.4 -- approximately
5  $2.4 million promissory note from The Dugaboy
6  Investment Trust and cash of nearly 600,000, RE:
7  Survios Interest?
8  **A   I believe -- I believe that note was**
9  **deemed worthless as it never paid anything and it**
10  **was transferred to Sebastian Clarke.**
11  Q   The Dugaboy Investment Trust, that's the
12  trust that's affiliated with Mr. Dondero, correct?
13       MS. SMITH:  Objection to form.
14  **A   I'm not sure.**
15  **BY MS. TOMKOWIAK:**
16  Q   You don't know?
17  **A   I'm not sure.**
18  Q   And do you know what the Survios Interest
19  is?
20  **A   I don't.**
21  Q   What about the next asset, something 5X
22  Floating?
23  **A   Also a worthless asset.**
24  Q   All right.  And then the next one is Cash.
25  I assume that Sentinel took custody of the cash?

---

247

1  **A   Yes.**
2  Q   Okay.  And since cash is fungible, there's
3  no way to know if that cash is still at Sentinel.
4  Does Sentinel still hold some cash balance?
5  **A   Yes.**
6  Q   Do you know approximately what that
7  balance is as of June 2021?
8  **A   It's approximately -- I think it's**
9  **approximately $27 million in cash.**
10  Q   So 27 million in cash and 25.3 in loss
11  reserves?
12  **A   No.  That number satisfies the loss**
13  **reserve requirement.**
14  Q   Gotcha.  Okay.  And then the last asset on
15  that page is Cash.
16       Okay.  So then looking at the second page,
17  HFT Real Estate, what about that?
18  **A   It was -- yeah, it -- Sentinel has custody**
19  **over that, but it's -- my understanding is it has**
20  **no value.**
21  Q   Did you understand it had no value at the
22  time or that it came to have no value?
23  **A   At the time and since.**
24  Q   So Sentinel took custody of it, but it had
25  no value?

---

248

1  **A   Right.**
2  Q   And it still has it today, but it has no
3  value?
4  **A   I believe so.**
5  Q   And then the next line down, 144A F, is
6  that a separate asset than the line above it?
7  **A   It's the same.  It's some -- I forget why**
8  **there's some designation 144A.  It's not the same.**
9  **It's the same asset.  It's not two 750,000 shares,**
10  **if that makes sense.  I just don't remember -- I**
11  **don't recall the specifics.**
12  Q   With respect to the next, NexPoint asset?
13  **A   Yes.  I believe that was -- NHF would be**
14  **the ticker.**
15  Q   Okay.  So this is a publicly traded --
16  **A   That's right.**
17  Q   And Sentinel took custody of that?
18  **A   That's right.**
19  Q   And still has it as of June?
20  **A   This was one of the assets that was sold**
21  **to generate cash.**
22  Q   All of it?
23  **A   That's right.**
24  Q   And what about the next one?
25  **A   That I believe is NexPoint Residential**

---

---

249

1  Trust, also public equity.
2  Q  So Sentinel took custody of that?
3  A  That's right.
4  Q  Was it sold to generate cash?
5  A  It was.
6  Q  All of it?
7  A  Yes.
8  Q  How about Stratford CL?
9  A  Yes to custody; yes, still owned.
10  Q  And then same thing with respect to the
11  144A, that's not actually a separate asset?
12  A  Right.  I think that shows up a couple
13  times in here.  And again, I'm not entirely sure
14  why, but it's one asset.
15  Q  Next is Highland Park?
16  A  I believe that was part of the worthless
17  group.
18  Q  So took custody but worthless?
19  A  I think so.  It may have been part of the
20  asset -- you know, the transfer to Sebastian
21  Clarke.
22  Q  And then what about the next item here,
23  which looks like it's a promissory note from CLO
24  Holdco?
25  A  Right.  Same, also transferred to

---

250

1  Sebastian Clarke, never paid, was deemed to have
2  no value.
3  Q  Do you know what CLO Holdco is?
4  A  I don't.
5  Q  Do you know if it's affiliated with
6  Highland in any way?
7  A  I don't know for sure.
8  Q  Do you know not for sure?
9  A  I don't know.
10  Q  Okay.  Then we have Cash and then
11  Dividends Receivable - Highland Capital
12  Management, Inc., what's that?
13  A  I don't know specifically what that is.  I
14  assume the -- I mean, just reading it, the fund
15  was owed a dividend from HCMLP, but I don't know
16  any more details.  And I don't know if it paid or
17  not.
18  Q  Okay.  Do you know if it took -- if it --
19  I don't know if took custody is the right term to
20  use there, but --
21     MS. SMITH:  Objection to form.
22  A  Yeah, it may have.  I don't remember
23  seeing it ever.
24  BY MS. TOMKOWIAK:
25  Q  And going down to Highland SOHC, the first

---

251

1  securities there is something for the Delphi -- I
2  don't know if I'm saying that right -- Corp?
3  A  Yeah.  So all of these, I can save us a
4  few minutes, are -- were part of the -- so Delphi
5  down to Vertical, worthless; if Sentinel took
6  custody, would have been transferred to Sebastian
7  Clarke.
8  Q  And then skipping down, we have two more
9  lines of Cash and then there's a Tax Refund
10  Receivable of 477,637.  Is this the tax receivable
11  that you were talking about earlier?
12  A  Yes.
13  Q  Okay.  And to your knowledge, I believe
14  you testified that Sentinel received approximately
15  433 of that; is that right?
16  A  Around 430.  Again, I'm not sure of the
17  actual number and would have written off whatever
18  the difference was.
19  Q  Okay.  Do you know whether the -- for each
20  of these entities, do you know whether any of them
21  had any assets left after making these transfers
22  to Sentinel?
23  A  I don't know.
24  Q  Do you know if that was the intent?
25     MS. SMITH:  Objection to form.

---

252

1  A  I assumed that all assets were
2  contributed, but I don't know for sure.
3  BY MS. TOMKOWIAK:
4  Q  Why did you make that assumption?
5  A  To me, it wouldn't make sense to hold
6  anything back if you're trying to pay for coverage
7  and you can't pay it.
8  Q  Did you reach that conclusion on your own?
9  A  I did.
10     MS. DANDENEAU:  Were you going to say
11  something?
12     MS. SMITH:  I was going to say objection
13  if he's going to divulge privileged information.
14  BY MS. SMITH:
15  Q  Do you know whether any of these funds
16  made any attempt to settle any of their
17  outstanding liabilities prior to selling all of
18  these assets to Sentinel?
19  A  I don't know.
20     MS. SMITH:  Objection to form.
21  A  I don't know.
22  BY MS. TOMKOWIAK:
23  Q  I'm handing you what's been marked
24  previously as Exhibit 38.
25     MS. SMITH:  I don't think we have that

253

1 one.
2     MS. TOMKOWIAK:  Do we have extra copies of
3 that one?
4     MS. HARTMANN:  I don't think I have that.
5     MS. SMITH:  Oh, yeah, we did get it.
6     MS. HARTMANN:  Do you have an extra one?
7     MS. TOMKOWIAK:  Is this extra?  Is that
8 okay?
9     MS. McLAUGHLIN:  Yeah.
10     MS. SMITH:  38.
11 BY MS. TOMKOWIAK:
12   Q   Have you had a chance to review that?
13   A   Yes.
14   Q   Let me know when you're ready if you want
15 more time.
16     (Witness reviews document.)
17   A   I've reviewed it.
18 BY MS. TOMKOWIAK:
19   Q   Are you familiar with this document?
20   A   Yes.
21   Q   Is this the -- does this agreement reflect
22 the transfer of assets from Sentinel to Sebastian
23 Clarke that you've been referring to throughout
24 today?
25   A   I believe it does, yes.

254

1   Q   Are you aware of any other agreements that
2 transferred assets from Sentinel to Sebastian
3 Clarke?
4   A   I'm not aware of any other agreements.
5   Q   And just for the record, can you summarize
6 one more time what was the purpose of transferring
7 these assets from Sentinel to Sebastian Clarke?
8     MS. SMITH:  Objection to form.
9   A   The assets were causing Sentinel's audit
10 to have a qualification and Sentinel was
11 instructed by CIMA, as part of its -- I think as
12 part of the inspection or at some point in a prior
13 audit, to no longer submit financials with
14 qualifications.  So this was what the board
15 thought best to do to remove the worthless assets
16 from Sentinel's balance sheet.
17 BY MS. TOMKOWIAK:
18   Q   Who had deemed them worthless?
19   A   These were assumed to be worthless when
20 they were transferred over.  I think, like I
21 mentioned before, we tried to have that valuation
22 company value some of them and we couldn't even
23 provide enough information for them to make a
24 determination because some of them are really old.
25 So the board kind of agreed that these things need

255

1 to go.
2   Q   Do you know why Sentinel would agree to
3 accept worthless assets in exchange for -- to pay
4 for the premium?
5     MS. SMITH:  Objection to form.
6   A   I don't.  I just assumed it was part of a
7 big, again, illiquid basket of securities used to
8 pay for the policy.
9 BY MS. TOMKOWIAK:
10   Q   Did any of Sentinel's other clients use
11 illiquid securities to pay the premiums on their
12 insurance policies?
13     MS. SMITH:  Objection to form.
14   A   I don't know.
15 BY MS. TOMKOWIAK:
16   Q   Were you aware of any other clients that
17 did that?
18   A   I was not aware of any others, no.
19   Q   Did Mr. Dondero provide any advice or
20 consulting with respect to this transfer of
21 assets?
22     MS. SMITH:  Objection to form.
23   A   Not to my knowledge.
24 BY MS. TOMKOWIAK:
25   Q   Did Mr. Dondero provide any advice or

256

1 consulting to Sentinel with respect to any of its
2 assets or investments?
3   A   Not to my knowledge.
4   Q   Do you know why Sebastian Clarke was
5 chosen as the entity to transfer these assets to?
6   A   I don't recall why.
7   Q   Do you know what Sebastian Clarke did with
8 these assets after they were transferred to it?
9   A   My understanding is they're still sitting
10 at Sebastian Clarke.
11   Q   If you look at the signature page, which
12 is the last page ending in Bates 76, is that your
13 signature?
14   A   Yes.
15   Q   And we don't have a signature for
16 Sebastian Clarke.  Do you know who signed on their
17 behalf?
18     MS. SMITH:  Objection, form.
19 BY MS. TOMKOWIAK:
20   Q   Strike that.
21     Do you know if they signed this agreement?
22   A   I seem to recall it being executed, yes.
23   Q   Do you know by who?
24   A   Sebastian Clarke has independent directors
25 of its own.  They work at Summit Management.

257

1    Q   What is Summit Management?
2    A   I believe it's similar to the two
3    companies that Sentinel's independent directors
4    worked at we mentioned earlier, a professional
5    director services business.
6    Q   Is it affiliated with Highland in any way?
7    A   I don't believe so.
8    Q   Have you -- what is your understanding
9    that Sebastian Clarke still has these assets based
10   on?
11   A   I don't generally -- I don't have an
12   understanding of why.  I just assume that they're
13   still there.
14   Q   So you don't know for sure, you just
15   assume?
16   A   Correct.
17   Q   Is there a different way to get rid of
18   worthless assets other than by transferring them
19   to some other entity?
20   MS. SMITH:  Objection to form.
21   A   I'm sure you could write them off, maybe.
22   I don't know.  I'm not an accountant.
23   BY MS. TOMKOWIAK:
24   Q   I'm handing you what I will ask the court
25   reporter to mark as Exhibit 79.

