

# Transcript of Clifford E. Stoops, II

**Date:** April 27, 2021
**Case:** UBS Securities LLC, et al. -v- Highland Capital Management, L.P.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**1**

1   IN THE UNITED STATES BANKRUPTCY COURT

2   FOR THE NORTHERN DISTRICT OF TEXAS

3   DALLAS DIVISION

4   ----------------------------x

5   In re                    : Chapter 11

6   HIGHLAND CAPITAL          : Case No. 19-34054-SGJ11

7   MANAGEMENT, L.P.,         :

8            Debtor.          :

9   ----------------------------x

10  UBS SECURITIES LLC AND    : Adversary Proceeding

11  UBS AG LONDON BRANCH      : No. 21-03020-SGJ

12           Plaintiffs,      :

13       v.                   :

14  HIGHLAND CAPITAL          :

15  MANAGEMENT, L.P.,         :

16           Defendant.       :

17  ----------------------------x

18

19   VIDEOTAPED DEPOSITION OF CLIFFORD E. STOOPS, II

20             Conducted Virtually

21         Tuesday, April 27, 2021

22            10:14 a.m. EDT

23  Job No.: 368733

24  Pages: 1 - 83

25  Reported by: Monique Vouthouris, CCR, RPR, CRR

**2**

6            REMOTE VIDEOTAPED deposition of CLIFFORD E.

7   STOOPS, II, pursuant to subpoena, before Monique

8   Vouthouris, CCR, RPR, CRR, Notary Public in and for

9   the States of New Jersey and New York.

11           Witness Location:

12           Dallas, Texas

**3**

1        A P P E A R A N C E S

2   ON BEHALF OF PLAINTIFFS UBS SECURITIES LLC

3   AND UBS AG LONDON BRANCH:

4       SHANNON E. MCLAUGHLIN, ESQ.

5       LATHAM & WATKINS LLP

6       885 Third Avenue

7       New York, New York  10022-4834

8       212.906.1200

9

10      ANDREW CLUBOK, ESQ.

11      SARAH TOMKOWIAK, ESQ.

12      LATHAM & WATKINS LLP

13      555 Eleventh Street, NW

14      Suite 1000

15      Washington, D.C.  20004-1304

16      202.637.2200

17

18  ON BEHALF OF DEFENDANT

19  HIGHLAND CAPITAL MANAGEMENT, L.P.:

20      ROBERT J. FEINSTEIN, ESQ.

21      GREGORY V. DEMO, ESQ.

22      PACHULSKI STANG ZIEHL & JONES LLP

23      780 Third Avenue, 34th Floor

24      New York, New York  10017-2024

25      212.561.7700

**4**

1    A P P E A R A N C E S   C O N T I N U E D

2   ON BEHALF OF THE WITNESS CLIFFORD E. STOOPS, II:

3       ROBERT M. THORNTON, ESQ.

4       KILGORE & KILGORE PLLC

5       3109 Carlisle Street

6       Dallas, Texas  75204

7       214.969.9099

8

9

10  ALSO PRESENT:

11      CHESTER WONG, Planet Depos Videographer

12      SARAH LOILER, Planet Depos Technician

**5**

C O N T E N T S

EXAMINATION OF CLIFFORD E. STOOPS, II          PAGE

By Ms. McLaughlin                                8


E X H I B I T S

(Attached to transcript.)

DEPOSITION EXHIBITS                            PAGE

Exhibit 1   Email October 26, 2017 from Isaac    22
            Leventon to Chris Dunn with
            attachment.

Exhibit 2   Purchase Agreement August 7,         27
            2017.

Exhibit 3   Email chain September 12, 2018,      38
            with attachment.

Exhibit 4   Email chain August 11, 2017,         42
            HCMUBS000563 and 564.

Exhibit 5   Email chain August 11, 2017,         52
            HCMUBS000567 and 568.

Exhibit 6   Email chain August 11, 2017,         71
            HCMUBS000642 through 644.

Exhibit 7   Email chain December 1, 2017.        76

**6**

P R O C E E D I N G S

THE VIDEOGRAPHER:  Here begins Media Number 1 of the remote videotaped deposition of Clifford Stoops in the matter of UBS Securities, LLC, et al. versus Highland Capital Management, L.P., in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, Case Number 19-34054-SGJ11.

Today's date is 27th of April 2021.  The time on the video monitor is 10:14 a.m.  The videographer for today is Chester Wong, on behalf of Planet Depos.  All participants of this video deposition are attending remotely.

Would all parties present in this videoconference please voice identify themselves and state whom they represent.

MS. McLAUGHLIN:  My name is Shannon McLaughlin, I represent UBS Securities and UBS AG London Branch, and I'm joined today by Sarah Tomkowiak and --

THE TECHNICIAN:  I'm sorry to interrupt.  I think the witness is having a problem hearing us.  I believe the problem is that Mr. Thornton joined the breakout room.  They were opened so that people can

**7**

access them on breaks.  But if Mr. Thornton is in the breakout room, that's why he's -- the audio is coming from Mr. Thornton's end.  That's why the witness can't hear us.

MR. CLUBOK:  Yeah, I did the same thing by mistake, too, but I came back.  Someone needs to tell Bob probably he needs to leave the breakout room and return to -- uh-oh, we lost --

THE TECHNICIAN:  It's because he joined as well.

MR. CLUBOK:  Okay.  Can someone join and tell them they need to just click on "leave the breakout room" and come back to the meeting.

THE COURT REPORTER:  Let's go off the record.

THE VIDEOGRAPHER:  Sure.  We are going off the record.  The time is 10:15 a.m.

(Recess 10:15 a.m. - 10:17 a.m.)

THE VIDEOGRAPHER:  All right.  Would all parties present in this videoconference please voice identify themselves and state whom they represent.

MS. McLAUGHLIN:  My name is Shannon McLaughlin, I'm with Latham & Watkins LLP, and I'm here today with Sarah Tomkowiak and Andrew Clubok.  We represent UBS Securities and UBS AG London Branch.

**8**

MR. FEINSTEIN:  My name is Robert Feinstein, Pachulski Stang Ziehl & Jones, LLP.  We are counsel for the Debtor and the Defendant in this adversary, Highland Capital Management, L.P., and with me is my colleague Gregory Demo.

MR. THORNTON:  And I'm Robert Thornton.  I'll be here as a representative of the witness, Clifford Stoops.

THE VIDEOGRAPHER:  All right.  The court reporter today is Monique Vouthouris on behalf of Planet Depos.  Would the reporter please swear in the witness.

CLIFFORD E. STOOPS, II
being first duly sworn or affirmed by the Notary, testifies as follows:

EXAMINATION
BY MS. McLAUGHLIN:

Q   Good morning, Mr. Stoops.  Can you still hear me okay?

A   Yes.

Q   Perfect.  Now, prior to today you and I have never spoken.  Is that right?

A   Correct.

Q   And while we're doing this virtually, I'm going to do my best to speak loudly, but please let me

---

9

1  know if at any point you can't hear me.
2      Are you aware of anything today that would
3  prevent you from testifying competently and
4  truthfully?
5      A  No.
6      Q  We're going to start with some brief
7  background about your employment history.  Is it
8  correct that you began working at Highland Financial
9  Partners, L.P. in 2006?
10     **A  Technically it was Highland Capital**
11 **Management working on Highland Financial Partners.**
12     Q  Thank you.
13     **A  So not an employee of Highland Financial**
14 **Partners, but that was the fund and fund complex I was**
15 **working on as an employee of Highland Capital**
16 **Management.  But the date is correct.**
17     Q  Thank you.  I appreciate that.  Your work
18 with Highland Financial Partners, did that also
19 involve work with Highland Financial Partners
20 subsidiaries, such as Highland Special Opportunities
21 Holding Company, Highland CDO Holding Company and
22 Highland Financial Corp.?
23     A  Yes.
24     Q  In 2012 is it correct that you moved to
25 Highland Capital Management, L.P. in a more general

---

10

1  sense?
2      **A  Technically it was 2009, but in 2012 I**
3  **received a title change around that move.**
4      Q  And did your title become chief accounting
5  officer?
6      **A  Yes.**
7      Q  While you were at Highland Capital, you also
8  had responsibilities with other funds that were
9  managed by Highland.  Is that true?
10     **A  Yes.**
11     Q  Those responsibilities included with
12 Highland Financial Partners and its subsidiaries?
13     **A  Yes.**
14     Q  And did you keep those responsibilities with
15 Highland Financial until the time you left Highland in
16 April 2020?
17     **A  Yes.**
18     Q  While an employee of Highland, were you also
19 involved with the Highland institutional funds as
20 their head of accounting -- fund accounting?  Excuse
21 me.
22     **A  And by "institutional," for clarification,**
23 **you're asking about the hedge funds, so to speak?**
24     Q  Um-hmm, yes.
25     **A  Yes, yes, that's correct.**

---

11

1      Q  At the time that you were employed at
2  Highland, were you also -- did you also have
3  responsibilities with Highland CDO Opportunity Master
4  Fund LP?
5      **A  Yes.**
6      Q  And you also had responsibilities with
7  NexPoint Real Estate Strategies Fund.  Is that
8  correct?
9      **A  Yes.**
10     Q  Did you receive separate compensation for
11 your role with these various entities?
12     **A  No.**
13     Q  So your checks issued only from Highland
14 Capital?
15     **A  Yes.**
16     Q  If one of Highland's affiliated or managed
17 funds had paid you directly, would you have considered
18 that to be unusual?
19     **A  Yes.**
20     Q  Since leaving Highland in April 2020, you've
21 worked at a publicly traded company.  Is that right?
22     **A  Yes.**
23     Q  And your present employer is not managed by
24 Highland Capital.  Is that true?
25     **A  No, it is not.  Yes, it's true.**

---

12

1      Q  Excellent.  Thank you.  Your present
2  employer is not owned or controlled by Mr. Dondero?
3      **A  No.**
4      Q  Your present employer is also not owned or
5  controlled by Mr. Ellington?
6      **A  No.**
7      Q  And since leaving Highland Capital in April
8  2020, you haven't had any communications with
9  Mr. Dondero or Mr. Ellington.  Is that correct?
10     **A  Correct.  I have not had any communications**
11 **with either.**
12     Q  We'll talk a little bit about Sentinel
13 Reinsurance Limited now.  Are you familiar with an
14 entity called Sentinel Reinsurance Limited?
15     **A  Roughly.**
16     Q  When did you --
17     **A  On a limited basis.**
18     Q  When did you get this limited understanding
19 of Sentinel?
20     **A  Generally I recall it being somewhere**
21 **around, my first introduction to it being around**
22 **August of 2017.**
23     Q  When -- in August of 2017, what did you
24 learn about Sentinel that caused you to become aware
25 of it?

