

**Planet Depos®**
We Make It *Happen*™

# Transcript of Jeremy Ringheimer

**Date:** April 30, 2021
**Case:** UBS Securities LLC, et al. -v- Highland Capital Management, L.P.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**1**

1      IN THE UNITED STATES BANKRUPTCY COURT
2        FOR THE NORTHERN DISTRICT OF TEXAS
3   - - - - - - - - - - - - - - - - - -x
4   In re                    : Chapter 11
5   HIGHLAND CAPITAL MANAGEMENT,   : Case No.
6   L.P.,            : 19-34054-SGJ11
7       Debtor.          :
8   UBS SECURITIES LLC AND UBS AG   : Adversary Proceeding
9   LONDON BRANCH,        : No. 21-03020-sgj
10      Plaintiffs,       :
11  vs.                :
12  HIGHLAND CAPITAL MANAGEMENT,   :
13  L.P.,            :
14      Defendant.        :
15  - - - - - - - - - - - - - - - - - -x
16
17      VIDEOTAPED DEPOSITION OF JEREMY RINGHEIMER
18              CONDUCTED VIRTUALLY
19            Friday, April 30, 2021
20                7:40 a.m. PST
21
22
23  Job No.: 368757
24  Pages: 1 - 55
25  Reported By: Charlotte Lacey, RPR, CSR No. 14224

**2**

1       VIDEOTAPED DEPOSITION OF JEREMY RINGHEIMER,
2   CONDUCTED VIRTUALLY.
3
4
5
6       Pursuant to notice, before Charlotte Lacey,
7   Certified Shorthand Reporter in and for the State of
8   California.
9

**3**

1              A P P E A R A N C E S
2   ON BEHALF OF UBS SECURITIES LLC:
3       ROBERT E. ALLEN, ESQUIRE
4       SARAH A. TOMKOWIAK, ESQUIRE
5       KATHRYN K. GEORGE, ESQUIRE
6       LATHAM & WATKINS, LLP
7       10250 Constellation Boulevard, Suite 1100
8       Los Angeles, California  90067
9       (424) 653-5563
10
11  ON BEHALF OF DEFENDANT HIGHLAND CAPITAL MANAGEMENT,
12  L.P.:
13      ROBERT FEINSTEIN, ESQUIRE
14      GREGORY V. DEMO, ESQUIRE
15      PACHULSKI STANG ZIEHL & JONES
16      780 3rd Avenue, 34th Floor
17      New York, New York  10017
18      (212) 561-7700
19
20  ALSO PRESENT:
21      Rick Spector, Videographer
22      Ian Rowe, AV Technician
23
24
25

**4**

1                  I N D E X
2   WITNESS                                PAGE
3   JEREMY RINGHEIMER
4   Examination by          Mr. Allen          7
5
6
7
8
9         I N D E X   O F   E X H I B I T S
10  EXHIBITS     DESCRIPTION              PAGE
11  Exhibit 1     E-mail from Isaac Leventon dated    38
12              10/26/2017; attachment, Legal
13              Liability Insurance Policy
14  Exhibit 2     Purchase agreement dated 8/7/2017   39
15  Exhibit 3     E-mail from Shawn Raver dated       44
16              9/12/2018; attachment, Memorandum
17  Exhibit 8     E-mail chain, top e-mail from Jeremy   22
18              Ringheimer dated 8/11/2017, Bates
19              number HCMUBS000516 through 517
20  Exhibit 9     E-mail chain, top e-mail from       29
21              Clifford Stoops dated 8/11/2017,
22              Bates number HCMUBS000574 through
23              576
24  Exhibit 10    E-mail from Alli Devins dated       47
25              5/22/2019; attachments, letters

5

```
1   Exhibit 12        Letter from Highland Capital        52
2                     Management to Crowe Cayman Ltd.
3                     Dated 5/31/2019
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

6

P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning. This is the beginning of media file number 1 in the video deposition of Jeremy Ringheimer in the matter of in re Highland Capital Management L.P. as debtor, specifically UBS Securities LLC, UBS AG, London branch, as plaintiffs, versus Highland Capital Management, L.P., as defendant, Case Number 19-34054-SGJ11 and adversary proceeding 2103020-SGJ before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

Today is Friday, April 30, 2021, and the time on the video monitor is 7:41 in the morning, Pacific Daylight Time.

The videographer today is Rick Spector, representing Planet Depos.

This video deposition is taking place virtually.

Would counsel please voice identify themselves and state whom they represent.

MR. ALLEN: This is Robert Allen on behalf of Latham & Watkins, counsel for UBS. I'm joined today by Sarah Tomkowiak and Katie George also of Latham & Watkins.

MR. FEINSTEIN: This is Robert Feinstein, Pachulski Stang Ziehl & Jones. We are counsel to the

7

defendant in the adversary proceeding and the debtor, Highland Capital Management. With me is my colleague Greg Demo.

THE VIDEOGRAPHER: The court reporter today is Charlotte Lacey, representing Planet Depos.

Would the reporter please swear in the witness.

THE REPORTER: Will counsel please stipulate that in lieu of formally swearing in the witness, the reporter will instead ask the witness to acknowledge that their testimony will be true under the penalties of perjury, that counsel will not object to the admissibility of the transcript based on proceeding in this way, and that the witness has verified that he is, in fact, Jeremy Ringheimer.

MR. ALLEN: Agreed.

MR. FEINSTEIN: Agreed.

THE REPORTER: Mr. Ringheimer, do you hereby acknowledge that your testimony will be true under the penalties of perjury?

THE WITNESS: Yes.

THE REPORTER: Thank you.

Proceed, Counsel.

EXAMINATION

BY MR. ALLEN:

8

Q   Can you hear me okay?

A   Yes.

Q   Excellent. Mr. Ringheimer, go ahead and please state your full name for the record and spell it as well.

A   Jeremy Ringheimer, J-e-r-e-m-y R-i-n-g-h-e-i-m-e-r.

Q   Thank you. Good morning. My name is Robert Allen. I think you just heard the introductions. I'm going to be joined as well by Sarah Tomkowiak and Katie George of Latham & Watkins.

Mr. Ringheimer, my first question, have you ever been deposed before?

A   No.

Q   Do you understand today that you are testifying here under oath?

A   Yes.

Q   And you understand that your testimony has the same force and effect as if you were in court in front of a judge or jury?

A   Yes.

Q   Just a couple quick ground rules to make sure this goes smoothly. Please go ahead and speak as clearly as possible and not too quickly, I'll try to do the same, so the court reporter can accurately take down

**9**

1  our testimony today. And I'm going to assume that you
2  understand any questions that I ask unless you tell me
3  others; is that fair?
4      A   Fair.
5      Q   Is there any reason, sitting here today, you
6  can think of that would prevent you from giving truthful
7  and accurate testimony?
