

# Transcript of James Dondero, Volume 2

**Date:** May 12, 2021
**Case:** UBS Securities LLC, et al. -v- Highland Capital Management, L.P.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

268

1    IN THE UNITED STATES BANKRUPTCY COURT
2       FOR THE NORTHERN DISTRICT OF TEXAS
3             DALLAS DIVISION
     --------------------------------X
4    In re              : Chapter 11
5    HIGHLAND CAPITAL MANAGEMENT, L.P., Case No:
6           Debtor      : 19-34054-SGJ11
7    --------------------------------:
8    UBS SECURITIES LLC and UBS AG    : Adversary No.
9    LONDON BRANCH,          : 21-03020-sgi
10              Plaintiffs,  :
11         vs.              :
12   HIGHLAND CAPITAL MANAGEMENT, L.P.:
13              Defendant.  :
14   --------------------------------X
15
16     CONTINUED DEPOSITION OF JAMES DONDERO
17               VOLUME II
18      APPEARING REMOTELY FROM DALLAS, TEXAS
19         WEDNESDAY, MAY 12, 2021
20             9:30 A.M. EST
21
22   Job No.: 372911
23   Pages 268 - 344
24   Reported by: Adrienne Mignano, RPR
25   Appearing remotely

269

1        Continued deposition of JAMES DONDERO, held
2    via Zoom videoconferencing, pursuant to Notice, before
3    Adrienne M. Mignano, a Registered Professional
4    Reporter and a Notary Public in and for the State of
5    New York.

270

1           A P P E A R A N C E S
2
3    ON BEHALF OF PLAINTIFFS:
4        ANDREW CLUBOK, ESQUIRE
5        SARAH TOMKOWIAK, ESQUIRE
6        KATHRYN GEORGE, ESQUIRE
7        LATHAM & WATKINS LLP
8        555 Eleventh Street, NW
9        Suite 1000
10       Washington, District of Columbia 20004
11       (202) 637-2200
12
13
14   ON BEHALF OF DEFENDANT-HIGHLAND CAPITAL MGMT.
15       ROBERT FEINSTEIN, ESQUIRE
16       JOHN MORRIS, ESQUIRE
17       GREGORY DEMO, ESQUIRE
18       JEFFREY POMERANTZ, ESQUIRE
19       PACHULSKI STANG ZIEHL & JONES
20       780 Third Avenue
21       34th Floor
22       New York, New York 10017
23       (212)561-7700
24
25

271

1        APPEARANCES (Continued)
2
3
4    ON BEHALF OF WITNESS
5        CLAY TAYLOR, ESQUIRE
6        BONDS ELLIS EPPICH SCHAFER JONES, LLP
7        420 Throckmorton Street
8        Suite 1000
9        Fort Worth, Texas 76102
10       (817)405-6900
11
12
13   ALSO PRESENT:
14   Drew Halton - Videographer
15   Joshua Tubbs - Remote Technician
16
17
18
19
20
21
22
23
24
25

**272**

C O N T E N T S

EXAMINATION OF JAMES DONDERO          PAGE
            By Mr. Clubok             275
            By Mr. Taylor             340

E X H I B I T S

(Not Attached to the Transcript)

DEPOSITION EXHIBIT                    PAGE

Exhibit 32   Transfer agreement between   306
             Highland CDO Opportunity
             Master Fund and Sentinel
             Reinsurance dated
             August 24, 2017

Exhibit 33   Document dated August 24, 2017   309

Exhibit 34   Multi Strat Summary Balance   311
             Sheet

Exhibit 35   E-mail from Tara Loiben to   318
             Helen Kim

Exhibit 38   Asset Transfer Agreement   331

**273**

1 REMOTE TECH: Thank you to everyone for
2 attending this proceeding remotely, which we
3 anticipate will run smoothly. Please remember to
4 speak slowly and do your best not to talk over one
5 another.
6         Please be aware we are recording this
7 proceeding for back-up purposes. Any
8 off-the-record discussions should be had away from
9 the computer. Please remember to mute your mic
10 for those conversations.
11        Please have your video enabled to help
12 the reporter identify who is speaking. If you are
13 unable to connect with video and are connecting
14 via phone, please identify yourself each time
15 before speaking.
16        I apologize in advance for any
17 technical-related interruptions. Thank you.
18        THE VIDEOGRAPHER: Here begins Volume
19 II, Tape Number 1 in the videotaped deposition of
20 James Dondero in the matter of UBS Securities,
21 LLC, et al., versus Highland Capital Management,
22 LP, in the U.S. Bankruptcy Court, Northern
23 District of Texas, Dallas Division, Chapter 11,
24 Case Number 19-34054-SGJ11, and Adversary
25 Proceeding Number 21-03020-SGJ.

**274**

1         Today's date is May 12, 2021. Time on
2 the video monitor is 9:34 a.m. Eastern. The
3 videographer today is Drew Halton, representing
4 Planet Depos. All participants are attending
5 remotely.
6         Would counsel please voice identify
7 themselves and state whom they represent.
8         MR. CLUBOK: On behalf of UBS, Andrew
9 Clubok, Sarah Tomkowiak and Kathryn George of
10 Latham & Watkins, LLP.
11        MR. TAYLOR: On behalf of the deponent,
12 Jim Dondero, Clay Taylor of Bonds Ellis Eppich
13 Schafer & Jones, LLP.
14        MR. FEINSTEIN: On behalf of the
15 defendant, Highland Capital Management, you have
16 got myself, Robert Feinstein; my colleagues,
17 Jeffrey Pomerantz and Greg Demo.
18        THE VIDEOGRAPHER: The court reporter
19 today is Adrienne Mignano, representing Planet
20 Depos.
21        Would the reporter please swear in the
22 witness.

**275**

1 Whereupon,
2         JAMES DONDERO,
3 having been recalled as a witness and having been
4 duly sworn or affirmed to testify to the truth,
5 the whole truth, and nothing but the truth, was
6 examined and testified as follows:
7         EXAMINATION BY COUNSEL FOR THE PLAINTIFF
8 BY MR. CLUBOK:
9    Q   Mr. Dondero, when we left off before,
10 we had been talking about the cash that was
11 transferred as part of the purchase of the legal
12 liability insurance policy that we have been
13 discussing. Do you remember that?
14   A   Yes.
15   Q   And I've got up here what's been marked
16 as Exhibit 2, which is the purchase agreement.
17 And, specifically, we're looking at Schedule A,
18 which identifies the assets that were transferred
19 as payment of the premium for the insurance
20 policy. Do you see that?
21   A   Yes.
22   Q   And just going to the cash very
23 quickly, it looks like there was approximately
24 $539,000 in cash that's identified sort of in the
25 bottom middle of the page under Highland CDO

276

1    Opportunity Fund.  I just highlighted it for you.
2      Do you see that?
3    **A**   **Yes.**
4    Q   And then there was another $599,000
5    that's marked "Re: Survios interest."  It's also
6    referenced on this same page, right?
7    **A**   **Yes.**
8    Q   And that adds up to about $1.1 million,
9    correct?
10    **A**   **Yes.**
11    Q   And then there is also a $7.7 million
12    entry for cash that's part of the transfer from
13    Highland CDO Opportunity Master Fund to pay for
14    the premium, correct?
15    **A**   **Yes.**
16    Q   And that 7.7 added to 1.1 gets you
17    about $8.8 million, correct?
18    **A**   **If you're asking me does that**
19    **addition -- I can't testify whether they should be**
20    **added together or they aren't included already in**
21    **that number, but if you're asking does, you know,**
22    **7 million and change plus one and change equal**
23    **eight and change, the math is correct.**
24    Q   Okay.  And then there is another entry
25    for cash under CDO Opportunity Fund on the same

277

1    page.  It's about 2.3 million, right?
2    **A**   **Yes.**
3    Q   And so 8.8 plus 2.3 is a little -- is
4    over 11.1, either 11.1 to 11.2 million in cash
5    total reflected on this page with the four
6    separate entries, correct?
7    **A**   **Same answer.  If -- your math is**
8    **correct in terms of adding those numbers.  But**
9    **whether or not they should be added or aren't**
10    **already included in this -- like in the 7.7, I**
11    **can't testify to.  I don't know.**
12    Q   Well, when we look up we see that there
13    is one entry that says, Highland Gemini Program
14    (Pollux) $2.399 million promissory note and cash
15    of 599,000 - Re: Survios interest.  And there is a
16    total there of 2.999995.
17      Do you see that?
18    **A**   **I do, but I'm just saying that it is**
19    **not clear to me that the 599 is not included in**
20    **the cash below.  I'm not the accountant.  I -- and**
21    **these statements aren't clear, so I don't want**
22    **to --**
23    Q   It --
24    **A**   **I don't want to testify to that.**
25    Q   Looking at this document -- well, first

278

1    of all, you signed this document, correct?
2    **A**   **Yes.**
3    Q   And just looking at it on its face, are
4    you saying you have no way to tell whether or not
5    the cash that's reflected in what I have currently
6    highlighted that says $2.399 million promissory
7    note, Dugaboy, and cash of 599, and has a total of
8    2.9995 -- you have no idea one way or the other
9    whether that total, which includes about 600,000
10    cash is separate from this other entry that says
11    7.779 in cash?
12      That's what you're testifying to?
13    **A**   **That's correct.**
14    Q   And do you think that that cash also --
15    you have no idea if that cash is separate and
16    distinct from this 2.349 million that is listed
17    under Highland CDO Opportunity Fund?
18    **A**   **That appears to be separate.  But,**
19    **again, I'm not the -- I'm not the accountant.**
20    Q   Right.  And you made no effort to
21    consider the values of the assets that you were
22    signing off to be transferred in satisfaction of
23    the $25 million premium; is that correct?
24      MR. TAYLOR:  Objection.  Form.  The --
25    Q   It -- okay.  Let me ask it again.

