

# Transcript of Jean Paul Sevilla

**Date:** July 21, 2021
**Case:** UBS Securities LLC, et al. -v- Highland Capital Management, L.P.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

```
 1          IN THE UNITED STATES BANKRUPTCY COURT
 2           FOR THE NORTHERN DISTRICT OF TEXAS
                      DALLAS DIVISION
 3   In re                 §
                           §
 4   HIGHLAND CAPITAL       §  Chapter 11
     MANAGEMENT, L.P.,      §  Case No. 19-34054-SGJ11
 5                          §
         Debtor.            §
 6                          §
 7   UBS SECURITIES LLC AND §
     UBS AG LONDON BRANCH,  §
 8                          §
         Plaintiffs,        §
 9                          §  Adversary Proceeding
     VS.                    §  No. 21-03020-sgj
10                          §
     HIGHLAND CAPITAL       §
11   MANAGEMENT, L.P.,      §
                           §
12       Defendant.         §
13
14
15
16          Videotaped Deposition of
17              JEAN PAUL SEVILLA
18                Dallas, Texas
19           Wednesday, July 21, 2021
20                  9:40 a.m.
21
22
23   Job No.:  386776
24   Pages:  1 - 318
25   Reported by:  Micheal A. Johnson, RDR, CRR
```

**Page 2**

```
 1       Deposition of JEAN PAUL SEVILLA, held at
 2   the location of:
 3
 4          Butler Snow LLP
 5          2911 Turtle Creek Boulevard, Suite 1400
 6          Dallas, Texas 75219
 7          (469) 680-5500
 8
 9
10       Pursuant to Notice, before Micheal A.
11   Johnson, Registered Diplomate Reporter and
12   Certified Realtime Reporter.
```

**Page 3**

```
 1                    APPEARANCES
 2   ON BEHALF OF PLAINTIFFS
     UBS SECURITIES LLC AND
 3   UBS AG LONDON BRANCH:
 4       Sarah Tomkowiak
         Andrew B. Clubok (Via Zoom)
 5       LATHAM & WATKINS LLP
         555 Eleventh Street, N.W., Suite 1000
 6       Washington, D.C. 20004
         (202) 637-2200
 7       sarah.tomkowiak@lw.com
         andrew.clubok@lw.com
 8
         Shannon E. McLaughlin
 9       LATHAM & WATKINS LLP
         885 Third Avenue
10       New York, New York 10022-4834
         (212) 906-4612
11       shannon.mclaughlin@lw.com
12
     ON BEHALF OF DEFENDANT
13   HIGHLAND CAPITAL MANAGEMENT, L.P.:
14       Robert J. Feinstein (Via Zoom)
         PACHULSKI STANG ZIEHL & JONES LLP
15       780 Third Avenue, 34th Floor
         New York, New York 10017-2024
16       (212) 561-7700
         rfeinstein@pszjlaw.com
17
18   ON BEHALF OF THE WITNESS:
19       Frances A. Smith
         ROSS & SMITH, PC
20       700 N. Pearl Street, Suite 1610
         Dallas, Texas 75201
21       (214) 377-7879
         frances.smith@judithwross.com
22
23       Debra A. Dandeneau
         BAKER & McKENZIE, LLP
24       452 Fifth Avenue
         New York, New York 10018
25       (212) 626-4875
         debra.dandeneau@bakermckenzie.com
```

**Page 4**

```
 1              APPEARANCES CONTINUED
 2   VIDEOGRAPHER:
 3       Brian Krieger
```

**Page 5**

```
                    INDEX
               JEAN PAUL SEVILLA
                 July 21, 2021

 APPEARANCES                                    3

 PROCEEDINGS                                    10


     EXAMINATION OF JEAN PAUL SEVILLA:

        BY MS. TOMKOWIAK                        11

        BY MR. FEINSTEIN                        277

        BY MS. TOMKOWIAK                        300


 ACKNOWLEDGMENT OF DEPONENT                     317

 REPORTER'S CERTIFICATION                       318
```

**Page 7**

```
                 DEPOSITION EXHIBITS
                  JEAN PAUL SEVILLA
                    July 21, 2021

 NUMBER         DESCRIPTION          MARKED

 Exhibit 55  06/16/2017 through 08/10/2017  161
             E-mail Chain, with
             Attachments
             HCMUBS000349 - HCMUBS000352

 Exhibit 56  10/25/2017 E-mail Chain, with  169
             Attachments
             UBSPROD2639074 -
             UBSPROD2639092

 Exhibit 57  10/26/2017 E-mail, Isaac        171
             Leventon to Chris Dunn, with
             Attachments
             UBSPROD1973053 -
             UBSPROD1973071

 Exhibit 58  Legal Liability Insurance       185
             Policy
             MD_000010 - MD_000028

 Exhibit 59  08/07/2017 through 08/11/2017   220
             E-mail Chain, with
             Attachments
             HCMUBS003583 - HCMUBS003585

 Exhibit 60  08/28/2017 E-mail, JP Sevilla   240
             to SEI-IS-Highland, with
             Attachments
             HCMUBS001616 - HCMUBS001670

 Exhibit 61  12/01/2017 E-mail Chain, with   246
             Attachments
             UBSPROD2020562 - UBSPROD2020563

 Exhibit 62  01/14/2019 through 02/07/2019   260
             E-mail Chain
             UBSPROD2669035 -
             UBSPROD2669041
```

**Page 6**

```
                 DEPOSITION EXHIBITS
                  JEAN PAUL SEVILLA
                    July 21, 2021

 NUMBER         DESCRIPTION          MARKED

 Exhibit 46  Notice of Transfer of Claim      24
             Other Than for Security

 Exhibit 47  04/19/2017 E-mail, Isaac         36
             Leventon to JP Sevilla, with
             Attachment
             HCMUBS005251 - HCMUBS005268

 Exhibit 48  PowerPoint Presentation:         45
             Settlement Analysis
             HCMUBS005304 - HCMUBS005321

 Exhibit 49  11/29/2012 through 12/10/2012    52
             E-mail Chain, with
             Attachments
             UBSPROD4837276 -
             UBSPROD4837350

 Exhibit 50  08/28/2017 through 08/29/2017    65
             E-mail Chain
             HCMUBS001787 - HCMUBS001789

 Exhibit 51  08/16/2017 E-mail, Katie         92
             Irving to Abbie Stonecypher,
             with Attachments
             HCMUBS001066 - HCMUBS001095

 Exhibit 52  09/20/2017 E-mail Chain, with    99
             Attachments
             HCMUBS002221 - HCMUBS002242

 Exhibit 53  07/25/2018 through 06/16/2020   108
             E-mail Chain
             UBSPROD000118 -
             UBSPROD000121

 Exhibit 54  08/10/2017 E-mail, JP Sevilla   157
             to Katie Irving, et al., with
             Attachments
             HCMUBS000365 - HCMUBS000395
```

**Page 8**

```
                 DEPOSITION EXHIBITS
                  JEAN PAUL SEVILLA
                    July 21, 2021

 NUMBER         DESCRIPTION          MARKED

 Exhibit 63  Subpoena to Testify at a        265
             Deposition in a Bankruptcy
             Case (or Adversary
             Proceeding)

 Exhibit 64  Subpoena to Produce             266
             Documents, Information, or
             Objects or to Permit
             Inspection of Premises in a
             Bankruptcy Case (or Adversary
             Proceeding)

 Exhibit 65  Confidentiality Agreement       273

 Exhibit 66  05/06/2016 through 05/07/2016   312
             E-mail Chain
             JS_000001 - JS_000003
```

**9**

```
                PREVIOUSLY MARKED EXHIBITS

 1
 2   NUMBER          DESCRIPTION              PAGE
 3   Exhibit 2    ........................    208
 4   Exhibit 3    ........................    226
 5   Exhibit 9    ........................    234
 6   Exhibit 19   ........................    237
 7   Exhibit 26   ........................     65
 8   Exhibit 28   ........................     72
 9   Exhibit 38   ........................    263
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**11**

1      MR. FEINSTEIN:  Via Zoom, Robert
2  Feinstein, Pachulski Stang Ziehl & Jones, counsel
3  for defendant Highland Capital Management, LP.
4      THE VIDEOGRAPHER:  The court reporter
5  today is Micheal Johnson also representing
6  PlanetDepos.  If the court reporter would please
7  swear in the witness.
8          JEAN PAUL SEVILLA,
9  called as a witness, having been duly sworn by a
10  Notary Public, was examined and testified as
11  follows:
12          EXAMINATION
13  BY MS. TOMKOWIAK:
14   Q   Good morning, Mr. Sevilla.
15   A   Good morning.
16   Q   Have you ever been deposed before?
17   A   I have.
18   Q   Okay.  So we will skip a lot of the ground
19  rules and we'll get right into it.  I will just
20  ask that if you do not answer -- if you don't
21  understand my question, please ask me to clarify.
22  Otherwise, I'm going to assume that you do
23  understand my question.  Is that fair?
24   A   Yes.
25   Q   Okay.  And you understand that you're

**10**

            PROCEEDINGS
1
2      THE VIDEOGRAPHER:  Here begins disk No. 1
3  in the videotaped deposition of Jean Paul Sevilla.
4  This is regarding the Highland Capital Management,
5  LP.  This is in the matter of UBS Securities LLC
6  and UBS AG London Branch versus Highland Capital
7  Management, LP in the United States Bankruptcy
8  Court for the Northern District of Texas, Dallas
9  Division, filed as Case No. 19-34054-SGJ11.
10     Today's date is Wednesday, July 21st,
11  2021.  Our time on the video monitor is 9:40 a.m.
12  Videographer today is Brian Krieger representing
13  PlanetDepos.  This video deposition is taking
14  place at Butler Snow, 2911 Turtle Creek Boulevard,
15  Suite 1400 in Dallas, Texas.
16     Would counsel please voice identify
17  themselves and whom they represent.
18     MS. SMITH: Frances Smith with Ross &
19  Smith on behalf of JP Sevilla.
20     MS. DANDENEAU:  Debra Dandeneau from the
21  firm of Baker McKenzie here on behalf of Jean Paul
22  Sevilla.
23     MS. TOMKOWIAK:  Sarah Tomkowiak and
24  Shannon McLaughlin on behalf of -- of Latham &
25  Watkins on behalf of UBS.

**12**

1  testifying today here under oath?
2   A   Yes.
3   Q   How many times have you been deposed?
4   A   Three or four.
5   Q   And generally speaking, what types of
6  matters?
7   A   Both commercial litigation.  One -- both
8  commercial litigation cases.
9   Q   Okay.  Are you an attorney?
10   A   Yes.
11   Q   What type of law do you practice?
12   A   Corporate, transactional for the most
13  part.
14   Q   Where are you barred?
15   A   New York, Texas and California.
16   Q   Where did you obtain your law degree?
17   A   University of North Carolina at Chapel
18  Hill.
19   Q   And when did you get your JD?
20   A   2007.
21   Q   Do you have any other professional
22  licenses?
23   A   I don't believe so.
24   Q   And you have a bachelor's degree, correct?
25   A   Yes.

---

13

1    Q   From the United States Naval Academy?
2    A   Correct.
3    Q   Did you serve in the Navy?
4    A   Yes.
5    Q   Approximately when did your service end?
6    A   2006.
7    Q   Were you honorably discharged?
8    A   Yes.
9    Q   Where are you currently employed?
10   A   Skyview Group.
11   Q   What does Skyview Group do?
12   A   Skyview Group is a -- effectively a
13   consultancy, but a back and middle office services
14   provider to financial services firms, banks -- and
15   banks in the financial services industry.
16   Q   What does it mean to provide back and
17   middle services?
18   A   So Skyview provides accounting support,
19   recruiting, HR, IT.  I'm sure I'm forgetting some,
20   but generally that sort of back and middle office
21   functionality that you would find at a financial
22   services firm.
23   Q   When did you start at Skyview?
24   A   March 1st of this year.
25   Q   Okay.  And what's your title?

---

14

1    A   Managing director.
2    Q   Who hired you at Skyview?
3    A   I don't know if it was an individual
4    per se.  Mr. Ellington owns Skyview, so I would
5    say it's his decision to employ me ultimately.
6    Q   And by Mr. Ellington, you're referring to
7    Scott Ellington?
8    A   Yes.
9    Q   As managing director, what are your duties
10   and responsibilities, generally speaking?
11   A   Fairly varied at this point.  I support
12   our clients' private equity investments, I work on
13   internal Skyview matters as the business is being
14   sort of built up.  It's a fairly new enterprise.
15   And then tasks that can come from our clients,
16   ranging from, you know, questions related to
17   potentially compliance questions or things of that
18   ilk.
19   Q   Are you in the legal department?
20   A   I guess technically.  Yeah.  Yes.
21   Q   Who do you report to?
22   A   Mr. Ellington.
23   Q   And what's his title?
24   A   President, I believe.
25   Q   Do you know when Skyview was formed?  You

---

15

1    said it was a relatively new company, I think.
2    A   Early this year.  I don't know exactly
3    when.
4    Q   Do you know who owns Skyview?
5    A   Yes.
6    Q   Who?
7    A   Scott Ellington.
8    Q   Anyone else?
9    A   No.
10   Q   Do you work with anybody at Skyview who
11   also used to work at Highland Capital Management?
12   A   Yes.
13   Q   And who is that?
14   A   It's a long list.
15   Q   Go for it.
16   A   Just start hitting names?
17   Q   Yeah.
18   A   Brian Collins, Frank Waterhouse, Will
19   Mabry, Matt DiOrio, Stephanie Vitiello, Isaac
20   Leventon, Brad McKay.  The employee count is north
21   of 30 and most of those -- most, if not all, were
22   ex-Highland employees, so it's a substantial
23   percentage of my coworkers are ex-Highland people.
24   Q   Were they all recruited by Mr. Ellington?
25   A   I wouldn't characterize it that way.

---

16

1    Q   How would you characterize it?  Were they
2    all hired by him?
3    A   They were hired by Skyview, so by
4    extension, if you want to say it that way, I guess
5    that's fair.
6    Q   Does Ms. Katie Lucas work there?
7    A   Yes.  She is on leave, though.  She has
8    not worked on anything, as far as I know, though.
9    Does she work there?  I think she's technically an
10   employee, but she's not actively doing stuff, as
11   far as I know.
12   Q   I appreciate the clarification.  Is
13   Mr. Dondero affiliated at all with Skyview?
14       MS. SMITH:  Objection to form.
15   A   What do you mean by affiliated?
16   BY MS. TOMKOWIAK:
17   Q   In the broadest sense possible.  Does he
18   own it?  Does he work there?  Does he have any
19   connection to Skyview?
20       MS. SMITH:  Objection, form.
21   A   He doesn't own it.  He doesn't work there.
22   I think he's in control of entities that are
23   Skyview clients, currently.
24   BY MS. TOMKOWIAK:
25   Q   What do you mean by control?

---

**17**

1  A  For example, he's the president of
2  NexPoint Advisors and NexPoint Advisors is a
3  client.
4      Q  Let me put it this way.  Does Mr. Dondero
5  have any financial interest in Skyview?
6      A  He does not.
7      Q  Who sets your salary?
8      A  Mr. Ellington.
9      Q  And is Skyview your only source of income
10 currently?
11     A  Yes.  No, it is not.
12     Q  What other source of income do you have?
13     A  Well, actually it is.  I'm on -- I still
14 serve on several portfolio company boards and I'm
15 correcting myself because those board fees are
16 going back to the funds that own the equity
17 interest, so my original answer stands.  My only
18 source of income is Skyview.
19     Q  Okay.  And how much do you make?
20     A  There's a deferred component.  My base is
21 275,000 and my annual bonus thus far for this
22 year, I believe I've been paid 350,000.
23     Q  Who decides whether and how much you get
24 for a bonus?
25     A  It's a new company, so I'm not sure going

---

**18**

1  forward, but I would say the president of the
2  company decided.
3      Q  That's Mr. Ellington?
4      A  Yes.
5      Q  And how does that salary compare to your
6  salary at Highland Capital Management?  If I say
7  HCM, is that --
8      A  Sure.
9      Q  How is your salary compared to your salary
10 at HCM?
11     A  Consistent with what I was paid at HCM.
12     Q  So let's turn to HCM.  During what period
13 of time were you employed by HCM?
14     A  From 2012 through 2021.
15     Q  How did you come to start working for HCM?
16     A  Can you be a little more specific?
17     Q  Sure.  Did you apply?  Did someone reach
18 out to you?  How did you get that job?
19     A  It was through a headhunter.
20     Q  Through a headhunter?
21     A  Yes.
22     Q  Can you -- nine years is a long period of
23 time, so can you just walk me through your roles
24 at HCM from when you started through when you
25 left?

---

**19**

1  A  Sure.  I was hired into the legal group.
2  My title was corporate counsel.  I reported to
3  Thomas Surgent.  And you asked for the
4  progression; is that right?
5      Q  Yes.  And I'm happy if you'd like to step
6  through it myself, but if you --
7      A  Yeah, yeah.  About a year in, my duties
8  expanded and so my title was changed to assistant
9  general counsel from corporate counsel.  That
10 would have been in 2013.
11     Q  Did you still report to Mr. Surgent at
12 that time?
13     A  Yes.  Assistant general counsel was a
14 title that I would then have until the end of my
15 time at Highland.  But I would say in 2018, in
16 addition to my duties in the legal group and sort
17 of consistent with my duties within the legal
18 group, portions of the private equity business
19 were transferred to legal, but I started working
20 more on the portfolio companies within the private
21 equity business, culminating in, I guess the
22 beginning of 2020, where my title changed to
23 cohead of private equity and assistant general
24 counsel all within the legal group.
25     Q  Did you report to Thomas Surgent for that

---

**20**

1  entire period of time or did that ever change?
2      A  I believe I reported to him for most of
3  the time.  There may have been a period in maybe
4  2018 that I didn't.  But at the end of my tenure,
5  I reported to him and certainly during the first
6  several years at Highland, I reported to him as
7  well.
8      Q  Did you have any dotted line reporting
9  relationships?
10        MS. SMITH:  Objection, form.
11 BY MS. TOMKOWIAK:
12     Q  Do you know what I mean by dotted line?
13     A  If you could tell me what you mean by it.
14     Q  Sure.  Like on a corporate org chart,
15 sometimes you have a direct report but then you
16 also have like somebody you indirectly report to.
17 Is there anybody like that?
18     A  I don't remember there being a dotted line
19 as it relates to me.  But practically speaking, I
20 would work with Mr. Ellington directly,
21 irrespective of whether I was Mr. Surgent's direct
22 report, as well as Mr. Dondero from time to time.
23     Q  Did anyone report to you?
24     A  At different times in -- at Highland, yes.
25     Q  And to the best of your recollection, who

**21**

1 reported to you?
2  A  Cameron Baynard, Sean Fox.  I think those
3 would have been my only direct reports.
4  Q  And generally speaking, what were your
5 duties as associate general counsel?
6  A  Assistant general counsel.
7  Q  I'm sorry, assistant general counsel.  I
8 apologize.
9  A  It's okay.  Generally anything in the
10 legal group that required assistance.  It could be
11 corporate matters relating to fund -- fund
12 documents or launching new funds, it could have
13 been managing some litigation, but kind of a wide
14 range of sort of a mishmash of both kind of legal
15 and sometimes nonlegal workflows and tasks.
16  Q  When did you leave HCM?
17  A  I believe my last day was February 28th of
18 2021.
19  Q  Why did you leave?
20  A  I was terminated.
21  Q  Okay.  Who terminated you?
22  A  Mr. Seery.
23  Q  While you were employed, you mentioned
24 working with portfolio companies.  Did you work
25 with specific Highland funds?

**22**

1  A  Yes.
2  Q  Okay.
3  A  Sorry, what do you mean -- work with
4 specific Highland funds, what do you mean by that?
5  Q  Like would you have done, just picking a
6 fund, CDO Opportunity Master Fund, would you have
7 done work specifically for that fund or would you
8 say that your work was undertaken on behalf of
9 HCM, as opposed to any particular fund?
10  A  I mean, my work was -- I mean, HCM was my
11 employer.  HCM is in the business of managing
12 funds, among other things, so I don't necessarily
13 distinguish between the two.  But you mentioned
14 portfolio companies, you know, to the extent a
15 fund had an interest, an equity interest or some
16 other interest in a portfolio company, my work for
17 that portfolio company would have been in
18 connection with managing -- Highland managing that
19 fund.
20  Q  Who paid you at Highland?  Was it just
21 Highland?
22  A  Yes.
23  Q  Okay.  So you weren't paid by any entity
24 other than Highland?
25  A  No.

**23**

1  Q  And when I say Highland, I mean HCM.
2  A  Yes.  Understood.
3  Q  So you didn't divide up your time spent
4 working for different Highland entities or funds?
5  A  What do you mean by that?
6  Q  And that was vague.  You didn't, like,
7 write down your time or somehow submit an invoice
8 or something like that?
9  A  No.
10  Q  Okay.  Were you paid by HCM on an hourly
11 basis or just a salary arrangement?
12  A  Salaried.
13  Q  And you said it was relatively consistent
14 with the -- your salary at Skyview?
15  A  Yes.
16  Q  And you also had an opportunity to receive
17 a bonus?
18  A  Yes.
19  Q  Are you familiar with an entity called
20 CPCM LLC?
21  A  Yes.
22  Q  What is that?
23  A  That is an entity that is a wholly owned
24 subsidiary of Skyview.  Skyview's legal name is
25 Highgate Consulting Group, Inc.  It uses a dba in

**24**

1 Texas, but that is an entity owned by Skyview that
2 essentially houses Skyview employee claims,
3 compensation claims.
4  Q  So just so I understand.  So Skyview's
5 legal name is Highgate Consulting Group; is that
6 right?
7  A  Yes.
8  Q  And it does business as Skyview in Texas?
9  A  Correct.
10  Q  And CPCM is a wholly owned subsidiary of
11 Highgate?
12  A  Yes.
13  Q  You submitted a claim in the underlying
14 bankruptcy case in this matter; is that right?
15  A  Yes.
16  Q  And you've since transferred that claim to
17 CPCM?
18  A  Yes.
19  Q  Okay.
20     (Deposition Exhibit 46 marked for
21 identification.)
22 BY MS. TOMKOWIAK:
23  Q  I'm going to hand you what has been
24 previously marked as Exhibit 46.  To be clear,
25 what we have just marked as Exhibit 46, it has not

**25**

1    been an exhibit in this case to date.
2         MS. SMITH:  Sarah, I'm going to object on
3    this.  What is the relevance of this to the motion
4    for a temporary retraining order and preliminary
5    injunction?
6         MS. TOMKOWIAK:  I just want to understand
7    this particular witness's financial stake in this
8    matter.  I'll be super brief.  It will just be
9    five minutes.  I just want to clarify --
10        MS. SMITH:  I just want to note my
11   objection on the record.  Okay.
12   BY MS. TOMKOWIAK:
13   Q  Mr. Sevilla, do you recognize this
14   document?
15   A  I do.
16   Q  Okay.  And this is the document
17   transferring your claim to CPCM on March 22nd,
18   2021?
19   A  Yes.
20   Q  And that's your signature on the second
21   page?
22   A  Yes.
23   Q  Okay.  Did you approach CPCM or did it
24   approach you?
25        MS. SMITH:  Objection, relevance.

**26**

1    A  I don't think either side approached the
2    other.  Transferring my compensation claim to this
3    entity was an expectation of my employer.
4    BY MS. TOMKOWIAK:
5    Q  I see.  So that's why you sold your claim
6    to CPCM?
7         MS. SMITH:  Objection, relevance.
8    A  I wouldn't characterize it as sold.  I
9    assigned it.
10   BY MS. TOMKOWIAK:
11   Q  Based on your testimony, it's fair to say
12   you assigned it as a condition of your employment?
13        MS. SMITH:  Objection, form.
14   A  Yes.
15   BY MS. TOMKOWIAK:
16   Q  Okay.  You can set that aside.
17        MS. SMITH:  What was the exhibit number on
18   that?
19        MS. TOMKOWIAK:  46.
20   BY MS. TOMKOWIAK:
21   Q  While you were at HCM, what e-mail address
22   did you use?
23   A  jsevilla@hcmlp.com was my Highland e-mail.
24   Q  Did you ever use
25   jsevilla@highlandcapital.com?

**27**

1    A  I believe they were one and the same.
2    They changed it from HCMLP to Highland Capital at
3    some point, but to me they're synonymous.
4    Q  Any others?
5    A  Those are the only Highland e-mail
6    addresses I had.
7    Q  Did you ever use your personal e-mail
8    address in connection with your work for HCM?
9    A  No.
10   Q  After you were terminated in
11   February 2021, did you have a chance to clean out
12   your office?
13   A  After I was terminated?
14   Q  Uh-huh.
15   A  Not after.  It was before.
16   Q  Okay.  So you --
17   A  I didn't have an office.  I had a desk.
18   Q  Okay.  But you did have a chance to clean
19   out your desk?
20   A  I did.
21   Q  So any files that you had on your desk
22   were left at HCM?
23   A  To the -- not every file.
24   Q  Okay.  That's a better question.  Did you
25   take any files with you?

**28**

1    A  I took some files with me, yes.
2    Q  What did you take with you?
3    A  Information relating to portfolio
4    companies that I was still on the board on --
5    board of.  To the extent I had any personal
6    effects or personal files, data, you know, in my
7    files, or information or -- information related to
8    NexPoint or HCMFA, which were shared services
9    recipients that I was still going to be working
10   on.  I would say that's the -- that's the
11   universe.
12   Q  What companies do you still sit on the
13   board of?
14   A  CCS Medical, TerreStar, Lake Las Vegas.  I
15   believe that's it.
16   Q  And are all of those still affiliated with
17   HCM?
18        MS. SMITH:  Objection, form.
19   A  No.
20   BY MS. TOMKOWIAK:
21   Q  No?
22   A  No.
23   Q  Were they ever?
24   A  What do you mean by affiliated?
25        MS. SMITH:  Objection.

**29**

1 BY MS. TOMKOWIAK:
2   Q   Well, again, were they owned directly or
3 indirectly?  Were they a portfolio company of a
4 Highland fund?  Were they --
5       MS. SMITH:  Objection, form.
6   **A   CCS --**
7       MS. TOMKOWIAK:  Sorry, just let me finish
8 my question -- and I know I paused there -- before
9 you object.
10 BY MS. TOMKOWIAK:
11  Q   Go ahead.
12  **A   CCS is owned, Highland's funds don't own**
13 **an interest in CCS, as do NexPoint and HCMFA fund.**
14 **TeraStar, Highland has no fund interest in**
15 **TerreStar.  However, Highland did provide shared**
16 **services at times, such that Highland would have**
17 **had touchpoints to TerreStar, but those are no**
18 **longer.  And similarly with Lake Las Vegas, it's**
19 **NexPoint and HCMFA funds that own the interest in**
20 **that portfolio company.  No Highland funds do.**
21 **But Highland's touchpoint would have been**
22 **providing shared services to those other advisors**
23 **in connection with that investment.**
24  Q   So when I've used the word affiliated, you
25 don't understand providing shared services to be

**30**

1 an affiliation; is that right?
2   **A   I do now, if we'd like to use -- I was --**
3   Q   I'm trying to understand how you use the
4 word.
5   **A   I was thinking like under common control**
6 **or something like that, but if -- I mean, that's a**
7 **much broader, I think, way to describe it.**
8   Q   Okay.  And I did it too so let's try not
9 to talk over each other.  That was also my fault.
10      Okay.  Since leaving HCM, have you had any
11 communications with Mr. Dondero?
12  **A   Yes.**
13  Q   Generally what was the nature of those
14 communications?
15  **A   Financial performance and prospects of**
16 **portfolio companies, financial performance of**
17 **funds advised by NexPoint and HCMFA, potential**
18 **initiatives regarding those funds.  I think that**
19 **would be -- that's pretty comprehensive.**
20  Q   Have you had any communications with
21 Mr. Dondero about this matter?
22  **A   No.**
23  Q   What about Mr. Ellington?  Have you had
24 any communications with him?
25  **A   About what?**

**31**

1   Q   Since you left HCM.
2   **A   Yes.**
3   Q   About what, generally speaking?
4   **A   Signing new business at Skyview, so**
5 **Skyview's financial performance and prospects.**
6 **Internal Skyview policies as they were being**
7 **determined just because Skyview is in the nature**
8 **of a start-up at this point.  Updates as to what**
9 **I'm working on with respect to the aforementioned**
10 **portfolio companies and retail funds.  I think**
11 **that would be a comprehensive universe.**
12  Q   Have you had any communications with
13 Mr. Ellington about this matter?
14  **A   No.**
15  Q   Same question for Isaac Leventon.  Have
16 you had any communications with him since you left
17 Highland?
18  **A   Yes.**
19  Q   And generally speaking, were the nature of
20 those communications also related to your work at
21 Skyview?
22  **A   Yes.**
23  Q   Have you had any communications with him
24 about this matter?
25  **A   No.**

**32**

1   Q   What about Matt DiOrio?  Have you had any
2 communications with him since you left Highland?
3   **A   Yes.**
4   Q   And have those communications also related
5 to your work at Skyview?
6   **A   Yes.**
7   Q   And same question for Ms. Lucas.  Have you
8 had any communications with her since you left
9 Highland?
10  **A   Yes.**
11  Q   Okay.  And have those communications also
12 been about your work at Skyview?
13  **A   No.**
14      MS. SMITH:  Objection, form.
15  **A   No.**
16 BY MS. TOMKOWIAK:
17  Q   What were those communications about?
18  **A   Inquiring about her newborns.  Personal**
19 **pleasantries.**
20  Q   Have you had any communications with her
21 about this matter?
22  **A   No.**
23  Q   Do you have a -- outside of your
24 professional relationship with the individuals
25 that I just mentioned, do you have a personal

33

1  relationship with any of them?
2      MS. SMITH:  Objection, form.
3      A  I would say so.
4  BY MS. TOMKOWIAK:
5      Q  Which ones?
6      A  Mr. DiOrio, Mr. Leventon, to some degree
7  Mr. Ellington, but I mean, I would say in the
8  nature of colleagues who inquire about each
9  other's personal lives.
10     Q  Since leaving Highland, have you had any
11 communications with any current employees of
12 Highland?
13     MS. SMITH:  Objection, form.
14     A  Yes.
15 BY MS. TOMKOWIAK:
16     Q  Who?
17     A  I sit on the board of CCS Medical with
18 Cameron Baynard and Sean Fox.  So in connection
19 with board functionality, I would say we have
20 communicated.  I have communicated with Mr. Seery.
21 I have communicated with Tim Cournoyer.  I think
22 that would be it.
23     Q  What were the nature of your
24 communications with Mr. Seery?
25     A  Relating to a portfolio company called

34

1  Cornerstone Healthcare Group.
2      Q  And what were the nature of your
3  communications with Mr. Cournoyer?
4      A  Cournoyer.
5      Q  Cournoyer.
6      A  Personal.
7      Q  I'm going to transition topics to the
8  litigation between Highland and UBS in New York
9  State court.  Are you familiar with that
10 litigation?
11     A  I've heard of it.
12     Q  You've heard of it?
13     A  Yes.
14     Q  Okay.  So what role, if any, did you play
15 in managing that litigation for Highland?
16     MS. SMITH:  Objection, form.
17     A  None.
18 BY MS. TOMKOWIAK:
19     Q  None?
20     A  None.
21     Q  What role did you play, if any, in
22 responding to discovery requests from UBS in that
23 matter?
24     A  None.
25     Q  Did you play any role in analyzing whether

35

1  Highland should settle that litigation?
2      A  No.
3      Q  What is your general understanding of that
4  litigation?
5      A  It began in -- around the time of the
6  economic crisis, 2008, 2009, related to a
7  warehouse facility, or something like it.  I mean,
8  that's pretty much the extent of it.
9      Q  That's the extent of your knowledge, that
10 it began around the time of the economic crisis
11 related to a warehouse facility or something like
12 that?
13     A  Yes.  I mean, generally that's my
14 understanding of what the adversity is about, a
15 failed loan warehouse or some sort of warehouse
16 facility that resulted in financial losses.
17     Q  Do you have any idea what the potential
18 liability was that Highland faced in that matter?
19     MS. SMITH:  Objection, form.
20     A  Only anecdotally from the Highland BK,
21 having listened to certain things in the Highland
22 bankruptcy.
23 BY MS. TOMKOWIAK:
24     Q  So to the best of your recollection, you
25 weren't aware of that at the time?

36

1      A  At which time?  I'm sorry.
2      Q  During the time that you were employed at
3  Highland.
4      A  Well, I --
5      MS. SMITH:  Objection, form.
6      A  My last year of employment was during the
7  pendency of the bankruptcy, so I would have
8  learned more about the UBS lawsuit.  But prior to
9  that, I had no real knowledge or understanding
10 about what it was about.
11     MS. TOMKOWIAK:  Can you mark that as 47.
12     (Deposition Exhibit 47 marked for
13 identification.)
14 BY MS. TOMKOWIAK:
15     Q  Okay.  I've handed you what we have marked
16 as Exhibit 47.  It's an e-mail from Isaac Leventon
17 to you, dated April 19th, 2017, subject:
18 UBS_Settlement_Structure_(9.pptx).
19     Is that your Highland Capital e-mail
20 address at the top?
21     A  It is.
22     Q  Do you have any reason to doubt that you
23 received this e-mail on April 19th, 2017?
24     A  No.
25     MS. SMITH:  I'm going to raise an

**37**

1 objection here. To the extent this is going to
2 require Mr. Sevilla to divulge privileged
3 information, as he was counsel for -- in the
4 general counsel's office for Highland at the time,
5 I'm going to assume that the debtor will make the
6 privilege or make the privilege objections or say
7 that it's waived so that Mr. Sevilla can answer.
8    MR. FEINSTEIN: We will waive the
9 privilege. This is Robert Feinstein on behalf of
10 the debtor. To the extent it applies at all.
11 BY MS. TOMKOWIAK:
12   Q  Okay. So have you had a chance to look
13 through that attachment? Take your time, let me
14 know when you're ready.
15    (Witness reviews document.)
16   A  Okay. I've looked at it.
17 BY MS. TOMKOWIAK:
18   Q  Do you recall receiving this UBS Highland
19 Settlement Analysis in April 2017?
20   A  I don't.
21   Q  No recollection at all?
22   A  No.
23   Q  If you take a look at this -- if you turn
24 to slide 1, the Bates number -- if I say that, do
25 you know what I'm talking about?

**38**

1   A  Yes.
2   Q  Okay. So Bates ending in 52.
3   A  Yeah.
4   Q  Is this type of document familiar to you?
5   A  Not really.
6    MS. SMITH: Objection, form.
7 BY MS. TOMKOWIAK:
8   Q  Okay. So you don't know whether Highland
9 prepared other settlement analyses like this?
10   A  I have no direct knowledge if that's -- if
11 it's something Highland would have done. No.
12   Q  Do you know who prepared this settlement
13 analysis?
14   A  I don't.
15   Q  Did you have any role in preparing it?
16   A  No, not that I remember.
17   Q  Do you know why Mr. Leventon is sending
18 this to you?
19   A  I do not.
20   Q  Do you know who would be the recipient of
21 a presentation like this?
22   A  I'm not familiar with this sort of
23 presentation, so I really don't have -- I don't
24 recall any context around it. So, no, I guess the
25 answer's no to that.

**39**

1   Q  Do you have any idea what was going on in
2 the UBS litigation in New York State court in
3 April of 2017?
4   A  I don't think so, no.
5   Q  Who at Highland had authority to settle a
6 litigation matter of the magnitude of the UBS
7 matter?
8   A  I don't know. I assume Mr. Dondero would
9 have had to sign off, but I don't know what
10 authority had been granted at any given moment.
11   Q  Okay. And similarly, you don't know
12 whether Mr. Ellington had that authority?
13   A  I don't know.
14   Q  Did you have that authority?
15   A  No.
16   Q  Okay. If you look at slide 2, Bates
17 ending in 53, if you see the -- halfway down, it
18 says, Or Highland Wins in bold underline.
19    Do you see that?
20   A  Yes.
21   Q  Okay. And then underneath it it says:
22 HFP is solvent. Reverses 2008's 257 million tax
23 write-off by HCMLP.
24    Do you know anything about that
25 257 million tax write-off?

**40**

1   A  No, I don't.
2    MS. SMITH: Objection, form.
3   A  I do not.
4 BY MS. TOMKOWIAK:
5   Q  All right. If you could turn to slide 6,
6 Bates ending in 57.
7   A  Okay.
8   Q  The title here is If Highland Settles.
9 And then No. 1, it says: Sentinel controls
10 HFP/CDO assets (currently 94 million) (see
11 Slide 10).
12    Do you see that?
13   A  I do.
14   Q  Are you familiar with the entity Sentinel?
15   A  Yes.
16   Q  Okay. And that was a Cayman insurance
17 company that was owned by Mr. Dondero and
18 Mr. Ellington, correct?
19    MS. SMITH: Objection, form.
20   A  At one point, yes, I think they had an
21 economic interest. I'm not certain if that
22 changed.
23 BY MS. TOMKOWIAK:
24   Q  Okay. And if you'd flip to slide 8, which
25 is Bates ending in 59.

41

1    A   Yes.
2    Q   So this is UBS Settlement: Structure
3 Summary.  Are you familiar with any of the steps
4 that are listed on this slide, in terms of a
5 settlement structure for settling the UBS matter?
6        MS. SMITH:  Objection, form.
7    A   I'm not familiar with the context of
8 settlement, but these steps -- I have some
9 familiarity with the steps, sort of without --
10 without that context, without a settlement
11 backdrop or context of settlement.
12 BY MS. TOMKOWIAK:
13   Q   Okay.  And which steps are those?
14   A   The ATE policy from Sentinel.  I mean,
15 really Step 1.  I mean, the rest of the steps sort
16 of, I guess, intuitively make sense, but I never
17 really -- I'm not familiar with the context here.