258

1        (Deposition Exhibit 79 marked for
2    identification.)
3    BY MS. TOMKOWIAK:
4    Q   Let me know when you're ready.
5        (Witness reviews document.)
6    A   Okay.
7    BY MS. TOMKOWIAK:
8    Q   Are you familiar with this document?
9    A   Not particularly.
10   Q   Well, you signed it.  So were you familiar
11   with it at the time?
12   A   I'm sure I was.
13   Q   And earlier today you spoke about Sentinel
14   having a third party do an independent assessment
15   or valuation analysis of its assets.  Is this what
16   you were referring to?
17   A   Yes.
18   Q   Is there -- other than this engagement,
19   did you ever -- did you, and by you, I mean did
20   Sentinel ever engage VRC to do any other valuation
21   of assets?
22   A   It became an annual exercise.
23   Q   So annually, VRC performed a valuation?
24   A   That's right.  And I -- yeah.
25   Q   Do you know when you received -- I think

259

1    you said earlier you received multiple reports; is
2    that right?
3    A   There was generally one report per
4    security.
5    Q   And so in 2018, you received one report
6    per security?
7    A   I believe so.
8    Q   And same thing in 2019?
9    A   I believe so.
10   Q   And 2020?
11   A   I believe so.
12   Q   Had you received those reports prior to
13   your resignation in 2021?
14   A   I don't remember seeing them this year.
15   Q   How did Sentinel identify VRC?
16   A   I don't know.  I assume a referral from
17   someone, but I don't know.
18   Q   If you turn to page 3, is that your
19   handwriting?
20   A   Looks like it.
21   Q   Do you know what the handwriting means?
22   Do you know what that notation means?
23   A   Looks like wire instructions and I'll -- I
24   believe that $2,000 -- or 2,000 number was the
25   price per security valued.

260

1        MS. SMITH:  I'm going to raise another
2    objection.  It looks like y'all put the Sentinel
3    account number on here without redacting it.  So I
4    would like these to be redacted.
5        MS. TOMKOWIAK:  I don't know if that is
6    the Sentinel --
7        THE WITNESS:  It would be VRC's.
8        MS. SMITH:  Oh, it's VRC's.
9        THE WITNESS:  But still probably should
10   be.
11       MS. TOMKOWIAK:  We'll look into that, but
12   I don't think that's Sentinel's account.
13       MS. SMITH:  Okay.
14   BY MS. TOMKOWIAK:
15   Q   Okay.  And so you think that $2,000 was
16   the price of the valuation per security?
17   A   That sounds -- yeah, I believe so.
18   Q   If you look on page 2 where it says
19   Required Information in bold, do you know who
20   would be in charge of providing VRC with that
21   information?
22   A   That probably would have been -- I
23   probably would have coordinated that.
24   Q   Do you recall actually providing VRC with
25   any of that information?

261

1    MS. SMITH: I'm going to object to the
2 extent that it requires you to divulge privileged
3 communications with counsel.
4    **A  I can't speak to the specific list, but we**
5 **provided them information to perform the**
6 **valuation.**
7 **BY MS. TOMKOWIAK:**
8    Q  That information came from you?
9    **A  I would have gathered it, yeah.**
10   Q  How would you have provided it to them?
11 By mail?  By e-mail?
12   **A  Probably via e-mail.**
13   Q  Would that have come from your SAS
14 Management account?
15   **A  Most likely.**
16   Q  Do you know who you sent that information
17 to?
18   **A  Generally there were multiple people on**
19 **the e-mail, but my contact's name was Shane**
20 **Newell.**
21   Q  And can you spell that?
22   **A  I think it's N-e-w-e-l-l, but don't hold**
23 **me to that.**
24   Q  Was Shane your contact throughout the
25 entire period of time from 2017 through 2020?

262

1    **A  Yes.**
2    Q  And did you ask VRC to evaluate the CLO
3 assets that Sentinel held even prior to
4 August 2017?
5    **A  Yes.**
6    Q  Did you provide -- once Sentinel received
7 the valuation report, did Sentinel provide them to
8 anybody else?
9    **A  They would have been provided to Beecher**
10 **Carlson so they could prepare financial**
11 **statements.**
12   Q  And anybody else?
13   **A  I don't think so.**
14   Q  So earlier we looked at -- we looked at
15 two endorsements to the ATE policy that contained
16 a valuation of the assets that were provided to
17 Sentinel.  Was that number based on a valuation by
18 VRC?
19   **A  I believe so.  And I think at the year-end**
20 **audit, VRC did a valuation as of August and as of**
21 **December; so as of the time of transfer and as of**
22 **the year end, if I remember correctly.**
23   Q  You can set that aside.  Okay.  I'm
24 handing you what I will ask the court reporter to
25 mark as Exhibit 80.

263

1    (Deposition Exhibit 80 marked for
2 identification.)
3 BY MS. TOMKOWIAK:
4    Q  And then I'm also going to ask the court
5 reporter to mark this as Exhibit 81.
6    (Deposition Exhibit 81 marked for
7 identification.)
8 BY MS. TOMKOWIAK:
9    Q  So Exhibit 81 is a color copy of the page
10 that's Bates-stamped UBSPROD2752264.  Couldn't get
11 it to print in color with the Bates stamp, so --
12 but I thought having the color version available
13 might be helpful.
14   **A  Okay.**
15   Q  So that's what that is.  If you can review
16 Exhibits 80 and 81 and let me know when you're
17 ready.
18   (Witness reviews document.)
19   **A  Okay.**
20 **BY MS. TOMKOWIAK:**
21   Q  Okay.  Are you -- do you recall seeing
22 this e-mail before?  Do you recall seeing -- do
23 you recall seeing the e-mail in Exhibit 80 or do
24 you recall what's being discussed in Exhibit 80?
25   **A  I don't recall the e-mail specifically,**

264

1 **but I kind of understand what's being discussed,**
2 **yes.**
3    Q  All right.  So taking a look at it, who is
4 Tom Adamczak?
5    **A  He works for Beecher Carlson.**
6    Q  And do you understand why he's reaching
7 out to Mr. Swadley here?
8    MS. SMITH:  Objection to form.
9    **A  It looks like he's trying to gather**
10 **information on the -- I think that's the tax**
11 **refund we discussed earlier.**
12 **BY MS. TOMKOWIAK:**
13   Q  Do you know why he copied you?
14   **A  No.**
15   Q  Okay.  He says in his e-mail:  I
16 understand from discussion with Matt DiOrio that
17 the tax refund receivable of 477,637 for Highland
18 Financial Corp. was included and relates to a
19 carryover of tax credits to 2017 tax return of
20 Highland Financial Corp. (see attached).
21   Do you recall this discussion with Mr. --
22 am I pronouncing his name right; do you know?
23   **A  Adamczak, I think is right.**
24   Q  Adamczak.  Okay.
25   **A  I don't recall the specific discussion,**

---

265

1  but we would have discussed this at some point.
2  Q  Do you know why he was asking questions
3  about that tax refund at this time?
4  A  I assumed having to do with the audit.
5  Q  Okay.  And if you look at Schedule A,
6  which is the attached listing of assets, which is
7  the one that I also provided to you in color as
8  Exhibit 81.
9  A  Yes.
10  Q  Do you know who put this list together?
11  A  I don't.
12  Q  Do you know who marked it up and
13  highlighted it?
14  A  I don't.
15  Q  Was it you?
16  A  I don't believe it was.
17  Q  Do you recognize whose handwriting that
18  is?
19  A  I don't.
20  Q  Do you have any idea what H&C stands for?
21  A  I don't.
22  Q  Could it be Hare & Co; do you know?
23      MS. SMITH:  Objection to form.
24  A  Probably.  Could be, yeah.
25

---

266

1  BY MS. TOMKOWIAK:
2  Q  And do you -- and knowing what you know
3  about these assets, so with your own knowledge,
4  and I recognize that you did not do this
5  highlighting yourself, does the green and orange
6  highlighting have any significance to you?
7  A  Nothing outside of what the notes say.
8  Green, original, transfer docs, not executed;
9  Orange, Original, H&C -- which I guess is Hare &
10  Co.
11  Q  Do you understand that for the Aberdeen
12  security listed there, the transfer docs were not
13  executed?
14  A  Do I understand that?
15  Q  Do you know that?
16      MS. SMITH:  Objection to form.
17  A  I don't know one way or the other.
18  BY MS. TOMKOWIAK:
19  Q  Same thing with respect to the GSC?
20  A  I don't know.
21  Q  Same thing with respect to Highland -- I
22  assume Financial Partners?
23  A  I don't know.
24  Q  Same thing with Highland Park on the other
25  side of that?

---

267

1      MS. SMITH:  Objection, form.
2  A  I don't know.
3  BY MS. TOMKOWIAK:
4  Q  If you go back to Mr. Swadley's e-mail, he
5  says -- I'm sorry.  So then Mr. Adamczak sends
6  that e-mail to Rick and then Rick Swadley forwards
7  it to you, he copies Mr. Sevilla and Mr. Broadus.
8  Who is that?  Who is Mr. Broadus?
9  A  It's Paul Broadus.
10  Q  Broadus.
11  A  Worked in tax with Rick Swadley.
12  Q  Okay.  And Mr. Swadley writes:  I am not
13  sure -- it's in the middle of his e-mail, the
14  third sentence, maybe the fourth sentence.  He
15  says:  I am not sure who determined that HFC's
16  assets should be part of this transaction.  I was
17  only involved to the extent there would be any
18  material tax consequences of transferring the
19  assets that were ultimately identified as being
20  part of the transaction.
21      Do you know who determined that HFC's
22  assets would be part of the transaction with
23  Sentinel?
24  A  I don't.
25  Q  Did you have any discussions with

---

268

1  Mr. Swadley regarding any material tax
2  consequences of transferring the assets?
3  A  I don't believe I did.
4  Q  Did you have any conversations with
5  anybody else about any material tax consequences
6  of transferring the assets?
7      MS. SMITH:  Objection to form.
8  A  I don't believe so.
9  BY MS. TOMKOWIAK:
10  Q  Did anybody express concerns that the IRS
11  might have concerns with the transfer of the
12  assets to Sentinel?
13      MS. SMITH:  Objection to form.
14  A  Not that I recall.
15  BY MS. TOMKOWIAK:
16  Q  Or that the transfer of assets to Sentinel
17  pursuant to the purchase agreement might be
18  illegal in any way?
19      MS. SMITH:  Objection to form.
20      And I caution you not to answer to the
21  extent it reveals privileged information.
22  A  Not that I recall.
23  BY MS. TOMKOWIAK:
24  Q  You can set that aside.
25  A  Both?

---

269

1    Q  Both.  I'm handing you what we have
2  previously marked in this case as Exhibit 3.  I
3  see that you're already reviewing it.  Just let me
4  know when you're ready.
5    A  Yeah.  I've never seen this before.
6       (Witness reviews document.)
7    MS. SMITH:  Sarah, what was the number on
8  this one again?
9    MS. TOMKOWIAK:  It's No. 3.
10   Do you have another one?
11   MS. SMITH:  Yeah, Shannon, if you have
12 another one.  Thank you.
13      (Witness reviews document.)
14   A  Okay.  I didn't read every word, but I
15 think I get the gist of it.
16 BY MS. TOMKOWIAK:
17   Q  Have you ever seen this document before?
18   A  I have not.
19   Q  Had you ever heard at Highland that any
20 analysis had been done regarding the tax
21 consequences of the Sentinel acquisition of those
22 assets?
23   MS. SMITH:  Objection.
24      I'm going to caution you not to divulge
25 any privileged information.