13

1    A   I was informed that Sentinel would be a
2  party to a transaction involving a legal insurance
3  policy and they would be the insurance provider for
4  this policy that was to be issued to Highland
5  Financial Partners and its subsidiaries and to CDO
6  Fund and its subsidiaries relating to an outstanding
7  legal matter.
8    Q   And who did this conversation happen with?
9  Who informed you of this?
10   A   I was informed by JP Sevilla and also
11 present was, I recall to some degree, Rick Swadley was
12 also present.
13   Q   And how did this conversation come about?
14   A   I don't recall the specifics, meaning I
15 don't think it was like a scheduled meeting. I think
16 it was an ad hoc meeting that occurred at some point
17 during the day in which JP came up and asked to speak
18 with me, and to some degree Rick got incorporated into
19 the conversation. And it occurred in a conference
20 room just off of where my groups operated.
21   Q   And so it was Mr. Sevilla that initiated the
22 conversation --
23   A   Yes.
24   Q   Do you remember about how long this meeting
25 took place for?

14

1    A   I thought it was around -- I recall it being
2  somewhere around like two hours. Several hours.
3    Q   Several hours?
4    A   Yes.
5    Q   During that conversation what did
6  Mr. Sevilla inform you of?
7    A   That in the matter relating to Highland
8  Financial Partners and CDO Fund and UBS, that we
9  collectively, meaning the Highland side, were nearing
10 an agreement or legal resolution that would involve a
11 large monetary payment in settlement for that legal
12 resolution. And I don't recall specifically if it was
13 a judgment or if it was a settlement or some
14 combination.
15       But I just recall specifically it was an air
16 -- had an air of finality to it, that it would bring
17 to close all of the outstanding legal matters and it
18 was a large -- a large number. And to effect that, we
19 would have to basically use the assets in both HFP and
20 its subsidiaries and the CDO Fund and its subsidiaries
21 to effectively pay for that insurance policy.
22   Q   All right. There's a lot there, so we're
23 going to break it down into smaller pieces.
24   A   Sure.
25   Q   The legal action that you're talking about,

15

1  are you referring to a litigation that UBS initiated
2  against Highland and some of its affiliated funds in
3  the New York State courts?
4    A   I'm not sure of the venue being New York,
5  but, yes, generally yes to everything else.
6    Q   Do you recall that litigation starting in
7  approximately 2009?
8    A   Yes. Yes.
9    Q   And in August 2017 in your conversation with
10 Mr. Sevilla, is this the first time you had heard
11 about a legal liability insurance policy being brought
12 up?
13   A   Yes. To my recollection. If there are any
14 documents indicating otherwise, I'd love to see them.
15 But, yes, to my recollection, that was the first time
16 I had ever heard of it.
17   Q   Okay. And do you remember what
18 Mr. Sevilla's role was in 2017?
19   A   Like formal -- like formal title, lawyer,
20 legal counsel. He might have been assistant general
21 counsel, AGC, something along those lines. But sort
22 of to break that down, he was an, you know, an active
23 lawyer, in-house legal counsel for Highland Capital.
24   Q   And what about -- I think you had mentioned
25 Rick Swadley. Does that (inaudible) --

16

1    A   Rick Swadley's role was I think director of
2  tax, tax compliance.
3    Q   And during this conversation you mentioned
4  that they were discussing something with urgency or a
5  finality about it. Did you understand -- or what did
6  you understand to be the final piece or what was the
7  finality?
8    A   Well, it was the -- the -- ultimately, it
9  would be the execution of that -- whatever legal
10 agreement, the settlement. I'll just -- for lack of a
11 better phrase or specificity here, let's assume it was
12 a settlement discussion. That was the end goal as
13 explained to me. And so the sense of urgency around
14 it was it was a large number and the two funds had
15 extremely illiquid assets that, you know, maybe for
16 whatever reason UBS wasn't interested in those, it
17 wanted cash on the barrel.
18       So to get the cash needed to get UBS to
19 sign, we had to translate those assets, you know,
20 somehow, for lack of a better -- translate those
21 assets into a cash equivalent that met the
22 expectations of UBS. And so the urgency was around
23 how do you do that. And that's what -- when it was
24 explained to us the need for the insurance policy,
25 that the insurance company would receive these assets

17

1 and in return would issue this insurance policy
2 against which it agreed to pay any sort of final
3 settlement agreement, you know, presumably in cash,
4 directly to UBS.
5        And so the urgency was around, you know,
6 effecting the transfer of the assets to the insurance
7 company so they had them in hand and were willing to
8 issue the insurance policy for UBS to get comfortable
9 with it.
10    Q   There's a lot there again, so we're going
11 to --
12    A   Sure.
13    Q   -- try to get some of the smaller pieces.
14        You've mentioned that there were -- there
15 were going to be some asset transfers.  Is that
16 correct?
17    A   Yes.
18    Q   Why would Mr. Sevilla have approached you
19 about asset transfers?
20    A   In my position I was responsible for the
21 accounting, you know, the books and records, plus the
22 operations.  And so given the sort of mixed bag of
23 assets, the transfer of the assets wouldn't be as
24 straightforward as, you know, one might presume, and
25 it would have been up to my team, my groups to sort of

18

1 effect those transfers in their different capacities
2 or in their different, you know -- in their different
3 states in which they existed, you know, whether it be
4 an LP interest or cash or DTC-held securities, et
5 cetera.
6    Q   You mentioned that you were responsible for
7 accounting.  Which entity were you responsible for the
8 accounting of?
9    A   So if you look at Highland as a whole, you
10 could separate it between two different groups.  You
11 have Highland and related advisors, what we sort of
12 loosely called the management company.  And then you
13 have the investment vehicles.  Those are the vehicles
14 in which investors put their money and the assets are
15 managed.
16        I generally was responsible for the books
17 and records for most but not all of the investment
18 vehicles managed by Highland and several of its
19 advisors.  I was not responsible for the accounting
20 for Highland as a management company, nor the
21 operations of Highland as a management company.
22    Q   And in August 2017 when Mr. Sevilla
23 approached you, he was coming to you because you had
24 responsibility for the accounting of Highland
25 Financial Partners and its subsidiaries.  Is that

19

1 correct?
2    A   Yes.
3    Q   And Mr. Sevilla began talking about this
4 transfer.  What -- what assets did he want you to
5 transfer?
6    A   All of them, all of them in HFP and all of
7 them in CDO Fund.
8    Q   Did he also want you to transfer any assets
9 from Highland CDO Opportunity Master Fund?
10    A   When I say CDO Fund, that's generally what
11 I'm referencing.  CDO Fund complex had -- again, I
12 acknowledge, I think you're saying Highland CDO Holdco
13 under HFP, and it sounds very much like CDO Fund.  But
14 when I say CDO Fund, I'm referencing the CDO
15 Opportunity Master Fund and its subsidiaries.  So the
16 answer to your question is yes.
17    Q   Okay.  I'm going to try to use HFP Funds and
18 CDO Funds to collectively mean what you just said,
19 Highland Financial and subsidiary -- Highland CDO
20 Master Fund and its subsidiaries.
21    A   Understood.
22    Q   Okay.  And Mr. Sevilla asked you to transfer
23 the funds -- or transfer the assets from HFP Funds and
24 the CDO Funds to which entity?
25    A   During that conversation it was just sort of

20

1 loosely described as Sentinel.  In other words, we
2 would be transferring these assets from the two funds,
3 HFP and CDO Fund, to Sentinel.  We didn't necessarily
4 get into the actual here's the name of the company,
5 here's the, you know, instructions, et cetera.  We
6 discussed that later.  But generally Sentinel, the
7 insurance company, who would be issuing the policy.
8    Q   And how was that transaction supposed to
9 work?
10    A   The transfer of the assets or the insurance
11 policy?
12    Q   Do you have knowledge of both?
13    A   I have knowledge of the transfer of assets.
14 The Sentinel policy I just have a very, very limited
15 knowledge of based on what was explained to me in that
16 conversation in the conference room.
17    Q   What was explained to you in the conference
18 room about the insurance policy?  We can start there.
19    A   That we would -- that we were in discussions
20 with UBS at the time regarding a settlement or legal
21 resolution.  It would involve a large monetary
22 payment.  But for whatever reason, the assets held by
23 the two relevant funds wouldn't work in this due to
24 the illiquid nature, in their current form wouldn't
25 work due to the illiquid nature of the assets, so we

---

**21**

1 had to come up with some way to monetize them, and we
2 didn't think we had time, and so this insurance policy
3 was the best solution.
4     And the intent was to transfer the assets to
5 the insurance company Sentinel. Sentinel would then
6 under some sort of, you know, arrangement -- I
7 wouldn't really -- the transfer would be governed by
8 some arrangement, and then Sentinel would issue a
9 policy in the names of the two funds. And then when
10 this legal resolution was finalized, Sentinel would
11 pay up to a hundred million dollars to UBS with
12 respect to this legal resolution. That's my
13 understanding of the policy and kind of the way it
14 worked.
15     And so then my part in it was my team,
16 various teams, actually both accounting and
17 operations, would facilitate the various transfers of
18 the different types of assets. And so during that
19 two-hour discussion -- I think it was during that
20 discussion, I seem to recall that -- we had a rough
21 list of the assets and we kind of walked through what
22 it would take to effect the transfer of each of the
23 assets. It wasn't -- the way you transfer one
24 wouldn't necessarily transfer all of them, so we had
25 to group them in different buckets and figure out the

---

**22**

1 best way to transfer the assets.
2     And so we spent a material amount of time in
3 that discussion covering that component of it and the
4 estimated amount of time it would take to potentially,
5 you know, finalize all the transfers.
6     MS. McLAUGHLIN: And if we can put Exhibit 1
7 on the screen, please.
8     (Deposition Exhibit 1, Email October 26,
9 2017 from Isaac Leventon to Chris Dunn with
10 attachment, marked for identification.)
11     MS. McLAUGHLIN: Thank you.
12   Q  Exhibit 1 is a 19-page document. It's an
13 email from Isaac Leventon dated October 26th, 2017,
14 attaching what's entitled a Legal Liability Insurance
15 Policy. Do you see the document on your screen,
16 Mr. Stoops?
17   A  Yes.
18     MS. McLAUGHLIN: Can we please go to page 2.
19     MR. FEINSTEIN: Excuse me. Shannon, before
20 you pose the next question -- it's Robert Feinstein,
21 for the record, counsel for Highland. The --
22 Mr. Leventon is an in-house lawyer. Mr. Sevilla is as
23 well. I thought this would be an appropriate point to
24 put on the record Highland's view as to the
25 applicability of the attorney-client privilege to the