8      A   No.
9      Q   And you are testifying today pursuant to a
10 subpoena, correct?
11     A   Correct.
12     Q   You also received a subpoena to produce
13 documents; is that correct?
14     A   Also correct.
15     Q   And you conducted a search for any relevant
16 documents you might have?
17     A   I have no documents.
18     Q   Got it. And have you spoken to any current or
19 former employees of Highland Capital Management about
20 this litigation?
21     A   I mentioned it to one, yes.
22     Q   And who is that?
23     A   Vishal Patel.
24     Q   Vishal -- and who is Vishal Patel?
25     A   He is now the director of operations at HCMLP.

**10**

1  He was my number two when we were there, and we were
2  friends outside of work. So we didn't really discuss
3  it. We just mentioned that, yes, I got a subpoena.
4      Q   Understood. Other than Mr. Patel, did you
5  discuss the litigation with anyone else at Highland
6  Capital Management?
7      A   No.
8      Q   Other than myself, Ms. George, and
9  Ms. Tomkowiak in connection with your deposition, have
10 you spoken with anyone else about this deposition?
11     A   I talked to Greg Demo for very briefly about
12 an NDA -- an existing NDA that I have signed with
13 Highland Capital Management.
14     Q   And other than Mr. Demo, was there anyone else
15 that you spoke with?
16     A   No.
17     Q   We'll get into a little bit of employment
18 background. Where are you currently employed?
19     A   At Park Walk LLP.
20     Q   And what does Park Walk do?
21     A   It's a brokerage firm. We buy and sell
22 securities. Yeah, we buy and sell distressed debt and
23 distressed equity and distressed bonds.
24     Q   Thank you. And what is your job title at Park
25 Walk?

**11**

1      A   I'm the director of operations.
2      Q   What are the duties and responsibilities that
3  you have in that position?
4      A   Basically, I settle all their trades, any
5  operation and functions that they have, reporting,
6  whatnot.
7      Q   And approximately when did you begin working
8  at Park Walk?
9      A   I started I think -- I think it's September of
10 last year.
11     Q   Prior to joining Park Walk, you worked for
12 Highland Capital Management, correct?
13     A   I did for six years.
14     Q   Do you recall approximately when you began
15 working for Highland?
16     A   So it would have been somewhere in February of
17 2014.
18     Q   And what was your job title at Highland?
19     A   When I was hired originally, I was brought in
20 as a senior analyst, specifically focusing on trade
21 settlement of -- of debt. And then I was the -- I was
22 promoted to operation -- manager of operations. Still
23 doing the same function, just I had a few people
24 reporting to me, and my team settled debt trades.
25     Q   And can you provide with -- I guess, a

**12**

1  slightly more detailed description, what your duties and
2  responsibilities entailed --
3      A   Right, so --
4      Q   -- as senior analyst first?
5      A   Yeah. So, you know, I'm sure you're aware
6  Highland trades in many different products; debt,
7  equities, bonds, swaps, you know, stuff like that. So
8  we would allocate all the debt trades into Bloomberg
9  from Bloomberg Bay, flow down into the accounting
10 system, which is Wall Street Office. Then we settle all
11 of the trades in something called ClearPar.
12         That was -- that was our primary duties. But
13 then we also do functions like position reconciliation,
14 cash reporting, you know, so where cash is on a trade
15 basis for all of your funds. You know, that's the --
16 that's the bulk of it.
17     Q   And after you were promoted, how did those
18 responsibilities change?
19     A   They didn't. I was basically doing the same
20 thing before. It's just it was more of a, you know,
21 compensation promotion and title change. And then the
22 two -- the two junior analysts were reporting to me
23 instead of the director of operations.
24     Q   And to whom did you report as a senior
25 analyst?

13

1   A   Carter Chism.
2   Q   And who did Mr. Chism report to?
3   A   Clifford Stoops.
4   Q   And did the chain of reporting change at all
5   after the title change?
6   A   No.
7   Q   Did you hold any other job titles while you
8   worked at Highland?
9   A   No.
10  Q   And you left in approximately September 2020?
11  A   No.  I left at the end of the year -- at the
12  beginning of 2020.
13  Q   Is Highland related in any way to your new
14  employer, Park Walk?
15  A   They are not.
16  Q   Do you know whether Highland does any work
17  with Park Walk?
18  A   They do not.
19  Q   So while you worked at Highland Capital
20  Management, did you have responsibilities with any other
21  funds that were managed by Highland?
22  A   Can you be more specific.
23  Q   So you mentioned earlier that you, you know,
24  settled bids on behalf of Highland?
25  A   Uh-huh.

14

1   Q   Would -- were you also acting in your capacity
2   as either analyst or in your operations capacity on
3   behalf of Highland Capital Management, or did you work
4   on behalf of any other Highland entity?
5   A   Are you -- are you talking about, like,
6   specifically front -- like different funds or
7   different -- are you --
8   Q   Yeah, specifically different funds.
9   A   So I think to answer your question would be
10  that NexPoint funds do not fall under the umbrella of
11  HCMLP, so to answer your question would be, yes, we
12  settled trades for all NexPoint funds as well.
13  Q   Got it.  And so within the Highland umbrella,
14  did you handle trades on behalf of any subsidiary
15  companies?
16  A   So Highland trades for Next Bank, but we do
17  not settle the trades.  We would allocate the trades
18  into their account in Wall Street Office, and then they
19  have their own settlement team, and they move their
20  office in.  But HCMLP's job would be -- they would make
21  trades for them, and we would allocate for them -- my
22  team would allocate them from Bloomberg into Wall Street
23  Office, and then they take it from there.  So that -- it
24  was allocation -- trade allocation for Next Bank.
25  Q   So did you do any work on behalf of any

15

1   Highland-affiliated entities?
2   A   So I guess -- I guess NexPoint is affiliated
3   with Highland.  And we would -- we would settle their
4   trades when they would make them.
5   Q   So I know there are a lot of Highland
6   entities, but are you familiar with Highland CDO
7   Opportunity Master Fund LP?  It's commonly referred to
8   as CDO fund?
9   A   So there are several funds that are named CDO,
10  and it's been four years or -- you know, however long
11  it's been since I left, a couple of years, and then, you
12  know, four years since this.  But I -- I don't recognize
13  the name, but I have heard CDO a lot.  It's not a --
14  it's not a commonly -- it's not a commonly traded fund.
15  And it doesn't -- it -- I don't remember it trading
16  debt.  So I didn't touch it very -- hardly at all
17  probably.
18  Q   And what is your basis for saying that it was
19  not a commonly traded fund?