279

1      Fair to say that prior to signing off
2    on the transfer of all these assets reflected on
3    Schedule A in satisfaction of the premium for the
4    legal liability insurance policy we have been
5    discussing, you made no effort to assess the
6    actual fair market value of the total assets,
7    correct?
8    **A**   **Yes.  I -- that's correct.  I relied on**
9    **Scott Ellington, you know.  And I think what this**
10    **deposition has shown is, you know, I had a**
11    **different general understanding, but the**
12    **transaction morphed over time.**
13    Q   You, by the way, are the -- you are an
14    owner of Gov Re, correct?
15      MR. TAYLOR:  Objection.  Form.
16    Q   Sorry.  You are an owner of Governance
17    Re, Limited, correct?
18    **A**   **I believe so.**
19    Q   And so where it says there is this
20    $2.157 million promissory note from Governance Re,
21    Limited, that is an affiliated entity to you,
22    correct?
23    **A**   **I believe so.**
24    Q   How much ownership do you have in
25    Governance Re, Limited?

**280**

1    A  I do not know.
2    Q  Roughly.
3    A  I would guess -- I would guess -- I do
4 not know.  I -- you know, generally, most of those
5 entities, old entities, are 75 percent me, 25
6 percent Marco, but I don't know for sure.
7    Q  Okay.  Your -- and in terms of the
8 Dugaboy Investment Trust, you are an owner of
9 that, right?
10    A  It is a -- it is a trust.  I think I'm
11 a beneficial owner until my death.
12    Q  And are you the sole beneficial owner
13 until your death of the Dugaboy Investment Trust?
14    A  It is -- I don't -- I believe I'm the
15 sole beneficiary.  It is not -- I'm not the owner,
16 but I'm the sole beneficiary, I believe, until my
17 death, yes.
18    Q  Okay.  You're the sole beneficiary of
19 the Dugaboy Investment Trust until your death,
20 correct?
21    A  I believe so.
22    Q  And so that would also be an affiliated
23 entity to you in context of this transaction,
24 correct?
25    A  Yes.

**281**

1    Q  Do you -- I asked you before about
2 Sentinel Re's history of issuing policies.  And we
3 know now that the insurance policy at issue in
4 this case is entitled A Legal Liability Insurance
5 Policy.
6    My question to you is:  In the history
7 of Sentinel Re, are you aware of them ever issuing
8 a legal liability insurance policy other than the
9 one that we have been discussing in this
10 deposition?
11    A  I don't have specific awareness.
12    Q  Do you have general awareness of
13 Sentinel Re ever issuing a legal liability
14 insurance policy other than the one that is at
15 issue in this case?
16    A  My general awareness is they evaluated
17 and considered similar-type policies, but I'm
18 not -- I don't have specific awareness that they
19 consummated other ones.
20    Q  Do you have any awareness, general or
21 otherwise, that they have ever actually issued
22 another legal liability insurance policy other
23 than the one in this case; yes or no?
24    A  I don't know.  I don't have specific --
25 I don't have specific awareness or other -- or

**282**

1 general awareness other than a general
2 understanding that they reviewed numerous ones.
3    Q  You say they review -- you say they --
4 do you have a specific awareness that they have
5 reviewed numerous other legal liability insurance
6 policies to consider whether to issue them?
7    A  Yeah.  Yes.  I mean, the answer is yes.
8 They --
9    Q  Okay.  Can you name a single one that
10 Sentinel Re has ever reviewed?
11    A  I can't remember the names, but there
12 were judgments out of Canada that they funded or
13 were considering structuring policies on that they
14 were working on as part of the SAS platform.
15    I know there was -- I know there was
16 numerous funding or -- of litigation or sharing of
17 litigation in multiple cases around the world on
18 the SAS platform, and they were considering -- and
19 they would consider doing some of the funding via
20 insurance products through Sentinel.
21    So I know they -- I know they were -- I
22 know they looked at and considered similar-type
23 structures.  But, again, I wasn't the person
24 directly involved with that stuff.  That was
25 all --

**283**

1    Q  How do you know that they did that?
2    A  Because I would -- it would be
3 conversations with Ellington.
4    Q  So Scott Ellington told you in words or
5 substance that Sentinel Reinsurance considered on
6 numerous occasions entering into a legal liability
7 insurance policy that is similar to the one that
8 is at issue in this case?
9    A  Yes.
10    Q  And the ones you specifically remember
11 in connection with that answer relate to some
12 Canadian judgment?
13    A  Yeah.  I mean, that's all I remember.
14 But, yeah, there was -- there were judgments out
15 of Canada and cases out of Canada that they were
16 considering structuring something similar, but --
17    Q  And were those --
18    A  -- I don't know the specifics.
19    Q  Were those judgments in any way
20 involving any sort of affiliated entity?
21    A  No.
22    Q  What -- who were they involving?
23    A  I don't know, but it wasn't an -- it
24 wasn't an affiliated entity.
25 And there was -- was this one occasion

284

1 where they considered issuing, according to you, a
2 legal liability insurance policy, or is it many
3 different, separate occasions?
4     A    My recollection is that it was at least
5 several, but...
6     Q    And all related to Canadian judgments?
7     A    No.  I -- no.  That's the one I
8 remember, but I know there were -- there was a
9 lightbulb case out of the U.S. that they were
10 considering, and they were trying to come up with
11 creative structures.  I -- there were -- but I
12 wasn't involved in the details or the assessments
13 of those.
14     Q    And was the lightbulb case before or
15 after this legal liability insurance policy was
16 issued?
17     A    I don't know.
18     Q    Was the Canadian judgment before or
19 after this legal liability insurance policy was
20 issued?
21     A    I don't know.
22     Q    When was the last time you recall ever
23 hearing that Sentinel Reinsurance was considering
24 issuing a legal liability insurance policy other
25 than the one that is at issue in this case?

285

1     A    I don't know.
2     Q    Roughly.
3     A    I don't know.  I don't remember.  Years
4 ago, but I don't remember when.
5     Q    You just testified that you believed
6 that the -- sorry.
7          You just testified that when you heard
8 about the Sentinel Reinsurance potential policies
9 relating to the Canadian judgments, they were
10 working on as part of the SAS platform, is what
11 you said.
12          What did you mean by that?
13     A    I believe the -- most of the litigation
14 funding or joint venturing of litigation that
15 Scott was working on was done off the SAS
16 platform.
17     Q    And you own approximately 70 percent of
18 SAS, ultimately, correct?
19     A    I believe that's -- oh, I -- no, no,
20 no.  Wait.  The SAS platform is separate from the
21 Sentinel platform.  You know, I saw the org charts
22 from earlier in the deposition, but my
23 recollection and my understanding is that because
24 it was a trader business, it wasn't essentially
25 owned by U.S. persons.  I -- my recollection was

286

1 that it was owned by offshore entities, but there
2 was some participation.
3     Q    Okay.
4     A    There was some participation that I had
5 in it.
6     Q    You have roughly 70 percent
7 participation in the economic benefits of SAS;
8 isn't that true?
9     A    I don't know exactly, but I -- I don't
10 know exactly, but, I mean, that would seem
11 reasonable to me.
12     Q    Okay.  And SAS is in the business of
13 funding litigation, not insuring against
14 litigation losses, correct?
15     A    I think funding and joint venturing
16 litigation is in a broad sense, which sometimes
17 includes structures that are insurance or resemble
18 insurance.
19     Q    Okay.  So the only other policies that
20 you believe SAS -- sorry.
21          The only other insurance policies that
22 you can think of that Sentinel Re ever considered
23 issuing in connection with the legal world, or
24 legal liability, I should say, relates to deals
25 that were being considered by SAS, another

287

1 affiliated entity, correct?
2     A    I don't know.  I mean, Scott Ellington
3 is your person to talk to regarding the structure
4 of -- the structure, the business opportunities,
5 the alternative and similar business
6 opportunities.  I am -- my involvement was not
7 direct or frequent.
8     Q    My question is more specific about what
9 your actual knowledge is, okay?  So listen to my
10 question, please.  I'll try to say it more
11 clearly.
12          The only other insurance policies, as
13 you sit here today, that you can think of that
14 Sentinel Re ever considered issuing in connection
15 with legal liability related to transactions that
16 were being considered by SAS, which is another
17 affiliated entity of yours, correct?
18     A    The Canadian examples are the only
19 things I can think of at this moment.
20     Q    And those Canadian examples were SAS
21 transactions, which are transactions of another
22 affiliated entity of yours, correct?
23     A    I don't know if SAS is an affiliated
24 entity.  I believe the relationship or the
25 sourcing of the Canadian opportunity came through