18   Q   Okay.  So you are -- and I'll talk about
19 this later today, but you're familiar with the ATE
20 policy from Sentinel, but you were unaware that
21 was in connection --
22       MS. SMITH:  Objection, form.
23       MS. TOMKOWIAK:  Hang on.  Let me just
24 finish the question.
25

42

1 BY MS. TOMKOWIAK:
2    Q   Let me do that again.
3        You were familiar with the ATE policy from
4 Sentinel, but you were unaware that this was in
5 connection with a potential settlement with UBS;
6 is that what you're saying?
7        MS. SMITH:  Objection, form.
8    A   I guess it's intuitive that there would be
9 a settlement step, but I don't recall this context
10 being explained to me or otherwise knowing of it
11 in real time, if that makes sense.
12 BY MS. TOMKOWIAK:
13   Q   Do you know whether any of the steps on
14 this page actually happened?
15   A   I believe the ATE policy was entered into.
16 I don't know the rest.
17   Q   And this slide contemplates buying a
18 $100 million policy; is that right?
19   A   Yes.
20   Q   If you go to slide 10, and that's Bates
21 ending 61.
22   A   Yes.
23   Q   It says:  UBS Settlement Step 1 - ATE
24 Policy, and then there's a box there that says,
25 Actor: Scott's Team?

43

1    A   Yes.
2    Q   Do you believe that refers to Scott
3 Ellington?
4        MS. SMITH:  Objection, form.
5    A   Yes.
6 BY MS. TOMKOWIAK:
7    Q   Were you part of Mr. Ellington's team?
8    A   Yes.
9    Q   And so it says here that the plan in
10 Step 1 is for HFP/CDO Fund to send their assets
11 (94 million) as ATE premium payments to Sentinel,
12 and then the other arrow says, Sentinel writes
13 100 million policy for UBS liability.
14       Is that your understanding of the ATE
15 policy?
16       MS. SMITH:  Objection, form.
17   A   I'm not certain of the $94 million part.
18 The $100 million ATE policy does -- I am familiar
19 with.  So, yes, generally I'm familiar with this.
20 BY MS. TOMKOWIAK:
21   Q   Okay.  And if you look at the next slide,
22 slide 11 that's ending in Bates 62, this is UBS
23 Settlement Step 2 - Negotiate Settlement Amount.
24 And then the box up top says:  Scott to negotiate
25 with Andy.

44

1        Do you know if that refers to my partner
2 Andy Clubok?
3        MS. SMITH:  Objection, form.
4    A   I'm assuming it does.
5 BY MS. TOMKOWIAK:
6    Q   Did you have any communications with
7 Mr. Clubok in the course of the UBS litigation?
8    A   No.
9    Q   Do you know whether any of those
10 negotiations between Mr. Ellington and Mr. Clubok
11 actually occurred?
12   A   I don't.
13   Q   You weren't part of those, if they did?
14   A   No.
15   Q   Who else was on Scott's team?
16       MS. SMITH:  Objection, form.
17   A   Thomas Surgent, Tim Cournoyer, Stephanie
18 Vitiello, Lauren Thedford, Helen Kim.  Obviously
19 the team changed over time.  I'm sort of
20 mentioning the individuals towards the end there.
21 There were other litigators over time who came --
22 you know, who came and went and corporate
23 attorneys as well.  But it's the legal group.  It
24 was the Highland legal group.
25

**45**

1  BY MS. TOMKOWIAK:
2    Q   What about Mr. Leventon?
3    A   Mr. Leventon.
4    Q   What about Mr. DiOrio?
5    A   Mr. DiOrio, Ms. Irving.
6    Q   If you could keep that exhibit open to
7  slide 10, which is at Bates 61, I'm going to also
8  hand you what we will mark as Exhibit 48.
9        (Deposition Exhibit 48 marked for
10 identification.)
11 BY MS. TOMKOWIAK:
12   Q   Go ahead and take your time to flip
13 through that.  This is another version of the same
14 settlement analysis that we were just looking at.
15   A   Sorry, the pages are upside down, so I'm
16 having to --
17   Q   Yeah, for me too.  That's not ideal.  I
18 think we're all out of practice printing out hard
19 copies.  I apologize for that.
20       (Witness reviews document.)
21 BY MS. TOMKOWIAK:
22   Q   Let me know when you've had a chance to
23 look through that.
24   A   Okay.
25   Q   So this is, again, another version of the

**46**

1  settlement analysis that we just looked at, but it
2  doesn't have a date.  It looks to us to be a later
3  version in time, but do you have any idea what the
4  date of this document would be?
5        MS. SMITH:  I'm going to object first on
6  the privilege.  If you're going to ask him
7  questions about this exhibit, I want to make sure
8  that Highland is going to waive the privilege on
9  this so that he can answer.
10       MS. TOMKOWIAK:  Sure.  Mr. Feinstein, I
11 don't know if it would make sense to do this on a
12 piecemeal basis or if there's -- you know, if you
13 want to articulate if there's going to be a
14 broader privilege waiver.  I don't care how we do
15 it.  I can do it either way.  It's up to you.
16 It's your privilege.
17       MR. FEINSTEIN:  Why don't we do this the
18 way we have in prior depositions in this action,
19 which is to say that the debtor is not going to --
20 chooses not to assert the privilege to the extent
21 that it may apply to questions that deal with the
22 basic factual matters that are laid out in the
23 complaint and in the motion to approve settlement,
24 where we disclose over the course of several
25 paragraphs, the facts surrounding the insurance

**47**

1  policy, the assignment of assets and related
2  matters.
3        MR. SMITH:  That doesn't exactly resolve
4  my objection.  This is an internal settlement
5  analysis document, and I don't want Mr. Sevilla to
6  be in any kind of trouble for discussing it.
7  This, as far as I know, was not an attachment to
8  the complaint and I don't know what, if anything,
9  she's going to ask that's related to the
10 complaint.
11       MR. FEINSTEIN:  Then maybe we should take
12 it question by question for now.
13       MS. TOMKOWIAK:  Question by question or
14 document by document?
15       MR. FEINSTEIN:  Document by document.
16 We're not going to assert the privilege on this
17 document.
18       MS. SMITH:  Okay.
19 BY MS. TOMKOWIAK:
20   Q   So, Mr. Sevilla, my question was, do you
21 have any idea what the date of this document would
22 be?
23   A   I don't.
24   Q   So you don't know if this is the final
25 version or not?

**48**

1        MS. SMITH:  Objection, form.
2    A   I don't.
3  BY MS. TOMKOWIAK:
4    Q   If you look at slide 8 on this version.
5  So slide 8 contains a structure summary that is
6  similar to the one that we just looked at, except
7  for in Step 1, HFP/CDO fund by a $90 million ATE
8  policy from Sentinel.  Do you know why that would
9  have changed from 100 to 90?
10       MS. SMITH:  Objection, form.
11   A   I don't.
12 BY MS. TOMKOWIAK:
13   Q   And it says here that the ATE premium is
14 all assets in HFP CDO fund.  Do you see that?
15   A   Yes.
16   Q   And if you look at the very last page of
17 this exhibit -- well, the very last two pages, I
18 guess, the second-to-last page is Appendix 1 and
19 then Appendix 1 is what appears to be a list of
20 assets.  Do you see that?
21   A   Yes.
22   Q   Okay.  Is it your understanding that these
23 were the assets that were planned to be used to
24 buy the premium for the ATE policy?
25       MS. SMITH:  Objection, form.

**49**

1    A   These look familiar.  I don't know if this
2  is the final asset list or if this is
3  comprehensive.  I can take it at face value, but I
4  don't have personal knowledge about the
5  completeness or incompleteness of it.
6  BY MS. TOMKOWIAK:
7    Q   Okay.  Do you know who would?
8    A   Sorry, we're referring to what?  Can you
9  restate what we're -- exactly what we're talking
10 about.
11   Q   Who would have knowledge about this list
12 of assets?
13      MS. SMITH:  Objection, form.
14   A   I mean, Highland accounting, I guess,
15 relating to these entities.
16 BY MS. TOMKOWIAK:
17   Q   Who would have pulled together something
18 like this?
19      MS. SMITH:  Objection, form.
20   A   In what year?  Like when?
21 BY MS. TOMKOWIAK:
22   Q   In 2017.
23   A   Probably Mr. Stoops, the chief accounting
24 officer.  Mr. Klos.  I think he was -- I don't
25 know if he was the controller then, but he -- I

**50**

1  remember him as the controller.  I don't know who
2  else they would have consulted, but that's who I
3  would sort of assume.
4    Q   Okay.  And you don't know who put this
5  specific list together?
6    A   Not that I know of, no.  Not that I
7  recall.
8    Q   I am going to switch topics.
9       MS. TOMKOWIAK:  I'm good to keep going,
10 but does anybody else want to take a break now?
11      MS. SMITH:  I could actually go to the
12 ladies room.
13      MS. TOMKOWIAK:  We can go off the record.
14      THE VIDEOGRAPHER:  We are off the record
15 at 10:30 a.m.
16      (Recess taken from 10:30 a.m. CDT to
17 10:41 a.m. CDT)
18      THE VIDEOGRAPHER:  The time is 10:41 a.m.
19 We are back on the record.
20 BY MS. TOMKOWIAK:
21   Q   Mr. Sevilla, earlier in the day you said
22 that you were familiar with an entity named
23 Sentinel; is that right?
24   A   Yes.
25   Q   What is Sentinel?

**51**

1    A   An insurance company.
2    Q   Do you recall when Sentinel was formed?
3    A   2011 -- or 2012, I believe.
4    Q   Were you involved in that?
5    A   I was.
6    Q   Do you recall at the time what the purpose
7  was of forming Sentinel?
8    A   The purpose was for it to be an insurance
9  company was my understanding.
10   Q   What type of insurance would it provide?
11   A   You're saying at formation?
12   Q   Yes.
13   A   Like what was the intention?  I don't know
14 what exactly the strategic intention was.  I know
15 the name -- the legal name has the word
16 reinsurance in it, but I -- at the time of
17 incorporation, I don't know what the strategic
18 vision was for it so I don't know what was
19 intended.
20   Q   Or what types of policies it would issue
21 or anything like that?
22   A   Correct.
23      MS. TOMKOWIAK:  We're on 49, right?
24   A   Should I set these to the side?
25

**52**

1  BY MS. TOMKOWIAK:
2    Q   Yes, go ahead.  We'll give those to the
3  court reporter at the end of the deposition.
4       MS. TOMKOWIAK:  If you could mark that as
5  Exhibit 49.
6       (Deposition Exhibit 49 marked for
7  identification.)
8  BY MS. TOMKOWIAK:
9    Q   Mr. Sevilla, this is a lengthy document.
10 Just to orient ourselves a bit, this is an e-mail
11 from Sara Galletly, if I'm pronouncing that right,
12 at Maples to you.  The date is December 10th,
13 2012, and the subject line is Sentinel
14 Restructure.  Do you see that?
15   A   Yes.
16   Q   Okay.  And --
17      MS. SMITH:  Sorry, is the debtor going to
18 waive the privilege as to this document too, to
19 the extent it's privileged?
20      MR. FEINSTEIN:  Yes, that's correct.
21 BY MS. TOMKOWIAK:
22   Q   Do you know who Ms. Galletly is?
23   A   I don't recall.
24   Q   Okay.  What about Maples in general?
25   A   A law firm.

53

1    Q   Okay.  And you can -- do you want to take
2 a minute to flip through this or the
3 attachments --
4    A   Do you want me to?  It's long.
5    Q   -- to see if it's familiar to you?
6    A   Sorry.  It's been a long time.  I would
7 need to -- I mean, generally, I kind of know what
8 it's about, but I haven't looked at this in a long
9 time.  But you tell me, do you want me to go page
10 by page?
11    Q   No.  I have questions about specific
12 pages, but if at any time you want to look at a
13 different page or you want to look for other
14 context before you answer my question, just let me
15 know.
16    A   Yeah.
17    Q   So the -- my first question is on --
18 relates to the e-mail dated November 30th, 2012,
19 from Ms. Galletly to you.  That's the first
20 that -- first time that you're copied into this
21 e-mail chain, as far as I can tell.
22    A   Okay.
23    Q   Okay.  And she says she is attaching draft
24 forms of memorandum and articles of association,
25 or M&A, for each of the following.  And then the

54

1 entities listed there are Patton, Nimitz, Sentinel
2 Re Holdings and Sentinel Reinsurance.  Do you see
3 that?
4    A   Yes.
5    Q   Are you familiar with each of those
6 entities?
7        MS. SMITH:  Objection, form.
8    A   I've heard their names, so I have a
9 general recollection of them.
10 BY MS. TOMKOWIAK:
11    Q   Okay.  Do you understand that Mr. Dondero
12 is the beneficial owner of Patton?
13        MS. SMITH:  Objection, form.
14    A   I'd need to confirm that.  I don't know if
15 it's in here, but -- I don't know if that's the
16 case.
17 BY MS. TOMKOWIAK:
18    Q   If you look at, I believe that it's page
19 ending in 349.
20    A   Yes.
21    Q   Does that confirm that Mr. Dondero is the
22 sole member of Patton?
23        MS. SMITH:  Objection, form.
24    A   Yes.
25

55

1 BY MS. TOMKOWIAK:
2    Q   With respect to Nimitz, do you understand
3 that Mr. Ellington is the owner of Nimitz?
4        MS. SMITH:  Objection, form.
5    A   If you have something like this for that,
6 I think that would be helpful.
7 BY MS. TOMKOWIAK:
8    Q   I do.  It's on Bates 312, I think.
9    A   Okay.
10    Q   Is that consistent with your recollection?
11        MS. SMITH:  Objection, form.
12    A   I take this at face value.  I don't have a
13 direct recollection, but I'll -- I believe this is
14 what it purports to be.
15 BY MS. TOMKOWIAK:
16    Q   So you don't recall learning at the time
17 that Mr. Dondero owned Patton and Mr. Ellington
18 owned Nimitz?
19        MS. SMITH:  Objection, form.
20    A   I'm sure I knew at time and I'll take this
21 at face value that it was the case.
22 BY MS. TOMKOWIAK:
23    Q   Okay.  If you look at the page before
24 that, both the sole director of Nimitz is
25 Caledonian Directors Ltd.?

56

1    A   Yes.
2    Q   And you can look back at -- there's a
3 similar document for Patton.  Do you know what
4 that entity is, Caledonian Directors Ltd.?
5    A   A directorship in Cayman, a corporate
6 directorship in Cayman.
7    Q   Was it related at all to Highland?
8        MS. SMITH:  Objection, form.
9    A   No.
10 BY MS. TOMKOWIAK:
11    Q   Do you know how it was selected to be the
12 director?
13    A   I don't.
14    Q   Do you know who Nathan Smith is?
15    A   The name sounds familiar, but I'm drawing
16 a blank.
17    Q   Okay.  If you go back to the November 30th
18 e-mail that we were discussing.
19        MS. SMITH:  What page is that?
20        MS. TOMKOWIAK:  Sure.
21        Do you have the Bates for that?
22        Should be the third page.
23 BY MS. TOMKOWIAK:
24    Q   My question is, do you know why you're
25 being copied here?

57

1    A  I was working on the Sentinel
2  incorporation with outside counsel.
3    Q  Do you recall who asked you to work on
4  that?
5    A  Yes.
6    Q  Who is that?
7    A  Mr. Ellington.
8    Q  Anybody else?
9    A  Not that I recall.
10   Q  Do you know who came up with this
11 structure for Sentinel?
12     MS. SMITH:  Objection, form.
13   A  My recollection is outside counsel.
14 BY MS. TOMKOWIAK:
15   Q  Outside counsel at where?
16   A  I don't remember whether it was at
17 Sutherland or at Maples.  I don't recall.
18   Q  So the -- to the best of your knowledge,
19 it was outside counsel and not in-house, that came
20 up with the ownership structure for Sentinel?
21     MS. SMITH:  Objection, form.
22   A  I don't recall.
23 BY MS. TOMKOWIAK:
24   Q  Did you have any role in reviewing the M&A
25 that are attached to this e-mail?

58

1    A  I'm sure I would have reviewed them, but
2  it's a Cayman document so I wouldn't have had had
3  much to say about it.
4    Q  Do you know why Sentinel was incorporated
5  in the Caymans?
6    A  I don't know the reasoning behind it.
7    Q  As you sit here today, you can't think of
8  any reason that they would've been incorporated in
9  the Cayman Islands?
10     MS. SMITH:  Objection, form.
11   A  Again, I don't know what the strategic
12 thought process was.  At least I don't recall as
13 to why Cayman.
14 BY MS. TOMKOWIAK:
15   Q  If you look at Ms. Galletly's e-mail,
16 about halfway down through her e-mail, she's
17 discussing the voting ratio and the different
18 classes of shares that Patton and Nimitz will
19 receive.  Do you see that?
20   A  Yes.
21   Q  Okay.  And then there's a sentence here
22 that says:  The economic rights entitle the
23 Class A shares to 70 percent of any dividends or
24 distributions of surplus assets on a winding up
25 and the Class B shares are entitled to the

59

1  remaining 30 percent.
2      Do you see that?
3    A  Yes.
4    Q  And above, it says that:  The Class A
5  shares are held by Patton and the Class B shares
6  are held by Nimitz.
7      Correct?
8    A  Yes.
9      MS. SMITH:  Objection, form.
10   A  I see that.
11 BY MS. TOMKOWIAK:
12   Q  Okay.  So you agree this means that if
13 Sentinel Holdings was somehow wound up, any
14 surplus assets that remained at the company, at
15 least according to this e-mail, would be divided
16 up 70/30 between Patton and Nimitz; is that right?
17     MS. SMITH:  Objection, form.
18   A  I believe that's what the e-mail says.
19 BY MS. TOMKOWIAK:
20   Q  Do you know whether these economic rights
21 were actually incorporated into the final articles
22 of association for SS Holdings?
23     MS. SMITH:  Objection, form.
24   A  I'd need to see them.
25

60

1  BY MS. TOMKOWIAK:
2    Q  Do you know who would have those?
3    A  The entity --
4      MS. SMITH:  Objection, form.
5    A  The entities themselves.  I don't have
6  them.
7  BY MS. TOMKOWIAK:
8    Q  So do you mean the Sentinel entities?
9    A  Yes.
10   Q  Did Sentinel have an office?
11   A  I believe it had a registered office.
12   Q  Did it have a physical office?
13   A  Not that I know of.
14   Q  Did it have employees?
15   A  Not that I know of.
16   Q  If you flip back a page, it looks like
17 you -- a couple e-mails up, you write on
18 December 10th, 2012:  Please update as to filing
19 status on this.
20     Do you see that?
21   A  Yes.
22   Q  Do you recall if there was any urgency at
23 the time surrounding the formation of Sentinel or
24 these other entities?
25   A  Not that I recall.

61

1    Q   So to the best of your recollection,
2  you're just asking for an update?
3    A   I don't recall there being urgency per se.
4  I don't know -- I don't remember much other than
5  that.
6    Q   And you don't recall there being a
7  specific time frame or deadline by which you were
8  supposed to --
9    A   I don't think so.
10   Q   Who is Tabor?  Tabor.  How do I say that?
11   A   Tabor Pittman.
12   Q   Tabor Pittman, who is that?
13   A   He was a lawyer in the Highland legal
14  group.
15   Q   To your knowledge, did Mr. Dondero or
16  Mr. Ellington make any investment in Sentinel?
17       MS. SMITH:  Objection, form.
18   A   I recall that they did, yes.
19  BY MS. TOMKOWIAK:
20   Q   In what form?
21   A   I don't recall exactly in what form, but I
22  have a general recollection that they did
23  capitalize the entity.  I don't remember the
24  amount or the form, but I have a general
25  recollection that that was done.

62

1    Q   That they put capital into the entity?
2    A   Yes.
3    Q   I believe you testified that you didn't
4  know what type of insurance Sentinel was intended
5  to provide at the time; is that right?
6       MS. SMITH:  Objection, form.
7    A   I don't think that's exactly right.  Yes,
8  that's true.  I wasn't sure exactly what kind of
9  insurance they intended to write in the -- I think
10  initially -- actually, I think initially there was
11  a thought of what kind of policies it would write,
12  D&O policies and the like, but as far as more than
13  that, I don't recall.
14  BY MS. TOMKOWIAK:
15   Q   Okay.  And just to go back to my question
16  about the capitalization, when you said that they
17  capitalized the entity, you were referring to
18  Mr. Dondero and Mr. Ellington; is that right?
19   A   Yes.
20       MS. SMITH:  Objection, form.
21  BY MS. TOMKOWIAK:
22   Q   Did anybody else capitalize Sentinel?
23   A   Not that I recall.
24   Q   Did anybody ever tell you to keep Sentinel
25  a secret?

63

1    A   No, not that I recall.
2    Q   Did anybody ever tell you to keep Sentinel
3  confidential?
4    A   I don't recall being told that.
5    Q   Did anybody ever tell you not to widely
6  discuss the existence of Sentinel within Highland?
7    A   I don't remember getting direction like
8  that, no.
9    Q   Not in words or substance?
10   A   No.  No, I don't recall it being a secret.
11   Q   Do you recall it being kept to a small
12  group of people?
13   A   I think a limited group of people provided
14  services to it, but I don't remember a mandate
15  that said keep it a secret.
16   Q   Did that ever change at any point after
17  2012?
18   A   I'm sorry, what?
19   Q   Keeping it a secret or keeping it limited
20  to a smaller group of people.
21       MS. SMITH:  Objection, form.
22   A   I don't remember that being a directive,
23  to keep it a secret.
24  BY MS. TOMKOWIAK:
25   Q   Even if it wasn't a directive, if it was

64

1  an understanding or anything else like that.
2       MS. SMITH:  Objection, form.
3    A   No, I don't remember that.
4  BY MS. TOMKOWIAK:
5    Q   What about its ownership?  Did anybody
6  instruct you to keep its ownership structure a
7  secret?
8    A   No, no one instructed me, but I do recall
9  there being confidentiality rules in Cayman around
10  ownership, so I think it would have been
11  somethings that was -- wasn't particularly, you
12  know, widely disseminated, just in light of that,
13  but I don't -- that would be the only sort of --
14  when you mention that, that's what I think of.
15   Q   Is that the reason that Sentinel was
16  incorporated in the Cayman Islands?
17   A   I don't know.
18       MS. SMITH:  Objection, form.
19   A   I don't know.
20  BY MS. TOMKOWIAK:
21   Q   So at some point between December 2012 and
22  August 2017, the ownership structure of Sentinel
23  became more complex.  Do you recall that?
24       MS. SMITH:  Objection, form.
25   A   I don't know if I would call it more

65

1  complex. I have a general recollection that the
2  ownership structure changed.
3  BY MS. TOMKOWIAK:
4  Q  Did you play any role in that?
5  A  I'm sure I -- I'm sure I had knowledge of
6  it. I don't remember what role I played, but I do
7  recall it happening. Yeah, I'm sure I did some
8  things on it.
9  MS. TOMKOWIAK: We're on Exhibit 50; is
10  that right?
11  A  Am I done with this?
12  BY MS. TOMKOWIAK:
13  Q  Yes, sir.
14  MS. TOMKOWIAK: Okay. I'm handing the
15  court reporter, to mark as Exhibit 50, the cover
16  e-mail.
17  (Deposition Exhibit 50 marked for
18  identification.)
19  BY MS. TOMKOWIAK:
20  Q  And then I'm also handing you one of the
21  attachments, which was previously marked as a
22  deposition exhibit in this case as Exhibit 26.
23  A  Okay.
24  Q  But there's several attachments to this
25  document. That is one of them and that's been

66

1  previously marked as Exhibit 26.
2  That is Exhibit 50. Do you want to take a
3  moment, look through that and let me know when
4  you're ready?
5  A  Sure.
6  (Witness reviews document.)
7  A  Okay.
8  BY MS. TOMKOWIAK:
9  Q  This is an e-mail from Daniel Bowen,
10  Bowen, Bowen, to you, dated August 29th, 2017.
11  Any reason to doubt that you received this e-mail?
12  A  No.
13  Q  Okay. And he's attaching the beneficial
14  ownership information for Sentinel Re Holdings
15  LTD. Do you see that?
16  A  Yes.
17  Q  And we'll talk about this a little bit
18  later, but do you recall at the time working on a
19  transfer of interest in the Multi Strat fund to
20  Sentinel Re Holdings in 2017?
21  A  I remember that.
22  Q  Okay. And if you look at the attachment,
23  which is Exhibit 26.
24  A  Okay. This?
25  Q  Yes. So at the top it shows the --

67

1  A  I'm sorry, so can I take it at face value
2  that this was the attachment to this?
3  MS. SMITH: No.
4  BY MS. TOMKOWIAK:
5  Q  Well, I am representing to you that this
6  is one of the attachments that is in the zip file
7  that is attached to this. If you have a question
8  to doubt that or if your answers to my questions
9  would change, let me know. We just didn't want to
10  kill --
11  A  I just didn't see the connection. Okay.
12  Q  It's on an Excel file, so it's difficult
13  to print it out with --
14  A  Understood.
15  Q  -- one of the stamps.
16  A  Understood.
17  Q  With that representation, at the top --
18  MS. SMITH: I'm sorry, Sarah, can I ask a
19  question? Does this have a corresponding Bates,
20  or is that what you are saying was difficult
21  because it was an Excel? This is not Bates'd.
22  MS. McLAUGHLIN: The Bates is -- the cover
23  sheet would be a Bates number, but this is the
24  native file.
25  MS. TOMKOWIAK: Can we go off the record

68

1  briefly?
2  THE VIDEOGRAPHER: Sure. We are off the
3  record at 11:02 a.m.
4  (Recess taken from 11:02 a.m. CDT to
5  11:03 a.m. CDT)
6  THE VIDEOGRAPHER: 11:03 a.m., we are back
7  on the record.
8  BY MS. TOMKOWIAK:
9  Q  So do you see at the top, the top entity
10  is the investor and that's Sentinel Reinsurance
11  Ltd.?
12  A  Yes.
13  Q  And then below that, we have the two
14  beneficial owners, Patton and Nimitz, that we
15  discussed earlier?
16  A  Yes.
17  Q  And then with respect to each of Patton
18  and Nimitz, there are now other entities that have
19  been inserted in between each of those entities
20  and Mr. Dondero and Mr. Ellington. Do you see
21  that?
22  A  I do.
23  MS. SMITH: Objection, form.
24  BY MS. TOMKOWIAK:
25  Q  Okay. So Patton is now owned by

**69**

1  Mainspring, which is owned by Loyal which is owned
2  by Mr. Dondero?
3      MS. SMITH: Objection, form.
4      A  That's what the document says, yes.
5  BY MS. TOMKOWIAK:
6      Q  Okay.  And with respect to Mr. Nimitz, the
7  document reflects that it is owned by Montage,
8  which is then 100 percent owned by HAL Holdings,
9  which is then 99 percent owned by Elderflower,
10 which is 100 percent owned by Mr. Ellington?
11     A  I see that.
12     Q  Do you know what the purpose was in
13 putting all of those other entities into this
14 Sentinel structure?
15     MS. SMITH: Objection, form.
16     A  I don't recall.
17 BY MS. TOMKOWIAK:
18     Q  Do you know what any of those entities do?
19     MS. SMITH: Objection, form.
20     A  The names are familiar to me.  I don't
21 know what they do.
22 BY MS. TOMKOWIAK:
23     Q  Do you know if any of them have
24 operations?
25     MS. SMITH: Objection, form.

**70**

1      A  I don't know.
2  BY MS. TOMKOWIAK:
3      Q  Okay.  Do you know if any of them are just
4  holding companies?
5      MS. SMITH: Objection, form.
6      A  I don't know for certain.
7  BY MS. TOMKOWIAK:
8      Q  Do you know if any of them are just dummy
9  entities?
10     MS. SMITH: Objection, form.
11     A  I don't know what a -- what do you mean by
12 a dummy entity?
13 BY MS. TOMKOWIAK:
14     Q  Or a fictitious entity?
15     MS. SMITH: Objection, form.
16     A  No, I don't know.
17 BY MS. TOMKOWIAK:
18     Q  And you don't know whether or not this was
19 done to separate Mr. Ellington or Mr. Dondero from
20 Sentinel in any way?
21     MS. SMITH: Objection, form.
22     A  When you say this, you mean what?
23 BY MS. TOMKOWIAK:
24     Q  Changing the beneficial ownership
25 structure of Sentinel so that there were

**71**

1  additional entities in between Sentinel and
2  Mr. Dondero on one hand and Mr. Ellington on the
3  other hand.
4      A  I don't recall that being a reason for
5  changing the structure.  I don't recall that being
6  a reason.
7      Q  Do you know who would have made the
8  decision to restructure Sentinel in this way?
9      A  I guess ultimately the Sentinel directors
10 and the -- Sentinel directors is what I would
11 think of.  I don't know who else they would take
12 direction from, but...
13     Q  So you would assume that the Sentinel
14 directors would have made that decision?
15     A  I think they would have had approval
16 authority over changes like that.
17     Q  You don't know whether or not they, in
18 fact, approved or authorized this?
19     MS. SMITH: Objection, form.
20     A  I'm going to take this at face value.  And
21 I do have a recollection of there being a change
22 in the structure and so -- and my recollection is
23 that that would have been approved according to
24 whatever the governing law is, but a more specific
25 recollection, I can't -- I don't have.

**72**

1  BY MS. TOMKOWIAK:
2      Q  You can set that aside.  I'm handing you
3  what's previously been marked as Exhibit 21 -- I'm
4  sorry, 28.  Go ahead and take a minute to
5  familiarize yourself with that and let me know
6  when you're ready.
7      (Witness reviews document.)
8      A  Okay.
9      MS. SMITH: This appears to be an e-mail
10 regarding legal perspective.  Does the debtor
11 waive the privilege on this document before
12 Mr. Sevilla answers questions?
13     MR. FEINSTEIN: We are not going to assert
14 the privilege, to the extent it applies.
15 BY MS. TOMKOWIAK:
16     Q  Okay.  This is an e-mail -- skipping ahead
17 a couple of years here to April 2019.  This is an
18 e-mail from Katie Irving, who I understand is now
19 Katie Lucas; is that right?
20     A  Yes.
21     Q  To Sam Dawson, Dylan Wiltermuth, and then
22 a CC to you and Mr. DiOrio.  The date is
23 April 10th, 2019, and the subject is Forward
24 Entity Restructure - Sentinel.
25     And Ms. Irving is forwarding an e-mail

**73**

1  from Stephen Beck.  Do you know who Stephen Beck
2  is?
3  **A  I have a general recollection that he's a**
4  **tax practitioner, an accounting practitioner.**
5  Q  External to Highland?
6  **A  Yes.**
7  Q  And do you know why you're being copied on
8  this?
9  **A  I don't know why exactly.**
10  Q  Katie writes to Mr. Beck in the earlier
11  e-mail in the chain, which is also CC'd to you and
12  she says:  Hi, Steve.  Further to entity
13  liquidation discussions last year, the Sentinel
14  Reinsurance Ltd. regulator, Cayman Islands
15  Monetary Authority (CIMA) is asking that the
16  Sentinel structure be simplified.
17  I'm not reading the rest of that sentence.
18  Do you recall having discussions with CIMA, or the
19  Cayman Islands Monetary Authority, asking that the
20  Sentinel structure be simplified, at any time
21  between 2017 and 2019?
22  MS. SMITH:  Objection, form.
23  **A  I recall this happening.  I recall hearing**
24  **about that feedback.**
25

**74**

1  BY MS. TOMKOWIAK:
2  Q  Do you recall why they wanted the
3  structure to be simplified?
4  **A  I don't recall --**
5  MS. SMITH:  Objection, form.
6  THE WITNESS:  Sorry.
7  **A  I don't remember the reason.**
8  BY MS. TOMKOWIAK:
9  Q  In that same e-mail, Ms. Irving says that:
10  We have a five-year taint issue as Montage,
11  Anthem, and Mainspring used to be CFCs.
12  Do you know what CFC means?
13  **A  At a high level.**
14  Q  What does it stand for?
15  **A  Controlled Foreign Corporation.**
16  Q  And at a high level, what is that?
17  **A  It's a tax moniker.  I don't -- I don't**
18  **remember -- I don't purport to be a specialist in**
19  **this.  It's a company control -- a foreign company**
20  **controlled by another company, but that's pretty**
21  **much all I remember about what a CFC is.**
22  Q  And then do you remember anything about
23  why they de-CFC'ed in October 2014?
24  **A  I don't.**
25  Q  In the chain -- in the later e-mail in the

**75**

1  chain, Ms. Irving writes:  I believe we looked at
2  the impact of GP's structure for these topcos
3  previously.
4  Do you know what a topco is?
5  **A  Sorry, I'm trying to find where she writes**
6  **that.**
7  Q  At the top.
8  **A  Yeah.**
9  Q  Top e-mail, second sentence.
10  **A  GP structure, I don't recall what that --**
11  **general partner.  I don't recall.**
12  Q  Do you know what a topco is?
13  **A  The entity at the top of the structure is**
14  **what I would refer to as a topco.**
15  Q  Okay.  If you can look at the second page
16  of the attachment first.  So this appears to be an
17  organizational chart of Sentinel as of April 9th,
18  2019.
19  MS. SMITH:  Objection, form.  And this is
20  the third page.
21  MS. TOMKOWIAK:  Okay.
22  BY MS. TOMKOWIAK:
23  Q  Bates ending 26.
24  **A  I'm there.**
25  Q  Okay.  At the top it says:  CFC

**76**

1  Restructure, Sentinel Structure as at 9 April
2  2019.
3  To the best of your recollection, did this
4  reflect Sentinel's ownership structure in
5  April 2019?
6  MS. SMITH:  Objection, form.
7  **A  I'll take it at face value.  I don't have**
8  **direct recollection of the exact structure chart.**
9  BY MS. TOMKOWIAK:
10  Q  Okay.  And taking it at face value,
11  there's other entities that appear to have been
12  added as well.  Do you know when, for example,
13  Anthem was added to this structure?
14  MS. SMITH:  Objection, form.
15  **A  Anthem.  No, I don't recall that.**
16  BY MS. TOMKOWIAK:
17  Q  Or Brave?
18  **A  I don't recall when that was added.**
19  Q  USP2 at the top right there, that refers
20  to Mr. Dondero, correct?
21  MS. SMITH:  Objection, form.
22  **A  I don't know whether it refers to him.**
23  BY MS. TOMKOWIAK:
24  Q  Well, would you expect that USP means US
25  person?

77

1    A  I believe that.
2    Q  Okay.  And we discussed earlier that
3  Mr. Dondero was the beneficial owner of Patton,
4  right?
5       MS. SMITH:  Objection, form.
6    A  Yeah, okay.  I see it now.
7  BY MS. TOMKOWIAK:
8    Q  Okay.  So reasonable to infer that USP2 is
9  Mr. Dondero?
10       MS. SMITH:  Objection, form.
11    A  I can't be certain.
12  BY MS. TOMKOWIAK:
13    Q  Okay.  Can't be certain, but it appears
14  that way based on what we've looked at before?
15       MS. SMITH:  Objection, form.
16    A  I know we looked at something referring to
17  Patton as Mr. Dondero.  Again, I didn't have
18  specific recollection of that, but I know you
19  showed that to me and I'm seeing it here, but as
20  far as personal knowledge, I don't want to
21  speculate.
22  BY MS. TOMKOWIAK:
23    Q  Same question with respect to US person 1,
24  that refers to Mr. Ellington, correct?
25       MS. SMITH:  Objection, form.

78

1    A  Same answer as to Mr. Dondero.  I know you
2  showed me something that referenced Nimitz and
3  Mr. Ellington, but I don't recall having personal
4  knowledge enough to, you know, agree to that, as I
5  sit here.
6  BY MS. TOMKOWIAK:
7    Q  And then at the top of all of this, so
8  maybe this would be the topco, is a company called
9  SAS Holdings.  Do you see that?
10    A  Yes.
11    Q  So at this point in time, Sentinel is part
12  of the structure of SAS Holdings; is that right?
13       MS. SMITH:  Objection, form.
14    A  I'm sorry, can you say that again?
15  BY MS. TOMKOWIAK:
16    Q  Sure.  I'm just trying to understand.  So
17  it looks to me like Sentinel Reinsurance is part
18  of this SAS Holdings ownership structure; is that
19  right?
20       MS. SMITH:  Objection, form.
21    A  I see SAS Holdings there at the top.  I
22  mean, I see that there.  So I'll accept that it's
23  in the structure.
24  BY MS. TOMKOWIAK:
25    Q  Okay.  And I mean, assuming that

79

1  Ms. Irving, who -- she's the one who looks like --
2  looks like she attached it to this structure.  So
3  assuming that it was put together correctly, you
4  would agree with me that SAS Holdings is here at
5  the top and Sentinel is part of that structure,
6  right?
7       MS. SMITH:  Objection, form.
8    A  I think that's fair.
9  BY MS. TOMKOWIAK:
10    Q  And if you turn back to the chart before
11  this, this reflects the SAS structure as of
12  April 9th, 2019?
13       MS. SMITH:  Objection, form.
14    A  That's what it says.
15  BY MS. TOMKOWIAK:
16    Q  Okay.  What is SAS?
17    A  A litigation funding business.
18    Q  What does SAS stand for?
19    A  I don't know.
20    Q  Sword and Shield?
21    A  Possibly.
22    Q  Did you come up with that or who came up
23  with the name SAS Holdings, if you know?
24       MS. SMITH:  Objection, form.
25    A  I did not.

80

1  BY MS. TOMKOWIAK:
2    Q  Do you know when SAS was formed?
3    A  I don't know when it was formed.
4    Q  Do you know who formed it?
5    A  I don't know who formed it.
6    Q  What is the relationship between SAS
7  Litigation Management, which is down here on -- in
8  the very lower right-hand corner, and SAS Asset
9  Recovery?
10       MS. SMITH:  Objection, form.
11  BY MS. TOMKOWIAK:
12    Q  If you know.
13    A  Other than being on the same structure
14  chart, I don't know of any other -- was the
15  question relationship or --
16    Q  Yeah.
17    A  I don't know of any other relationship,
18  other than being on a structure chart together.