270

1    A  I never heard that at Highland, no.
2  BY MS. TOMKOWIAK:
3    Q  Did you ever hear that at Sentinel?
4    A  No.
5    Q  Do you know who Shawn Raver is?
6    A  I've heard the name.
7    Q  But you don't know who he is?
8    A  I've never met him before.
9    Q  Okay.  Do you know that he worked with
10 Mr. Swadley?
11   A  That sounds right.
12   Q  If you look at page 2 of the document, and
13 if you look at the last paragraph, it says:  The
14 aggregate purchase price paid by Sentinel for the
15 assets was $25 million.
16      Do you see that?
17   A  Yes.
18   Q  Do you agree with that?
19   A  Do I agree that Sentinel paid $25 million
20 for the assets?
21   Q  Yeah.
22   MS. SMITH:  Objection, form.
23   A  I guess when the policy was put in place,
24 yeah.
25

271

1  BY MS. TOMKOWIAK:
2    Q  Did that change at some point in time?
3    A  Yes.
4    Q  And it changed through those endorsements
5  that we looked at earlier?
6    A  That's right.
7    Q  Is that how you would characterize it,
8  that Sentinel paid $25 million for the assets?
9    MS. SMITH:  Objection to form.
10   A  That's not how I would -- I think of it,
11 but...
12 BY MS. TOMKOWIAK:
13   Q  How do you think of it?
14   A  That Sentinel accepted a number of assets,
15 a basket of securities, whatever you want to call
16 it, in exchange for a liability policy.
17   Q  The next sentence says:  The aggregate
18 fair market value of the assets on the date of the
19 transaction was 105,647,679.
20      Do you see that?
21   A  I do.
22   Q  Have you ever seen that figure before?
23   MS. SMITH:  Objection to form.
24   A  I believe it was -- I believe I learned of
25 it in reviewing the complaint, if I remember

272

1  correctly, that we were allowed to review.
2  BY MS. TOMKOWIAK:
3    Q  Prior to reviewing the complaint, did you
4  ever receive any documentation or any
5  communication indicating that the fair market
6  value of the assets that were transferred to
7  Sentinel in exchange for the insurance policy was
8  approximately 105 million?
9    A  No.
10   MS. SMITH:  Objection.
11      You can answer if it does not reveal any
12 privileged information from counsel for Sentinel.
13   A  No.
14 BY MS. TOMKOWIAK:
15   Q  Do you know where Mr. Raver would have
16 gotten this number?
17   A  I have no idea.
18   Q  In your capacity as Sentinel's director,
19 if the insureds believed that the fair market
20 value of the assets that were transferred were
21 over $105 million, would you have wanted to know
22 that?
23   MS. SMITH:  Objection to form.
24   A  In my capacity as a director, would I have
25 wanted to know if the insureds believed their

273

1 assets were worth 105 million?
2 **BY MS. TOMKOWIAK:**
3    Q  Yes.
4    **A  I think it would have been irrelevant**
5 **after we had our own third-party valuation done.**
6    Q  Would you have expected them to negotiate
7 for a higher limit of indemnity if they believed
8 that what they were providing to Sentinel was
9 greater than the coverage amount?
10      MS. SMITH:  Objection to form.
11   **A  I'm not sure.**
12 **BY MS. TOMKOWIAK:**
13   Q  Are you aware of any other insurance
14 policy issued by Sentinel where the purchase price
15 exceeds the amount of coverage?
16      MS. SMITH:  Objection to form.
17   **A  I'm not aware of any, no.**
18 **BY MS. TOMKOWIAK:**
19   Q  Are you okay to keep going?
20   **A  Yeah.**
21      MS. TOMKOWIAK:  You okay?
22      THE WITNESS:  Everybody else?
23      MS. SMITH:  We all good?
24      MS. TOMKOWIAK:  Are you good?
25

274

1 BY MS. TOMKOWIAK:
2    Q  I'm handing you what I will ask the court
3 reporter to mark as Exhibit 82.
4      (Deposition Exhibit 82 marked for
5 identification.)
6      (Witness reviews document.)
7    **A  Okay. I've reviewed.**
8 **BY MS. TOMKOWIAK:**
9    Q  Okay.  So earlier we discussed the fact
10 that one of the assets that was transferred to
11 Sentinel as part of the premium payment was an
12 interest from CDO to -- in this Multi Strat fund.
13 Do you recall that?
14   **A  Yes.**
15   Q  Okay.  And you said that you believed that
16 Sentinel had requested those shares to be
17 redeemed?
18   **A  Those and the rest of Sentinel's**
19 **investment in Multi Strat, yes.**
20   Q  Okay.  And if you look at the document
21 ended Bates 898, is this the request for
22 redemption of shares that you were referring to?
23   **A  Yes, it looks like it.**
24   Q  Is that your handwriting?
25   **A  I believe it is.**

275

1    Q  So to the best of your belief, you're the
2 one that filled this out?
3    **A  That's right.**
4    Q  And then did you send it to somebody?
5    **A  I mean, it had to be submitted somewhere.**
6 **I just don't recall where.**
7    Q  So you don't recall if you sent this to
8 somebody by e-mail or mail or who you sent it to?
9    **A  I'm sure it would have been an e-mail**
10 **scan.**
11   Q  Would you have done that yourself or would
12 you have asked somebody to do it for you?
13   **A  I would have done it myself.**
14   Q  Did you have an assistant at Highland?
15   **A  No.**
16   Q  Did you have an assistant that -- well,
17 for SAS?
18   **A  No.**
19   Q  Or for Sentinel?
20   **A  No.**
21   Q  Okay.  And then did you receive any
22 response to this letter?
23      MS. SMITH:  Objection, form.
24   **A  To the redemption letter?  I don't recall.**
25

276

1 BY MS. TOMKOWIAK:
2    Q  You don't recall if you did or not?
3    **A  I don't recall receiving anything.**
4    Q  At the top of this e-mail, Mike
5 Throckmorton writes to you, Helen Kim, Surgent and
6 David Klos, and he says:  It appears the transfer
7 from CDO Opportunity Fund to Reinsurance happened
8 in August 2017, but I have not been able to find
9 any transfer docs.
10      Do you know -- earlier today you indicated
11 that you believed that interest had been
12 transferred to Sentinel in August 2017; is that
13 right?
14   **A  Yes.**
15   Q  Do you know what documentation would exist
16 in that respect?
17   **A  If you'll recall, there was -- that**
18 **Sentinel Re Holdings that's mentioned in this**
19 **e-mail also held some interest in Multi Strat and**
20 **I don't remember the specifics, I just remember**
21 **trying to sort it out and have it all registered**
22 **into Sentinel Reinsurance's name.  So if they were**
23 **looking for Sentinel Reinsurance and it was**
24 **actually in Sentinel Re, because the names are**
25 **similar, Sentinel Re Holdings, or whatever it's**

277

1  called, that could be it.
2     Q  Okay.  But to the best of your belief,
3  that transfer did happen in August 2017?
4     A  Yes.
5     Q  Okay.  And do you know if you submitted --
6  this letter to me looks like it's incomplete
7  because it's not signed or dated.  Would you have
8  done that before you sent it in?
9        MS. SMITH:  Objection to form.
10    A  I believe a full -- fully signed filled
11  out form was submitted.
12  BY MS. TOMKOWIAK:
13    Q  And did you keep a copy of that?
14    A  I don't think so.
15    Q  Do you know whether you would have signed
16  this?
17    A  I may have or it may have been another
18  director, other directors.  They may have filled
19  it out, provided and signed.  I just don't recall.
20    Q  Were you authorized to sign documents on
21  Sentinel's behalf?
22        MS. SMITH:  Objection to form.
23    A  Yes.
24  BY MS. TOMKOWIAK:
25    Q  How did Sentinel decide that it -- without

278

1  revealing the content of any conversations you had
2  with counsel, how did Sentinel decide that it
3  wanted to redeem its shares in Multi Strat?
4     A  It was an idea I had, just uncertainty
5  with bankruptcy, with Highland filing bankruptcy,
6  what would happen with Multi Strat.  So I flagged
7  it for the directors and suggested that we redeem
8  and they agreed.
9     Q  Okay.
10       MS. TOMKOWIAK:  Why don't we go ahead and
11  take a break.
12       THE VIDEOGRAPHER:  We are off the record
13  at 5:08 p.m.
14       (Recess taken from 5:08 p.m. CDT to
15  5:31 p.m. CDT)
16       THE VIDEOGRAPHER:  The time is 5:31 p.m.
17  We are back on the record.
18  BY MS. TOMKOWIAK:
19    Q  Mr. DiOrio, you testified before the break
20  that certain of the promissory notes that were
21  transferred to Sentinel were deemed worthless.  Do
22  you recall that?
23    A  Yes.
24    Q  And how -- how were they deemed worthless?
25    A  I don't believe they ever paid, made any

279

1  payments.
2     Q  Did Sentinel ever try to renegotiate the
3  terms of those notes with anyone?
4     A  Not that I recall.
5     Q  Okay.  So if a payment wasn't made on a
6  note, then Sentinel deemed it to be worthless?
7     A  It was a year's worth of nonpayment.
8     Q  Were any of those notes past due?
9     A  I don't believe so.
10    Q  Okay.  So Sentinel deemed them to be
11  worthless before the maturity date?
12    A  I think so.
13       MS. SMITH:  Objection to form.
14  BY MS. TOMKOWIAK:
15    Q  Why?
16    A  Again, there was no -- there were no
17  payments coming in.  Sentinel knew nothing really
18  about the substance of the notes.
19    Q  Did Sentinel attempt to reach out to the
20  maker of those notes to figure out why they
21  weren't making payments and whether they would
22  make any payments in the future?
23    A  I don't recall.
24    Q  And in your role at managing investment
25  assets for Sentinel, don't you think that would be

280

1  something Sentinel would want to do?
2        MS. SMITH:  Objection to form.
3     A  I'm not sure.
4  BY MS. TOMKOWIAK:
5     Q  If there was a way for Sentinel to get
6  more assets instead of writing something off or
7  deeming it worthless, don't you think that would
8  be worthwhile to do?
9        MS. SMITH:  Objection to form.
10    A  Conceptually, sure.
11  BY MS. TOMKOWIAK:
12    Q  Does Sentinel still hold those notes
13  today?
14    A  Which notes?
15    Q  Well, for example, the -- I think it was
16  about a $32 million promissory note.  Does it
17  still hold that one?
18       MS. SMITH:  Objection to form.
19    A  I believe that was transferred to
20  Sebastian Clarke.
21  BY MS. TOMKOWIAK:
22    Q  And to your knowledge, I think you
23  testified that Sebastian Clarke still would hold
24  that today?
25       MS. SMITH:  Objection to form.

281

1    A  I believe so.
2    BY MS. TOMKOWIAK:
3    Q  I'm going to hand you what's been
4    previously marked as Exhibit 61.  So Exhibit 61,
5    there's a black-and-white copy and then there is a
6    color copy attached to the end that I understand
7    that that was what was agreed upon yesterday.
8    Maybe agreed upon is the wrong word, but the same
9    document was used yesterday in that format so that
10   you could see the color version as well.
11   A  Okay.
12   Q  Let me know when you're ready.
13       (Witness reviews document.)
14   A  I'm sorry.  The second set is just the
15   same stuff but in color; is that correct?
16   BY MS. TOMKOWIAK:
17   Q  Yeah.
18   A  Okay.  Does it matter which one I look at?
19       MS. SMITH:  Use the colored one because
20   she's going to -- she may ask you some questions
21   and the shading doesn't show up on the black and
22   white.
23       THE WITNESS:  Understood.  Let me have a
24   quick look, then.
25   A  Sorry, should have started with these.

282

1    BY MS. TOMKOWIAK:
2    Q  That's okay.
3        (Witness reviews document.)
4    A  Okay.  I think I'm good.
5    BY MS. TOMKOWIAK:
6    Q  Okay.  With respect to the attachments,
7    have you ever seen that before or a chart like
8    that?
9        MS. SMITH:  Objection to form.
10   A  I don't recall ever seeing any of these
11   charts before.
12   BY MS. TOMKOWIAK:
13   Q  Do you recall seeing any other breakdown
14   of investors in Multi Strat?
15   A  I don't.
16   Q  Okay.  If you look at the version that
17   says Credit Ops Investors by NAV.  You see that?
18   A  Yeah, I have it open.
19   Q  Okay.  Are you able to discern what the
20   shading on this chart means?
21   A  I'm not.
22   Q  Okay.  From the math, it looks like that
23   the nonshaded lines are the affiliates, the
24   Highland affiliates, and the shaded lines are
25   Highland affiliates -- I'm sorry, and the shaded

283

1    lines are not.  Do you agree with that?
2        MS. SMITH:  Objection to form.
3    A  I don't know.
4    BY MS. TOMKOWIAK:
5    Q  Do you know if Starck, Ltd., for example,
6    was a Highland affiliate?
7    A  I don't believe I ever heard of Starck,
8    Ltd., before.
9    Q  What about The Dugaboy Investment Trust?
10   A  I've heard the name.
11   Q  Do you know if that's a Highland
12   affiliate?
13       MS. SMITH:  Objection to form.
14   A  I don't know much about it, so I don't
15   know.
16   BY MS. TOMKOWIAK:
17   Q  What about Mark Okada?  Do you know if
18   that's -- he's a Highland affiliate?
19       MS. SMITH:  Objection to form.
20   A  He was a former owner or co-owner.
21   BY MS. TOMKOWIAK:
22   Q  Okay.  And what about Sentinel Re?  Would
23   you consider that to be a Highland affiliate?
24       MS. SMITH:  Objection to form.
25   A  I don't believe it was.