---

**23**

1 deposition you're taking and the questions you're
2 asking.
3     So to be clear, Highland is not going to
4 assert the attorney-client privilege to preclude
5 inquiry into the matters that I think are summarized
6 in paragraphs 5 through 11 of a motion that the
7 company recently filed in the bankruptcy to approve
8 its settlement with UBS outlining facts relevant to
9 the Sentinel insurance policy and so forth. That's at
10 docket number 2199. This is not a blanket waiver of
11 the privilege. It is transactional, if you will, as
12 to those transactions that are summarized in those
13 paragraphs, and that's the extent of the waiver and
14 non-assertion of the privilege. Thank you.
15     MS. McLAUGHLIN: Thank you, Mr. Feinstein.
16     Could we please turn to the last page of
17 Exhibit 1.
18 BY MS. McLAUGHLIN:
19   Q  Now, Mr. Stoops, do you see at the top here
20 where it lists Sentinel Reinsurance Limited as the
21 insurer signed by Andrew Dean?
22   A  Yes.
23   Q  And below that it lists insureds and then
24 has three entities all signed by Jim Dondero on behalf
25 of Highland CDO Opportunity Master Fund, L.P.,

---

**24**

1 Highland CDO Holding Company and Highland Special
2 Opportunities Holdings Company. Do you see that as
3 well?
4   A  Yes.
5   Q  And are these the parties that you
6 understood to be -- excuse me.
7     Are these the entities that you understood
8 to be parties in the transaction Mr. Sevilla described
9 to you in August 2017?
10   A  Yes.
11   Q  Have you ever seen this policy at the time
12 you were discussing it with Mr. Sevilla?
13   A  I don't recall it. I don't. But, again, if
14 you've got a document that indicates I did, I'd be
15 happy to see it. I don't recall specifically seeing
16 the policy, no. But I may have just passing in an
17 email, but I don't recall specifically seeing it, no.
18   Q  Do you now understand that this is the
19 policy Mr. Sevilla was referring to at that time?
20   A  It -- yeah, I mean, it generally appears to
21 be and capture the salient terms that were sort of
22 discussed orally with me at the time, you know, in the
23 conference room, yes.
24   Q  And do you know who Andrew Dean is?
25   A  No. That's -- no. To my knowledge, I have

25

1 no previous experience with him in any capacity.
2    MS. McLAUGHLIN: Can we please go one page
3 prior to this, to page 18.
4    Q   It looks here towards the bottom of the page
5 do you see where it lists the indemnity limit of $100
6 million?
7    A   Yes.
8    Q   Do you also see it lists a premium of $25
9 million?
10   A   Yes.
11   Q   Now, do you know how either figure was
12 determined?
13   A   No.
14   Q   Do you know whether this premium was paid?
15   A   No, I -- no.  No.  I was -- I think this was
16 kind of part of our understanding how the mechanics
17 would work on everything during the lengthy
18 discussion.  But we really -- I don't recall
19 specifically getting into the premium aspect of it.
20 I -- I -- honestly, I don't recall the 25 million in
21 the original discussion.  I don't know if it was
22 present, we just didn't really cover it, or if it
23 developed later for some reason.  I don't recall.
24       We simply talked about it in terms of here
25 are the assets and in return we're getting a $100

26

1 million policy.  Now, clearly the $25 million
2 component, you know, developed at some point.  I just
3 don't recall spending a lot of time on it during the
4 original discussion.
5    Q   Had Mr. Sevilla's instructions been to
6 transfer all the assets at the relevant funds?
7    A   Yes, that was -- that's my recollection,
8 yes.
9    Q   And in that instruction Mr. Sevilla wanted
10 all funds or all assets transferred regardless of the
11 value of those assets?
12   A   That's right, yes.
13   Q   Do you know, based on your conversation with
14 Mr. Sevilla, if UBS knew about this insurance policy?
15   A   I can't say specifically about the policy
16 itself.  It was my understanding -- you know, it's two
17 steps.  The first is you have to reach the settlement
18 and then you have the payment where the policy comes
19 in.
20       I mean, I think during the conversations it
21 was very clear to us, or at least made very clear to
22 us, that UBS was actively involved in the negotiations
23 because at the time it was -- the only rotating item
24 was the bid and the ask.  The difference between what
25 we were offering and what UBS was asking was material

27

1 but narrowing.  And so there was enough, I guess,
2 support there for somebody to conclude that we were
3 near resolution and to effect it we would need this
4 policy.
5       But your question was do I have knowledge of
6 UBS being aware of the policy, no, I don't have
7 specific knowledge of that.  But it was represented to
8 us that there were negotiations in which UBS was an
9 active participant.
10   Q   And it was Mr. Sevilla that made
11 representations that UBS was an active participant at
12 this time?
13   A   Yes.
14       MS. McLAUGHLIN:  We can take Exhibit 1 down,
15 please.  Could we please put Exhibit 2 up instead.
16       (Deposition Exhibit 2, Purchase Agreement
17 August 7, 2017, marked for identification.)
18   Q   Okay.  Exhibit 2 is a seven-page document,
19 it's entitled "Purchase Agreement," and it's dated as
20 of August 7th, 2017.  Do you see Exhibit 2 on your
21 screen?
22   A   Yes.
23   Q   And this purchase agreement lists Sentinel
24 Reinsurance Limited as the purchaser.  Do you see
25 that?

28

1    A   Yes.
2    Q   And it also lists three Highland entities as
3 the sellers:  Highland CDO Opportunity Master Fund,
4 L.P., Highland CDO Holding Company and Highland
5 Special Opportunities Holding Company.  Do you see
6 that?
7    A   Yes.
8    Q   Prior to preparing for this deposition, had
9 you seen this agreement before?
10   A   I don't recall it.  I don't recall it.  No,
11 I don't recall.  But, again, that doesn't mean somehow
12 maybe I got it sent to me by email.  I don't recall
13 seeing this specifically.
14       MS. McLAUGHLIN:  And if we could please turn
15 to the last two pages, page 6 and 7.  Starting at page
16 6.  Obviously you can't put both up.
17   Q   This is a page titled "Schedule A" with a
18 list of assets.  Mr. Stoops, you can still see this on
19 your screen?
20   A   Yes.
21   Q   The assets listed here are broken out by
22 different entities starting with Highland CDO
23 Opportunity Master Fund L.P., correct?
24   A   Yes.
25   Q   Do you have an understanding as to what the

29

1  third column is? It's titled "Traded Shares/Par."
2      A   Yes, I do.
3      Q   And what do you understand that column to
4  be?
5      A   Well, so when you have -- when you have
6  securities such as stock, then you have shares, traded
7  shares. When you have bonds, you talk about it in
8  terms of par; that's effectively the face value. When
9  you have CLO equity, they typically -- it's not one
10 for one as you would a bond, but they typically use
11 the same concept for CLO equity, the par concept for
12 CLO equity for reference, and that's what this is.
13     So "traded shares" refers to the number of
14 shares held in your certificated interest in a
15 vehicle; "par" represents in the terms, context of
16 bonds, the face value of original issuance, and for
17 CLO equity effectively the same, face value of
18 original issuance of your interest in the vehicle.
19     Q   Do you have an understanding as to who would
20 have determined these numbers put into that column?
21 Would that have been something your department put
22 together or a different department?
23     A   I can't say specifically, not having seen
24 this before. But let me say it was readily available
25 on the intranet at Highland for anybody to use.

30

1      Q   And the assets that are listed on this page,
2  do you recognize any of the assets listed here?
3      A   Many, if not most or all, yes.
4      Q   Where do you recognize them from?
5      A   Well, this Aberdeen, Southfork, those are
6  all CLOs that Highland managed. Highland was the
7  advisor for these. The GSC, I don't recall that.
8  Greenbriar, Highland Financial Partners. Longstreet
9  was external. NexPoint is internal. PAM Cap is
10 internal, CLO or CDO. So it's just kind of a mixed
11 bag. And then others we sort of recognize just over
12 the years having to do the accounting for these
13 entities. These were the assets held by these
14 entities for a number of years. They didn't change,
15 so you would kind of see them over and over again.
16     Q   And are the assets listed here similar to
17 the assets Mr. Sevilla was talking to you about in
18 that meeting in August 2017?
19     A   I can't say specifically they were the
20 exact, but, yes, this is probably consistent with what
21 I would have expected to be the subject of that
22 conversation. This appears to be the listing -- as I
23 said, I think we broke out a list of assets to kind of
24 walk through how they would be settled, and this
25 likely would have been consistent with what was -- we

31

1  were talking about.
2      Q   Okay. And your understanding was that the
3  assets would be transferred to pay UBS. Is that
4  correct?
5      A   In the sequence of events, the assets would
6  be transferred to pay for a policy, a settlement
7  policy that would then pay UBS in cash if a settlement
8  or legal judgment were reached. There was that last
9  contingency in there.
10     Q   And do you know whose idea it was to
11 transfer the assets to Sentinel and then to UBS if a
12 settlement were reached?
13     A   Meaning whose idea was it to take out the
14 policy? Is that what -- is that your question?
15     Q   Yes. Thank you.
16     A   Yeah, I don't know. That preceded me, and I
17 wasn't involved in those conversations.
18     Q   Okay.
19     A   Meaning by the time I was sitting in that
20 conference room discussing it, the idea of the policy
21 was well in motion at that point, and I don't know the
22 origins of it at all.
23     Q   And you've mentioned that Mr. Sevilla,
24 yourself and Mr. Swadley discussed how to transfer the
25 assets or the mechanics of it being the baskets were

32

1  all a different kind. Is that -- is that correct?
2      A   Well, to his credit, Rick probably wouldn't
3  have been involved in the transfer of the assets.
4  That would have been primarily JP and me, JP Sevilla
5  and me. Rick was more interested in the what happens
6  next, the sort of tax implications. But, yes, we --
7  JP Sevilla and I discussed the how to effect the
8  transfer of each of the different groups of assets on
9  the list.
10     Q   So in your understanding, how much money was
11 to be transferred?
12     A   Meaning the overall value of the assets?
13     Q   Yes. Yes.
14     A   Yes. Yes.
15     Q   Sorry. What was your understanding of the
16 overall value of the assets to be transferred?
17     A   So I think -- and that's why this one is a
18 little odd to me. I would have expected, quite
19 frankly -- is this the -- is this the original format
20 of the Schedule A? It wasn't changed in any way?
21     Q   I can't answer that. I have no idea.
22     A   Okay, fair enough. I would expect market
23 value to be on there as well; price and market value
24 to be on there as well. And, you know, collectively,
25 I've seen the number about 105 thrown around, 105