20  A   So at the end of every day, we -- the
21  operations team allocates trades and -- you know, like I
22  previously mentioned, from Bloomberg into Wall Street
23  Office and another system called Geneva.  And then we
24  reconcile the trade blotter, and then this is sent out
25  to everybody saying that the blotter has been

16

1   reconciled, so all trades are in.  And I don't -- didn't
2   remember seeing that fund make trades.
3   Q   Would you feel confident more generally
4   identifying which funds were commonly traded out of and
5   which were not?
6   A   So the funds that I dealt with that -- that
7   traded debt would be Highland/iBoxx.  So that's a --
8   that's a retail ETF.  Highland Floating Rate
9   Opportunities Fund.  Pension Denmark.  Let's see,
10  Highland Global Allocation Fund.  Those are just --
11  those were some of the big ones.
12  Q   So I guess the slightly more specific question
13  would be, given the volume that came across your desk,
14  do you feel confident identifying, you know, which were
15  high-volume funds versus which were not?
16  A   So the ones that I mentioned were the high
17  volume for debt.  Now, there are also several funds
18  that, you know, would be trading equity, and the equity
19  team would be allocating those.  So my team, they
20  allocate.  So the equity team allocates trades
21  at 3 o'clock every day, 'cause that's when they -- they
22  drop, the market closes, and then when they're done,
23  that's when my team would go in there and allocate debt
24  trades.  So equity at 3.  We would normally be about 4.
25  Q   And who would your counterpart be on the

17

1  equities side?
2      A   Vishal Patel.
3      Q   And we're going to go through a couple other
4  entities.  I understand it's been a while.  Do you
5  recognize the name Highland Special Opportunities
6  Holdings Company?
7      A   I don't offhand but -- I don't.
8      Q   What about Highland Financial Partners L.P.?
9      A   I recognize that one because I think that our
10  team would pay -- I think that we might have paid, like,
11  an audit invoice for them from time to time.
12      Q   Do you recall whether or not you did any work
13  in your capacity as either senior analyst or in your
14  manager of operations role on behalf of HFP?
15      A   I don't.
16      Q   Are you aware, Mr. Ringheimer, of litigation
17  between UBS and Highland Capital Management?
18      A   I am.
19      Q   And what is your understanding of that
20  litigation?
21      A   That it is over the transfer of assets from a
22  few funds to -- to -- for an insurance policy.
23      Q   And are you aware of any other litigation
24  between UBS and Highland Capital Management?
25      A   I'm not.

18

1      Q   Are you familiar with an entity called
2  Sentinel Reinsurance Ltd.?
3      A   Only the name.
4      Q   And how did you become familiar with the name
5  of the company?
6      A   That's where these assets were transferred to.
7      Q   So slightly more specific question, how did
8  you learn about or how did you first come across --
9  sorry.  I'll fix the question.
10          When did you first become aware of Sentinel
11  Reinsurance?
12      A   When we transferred these.  I had never heard
13  of it before that.
14      Q   And when you say "we transferred these," who
15  is "we"?
16      A   Highland Capital.
17      Q   And do you recall approximately when the
18  transfer was?
19      A   I do not.
20      Q   And do you recall what in particular was
21  transferred by Highland?
22      A   It was primarily CLOs, I believe.  CLO bonds
23  more specifically.
24      Q   Okay.  And what is your basis for that?
25      A   The list that you sent me.

19

1      Q   The list that -- so what -- what list in
2  particular are you referring to?
3      A   It was in one of the attachments, the PDFs.
4  The document that has --
5      Q   And so --
6      A   The assets that were transferred.
7      Q   So we'll go through some --
8      A   Until then, I hadn't remembered what was
9  transferred.
10      Q   Got it.
11          So, you know, prior to, you know, your
12  preparation for this deposition --
13      A   Right.  Right.
14      Q   -- did you have any recollection as to what
15  was transferred to Sentinel?
16      A   No.  No.
17      Q   And sitting here today, are you aware whether
18  Sentinel is an affiliate of Highland Capital Management?
19      A   I became aware of that yesterday.
20      Q   So would be -- prior to, you know, your
21  preparation for this deposition or in connection to this
22  litigation, did you know that Sentinel is an affiliated
23  company?
24      A   No.
25      Q   Do you know anyone that worked at Sentinel?

20

1      A   I do not.
2      Q   Did you ever recall communicating with anyone
3  at Sentinel while you were at Highland?
4      A   No.  I believe the only communication I had
5  was with an auditor that was auditing their -- their
6  whatever -- their company.
7      Q   And what is your understanding of how the
8  Sentinel is connected to Highland?
9      A   I don't have an understanding of it.
10      Q   Other than -- you had testified earlier that
11  there were some transfers sent from Highland to
12  Sentinel.  Is that the full extent of your understanding
13  of the relationship between those companies?
14      A   That's correct.
15      Q   Are you aware of any connection between
16  Sentinel and Mr. James Dondero?
17      A   I became aware of that yesterday.
18      Q   And what is your understanding of that
19  relationship?
20      A   I believe he owns the entity.
21      Q   And are you aware of any connection between
22  Scott Ellington and Sentinel?
23      A   He is -- I believe he owns it as well.
24      Q   Are you aware of any connection between
25  Sentinel and Matthew DiOrio?

---

21

1　　A　I do not. Well, I know that he was -- he was
2　one of the primary people that was involved in -- in the
3　transfer with the -- preparing documents for it I think.
4　　Q　And do you recall what that involvement was?
5　　A　I do not.
6　　Q　Do you have a general understanding of the
7　services that Sentinel provides?
8　　A　I do not other than this insurance policy.
9　And I'm not really sure what -- the details of that as
10　well.
11　　Q　Have you ever heard of Sentinel RE Holdings
12　Limited or SS Holdings Limited?
13　　A　No.
14　　Q　Do you have any knowledge of the officers and
15　directors at Sentinel at any time?
16　　A　No.
17　　Q　Do you know who, if anyone, made decisions on
18　behalf of Sentinel?
19　　A　I do not.
20　　Q　And are you aware of any transactions that
21　Sentinel was involved in?
22　　A　No.
23　　Q　Other than the transfers to Sentinel from
24　Highland.
25　　A　Right. Yep.

---

22

1　　Q　Let's go ahead and take a quick break, about
2　five minutes or so, and then we can pop back on the
3　record.
4　　A　Sounds good.
5　　　THE VIDEOGRAPHER: It's 8 o'clock Pacific
6　Daylight Time. We are going off the record.
7　　　(A recess ensued from 8:00 a.m. to 8:06 a.m.)
8　　　THE VIDEOGRAPHER: It's 8:06 Pacific Daylight
9　Time. We are back on the record.
10　　　MR. ALLEN: All right.
11　　　Madam Court Reporter, could you please bring
12　up Deposition Exhibit 8 for the witness.
13　　　AV TECHNICIAN: Please stand by.
14　　　(Deposition Exhibit 8 was marked for
15　identification.)
16　　　AV TECHNICIAN: The document should now be on
17　screen.