288

1  the SAS platform.
2      Q   Okay.  And so the only legal liability
3  insurance policies that you can ever recall
4  Sentinel Re considering, other than the one that
5  was issued that has been the subject of this case,
6  relate to business being done by SO -- SAS, in
7  which you have a, roughly, 70 percent economic
8  interest, fair?
9      A   Source through -- source through SAS,
10 which I believe I have a material participation
11 interest, I -- yes, I would -- but I need to
12 clarify it that way because I don't know.
13     Q   You don't know the exact interest,
14 although you thought it was fair that it might be
15 roughly 70 percent, correct?
16     A   Yes.  And, again, I resisted -- I know
17 it is not a specific equity interest, you know.  I
18 think it is a profit sharing, you know, but I
19 don't know what comes out of the profit sharing
20 before that, you know.  It is --
21     Q   Yeah.  Okay.
22     A   And I don't know what the interest is
23 exactly.  I don't know if it is a participation,
24 but there is some --
25     Q   Fair to say --

289

1      A   There is some --
2      Q   Okay.  Mr. Dondero --
3          MR. TAYLOR:  Andy, he has got to be
4  able to --
5          MR. CLUBOK:  Wait, wait, wait.  No, no.
6      Q   For the purposes of trying to get
7  through today, I'm going to cut you off if you're
8  going off on tangents, and ask you to just focus
9  on my questions, okay, just to try to get through
10 the last hour here.
11         So fair to say you have a substantial
12 economic interest in SAS, correct?
13     A   Economic participation.
14     Q   Okay.
15     A   There is --
16     Q   By "economic participation," you mean
17 the right to obtain the economic benefits of
18 SAS --
19     A   If there are -- if --
20     Q   -- after any -- after expenses?
21     A   Yeah, if there are any or if there
22 ultimately are.  But as far as I know, I have
23 gotten nothing from it to date, and I don't know
24 if there is any residual or equity value in it at
25 all, so I don't want to represent that I have got

290

1  some material interest in it.
2      Q   I understand.  But if there is any
3  value --
4          MR. CLUBOK:  Strike that.
5      Q   You have a substantial economic
6  interest in whatever SAS generates?
7      A   I have a potential participation if
8  there is any -- a significant potential
9  participation if there is any value there some
10 day.
11     Q   So you have a significant economic
12 interest in SA -- in whatever value SAS ultimately
13 generates, fair?
14     A   Close enough, yes.
15     Q   Okay.  And other than SAS, you -- for
16 the --
17         MR. CLUBOK:  Strike that.
18     Q   Other than transactions that relate to
19 SAS deals or the legal liability insurance policy
20 that was issued, that's the subject of this case,
21 you can't think of any instance where Sentinel Re
22 has ever considered another legal liability
23 insurance policy, correct?
24     A   Yes.
25     Q   Okay.  So I want to turn to what's been

291

1  previously marked as Exhibit 3 if we can put that
2  up on the screen.
3          REMOTE TECH:  Stand by.
4      Q   Exhibit 3 is a cover e-mail from Shawn
5  Raver to Rick Swadley attaching a tax compliance
6  memo dated 2017 re: sale of assets to Sentinel.
7          Do you see Exhibit -- the first page of
8  Exhibit 3?
9      A   Yes.
10     Q   Have you ever seen this before?
11     A   No.
12     Q   The attachment is --
13         MR. CLUBOK:  Strike that.
14     Q   Exhibit 3 consists of this cover e-mail
15 that you see on the first page, along with the
16 attachment that is a five-page memo from Shawn
17 Raver to the Tax Files of Highland Capital
18 Management, dated June 30, 2018, Re: Tax
19 Consequence of Sentinel Acquisition of HFP/CDO
20 Opportunity Assets.
21         Do you see that?
22     A   Yes.
23     Q   Are you aware that a memo was written
24 regarding the tax consequences of the Sentinel
25 acquisition of the HFP/CDO Opportunity assets?

292

1    A   No.
2    Q   Are you aware that there was a concern
3  that the IRS could attempt to characterize the
4  transaction as a sham?
5    A   No.
6    Q   Did you know that CDO and SOHC were at
7  significant risk of being held liable to UBS at
8  the time of the transaction?
9    A   No.
10   Q   Was it true that CDO and SOHC were at
11 significant risk of being held liable to UBS at
12 the time the insurance policy was issued?
13       MR. TAYLOR: Objection. Form.
14   A   Not that I'm aware of.
15   Q   Did you -- when you signed off on the
16 insurance policy, did you believe that CDO Fund
17 and SOHC were at significant risk of being held
18 liable to UBS?
19   A   No. I believed it was compliance --
20 compliant, approved by compliance and approved and
21 structured -- or by the tax department also.
22   Q   Okay.
23   A   I had no reason to doubt that process
24 wasn't followed.
25   Q   I didn't ask you about that question,

293

1  sir, so I'm going to move to strike everything
2  after my question. But let me try it again.
3        I want you to focus on my question and
4  not answer things about what you believed or
5  didn't believe that don't respond to my question
6  directly.
7        At the time you signed off on the legal
8  liability insurance policy that's been the subject
9  of this proceeding, did you believe that CDO Fund
10 and SOHC were at significant risk of being held
11 liable to UBS in connection with the litigation
12 that was then pending in New York?
13   A   No.
14   Q   And did you believe when you signed off
15 on the legal liability insurance policy that you
16 were obtaining $100 million of liability
17 protection for the defendants in the New York
18 litigation?
19   A   I gave -- I gave my -- my recollection
20 has been different than the documents presented.
21 Again, I thought it was a transition policy. I
22 didn't -- it -- I didn't realize it had morphed
23 specifically to UBS, but it -- in aggregate, it
24 makes sense based on what we have seen.
25   Q   Did you believe that when you

294

1  authorized the transfer of the assets to pay for
2  the policy that it was allowing CDO and SOHC to
3  obtain legal liability insurance with respect to
4  the UBS litigation?
5    A   I don't -- you know, like I just said,
6  I don't recall it that way.
7    Q   Did you -- but at the time you
8  authorized the transaction, you knew that Sentinel
9  was related to the seller entities, correct?
10   A   Yes.
11   Q   And you knew that there was no
12 independence on each side of the transaction at
13 the time the policy was issued, correct?
14   A   That's not true.
15   Q   Oh. So how was -- but Scott Ellington
16 provided legal advice to all the parties involved
17 in the transaction, correct?
18   A   Yes.
19   Q   And who acted independently on behalf
20 of Sentinel with respect to the transaction, if
21 anyone?
22   A   The independence role would have been
23 handled through compliance.
24   Q   What do you mean by that?
25   A   We talked about this significantly the

295

1  other day, but when a transaction involves
2  affiliates, compliance is responsible for
3  assessing the appropriateness and fairness of the
4  transaction. And to the extent that independence
5  or marks or vetting or the transaction changing
6  from what I thought it was initially, compliance
7  is the one that, through an iterative process,
8  usually makes the transaction -- makes sure the
9  compliance -- makes sure the transaction is
10 compliant and fair.
11   Q   And by compliance, you mean Thomas
12 Surgent and his team?
13   A   Yes.
14   Q   And yesterday, by the way, just -- you
15 said at one point -- or not yesterday, but when we
16 previously had the deposition, at one point, you
17 said that there were a bunch of guys currently
18 working with you who talked to Thomas Surgent.
19       Who are those guys that you meant?
20   A   I still don't remember.
21   Q   When you testified that there are a
22 bunch of guys who talk to Thomas Surgent to this
23 day, you had no specific people in mind; is that
24 correct?
25   A   Correct.