19    Q  Well, is -- you said it was a litigation
20  funding company.  Is that what you said?
21    A  The enterprise was a -- when you asked
22  what's SAS, I -- my response is it's a litigation
23  funding enterprise business, series of businesses.
24    Q  Yeah.  Do you know which of these
25  businesses, SAS businesses, are actually in the

81

1 litigation funding business?
2   A  I would say all of them at different times
3 were litigation funders or contemplated litigation
4 funders. I don't want to represent that, but when
5 I -- when you asked what's SAS, litigation funding
6 business. And, you know, these are the entities
7 that effectuated that business.
8   Q  Do you know whose idea it was to form SAS?
9   A  I don't.
10   Q  Do you know when it was formed?
11     MS. SMITH: Objection, form.
12   A  It predated my time at Highland. I don't
13 know exactly when it was formed.
14 BY MS. TOMKOWIAK:
15   Q  When you arrived at Highland, it was
16 already in existence?
17     MS. SMITH: Objection, form.
18   A  That's my recollection.
19 BY MS. TOMKOWIAK:
20   Q  What was the relationship between SAS and
21 Highland?
22     MS. SMITH: Objection, form.
23   A  The relationship between the two?
24 BY MS. TOMKOWIAK:
25   Q  Yes.

82

1   A  Is that the question?
2   Q  Yeah.
3   A  I don't think there was -- I mean, I don't
4 think there was a relationship between Highland
5 and SAS, other than Highland employees providing
6 services to SAS from time to time, but I -- that's
7 about as much as I knew.
8   Q  So there's no affiliation between Highland
9 and SAS?
10     MS. SMITH: Objection, form.
11   A  When you say affiliation, you mean --
12 BY MS. TOMKOWIAK:
13   Q  So is -- I guess let me back up. Let me
14 ask it in a series of questions.
15     Did SAS have separate offices from HCM?
16   A  I believe SAS had offices.
17   Q  Do you know where?
18   A  In Cayman. In the Cayman Islands.
19   Q  In the US?
20   A  In the Cayman Islands.
21   Q  Just in the Cayman Islands?
22   A  Yeah.
23   Q  Okay. Did they have separate bank
24 accounts from Highland?
25     MS. SMITH: Objection, form.

83

1   A  I don't know specifics as to bank
2 accounts.
3 BY MS. TOMKOWIAK:
4   Q  Did they have any common ownership between
5 SAS and any Highland entity?
6     MS. SMITH: Objection, form.
7   A  Any Highland entity?
8 BY MS. TOMKOWIAK:
9   Q  Any Highland entity.
10     MS. SMITH: Objection, form.
11   A  I can't recall directly. I know the
12 Highland ownership structure changed over time, so
13 I don't want to represent that I know Highland's
14 ownership structure at any moment.
15 BY MS. TOMKOWIAK:
16   Q  Did Mr. Ellington form SAS?
17   A  I don't --
18     MS. SMITH: Objection, form.
19   A  I don't know exactly.
20 BY MS. TOMKOWIAK:
21   Q  Did Mr. Ellington own SAS?
22     MS. SMITH: Objection, form.
23   A  Did he own it? I don't think he owned it.
24 No, I don't think he owned it.
25

84

1 BY MS. TOMKOWIAK:
2   Q  Do you know who owned SAS?
3     MS. SMITH: Objection, form.
4   A  I believe Mr. Ellington had a beneficial
5 interest. I don't know if I would consider that
6 the owner or I would break it down that way, but I
7 know he had a beneficial interest in the
8 litigation funding enterprise.
9 BY MS. TOMKOWIAK:
10   Q  What does a beneficial interest mean?
11   A  I'd refer to it as economics, an economic
12 interest.
13   Q  What does that mean?
14   A  I mean, nothing -- I mean, I mean it in
15 the simplest possible terms. I think he had an
16 ownership interest in the economics of whatever
17 the entity created or whatever the fruits of the
18 business were, I think he had an economic interest
19 in that.
20   Q  So are you saying he got paid by SAS?
21   A  I don't know if he got paid by SAS.
22 BY MS. TOMKOWIAK:
23   Q  So I'm still struggling to understand what
24 you mean by ownership interest in the economics of

85

1  SAS. How did he benefit from SAS?
2      A  I mean, I think one can own shares in
3  something without necessarily being paid by them
4  or being their employee, is sort of what I mean.
5      Q  So was he a shareholder of SAS?
6      MS. SMITH:  Objection, form.
7      A  I don't know if I would consider him a
8  shareholder.  I think -- the extent of what I know
9  is that he had a beneficial interest in the
10  litigation funding business.
11  BY MS. TOMKOWIAK:
12      Q  What about Mr. Dondero?  Did he also have
13  a beneficial interest in the litigation funding
14  business?
15      A  I believe so.
16      Q  What about Mr. Leventon?  Did he have a
17  beneficial interest in the litigation funding
18  business?
19      A  I don't know.
20      Q  What about you?  Did you have a beneficial
21  interest in the litigation funding business?
22      A  I did not.
23      Q  What about Mr. DiOrio?
24      A  I don't know.
25      Q  What services did Highland employees

86

1  provide to SAS?
2      MS. SMITH:  Objection, form.
3      A  Diligence on potential litigation funding
4  matters.  That's largely the -- that's what I
5  would consider the kind of material services
6  provided were relating to kind of the litigation
7  funding of cases of different cases as they arose
8  from time to time.
9  BY MS. TOMKOWIAK:
10      Q  Which Highland employees provided those
11  services?
12      A  I don't have an exact -- I don't know the
13  exact universe at any given time.  I know I did
14  from time to time.
15      Q  And to the best of your recollection, who
16  else?
17      A  I believe Mr. Leventon did from time to
18  time.  I believe Ms. Irving did.  Different
19  Highland litigators at different points.  Like I
20  said, you'd have to narrow it down temporally.
21      Q  Mr. DiOrio?
22      MS. SMITH:  Objection, form.
23      A  I think he may have.  I'm not certain.
24  BY MS. TOMKOWIAK:
25      Q  Is he a lawyer?

87

1      A  He is not.
2      Q  Did you ever receive payments from SAS for
3  these services?
4      MS. SMITH:  Objection, form.
5      A  I never received payment from SAS.
6  BY MS. TOMKOWIAK:
7      Q  Did anybody else?
8      MS. SMITH:  Objection, form.
9      A  I don't know.
10  BY MS. TOMKOWIAK:
11      Q  Why would Highland employees, including
12  yourself, provide services for free?
13      MS. SMITH:  Objection, form.
14      A  I don't know if they were for free.  I
15  know my only paycheck was from Highland.
16  BY MS. TOMKOWIAK:
17      Q  And did that paycheck from Highland
18  include any compensation for the services that you
19  provided to SAS?
20      MS. SMITH:  Objection, form.
21      A  I don't know.  My paycheck from Highland
22  was compensation for the services that I was
23  assigned to work on.
24  BY MS. TOMKOWIAK:
25      Q  And were you assigned to work on projects

88

1  for SAS?
2      MS. SMITH:  Objection, form.
3      A  I was.
4  BY MS. TOMKOWIAK:
5      Q  Who assigned you to work on them?
6      A  Mr. Ellington.
7      Q  Anybody else?
8      A  Assigned me?  No, just him.
9      Q  Anybody else tell you to work on SAS
10  projects?
11      A  Tell me to?
12      Q  Ask you to.  Anybody besides Mr. Ellington
13  say, hey, here's something for SAS, can you help
14  work on it?
15      A  No.
16      Q  Did you have an SAS management e-mail
17  address?
18      A  Yes.
19      Q  And why is that?
20      A  To work on SAS litigation matters,
21  litigation funding matters.
22      Q  Even though those were being done in your
23  capacity as a Highland employee?
24      MS. SMITH:  Objection, form.
25      A  Yes.

**89**

1 BY MS. TOMKOWIAK:
2 Q Was there a shared services agreement
3 between Highland and SAS?
4 A I don't know.
5 MS. SMITH: Objection, form.
6 BY MS. TOMKOWIAK:
7 Q I'm sorry, what?
8 A Sorry. I don't know.
9 Q Were you personally involved in finding
10 claims to fund?
11 A No.
12 Q Were you personally involved in doing
13 diligence, as you said?
14 A I had -- I have done that.
15 Q Do you recall any specific claims or
16 matters?
17 A Vaguely I have a recollection. It's been
18 quite some time since I did that.
19 Q In her e-mail, Ms. Irving refers to a
20 Mexican case. Was that something that SAS was
21 funding?
22 MS. SMITH: Objection, form.
23 A Yes.
24 BY MS. TOMKOWIAK:
25 Q In brief, what is that case?

**90**

1 A It was a case from 2003 involving a sale
2 of securities of a Mexican -- sale of shares of a
3 Mexican company.
4 Q Why were you talking about it in 2019?
5 MS. SMITH: Objection, form.
6 A I don't know why it would be brought up in
7 2019. I don't know what the relevance was to
8 Katie to Sam Dawson -- I need to remember to
9 brief -- I don't know what she had in mind when
10 she said that. I don't know.
11 BY MS. TOMKOWIAK:
12 Q Did SAS make any money off of that case?
13 A No.
14 Q In the organizational structure of SAS,
15 there's an entity in the lower right that's
16 Sebastian Clarke Ltd. Do you see that?
17 A Yes.
18 Q Do you know anything about that entity?
19 MS. SMITH: Objection, form.
20 A The name looks familiar, but I don't have
21 specific knowledge of it.
22 BY MS. TOMKOWIAK:
23 Q What about any of the other entities in
24 here? Do you have any specific knowledge about
25 what any of them do?

**91**

1 MS. SMITH: Objection, form.
2 A Again, the names look familiar, sound
3 familiar. I don't recall exactly what any of them
4 did in any -- at any given moment.
5 BY MS. TOMKOWIAK:
6 Q Do you know who came up with names like
7 Helpful or Clean or Courteous?
8 A No.
9 Q You don't?
10 A I don't.
11 Q To your knowledge, is SAS still a
12 functioning entity today?
13 MS. SMITH: Objection, form.
14 A I don't know if it is.
15 BY MS. TOMKOWIAK:
16 Q Do you still have an SAS management e-mail
17 account?
18 A I don't know.
19 Q When was the last time you used it?
20 A December of '20 was the last time I
21 recall.
22 Q When was the last time that you performed
23 services for SAS?
24 MS. SMITH: Objection, form.
25 A Summer of '19, I would say is the last

**92**

1 time I remember doing work on SAS.
2 BY MS. TOMKOWIAK:
3 Q Does anybody at Skyview provide services
4 to SAS?
5 MS. SMITH: Objection, form.
6 A Not that I know of.
7 BY MS. TOMKOWIAK:
8 Q You can set that aside.
9 Mr. Sevilla, did you have any role in
10 preparing financial statements for Sentinel?
11 A Any role? I did not prepare financial
12 statements for Sentinel.
13 Q Did you review them?
14 A I think from time to time I've seen them,
15 but I wouldn't consider myself qualified to review
16 them in an official capacity. I'm sure I've seen
17 them from time to time.
18 MS. TOMKOWIAK: So I'm going to ask the
19 court reporter to mark this as Exhibit 51.
20 (Deposition Exhibit 51 marked for
21 identification.)
22 BY MS. TOMKOWIAK:
23 Q Let me know when you're ready. And when
24 the court reporter is ready.
25 A Go ahead.

93

1  Q  So this is -- Exhibit 51 is an e-mail from
2  Ms. Irving, now Lucas, to Abbie Stonecypher. Who
3  is Abbie Stonecypher, if I'm saying that
4  correctly?
5  **A  I recall she was an employee in the**
6  **accounting group.**
7  Q  And there's a CC to you and the subject is
8  Financials, and the date of the e-mail is
9  August 16th, 2017. Any reason to doubt that you
10  received this e-mail at the time?
11  **A  No.**
12  Q  And I think you said earlier that you
13  recall receiving financial statements for Sentinel
14  from time to time?
15  **A  I've -- yes, I've seen them.**
16  Q  What did you do, if anything, with them
17  when you received them?
18  **A  Nothing, unless someone else was asking me**
19  **for them or there was a discrete question related**
20  **to them. I didn't do anything with them.**
21  Q  Were you ever employed by Sentinel?
22  **A  No.**
23  Q  If you turn the page to the page ending in
24  Bates number 1067, this is a cover letter
25  addressed to you from Mr. Kranz at Beecher

94

1  Carlson?
2  **A  Yes.**
3  Q  And he says: Dear JP, Enclosed please
4  find the revised unaudited financial statements of
5  Sentinel Reinsurance, Ltd. as of, and for the
6  year-ended December 31st, 2016.
7  **A  Yes.**
8  Q  Do you know why Mr. Kranz is sending these
9  to you at SAS Asset Recovery?
10  **A  I don't know.**
11  Q  Well, what was the relationship between
12  SAS and Sentinel at this time?
13  MS. SMITH: Objection, form.
14  **A  I don't recall there being one. I don't**
15  **recall there being one.**
16  **BY MS. TOMKOWIAK:**
17  Q  Okay. Did you ever -- did SAS have an
18  office in the Caymans?
19  **A  Yes.**
20  MS. SMITH: Objection, form.
21  BY MS. TOMKOWIAK:
22  Q  Okay.
23  **A  Yes.**
24  Q  Did you ever work there?
25  **A  No.**

95

1  Q  But you received mail there?
2  MS. SMITH: Objection, form.
3  **A  It appears that way, although this looks**
4  **like this was e-mailed, but...**
5  **BY MS. TOMKOWIAK:**
6  Q  If you turn to the -- turn to the page
7  ended 1069.
8  **A  Yes.**
9  Q  And under the heading Income Statement, it
10  says that: Through December 31st, 2016, Sentinel
11  had premiums earned of 2.6 million.
12  **A  Yes.**
13  Q  Do you know what those premiums related
14  to?
15  **A  A series of D&O insurance policies.**
16  Q  For what types of clients?
17  **A  Corporate entities. Corporate entities on**
18  **the SAS side.**
19  Q  So Sentinel issued D&O policies for
20  corporate entities within the SAS structure?
21  **A  That's correct.**
22  Q  Any other types of clients?
23  **A  Not that I recall.**
24  Q  Okay. And then if you look at Bates
25  ending 1071.

96

1  **A  Okay.**
2  Q  It shows that Sentinel had approximately
3  19.2 million in total assets as of the end of
4  December 2016. Do you agree with that?
5  MS. SMITH: Objection, form.
6  **A  I agree that's what it says. Again, I'm**
7  **not qualified to attest to the accuracy. I'll**
8  **take it at face value.**
9  **BY MS. TOMKOWIAK:**
10  Q  Okay. And approximately $5.9 million in
11  cash?
12  MS. SMITH: Objection, form.
13  **A  Yes.**
14  **BY MS. TOMKOWIAK:**
15  Q  With respect to the shareholders' equity,
16  it has a line for dividends declared and paid.
17  Who are the shareholders that would have received
18  those dividends?
19  **A  I don't recall.**
20  Q  Would that be Mr. Dondero and
21  Mr. Ellington?
22  MS. SMITH: Objection, form.
23  **A  I don't recall where dividends flowed to.**
24  **BY MS. TOMKOWIAK:**
25  Q  If you look at the supporting schedules,

97

1  and page 1081.
2  A  Yes.
3  Q  This is a little small, so let me --
4  I'm --
5  A  Yeah.
6  Q  Let me know if you can't see something.
7  A  No.  I see it.
8  Q  It's a detailed investment schedule for
9  Sentinel as of December 31st, 2016.  And then it
10  lists four different CLOs?
11  A  Okay.
12  Q  What's a CLO?
13  A  Collateralized Loan Obligation.
14  Q  And the acquisition dates for three of
15  them are January 7th, 2014, and then for Grayson,
16  it looks like it's December 30th, 2013.  Do you
17  see that?
18     MS. SMITH:  Objection, form.
19  A  I see that.
20  BY MS. TOMKOWIAK:
21  Q  Do you know who Sentinel acquired these
22  securities from?
23  A  I don't recall.
24  Q  Did you have any role in that?
25  A  I have a recollection of when the CLO

98

1  assets were acquired.  I don't remember who the
2  seller was, but I have a general recollection of
3  the circumstances around that purchase.
4  Q  What is your general recollection?
5  A  That the seller was Morgan Stanley or
6  Merrill Lynch.  A bulge bracket bank.  I don't
7  remember much more than that.
8  Q  Not a Highland-affiliated entity?
9  A  Not that I recall.
10  Q  Do you recall anything else about the
11  circumstances around those purchases?
12  A  I don't.
13  Q  There's also a line here for Investment at
14  Cost and then it says SS Holdings.  Do you see
15  that?
16  A  Yes, I do.  I do.
17  Q  Do you know what an investment at cost is?
18  A  At a high level.
19  Q  At a high level, what is that?
20  A  I think you would mark the investment at
21  what it cost you not to mark it.  I could be
22  wrong.  I could be wrong.
23  Q  Do you have any investment background?
24  A  Not directly, no, not -- not to speak
25  authoritatively on a term of art like that.  I

99

1  don't want to lead you astray.
2  Q  Do you recall that Asset Holdings was a
3  wholly owned subsidiary of Sentinel?
4     MS. SMITH:  Objection, form.
5  A  I don't recall if that's true.
6  BY MS. TOMKOWIAK:
7  Q  All right.  You can set that aside and we
8  will hand you what we're going to mark as
9  Exhibit 52.
10     (Deposition Exhibit 52 marked for
11  identification.)
12  BY MS. TOMKOWIAK:
13  Q  Exhibit 52 is an e-mail with attachments,
14  and if you want to take a couple minutes, then let
15  me know when you're ready.
16     (Witness reviews document.)
17  A  Okay.  Go ahead.
18  BY MS. TOMKOWIAK:
19  Q  Okay.  So these appear to be another copy
20  of the consolidated financial statements of
21  Sentinel, but there's an independent auditor's
22  report attached from Crowe Horwath, if I'm saying
23  that correctly.  Are you familiar with this type
24  of document for Sentinel?
25  A  I've seen it before.

100

1  Q  Okay.  And so you've also seen before
2  reports from this independent auditor regarding
3  Sentinel?
4  A  I'm sure I have.
5  Q  This document reflects that the auditor is
6  providing a qualified opinion.  Do you have a
7  general understanding of what that means?
8  A  Generally.
9  Q  What does that mean?
10  A  There is an issue that they feel the need
11  to articulate to make sure that the -- that their
12  findings and that their report are as accurate as
13  possible.
14  Q  And then at the middle of this page, they
15  describe the basis for that qualified opinion,
16  right?
17     MS. SMITH:  Objection, form.
18  A  That's what it says.
19  BY MS. TOMKOWIAK:
20  Q  And they refer to the group's investment
21  in SeaOne Holdings, LLC, and then in the second
22  sentence of that paragraph under Basis for
23  Qualified Opinion, they say:  We were unable to
24  obtain sufficient appropriate audit evidence for
25  the carrying amount and classification of the

**101**

1 Group's Investment in SeaOne Holdings, LLC as at
2 December 31st, 2016.
3      And then I'm not going to read the rest of
4 the sentence, which is very lengthy.
5      Do you know what Sentinel's investment was
6 in SeaOne Holdings?
7      MS. SMITH: Objection, form.
8    A   I don't remember the exact amount.
9 **BY MS. TOMKOWIAK:**
10    Q   Do you know what SeaOne Holdings is?
11    A   It's a liquid natural gas company.
12    Q   In the United States?
13    A   Yes.
14    Q   Do you know why Sentinel invested in a
15 liquid natural gas company in the United States?
16      MS. SMITH: Objection, form.
17    A   I don't recall -- I don't recall the
18 reasoning. I know nothing -- I know next to
19 nothing about the company, so I don't know.
20 **BY MS. TOMKOWIAK:**
21    Q   Did you have any involvement in that
22 investment?
23    A   I did, insofar as connecting the company
24 with Sentinel and essentially facilitating the
25 investment. So I'd largely considered clerical,

**102**

1 connecting the -- I guess the CFO of SeaOne with
2 the directors of Sentinel and then essentially
3 closing -- consummating the investment.
4    Q   Who are the directors at Sentinel that
5 you're referring to at this time?
6    A   When was this? At the time of SeaOne --
7    Q   Uh-huh.
8    A   -- investment?
9    Q   Yeah.
10    A   I want to say one gentleman was Andrew
11 Dean and then Christopher Watkins -- Andrew Dean
12 and then there was a second one, but I'm fuzzy on
13 the name.
14    Q   To the best of your recollection, does
15 Sentinel still have this investment in SeaOne
16 Holdings?
17    A   I don't know.
18    Q   Do you know if this company still exists?
19      MS. SMITH: Objection, form.
20    A   I do believe it still exists.
21 **BY MS. TOMKOWIAK:**
22    Q   Same question for the CLOs that we looked
23 at before, do you know whether Sentinel still has
24 that investment in those CLOs?
25      MS. SMITH: Objection, form.

**103**

1    A   I can't be certain. I don't know.
2 **BY MS. TOMKOWIAK:**
3    Q   At the time you left Highland, did
4 Sentinel still have an investment in those CLOs?
5      MS. SMITH: Objection, form.
6    A   I had not reviewed financials or an
7 investment portfolio on Sentinel in quite some
8 time. So I don't want to represent to that time.
9 I know at one point they did. I can't -- I don't
10 want to speak to more current times.
11      MS. TOMKOWIAK: I have some more questions
12 about this document, but we need to switch out the
13 videotape, so we can -- let's take a short break
14 to do that.
15      THE VIDEOGRAPHER: This ends disk 1. The
16 time is 11:45 a.m. We are off the record.
17      (Recess taken from 11:45 a.m. CDT to
18 11:57 a.m. CDT)
19      THE VIDEOGRAPHER: Here begins disk No. 2
20 in the videotaped deposition of Jean Paul Sevilla.
21 The time is 11:57 a.m. We are back on the record.
22      MS. TOMKOWIAK: Before we get back to the
23 questioning, I wanted to do just two housekeeping
24 things on the record. One, I just wanted to note
25 that Mr. Feinstein has a copy of these exhibits so

**104**

1 that when he -- he's been provided with a copy of
2 them so that when he's making these privilege
3 determinations, he is doing so with a copy of the
4 document, in case that wasn't --
5      MR. FEINSTEIN: I can confirm that.
6      MS. TOMKOWIAK: In case that wasn't clear,
7 for the record. And then second, with respect to
8 Exhibit 26, we did want to note that there are two
9 black boxes on that document and that is because
10 we redacted Mr. Ellington and Mr. Dondero's Social
11 Security numbers. So you asked if that was
12 exactly how it was -- you know, if that attachment
13 was exactly what was attached to the e-mail. So
14 with that caveat that we redacted for their
15 confidential information. Yes.
16      MS. SMITH: Okay.
17 BY MS. TOMKOWIAK:
18    Q   So, Mr. Sevilla, one quick question about
19 SAS. When you -- if somebody called SAS, did that
20 call go to the Cayman Islands or was it routed to
21 Highland's office in Texas?
22      MS. SMITH: Objection, form.
23    A   I don't know.
24 **BY MS. TOMKOWIAK:**
25    Q   You don't remember?

105

1     A  I don't remember.
2     Q  Okay.  Did you ever answer the phone on
3  behalf of SAS?
4        MS. SMITH:  Objection, form.
5     A  I did not.
6  BY MS. TOMKOWIAK:
7     Q  Do you know who did?
8     A  I do not.
9     Q  If you look at -- if you turn to page 2230
10  of this document, it's page 7 but Bates-numbered
11  2230.  At the bottom of the page it says there's a
12  supplemental noncash disclosure.  Well, I think
13  disclosure is spelled wrong, but it should say
14  disclosure, and then it says settlement of demand
15  note with dividend.  Do you know what that's
16  referring to?
17     A  No, I don't.
18     Q  If you look at the next page that's ending
19  in 2231.
20     A  Okay.
21     Q  This first paragraph is providing a little
22  bit of background information about Sentinel and
23  it says in the second paragraph that the company
24  provides directors and officers (D&O) coverage to
25  SAS Asset Recovery structure and its subsidiaries

106

1  (SAS).
2        Is that consistent with the understanding
3  that you articulated earlier in your testimony?
4     A  Yes.  Yes.
5     Q  And then it says that effective March 1st,
6  2015, limits of D&O coverage were US5 million per
7  occurrence.  Do you see that?
8     A  Yes.
9     Q  Is that consistent with your recollection
10  of the types of policies and coverage that
11  Sentinel provided to the SAS entities?
12     A  Generally, yes.
13     Q  And again, to the best of your knowledge,
14  SAS -- I'm sorry, Sentinel did not provide
15  coverage to any entities outside of the SAS
16  structure?
17        MS. SMITH:  Objection, form.
18     A  I'm not -- I don't recall exactly.  By SAS
19  structure, you mean?  I know there were universal
20  policies.  I don't know exactly which entities
21  were covered, so I don't want to...
22  BY MS. TOMKOWIAK:
23     Q  Okay.  Yeah, when I say SAS Asset Recovery
24  structure, I was just reading from here.  Again,
25  to the best of your knowledge, you don't know if

107

1  there were policies that were provided outside of
2  that structure?
3     A  I don't recall exactly.
4     Q  And if you look at page 13, which is Bates
5  ending in 2236, Note 5 is titled Related Party
6  Transactions.  And it says:  As outlined in
7  Note 1, the Group issues insurance coverage to
8  policyholders under common ownership and therefore
9  all insurance-related transactions are with
10  related parties.
11        Do you agree with that?
12        MS. SMITH:  Objection, form.
13     A  I agree that's what it says.
14  BY MS. TOMKOWIAK:
15     Q  Well, do you agree that Sentinel issued
16  coverage to policy owners under common ownership?
17        MS. SMITH:  Objection, form.
18     A  I don't want to opine on what common
19  ownership means in Cayman, so I'll leave it as to
20  what it says.  I don't have any further knowledge.
21  BY MS. TOMKOWIAK:
22     Q  So you don't know one way or the other if
23  Sentinel's insurance-related transactions with SAS
24  Asset Recovery were with related parties?
25     A  I think, based on this, it's the position

108

1  that the auditor took.
2     Q  Okay.  Who would be most knowledgeable
3  about Sentinel's financials?
4        MS. SMITH:  Objection, form.
5     A  Its auditors.
6  BY MS. TOMKOWIAK:
7     Q  Its auditors?
8     A  I would think so.
9     Q  So those would be the folks at Crowe
10  Horwath?
11     A  I don't know who -- what firm Sentinel
12  uses today.  It appears this was issued by that
13  firm, Crowe.
14     Q  Okay.  I'm going to hand you what we are
15  going to mark as Exhibit 53, I believe.
16        (Deposition Exhibit 53 marked for
17  identification.)
18  BY MS. TOMKOWIAK:
19     Q  Let me know when you're ready.
20        (Witness reviews document.)
21     A  Okay.
22  BY MS. TOMKOWIAK:
23     Q  Okay.  So this is an e-mail from -- the
24  top of the e-mail chain is an e-mail from
25  Mr. Leventon to Mr. DiOrio with a copy to you and

---

**109**

1  Ms. Irving. He's forwarding a legal rep letter
2  and the subject is FW: Sentinel Re - Legal Rep.
3  If you look a couple of e-mails down, Mr. Kemp
4  sends an e-mail to Mr. Leventon and he says: I'm
5  the auditor working on the Sentinel Re engagement
6  for the year ended December of 2018, and then he
7  asks for an update as to any actions that occurred
8  during 2018 and asked when do you believe the
9  issues will be wrapped up by the courts.
10      Do you believe that Mr. Kemp is referring
11 to the UBS litigation?
12  **A  I don't know.**
13  Q  Okay. At this point in time, Sentinel had
14 already issued the ATE policy that covered the UBS
15 litigation that we briefly spoke about earlier; is
16 that right?
17  **A  At which -- sorry, at which point?**
18  Q  In May 24, 2019.
19  **A  Yes.**
20  Q  Okay. And at this point in time, UBS --
21 are you aware that the trial between UBS and
22 Highland had occurred?
23      MS. SMITH: Objection, form.
24  **A  I was not.**
25

---

**110**

1  BY MS. TOMKOWIAK:
2  Q  Okay. Were you involved in that trial at
3  all?
4  **A  No.**
5  Q  And then Mr. Kemp sends Mr. Leventon
6  another e-mail about a year later, June 16th,
7  2020, again, trying to wrap up the audit and
8  asking for a brief update on what happened during
9  that year. Are you aware that at this time -- by
10 this time UBS had obtained a $1.2 billion judgment
11 against Highland?
12      MS. SMITH: Objection, form.
13  **A  I don't remember the exact timing of when**
14 **that happened, but I have a general recollection**
15 **that it happened.**
16 BY MS. TOMKOWIAK:
17  Q  And I should be more precise. It was
18 actually a judgment against certain of Highland's
19 funds, but with that -- with that --
20  **A  Again, I don't have specific knowledge**
21 **about what was awarded to whom or the exact**
22 **timing. I have a general recollection that there**
23 **was a verdict of some sort.**
24  Q  Okay. Do you know whether Sentinel's
25 auditors were provided information regarding that

---

**111**

1  judgment?
2  **A  I don't.**
3  Q  Okay. Who would be the primary persons in
4  charge of providing the auditors with the
5  information that they would request about
6  Sentinel?
7      MS. SMITH: Objection, form.
8  **A  Sorry, say -- who would provide the**
9  **auditors information requested about Sentinel?**
10 BY MS. TOMKOWIAK:
11  Q  Yes.
12  **A  I don't know. I mean, the -- I don't**
13 **know. The directors I assume would manage**
14 **information flow. I don't know who would answer**
15 **what or what you -- exactly you're referring to,**
16 **as far as updates or information and it's pretty**
17 **broad.**
18  Q  Sure. I mean, like we looked at an
19 exhibit earlier where the auditor said that they
20 were unable to obtain sufficient information, and
21 now we have an e-mail that's being sent to
22 Mr. Leventon asking for information regarding the
23 Sentinel audit.
24      So my question is, who, if you know, would
25 be the persons responsible for responding to those

---

**112**

1  types of inquiries from Sentinel's auditors?
2      MS. SMITH: Objection, form.
3  **A  Depends when you're asking temporally. I**
4  **don't have personal knowledge of, for example,**
5  **this time frame. I don't know what the**
6  **information flow would have been.**
7  BY MS. TOMKOWIAK:
8  Q  And is that true in 2017 as well?
9  **A  I had been asked in 2017 for information**
10 **and so I would have answered questions to the**
11 **extent they were posed to me, which they were a**
12 **few times, but I don't know the entire universe of**
13 **who was providing what.**
14  Q  So who posed questions to you in 2017?
15      MS. SMITH: Objection, form.
16  **A  And I'm sorry, let's narrow this. When**
17 **you say information, we're referring to what?**
18 **What are you referring to?**
19 BY MS. TOMKOWIAK:
20  Q  Information relevant to the audit of
21 Sentinel.
22  **A  I recall being asked by the administrator.**
23  Q  Who was the administrator?
24  **A  Beecher Carlson Cayman.**
25  Q  So Beecher Carlson was the administrator

---

113

1  of Sentinel; is that what you're saying?
2      A  Yes.
3      Q  And you recall that they would reach out
4  to you with questions relating to the audit of
5  Sentinel?
6      A  They had in the past.
7      Q  In what time frame?
8      A  Over the course of 2012 through -- I mean,
9  at different times, but starting in 2012.
10     Q  Through approximately when?
11     A  '17 I would say.
12     Q  Do you know why they stopped reaching out
13  to you for questions after 2017?
14     A  I don't.  I don't.
15     Q  Did your role change?
16        MS. SMITH:  Objection, form.
17     A  My role with respect to what?
18  BY MS. TOMKOWIAK:
19     Q  To your duties at Highland.  Did anything
20  about your role change such that you would no
21  longer be the person who would provide them with
22  that information that they requested from you?
23     A  I mean, I ended up working on a range of
24  matters over my time at Highland, so I don't know
25  if my role would have changed.  I just know that

---

114

1  the questions stopped -- I stopped receiving the
2  questions.  Yeah.
3      Q  What types of questions did they ask?
4      A  I recall that there had been questions about --
5  for example, in 2013 or '14, there had been
6  questions about distributions from CLOs and so I
7  would connect them with the indentured trustee,
8  for example.  That sort of connecting information
9  flow.
10     Q  Distributions from CLOs to Sentinel?
11     A  Uh-huh.  Yes.
12     Q  The CLOs that we looked at earlier or
13  different CLOs?
14        MS. SMITH:  Objection, form.
15     A  I don't remember which exact ones.  I just
16  remember that as an example of being asked a
17  question at Highland with respect to Sentinel.
18  BY MS. TOMKOWIAK:
19     Q  Grayson or Greenbriar?
20     A  Could have been any of those.
21     Q  Do you know why Mr. Leventon is forwarding
22  this to you?
23     A  I don't.
24     Q  In the first -- in the June 16th e-mail,
25  Mr. Kemp references an actuary who has provided

---

115

1  the following table with the likely outcomes of
2  the case.
3      Q  Do you see that sentence?
4      A  Yes.
5      Q  Do you know who the actuary is?
6      A  I don't recall.
7      Q  And by the case, looking at this chart,
8  does this look like it refers to the UBS matter?
9      A  I don't want to speculate.
10     Q  Is there any other -- any other litigation
11  that Highland had going on at the time related to
12  synthetic warehouse losses?
13     A  I have no personal knowledge.  I don't
14  want to -- I don't know.
15     Q  And in the column that says expected
16  payout, do you know, payout, from whom is that
17  referring to; do you know?
18        MS. SMITH:  Objection, form.
19     A  I'm sorry, I'm not -- where is that?
20  BY MS. TOMKOWIAK:
21     Q  Sure.  In the chart there's -- the header
22  is Outcome Probability and then Expected Payout is
23  the last column.
24     A  Oh, no, I -- no, I don't know.
25     Q  And when Mr. Kemp says to Mr. Leventon in

---

116

1  that second sentence there -- or the sentence
2  after point 2, per their report, you have agreed
3  that these estimates are reasonable.
4      Q  Do you know if that's referring to anybody
5  besides Mr. Leventon?
6      A  I don't have personal knowledge of the
7  e-mail.  I don't know.
8      Q  You don't recall today, as we sit here
9  today, getting a copy of this e-mail in June of
10  last year?
11     A  I'm just not agreeing or disagreeing with
12  what Kemp tells -- Kemp says in this e-mail.
13     Q  Did you -- do you recall agreeing at the
14  time that any of these estimates were reasonable?
15        MS. SMITH:  Objection, form.
16     A  I don't recall that.  I was never asked
17  any of that.
18  BY MS. TOMKOWIAK:
19     Q  And just to be clear, because I'm not sure
20  that it is clear, do you recall receiving this in
21  June of 2020?
22     A  I'm CC'd on a lot of e-mails.  I don't --
23  I believe I got it.  I don't recall exactly
24  getting it.
25     Q  Do you recall that during this time

117

1  period, any analysis of the likely outcomes of the
2  UBS matter in June of 2020?
3      MS. SMITH:  Objection, form.
4  **A  I have no personal knowledge or**
5  **recollection of that.**
6  **BY MS. TOMKOWIAK:**
7      Q  Did you have any role in preparing legal
8  rep letters?
9      MS. SMITH:  Objection, form.
10  **A  No.**
11  **BY MS. TOMKOWIAK:**
12     Q  Do you know what a legal rep letter is?
13  **A  Generally.**
14     Q  And with respect to Sentinel, did you have
15  any role preparing legal rep letters?
16  **A  Not that I recall.**
17     Q  After 2016 who -- who would have
18  Sentinel's financial statements and audits for
19  2017 through the present?
20     MS. SMITH:  Objection, form.
21  **A  I don't know.  Sentinel.**
22  **BY MS. TOMKOWIAK:**
23     Q  Meaning its directors?
24  **A  I don't know.**
25     Q  You can set that aside.  Okay.  Let's talk

118

1  about the ATE policy that Sentinel issued in
2  connection with the UBS litigation.  What role did
3  you have in procuring that policy?
4  **A  In procuring the policy?**
5     Q  Yeah.
6  **A  I worked with outside counsel.  I had a**
7  **general understanding of what the goal was.  I**
8  **worked with outside counsel, the administrator,**
9  **the board -- the directors, Highland personnel, in**
10  **connection with that being put into place.**
11     Q  Who's outside counsel?
12  **A  Solomon Harris.**
13     Q  Anyone else?
14  **A  Not that I recall.**
15     Q  Who is the administrator?  Is that Beecher
16  Carlson?
17  **A  Beecher Carlson Cayman.**
18     Q  The directors, do you mean the directors
19  of Sentinel?
20  **A  Yes.**
21     Q  And then who were they in August of 2017,
22  if you recall?
23  **A  Again, the name I remember is Andrew Dean.**
24  **I don't remember the other person's name.**
25     Q  Christopher Watler?

119

1  **A  Christopher Watler.**
2     Q  And then you also mentioned Highland
3  personnel.  Who from Highland worked on the
4  Sentinel UBS policy?
5      MS. SMITH:  Objection, form.
6  **A  I don't -- I don't want to speak to -- I**
7  **don't know the entire universe.  I recall working**
8  **with the compliance team, the accounting team.**
9  **Maples and Calder also was outside counsel that**
10  **worked on the matter.  The accounting team,**
11  **trading and settlement team, I believe the tax**
12  **team.**
13  **BY MS. TOMKOWIAK:**
14     Q  Let's take those in turn.  So who's on the
15  compliance team that you recall working on the UBS
16  policy with?
17      MS. SMITH:  Objection, form.
18  **A  Mr. Surgent was the chief compliance**
19  **officer.  I don't know who else he may have worked**
20  **with, but I recall working with him on sort of**
21  **compliance approval.**
22  **BY MS. TOMKOWIAK:**
23     Q  Compliance approval generally or
24  compliance approval of the -- what I'll refer to
25  today as the UBS policy?  Do you understand what I

120

1  mean by that?