284

1    BY MS. TOMKOWIAK:
2    Q  Okay.  Why not?
3    A  Why do I believe it wasn't an affiliate?
4    Q  Yes.
5    A  As I think I said earlier -- well,
6    Sentinel Re Holdings also doesn't exist anymore.
7    Is that what you were talking about?
8    Q  No.  I mean, I don't -- you say it doesn't
9    exist anymore.  This looks to me like it's dated
10   October 30th, 2017.  Did it exist at the time?
11   A  Yes, but -- yes, it did.
12   Q  Okay.  So at the time was that a Highland
13   affiliate?
14   A  I don't --
15       MS. SMITH:  Objection to form.
16   A  I don't think it was.
17   BY MS. TOMKOWIAK:
18   Q  And why not?
19   A  Again, not an attorney, but it's, you
20   know, a stand-alone Cayman company.
21   Q  Is that your same answer with respect to
22   Sentinel Reinsurance?
23   A  Yes.
24   Q  Mr. Colbert in the e-mail attachment sends
25   this to Mr. Parker, amongst other folks, and says:

285

1  As discussed, please see the updated file with
2  Sentinel being presented as an affiliated
3  investor.
4       Earlier today you mentioned that there was
5  a big to-do, I think you said, I think those were
6  your words, over Sentinel being presented as an
7  affiliated investor.  Is this what you were
8  referring to?
9    **A  This is not what I was referring to.**
10   Q  Okay.  What were you referring to?
11   **A  I think as I stated earlier, it had**
12 **something to do with one of the real estate**
13 **investments Highland -- sorry, Sentinel held.**
14   Q  Okay.  And just to refresh, since that was
15 this morning, what was the big to-do?
16   **A  That it was classified on some spreadsheet**
17 **as an affiliate and ultimately through compliance,**
18 **it was determined it was not an affiliate.**
19   Q  And when you say through compliance, who
20 are you referring to?
21   **A  I believe it was Lauren Thedford and**
22 **Tom Surgent.**
23   Q  How did you come to learn about this real
24 estate investment and this issue with Sentinel
25 being presented as an affiliated investor?

286

1    **A  I don't recall how it came to my**
2  **attention.**
3    Q  Do you recall approximately when this was?
4    **A  Probably summer of maybe -- '18, maybe.**
5  **Maybe '19.  I'm not entirely sure.**
6    Q  Do you recall who told you about it?
7    **A  I don't.**
8    Q  Do you recall anything at all about how
9  you came to learn about this?
10      MS. SMITH:  Objection to form.
11   **A  I don't remember how it started, but I**
12 **know it ultimately -- there was a conversation, I**
13 **believe I spoke to Ms. Thedford and then**
14 **Mr. Surgent at some point.**
15 **BY MS. TOMKOWIAK:**
16   Q  So why were you speaking to Ms. Thedford
17 about this?
18   **A  I think because she knew I worked --**
19 **provided service to Sentinel.**
20   Q  So was she informing you of this
21 conclusion?
22   **A  Informing me of what conclusion?**
23   Q  That Sentinel was not an affiliated
24 investor.
25   **A  I don't believe so.**

287

1    Q  Okay.  So then what was the context for
2  that conversation?
3    **A  Again, just that it was on a sheet or**
4  **something that said Sentinel was listed as an**
5  **affiliate.**
6    Q  Did you see the sheet?
7    **A  Probably.**
8    Q  Do you have any other details about the
9  sheet?
10   **A  I don't, none that I can recall.**
11   Q  No other context for why people were
12 working on the sheet or why people were upset that
13 Sentinel was being presented as an affiliate?
14      MS. SMITH:  Objection to form.
15   **A  None that I recall.**
16 **BY MS. TOMKOWIAK:**
17   Q  Do you know why that mattered?
18      MS. SMITH:  Objection to form.
19   **A  I don't.**
20 **BY MS. TOMKOWIAK:**
21   Q  Did you ask?
22   **A  Probably not.**
23   Q  Why not?
24   **A  I don't recall.**
25   Q  Well, did you think it was important for

288

1  you to know as a director of Sentinel whether or
2  not Sentinel was an affiliate of Highland or not?
3    **A  Yeah.  My general understanding is that it**
4  **was not an affiliate.**
5    Q  Okay.  But you don't know why that
6  mattered?
7       MS. SMITH:  Objection to form.
8    **A  Why it mattered whether it was or was not**
9  **an affiliate?  I don't know why it matters.**
10 **BY MS. TOMKOWIAK:**
11   Q  Did Ms. Thedford tell you why that
12 mattered?
13   **A  I don't believe so.**
14   Q  Did Mr. Surgent tell you why that
15 mattered?
16   **A  I don't believe so.**
17   Q  If you had already talked to Ms. Thedford,
18 why did you need to talk to Mr. Surgent?
19      MS. SMITH:  Objection to form.
20   **A  Generally anything compliance related**
21 **would lead up to Mr. Surgent.  He was the chief**
22 **compliance officer.**
23 **BY MS. TOMKOWIAK:**
24   Q  So did you approach him about this?
25   **A  I don't remember.**

289

1    Q  Did he approach you?
2    A  Probably not.
3    Q  Okay.  So you probably approached him?
4    A  Ms. Thedford may have approached him, I
5  may have approached him.  I don't recall.
6    Q  Was Ms. Thedford there when you spoke to
7  Mr. Surgent?
8    A  I don't recall.
9    Q  And what did Mr. Surgent say to you?
10   A  I think the ultimate outcome was that
11  Sentinel Reinsurance was not an affiliate, if I
12  remember correctly.
13   Q  Was this a meeting in his office?
14   A  Maybe, but I sat right outside his office,
15  so people were in and out.
16   Q  But you recall this being in person?
17   A  I believe so.
18   Q  And do you know how long that conversation
19  lasted?
20   A  I don't.
21   Q  Five minutes?  An hour?  Two hours?
22   A  It was probably short.
23   Q  Okay.  And do you recall if he provided
24  you any reasoning for that conclusion?
25   A  I don't recall.

290

1    Q  Did he ever provide you with that
2  conclusion in writing?
3    A  I don't remember.  I don't know.
4    Q  Did you ask for it to be in writing?
5    A  I don't know.
6    Q  Did you do anything with that information?
7    A  Not that I recall.
8    Q  So then do you know why it was being
9  provided to you?
10   A  Why it was being provided to me?  Why what
11  was being provided to me?
12   Q  Why did you need to know whether or not
13  Sentinel was an affiliate?
14   A  Again, I think it was a question that came
15  up somehow and I think it was generally known that
16  I worked on Sentinel -- or provided service for
17  Sentinel Reinsurance, so...
18   Q  And you don't recall how the question came
19  up?
20   A  I don't.
21   Q  Did you ever ask whether or not Sentinel
22  was an affiliate?
23   A  It was my understanding that it was not.
24   Q  And was that understanding based on
25  anything other than the conversations that you had

291

1  with Ms. Thedford or Mr. Surgent?
2    A  Not that I recall.
3    Q  Did you discuss that with Scott Ellington?
4    A  When?
5    Q  Any time.
6    A  I had heard him say it's not an affiliate.
7    Q  When did you hear him say that?
8    A  I heard it -- I don't remember
9  specifically, but something I had heard before.
10   Q  Can you put any time frame around that?
11  Was that before you -- after you became a director
12  of Sentinel?
13   A  Most likely.
14   Q  And you don't recall any other context?
15   A  I don't.
16   Q  Okay.  I'm handing the court reporter a
17  document to mark as Exhibit 83.  The Bates number
18  got cut off at the bottom, so I wrote it on there
19  just so that we can refer to it in that way and we
20  can replace the official copy with that version.
21       MS. TOMKOWIAK:  I only have two of those.
22  I'm sorry.
23       (Deposition Exhibit 83 marked for
24  identification.)
25       (Witness reviews document.)

292

1    A  Okay.
2  BY MS. TOMKOWIAK:
3    Q  Okay.  Do you -- are you familiar with
4  these documents?
5    A  I just refamiliarized myself, yes.
6    Q  Okay.  Is that your signature on the
7  signature of transfer?
8    A  I believe it is.
9    Q  Okay.  And do you know why in
10  February 2019, you issued a power of attorney to
11  transfer shares in the Greenbriar CLO and
12  Stratford CLO to CIBC bank?
13   A  I believe this was to register -- or to
14  make it so the cash distributions went directly to
15  CIBC.
16   Q  Okay.  Prior to this time, where were the
17  cash distributions going to?
18   A  They would be received at some custody
19  account in somewhere -- I think State Street, I
20  think is where it went.
21   Q  Okay.  And I think earlier today we
22  testified that there -- you testified that there
23  had been an issue with respect to certain of the
24  certificates with respect to the Greenbriar CLO;
25  is that right?

293

1   A   That's right.
2   Q   So at this point in time, did you believe
3   that Sentinel Reinsurance had those certificates?
4   A   This is a different amount of Greenbriar.
5   I'm not sure if it's the same share class or not.
6   Q   Okay.  So this is one that you believe
7   Sentinel did actually take and have custody of?
8       MS. SMITH:  Objection to form.
9   A   I don't know where the actual shares went,
10  but I believe this paperwork was to just directly
11  make sure the cash distributions directly went to
12  Sentinel's custody account.
13  BY MS. TOMKOWIAK:
14  Q   And did they, in fact, at this time go to
15  Sentinel's CIBC account?
16  A   I believe they did.
17  Q   Do you know whose signature that is,
18  witness to signatures of transfer?
19  A   I don't.
20  Q   Do you know why this document was sitting
21  on your desk in February of 2021?
22      MS. SMITH:  Objection, form.
23  A   I don't.
24  BY MS. TOMKOWIAK:
25  Q   Do you recall reviewing it in February of

294

1   2021?
2   A   I don't.
3   Q   Do you know how the par value is
4   determined?
5       MS. SMITH:  Objection to form.
6   A   The par value?
7   BY MS. TOMKOWIAK:
8   Q   Uh-huh.
9   A   I believe it's determined when the
10  securities are established.
11  Q   Okay.  So where would you have gotten that
12  information?
13  A   It may say it on the certificates.  I
14  think it says it on there.
15  Q   Okay.  So do you recall going to look at
16  the certificates for that information?
17  A   I don't recall going to look at it, but I
18  think all the CLOs had the same one cent par
19  value.
20  Q   Do you know who you appointed as your
21  lawful attorney?  Looks to us like that was shaded
22  out.
23      MS. SMITH:  Objection to form.
24  A   I don't.
25

295

1   BY MS. TOMKOWIAK:
2   Q   You don't recall who you -- if you wrote
3   anybody in that line and if so, who?
4   A   Right.
5   Q   Do you have any reason -- is there any
6   reason why you would have redacted or shaded out
7   that information?
8   A   No.
9       MS. SMITH:  Objection to form.
10  A   None that I can think of.
11  BY MS. TOMKOWIAK:
12  Q   Okay.  You can set that aside.
13  Mr. DiOrio, do you know who's paying for your
14  counsel's fees in this matter?
15  A   I don't.
16  Q   You don't?  Are you?
17  A   I haven't -- I don't think so.  I haven't
18  paid anything.
19  Q   Okay.  And you don't know if you will have
20  to pay anything?
21  A   That's right.
22  Q   Is your employer paying for your counsel's
23  fees?
24  A   My current employer?
25  Q   Yes.

296

1   A   I don't know.
2   Q   What about your former employer?
3   A   I don't know.
4   Q   Do you know when you're going to find out?
5   A   I don't.
6       MS. TOMKOWIAK:  I am handing the court
7   reporter a document to mark as Exhibit 83 -- 84.
8       I only have two of these too.  I'm sorry.
9       (Deposition Exhibit 84 marked for
10  identification.)
11  BY MS. TOMKOWIAK:
12  Q   Let me know when you're ready.
13      (Witness reviews document.)
14  A   Okay.
15  BY MS. TOMKOWIAK:
16  Q   Have you seen a version of this
17  presentation before?
18  A   Yes.
19  Q   Do you know who drafted it?
20  A   I believe it was a collaborative effort.
21  Q   Who was involved in the collaboration?
22  A   It would have been myself and Mr. Sevilla
23  and possibly Katie Irving.
24  Q   Okay.  What was Katie Irving's role with
25  respect to Sentinel?