33

```
1    million, and so clearly you're talking about a policy
2    of 105 -- I mean, a transfer of assets worth 105
3    million versus a policy of a hundred million.  There's
4    a slight difference there.  And the way it was
5    explained to us was due to the illiquid nature of it,
6    of the assets, the overall asset pool and the time
7    required to liquidate it, there was some concern of
8    would we actually achieve the upper boundaries of the
9    potential settlement number.  And in the interest of
10   time, this was the best solution.
11        Additionally, there would also be expenses
12   to be paid -- legal expenses, administrative expenses,
13   et cetera -- around this, and that these assets would
14   be used to pay whatever ancillary expenses, you know,
15   remained going forward.  Because that was one of my
16   concerns was, you know -- one of my responsibilities
17   at HFP was from time to time if I was presented with a
18   bill to pay -- legal expenses, tax prep fees,
19   whatever -- I used, you know, whatever cash was in the
20   account to pay for it.  And as represented to me, we
21   would be transferring all of the assets, how would I
22   pay expenses going forward in any capacity, you know,
23   in whatever they are, the nature.
24        And it was represented to me that Sentinel
25   would be paying those expenses going forward, and I
```

34

```
1    was like BDO -- BDO is an accounting firm -- tax prep
2    fees, yes, that would be paid by them.  You know, they
3    had offshore governance, they had directors, the CDO
4    Holdco and HSC had offshore directors.  Yes, that
5    would be paid by them.
6         So going forward I had no responsibilities
7    to pay any expenses out of HFP and because there won't
8    be any cash, yes, that's correct.
9         So that's kind of -- that was the -- getting
10   back to your question of what was my understanding of
11   the value of the assets, that was the justification
12   for the differential between the $105 million fair
13   value of the assets versus the potential outlay the
14   insurance company would incur with respect to the
15   issuance of this policy.
16   Q    And I think you said it in there, but just
17   to make sure that we understand, in August 2017 you
18   understood that these transfers were for a market
19   value of approximately $105 million.  Is that correct?
20   A    That's generally my recollection, yes.  I
21   don't remember the precise number, but it was in that
22   neighborhood, yes.
23   Q    Okay.  And you also understand that $105
24   million is greater than $25 million.  Is that right?
25   A    Yes.
```

35

```
1    Q    We didn't start beginning -- begin to
2    discuss some of the transfers themselves.  Do you know
3    if any of the assets listed on page 6 of this
4    agreement were ever transferred to Sentinel?
5    A    It was my understanding -- are you limiting
6    the scope of your question to only page 6 or are you
7    also including page 7?
8    Q    I started with page 6 only because it's on
9    the screen.  However --
10   A    Sure.
11   Q    -- you have a binder in front of you with
12   the document in it, and so we can go page 6 and page 7
13   at the same time.
14   A    It was my understanding that all assets on
15   both page 6 and 7 were to be transferred.
16   Q    Do you know if in fact all assets on pages 6
17   and 7 were transferred?
18   A    I've learned recently in just very recent
19   discussions, as early as today, that no, apparently
20   not all assets were transferred, which was news to me.
21   Q    But the goal was to transfer all assets,
22   right?
23   A    That's right.  That's right.  That's again
24   illustrated by my concern about how are we going to
25   pay expenses for these funds going forward if there
```

36

```
1    were no assets left, and, you know, that was, again,
2    we had, like, the two-hour conversation, that was part
3    of it; Sentinel will pay all expenses for the funds
4    going forward, okay.
5    Q    When this transaction was complete, your
6    concern was that there'd be no funds at any of the HFP
7    entities or the CDO entities.  Is that correct?
8    A    That's correct, yes.
9    Q    So the assets then were pooled from those
10   entities collectively.  Is that correct?
11   A    They ultimately would have been pooled at
12   Sentinel.  They weren't pooled at Highland.  We
13   wouldn't have commingled them at Highland.  But
14   theoretically Sentinel pooled them and commingled
15   them.
16   Q    And there are several entities listed on
17   pages 6 and 7.  We've got Highland CDO Opportunity
18   Master Fund, Highland CDO Opportunity Fund, Limited on
19   page 6.  And then if we can go to page 7, it shows
20   several more:  Highland CDO Holdings Company, Highland
21   Special Opportunities Holding Company, Highland
22   Financial Corp. and Highland Financial Partners.
23        So that's six total entities.  Is that
24   correct?
25   A    That's what's listed here, agreed, yes.
```

---

**37**

1    Q   But the purchase agreement itself, if you
2  look on page 1, was only entered into by three
3  Highland entities.  Is that true?
4    A   I'm -- not being involved in the purchase
5  agreement, I -- I couldn't tell you ultimately who was
6  a party to it.  I don't believe I was involved.  I
7  don't recall seeing it.
8    Q   If we could go to page 1, please.
9        The nice thing about these agreements is
10 that they give you some of the answers.
11   A   Sure.
12   Q   So here up top in that first paragraph, this
13 agreement only lists those three entities:  Highland
14 CDO Opportunity Master Fund, L.P., Highland CDO
15 Holding Company and Highland Special Opportunities
16 Holdings Company.  Is that right --
17   A   Yeah.  That's right.
18   Q   -- three --
19   A   Yes.  That's right.
20   Q   And so is it correct that the entities of --
21 excuse me, starting over.
22       Is it correct that the assets of all the CDO
23 Fund and HFP entities were put together under this
24 purchase agreement even if the entity was not a party
25 to the agreement?

---

**38**

1    A   Yes, it appears assets from entities in the
2  HFP -- in the HFP complex were included in the
3  agreement, while the entities themselves were not
4  listed on page 1, yes, I agree.
5        MS. McLAUGHLIN:  We can take Exhibit 2 down,
6  please.
7        (Deposition Exhibit 3, Email chain September
8  12, 2018, with attachment, marked for identification.)
9    Q   We'll briefly look at Exhibit 3.  And
10 Exhibit 3 is a six-page document.  It starts with an
11 email from Shawn Raver dated September 12th, 2018.
12 And if you look on page 2, it attaches a document
13 entitled -- or a memo entitled "Tax Consequences of
14 Sentinel Acquisition of HFP/CDO Opportunity Assets."
15       Do you see Exhibit 3 on the screen?
16   A   Yes.
17   Q   And before you began preparing for this
18 deposition, had you ever seen this memo before?
19   A   To my recollection, no, I don't recall
20 seeing it.  But, again, if you've got a document
21 indicating something to the contrary, I would be happy
22 to look at it to see if it reminds me.  But I don't
23 recall seeing this previously.
24   Q   Do you recall who Shawn Raver was?
25   A   Yes.

---

**39**

1    Q   And who was Shawn Raver?
2    A   So the tax department basically had two
3  functions.  You had tax compliance, which is the
4  preparation of tax returns, and that was Rick
5  Swadley's sort of jurisdiction.  It also had sort of a
6  tax research or positions team and much smaller, and
7  that was headed by Mark Patrick, a tax attorney, and
8  Shawn Raver.  Shawn Raver basically rolled up to him.
9  You know, he was -- he was the -- he was in that
10 group; Shawn Raver was in that group and reported to
11 Mark Patrick.
12       I'm only sort of hesitant in one sense.
13 Shawn Raver, I don't think was an employee of
14 Highland.  I think he was like a contractor, 1099, who
15 was there for like five years or something in that
16 capacity.  So that's why I'm hesitant to describe it.
17 But technically he reported to Mark.  He had a desk
18 there.  But I don't think he was an employee of
19 Highland per se; I think he was an external
20 contractor.
21   Q   Okay.  On page 3 here, on the bottom of page
22 3, do you see where it says, "The aggregate purchase
23 price"?  This is in the last paragraph.  "The
24 aggregate purchase price paid by Sentinel for the
25 Assets was 25 million"?

---

**40**

1    A   Yes.
2    Q   "The aggregate fair market value of the
3  assets on the date of the Transaction was
4  $105,647,679."
5    A   Yes.
6    Q   And do you know how that full market value
7  was determined?
8    A   The 105 million?
9    Q   Yes.
10   A   So Highland had a separate valuation team
11 that was responsible for at least, on a monthly basis,
12 coming up with or determining the value of all assets,
13 quote/unquote, in the system, and so these assets were
14 in the system and so they would have derived a value
15 for them.  So --
16   Q   Were you involved?  Sorry, I didn't mean to
17 cut you off.
18   A   No, I was not involved.
19   Q   Okay.  On page 4 of this memo -- if we can
20 flip one more -- it mentions here, "The IRS may
21 attempt to characterize the transaction as a 'sham.'
22 The focus of this argument would be on the fact the
23 Seller Entities sold assets with a fair market value
24 of 105,647,679 for a purchase price of 25 million.
25 And this was done solely to fund the $25 million

---

**41**

1 premium required by the Policy. The obvious question
2 would be why sell all the assets if all was required
3 was 25 million."
4     Do you see those sentences in the bottom
5 paragraph?
6     **A I do. I do.**
7     Q Do you know if people thought this
8 transaction was a sham?
9     **A I don't know --**
10     MR. FEINSTEIN: Before you answer, please --
11 it's Robert Feinstein again. I just want to note,
12 again, that the author of this memo is an attorney. I
13 understand he might have been an independent
14 contractor or whatever, but he was an attorney, and
15 I'm going to make the same observation again about not
16 asserting the privilege as to the memo and your
17 question, but thought it was appropriate, at least, to
18 note that this gentleman was an attorney. Thank you.
19     Q Mr. Stoops, do you know if people thought
20 the transaction was a sham?
21     **A This is the first time I've seen it even**
22 **sort of discussed in that potential context.**
23     **But I'll also note for the record that a**
24 **sham transaction is an IRS phrase, and so I don't know**
25 **that if you talk about it outside of the context of**

**42**

1 **IRS discussions that many people would have used the**
2 **phrase "sham." But whatever -- no, I'm not aware of**
3 **any actual discussions around it. I don't recall any.**
4     Q Okay. Thank you.
5     MS. McLAUGHLIN: We can take Exhibit 3 down,
6 please.
7     Q We're going to turn to a few documents that
8 discuss some of the transfers in more detail. We'll
9 start with Exhibit 4.
10     (Deposition Exhibit 4, Email chain August
11 11, 2017, HCMUBS000563 and 564, marked for
12 identification.)
13     Q And Exhibit 4 is an email with the top email
14 dated Friday, August 11th, 2017 from David Willmore to
15 Carter Chism, Katie Irving, JP Sevilla and Isaac
16 Leventon, and then copying you and several other
17 people. Do you see Exhibit 4?
18     **A Yes.**
19     Q And do you recognize this email?
20     **A I don't recall it specifically, but I -- you**
21 **know, I don't recall it specifically, but, you know,**
22 **I'm -- I understand it.**
23     Q Any reason to doubt that you received this
24 email on August 11th?
25     **A No, no reason to doubt that.**