18　　　MR. ALLEN: Thank you. Could you zoom in
19　slightly to about 100 percent.
20　　　Excellent.
21　BY MR. ALLEN:
22　　Q　Mr. Ringheimer, can you see the document on
23　your screen?
24　　A　I can.
25　　Q　And can you read the document?

---

23

1　　A　I can.
2　　Q　Go ahead and take a quick moment to
3　familiarize yourself with the contents of the page
4　that's visible right now.
5　　A　Uh-huh.
6　　Q　So this is an e-mail chain with the top e-mail
7　dated Friday August 11th, 2017, and it appears to be
8　sent from you to a James Palmer. Can you confirm that
9　the e-mail at the top, JRingheimer@HighlandCapital.com,
10　is your e-mail address?
11　　A　Yes.
12　　Q　Do you recall sending this e-mail to
13　Mr. Palmer?
14　　A　I don't.
15　　Q　Do you have any reason to believe you did not
16　actually send this e-mail?
17　　A　I do not.
18　　Q　Let's move to the first e-mail at the bottom
19　of this PDF. So this is an e-mail from Katie Irving to
20　Carter Chism. I believe you testified earlier that
21　Mr. Chism was in your reporting structure?
22　　A　That's correct.
23　　Q　So Ms. Irving writes here --
24　　A　He was my supervisor.
25　　Q　I'm sorry. What was that?

---

24

1　　A　He -- yeah, he was my supervisor. That's
2　correct.
3　　Q　Okay. And Ms. Irving writes here, "Sentinel
4　wiring instructions for cash arising from transaction
5　are below. Thank you."
6　　　Do you see that?
7　　A　I do.
8　　Q　And the reference here at the bottom says
9　"Sentinel Reinsurance Ltd."
10　　　Do you see that?
11　　A　I do.
12　　Q　Is it fair to say this is an e-mail exchange
13　about a transfer of funds from Highland to Sentinel?
14　　A　That is correct.
15　　Q　And in the e-mail immediately above this, from
16　Mr. Chism, he writes, "Please confirm this serves as
17　instruction to wire cash from all HFP funds and all CDO
18　funds to the account listed in the instructions below."
19　　　Do you see that?
20　　A　I do.
21　　Q　You referred earlier to "transfer made from
22　Highland to Sentinel."
23　　　Is this the transfer that you were referring
24　to?
25　　A　I have no reason to believe it's not.

25

1    Q   Do you recall a transfer from Highland to
2  Sentinel around August 11, 2017?
3    A   I do.
4    Q   And what is your basis for recalling?
5    A   The fact that that is -- that I have twins and
6  that's their birthday, and I was trying to leave early
7  that day, and because I did not get to leave early that
8  day because of this.
9    Q   I'm sorry to hear that.  So that -- just so
10 we're clear, your testimony is working on these
11 transfers kept you from getting home for your children's
12 birthday?
13   A   That is correct.  Because Carter left early
14 that day.  He had a planned vacation.  And so that's why
15 I'm guessing that -- at the top of the e-mail, that
16 Cliff sent that to me.
17   Q   And can you tell from this e-mail who
18 Mr. Chism is seeking confirmation from?
19   A   I would think all of them.  So if you look at
20 that e-mail, everybody that's listed at the top, so
21 Irving, JP, Isaac, they're all in legal.  Then you have
22 Thomas Surgent is compliance.  Frank Waterhouse is the
23 CFO.  David Willmore is the accounting manager.  And
24 Chris Dunn is a senior accountant.
25     So I think he's wanting everybody to know that

26

1  he is sending this money.
2    Q   And what do you understand Mr. Chism to mean
3  by "all HFP funds"?
4    A   I don't understand that.  It's been four
5  years.
6    Q   So presumably if they were HFP funds, he's
7  asking for cash from all of them?
8    A   I -- I couldn't -- I couldn't guess on that.
9  I don't know.  I don't remember.
10   Q   That's fine.  Is your answer the same with
11 respect to CDO funds?  Do you have an understanding of
12 what he means by "all CDO funds"?
13   A   Yeah.  No, I don't.
14   Q   To the extent that this is a transfer of all
15 of the funds of a particular entity, would you say it
16 was common while you were at Highland for Highland to
17 transfer all of the assets out of a Highland entity?
18   A   I don't believe I -- so I have seen funds wind
19 down before, but I don't believe I have seen another
20 transfer like this before.
21   Q   On the second e-mail from the top, if we could
22 go up a page, Carter -- sorry.  Go -- other direction.
23 Thank you.
24     Second e-mail from the top is from Clifford
25 Stoops, and he's forwarding the below e-mail exchange to

27

1  you, correct?
2    A   Correct.
3    Q   And what was your involvement with this
4  transfer?
5    A   So if you're going to wire money to anybody at
6  Highland, the way it works is, on the intranet, there's
7  a wire system, and you have to go and enter the wire,
8  and then an authorized signatory has to go into that
9  system and sign it.
10     Now, I don't know who entered it, and I don't
11 know who signed it.  The only people I believe who could
12 have signed it would be James Palmer, Clifford Stoops,
13 Carter Chism, and possibly David Willmore and maybe
14 Frank Waterhouse.  So I don't know who signed it or set
15 it up, but in order to send a wire, you need to have the
16 vendor -- or you need to have the wire instructions
17 confirmed to set it up and just as a general vendor in
18 the system.  And I would have had to set it up, just
19 that vendor, not a wire, but just those wiring
20 instructions.
21   Q   Great.  So just to sort of clean that up
22 slightly.  So you did not send the wire, correct?
23   A   I could not have signed it.  No, I was not an
24 authorized signatory at that time.
25   Q   And you did not set up -- or sorry.  You did

28

1  not sign for the wire, correct?
2    A   No.
3    Q   But you did set up the vendor?
4    A   The wiring instructions on the -- on the -- on
5  our vendor list, yes.
6    Q   And which vendor was this for?
7    A   The below.  So that would have been the --
8  that would have been the support to set that up.
9    Q   Got it.  And so when you say "the below,"
10 you're referring to the instructions in the bottom
11 e-mail?
12   A   Right.  So you have your account number and
13 your ABA, and there's a few other things in there that
14 you need to send a cash wire.
15   Q   Got it.  And those are for Sentinel
16 Reinsurance?
17   A   Yes.
18   Q   Do you recall why you forwarded this e-mail to
19 James Palmer?
20   A   I do not.  But it would have either been
21 because -- it would have been for him to sign it because
22 Carter was gone for the day or the fact that he sat
23 behind me, and he wanted to know what was going on with
24 this because he is the accounting manager.
25   Q   And --

---

29

1    A   But I don't know.
2    Q   I'm sorry.  I didn't mean to cut you off
3 there.