296

1    Q    You said you would think about it and
2  get back to me and identify those people, and you
3  have not done that in the last couple of days?
4    **A    No.**
5    Q    You also said that at the time of the
6  policy, you claim that there was buzz around the
7  office and a lot of people who were talking about
8  it.
9        Can you name any of those people at all
10 other than Scott Ellington who specifically talked
11 about the Sentinel Re insurance policy at the time
12 it was being considered?
13   **A    And Thomas Surgent and his team.  It**
14 **was a --**
15   Q    But you --
16   **A    I know --**
17   Q    Sorry.  You heard Thomas Surgent
18 specifically talking about the Sentinel Re
19 insurance policy at that time?
20   **A    Well, I knew he was directly involved,**
21 **yes.**
22   Q    You actually heard Thomas Surgent say
23 something about the Sentinel Re insurance policy
24 at the time it was being considered?
25   **A    Yes.  Yeah, I can't remember exactly**

297

1  **what, but I know he was directly involved and**
2  **directly working on it with Scott Ellington.**
3    Q    What did Mr. Surgent say, if anything,
4  about the Sentinel Re insurance policy at the
5  time?
6    **A    That they were working on it and trying**
7  **to get it done.**
8    Q    When did he tell you that?
9    **A    On or about when it was being worked**
10 **on.**
11   Q    And in what context?  In person?
12   **A    Yeah.**
13   Q    In your office?  In his office?  In the
14 hallway?  Where?  In a conference room?
15   **A    In the area outside his office.**
16   Q    You were standing in the area outside
17 his office and he specifically told you he was
18 working on the Sentinel Re insurance policy?
19   **A    Yeah.  I mean, I do remember an update**
20 **like that.  I -- you know, and historically, I**
21 **used to talk to Thomas almost every day.**
22   Q    I'm sorry.  You never mentioned this
23 the other day when I asked you repeatedly if you
24 remembered anything else at all about anything
25 from Sentinel Re other than what Thomas -- Scott

298

1  Ellington told you.  And you are now saying you
2  remember getting an update from Thomas Surgent
3  about it?
4    **A    No, I mean, not an update because I**
5  **stay away from any kind of involvement or**
6  **interference with compliance so that they can be**
7  **independent, but I knew he was working on it**
8  **and --**
9    Q    No.  You said you remember an update
10 from Thomas Surgent just two minutes ago.
11   **A    Well -- but the update was that he was**
12 **working on it.  I -- again, I know they were both**
13 **working on it, but I wasn't directly involved, and**
14 **nor do I ever get, generally, directly involved**
15 **with compliance unless it is a factual**
16 **misunderstanding, but I let the business people**
17 **handle it with compliance.**
18   Q    In what context did Mr. Surgent give
19 you this supposed update?  Did you ask him for an
20 update?  Did he just pop out of his office and
21 just bring it up?  What was the context of this
22 update, James?
23   **A    Again, I talked to him -- was talking**
24 **to him almost every day, and it would be like,**
25 **What are you working on?  It would be sometimes**

299

1  the start of a conversation.
2        **And I know he would say -- there were**
3  **times where he would say, I'm working on getting**
4  **this Sentinel transaction done.**
5    Q    And did he say anything else beyond
6  that?
7    **A    No.  I didn't ask.  I knew what he --**
8    Q    I'm -- okay.  Just please listen to my
9  question and just answer my question.
10       How many times did he say that he was
11 working on this, getting the Sentinel transaction
12 done?
13   **A    At least a couple, a few times because**
14 **the Sentinel transaction morphed and changed based**
15 **on the input and adjustments from compliance based**
16 **on what the -- versus what the business people**
17 **were doing or originally intended to do.  That is**
18 **why I think --**
19   Q    I -- okay.  Stop.  Stop.  Stop.  Stop,
20 please, just for purposes of trying to get this
21 deposition done.
22       My specific question was:  How many
23 times do you recall Thomas Surgent say to you that
24 he was working on getting the Sentinel Reinsurance
25 transaction done?

300

1     A   At least a couple times.
2     Q   At least two times?
3     A   Yes.
4     Q   And perhaps more?
5     A   I don't remember. Let me just say, at
6   least, a couple times.
7         Q   And is there anything else that anyone
8   other than Scott Ellington ever told you about the
9   Sentinel Re insurance, other than Mr. Surgent a
10  couple of times say he was working to get it done?
11    A   No.
12        Q   Did you tell Mr. Surgent that Sentinel
13  Re was a related party?
14    A   No. I wasn't involved in the process,
15  so no, I did not tell him. He never -- he didn't
16  ask me. I wasn't involved in the process.
17        Q   But you expected that Thomas Surgent
18  would learn at the time the transaction was being
19  considered that Sentinel Re was a related party,
20  correct?
21    A   We talked about this the other -- it
22  wouldn't have been in front of him if it wasn't a
23  related-party transaction.
24        Q   My question is: Did you expect Thomas
25  Surgent to have learned at the time the

301

1   transaction was being considered that Sentinel Re
2   was a related party; yes or no?
3     A   Yes.
4     Q   Thank you.
5         So did Scott Ellington set all the
6   terms of the transaction for both sides?
7     A   I think -- as far as I know, he framed
8   the transaction, and then it was an iterative
9   approval process through compliance. That's the
10  way it would typically work. And that's as far as
11  my understanding goes. I wasn't directly
12  involved.
13        Q   Okay. And you don't know whether or
14  not there actually was an arm's-length process
15  regarding the consideration to be paid for the
16  policy, correct?
17    A   I don't know directly, but I believe it
18  would have been in an -- yes, that would have been
19  the process.
20        Q   You believe that -- well, your process
21  required there to have been an arm's-length
22  negotiation for a policy like this, correct?
23    A   Or arm's-length equivalent,
24  essentially.
25        Q   Or an equivalent.

302

1     A   That is what compliance would have been
2   pushing towards.
3     Q   Right. Your policies at the time would
4   have required there to be confirmation that there
5   was the equivalent of an arm's-length process to
6   set the terms of the insurance policy prior to it
7   being agreed upon, correct?
8     A   That would have been the
9   back-and-forth, correct.
10        Q   And you personally didn't take any
11  steps to ensure that those policies were complied
12  with, with respect to this insurance policy,
13  correct?
14    A   I was not directly involved.
15        Q   So you personally did not take any
16  steps to ensure that there were policies designed
17  to ensure the equivalent of an arm's-length
18  process with respect to setting the terms of the
19  insurance policy, correct?
20    A   I did not.
21        Q   Is that a yes?
22    A   I'm sorry. I may -- I wasn't paying
23  attention. Perhaps --
24        Q   Okay. Please --
25    A   Can you rephrase it?

303

1         Q   Sure.
2             Sir, you personally did not take any
3   steps to ensure that the policies designed to
4   confirm the equivalent of an arm's-length process
5   with respect to setting the terms of the insurance
6   policy were actually followed, correct?
7             MR. TAYLOR: Andy, I'm going to
8   interject here. Literally, he answered the
9   question for you. He said, "No, I did not."
10            MR. CLUBOK: I --
11            MR. TAYLOR: That is a clear answer.
12            MR. CLUBOK: It was just a -- it is
13  slightly a double negative, so I just wanted to
14  ask it again. I think it -- this is -- I think it
15  should be very simple. I'm just trying to get a
16  simple yes, so let me just ask it again.
17        Q   Sir, you personally did not take steps
18  to ensure that the policies were -- that were in
19  place at the time that were designed to confirm
20  the equivalent of an arm's-length process with
21  respect to setting the terms of the insurance
22  policy were actually followed, correct?
23    A   I did not take such steps to -- I did
24  not take any steps to ensure. I was not involved.
25        Q   Going back to Exhibit 2 briefly,

304

1  Schedule A.
2       MR. CLUBOK:  Can we put that back up on
3  the screen.
4       REMOTE TECH:  It should be on screen
5  and ready.
6       MR. CLUBOK:  Okay.
7     Q  Can you see it, Mr. Dondero?
8     A  Yep.
9     Q  Unfortunately, that makes one of us.
10  Give me a second here.
11       REMOTE TECH:  Try hovering over your
12  Zoom screen at the bottom, and then --
13       MR. CLUBOK:  I got it now.  Thank you.
14     Q  Do you see the column that says "Traded
15  Shares/Par"?
16     A  Yes.
17     Q  Do you have an understanding what that
18  means?
19     A  Yeah.  I think there is -- there is
20  an -- I do not -- I've never seen this before.  I
21  believe some of the CLO positions are in shares,
22  and then some of them are stated in par value.
23  But in neither case would the actual value be the
24  number of shares or the par value.  There would be
25  a trading value that would have to get multiplied

305

1  by either the par value or the number of shares to
2  get the actual value.
3     Q  And where would the records for
4  those -- for the information necessary to perform
5  those calculations be?
6     A  Highland would have all of those.
7     Q  Okay.  And you would have retained --
8  you would -- Highland would have retained all
9  those records since August of 2017 if you wanted
10  to go find them now?
11     A  Yeah.  At least seven years.  And all
12  of those are -- they are done at least on a
13  monthly basis for all of those securities if not
14  more frequently.
15     Q  Do you -- did you or anyone who works
16  for you currently have any access to the Highland
17  accounting system?
18     A  No.
19     Q  Let's turn to what is behind tab 14,
20  which I guess we'll mark as Exhibit 30 -- somebody
21  help me.  32.
22       REMOTE TECH:  Stand by.
23       (Deposition Exhibit 32 marked for
24  identification.)
25       MR. CLUBOK:  We're putting up Exhibit

306

1  32, which is a document entitled Highland Multi
2  Strategy Credit Fund, L.P., Transfer of Limited
3  Partner Interest.  And it is a transfer agreement
4  between Highland CDO Opportunity Master Fund and
5  Sentinel Reinsurance dated August 24, 2017.
6       Do we have that up?
7       REMOTE TECH:  It is on screen and
8  ready.
9       MR. CLUBOK:  Okay.
10     Q  And, sir, have -- that is your
11  signature on Exhibit 32, correct?
12     A  Yes.
13     Q  And you signed Exhibit 32 and this
14  transfer agreement on behalf of Highland CDO
15  Opportunity Master Fund and then all the other
16  entities that are listed there, including Highland
17  Capital Management and Strand Advisors, correct?
18     A  Yes.
19     Q  And then the transferee is somebody
20  named Christopher Watler, Director of Sentinel
21  Reinsurance.  Do you know who that is?
22     A  No.
23     Q  Have you ever met or heard of him
24  before today?
25     A  I think he signed one of the other

307

1  documents we talked about a couple days ago, but I
2  haven't met him.
3     Q  Other than seeing his signature a
4  couple days ago during this deposition, had you
5  ever heard his name before?
6     A  No.
7     Q  The -- as of -- prior to this transfer,
8  it appears that Highland CDO Opportunity Master
9  Fund had some limited partner interest in Highland
10  Multi Strategy Credit Fund, correct?
11     A  It appears so.
12     Q  And that was then transferred to
13  Sentinel Reinsurance, right?
14     A  It appears that was, yes, part of the
15  asset pool.
16     Q  So, in other words, Highland CDO
17  Opportunity Master Fund's interest in Multi
18  Strategy Credit Fund was transferred to an entity
19  for which you have approximately 70 percent
20  beneficial ownership, correct?
21     A  Well, it was transferred as part of an
22  insurance policy for -- right?  For Sentinel,
23  right?  It wasn't just directly transferred.
24     Q  Correct.  This is part of the payment
25  for the insurance policy, correct?