2  **A  I don't know the distinction you're trying**
3  **to draw.**
4     Q  With the policy or with respect to
5  approval?  Let's back up.
6  **A  Sorry.**
7     Q  That's okay.  That's all right.  So you
8  said that Mr. Surgent was the chief compliance
9  officer, right?
10  **A  Yes.**
11     Q  And you recall working with him on sort of
12  compliance approval?
13  **A  Oh, okay.  Yeah.**
14     Q  Were you referring to compliance approvals
15  in general or were you referring to compliance
16  approval of the Sentinel policy that was issued in
17  connection with the UBS matter?
18  **A  Compliance approval of the transaction in**
19  **the Sentinel policy.**
20     Q  So you recall that Mr. Surgent approved
21  that?
22  **A  Yes.**
23     Q  Did he do that orally?  Did he do that in
24  writing?  Do you recall how he approved that?
25  **A  I believe both ways.**

121

1    Q   Did he do that to you personally or was
2    that just your understanding?
3        MS. SMITH:  Objection, form.
4    A   I remember personally being in a meeting
5    where he approved of the transaction.
6    BY MS. TOMKOWIAK:
7    Q   And when you say the transaction, what do
8    you mean by that?
9    A   The UBS ATE policy.
10   Q   Tell me everything you remember about that
11   meeting.
12       MS. SMITH:  Objection, form.
13   A   I believe Mr. Ellington was present.  I
14   believe --
15       MS. SMITH:  Before you answer anything,
16   this sounds like it's going to go into an area
17   that might be privileged, so I want to make sure
18   that Mr. Feinstein is fine with this line of
19   questioning and waives the privilege on behalf of
20   the debtor.
21       MR. FEINSTEIN:  To the extent that the
22   privilege may apply to these conversations, we
23   would not assert.
24   A   Yeah, I believe Mr. Ellington was present,
25   representatives from the accounting and tax -- or

122

1    accounting team, excuse me.
2    BY MS. TOMKOWIAK:
3    Q   Who was that?
4    A   I don't recall exactly.  Mr. Stoops, plus
5    another individual, I believe.  I was present.
6    And I don't recall if there was an additional
7    person from the compliance team.  There may have
8    been, but I don't recall specifically.
9    Q   Anybody from the tax team?
10   A   Not that I recall.
11   Q   Was Rick Swadley there?
12   A   Not that I recall.
13   Q   Okay.  So to the best of your
14   recollection, the people in the room were
15   Mr. Surgent, Mr. Ellington, Mr. Stoops, you, one
16   other individual who worked with Mr. Stoops and
17   possibly one other individual who worked with
18   Mr. Surgent; is that right?
19       MS. SMITH:  Objection, form.
20   A   I believe that's right.
21   BY MS. TOMKOWIAK:
22   Q   Where did this meeting take place?
23   A   In the -- at Highland offices in the Bois
24   d'Arc conference room.
25   Q   Where is the Bois d'Arc conference room?

123

1    A   Where, in the Highland offices?
2    Q   Yeah.
3    A   Do you know the Highland offices?
4    Q   I don't.  That's why I'm asking.
5    A   In the Highland offices.  It's one of the
6    larger conference rooms at Highland.
7    Q   How many floors does Highland have on --
8    A   Just one.
9    Q   Just one?
10   A   Yeah.
11   Q   Okay.  So it's one of the main conference
12   rooms --
13   A   That's right.
14   Q   -- on Highland's only floor?
15   A   That's correct.
16       MS. TOMKOWIAK:  Apologies.  Sorry.
17   BY MS. TOMKOWIAK:
18   Q   So this meeting took place in the
19   Bois d'Arc conference room.  Whose office was that
20   conference room near?
21   A   I think the closest office would have been
22   Mr. Surgent's.
23   Q   Okay.  Was Mr. Ellington next door?
24   A   Mr. Ellington --
25       MS. SMITH:  Objection, form.

124

1    A   Mr. Ellington's office is next door to
2    Mr. Surgent's.
3    BY MS. TOMKOWIAK:
4    Q   What about Mr. Stoops?  Where did he sit
5    at the time in relation to that conference room?
6    A   Farther away.  On kind of a different wing
7    of the building, let's call it.
8    Q   Do you recall when this meeting took
9    place?
10   A   I don't recall the exact date.
11   Q   Are you able to estimate it as it relates
12   to the date of the insurance policy?
13   A   I would estimate July of 2017.
14   Q   Do you recall what day of the week this
15   was?
16   A   I don't.
17   Q   Do you recall approximately what time this
18   meeting took place?
19   A   I don't.
20   Q   Do you recall if it was in the morning?
21   A   I don't.  I don't recall the time of day.
22   Q   Do you recall approximately how long it
23   lasted?
24   A   I recall it being somewhat involved and
25   then spilling over into Mr. Surgent's office

---

**125**

1 afterwards, directly, where Mr. Ellington and I
2 sat with Mr. Surgent. I think -- no less than
3 one hour, I think, in total.
4    Q  So just to be clear, no less than one hour
5 meeting in the conference room?
6    A  Correct.
7    Q  And then you said it spilled over to
8 Mr. Surgent's office. And in that meeting is it
9 your recollection that that was only you,
10 Mr. Ellington and Mr. Surgent?
11    A  That's my recollection.
12    Q  And do you recall how long you met with
13 those other -- two other individuals?
14    A  I don't.
15    Q  More than an hour?
16    A  I don't recall.
17    Q  Who organized this meeting?
18    A  I don't recall who set the -- who set the
19 meeting.
20    Q  Did you?
21    A  It's possible.
22    Q  Do you recall how you did that? Was that
23 by e-mail? Did you go around to people's offices
24 and just say, hey, can we have a meeting?
25       MS. SMITH: Objection, form.

---

**126**

1    A  I don't recall exactly how it came
2 together. It could have been an admin sending
3 around a calendar. I don't recall.
4 BY MS. TOMKOWIAK:
5    Q  Who decided who to invite to the meeting?
6    A  I don't recall. I don't recall, but the
7 meeting focused on the compliance component of it,
8 so by definition, the sort of compliance
9 department needed to be there. I don't recall --
10 again, I don't recall who set the meeting. I just
11 recall it happening.
12    Q  What was the purpose of the meeting?
13    A  To ensure that there were no compliance
14 issues related to the policy, to make sure there
15 was approval, necessary compliance approval,
16 concerning the policy, the transaction.
17    Q  Was this meeting the first time that you
18 learned of the ATE policy?
19    A  No.
20    Q  When did you first hear about that?
21    A  I don't recall the exact date, but prior
22 to that.
23    Q  Do you have an estimate? A couple days
24 before that? Weeks before that?
25    A  I would say -- I would say several days or

---

**127**

1 potentially weeks, but I don't recall exactly how
2 much in advance I learned about it.
3    Q  Who told you about it?
4    A  About?
5    Q  The policy.
6    A  Mr. Ellington.
7    Q  Anybody else?
8    A  No.
9    Q  And I want to come back to that. As to
10 the other people in the room, was everybody else
11 in the room aware of the policy and the
12 transaction underlying the policy prior to this
13 meeting?
14       MS. SMITH: Objection, form.
15    A  I don't know what anyone else knew at any
16 given moment. I knew I had previous knowledge of
17 it.
18 BY MS. TOMKOWIAK:
19    Q  So based on what happened in the meeting,
20 you didn't learn one way or the other if this was
21 anybody else's first time hearing about that?
22    A  I don't recall remembering -- I don't
23 remember that being the case.
24    Q  And you said that you learned about it
25 from Mr. Ellington. Was that in a -- well, how

---

**128**

1 did you learn about it from Mr. Ellington?
2    A  I believe he was in the office and he came
3 by my desk.
4    Q  Again, days or weeks prior to this
5 meeting?
6    A  Yes. I don't -- I mean, it could have
7 been weeks. I don't recall exactly the gap in
8 time, let's call it.
9    Q  But it was -- you recall that it was an
10 oral conversation?
11    A  It was.
12    Q  Was anybody else present?
13    A  Not that I remember.
14    Q  Do you recall how long that conversation
15 lasted?
16    A  Twenty, 30 minutes.
17    Q  What did Mr. Ellington say?
18    A  He just made me aware that the intention
19 was to create an ATE policy, an after-the-event
20 policy relating to the UBS case and that Sentinel
21 would be the insurance company.
22    Q  Okay. And when you say with respect to
23 the UBS case, do you mean that the intention was
24 to create an insurance policy that would cover
25 Highland's liability to UBS in connection with the

---

---

**129**

1  litigation in the New York State court?
2      MS. SMITH:  This is getting into an area
3  that may be privileged.  Again, I just want to
4  make sure that Mr. Feinstein and the debtor is not
5  objecting to this or the debtor's going to waive
6  the privilege as to this.
7      MR. FEINSTEIN:  You keep speaking in terms
8  of waiver, and I guess maybe we're talking past
9  one another.  With respect to many of these
10  conversations, it's more than arguable that the
11  privilege doesn't apply.  And I'm sure you're well
12  aware of the exceptions to the attorney-client
13  privilege.  So if you hear me object, you can
14  assume that I have a problem with the question
15  being asked.  If I don't object, I would suggest
16  that you let counsel continue with the deposition.
17  BY MS. TOMKOWIAK:
18   Q  Do you want me to repeat my question?
19   A  Sure, please.
20   Q  Do you mean that the intention was to
21  create an insurance policy that would cover
22  Highland's liability to UBS in connection with the
23  litigation in state court?
24   A  That wasn't -- that overarching strategy
25  or end that you're describing was not part of a

---

**130**

1  conversation that I had with Mr. Ellington.
2   Q  So I don't understand.  What was the
3  purpose?  What did Mr. Ellington tell you was the
4  purpose of getting an insurance policy?
5   A  That the intention of the policy would be
6  to essentially have Sentinel issue a policy to
7  insure the defendants in the UBS case.
8   Q  To insure the defendants in the UBS case
9  against losses that they incurred in connection
10  with the UBS case, right?
11      MS. SMITH:  Objection, form.
12   A  Insure defendants in the UBS case related
13  to the litigation.  I didn't -- again, the
14  overarching strategy or the -- we didn't get into
15  that.  That's not something we discussed or I
16  asked about.
17  BY MS. TOMKOWIAK:
18   Q  Did you ask whether there was a pending
19  settlement on the horizon of the UBS case?
20   A  I did not.
21   Q  Did you know whether there was?
22   A  No, I did not know.  I do not know.
23   Q  Was it your understanding that the policy
24  was intended to cover any other matter other than
25  the UBS litigation?

---

**131**

1   A  I don't recall hearing that.  No, I don't
2  think that's the case.  I believe it was just
3  related to the UBS action.
4   Q  Had Sentinel ever issued an
5  after-the-event policy before?
6   A  No.
7   Q  So this was the first?
8   A  This was the first.
9   Q  Going back to the meeting.  So you said
10  that it occurred -- I'm sorry, you said that it
11  lasted just over an hour?
12   A  Again, rough estimate.  I remember --
13      MS. SMITH:  Objection, form.  Which
14  meeting are we on now?
15  BY MS. TOMKOWIAK:
16   Q  The meeting that you estimated occurred in
17  July 2017 in the Bois d'Arc conference room.
18   A  I remember it being a lengthy meeting.  I
19  don't recall the exact time.
20   Q  What happened during the meeting?
21   A  The policy was discussed, the -- sort of
22  the compliance component included whether -- or
23  compliance approval of a -- of a transaction of a
24  policy that was being written by an insurance
25  company in which Mr. Dondero and Ellington had an

---

**132**

1  interest, whether the policy was acceptable from a
2  compliance perspective, things of that nature.
3   Q  So what is the compliance component of
4  that transaction?
5   A  Again, I -- well, I think the compliance
6  component largely turned on whether Sentinel was
7  some sort of affiliate or related party and
8  whether there was a conflict of interest and
9  whether from -- and again, I don't know the entire
10  regulatory framework applicable.  I don't want to
11  say -- represent that I was in the compliance --
12  on the compliance team, but the acceptability and
13  the -- whether there were any compliance issues
14  related to the policy being put into place.
15   Q  Related to this being a related party
16  transaction?
17   A  Potential --
18      MS. SMITH:  Objection, form.
19   A  Potentially.  That was one of the
20  questions.
21  BY MS. TOMKOWIAK:
22   Q  Well, was that question answered during
23  the meeting?
24   A  I believe so.
25   Q  And what was the answer?

---

133

1    A    That Sentinel was not an affiliate under
2    common control with Highland.
3        Q    Who reached that conclusion?
4    A    I believe Mr. Surgent did.
5        Q    Anybody else?
6    A    I don't recall.
7        Q    And to the best of your recollection,
8    was -- well, start with -- Mr. Surgent aware
9    that -- aware of Mr. Dondero and Mr. Ellington's,
10   I'll say relationship to Sentinel?
11       MS. SMITH:  Objection, form.
12   A    I believe so.
13   BY MS. TOMKOWIAK:
14       Q    To the best of your recollection, was
15   everybody in the room aware of that fact?
16       MS. SMITH:  Objection, form.
17   A    I believe so.
18   BY MS. TOMKOWIAK:
19       Q    You say that's what you were discussing,
20   so if everybody was in the room, they would have
21   heard that discussion, right?
22   A    Yes, I think that's correct.
23       Q    Why was Mr. Stoops in the room?
24   A    My recollection is he -- he could speak to
25   the, sort of trading and settlement component to

134

1    the assets being transferred to Sentinel in
2    connection with the policy.  And I think he had --
3    he was the person who had the most accounting
4    knowledge and background on some of these
5    defendant entities.
6        Q    Did you ask Mr. Stoops to do anything
7    during that meeting?
8    A    I don't recall.  I don't think so.
9        Q    You mentioned earlier that -- when we were
10   talking about Highland personnel, you talked about
11   Mr. Surgent, you talked about accounting, you
12   talked about trading and settlement and tax.
13   Outside of the individuals that we have discussed
14   were at this meeting, who else falls within that
15   group of people that you worked on with respect to
16   this policy?
17       MS. SMITH:  Objection, form.
18   A    I don't understand the question.  Can
19   you --
20   BY MS. TOMKOWIAK:
21       Q    Sure.  Let me just break it down.  So who
22   did you work on it from the compliance group
23   besides Mr. Surgent?
24       MS. SMITH:  Objection, form.
25

135

1    BY MS. TOMKOWIAK:
2        Q    As it relates to this -- let me just be
3    clear.  As it relates to this insurance policy and
4    transaction.
5    A    In July 2017 -- July, August 2017 time
6    frame.
7        Q    July, August 2017?
8    A    Ms. Thedford, Lauren Thedford.  I believe
9    that's it.
10       Q    Okay.  And then the same question with
11   respect to accounting.  Who did you work on in
12   accounting -- who did you work with in accounting
13   related to this policy and transaction?
14   A    Mr. Stoops.  A gentleman named Carter
15   Chism.  He was more on the trading and settlement
16   side, but I sort of consider that part of the
17   accounting function.
18       Q    And anybody else?
19   A    Those are the two I recall.  Possibly
20   others, but I'm not remembering exactly.
21       Q    Anybody else from the trading settlement
22   group?
23   A    I'm forgetting some of the gentlemen's
24   names, but, yes, others.  There was a gentleman on
25   the retail side.  Mr. Fuentes, I believe,

136

1    addressed some settlement questions.  I believe
2    that's it.
3        Q    Who did you work with on this policy and
4    transaction from the tax group?
5    A    Mr. Swadley and Mr. Patrick.
6        Q    Anybody else?
7    A    Not that I recall.
8        Q    Okay.  And then you said that in this
9    meeting in the conference room, that a conclusion
10   was reached with respect to whether this was a
11   conflict of interest; is that fair?
12   A    Whether there was compliance approval.
13       Q    Well, let me back up.
14       So I think you said that there was a
15   question about whether or not doing this
16   particular type of transaction with Sentinel,
17   because of Mr. Ellington and Mr. Dondero,
18   presented some type of -- I don't want to put
19   words in your mouth, but I think you said a
20   conflict of interest; is that right?
21   A    That was one of the issues I think that
22   required compliance review.
23       Q    Okay.  And did they review that during
24   this meeting?
25   A    During that meeting and during subsequent

137

1  meetings, yes.
2     Q   Okay.  And what was the outcome of that
3  review?
4     A   The conclusion was that the ATE policy
5  wasn't an impermissible conflict of interest and
6  there was compliance sort of approval that that
7  was not -- that that was not a problem or that was
8  not an issue that needed to somehow change the
9  policy or the transaction.
10    Q   And who specifically reached that
11 conclusion?
12    A   The compliance team, Mr. Surgent.
13    Q   Anybody else?
14    A   I don't know who he consulted.  I wasn't
15 privy; but as far as I knew, Mr. Surgent approved
16 the transaction.
17    Q   During this meeting, was -- did anybody
18 direct you or anybody else in the room to keep
19 this policy a secret?
20    A   No.
21    Q   Did anybody instruct you or anybody else
22 in the room to keep the transaction a secret?
23    A   No, I don't remember that.
24    Q   Or to keep it confidential or limited to a
25 small group of people in any way?

138

1        MS. SMITH:  Objection, form.
2     A   No.  I never considered it a secret.
3  BY MS. TOMKOWIAK:
4     Q   Do you recall anything else about that
5  meeting?
6     A   Other than the topics I mentioned were
7  covered, there were subsequent meetings.  But from
8  that meeting, no, I remember the compliance
9  approval component is what I remember most.
10    Q   And you also mentioned some discussion
11 about the -- on the assets at the funds?
12    A   Yes.
13    Q   Are there any other topics that you
14 remember being discussed at that meeting?
15    A   Not that I recall.
16    Q   Did you have any experience with ATE
17 policies prior to this?
18    A   I had knowledge of ATE policies because
19 several years before, Sentinel applied to the
20 regulator to write this sort of policy.  And so I
21 recall that process and I recall understanding in
22 general what ATE is.
23    Q   But you said this was Sentinel's first ATE
24 policy, right?
25    A   That's correct.

139

1     Q   So do you recall why Sentinel had applied
2  years earlier to the regulators to write this kind
3  of policy?
4     A   My recollection is that in the UK
5  litigation funding industry, ATE is fairly common
6  and in the SAS, the litigation funding business
7  was encountering situations where this ATE concept
8  was in play.  I believe that's what resulted in
9  Sentinel applying to be able to write this
10 business.
11    Q   Do you recall approximately when Sentinel
12 made that application?
13    A   2015, perhaps.  I don't recall exactly,
14 but that -- I believe it was 2015.
15    Q   Were you involved in that application?
16    A   I was not directly involved.  I had
17 knowledge that it was occurring, but I was not
18 directly involved.
19    Q   Do you know who was directly involved?
20    A   The directors, Beecher Carlson Cayman.  I
21 believe that's it.
22    Q   Do you know whether it was approved?
23        MS. SMITH:  Objection, form.
24    A   I understand that it was approved.
25

140

1  BY MS. TOMKOWIAK:
2     Q   Going back briefly to the meeting and
3  Mr. Surgent's conclusion and approval.  Did he say
4  that directly during the meeting or did you hear
5  that from someone else?
6     A   I heard it directly -- I don't know if
7  there were subsequent meetings where he reiterated
8  that, but I heard that from him during that
9  meeting and the subsequent meeting in his office.
10    Q   And what was discussed at the subsequent
11 meeting in Mr. Ellington's office -- I mean, I'm
12 sorry, you said it was Mr. Surgent's office?
13    A   Mr. Surgent's office.
14    Q   Yeah.  What was discussed at that meeting?
15    A   Specifics about the policy and the
16 documentation.  I think a rehash of what had been
17 discussed in the broader meeting.  But from my
18 perspective, it was all sort of -- it was all the
19 same topics that were being discussed, perhaps in
20 different ways, but it was all the same universe
21 of topics and kind of compliance approval
22 components.
23    Q   Do you know why you met as a smaller group
24 after the larger group meeting?
25    A   I don't recall.  I kind of -- I believe I

141

1  followed Mr. Ellington and Mr. Surgent.

2    Q  So to the best of your recollection, that

3  just sort of happened informally; you guys just

4  walked into Mr. Surgent's office?

5    A  I believe so.

6    Q  Do you know whether the funds who are

7  insured under the policy got quotes from any other

8  insurance companies?

9    A  I don't know.

10    MS. SMITH:  Objection, form.

11    THE WITNESS:  Sorry.

12    A  I don't know.

13  BY MS. TOMKOWIAK:

14    Q  Was that discussed at either of the

15  meetings that you described?

16    A  No.

17    Q  Did you ask whether you should get quotes

18  from other insurance companies?

19    MS. SMITH:  Objection, form.

20    A  I did not ask.

21  BY MS. TOMKOWIAK:

22    Q  And who was going to negotiate this policy

23  on behalf of Sentinel?

24    A  Sentinel had outside counsel drafting the

25  policy and it also had its own directors and

142

1  administrator.

2    Q  So at the time that you had this meeting,

3  to the best of your recollection, was the policy

4  already being drafted?

5    MS. SMITH:  Objection, form.

6    A  Yes.  It had been -- the proposed policy

7  had been drafted by this point.

8  BY MS. TOMKOWIAK:

9    Q  And how had that already happened?

10    A  Again, I had come to learn that the

11  intention was for this policy to be put into

12  place.  Sentinel's outside counsel drafted the

13  proposed policy and that was part and parcel to

14  the meeting as approval of that policy.

15    Q  By outside counsel, do you mean Maples?

16    A  No.  The Solomon Harris firm.

17    Q  So Solomon Harris is the one that drafted

18  the policy?

19    A  Correct.

20    Q  Was Mr. DiOrio in the meeting in

21  Mr. Surgent's office?

22    A  I don't think so.  I don't recall him

23  being in any of those meetings.

24    Q  How about Mr. Leventon?

25    A  I don't think so.  I don't recall.

143

1    Q  Okay.  Ms. Irving?

2    A  I don't recall.

3    MS. TOMKOWIAK:  Why don't we take another

4  break, if it's okay.  Let's go off the record.

5    THE VIDEOGRAPHER:  The time is 12:49 p.m.

6  We are off the record.

7    (Recess taken from 12:49 p.m. CDT to

8  1:39 p.m. CDT)

9    THE VIDEOGRAPHER:  The time is 1:39 p.m.

10  We are back on the record.

11  BY MS. TOMKOWIAK:

12    Q  Mr. Sevilla, before lunch we were talking

13  about a meeting that occurred in the Bois d'Arc

14  conference room that you believe occurred around

15  July 2017.  Do you remember that?

16    A  Yes.

17    Q  And you testified that you recall

18  Mr. Ellington was in the room, Mr. Stoops was in

19  the room, Mr. Surgent was in the room, you were in

20  the room and then you believed that there might

21  have been one other person with Mr. Stoops and one

22  other person with Mr. Surgent in the room; is that

23  right?

24    A  Yes.

25    Q  And you don't have any recollection of who

144

1  those other two individuals were?

2    A  Yeah, it's a vague recollection and I

3  don't remember who.  And it -- I may be mistaken,

4  but that's sort of my recollection is it was a

5  larger group in that conference room.

6    Q  And you don't recall Mr. Leventon being

7  there?

8    A  I don't.

9    Q  And you don't recall Mr. DiOrio being

10  there?

11    A  I do not.

12    Q  You don't recall Ms. Irving being there?

13    A  Correct.

14    Q  You don't recall Mr. Dondero being there?

15    A  Correct.

16    Q  When you say you have a vague

17  recollection, does that mean you have a

18  recollection of someone you think was in the room

19  but you don't know if they were in the room?

20    A  Mr. Post, who was on the compliance team,

21  may have been in the room.  I know there were

22  issues that he weighed in on, not necessarily at

23  that meeting, but in -- at different times.  But

24  that's my best recollection of that one meeting

25  you're referencing.

145

1    Q   And you don't recall who was there with
2  Mr. Stoops?
3    A   That's right.
4    Q   Do you recall that there were -- there was
5  definitely somebody else there with Mr. Stoops,
6  you just don't remember who?
7    A   No.  It could be that there wasn't, that
8  it was just Mr. Stoops from the accounting side.
9    Q   So the only four people you know were in
10  the room were yourself, Mr. Leventon, Mr. Surgent,
11  and Mr. Stoops?
12      MS. SMITH:  Objection, form.
13    A   Ellington, Surgent and me, and I believe
14  Mr. Stoops and then it kind of goes foggier with
15  respect to the others.
16      MS. SMITH:  Can we go off just really
17  quick, please?
18      THE VIDEOGRAPHER:  We are off the record
19  at 1:41 p.m.
20      (Recess taken from 1:41 p.m. CDT to
21  1:42 p.m. CDT)
22      THE VIDEOGRAPHER:  1:42 p.m., we're back
23  on the record.
24  BY MS. TOMKOWIAK:
25    Q   Mr. Sevilla, let's clear up the record.

146

1  So the only four people that you know were in that
2  meeting were yourself, Mr. Surgent, Mr. Ellington
3  and Mr. Stoops; is that right?
4    A   Correct.
5    Q   And were there any notes taken at this
6  meeting?
7      MS. SMITH:  Objection, form.
8    A   I don't recall.
9  BY MS. TOMKOWIAK:
10    Q   Did you take any notes?
11    A   I don't recall.
12    Q   Did you see anybody else taking notes?
13    A   I don't recall.
14    Q   Were there any documents reviewed at this
15  meeting?
16    A   Yes.
17      MS. SMITH:  Objection, form.
18      THE WITNESS:  Sorry.
19    A   Yes, the proposed -- the insurance policy,
20  the document, transaction documents.
21  BY MS. TOMKOWIAK:
22    Q   So by insurance policy, do you mean there
23  was a copy of the draft insurance policy in the
24  room?
25    A   Correct.

147

1    Q   And then what do you mean by transaction
2  documents?
3    A   I believe the purchase agreement.
4    Q   Anything else?
5    A   That would have been it.
6    Q   So to the best of your recollection, the
7  two documents that were in the room were the
8  insurance policy draft form and the purchase
9  agreement?
10    A   I think that's right.
11    Q   Was that also in draft form?
12    A   It would have been in draft form, yeah.
13    Q   Do you know who drafted that?
14    A   Outside counsel.  I believe Mr. Stoops
15  would have also had the asset listing, the
16  spreadsheet of assets.
17    Q   Who asked him to bring that?
18    A   I don't know.
19    Q   Did you?
20    A   I don't think so.
21    Q   Did anybody make a presentation at this
22  meeting?
23    A   I don't think it was a presentation, but
24  it -- it was more of a discussion.
25    Q   Who led the discussion?

148

1    A   Mr. Ellington.
2    Q   Who brought the insurance policy to the
3  meeting?
4    A   I did.
5    Q   And did you also bring the purchase
6  agreement?
7    A   Yes.
8    Q   Did you bring any other documents?
9    A   Not that I recall.
10    Q   Did anybody else bring any other
11  documents?
12    A   Not that I recall.
13    Q   Were there any reports that were written
14  about this meeting afterwards?
15    A   Not that I have knowledge of.
16    Q   Were there any reports written about any
17  of the conclusions that were reached at this
18  meeting?
19    A   Not that I know of.
20    Q   Was it specifically discussed at this
21  meeting that Mr. Dondero owned 70 percent of
22  Sentinel?
23      MS. SMITH:  Objection, form.
24    A   Ownership was discussed.  I don't know if
25  it was on a percentage basis to the exact number

149

1 that you're referencing.
2 BY MS. TOMKOWIAK:
3    Q  But it was specifically discussed that
4 Mr. Dondero owned part of Sentinel?
5       MS. SMITH:  Objection, form.
6    A  Yes.  Yes.
7 BY MS. TOMKOWIAK:
8    Q  Who said that?
9    A  I don't recall exactly who.  Mr. Ellington
10 and myself both would have conveyed that to -- I
11 certainly mentioned it.
12    Q  You mentioned it?
13    A  Yes.
14    Q  Okay.  Did you also mention that
15 Mr. Ellington also owned part of Sentinel?
16       MS. SMITH:  Objection, form.
17    A  I don't know if I mentioned that or not.
18 BY MS. TOMKOWIAK:
19    Q  Did Mr. Ellington mention that?
20    A  I don't know.
21    Q  So you --
22    A  I don't recall.
23    Q  -- don't know if the folks in the room
24 knew that Mr. Ellington owned part of Sentinel?
25       MS. SMITH:  Objection, form.

150

1    A  I don't have direct recollection of that
2 being discussed.
3 BY MS. TOMKOWIAK:
4    Q  You knew it at the time, right?
5    A  Yes.
6    Q  And Mr. Ellington knew it at the time?
7    A  I suppose.  I presume he did.
8    Q  But to the best of your recollection,
9 neither you nor Mr. Ellington mentioned that fact
10 in the room?
11       MS. SMITH:  Objection, form.
12    A  I don't recollect one way or the other
13 that that came up.
14 BY MS. TOMKOWIAK:
15    Q  So then was the discussion of the
16 compliance issues, as you said, around
17 Mr. Dondero's ownership of Sentinel?
18       MS. SMITH:  Objection, form.
19    A  It was a discussion of a broad range of
20 facts and -- about the policy and about Sentinel
21 itself.
22 BY MS. TOMKOWIAK:
23    Q  What about Sentinel itself?
24    A  Its ownership, Mr. Dondero's connection
25 with it, and that's large -- that's largely --

151

1 that's largely what was discussed.  The proposed
2 terms of the policy, the proposed terms of the --
3 you know, proposed terms of the insurance policy
4 and the purchase agreement.
5    Q  Did you think it was not relevant that
6 Mr. Ellington also owned part of Sentinel?
7       MS. SMITH:  Objection, form.
8    A  Again, it may have been discussed.  It's
9 not something I recall, but I think it's -- I do
10 think it's relevant.
11 BY MS. TOMKOWIAK:
12    Q  You do think it's relevant sitting here
13 today?
14    A  I think it's a fact around the ownership
15 of the company.  So if there are questions about
16 the ownership of the company, I think that would
17 be something discussed.  And it very well might --
18 might well have, I just -- what I recall is
19 Dondero's ownership component.
20    Q  Who asked you to bring those documents to
21 the meeting?
22    A  I don't recall.  I don't know if anyone
23 did.
24    Q  And what was the specific question posed
25 to Mr. Surgent during that meeting?

152

1    A  The specific -- I don't think it was one
2 question.  I think it was a number of questions
3 and discussion points.  I don't think there was
4 just one thing.
5    Q  When it came to Sentinel's ownership --
6 when it came to Sentinel's ownership, was there a
7 specific question posed to Mr. Surgent?
8    A  I don't -- I don't remember the meeting in
9 those terms to break it down into one question or
10 another.  It was a meeting that covered a broad
11 variety of topics, including ownership, commercial
12 terms, documentation, et cetera.  So I apologize.
13 I can't break it down the way you're asking me to.
14    Q  You mentioned earlier that there was a
15 discussion of the potential conflict of interest.
16 What was the conflict of interest that was
17 discussed?
18    A  Well, there was an ownership interest on
19 the part of Sentinel, Mr. Dondero's ownership
20 interest on the Sentinel side, and where Highland
21 sat in relation to the insureds and also being a
22 defendant in the case.
23    Q  So was the question whether it was a
24 conflict of interest for these funds to enter into
25 this transaction and insurance policy with

153

1  Sentinel?
2     A   Again, it was a series of discussions and
3  questions around these facts. I can't break it
4  into -- you know, a discrete question set, but it
5  was a comprehensive discussion around all of these
6  salient facts.
7     Q   You testified earlier that there was a
8  conclusion reached around all of those salient
9  facts of the meeting; is that right?
10    A   I think at this meeting and subsequent
11 meetings, certainly.
12    Q   Right.  But when you say that, was there a
13 conclusion reached at this meeting and then that
14 was repeated in subsequent meetings or are you
15 saying there were additional decisions made in
16 subsequent meetings?
17    A   I think there was a conclusion at this
18 meeting that it was -- it was an acceptable
19 transaction from a compliance perspective and that
20 that was reinforced and discussed in subsequent
21 meetings, touching on topics like the actual block
22 and tackle of transferring the assets and the
23 like. So it was a series of meetings, but this
24 was certainly one where approval from a compliance
25 perspective, I think -- I think that was the gist

154

1  of that meeting.
2     Q   So was the conclusion that the transaction
3  was approved from a compliance perspective or was
4  the conclusion that it didn't need to be approved
5  from a compliance perspective?
6        MS. SMITH:  Objection, form.
7     A   I'm not following the distinction.
8  BY MS. TOMKOWIAK:
9     Q   Well, was the conclusion that this is not
10 the type of transaction that compliance needs to
11 review or approve?
12    A   I don't think that's right.
13    Q   Okay.  So was the conclusion that
14 compliance has reviewed and approved this
15 transaction?
16    A   That was my takeaway.
17    Q   Why was that your takeaway?
18    A   Because I believe in form and substance,
19 that -- spirit and substance, that's what was said
20 and discussed at the meeting and in subsequent
21 meetings.
22    Q   And do you know whether that spirit and
23 substance was ever recorded in any other manner?
24    A   Not that I know of.
25    Q   So that oral approval at that meeting

155

1  would have been sufficient from your perspective
2  to move forward with the transaction?
3        MS. SMITH:  Objection, form.
4     A   I don't think it was up to me to move
5  forward with the transaction.  It would have been
6  up to others, but that was my -- certainly my
7  takeaway.
8  BY MS. TOMKOWIAK:
9     Q   Who was it up to to move forward with the
10 transaction?
11    A   Mr. Surgent, Mr. Ellington, Mr. Dondero.
12    Q   Why Mr. Dondero?
13    A   I think as just -- because of his
14 relationship and control of Highland and
15 Highland's relationship to those insureds.
16    Q   Do you know whether that conclusion was
17 ever conveyed to Mr. Dondero?
18    A   Which conclusion?
19    Q   The conclusion that it was an acceptable
20 transaction from a compliance perspective.
21    A   I don't have firsthand -- I did not convey
22 to him, so I don't have firsthand knowledge of
23 that.
24    Q   Okay.  Did Mr. -- well, we'll look at it.
25        What was your role with respect to the

156

1  policy?  What was your specific role?
2     A   I think I provided some interface with
3  outside counsel, with the insurance administrator,
4  with the board.  To the extent there were
5  questions from Sentinel with respect to the assets
6  and in what form they were, whether it was
7  certificated securities or otherwise. So I think
8  I consider the tasks in the nature of interface
9  between all of these different subject matter
10 experts, whether on the Highland side or the
11 Sentinel side.
12    Q   I don't mean to diminish that role, but
13 did you have any substantive responsibilities with
14 respect to the terms of the policy or the terms of
15 the purchase agreement?
16    A   I don't believe I did.  I had -- I didn't
17 have a say in the commercial -- or the -- no, I
18 don't -- I don't think so. I certainly
19 communicated with outside counsel, but I left it
20 to all of them to do their respective jobs.
21    Q   So outside counsel were the ones that were
22 responsible for that?
23        MS. SMITH:  Objection, form.
24 BY MS. TOMKOWIAK:
25    Q   So in your -- from your perspective,

157

1 outside counsel was the one who had the
2 substantive responsibility for negotiating the
3 terms of the policy and the purchase agreement?
4    A  The directors, I would add to that.
5    Q  Okay.
6    A  The administrator or the actuaries, I
7 think they all played their separate parts in
8 putting it together.
9    Q  Do you know who the actuary was?
10   A  I don't remember the name.
11   Q  All right.  I'm going to hand you what we
12 will mark as Exhibit 54.
13       (Deposition Exhibit 54 marked for
14 identification.)
15 BY MS. TOMKOWIAK:
16   Q  Go ahead and take a minute to look at
17 that.  Exhibit 54 is an e-mail with attachments
18 and let me know when you're ready.
19       (Witness reviews document.)
20   A  Okay.
21 BY MS. TOMKOWIAK:
22   Q  Okay.  This is an e-mail from you to
23 Ms. Irving and Ms. Kim, dated August 10th, 2017,
24 subject Sentinel Reinsurance Proposed ATE Policy.
25       Do you see that?

158

1    A  Yes.
2    Q  All right.  And this looks like you are
3 sending to Ms. Irving and Ms. Kim a draft of the
4 insurance policy that we've been discussing and
5 also a draft of the resolutions of the board of
6 directors of Sentinel.  Do you see that second
7 attachment?
8    A  Yes.
9    Q  What is Ms. Kim's role at the time?  What
10 was her role at the time?
11   A  A Paralegal.
12   Q  Why are you sending this to Ms. Irving and
13 Ms. Kim?
14   A  Ms. Irving was assisting with -- assisting
15 with the transaction with closing the -- some of
16 the security transfers.  I'm not sure why I sent
17 it to Ms. Kim.  I don't remember.
18   Q  When did Ms. Irving learn about the
19 insurance policy, to the best of your
20 recollection?
21   A  I don't know.
22   Q  But at the time you were sending this,
23 you -- she knew about it?
24       MS. SMITH:  Objection, form.
25   A  I don't know.  I don't know one way or the

159

1 other.  I don't remember.
2 BY MS. TOMKOWIAK:
3    Q  Okay.  Well, your e-mail doesn't provide
4 any explanation, correct?
5    A  Correct.
6    Q  Did you draft either of the attachments to
7 this e-mail?
8    A  I may have put the Schedule A, dropped it
9 into Word form from an Excel.  I remember --
10   Q  Just for our record, you're talking about
11 Schedule A to the purchase agreement?
12   A  Schedule A to the purchase agreement.  I
13 think ultimately outside counsel put all of this
14 together.  I may have proposed the first draft of
15 the purchase agreement before handing it off to
16 them.  I don't know what they changed, but I
17 remember reviewing the documents as well.