297

```
1    A  She didn't really have one, generally.
2    Q  Why is she helping to put together this
3 presentation?
4    A  I'm not entirely sure.
5    Q  You --
6    A  I don't remember.
7    Q  Well, you had a chance to flip through it.
8 Are there any parts of this presentation that
9 would have -- you believe would have come from
10 Ms. Irving specifically?
11   A  No.
12   Q  Who's Lauren Baker?
13   A  She is -- she was at one point an admin at
14 Highland now I think, and then she moved to PR,
15 marketing, something like that.
16   Q  So when Katie is asking Lauren to help put
17 these together, you believe that Lauren's job was
18 just more administerial, just to bind these
19 presentations together?
20       MS. SMITH:  Objection to form.
21   A  I believe so.
22 BY MS. TOMKOWIAK:
23   Q  Do you believe that this is the final
24 version of the presentation?
25   A  I can't say one way or the other.  It
```

298

```
1 doesn't indicate draft or otherwise.
2    Q  Did you typically wait until you had the
3 final version of a presentation to have it bound?
4    A  Generally, I think so.
5    Q  So again, do you know why Ms. Irving would
6 have been helping you put this presentation
7 together?
8    A  She --
9       MS. SMITH:  Objection, form.
10   A  She may have just been helping us get it
11 bound.  If Lauren Baker, now Short, wasn't doing
12 it -- or was doing it, that would mean that the
13 legal group admin was out.
14 BY MS. TOMKOWIAK:
15   Q  Was Katie Irving in the legal group at the
16 time?
17   A  Yes.  In private equity.
18   Q  Okay.  Is there a reason that you or
19 Mr. Sevilla couldn't have e-mailed Ms. Baker and
20 asked her to print this out or bind it and print
21 it out?
22   A  I don't want to speak for Mr. Sevilla, but
23 the only admin I knew at Highland was Sarah
24 Goldsmith, and I wouldn't have felt comfortable
25 just randomly e-mailing a different admin and
```

299

```
1 asking her to print something.
2    Q  Okay.  So Ms. Irving had a relationship
3 with Ms. Baker.  I mean, was that your
4 understanding?
5    A  More so than I would have, yeah.
6    Q  Okay.  So you believe that Ms. Baker would
7 have been helping you out because Ms. Goldsmith
8 might have been out of the office; is that what
9 you're saying?
10   A  That's right.
11   Q  And do you -- did you -- did you actually
12 give this presentation to CIMA?
13   A  I believe we did, yes.
14   Q  Okay.  And who is we?
15   A  I believe myself and Mr. Sevilla.
16   Q  Anybody else?
17   A  I don't recall if anyone else was in
18 there.
19   Q  And was this an in-person meeting?
20   A  Yes.
21   Q  Did Mr. Sevilla travel with you to the
22 Cayman Islands to provide -- to give presentations
23 to CIMA?
24       MS. SMITH:  Objection to form.
25   A  He did on this one, yes.
```

300

```
1 BY MS. TOMKOWIAK:
2    Q  Did he go on any other ones -- let me
3 strike that.
4       Did Mr. Sevilla -- is that the only time
5 that he traveled with you to the Cayman Islands
6 with respect to -- well, is that the only time
7 that you and Mr. Sevilla traveled to the Cayman
8 Islands together?
9       MS. SMITH:  Objection to form.
10   A  No.  I mentioned before, we met with CIMA
11 twice so he would have attended both meetings.
12 BY MS. TOMKOWIAK:
13   Q  Okay.  Before, you talked about you and
14 Mr. Ellington, so I wasn't aware that Mr. Sevilla
15 was there.  Did anybody else besides you,
16 Mr. Ellington and Mr. Sevilla go to the Cayman
17 Islands to meet with CIMA?
18   A  Yes.  And you didn't ask before, which is
19 why I didn't offer it.  Katie Irving would have
20 been on those trips as well.
21   Q  Okay.  Anybody else?
22   A  I believe that's it.
23   Q  Okay.  So I will ask again, what was
24 Ms. Irving's role with respect to Sentinel?
25   A  She really didn't have one.
```

---

**301**

1    Q   Then why did she travel with you to the
2  Cayman Islands?
3    A   I don't know.
4    Q   Just wanted to go to the Cayman Islands?
5    A   I don't --
6         MS. SMITH:  Objection to form.
7    A   I don't set the roster for trips.
8  BY MS. TOMKOWIAK:
9    Q   Okay.  Who did?
10   A   Generally Mr. Ellington.
11   Q   Okay.  So is it your -- to the best of
12 your knowledge, Mr. Ellington invited Ms. Irving
13 to these trips?
14        MS. SMITH:  Objection to form.
15   A   I don't know.
16 BY MS. TOMKOWIAK:
17   Q   So Ms. Irving just showed up at the
18 airport and you have no idea why?
19        MS. SMITH:  Objection to form.
20   A   I don't want to assume.  I didn't hear an
21 invite.  I didn't hear an invite extended.  She
22 most likely didn't just show up at the airport.
23 BY MS. TOMKOWIAK:
24   Q   You didn't ask her, hey, why are you here?
25   A   No.

---

**302**

1    Q   Okay.  Did she attend the meeting?
2    A   I believe so.
3    Q   Okay.  Did she just sit there?
4         MS. SMITH:  Objection to form.
5    A   I believe so.
6  BY MS. TOMKOWIAK:
7    Q   Who spoke at these meetings?
8    A   Myself and Mr. Sevilla.
9    Q   Mr. Ellington didn't speak?
10   A   I don't remember him speaking.
11   Q   Who paid for Ms. Irving to travel to these
12 meetings that she didn't speak at?
13        MS. SMITH:  Objection to form.
14   A   I'm not -- I'm not entirely sure who paid
15 for her --
16 BY MS. TOMKOWIAK:
17   Q   Is that -- sorry.  Go ahead.
18   A   I'm not sure who paid for her
19 specifically.
20   Q   Is that an expense that was submitted to
21 Sentinel's directors for approvement, for their
22 approval?
23   A   Was what an expense?
24   Q   Her trips to the Cayman Islands.  Her
25 hotels, her flights, her meals, anything like

---

**303**

1  that, were those expenses submitted to Sentinel's
2  independent directors for approval?
3    A   I never processed an expense for
4  Ms. Irving that I can remember or submit an
5  expense.
6    Q   What about for Mr. Sevilla?
7    A   Same.
8    Q   What about for yourself?  I believe, but
9  maybe I'm wrong, let me know, that you submitted
10 your own expenses for these trips to
11 Sentinel [sic]  Is that correct or no?
12        MS. SMITH:  Objection to form.
13   A   Once I had one expense.  Generally
14 Mr. Ellington would pay for everything and just --
15 he would be reimbursed.
16 BY MS. TOMKOWIAK:
17   Q   So once you submitted -- one time you
18 submitted to Sentinel expenses for a trip to the
19 Cayman Islands; is that right?
20   A   That was for a dinner.
21   Q   For a dinner.  Is that the only
22 Sentinel-related expense that you incurred
23 personally that you submitted to Sentinel's
24 directors for reimbursement?
25   A   That's the only one I can think of, yeah.

---

**304**

1    Q   Okay.  So every other time that you went
2  to Cayman Islands for Sentinel matters,
3  Mr. Ellington paid all of your expenses?
4    A   That's correct.
5    Q   And you don't know if he also paid
6  Mr. Sevilla's expenses?
7    A   I believe he paid for the group or -- paid
8  for the group.
9    Q   Okay.  So earlier you testified that
10 Sentinel would have paid if these trips were
11 Sentinel related.  So were you just mistaken
12 earlier?
13   A   How would I be mistaken?
14   Q   Well, I asked you did Sentinel -- when we
15 were talking about the Cayman trips earlier today,
16 I asked you did Sentinel pay for them and you said
17 yes, they would have paid if it was Sentinel
18 related.
19   A   Right.
20   Q   Okay.  So were these trips -- these trips
21 to talk to CIMA about Sentinel were not Sentinel
22 related?
23   A   They were.
24   Q   Okay.
25   A   Mr. Ellington would pay and be reimbursed.

305

1  Q  So Mr. Ellington submitted expenses to
2  Sentinel and then Sentinel would approve them?
3  **A  He would submit them to me and then I**
4  **would submit them to -- again, the same process we**
5  **outlined earlier.**
6  Q  Okay.
7  **A  And it was all up to the directors to**
8  **approve them.**
9  Q  So on both of the trips in 2019 to meet
10 with CIMA, did the four of you attend both of
11 those trips?
12 **A  I believe so.**
13 Q  And during both of those meetings, were
14 you and Mr. Sevilla the only persons who
15 presented?
16 **A  That's my recollection, yeah.**
17 Q  How long did those meetings last?
18 **A  Probably an hour or so.**
19 Q  Okay.  How long were you in the Cayman
20 Islands for?
21 **A  I don't recall.**
22 Q  Did you fly in for the meeting and fly out
23 that same day?
24 **A  No.**
25 Q  On any of your other trips to the Cayman

306

1  Islands with Mr. Ellington, did anybody else
2  attend with you?
3  **A  I went once with Mr. Ellington and**
4  **Mr. Surgent.**
5  Q  Okay.  And what was the purpose of that
6  trip?
7  **A  A conference.**
8  Q  For what?
9  **A  Like alternative investments.**
10 Q  Any other trips that you can think of
11 where you went to the Cayman Islands with
12 Mr. Ellington where somebody else attended?
13 **A  No one outside of the group we mentioned.**
14 Q  Okay.  So Ms. Irving is sending this to
15 Ms. Baker on Tuesday, August 6th.  Do you see
16 that?
17 **A  Yes.**
18 Q  Okay.  And the presentation is dated
19 August 7th, 2019.  So was Ms. Baker binding them
20 in the next hour for you to take on the plane with
21 you?
22 **A  Possibly.**
23 Q  Do you recall taking presentations with
24 you on the plane to CIMA?
25 **A  Yes.**

307

1  Q  Okay.  So you went to CIMA the next day.
2     MS. SMITH:  Objection, form.
3  BY MS. TOMKOWIAK:
4  Q  If you look at Slide 2, it refers to a
5  meeting with CIMA on June 25th, 2019.
6  **A  I see that.**
7  Q  Okay.  And is that the first meeting that
8  you reference where the four of you, you,
9  Mr. Sevilla, Ms. Irving and Mr. Ellington traveled
10 to the Cayman Islands to meet with CIMA?
11 **A  I think so.**
12 Q  And August 7th was the second meeting?
13 **A  I think so.**
14 Q  And were there any other meetings with
15 CIMA in the Cayman Islands that year?
16 **A  Not that I'm aware of.**
17 Q  Did CIMA ask you to come back to the
18 Cayman Islands for a follow-up meeting?
19 **A  I don't recall if they asked or not.**
20 Q  Who was present at this meeting from CIMA?
21 **A  I'm not going to remember their names, but**
22 **people from the insurance division.**
23 Q  How many?
24 **A  Three or four.**
25 Q  And did you put your presentation on a

308

1  screen for them?
2  **A  I think we had printouts.**
3  Q  Bound printouts?
4  **A  (Nods head.)**
5  Q  Okay.  On Slide 3, Slide 3 is UBS versus
6  Insureds.  Do you agree that relates -- that this
7  slide is referencing the UBS litigation that's the
8  subject of the ATE policy?
9  **A  Yes.**
10 Q  Okay.  Who would have put the -- who would
11 have drafted this slide?
12 **A  This slide, probably Mr. Sevilla.**
13 Q  You don't recall drafting any part of
14 this?
15 **A  This particular slide?**
16 Q  Yes.
17 **A  I wouldn't have written this slide.**
18 Q  Where would Mr. Sevilla have gotten this
19 information?
20    MS. SMITH:  Objection, form.
21 **A  Not sure.**
22 BY MS. TOMKOWIAK:
23 Q  Okay.  If you see the last bullet, it
24 says:  Assuming the insureds lose on liability but
25 win their damages arguments, insured damages could

309

1  be as low as 6 million.
2      Do you recall ever being told in your
3  capacity as a director at Sentinel that damages
4  could be as low as 6 million?
5      MS. SMITH: Objection.
6      I'm going to caution you not to divulge
7  any privileged information.
8  **A  I think in the actuarial table, I think I**
9  **had seen something around that number.**
10 BY MS. TOMKOWIAK:
11 Q  Okay. And then you're conveying that to
12 CIMA, right?
13 **A  It looks like it, yeah.**
14 Q  Okay. Do you recall any analysis of how
15 high insured damages could be?
16 **A  With respect to Sentinel, it would have**
17 **been the limit of the policy.**
18 Q  Okay. But that's a slightly different
19 point. I mean, do you recall anybody doing any
20 analysis of how -- about the size of a potential
21 judgment against the funds even if it exceeded
22 Sentinel's insurance policy?
23 **A  I don't recall specifics.**
24 Q  Do you know why CIMA wanted -- did CIMA
25 request this information?