**43**

1     Q There's a few people listed on here. Katie
2 Irving is listed. Do you know -- do you know what
3 Katie Irving's role was?
4     **A I couldn't tell you specifically. She**
5 **was -- from my description, she was in the legal**
6 **department but was not a lawyer. I thought she came**
7 **from Big Four accounting, and we just sort of viewed**
8 **her as litigation support.**
9     Q And I'm going to ask you about several other
10 individuals, too.
11     **A Sure.**
12     Q If you know their title, that's great, but,
13 otherwise, just a general description of what you
14 understood their role to be is --
15     **A Sure.**
16     Q Katie Irving, do you know who she reported
17 to in the legal department? Or the legal services
18 department you might have said.
19     **A I can't say definitively, but it was my**
20 **understanding I think she reported to Scott Ellington**
21 **directly.**
22     Q And Carter Chism is also on this email. Do
23 you know what his role was?
24     **A He was -- I believe at the time his role was**
25 **director -- or title was director of operations.**

**44**

1     Q And what department did Mr. Chism work in,
2 if you know?
3     **A Settlement. He reported directly to me.**
4     Q Okay. And if we're looking -- well, we'll
5 start there's a few more names here. David Willmore,
6 do you know what his role was?
7     **A At the time senior manager for in fund**
8 **accounting. Translated, he did -- handled the books**
9 **and records for the hedge funds, and he was the group**
10 **leader, and he reported directly to me.**
11     Q I see you're catching on to these questions,
12 the second part that comes after.
13     Who is Chris Dunn, if you know?
14     **A Chris Dunn was sort of a junior accountant**
15 **at the time in the fund accounting team, and he would**
16 **have reported directly to David Willmore.**
17     Q And that leaves three people left. I think
18 we've got JP Sevilla listed here?
19     **A In-house legal -- I'm sorry. Go ahead.**
20     Q Please. After you.
21     **A JP Sevilla, my understanding, in-house legal**
22 **counsel, a lawyer, reporting, it's my understanding,**
23 **to Scott Ellington.**
24     Q And did you have an understanding about
25 Isaac Leventon's role at the time?

45

1    A    Also in-house legal counsel, presumably
2  assistant general counsel, reporting to Scott
3  Ellington.
4    Q    And the last name I believe is Thomas
5  Surgent.  Do you understand what his role was?
6    A    Chief compliance officer for Highland, also
7  reporting to Tom -- I mean to Scott Ellington.
8    Q    Was it --
9    A    He was also -- I'm sorry, I don't mean to
10 cut you off but I need to modify it.  I think he had
11 two titles.  He was maybe also assistant general
12 counsel or something like that, and he had kind of a
13 dual role, a split role.  He was CCO, plus this sort
14 of assistant general counsel or deputy.  Maybe that
15 was it.  Maybe that was it.  Deputy general counsel,
16 something like that, something elevated higher than
17 the assistant general counsel that Isaac had, but
18 lower than Scott's title of, you know, whatever,
19 general counsel or chief legal; yeah, I think general
20 counsel.
21       So I think Scott -- I mean Thomas was deputy
22 general counsel, something like that, and CCO.
23   Q    Thank you.
24       We'll start at the bottom email, which is
25 the earliest in time, from Kate Irving to Carter

46

1  Chism.  Do you see where Ms. Irving wrote, "Sentinel
2  wiring instructions for cash arising from transaction
3  are below"?
4    A    Yes.
5    Q    The transaction here is the one that you
6  were made aware of in August 2017 in the conference
7  room with Mr. Sevilla.  Is that right?
8    A    Presumably, yes, it would have been in this
9  context.
10   Q    And what allows you to make that
11 presumption?
12   A    Well, it says on the subject line "Sentinel
13 wiring info."  It was around that time frame, and she
14 says, "Sentinel wiring instructions from cash arising
15 from transaction" -- "from transaction," you know, the
16 transfer, "are below."
17   Q    And in the next email, Mr. Chism responds,
18 and as he does, he copies in several additional people
19 to the email.  Do you recall why Thomas Surgent,
20 yourself, Frank Waterhouse, David Willmore and Chris
21 Dunn, Isaac Leventon were all added to this email?
22   A    I seem to recall it was on my instruction.
23   Q    I'm sorry, what do you mean by that, it was
24 on your instruction?
25   A    Well, we had just sat in a conference

47

1  room -- rephrase.  That's the "why."  The "what" is I
2  seem to recall instructing Carter to reply to this
3  email with these people on there so that everybody was
4  aware of what we were being instructed to do.
5       And you see Thomas Surgent, he represents
6  the compliance group.  You see Frank Waterhouse, he
7  was my boss.  And then obviously David and Chris
8  because they would have been handling the cash
9  transactions.  And then you also see -- that's a good
10 point.  I don't recall why Isaac would have been
11 added.  Clearly, to some degree, he had some
12 involvement.  I don't recall what.  But clearly, to
13 some degree, he was added for some reason, presumably
14 because he had some level of involvement.  Maybe
15 because it was HFP.  I can only speculate on why Isaac
16 was added.
17   Q    I think I heard you say that you had asked
18 Mr. Chism to copy these people on the email.  Is that
19 right?
20   A    Correct.
21   Q    Why did you want this variety of people
22 copied on the email?
23   A    Just the magnitude of it.  Again, I wasn't
24 familiar with this sort of policy.  It involved
25 legal -- outstanding legal matter, and it involved the

48

1  transfer of these assets, and so it was let's just
2  make sure everybody is aware of this.  It was moving
3  that quickly, right.  And it was, hey, get started on
4  this, we need to start making this happen, so let's
5  just everybody know that this is what's going on.
6  Sort of a fail-safe, if you will, just a backup, just
7  so that everybody knows what's being asked of us.
8       And as you can see, Carter used some very
9  specific language to make it very clear.
10   Q    Mr. Chism in this email had written, "Please
11 confirm this serves as instruction to wire cash from
12 all HFP Funds and all CDO Funds to the account listed
13 in the instructions below."
14   A    Um-hmm.
15   Q    Do you see the middle email there?
16   A    I do.
17   Q    And who was Mr. Chism asking for this
18 confirmation from?
19   A    Presumably Katie, JP or Isaac, any
20 combination of those three.
21   Q    He was asking for confirmation from the
22 legal department.  Is that right?
23   A    That's correct, yes.
24   Q    Looking at the top email, one more up,
25 Mr. Willmore responded and said, "FYI, I've entered

49

1 wires to move all of CDO Fund's cash to Sentinel." Do
2 you see that spot?
3    A   I do.
4    Q   This indicated to you that Mr. Willmore had
5 completed the steps to move all cash assets from CDO
6 Funds to Sentinel, right?
7    A   Not quite. So Highland had a proprietary
8 wire system where an accountant would go in and enter
9 the wire to go, and then that wire would then be
10 approved, and then those instructions would then go to
11 the bank. So think of this as, like, step one of
12 three or four. And all David is saying is, I've
13 entered the wires into our system.
14    Q   And do you recall who they would be approved
15 by when entered into that system?
16    A   I don't, I don't recall. It was over 7
17 million. I think at the time maybe only Frank had the
18 ability to approve wires that large. That's -- it
19 should be in the system. Anybody should be able to go
20 look at it. But I don't recall it specifically.
21    Q   A wire over 7 million, though, was --
22    A   No, no, technically -- technically -- I
23 mixed my words. I think the threshold was 5 million.
24 So because this one was 7 million, I think that was
25 the threshold and Frank would have to go -- Frank

50

1 would have to be the one to approve it.
2    Q   And did Frank have to seek approval from
3 anyone else, if you recall?
4    A   I don't know. Frank would have done that on
5 his own.
6    Q   In the next line here Mr. Willmore wrote
7 there were two wires, one for approximately 7.8
8 million and he lists the second number of
9 approximately 2.3 million?
10    A   Um-hmm.
11    Q   Do you see that line?
12    A   I do.
13    Q   These two wires were pursuant to the
14 purchase agreement. Is that correct? As you now
15 understand, these two wires were pursuant to the
16 purchase agreement?
17    A   Presumably, yes.
18    Q   I know you have a binder of exhibits there.
19 So in the binder you look at Exhibit 2.
20    A   Yeah, unfortunately, it's in a different
21 order. If you could help me reference it, I could
22 find it.
23         THE TECHNICIAN: Would you like me to pull
24 Exhibit 2 back up?
25    A   Or if someone can just tell me what it looks

51

1 like, I can find it.
2    Q   We're looking at Schedule A on page 6.
3    A   This was the PSA?
4    Q   Yes, the PSA?
5    A   If you'll give me a minute.
6         THE TECHNICIAN: Ms. McLaughlin, would you
7 like me to pull it up?
8         THE WITNESS: No, thank you. I'll be there
9 in 30 seconds, so...
10         MR. THORNTON: I've written Exhibit 2 on the
11 back of the divider page.
12    A   Okay. I've got it. I've got it. I've got
13 it in front of me.
14    Q   And on page 6 --
15    A   It's the same numbers, yes.
16    Q   Sorry?
17    A   I answered your -- but you need to put the
18 question on the record. So, I'm sorry, I cut you off.
19 Go ahead and finish your question.
20    Q   On page 6 do you see a transfer of a cash
21 amount for approximately $7.8 million listed?
22    A   I don't see a transfer. I see a listing of
23 a cash balance for that amount.
24    Q   Thank you. And the cash transfer -- let me
25 get the words right here with you. The cash amount

52

1 listed under Highland CDO Opportunity Master Fund is
2 roughly the same as what's listed in Mr. Willmore's
3 email in Exhibit 4?
4    A   Yes, agreed, roughly the same.
5    Q   40 cents?
6    A   Right, agreed.
7    Q   The other number in Mr. Willmore's email, he
8 listed 2.4 million, 2.3 million, approximate
9 number.
10    A   Um-hmm.
11    Q   Do you see a cash asset on Schedule A in
12 Exhibit 4 that matches that wire transfer?
13    A   Roughly. Immaterial difference, yes. 20
14 cents difference, but yes.
15    Q   And so looking at both of those, does this
16 confirm for you that the transfers of cash, or the
17 wires of cash that Mr. Willmore is referencing were
18 pursuant to the asset purchase agreement?
19    A   Yes, I think that's a very reasonable
20 conclusion, yes.
21         MS. McLAUGHLIN: We can take Exhibit 4 down
22 and put Exhibit 5 instead, please.
23         (Deposition Exhibit 5, Email chain August
24 11, 2017, HCMUBS000567 and 568, marked for
25 identification.)