4    A   No, you're fine.  But, yeah, I don't know why.
5 I don't recall.
6    Q   And you testified earlier that you had been
7 asked to stay late to help with this transfer.  Do you
8 recall who asked you to stay late?
9    A   So by "stay late," I guess I should be more
10 specific than that.  I still -- I still worked a normal
11 day -- right? -- but I was wanting to leave at, like,
12 lunch that day.  So you can see on the time stamp of the
13 last e-mail, that was, what, 2 o'clock.
14    Q   Do you recall what the urgency was for
15 executing the transfer that day?
16    A   I do not.
17    Q   No one communicated to you why it was urgent?
18    A   If they did, I don't remember.
19    MR. ALLEN:  Madam Reporter, could we please
20 bring up Deposition Exhibit 9?
21    AV TECHNICIAN:  Please stand by.
22    MR. ALLEN:  Thank you.
23    (Deposition Exhibit 9 was marked for
24 identification.)
25    MR. ALLEN:  And if we could pull that up again

---

30

1 to maybe 125.
2    Q   All right.  Can you see the exhibit,
3 Mr. Ringheimer?
4    A   I can.
5    Q   And -- and you can read it well enough?
6    A   I can.
7    Q   Okay.  So this is another e-mail from
8 August 11, 2017.  And it flows from the same initial
9 e-mail from Ms. Irving on the last exhibit.  And if you
10 look at the "cc" line, the second line from the bottom,
11 you appear to be copied here again, correct?
12    A   Yes.
13    MR. ALLEN:  So if we scroll down, I think, to
14 the fourth e-mail from the top.  Right there.  So the --
15 exactly.  Perfect.  Thank you.
16    Q   From Mr. Stoops, this is the top of the next
17 page, he writes "All cash has been sent.  Working on DTC
18 securities.  Still waiting on delivery instructions for
19 physicals from legal."
20    So do you have any reason to believe that the
21 cash was not transferred to Sentinel?
22    A   I do not.
23    Q   And what do you understand Mr. Stoops to mean
24 here by "DTC securities"?
25    A   So that would have been all of the CLO bonds.

---

31

1 Anything that's -- anything that's held DTC, right?
2 With physicals, you have, like, an actual physical
3 certificate, and, generally, those are held in a vault
4 in New York.  And then as you trade physicals, if -- if
5 it's for the amount of your -- of your cert, then it's
6 transferred, or they chop them up.  And that's kind of
7 how physical settlement works.
8    Q   Do you know in which vaults the physical
9 certificates would have been held for this transaction?
10    A   I do not.
11    Q   And do you know which DTC securities this
12 refers to?
13    A   I do not.
14    Q   Would you have been provided a list of the DTC
15 securities?
16    A   Yes, and to my recollection is they would have
17 all been held in the custody accounts for any -- for
18 these funds at BNY, and BNY should be able to provide
19 you a list of any DTC securities that were transferred.
20    Q   And when you say BNY what are you referring
21 to?
22    A   Bank of New York Mellon.
23    Q   And would you have been provided a list of the
24 physical certificates for this transfer?
25    A   So I really didn't have -- I had never -- I

---

32

1 had never settled physicals really the whole time I was
2 there.  So my knowledge of physicals is extremely
3 limited.
4    Q   Who would have been responsible at the time
5 for settling physical certificates?
6    A   My guess would be both Carter and -- and/or
7 Vishal.
8    Q   And do you recall whether you settled the
9 physical certificates for this transfer?
10    A   I do not.
11    Q   And do you have any reason to -- or I -- let
12 me move to a different part of the document, actually.
13    MR. ALLEN:  So can we pull up the e-mail at
14 the very top of this document, please?
15    Q   And so Mr. Stoops writes "We have now provided
16 the list of securities not eligible for DTC
17 settlement" --
18    A   Uh-huh.
19    Q   -- "and instructions for physical delivery to
20 BNY for all funds.  Will update the group on Monday."
21    Mr. Ringheimer, do you ever recall receiving
22 an update from Mr. Stoops?
23    A   I don't.
24    Q   Do you recall following up on these transfers?
25    A   I don't remember, no.  Sorry.

---

33

1    Q    And, Mr. Ringheimer, do you have any reason to
2  believe that the DTCs securities and physical
3  certificates were not ultimately settled?
4    A    I do not, no.
5    Q    Were you aware of any obstacles to
6  transferring any of the assets to Sentinel?
7    A    No.
8    Q    Do you have any idea what happened to these
9  assets once they were transferred to Sentinel?
10   A    I do not.
11   Q    And are you aware of any other assets
12 transferred to Sentinel?
13   A    I am not.
14   Q    Are you aware of any assets transferred to
15 Sentinel from any entity other than the HFP or CDO funds
16 referred to here?
17   A    I am not aware.
18   Q    And did you have any understanding at the
19 time, in August 2017, what the purpose of these
20 transfers was?
21   A    I believe it was -- so I -- somebody, I don't
22 remember who, told me it was for an insurance policy,
23 but I didn't -- I didn't know any details about it.
24   Q    Were you ever provided a copy of that
25 insurance policy?

34

1    A    No.
2    Q    And no one told you what that insurance policy
3  was for?
4    A    No. And in my -- in my role as a -- as a
5  operations person, I generally wouldn't have anything
6  like that shown or discussed with me.
7    Q    Other than, I suppose, the entity name,
8  Sentinel Reinsurance, did you have any reason to believe
9  the insurance policy was with Sentinel?
10   A    I didn't know. I didn't -- like I said, I
11 didn't have any details on it.
12   Q    And for a transfer of this size, who would
13 typically initiate a transfer?
14   A    Well, so I would think that -- I would think
15 that these would have been made as actual trades. So
16 they would have been booked in the OMS in Bloomberg, but
17 I don't know if that actually happened or not. And if
18 they were booked in the OMS, compliance would have had
19 to sign off on that. And regardless whether they
20 were -- they were booked in the OMS or not, compliance
21 would still have to sign off on that. But I wouldn't
22 have been in those discussions. That would have been
23 with Cliff Stoops and Frank Waterhouse.
24   Q    Okay. Was there anyone else that would have
25 had to sign off on these transfers?

35

1    A    I would say, other than compliance, probably
2  Jim Dondero.
3    Q    Do you know whether the legal team would have
4  to sign off on this?
5    A    I do not.
6    Q    And --
7    A    But they were -- I know they were heavily
8  involved. I can see all their names on the e-mail.
9    Q    So it's your understanding that the people
10 included on this e-mail would need -- would have needed
11 to approve this transaction?
12   A    Yeah. I'm not sure. Like I said, it's been
13 so long. I mean, I -- I can assume that, but I -- I
14 don't know.
15   Q    Was the operations team typically informed of
16 the purpose behind a particular transfer?
17   A    No.
18   Q    Do you know when it would have been?
19   A    Well, so like you said, you know, this is --
20 this is kind of a rare occurrence, so I don't really
21 know.