**308**

1    A   Yes.
2    Q   And as part of the payment for the
3  insurance policy, the legal liability insurance
4  policy that Sentinel issued, that we have been
5  discussing, an interest in Multi Strat that was
6  previously owned by CDO Fund was transferred to
7  Sentinel Reinsurance, correct?
8    A   Yes.
9    Q   And at the time, you owned
10  approximately 70 percent of the beneficial
11  interest in Sentinel Reinsurance, right?
12    A   I ought -- I want to answer that the
13  way I have answered it before.  Yes.  I mean --
14  yes.  I --
15    Q   Okay.
16    A   Yeah.  Yes.
17    Q   Okay.  And then at the time did you
18  make any effort to determine the fair market value
19  of that partnership interest in Highland Multi
20  Strategy Credit Fund?
21    A   No.  That wasn't -- no, I did not.
22  That wasn't my role.
23    Q   Where -- does Sentinel still own that
24  limited partner interest in Highland Multi
25  Strategy Credit Fund, to your knowledge?

**309**

1    A   I'm not aware.  I'm not aware if it
2  sold it or transferred -- I have no awareness
3  of -- I have no awareness of the current Sentinel
4  balance sheet.
5    MR. CLUBOK:  Let's turn to tab 14A for
6  an exhibit that's marked 33.
7    REMOTE TECH:  Stand by.
8    (Deposition Exhibit 33 marked for
9  identification.)
10    REMOTE TECH:  Exhibit 33 is on screen
11  and ready.
12    MR. CLUBOK:  Okay.
13    Q   Exhibit 33 is a document that's also
14  dated August 24, 2017, that reflects a transfer of
15  limited partner interest from Highland CDO
16  Opportunity Fund to Sentinel Reinsurance.
17    Do you see that?
18    A   Yes.
19    Q   And Exhibit 33 shows -- by the way,
20  when I call -- can I shorthand Highland Multi
21  Strategy Credit Fund as Multi Strat and you'll
22  understand what I mean?
23    A   Sure.
24    Q   Okay.  So the previous document showed
25  a transfer of partnership interest in Multi Strat

**310**

1  by CDO Opportunity Master Fund.  And this shows a
2  transfer on the same date of an interest in Multi
3  Strat by Highland CDO Opportunity Fund, Ltd.,
4  correct?
5    A   Yes.
6    Q   And you signed off on this as well,
7  right?
8    A   Yes.
9    Q   And you made no effort to determine the
10  fair market value of this partnership interest in
11  Multi Strat before signing off on the transfer as
12  part of the insurance agreement, correct?
13    A   I did not under the belief that process
14  and the accurate marked to market reflection would
15  have been done by other people as part of the
16  transaction.  And I believe it was done, so...
17    Q   Okay.  I'm going to put up what we're
18  going to -- the next document we're going to put
19  up and we are going to mark as Exhibit 34 is a
20  Multi Strat Summary Balance Sheet.
21    MR. CLUBOK:  Ms. George, maybe you can
22  help identify -- I don't know what tab we used for
23  that or how to easily identify that.
24    MS. GEORGE:  Hold on a sec, please.
25    It should be called the Multi Strat

**311**

1  Summary Balance Sheet --
2    MR. CLUBOK:  Okay.
3    MS. GEORGE:  -- as you described it.
4    MR. CLUBOK:  Pull up the Multi Strat
5  Summary Balance Sheet, please, and we'll mark it
6  as Exhibit 34.
7    REMOTE TECH:  One moment.
8    (Deposition Exhibit 34 marked for
9  identification.)
10    REMOTE TECH:  Exhibit 34 is on screen
11  and ready.
12    MR. CLUBOK:  Okay.
13    Q   Exhibit 34 is a document that you sent
14  to me in connection with settlement discussions,
15  correct?
16    MR. TAYLOR:  Andy, we're going to
17  reserve any and all rights of your ability to use
18  that.
19    MR. CLUBOK:  Okay.
20    Q   Mr. Dondero, you recognize Exhibit 34,
21  right?
22    A   Yes.
23    Q   And this is a document that you asked
24  someone at Highland to prepare for you to send
25  in -- me on behalf of UBS, correct?

312

1     A   Yes.
2     Q   And this purports to show the ownership
3   or the redemption interest in Multi Strat as of
4   today -- or as of October 31, 2020, correct?
5     A   Yes.
6     Q   And there were -- you listed the top
7   six redemption payables outstanding.  The first
8   one is Quentin Ayers (multiple classes).
9         Do you see that?
10    A   Yes.
11    Q   Who is Quentin Ayers?
12    A   It is an Australian fund to funds.
13    Q   Are you related in any way to that,
14  Quentin Ayers?
15    A   No.
16    Q   They are completely separate in every
17  way, control, economic interest, et cetera, from
18  you?
19    A   Yes.
20    Q   Do you have any ownership interest in
21  any Quentin Ayers fund?
22    A   No.
23    Q   Okay.  Then the next highest redemption
24  payable is this entity called SS Holdings; do you
25  see that?

313

1     A   Yes.
2     Q   What is SS Holdings?
3     A   I don't know.
4     Q   It says there is a $32.8 million
5   payable to SS Holdings; do you see that?
6     A   Yes.
7     Q   SS Holdings relates to Sentinel
8   Insurance, correct?
9     A   I don't know that.
10    Q   There -- Sentinel Insurance -- Sentinel
11  Reinsurance had a, roughly, $32 million interest
12  in Multi Strat following the insurance policy
13  transaction; isn't that true?
14    A   I don't know that.  I mean, I did know
15  that at the time of this.
16    Q   You knew that Sentinel Reinsurance had
17  a, roughly, $32 million redemption payable in
18  connection with Multi Strat at some point,
19  correct?
20    A   No.
21    Q   You knew that Sentinel Reinsurance had
22  a significant interest in Multi Strat at some
23  point, correct?
24    A   Significant -- I knew it -- at some
25  point, I knew it had an interest in Multi Strat.

314

1     Q   And --
2     A   But it -- but I didn't know -- I didn't
3   know the amount or specifically what kind of
4   interest.
5     Q   Okay.
6         And you knew that they -- you
7   knew that they -- did you believe they ever
8   disposed of that interest?
9     A   I didn't have awareness.  But I -- at
10  some point, I was made aware they had some
11  interest.
12        MR. CLUBOK:  Let's turn to Exhibit 28
13  that was previously used in this deposition.  It
14  was at tab 8.
15        REMOTE TECH:  Stand by.
16        MR. CLUBOK:  Exhibit 28 has the org
17  structures that we previously discussed for SAS
18  and for Sentinel Reinsurance.
19        REMOTE TECH:  One moment.  I'm
20  double-checking that I have the correct file.  You
21  said it was --
22        MR. CLUBOK:  It is Exhibit 28 in this
23  deposition.  It was previously tab 8, but it is
24  Exhibit 28.
25        REMOTE TECH:  Okay.  I found it.  One

315

1   moment.
2         Exhibit 28 is back on screen.
3   BY MR. CLUBOK:
4     Q   We previously showed you Exhibit 28
5   and, in particular, the last page, which showed
6   the Sentinel structure as of April 2019.  And I
7   have just zoomed it up a little bit.
8         And, again, you are the USP2 here that
9   ultimately has about 70 percent of value in
10  Sentinel, correct?
11    A   I assume so.  I don't know.  I have
12  never seen this -- I never saw this before two
13  days ago.
14    Q   Okay.  But the only two human beings on
15  the planet that you are aware of that have any
16  substantial interest in Sentinel Reinsurance are
17  Scott Ellington and you, correct?
18    A   Yeah.  As far as I know, yes.
19    Q   And Scott Ellington has a, roughly, 30
20  percent interest and you have a, roughly, 70
21  percent interest, to the best of your knowledge,
22  as you sit here today, correct?
23    A   Yes.
24    Q   Okay.  So on this org chart of Sentinel
25  Reinsurance, where it shows USP2 has 70 percent

**316**

1  value and a 91 percent vote, in this complicated
2  org chart, almost near the bottom, you see
3  SS Holdings, Limited, correct?
4  　A　Yes.
5  　Q　Okay.  Does that ring a bell that
6  SS Holdings is connected to Sentinel Reinsurance?
7  　A　Again, not to me.  I wasn't aware of
8  this structure and I have never seen it before, so
9  I wasn't aware of it when I sent you settlement
10 stuff a year and a half ago, or whatever.
11 　Q　Did you know what SS was when you
12 sent the -- sorry.
13 　Did you say you sent the settlement
14 stuff a year ago to me?
15 　A　Well, when I -- the settlement stuff
16 seven months ago, whenever it was.
17 　Q　Okay.
18 　A　Whenever it would have been in the
19 last --
20 　Q　And when you sent that, did you know --
21 did you know what SS -- did you have any idea what
22 SS Holdings were?
23 　A　I had no idea.
24 　Q　And you represented that SS Holdings
25 was a wholly third party, correct?