18   Q  What about the resolutions?  Is that
19 something you would have put together?
20       MS. SMITH:  Objection, form.
21   A  I don't think so.  I don't recall doing
22 so.
23 BY MS. TOMKOWIAK:
24   Q  Did somebody tell you to put together this
25 purchase agreement?

160

1    A  No, I don't think anyone told me.  I think
2 I was working with outside counsel.  I may have --
3 I may have prepared this schedule.  Sorry, I
4 didn't see it at the end here.
5    Q  The schedule to the insurance policy?
6    A  Insurer, Insured, Appointed
7 Representative.  No, other than the instruction to
8 work on this project, I wasn't instructed to
9 prepare this schedule.  I mean, it was sort of a
10 matter of putting the documents together.
11   Q  Do you know what was going on in the UBS
12 litigation in August 2017?
13   A  No.
14   Q  Was -- did you receive any directions or
15 guidance as to why the policy was being purchased
16 at this particular point in time?
17   A  No.
18   Q  You were aware that the US -- UBS
19 litigation had been going on for several years at
20 this point?
21   A  That was my colloquial understanding, yes,
22 that it had been.
23   Q  But you weren't given any context as to
24 why this insurance policy was being -- why they
25 were just now receiving -- or getting an insurance

161

1  policy?
2  **A  No, not that I recall.**
3  Q  Was there any urgency around doing this at
4  the time?
5  **A  No, I don't remember urgency one way or**
6  **the other, other than being timely with getting**
7  **tasks completed.  I don't remember any sort of**
8  **urgency or exigency surrounding this.**
9  Q  Okay.  You can put that aside.  I'm going
10 to hand you what is --
11     MS. SMITH:  Need some water?
12     THE WITNESS:  I'm good.  Maybe.
13 BY MS. TOMKOWIAK:
14     Q  I'm going to ask the court reporter to
15 mark that as Exhibit 55 and hand that to you.
16        (Deposition Exhibit 55 marked for
17 identification.)
18 BY MS. TOMKOWIAK:
19 Q  Let me know when you're ready.
20     (Witness reviews document.)
21 **A  Okay.**
22 **BY MS. TOMKOWIAK:**
23     Q  So this is an e-mail from Katie Irving to
24 Helen Kim with a CC to you.  Subject is Forward
25 Sentinel Reinsurance Proposed ATE Policy.  The

162

1  date is August 10th, 2017, and Ms. Irving writes:
2  Helen - request JD execution of the attached,
3  please, thank you.
4     Do you understand JD to be referring to
5  Mr. Dondero?
6  **A  Yes.**
7  Q  And was that Ms. Kim's role to get
8  Mr. Dondero to sign these documents?
9     MS. SMITH:  Objection, form.
10 **A  I don't think it was her role per se.  I**
11 **think in this case she was asked to.**
12 **BY MS. TOMKOWIAK:**
13 Q  The e-mail one down in the chain is from
14 Lesley Thompson to you.  What was Lesley
15 Thompson's role with respect to Sentinel and this
16 policy specifically?
17 **A  I don't remember exactly what her function**
18 **was.  I'd say a facilitator for the Maples side.**
19 Q  And Ms. Thompson writes:  Hi JP.  Please
20 find attached the Signed directors resolution
21 along with the signature pages for the ATE policy
22 and Purchase Agreement.
23     And then she attaches signature pages from
24 the Sentinel side.  And if you turn to those last
25 few pages --

163

1  **A  Yes.**
2  Q  -- it looks like Andrew Dean has signed
3  all three agreements --
4  **A  Yeah.**
5  Q  -- the policy, the purchase agreement and
6  the board resolutions?
7     MS. SMITH:  Objection, form.
8  BY MS. TOMKOWIAK:
9  Q  Do you agree with that?
10 **A  I see -- I see that.**
11 Q  And to your recollection, Mr. Dean was a
12 director of Sentinel on August 10th, 2017?
13 **A  That's my recollection.**
14 Q  And he was authorized to sign these
15 documents?
16     MS. SMITH:  Objection, form.
17 **A  I defer to what the resolutions say.  I**
18 **don't want to take the view of Cayman law, but it**
19 **certainly looks like that.**
20 **BY MS. TOMKOWIAK:**
21 Q  You don't recall anybody saying that these
22 were invalid and we need to go get somebody else
23 to sign them?
24 **A  I don't recall that.**
25 Q  And then Christopher Watler, is that the

164

1  individual that we discussed earlier today that
2  you believed was a director of Sentinel?
3  **A  Yes.**
4  Q  Do you know when Mr. Dean became a
5  director of Sentinel?
6  **A  I don't remember the exact date.**
7  Q  Do you recall roughly?
8  **A  He may have been from the beginning.  I**
9  **believe -- but other than that -- other than that**
10 **recollection, I can't be more specific.**
11 Q  What about with respect to Mr. Watler?
12 **A  I think the same.**
13 Q  Do you know who chose the board of
14 directors of Sentinel?
15 **A  I don't.**
16 Q  If you look on the page with the Bates
17 ending 350.
18 **A  Yeah.**
19 Q  There's an e-mail from Ms. Thompson at
20 17:01.  She writes to you and Ms. Irving and she
21 says in the second paragraph:  Can you please
22 confirm that in the event of an adverse loss which
23 exceeds the existing assets equity of the company,
24 the shareholders will inject the necessary capital
25 in order for the company to meet its obligations

165

1 and maintain its solvency.
2  A  Yes.
3  Q  Who are those shareholders that she's
4 referring to?
5     MS. SMITH:  Objection, form.
6  A  I believe she was referring to
7 Mr. Ellington and Mr. Dondero.
8 BY MS. TOMKOWIAK:
9  Q  You respond to her and you say:  Lesley,
10 The shareholders have made a fundamental
11 commitment, both fiscally and governance-wise, to
12 Sentinel Reinsurance for the long term, including
13 in the situation of an adverse loss.
14     What did you mean by that?
15  A  That the shareholders were committed to
16 the -- committed to the company and committed to
17 seeing it succeed.
18  Q  By shareholders, were you referring to
19 Mr. Dondero and Mr. Ellington?
20  A  Yes.
21  Q  How did you know that they had made this
22 fundamental commitment?
23  A  I had spoken to Mr. Ellington about
24 Ms. Thompson's inquiry and he had authorized me to
25 make this comment.

166

1  Q  So after you received Ms. Thompson's
2 e-mail, you reached out to Mr. Ellington?
3  A  Yes.  Although I had spoken to
4 Ms. Thompson, she may have previewed this issue,
5 so I may have spoken to him before she sent the
6 e-mail, but I remember her conveying to me this
7 concept and me connecting with Mr. Ellington about
8 it.
9  Q  Okay.  And why was this an issue?
10  A  I didn't think it was an issue.  I just
11 didn't want to speak out of school.
12  Q  When you spoke to Mr. Ellington about this
13 inquiry, what did he say?
14  A  He authorized me to make this comment.
15  Q  Were these his words?
16  A  Substantially.  I may have formalized them
17 a little bit, but he authorized me to convey that
18 there was a commitment on his part and
19 Mr. Dondero's part to the company's long-term
20 success.
21  Q  Do you know whether Mr. Ellington spoke
22 with Mr. Dondero before he authorized you to
23 convey this commitment?
24     MS. SMITH:  Objection, form.
25  A  I don't know.

167

1 BY MS. TOMKOWIAK:
2  Q  Did you ask him?
3  A  I don't recall asking him.  I don't have
4 personal knowledge of what they discussed.
5  Q  And so is it your understanding that if
6 there was an adverse loss which exceeded the
7 existing assets of Sentinel, that Mr. Dondero and
8 Mr. Ellington would put additional capital into
9 Sentinel in order for it to remain solvent and
10 meet its obligations?
11     MS. SMITH:  Objection, form.
12  A  I don't think that's what my response
13 commits to on their behalf.  I think the -- no, I
14 don't think that's what my response conveys.
15 BY MS. TOMKOWIAK:
16  Q  So are you saying your response didn't
17 actually answer her question?
18  A  You'd have to ask her, but this is what I
19 was authorized to convey.
20  Q  So you -- did you ask Mr. Ellington if you
21 were authorized to convey that he would, in fact,
22 provide additional capital to Sentinel in order
23 for it to meet its obligations and maintain its
24 solvency?
25  A  My recollection is that that was a -- that

168

1 seemed to be a bit of an aggressive ask and
2 unorthodox to ask of a shareholder.  And so this
3 response tried to convey comfort.  That was the
4 thrust of the communication between he and I
5 around this.
6  Q  Did Mr. Ellington tell you that he would
7 not, in fact, be willing to inject additional
8 necessary capital in order for Sentinel to meet
9 its obligations?
10     MS. SMITH:  Objection, form.
11  A  We did not speak to that point, so I -- he
12 never told me that.
13 BY MS. TOMKOWIAK:
14  Q  So did it seem to be a bit of an
15 aggressive ask from your perspective or from his?
16  A  I think from mine, certainly.  You'll have
17 to ask him how he thought of it.
18  Q  And under the policy, an adverse loss
19 would be a loss with respect to the UBS
20 litigation, right?
21     MS. SMITH:  Objection, form.
22  A  I don't know if -- I think it's related to
23 UBS, but I wouldn't say globally.  I would say
24 more on a micro perspective from the ATE policy
25 perspective.

169

1  BY MS. TOMKOWIAK:
2      Q  So a loss related to the New York State
3  litigation that was covered by this policy?
4      A  The topic of the policy or the -- yeah,
5  the lawsuit referred to in the policy is how I
6  would think about it.
7      Q  And if we look at the schedule -- well,
8  Schedule A is not in this document.  Okay.  Let's
9  look at the -- by the way, is -- do you have any
10 understanding of whether Mr. Ellington or
11 Mr. Dondero has still made that same commitment
12 today?
13     MS. SMITH:  Objection, form.
14     A  I haven't discussed any matters -- any
15 Sentinel matters with them on this topic.  I don't
16 know.
17     MS. TOMKOWIAK:  Okay.  I am going to have
18 the court reporter mark this next document as
19 Exhibit 56.
20     (Deposition Exhibit 56 marked for
21 identification.)
22 BY MS. TOMKOWIAK:
23     Q  Take a moment to review that and let me
24 know when you're ready.
25     (Witness reviews document.)

170

1      A  Okay.
2  BY MS. TOMKOWIAK:
3      Q  So this is an e-mail chain between you and
4  Mr. Leventon, dated October 25th, 2017.  In the
5  earlier e-mail chain, Mr. Leventon is asking you
6  for a copy of the final executed insurance
7  agreement and then it looks like you provide him
8  with that in the attached.  Do you agree this
9  looks like a copy of the final executed insurance
10 policy?
11     MS. SMITH:  Objection, form.
12     A  Doesn't look to be executed.
13 BY MS. TOMKOWIAK:
14     Q  It doesn't?
15     A  No.
16     Q  Well, there are signatures on the back.
17     A  Oh, I'm sorry.  Yes, there are.  Yes.
18     Q  Okay.  Do you know why Mr. Leventon was
19 asking you for a copy of the final insurance
20 policy in October 2017?
21     A  I really don't.
22     Q  Do you know where you would have pulled
23 this document from?
24     A  My e-mails.
25     Q  Is that where you stored your documents?

171

1      A  Generally.
2      Q  Anywhere else that you would have possibly
3  pulled this from?
4      A  I don't think so.
5      Q  Would you have had like a specific folder
6  about the UBS policy?
7      A  Most likely.  E-mail folder.
8      Q  I realize this is testing your memory, but
9  do you know what that folder would be called?
10     A  Oh, gosh.  No, I don't remember.
11     Q  Okay.  Let's look at one more document and
12 then we'll take a look at the policy.  So I'm
13 handing you what we are going to mark as
14 Exhibit 57.
15     (Deposition Exhibit 57 marked for
16 identification.)
17 BY MS. TOMKOWIAK:
18     Q  Let me know when you're ready.
19     (Witness reviews document.)
20     A  Okay.
21 BY MS. TOMKOWIAK:
22     Q  This is an e-mail from Mr. Leventon to
23 Chris Dunn.  Who is Chris Dunn?
24     A  The name rings a bell.  I don't remember
25 what he did at Highland.

172

1      Q  Was he in the legal department?
2      A  No.
3      Q  Was he in the -- do you remember what
4  department he was in?
5      A  No.
6      Q  And Mr. Leventon says:  Please see
7  attached.  Please label all communications related
8  to this project as Privileged as all documents are
9  being drafted at the request of the Legal Team.
10     Do you know what project he's talking to?
11     MS. SMITH:  Objection, form.
12     A  I don't.
13 BY MS. TOMKOWIAK:
14     Q  This is the day after Mr. Leventon asked
15 you to send him the policy in Exhibit 56.  Does
16 Exhibit 57 help refresh your recollection at all
17 as to why Mr. Leventon was asking you for the
18 policy on that day?
19     A  I don't recall the context.
20     MS. SMITH:  Objection, form.
21     A  I don't recall the context.
22 BY MS. TOMKOWIAK:
23     Q  Do you know what Mr. Leventon is referring
24 to when he says documents are being drafted at the
25 request of the legal team?

173

1      MS. SMITH:  Objection, form.
2    A  I don't.
3  BY MS. TOMKOWIAK:
4    Q  At this point, October 2017, all of the
5  documents related to the ATE policy had already
6  been drafted and signed, right?
7    A  I think that's true.  Yeah.
8    Q  Same answer with respect to the purchase
9  agreement?
10     MS. SMITH:  Objection, form.
11    A  From what I recall.  From what I recall.
12  BY MS. TOMKOWIAK:
13    Q  Would you consider yourself a member of
14  the legal team at this time?
15    A  Yes.
16    Q  Did you make any request to Mr. Dunn or
17  others, related to a project in October 2017
18  regarding the UBS insurance policy?
19    A  Not that I recall.
20    Q  If we look at the attachment, it's titled
21  Legal Liability Insurance Policy.  Is this the ATE
22  policy that we've been talking about today?
23    A  I believe so, yes.
24    Q  And if you turn to schedule -- the
25  schedule on the back, I believe it's Bates ending

174

1  3070.
2    A  Yes.
3    Q  You testified earlier that you think you
4  might have drafted this?
5    A  I may have aggregated this information
6  into a schedule.
7    Q  Where would you have aggregated it from?
8    A  Information I received from others working
9  on the litigation.
10    Q  Others working on the litigation or
11  working on the policy or both?
12    A  Both.
13    Q  Do you remember anybody specifically
14  sending you information for this schedule?
15    A  No, I don't remember -- I don't -- no, I
16  don't remember.
17    Q  Okay.  And there are three Highland
18  entities that are insured under this policy?
19     MS. SMITH:  Objection, form.
20  BY MS. TOMKOWIAK:
21    Q  There's three funds that are listed as
22  being insured, correct?
23    A  I see the insureds, the three entities,
24  yes.
25    Q  Okay.  And then the appointed

175

1  representative is Paul Lackey.  Do you know who
2  decided that Mr. Lackey would be the appointed
3  representative.
4    A  No, I don't.  I don't know.  I don't
5  remember who would have made that decision.
6    Q  Do you know what Mr. Lackey's role was
7  with respect to the UBS litigation at this time?
8    A  I believe he was trial counsel for the
9  insureds.
10    Q  Okay.  And then the period of insurance
11  commences August 1st, 2017.  Do you see that?
12    A  Yes.
13    Q  And the legal action, is this referring to
14  the New York State action between UBS and Highland
15  that's listed here?
16    A  I don't know how that case is styled.
17    Q  Did this policy relate to any other
18  litigation matter other than the litigation
19  between UBS and Highland in New York State court?
20    A  Not that I know of.
21    Q  And then, in fact, it says here, Supreme
22  Court of the State of New York, County of
23  New York, right?
24    A  It does say that, yes.
25    Q  And the opponent is UBS Securities LLC and

176

1  UBS AG, London Branch?
2    A  Yeah.
3    Q  And again, you don't know what was going
4  on in that litigation as of August 1st, 2017?
5    A  No.
6    Q  So the coverage here is US $100 million in
7  aggregate.  Do you see that?
8    A  Yes.
9    Q  I know earlier we looked at some
10  presentations that mentioned a policy of
11  90 million or 100 million.  Do you know how it was
12  determined that the coverage would be 100 million?
13    A  I don't recall.
14    Q  Would you agree with me that this is the
15  largest policy that Sentinel had written to date?
16     MS. SMITH:  Objection, form.
17    A  Yes.  That's my understanding.
18  BY MS. TOMKOWIAK:
19    Q  In fact, it was significantly higher than
20  the D&O policy that it had written for the SAS
21  entities, correct?
22    A  Yes.
23    Q  Do you see that the premium is
24  $25 million?
25    A  Yes.

---

**177**

1    Q   Do you know how -- who set that figure?
2    A   My recollection, it was a combination of
3    input from the actuary, input from the
4    administrator, input from outside counsel.
5    Q   Did anybody from Highland have any input
6    into that?
7        MS. SMITH:  Objection, form.
8    A   I don't recall -- I don't recall others at
9    Highland having input.  No, I don't recall.
10   BY MS. TOMKOWIAK:
11   Q   Who decided on behalf of the insured
12   entities, that $25 million was a fair premium to
13   pay for this policy?
14       MS. SMITH:  Objection, form.
15   A   I guess it would have been a -- the result
16   of the review of the different -- of the different
17   Highland groups that reviewed this:  Compliance,
18   accounting, ultimately the -- Mr. Dondero.
19   BY MS. TOMKOWIAK:
20   Q   So within those groups, who, to your
21   recollection, would have reviewed this policy?
22   A   The names I've been -- the names I've been
23   mentioning throughout.  I don't know who else
24   within those groups would have reviewed it.  I
25   assume others.  I don't have firsthand knowledge

---

**178**

1    of -- you know, other than Mr. Swadley and
2    Mr. Patrick, for example, I don't know if their
3    colleagues reviewed it, but I would assume several
4    others at Highland would have reviewed more than I
5    have firsthand knowledge of.
6    Q   And pursuant to the purchase agreement,
7    the assets that were being transferred from the --
8    pursuant to the purchase agreement were being
9    transferred to pay this premium, correct?
10   A   Right.
11   Q   And is it your understanding that the
12   assets being transferred were worth $25 million?
13   A   I didn't have -- I didn't have an
14   independent view on the value.  I know we had
15   the -- there were Highland valuations, but I had
16   no valuation -- I made no valuation myself.
17   Q   So you don't know if the assets, that were
18   transferred to Sentinel in exchange for the
19   policy, were substantially more or less than
20   $25 million?
21       MS. SMITH:  Objection, form.
22   A   I don't know the valuation methodology
23   relevant for insurance companies, so I don't have
24   an independent view of that.
25

---

**179**

1    BY MS. TOMKOWIAK:
2    Q   Do you recall any discussions around that
3    in any of the meetings that you attended about
4    this policy?
5    A   I know it was discussed.  I don't remember
6    the -- who said what or the date of any given
7    meeting, but I know it was a topic of discussion.
8    Q   And again, the point of this policy was to
9    cover the insureds with respect to legal liability
10   occurring from the UBS litigation, right?
11   A   I'd refer to what the policy says as to
12   what the -- what the point here was.
13   Q   Okay.  Well, in Section 2.1, if you want
14   to take a look at that, it's on page Bates ended
15   3056.
16   A   Yes.
17   Q   Okay.  So the -- under Section 2.1.  It
18   says:  The insurer -- that means Sentinel, right?
19   A   Yes.
20   Q   -- agrees to indemnify the insured as it's
21   defined in the schedule in respect to any legal
22   liability occurring during the period of insurance
23   up to and including but not exceeding the limit of
24   indemnity.
25       And then they have two conditions there,

---

**180**

1    provided that.  Do you see that?
2    A   Yes.
3    Q   Okay.  And the limit of indemnity that we
4    just looked at was $100 million, right?
5    A   Yes.
6    Q   And if you go to Section 9.13, which is on
7    page ended 3066.  So this defines legal liability
8    and I'm going to paraphrase, but as the aggregate
9    of the total sum awarded by the court in the legal
10   action or the aggregate of the total sum to be
11   paid by the insured to the opponent pursuant to a
12   settlement of the legal action.
13   A   Okay.
14   Q   So wouldn't you agree that the point of
15   this policy is to pay up to $100 million in the
16   event that the insureds were ordered by the
17   New York State court to pay some judgment in the
18   New York State action or reached a settlement with
19   UBS in the New York State action?
20       MS. SMITH:  Objection to form.  The
21   document speaks for itself.
22   A   Yeah, I would -- I would -- I can read it
23   out loud too.  I would defer to what the document
24   says as to what it's supposed to mean.
25

---

181

1   BY MS. TOMKOWIAK:
2       Q   So this is $100 million insurance policy,
3   the first one that Sentinel ever wrote and you
4   worked on it, and you have no idea what the
5   purpose of the policy was other than what the
6   words say on the page?
7           MS. SMITH:  Objection, form.
8       A   I think that mischaracterizes what I said.
9   BY MS. TOMKOWIAK:
10      Q   Well, then, what is the purpose of this
11  policy?
12      A   For the insurer to indemnify the insured
13  in respect to any legal liability, et cetera,
14  et cetera.
15      Q   Okay.  And indemnify meaning pay up to
16  $100 million if the insureds get a judgment
17  entered against it or settles with UBS in the
18  New York State court, right?
19      A   Again, I'd defer to the language.  I don't
20  want to summarize it and use some legal term of
21  art the wrong way.  I think this speaks for
22  itself.
23      Q   So if UBS won a $1.2 billion judgment in
24  the New York State action, does this policy apply?
25          MS. SMITH:  Objection, form.

182

1       A   I'd refer to counsel as to the
2   applicability and what these words mean.  These
3   words seem clear to me on their face, but, you
4   know, I can read them the same way.  They seem --
5   they speak for themselves.
6   BY MS. TOMKOWIAK:
7       Q   Yeah, but -- so you were counsel to
8   Highland and I believe you testified earlier that
9   you did work for these funds and you certainly had
10  a role in this particular insurance policy.  So
11  setting aside what the words say, what was your
12  understanding?  Why did the funds get this policy?
13      A   To insure against a loss in a lawsuit.
14      Q   In a lawsuit against UBS?
15      A   In the UBS lawsuit.
16          MS. SMITH:  Objection, form.
17  BY MS. TOMKOWIAK:
18      Q   Do you know whether there were any
19  endorsements to this policy?
20      A   I have knowledge that there might have
21  been subsequently, but I don't have direct
22  recollection of them.
23      Q   Okay.  Would Highland have conducted its
24  own valuation of the assets prior to entering into
25  this policy?

183

1       A   I believe so.
2       Q   Who would have done that?
3       A   The valuation group.
4       Q   Who is the valuation group?
5       A   In 2017, I don't remember who was on the
6   valuation group, but I think it was a subset of
7   the accounting team.
8       Q   Do you remember discussing with anybody in
9   the valuation group what the value was of the
10  assets that were being transferred for this
11  insurance policy?
12          MS. SMITH:  Objection, form.
13      A   I don't remember discussions to that
14  effect, other than knowing that they did -- they
15  did evaluate -- excuse me -- a valuation
16  methodology.  I don't know exactly what that
17  methodology was.
18  BY MS. TOMKOWIAK:
19      Q   And in the earlier settlement presentation
20  we looked at, it's suggested that these assets
21  were worth $94 million.  Is that consistent with
22  your recollection?
23          MS. SMITH:  Objection, form.
24      A   I don't remember what the date or the
25  timing of that was, so I don't want to commit to,

184

1   but I know there was a number -- I know there was
2   a number in time.  I don't know what time you're
3   referring to, but...
4   BY MS. TOMKOWIAK:
5       Q   Well, that settlement analysis was in
6   April 2019.
7           MS. SMITH:  Objection, form.
8       A   Okay.
9   BY MS. TOMKOWIAK:
10      Q   So that was a few months before this
11  policy.
12      A   Agreed.
13      Q   But sitting here today, you don't recall
14  if these assets were worth approximately
15  $94 million, at least as someone at Highland had
16  valued them?
17      A   I know I saw that for April.  I don't know
18  what it was in July, August, subsequent before
19  that.  Yeah, I...
20      Q   Could have gone up, could have gone down?
21      A   I wouldn't know.
22      Q   And that wouldn't be relevant to know
23  before you entered into this policy?
24          MS. SMITH:  Objection, form.
25      A   I guess I don't understand the question.

185

**BY MS. TOMKOWIAK:**

2 Q That's a double negative. Would that be
3 relevant to know before you entered into this
4 policy?

5 **A I think that valuation methodology was an**
6 **input. As to its relevance, that was outside of**
7 **my -- the scope of my involvement.**

8 MS. TOMKOWIAK: Okay. I'm going to ask
9 this to be marked as Exhibit 58.

10 (Deposition Exhibit 58 marked for
11 identification.)

12 BY MS. TOMKOWIAK:

13 Q Exhibit 58 is another version of the
14 insurance policy that we've been looking at, but
15 it has two endorsements. So if you want to focus
16 on the Bates ended 27 and 28.

17 **A Okay.**

18 Q Are you familiar with either of these
19 endorsements?

20 MS. SMITH: Objection, form.

21 **A Not directly.**

22 **BY MS. TOMKOWIAK:**

23 Q Okay. Well, I think you testified that
24 you thought there were endorsements to the policy.
25 Do you have any -- are these the endorsements that

186

1 you thought you recalled?

2 **A Yes. I came to know that there was a**
3 **question about endorsements. I didn't work on it,**
4 **so I -- these don't seem particularly -- I don't**
5 **have a direct recollection of these. I kind of**
6 **anecdotally knew that there had been these**
7 **endorsements.**

8 Q Do you know when these endorsements were
9 entered into?

10 **A I don't.**

11 Q Let's take a look at the first one. The
12 first one is -- again, it's not dated and it's
13 signed by Lesley Thompson, director. Do you know
14 when Ms. Thompson became a -- well, do you know
15 whether Ms. Thompson was ever a director of
16 Sentinel?

17 **A I guess she elevated to a director at some**
18 **point from whatever she was before. I don't**
19 **recall when that would've been.**

20 Q You don't know when that took place?

21 **A No.**

22 Q And are you basing that assumption on
23 anything besides the fact that it's stamped
24 director here?

25 **A That -- seeing that stamp recollects**

187

1 **that -- I remember her becoming a director at some**
2 **point. I don't remember exactly when.**

3 Q And this endorsement says that the premium
4 as stated in this schedule is adjusted to
5 $68,362,333.62, to include the total fair value of
6 received assets.

7 Are you with me?

8 **A Yes.**

9 Q Okay. Do you know who would have
10 calculated the total fair value of received
11 assets?

12 **A No.**

13 Q Do you know why that number would have --
14 do you know why that number would not have been
15 calculated before you entered into -- the
16 premium into the policy?

17 MS. SMITH: Objection, form.

18 **A I don't know. I don't recall.**

19 **BY MS. TOMKOWIAK:**

20 Q Do you know whether that number is
21 consistent with any valuation that anybody did
22 before signing the insurance policy?

23 **A No. I don't know. And I don't know the**
24 **timing of this either, so I -- no.**

25 Q Well, it has to come after the insurance

188

1 policy because it's an endorsement, right?

2 **A Yes.**

3 Q And then this further breaks down the
4 premium into cash, miscellaneous receivables. Do
5 you know what the miscellaneous receivables are?

6 **A No.**

7 Q And an investment portfolio, and it
8 provides a number of $55,525,457.88 as measured at
9 fair value on the transfer date. Do you know what
10 the transfer date would be?

11 **A August of some -- August of 2017 at some**
12 **point is what I would think as the transfer date.**

13 Q Do you know why the estimate of
14 $94 million that we saw in April 2019 has gone
15 down to 68 million?

16 **A I don't.**

17 Q And then it says here that all other terms
18 and conditions remain unchanged?

19 **A Yes.**

20 Q So is it your understanding that the
21 amount of coverage would remain the same?

22 **A I don't want to interpret a Cayman Islands**
23 **insurance document. It speaks for itself.**

24 Q You would agree that one term of the
25 insurance policy is the indemnity limit, correct?

189

1    A   Yes.
2    Q   So why would the premium increase by
3  150 percent but the amount of coverage would
4  remain the same?
5       MS. SMITH:  Objection, form.
6    A   I don't know.
7  BY MS. TOMKOWIAK:
8    Q   Does that seem reasonable to you?
9       MS. SMITH:  Objection, form.
10   A   I don't have a view as to what the
11 auditors or anyone else -- what conclusions they
12 came to.  I wouldn't know.
13 BY MS. TOMKOWIAK:
14   Q   Was there any other insurance policy that
15 you were aware of, where Sentinel had agreed to
16 provide an amount of coverage for a premium
17 consisting of over two-thirds of the amount of
18 coverage?
19   A   I'm sorry, can you repeat that?
20   Q   Are you aware of any other policy that was
21 issued by Sentinel, where the premium was over
22 two-thirds of the coverage amount?
23   A   Not that I recall.
24   Q   Do you know why the insured didn't sign
25 this endorsement?

190

1    A   I don't.
2    Q   If you look at the second endorsement,
3  Endorsement No. 2.  This is also undated and I
4  take it you don't know when this was signed
5  either?
6    A   I don't.
7    Q   Okay.  And it looks like this is also
8  signed by Lesley Thompson, but she's not listed as
9  a director.  Do you know if Ms. Thompson ceased
10 being a director at some point in time?
11   A   I don't recall.
12   Q   And then in this endorsement, the premium
13 has been further reduced to 59,362,333.62;
14 9 million has been prepaid by the insured to the
15 insurer and then the limit of indemnity is reduced
16 to 91 million.  Is that a fair reading of this
17 endorsement?
18      MS. SMITH:  Objection as to form.
19   A   It says what it says.
20 BY MS. TOMKOWIAK:
21   Q   So you don't have an understanding one way
22 or the other if this reflects that the insureds
23 are paying an additional $9 million to Sentinel?
24   A   Sorry, say that last part, the insureds
25 are paying an additional --

191

1    Q   Yeah, an additional $9 million are being
2  prepaid by the insured to the insurer.  Is that on
3  top of the money assets that were already
4  transferred to Sentinel?
5    A   I don't know.
6    Q   You don't know.  If that was an additional
7  $9 million, is there any reason why the amount of
8  liability or the amount of coverage would be
9  lowered?
10      MS. SMITH:  Objection, form.
11   A   I don't have a view on this.  I'm not
12 familiar with it.
13 BY MS. TOMKOWIAK:
14   Q   Okay.  So you're not -- looking at
15 Endorsement No. 1, looking at Endorsement No. 2,
16 you have no idea, you were not involved at all in
17 these endorsements and you don't understand the
18 context behind either of them?
19   A   I don't recall being involved in this.  I
20 don't know what the dates were, so I -- I can't
21 speak to them with any authority.
22   Q   Would the same valuation team have come up
23 with the $68 million total fair value here?
24      MS. SMITH:  Objection to form.
25   A   I don't know.  I don't know.

192

1  BY MS. TOMKOWIAK:
2    Q   Okay.  So you don't know who calculated
3  that as the total fair value?
4    A   I don't.
5    Q   And you don't recall anybody having any
6  discussions around increasing the premium or
7  decreasing the premium at any point after the
8  policy was signed?
9    A   Not that I recall being a part of.
10   Q   And you don't recall being part of any
11 discussions in which the amount of coverage was
12 being adjusted after the policy was signed?
13   A   Not that I remember, no.
14   Q   Okay.  So after the policy and the
15 purchase agreement were signed, did you have any
16 involvement with Sentinel going forward?
17   A   It became minimal.  Not a lot of
18 involvement.
19   Q   Do you know why?
20   A   I started focusing on other matters.
21   Q   Are you aware that there was a trial in
22 the UBS litigation?
23   A   I'm sorry, when?
24   Q   Pardon me?
25   A   When?

193

1    Q   Are you aware there was a trial in 2018 in
2    the UBS litigation?
3    A   Am I aware of that today or was I aware of
4    that then?
5    Q   Well, were you aware of it at the time?
6    A   No.
7    Q   When did you become aware of it?
8    A   In the past several months.
9    Q   Was it before you left Highland?
10   A   I think it would've been during the
11   pendency of Highland's bankruptcy, I probably
12   would've learned more about the UBS matter, just
13   because it was front and center in the Highland
14   bankruptcy.  I don't recall knowing that at the
15   time.
16   Q   Okay.  So you don't recall knowing at the
17   time that there was a trial that could potentially
18   generate an adverse loss that would trigger
19   coverage under this policy?
20       MS. SMITH:  Objection, form.
21   A   I knew at a high level that that was in
22   the works.  I didn't know anything about the
23   timing or anything about that.
24   BY MS. TOMKOWIAK:
25   Q   What do you mean that you knew that it was

194

1    in the works?
2    A   I knew there was a lawsuit referred to in
3    the policy, so I knew there was some sort of
4    litigation progressing.  I didn't know where it
5    was at any given moment, is my point.
6    Q   And you had no role in the trial?
7    A   No.
8    Q   Are you aware, sitting here today, that a
9    judgment in UBS's favor was entered in the first
10   quarter of 2020?
11   A   I have heard that.
12   Q   Do you recall when you heard that?
13   A   No.
14   Q   Was it while you were still employed at
15   Highland?
16       MS. SMITH:  Objection.
17       If this has anything to do with
18   conversations with your counsel, then it's
19   privileged.
20   BY MS. TOMKOWIAK:
21   Q   Yeah, I agree.  I'm not interested in your
22   conversations with your counsel.  But outside of
23   those conversations, and I don't want to know
24   specifics, but do you recall when -- not from who
25   or the substance, do you recall when you heard

195

1    that?
2    A   I don't.  I came to know it anecdotally
3    and I can't pinpoint as to when that may have
4    been.
5    Q   Not even as before or after you left
6    Highland?
7    A   I honestly don't know what date the
8    actual -- when this was in 2020.  No, I can't
9    pinpoint it.  I don't know.  I certainly came to
10   know it, though.
11   Q   Before you left Highland, was there any --
12   to your knowledge, was there any claim made on
13   this insurance policy?
14   A   Before I left Highland?
15   Q   Uh-huh.
16   A   Was there a claim -- I don't know.
17       MS. TOMKOWIAK:  I've been told we need to
18   switch tapes again.
19       THE VIDEOGRAPHER:  This ends disk 2.  The
20   time is 2:46 p.m.  We are off the record.
21       (Recess taken from 2:46 p.m. CDT to
22   3:00 p.m. CDT)
23       THE VIDEOGRAPHER:  Here begins disk No. 3
24   in the deposition of Jean Paul Sevilla.  The time
25   is 3 p.m.  We are back on the record.

196

1    BY MS. TOMKOWIAK:
2    Q   Okay.  Mr. Sevilla, so if you go back to
3    the schedule of the insurance policy that we've
4    been looking at.
5    A   Yes.
6    Q   So for the first insured Highland CDO
7    Opportunity Master Fund LP, who negotiated this
8    insurance agreement on behalf of that entity?
9    A   Highland.
10   Q   Who with Highland?  Who at Highland?
11   A   I don't know if I can point to an
12   individual, but I would consider Highland as
13   authorizing that entity intent to enter into the
14   policy.
15   Q   Well, did Mr. Dondero have a role?
16   A   I think he signed the -- he signed the
17   policy.
18   Q   I see that he signed it, but did he have a
19   role negotiating the policy for Highland CDO
20   Opportunity Master Fund?
21   A   I'm not sure what negotiation there was.
22   I don't know.
23   Q   Was there any negotiation?
24   A   I don't know.  I don't know what the level
25   of negotiation was.

197

1    Q  What about Mr. Ellington?  Would he have
2  had a role?
3    A  I'm not sure.
4    Q  Okay.  So you just have no clue who
5  negotiated this agreement on behalf of Highland
6  CDO Opportunity Master Fund?
7    A  I don't know if there were discussions
8  that I'm not privy to, so I don't know.
9    Q  Okay.  Yeah, you only know what you know,
10  but you don't know?
11    A  Correct.
12    Q  Same question with respect to Highland CDO
13  Holding Company.  Do you know who negotiated this
14  policy on their behalf?
15    A  It would be the same answer, Highland.
16    Q  But you don't know who at Highland?
17    A  I can't point to a single person, no.
18    Q  You have no idea?
19    A  I don't know.
20    Q  And what about with respect to Highland
21  Special Opportunities Holding Company?  Who
22  negotiated this policy on its behalf?
23    A  Same answer.
24    Q  And just for the record, the same answer
25  meaning, you don't know?

199

1  about that at all?
2    A  I learned of it anecdotally.  I can't
3  point to the date when I came to know that
4  information.  It was not on November --
5    Q  2019?
6    A  It was not then.
7    Q  Okay.  So there's a $1.2 billion decision,
8  but you don't recall learning about it at the
9  time?
10    A  I can't point to when I came to know of
11  it.
12    Q  But to the best of your recollection, it
13  was not in November 2019?
14    A  Correct.  It was not in real time.  Let's
15  put it that way.
16    Q  And are you aware that that decision was
17  not made public for a period of time so that UBS
18  and the Highland defendants in that action could
19  try to negotiate a settlement?
20    MS. SMITH:  Objection to form.
21    A  I know nothing about that.
22  BY MS. TOMKOWIAK:
23    Q  You know nothing about that?
24    A  No.
25    Q  You weren't part of those discussions?

198

1    A  I believe Highland negotiated on their
2  behalf.
3    Q  But you don't know who at Highland?
4    A  I don't.
5    Q  What about Sentinel Reinsurance?  Do you
6  know who specifically negotiated this policy on
7  its behalf?
8    A  Same answer.  I don't know.  Sentinel on
9  its behalf.
10    Q  But you don't know the specific
11  individuals?
12    A  No.
13    Q  You said you can't point to a single
14  person.  Is there a combination of persons you can
15  point to?
16    A  I can't identify names, if that's the
17  question.
18    Q  I guess the question is, can you be any
19  more specific than Highland?