310

1  **A  I believe this was a result of the**
2  **inspection -- or part of the inspection that I**
3  **mentioned earlier.**
4  Q  Okay. And this was their five-year
5  inspection?
6  **A  Yes.**
7  Q  If you look at the second -- I'm sorry,
8  the next slide. I don't know why some slides have
9  numbers and some don't. Have you seen a version
10 of this policy timeline before?
11 **A  Yes.**
12 Q  Okay. Who would have put this together?
13 **A  I would have put most of this together.**
14 Q  So the first thing on here is
15 June 2017, ATE opportunity arises. What does that
16 mean?
17 **A  I think it's referring to when this**
18 **ATE policy may have been contemplated.**
19 Q  Well, where did you get that information?
20 **A  Probably Mr. Sevilla.**
21 Q  Probably Mr. Sevilla. So do you recall
22 one way or the other?
23 **A  I don't.**
24 Q  Okay. So if you got that from
25 Mr. Sevilla, is there some reason why he wouldn't

311

1  have just put this together himself?
2  **A  The entire presentation?**
3  Q  No, this slide.
4  **A  I mean, I'm better than him at PowerPoint.**
5  **It's easy for me to do.**
6  Q  And what did Mr. Sevilla tell you about
7  how the ATE opportunity arose in June of 2017?
8  **A  I don't remember specifics. We were just**
9  **filling out kind of bubbles on a slide.**
10 Q  Bubbles on -- I'm sorry, go ahead.
11 **A  It's more about getting the presentation**
12 **done. I didn't ask follow-up questions to every**
13 **bullet point provided.**
14 Q  Well, were you the person in charge of
15 presenting the slide?
16 **A  We presented the presentation together. I**
17 **don't recall who spoke to which slide.**
18 Q  Okay. But you're speaking to a regulatory
19 authority, so I assume you would have wanted to be
20 knowledgeable about the information on the slide,
21 right?
22 **A  That's correct.**
23 Q  Okay. And you just don't remember knowing
24 anything about how the ATE opportunity actually
25 arose in June of 2017?

312

1  **A  I would have asked further questions if I**
2  **was presenting by myself, but things I didn't**
3  **know, I knew Mr. Sevilla could speak to.**
4  Q  So if CIMA had a question about that, you
5  would have deflected that to Mr. Sevilla.
6  **A  That's right.**
7  Q  And you in your capacity as a director of
8  Sentinel didn't care about knowing how the
9  opportunity arose?
10     MS. SMITH: Objection to form.
11 **A  I came to -- you know, when I was**
12 **appointed, the policy was in place. So I don't**
13 **think I went and had a look back of however many**
14 **months prior.**
15 BY MS. TOMKOWIAK:
16 Q  Okay. The next thing on this timeline is
17 July 2017. Diligence performed on the potential
18 insureds and underlying litigation and risk
19 surrounding directors, engage counsel, actuary and
20 other service providers.
21     Who provided you with that information?
22 **A  I think anything prior to the January 2018**
23 **bullet on the -- or portion of the timeline would**
24 **have come from Mr. Sevilla.**
25 Q  Well, you became a director of Sentinel in

313

1  September of 2019 -- of 2017, right?
2  **A  That's right.**
3  Q  Okay.  So you're just making that
4  distinction because the only other thing before
5  January 2018 is this August 2017?
6  **A  That's right.**
7  Q  Okay.  So with respect to August 2017 --
8  I'm sorry.  With respect to July 2017, you don't
9  know what diligence Sentinel performed on the
10  potential insureds and the underlying litigation
11  and risk?
12  **A  That's right.**
13  Q  And you didn't ask Sentinel when you
14  joined the board what diligence it had performed
15  before issuing a $100 million policy?
16      MS. SMITH:  Objection to form.
17  **A  I didn't.  The policy was active and as I**
18  **understood it, already approved by CIMA.**
19  **BY MS. TOMKOWIAK:**
20  Q  Do you know when CIMA approved the policy?
21  **A  I don't.**
22  Q  Do you know how they approved the policy?
23  **A  I don't.**
24  Q  Who told you that they had approved the
25  policy?

314

1  **A  I'm not entirely sure.**
2  Q  You just at some point came to know it?
3  **A  Right.  At least after Sentinel was**
4  **audited for the year of 2017, had there been an**
5  **issue with CIMA with the policy, we would have --**
6  **Sentinel would have heard about that.**
7  Q  Okay.  So then with respect to
8  August 2017, who would have provided you with that
9  information?
10  **A  I'm not sure.**
11  Q  Would that be Mr. Sevilla?
12  **A  I'm not sure.**
13  Q  Did anybody besides Mr. Sevilla or
14  Ms. Irving help you put together this deck?
15  **A  I don't believe so.**
16  Q  Okay.  So it was either Ms. Irving or
17  Mr. Sevilla?
18  **A  Oh, I'm sorry, I thought you were asking a**
19  **different question.  I thought you were -- yes.**
20  **Mr. Sevilla would have provided this August '17**
21  **bullet.**
22  Q  And then for the January bullet, that's
23  the VRC valuations that we discussed earlier
24  today?
25  **A  That's right.**

315

1  Q  Okay.  And then with respect to June,
2  where the auditors and actuary recommend that the
3  board authorize adjusting the ATE premium to
4  68 million to account for the value of the
5  underlying securities, that is the issue that we
6  discussed earlier today in connection with
7  Endorsement No. 1?
8  **A  I believe so.**
9  Q  Does this help refresh your recollection
10  as to when Endorsement No. 1 was executed?
11  **A  It doesn't.**
12  Q  You don't know if Endorsement No. 1 would
13  have been executed around the time that the
14  auditors and the actuary made the recommendation
15  to make the adjustment?
16  **A  Possibly.  I just don't recall when it was**
17  **actually completed.**
18  Q  Okay.  Same thing for the next bullet, you
19  don't -- I realize they're not bullets, but same
20  thing for the next entry, you don't -- says here:
21  Premium readjusted to 59 million.  That is
22  consistent with Endorsement No. 2 that we looked
23  at, right?
24  **A  That's right.**
25  Q  Okay.  But that -- you still don't know if

316

1  Endorsement No. 2 was executed around this time?
2  **A  I don't.**
3  Q  Okay.  Is that something that you would
4  have sat on?
5      MS. SMITH:  Objection to form.
6  **A  Sat on, what do you mean?**
7  **BY MS. TOMKOWIAK:**
8  Q  Well, if the -- if a recommendation was
9  made to the board to authorize doing something,
10  would they have waited a long time to actually do
11  it?
12  **A  Oh.  Generally, no.**
13  Q  And then here it says:  Sentinel audit
14  issued with third-party valuations and actuary
15  approved premium.
16      Is that an audit by Crowe?
17  **A  Yes.**
18  Q  Okay.  Was that a special audit outside of
19  an annual audit?
20  **A  No, it was late that year.  It was a**
21  **June 30th deadline and if it was filed in July,**
22  **Sentinel would have had to request an extension**
23  **from CIMA.**
24  Q  Do you know why CIMA was -- well, did CIMA
25  ask you to provide a timeline of the policy?

317

1     MS. SMITH: Objection to form.
2     **A   I don't recall.**
3   **BY MS. TOMKOWIAK:**
4     Q   Do you know why this information was
5   important to convey to CIMA?
6     **A   Possibly they may have asked for it.  I'm**
7   **not sure.  We could have been proactive in**
8   **preparing this deck, thinking it useful for them**
9   **to see it laid out like this.**
10    Q   So to the best of your recollection, CIMA
11  hadn't asked any questions about the timeline for
12  the policy?
13    **A   I don't recall.**
14    Q   If you look at the next slide, this slide
15  is entitled Business Rationale, The Insureds.  Who
16  would have provided the information for this
17  slide?
18    **A   Probably Mr. Sevilla.**
19    Q   Okay.  So is it your understanding that
20  Mr. Sevilla negotiated the policy on behalf of the
21  insureds?
22    MS. SMITH: Objection to form.
23    **A   No.**
24  **BY MS. TOMKOWIAK:**
25    Q   Okay.  And you don't know who did?

318

1     **A   I don't.**
2     Q   So how would Mr. Sevilla had known what
3   the insureds' business rationale was?
4     MS. SMITH: Objection to form.
5     **A   I don't know.**
6   **BY MS. TOMKOWIAK:**
7     Q   Did you ask him?
8     **A   I don't remember asking him.**
9     Q   Did he prepare this slide or did you?
10    **A   He probably sent me the language and I had**
11  **the pen on the deck, I guess.**
12    Q   In the third bullet point here it says:
13  Essentially turned an illiquid portfolio into a
14  liquid one.  Future cash generation to pay counsel
15  and potentially satisfy a judgment was, prior to
16  the ATE policy, questionable at best.  Avoided a
17  fire sale of assets.
18    Do you see that?
19    **A   I do.**
20    Q   And after the portfolio was transferred to
21  Sentinel, did you believe that the potential to
22  satisfy a judgment was no longer questionable?
23    MS. SMITH: Objection to form.
24    **A   Did I believe the potential to satisfy a**
25  **judgment in court, like in -- on behalf of the**

319

1   insureds?
2   **BY MS. TOMKOWIAK:**
3     Q   Yes.
4     **A   Sorry, the insureds' ability to satisfy a**
5   **judgment?  I only considered this in the lens**
6   **of -- through the lens of the policy, so the**
7   **insureds could satisfy up to the limits of the**
8   **policy.**
9     Q   Were you told -- was there any reason that
10  Sentinel was better at liquidating the assets than
11  the funds?
12    MS. SMITH: Objection to form.
13    **A   I don't think that's what this is saying.**
14  **BY MS. TOMKOWIAK:**
15    Q   I'm just asking.
16    **A   I don't know that.**
17    Q   Okay.  If you look at the next slide, do
18  you know who would have provided this information
19  regarding the business rationale from Sentinel's
20  point of view?
21    **A   This probably would have been myself and**
22  **Mr. Sevilla together.**
23    Q   Okay.  And so Mr. Sevilla provided both
24  sides' rationale, for the insureds and Sentinel?
25    **A   In part.**

320

1     Q   And how did you get the information
2   regarding the business rationale?
3     **A   How did I receive the information?**
4     Q   How did you get it?  You weren't there
5   when the policy was entered into, you didn't
6   negotiate it.  You told me earlier today that you
7   didn't know who did.  So who would you have
8   reached out to to understand Sentinel's business
9   rationale for entering into the policy?
10    **A   Well, I would have discussed that most**
11  **likely with Mr. Sevilla.**
12    Q   What about the independent directors?
13  Would you have discussed that with them?
14    **A   The business rationale?**
15    Q   Yes.
16    **A   With the current directors?**
17    Q   Yeah.
18    **A   No, probably not.**
19    Q   In that last bullet it says that the board
20  and advisory committee were satisfied that this
21  was an economically feasible transaction even if
22  the policy limits were ultimately reached.
23    Did you understand that even if Sentinel
24  had to pay out the full policy limit, it would
25  still be solvent?  Is that what that means?