53

1    Q   And Exhibit 5 is another August 11th, 2017
2  email. This one, this time it's from you to Katie
3  Irving, JP Sevilla, Isaac Leventon and copying the
4  same set of other people who were listed on Exhibit 4.
5       Do you see Exhibit 5 on your screen as well?
6    A   Yes.
7    Q   And do you remember sending this email?
8    A   Not specifically.
9    Q   Any reason to doubt that you sent this
10 email?
11   A   No.
12   Q   The top email is you responding to David
13 Willmore and the wire transfers -- sorry, excuse me.
14 This top email is you responding to Mr. Chism's
15 request for confirmation of assets to be transferred
16 or wire transferred?
17   A   Um-hmm.
18   Q   You write here, "All cash has been sent."
19 Is that you confirming that all the cash from HFP and
20 CDO Fund entities had been sent to Sentinel?
21   A   Yes, I think that's what it's confirming.
22   Q   At this point, then, they've already been
23 approved in the internal --
24   A   That's right. That's right.
25   Q   And we looked at the two wires in

54

1  Mr. Willmore's email already, but it seems here that
2  you're referencing additional cash wires as well. Is
3  that right?
4    A   Yes.
5    Q   Do you have a general sense of what other
6  cash wires had been executed?
7    A   Going back to your Schedule A, it would be
8  in Exhibit 6, I think it would be the cash balances
9  listed for the HFP entities.
10   Q   Are you looking at Exhibit 2, I think, the
11 asset purchase agreement? You mentioned Exhibit 6 --
12   A   I see schedule -- I see Schedule A at the
13 top. It's the list of assets.
14   Q   Oh, got it. Schedule A of Exhibit 2.
15 You're looking at the HFP entities on page 7?
16   A   Yes. Yes.
17   Q   You also mention in your email working on
18 DTC securities?
19   A   Correct.
20   Q   What were DTC securities?
21   A   Depository Trust Company. It's basically
22 electronic transfers. So, you know, any sort of
23 publicly traded securities, traded DTC. So you can go
24 in and just flip them from one DTC account to another.
25 So think of just publicly traded traded

55

1  electronically.
2    Q   And was this a reference to the -- to some
3  of the securities listed on Schedule A of the purchase
4  agreement?
5    A   Yes.
6    Q   And why were you working on it?
7    A   Because the settlement instructions would
8  have been different; they would have been settled to a
9  different account.
10   Q   And by working on DTC securities, you meant
11 working on getting them transferred to Sentinel. Is
12 that right?
13   A   That's right. That's right.
14   Q   And who directed you to work on this?
15   A   Well, it would have been involved in the
16 original -- it would have been a part of the original
17 conversation with JP. So, in other words, part of
18 a -- material part of our conversation, I recall we
19 got a list similar to this and we went through and
20 we're like, okay, these are physicals, these are DTC,
21 this is just cash. And so we were kind of bucketing
22 them.
23       And you're seeing on your screen here the
24 different buckets. Cash is pretty easy; we just
25 covered that. DTC would have been -- we would have

56

1  sent instructions to the brokers and just changed them
2  from one DTC account to another, and then what was
3  left would be the physical, the investments that are
4  in sort of what we call physical form.
5       And so this is just a way of saying we've
6  covered one grouping, we're working on the second
7  grouping, and for the third grouping we're still
8  waiting for legal to provide us with how you want to
9  do this, where do you want us to deliver them. We
10 would have to instruct -- we would have to instruct
11 our custodian to deliver physicals to another
12 custodian.
13   Q   And do you know if legal did provide those
14 delivery instructions?
15   A   Presumably. I can't recall specifically who
16 or when or what they were, but presumably, yes.
17   Q   Do you recall who in legal would have given
18 that instruction?
19   A   I -- I can't say definitively. I can
20 only -- I can only speculate.
21   Q   Well, it's been a number of years, so --
22   A   It has been.
23   Q   -- it's understandable. What would you have
24 done once you had the delivery instructions?
25   A   For DTC or physicals?

57

1    Q   For the physicals.
2    A   Yeah, so realistically this also would have
3  been covered by Carter's team as well. This was kind
4  of standard. You know, Highland was a CLO manager who
5  both managed CLOs but also purchased them. And it
6  wasn't uncommon for certain CLO interests, especially
7  equities, to be -- the certificated interest to be in
8  the form of physical securities.
9        And so if you were sort of breaking it up or
10  selling them whole or partial, you would have to
11  inform the custodian bank holding them that we want
12  them transferred in the name of this entity to this
13  new custodian. And so they would have to
14  re-certificate the interest in the new beneficiary's
15  name and then transfer the physicals to that custodial
16  bank.
17    Q   And did --
18    A   So, in other words, simply put, cash could
19  go in an hour or two. DTC securities could go in a
20  couple of hours. Physicals likely would have taken
21  one to two to three weeks to get them all covered.
22    Q   And you knew to transfer the physicals
23  because of your conversation with Mr. Sevilla as well.
24  Is that right?
25    A   That's right. That's right.

58

1    Q   I think you had mentioned earlier that there
2  was 105 million market value of the assets and they
3  needed to be discounted for being illiquid. Was that
4  your understanding?
5    A   That was the explanation provided to me.
6    Q   Is cash a liquid asset?
7    A   Let me make sure I heard you correctly. Are
8  you asking is cash "a liquid" or are you saying is
9  cash "illiquid"?
10    Q   Well, the former. To make it very clear,
11  would cash be a liquid or --
12    A   Let me describe it. Cash is considered very
13  liquid. It's the most liquid form of asset you can
14  have, basically.
15    Q   And so on Schedule A in Exhibit 2, when
16  there's a cash transfer of approximately $7.8 million,
17  would that need to be discounted for being illiquid?
18    A   No.
19    Q   And the cash transfer of approximately $2.3
20  million, would that need to be discounted for being
21  illiquid?
22    A   Presumably, no. No.
23    Q   And the same is true for any cash assets
24  listed on page 7 of Schedule A, they would not need to
25  be discounted for being illiquid. Is that correct?

59

1    A   That's correct.
2        MS. McLAUGHLIN: We can take Exhibit 5 down,
3  please.
4    Q   If the goal is to make the fund's assets
5  liquid, why did they need to transfer cash to
6  Sentinel?
7    A   Any answer I give you would be purely
8  speculation. I wasn't involved in any component of
9  the negotiations or discussions around the decision of
10  that. I could speculate if you want me to, but it
11  would be entirely speculation.
12        MR. THORNTON: Let's don't speculate.
13    Q   You can't think of a good reason why you
14  would need to transfer cash to Sentinel if the goal
15  was to make the funds more liquid, can you?
16    A   The good reason would be as a partial
17  payment on the premium. But obviously there's a
18  deficit in there, a difference in there, between the
19  apparent 25 million or hundred million, whichever
20  number you want to focus on, and the cash balance.
21        And I say that because honestly I don't
22  recall at the time the significance of that 25
23  million. We were just sort of viewing it as 105 for a
24  hundred. But, you know, I get the math now clearly.
25  And the differential between whatever the total

60

1  cash -- aggregate cash value is in that premium was
2  presumably going to be made up by the perceived
3  liquidation value of the remaining assets.
4    Q   Is it correct, then, if I'm understanding
5  this right, everything listed on Schedule A that is
6  not cash value needed to make up the differential
7  between the value of the cash and the $25 million?
8    A   That's me speculating, that's entirely me
9  speculating. As represented to me, there were going
10  to be expenses to be paid. So maybe a part of the
11  understanding was they also needed excess cash to pay,
12  you know, whatever fees or expenses they were
13  expecting to incur. I just simply don't know.
14        I can tell you what was represented to me,
15  which was all of this is with respect to the payment
16  and application of that policy, and we didn't really
17  get into a -- we didn't really get into extensively,
18  well, how are you coming up with the net present value
19  of that or represent this or -- that was -- that was
20  an obligation of the dealmakers, you know, the people
21  responsible for negotiating the principal terms of the
22  agreement.
23    Q   And so you were just accepting the
24  information that was presented to you by Mr. Sevilla
25  in that August meeting. Is that right?

61

1    A    That's right, with some follow-up questions
2  on -- on understanding it better and clarification.
3  But, yes, I was acting on the legal instruction from
4  counsel.  I was acting on instructions from legal
5  counsel.
6      Q    And the instructions from legal counsel was
7  to transfer all of the assets of CDO Funds and HFP
8  Funds to Sentinel so they would be left with no
9  assets?
10    A    Yes.
11    Q    Were the HFP Funds and CDO Funds to be left
12 with liability still?
13    A    As I understood it, the only remaining
14 liability would be that owed to UBS.  All operational
15 liabilities, i.e., fees and expenses for tax prep,
16 corporate governance, would be paid by Sentinel.  So
17 in theory the only thing left on the books would be --
18 would be the obligation owed to UBS.
19    Q    Is it typical in a transaction to have all
20 the liability kept on an entity's books or the
21 liability to UBS kept on an entity's books but all the
22 assets transferred away?
23    A    Please bear in mind this was my first
24 experience with a transaction like this, so I'm
25 certainly in no position to tell you what's typical in

62

1  these types of transactions.
2      It's a -- it's a reasonable question and
3  one -- that's where we spent more of our time also
4  exploring, trying to understand it.  We were trying to
5  understand would I have a policy on my books.  In
6  other words, do I transfer these assets and I get a
7  $50 million policy, you know, the payout, $50 million,
8  I get a receivable.
9      And that's when it was explained to us:
10 you'll never see that cash at HFP.  Well, why not?
11 Well, the way it's going to work operationally is the
12 cash will go from Sentinel directly to UBS after an
13 agreement has been, you know, executed.  So, in other
14 words, it won't go to HFP and HFP paid them.  It will
15 be assumed by that.
16     So even if you had an asset -- even if you
17 had an asset like a receivable, you effectively wind
18 up impairing it because you'll never realize that
19 asset, and so the net result is the same.  In other
20 words, because you're never going to see that cash,
21 you wouldn't show a $50 million receivable, because
22 you're never going to see it.  So the net result is no
23 assets and just the liability.
24     And the reason for that is under GAAP you
25 can only remove a liability I think under -- it's been