22   Q    So who would typically know -- outside of
23 operations, who would typically know what the purpose of
24 a transfer was?
25   A    I would say probably legal and compliance.

36

1    Q    And when you say "legal," who are you
2  referring to?
3    A    Just anyone in the legal department.
4    Q    And specifically with respect to this e-mail,
5  can you identify who from legal is present?
6    A    So Isaac Leventon is legal. Thomas Surgent is
7  compliance. Katie Irving is legal. Let me see. Jay
8  Sevilla is legal -- JP Sevilla is legal. And I think
9  that's all I see. Yeah.
10   Q    And, Mr. Ringheimer, you mentioned you had
11 some understanding that this may have related to an
12 insurance agreement. Did anyone ever tell you whether
13 the transfer related to any other agreement?
14       MR. FEINSTEIN:  Let me -- this is Rob
15 Feinstein. Let me just interject at this point with one
16 comment. Since counsel just went through the fact that
17 there were a number of in-house lawyers on this e-mail
18 who may have been involved in the transaction, and to
19 the extent that that question calls for revealing things
20 that were said by in-house lawyers, we want to be clear
21 on behalf of the debtor, slash, defendant that, as to
22 those facts and circumstances that are disclosed in the
23 debtor's filed motion to approve settlement with UBS,
24 and specifically, I believe, it's paragraphs 5 to 11,
25 where it describes the Sentinel transaction insurance

37

1  policy, et cetera, we are not asserting the privilege as
2  to discussions with counsel regarding those specific
3  transactions, but maintaining the privilege otherwise in
4  all respects. Thank you.
5      MR. ALLEN: Thank you, Counsel.
6      Q  So I'll rephrase the question. So,
7  Mr. Ringheimer, was it your understanding that these
8  transfers related to any other agreement between
9  Highland and Sentinel?
10     A  Not that I'm aware of.
11     Q  Did anyone ever inform you that there was a
12  purchase agreement between Highland and Sentinel?
13     A  They did not.
14     Q  And you've never seen a copy of any purchase
15  agreement between Highland and Sentinel related to this
16  transaction?
17     A  Not until yesterday.
18     Q  So other than in connection with this
19  deposition, certainly -- in 2017, I guess is sort of a
20  clearer question, no one shared with you a purchase
21  agreement?
22     A  No. No.
23     MR. ALLEN: And, Madam Reporter, could we
24  please bring up Deposition Exhibit 1.
25     AV TECHNICIAN: Please stand by.

38

1      (Deposition Exhibit 1 was marked for
2  identification.)
3      AV TECHNICIAN: The document should now be on
4  screen.
5      MR. ALLEN: Thank you very much.
6      Can you zoom in a little bit more?
7      Thank you very much.
8      Q  Mr. Ringheimer, can you see the exhibit?
9      A  I can.
10     Q  The exhibit appears to be an -- this is a
11  19-page PDF document. It consists of an e-mail, on the
12  first page, from Isaac Leventon, and the attached
13  document begins on page 2, I believe.
14     MR. ALLEN: Can you scroll down to page 2?
15     Q  This is a legal liability insurance policy.
16     MR. ALLEN: Could you please scroll down to, I
17  believe it's page 17 of the PDF? Sorry. Page 18 of the
18  PDF. Thank you very much.
19     Q  So the insurer here is listed as Sentinel
20  Reinsurance, and the insured are Highland CDO
21  Opportunity Master Fund LLP, Highland CDO Holding
22  Company, and Highland Special Opportunities Holding
23  Company.
24     Mr. Ringheimer, in 2017, when these transfers
25  were happening, were you ever shown this document?

39

1      A  I don't believe I was, no.
2      Q  You didn't have any understanding at the time
3  that this policy existed?
4      A  No.
5      Q  Did anyone at Highland Capital Management ever
6  inform you that this policy existed?
7      A  I don't believe they did.
8      Q  And specifically with regard to Sentinel --
9  I'll -- I'll strike that question, actually.
10     MR. ALLEN: If we can scroll up, I think, two
11  pages. All right. Go down one more page.
12     Q  So we see Mr. Dondero is signing on behalf of
13  the Highland entities.
14     MR. ALLEN: And if we scroll down -- I guess,
15  can you scroll to the very last page?
16     Q  Here's the executed signature page. So the
17  signature for Sentinel Reinsurance is from a Mr. Andrew
18  Dean. Mr. Ringheimer, do you know who Andrew Dean is?
19     A  I do not.
20     MR. ALLEN: Madam Reporter, can you please
21  bring up Deposition Exhibit 2?
22     AV TECHNICIAN: Stand by.
23     (Deposition Exhibit 2 was marked for
24  identification.)
25     MR. ALLEN: And if we can pull into about

40

1  125 percent, please.
2      Q  Mr. Ringheimer, this is a seven-page document
3  entitled "Purchase Agreement" and dated August 7, 2017.
4  Do you see this exhibit?
5      A  I do.
6      Q  And in the very first paragraph, Sentinel
7  Reinsurance is listed as the purchaser, and CDO --
8  Highland CDO Opportunity Master Fund LP, Highland CDO
9  Holding Company, and Highland Special Opportunities
10  Holding Company are listed as the sellers, correct?
11     A  I see that.
12     Q  At the time of these transfers,
13  Mr. Ringheimer, were you aware of the existence of this
14  purchase agreement?
15     A  I was not.
16     Q  And no one shared with you this purchase
17  agreement at the time?
18     A  I don't believe they did, no.
19     Q  Has anyone from Highland Capital Management
20  ever shared this purchase agreement with you?
21     A  No.
22     Q  And if we can look at this first recital here
23  underneath the recitals.
24     So here it notes that in -- if you look at
25  number 1, under "Payment of Premium," it says "Purchaser

41

1  agrees to accept the assets listed in schedule A hereto
2  as 100 percent payment of the premium, including any as
3  yet unpaid or contingent financial proceeds or other
4  benefits related thereto."
5       MR. ALLEN:  If we could go back -- actually,
6  could we scroll all the way down here first to
7  schedule A.
8       Thank you very much.
9    Q  So again this is, you know, signed by Mr. Dean
10 on behalf of Sentinel and Mr. Dondero on behalf of the
11 Highland entities.
12      So this schedule A that's on the screen right
13 now, can you see schedule A, Mr. Ringheimer?
14   A  I do.
15   Q  Are you familiar with any of the assets listed
16 in schedule A?
17   A  I've seen the names of a lot of those CLOs
18 before.
19   Q  And --
20   A  They're all Highland-created CLOs, a lot of
21 those are.
22   Q  Thank you.  Do you recall whether these assets
23 were included in the transfers to Sentinel?
24   A  I don't know.  If they're on that list, I'm
25 not sure.

42

1    Q  Do you have any understanding of what the
2  value of these assets was back in 2017?