**317**

1  　A　I had no idea what it was.  And as far
2  as I knew --
3  　Q　Right.  And at the time -- at the time
4  when we asked you whether SS was in any way
5  related, you said, like Quentin Ayers, it was a
6  completely third party?
7  　A　I -- if I said that, that was my belief
8  at the time, absolutely.
9  　Q　And was that based on anything, that
10 belief?
11 　A　It was based on no knowledge that it
12 was part of this.
13 　Q　Okay.  But you had done nothing to
14 investigate what SS Holdings was before you
15 represented that it was a wholly third party,
16 correct?
17 　A　Correct.
18 　MR. CLUBOK:  Let's turn to what's
19 behind tab 15.  Tab 15, we will mark as Exhibit
20 35.
21 　REMOTE TECH:  Stand by.
22 　(Deposition Exhibit 35 marked for
23 identification.)
24 　MR. TAYLOR:  Andy, I am back.  Sorry,
25 we had a power loss and, therefore, that caused

**318**

1  the WiFi to go out.
2  　MR. CLUBOK:  Oh, that's okay.  But you
3  are -- do you need to go off the record?
4  　MR. TAYLOR:  Yes, please.
5  　MR. CLUBOK:  All right.  Let's go off
6  the record.
7  　THE VIDEOGRAPHER:  Off record, 10:31.
8  　(A recess was taken.)
9  　THE VIDEOGRAPHER:  On record, 10:40.
10 BY MR. CLUBOK:
11 　Q　Okay.  We've got on the screen Exhibit
12 35, which is an e-mail from Tara Loiben to Helen
13 Kim; subject, "Here is my signed document
14 Assignment Agreement - PNotes - CLO Holdco," dated
15 August 14, 2017 at approximately 5:07.
16 　Do you see this?
17 　A　Yes.
18 　Q　And Tara Loiben was your executive
19 assistant at the time?
20 　A　Yes.
21 　Q　Does she still work for you?
22 　A　Yes.
23 　Q　So she is now at that office that
24 you're in?
25 　A　Yes.

**319**

1  　Q　And what about Helen Kim, did she come
2  with you?
3  　A　Yes.
4  　Q　Okay.  And this cover e-mail says --
5  Tara says:  "I signed the attached document.
6  Thanks." And then it says:  "Sorry Tara, Jim
7  can't sign for Sentinel.  Can you only sign for
8  Highland CDO Holding?  Thank you." And she says,
9  "Sorry yes."
10 　Do you see that?
11 　A　Yes.
12 　Q　Okay.  So did you sometimes authorize
13 your assistant to sign documents on your behalf?
14 　A　Yes.
15 　Q　Would Tara have ever signed a document
16 on your behalf without direct authorization from
17 you?
18 　A　I don't believe so.
19 　Q　Okay.  That would -- okay.
20 　Let's turn to Exhibit 36, which is one
21 of the attachments originally to this e-mail.  And
22 it says, "Assignment Agreement" between Highland
23 CDO Opportunity Master Fund and Sentinel
24 Reinsurance, and it is to be effective August 7,
25 2017; do you see that?

**320**

1      A   Yes.

2      Q   And on this document, this was another
3  document that consummated one of the transfers in
4  connection with the insurance policy that we have
5  been talking about?

6      A   I believe so.

7      Q   And we look at the second page -- or,
8  sorry, the third page, the signature page.

9          And, here, it has assignor and
10 assignee, and we have got Jim Dondero's signature
11 for both entities, correct?

12     A   Yes.

13     Q   And as we noted before in Exhibit 34,
14 someone pointed out -- Helen Kim pointed out to
15 Tara that "Jim can't sign for Sentinel." So, now,
16 let's look at Exhibit 37, please. Exhibit 37 is
17 an e-mail document that's dated a few minutes
18 later from Helen Kim on August 14, 2017. It is
19 now 5:29, according to this e-mail, and it has got
20 several attachments, including Sentinel -- it
21 says, "Sentinel (executed), CDO Holdco (executed),
22 CDO Fund - Dugaboy, Survios (executed)."

23     It says:  "Attached are the docs signed
24 by JD.  I'm waiting on the Dugaboy sign from Nancy
25 Dondero."

**321**

1          Do you see that?

2      A   Yes.

3      Q   And then if we look at page 4 -- or we
4  see that attached here is the same assignment
5  agreement that we just saw at Exhibit 36, but now
6  the signature page just has you signing on behalf
7  of the assignor and a blank for Sentinel
8  Reinsurance.

9          Do you see that?

10     A   Yes.

11     Q   Do you know if this -- if Sentinel
12 Reinsurance ever signed this asset transfer
13 agreement?

14     A   I have no idea, but they -- I would
15 have expected, but I have no idea.

16     Q   The next document -- so, again, Exhibit
17 37 is an e-mail and it mentions several
18 attachments. The first is this assignment
19 agreement that is between Highland CDO Opportunity
20 Master Fund and Sentinel Reinsurance that you had
21 previously -- or your assistant had previously
22 signed your name to both the assignor and the
23 assignee, and now there is a version with just you
24 signing it.

25         The next attachment is an assignment

**322**

1  agreement between Highland CDO Holding Company and
2  Sentinel Reinsurance, where it also refers to the
3  asset purchase agreement that was executed in
4  connection with the insurance policy.

5          Do you see that?

6      A   Yes.

7      Q   And on the next page, or two pages
8  later, it shows you signing on behalf of Highland
9  CDO Holding Company as the assignor, correct?

10     A   Yes.

11     Q   And, again, there is a blank for
12 Sentinel Reinsurance, right?

13     A   Yes.

14     Q   And you authorized -- you either signed
15 this or authorized your assistant to sign on your
16 behalf; is that correct?

17     A   Yes.

18     Q   And you had the authority to do that at
19 the time on behalf of Highland CDO Holding
20 Company?

21     A   Yes, I believe so.

22     Q   Okay.  Continuing to the next
23 attachment to what's marked as Exhibit 37,
24 we -- there is a purchase agreement that has the
25 seller, CDO Opportunity Master Fund, and you

**323**

1  signed on their behalf.

2          Do you see that?

3      A   Yes.

4      Q   And this is -- relates to 269,000
5  shares of NexPoint Multifamily Capital Trust.

6          Do you see that?

7      A   Yes.

8      Q   And it says that the seller was selling
9  to purchaser and purchaser purchases from seller
10 the assets in accordance with the terms hereof for
11 an aggregate purchase price of 2,693,930, to be
12 paid for as follows:  20 percent in cash and the
13 balance pursuant to the promissory note attached
14 hereto.

15         Do you see that?

16     A   Yes.

17     Q   Did you ever obtain any cash in
18 connection with this transaction?

19     A   I'm sorry.  I'm not part of the
20 purchase agreement, am I?

21     Q   Did Highland CDO Opportunity Master
22 Fund, seller, obtain any cash in connection with
23 this transaction, as far as you know?

24     A   I don't have any specific knowledge or
25 reason to think it wasn't performed as stated.

**324**

1  Q  Who owned Highland CDO Opportunity
2  Master Fund, or who was the beneficial owner of
3  Highland CDO Opportunity Master Fund at the time
4  of this transaction in August of 2017, as far as
5  you know?
6  A  I don't know.
7  Q  You had an economic interest in it,
8  though, right?
9  A  I don't know.
10  Q  Do you have any idea who has ever owned
11  Highland CDO Opportunity Master Fund?
12  A  In -- I don't -- Highland?  I don't
13  know.  I don't know.
14  Q  Okay.  And Highland, you -- at some --
15  through whatever chain, fair to say that you
16  expect you would have had some economic interest
17  in Highland CDO Opportunity Master Fund as of
18  August 7, 2017, correct?
19  A  I don't know.
20  Q  Well, Highland Capital Management would
21  certainly have had some economic interest in
22  Highland CDO Opportunity Master Fund as of August
23  7, 2017, correct?
24  A  Not necessarily.  But, typically, it
25  did, but I don't know.