20    A  I don't think so.
21    Q  Are you aware that in November 2019, the
22  judge in the New York State court issued a
23  judgment in Phase 1 of the trial with UBS?
24    A  No.
25    Q  So at the time you don't recall hearing

200

1    A  If you're representing that that's what
2  happened, I don't know.
3    MS. SMITH:  Objection.
4  BY MS. TOMKOWIAK:
5    Q  Oh, no, you weren't -- yeah, you were not
6  part of any settlement negotiations or discussions
7  in the late 2019-2020 time period?
8    A  No.
9    Q  And were you aware that any such
10  settlement discussions were occurring?
11    A  No.
12    Q  Did you hear that there was roughly a
13  $1 billion judgment?
14    MS. SMITH:  Objection, form.
15    A  When?  Sorry, this feels like a question
16  I've already -- but I came to know it at some
17  point.
18  BY MS. TOMKOWIAK:
19    Q  But at some point you came to know it,
20  right?
21    A  Yeah.
22    Q  And I -- a few months ago?  Five month
23  ago?  Six months ago?  Before you left Highland?
24    A  It wasn't in real time.  I can't point to
25  when I came to know it.  But as I sit here today,

201

1  that sounds familiar to me and it sounds like I
2  have heard that. I can't point to when I learned
3  it. I don't know.
4     Q  Whenever you came to learn it, did you say
5  to anybody, hey, there's an insurance policy that
6  could help pay that judgment?
7     A  I did not say that.
8     Q  Why not?
9     A  Nobody asked me and it was outside of -- I
10 don't know. I just -- I don't know.
11    Q  Well, did you think of the insurance
12 policy when you heard that there was a $1 billion
13 judgment in UBS's favor?
14    A  Did I think of it?
15    Q  Yeah.
16    A  I'm sure I did.
17    Q  Did you raise it with anybody at the time?
18    A  No.
19       MS. SMITH: Objection to form.
20    A  No.
21 BY MS. TOMKOWIAK:
22    Q  After Highland declared bankruptcy, what
23 was your role?
24       MS. SMITH: Objection to form.
25    A  I was largely focused on the private

202

1  equity business at that point.
2  BY MS. TOMKOWIAK:
3     Q  And in that role, did you understand that
4  after the bankruptcy that you were -- that you
5  reported to the indirect -- sorry, the independent
6  board of the Highland then debtor?
7       MS. SMITH: Objection to form.
8     A  Can you repeat that?
9  BY MS. TOMKOWIAK:
10    Q  Yeah. So after Highland filed for
11 bankruptcy, did you understand that Highland was
12 being managed by an independent board of
13 directors?
14    A  I think there was a gap between when
15 Highland filed and the board came in.
16    Q  Do you recall when the board came in?
17    A  Beginning of 2020. I can't point to the
18 date, but sometime in early -- very early 2020.
19    Q  Okay. So between when Highland filed for
20 bankruptcy and the independent board came in, do
21 you recall being aware in that time period of the
22 $1 billion judgment against Highland in UBS's
23 favor?
24    A  Sorry, between when Highland filed and
25 when the board came in?

203

1     Q  Correct.
2     A  I don't recall.
3     Q  Do you recall if you were aware of it
4  after the -- sorry, after the board was put in
5  place?
6       MS. SMITH: Objection to form.
7     A  Again, I can't point to a date. I can't
8  point to it.
9  BY MS. TOMKOWIAK:
10    Q  And when you -- you said you thought of
11 it, did you discuss it with anybody?
12    A  No, I did not.
13    Q  Well, if you knew that there was
14 $100 million in coverage available for this
15 $1 billion judgment, why wouldn't you raise that
16 with somebody?
17       MS. SMITH: Objection to form.
18    A  It's not something I worked on. Others
19 were working on those matters. I had my own job
20 to worry about, my own tasks.
21 BY MS. TOMKOWIAK:
22    Q  Well, you worked on the policy, right?
23    A  When?
24    Q  In 2017.
25    A  Yes.

204

1     Q  Okay. But by 2019, '20, is it your
2  testimony that that was somebody else's job?
3       MS. SMITH: Objection to form.
4     A  No. My job was what I was working on at
5  the time, which was largely trying to turn the
6  portfolio companies around. Other people did
7  their jobs.
8  BY MS. TOMKOWIAK:
9     Q  Did anybody ever tell you to disclose this
10 policy to UBS?
11    A  Did anyone ever tell me that? No.
12    Q  Did anybody ever tell you not to disclose
13 the existence of this policy to UBS?
14    A  No.
15    Q  Did anybody ever tell you not to disclose
16 the existence of this policy to any of the
17 independent directors?
18    A  Nobody ever told me that.
19    Q  Did you ever disclose this policy to any
20 of the independent directors?
21    A  No.
22    Q  Why not?
23    A  It wasn't my job. I was never asked and I
24 had plenty of other things to do that were within
25 my lane.

205

1    Q   Did you ever discuss the -- disclose the
2   existence of this policy to any of the outside
3   counsel that was representing Highland or the
4   independent board?
5    A   I did not.
6    Q   Did anybody ever instruct you not to do
7   that?
8    A   No.
9    Q   Before you left Highland, do you recall
10  Mr. Ellington ever raising this policy again?
11      MS. SMITH:  Objection to form.
12  BY MS. TOMKOWIAK:
13   Q   Let me rephrase that.  After -- at any
14  point in time after you learned that UBS had
15  obtained a $1 billion judgment, do you recall
16  Mr. Ellington raising the ATE policy?
17   A   No.
18   Q   Do you recall anybody else raising it?
19   A   No.
20   Q   Do you recall receiving any communications
21  from Sentinel or any of its auditors following the
22  judgment?
23   A   No.
24   Q   Did you think that it was strange that
25  nobody had made a claim on the policy?

206

1      MS. SMITH:  Objection to form.
2    A   I didn't have an opinion one way or the
3   other.  I was focused on my job.
4   BY MS. TOMKOWIAK:
5    Q   At this point in time, did you know
6   whether any part of that policy had been written
7   down or used to pay other costs in connection with
8   the UBS litigation?
9      MS. SMITH:  Objection to form.
10   A   Can you ask -- sorry, can you ask that
11  again?
12  BY MS. TOMKOWIAK:
13   Q   Sure.  Were you aware if the -- was there
14  still $100 million in coverage left on the policy
15  in 2020, or do you know whether part of that had
16  been used to pay for other costs that were covered
17  by the policy?
18   A   I don't have -- sorry, I don't have direct
19  knowledge as to what had -- what, if anything, had
20  been -- you said paid for legal -- for legal
21  expenses.
22   Q   Did you have any role in paying outside
23  counsel or other vendors -- let me rephrase that.
24      Did you have any role in facilitating
25  payment from Sentinel to outside counsel or other

207

1   vendors in connection with their representation of
2   the insureds in the UBS litigation?
3      MS. SMITH:  Objection to form.
4    A   And during what time frame?
5   BY MS. TOMKOWIAK:
6    Q   Between 2017 and 2020.
7    A   I think over the course of '17, I recall
8   there being expenses that I passed through to the
9   Sentinel board and the administrator.  I don't
10  remember what the expenses were or the size, but I
11  remember them -- I remember being told that they
12  were related to the litigation.  But after that,
13  no, I don't recall.  After 2017, I don't recall
14  that workflow or being asked to do that.
15   Q   And other than your lawyers sitting here
16  today, have you ever spoken with anybody on this
17  planet about this policy since you heard about the
18  $1 billion judgment in UBS's favor?
19      MS. SMITH:  Objection to form.
20   A   Since I came to learn of the
21  billion-dollar judgment and what, and now?
22  BY MS. TOMKOWIAK:
23   Q   Uh-huh.
24   A   And now?
25   Q   Yeah.

208

1    A   Have I spoken about the policy to anyone
2   other than my lawyers?
3    Q   Correct.  Other than to your lawyers who
4   are representing you in your personal --
5    A   Yeah, I get it.  No, not that I can
6   recall.
7    Q   So you thought about it, but you didn't
8   discuss it with anyone?
9      MS. SMITH:  Objection to form.
10   A   Yeah.  I guess, I -- I made the connection
11  briefly but, no, I didn't bring it up to anyone
12  and I didn't -- no, I didn't talk about it with
13  anyone.
14  BY MS. TOMKOWIAK:
15   Q   I'm handing you what has been marked
16  previously in this case as Exhibit 2.
17   A   Okay.
18   Q   Exhibit 2 is the seven-page document
19  titled Purchase Agreement, dated August 7, 2017.
20  Is this the purchase agreement that we've been
21  referring to today?
22   A   I believe so.
23   Q   And I think you said, and I just wanted to
24  clarify, that you might have drafted this and then
25  provided it to outside counsel for review; is that

209

1  right?
2  **A  So I worked on this Schedule A,**
3  **transferring it into Word form.  And I recall**
4  **working on the purchase agreement with outside**
5  **counsel -- I believe I -- I worked on it**
6  **initially, sent it to outside counsel just from a**
7  **form and they added to it.  It's pretty -- it's**
8  **pretty short.**
9  Q  From a form -- was this a Highland form?
10  **A  I don't recall.  I don't recall if it was**
11  **a Highland form.**
12  Q  Do you recall who asked you to put an
13  initial draft of this together?
14  **A  Again, I don't -- I don't recall who**
15  **asked.  It was sort of on the list of things that**
16  **needed to be done.  I don't recall who asked.**
17  Q  If you look at Section 1, it says
18  Purchaser, and that is Sentinel, agrees to accept
19  the assets listed in Schedule A hereto as
20  100 percent payment of the premium.
21      And then it goes on to say, skipping a
22  clause, that:  with the explicit undertaking that
23  if anything of value is received by the Sellers,
24  such cash or other item of value shall be held in
25  trust for the Purchaser and promptly remitted

210

1  thereto.
2      And then you define that as the
3  transferred interest.  Do you see that?
4  **A  I see that.**
5  Q  Is that meant to say that if the sellers
6  receive anything of value not listed in
7  Schedule A, that they commit to remitting those
8  interests to Sentinel as well?
9      MS. SMITH:  Objection to form.
10  BY MS. TOMKOWIAK:
11  Q  A simpler question would be, what did you
12  mean by that?
13      MS. SMITH:  Objection to form.
14  **A  I don't recall exactly.  I don't know if**
15  **outside counsel drafted the -- what is it, the**
16  **explicit undertaking.  My view would be that**
17  **anything deriving from the assets in Schedule A,**
18  **but I -- that's my understanding.**
19  BY MS. TOMKOWIAK:
20  Q  What would that be?  Like cash
21  distributions?  Do you have any understanding of
22  that?
23      MS. SMITH:  Objection to form.
24  **A  Not particularly.  I don't really recall.**
25

211

1  BY MS. TOMKOWIAK:
2  Q  Okay.  The purchaser is Sentinel
3  Reinsurance, right?
4  **A  Yes.**
5  Q  We're in the first paragraph or the
6  preamble.  And then the sellers are Highland CDO
7  Opportunity Master Fund, Highland CDO Holding
8  Company and Highland Special Opportunities Holding
9  Company, right?
10  **A  Yes.**
11  Q  And these sellers are the same three
12  entities that are the insureds under the policy?
13      MS. SMITH:  Objection to form.
14  **A  I'd have to --**
15  BY MS. TOMKOWIAK:
16  Q  You can take a look at the -- if you want
17  to compare, match them up.
18  **A  Yeah.  Yes, they are the same.**
19  Q  If you'd turn to Schedule A.  So the
20  assets listed in Schedule A are what the purchaser
21  Sentinel has agreed to accept as payment for the
22  premium, right?
23      MS. SMITH:  Objection to form.
24  **A  It's whatever the document says.**
25

212

1  BY MS. TOMKOWIAK:
2  Q  Right.  That's what the document says.
3  That's what we just read:  The Purchaser agrees to
4  accept the assets listed in Schedule A hereto as
5  100 percent payment of the Premium.
6  **A  Okay.**
7  Q  Okay.  And there's six different entities
8  listed here, right?
9  **A  Yes.**
10  Q  Why are entities -- you agree with me that
11  at least three of these entities are not covered
12  insureds under the insurance policy, right?
13      MS. SMITH:  Objection, form.
14  **A  I don't know if that's true or not.  I**
15  **can't agree with that.**
16  BY MS. TOMKOWIAK:
17  Q  Well, Highland CDO Opportunity Master
18  Fund, that's an insured under the policy, right?
19  **A  Yes.**
20  Q  Okay.  And Highland CDO Opportunity Fund,
21  is that an insured under the policy?
22  **A  I don't know.  I don't know how these**
23  **entities are related to each other or whether --**
24  **the answer is I don't know if they're an insured**
25  **or not.**

213

1    Q   Well, I mean, the insurance policy that
2   you worked on lists three companies that are
3   insured, right, three I should say entities, three
4   funds?
5    A   I agree that there are three entities
6   listed as insured.
7    Q   Okay.  So are you saying that there might
8   have been other entities that were insured under
9   the policy that weren't listed in the schedule to
10  the policy?
11   A   I'm saying I'm not certain as to how these
12  entities are related to own each other or not such
13  that they are insureds as well.  I don't know if
14  that's a matter of insurance law or what.  I just
15  don't want to represent to that because I'm not
16  certain.
17   Q   Okay.  And you don't know why entities
18  that don't appear to be insureds would be
19  transferring assets to pay a premium on a policy
20  that they're not insured under?
21   A   Again, I know they're related to each
22  other in some way.  I don't know how and I don't
23  know what the structure chart looks like, so I
24  can't speak to that.
25   Q   But for purposes of paying the premium on

214

1   the policy, all of these entities commingled their
2   assets together and that's what was used to pay
3   the premium?
4      MS. SMITH:  Objection to form.
5    A   I'm not going to opine on the commingled
6   part.  The purchase agreement says what it says.
7   These are the assets in Schedule A.
8   BY MS. TOMKOWIAK:
9    Q   That will be used to pay the premium on
10  the insurance policy?
11   A   That's what the -- yes, the policy says.
12   Q   Who negotiated the purchase agreement on
13  behalf of Sentinel?
14   A   Sentinel.
15   Q   Who at Sentinel?
16   A   I can't point to a specific advisor or
17  outside counsel.
18   Q   If your issue is with my word commingled,
19  would you agree with me that all of these entities
20  pooled their assets to pay the premium on the
21  insurance policy?
22      MS. SMITH:  Objection to form.
23   A   I wouldn't editorialize it one way or
24  another.  The schedule is what it says and the
25  schedule is a list of assets used to pay for a

215

1   premium.  That's where I would -- that's how I
2   would say it.
3   BY MS. TOMKOWIAK:
4    Q   Where did the list of assets on the
5   schedule come from?
6    A   The accounting team.
7    Q   And the assets that are listed under
8   Highland -- I'm sorry, who on the accounting team?
9   Is that Mr. Stoops that would have provided this?
10   A   Mr. Stoops or one of his colleagues.  I
11  don't know exactly who.
12   Q   And Highland CDO Opportunity Master Fund,
13  is this all of the assets at that fund in
14  August 2017?
15   A   I don't know for certain.
16   Q   So you don't know one way or the other if
17  this is a complete list of all of the assets at
18  Highland CDO Opportunity Master Fund in
19  August 2017?
20   A   Yeah, I -- I can't represent to the
21  accuracy of this.  It's something I received from
22  another team at Highland.  I didn't check line by
23  line and tick-and-tie them.
24   Q   Was the intent that all of the assets of
25  each of these entities would be used to pay the

216

1   premium on the insurance policy?
2    A   That was the intent.
3    Q   So when you say you don't know, you mean
4   you just don't know if something was inadvertently
5   left off, but if -- the intent was that all of the
6   assets of each of the entities listed on
7   Schedule A were supposed to be transferred to
8   Sentinel to pay the premium on the insurance
9   policy?
10      MS. SMITH:  Objection to form.
11   A   I just don't want to represent to the
12  accuracy of this just -- because I haven't done
13  the work to tick-and-tie.  But you have my answer
14  as to the intent.
15  BY MS. TOMKOWIAK:
16   Q   So to your knowledge, after the transfers
17  were made pursuant to this purchase agreement, the
18  entities listed on Schedule A had no assets left?
19   A   Again, I can't -- I don't know personally
20  whether that's the case or not.  I never checked.
21  I never did that.
22   Q   But that was the intent?
23      MS. SMITH:  Objection to form.
24   A   The intent was for the assets on this
25  schedule provided to me to be transferred.

217

1 BY MS. TOMKOWIAK:
2    Q    Would you say this transaction was in the
3 ordinary course of business?
4        MS. SMITH:  Objection to form.
5    A    Whose ordinary course of business?
6 BY MS. TOMKOWIAK:
7    Q    Highland's.
8    A    I don't think I would say one way or the
9 other.
10    Q    Well, was it common to transfer all of the
11 assets out of multiple funds on one day to another
12 entity?
13        MS. SMITH:  Objection to form.
14    A    Again, I can't speak to what's common or
15 not.  I'm just -- I'm not able to speak to what's
16 common or not.
17 BY MS. TOMKOWIAK:
18    Q    Can you recall working on another transfer
19 of assets of this scope or magnitude in the time
20 that you worked at Highland?
21    A    I mean, when you have a fund launch,
22 you're selling securities into the market and it's
23 at a high -- it's at a high volume, a high level.
24 I can't say -- this is the only policy -- ATE
25 policy I worked on while I was at Highland.

218

1    Q    And who directed the accounting team to
2 provide this list of assets?
3        MS. SMITH:  Objection to form.
4    A    I'm not sure.
5 BY MS. TOMKOWIAK:
6    Q    It wasn't you?
7        MS. SMITH:  Objection to form.
8    A    Initially, no.  No, it wasn't -- no, it
9 wasn't.
10 BY MS. TOMKOWIAK:
11    Q    What do you mean by initially?
12    A    I'm sure I asked for a schedule, but I
13 distinguish that from directing the accounting
14 team to send me information.  I don't know who
15 originally -- I don't know where the directive
16 came from originally.
17    Q    But there was a directive originally?
18    A    I know the policy contemplated the
19 schedule of assets.  How it came to be that that
20 asset group was identified, I'm not certain.
21    Q    So when you reached out to the accounting
22 team to give this to you, they had already been
23 given guidance from somebody else on what that
24 list needed to include?
25        MS. SMITH:  Objection to form.

219

1    A    I think that's probably true.
2 BY MS. TOMKOWIAK:
3    Q    You know that's true, or you just believe
4 that to be the case?
5    A    I believe at the time that was true.
6    Q    Why do you believe that?
7    A    Because they provided the schedule.
8    Q    Would they have needed somebody else's
9 approval to do that before sending you the
10 schedule?
11        MS. SMITH:  Objection to form.
12    A    I don't know.
13 BY MS. TOMKOWIAK:
14    Q    Did the accounting team have any questions
15 about why they were providing this to you?
16    A    Not that they asked me, no.
17    Q    Do you know whether there were multiple
18 versions of this schedule?
19    A    I don't recall.
20    Q    Do you know whether the list of assets
21 that were to be transferred were changed or
22 adjusted at any time before this was finalized?
23    A    Not that -- no, not that I recall.
24    Q    Anything about these assets that made them
25 particularly illiquid?

220

1        MS. SMITH:  Objection to form.
2    A    Not that I have direct knowledge of.  That
3 would have been a valuation question, valuation
4 team question.
5 BY MS. TOMKOWIAK:
6    Q    Was it your understanding that these
7 assets were being transferred to Sentinel so that
8 Sentinel could turn them into cash?
9        MS. SMITH:  Objection to form.
10    A    I don't remember being told that.
11 BY MS. TOMKOWIAK:
12    Q    Do you remember telling anybody that?
13    A    I don't recall telling anyone that either.
14    Q    On the face of this question, are you able
15 to tell what the fair value is of these assets?
16    A    I am not.
17        MS. TOMKOWIAK:  I'm going to ask the court
18 reporter to mark this next document as Exhibit 59.
19 BY MS. TOMKOWIAK:
20    Q    It printed out a little bit small, so --
21 and let me know if there's something that you
22 cannot read when you see it.
23        (Deposition Exhibit 59 marked for
24 identification.)
25

221

1  BY MS. TOMKOWIAK:
2     Q   Take a few minutes to study it and let me
3  know when you're ready.
4        (Witness reviews document.)
5     A   Okay.
6  BY MS. TOMKOWIAK:
7     Q   So Exhibit 59 is an e-mail and an
8  attachment.  The attachment is also a native file,
9  so that's why, like the other attachment that we
10  looked at, it doesn't have a Bates stamp on it.
11  The top e-mail is from Carter Chism to Vishal
12  Patel, and it's dated August 11th, 2017.  And if
13  you go back earlier in time in the chain, the very
14  first e-mail is from Mr. Stoops to Mr. Ringheimer,
15  yourself and other individuals.  And here
16  Mr. Stoops is asking Mr. Ringheimer to send
17  custodial admin details for the following entities
18  to JP Sevilla and Isaac copied.  And then he lists
19  the entities that are on Schedule A at that
20  purchase agreement.
21        MS. SMITH:  Sarah, is this attachment the
22  attachment to the top e-mail, Carter to Vishal
23  Patel?
24        MS. TOMKOWIAK:  Yes.
25        MS. SMITH:  And is this the complete

222

1  attachment?
2        MS. TOMKOWIAK:  That's my understanding.
3  Is that right?  Yes.
4  BY MS. TOMKOWIAK:
5     Q   So do you recall asking Mr. Stoops to send
6  you custodial admin details for these entities?
7     A   Do I recall asking Mr. Stoops that?
8     Q   Yeah.
9     A   I don't.
10     Q   Okay.  Do you think that that -- this
11  e-mail would have been after the meeting that you
12  described in the conference room?
13     A   Yes.  This would have been subsequent to
14  that.
15     Q   Okay.  And so -- and take as much time as
16  you need, but does it appear to be that this is
17  Mr. Stoops and the accounting team gathering the
18  asset information for Schedule A to the purchase
19  agreement?
20        MS. SMITH:  Objection to form.
21     A   I'd need to look at what's listed here.
22  It appears to be that.  I can't -- I mean, I can't
23  read part of this, so I -- you know.
24  BY MS. TOMKOWIAK:
25     Q   Yeah, understood.  And was all of this

223

1  being done at your direction or at somebody else's
2  direction?
3        MS. SMITH:  Objection to form.
4     A   This would not have been done at my
5  direction.
6  BY MS. TOMKOWIAK:
7     Q   Do you know why Mr. Stoops is asking
8  Mr. Ringheimer to send the information to you and
9  Mr. Leventon?
10        MS. SMITH:  Objection to form.
11     A   I don't know who directed him to do it.
12  BY MS. TOMKOWIAK:
13     Q   Okay.  And then at the bottom of that
14  first e-mail from Mr. Stoops where he says:  JP,
15  Isaac, Please forward custodial admin details from
16  the counterparty at your earliest convenience, as
17  we will need to share those with BNY to settle the
18  trades.
19        Do you know who the counterparty is that
20  he's referring to?
21     A   I believe it would be Sentinel.
22     Q   And above that he says that he has
23  included the feeder funds for CDO fund on here
24  just in case there is also cash held at these
25  entities.

224

1        So was the idea here to -- that any cash
2  that was held at any of these entities should be
3  included as part of the assets that were
4  transferred to Sentinel in exchange for the
5  insurance policy?
6        MS. SMITH:  Objection to form.
7     A   I don't recall that.
8  BY MS. TOMKOWIAK:
9     Q   Okay.  So at the various meetings that you
10  had that you testified to where you discussed the
11  policy and the terms, you don't recall anybody
12  saying that we should take all of the cash held at
13  these entities and transfer it to Sentinel in
14  exchange for the policy?
15        MS. SMITH:  Objection to form.
16     A   Again, I don't remember it being said that
17  way.  I remember there being a list of assets, and
18  I did not identify the assets.
19  BY MS. TOMKOWIAK:
20     Q   Do you recall if any of these entities
21  entered into purchase agreements with any other
22  entities around the same time frame?
23        MS. SMITH:  Objection to form.
24     A   Sorry, which entities?
25

225

BY MS. TOMKOWIAK:
2  Q  Well, the ones that -- who are listed on
3  Schedule A.  Did they sell any of their assets to
4  anybody besides Sentinel in August 2017?
5  A  I don't know.
6  Q  You don't know.  One more question on that
7  document.  There is an e-mail from Chris Dunn to
8  you that is the one that Mr. Chism is then
9  forwarding and he says:  JP, See attached for the
10 summary of assets and liabilities by fund as
11 discussed.
12     Do you recall what discussion you had with
13 Mr. Dunn regarding this summary of assets and
14 liabilities?
15 A  I do not.
16 Q  Would that discussion have occurred by
17 phone or e-mail, if you know?
18    MS. SMITH:  Objection to form.
19 A  I don't know.
20 BY MS. TOMKOWIAK:
21 Q  Or in person?
22 A  Could have been any of the above.
23 Q  Did anybody ever instruct you to limit
24 written communications about Sentinel or this
25 policy?

226

1  A  No.
2  Q  Okay.  I'm going to hand you what's been
3  previously marked as Exhibit 3.  Take a few
4  minutes and let me know when you're ready.
5     (Witness reviews document.)
6  A  Should I read the whole memo?
7  BY MS. TOMKOWIAK:
8  Q  You don't need to.  I will point you to
9  specific parts of it, but you can take as much
10 time as you need or if you're ready now, that's
11 fine.
12 A  Why don't I read it, then.
13 Q  Okay.
14    MS. SMITH:  Sarah, while he's reading, can
15 I take a second and ask a housekeeping question?
16 On this Exhibit 26 that you represented was
17 redacted as Social Security numbers, did Highland
18 redact those before producing it to you or did you
19 redact those before preparing the exhibit for
20 today's deposition?
21    MS. TOMKOWIAK:  We did.  Did we?  We did.
22    MS. SMITH:  You did?
23    MS. TOMKOWIAK:  We did.
24    (Witness reviews document.)
25 A  Okay.

227

BY MS. TOMKOWIAK:
2  Q  Exhibit 3 is a e-mail from Shawn Raver to
3  Rick Swadley and he's attaching a tax compliance
4  memo.  The date is September 12th, 2018.  Before
5  today, have you ever seen this memo?
6  A  No.
7  Q  So just now the first time that you've
8  seen it?
9  A  Yes.
10 Q  Do you know who Shawn Raver is?
11 A  Yes.
12 Q  Who is he?
13 A  He was a tax counsel at Highland.
14 Q  And who is Rick Swadley?
15 A  He also worked on the tax team at
16 Highland.
17 Q  And before when we talked about who worked
18 on the Sentinel policy, you mentioned tax.  Is
19 Mr. Swadley one of the people who worked on the
20 Sentinel policy and the purchase agreement?
21 A  Yes.
22 Q  Okay.  Do you know whether Mr. Raver did
23 as well?
24 A  I don't recall.
25 Q  Okay.  Did you have any interactions with

228

1  Mr. Raver regarding the UBS policy?
2  A  I don't think so.  Not that I recall.
3  Q  What about with respect to Mr. Swadley?
4  A  Did I have any interaction with him --
5  sorry, can you ask the question again?
6  Q  Sure.  With respect to the legal liability
7  policy.
8  A  Yes.
9  Q  What was the nature of those interactions?
10 A  I remember discussing the policy with him
11 in July or August of 2017.
12 Q  What did you discuss?
13 A  The nature of the policy.  He asked for a
14 copy of it.  That's all I remember.
15 Q  Do you know why he was asking for a copy
16 of the policy?
17 A  I don't.
18 Q  Was that before the policy was finalized
19 or after the policy was finalized?
20    MS. SMITH:  Objection to form.
21 A  I want to say both.  Both, before and
22 after, I had discussions with him about it.
23 BY MS. TOMKOWIAK:
24 Q  Did your discussions relate to the tax
25 implications of the transaction and entering into

229

```
1    the policy?
2        A  I don't recall exactly what the substance
3    was, but he was on the tax team and it was tax
4    stuff.
5        Q  Do you recall that there were tax
6    implications of doing -- entering into this
7    purchase agreement and policy?
8        A  I didn't know of any.  I have no knowledge
9    of whether there were or not.  No one discussed
10   that with me.
11       Q  Would Mr. Swadley have been involved if
12   there weren't any tax issues?
13       MS. SMITH:  Objection to form.
14       A  I'm sorry?
15   BY MS. TOMKOWIAK:
16       Q  Would Mr. Swadley be involved if there
17   were no tax issues?
18       A  I think Mr. Swadley works on all manner of
19   topics.  I wouldn't assume that.
20       Q  Do you know why Mr. Raver would be putting
21   together a memorandum regarding the tax
22   consequences of the Sentinel acquisition of the
23   assets that we just looked at in June of 2018?
24       MS. SMITH:  Objection to form.
25       A  No.
```

230

```
1    BY MS. TOMKOWIAK:
2        Q  In the other matters that you've worked on
3    at Highland, have you received similar memorandum
4    regarding the tax consequences of a particular
5    transaction or acquisition that you've worked on?
6        MS. SMITH:  Objection to form.
7        A  Have I received memos like this?  No.
8    BY MS. TOMKOWIAK:
9        Q  Do you know if others have?
10       A  I don't.
11       Q  If you look at page 2 of the memo and the
12   last full paragraph, it says:  The aggregate
13   purchase price paid by Sentinel for the Assets was
14   $25 million.
15          That's the amount of the premium on the
16   policy, right?
17       A  The premium --
18       Q  On the UBS policy was $25 million?
19       MS. SMITH:  Objection to form.
20       A  In the 2017 policy, yes.
21   BY MS. TOMKOWIAK:
22       Q  Yes.
23       A  That's correct.
24       Q  Okay.  And then the -- he writes here:
25   The aggregate fair market value of the assets on
```

231

```
1    the date of the Transaction was 105,647,679.
2          Do you see that?
3        A  Yes.
4        Q  Do you know where Mr. Raver would have
5    gotten that number?
6        A  No.
7        Q  So we've seen several calculations today.
8    I guess I wouldn't call them calculations.  We've
9    seen several statements today regarding the fair
10   value of the assets that were transferred to
11   Sentinel, including 94 million, 68 million,
12   105 million.  Do you have any idea which of those
13   valuations is right?
14       MS. SMITH:  Objection to form.
15       A  No.
16   BY MS. TOMKOWIAK:
17       Q  Well, at least according to this memo, the
18   value of those assets was approximately four times
19   the premium price; is that right?
20       MS. SMITH:  Objection to form.
21       A  I don't know.  I mean, it says what it
22   says.  I don't know what -- I don't know.  Are you
23   asking if -- sorry, what was the question?
24   BY MS. TOMKOWIAK:
25       Q  Well, by -- at least by Mr. Raver's memo,
```

232

```
1    the value of the assets was at least four times
2    the premium paid, right?
3        MS. SMITH:  Objection to form.
4    BY MS. TOMKOWIAK:
5        Q  105 million is at least four times greater
6    than 25 million?
7        A  I agree that's what it says.
8        Q  Did the fair market value of the assets
9    that were being transferred to Sentinel really
10   matter?
11       A  I don't understand the question.
12       MS. SMITH:  Objection to form.
13   BY MS. TOMKOWIAK:
14       Q  Was the premium going to stay 25 million
15   regardless of what the value of the assets were
16   that Sentinel received for the premium?
17       A  I don't know.
18       Q  Who would know that?
19       A  I don't know.  I'm not sure I understand
20   the question, but -- I don't know what -- I don't
21   know.  Can you ask it again?
22       Q  Sure.  Under the policy --
23       A  Yes.
24       Q  -- the premium was $25 million, right?
25       A  Yes.
```

233

1    Q   And the insureds and other Highland
2  entities were using assets to -- and they were
3  transferring those assets to Sentinel as payment
4  for the premium, right?
5    A   Yes.
6    Q   So did it matter what the fair value or
7  market value or any value of those assets were?
8  Was it going to -- was there -- did it matter in
9  terms of what the premium was or was the premium
10  set and the fair market value of the assets
11  would -- didn't matter?
12      MS. SMITH:  Objection to form.
13    A   So, yeah, so it's compounded.  I don't
14  know the answer to both of those.  I don't know if
15  the premium would have changed and I don't know to
16  the first part as well.  I have no basis to have
17  an opinion on that.  I never heard anyone say that
18  to me.
19  BY MS. TOMKOWIAK:
20    Q   Did the fair market value of the assets
21  matter when it came to the amount of coverage that
22  Sentinel would provide?
23      MS. SMITH:  Objection to form.
24    A   I don't know.
25

234

1  BY MS. TOMKOWIAK:
2    Q   Okay.  So you don't recall anybody saying
3  that if the value of the assets being provided to
4  Sentinel was greater than the coverage amount,
5  that maybe the coverage amount should be
6  increased?
7    A   I don't remember hearing that or
8  discussing that with anyone.
9      THE VIDEOGRAPHER:  Your microphone, sir.
10      THE WITNESS:  Shoot.  I'm sorry.
11  BY MS. TOMKOWIAK:
12    Q   What role did you play in transferring the
13  assets pursuant to the purchase agreement?
14      MS. SMITH:  Objection to form.
15    A   I connected the Highland trading and
16  settlements team with Sentinel's personnel.
17  BY MS. TOMKOWIAK:
18    Q   Handing you what's been previously marked
19  in this case as Exhibit 9.  Exhibit 9 is an e-mail
20  chain between Mr. Stoops and yourself, amongst
21  several other Highland individuals.  Just take a
22  minute with that and let me know when you're
23  ready.
24      (Witness reviews document.)
25    A   Okay.

235

1  BY MS. TOMKOWIAK:
2    Q   So this e-mail exchange is discussing the
3  transfers of assets to Sentinel pursuant to the
4  purchase agreement; is that fair?
5      MS. SMITH:  Objection to form.
6    A   Sorry, say -- can you say it again?
7  BY MS. TOMKOWIAK:
8    Q   Sure.  The e-mail starts with Ms. Irving
9  providing Sentinel wiring information and she
10  says:  Sentinel wiring instructions for cash
11  arising from the transaction are below, thank you.
12      And that's on Bates ending 575.
13    A   Yes, I see that.
14    Q   Okay.  And by transaction, she's referring
15  to the purchase agreement.  Do you agree?
16    A   I don't know for certain.
17    Q   Was there another transaction with
18  Sentinel that was occurring in August 2017?
19    A   No, there wasn't.
20    Q   And then Mr. Chism writes to Ms. Irving:
21  Please confirm this serves as instruction to wire
22  cash from all HFP funds and all CDO funds to the
23  account listed in the instructions below.
24      Do you know who he's asking for
25  instruction from?

236

1    A   I don't.
2    Q   Okay.  And then Mr. Stoops responds and he
3  says:  All cash has been sent.  Working on DTC
4  securities.  Still working on delivery
5  instructions for physicals from Legal.
6      Do you know who he's referring to there
7  when he says from legal?
8      MS. SMITH:  Objection, form.
9    A   No, I don't.
10  BY MS. TOMKOWIAK:
11    Q   Were you in charge of providing delivery
12  instructions for physicals to Mr. Stoops or
13  anybody else on his team?
14    A   I don't think I was in charge of that, no.
15    Q   Did you, in fact, provide any of those
16  instructions?
17    A   I don't recall whether I did or not.
18    Q   Do you know what he means by physicals?
19      MS. SMITH:  Objection to form.
20    A   Physical certificates.
21  BY MS. TOMKOWIAK:
22    Q   Physical stock certificates or physical
23  certificates of what?
24    A   Securities.
25    Q   This e-mail chain is August 11th, which is

237

1  the day after the insurance policy is signed.  Do
2  you recall whether there is any urgency or
3  deadline for transferring these assets to
4  Sentinel?
5      A  I don't recall any urgency or deadline.
6      Q  So to the best of your recollection, there
7  was no time frame by which the assets needed to be
8  transferred to Sentinel?
9      A  Not that I know of.
10     Q  I'm handing you what has been previously
11  marked in this case as Exhibit 19.  And if you can
12  take a minute to look through that.
13         (Witness reviews document.)
14     A  Okay.
15  BY MS. TOMKOWIAK:
16     Q  Earlier today we looked at certain of
17  Sentinel's financial statements and that showed
18  that there were certain investments in certain
19  CLOs.  Do you recall that?
20     A  Yes.
21     Q  And this e-mail chain and attachments
22  appears to reflect that there were certain issues
23  with the certificates for certain CLOs that were
24  supposed to be registered in Sentinel's name that
25  were not, in fact, registered in Sentinel's name.

238

1  Do you recall this issue at all?
2      A  I do.
3      Q  What do you recall about it?
4      A  Just as you said, certificates -- an
5  investment was made in certain CLOs and the
6  certificates were never reregistered and so there
7  was administrative friction around waterfall
8  payments from time to time.
9      Q  And what are waterfall payments as they
10  relate to CLOs?
11     A  To the extent there's residual cash on a
12  quarterly basis, the CLO will pay that cash to the
13  bondholder of the relative tranche.
14     Q  And do you recall whether these CLOs
15  regularly made those types of distributions to
16  Sentinel?
17     A  I don't know if they did so regularly.
18  They did from time to time.
19     Q  Do you recall whether this issue was ever
20  resolved?
21     A  I don't recall whether it was ever
22  resolved.
23     Q  So you don't know if the certificates were
24  ever registered in Sentinel's name?
25     A  I don't.

239

1      Q  Do you know who those certificates were
2  incorrectly registered to?
3      A  No.  I'd have to look at them.
4      Q  On the page ending 2523, there is an
5  e-mail from you to Lesley Thompson that says:  Can
6  the directors please review and execute the
7  attached - these are related to the November
8  waterfall distributions for the CLO securities
9  held by Sentinel.  These should be the last manual
10  applications - hopefully State Street has
11  acknowledged the transfers into Sentinel's name.
12         What was State Street's role in this?
13     A  Indentured trustee.
14     Q  So was the mistake on their part?
15         MS. SMITH:  Objection to form.
16     A  I'm not sure on whose part the mistake
17  was.  I don't know when -- no, I don't know.