321

1    **A  That's what that's saying, that Sentinel**
2    **could pay the policy and survive.**
3    Q  Okay.  And then if you look at the last
4    slide; do you know who prepared this slide?
5    **A  This probably -- again, I prepared all the**
6    **slides, but this information probably would have**
7    **come from Katie.**
8    Q  And when it says, CIMA approved Sentinel
9    structure, we looked at an e-mail earlier today
10   from April 2019 where you were discussing the fact
11   that CIMA had asked for the structure to be
12   simplified?
13   **A  That's right.**
14   Q  By this point in time, had the structure
15   actually been simplified or was this aspirational
16   this is what it was going to look like?
17   **A  I don't know.  This is -- I know this is**
18   **what it was -- what CIMA asked for.  I don't know**
19   **if the work had been done yet.**
20   Q  How long did this presentation last?
21   **A  Probably an hour or so.**
22   Q  And what actions, if any, did CIMA take
23   after this presentation?
24   **A  Actions, I'm not entirely sure.**
25   Q  Well, why were you making this

322

1    presentation to them?
2    **A  To -- again, as part of the inspection**
3    **process.**
4    Q  So did they complete their inspection
5    after this?
6    **A  At some point in 2019 they did.  I believe**
7    **it was after this.**
8    Q  Would you have received a copy of that
9    inspection?
10   **A  Probably.**
11   Q  Do you recall CIMA asking any questions
12   during either of those presentations?  Well, let's
13   stick with this one.  Do you recall CIMA asking
14   you any questions during that presentation?
15   **A  Not specific questions, but I know they**
16   **did.  There was a conversation.**
17   Q  And who responded to those questions?
18   **A  Myself or Mr. Sevilla.**
19       MS. TOMKOWIAK:  Let's go off the record
20   very shortly.
21       THE VIDEOGRAPHER:  We are off the record
22   at 6:29 p.m.
23       (Recess taken from 6:29 p.m. CDT to
24   6:48 p.m. CDT)
25       THE VIDEOGRAPHER:  The time is 6:48 p.m.

323

1    We are back on the record.
2    BY MS. TOMKOWIAK:
3    Q  Okay.  Mr. DiOrio, while you were employed
4    at Highland, did you ever come to know that
5    Mr. Dondero had an ownership interest in Sentinel?
6        MS. SMITH:  Objection to form.
7    BY MS. TOMKOWIAK:
8    Q  Yes or no?
9    **A  Did I ever come to know that he had an**
10   **ownership interest?  Yes.**
11   Q  While you were employed at Highland, did
12   you ever come to know that Mr. Ellington had an
13   ownership interest in Sentinel?
14       MS. SMITH:  Objection to form.
15   **A  Yes.**
16   BY MS. TOMKOWIAK:
17   Q  Okay.  I am handing the court reporter an
18   exhibit to mark as -- document to mark as
19   Exhibit 85.
20       (Deposition Exhibit 85 marked for
21   identification.)
22   BY MS. TOMKOWIAK:
23   Q  Take a look at that and let me know when
24   you're ready.
25       (Witness reviews document.)

324

1    **A  Okay.**
2    BY MS. TOMKOWIAK:
3    Q  Okay.  Do you recall working with --
4    working with folks at Highland and attorneys at
5    the Pachulski firm in January 2021 to track down
6    the physical certificates of the Greenbriar shares
7    that we were talking about earlier today?
8    **A  Yes.**
9    Q  Okay.  And at the time that -- at the time
10   of this e-mail, were you aware that the original
11   certificates had been lost?
12       MS. SMITH:  Objection to form.
13   **A  Which e-mail?  There seems to be a lot on**
14   **here.**
15   BY MS. TOMKOWIAK:
16   Q  On January 21st, were you aware that the
17   original certificates had been lost and were never
18   transferred to Sentinel?
19   **A  Is that back --**
20   Q  I'm just asking whether on -- I believe
21   earlier today that we talked about this issue
22   where the physical certificates got lost somehow,
23   right?
24   **A  Yeah.**
25   Q  Okay.  And did you know that prior to

325

1 January 21st, 2021?
2   A  Yes.  Probably -- yes.
3   Q  Okay.  And if you look at the Bates number
4 ending 4482, at the very bottom of the page,
5 Mr. Demo writes to you:  The time sensitivity is
6 more on figuring out what happened to the original
7 certificate.
8      Do you see that?
9   A  I do.
10   Q  Okay.  And so do you understand that
11 Mr. Demo was trying to understand what happened to
12 the original Greenbriar certificates?
13      MS. SMITH:  Objection, form.
14   A  That's what he's saying.
15 BY MS. TOMKOWIAK:
16   Q  Okay.  Do you understand that to be his
17 ask at the time?
18      MS. SMITH:  Objection to form.
19   A  I believe his original -- are you
20 referring to the e-mail about I must have
21 understood the original ask or --
22 BY MS. TOMKOWIAK:
23   Q  Well, what did you think Mr. Demo was
24 asking you to do in the first place?
25   A  Initially, I don't see it on here, but I

326

1 believe he reached out to ask something about a
2 custody account with regards to Greenbriar.
3   Q  Okay.  Well, you write here, as you point
4 out:  I must have misunderstood the original ask.
5 I thought we were just trying to determine whether
6 or not green -- I'm sorry -- whether or not CDO
7 Fund was still the owner of these shares and then
8 to have new certs issued once we determined they
9 weren't held at BONY but that they were still
10 receiving cash on behalf of CDO Fund.
11      Is that what you thought Demo was asking
12 you?
13      MS. SMITH:  Objection to form.
14   A  Yes.  I think if that's what I wrote,
15 that's probably what I meant.
16 BY MS. TOMKOWIAK:
17   Q  Okay.  And did you tell Mr. Demo at the
18 time, that CDO Fund had tried to transfer those
19 certificates to Sentinel but that they had gotten
20 lost?
21   A  I don't believe I did.
22   Q  Okay.  Why not?
23   A  Because my task, as I understood it, was
24 to assist in issue -- helping issue, getting new
25 paper certificate shares issued and I believe

327

1 since obviously the shares never made it to
2 Sentinel, that they were still actually in CDO
3 Fund's name.
4   Q  Okay.  And in your capacity as a director
5 of Sentinel, did you think that that was okay to
6 try to get physical certificates reissued in the
7 name of CDO Fund even though Sentinel was supposed
8 to be the owner of that asset?
9      MS. SMITH:  Objection to form.
10   A  Not something I really considered.
11 BY MS. TOMKOWIAK:
12   Q  Were you planning to tell Sentinel that
13 you were planning to get these certificates
14 reissued in CDO Fund's instead of Sentinel's name?
15      MS. SMITH:  Objection to form.
16   A  I didn't have a plan for informing
17 Sentinel.
18 BY MS. TOMKOWIAK:
19   Q  Meaning you didn't plan to inform Sentinel
20 or you don't know if you were going to inform
21 Sentinel or not?
22   A  I don't remember considering what to do
23 with respect to Sentinel.
24   Q  Did you think that this is kind of a
25 conflict here because you're being asked to

328

1 reissue these certificates in the name of CDO Fund
2 but Sentinel is supposed to be the owner of them?
3      MS. SMITH:  Objection to form.
4   A  A conflict between who?
5 BY MS. TOMKOWIAK:
6   Q  An inner conflict, a conflict between the
7 two hats that you wear.
8   A  Again, I didn't --
9      MS. SMITH:  Objection, form.
10   A  I was trying to do this job and did not
11 consider other things that might impact it at the
12 time.
13 BY MS. TOMKOWIAK:
14   Q  Okay.  And with respect to this job,
15 again, you didn't think it was relevant to say CDO
16 Fund actually tried to transfer those shares to
17 Sentinel in August 2017 so CDO Fund is not --
18 should not be the owner of those shares?
19      MS. SMITH:  Objection to form.
20   A  No.
21 BY MS. TOMKOWIAK:
22   Q  Why not?
23   A  It's, again, not what I was asked to do.
24   Q  So did you tell Mr. Demo that CDO Fund was
25 still the owner of these shares?

329

1  MS. SMITH: Objection to form.
2  **A  I don't know.**
3  **BY MS. TOMKOWIAK:**
4  Q  Did you think that reissuing these shares
5  in the name of CDO Fund would be acting in the
6  best interest of Sentinel?
7  MS. SMITH: Objection to form.
8  **A  Again, I did not consider it.**
9  **BY MS. TOMKOWIAK:**
10  Q  Okay. So when you were responding to
11  Mr. Demo's e-mails, you just weren't acting at all
12  in your capacity as Sentinel's director?
13  MS. SMITH: Objection to form.
14  **A  I was trying to answer the questions**
15  **Mr. Demo was asking.**
16  **BY MS. TOMKOWIAK:**
17  Q  And he didn't ask you if CDO Fund had
18  tried to transfer the Greenbriar shares to
19  Sentinel, so you didn't feel like you had to
20  answer that question?
21  MS. SMITH: Objection to form. Ms. --
22  MS. TOMKOWIAK: Tomkowiak.
23  MS. SMITH: -- Tomkowiak, there's
24  extensive e-mails on this exhibit, and if you --
25  if he looks at the whole thing, he can answer your

330

1  question without focusing on the one paragraph on
2  the page that you are talking about.
3  MS. TOMKOWIAK: Okay. I noted your
4  objection. I have limited time left on the
5  record, so if we could limit the speaking
6  objections so we can get through this and we can
7  just get through the document.
8  **BY MS. TOMKOWIAK:**
9  Q  You have the whole document in front of
10  you. I have told you that you can always look at
11  another part of the document if you need to to
12  answer my question.
13  **A  Okay.**
14  Q  Okay. So my question is, and he didn't
15  ask you if CDO Fund had tried to transfer the
16  Greenbriar shares to Sentinel so you didn't feel
17  like you had to answer that question, right?
18  MS. SMITH: Objection to form.
19  **A  I think that's right.**
20  **BY MS. TOMKOWIAK:**
21  Q  And if you look at your e-mail on
22  Wednesday, January 27th, that's at the Bates
23  number ended 4478. It's at 2:10 p.m. on
24  Wednesday, January 27th.
25  **A  Okay.**

331

1  Q  Okay. And you write: Hi Guys. I am
2  working with State Street to reissue physical
3  certificates and will keep everyone in the loop on
4  timing.
5  How did -- prior to this, had you already
6  tried working with State Street to reissue
7  physical certificates?
8  **A  I don't remember the exact timing, but at**
9  **some point I would have reached out to State**
10  **Street.**
11  Q  Okay. But was that in connection with
12  trying to reissue the physical certificates to
13  Sentinel?
14  **A  No.**
15  Q  No. Okay. So prior to this e-mail, you
16  had not reached out to State Street to try to
17  reissue the physical certificates to Sentinel
18  because they had been lost?
19  **A  I may had years -- several years prior,**
20  **but I don't have a specific recollection of that.**
21  Q  Then later in your e-mail you say: The
22  certificates were transferred in error in 2017 by
23  Carter Chism, who no longer works at HCM, and the
24  recipients never took delivery.
25  Do you see that?