63

1  a while, but under two conditions; you have a legal
2  court order absolving, you know, absolving the entity
3  of the liability, or you have a settlement agreement
4  between the two parties in which the person to which
5  the liability is owed releases, you know, the other
6  party for the liability.  Only in those two conditions
7  do you do that, do you remove the liability.
8      So given the fact that we didn't have a
9  settlement agreement that had been signed, we couldn't
10 at the time remove the liability.  So, in other words,
11 the different steps of the transaction governed and
12 influenced the accounting results being presented.
13    Q    And a decision to move approximately $105
14 million in value would have been a decision that
15 involved everyone throughout Highland Capital at the
16 highest levels.  Is that correct?
17    A    Presumably, yes.  Given the magnitude of the
18 decision, the implications and the size of the
19 transaction, yes.
20    Q    And the $105 million value is the value
21 presented to you by Mr. Sevilla.  Is that how you got
22 that number?
23    A    I don't recall specifically.  I don't recall
24 specifically.  It may have been -- it may have been
25 we -- we pulled it up out of the system.  Like I said,

64

1  the assets owned by each of the entities was readily
2  available to anybody and everybody at Highland, and so
3  we may have just pulled it up right then and there
4  on-screen or had someone print it out and give it to
5  us and we just looked at it.  I don't recall that
6  specifically but...
7      Q    You don't have any idea, then, if normal
8  processes were followed to ensure an accurate
9  valuation, you wouldn't have that information?
10    A    My assumption would be that the valuation
11 would have followed the normal process.  So if that
12 was the value assigned to them and I was asked to, you
13 know, testify, I would say, yes, I'm guessing they
14 followed the normal valuation process.  I don't have
15 any reason to believe they didn't follow the normal
16 valuation process.  Not to my recollection, no.
17    Q    But it's just a guess, correct?  You're not
18 positive --
19    A    Yes.
20    Q    -- that they did follow --
21     (Simultaneously speaking.)
22    A    Yes, I -- it is speculation.
23    Q    And would the highest levels of management
24 at Highland include Mr. Dondero?
25    A    I can't say definitively.  I was never in --

65

1    that I recall, in a discussion with Jim in which I
2    heard his approval or whatever.  But, presumably, yes,
3    it would include him.  You know, the fact that he
4    signed several of the documents, at some point
5    presumably someone had to explain it to him.
6        Q    And you mentioned that Mr. Dondero signed
7    several of the documents.  If we look at the insurance
8    policy at Exhibit 1, that is the 19-page document, and
9    I believe the signatures are on the last page, page
10   19.
11       A    Right.
12           THE TECHNICIAN:  Would you like me to pull
13   that up, Ms. McLaughlin?
14           MS. McLAUGHLIN:  No, thank you.
15       Q    So you see where Jim Dondero signed on
16   behalf --
17       A    Yes.
18       Q    -- of the three entities on the insurance
19   policy?
20       A    Yes.
21       Q    And we've already looked at, I believe,
22   Exhibit 2, the purchase agreement to see that it was
23   Jim Dondero who signed on behalf of all six Highland
24   entities there as well?
25       A    Yes.

66

1        Q    Do you know if Mr. Dondero typically signed
2    things without reading them or understanding them?
3        A    I didn't witness him signing everything,
4    but, no, for the most part he was pretty particular
5    about going through things, especially of this
6    magnitude.  There might be kind of routine matters
7    that he might not have.  But of items of particular
8    importance, he, in my opinion, would have been pretty
9    specific and particular about the execution of those
10   agreements.
11       Q    And what are you basing your opinion on?
12       A    I just -- involvement in other matters of a
13   material nature.  In other words, I have experience
14   with him with other matters in which we would
15   routinely go down to his conference room and sit in
16   his conference room and discuss it in detail for some
17   time.
18       Q    Mr. Dondero was also the portfolio manager
19   of many of the Highland funds.  Is that correct?
20       A    That's correct.
21       Q    And as a portfolio manager, would it have
22   been typical to be involved in the decision making to
23   transfer all of the assets out of a fund?
24       A    That would be my expectation.
25       Q    At the time in August 2017, were you aware

67

1    who held the ownership interest in Sentinel?
2        A    No.
3        Q    Have you recently come to learn who held --
4    who holds the ownership interest in Sentinel?
5        A    I recently, i.e., Saturday of -- this past
6    Saturday read in some sort of filing a suggestion that
7    it appears Dondero and Ellington through a series of
8    offshore complex, offshore entities, owns a 70/30
9    split on that.  Anyways, that's, I think -- I'm
10   summarizing what it said in the finding -- or in the
11   filing.
12       Q    Were you surprised to read that Dondero and
13   Ellington may hold 100 percent of the Sentinel
14   ownership --
15       A    Yes.  Yes.
16       Q    What was surprising about that to you?
17       A    I guess kind of generally through my normal
18   operations, you sort of learned who owned what or what
19   we were doing, and that never really surfaced for me
20   that I recall, where it was, hey, this is their
21   entity, as suggested in that filing I read on
22   Saturday.  So that was -- it seemed to be new
23   information to me.
24           And then obviously -- obviously then
25   connecting it back to this transaction in the context

68

1    of, you know, the subpoena I received and what I was
2    reading, that's when it really sort of became a little
3    bit more sort of surprising, if you will.
4        Q    You mentioned earlier that all trades or
5    sales have to go into a system for approval?
6        A    The OMS, order management system.
7        Q    And what details about a transaction would
8    go into the order management system for a related
9    party, if you know?
10       A    Well, it's been a while, but it wouldn't
11   necessarily per se be, hey, this is what we're in
12   because it's a related party.  The way it would work
13   is you have the -- can you still see me okay?
14           You have the same trade details in which,
15   like, you have buyers, seller, seller, quantity,
16   price, trade date, et cetera, and then that
17   constituted an order.  And so that system was
18   monitored by compliance in which they had the ability
19   to tag affiliated entities.  And so to the extent
20   there was an affiliated entity involved, it should
21   have raised a red flag that only compliance could have
22   cleared.
23       Q    And that was a Highland policy that
24   compliance would have had to clear the flag if one was
25   raised?

69

1    A    That's right, and only compliance.  Nobody
2  in my group or anybody outside of compliance, to my
3  understanding, had the ability to clear those.
4    Q    And a transaction where Dondero and
5  Ellington owned 100 percent of the interests in an
6  entity receiving assets, that would have had to be
7  flagged in this OMS system, to be clear?
8    A    Well, that would have been dependent on if
9  at the time it went through the OMS Sentinel was known
10  to be an affiliate and someone had already flagged it
11  as an affiliate.  If no one had flagged it at the
12  time, it would have just moved through the normal way.
13    Q    And would you have had any reason to know if
14  a transaction was flagged to be a related party
15  transaction, would that have been --
16    A    It wouldn't have necessarily been a big
17  flashing light on my screen, but presumably it would
18  have impacted Carter's team, settlement, and maybe
19  Carter would have mentioned it to me.  But if it got
20  cleared very quickly, meaning someone from compliance
21  cleared it -- in other words, it would have only come
22  up in the context of if we weren't able to settle any
23  of the transactions we were trying to.  Carter likely
24  would have come to me and said, hey, we're sitting on
25  our hands because we're waiting for compliance;

70

1  apparently, this is an affiliate, and we're waiting
2  for compliance to clear it or instruct otherwise.
3        I don't recall any of that happening.
4    Q    And that could be because compliance cleared
5  it very quickly and there was no reason for you to
6  know?
7    A    Or it wasn't flagged as an affiliate at the
8  time the transaction went through, or, I mean, there's
9  a presumption on my part that someone entered it in
10  the OMS.  The first step in this would be let's nail
11  down was it entered in the OMS.  I just -- I simply
12  don't recall.
13        Trades were entered in the OMS outside of my
14  group.  They would have been entered by the front
15  office, the PM, somebody, and then that's how they hit
16  our screens.
17        But just to reiterate, if it wasn't in the
18  OMS, clearly it wouldn't have tripped a flag, or if
19  the counterparty, Sentinel, hadn't been flagged as an
20  affiliate, it wouldn't have tripped it, and it would
21  have just sailed through, or someone could have
22  cleared it very quickly and it sailed through.
23    Q    Okay.  And only compliance could have
24  cleared it you said?
25    A    That's my understanding, that's right.

71

1  That's right.
2        MS. McLAUGHLIN:  We'll take a look at
3  Exhibit 6, please.
4        (Deposition Exhibit 6, Email chain August
5  11, 2017, HCMUBS000642 through 644, marked for
6  identification.)
7    Q    Mr. Stoops, are you aware of any assets that
8  were transferred to Sentinel other than the ones we've
9  been looking at on Schedule A of the purchase
10  agreement?
11    A    I'm -- it's two -- it seems potentially two
12  different questions, so I'm trying to make sure I
13  answer both.  I'm not aware of any other assets on
14  that Schedule A, but I can't -- I don't know for sure
15  which one of these these pertain to.  I'd have to
16  cross-index it.  But I don't know specifically which
17  ones these pertain to.
18    Q    What do you mean by these ones?
19    A    Whatever you're showing me -- you're showing
20  me a DTC or you're showing me application account
21  which needed to transfer the shares.  It appears to be
22  setting up a DST account for some assets and I just --
23  I don't know which assets.
24    Q    Aside from this document, ignoring the
25  Exhibit 6 on the screen --

72

1    A    Okay.
2    Q    -- aside from anything in Exhibit 6, are you
3  just generally aware of any assets that were
4  transferred to Sentinel other than those listed on
5  Schedule A?
6    A    No, no.  It was my understanding that that
7  was to be the full list, that that was it.
8    Q    And could there have been other assets that
9  were transferred that you were unaware of at the time?
10    A    Sure.  I guess, yeah.  I guess so.
11    Q    Now looking at the screen -- I apologize I
12  put it up too soon, but here on the screen we've got
13  Exhibit 6, which is an email chain dated August 11th,
14  2017 from Samantha Bennetzen.  Do you see Exhibit 6?
15    A    I do see Exhibit 6.
16    Q    And you were not on this email, so you may
17  very well not be aware of this email or what's
18  included.  But just to look at some of the content,
19  we're looking at this top email where it lists an
20  application for the NRESF account.  Do you know what
21  the "NRESF account" would mean?
22    A    So it appears they're looking to -- if it's
23  DST, I think DST was where we maintained our closed-in
24  fund shares, and it appears someone is asking to set
25  up a new account for the NexPoint Real Estate

73

1 Strategies Fund to transfer those shares into it once
2 this new application has been set up. But it isn't --
3 it isn't apparent in whose name this new account
4 should be transferred, you know, the beneficiary
5 account name.
6     Q   Okay. If we scroll down the document.
7 Thank you.
8         Just for context, this chain started on
9 August 11th. And we'll go up a little bit higher.
10 That's good, thank you.
11         Here Katie Irving writes to Brian Fuentes,
12 and she is talking about "appreciate your assistance
13 in getting Sentinel set up with DST account to take
14 transfer of CDO Fund NRSZX shares." Do you see that,
15 that sentence?
16    A   Yes.
17    Q   And in response to Katie -- if we can scroll
18 slightly up -- in response to Katie, Katie then sends
19 a follow-up, "as discussed, wiring instructions for
20 cash distributions are below:"
21    A   Um-hmm.
22    Q   And lists a Sentinel Reinsurance Limited
23 account. Do you see that?
24    A   I do.
25    Q   Is it possible that this is the account