3    A  I do not.  I don't know if these -- if -- I
4  don't know if these -- that's traded shares, but I don't
5  know where they're marked at and if they're factored, so
6  I couldn't tell you.
7    Q  Do you -- do you know who would know that
8  information?
9    A  Either the CLO team at Highland or valuation
10 team at Highland.
11   Q  Is it your understanding that either of those
12 teams would have had an understanding of the value of
13 those assets specifically in August 2017?
14   A  I think that's fair.
15   Q  Do you have any idea what happened to the
16 assets listed in schedule A after August 2017?
17   A  I do not.
18   Q  Do you have any idea where these assets might
19 be today?
20   A  I do not.
21   Q  Do you have any reason to believe that these
22 assets were not transferred to Sentinel?
23   A  I -- I do not.
24      MR. ALLEN:  Can we go ahead and bring back up
25 Deposition Exhibit 1, please.  And then if we could go

43

1  back to page 18 of the PDF.  Thank you very much.
2    Q  And then one quick question before I forget,
3  Mr. Ringheimer.  Do you have any idea who specifically
4  on the valuation team might have known what the value of
5  those assets was in 2017?
6    A  I do not.  But Dave Klos was over that team.
7    Q  Thank you.
8       MR. ALLEN:  And if we can scroll down a little
9  bit here, so date of transmit at the top of the page,
10 please.  Sorry.  Scroll the other direction.  Thank you.
11 Oh.  Sorry.  Go up a little bit.  Up a tiny bit more.
12 Thank you very much.
13   Q  Okay.  This is a legal liability insurance
14 policy, and the legal action that it's referring to here
15 is UBS Securities LLC and UBS AG London branch versus
16 Highland Capital Management L.P., Highland Special
17 Opportunities Holding Company, Highland Financial
18 Partners L.P., Highland CDO Opportunity Master
19 Fund L.P., Highland Credit Opportunities CDO L.P., and
20 Strand Advisors, Incorporated.
21      Mr. Ringheimer, do you have any understanding
22 of what this legal action is?
23   A  I do not.
24   Q  And if you look down where it says "limit of
25 indemnity," the policy limit appears to be $100 million,

44

1  correct?
2    A  Okay.
3    Q  And under "premium," the premium appears to
4  be $25 million.  Do you see that?
5    A  I see that.  I do.
6    Q  So, you know, we -- we just looked at the
7  purchase agreement which contemplates a transfer of the
8  assets in schedule A in satisfaction of the premium of
9  this policy, correct?
10   A  Yes.
11   Q  And just to confirm, you don't have an
12 understanding of what the value of the assets in
13 schedule A was as of August 2017, correct?
14   A  I do not.
15   Q  Does -- is your recollection refreshed by
16 either this 25 million number or the $100 million
17 number?
18   A  I don't believe I've ever seen the $25 million
19 number.  And I don't -- I'm not sure on the hundred
20 either.
21      MR. ALLEN:  Madam Reporter, can you please
22 bring up Deposition Exhibit 3.
23      AV TECHNICIAN:  Please stand by.
24      (Deposition Exhibit 3 was marked for
25 identification.)

45

1      AV TECHNICIAN:  The exhibit should now be on
2  screen.
3      MR. ALLEN:  Thank you very much.
4      Q   Mr. Ringheimer, can you see the exhibit?
5      A   I do.
6      Q   And you can read the exhibit well enough?
7      A   Yes.
8      Q   So this is a six-page document consisting of
9  an e-mail from a Shawn Raver and an attached document
10 entitled "Tax Consequences of Sentinel Acquisition of
11 HFP/CDO Opportunity Assets."
12     MR. ALLEN:  We can scroll down to confirm
13 that, to the second page.
14     Thank you.
15     Q   Mr. Ringheimer -- or rather, I'll pause for a
16 moment.
17     MR. ALLEN:  I know there was an instruction
18 earlier regarding privilege, Counsel --
19     MR. FEINSTEIN:  Yeah.  I was going to
20 reiterate that at this point that Mr. Raver is an
21 attorney, and that we're taking the same position with
22 respect to this memo insofar as it falls within the
23 scope of the transactions that were described in the
24 debtor's settlement motion with UBS.
25     So you can proceed, Counsel.

46

1      MR. ALLEN:  Thank you, Counsel.
2      Q   So, Mr. Ringheimer, prior to your preparation
3  for this deposition, have you ever seen this tax
4  memorandum?
5      A   No.
6      Q   And it was not shared with you in 2017?
7      A   No.
8      MR. ALLEN:  If we can turn to document
9  page 2 -- I think we're on page 2 actually.  Can we go
10 to the beginning of the last paragraph on the page?
11 Thank you very much.
12     Oh, I'm sorry.  Can we scroll down one more
13 page.  I'm looking for a page with the document, not the
14 PDF.  It's my mistake.
15     And then the final paragraph on this page,
16 please.  Excellent.
17     Q   So where it says "The aggregate purchase price
18 paid by Sentinel for the assets was $25 million.  The
19 aggregate fair market value of the assets on the date of
20 the transaction was $105 million."
21     Do you see that, Mr. Ringheimer?
22     A   I do.
23     Q   Mr. Ringheimer, do you recall being told at
24 the time of these transfers that the assets were
25 worth $105 million?

47

1      A   I do not.
2      Q   Do you recall ever seeing this $105,647,679
3  number before?
4      A   I don't think so.  But like I said, it's been
5  four years.
6      Q   Understandable.
7      MR. ALLEN:  Madam Reporter, can you go ahead
8  and bring up Deposition Exhibit 10, please.
9      AV TECHNICIAN:  Please stand by.
10     (Deposition Exhibit 10 was marked for
11 identification.)
12     AV TECHNICIAN:  Exhibit 10 should be on
13 screen.
14     MR. ALLEN:  And I think we're just about at
15 the hour mark at this point.  Let's take another quick
16 five-minute break.
17     If you could please put us into breakout
18 rooms.
19     THE VIDEOGRAPHER:  It's 8:43 Pacific Daylight
20 Time.  We are going off the record.
21     MR. ALLEN:  Thank you.
22     (A recess ensued from 8:43 a.m. to 8:50 a.m.)
23     THE VIDEOGRAPHER:  It's 8:50 Pacific Daylight
24 Time.  We are back on the record.
25     MR. ALLEN:  So I believe we have Deposition

48

1  Exhibit 10 up.  I've not -- oh.  There we go.
2  BY MR. ALLEN:
3      Q   Mr. Ringheimer, can you see the exhibit on
4  your screen?
5      A   I see it.
6      Q   This is a May 22nd, 2019, e-mail from an Alli
7  Devins at Beecher Carlson to a Matt DiOrio and,
8  Mr. Ringheimer, in the "cc" line, I believe you are
9  copied.  Do you see that?