**325**

1  Q  Okay.  There is also, here, a signature
2  for the purchaser of this asset by Governance Re,
3  Limited; do you see that?
4  A  Yep.
5  Q  So on -- and for this document, you
6  signed both of behalf of the seller, Highland CDO
7  Opportunity Master Fund through Highland Capital
8  Management and Strand, and then you sign also on
9  behalf of the purchaser, Governance Re, Limited,
10  as its sole director, correct?
11  A  Yes.
12  Q  Did you have authority to act on both
13  sides of this transaction at the time?
14  A  I believe so.
15  Q  Who gave you that authority?
16  A  Who gave me that -- I believe I'm an --
17     MR. CLUBOK:  Strike that.
18  Q  Did --
19  A  I believe I am an authorized signatory
20  or officer of both those entities, I believe.
21  Q  Did you make any effort to ensure that
22  it was compliant for you to act on both sides of
23  this transaction that's reflected in this purchase
24  agreement between Governance Re, Limited and
25  Highland CDO Opportunity Master Fund?

**326**

1  A  Again, all trades that involve
2  affiliates go through compliance.  This one would
3  have been easy because they were publicly listed
4  shares at a price on the exchange on the day of
5  transfer.  There wouldn't have been controversy
6  regarding the propriety of the amounts.
7  Q  Okay.  By the way, is -- was Sentinel
8  Reinsurance an advisory fund or an advisory client
9  of Highland Capital Management?
10  A  I don't know.
11  Q  If there was an entity that was not an
12  advisory client of Highland Capital Management but
13  was nevertheless related to you or affiliated with
14  you, would compliance at Highland Capital
15  Management have needed to be involved?
16  A  Yes.
17  Q  Why is that?
18  A  Because it was an affiliate of me.
19  Q  Okay.  So any transaction where it is
20  an affiliate of you would require compliance to
21  sign off on if you were on both sides of the
22  transaction or affiliates of you were on both
23  sides of the transaction, correct?
24  A  Yes.
25  Q  Okay.  The last attachment -- or the

**327**

1  next attachment here is a promissory note from
2  Governance Re to Highland CDO Fund.  And, again,
3  you signed on behalf of Governance Re; do you see
4  that?
5  A  Yes.
6  Q  And then there is a purchase agreement
7  between Dugaboy Investment Trust and Highland CDO
8  Opportunity Master Fund, and you sign on behalf of
9  the seller, Highland CDO Opportunity Master Fund?
10  A  Yes.
11  Q  And there is no signature on behalf of
12  Dugaboy Investment Trust.  You would have expected
13  the trustee to sign that?
14  A  Yes.
15  Q  Did you ever direct the trustee of
16  Dugaboy to do anything?
17  A  No.
18  Q  Do you know whether -- and that -- who
19  was the Dugaboy Investment trustee at the time?
20  A  I don't know.  It would have been
21  either Grant Scott or my sister.  More recently
22  it's been my sister, but I don't know at this
23  point in time.
24  Q  Is your sister currently the trustee of
25  Dugaboy Investment Trust?

328

1      A   Yes.
2      Q   What is your sister's name?
3      A   Nancy.
4      Q   Where does she live?
5      A   In Florida.
6      Q   Have you ever directed her in
7  connection with anything having to do with
8  Sentinel Reinsurance?
9      A   Not that I'm aware of.
10     Q   Okay.  And then there is a final
11 document that relates to Dugaboy that looks like
12 it is unsigned.
13         If we go back to the first page of
14 Exhibit 37, Helen Kim says:  "Attached are the
15 docs signed by JD.  I'm waiting on the Dugaboy
16 signs from Nancy Dondero."
17         Do you see that?
18     A   Yes.
19         MR. TAYLOR:  Just objection to clarify.
20 You said, "signs."  I believe you meant to say
21 "sigs."
22         MR. CLUBOK:  I'm so sorry.  Thank you.
23     Q   In Exhibit 37, Helen Kim says:
24 "Attached are the docs signed by JD.  I'm waiting
25 on the Dugaboy sigs," S-I-G-S, "from Nancy

329

1  Dondero."
2         Do you see that?
3      A   Yes.
4      Q   And that is an e-mail to J.P. Sevilla,
5  correct?
6      A   Yes.
7      Q   And what that means is that she was
8  waiting for Nancy Dondero, your sister, to sign
9  off on the Dugaboy transactions where there were
10 blanks that we just looked at, correct?
11     A   I -- it seems logical, but I don't have
12 specific awareness.
13     Q   How did Nancy Dondero get information
14 about this transaction?
15     A   I don't know.
16     Q   How did Nancy Dondero make the decision
17 as to whether or not to sign off on this
18 transaction?
19     A   I don't know.
20     Q   Did you ever talk to Nancy Dondero
21 about Dugaboy in connection with this transaction?
22     A   Not that I -- not that I recall.
23     Q   You had an understanding at the time
24 with Nancy that she would pretty much sign
25 anything that was put in front of her related to

330

1  Dugaboy, correct?
2      A   No, I don't.
3         MR. TAYLOR:  Objection.
4      A   I do not.  I did not.
5      Q   Okay.  Do you know if Sentinel ever
6  hired an outside valuation firm to value the
7  assets?
8      A   I -- Highland does, and I think
9  Sentinel relied on the Highland marks.
10     Q   You think Sentinel relied on the
11 Highland marks prior to consummating this
12 transaction, correct?
13     A   Yes.
14     Q   After this transaction, since the
15 transaction, since August of 2017, do you know
16 whether or not Sentinel has ever hired an outside
17 valuation firm to value the assets?
18     A   I don't know.
19         MR. CLUBOK:  Okay.  Turn to tab -- to
20 Exhibit 38, please.  Exhibit 38 is a document
21 entitled Asset Transfer Agreement, dated as of
22 December 31, 2019.
23         (Deposition Exhibit 38 marked for
24 identification.)
25         MR. CLUBOK:  I'm going to blow it up.

331

1         THE WITNESS:  Yes, please.
2      Q   Okay.  Do you see that?
3      A   Yes.
4      Q   And it says the parties are Sentinel
5  Reinsurance and Sebastian Clarke; do you see that?
6      A   Yes.
7      Q   And it says, on December 31, 2019, the
8  seller, that is Sentinel Reinsurance, agreed to
9  sell certain assets to the purchaser for the
10 consideration in this agreement.
11         Do you see that?
12     A   Yes.
13     Q   Were you aware of this transaction
14 between Sentinel Reinsurance and Sebastian Clarke
15 in approximately December of 2019?
16     A   No.
17     Q   This would have been after you went
18 through bankruptcy for Highland Capital
19 Management, correct?
20     A   Yes.
21     Q   And it -- there is a purchase price
22 here of $3 from purchaser to seller; do you see
23 that?
24     A   Yes.
25     Q   And then there is a schedule that lists

332

1 a series of assets; do you see that?
2     **A  Yes.**
3     Q  Do you recognize the Dugaboy Investment
4 Trust promissory note amongst those assets of
5 approximately 2.4 million?
6     **A  Yes.**
7     Q  And do you see where there is a CLO
8 Holdco, Limited promissory note of approximately
9 32.8 million?
10     **A  Yes.**
11     Q  And then there are several other
12 assets, correct?
13     **A  Yes.**
14     Q  And it says all these assets were
15 acquired the same day, August 11, 2017; do you see
16 that?
17     **A  Yes.**
18     Q  Those assets were all acquired by
19 Sentinel Reinsurance in connection with the
20 insurance policy issuance that we have been
21 talking about, right?
22     **A  Well, it appears, but I don't know**
23 **that for sure.**
24     Q  Okay. But we could compare this
25 document with the schedule in the purchase

333

1 agreement to confirm that. But it certainly --
2 from a quick glance, it appears that's to be the
3 case, correct?
4     **A  It appears, yes.**
5     Q  And do you have any idea, is the
6 Dugaboy Investment -- does Dugaboy currently have
7 the wherewithal to pay off its promissory note
8 that's reflected here in Exhibit 38?
9     **A  Yeah, it has the solvency. I don't**
10 **know about the liquidity on a day-to-day basis.**
11     Q  Okay. But it has solvency such that it
12 can make good on this $2.399 million promissory
13 note that is reflected in the assets that were
14 sold pursuant to this agreement on December 31,
15 2019, correct?
16     **A  Yes.**
17     Q  And does CLO Holdco have the
18 wherewithal to pay off the, roughly, $32.8 million
19 promissory note that's reflected here?
20     **A  I don't know. The doc overall has**
21 **solvency well beyond 32 million, but I don't know**
22 **about CL -- CLO Holdco.**
23     Q  Do you know about the value of the
24 Vertical ABS CDO 2.00 that's reflected here, has a
25 Par/Face, 11 million?