18  BY MS. TOMKOWIAK:
19     Q  Do you know whether Sentinel received
20  additional distributions from these CLOs after
21  November 2016?
22     A  I don't recall offhand.
23     Q  Okay.
24         MS. TOMKOWIAK:  Let's take a break.
25         THE WITNESS:  Are we done with this?

240

1          MS. TOMKOWIAK:  Yeah.
2          THE VIDEOGRAPHER:  The time is 4:03 p.m.
3  We are off the record.
4          (Recess taken from 4:03 p.m. CDT to
5  4:26 p.m. CDT)
6          THE VIDEOGRAPHER:  Disk -- the next --
7  disk No. 4 in the videotaped deposition of Jean
8  Paul Sevilla.  The time is 4:26 p.m.  We are back
9  on the record.
10         (Deposition Exhibit 60 marked for
11  identification.)
12  BY MS. TOMKOWIAK:
13     Q  Mr. Sevilla, we've handed you what we've
14  marked as Exhibit 60 in this case.  Have you had a
15  chance to look at that?  We're handing it to you
16  now.  So take a look at it and let me know when
17  you're ready.
18         (Witness reviews document.)
19     A  Okay.
20  BY MS. TOMKOWIAK:
21     Q  I believe you testified earlier that you
22  recalled transferring an interest in the
23  Multi Strategy Credit fund, or if I refer to that
24  as Multi Strat; is that okay?
25     A  Yes.

241

1   Q   Okay.  And I believe you testified earlier
2   that you recalled transferring certain limited
3   partnership interests from one of the CDO funds to
4   Sentinel around August 2007; is that right?
5   A   2017.
6   Q   2017, yes.
7   A   Yes.
8   Q   Okay.  And what role did have you in that
9   transfer?
10  A   Connected Highland SEI and Sentinel's
11  personnel to effectuate and settle the transfer.
12  Q   Was this transfer part of the broader
13  transfer of assets that was -- that Sentinel
14  exchanged for the insurance policy or was this
15  something separate from that?
16      MS. SMITH:  Objection to form.
17  A   This was part of that.
18  BY MS. TOMKOWIAK:
19  Q   And if you -- who is -- what is SEI-IS
20  Highland?  It says there this -- the cover e-mail
21  here at Bates 616 is an e-mail from you to looks
22  like a Listserv, SEI-IS Highland.
23  A   SEI is the fund administrator for
24  Multi Strat.
25  Q   Okay.  And if you look at the next page,

242

1   which is Bates ended 617, the amount of the
2   subscription is 24,313 shares?
3   A   Yes.
4   Q   And then that's signed by Mr. Watler?
5   A   Yes.
6   Q   Turning to the description -- subscription
7   agreement itself, which starts at Bates ending
8   616.
9       MS. SMITH:  Objection to form.  618?
10  1618?
11      MS. TOMKOWIAK:  I'm sorry, 1618.  You're
12  right.
13  BY MS. TOMKOWIAK:
14  Q   1618, are you there?
15  A   Yes.
16  Q   My first question is on page 3, which is
17  the Bates number ending 624.
18  A   Yes.
19  Q   So this lists contact information and I
20  see that Mr. Kranz at Beecher Carlson is listed as
21  the primary contact for Sentinel Reinsurance and
22  that you're listed as the secondary contact.  Why
23  were you listed as the contact for Sentinel?
24  A   I have no idea.  I don't know.
25  Q   Do you know who made that decision?

243

1   A   No, I don't.
2   Q   Were you aware when you sent these
3   documents to the administrator that you were
4   listed as a contact for Sentinel?
5   A   No, not at the time.
6   Q   Is there any reason why you would have
7   been listed as a secondary contact for Sentinel?
8   A   Highland's the manager of Multi Strat.  I
9   was at Highland, but...
10  Q   Have you, in fact, ever received
11  communications pursuant to your role here as
12  secondary contact for notices and communications?
13  A   I have not.
14  Q   Do you know who filled out this form?
15  A   I don't.
16  Q   Was it you?
17  A   I may have filled out portions of it, but
18  certainly not all of it.
19  Q   If you go to Section 9, which starts at
20  page 6 which is Bates ending 627.
21  A   Okay.
22  Q   Section 9 is asking about common
23  beneficial ownership with other investors.  And
24  then it asks:  Does the subscriber have any
25  affiliated investors in the fund?

244

1       And the subscriber in this context is
2   Sentinel Reinsurance, right?
3   A   Yes.
4   Q   And the box here is checked yes.  Do you
5   recall if this is a section that you filled out?
6   A   I don't recall.
7   Q   And then on the next page ending in 628,
8   it asks to identify the affiliated investor or
9   investors with which it has agreed to act
10  together.  And two investors are identified there,
11  Starck, Ltd. and Sentinel Re Holdings Ltd.  Do you
12  see that?
13  A   Yes.
14  Q   Do you know how Starck, Ltd. is affiliated
15  with Sentinel Reinsurance?
16  A   I don't recall.
17  Q   Do you know how Sentinel Re Holdings is
18  affiliated with Sentinel Reinsurance?
19  A   It's in the same organizational structure
20  as Sentinel, either a parent or a subsidiary, but
21  they're in the same structure.
22  Q   And is Starck, Ltd. affiliated with
23  Highland Capital Management?
24  A   I don't know.  I don't recall.
25  Q   If you look at the footnote 7 on the

245

1  preceding page, it defines affiliated investor as:
2  any investor who would be deemed to be a
3  Controlling Person with respect to the Interests
4  held by the Subscriber or who would have an
5  indirect Controlling Person in common.
6      Do you know if Starck, Ltd. and Sentinel
7  Reinsurance had an indirect controlling person in
8  common?
9      A  I don't.
10     Q  Do you know if Starck, Ltd. would be
11  deemed to be a controlling person with respect to
12  the interests held by Sentinel Reinsurance?
13     MS. SMITH: Objection, form.
14     A  I don't -- I have no direct knowledge.  I
15  don't see -- it doesn't -- I don't know the -- an
16  entity Stark Limited.  It doesn't ring a bell.
17  BY MS. TOMKOWIAK:
18     Q  As you sit here today, you don't know how
19  these -- how Starck, Ltd. would fit within the
20  definition of an affiliated investor?
21     A  As I sit here, I don't.
22     Q  Do you recall if you reviewed this e-mail
23  before you sent it to the administrator?  I'm
24  sorry, do you recall if you reviewed this
25  subscriber information form before you sent it to

246

1  the administrator?
2      A  I don't.
3      Q  If you didn't fill out the whole thing, do
4  you know who else would have?
5      A  Sentinel, the directors would have filled
6  out portions of it.  I don't recall exactly which
7  portions, but things like Section 3 and the like.
8      Q  Do you know when Sentinel Re Holdings
9  obtained its interest in the Multi Strat fund?
10     A  I believe it was sometime in 2015.
11     Q  Were you involved in that?
12     A  I recall being involved in that, yeah.
13     Q  Do you recall who it received that
14  interest from?
15     A  I don't recall exactly.
16     Q  Do you recall if it was another Highland
17  entity?
18     A  I don't recall.  I would need to look at
19  the underlying document.
20     Q  You can set that aside.
21     MS. TOMKOWIAK: I'm going to ask the court
22  reporter to mark the next document as Exhibit 61.
23     (Deposition Exhibit 61 marked for
24  identification.)
25

247

1  BY MS. TOMKOWIAK:
2      Q  Exhibit 61 is also an e-mail with an
3  attachment that was -- it's an Excel spreadsheet.
4  It was also produced in native form without a
5  Bates number.  Let me know when you're ready.
6      MS. SMITH: Is this the complete Excel
7  sheet?
8      MS. TOMKOWIAK: Yes.
9      (Witness reviews document.)
10     A  Okay.
11  BY MS. TOMKOWIAK:
12     Q  So in this e-mail chain, which starts with
13  an e-mail from Taylor Colbert, is that how you say
14  it, or Colbert or Colbert?  Do you know who Taylor
15  Colbert is?
16     A  I've always said Colbert, but that may be
17  wrong.
18     Q  Do you know who Taylor Colbert is?
19     A  Generally.
20     Q  And who is he or she?
21     A  He worked in the accounting group.
22     Q  At Highland?
23     A  At Highland.
24     Q  And he is sending Trey Parker a
25  Multi Strat cash projection.  Who is Trey Parker?

248

1      A  Trey Parker was the ex-head of private
2  equity.
3      Q  And when you say ex, do you mean --
4      A  Previously -- until February of '20.
5      Q  Okay.  But at the time he was the head of
6  private equity at the time of this e-mail?
7      A  Yeah.  Yes.  He was the -- he was head of
8  credit research at this time, I believe, in
9  December of 2017.
10     Q  Okay.  And then the next e-mail in the
11  chain is another e-mail from Mr. Colbert to
12  Mr. Parker, where the file has been updated to
13  include Sentinel being presented as an affiliated
14  investor.  Do you see that?
15     A  Yes.
16     Q  Okay.  And if you look at the attachment,
17  the first -- the first document in the attachment,
18  and it looks like this is taking the master fund
19  and dividing it into Highland affiliates and
20  nonaffiliates.
21     A  Yes.
22     Q  Do you agree with that?
23     A  That's what it -- well, I'm sorry.
24     MS. SMITH: Objection, form.
25     A  I don't see that.

249

1  **BY MS. TOMKOWIAK:**
2   Q   Okay.  Your copy might be -- certain lines
3  are shaded.  Are you able to tell that in your
4  copy?
5   **A   Shaded lines, yes.**
6   Q   Yes.  Okay.  And it looks like the shaded
7  lines are the non-Highland affiliates; whereas the
8  nonshaded lines are the Highland affiliates.
9  Based on what you know about the Highland
10  structure, do you agree with that?
11  **A   I can't agree with it.  I don't know**
12  **enough -- I don't know what Core Credit Holdings**
13  **is, I don't know what Japanese Unit Trust is.  No,**
14  **I can't attest to the accuracy of this.**
15  Q   Okay.  But this document with Sentinel
16  being presented as an affiliated investor is
17  consistent with the subscriber agreement that we
18  just looked at, right?
19     MS. SMITH:  Objection, form.
20  **A   I don't -- I'm sorry, I don't -- I see**
21  **Starck here and I see Sentinel here, but -- or**
22  **Sentinel Re and Sentinel.  What --**
23  **BY MS. TOMKOWIAK:**
24   Q   Do you agree that Sentinel Reinsurance was
25  an affiliated investor in the Multi Strat fund?

250

1  **A   Affiliated to who?**
2   Q   Affiliated to Highland.
3     MS. SMITH:  Objection, form.
4  **A   I don't -- my understanding was that**
5  **Sentinel was not an affiliate of Highland.  So**
6  **I -- no, I -- and I don't see that in this -- I**
7  **apologize.  I don't see that in this spreadsheet.**
8  **BY MS. TOMKOWIAK:**
9   Q   Okay.  Well, The Dugaboy Investment Trust,
10  did that have an affiliation with Highland?
11  **A   I don't know.**
12   Q   Highland Capital Management, LP 2, did
13  that have an affiliation with Highland?
14     MS. SMITH:  Objection, form.
15  **A   I've never heard of that entity.**
16  **BY MS. TOMKOWIAK:**
17   Q   Okay.  And how -- when you said my
18  understanding was that Sentinel was not an
19  affiliate of Highland, what's that understanding
20  based on?
21  **A   Compliance.**
22   Q   What do you mean by compliance?
23  **A   My recollection is that compliance had**
24  **made the determination that Highland and Sentinel**
25  **were not affiliates under common control.**

251

1   Q   And so is that what the term affiliates
2  means to you when you're using it, entities under
3  common control?
4  **A   I'm sorry, I thought you said affiliates**
5  **under common control.  Perhaps I misheard.**
6   Q   No, I'm just looking at your -- you said
7  my understanding was that Sentinel was not an
8  affiliate of Highland, so I was asking how you
9  were using that term.
10  **A   Oh, okay.  Can you start the question**
11  **over?**
12   Q   Sure.  Is it your --
13  **A   Okay.**
14   Q   Is it your understanding that Sentinel was
15  an affiliate of Highland?
16     MS. SMITH:  Objection, form.
17  **A   Depends on your definition of affiliate.**
18  **BY MS. TOMKOWIAK:**
19   Q   Okay.  So if affiliate means that they
20  share an owner in common, was Sentinel an
21  affiliate of Highland?
22  **A   I don't know Highland's ownership**
23  **structure.  It changed over time, so I can't**
24  **attest to it at any given moment.**
25   Q   Was there ever a point in time in which

252

1  Mr. Dondero did not own part of Highland?
2  **A   I believe so.**
3   Q   When was that?
4  **A   I don't know the exact time.  I don't know**
5  **exactly when that changed, but I think -- Highland**
6  **has had different ownership structures over years.**
7   Q   Well, if there -- at any particular point
8  over the course of the years when Mr. Dondero
9  owned part of Highland and Mr. Dondero owned part
10  of Sentinel, would you say that they were
11  affiliated?
12     MS. SMITH:  Objection, form.
13  **A   I don't know if that's the definition of**
14  **affiliate.**
15  **BY MS. TOMKOWIAK:**
16   Q   Well, you asked me what my definition was
17  and I said if my definition is that they share an
18  owner and at one point in time Highland was owned
19  in part by Mr. Dondero and Sentinel was owned in
20  part by Mr. Dondero, then --
21  **A   Is this a hypothetical?**
22   Q   Well, if we're using that definition of
23  affiliate.
24  **A   Again, I don't know Highland's ownership**
25  **structure at any given moment.  When you say**

253

1  affiliate, I think of affiliate under common
2  control or the definition of affiliate.  So that's
3  what I was answering.
4      Q   And by common control, do you mean that
5  the control has to be identical?
6      A   No.
7      Q   So you just don't know if Sentinel was an
8  affiliate of Highland?
9          MS. SMITH:  Objection, form.
10     A   It's my understanding that compliance --
11  the compliance group determination was that they
12  were not affiliates under common control.
13  BY MS. TOMKOWIAK:
14     Q   And who in the compliance group made that
15  determination?
16     A   Mr. Surgent.
17     Q   Anybody else?
18     A   I don't know who else he would have
19  consulted.
20     Q   And do you know when he made that
21  determination?
22     A   I can't point to an exact date.
23     Q   Was it before or after the insurance
24  policy was executed?
25     A   My recollection is it was around the same

254

1  time.
2      Q   And did he make that determination during
3  the meeting in the conference room that you
4  referenced earlier?
5      A   I don't recall that being a conclusion
6  from that meeting, the meeting in Bois d'Arc, no.
7      Q   And how did you learn of that conclusion?
8      A   Over the course of time after I came to
9  understand from compliance that Sentinel was not
10  a -- an affiliate under common control.  I'm not
11  sure how the question initially had been posed to
12  them, but I remember learning that from --
13  directly from Mr. Surgent, let's call it August --
14  August of 2017.
15     Q   And did Mr. Surgent provide you anything
16  in writing?
17     A   I don't know if there are e-mails to that
18  effect.  There might be, but certainly verbally
19  around the group, that was made clear.
20     Q   Around what group?
21     A   The group that had worked on the ATE
22  policy that I had referenced earlier, the
23  accounting and settlement and ops and et cetera.
24     Q   So was that conclusion that was made by
25  Mr. Surgent in connection with the UBS policy?

255

1      A   I don't know if it was in connection with
2  it.  It was temporally around the same time.  I
3  don't -- I can't state that one followed the other
4  necessarily.
5      Q   And you said that you remember learning it
6  directly from Mr. Surgent?
7      A   Yes.
8      Q   Was there anybody else in compliance that
9  you remember discussing that conclusion with?
10     A   Jason Post.
11     Q   Anybody else?
12     A   Lauren Thedford.
13     Q   Anybody else?
14     A   Well, Mr. Ellington was not in compliance,
15  but Mr. Ellington.
16     Q   Anybody else?
17     A   That's probably it.
18     Q   When did you discuss that conclusion with
19  Mr. Post?
20     A   Same time frame, August of '17.
21     Q   And was this separate from your
22  conversation with Mr. Surgent?
23     A   No, it would have been simultaneous.
24  Mr. Post would have been in the conversation or
25  nearby.  He's the deputy CCO.  So he was often

256

1  present.
2      Q   And what about Ms. Thedford?  Would you
3  have had a separate conversation with her about
4  that conclusion?
5      A   I don't recall.
6      Q   What about Mr. Ellington?  Would you have
7  had a separate -- did you have a separate
8  conversation with him regarding that conclusion?
9      A   We discussed it separately, yes.
10     Q   What was the context of that discussion?
11     A   We confirmed our understanding of
12  Mr. Surgent -- Mr. Surgent and the compliance
13  group's determination that Sentinel was not an
14  affiliate of Highland.
15     Q   And when you say the compliance group, are
16  you referring to anybody besides Mr. Post and
17  Ms. Thedford?
18     A   Whoever Mr. Surgent consulted in the
19  compliance group.
20     Q   Okay.  And so -- do you know that he
21  consulted with Mr. Post?
22         MS. SMITH:  Objection to form.
23     A   I believe Mr. Post was in the conversation
24  where Mr. Surgent let me know that that was their
25  determination.

257

BY MS. TOMKOWIAK:

Q   Is that the same with respect to Ms. Thedford, or you don't recall?

A   I don't recall the specifics of Ms. Thedford.

Q   And when you had that conversation with Mr. Surgent and Mr. Post, was that a conversation that you had at the office?

A   Yes.

Q   And where was that?

A   On the floor of the legal group.  It's like a trading floor environment, so in between one of our desks.

Q   Was this a scheduled conversation?  Was this an impromptu conversation?

A   I don't recall.

Q   And you don't recall what prompted Mr. Surgent to convey that conclusion to you?

A   Again, it was around the time of the ATE compliance analysis.  I don't recall what -- what came first or if one necessarily was a result of the other.  I just remember them being around the same time.

Q   So do you know who asked him that question?

258

MS. SMITH:  Objection to form.

A   I had asked him.  I'm not sure who else asked him.

BY MS. TOMKOWIAK:

Q   When did you ask him?

A   Around this time.

Q   How did you ask him?

A   I don't remember the exact words, but the question was that -- the discussion was about whether Sentinel was an affiliate of Highland.

Q   Was it in connection with this Multi Strat transfer?

A   I don't recall.

Q   Was this an in-person conversation?

A   Yes.

Q   And what about the conversation that you had referenced with respect to Mr. Ellington?  Was that an in-person conversation?

A   Yes.

Q   Did that also take place in the office?

A   Yes.

Q   And what did you and Mr. Ellington discuss?

A   I can't speak to the -- you know, the entirety of the conversation, but I remember

259

confirming with Scott that compliance had come back to say that Sentinel was not an affiliate of Highland and he said, yeah, that's my understanding.

Q   So were you confirming that to Scott?

A   I was confirming what I had heard to Scott and confirming that he had understood the same thing and he -- we confirmed that to each other.

Q   And you don't recall if that conversation took place in the context of taking any specific action?

A   I don't remember what backdrop it was against.

Q   Going back to this document.  Mr. Surgent forwards this to Mr. Ellington and then Mr. Ellington forwards these attachments to you and Mr. Leventon and asked him to call him tomorrow on this.

Do you recall if you, in fact, called Mr. Ellington?

A   I don't recall.

Q   Do you recall having a conversation with Mr. Ellington at any point in time regarding Sentinel being presented as an affiliated investor in the Multi Strat fund?

260

A   I can't point to a specific conversation, other than the one in the August time frame.  So I -- and I don't remember this e-mail, this particular e-mail, but...

Q   And you don't recall, again, if that conversation that you had with Mr. Ellington was in the specific context of Multi Strat?

A   I'm sorry, which conversation?

Q   The one that you described to me earlier in the office.

A   No, I don't remember that it was in the context of Multi Strat at all.

Q   Okay.  You can set that aside.  I'm handing you what I will ask the court reporter to mark as Exhibit 62.

(Deposition Exhibit 62 marked for identification.)

BY MS. TOMKOWIAK:

Q   Let me know when you're ready.

(Witness reviews document.)

A   Okay.

BY MS. TOMKOWIAK:

Q   Okay.  Exhibit 61 [sic] is an e-mail exchange between Carter Chism, you, Mr. Leventon, Mr. DiOrio and Mr. Stoops, dated February 7th,

261

1   2019, and some of the earlier e-mails go back to
2   January 2019.
3      A  Yeah.
4      Q  Do you recall the issue that's being
5   described in this e-mail regarding the Bank of
6   New York accounts?
7      A  I do recall this.
8      Q  What was going on here?
9      A  I believe there were some amounts
10  outstanding to the Bank of New York, some fees
11  that were outstanding on the part of CDO ops and
12  HFP.
13     Q  Those were custodial funds or --
14     A  I don't know exactly what they were.  I
15  don't know what the funds were in relation to.
16     Q  Okay.  In the e-mail chain from
17  Mr. Leventon to Mr. Chism on February 7th at
18  7:59 a.m. he says:  Jason -- not sure why.  Jason,
19  CDO Fund is and has been insolvent since the
20  financial crisis in 2009.
21        Do you agree that in February 2019, do you
22  agree with the statement that CDO fund was and had
23  been insolvent since 2009?
24        MS. SMITH:  Objection to form.
25     A  I don't know.

262

1   BY MS. TOMKOWIAK:
2      Q  You don't know one way or the other?
3      A  I have no opinion -- yeah, I have no
4   opinion one way or the other.
5      Q  And then at the top of it, the --
6   Mr. Chism writes:  Should we have Bank of New York
7   close the accounts and sweep the cash in full
8   resolution of the amounts BNY claims are owed?
9        Do you recall if that proposal -- do you
10  recall if that happened?
11     A  I don't know if it happened one way or the
12  other.
13     Q  So you don't know if you had Bank of
14  New York close those accounts?
15     A  I did not take this for action or do
16  anything with it.
17     Q  And when Mr. Chism says, I believe the CDO
18  ops fund was included in the transfer to Sentinel,
19  is that referring to the transfer of assets to pay
20  the premium in the insurance policy?
21     A  I'm not sure exactly what he meant there.
22     Q  Do you recall a transfer of assets to
23  Sentinel from CDO or any of the CDO funds at any
24  other point in time?
25        MS. SMITH:  Objection, form.

263

1      A  I don't know what you mean by CDO fund.
2   CDO ops fund, I'm not sure what he means.  You
3   know, certainly one of the insurers is CDO, but I
4   don't -- CDO fund, but I don't -- again, I don't
5   know what he means exactly.
6   BY MS. TOMKOWIAK:
7      Q  Other than the transfers to Sentinel
8   pursuant to the purchase agreement that we looked
9   at earlier, did you have any role in making any
10  other transfers of assets from any Highland fund
11  to Sentinel?
12        MS. SMITH:  Objection to form.
13     A  No.
14  BY MS. TOMKOWIAK:
15     Q  You can set that aside.  I'm handing you
16  what's been previously marked as Exhibit 38.  Take
17  a look at Exhibit 38 and let me know when you're
18  ready.
19        (Witness reviews document.)
20     A  Okay.
21  BY MS. TOMKOWIAK:
22     Q  Have you ever seen this document before?
23     A  No.
24     Q  Do you have any knowledge at all about a
25  transfer -- a sale and purchase between Sentinel

264

1   Reinsurance and Sebastian Clarke Ltd. in 2019?
2      A  No, not that I recall.
3      Q  Don't remember hearing about it?
4      A  No.
5      Q  Did you have any role in any transaction
6   between Sentinel Reinsurance and any non-Highland
7   entity?
8        MS. SMITH:  Objection, form.
9      A  Any transfer between Sentinel Reinsurance
10  and a non-Highland entity?
11  BY MS. TOMKOWIAK:
12     Q  Correct.  Any transfer or other
13  transactions that Sentinel undertook with respect
14  to non-Highland entities.
15        MS. SMITH:  Objection, form.
16     A  There was an e-mail I found in my Gmail
17  that we've produced, about an investment that
18  Sentinel made in a gold fund, some sort of gold
19  commodities fund, in like twenty -- early 2016.  I
20  believe it redeemed its interest in that fund 12
21  to 18 months after, but that would be it.  I'm not
22  familiar with these -- with the subject of this.
23  That would be the other -- the only example I
24  have.
25

265

1  BY MS. TOMKOWIAK:
2    Q  Okay.  Well, that's a good segue into
3  that.  So you can set that aside.
4        You're testifying here today pursuant to a
5  subpoena, correct?
6    A  Yes.
7    Q  And you also received a subpoena to
8  produce documents; is that right?
9    A  Yes.
10       MS. TOMKOWIAK:  We will mark this as
11  Exhibit 63.
12       (Deposition Exhibit 63 marked for
13  identification.)
14  BY MS. TOMKOWIAK:
15   Q  Mr. Sevilla, this is the subpoena issued
16  to you to produce documents in this case.  Have
17  you seen this before?
18   A  Yes.
19       MS. SMITH:  Objection.
20  BY MS. TOMKOWIAK:
21   Q  Oh, shoot, that's the deposition subpoena.
22  Okay.  Well, have you seen that before?
23   A  Yes.
24       MS. TOMKOWIAK:  Then let's mark as
25  Exhibit 64, the document subpoena.

266

1        (Deposition Exhibit 64 marked for
2  identification.)
3  BY MS. TOMKOWIAK:
4    Q  Have you seen this document before?
5    A  Yes.
6    Q  When is the first time you saw it?
7    A  I don't remember the exact date.
8    Q  Was it on or around April 20th, 2021, or
9  after that?
10   A  Would have been whenever I got served with
11  it.  I don't remember the exact date I was served.
12   Q  Okay.  And what did you do to search for
13  documents responsive to the subpoena?
14   A  I searched my phone, I searched my
15  e-mails, I searched any documents or papers I have
16  at my residence and in my office, my place of work
17  at Skyview.  That's the extent of it.
18   Q  What -- where did you search on your
19  phone?
20   A  I searched for text messages, I searched
21  for Signal messages, I searched for e-mails,
22  personal e-mails.  I had access to -- I believe I
23  still had access to Highland e-mails, but I did
24  not review those or access my Highland account.
25  That would have -- yeah, that's --

267

1    Q  Okay.  How did you search your text
2  messages?
3    A  Went text by text and tried to do a search
4  at the top of the search bar.
5    Q  Does that mean that you searched texts
6  with specific people?
7    A  I did both.  I searched texts with
8  specific people and entered -- and entered
9  Sentinel in the search on iMessage and it will
10  show whatever hits.
11   Q  And who are those people that you
12  searched?
13   A  Ellington, Leventon, any work colleague,
14  anyone who had worked at Highland.  I made sure if
15  there were texts from work colleagues, that I
16  searched through there.
17   Q  What are Signal messages?
18   A  It's like a messaging -- like a messaging
19  app, like IM.  I use it very, very infrequently.
20  Nothing responsive came up.
21   Q  But that's an app on your phone?
22   A  It's an app, yeah.
23   Q  Like WhatsApp or something like that?
24   A  Something like that.  And I don't have
25  WhatsApp.

268

1    Q  What e-mail addresses did you search?
2    A  sevillajp@gmail.  I have another e-mail
3  that is largely dormant that I used to sign up for
4  things I thought would be spam, jaypsev@gmail.  I
5  checked my wife's and I family e-mail, which is
6  jpml755@gmail.  And then I checked my work e-mail
7  at jsevilla@skyviewgroup.com.
8    Q  And you said that you did not -- you
9  thought you had access to your Highland account
10  but you didn't access it?
11   A  Yeah.  My understanding is that I had
12  access to -- my Highland e-mail had not been shut
13  off, at the decision of Highland.  So I knew I
14  could access it, but I agreed with counsel that I
15  would flag that and not search that or access
16  Highland property to respond to the subpoena.
17   Q  So do you know that you have access to
18  your Highland e-mail account?
19   A  At the time of the subpoena, I knew I did.
20  I could check it if I wanted to.  I don't know if
21  that's since changed.
22   Q  And again, you knew that because you had
23  accessed it recently?
24   A  No, I knew that because it was still -- I
25  have an iPad and the e-mail client was still on

269

1    the iPad and I wasn't getting any kind of password
2    or error message, so I kind of left it there in
3    stasis out of an abundance of caution. So -- and
4    then I let them know that was the case.
5        Q   When was the last time that you accessed
6    your Highland e-mail account?
7        A   I haven't accessed it since I left
8    Highland, but e-mails have come into the Highland
9    e-mail on my -- e-mails had come into the Highland
10   e-mail on my iPad and so to the extent I was on --
11   the cursor was on it, I guess it would show the
12   top e-mail as being read, but I didn't access it.
13   I wasn't looking for stuff.
14       Q   So on your iPad, you don't need to like
15   put in a password? Your Highland account is just
16   set up so that new e-mails come in?
17       A   That's how it had been set up, yes. And I
18   believe that's since been shut off.
19       Q   And why do you believe that?
20       A   We received a -- Skyview received some
21   communication from the debtor saying they were
22   shutting it off.
23       Q   When did you find the e-mail that you
24   produced to us?
25       A   Friday -- what was last Friday? Whatever

270

1    last Friday was.
2        Q   And was that a result of a subsequent
3    search for documents, or was that as a result of
4    what you just described to me here? So how many
5    times did you look for documents?
6        A   I looked for documents one time. I
7    accessed my Gmail differently on my home laptop.
8    I used the Gmail on like the web browser, which
9    showed more e-mails. I was looking for an e-mail
10   from counsel and I saw that there was one that I
11   hadn't seen. I don't know if it was archived or
12   what, but I saw it and then flagged it for
13   counsel.
14       Q   So the first time you looked in your Gmail
15   you did not identify any responsive documents, but
16   then you subsequently identified the document that
17   you produced to us?
18       A   Correct.
19       Q   Before you were terminated from Highland,
20   did you have a chance to clear out any materials
21   on your desk?
22       MS. SMITH: Objection to form.
23       A   Yes.
24   BY MS. TOMKOWIAK:
25       Q   What did you do with those materials?

271

1        A   The materials that I cleared my desk off?
2        Q   That you had at the office, yeah.
3        A   Took them home or disposed of them if they
4    were personal and I didn't want them.
5        Q   Did you look through those documents to
6    identify anything potentially responsive to the
7    subpoena?
8        MS. SMITH: Objection to form.
9        A   I looked at documents that I cleared my
10   desk of, yes.
11   BY MS. TOMKOWIAK:
12       Q   You're represented by counsel in this
13   matter; is that right?
14       A   Yes.
15       Q   And specifically both of the individuals
16   here?
17       A   Yes.
18       Q   Who is paying for your counsel's fees in
19   this matter?
20       A   I don't know if they've been paid --
21       Q   Who is --
22       A   -- to date.
23       Q   -- expected to pay them?
24       A   I have not been asked to pay. I would
25   expect to have an indemnity or indemnities, but

272

1    I'm not certain if that's the case.
2        Q   Would that be an indemnity by Skyview?
3        A   Potentially.
4        Q   Or Highland?
5        A   Potentially.
6        Q   Okay. So as you sit here today, you don't
7    know who will pay for your counsel's fees?
8        A   I'm not certain who's going to pay or
9    whether it will be me.
10       Q   One other point of clarification. I think
11   you testified -- I was unclear from your testimony
12   earlier. Other than the ATE policy with respect
13   to the UBS litigation, during the course of your
14   employment at Highland, did you work on any other
15   ATE insurance policies?
16       A   Other -- I'm sorry, other than --
17       Q   Other than the one between -- other than
18   the UBS policy with Sentinel.
19       A   I had worked on diligencing SAS litigation
20   funding matters that involved ATE. And so in
21   connection with that, I had reviewed terms of ATE
22   and sort of looked at policies from that
23   perspective.
24       Q   Okay. So you had a general understanding
25   prior to the UBS policy of what an ATE policy was?

273

1    MS. SMITH: Objection to form.
2    **A  I generally knew of what it was, yeah.**
3  **BY MS. TOMKOWIAK:**
4    Q  And the -- and what the purpose of an ATE
5  policy was?
6    **A  Or at least one purpose based on what I**
7  **had seen previously.  I don't think I got a**
8  **comprehensive understanding or view of the**
9  **product, but I certainly had seen it before.**
10    MS. TOMKOWIAK: I'm going to ask the court
11  reporter to mark this as Exhibit 65.
12    (Deposition Exhibit 65 marked for
13  identification.)
14  BY MS. TOMKOWIAK:
15    Q  You can put the subpoena aside.
16    **A  Okay.**
17    MS. SMITH: I'm going to caution you not
18  to reveal any privileged communications between
19  yourself and counsel.
20    THE WITNESS: Okay.
21  BY MS. TOMKOWIAK:
22    Q  Exhibit 65 is a confidentiality agreement.
23  Have you seen this agreement before?
24    **A  Yes.**
25    Q  And did you authorize your attorney to

274

1  sign it on your behalf?
2    **A  Yes.**
3    Q  Do you understand your obligations with
4  respect to confidentiality under this agreement?
5    **A  I believe so, yes.**
6    Q  Okay.  And have you adhered to those
7  obligations?
8    **A  I believe so, yes.**
9    Q  And are you qualifying your answer in any
10  way when you say I believe so, or is there
11  something that you're unsure of there?
12    **A  No.  I think I have complied with it.**
13    MS. TOMKOWIAK: So let's go off the record
14  briefly.
15    THE VIDEOGRAPHER: The time is 5:14 p.m.
16  We are off the record.
17    (Recess taken from 5:14 p.m. CDT to
18  5:15 p.m. CDT)
19    THE VIDEOGRAPHER: The time is 5:15 p.m.
20  We are back on the record.
21    MS. TOMKOWIAK: While we were off the
22  record, I said that I would like to confer with my
23  colleagues to see if we have any further questions
24  for this witness and I also indicated that I
25  believed that the debtor's counsel had some

275

1  questions and I will let Ms. Smith respond to
2  that.
3    MS. SMITH: I'm going to object to the
4  debtor's counsel asking any questions.  He did not
5  join in the notice of deposition and the purpose
6  of the deposition, pursuant to the Court's order,
7  was for UBS to make a record in support of the
8  plaintiff's motion for temporary restraining order
9  and preliminary injunction, not for the debtor.
10  Judge Jernigan limited the scope of the
11  depositions in her ruling, so I'm going to object
12  to him asking any questions.
13    MR. FEINSTEIN: Well, that's unfortunate.
14  Not a good look.  Are you -- do you acknowledge
15  that the debtor has the right to notice the
16  witness for a separate deposition before the
17  cutoff of discovery?  We can do it that way.  I
18  mean, I'll represent that I've got 15 minutes of
19  questions.  But, you know, I take your point, but
20  certainly we have the right to depose the witness
21  in the adversary.
22    MS. SMITH: Just give me one second.
23    MS. DANDENEAU: Can we -- we'll go off the
24  record and confer on that.
25    MR. FEINSTEIN: Maybe we should do that.

276

1    THE VIDEOGRAPHER: We are off the record
2  at 5:17 p.m.
3    (Recess taken from 5:17 p.m. CDT to
4  5:41 p.m. CDT)
5    THE VIDEOGRAPHER: The time is 5:41 p.m.
6  We are back on the record.
7    MS. DANDENEAU: I just want to make a
8  statement.  Before we broke, Mr. Feinstein had
9  indicated that he wished to ask about 15 minutes
10  of questions to Mr. Sevilla.  We raised an
11  objection to that.  We subsequently conferred and
12  we have an understanding with Mr. Feinstein that
13  if we permit those questions to be asked now in
14  the context of this deposition, that Mr. Feinstein
15  will not recall Mr. Sevilla as a witness for a
16  deposition in this proceeding.  And I just want to
17  confirm with Mr. Feinstein if that's correct.
18    MR. FEINSTEIN: I can confirm that.
19    MS. DANDENEAU: Thank you.  And I will be
20  defending Mr. Sevilla for the purposes of
21  Mr. Feinstein's questions.
22    MR. FEINSTEIN: Okay.  Before I start,
23  though, is there any more questioning from UBS?
24    MS. TOMKOWIAK: Yes.  But I will defer the
25  rest of my time until after your questions.

277

1    MR. FEINSTEIN: Okay. Then we can get
2 started, then.
3    Madam Court Reporter, are you ready -- or
4 Mister. Not being in the room, that's the
5 problem. I'll be gender neutral. Are you ready?
6    THE REPORTER: Yes.
7    MR. FEINSTEIN: I'm ready. Thank you,
8 sir.
9          EXAMINATION
10 BY MR. FEINSTEIN:
11   Q   Good afternoon, Mr. Sevilla. I'm Robert
12 Feinstein from Pachulski Stang Ziehl & Jones for
13 counsel to Highland. We've never met before, have
14 we?
15   A   No, sir.
16   Q   So I want to focus you on the time period
17 between the appointment of the independent board
18 and the time you left the company. So the
19 independent board was put in place in or about
20 January of 2020, correct?
21   A   I believe that's right.
22   Q   And the board -- do you know -- can you
23 identify the board members by name?
24   A   Yes.
25   Q   And who are they?

278

1    A   Dubel, Nelms and Seery.
2    Q   Okay. And to what extent did you have
3 interaction with them over the course of calendar
4 year 2020?
5    MS. DANDENEAU: Objection to form.
6 BY MR. FEINSTEIN:
7    Q   You can answer.
8    A   I interacted with all of them at different
9 times from time to time.
10   Q   Did there come a point when Mr. Seery
11 became the CEO?
12   A   Yes.
13   Q   And of the three of them, would you say
14 that your greatest contact over the course of last
15 year was with Mr. Seery?
16   A   Yes.
17   Q   And when did you leave the employ of the
18 debtor?
19   A   February 28th of '21.
20   Q   Okay. And so between the time that the
21 independent board was appointed and your departure
22 from the company, did you ever disclose to any of
23 the members of the independent board that you were
24 aware of the existence of the Sentinel insurance
25 policy ostensibly providing for coverage for the

279

1 loss of the UBS litigation?
2    MS. DANDENEAU: Objection to form.
3    A   No.
4 BY MR. FEINSTEIN:
5    Q   Is there any reason why you didn't do
6 that?