332

1  **A  I do.**
2  Q  Okay. What did you mean by transferred in
3  error?
4  **A  Well, if they never arrived where they**
5  **were supposed to and were lost, I call that an**
6  **error.**
7  Q  Okay. So you don't mean that Mr. Chism
8  wasn't supposed to transfer them, you just mean he
9  didn't do it right?
10  MS. SMITH: Objection to form.
11  **A  I can't really speculate on what Carter**
12  **Chism did or did not do. I just know that**
13  **certificates ended up lost.**
14  **BY MS. TOMKOWIAK:**
15  Q  Right. These are -- but these are your
16  words and I just want to make sure I understand
17  the error. The error was that he didn't execute
18  the transfers properly?
19  **A  I believe so.**
20  Q  Not that he transferred them by mistake or
21  tried to transfer them by mistake?
22  **A  I believe so.**
23  Q  And the recipient never took delivery. By
24  recipient, you mean Sentinel, right?
25  **A  That's right.**

333

1    Q  Is there a reason you didn't say Sentinel?
2        MS. SMITH:  Objection to form.
3    A  I believe if you follow the e-mail chain
4    when I was asked, I offered that up.
5    BY MS. TOMKOWIAK:
6    Q  And you didn't think it was misleading not
7    to just mention right here who the recipient was?
8        MS. SMITH:  Objection to form.
9    A  No.  My task was to find and help reissue
10   the certificates.  If they were lost, they were
11   lost.  And when I was directly asked, I answered.
12   BY MS. TOMKOWIAK:
13   Q  And you don't think it -- so did you make
14   a conscious decision here not to say Sentinel and
15   instead say recipient?
16       MS. SMITH:  Objection to form.
17   A  I don't recall.
18   BY MS. TOMKOWIAK:
19   Q  Did you think it was relevant who the
20   recipient was?
21       MS. SMITH:  Objection to form.
22   A  When asked, I answered.
23   BY MS. TOMKOWIAK:
24   Q  I understand, but is there a reason that
25   you didn't just offer that information in the

334

1    first place?
2        MS. SMITH:  Objection to form.
3    A  Not that I recall.
4    BY MS. TOMKOWIAK:
5    Q  Okay.  So then Mr. Romey -- is it Romey or
6    Romey?
7    A  I think it's Romey.
8    Q  Okay.  So then Mr. Romey asked Matt:  Who
9    was the intended recipient of the transfer
10   initiated by Carter?
11       And you respond:  My understanding is that
12   they were transferred to Maples FS in Cayman as
13   custodian for Sentinel Reinsurance.
14       Do you see that?
15   A  I do.
16   Q  Is there a reason that you qualified that
17   with my understanding?
18       MS. SMITH:  Objection to form.
19   A  Just like -- I think if you look back at
20   the power of attorney with CIBC with those other
21   shares, you don't transfer directly to the
22   company; you transfer the certificates to a
23   custodian.  So that was a meaningful -- you should
24   call it a qualification, but that's a meaningful
25   fact.

335

1    BY MS. TOMKOWIAK:
2    Q  But my question is you knew that they were
3    transferred to Maples as custodian for Sentinel,
4    right?
5    A  Which is what I said.
6    Q  Okay.  So you -- my understanding is
7    synonymous with I know they were transferred to
8    Maples?
9        MS. SMITH:  Objection to form.
10   A  It's my understanding.
11   BY MS. TOMKOWIAK:
12   Q  And then Mr. Demo asked you:  Do you -- do
13   we have any visibility into who Sentinel
14   Reinsurance is, who owns them, what do they do,
15   et cetera.
16       Do you see that on Bates ending 4476?
17   A  I do.
18   Q  Okay.  And then your response is:  It is a
19   nondebtor, nonaffiliate reinsurance company and I
20   do not know who or how it's owned.
21       Was that true, Mr. DiOrio?
22       MS. SMITH:  Objection to form.
23   A  Yeah.  I don't generally -- my
24   understanding of the high-level ownership does not
25   mean I know how it's owned, meaning what structure

336

1    it sits in and all that stuff.
2    BY MS. TOMKOWIAK:
3    Q  Well, you knew that it was owned in part
4    by Mr. Dondero?
5        MS. SMITH:  Objection to form.
6    A  Yes.
7    BY MS. TOMKOWIAK:
8    Q  You knew that it was owned at least in
9    part by Mr. Ellington?
10   A  That's right.
11   Q  So did you expect Mr. Demo to ask you
12   those specific questions before you offered that
13   information?
14       MS. SMITH:  Objection to form.
15   A  He did ask those -- I'm sorry, I'm not
16   following.  He did ask those questions.
17   BY MS. TOMKOWIAK:
18   Q  Well, he asked who owns Sentinel
19   Reinsurance, right?
20   A  Yeah.
21   Q  Okay.  And you didn't tell him Mr. Dondero
22   and Mr. Ellington owned part of it, right?
23   A  Right.
24   Q  Why not?
25   A  They don't, as I understand it, personally

337

1  own it directly, you know, like one layer up, I
2  guess.  So I can't honestly -- I can't honestly
3  tell him I know how or who it's ultimately owned
4  through an entity through something else.  I don't
5  know.
6     Q   You have those structure charts, you have
7  the whole structure of Sentinel's ownership.
8        MS. SMITH:  Objection to form.
9     A   I've seen the structure charts.
10 BY MS. TOMKOWIAK:
11    Q   You presented the structure to CIMA in
12 2019?
13    A   That's right.  This is 2021.
14    Q   Right.  So you -- in 2021, you didn't know
15 if that was the structure of Sentinel?
16    A   I don't remember the structure.  I
17 couldn't draw it out for you, for example.  So if
18 I don't know anything 100 percent, that's why I
19 didn't offer it.
20    Q   Why didn't you just explain that to
21 Mr. Demo, hey, I -- why didn't you just explain
22 that to Mr. Demo?
23       MS. SMITH:  Objection to form.
24    A   I wanted as little to do with Pachulski as
25 possible, so I answered the questions and waited

338

1  for the next one.
2  BY MS. TOMKOWIAK:
3     Q   So you wanted as little to do as possible
4  with counsel for the independent board of the
5  entity that you were still employed with?
6        MS. SMITH:  Objection to form.
7     A   Are they counsel to the debtor or the
8  board?
9  BY MS. TOMKOWIAK:
10    Q   At some point in time, the independent
11 board had control of the debtor and Mr. Seery
12 became the CEO.
13    A   Okay.
14       MS. SMITH:  Objection to form.
15    A   Again, I was trying to be helpful doing
16 what I was asked.  I don't report to Mr. Demo, I
17 never did.  I think here I'm being as helpful as I
18 can be.
19 BY MS. TOMKOWIAK:
20    Q   Did you tell Mr. Demo that you were a
21 director of Sentinel?
22    A   No.  I don't think so.
23    Q   Don't you think that would have been more
24 helpful than your response?
25       MS. SMITH:  Objection to form.

339

1     A   I don't think that would have been
2  helpful.
3  BY MS. TOMKOWIAK:
4     Q   Why not?
5     A   He didn't ask.
6     Q   Well, he asked what do they do and did you
7  respond to that?
8     A   I think by saying it is a nondebtor
9  nonaffiliate reinsurance company.  It's a
10 reinsurance company, so that's what they do.  I
11 think that's an answer.
12    Q   And you don't think there's any other
13 details that you could have provided that would
14 have been helpful to Mr. Demo?
15       MS. SMITH:  Objection to form.
16    A   Again, I was answering the questions I was
17 asked.
18 BY MS. TOMKOWIAK:
19    Q   You agree that you had more information
20 about Sentinel and you just chose not to disclose
21 it to Mr. Demo at this time?
22    A   I wasn't asked.
23    Q   So if Mr. Demo had asked you are you a
24 director of Sentinel, you would have said what?
25    A   I would have said yes.

340

1     Q   And by providing this answer, you don't
2  think you were conveying, this is all I know about
3  Sentinel Reinsurance?
4        MS. SMITH:  Objection to form.
5     A   No, because I was asked follow-up
6  questions that I answered.
7  BY MS. TOMKOWIAK:
8     Q   Mr. Romey then responds to you:  They are
9  part of the MSCF redemption group, correct?
10    A   Yes, he asked that.
11    Q   You see that?  And you respond:  Yes, I
12 believe that's correct.
13       Do you see that?
14    A   I do.
15    Q   And then Mr. Demo writes:  Matt, Two
16 follow ups.
17       And then the second follow-up is:  Can you
18 please send us Sentinel's subscription documents
19 in MSCF and their redemption request?
20       Do you see that?
21    A   I do.
22    Q   And you respond:  2, I do not have any of
23 those documents.
24       Do you see that?
25       MS. SMITH:  Objection to form.

341

1    A  I see that.
2  BY MS. TOMKOWIAK:
3    Q  Was that true?
4    A  I believe so.
5    Q  Why?
6    A  Any record I would have had of
7  subscription or redemption most likely would have
8  been in my SAS e-mail or on my old tablet that was
9  stolen out of my car.
10   Q  Did you not have access to your SAS e-mail
11 at this time?
12   A  I don't believe I did.
13   Q  And you don't think that your answer
14 suggested that you never had any of those
15 documents?
16     MS. SMITH:  Objection to form.
17   A  He said can you please send us the
18 documents, and I said I don't have them.
19 BY MS. TOMKOWIAK:
20   Q  And you didn't think it was relevant to
21 say I can get them for you?
22     MS. SMITH:  Objection to form.
23   A  No.  I assumed they were on -- whoever
24 does the shareholder registration would have had
25 them, whoever at Highland does that.

342

1  BY MS. TOMKOWIAK:
2    Q  Whoever at Highland does the shareholder
3  registration for who?
4    A  Or the subscriptions and redemptions,
5  excuse me, for Multi Strat.
6    Q  And you didn't think it was relevant to
7  tell Mr. Demo that you had filled out a redemption
8  request on Sentinel's behalf?
9      MS. SMITH:  Objection to form.
10   A  I didn't.
11 BY MS. TOMKOWIAK:
12   Q  Is that because he didn't ask you?
13   A  Yes.
14   Q  At any point in time prior to your
15 termination from Highland, did you tell anybody on
16 the independent board that you were a director of
17 Sentinel?
18     MS. SMITH:  Objection to form.
19   A  No.  I had very little interaction with
20 the independent board.
21 BY MS. TOMKOWIAK:
22   Q  At any point in time prior to your
23 termination from Highland, did you tell anybody on
24 the independent board that Sentinel Reinsurance
25 had issued a $100 million ATE policy to cover the

343

1  Highland funds liability to UBS?
2    A  I did not.
3    Q  You signed a confidentiality -- I'm sorry.
4  Have you seen the confidentiality agreement in
5  connection with this matter?
6    A  I believe so.
7    Q  I am handing you what's been previously
8  marked as Exhibit 65.  This is a Confidentiality
9  Agreement.  Have you seen this document before?
10     (Witness reviews document.)
11   A  I don't believe so.
12 BY MS. TOMKOWIAK:
13   Q  Did you authorize your counsel to enter
14 into this agreement on your behalf?
15   A  I believe so, yes.
16   Q  And have you -- do you understand what
17 your obligations are under this confidentiality
18 agreement?
19   A  I think so.
20   Q  Have you abided by them?
21   A  I believe I have.
22   Q  Have you discussed the materials that were
23 provided to you with anybody other than your
24 counsel?
25   A  No.

344

1      MS. TOMKOWIAK:  I have no further
2  questions.  I would like to just make sure that
3  this transcript is marked and the materials are
4  marked highly confidentiality pursuant to the
5  confidentiality agreement.
6      MS. DANDENEAU:  I don't know how much time
7  you have left.  Does Mr. Feinstein want to ask any
8  questions?
9      MS. TOMKOWIAK:  Mr. Feinstein, do you want
10 to ask any questions?
11     MR. FEINSTEIN:  No.  As indicated
12 yesterday, we have plenty of questions, but we're
13 not going to address them today.  We'll address
14 them in some other proceeding or forum, so we do
15 not have any questions for the witness today.
16     MS. TOMKOWIAK:  Okay.
17     THE VIDEOGRAPHER:  Is that it?
18     MS. TOMKOWIAK:  That's it.
19     THE VIDEOGRAPHER:  This ends the
20 videotaped deposition of Matthew DiOrio.  The time
21 is 7:15 p.m.  We are off the record.
22     (Deposition concluded at 7:15 p.m. CDT)
23
24
25

345

1     ACKNOWLEDGMENT OF DEPONENT
2         I, MATTHEW T. DiORIO, do hereby
3  acknowledge that I have read and examined the
4  foregoing testimony, and the same is a true,
5  correct and complete transcription of the
6  testimony given by me and any corrections appear
7  on the attached Errata sheet signed by me.
8
9
10  _____     _____
11  (DATE)          (SIGNATURE)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

346

1     REPORTER'S CERTIFICATION
2         I, Micheal A. Johnson, the officer before
3  whom the foregoing deposition was taken, do hereby
4  certify that the foregoing transcript is a true
5  and correct record of the testimony given; that
6  said testimony was taken by me stenographically
7  and thereafter reduced to typewriting under my
8  direction; that reading and signing was requested;
9  and that I am neither counsel for, related to, nor
10  employed by any of the parties to this case and
11  have no interest, financial or otherwise, in its
12  outcome.
13         IN WITNESS WHEREOF, I have hereunto set my
14  hand this 28th day of July, 2021.
15
16
17  _____
18  MICHEAL A. JOHNSON, RDR, CRR
19  NOTARY PUBLIC IN AND FOR
20  THE STATE OF TEXAS
21
22
23
24
25