74

1 she's still talking about or that's still being
2 discussed at the top of this email chain?
3    A   Yes.
4    Q   And can we go back to the top of the email
5 chain. Based on the rest of this document, does it
6 look like these shares that are being transferred are
7 being sent to Sentinel? Is that a fair conclusion?
8    A   It's a fair conclusion.
9    Q   And we have account number and then a bunch
10 of numbers listed for Highland CDO Opportunity Fund
11 Limited. Do you see on Schedule A of the purchase
12 agreement any shares transferred from Highland CDO
13 Opportunity Fund Limited?
14    A   Yeah, it says NexPoint C Com.
15    Q   That's for Highland CDO Opportunity Fund
16 Limited?
17    A   Right, right, right. At the top, but I'm
18 looking at the share names, the description. Yes, I
19 see Highland CDO Opportunity Fund at the top, but I'm
20 now trying to match it up with the shares they might
21 have been trying to transfer, and all I see
22 potentially one -- no. Here. Yes. Okay. No, here
23 it is. Yes. Okay, I see it. NRES, sure, NRESZ,
24 sure, it's on here.
25    Q   And where you're looking on Schedule A, is

75

1 it NRES, is that how you pronounce it?
2    A   That's how we refer to it, sure, NRES.
3    Q   The NexPoint Real Estate Strat - Z --
4    A   Yes.
5    Q   -- NRES asset that is listed on Schedule A,
6 what entity is that asset listed under?
7    A   Highland CDO Opportunity Master Fund.
8    Q   On Exhibit 6, though, this email is
9 discussing transferring shares from Highland CDO
10 Opportunity Fund Limited. That would be a different
11 entity, correct?
12    A   I -- I -- I can't say for sure. To me I
13 think this is just typed incorrectly. But I guess,
14 yeah, presumably it could be a different one.
15    Q   Because on Schedule A there are no shares or
16 securities listed under Highland CDO Opportunity Fund
17 Limited. Is that right?
18    A   That's right. That's right.
19        MS. McLAUGHLIN: Okay. We can take Exhibit
20 6 down, please.
21        And, Mr. Stoops, unless you're really hoping
22 to stay on the record a little bit longer, we propose
23 that we just take a short break so that we can go
24 through some notes and come back and conclude
25 afterwards. So does five minutes work?

76

1        THE WITNESS: Fine with me.
2        THE VIDEOGRAPHER: We are going off the
3 record. The time is 12 o'clock p.m.
4        (Recess 12:00 p.m. - 12:18 p.m.)
5        THE VIDEOGRAPHER: We are back on the
6 record. The time is 12:18 p.m.
7 BY MS. McLAUGHLIN:
8    Q   Mr. Stoops, I think earlier today you were
9 saying how you were not aware in August 2017 that
10 Sentinel was an affiliated entity with Highland
11 Capital. Is that correct?
12    A   Yes.
13        MS. McLAUGHLIN: If we could, please, put up
14 a new exhibit. I believe it's marked as Exhibit 7.
15        (Deposition Exhibit 7, Email chain December
16 1, 2017, marked for identification.)
17    Q   Yes. Exhibit 7 is an email chain with the
18 top email dated December 1st, 2017 from Scott
19 Ellington. Do you see Exhibit 7 on your screen,
20 Mr. Stoops?
21    A   Yes, I do.
22    Q   And we can scroll down a little bit.
23        You're not on the first or second email, but
24 you are on the third email on this page from Taylor
25 Colbert.

**77**

1  Can we scroll back up, please. Right there
2  is good. Thank you.
3  Mr. Stoops, what role did Taylor Colbert
4  have, if you know?
5  **A  So Taylor was a financial analyst, financial**
6  **fund accountant, same thing, just under different**
7  **reference, but same thing, a fund accountant who**
8  **reported directly to David Willmore, who reported**
9  **directly to me. And in his capacity he handled the**
10  **sort of monthly financial reporting obligations for**
11  **certain hedge funds.**
12  Q  And the subject of this email was a Multi
13  Strat Cash Projection, correct?
14  **A  Yes.**
15  Q  And Taylor writes here, "As discussed,
16  please see the updated file with Sentinel being
17  presented as an affiliated investor." Did I read that
18  right?
19  **A  Yes, you did.**
20  Q  And you understand Taylor to be saying
21  Sentinel and Multi Strat were affiliates. Is that
22  correct?
23  **A  Yes, that appears what he's saying here.**
24  Q  And do you have any understanding as to why
25  Taylor was updating the file?

**78**

1  **A  I don't specifically recall. I can sort of**
2  **guess by the flow of the email, but I don't**
3  **specifically recall.**
4  Q  And after this update, Sentinel was listed
5  in the cash projection as an affiliated investor,
6  correct?
7  **A  Yes.**
8  MS. McLAUGHLIN: We can take Exhibit 7 down,
9  please.
10  Q  Just a few more questions about the
11  conversation you had with Mr. Sevilla back in August
12  2017. After your initial conversation, did you have
13  any follow-up discussions with Mr. Sevilla about what
14  he was asking you to do?
15  **A  I don't recall anything specific. But I do**
16  **know there were follow-up conversations, and it was**
17  **probably more about updates or clarification.**
18  Q  Updates --
19  **A  For example -- for example, in one of my**
20  **emails we brought up as an exhibit earlier, I said**
21  **we're still waiting on delivery instructions for**
22  **physicals. So it would have been something along**
23  **those lines, we need to anticipate getting those to**
24  **us, or something along those lines.**
25  Q  And under the transaction that Mr. Sevilla

**79**

1  describes to you in August 2017, all the assets from
2  HFP and its subsidiaries were transferred to Sentinel
3  regardless which entity they were held at. Is that
4  right?
5  **A  Yes, that's my recollection, yes.**
6  Q  And so is the same thing true for CDO Funds
7  affiliates as well, assets were transferred from CDO
8  Fund -- the CDO Fund family regardless of which entity
9  they were held at?
10  **A  Yes, that's my recollection, that -- it's my**
11  **recollection those were the instructions, yes, and the**
12  **intent.**
13  Q  And we mentioned a few times the UBS
14  litigation that's been ongoing since about 2019. I
15  believe you -- excuse me. I'll restart.
16  Were you aware throughout the UBS litigation
17  that UBS had been making information requests to
18  Highland for financial information of HFP and its
19  subsidiaries?
20  **A  So, forgive me, but just to be clear, I**
21  **think you said ongoing since 2019. I'm thinking you**
22  **meant 2009, agreed?**
23  Q  Agreed.
24  **A  Okay. Okay.**
25  Q  Since 2009 --

**80**

1  (Simultaneously speaking.)
2  **A  Yes, yes, yes.**
3  Q  -- since 2009 --
4  **A  Sure.**
5  Q  -- have you been aware of financial
6  information requests from UBS?
7  **A  Yes. There were from time to time requests**
8  **for certain documents from UBS related to that matter.**
9  Q  And were you ever entrusted with the
10  responsibility of responding to those requests?
11  **A  As in sending them to UBS?**
12  Q  Collecting them or sending them. Just at
13  Highland, was it part of your role to have
14  responsibility for --
15  **A  It sort of varied. From time to time I**
16  **might get involved, but then in others not at all. It**
17  **just sort of really varied on what the legal team had**
18  **available to it at the time. So it sort of--**
19  Q  And your --
20  **A  Go ahead.**
21  Q  Oh. And your responsibilities with UBS's
22  document requests were limited to helping the legal
23  team find certain documents. Is that correct?
24  **A  Generally, yes. Yes.**
25  Q  You were not the person responsible for

81

1 final collection or production of any documents to
2 UBS. Is that correct?
3    **A    No. I would have turned everything over to**
4 **our legal team.**
5    Q    And do you also recall that Isaac Leventon
6 was the person on the legal team that had the ultimate
7 responsibility for productions at that time?
8    **A    That was my understanding, yes.**
9    Q    All right. Mr. Stoops, we have, I think,
10 four questions here or five questions here left for
11 you.
12        You're testifying today pursuant to a
13 subpoena. Is that correct?
14    **A    Yes.**
15    Q    Would you have shown up without a subpoena?
16    **A    I don't know. I hadn't thought about it. I**
17 **couldn't say for sure.**
18    Q    And you're represented by counsel today,
19 right?
20    **A    Yes.**
21    Q    Who is paying for your counsel?
22    **A    Me.**
23    Q    Did anyone else offer to pay or reimburse
24 your legal fees?
25    **A    No.**

82

1    Q    You also received a subpoena to produce
2 documents, right?
3    **A    Yes. Yes.**
4    Q    And you don't have any documents to produce
5 to UBS in response to that subpoena?
6    **A    Based on my search, no, I don't believe I**
7 **do.**
8    Q    And you conducted a search?
9    **A    I did.**
10        MR. McLAUGHLIN: Well, with that,
11 Mr. Stoops, thank you very much. We appreciate your
12 time, and that's all we have today.
13        THE WITNESS: Thank you very much.
14        MR. THORNTON: Thank you.
15        MS. McLAUGHLIN: Bob, you didn't have
16 questions, did you?
17        MR. THORNTON: No, no questions.
18        MS. McLAUGHLIN: I believe we can go off the
19 record, then.
20        THE VIDEOGRAPHER: We are going off the
21 record. The time is 12:27 p.m.
22        (Time noted: 12:27 p.m.)
23
24 *****
25

83

1                    CERTIFICATE
2
3        I, MONIQUE VOUTHOURIS, a Notary Public and
4 Certified Court Reporter of the State of New Jersey,
5 License No. X100834, do hereby certify that prior to
6 the commencement of the examination CLIFFORD E.
7 STOOPS, II, was duly sworn by me to testify the truth,
8 the whole truth, and nothing but the truth.
9
10    I DO FURTHER CERTIFY that the foregoing is a true
11 and accurate transcript of the testimony as taken
12 stenographically by and before me at the time, place,
13 and on the date hereinbefore set forth.
14
15    I DO FURTHER CERTIFY that I am neither a relative
16 nor employee nor attorney nor counsel of any of the
17 parties to this action, and that I am neither a
18 relative nor employee of such attorney or counsel, and
19 that I am not financially interested in the action.
20
21 _____
22    Notary Public of the State of New Jersey
23    My Commission expires April 8, 2024
24
25 Dated: May 5, 2021