10     A   I do.
11     Q   And do you recall receiving this e-mail in
12 May 2019?
13     A   Vaguely.
14     Q   And I'll direct your attention to the second
15 page -- or sorry -- the -- the final page of this PDF.
16     MR. ALLEN:  If we could scroll down to page 3,
17 please.
18     Q   So this e-mail attachment appears to be a
19 draft response letter which Ms. Devins indicates
20 auditors are expecting -- appears, based on the bottom,
21 that this is expected to come from you.
22     Do you recognize this draft letter?
23     A   I do.
24     Q   And, Mr. Ringheimer, do you recall what the
25 purpose of this letter was?

49

1    A   I believe I was told that it was -- I think it
2  was confirming -- I thought it was confirming that we
3  sent it, but I don't really remember the specifics of
4  it. To -- and it was confirming to the auditors because
5  they are -- they were being audited. And so in our
6  group, it's fairly -- it's very common that everybody,
7  all the counterparties, when they go through their
8  audits, they reach out to you about specific trades and,
9  you know, quantity and price and things, whether they're
10 settled or unsettled. And, you know, me and my two
11 analysts that reported to me, we would, you know,
12 confirm that to counterparties.
13       So this was -- this was very common in our
14 duties.
15    Q   So you were confirming the existence and
16 ownership of the securities listed here?
17    A   Right.
18    Q   And to the extent that there are securities
19 listed here as being associated with Sentinel
20 Reinsurance that were in schedule A to the exhibit we
21 looked at earlier, is it your understanding that this
22 would confirm that those assets were ultimately
23 transferred to Sentinel?
24    A   It appears to be, yes.
25    Q   And to the extent there are any assets listed

50

1  here that do not appear on schedule A, is it your
2  understanding that you would not have been involved in
3  any transfer of those assets?
4    A   No.
5    Q   Do you know why you were responsible for
6  confirming the information --
7    A   Sorry. When you say transfer -- sorry. When
8  you say transfer, do you mean Highland to Sentinel or
9  from Sentinel to somewhere else?
10    Q   To Sentinel from any source.
11    A   Okay. I would say it would be my
12 understanding that these were transferred. But it
13 could -- there could be others. I just -- I don't know.
14    Q   And do you recall, Mr. Ringheimer, why you
15 were the person responsible for confirming this
16 information?
17    A   So this is a couple -- this is fast-forward
18 two years from the original transfer, I believe, right?
19    Q   Correct.
20    A   And so Carter had left the team, and he went
21 to another firm.
22       When was this at the top of the e-mail? What
23 month was this? Can you --
24    Q   May 22nd, 2019.
25    A   Right. And so Carter left toward the end of

51

1  March I believe. And so I had been on the job for like
2  maybe a month.
3       And so Mr. DiOrio, in the e-mail, these
4  e-mails went -- a couple of these went around, and then
5  he swung by my desk with that document and had some
6  support, and I confirmed it.
7    Q   And do you recall what that support was?
8    A   I don't.
9    Q   But it was your understanding that the support
10 he provided to you confirmed the information in this
11 chart?
12    A   Yeah. Yeah.
13    Q   Would you have ordinarily undertaken that
14 investigation on your own?
15    A   Sorry. Can you go more specific on that?
16    Q   Sure. So in -- normally in confirming
17 information such as the information in this chart, would
18 you investigate the accuracy of this information
19 yourself, or would you rely on that information being
20 provided to you by someone else?
21    A   Both.
22    Q   And in this instance, you relied on
23 information provided to you by Mr. DiOrio?
24    A   I don't recall.
25    Q   But you do recall Mr. DiOrio providing you

52

1  some support for this information?
2    A   Right. Right.
3    Q   Do you work with Mr. DiOrio regularly? Sorry.
4  Did you work with Mr. DiOrio regularly?
5    A   This was the only time.
6    Q   And you ultimately signed a version of this
7  letter, correct?
8    A   Correct.
9       MR. ALLEN: Madam Reporter, could you please
10 bring up Deposition Exhibit 12.
11       AV TECHNICIAN: Please stand by.
12       (Deposition Exhibit 12 was marked for
13 identification.)
14       MR. ALLEN: And if we could scroll down just a
15 little bit to the signature line, please. Excellent.
16    Q   Mr. Ringheimer, this document appears to bear
17 your signature. Is this the signed version of that
18 draft response letter?
19    A   It looks like it, yes.
20    Q   And, Mr. Ringheimer, were there any other
21 instances after the transfers in 2017 in which you were
22 asked to review or identify assets held by Sentinel?
23    A   No. So Carter would have been probably the
24 year before, and Vishal Patel would have been the year
25 after.

---

53

1    Q    Do you recall the last time anyone at Highland
2   informed you of any assets held by Sentinel Reinsurance?
3    **A    No.  I believe this was the last -- the last**
4   **time that I had had any -- anything that I had heard of**
5   **for this.**
6    Q    All right.
7        MR. ALLEN:  Let's go off the record one more
8   time.  I think we're going to be done, but I'm going to
9   take a quick look at my notes.
10       THE VIDEOGRAPHER:  It's 8:58 Pacific Daylight
11  Time.  We are going off the record.
12       (A recess ensued from 8:58 a.m. to 9:04 a.m.)
13       THE VIDEOGRAPHER:  It's 9:04 Pacific Daylight
14  Time.  We are back on the record.
15  BY MR. ALLEN:
16   Q    Mr. Ringheimer, I just have one last question
17  about that audit letter in 2019.  Was that audit letter
18  the last time you heard anything about Sentinel while
19  you were at Highland?
20   **A    I believe it was.**
21       MR. ALLEN:  I don't have any further
22  questions.  Thank you very much.
23       THE VIDEOGRAPHER:  Any cross?
24       MR. FEINSTEIN:  It wouldn't be cross, but the
25  debtor has no questions.

---

54

1        THE VIDEOGRAPHER:  Very well then.
2        I believe this will conclude the deposition of
3   Jeremy Ringheimer.  It is 9:05 Pacific Daylight Time.
4   We are going off the record.
5        (The deposition concluded at 9:05 a.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

55

1            CERTIFICATE OF SHORTHAND REPORTER
2
3        I, Charlotte Lacey, the officer before whom the
4   foregoing deposition was taken, do hereby certify that
5   the foregoing transcript is a true and correct record of
6   the testimony given; that said testimony was taken by me
7   stenographically and thereafter reduced to typewriting
8   under my direction; that reading and signing was not
9   requested; and that I am neither counsel for, related
10  to, nor employed by any of the parties to this case and
11  have no interest, financial or otherwise, in its
12  outcome.
13
14       IN WITNESS WHEREOF, I have hereunto subscribed my
15  hand this 10th of May, 2021.
16
17
18  _____
19       Charlotte Lacey, RPR, CSR #14224
20
21
22
23
24
25