334

1     **A  No.**
2     Q  Do you know about the Highland Park
3 note that's noted as a Par/Face of 17 million?
4     **A  No. The -- I think we commented on**
5 **these before. I think Highland Park and Aberdeen**
6 **are old CLOs, tranches that would be cents on the**
7 **dollar in terms of value versus those numbers.**
8 **The Vertical ABS CDO, I believe, is a third-party**
9 **CLO.**
10     Q  Is that worth cents on the dollar or is
11 that money good right now?
12     **A  No, well, they are all cents on the**
13 **dollar --**
14     Q  What about Pam Cap FTG?
15     **A  That is a very old CLO, and that would**
16 **be literally a couple, few cents on the dollar.**
17     Q  Okay. You wouldn't expect, though, the
18 CLO Holdco note to be cents on the dollar, would
19 you?
20     **A  It shouldn't be.**
21     Q  Okay. Sebastian Clarke is an entity
22 that's ultimately -- that you have economic
23 interest in, correct?
24     **A  I have never heard of Sebastian Clarke**
25 **before unless you refresh or educate me.**

335

1     MR. CLUBOK: Let's go to -- what was
2 it? Tab 6?
3     REMOTE TECH: Is that Exhibit 39?
4     MR. CLUBOK: Sorry. Sorry. Tab 8,
5 Exhibit 28. Back to Exhibit 28.
6     Q  Exhibit 28 had the charts for SAS and
7 Sentinel. And you can see in the SAS chart,
8 Sebastian Clarke is identified as one of the
9 entities that rolls up to SAS, or did roll up to
10 SAS as of the date of this chart.
11     Do you see that?
12     **A  Yes.**
13     Q  And you have an economic interest in
14 the SAS entity, correct?
15     **A  Participation interest, right? Anyway,**
16 **but yes.**
17     MR. CLUBOK: All right. I think that's
18 all I have for now. Let's go off the record.
19     THE VIDEOGRAPHER: Off record, 11
20 o'clock.
21     (A recess was taken.)
22     THE VIDEOGRAPHER: On the record,
23 11:06.
24     MR. CLUBOK: If we could, put up
25 Exhibit 2, Schedule A, please.

**336**

1    Q   Exhibit 2 was the purchase agreement in
2  connection with the legal liability insurance
3  policy that we have been discussing.
4        And as you know, Schedule A is a
5  two-page document that lists all the assets that
6  were transferred in connection with the purchase
7  of that policy, correct, Mr. Dondero?
8    A   Yes.
9    Q   My question is -- and I think you said
10  that you have -- sitting here today, you have no
11  idea what the value of any of these assets are
12  today, correct?
13    A   Correct.
14    Q   Other than with respect to the
15  promissory notes, you have testified that you
16  believe that various entities we have talked about
17  have the capacity to pay the -- to the extent you
18  have testified; is that fair?
19    A   Yes.
20    Q   Okay.  So my only other question is:
21  Do you know if any of these assets have ever
22  generated cash since they were transferred?
23        And I'll give you a chance to just look
24  over Schedule A, the first page.  And tell me when
25  you're ready, and I'll move to the second page.

**337**

1    A   Yeah, I would expect that some of the
2  CLOs would have generated some cash.
3    Q   Which ones on page 1?
4    A   I would have expected the first six to
5  generate cash.
6    Q   Okay.  So you would have expected the
7  Aberdeen, the two South Forks, the other Aberdeen,
8  the GSC and the Greenbriar --
9    A   Yes.
10    Q   -- that are all listed at the top of
11  Schedule A to generate cash since the time they
12  were transferred?
13    A   Yes.
14    Q   Do you expect that some of them are
15  still continuing to generate cash?
16    A   I don't know, but I would have expected
17  them to generate some cash, but I don't know if
18  they currently are.
19    Q   And do you have any idea how much cash
20  you would have expected them to generate when you
21  authorized their transfer as part of the insurance
22  policy premium?
23    A   I don't know.
24    Q   Anything else on Schedule A here?
25  Looking down, do you see any other assets that you

**338**

1  would expect to have generated cash?
2    A   The Valhalla and the Vertical.
3    Q   Okay.  And I -- the ones that are
4  marked Valhalla CLO, Limited and Vertical ABS CDO
5  were two other assets that you would have expected
6  to generate cash after the time they were
7  transferred?
8    A   Yes.
9    Q   Okay.  Anything else?
10    A   So I don't know what the Cambridge note
11  is, so I -- some of these -- yeah, that -- well,
12  that's it on that page that I would comment on.
13    Q   And, again, with those last two, you
14  don't know how much cash you would have expected
15  to generate when you authorized their transfer as
16  part of the insurance policy, correct?
17    A   That's right.
18    Q   So on the second page, any assets that
19  you would have expected to generate cash when you
20  transferred the assets?
21    A   Under Special Opportunities Fund,
22  everything there other than -- everything other
23  than Tousa, I would have expected to generate some
24  cash.  The --
25    Q   Okay.  So Delphi Corp., Longstreet and

**339**

1  Vertical ABS CDO 2 and the 144A, you would have
2  all expected to generate cash?
3    A   Yeah.  I think that -- I think the
4  Vertical and the -- I think that the -- that looks
5  to be a repeat.  It looks like it is 5 million,
6  but it was repeated twice.  That's what it looks
7  like there, but --
8    Q   Okay.
9    A   But anyway --
10    Q   But those entries are ones that you
11  would have expected to generate cash subsequent to
12  the transfer, right?
13    A   Yeah.  And then going back --
14    Q   But, again, you have no idea how much
15  cash, correct?
16    A   Yeah, going back above, I would say the
17  Stratford CLO also.
18    Q   Okay.  The Stratford CLO listed under
19  Highland CDO Holdings Company --
20    A   Yeah.
21    Q   -- is another asset that you would have
22  expected to generate cash subsequent to the
23  transfer, correct?
24    A   Yes.
25    Q   And you don't know the amount?

---

340

1    A   No.
2    Q   And then in terms of the tax refund
3  receivable from Highland Capital, would you have
4  expected that to be paid in full?
5    A   I have no awareness on the details on
6  that.
7    Q   And the dividends receivable from
8  Highland Capital in August of 2017, would you have
9  expected that to have been paid in full?
10    A   I have no awareness of the details on
11  that.
12        MR. CLUBOK:  Okay.  That's all I have
13  subject to Mr. Taylor's questions.
14  EXAMINATION BY COUNSEL FOR NON-PARTY WITNESS
15  BY MR. TAYLOR:
16    Q   Jim, you're appearing here today
17  pursuant to a subpoena that was issued to you,
18  correct?
19    A   Yes.
20    Q   Are you -- you're not the plaintiff in
21  this action, are you?
22    A   No.
23    Q   You're not a defendant in this action,
24  are you?
25    A   No.

---

341

1    Q   You're not a third-party defendant in
2  this action, are you?
3    A   I don't believe so.
4    Q   In fact, you're not a party at all in
5  this litigation, are you?
6    A   No.
7    Q   But for the subpoena, you would not
8  have appeared in this -- for this deposition,
9  correct?
10    A   Correct.
11        MR. TAYLOR:  Okay.  I have no further
12  questions.
13        MR. CLUBOK:  Perfect.  Neither do I.
14  Thank you very much, Mr. Taylor.  Looks like we
15  got done just in the nick of time.
16        THE VIDEOGRAPHER:  Anything else before
17  we close?
18        MR. CLUBOK:  Oh, I should ask, anything
19  from Highland Capital?
20        MR. FEINSTEIN:  No, thank you.
21        THE VIDEOGRAPHER:  Anything else?
22        MR. CLUBOK:  Okay.
23        THE VIDEOGRAPHER:  Mr. Clubok?
24        The time is 1:12.  This concludes the
25  deposition of James Dondero.  We are off the

---

342

1  record.
2        (Time noted: 1:12 p.m.)
3        THE COURT REPORTER:  Counsel, do you
4  want to keep the same order from the first
5  deposition of Mr. Dondero?
6        MR. CLUBOK:  Yes, please.
7        MR. FEINSTEIN:  Yes.
8        MR. TAYLOR:  Yes.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

343

1
2        ACKNOWLEDGMENT OF DEPONENT
3
4        I, JAMES DONDERO, do hereby acknowledge
5  that I have read and examined the foregoing
6  testimony, and the same is a true, correct and
7  complete transcription of the testimony given by
8  me and any corrections appear on the attached
9  Errata sheet signed by me.
10
11  _____   _____
12    (Date)                (Signature)
13
14
15
16
17
18
19
20
21
22
23
24
25

344

1
2        CERTIFICATE OF REPORTER - NOTARY PUBLIC
3        I, ADRIENNE MIGNANO, the officer before
4   whom the foregoing deposition was taken, do hereby
5   certify that the foregoing transcript is a true
6   and correct record of the testimony given; that
7   said testimony was taken by me and thereafter
8   reduced to typewriting under my direction; that
9   reading and signing was requested; and that I am
10  neither counsel for, related to, nor employed by
11  any of the parties to this case and have no
12  interest, financial or otherwise, in its outcome.
13        IN WITNESS WHEREOF, I have hereunto set
14  my hand and affixed my notarial seal this 18th day
15  of MAY, 2021.
16  My Commission Expires: June 2022.
17
18
19
20
21
22
23
24
25