7    A   I wasn't asked. No one ever asked me
8 about UBS matters. It's not a case that I worked
9 on or had any knowledge about. I was focused
10 on -- my primary focus was on the portfolio
11 companies in the private equity book and those
12 would be the matters that Mr. Seery asked me
13 about.
14      The one litigation I did work on in the
15 past had been the ACIS matter. And so Mr. Seery
16 would ask me about those matter -- about ACIS, if
17 he had ACIS questions. But my recollection is
18 that he and the board were very, sort of -- I
19 don't want to say disciplined, but very particular
20 about who they would ask about certain matters at
21 Highland and my function was primarily private
22 equity.
23   Q   All right. You testified before that, to
24 your knowledge, the UBS claim, given its size,
25 was, I think you used the word front and center in

280

1 the bankruptcy case. Do you recall that
2 testimony?
3    A   I don't recall using those words, but I
4 know it was -- it was litigated over and it was
5 discussed quite extensively.
6    Q   And are you aware that last year, calendar
7 year 2020, Highland was both litigating with UBS
8 and also attempting to settle?
9    A   Yes, I did know that.
10   Q   Did you -- do you think it would have been
11 relevant information to tell Mr. Seery of the
12 possible availability of $100 million of insurance
13 proceeds to help settle the UBS litigation?
14   MS. DANDENEAU: Objection to form.
15   A   No, I didn't think to volunteer that
16 information. I knew he was consulting with others
17 and colleagues, and our interaction was primarily
18 related to the private equity team and to all of
19 the issues -- particularly during COVID, several
20 were exigent -- all of the issues facing the
21 portfolio companies. So I had a full plate, as
22 did he.
23 BY MR. FEINSTEIN:
24   Q   The purchase agreement that was entered
25 into alongside the Sentinel insurance policy

281

1   involved the transfer to Sentinel of assets from
2   the two funds that were named by UBS in the state
3   court litigation; isn't that correct?
4       A  I believe that's right.
5       Q  Yeah.  Do you know -- were you made aware
6   of the fact last year, that UBS was asking
7   Highland for information about what assets were
8   made in those funds?
9       MS. DANDENEAU:  Objection to form.
10      A  I was not made aware of that.
11  BY MR. FEINSTEIN:
12      Q  Were you ever instructed by Mr. Dondero,
13  Mr. Ellington or Mr. Leventon not to reveal the
14  facts and circumstances surrounding the Sentinel
15  insurance policy or the transfer of assets to the
16  independent directors?
17      A  No.
18      Q  I want to go back to the July -- or
19  August 17 meetings.  There was a larger group and
20  then there was a meeting with you and Mr. Surgent
21  and Mr. Ellington.  Do you recall testifying about
22  those meetings today?
23      A  My testimony was not that they occurred on
24  August 17th.
25      Q  I'm sorry.  What was the date?  Was it

282

1   July 17th, thereabouts?
2       A  No, I couldn't pinpoint the exact date.
3   My recollection is that it was over the course of
4   late July, early August, but I couldn't
5   necessarily pinpoint.
6       Q  Okay.  But you do remember the meetings?
7       A  Yes.
8       Q  Okay.  So now there was a compliance issue
9   discussed at those meetings, was there not?
10      A  I wouldn't characterize it as a compliance
11  issue.
12      Q  Well, you were aware, were you not, that
13  Mr. Dondero was the beneficial owner of Highland
14  Capital, correct?
15      MS. DANDENEAU:  Objection to form.
16      A  I wasn't -- I had no direct knowledge of
17  what Highland's ownership structure was over time.
18  I knew colloquially that it had changed.  It was
19  never part of my job to really understand or get
20  granular.  So, no, I don't know to what extent he
21  was the beneficial owner of Highland, if ever.
22  BY MR. FEINSTEIN:
23      Q  Was there any doubt in your mind,
24  Mr. Sevilla, that James Dondero was the
25  controlling shareholder, owner, manager of

283

1   Highland Capital?
2       MS. DANDENEAU:  Objection to form.
3       A  I would say there's no doubt in my mind
4   that he was the president of the company.  As far
5   as a shareholder and the rest, I can't testify to
6   that.
7   BY MR. FEINSTEIN:
8       Q  And you were also aware at this time, were
9   you not, that Mr. Dondero had a beneficial
10  ownership in Sentinel, correct?
11      A  Yes.
12      Q  Okay.  And what -- was the compliance
13  question that was discussed at those meetings in
14  late July, whether or not Mr. Dondero's status as
15  a beneficial owner of Sentinel and his
16  relationship as president, among other things to
17  Highland Capital, that that created the prospect
18  of the Sentinel transaction, the insurance policy,
19  the transfer of assets, being an affiliated party
20  transaction; that was mutual, wasn't it?
21      MS. DANDENEAU:  Objection to form.
22  BY MR. FEINSTEIN:
23      Q  You can answer.
24      A  It wasn't just one compliance issue being
25  reviewed.  I acknowledge that was one issue, but

284

1   there was a whole slew of issues or a whole -- a
2   whole compliance approval that didn't just rest on
3   that one discrete issue.
4       Q  But that was one of the issues that was
5   discussed, was it not?
6       A  Yes.
7       Q  Did you weigh in on the discussion at all
8   at the meetings?
9       MS. DANDENEAU:  Objection to form.
10      A  I don't recall what I said.  I knew -- I
11  would have weighed in with respect to questions
12  about Sentinel or what I had been told was the,
13  sort of approval process at the Sentinel level,
14  but I didn't weigh in on the compliance analysis.
15  I wasn't asked to give an opinion on that.
16  BY MR. FEINSTEIN:
17      Q  You testified that Mr. Surgent approved of
18  the transaction from a client -- compliance
19  standpoint, correct?
20      A  Yeah, I believe compliance approved the
21  transaction, yes.
22      Q  And did he articulate at the meeting in
23  particular that the relationship of James Dondero
24  to both Sentinel and Highland Capital was not a
25  live compliance issue in his mind?

285

1    MS. DANDENEAU:  Objection to form.
2    A  I don't think he said that.  I don't
3  recall verbatim what he said.  But from that
4  longer meeting and subsequent meetings, my
5  understanding was that compliance had approved the
6  transaction, including the issues you just
7  highlighted.
8  BY MR. FEINSTEIN:
9    Q  But knowing that, Mr. Dondero's
10  relationship to both Sentinel and Highland
11  Capital, did you question the conclusion that this
12  was not a problem?
13    MS. DANDENEAU:  Objection to form.
14    A  No, I did not question it.
15  BY MR. FEINSTEIN:
16    Q  You have a law degree, correct?
17    A  Yes.
18    Q  And how many years have you been in
19  business?
20    MS. DANDENEAU:  Objection to form.
21    A  I graduated law school in 2007.
22  BY MR. FEINSTEIN:
23    Q  And have been working in the fund industry
24  since then?
25    A  No.

286

1    Q  With respect to the policy itself, the
2  premium was 25 million, correct?
3    A  Yes.
4    Q  And the coverage was 100 million, correct?
5    A  I believe that's right, in 2017, yes.
6    Q  And you've seen documents today that show
7  that approximately 11 million in cash and then
8  various forms of securities and CLO assets was
9  transferred to Sentinel to pay the premium,
10  correct?
11    MS. DANDENEAU:  Objection to form.
12    A  It's been a long day.  I know I saw
13  schedules of assets and a portion of that was
14  cash.  I don't know what the exact numbers were.
15  BY MR. FEINSTEIN:
16    Q  But is it consistent with your
17  understanding of the transaction having
18  participated in it, that Highland -- that assets
19  were transferred to Sentinel, including cash and a
20  substantial amount of CLO assets from the funds?
21    MS. DANDENEAU:  Objection to form.
22    A  I don't know if I would say a substantial
23  amount of CLO assets.  I would agree that assets
24  were transferred, including cash and CLOs.
25

287

1  BY MR. FEINSTEIN:
2    Q  And you've seen estimates that the CLO
3  assets that were transferred were worth tens of
4  millions of dollars, correct?
5    MS. DANDENEAU:  Objection to form.
6    A  Again, I don't -- I don't recall what
7  value was attributed by valuation to the CLO
8  assets, but I know there were CLO assets.
9  BY MR. FEINSTEIN:
10    Q  Did it make sense to you at the time that
11  Sentinel was going to receive 11 million in cash
12  plus the CLO assets to satisfy a premium
13  obligation of $25 million?
14    MS. DANDENEAU:  Objection to form.
15    A  I'm sorry, the question was did it seem --
16  can you repeat that, please?
17  BY MR. FEINSTEIN:
18    Q  Did it make sense to you that to satisfy a
19  $25 million premium, Sentinel was going to receive
20  $11 million in cash and all those CLO assets on
21  that schedule?
22    MS. DANDENEAU:  Same objection.
23    A  I understood what the transaction was to
24  be.  So, yes, I understood that was a portion of
25  it.

288

1  BY MR. FEINSTEIN:
2    Q  Right.  And did it strike you as strange
3  or inappropriate or improper that Highland -- that
4  Sentinel was receiving all those assets in
5  exchange for a $25 million premium obligation?
6    MS. DANDENEAU:  Objection to form.
7    A  I wouldn't say that I thought it was
8  strange or -- is inappropriate the second word you
9  used?  I wouldn't say that I thought it was
10  strange or inappropriate.  I left the approval and
11  propriety of the matter to others above my rank, I
12  guess.
13  BY MR. FEINSTEIN:
14    Q  Did it seem to you, though, that there was
15  an imbalance between the premium payment and the
16  amount of assets that Sentinel was receiving from
17  the funds?
18    MS. DANDENEAU:  Objection to form.
19    A  I didn't think of it that way, as far as
20  an imbalance.  That's not how I thought of it.
21  BY MR. FEINSTEIN:
22    Q  No, but I'm thinking that way and I asked
23  you the question.  Do you see that -- my point,
24  that there's an imbalance between a $25 million
25  premium payment and the receipt by Sentinel of

289

1  11 million in cash and that whole list of CLO
2  assets?
3       MS. DANDENEAU:  Objection to form.
4  BY MR. FEINSTEIN:
5    Q  You can answer.
6    A  No, I don't disagree as to the imbalance.
7  The inputs or the -- the data inputs that I would
8  have been considering would have been from the
9  actuaries, the Highland team and outside counsel.
10  You know, whether the face amount of the policy,
11  et cetera, were appropriate or whether there was
12  an imbalance wasn't within what I was asking --
13  being asked to do or opine on.
14    Q  Yes.  But do you believe that the CLO
15  assets that were on the schedule to the purchase
16  agreement were worth less than $15 million?
17    A  Again, I don't know what valuation
18  methodology would be used in an insurance context
19  or at the Highland context.  I'm certainly not an
20  expert on that.  I -- I wouldn't weigh in on that
21  because I know there are several different ways to
22  value securities like CLOs.  That's not something
23  I've ever been asked to do.
24    Q  You saw documents at the time, did you
25  not, that showed that those assets were worth tens

290

1  of millions of dollars, correct?
2       MS. DANDENEAU:  Objection to form.
3    A  I saw valuation -- I saw value -- I saw
4  spreadsheets with valuation conclusions as to
5  assets.  I didn't know what valuation methodology
6  was being used for those versus in an insurance
7  context.  So again, the idea of an imbalance
8  wasn't within my -- within my workflow or what I
9  was being asked to opine on.
10  BY MR. FEINSTEIN:
11    Q  When you say -- use the words in an
12  insurance context, do you think that the value of
13  the assets transferred to satisfy a premium
14  payment are -- should be treated specially because
15  they're being transferred to pay for an insurance
16  policy?
17       MS. DANDENEAU:  Object to the form.
18    A  I'm not saying that.  I'm not purporting
19  to be an insurance expert by any means.  I'm just
20  acknowledging that there's several ways to value
21  securities and I am an expert as to none of them.
22  And so I hesitate, I shun this idea that I would
23  come up with some sort of conclusion that there
24  was an imbalance, because I acknowledge there are
25  valuation methodologies that frankly I don't

291

1  understand.
2  BY MR. FEINSTEIN:
3    Q  Do you think it makes business sense to
4  pay tens of millions of dollars for an insurance
5  policy that provides $100 million of coverage?
6       MS. DANDENEAU:  I'm going to object, by
7  the way, because -- as to relevance as well as
8  form, because the propriety of the transaction is,
9  to my knowledge, not at issue in the current
10  litigation between UBS and the debtor.  And that's
11  not part of the relief that's being sought.
12       And so you can keep asking him what he
13  thinks and his opinions.  He's told you he's not
14  qualified to give that opinion, but it's not
15  only -- I mean, it's just not a relevant question.
16       Again, you want to spend the rest of the
17  time in this deposition -- allotted to this
18  deposition asking him these irrelevant questions,
19  that's, I guess, your prerogative and
20  Ms. Tomkowiak's prerogative.
21       MR. FEINSTEIN:  Irrelevance is not an
22  appropriate objection in a deposition.
23  BY MR. FEINSTEIN:
24    Q  Can you answer my question, please?
25    A  Will you please repeat it?

292

1    Q  Do you think it's appropriate as a
2  business matter to pay tens of millions of dollars
3  for an insurance policy with $100 million of
4  coverage?
5       MS. DANDENEAU:  Objection to form.
6    A  I think it depends on risk and a number
7  of -- a number of other considerations.  Again, I
8  was not qualified -- I was not qualified or asked
9  to provide my input as to the business sense or
10  the business rationale.  I wasn't qualified to do
11  that nor was I asked.  So I unfortunately don't
12  have a developed view as to that point, or some
13  sort of a conclusion that what you're describing
14  is patently uncommercial.
15  BY MR. FEINSTEIN:
16    Q  Did you ever ask Mr. Dondero or
17  Mr. Ellington in words or substance, why are you
18  paying so much in the way of assets and cash to
19  satisfy a $25 million insurance premium?
20       MS. DANDENEAU:  Objection to form.
21    A  I don't remember asking them that
22  question, as you've phrased it.
23  BY MR. FEINSTEIN:
24    Q  Do you recall any discussions with either
25  of them about the amount of the premium relevant

293

1  to the amount of assets that were being
2  transferred to satisfy?
3      A  I remember discussing with them all -- all
4  material terms, including those and including the
5  other terms of the policy.
6      Q  And in those discussions, was there
7  anything more -- any substantive discussion of the
8  relevant value of the assets being transferred to
9  Sentinel and the amount of the premium obligation?
10     A  We certainly covered those topics.  Again,
11 I can't quote as to what was said, but we
12 certainly covered those topics and I was not asked
13 about the propriety or impropriety of the
14 transaction.
15     Q  But did it strike you as puzzling, that to
16 satisfy a $25 million premium obligation, the
17 funds were going to hand over 11 million in cash
18 and securities and CLO assets that potentially
19 were worth substantially more than 14 million,
20 which would have been the balance due to satisfy
21 the premium obligation?
22     MS. DANDENEAU:  Objection to form.
23     A  Again, I wouldn't use the word puzzling.
24 I didn't -- I wouldn't say that I felt puzzled by
25 it.  What I did have in mind was that it was an

294

1  obligation on the part of the insurance company to
2  pay cash and it was being paid with something
3  other than cash.  So no, I didn't think that was
4  particularly puzzling.
5  BY MR. FEINSTEIN:
6      Q  Did you ever have any one-on-one
7  discussions with Surgent about the insurance
8  policy and the transfer of assets?
9      A  One-on-one, meaning just he and I?
10     Q  Yes.
11     A  I don't -- I'm sure we did.  I can't point
12 to a specific date.  And the meetings that I
13 recall had others in attendance.
14     Q  Well, did you ever probe with Mr. Surgent
15 compliance determinations that there was no
16 affiliated party transaction involved and that the
17 Sentinel transaction was okay from a compliance
18 standpoint, just you and him?
19     MS. DANDENEAU:  Objection to form.
20 BY MR. FEINSTEIN:
21     Q  You can answer.
22     A  I wouldn't call it probing, but I would
23 say that we had fulsome conversations about these
24 matters.
25     Q  You and he, you and Mr. Surgent?

295

1      A  As well as others.
2      Q  Can you tell me to your best recollection,
3  what you and Mr. Surgent discussed on this topic?
4      A  The potential conflicts of interest and
5  other compliance issues that would otherwise
6  disqualify this transaction from being
7  appropriate.
8      Q  Why would there be a conflict of interest?
9      A  As you had indicated, there was a
10 question, among many, with respect to
11 Mr. Dondero's control of Highland and his
12 beneficial -- beneficial interest in the insurance
13 company and that certainly gave rise to compliance
14 scrutiny.
15     Q  Your testimony is that Surgent said it was
16 okay and that ended the matter, right?
17     MS. DANDENEAU:  Objection to form.
18     A  I don't think that's what I said.
19 BY MR. FEINSTEIN:
20     Q  Well, did you push back on Surgent's
21 advice that this was not a compliance problem?
22     A  Again, I don't want to characterize what
23 he said as this is not a compliance problem.  I
24 will submit that there was compliance approval, in
25 my mind, of the transaction.  Did I push back on

296

1  that or push back on that conclusion?  No, I did
2  not.
3      Q  You said before, that nobody ever asked
4  you to restrict your discussion about the Sentinel
5  policy or the transfer of assets, correct?
6      A  Yes.
7      Q  There was that one e-mail at the beginning
8  that said all these documents that are being
9  prepared are attorney-client privilege.  You
10 recall seeing that e-mail today?
11     A  I do recall that.
12     Q  Did that e-mail raise a red flag to you
13 that this transaction was different somehow or
14 questionable?
15     MS. DANDENEAU:  Objection to form.
16     A  I don't think it did.
17 BY MR. FEINSTEIN:
18     Q  Did you ever discuss the assets that
19 remained in SOHC and CDO fund with Mr. Seery last
20 year?
21     MS. DANDENEAU:  Objection to form.
22     A  No.
23 BY MR. FEINSTEIN:
24     Q  I just need a minute to look at my notes.
25     Would it have made more sense to you to

297

1  satisfy the premium obligation by using the
2  $11 million in cash that was transferred to
3  Sentinel and liquidating a CLO asset to generate
4  another 14 million instead of transferring all
5  those CLO assets?
6      MS. DANDENEAU: Objection to form.
7      A  I don't know -- no, I don't -- I would
8  have not thought of that as an option. I don't
9  know what the marketability of them were -- of the
10 securities were. I didn't dive into any of that.
11 So I don't know -- I don't know if -- you started
12 your question, did I think it was reasonable or
13 did I think it would be a better idea to have done
14 that. It's not an analysis I performed or was
15 asked to perform.
16 BY MR. FEINSTEIN:
17     Q  Do you know whether the transaction
18 documents with Sentinel obligates Sentinel to
19 return money to the insureds to the extent that
20 the CLO assets it received are liquidated and
21 generate cash in excess of $14 million?
22     A  I don't know. I'd have to review it and
23 probably want outside counsel to give that
24 opinion. I don't know.
25     Q  Well, you're a lawyer and you worked on

298

1  the transaction documents. Do you recall anything
2  in the documents that obligate a rebate, if you
3  will, to the funds if the CLO assets were sold for
4  more than what was needed to satisfy the premium
5  obligation?
6      MS. DANDENEAU: Objection, asked and
7  answered.
8      A  I don't recall that being a provision. I
9  would have to -- but I haven't committed the
10 document to memory, so I don't want to --
11 BY MR. FEINSTEIN:
12     Q  To the extent that that was not a
13 provision and you worked on the transaction, did
14 you ever suggest to anyone at Highland that such a
15 provision be sought, given the value of the assets
16 being transferred?
17     A  I did not -- I did not tell anyone at
18 Highland that. I did not say -- I did not say
19 that to anyone at Highland. Sorry.
20     Q  Did you think about it at the time?
21     MS. DANDENEAU: Objection to form.
22     A  Candidly, insurance was not my bailiwick.
23 I relied on the subject matter experts to know
24 what was reasonable and feasible.
25

299

1  BY MR. FEINSTEIN:
2      Q  But if Highland was going to buy a piece
3  of real estate for $25 million, isn't the analysis
4  the same, that we're going to transfer either
5  25 million in cash or we're going to transfer
6  11 million in cash and a bunch of securities?
7  It's a valuation issue, isn't it?
8      MS. DANDENEAU: Objection to form. And I
9  think you're really straying into argumentative at
10 this point.
11 BY MR. FEINSTEIN:
12     Q  You can answer.
13     A  I understand your analogy, sir. I'm not
14 able to agree with your way in. That's outside of
15 my work.
16     Q  Which part of my question don't you
17 understand? It's a simple question.
18     MS. DANDENEAU: Objection to form.
19     A  I didn't say I didn't understand it. I
20 just said I'm not -- I understand your analogy.
21 I'm just not willing to agree or disagree. There
22 are questions as to liquidity of the securities.
23 There are questions of when the cash is needed,
24 what the risk of the investment -- I mean, there
25 are so many variables, I think it's unfair to ask

300

1  me to agree with a very simple premise like that.
2      MR. FEINSTEIN: I have no further
3  questions.
4      MS. SMITH: I'm ready.
5      FURTHER EXAMINATION
6  BY MS. TOMKOWIAK:
7      Q  Okay. Mr. Sevilla, I just have some
8  cleanup questions. Do you know whether Sentinel
9  was a managed fund?
10     MS. SMITH: Objection to form.
11     A  Managed fund. Can you be a little more
12 specific? What do you mean by managed fund?
13 BY MS. TOMKOWIAK:
14     Q  Is that a term that you -- that was used
15 at Highland?
16     A  Yeah, I mean, generally, the concept of a
17 fund managed by Highland.
18     Q  Would you consider Sentinel to be a fund
19 managed by Highland?
20     A  I never considered it that way.
21     Q  When the funds purchased the policy from
22 Sentinel, did you think that they were buying
23 coverage in the event that there was legal
24 liability to UBS in the state court action?
25     MS. SMITH: Objection to form.

301

1    A  Yes.
2    BY MS. TOMKOWIAK:
3    Q  And there's no question that before you
4  left Highland, you were personally aware of the
5  $1 billion judgment in UBS's favor against the
6  funds; is that right?
7    A  I had become aware of it before I left
8  Highland.
9    Q  You testified earlier today and in
10  response to the debtor's questions, that at this
11  meeting that occurred in the conference room, the
12  conflict of interest was one compliance question
13  among many.  What were the other compliance
14  questions?
15    A  Suitability of the funds to -- and
16  wherewithal to purchase the -- or enter into the
17  insurance policy.  Where the fund -- where the --
18  where the assets -- how Sentinel would hold the
19  assets and whether that was acceptable.  But, you
20  know, I think of compliance approval and I think
21  of a whole bevy of -- a whole bevy of issues, some
22  of which involve conflicts of interest, some of
23  which involve, you know, an ability of a fund to
24  enter into a given investment or transaction,
25  things of that nature.

302

1    Q  Other than the two issues that you
2  mentioned, and I want to talk about each of them,
3  are there any other compliance issues that you
4  recall being raised during that meeting?
5    MS. SMITH:  Objection to form.
6    A  I think the appropriateness of the
7  transaction on a holistic level.  I believe that
8  was part of the compliance review and approval
9  ultimately.
10  BY MS. TOMKOWIAK:
11    Q  Anything else?
12    A  That's what I can think of now.
13    Q  What do you mean by suitability and
14  wherewithal to purchase?
15    A  It involves a lawsuit.  Is the lawsuit
16  active and alive?  Is the insurance company a bona
17  fide counterparty?  Things like that.
18    Q  Okay.  And were any conclusions reached
19  about whether the lawsuit was active and alive?
20    A  I believe the answer is yes, it was.
21    Q  Okay.  And do you recall that conclusion
22  being reached during that meeting?
23    A  I remember that conclusion being reached.
24  I don't necessarily know whether it was during
25  that meeting or subsequent meetings, in the

303

1  compliance review sort of apogee.
2    Q  Who reached that conclusion?
3    A  The chief compliance officer.
4    Q  Mr. Surgent?
5    A  Yes.
6    Q  Anybody else?
7    A  Compliance was the only -- at least as far
8  as I know, compliance was being asked to weigh in
9  on these questions.
10    Q  And what about the issue of whether the
11  insurance company was a bona fide counterparty?
12  Was there any conclusion reached with respect to
13  that issue?
14    A  I think the answer was, yes, that it was.
15    Q  And who reached that conclusion?
16    A  I think for some of the securities, I
17  think it ultimately would have been approved by
18  Mr. Surgent, but I think there was a question as
19  to some of the securities that involved Mr. Post
20  weighing in, but I would consider it having been
21  approved by compliance versus one person or
22  another.
23    Q  So whether or not Sentinel was a bona fide
24  counterparty depended on the -- depended on the
25  securities being transferred to Sentinel?  I'm

304

1  confused by that.
2    A  Whether Sentinel was qualified to take
3  ownership of certain securities, is what I mean.
4    Q  I see.  Was Mr. Post a Highland employee
5  at this time?
6    A  I believe so.
7    Q  Okay.  And so with what securities do you
8  believe he would have weighed in on?
9    A  I think there were some questions as to
10  interval funds.  I don't have more specific
11  recollection than that.
12    Q  What's an interval fund?
13    A  A fund where the -- as I understand it,
14  the redemption period is -- it's fixed by length
15  of time.  So it could be quarterly, it could be
16  yearly, but there's an interval in which the
17  investor can be redeemed, as far as I understand,
18  and that's a very rudimentary sort of
19  understanding of it.
20    Q  And were any conclusions reached at the
21  meeting as to whether or not Sentinel could, in
22  fact, take ownership of all of the assets that
23  were contemplated being transferred to Sentinel?
24    A  I think that would have been subsequent to
25  the larger meeting.

305

1    Q   Okay.  And when do you -- well, first of
2  all, was that conclusion, in fact, reached?
3    A   Yes.
4    Q   And when was that conclusion reached?
5    A   Over the course of August, I would say.  I
6  don't have an exact date.
7    Q   Who reached that conclusion?
8    A   Again, the compliance group, Mr. Fuentes,
9  I think was asked or weighed in, but, yeah, I -- I
10  can't point to a specific individual.  I just
11  considered it a compliance-approved component to
12  the transaction.
13   Q   Okay.  And Mr. Fuentes, was he employed by
14  Highland or NexBank at this time?
15   A   I don't know.
16   Q   You don't know.  Okay.  But you recall him
17  being involved in discussions regarding the assets
18  that were being transferred to Sentinel?
19   A   I recall he had to weigh in on certain --
20  on certain assets.
21   Q   Okay.  Did those assets relate to NexBank;
22  do you recall?
23   A   NexBank?
24   Q   Yeah.
25   A   No, I don't think anything related to

306

1  NexBank.
2    Q   And then you also mentioned that the
3  appropriateness of the transaction on a holistic
4  level was discussed.  What do you mean by that?
5    A   The transaction was -- the material terms
6  and documentation of the transaction were
7  discussed.  Different groups had a chance to weigh
8  in, and my understanding was that the conclusion
9  was that it was appropriate, feasible, complied
10  with compliance regulations, the Highland
11  compliance handbook, any other kind of governing
12  regime at Highland.
13   Q   So between Mr. Surgent, Mr. Stoops, you
14  and Mr. Ellington, the conclusion was reached that
15  this transaction complied with any other type of
16  governing regiment at Highland; is that what you
17  meant to say?
18       MS. SMITH:  Objection to form.
19   A   No, I wasn't asked to weigh in on
20  compliance matters or feasibility of the trade or
21  any of those matters.  What I would say is,
22  between that meeting and the subsequent -- and
23  meetings subsequent to that, the transaction was
24  approved from a compliance perspective, tax,
25  accounting, trading and settlement, all the

307

1  different Highland touchpoints I previously
2  mentioned.
3  BY MS. TOMKOWIAK:
4    Q   So did the legal department have no role
5  in that?
6        MS. SMITH:  Objection to form.
7    A   No, I would say legal -- yeah, I -- the
8  legal department would have an approval component,
9  sure.
10  BY MS. TOMKOWIAK:
11   Q   And would that be Mr. Ellington?
12   A   Mr. Ellington and Mr. Surgent.
13  Mr. Surgent -- both of them, I think, as GC and
14  deputy GC.
15   Q   And I spoke earlier about NexBank.  What
16  about NexPoint?  Do you recall if any of NexPoint
17  securities were involved?
18   A   I think so.  I don't recall directly, but
19  I think so.
20   Q   Okay.  And again, during this conversation
21  or these series of conversations about the
22  appropriateness of the transaction at a holistic
23  level and various conflicts of interest issues,
24  was -- Mr. Ellington's ownership interest in
25  Sentinel was never discussed?

308

1        MS. SMITH:  Objection to form.
2    A   I have no doubt that it was discussed.  I
3  just don't remember it creating a conflict of
4  interest question or issue.
5  BY MS. TOMKOWIAK:
6    Q   And when you say you have no doubt that it
7  was discussed, do you believe that it was
8  discussed during the July 2017 meeting that you
9  talked about?
10   A   I don't know necessarily if it was
11  discussed then.  Again, it wasn't a compliance --
12  I don't think it gave rise to a compliance issue,
13  but in discussing the transaction and Sentinel, it
14  certainly came up.  I just don't think it created
15  a compliance -- a compliance issue that needed to
16  be analyzed or resolved.
17   Q   Did Mr. Ellington ever recuse himself from
18  any of these conversations?
19   A   Not that I recall.
20   Q   You testified that after the independent
21  board took over, your plate was full and you
22  didn't think that it was your responsibility to
23  bring this policy to their attention.  Do you
24  remember that?  Do you remember that testimony?
25       MS. SMITH:  Objection, form.

309

1    A  I remember testimony to that effect.
2  BY MS. TOMKOWIAK:
3    Q  Okay.  Did you assume that somebody else
4  would bring it to their attention?
5    A  My assumption solely was that other --
6  other colleagues were working on these different
7  litigation matters and working with the
8  independent board and the Pachulski firm about
9  these matters.  I -- the only assumption I had is
10  that all of those people were working together and
11  working effectively together.
12    Q  Do you think any of those colleagues had a
13  duty to bring the UBS policy to the board's
14  attention?
15    MS. SMITH:  Objection to form.
16    A  I don't know what was asked, what
17  discussions they had or otherwise.  I really can't
18  opine.
19  BY MS. TOMKOWIAK:
20    Q  Okay.  And you didn't have an assumption
21  one way or the other that somebody was going to
22  bring that to the board's attention?
23    A  Again, my only assumption was that very
24  qualified people were working with the Pachulski
25  firm and the independent board on these matters.

310

1  These weren't matters I was working on.  And that
2  they were effectively being handled, worked on,
3  addressed and resolved.
4    Q  So as Highland's assistant general counsel
5  at the time that the policy was entered into, were
6  Highland and Sentinel affiliated entities?
7    MS. SMITH:  Objection to form.
8    A  I think the compliance conclusion is that
9  they were not affiliates.
10  BY MS. TOMKOWIAK:
11    Q  Did you have a conclusion as to whether or
12  not they were affiliates?
13    MS. SMITH:  Objection to form.
14    A  I was not asked nor was that -- nor would
15  it have mattered what -- my view.  Compliance's
16  perspective was the one that counted.
17  BY MS. TOMKOWIAK:
18    Q  Okay.  But did you have a view?
19    A  I deferred and agreed to compliance.  I
20  didn't have reason to think they were wrong or
21  they had missed something.
22    Q  Do you still hold that belief today?
23    A  Yes.
24    Q  Is there any definition of affiliates that
25  you would use under which Highland and Sentinel

311

1  would be affiliates?
2    MS. SMITH:  Objection, form.
3    A  That I would use -- can you be a little
4  more specific?
5  BY MS. TOMKOWIAK:
6    Q  That you would use in your capacity as a
7  lawyer.  Is there any definition of affiliates
8  under which Highland and Sentinel would be
9  affiliates?
10    MS. SMITH:  Objection to form.
11    A  The only legal term of art I know of is
12  this concept that affiliates are entities under
13  common control, which I think derives from the
14  securities laws.  Applying that definition, I
15  would say that they're not.
16  BY MS. TOMKOWIAK:
17    Q  And how do you reach that conclusion?
18    A  Because I don't think they're under common
19  control.
20    Q  Why don't you think they're under common
21  control?
22    A  They're controlled by two different sets
23  of people.
24    Q  And it doesn't matter if those two
25  different sets of people have any overlap?

312

1    MS. SMITH:  Objection to form.
2    A  Those two sets of people have any overlap.
3  What do you mean by that?
4  BY MS. TOMKOWIAK:
5    Q  Well, you said that they're controlled by
6  two different sets of people, right?
7    A  Yes.
8    Q  And those two different sets of people
9  included at least, at some point in time,
10  Mr. Dondero, correct?
11    A  Yes.
12    Q  And that doesn't change your analysis as
13  to whether they're controlled -- they're under
14  common control; is that right?
15    A  Right.
16    Q  I'm going to hand you what we will mark as
17  Exhibit --
18    A  66.
19    Q  -- 66; is that right?
20    (Deposition Exhibit 66 marked for
21  identification.)
22    A  Okay.
23  BY MS. TOMKOWIAK:
24    Q  Mr. Sevilla, is this the document that you
25  have in your Gmail that you produced to us?

313

1    A  Yes.
2    Q  I think you testified earlier that you
3  didn't typically use your Gmail -- well, that you
4  didn't use your Gmail for work purposes.  Do you
5  know why you're forwarding this particular e-mail
6  to your Gmail?
7    A  I believe the file was corrupted and I was
8  resending it to myself to try and open it with a
9  different program.  That's vaguely my
10  recollection.  But it was certainly an aberration
11  to do that.  That's not something I did.
12    Q  So as far as you can recall, you would
13  forward items to your personal e-mail if you were
14  having some type of technological issue?
15    A  No.  I think this was a one-time thing.
16  It's not something I did.
17    Q  And this e-mail reflects that Sentinel is
18  investing in the Sequoia fund that you mentioned
19  earlier, right?
20    A  I think that's what it was called.  The
21  gold fund or whatever the --
22      MS. SMITH:  Objection to form.
23    A  I don't remember the formal name.  Sequoia
24  Diversified Growth Fund.
25  BY MS. TOMKOWIAK:

314

1    Q  And do you recall anything about that
2  fund?
3    A  It was -- the manager was based in the
4  Middle East.  It was related to investments in
5  gold.  It would pay a dividend and Sentinel was in
6  the investment for a set period of time, a year or
7  maybe 18 months, could have been less, but it
8  was -- it was a somewhat nominal investment in
9  this gold fund.  I didn't really know much else
10  about it.
11    Q  And your e-mail, Friday, May 6, 2016, at
12  9 a.m., you mention that Sentinel's funds for this
13  investment are already at Noor Capital.  Is that a
14  financial firm in the Middle East?
15    A  Noor Capital was the -- yes, it's a
16  financial firm in the Middle East.  Yes.
17    Q  Do you know why Sentinel wanted to invest
18  in gold in the Middle East?
19    A  I don't know.  I don't know why.
20    Q  Do you know why they reached out to you to
21  handle the subscription documents?
22    A  I'm sorry, who's they?
23    Q  Christopher Watler, Andrew Dean, Amelia
24  Watler.
25    A  No, I reached out to them.  Mr. Ellington

315

1  wanted to make the investment and it required
2  director approval and processing.  So I reached
3  out to the directors.
4    Q  Okay.  I see.  So Mr. Ellington had the
5  idea for Sentinel to invest in this fund?
6    A  Yes.
7    Q  Okay.  Do you know why he wanted to invest
8  in this fund?
9      MS. SMITH:  Objection, form.
10    A  That was not shared with me.
11  BY MS. TOMKOWIAK:
12    Q  He didn't tell you why?
13    A  I don't recall.  I don't recall why.
14    Q  Well, you write here:  Please expedite as
15  this is time sensitive.
16      Do you recall why it was time sensitive?
17    A  I don't remember why it would have been
18  time sensitive.
19    Q  Are you aware of any other investments
20  like this by Sentinel between 2012 and 2017?
21    A  Like what?
22    Q  Like the Sequoia fund.  Are there other
23  instances where Mr. Ellington came to you and
24  asked you to assist with investment on behalf of
25  Sentinel?

316

1    A  No.
2      MS. TOMKOWIAK:  Okay.  We have no further
3  questions.  We would just mark this transcript
4  confidential and remind everybody that it is
5  subject to the confidentiality agreement that we
6  looked at earlier, including all of the documents
7  that we've reviewed today.
8      THE VIDEOGRAPHER:  Anybody else?
9      MS. SMITH:  No.
10      MS. DANDENEAU:  No.
11      THE VIDEOGRAPHER:  This concludes the
12  videotaped deposition of Jean Paul Sevilla.  The
13  time is 6:32 p.m.  We are off the record.
14      (Deposition concluded at 6:32 p.m. CDT)
15
16
17
18
19
20
21
22
23
24
25

317

1    ACKNOWLEDGMENT OF DEPONENT
2    I, JEAN PAUL SEVILLA, do hereby
3  acknowledge that I have read and examined the
4  foregoing testimony, and the same is a true,
5  correct and complete transcription of the
6  testimony given by me and any corrections appear
7  on the attached Errata sheet signed by me.
8
9
10 _____   _____
11  (DATE)          (SIGNATURE)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

318

1    REPORTER'S CERTIFICATION
2    I, Micheal A. Johnson, the officer before
3  whom the foregoing deposition was taken, do hereby
4  certify that the foregoing transcript is a true
5  and correct record of the testimony given; that
6  said testimony was taken by me stenographically
7  and thereafter reduced to typewriting under my
8  direction; that reading and signing was requested;
9  and that I am neither counsel for, related to, nor
10 employed by any of the parties to this case and
11 have no interest, financial or otherwise, in its
12 outcome.
13    IN WITNESS WHEREOF, I have hereunto set my
14 hand this 27th day of July, 2021.
15
16
17 _____
18 MICHEAL A. JOHNSON, RDR, CRR
19 NOTARY PUBLIC IN AND FOR
20 THE STATE OF TEXAS
21
22
23
24
25