

## Planet Depos
### We Make It *Happen*™

**CONTAINS HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**INFORMATION**

# Transcript of Scott Ellington

**Date:** July 29, 2021
**Case:** UBS Securities LLC, et al. -v- Highland Capital Management, L.P.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

```
 1        IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
 2                  DALLAS DIVISION
    In re                         §
 3                                §
    HIGHLAND CAPITAL              § Chapter 11
 4  MANAGEMENT, L.P.,             § Case No. 19-34054-SGJ11
                                  §
 5         Debtor.                §
                                  §
 6                                §
    UBS SECURITIES LLC AND        §
 7  UBS AG LONDON BRANCH,         §
                                  §
 8         Plaintiffs,            §
                                  § Adversary Proceeding
 9         vs.                    § No. 21-03020-sgj
                                  §
10  HIGHLAND CAPITAL              §
    MANAGEMENT, L.P.,             §
11                                §
           Defendant.            §
12
13        CONTAINS HIGHLY CONFIDENTIAL
14        SUBJECT TO PROTECTIVE ORDER
15              INFORMATION
16        Videotaped Deposition of
17        SCOTT BYRON ELLINGTON
18          Conducted Virtually
19        Thursday, July 29, 2021
20            10:39 a.m. EST
21
22  Job No.: 386794
23  Pages: 1 - 407
24  Reported by: Lisa M. Barrett, RPR, CRR, CRC, CSR
25
```

**Page 2**

```
 1      Videotaped virtual deposition of SCOTT BYRON
 2  ELLINGTON, pursuant to notice, before Lisa M.
 3  Barrett, a Certified Shorthand Reporter,
 4  Registered Professional Reporter, Certified
 5  Realtime Reporter, and a Notary Public in and for
 6  the State of Maryland.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                  APPEARANCES
 2  ON BEHALF OF PLAINTIFFS UBS SECURITIES LLC
 3  AND UBS AG LONDON BRANCH:
 4       Andrew B. Clubok (Via Zoom)
 5       LATHAM & WATKINS LLP
 6       555 Eleventh Street, N.W., Suite 1000
 7       Washington, D.C. 20004
 8       (202) 637-2200
 9       Andrew.clubok@lw.com
10
11       Shannon E. McLaughlin
12       Robert Allen
13       LATHAM & WATKINS LLP
14       1271 Avenue of the Americas
15       New York, NY 10020
16       (212) 906-4612
17       Shannon.mclaughlin@lw.com
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              APPEARANCES CONTINUED
 2  ON BEHALF OF DEFENDANT HIGHLAND CAPITAL
 3  MANAGEMENT, L.P.:
 4       Robert J. Feinstein (Via Zoom)
 5       Greg Demo
 6       PACHULSKI STANG ZIEHL & JONES LLP
 7       780 Third Avenue, 34th Floor
 8       New York, New York 10017-2024
 9       (212) 561-7700
10       Rfeinstein@pszjlaw.com
11
12
13  ON BEHALF OF THE WITNESS:
14       Frances A. Smith
15       Eric Soderlund
16       ROSS & SMITH, PC
17       700 N. Pearl Street, Suite 1610
18       Dallas, Texas 75201
19       (214) 377-7879
20       Frances.smith@judithwross.com
21
22
23
24
25
```

5

```
1              APPEARANCES CONTINUED
2
3  ON BEHALF OF THE WITNESS:
4      Debra A. Dandeneau
5      Michelle Hartmann
6      BAKER & McKENZIE, LLP
7      452 Fifth Avenue
8      New York, New York 10018
9      (212) 626-4875
10     Debra.dandeneau@bakermckenzie.com
11     Michelle.hartmann@bakermckenzie.com
12
13 Videographer:  Robert Leonard
14 Remote Technician:  Nate Riveness
15
16
17
18
19
20
21
22
23
24
25
```

6

```
1                   INDEX
2              SCOTT B. ELLINGTON
3                JULY 29, 2021
4                                        PAGE
5  APPEARANCES .................................. 11
6
7  PROCEEDINGS .................................. 11
8
9  EXAMINATION OF SCOTT B. ELLINGTON
10 BY MR. CLUBOK ................................ 11
11 MARKED HIGHLY CONFIDENTIAL ................... 28
12
13 REPORTER'S CERTIFICATION ..................... 407
14
15
16
17
18
19
20
21
22
23
24
25
```

7

```
1              DEPOSITION EXHIBITS
2              SCOTT B. ELLINGTON
3                July 29, 2021
4              (Retained by counsel)
5  NUMBER          DESCRIPTION          MARKED
6  Exhibit 86   Notice of Transfer of Claim    41
7               Other Than for Security
8               Case. No. 19-34054-sgj11
9               Two pages
10 Exhibit 87   Email from Isaac Leventon to   265
11              Scott Ellington, September
12              9, 2019, Bates Nos.
13              UBSPROD2502008 to -2009
14              with attachment, NREF Timeline
15 Exhibit 88   Email from Stephanie Vitiello  313
16              to Isaac Leventon, dated April
17              11, 2017 showing attachment
18              UBS_Settlement Stucture (SV)
19              UBSPROD4837429
20 Exhibit 89   Email from JP Sevilla to Scott  315
21              Ellington dated 11 August 2017
22              with forwarded email
23              Bates Nos. USBPROD2632632-33
24
25
```

8

```
1           DEPOSITION EXHIBITS CONTINUED
2              SCOTT B. ELLINGTON
3                July 29, 2021
4  NUMBER          DESCRIPTION          MARKED
5
6  Exhibit 90   Email from Stephanie Vitiello  383
7               to Isaac Leventon dated
8               11 April 2017 with attachments
9               Bates Nos. UBSPROD4837429-7444
10 Exhibit 91   Email from Stephanie Vitiello  387
11              to Isaac Leventon, dated
12              12 April 2017, Bates Nos.
13              UBSPROD4837505-7524
14 Exhibit 92   Email from Stephanie Vitiello  391
15              to Isaac Leventon, dated
16              12 April, 2017, Bates Nos.
17              UBSPROD4837593-7610
18
19
20
21
22
23
24
25
```

**9**

PREVIOUSLY MARKED EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| Exhibit 50 | ................................ | 140 |
| Exhibit 26 | ................................ | 152 |
| Exhibit 77 | ................................ | 156 |
| Exhibit 39 | ................................ | 190 |
| Exhibit 26 | ................................ | 197 |
| Exhibit 28 | ................................ | 199 |
| Exhibit 61 | ................................ | 255 |
| Exhibit 47 | ................................ | 284 |
| Exhibit 2 | ................................ | 310 |
| Exhibit 82 | ................................ | 329 |
| Exhibit 38 | ................................ | 333 |
| Exhibit 55 | ................................ | 339 |
| Exhibit 69 | ................................ | 354 |
| Exhibit 70 | ................................ | 365 |

**10**

1  HIGHLY CONFIDENTIAL
2  Videotaped Deposition of Scott Ellington
3  Conducted Virtually
4  Thursday, July 29, 2021
5  --- Commencing at 10:30 a.m. (EST)
6      REMOTE TECHNICIAN:  Thank you to
7  everyone for attending this proceeding remotely,
8  which we anticipate will run smoothly.
9      Please remember to speak slowly and do
10 your best not to talk over one another.  Please be
11 aware that we are recording the proceeding for
12 backup purposes.  Any off-the-record discussion
13 should be had away from the computer.  Please
14 remember to mute your mic for those conversations.
15     Have your video enabled to help the
16 reporter identify who is speaking.  If you are
17 unable to connect with the video and are
18 connecting via phone, please identify yourself
19 each time.
20     And apologies in advance for any
21 technical-related interruptions.  Thank you.
22     THE VIDEOGRAPHER:  Here begins video
23 file number 1 in the video deposition of Scott
24 Ellington in the matter of UBC (sic) Securities
25 versus Highland Capital Management in the United

**11**

1  states Bankruptcy Court for the Northern District
2  of Texas, Dallas Division.  Case number
3  1934054FGJ11.
4      Today's date is July 29th, 2021.
5      The time on my video monitor is
6  10:40 a.m., eastern time.
7      My name is Robert Leonard.  I'm the
8  Video Specialist.  I represent Planet Depos.
9      This deposition is being taken via Zoom
10 online.
11     Will counsel please identify themselves
12 verbally and state who they represent.
13     MR. CLUBOK:  Good morning.  This is
14 Andrew Clubok and Shannon McLaughlin from Latham &
15 Watkins LLP on behalf of UBS.
16     MR. FEINSTEIN:  Good morning.  This is
17 Robert Feinstein, Pachulski Stang Ziehl & Jones.
18 We are counsel for the defendant in the adversary
19 proceeding, Highland Capital Management LP.
20     My colleague Greg Demo is also on the
21 Zoom.
22     MS. SMITH:  Good morning.  Frances
23 Smith with Ross and Smith on behalf of the
24 non-party witness, Scott Ellington.
25     MR. CLUBOK:  Okay.  Can you swear the

**12**

1  witness in, please.
2      THE VIDEOGRAPHER:  The court reporter
3  today is Lisa Barrett.  She also represents Planet
4  Depos.
5      Will the court reporter please swear in
6  the witness.
7      (OATH STIPULATION)
8      SCOTT BYRON ELLINGTON, called as a witness,
9        having been duly sworn was examined
10         and testified as follows:
11          EXAMINATION
12 BY MR. CLUBOK:
13     Q   Okay.  Good morning, Mr. Ellington.
14     A   Good morning, Mr. Clubok.
15     Q   Can you state your full name, please?
16     A   Scott Byron Ellington.
17     Q   What is your home address?
18     A   I currently don't have a home address.
19 I recently sold the place I was living.
20     Q   Where are you living right now?
21     A   I'm staying between my father's house
22 and my girlfriend's house.
23     Q   And today, you are taking the
24 deposition at your girlfriend's house.
25     A   Correct.

---

13

1    Q    And that is Stephanie Archer.
2    A    That is.
3    <-- HIGHLY CONFIDENTIAL
4
5
6
7
8    -->
9    Q    So you currently have no principal
10 residence at all.
11   A    Not right now, no.
12   Q    You recently purchased a property to
13 build a home on?
14   A    Not to build a home on, no. I recently
15 purchased a property to move into, but it's not
16 available to move into yet.
17 <-- HIGHLY CONFIDENTIAL
18
19
20
21
22
23
24
25 -->

---

14

1  number that I've had for many years. I don't
2  really use that anymore. It's a legacy number
3  that I'm -- have people that still correspond to
4  me on that, so I left it open to see -- tell
5  people the new numbers I use.
6    Q    Any other phones that you currently
7  have?
8    A    I do. I have one in front of me, if I
9  could look, Mr. Clubok. I actually don't know the
10 number on it because it is only for my family and
11 close friends.
12       Do you mind if I look?
13   Q    Sure.
14   A    Okay. It is -- sorry, it's opening, I
15 <-- HIGHLY CONFIDENTIAL -->
16   Q    And you say that number you only use
17 for family and close friends, not for work, I take
18 it?
19   A    Not for work at all, no.
20   Q    Any other phone number that you
21 currently have?
22   A    There is a phone that's owned by
23 Skyview that I don't know the phone number. I can
24 get that to you at a later date.
25   Q    Do you have that phone with you on your

---

15

1  person today?
2    A    No, I do not.
3    Q    Where is it?
4    A    I believe it's at my dad's house.
5  Because I recently moved, I have stuff in several
6  locations.
7    Q    Did you have that phone with you when
8  you were in Africa on a recent trip?
9    A    I did.
10   Q    And did you get that phone -- you
11 mentioned Skyview.
12       What's Skyview?
13   A    Skyview is an entity that I am
14 currently employed by.
15   Q    Did -- when did you get that phone
16 associated with Skyview?
17   A    I don't know the exact date. They set
18 it up for me. I don't know the date, I'd have to
19 look, a couple of months ago.
20   Q    Since you left the employment of
21 Highland Capital Management?
22   A    Yes.
23   Q    And do you have any other phone numbers
24 currently?
25   A    No.

---

16

1    Q    Have you had any other phone numbers --
2  strike that.
3        Have you had any other phone numbers
4  that you have used for any purpose in the last two
5  years --
6    A    No.
7    Q    -- aside from the ones you've
8  identified?
9    A    No. Other than my desk phone number at
10 Highland, no.
11   Q    Have you ever had -- have you ever
12 referred to a burner phone?
13   A    Never. I don't really even understand
14 what that is.
15   Q    Okay. What's your current -- who's
16 your current employer?
17   A    Skyview.
18   Q    What's the business address of Skyview?
19   A    I don't know the business address of
20 Skyview. I don't know what they've registered it
21 as.
22   Q    Where do you -- do you have a office
23 for Skyview --
24   A    There is not office space yet, no.
25   Q    Do you have any business office

---

**17**

1  anywhere right now?
2      A   No, I do not.
3      Q   Does anybody who works for -- how many
4  employees does Skyview have?
5      A   I believe there is right around 40.  I
6  don't know the exact headcount.
7      Q   Do any of them work in an office?
8      A   They all work remotely, as far as
9  I know.
10     Q   When was the last -- as far as you
11 know, every other employee for Skyview works
12 remotely?
13     A   I believe they work remotely, yes.  I
14 don't know where they work from on a daily basis.
15     Q   Who owns Skyview?
16     A   I do.
17     Q   You are the sole owner of Skyview?
18     A   Yes.
19     Q   Does anyone else have any economic
20 stake in Skyview?
21     A   No.
22     Q   Does any employee of Skyview use office
23 space at the same building where NexBank is
24 located?
25     A   I believe that some people come in

---

**18**

1  there to use those facilities on a -- on an ad hoc
2  basis, yes.
3      Q   But you don't believe that anyone has a
4  permanent office associated with Skyview in
5  that -- in that office?
6      A   Not that I'm aware of it being
7  permanent, no.
8      Q   Do you have any connection whatsoever
9  with NexBank?
10     A   I am a very --
11         -- (overspeaking) --
12     MS. SMITH:  Objection, form.
13     THE WITNESS:  I hold shares or entities
14 affiliated with me hold a very, very tiny amount
15 of shares in NexBank.
16 BY MR. CLUBOK:
17     Q   Do you have any connection with SSB?
18     MS. SMITH:  Objection, form.
19     THE WITNESS:  I don't know what SSB is.
20 BY MR. CLUBOK:
21     Q   Do you have any other employers, other
22 than Skyview?
23     A   No.
24     Q   What is your compensation from Skyview?
25     A   I would have to look at the agreement.

---

**19**

1      Q   Well, who made the agreement?
2      A   The agreement was negotiated by several
3  parties and representatives of Skyview, and I
4  personally was not involved in those negotiations.
5      Q   Who was?  Who negotiated your comp for
6  Skyview?
7      A   I think it wasn't my comp; it was an
8  overall consulting fee and then the comp was set
9  by senior people at Skyview, Frank Waterhouse and
10 Brian Collins.
11     Q   As best you know, what is your
12 compensation for this year going to --
13     A   Commensurate --
14     Q   Strike that.  What do you expect your
15 compensation to be for the work you do associated
16 with Skyview for the year 2021?
17     A   Commensurate --
18     MS. SMITH:  Objection, form.  Objection
19 also as to relevance, as I objected on all of the
20 previous depositions.  This is beyond the scope of
21 the deposition which is due to the facts and
22 circumstances to prove or defend the temporary
23 and -- motion for temporary injunction and motion
24 for protective order and having to do with
25 Sentinel.

---

**20**

1  BY MR. CLUBOK:
2      Q   What do you expect your compensation to
3  be for the work you do associated with Skyview for
4  the year 2021?
5      A   It would be commiserate to what it
6  should have been in the calendar year 2020 at
7  Highland Capital Management Company. (inaudible)
8      Q   So, your compensation was intended to
9  reflect what you believed you were entitled to get
10 in the last year working for Highland Capital
11 Management; correct?
12     A   I don't know if it was what I believed,
13 but I was, again, set by Mr. Collins and
14 Mr. Waterhouse.
15     Q   And what was your compensation for
16 Capital -- Highland Capital Management in 2020?
17     A   I believe it was around $3 million,
18 according to Highland Capital.
19     Q   Is that all in, bonus, deferred comp,
20 equity, any other source of compensation?
21     A   It would be every source --
22     MS. SMITH:  Objection to form.
23     THE WITNESS:  Sorry Frances, my
24 apologies.
25         It would be every form of compensation

---

**21**

1   as reflected in their award letters from all in of
2   everything that you could put as compensation,
3   including free lunches and cell phone
4   reimbursement and parking and that kind of thing.
5   BY MR. CLUBOK:
6        Q   And did you actually receive that
7   $3 million?
8        A   I did not.
9        Q   How much of it did you receive,
10  roughly?
11       A   I received just my base salary in 2020.
12       Q   Which was roughly?
13       A   $450,000.
14       Q   And are you contesting the fact that
15  you did not receive roughly $2.5 million that you
16  believe you are entitled to?
17       A   Yes.
18            MS. SMITH:  Objection.  I'm going to
19  object to the extent that it requires you to
20  divulge any privileged conversations with your
21  attorneys.
22  BY MR. CLUBOK:
23       Q   Yeah, all -- all of my questions are
24  intended to -- are not intended to seek privileged
25  communications with your attorneys.

**22**

1            So when I say contesting, I mean to
2   Highland Capital Management in some form or
3   another, not what you might be personally saying
4   to your attorney in a privilege setting.
5        A   Without divulging any privileged
6   communications, the general answer is yes.
7        Q   In what form are you contesting that or
8   have you -- have you made that -- have you -- in
9   what form have you expressed that disagreement?
10  Do you have a claim?  Have you given notice?
11       A   I follow the advice of counsel.
12       Q   Right.  But how have you communicated,
13  if you have communicated, your challenge to your
14  compensation for 2020 to Highland Capital
15  Management?
16       A   Again, without divulging privileged
17  communication with counsel, I believe a proof of
18  claim has been filed.
19            Pardon me?
20       Q   The question or the answer?
21       A   I said a proof of claim has been filed.
22       Q   You're an attorney authorized to
23  practice law?
24       A   Yes.
25       Q   Are you -- are you currently an active

**23**

1   member of the bar?
2        A   Yes.
3        Q   Which bar or bars?
4        A   The Texas bar.
5        Q   Do you have any other bar memberships,
6   other than Texas, state court or Supreme Court?
7        A   I do not.
8        Q   Any federal court bar memberships?
9        A   No.
10       Q   Where did you go to law school?
11       A   Pepperdine University.
12       Q   What year did you graduate?
13       A   Sorry?
14       Q   Sorry.  What year did you graduate?
15       A   2000.
16       Q   Have you ever had any disciplinary
17  actions taken against you since you became a
18  lawyer?
19       A   No.
20            MS. SMITH:  Objection to form.
21  BY MR. CLUBOK:
22       Q   Have you ever had any complaints to the
23  bar, as far as you know?
24       A   As far as I know, no.
25       Q   Do you have any other professional

**24**

1   licenses, other than law degree?
2        A   I do not.
3        Q   What does Skyview Group do?
4        A   Skyview Group advises and consults with
5   its clients.
6        Q   On what matters?
7        A   Anything that we're contracted to
8   consult and advise upon.
9        Q   What do you -- what -- what area
10  generally do you advise and consult on?
11       A   Middle and back office functions to
12  money managers and family offices and related
13  parties.
14       Q   Anything else?
15       A   No.
16       Q   And how many clients do you have?
17       A   I'd have to think of the number of
18  entities.
19            I'm not certain, but I would say around
20  probably -- let me think.  I'd have to look at the
21  agreements to give you an exact number, but I'd
22  say less than a dozen.
23       Q   And of those, are any completely
24  unaffiliated with Jim Dondero, yourself or other
25  current or former employees of Highland Capital

---

**25**

1 Management?
2     MS. SMITH:  Objection to form.
3     THE WITNESS:  Yes.
4 BY MR. CLUBOK:
5     Q  How many?
6     **A  Three.**
7     Q  Who are they?
8     **A  There is confidentiality agreements**
9 **with who the clients are.  I believe I would**
10 **violate those contracts if I disclose.**
11     Q  We -- we can designate this part of the
12 transcript as confidential.
13              CONFIDENTIAL
14     THE WITNESS:  I'd have to look at the
15 agreements to tell you the entity names.
16 BY MR. CLUBOK:
17     Q  Okay, well, we'll ask you to do that,
18 then, at the (inaudible)
19     You believe there's a confidentiality
20 agreement that prohibits you, in response to this
21 subpoenaed deposition that was court ordered, from
22 disclosing those names, even under the protective
23 order in this case?
24     MS. SMITH:  Objection to form.  He's
25 already -- he's already answered the question

---

**26**

1 saying --
2     MR. CLUBOK:  Yeah.
3     MS. SMITH:  -- he thinks it's
4 confidential.
5 BY MR. CLUBOK:
6     Q  Well, no, let me just be clear.  You
7 understand you are here testifying under a
8 subpoena; correct?
9     **A  Yes.**
10     Q  And you understand that you contested
11 that subpoena and litigated in court to try to
12 quash this deposition; correct?
13     **A  Correct.**
14     Q  You understand you've been court
15 ordered to sit for this deposition; right?
16     **A  Yes.**
17     Q  And you are a lawyer; correct?
18     **A  Yes.**
19     Q  Okay.  And you believe that you have a
20 binding, private contract with your clients that
21 protects you from disclosing them even in this
22 deposition setting?  As you sit here today, that's
23 your legal belief?
24     MS. SMITH:  Objection, calls for legal
25 conclusion.

---

**27**

1     THE WITNESS:  I will -- I will take
2 advice from counsel, and, like you said, they can
3 be provided under some kind of a confidentiality
4 agreement under this deposition.  I'm not saying
5 that I -- that I don't have to disclose them.
6 I'll just take the advice of counsel.
7     MR. CLUBOK:  Okay.  Why don't we go off
8 the record.
9     -- Off-record discussion --
10     THE VIDEOGRAPHER:  We're going off the
11 record at 10:56 a.m.
12 (Recess taken 10:56 a.m. to 11:05 a.m.)
13     THE VIDEOGRAPHER:  We're going back on
14 the record at 11:05 a.m., eastern time.
15 BY MR. CLUBOK:
16     Q  Okay.  Sir, to the -- my understanding
17 that Ms. Smith, on your behalf, is going to
18 designate this next answer highly confidential and
19 myself, the other lawyers reasoning UBS and
20 debtor's counsel will all abide by the orders in
21 this case with respect to confidentiality.  So
22 with that said --
23     MR. FEINSTEIN:  That's agreed.
24     MR. CLUBOK:  Thank you, Mr. Feinstein.
25 BY MR. CLUBOK:

---

**28**

1     Q  Let's just ask you again.  To the bet
2 of your ability, can you identify any clients of
3 Skyview Group that are not affiliated with
4 Mr. Dondero or some other current or former
5 employee of Highland Capital Management?
6     **A  Yes.**
7     MS. SMITH:  Objection as to --
8 objection as to form, and this is to be marked
9 highly confidential.
10     You can answer to the extent you know.
11          HIGHLY CONFIDENTIAL
12     THE WITNESS:  The first one I'm aware
13 of is a real estate developer in Austin.  I do not
14 know the entity name.  I know generally that they
15 have a distressed situation that involves
16 litigation.  And they do not have any resources
17 in-house, so they wanted to retain Skyview and
18 have retained Skyview to generally manage
19 litigation in a distress workout situation on a
20 project -- real estate project in Austin, Texas.
21     MR. CLUBOK:  Who is the human being
22 that you deal with there?
23     THE WITNESS:  I have never dealt with
24 anyone.  I was informed by JP Sevilla that they
25 had signed an agreement and agreed to a fee

---

**29**

1  structure with generally what I just told you.
2  I have zero involvement.
3  BY MR. CLUBOK:
4      Q   Okay.  Do you know how Skyview got that
5  business?  Through some --
6      A   I do not.  I know that someone at
7  Skyview was contacted that had a personal
8  relationship with this person, and said "Do you
9  guys have these resources."
10     Q   Okay.  And the other two clients -- and
11  by the way, you don't know who that person was at
12  Skyview who was in contact --
13     A   I really don't.
14     Q   Who are the other two clients that
15  Skyview has that are not affiliated in some way
16  with Mr. Dondero or another Highland current or
17  former employee?
18         MS. SMITH:  Objection as to form.
19  Again, this needs to be marked highly
20  confidential.
21         THE WITNESS:  A group of retired
22  executives in Dallas have a relationship with Lucy
23  Bannon at Skyview, and they are forming a small VC
24  firm and have zero resources, other than their
25  contacts.  And they asked us to structure from a

---

**30**

1  tax standpoint and consult on docs for their
2  outside counsel on structuring this VC fund
3  they're trying to put together.
4  BY MR. CLUBOK:
5      Q   And they are retired from what company?
6      A   I really don't know.
7      Q   And what's the third one?
8      A   The third one is a Swiss-based
9  commodities broker that was looking for fund
10  accounting work -- fund accounting help and
11  compliance help in opening a U.S. operation.
12         From what I understand, that's under an
13  LOI, and there is not agreement to fees.
14     Q   What's the name of that Swiss Bank?
15     A   I do not know.
16     Q   What's your job title at Skyview?
17     A   I believe they -- they have given me
18  the title of president.
19     Q   Well, you own the company; right?
20     A   Correct.
21     Q   So ultimately you make any final
22  decisions about the company?
23     A   Correct.
24         MS. SMITH:  Objection as to form.
25

---

**31**

1  BY MR. CLUBOK:
2      Q   What are your duties and
3  responsibilities at Skyview Group?
4      A   To manage the employee base, originates
5  new business, and consult, advise clients.
6      Q   Do you -- does Skyview pay any rent or
7  any compensation for the use of offices at the
8  NexBank?
9          MS. SMITH:  Objection as to form.
10         THE WITNESS:  I don't know.
11  BY MR. CLUBOK:
12     Q   Who worked out an agreement, such that
13  you were given office space at NexBank?
14     A   I don't know.
15         MS. SMITH:  Objection as to form.
16  BY MR. CLUBOK:
17     Q   How many people routinely work at those
18  offices?
19         MS. SMITH:  Objection, calls for
20  speculation.
21         THE WITNESS:  I don't know.
22  BY MR. CLUBOK:
23     Q   Have you ever been to those offices?
24     A   Yes.
25     Q   When was the last time you were there?

---

**32**

1      A   Early June.
2      Q   And how often have you gone there since
3  forming Skyview Group?
4      A   I think I've been there three times.
5      Q   Do you -- is there an office designated
6  for you there?
7      A   No.
8      Q   Do you plan to remain the sole owner of
9  Skyview Group?
10     A   The plan is to distribute equity to
11  senior and employees in general.
12     Q   How many employees are slated to get
13  equity under your current planning?
14         MS. SMITH:  Objection to form.
15         THE WITNESS:  We did not have a -- we
16  do not have a final determination that's being
17  evaluated.
18  BY MR. CLUBOK:
19     Q   But it would include Mr. Sevilla;
20  correct?
21     A   I would highly assume so.
22     Q   And Mr. DiOrio?
23     A   I would highly assume so.
24     Q   And what about Ms. Irving?
25     A   I don't know about Ms. Irving, because

---

33

1 I don't know what Ms. Irving's ability to work
2 looks like in the future.
3     Q    And what about Mr. Leventon?
4     A    I would highly assume so.
5     Q    Highly assume that he would be slated
6 to get equity when you figure out a plan for
7 distributing equity to employees; correct?
8     A    I agree.
9     Q    When did you get the idea to form
10 Skyview?
11    A    Five years ago.
12    Q    And did you make efforts to make
13 Skyview a reality prior to leaving Highland
14 Capital Management?
15         MS. SMITH:  Objection as to form.
16         THE WITNESS:  Yes.  Yes, several times.
17 BY MR. CLUBOK:
18    Q    And so you'd been planning to form
19 Skyview during the last year of working at
20 Highland Capital Management, at least; correct?
21    A    Yes, for many years before that.
22    Q    In fact, you incorporated just two days
23 after you were fired from Highland Capital
24 Management?
25         MS. SMITH:  Objection as to form.

34

1         THE WITNESS:  I don't know when the
2 entity was incorporated.
3 BY MR. CLUBOK:
4     Q    Fair to say it was very shortly after
5 you were terminated from Highland Capital
6 Management?
7     A    That would be my assumption, yes.
8     Q    Does Jim Dondero have any sort of
9 economic stake in Skyview, in -- directly or
10 indirectly?
11    A    No.
12    Q    What is Mr. Dondero's relationship to
13 Skyview, if any?
14         MS. SMITH:  Objection as to form.
15         THE WITNESS:  Mr. Dondero's entity is
16 related to Helm (inaudible) or some of the
17 contractual clients.
18 BY MR. CLUBOK:
19    Q    And Skyview is currently operating out
20 of NexBank's offices; correct?
21         MS. SMITH:  Objection as to form.  He's
22 already explained that multiple times.
23         THE WITNESS:  Skyview employees on an
24 ad hoc basis work in the NexBank offices.
25         I don't know how many, but I certainly

35

1 wouldn't consider it as operating out of NexBank's
2 offices.
3 BY MR. CLUBOK:
4     Q    Have any Skyview employees given the
5 NexBank offices as their business address as far
6 as you know?
7     A    I have no idea what they've given as a
8 business address.
9     Q    When you worked out agreements with
10 your clients, did you ever include a business
11 address for Skyview Group in any of those
12 agreements?
13    A    I haven't been involved in working out
14 those agreements.
15    Q    Has Skyview ever represented to any
16 clients that its business address was the NexBank
17 office?
18    A    I --
19         MS. SMITH:  Objection as to form.
20         THE WITNESS:  Sorry.  I don't know.
21 BY MR. CLUBOK:
22    Q    If they did so, that would be false;
23 correct?
24         MS. SMITH:  Objection as to form.
25         THE WITNESS:  That would be false, in

36

1 my opinion, yes.
2 BY MR. CLUBOK:
3     Q    So if a Skyview employee was
4 representing that his or her business address was
5 the NexBank office, that would be a false
6 statement; correct?
7         MS. SMITH:  Objection as to form.
8         THE WITNESS:  To me, it would be
9 because I don't consider that where Skyview's
10 offices are since a very small number of
11 employees, as far as I know, worked there on an ad
12 hoc basis.
13 BY MR. CLUBOK:
14    Q    Do you have any other employment
15 currently?  And I apologize if I asked that
16 already, but...
17    A    I do not.  You already asked, and I do
18 not.
19    Q    Do you have any other source of income,
20 other than the income you get from Skyview Group?
21    A    Well, I have shares in the REITs that
22 are granted by the independent board members to
23 myself.  But I don't know if you would consider
24 that income or not.
25    Q    The REITs that Skyview Group manages?

37

1    A   Skyview Group does not manage anything.
2    Q   All right.  Are these REITs that are
3  clients of Skyview Group?
4    A   NexPoint Advisors --
5        MS. SMITH:  Objection as to form.
6        THE WITNESS:  Sorry, Frances, I keep
7  stepping on you, I apologize.
8        NexPoint Advisors is the investment
9  manager that manages the REIT on our part.
10 BY MR. CLUBOK:
11    Q   And is NexPoint Advisors a part of
12 Skyview Group?
13    A   Yes.
14    Q   And you are allocated shares in the
15 REITs that NexPoint Advisors manages; correct?
16    A   Yes.  And -- by the independent board
17 members, as they see fit.
18    Q   Do you have any other source of income?
19    A   No.
20    Q   As a rough percentage, what do you
21 expect your Skyview Group income to be in terms of
22 your total income as vis-a-vis the REITs?
23        MS. SMITH:  Objection as to form.
24 Again, none of this is relevant to the topics of
25 the deposition.

38

1        THE WITNESS:  I wouldn't know how to
2  calculate that because they could give me zero or
3  they could give me ad infinitum shares.  But in
4  looking historically, it would be less than
5  probably -- I don't know, I'd have to do the math,
6  but about 10 or 15 percent.  But, again, it's not
7  necessarily income.
8    Q   Are there any subsidiaries of Skyview
9  Group?
10    A   I would -- I would have to have
11 somebody update the org chart.  I know that that's
12 been considered, but I don't know what's been
13 implemented.
14    Q   Have you ever heard of an entity called
15 Skyview Legal PC?
16    A   I know that something was being
17 discussed about a legal PC.  I don't know what the
18 gentlemen working on it decided to name it or if
19 it's been implemented.
20    Q   Who's the gentlemen working on it?
21    A   I believe JP Seery and Isaac Leventon
22 were the people in charge of that.
23    Q   Do you know what CPCM LLC is?
24    A   I do.
25    Q   What is it?

39

1    A   I believe it's an entity that holds
2  claims that the former Highland employees
3  potentially have against the debtor.
4    Q   Did you assign your claim to CPCM?
5    A   I believe I did.
6    Q   For what consideration?
7    A   My employment.
8    Q   Your employment with whom?
9    A   My employment with Skyview.
10    Q   You own Skyview; correct?
11    A   Correct.
12    Q   And you had to assign your claim to
13 CPCM as -- in order to get a job with a company
14 you fully owned?
15    A   No.
16    Q   Okay.  So was there any consideration
17 at all for the assignment of your claim to CPCM?
18        MS. SMITH:  Objection to form.  He's
19 already answered that.
20        (No response)
21 BY MR. CLUBOK:
22    Q   Was there any consideration at all for
23 the assignment of your claim to CPCM?
24    A   I believe it was my employment with
25 Skyview.

40

1    Q   But that employment you had the right
2  to give yourself, regardless of whether or not you
3  assigned your claim to CPCM as a hundred percent
4  owner of Skyview; correct?
5        MS. SMITH:  Objection to form.
6        THE WITNESS:  Theoretically, yes.
7  BY MR. CLUBOK:
8    Q   Not just theoretically, actually, as
9  far as you know.
10        As far as you understand, owning a
11 company a hundred percent, you certainly had the
12 right to employ yourself in any capacity you
13 chose; correct?
14    A   Yeah, I would agree with that.
15    Q   And is there any other consideration
16 at all that you could identify, even a peppercorn,
17 for the transfer or assignment of your claims to
18 CPCM?
19    A   I don't remember the agreements in
20 detail.  I'd have to look at the agreements
21 relating to (inaudible) to see what (inaudible)
22 was considered.
23    Q   But as you sit here today, you are not
24 aware of any; correct?
25    A   Not that I can recall, but there may be

41

1  some.
2      Q   Well, we're going to put up Exhibit 1.
3  By the way, do you have exhibits in front of you?
4      **A   I have a folder of (inaudible) yes,**
5  **sir, I do.**
6      Q   Okay.  Take a look at Exhibit 1.
7      **A   Give me a second to find it.**
8      Q   Sorry.  It's -- I said Exhibit 1.
9          It is Tab actually 1, and it is going
10  to be Exhibit 86.  I apologize.
11         (Deposition Exhibit 86 was marked for
12  identification.)
13         THE WITNESS:  Exhibit 86.  Okay.
14  BY MR. CLUBOK:
15     Q   You may or may not have that one in
16  your --
17     **A   I believe that they end at 84.**
18     Q   Okay.  So we'll put up tab -- or
19  Exhibit 86 on the screen.
20         Exhibit 86 is a Notice of Transfer of
21  Claim Other Than for Security by Scott Ellington
22  to CPCM.
23     **A   Okay.**
24         MS. SMITH:  Andy, since we are not
25  copied on the exhibits, could someone please load

42

1  them into the chat?
2          MR. CLUBOK:  Yes.  We'll start to make
3  them --
4          Shannon, maybe you can circulate them
5  at the same time that we put them up on the
6  screen.
7          MS. McLAUGHLIN:  Certainly.
8          MR. CLUBOK:  Thank you.
9  BY MR. CLUBOK:
10     Q   And Mr. Ellington, can you --
11         MR. CLUBOK:  Let's see.
12         Nate, we got it up there?
13         REMOTE TECHNICIAN:  Yes, I will -- I
14  will circulate the document in chat.  Or actually,
15  Shannon has already done --
16         MR. CLUBOK:  Can you put the document
17  on the screen, or maybe it's up there and I just
18  don't see it.
19         REMOTE TECHNICIAN:  Yes.  Thank you,
20  one moment.
21  BY MR. CLUBOK:
22     Q   So this is the -- do you recognize
23  Exhibit 86 as the Notice of Transfer of Claim
24  Other Than for Security with respect to yourself,
25  as the transferor and CPCM as the transferee?

43

1      **A   I see that written on the document,**
2  **yes.**
3      Q   And on page 2, it says, "For value
4  received, the adequacy and sufficiency of which
5  are hereby acknowledged, Scott Ellington has
6  unconditionally and irrevocably sold, transferred,
7  assigned to CPCM," et cetera, et cetera.
8          Do you see that?
9      **A   I do.**
10     Q   And as far as you sit here today, the
11  only consideration you can think of is the
12  employment you gave yourself at Skyview Group;
13  correct?
14     **A   And, again, I'd have to see the --**
15         MS. SMITH:  Objection, form.
16         THE WITNESS:  I'd have to see all
17  the -- the related documents.  But that's --
18  that's what I consider the consideration without
19  looking at the documents.
20  BY MR. CLUBOK:
21     Q   What documents would you have to look
22  at?
23     **A   I don't know what's out there related**
24  **to this.  I'm being shown two pages.  I wasn't**
25  **involved in negotiation or drafting of these.  I**

44

1  don't know what else is relatable.
2      Q   Were you involved in any negotiation of
3  the transfer of claims to CPCM by any -- any
4  individual?
5      **A   No.**
6      Q   Were you involved at all in the
7  approval of those transfers?
8      **A   No.**
9      Q   Did you have any involvement at all?
10     **A   None.**
11     Q   You just -- who told you about it?
12     **A   I believe counsel.**
13     Q   You learned about the transfers through
14  counsel and no other -- no other source?
15         MS. SMITH:  Objection to form.
16         THE WITNESS:  Yeah.  Yes, at the time I
17  was under a restraining order, so I had very
18  limited communication with anyone, but counsel.
19     Q   Do you know whose idea it was to
20  transfer the claims to the CPCM?
21         MS. SMITH:  Objection.
22         THE WITNESS:  No, I don't.
23         MS. SMITH:  Do not answer to the extent
24  it calls for privileged information.
25         THE WITNESS:  I do not know.

45

1  BY MR. CLUBOK:
2      Q   Did you ever discuss it with anyone
3  other than your counsel?
4      A   No.
5      Q   CPCM is wholly owned by Skyview Group?
6      A   I'd have to look at an org chart or
7  related documents.  I'm not certain, but that's my
8  understanding.
9      Q   So you have all the economic interest
10 in CPCM; correct?
11     A   Again, I'd have to look at how it was
12 structured.
13         I don't -- I just know anecdotally what
14 I was told.
15     Q   As far as you know sitting here today,
16 can you -- are you aware of anyone else who has
17 any other economic interest in CPCM other than
18 you?
19     A   No, I think it's a wholly-owned sub of
20 Skyview, but, again, I'd have to look at the
21 documents to be certain.
22     Q   CPCM is represented by Ross and Smith
23 and Baker MacKenzie.
24     A   That's my understanding, yes.
25     Q   And these are the attorneys who are

46

1  sitting here today with you during this
2  deposition?
3      A   Yes.
4      Q   And Mr. Sevilla, Mr. Leventon,
5  Mr. DiOrio and Ms. Lucas/Irving also shared that
6  same set of counsel; correct?
7      A   That's my understanding, yes.
8      Q   Who is paying the legal fees for Ross
9  and Smith?
10     A   I'm not certain.
11         MS. SMITH:  Objection to form.
12 BY MR. CLUBOK:
13     Q   You have -- Ross and Smith, Ms. Smith
14 has been here object -- making these objections.
15 She has got a colleague of hers also sitting on
16 this deposition, and you have no idea who's paying
17 their bills?
18     A   No, I don't.
19     Q   Who else do they represent, other than
20 you, CPCM, Mr. Sevilla, Mr. Leventon and Mr.
21 DiOrio and Ms. Irving?
22     A   No, I don't.
23         MS. SMITH:  Objection -- objection,
24 calls for speculation and potentially privileged
25 communications.

47

1  BY MR. CLUBOK:
2      Q   Are you aware of anyone else they
3  represent?
4      A   I believe they represent Mr. Waterhouse
5  and potentially Mr. Collins.  I believe them or a
6  subset of them represents Skyview as an entity,
7  but I don't know that for a fact as I haven't seen
8  those engagement letters with my own eyes.
9      Q   Who hired them?
10     A   Who hired whom?
11     Q   Who hired Ross and Smith to represent
12 you and your colleagues?
13     A   Well, I personally hired them to
14 represent me.  I would assume each individual
15 hired them on their own behalf.
16     Q   And when you hired them, did you -- you
17 worked out no payment arrangements with them; you
18 just hired them and didn't have any compensation
19 worked out?
20         MS. SMITH:  Objection to form.
21         THE WITNESS:  The payor of the bills,
22 as far as I understand, are through various
23 indemnities and insurance policies with entities
24 and insurers.  But, again, that's not -- I'm not
25 the person that processes or pays the bills, so I

48

1  don't know how they're being paid.
2  BY MR. CLUBOK:
3      Q   When you -- when you said you were
4  going to work with Ms. Smith, did you discuss
5  compensation in any way of who would pay for it?
6         MS. SMITH:  Objection, privileged.
7         THE WITNESS:  Yeah, I think that's
8  getting into privileged communications.
9  BY MR. CLUBOK:
10     Q   Do you have any idea who is paying
11 Ms. Smith's bills to represent you and your
12 colleagues?
13     A   Currently, no.
14     Q   Did you ever have any idea as to who
15 was going to be paying Ms. Smith's bills to
16 represent you, your colleagues and the company you
17 100 percent own?
18     A   Yes.
19         MS. SMITH:  Objection to form.
20 BY MR. CLUBOK:
21     Q   And who -- and what was your
22 understanding?
23     A   At the inception, I believe it was an
24 entity called Gov Re.
25     Q   So when you first hired Ms. Smith, you

**49**

1 believe that Gov Re would pay all of her legal
2 fees for representing you and your colleagues and
3 Skyview Group?
4     A  That's my understanding, but I don't
5 have any transparency in the operations of Gov Re.
6     Q  Who runs Gov Re?
7     A  I don't know.
8     Q  What connection --
9       -- (overspeaking) --
10     A  Bermuda Directors (?) would be my
11 assumption.
12     Q  What connection do you have with Gov
13 Re?
14     A  None.
15     Q  What made you think that Gov Re would
16 pay the bills for you and all your colleagues and
17 your company?
18     MS. SMITH:  Objection to form.
19     THE WITNESS:  Because they had an
20 insurance policy that covered us.
21 BY MR. CLUBOK:
22     Q  Through what entity?
23     A  I don't know.
24     Q  Who is Mr. Collins, I think you
25 mentioned?

**50**

1     A  Brian Collins, he's the chief
2 administrative officer of Skyview.
3     Q  Was he a former Highland Capital
4 Management employee?
5     A  He was.
6     Q  Was he also terminated on or about the
7 same time you were?
8     MS. SMITH:  Objection to form.
9     THE WITNESS:  I believe he was
10 terminated with the rest of the employees about a
11 month later.
12 BY MR. CLUBOK:
13     Q  When you were terminated, were you told
14 why you were being terminated from HCM?
15     A  Yes.
16     Q  What is -- were you told?
17     A  I was told by Mr. Seery that I had
18 worked against the estate.
19     Q  Anything else?
20     A  Not that I recall.
21     Q  What did you say in response?
22     A  "I don't know what you're talking
23 about.  Can you please tell me -- give me an
24 example"?  And he said "No."
25     Q  Anything else?

**51**

1     A  No.
2     Q  All the -- who hired Baker MacKenzie,
3 as far as you know?
4     A  For whom as a client?
5     Q  For you.
6     A  Me.
7     Q  Who hired Baker MacKenzie for all the
8 other employees?
9     MS. SMITH:  Objection as to form.
10     THE WITNESS:  I assume them as
11 individuals?
12 BY MR. CLUBOK:
13     Q  Yeah, who hired Baker MacKenzie for
14 your other -- well, strike that.
15     Is it fair to say that Baker MacKenzie
16 represents all the same entities and individuals
17 that we identified as being represented by Ross
18 Smith, as far as you know?
19     A  Oh, I don't -- I don't know how that's
20 broken down.
21     Q  Well, does Baker MacKenzie represent
22 Skyview Group and CPCM?
23     A  I believe so.
24     Q  Does Baker MacKenzie represent Mr.
25 Sevilla, Mr. Leventon, Mr. DiOrio and Ms. Irving?

**52**

1     A  That's my understanding, but I have not
2 seen those engagement letters.
3     Q  And who arranged for them to represent
4 all of those individuals other than --
5     MS. SMITH:  Objection -- objection
6 speculation.
7     THE WITNESS:  I would assume them as
8 individuals.
9 BY MR. CLUBOK:
10     Q  And -- and is was paying Baker
11 MacKenzie's bills?
12     A  I don't know at this point.
13     Q  Was it originally your anticipation
14 that Gov Re would pay Baker MacKenzie's bills as
15 well?
16     A  That was my understanding.
17     Q  Has anyone from Gov Re ever
18 communicated to you in words or substance that
19 they would not be paying the legal fees incurred
20 by hiring Baker MacKenzie or Ross Smith?
21     A  No.
22     Q  Who handles making sure that those
23 firms get paid?
24     A  It's --
25     MS. SMITH:  Objection.

53

1  THE WITNESS: It's an assumption,
2 Mr. Waterhouse.
3 BY MR. CLUBOK:
4  Q  Did you discuss with any individual
5 other than your -- the lawyers assigning any
6 claims to Skyview Group?
7  -- (overspeaking) --
8  A  Assigning --
9  Q  Excuse me -- (overspeaking) --
10 assigning things with CPCM?
11  A  No, only discussed with counsel.
12  Q  When were you first employed by
13 Highland Capital Management?
14  A  May of 2007.
15  Q  How did you start working for Highland
16 Capital Management?
17  A  I was in the syndications group, the
18 real estate group of Wells Fargo. Highland bought
19 into those syndicated levels, and they asked me to
20 come interview to work in-house with them.
21  Q  Prior to Wells Fargo, where did you
22 work?
23  A  Countrywide Home Loans.
24  Q  Doing what?
25  A  In the syndications group, and in the

54

1 -- ultimately in the bankruptcy group.
2  Q  Doing legal work?
3  A  Yes.
4  Q  Prior to -- sorry, Countrywide, you
5 said?
6  A  Yeah, Countrywide Home Loans.
7  Q  What did you do prior to working at
8 Countrywide?
9  A  I worked at a talent agency in Los
10 Angeles.
11  Q  In what capacity?
12  A  It was an assistant.
13  Q  What year?
14  A  The year would have been starting in
15 2000.
16  Q  So when did you graduate law school?
17  A  2000.
18  Q  And your first job was as an assistant
19 at a talent agency.
20  A  Yes.
21  Q  Why did you do that?
22  A  Because to get into the top talent
23 agencies, you had to have a law degree with an
24 MBA, and I wanted to work in the film industry.
25  Q  Okay. And when did you move to

55

1 Countrywide?
2  A  It would have been about 2002, I
3 believe.
4  Q  Okay. Going back to your employment
5 with HCM, when you first started there, what was
6 your job title?
7  A  In-house counsel.
8  Q  And eventually you became the general
9 counsel?
10  A  Yes.
11  Q  When was that?
12  A  I'd have to go back and look. I don't
13 recall. But I believe it was around 2010.
14  Q  So, after the -- you remember that UBS
15 filed a lawsuit against Highland in roughly
16 2000 -- in early 2009?
17  A  Yes.
18  MS. SMITH: Objection -- objection.
19 Before you start this line of questioning, I want
20 to caution you, Mr. Ellington, not to disclose any
21 privileged communications with counsel that you
22 might have gotten in your role as Highland Capital
23 GC, unless the debtor -- or I will rely on the
24 debtor to assert privilege, if needed.
25  MR. FEINSTEIN: Well, yes. It is Rob

56

1 Feinstein. So that privilege does belong to the
2 debtor and the extent to which we assert the
3 privilege, you will know on a question-by-question
4 basis.
5  If you don't hear an objection from us,
6 it's because we determined either the privilege
7 doesn't apply or one of the recognized exceptions
8 apply, like the crime fraud exception, or that
9 we're waiving it. But in all events, we'll assert
10 the privilege as and if we see fit; otherwise,
11 counsel should feel free to answer the question --
12 excuse me, the witness should feel free to answer
13 the questions.
14  THE WITNESS: Mr. Feinstein, thank you.
15 BY MR. CLUBOK:
16  Q  Do you understand?
17  A  Yes.
18  Q  Do you understand the consent?
19  A  Yes.
20  Q  So you became general counsel after UBS
21 filed its lawsuit against Highland in New York?
22  A  Yes.
23  Q  And in addition to being general
24 counsel, were you a partner in Highland Capital
25 Management?

57

```
1     A   Ultimately, yes.
2     Q   When was that?
3     A   I don't remember the date.
4     Q   Roughly?
5     A   I want to say around '13, maybe '12 --
6  2012 or 2013.
7     Q   Okay.  And you remained a partner until
8  the bankruptcy?
9     A   Until my termination, yes.
10    Q   Until your termination.
11        And did you remain general counsel
12 until your termination?
13    A   Yes.
14    Q   Who did you report to at Highland?
15    A   Jim Dondero.
16    Q   Where did you work?
17    A   In the offices at the Crescent.
18    Q   Were you physically near Jim Dondero,
19 your office?
20    A   No, I was not physically near Dondero.
21    Q   Same floor?
22    A   Same floor, yes.  There was only one
23 floor.
24    Q   And you had your own private office?
25    A   I did.
```

58

```
1     Q   And you spoke with Mr. Dondero on an
2  average of a daily basis?
3     A   Yes.
4         MS. SMITH:  Objection as to form.
5         THE WITNESS:  I'm sorry, Frances.
6     Yes.
7  BY MR. CLUBOK:
8     Q   Did anyone report to you directly at
9  Highland Capital Management?
10    A   Yes.
11    Q   Who?
12    A   I'll try my best to give an exhaustive
13 least.
14        Thomas certainly reported to me in his
15 deputy general counsel role, but not in his chief
16 compliance officer role.
17        JP Sevilla, Ms. Irving, Mr. DiOrio,
18 Ms. Vitiello, Ms. Leventon -- I mean, Mr.
19 Leventon, sorry.  I think that was the direct
20 reports upon determination, but at different
21 times, it's been various other people.
22    Q   What about Lauren Thedford?
23    A   She did not report to me.  She reported
24 to Mr. Surgent.
25    Q   And what about Jason Post?
```

59

```
1     A   Reported to Mr. Surgent.
2     Q   When he was the chief compliance
3  officer?
4     A   Yeah, they -- they were in
5  compliance-based roles at the end of my tenure.
6     Q   When Mr. Surgent was the chief
7  compliance officer, who did he report to?
8     A   Jim Dondero.
9     Q   Was there anyone else in the Highland
10 Capital Management legal department, other than
11 the names you've identified?
12    A   Sarah Bell, my executive assistant,
13 reported to me.  I believe she may have reported
14 to Mr. Collins.  I believe she reported to
15 Mr. Collins, technically.
16    Q   Anyone else in the Highland Capital
17 Management legal department?
18    A   Not that I can recall.
19    Q   Prior to becoming general counsel, were
20 you the assistant general counsel?
21    A   I was.
22    Q   And did you ever hold a title of
23 portfolio manager?
24    A   I did.
25    Q   When?
```

60

```
1     A   I'd have to go back and think about
2  that, Mr. Clubok.  I apologize.  But it was, I
3  want to say, '08 and '09, maybe in '10.
4     Q   When you communicated with Mr. Dondero,
5  is it fair to say you -- you communicated
6  verbally, like in-person?
7     A   I communicated verbally in-person as
8  well as telephonically.
9     Q   How about by text message?
10    A   Very limited.
11    Q   When you would text message with
12 Mr. Dondero, which phone would you use?
13    A   214-649-5475.
14    Q   Did you use any other messenger systems
15 to communicates with Mr. Dondero, like --
16    A   No.
17    Q   Did you ever use signal or What's App
18 or any other text messaging?
19    A   No, I exclusively communicated with
20 Mr. Dondero on iMessage.
21    Q   iMessage on your iPhone?
22    A   Yes.
23    Q   Did he have an iPhone?
24    A   Yes.
25        MS. SMITH:  Objection, form.
```

61

1  BY MR. CLUBOK:
2      Q   Did you ever email with him?
3      A   Yeah, there was -- there was emails
4  with Mr. Dondero.
5      Q   Who set your compensation at HCM?
6      A   I believe there was a compensation
7  committee, but the ultimate arbiter was
8  Mr. Dondero.
9      Q   Did you have responsibilities for any
10 other HCM-affiliated or managed entities while you
11 were the general counsel at Highland Capital
12 Management?
13     A   I believe that I was a managing member
14 or officers of various entities at different
15 times.
16     Q   Did any of those entities separately
17 compensate you for the work you did?
18     A   No.
19     Q   So all of the compensation you received
20 came -- even if you did it on behalf of some of
21 these other entities came directly from Highland
22 Capital Management LP?
23     A   Yes.
24     Q   Was there ever a time when one of
25 Highland's affiliated or managed funds paid you

62

1  directly?
2      A   Again, only with --
3          MS. SMITH:  Objection to form.
4          THE WITNESS:  Again, only with the
5  exception of the NexPoint Advisor-managed REITs
6  when I was granted shares.
7  BY MR. CLUBOK:
8      Q   So other than NexPoint Advisor-managed
9  REITs in which you were granted shares, there was
10 never a Highland Capital Management affiliate or
11 managed fund that paid you directly; is that
12 correct?
13     A   That paid me directly, no.
14     Q   Is that correct?
15     A   That's what -- that's my belief, yes.
16     Q   And by the way, that was an example of,
17 I think, a double negative.
18         The only reason I reiterated that
19 question is if I say -- if you say -- I said was
20 there -- I said was there never.
21         I put in a negative.  And you said
22 "No," and so it became a little confusing.  So
23 I am just going to ask that question again without
24 the negative.
25     A   Please.

63

1      Q   So I can get it clean for the record.
2          And when you say -- it's like if I said
3  it's not raining range outside and you said "No,"
4  you're meaning yes, it's not raining, but it says
5  no.  So, anyway, I'm just going to ask you that
6  again just not to make you repeat, but just so you
7  can answer.  Whatever your answer is I don't care.
8  I just want to --
9      A   Yes, I understand that.
10     Q   Okay.  So is it true that other than
11 the NexPoint advisor-managed REITs in which you
12 were granted shares, there was never a Highland
13 Capital Management affiliate or managed fund that
14 paid you directly while you were working at HCM;
15 correct?
16         MS. SMITH:  Objection to form.
17         THE WITNESS:  That is my understanding,
18 yes.
19 BY MR. CLUBOK:
20     Q   When you were at Highland, you used
21 email addresses that ended in "hcmlp.com" and
22 "highlandcapital.com?"
23     A   Yes.
24     Q   Did you ever use any other email to
25 conduct any business for Highland or any of its

64

1  affiliates?
2          MS. SMITH:  Objection to form.
3          THE WITNESS:  For Highland or its
4  affiliates, no.
5          MR. CLUBOK:  I'm sorry.  What was the
6  form objection to that, Ms. Smith?
7          MS. SMITH:  That was a -- that was a
8  compound question.
9          MR. CLUBOK:  Okay.  I'm trying to --
10 one second here.  My wife just nicely brought me a
11 cup of coffee.
12         MS. SMITH:  I wish I had someone
13 bringing me coffee.
14         MR. CLUBOK:  It's very nice.  You guys
15 may regret that I have coffee.  I don't know.
16         Sorry, let me back to it.
17 BY MR. CLUBOK:
18     Q   When you conducted business for
19 Highland Capital Management, did you ever use any
20 other email, other than the HCMLP.com or the
21 HighlandCapital.com?
22     A   No, not for business related to
23 Highland Capital Management.
24     Q   While you were employed at Highland
25 Capital Management, did you ever use any email for

**65**

1  any other business-related purpose?
2      A   Yes.
3      Q   And what emails -- what email or emails
4  were that?
5      A   WWWSA -- or my name, sorry,
6  "sasmgt.com."
7      Q   Under what circumstances would you use
8  the sasmanagement.com email?
9      A   In things related to SAS or Sentinel or
10 its related entities.
11     Q   Why?
12     A   Because we were instructed by
13 compliance that all aspects of those businesses
14 should be conducted on their own servers and
15 completely separate from Highland Capital
16 Management LP.
17     Q   Okay, other than that email address and
18 the Highland-related email addresses that you've
19 already mentioned, was there ever any other email
20 that you used for any business purposes while you
21 were employed at Highland Capital Management?
22     A   Not that I recall.
23     Q   Did you ever -- what is Blackland
24 Associates?
25     A   Consulting firm.

**66**

1      Q   When was that -- what -- does that have
2  any connection with Highland Capital Management?
3      A   None.
4      Q   Did you ever use emails with the
5  blacklandassociates.com?
6      A   No.
7      Q   Did you ever -- what's your sister's
8  name.
9      A   I have two sisters.
10     Q   What are their names?
11     A   Sharon Ellington and Marcia Maslow.
12     Q   Have either of those individuals ever
13 done any work in connection with Highland Capital
14 Management?
15     A   My sister Marcia assisted on some IT
16 projects.
17     Q   Any other work that either of them ever
18 did in connection with your work at Highland
19 Capital Management?
20     A   My -- my other sister is an estate
21 planning attorney, and she's helping me with my
22 personal finances.
23     Q   Anything else?
24     A   Not that I -- not that I recall.
25     Q   Have you ever heard of OG Ventures?

**67**

1      A   OG Ventures?  No.
2      Q   Were you surprised when you were hired
3  from Highland Capital Management?
4      A   Yes.
5          MS. SMITH:  Objection as to form.
6  BY MR. CLUBOK:
7      Q   Did you have a chance to clean out your
8  office?
9      A   No.
10     Q   Have you performed any services for any
11 HCM-related entities since your termination?
12     A   Other than in my employment with
13 Skyview, but I don't know that it's considered
14 related anymore due to the bankruptcy.
15     Q   When was the last time you spoke with
16 Jim Dondero?
17     A   About 32 days ago.
18     Q   And prior to that, how frequently were
19 you speaking to him?
20     A   Once every couple to three days.
21     Q   When's the last time you spoke with
22 Isaac Leventon?
23     A   About 35 days ago.
24     Q   And prior to that, how often did you
25 speak with Mr. Leventon?

**68**

1      A   Maybe a couple of times a week.
2      Q   When's the last time you spoke with
3  JP Sevilla?
4      A   Close to 40 days ago, I believe.
5      Q   And how often did you speak to him
6  prior to that?
7      A   A couple of times a week.
8      Q   When was the last time you spoke with
9  Matt DiOrio?
10     A   I would say about 30 days ago.
11     Q   How often did you speak with him prior
12 to that?
13     A   Two or three times a week.
14     Q   When was the last time you spoke with
15 Ms. Irving?
16     A   Two plus months ago.
17     Q   What did Ms. Irving do for
18 Skyview Group?
19     A   Ms. Irving has never worked for
20 Skyview Group because she is on medical leave.
21     Q   Is Skyview Group paying her any
22 compensation at all for 20 -- for -- strike that.
23         Has Skyview Group agreed to pay her any
24 compensation at all for 2021?
25     A   I have no idea.

---

69

1    Q    So Ms. Irving is currently not employed
2  by Skyview Group; is that correct?
3        MS. SMITH:  Objection.  Objection to
4  form.  That misstates what he said.
5        THE WITNESS:  I don't know the
6  arrangement.  I don't know how that FMLA works.  I
7  just -- I just don't know enough about it.
8        That's handled by Mr. Collins.
9  BY MR. CLUBOK:
10    Q    Did you speak with -- so you've been in
11  Africa?  You were on an extended trip to Africa
12  for about a month or so?
13    A    Yeah, 26 days.
14    Q    And when did you return?
15    A    I returned about 30 hours ago, 36 hours
16  ago, something like that.
17    Q    During the time -- who were you in
18  Africa with?
19    A    My father.
20    Q    Just you and your father, that's it?
21    A    Some of my family --
22        MS. SMITH:  Objection to form.
23        THE WITNESS:  A subset of my family
24  members joined us for the -- for about ten days on
25  the beginning.

---

70

1  BY MR. CLUBOK:
2    Q    And during that time, other than your
3  attorney, did you communicate with anyone in the
4  U.S.?
5    A    I don't believe so.  And I didn't
6  communicate with my attorneys either, that I
7  recall.
8    Q    You didn't communicate with your
9  attorneys at all -- I don't want to get into the
10  substance, but you didn't communicate with your
11  attorneys at all during the time you were in
12  Africa; is that true?
13    A    No, someone decided to politely -- I --
14  when I signed up for the international phone plan,
15  what I was told by AT&T is that the email went to
16  my former executive admin at Highland and someone
17  at (inaudible) someone informed them they're to
18  turn off my phones.
19    Q    So, you had absolutely no communication
20  with your attorneys during the time you were in
21  Africa; is that true?
22        MS. SMITH:  Objection to form.
23        THE WITNESS:  I don't believe I had any
24  at all.
25  BY MR. CLUBOK:

---

71

1    Q    When did you find out that you were
2  going to be deposed today?
3    A    I found out I was going to be deposed
4  today, I believe, before I left.
5        My dad had a -- about a
6  ten-generational iPad that I would try to get
7  emails on, and I think I received some calendar
8  notices when I had Wi-Fi.
9    Q    I'm sorry, you say that you found out
10  about today's deposition before you left for your
11  Africa trip?
12    A    No.  I said I knew I was going to be
13  deposed.  I didn't know the date.
14        I was able to get some calendar invites
15  through a personal email account off my dad's
16  iPad, but it was incredibly difficult.
17    Q    So you got a calendar invite for
18  today's deposition and no other information at all
19  about today's deposition before you got back to
20  the US?
21    A    Literally none.
22    Q    Did you -- how did you spend yesterday?
23    A    How did I spend yesterday?
24        MS. SMITH:  Objection to form.
25        THE WITNESS:  I went to AT&T to try to

---

72

1  get my phones turned on, and then I had a
2  discussion with counsel yesterday afternoon.
3  BY MR. CLUBOK:
4    Q    Did you do anything else related to
5  this case yesterday?
6    A    Nothing.
7    Q    Do you have -- you have files of
8  documents that you took from Highland Capital?
9    A    No, I didn't.
10        MS. SMITH:  Objection to form.
11  BY MR. CLUBOK:
12    Q    Strike that.  You -- you have documents
13  in your possession that are Highland Capital or
14  related documents; correct?
15    A    That is --
16        MS. SMITH:  Objection to form.
17        THE WITNESS:  That is incorrect.
18  BY MR. CLUBOK:
19    Q    Do you have any boxes that you
20  needed -- strike that.
21        Do you have any boxes in your
22  possession that potentially contain information
23  responsive to the document subpoena we issued in
24  this case?
25        MS. SMITH:  Objection.

---

73

1     THE WITNESS: No, I have moving boxes
2  where my former partner was packed up, and I had
3  personal notebooks that I searched through to see
4  if there is anything relevant to this case. And I
5  don't have any documents that are Highland Capital
6  Managements or otherwise else.
7  BY MR. CLUBOK:
8     Q   But you didn't search those notebooks
9  prior to leaving for Africa; correct?
10    A   No, I did not.
11    Q   And you have not searched them since
12 you got back; correct?
13    A   That is wrong.
14    Q   When did you search them?
15    A   The day I got back, I searched through
16 the boxes until 3:00 o'clock in the morning until
17 I found them.
18    Q   And you found the notebooks, and they
19 had absolutely nothing to do with anything
20 requested in the subpoena; is that correct?
21    A   No, there was absolutely nothing.
22        The notebooks were only a few months
23 old. I mean, they mostly went back to December.
24    Q   Do you currently sit on the board of
25 any companies?

74

1     A   Sit on the board of any companies?
2  I believe I still may be on a real estate
3  transaction that was relative to the NexPoint
4  Advise funds called "GEN," but I don't know if
5  I'm still on the board there or not.
6     Q   Anything else?
7     A   No.
8     Q   Have you ever served as a director for
9  any company affiliated with Highland Capital
10 Management or Jim Dondero?
11    A   That's --
12        MS. SMITH: Objection to form.
13        THE WITNESS: That's a difficult
14 question to answer, as very often there are
15 entities formed and they'll put my name or other
16 senior employees' name as an officer or director
17 of an LLC like an SPV without my knowledge, but an
18 actual board, no.
19 BY MR. CLUBOK:
20    Q   So other than being just listed in some
21 document without your knowledge, you've never
22 served as a director for any --
23    A   No, I think I was on -- I can't
24 remember, but I -- I serve a short stint when Tray
25 Parker resigned on a motion, I believe.

75

1     Q   Have you ever served as a direct -- as
2  a director of any other entity related in any way
3  to Highland Capital Management or Jim Dondero?
4     A   Not that I can recall.
5     Q   And so other than this one instance
6  that you've described as a short stint, you've
7  never actively engaged in the duties of a
8  director, as far as you know?
9     A   Yes.
10    Q   Have you formed any other entities,
11 other than Skyview and its subsidiaries?
12        MS. SMITH: Objection to form.
13        MR. CLUBOK: Sorry, what's the
14 objection to that question?
15        MS. SMITH: And what is the time period
16 and the relation to this matter.
17        MR. CLUBOK: Okay.
18 BY MR. CLUBOK:
19    Q   Have you formed any other entities
20 other than Skyview and its subsidiaries?
21    A   I -- I don't understand how I can
22 answer that, Mr. Clubok, because in my role as
23 Highland, I was involved in forming numerous
24 entities. I've formed entities for my own estate
25 and tax planning on advice of counsel, so --

76

1  I'm -- I'm trying my best to answer that.
2        Maybe you if you could give me a
3  timeframe or a limitation.
4     Q   How about -- since you became general
5  counsel of Highland, are there any other entities,
6  other than Skyview and its subsidiaries, that
7  you've formed where you are the sole owner?
8     A   Again, other than relative to estate or
9  tax planning on advice of counsel, no, or
10 investment in these.
11        I was involved in private investing
12 with my own firms.
13    Q   What about Sentinel?
14    A   I did not form Sentinel.
15    Q   Who formed Sentinel?
16    A   Maples and Calder.
17    Q   Okay, you were an original equity owner
18 of Sentinel; correct?
19    A   I would have to look at the original
20 documentations. I don't know how that was held or
21 structured.
22    Q   Well, you had an equity stake in
23 Sentinel; correct?
24    A   Maybe ultimately. Again, I don't
25 remember how it was structured.

77

1    Q   Yeah, ultimately.  You have an economic
2  interest in Sentinel -- maybe through some other
3  entities, but you have an ultimate economic
4  interest in Sentinel; correct?
5    A   Potentially.  I would have to look how
6  that's held.
7    Q   And what about an entity called SAS?
8    A   Same.  That was formed by Maples and
9  Calder.
10    Q   Formed by Maples and Calder.
11        But -- and that one you have all of the
12  equity interest; correct?
13    A   Not true.
14        MS. SMITH:  Object to the form.
15  BY MR. CLUBOK:
16    Q   Roughly, how much of the equity
17  interest in SAS do you have?
18    A   Again, it considers how it's held.  I
19  don't know that I hold any as an individual.  But
20  what could be argued that I was the ultimate
21  beneficial or a beneficiary in some way, it would
22  be 30 percent.
23    Q   And who has the other 70 percent of
24  SAS?
25    A   Entities --

78

1        MS. SMITH:  Objection to form.
2        THE WITNESS:  Entities related to
3  Mr. Dondero.
4  BY MR. CLUBOK:
5    Q   Okay.  And is that same 30/70
6  proportion apply to Sentinel, as far as you know?
7    A   As far as I know.  Again, I don't know
8  how Mr. Dondero holds that.  He may not hold any
9  as an individual.  And the structure has changed
10  so many times for -- at the -- at the request of
11  the Cayman International Monetary authorities, I
12  don't even know what it looks like.
13    Q   But without getting into the
14  complicated structures -- and the court in this
15  case has asked at some point about those -- you
16  understand that the ultimate economic interest in
17  both Sentinel and SAS is split roughly 70/30
18  respectively between Mr. Dondero and you; correct?
19        MS. SMITH:  Objection to form.
20        THE WITNESS:  Or entities related to
21  us.
22        I have no transparency, and Mr. Dondero
23  holds it.  And to be quite honest with you,
24  without looking at the docs, I don't know how it
25  even is related to me.

79

1  BY MR. CLUBOK:
2    Q   But you personally believe that you
3  have -- whether it's directly or indirectly a
4  roughly 30 percent economic interest in Sentinel;
5  correct?
6    A   That's related to me somehow, yes.
7    Q   And you personally, whether directly or
8  indirectly, have a roughly 30 percent economic
9  interest in SAS; correct?
10    A   Again, in some way related to me, yes.
11    Q   Are there any other entities that have
12  been formed since you became general counsel of
13  Highland in which you have a economic interest
14  that you've not identified?
15    A   No, not that I'm aware of, except for
16  entities related to those two global monikers of
17  SAS and Sentinel.
18    Q   What is Millennium Risk Management?
19    A   I have no idea.
20    Q   What is TT3 Partners?
21    A   Never heard of it.
22    Q   What is BSN Ventures LLC?
23    A   I don't know.
24    Q   Did you ever form any entity with
25  Mr. Leventon?

80

1        MS. SMITH:  Objection to form.
2  BY MR. CLUBOK:
3    Q   Strike that.
4        Was an entity ever formed that had you
5  and Mr. Leventon as the chief economic
6  beneficiaries, either directly or indirectly?
7    A   Not that I recall, no.
8    Q   How about same question with respect to
9  Mr. DiOrio.
10    A   No, not that I recall.
11    Q   Same question with respect to William
12  T. Reid of Reid Collins.
13    A   No.  No, that's not true.  I'm involved
14  in an entity with Mr. Reid and one of his partners
15  on a deer lease outside of Austin, Texas.  I
16  believe that's the BSN Ventures that you just
17  mentioned.  They formed it, I didn't.
18    Q   Sorry.  What is a deer lease?
19    A   You pay money to a rancher to lease
20  property to hunt upon.
21    Q   Is it for commercial purposes or is it
22  just a payment like you'd join a hunting club or a
23  golf club?
24    A   Exactly the same --
25        MS. SMITH:  Objection to form.  And

---

**81**

1  this is way off the track of the purpose of the
2  deposition.
3        THE WITNESS:  Exactly the same as a
4  country club membership or a hunting club or a
5  tennis club or a golf membership, but it is paid
6  to an individual rancher.
7  BY MR. CLUBOK:
8      Q    And you did enter into that arrangement
9  with Mr. Collins; right?
10     A    No, Mr. Reid.
11     Q    I'm sorry, Mr. Reid.
12     A    And -- yeah, Mr. Reid and a partner of
13 his named Nate Palmer.  And, again, they formed
14 the entity.  I just paid my pro rata share to the
15 LLC.  They run it, they manage it.
16         It is literally a friendship thing
17 that's centered around deer hunting.
18     Q    And that firm for a while represented
19 Highland Capital Management in the litigation
20 against UBS; correct?
21     A    Correct.
22         MS. SMITH:  Objection to form.
23 BY MR. CLUBOK:
24     Q    They did so until they sought to
25 withdraw earlier this year; correct?

---

**82**

1      A    Correct.
2      Q    Did you discuss withdrawal with them?
3      A    I did not.
4      Q    Did you discuss the UBS litigation with
5  them during -- during 2020, the last year of your
6  employment with Highland Capital Management?
7      A    Yeah, I'm sure I did at some point.
8      Q    Did you ever discuss with them what to
9  do about the judgment that UBS obtained?
10     A    No.
11     Q    Did you discuss with anybody -- strike
12 that.
13         Post bankruptcy and prior to
14 termination, did you discuss with anybody in the
15 world what to do about the judgment that UBS
16 obtained in New York?
17     A    Yes.
18     Q    Who did you discuss that with?
19     A    Again, what time period?  I'm sorry.
20     Q    From the time of the bankruptcy until
21 the time you were terminated.
22     A    You, Mr. Dondero, Mr. Seery, former
23 Judge Nelms, Mr. Dubel.  I think that's pretty
24 much it.
25     Q    So that's the entire list of

---

**83**

1  individuals that you can recall ever discussing
2  what to do about the judgment that UBS obtained in
3  New York since Highland's bankruptcy and prior to
4  you being terminated from Highland Capital
5  Management; correct?
6      A    I'm sure I hypothecated with -- I'm
7  certain that I did with Mr. Leventon just about,
8  you know, what we thought the outcome would be for
9  Mr. Sevilla.  And I'm sure that I talked to
10 Mr. Reid about it several times, you know, because
11 I -- I interact with him socially, so you know how
12 those kind of conversions go.
13     Q    Anybody else at all?
14     A    Not that I can think of.
15     Q    Did you ever tell me that there was an
16 insurance policy issued by Sentinel that
17 potentially could satisfy that judgment?
18         MS. SMITH:  Objection to form.
19         THE WITNESS:  No.
20 BY MR. CLUBOK:
21     Q    Did you ever tell Mr. Dondero that
22 there was an insurance policy issued by Sentinel
23 that could potentially satisfy that judgment?
24     A    I didn't need to tell Mr. Dondero.  He
25 was aware of it since inception.

---

**84**

1      Q    Did you ever tell Mr. Seery that there
2  was an insurance policy issued by Sentinel that
3  could potentially satisfy at least part of the
4  judgment that UBS obtained in New York?
5          MS. SMITH:  Objection to form.
6          THE WITNESS:  No.
7  BY MR. CLUBOK:
8          MR. CLUBOK:  What was the form
9  objection?
10         MS. SMITH:  Well, it calls for a legal
11 conclusion on what the insurance policy can do and
12 who it can pay out on.
13         MR. CLUBOK:  Okay.
14 BY MR. CLUBOK:
15     Q    Did you ever tell Mr. Seery anything
16 at all about the insurance policy that was issued
17 by Sentinel with respect to the UBS litigation in
18 New York?
19     A    No.
20     Q    Did you ever tell Mr. Nelms, Judge
21 Nelms anything at all about the insurance policy
22 that was issued by Sentinel with respect to the
23 UBS litigation in New York?
24     A    No.
25     Q    Did you ever tell Mr. Dubel anything

---

**85**

1  at all about the insurance policy that had been
2  issued by Sentinel with respect to the UBS
3  litigation in New York?
4      A  No.
5      Q  Did you ever tell Mr. Leventon anything
6  at all about the insurance policy that had been
7  issued by Sentinel with respect to the UBS
8  litigation in New York?
9      A  Mr. Leventon knew about it since
10  inception.
11      Q  Mr. Leventon, since inception, knew
12  that there was an insurance policy issued by
13  Sentinel with respect to the UBS litigation
14  pending in New York?
15      A  Yes.
16      Q  How did he know about that?
17      MS. SMITH:  Objection.
18      THE WITNESS:  He was part of the
19  overall group of a dozen, if not 20, people inside
20  of Highland that went through the process of
21  approving the transaction, so he was around for
22  the genesis, then quickly became not part of that
23  process.
24  BY MR. CLUBOK:
25      Q  What do you mean quickly became not

**86**

1  part of that process?
2      A  It went to a process that was solely
3  compliance and finance and some individuals from
4  tax, if I remember correctly, and a couple of guys
5  in accounting and training.
6      Q  When did it go to that?
7      A  After about the second and third week
8  of discussing it as a possibility.
9      Q  And Mr. Leventon never had anything
10  whatsoever to do with it after that?
11      A  Not that I recall.
12      MS. SMITH:  Objection to form.
13      THE WITNESS:  I mean, there were --
14  there were literally two dozen people involved, if
15  not more, so I don't -- I didn't really keep a
16  leash on Mr. Leventon and his involvement, but I
17  don't remember him being intimately involved.
18  BY MR. CLUBOK:
19      Q  Did you ever mention that -- strike
20  that.
21      So you are saying Mr. Leventon -- the
22  idea first came to have a insurance policy issued
23  by Sentinel, Mr. Leventon was involved in that
24  initial conversation; correct?
25      A  I had that initial conversation with

**87**

1  Mr. Leventon because it was my idea.
2      Q  It was your idea to have Sentinel issue
3  an insurance policy with respect to the UBS
4  litigation that was then pending in New York;
5  correct?
6      A  Yes.
7      Q  And when you initially had that idea,
8  you discussed it fully with Mr. Leventon?
9      A  Well, I discussed with Mr. Leventon
10  because the idea came from a matter called
11  Cornerstone that Highland Capital Management, its
12  funds brought against Nautic, a private equity
13  advisor.  And I had never heard of an ATE policy
14  before.  And we discovered in that litigation that
15  they had made a payment out of their funds for a
16  premium.  And they had bought an ATE policy, and
17  it produced a large settlement that the debtor and
18  Highland Capital Management funds benefited from.
19      Q  And as a result of that, you discussed
20  with Mr. Leventon the idea of purchasing an ATE
21  policy from Sentinel with respect to the UBS
22  litigation that was then pending in New York?
23      A  Mr. Leventon, Mr. Sevilla, Mr. Surgent
24  were the initial people that I had the
25  conversation with.

**88**

1      Q  All three of those equally in terms of
2  being involved?
3      A  They were all sitting --
4      MS. SMITH:  Objection to form.
5      THE WITNESS:  They were all sitting in
6  Mr. Surgent's office when I walked in and said is
7  it possible to do an ATE like Nautic did?
8  BY MR. CLUBOK:
9      Q  And this was the very first time that
10  you ever mentioned this idea to get an ATE policy
11  with respect to the UBS litigation to anyone?
12      A  Yes.
13      Q  And you mentioned that in Mr. Surgent's
14  office to a group that included Mr. Leventon,
15  Mr. Sevilla and Mr. Surgent?
16      A  That's my memory, yes.
17      Q  How long did you discuss it in the
18  initial meeting?
19      A  Less than five minutes.
20      Q  Okay.  And then after that, did you
21  ever talk to Mr. Leventon again about the idea?
22      A  I'm sure I did, yes.  Or in a larger
23  group, because then it went through an approval
24  process and that became run by compliance.
25      Q  And was Mr. Leventon aware that the

89

1  insurance policy was actually issued, as far as
2  you know?
3      MS. SMITH: Objection to form.
4      THE WITNESS: As far as I know.
5  BY MR. CLUBOK:
6      Q  And was that because you discussed it
7  with Mr. Leventon since that policy has been
8  issued?
9      A  I'm sure that I have. I don't recall
10 it specifically, but, you know, it's like every
11 person in the firm knew.
12     Q  Every person in what firm knew?
13     A  In Highland Capital Management, I'd be
14 surprised if anyone didn't know especially above a
15 certain level because they were involved or their
16 team members were involved.
17     Q  Sorry, what specifically did every
18 person at Highland Capital Management above a
19 certain level know that you are referring to?
20     A  That the ATE policy was being
21 considered because it went through its normal
22 process that involved almost every group in the
23 firm.
24     Q  So, every single person who did an ATE
25 policy was being considered.

90

1          And roughly when was that?
2      A  Several months before it was put in
3  place.
4      Q  And how many people knew it was
5  actually put in place?
6      A  I would say the entire group that was
7  part of the process.
8      Q  So virtually every single senior person
9  at Highland Capital Management knew that the ATE
10 policy had been put in place?
11     A  That's my understanding. I'd be
12 shocked if they didn't. Because, again, we're
13 talking two dozen people involved in the process.
14     Q  Right. But, as far as you --
15         You have no knowledge that Mr.Seery was
16 ever made aware of this; correct?
17     A  I-- I don't --
18     MS. SMITH: Objection to form.
19     THE WITNESS: I don't know if Mr. Seery
20 was made aware of it or not.
21 BY MR. CLUBOK:
22     Q  You -- you certainly never told
23 Mr. Seery about the ATE policy during your
24 employment at Highland Capital Management;
25 correct?

91

1      A  I did not.
2      Q  And you never told Judge Nelms about
3  it; correct?
4      A  I did not.
5      Q  You never told John Dubel about it;
6  correct?
7      A  I did not.
8      Q  You never took any action to make sure
9  that the court -- the bankruptcy court was aware
10 about the ATE policy; correct?
11     MS. SMITH: Objection to form.
12     THE WITNESS: No, I did not.
13 BY MR. CLUBOK:
14     Q  That's like one of those double
15 negatives, so let me just ask it again: It's true
16 that you never took any action to ensure that the
17 bankruptcy court became aware of the ATE policy
18 that had been taken out with respect to the UBS
19 litigation in New York; correct?
20     A  Correct.
21     Q  Did you ever make any effort to collect
22 on that policy?
23     A  I--
24     MS. SMITH: Objection to form.
25     THE WITNESS: No.

92

1      MR. CLUBOK: Okay. I think this is a
2  good time for a break.
3      THE WITNESS: Okay.
4      THE VIDEOGRAPHER: We're going off the
5  record at 12:05 p.m. Eastern time.
6      (Recess taken 12:05 p.m. to 12:15 p.m.)
7      THE VIDEOGRAPHER: We're going back on
8  the record at 12:21 p.m. Eastern Time.
9  BY MR. CLUBOK:
10     Q  Okay, Mr. Ellington, we've been talking
11 about an entity that I referred to as Sentinel,
12 and I believe there's some different entities with
13 Sentinel in their name, but when we've been
14 talking about Sentinel, have you understood me to
15 be referring to Sentinel Reinsurance Limited?
16     A  Yes, I believe that is the main entity,
17 but I'd have to see an org chart. I don't know
18 what it looks like now.
19     Q  And you recall it is a fairly
20 complicated structure with lots of different
21 entities and subs and pass-through entities and so
22 forth?
23     MS. SMITH: Objection to form.
24     THE WITNESS: That's my understanding.
25 BY MR. CLUBOK:

93

1    Q   And -- and if I talk about it -- if I
2  generally refer to it as Sentinel, will you
3  understand it to be the collective organization,
4  unless it's necessary to identify a specific sub
5  or a specific entity; is that okay?
6    A   Yeah, yeah, that's fine with me.  And
7  if I get into any specificity, I may need to see
8  an org chart.
9    Q   When was Sentinel formed, roughly?
10   A   My best recollection is 2012.
11   Q   What was the purpose of forming
12 Sentinel, as far as you understood?
13   A   To create a reinsurer.
14   Q   For whom?
15   A   It was -- the instruction of
16 Mr. Dondero was to make every attempt to originate
17 and structure a Cayman-based reinsurer.
18   Q   So the idea for forming Sentinel, as
19 far as you know, was Jim Dondero's.
20   A   Yes.
21   Q   And is he -- did he -- is he the one
22 who explained to you the purpose behind forming
23 Sentinel?
24   A   Yes.
25   Q   Was there anyone else in that

94

1  conversation when he initially told you about it?
2    A   I don't recall.  I think it was just me
3  and him.
4    Q   And what -- what else did he tell you
5  about the kind of business that he expected
6  Sentinel to engage in?
7    A   He wanted Sentinel to be a
8  full-serviced reinsurer, not just a captive.
9    Q   Why?
10   A   Because he had attempted to do that
11 with Gov Re, and due to regulatory issues, again,
12 beyond my knowledge, he thought that Cayman was a
13 better place to domicile a new reinsurer.
14   Q   Was the idea that -- when you say --
15 when you say a full-service reinsurer, not just a
16 captive, what's the distinction that you
17 understood him to be making?
18   A   That captive reinsurers serve a limited
19 set of counter-parties and ensure a limited set
20 where a full service, it serves any and all
21 potential parties.
22   Q   And did he talk to you about the
23 economics during this initial conversation?
24   A   Meaning what?
25   Q   Meaning who would have the economic

95

1  interest in Sentinel if it was established.
2    A   No.
3    Q   When did he -- did he ever speak to you
4  about the economics of Sentinel?
5    A   When you mean the economics, who would
6  ultimately the potential beneficial owners?
7    Q   Yes.
8    A   At a much later date after it was
9  established?
10   Q   Roughly when?
11   A   I would say probably six to nine
12 months, if not a year, after it was established.
13 I really can't remember.
14   Q   And what was the nature of that
15 conversation, as best you can remember?
16   A   That because me and my team had been
17 able to pull it off, that I would have some
18 beneficial ownership.
19   Q   Because you were able to pull off
20 establishing this full-service reinsurer?
21   A   Yes.
22   Q   And when you say "some beneficial
23 ownership" ultimately you obtained about
24 30 percent; correct?
25   A   Again, or entities somehow related to

96

1  me.
2    Q   At what point did he tell you that
3  that's the percentage you would get?
4    A   I don't recall.
5    Q   Well, roughly, how long after it was
6  formed before --
7    A   I don't know.  I'm sorry, I didn't let
8  you finish your question.
9    Q   Sure.  Was it, you know, within the
10 first year that it was formed?  Was it five years
11 later?  Just your best estimate.
12   A   Oh, within the first year.  That's a
13 very long due diligence period from the regulator.
14   Q   So within the first year of Sentinel
15 being formed, it was established that you would,
16 at least indirectly, if not directly, have a
17 roughly 30 percent economic interest in Sentinel;
18 correct?
19   A   Correct.
20   Q   And Mr. Dondero would retain the other
21 roughly 70 percent economic interest, as far as
22 you understood; correct?
23   A   As far as --
24       MS. SMITH:  Objection to form.
25       THE WITNESS:  As far as I understood,

97

1  again, or entities related to me or entities
2  related to him. I don't know how he holds it, if
3  he does hold it.
4  BY MR. CLUBOK:
5      Q   Did Sentinel ever have a shared
6  services agreement with Highland Capital
7  Management?
8      A   Not that I'm aware of.
9      Q   Did Sentinel ever have an office?
10     A   Did it have an office? Yes.
11     Q   Where was its office?
12     A   Grand Pavilion in the Cayman Islands.
13     Q   Is that a mailbox or is it an actual
14 physical office?
15     A   It is an actual physical office.
16     Q   Was it dedicated just to Sentinel?
17     A   Part of the office space was dedicated
18 to Sentinel. Part of the office space was
19 dedicated to SAS Management and its related
20 entities.
21     Q   And so SAS is another entity that you
22 had, directly or indirectly, roughly 30 percent
23 economic interest in; correct?
24     A   Or entities related to me and entities
25 related to SAS Management subs.

98

1      Q   And you established an office in the
2  Caymans for both -- both of these entities to
3  share?
4      MS. SMITH: Objection to form.
5  BY MR. CLUBOK:
6      Q   Strike that.
7          You understood an office was
8  established in the Caymans for Sentinel and SAS to
9  share?
10     A   No, an office was established for SAS,
11 and then in the inception of Sentinel, they leased
12 part of the space.
13     Q   When was SAS established?
14     A   I want to say 2009.
15     Q   Got it. So SAS was already in
16 existence when you got the idea or when you --
17 when you achieved the formation of Sentinel, it
18 was arranged that SAS would share some of its
19 office space with Sentinel?
20     MS. SMITH: Objection to form.
21     THE WITNESS: Correct.
22 BY MR. CLUBOK:
23     Q   And how many employees did Sentinel
24 have, if any?
25     A   Other than the independent directors,

99

1  which I don't know if you'd call them employees, I
2  don't know that it ever had employees, but I would
3  have to see how the independent directors employed
4  people, whether it is vendors or employees. I'm
5  not certain.
6      Q   Okay. But other than the independent
7  directors, you are not aware of any employees of
8  Sentinel Reinsurance; correct?
9      A   Not to my knowledge, no.
10     Q   So it's correct that you are unaware of
11 any employees of Sentinel Reinsurance other than
12 the independent directors?
13     MS. SMITH: Object to form.
14     THE WITNESS: To my knowledge, yes.
15 BY MR. CLUBOK:
16     Q   Did SAS have any employees?
17     A   Other than the independent directors,
18 again, unless they hired people as employees or
19 vendors, that's -- that's their decision. And to
20 my knowledge, I don't think they did.
21     Q   Who was responsible for -- for example,
22 let's say if Sentinel issued an insurance policy,
23 who was responsible for negotiating that?
24     A   The independent directors and Beecher
25 Carlson.

100

1      Q   What's Beecher Carlson?
2      A   They are a service provider that is the
3  originator of the policies.
4      Q   Where are they based out of?
5      A   I believe they're based globally. I'm
6  not really certain.
7      Q   Was there a person at Beecher Carlson
8  that you are familiar with who was responsible for
9  negotiating the terms of any insurance policy that
10 Sentinel issued?
11     A   I never dealt with them, so I don't
12 know their names.
13     Q   Who did deal with them?
14     A   The independent directors.
15     Q   Anybody else other than independent
16 directors ever deal with them?
17     A   I'm sure other vendors, auditors,
18 counsel.
19     Q   Is there anyone employed by Highland
20 Capital Management, to your knowledge, who ever
21 dealt with Beecher Carlson other than the
22 independent directors?
23     A   Not to my knowledge.
24     Q   Was there anyone at Highland -- strike
25 that.

**101**

1 Was there any Highland Capital
2 Management employee who ever performed any
3 services on behalf of Sentinel Reinsurance?
4 MS. SMITH: Objection to form.
5 THE WITNESS: Not to my knowledge.
6 BY MR. CLUBOK:
7 Q What about JP Sevilla?
8 MS. SMITH: Objection to form.
9 THE WITNESS: My understanding, he did
10 not provide services to Sentinel.
11 BY MR. CLUBOK:
12 Q Did he ever -- was there anybody at
13 Highland who was a director for Sentinel?
14 A I believe for a period of time,
15 Mr. DiOrio was.
16 Q When he was a director of Sentinel --
17 strike that.
18 He was a director of Sentinel during
19 his employment with Highland Capital Management?
20 MS. SMITH: Objection to form.
21 THE WITNESS: That's what I understand.
22 BY MR. CLUBOK:
23 Q And that continued until sometime after
24 his employment with Highland Capital Management,
25 till he resigned?

**102**

1 A I don't know -- I don't know when that
2 ended.
3 Q You are aware that he's -- well, he was
4 still a director of Sentinel Reinsurance at the
5 time that you and he were terminated from Highland
6 Capital Management; correct?
7 MS. SMITH: Objection to form.
8 THE WITNESS: I don't know.
9 BY MR. CLUBOK:
10 Q Was there any person at Highland who
11 had responsibility for day-to-day -- any -- any
12 duties with respect to Sentinel, whether as
13 monitoring them or dealing with them or anything
14 like that?
15 A That ran the day-to-day, no one in
16 particular, no.
17 Q Did you -- when was the last time you
18 discussed the insurance policy with anyone prior
19 to today, other than with your counsel?
20 A I'd say months.
21 Q Is that after you were terminated from
22 Highland Capital Management?
23 A I don't -- I don't recall discussing it
24 after I was terminated, no.
25 Q So prior to your termination with

**103**

1 Highland -- with Highland Capital, when was the
2 last time you discussed the insurance policy with
3 anyone in the world?
4 A Anyone in the world?
5 Q Yes.
6 A Other than counsel?
7 Q No. Now I'm talking about while you
8 were still -- and you've got Mr. Feinstein here
9 who will object or tell you not to answer. But
10 I'm including now --
11 A Okay.
12 Q -- Pachulski, other in-house counsel,
13 anyone in the world, while you were still at
14 Highland Capital Management. And so let me ask
15 the question again: What was the last time you
16 spoke to anyone about the ATE policy that was
17 taken out in connection with the UBS litigation in
18 New York while you were still employed at Highland
19 Capital Management?
20 MS. SMITH: Objection to form.
21 THE WITNESS: I believe that's
22 discussed last fall with Mr. Leventon.
23 BY MR. CLUBOK:
24 Q So you discussed the ATE policy last
25 fall with Mr. Leventon?

**104**

1 A Yes.
2 Q And in great a detail as you can,
3 describe that conversation.
4 A I don't remember much about the
5 conversation. I just remember discussing the
6 existence of the policy with Mr. Leventon.
7 Q What did -- what did you say to him?
8 A I was discussing what the independent
9 directors may or may not do.
10 Q What do you mean -- with as much detail
11 as possible, describe exactly what you said to him
12 and what he said to you.
13 A I said, "What do you think the
14 independent directors are going to do relative to
15 the policy"?
16 Q What did he say?
17 A "Your guess is as good as mine."
18 Q And that's the only thing that you said
19 to each other about the policy, nothing else in
20 that conversation that you can remember?
21 A Not in -- not in -- not generally.
22 That was -- that was pretty much the limitation.
23 Q What -- what sparked that conversation?
24 Did you start that conversation or did
25 he start that conversation?



105

1    **A  I did.**
2       MS. SMITH:  Objection to form.
3  BY MR. CLUBOK:
4    Q  And why did you start a conversation
5  with Mr. Leventon about the ATE policy?
6    **A  Because Mr. Leventon handled the matter**
7  **for UBS for years, and I wanted to get his**
8  **thoughts on it.**
9    Q  And so you just said to him -- what --
10  how did you start the conversation, as best you
11  can remember?
12    **A  I said, "Hey, what do you think the**
13  **independent directors do relative to the ATE**
14  **policy?"**
15    Q  And he said, "Your guess is as good as
16  mine," and that was the extent of your
17  conversation, the best you can recall?
18    **A  Pretty much.**
19    Q  Did you discuss in any way in words or
20  substance the question of whether or not the
21  directors even knew about the policy?
22    **A  The directors of Sentinel knew about**
23  **the policy?  No, I wouldn't, because it's obvious**
24  **they know about a policy they issued.**
25    Q  Oh, I'm sorry.  Your -- I apologize.  I

106

1  misunderstood your answer.
2      You asked Mr. Leventon what he thought
3  the independent directors at Sentinel would do
4  relative to the policy?
5    **A  Yes.**
6    Q  You -- I thought you meant the
7  directors who had been put in place at Highland.
8  But that's --
9    **A  No.**
10    Q  Okay.  So let me -- let me just make
11  sure the record's clear so -- and I apologize if
12  I -- if it was clear from your mind, but I didn't
13  understand.
14      When you had this conversation with Mr.
15  Leventon, you asked him what he thought the
16  independent directors of Sentinel would do with
17  respect to the ATE policy in light of the judgment
18  that had been entered into UBS's favor; correct?
19    **A  Correct.**
20    Q  And he said in words or substance "Your
21  guess is as good as mine"?
22    **A  Yes.**
23    Q  Did you ask him whether or not he had
24  communicated anything with the independent
25  directors about what to do with the policy in

107

1  light of the judgment?
2    **A  No.**
3    Q  Did you ever discuss the policy ever
4  with any of the independent directors?
5    **A  Never.**
6    Q  Do you know if anyone did on behalf of
7  Highland?
8       MS. SMITH:  Objection to form.
9       THE WITNESS:  No, I don't.
10  BY MR. CLUBOK:
11    Q  Do you know if anybody who worked at
12  Highland Capital Management ever discussed the ATE
13  policy with any of the independent directors of
14  Sentinel?
15       MS. SMITH:  Objection to form.
16       THE WITNESS:  I have no knowledge of
17  that.
18       MR. CLUBOK:  And what was the form
19  objection for that question, Ms. Smith?
20       MS. SMITH:  Mr. Clubok, that calls for
21  speculation.  And I have been helping you out with
22  your questions, and it is not my job to help you
23  rephrase your questions.
24       MR. CLUBOK:  Yeah.  My question was:  Do
25  you know?  So it doesn't call for speculation.  It

108

1  very clearly does not.  I'm just going to -- you
2  know, I sometimes ask you for your form objections
3  when I really don't understand them.
4      Sometimes your answers have helped me
5  and I understand.  Other times like that, I remain
6  perplexed how you could say it calls for
7  speculation.  Maybe I -- maybe you didn't hear me
8  ask him -- starting that question with, "Do you
9  know".  But I'm going to ask you, please -- if
10  it's a question like that going forward, please
11  don't make an objection if it's not warranted.
12       MS. SMITH:  I'll make my objections
13  when needed.
14       THE VIDEOGRAPHER:  Counsel, this is the
15  videographer.
16      I think the witness is frozen.
17       MR. CLUBOK:  Oh, dear.  Well, I guess
18  it was a good time for Ms. Smith and I to have
19  that little colloquy.
20       THE VIDEOGRAPHER:  Should we go off the
21  record?
22       MR. CLUBOK:  Yeah.
23       THE VIDEOGRAPHER:  We are going off the
24  record at 12:37 p.m.
25      (Recess taken from 12:37 p.m. to 1:11

109

1  p.m.)
2       THE VIDEOGRAPHER:  We are going back on
3  the record at 1:11 p.m. eastern time.
4  BY MR. CLUBOK:
5       Q   So, Mr. Ellington, we were talking
6  about the independent directors of Sentinel who
7  you were discussing what they might do or not do
8  with respect to the ATE policy last fall with Mr.
9  Leventon; do you remember that before the break?
10      A   Yes.
11      Q   And who were the independent directors
12 of Sentinel at the time?
13      A   I don't know.  I know one of them's
14 name was Jan.  I don't know their names.
15      Q   When was the last time you spoke to any
16 independent director at Sentinel?
17      A   I believe it was August of '19.
18      Q   And why did you speak to them in August
19 of 2019?
20      A   A required meeting with Cayman's --
21 Cayman Islands Monetary Authority.
22      Q   Did you discuss the UBS litigation at
23 all during that conversation?
24      A   Not with the independent directors, but
25 with CIMA.

110

1       Q   What's CIMA?
2       A   Cayman Islands Monetary Authority.
3       Q   And this is after the trial in the UBS
4  litigation?
5       A   No, previous to the trial.
6       Q   You said it was August of 2019.
7       A   Oh, yeah, sorry.  I'm sorry, Andy, I
8  was -- I thought you meant the verdict.  Sorry,
9  yes, after the trial.
10      Q   Okay.  So after the trial, but prior to
11 the verdict, you spoke with Cayman Islands
12 Monetary Authority about the UBS litigation?
13      A   Correct.
14      Q   And what was the nature of that
15 investigation?
16      A   They wanted an update as to the status
17 of the litigation.
18      Q   Why?
19      A   Because they have minimum annual
20 meetings with the, at least, a director and other
21 functions of the reinsurer to get a status on the
22 portfolio.
23          It is just an annual review that is
24 required by CIMA.
25      Q   Well, were you a director of CIMA?

111

1       A   No, I was not.
2       Q   So why were you the one having that
3  meeting?
4       A   As a representative of the
5  shareholders.  I wasn't having the meeting; it was
6  requested by CIMA.
7       Q   And, sorry, you represented the
8  shareholders of Sentinel?
9          MS. SMITH:  Objection --
10         THE WITNESS:  No, as a shareholder of
11 Sentinel or an entity relative to me as a
12 shareholder.
13 BY MR. CLUBOK:
14      Q   So you were -- you were there as a
15 shareholder in Sentinel?
16      A   Correct.
17      Q   And in that -- so you did have some
18 direct economic interest in Sentinel at the time?
19      A   No, not true.
20      Q   Okay.  You had indirect interest in the
21 equity value of Sentinel.
22      A   Like I said, or entities related to me.
23      Q   Were you the only person who was there
24 before CIMA representing the interest of the
25 shareholders?

112

1       A   Yes.
2       Q   Was anyone else involved in that
3  meeting?
4       A   Yes.
5       Q   Who?
6       A   Mr. Sevilla was there.  Mr. DiOrio was
7  there.  The director's first name is Jan -- I
8  don't know his last name -- independent director
9  of Sentinel, and Sentinel's counsel.
10      Q   Who was Sentinel's counsel?
11      A   Her first name was Simone.  I don't
12 remember her last name.
13      Q   From what firm?
14      A   I believe she was from Soloman Harris,
15 but I don't know that for a fact.
16      Q   Was she a Cayman attorney?
17      A   Yes.
18      Q   And was this meeting in the Cayman
19 Islands?
20      A   Yes.
21      Q   And about how long did it last?
22      A   The portion I was involved in lasted
23 about half an hour.
24      Q   Now, Katie Irving was also at that
25 meeting; correct.

113

1    A   I believe so, but I'm not certain.
2  I cant remember, but I believe se may have been.
3    Q   And why was she there?
4    A   She was along on the trip to do other
5  business with us, and she attended the meeting.
6    Q   What business was Ms. Irving doing that
7  was unrelated to Sentinel?
8    A   Relative to SAS Management.
9    Q   So Ms. Irving was in the Caymans on
10 that trip only with respect to business on behalf
11 of SAS?
12   A   Yes.
13   Q   But you brought her along to this
14 meeting with CIMA that was specifically focused on
15 Sentinel?
16   A   Yes.
17   Q   Why?
18   A   Because she asked if she should come
19 and listen, and I said sure.
20   Q   Why?
21   A   I guess she had a curiosity.  I don't
22 know.
23   Q   Did you report to anyone about this
24 meeting who was not at the meeting?
25   A   No.

114

1    Q   So, no one other than you, Mr. Sevilla,
2  Mr. DiOrio, Jan, Sentinel's counsel and Ms. Irving
3  were informed about this meeting to the best of
4  your knowledge?
5    A   To my knowledge, that's the only people
6  that were informed, yes.
7    Q   And at this meeting, did you talk about
8  the prospects -- this is after the trial had
9  already occurred; right?
10   A   I believe so, yeah.
11   Q   And so for example, at the trial, the
12 court ruled from the bench that -- in a way that
13 disallowed one of the defendant's arguments
14 specifically with respect to offset for hedging.
15      Do you remember that?
16   A   I do.
17   Q   What's that?
18   A   Yes, I do.
19   Q   Did you tell CIMA about that
20 development at trial?
21   A   I did not tell CIMA anything about the
22 developments at trial.
23   Q   Did they ask?
24   A   No, they did not.
25   Q   Who spoke at the meeting, other than

115

1  you?
2    A   I did not speak at the meeting.
3    Q   Who did?
4    A   Mostly Cayman counsel.  I remember Jan
5  discussing the portfolio, and potentially
6  Mr. DiOrio.  I don't recall if he spoke or not.
7    Q   Did anyone give any details about what
8  had happened at the trial?
9    A   No.
10   Q   Did anyone talk about the merits of the
11 UBS litigation in any way?
12   A   No.
13   Q   At the time -- now, you previously said
14 a number of times that you believed that the
15 defendants were going to lose that litigation even
16 before the verdict came out; right?
17   A   Yes, I did.
18   Q   And in fact, you believed there was a
19 decent chance that the defendants would get hit
20 with substantial portion, if not all, of the
21 billion dollars that was being sought; correct?
22   A   I didn't have an -- idea as to damages,
23 but I thought the -- there was a likelihood that
24 the defendants would lose.
25   Q   And you thought there was a likelihood

116

1  that the damages would be substantial, at least in
2  the several hundred million dollar range; correct?
3    A   Again, I had no insight into what
4  damages or how they would be calculated, but I
5  thought the defendants would lose.
6    Q   And you said a number of times that it
7  didn't surprise you at all about the size or the
8  magnitude of the damages verdict; correct?
9    A   Correct.
10   Q   And you had warned Mr. Dondero, in
11 words or substance, that this was likely to occur
12 before the verdict came; correct?
13   A   Yes.
14   Q   Did you ever communicate those beliefs
15 about the likelihood of a large judgment being
16 issued against the defendants to anybody
17 affiliated with Sentinel?
18   A   Myself, no.
19   Q   Did you -- are you aware of those
20 beliefs about the likelihood of a large judgment
21 being issued against the defendants in the UBS
22 litigation being communicated to anyone affiliated
23 with Sentinel?
24   A   Am I personally aware of it?  No.
25   Q   Were you made -- did you get any --

117

1  strike that.
2      Did you ever come to believe that
3  anyone at Sentinel was being advised as to the
4  likelihood of a significant judgment coming out of
5  the trial?
6      A  Yes.
7      Q  Describe the nature of that belief and
8  the circumstances.
9      A  I believe, and I was told anecdotally,
10 that Cayman counsel was following the matter very
11 closely and updating the directors in their
12 capacity.
13     Q  And Cayman counsel being Simone?
14     A  Yes.  And I believe there may have been
15 other Cayman counsel that Sentinel directors
16 retained, but I don't know that.
17     Q  Who told you that Cayman counsel was
18 following it very closely?
19     A  Simone.
20     Q  And -- but you never saw her
21 communicate -- strike that.
22         You never were copied on any
23 communication she had with the Sentinel directors
24 about the merits of the litigation?
25     A  Never.

118

1      Q  And you don't know anything more than
2  she assured you that the Sentinel directors were
3  being closely informed?
4      A  A general statement as we were walking
5  from the car into CIMA.
6      Q  So she told you on the way in words to
7  the effect that the directors know all about the
8  events of the litigation and that prospects?
9      A  Yes.
10     MS. SMITH:  Objection, form.
11     THE WITNESS:  Yes.
12 BY MR. CLUBOK:
13     Q  Other than that, were you ever made
14 aware in any way of what extent to which the
15 directors at Sentinel were being kept apprized of
16 the prospects for the New York litigation against
17 UBS?
18     A  No.
19     Q  And in between that meeting in August
20 of '19 and the meeting in the fall with Isaac
21 Leventon where you described, did you ever discuss
22 the ATE policy with any other human in the world?
23     MS. SMITH:  Objection to form.
24     THE WITNESS:  Not that I recall.
25     MR. CLUBOK:  And what's the form

119

1  objection for that question?
2      MS. SMITH:  I'm not going to explain
3  all of my objections.
4      MR. CLUBOK:  All right.  Okay.  I have
5  a right to ask, and if you don't have a -- okay.
6  I have a right to correct the form objection.  So
7  if there is a form objection, I have the right to
8  ask you what the basis is, so I can correct it if
9  it's -- if it's necessary.
10         Are you going to tell me anything more
11 than just objection to form?
12     MS. SMITH:  Okay.  Well, any other
13 human in the world is fake.
14 BY MR. CLUBOK:
15     Q  Okay.  Mr. Ellington, when I say any
16 other human in the world, are you confused that I
17 might be talking about animals or something;
18 nonhuman -- nonhumans?
19     A  Not confused.  But it's certainly very
20 difficult to remember what I said to every human
21 in the world, well over a period of five years.
22     Q  Sure.  But between August of 2019, when
23 you met in the Caymans with CIMA and the
24 discussions you had with Mr. Leventon that you've
25 described in the fall of 2020, did you discuss the

120

1  ATE policy with anybody else at all that you can
2  think of, sitting here today?
3      A  Not that I recall.
4      Q  Did Mr. Leventon ever seek out your
5  advice as to whether or not to disclose the
6  existence of the policy to the independent
7  directors that were appointed to manage Highland's
8  affairs in the bankruptcy?
9      A  Not that I specifically recall.
10     Q  Did Mr. Leventon ever seek out your
11 advice as to whether or not to disclose the
12 existence of the ATE policy to the Pachulski firm
13 or any lawyer that was representing Highland in
14 connection with the bankruptcy?
15     A  Not that I recall.
16     Q  Do you recall ever discussing with
17 Mr. Leventon whether or not the ATE policy should
18 be disclosed in connection with the bankruptcy?
19     A  No, not Mr. Leventon.
20     Q  With anyone?
21     A  Maybe I didn't understand your
22 question.  I'm sorry.
23         Could you ask -- could you please ask
24 it again?
25     Q  Did you ever recall discussing with

121

1  anybody whether or not the ATE policy should be
2  disclosed to anybody in connection with the
3  bankruptcy?
4  **A   I remember having a conversation with**
5  **Cayman counsel in regards to that.**
6  Q   Who at Cayman counsel?
7  **A   Sam Dawson.**
8  Q   And when was that discussion?
9  **A   Sometime post the filing. I don't**
10 **remember when. Post the debtor filing bankruptcy.**
11 Q   So at that time you were the general
12 counsel for Highland; correct?
13 **A   Yes.**
14 Q   And Highland was in bankruptcy?
15 **A   Yes.**
16 Q   And the Pachulski firm was representing
17 Highland in the bankruptcy?
18 **A   The Pachulski firm notified us in**
19 **writing that they weren't representing Highland,**
20 **they were representing the independent board.**
21 Q   Okay. Pachulski was representing the
22 independent board.
23     So the board had already been named in
24 the bankruptcy; correct?
25 **A   Yes.**

122

1  Q   In the discussion with Mr. Dawson?
2  **A   Yes, that's my recollection.**
3  Q   And his name is Dawson, D-A-W-S-O-N?
4  **A   Yes.**
5  Q   And you were -- you say that at the
6  time, Pachulski was not representing the debtor.
7  **A   Very -- very soon after the independent**
8  **award was put in place, Mr. Pomerantz maybe**
9  **others, wrote correspondence to a subset of us,**
10 **I believe a legal group -- maybe -- I don't**
11 **remember who all was included -- that said that**
12 **they did not represent Highland and certainly**
13 **didn't represent the employees and could not**
14 **provide us with legal advice. There was no**
15 **privilege that they -- they represented the**
16 **independent board, which needless to say we were a**
17 **little shocked by since they are called debtor's**
18 **counsel.**
19 Q   And you understood them to say that
20 there would be no privy with any discussions that
21 you had with the Pachulski firm from that point
22 forward?
23 **A   That's my recollection of the**
24 **correspondence.**
25 Q   So let's get back to this conversation

123

1  with Mr. Dawson.
2     Did you initiate that conversation?
3     MS. SMITH:  Objection -- objection.
4  I'm going to object to the extent that any of
5  these answers require you to divulge privileged
6  information.
7  BY MR. CLUBOK:
8  Q   Did you -- let's go back to this
9  conversation with Mr. Dawson.
10    Did you initiate that conversation?
11 **A   I did not.**
12 Q   He called you.
13    MS. SMITH:  Objection, privileged.
14    THE WITNESS:  I was speaking to
15 Mr. Dawson on an unrelated matter.
16 BY MR. CLUBOK:
17 Q   Okay. And who brought up the issue of
18 the ATE policy?
19 **A   I don't recall if it was me or him.**
20 Q   And describe what was said about it.
21    MS. SMITH:  Objection to the extent it
22 requires you to disclose privileged information.
23    THE WITNESS:  I think I'm clearly
24 describing privileged information.
25 BY MR. CLUBOK:

124

1  Q   Sorry, who was Mr. Dawson representing
2  at that point in the -- in connection with that
3  discussion?
4  **A   I believe he was Sentinel's counsel at**
5  **that point.**
6  Q   And you believed when you had this
7  discussion you were acting with your Sentinel hat
8  on exclusively?
9  **A   I believe this discussion I was having**
10 **a conversation on an unrelated matter and the**
11 **issue arose.**
12 Q   Right. But I'm -- in this particular
13 issue of whether or not to disclose the ATE policy
14 to the independent board, is it your testimony
15 that when you spoke -- I want to understand. What
16 capacity were you speaking with Mr. Dawson about
17 when you had the -- just that portion of the
18 discussion. I haven't asked you about the rest of
19 your discussion, but I'm asking about the question
20 about whether to disclose the ATE policy to the
21 independent board was -- and -- and actually let
22 me take a step back.
23    At that time, did you understand that
24 you reported to the independent board?
25 **A   No, I didn't report to the independent**

125

1 board. I believe I reported to Jim Seery at that
2 point.
3  Q  At that point, you reported to Mr.
4 Seery?
5  A  I believe so, yes.
6  Q  And did you discuss with Mr. Dawson
7 whether to disclose the ATE policy to Mr. Seery?
8  A  Matter of fact, I may have just been
9 reporting to Mr. Dondero at this time. I just
10 don't remember the timeframe.
11  Q  Okay.
12  A  Because it's kind of fuzzy of when
13 Mr. Seery became the CEO and when Mr. Dondero was
14 the CEO.
15  Q  What did Mr. -- what did Mr. Dawson
16 tell you what to do in terms of whether or not to
17 disclose the ATE policy to Mr. Seery?
18  A  He was not --
19  MS. SMITH: Objection.
20  THE WITNESS: -- not disclosing it to
21 the board, he was discussing ATE policies in
22 general.
23 BY MR. CLUBOK:
24  Q  In my opinion, he was just talking
25 about ATE policies in general, not this specific

126

1 ATE policy?
2  A  Correct.
3  Q  And -- okay. This kind of -- this line
4 of questioning began when I asked you if you
5 recall discussing with anybody whether or not the
6 ATE policy should be disclosed to anybody in
7 connection with the bankruptcy, and you said you
8 had a conversation with Sam Dawson in regards to
9 that.
10  A  About generally in a matter of practice
11 under Cayman law if the ATE policy should be
12 disclosed and when.
13  Q  What did he tell you?
14  MS. SMITH: Objection, privileged.
15  THE WITNESS: Yeah, I think I'm clearly
16 into privileged conversation.
17 BY MR. CLUBOK:
18  Q  Sorry, and you -- because you were at
19 the time not getting advice -- were you -- were
20 you at the time seeking advice on behalf -- well,
21 at the time you were general counsel still of
22 Highland; right?
23  A  Correct.
24  Q  And are you saying that -- when you
25 asked that question, were you asking with your

127

1 general counsel of Highland's hat on or some
2 different hat on?
3  A  It was no hat. It was a social call.
4 His wife had recently passed away from cancer, and
5 I was calling to give him my condolences.
6  Q  So you are saying this is privileged
7 advice.
8  Whose privilege is it?
9  A  Well, the other matters we talked about
10 was an SAS matter.
11  Q  I'm not asking about any other matter.
12 I'm asking what's the portion of that conversation
13 about whether or not to disclose the ATE policy
14 that was taken out in connection with the UBS New
15 York litigation to the directors that were
16 appointed on the restructuring. That's the only
17 part of this conversation I'm asking about.
18  MS. SMITH: Objection, form.
19 BY MR. CLUBOK:
20  Q  Okay. With respect to the part of the
21 conversation where Mr. Dawson gave you advice as
22 to whether or not to disclose the ATE policy to
23 the ORG members who had been appointed in the
24 restructuring case, whose privilege are you
25 asserting for not disclosing what he said? Who

128

1 was the entity that had the privilege there?
2  A  It was going to be Sentinel's privilege
3 since he was, I believe, Sentinel's counsel at the
4 time.
5  Q  So you were speaking to him in that --
6 with that -- respect to that part of the
7 conversation, just on behalf of Sentinel and not
8 on behalf of Highland Capital Management; is that
9 what you're saying?
10  A  I didn't sit there -- I didn't sit
11 there and parse through an extemporaneous
12 conversation of what hat I was wearing. But since
13 he's Sentinel counsel, I think it's their
14 privilege because since he was having legal
15 advice.
16  Q  Right. But at the time you were
17 general counsel of Highland Capital Management.
18 And I'm going to ask again -- and I believe
19 Mr. Feinstein clearly by his silence is not
20 asserting any privilege that you obtained while
21 you were still being paid by Highland Capital
22 Management -- what was the advice Mr. Dawson gave
23 you as to whether or not you should disclose that
24 ATE policy to the directors who were appointed in
25 the bankruptcy?

129

1     MS. SMITH: Objection, privileged. I'm
2 going to instruct you not to answer.
3     MR. CLUBOK: And the -- and I want you
4 to lay out exactly the basis of your instruction,
5 Ms. Smith.
6     You are asserting purely on behalf of
7 Sentinel; is that correct?
8     MS. SMITH: I'm instructing
9 Mr. Ellington not to answer to the extent it
10 discloses privileged information of Sentinel.
11 BY MR. CLUBOK:
12    Q   Are you -- are you instructing him
13 specifically not to -- so -- so the fact that
14 Mr. Ellington was general counsel of Highland at
15 the time, you are saying that in this
16 conversation, though, you did not -- you're
17 parsing the information in your head so that
18 Highland doesn't -- didn't gain access to it?
19    MS. SMITH: No, I'm listening to his
20 testimony where he testified that it was a social
21 call. He did not call him as general counsel of
22 Highland Capital Management LP.
23    He called as a social call, and he
24 asked a question generally -- I don't have the
25 realtime up, but he asked a question generally

130

1 about ATE's policies and Sentinel.
2 BY MR. CLUBOK:
3    Q   And did you ask him -- did you ever ask
4 anybody, in your capacity as general counsel of
5 Highland, for any advice as to whether or not you
6 should disclose the existence of the ATE policy to
7 the board that was appointed in the restructuring
8 case?
9    A   No.
10    Q   Did you ever ask anybody, in your
11 capacity as general counsel for Highland, for any
12 advice as to whether or not you should disclose
13 the existence of the ATE policy to Jim Seery?
14    A   No.
15    Q   Did you ever consider the question of
16 whether or not you should disclose the existence
17 of the ATE policy to Jim Seery in the perspective
18 of your role as general counsel of Highland
19 Capital Management?
20    MS. SMITH: Objection to form.
21    THE WITNESS: What do you mean by
22 consider?
23 BY MR. CLUBOK:
24    Q   Did you ever think with your general
25 counsel of Highland Capital Management hat on, I

131

1 wonder if I have a fiduciary obligation to
2 disclose the existence of ATE policy to Mr. Seery?
3     MS. SMITH: Objection.
4 BY MR. CLUBOK:
5    Q   Did you consider that question in words
6 or substance?
7     MS. SMITH: Objection, calls for a
8 legal conclusion.
9     THE WITNESS: I generally considered
10 it, yes.
11 BY MR. CLUBOK:
12    Q   And did you consult anyone for advice,
13 other than this -- whatever general discussion you
14 had with Mr. Dawson in the context of the social
15 call?
16    A   No.
17    MS. SMITH: Objection to the extent it
18 calls for privileged information.
19 BY MR. CLUBOK:
20    Q   And did you independently conclude
21 whether or not as the general counsel of Highland
22 Capital Management you had a duty to disclose the
23 existence of the ATE policy to Mr. Seery or the
24 Pachulski firm?
25    MS. SMITH: Objection, legal

132

1 conclusion.
2     THE WITNESS: Yes, I have generally
3 concluded.
4 BY MR. CLUBOK:
5    Q   What was your conclusion?
6    A   That I was under no obligation to
7 disclose it.
8    Q   What was that based on?
9    A   As I previously said, Pachulski had
10 said they had no representation of any Highland
11 employee, only an independent board. They didn't
12 represent the debtor. There was no privilege.
13    I -- as you know, you had even asked to
14 speak to me because you and I had always had a
15 good rapport of trying to solve things and had
16 made numerous attempts to solve things. And I was
17 affirmatively told by Pachulski and the
18 independent board not to be a part of any
19 settlement discussions in any way and not to speak
20 to you in any way.
21    Q   Is there -- you knew that Mr. Seery and
22 the Pachulski firm was at some point making an
23 effort to identify all of the assets of CDO Fund,
24 SOHC and HFP; correct?
25    MS. SMITH: Objection to form.

---

133

1      THE WITNESS: I generally knew that
2   they were -- they were looking at the assets of
3   those entities, yes.
4   BY MR. CLUBOK:
5      Q   And you knew that the trigger for the
6   ATE policy had already occurred as of the date of
7   the judgment?
8      MS. SMITH: Objection to form.
9   BY MR. CLUBOK:
10     Q   Correct?
11     A   I disagree.
12     Q   Why do you disagree with that?
13     A   It was intimated to me that the trigger
14  would be a perfection of a judgment from New York
15  to the Cayman Islands.
16     Q   Who intimated that to you?
17     A   CIMA.
18     MS. SMITH: Objection.
19  BY MR. CLUBOK:
20     Q   CIMA did?
21     A   Yes.
22     Q   When?
23     A   In the meeting aforementioned in August
24  of '19.
25     Q   So it was intimated to you that until

134

1   the judgment was perfected in the Cayman Islands,
2   there was no trigger for paying ATE?
3      A   Yes.
4      Q   Who specifically intimated that to you?
5      A   CIMA.
6      Q   Who, name of a human being.
7      A   I don't know the human being's name.
8   There was five people from CIMA in the room. It
9   was three years ago.
10     Q   When you say it was intimated, what do
11  you mean?
12     A   They said there is not a claim on the
13  policy to perfect the judgment here.
14     Q   Was it a man or a woman who said that?
15     A   It was a man.
16     Q   Was it the man who was the -- was there
17  one person who was the principal spokesperson for
18  CIMA at this meeting?
19     A   Yes.
20     Q   And you just don't remember his name?
21     A   No.
22     Q   Did you have any documents, records of
23  this meeting?
24     A   No.
25     Q   And now if there is a settlement, that

135

1   would also trigger the policy; correct?
2      MS. SMITH: Objection to form.
3      THE WITNESS: I don't have the
4   expertise to say whether that triggers a policy or
5   not. That's not a determination I could make.
6   BY MR. CLUBOK:
7      Q   Isn't it true that Mr. Leventon at some
8   point consulted with you about whether or not he
9   should disclose the policy to either Mr. Seery or
10  the lawyers at the Pachulski firm?
11     A   I don't know.
12     MS. SMITH: Objection to form.
13  BY MR. CLUBOK:
14     Q   Sorry, can you answer the -- I think
15  your answer came in over Ms. Smith's objection, so
16  I'll ask the question again.
17     Is it true that Mr. Leventon at some
18  point consulted with you about whether or not he
19  should disclose the ATE policy to either Mr. Seery
20  or the lawyers at the Pachulski firm?
21     A   I don't recall.
22     Q   Between -- other than this meeting with
23  CIMA and the discussion you had with Mr. Leventon,
24  did you ever discuss the ATE policy with anyone
25  else in the world since the bankruptcy that you

136

1   can recall other than --
2      A   Not that I recall.
3      Q   -- other than Ms. Smith?
4      A   Not that I recall.
5      Q   Did you ever discuss -- when was the
6   last time you spoke to Mr. Dondero about the ATE
7   policy?
8      A   I would say at least two years.
9      Q   And what was the nature of that
10  conversation?
11     A   I believe that Mr. Dondero asked me if
12  it was still in place.
13     Q   Roughly when was that?
14     A   I would say sometime in 2018.
15  That's -- that's my best guess.
16     Q   Was it before or after the trial?
17     A   Before.
18     Q   So before the trial, he asked you if
19  the ATE policy was still in place?
20     A   Yes.
21     Q   And what did you say?
22     A   I said as far as I know, yes.
23     Q   And after the trial, but before the
24  judgment, did you ever speak with Mr. Dondero
25  again about the ATE policy?

137

1     A   Not that I recall.
2     Q   And after the judgment, did you ever
3  talk to Mr. Dondero about how the ATE policy could
4  somehow be used to satisfy the judgment or settle
5  the case?
6     A   No.
7        MS. SMITH:  Objection to form.
8        THE WITNESS:  Not that I recall.
9  BY MR. CLUBOK:
10    Q   Right before the bankruptcy, you tried
11 to settle the claims against CDO Fund, SOHC and
12 HFP; correct?
13    A   Yes, I approached you to try to
14 structure a settlement.
15    Q   And you claimed at the time that those
16 funds were ghost funds, in your words; correct?
17    A   Yes.
18    Q   And you -- basically, you said, in
19 substance, though, they had no assets left, but if
20 there was a settlement, that Mr. Dondero could
21 come up with funds from some other source to
22 satisfy a relatively small settlement on behalf of
23 those funds; is that true?
24    A   On behalf of all defendants, yes.
25    Q   Well, you specifically talked about --

138

1  you specifically talked about settling the
2  non-HCM-related claims for a relatively small
3  amount and then separately agreeing to an allowed
4  claim for HCM; isn't that true?
5     A   That was one of the options you and I
6  discussed.  We discussed many options.
7     Q   And you never disclosed the fact that
8  there was an ATE policy that could satisfy a
9  potential settlement of the claims against CDO
10 Fund, SOHC and HFP; correct?
11    A   Correct.
12        -- (overspeaking) --
13        MS. SMITH:  Objection, form.
14 BY MR. CLUBOK:
15    Q   I want to make sure the court reporter
16 got the -- okay.  There was simultaneous speakers,
17 so I don't think she heard your answer even though
18 the audio will capture it.
19        And do me a favor, Mr. Ellington.
20 Since Ms. Smith is objecting sometimes, if you
21 could -- I really appreciate you giving answers
22 quickly on the one hand.  On the other hand, if
23 you could just take one more beat so that you are
24 not talking over her as she's making her
25 objections, that will be helpful.

139

1     A   Absolutely.  It is my fault, and there
2  is some slight delay on my end, so I think that's
3  part of the problem.  I apologize.
4     Q   That's okay.  I appreciate -- again,
5  like I said, I appreciate your effort to just
6  answer these questions clearly, but you overshot
7  that by a scooch.
8     A   I apologize to both you and Ms. Smith
9  and the court reporter.  I'm not trying to do that
10 at all.
11    Q   No, no, I understand.  I understand.
12    A   Yeah.
13    Q   So let me just ask it one more time.
14        You never disclosed in the course of
15 any settlement discussions with UBS's counsel that
16 there was an ATE policy that could satisfy a
17 potential settlement of the claims against CDO
18 Fund, SOHC and HFP; correct?
19    A   The only person I discussed it with was
20 you, and, no, I did not disclose that.
21    Q   I apologize if I've asked this earlier:
22 Did Sentinel ever have a shared services agreement
23 with Highland Capital Management?
24    A   Not that I'm aware of.
25    Q   Does it have one today with Skyview?

140

1     A   Not that I'm aware of.
2     Q   Does it have a client relationship with
3  Skyview?
4        THE WITNESS:  Not that I'm --
5        MS. SMITH:  Object to the form.
6        THE WITNESS:  Sorry, not that I'm aware
7  of.
8  BY MR. CLUBOK:
9     Q   Let's turn to what's behind tab 2,
10 Exhibit 50.
11        I think we do have here -- we've asked
12 you before about the ownership interest, and you
13 said you had seen some documents.  Hopefully this
14 will help refresh your recollection.
15    A   You want me to go ahead and open the
16 envelope, Mr. Clubok?
17    Q   Yeah, open Exhibit 50.  Exhibit 50 --
18 while you're opening it, I'll just describe -- is
19 an email exchange that starts with an email from
20 Mr. Sevilla to SEI-IS-Highland and that appears to
21 be to someone named Daniel Bowen, and there is
22 some back and forth that continues through the
23 email chain between these two individuals.
24        Do you have Exhibit 50 in front of you?
25    A   I do.

---

141

1    Q   Do you know who Mr. Bowen is?
2    **A   I do not.**
3    Q   Do you know what SEIC is?
4    **A   Say that again. I'm sorry.**
5    Q   Do you know what SEIC is?
6    **A   I do not.**
7    Q   Or SEI-IS?
8    **A   I do not.**
9    Q   Okay. So, in this email Mr. Sevilla --
10   this is August 28th, 2017 and the subject is
11   "Highland Multi-track Transfer."
12       Do you see that?
13   **A   Yes.**
14   Q   And it says, "SEI. Please see transfer
15   documents attached from Multi Strat firm. Please
16   let me know if you have any questions."
17       Do you see that?
18   **A   I do.**
19   Q   And you don't know who SEI is in that
20   context?
21   **A   I do not.**
22   Q   And you see Mr. Bowman responds and
23   says, "We are in the process of reviewing the
24   attached and still require additional
25   documentation. Can you please provide" and there

---

142

1    are a number of things that they list.
2        Do you see that?
3    **A   Yes, I do.**
4    Q   And one of them that's shaded out
5    that's maybe hard for you to read. And it says,
6    "List of beneficial owners with 25 percent or more
7    interest. Additional AML required."
8        Do you see that?
9    **A   I do.**
10   Q   And Mr. Sevilla says, "Please note that
11   you already have the items I've highlighted in
12   yellow. Sentinel Re Holdings is a limited partner
13   in the fund already and Sentinel Reinsurance
14   Limited is 100 percent owned by Sentinel Re
15   Holdings."
16       Do you see that?
17   **A   I do.**
18   Q   And do you have any reason to disagree
19   with what Mr. Sevilla says here?
20   **A   I don't have --**
21       MS. SMITH: Objection, form.
22       And, Mr. Ellington, please review the
23   whole exhibit before you answer specific
24   questions.
25       I don't think he's had an opportunity

---

143

1    to look at the whole exhibit.
2        THE WITNESS: No, I have not.
3    BY MR. CLUBOK:
4    Q   I have a very specific question.
5        MR. CLUBOK: And I'd appreciate no
6    speaking objections or instructions like that when
7    they're not necessary.
8    BY MR. CLUBOK:
9    Q   Sometimes, Mr. Ellington, if it's
10   necessary to read a whole document, that's fine,
11   obviously. But I'm going to just ask -- and I'll
12   ask my question more clearly: Just with respect to
13   this particular statement that Sentinel Re
14   Holdings is a limited partner in the fund and
15   Sentinel Reinsurance Limited is 100 percent owned
16   by Sentinel Re Holdings, do you have any basis to
17   disagree with those statements?
18   **A   I don't have any basis to agree or**
19   **disagree. I don't have enough information to...**
20   Q   Is this the kind of -- yeah, is this
21   the kind of information you would trust JP Sevilla
22   to report on accurately during this time period?
23   **A   I don't have any reason to believe that**
24   **Mr. Sevilla would be inaccurate.**
25   Q   Why -- was Mr. Sevilla tasked with

---

144

1    dealing with the Highland Multi Strat transfer?
2    **A   I don't know.**
3    Q   August 28, 2017 is around the time
4    shortly there -- shortly after the time that the
5    ATE policy was purchased; correct?
6    **A   I don't know.**
7    Q   Well, there was a highly Multi Strat
8    transfer in connection with the purchase of the
9    ATE policy; correct?
10   **A   I really don't know.**
11   Q   You do know that the intent of
12   purchasing the policy was to transfer all or
13   substantially all of the assets of CDO Fund, SOHC
14   and HFP; correct?
15       MS. SMITH: Objection to form.
16       THE WITNESS: The purpose of purchasing
17   the policy was to transfer?
18   BY MR. CLUBOK:
19   Q   No, no, sorry, let me -- let me ask
20   again.
21       You know, sir, that in the -- the part
22   of the -- strike that.
23       As part of the purchase of the ATE
24   policy, you understood that it was the intent of
25   the purchasers of that policy to transfer all or

---

145

1  substantially all of the assets of CDO Fund, SOHC
2  and HFP to Sentinel as payment for that policy;
3  correct?
4      A  I knew that --
5          MS. SMITH:  Objection to form.
6          THE WITNESS:  I knew that there was a
7  premium that was required and regulated by CIMA,
8  and I know that that had been contemplated as a
9  way to pay that premium.
10 BY MR. CLUBOK:
11     Q  And how was that premium set?
12     A  I wasn't involved in those
13 conversations.
14     Q  Who set that premium?
15     A  From my understanding, the -- the level
16 of the premium was ultimately set by CIMA.
17     Q  How was it initially set?
18     A  I was not involved in any of those
19 conversations, so I don't know.
20     Q  You have no idea how the premium to pay
21 for this ATE policy that was your idea was
22 initially set?
23     A  No.
24     Q  You do know that before the actual
25 dollar amount was settled on for what the premium

146

1  would be, there was discussion involving --
2  including you, that the premium would equal
3  substantially all, if not all of the assets of CDO
4  Fund, SOHC and HFP; correct?
5          MS. SMITH:  Object to the form.
6          THE WITNESS:  I knew that was the -- I
7  knew that was the idea and requirement to reach
8  the premium required by CIMA.
9  BY MR. CLUBOK:
10     Q  So -- but before talking to CIMA,
11 before there was ever a discussion with CIMA about
12 what the premium would be, there was an idea to
13 calculate the total value of all the assets of CDO
14 Fund, SOHC and HFP and make that be the amount
15 that that would satisfy the premium that was going
16 to be set thereafter; fair?
17         MS. SMITH:  Objection to form.
18         THE WITNESS:  I don't know.  I wasn't
19 involved at that level.
20 BY MR. CLUBOK:
21     Q  Well, you were involved in discussions
22 that occurred prior to ever talking to CIMA about
23 what the premium would actually be in which it was
24 discussed using all the assets of CDO Fund, SOHC
25 and HFP to satisfy whatever the premium turned out

147

1  to be; correct?
2      A  I was involved --
3          MS. SMITH:  Objection to form.
4          THE WITNESS:  I was involved in
5  discussions at the genesis of the idea, and then
6  it went through a formal process involving
7  numerous areas of the debtor.
8  BY MR. CLUBOK:
9      Q  Right.  But before that process ever
10 got to discussing it with CIMA, there was a
11 communication that you were included on that
12 talked about using all of the assets of SOHC, CDO
13 Fund and HFP to purchase the ATE policy; correct?
14     A  I don't know.  I'd have to see that
15 communication.  Your question was:  Was I involved
16 in discussions.  Being copied on a communication
17 to me is not discussions.
18     Q  Okay.  You were aware that the intent,
19 prior to ever talking with CIMA, was to use all
20 the assets of SOHC, CDO Fund and SOHC (sic) to
21 purchase the ATE policy; correct?
22     A  No.
23         MS. SMITH:  Objection to form.
24         THE WITNESS:  No, that's not true.  I
25 didn't -- I believe that was in response to CIMA

148

1  saying what the premium had to be.  But I, again,
2  was not involved in that level of discussion and
3  was not part of the process.
4      A  From the very beginning -- strike that.
5          Well, let's be clear.  You had the
6  initial idea of the ATE policy; correct?
7          THE WITNESS:  As a concept, yes.
8  BY MR. CLUBOK:
9      Q  And there were initial discussions that
10 ultimately stretched over weeks, if not months,
11 before the policy was executed; correct?
12     A  That's my understanding.  I was
13 involved at the beginning, and then it went
14 through a formal process I was not involved in.
15     Q  But at some point, it came to your
16 attention that the idea was for the policy to be
17 paid for with all of the assets of SOHC, CDO Fund
18 and HFP; correct?
19     A  Yes.  But it's my understanding that
20 was in response to the premium set by CIMA.
21     Q  You -- you --
22     A  I was not intimately involved in any of
23 those discussions with CIMA or otherwise.
24     Q  You are saying as you sit here today,
25 that it is your understanding that CIMA first set

**149**

1  the premium, and after that, it just so happened
2  that that premium exactly equalled all of the
3  assets in HFP, CDO Fund and SOHC?
4      A  No, I'm telling you, you're asking if I
5  was aware of how it happened.  My understanding is
6  that was the amount required for the premium.  I
7  wasn't involved in any of the discussions, none of
8  the mechanics of setting how much, none of the
9  mechanics of valuation, none of the aspects of
10  transfer.
11          That's all a formal process that was
12  directed by compliance, and it went through all
13  the proper channels.
14      Q  Okay.  Then break down -- and please
15  answer my questions I'm asking you.
16      A  I'm trying.
17      Q  And we'll do it in little pieces.
18  Don't jump ahead, please.
19      A  Okay.
20      Q  True that at some point, it came to
21  your attention that the idea --
22      A  Sorry.
23      Q  Let me strike that.  I'll start over.
24      A  Okay.  Sorry.
25      Q  At some point, it came to your

**150**

1  attention that the idea was for the policy to be
2  paid for with all of the assets that remained at
3  SOHC, CDO Fund and HFP; correct?
4      A  Anecdotally --
5          MS. SMITH:  Objection, asked and
6  answered.
7          THE WITNESS:  Anecdotally, yes.
8  BY MR. CLUBOK:
9      Q  And you learned of that intention prior
10  to the premium price being approved by CIMA;
11  correct?
12      A  I have no idea because I don't know
13  when the premium price was set by CIMA because I
14  wasn't involved.
15      Q  Okay.  So when you said earlier that it
16  was your understanding that the amount paid for
17  the premium was -- okay.  You don't -- so let me
18  ask it this way:  You are saying, as you sit here
19  today, you have no idea whether or not -- first,
20  it was determined that all of the assets from HFP,
21  CDO Fund and SOHC would be used or first it was
22  determined here's the premium price and now let's
23  see what we need to satisfy that premium price.
24          As you sit here today, you don't know
25  the order of those two events?

**151**

1      A  I have no idea.
2          MS. SMITH:  Objection to form.
3  BY MR. CLUBOK:
4      Q  What's that?
5      A  I have no --
6          MS. SMITH:  Objection, form.
7          THE WITNESS:  I'm sorry, I have no idea
8  as to the order.  I just simply wasn't involved.
9  BY MR. CLUBOK:
10      Q  And -- and -- but you were the owner at
11  the time -- 30 percent beneficial owner of
12  Sentinel; correct?
13      A  No, entities related to me were.  I was
14  not.
15      Q  Okay.  But you -- right, entities
16  related to you had the 30 percent beneficial
17  ownership of Sentinel at the time the ATE policy
18  was issued; correct?
19      A  Correct.
20      Q  And going back to this Exhibit 50,
21  Mr. Bowman on the first page of Exhibit 50 at the
22  bottom asked if Mr. Sevilla could confirm if he
23  would like to pass along the beneficial ownership
24  information they had on file for Sentinel Re
25  Holders.

**152**

1          Do you see that?
2          MS. SMITH:  Objection to form.  That
3  misread that quote.
4          THE WITNESS:  Yeah.  And what I see is
5  "Hi, Big JP.  Can you please confirm if you would
6  like us to pass along the beneficial owner
7  information that we have on file for Sentinel Re
8  Limited for all the AO that we have on file for
9  that investor."
10  BY MR. CLUBOK:
11      Q  Right.  And Mr. Sevilla then tells him
12  "Just the beneficial owner, please."  Correct?
13      A  And he says, "Thanks.  Yes, correct."
14      Q  And then Mr. Bowen has an email at the
15  top, with an attachment that says, "Hi, JP.
16  Please see the attached beneficial ownership
17  information for Sentinel Re Holdings Limited."
18          Do you see that?
19      A  I do.
20      Q  And I'm going to ask you to turn and
21  look at Exhibit 26 --
22      A  Okay.
23      Q  -- which I will tell you is the
24  attachment --
25      A  Okay.  I don't have 26, I don't

153

1  believe. Let me see.
2      Q   You should.
3      A   I think I do. Sorry. Yes, I have it.
4          May I open it now?
5      Q   Yeah, if you could open it, please.
6  And while you're opening it, I will represent that
7  Exhibit 26 was attached to Exhibit 50 in the
8  original email.
9          And Exhibit 26 shows at the top,"The
10 fund, Multi Strat Credit Fund, with an investor
11 Sentinel Reinsurance."
12         Do you see that?
13     A   Investor Sentinel Reinsurance Limited,
14 yes.
15     Q   And it talks about the beneficial
16 owners of Sentinel Reinsurance being 70 percent
17 Patton Limited and 30 percent Minutes Limited;
18 correct?
19     A   Yes.
20     Q   And, in turn, under Patton, it has the
21 breakdown of various beneficial ownerships. But
22 the only individual identified is James Dondero.
23         Do you see that?
24     A   I do.
25     Q   And then with respect to the Mimic

154

1  Holdings it says, 100 beneficial ownership,
2  Montage Holding Limited which, in turn,
3  100 percent beneficial ownership AHL Holdings LP,
4  which, in turn, has 99 percent beneficial
5  ownership, Elderflower Limited, which, in turn, is
6  100 percent beneficial ownership, Scott Ellington,
7  you. Correct?
8      A   I see that, yes.
9      Q   And does that -- seeing this, does that
10 confirm that at the time of the ATE policy, you
11 had close to or approximately 30 percent
12 beneficial ownership ultimately in Sentinel?
13         MS. SMITH: Objection to form.
14         THE WITNESS: That's what this document
15 seems to suggest. But I don't know where this
16 information came from to SEI. I don't know.
17 BY MR. CLUBOK:
18     Q   Do you have any reason to believe that
19 it's inaccurate?
20     A   I'd have to see the org chart at the
21 time that this was generated. I just don't
22 remember.
23     Q   Do you -- as you sit here today, do you
24 have any reason to believe that this would be
25 inaccurate information?

155

1          MS. SMITH: Objection to form.
2  Answered.
3          THE WITNESS: I can't say whether it is
4  or isn't without the documents.
5  BY MR. CLUBOK:
6      Q   My question is -- my simple question is
7  whether you can say it isn't.
8          Do you -- as you sit here today,
9  looking at this, do you -- do you know any reason
10 why this would be inaccurate?
11     A   Without the documents, I cannot say
12 it's inaccurate.
13     Q   What further documents would you need
14 to know whether or not this is accurate?
15     A   Well, I would have to see the documents
16 of all these entities.
17     Q   Okay. Did you ever contribute capital
18 to Sentinel?
19     A   Excuse me?
20     Q   Did you ever contribute any capital to
21 Sentinel?
22     A   Did I ever contribute any capital to
23 Sentinel? No, I do not believe so.
24     Q   Did you ever -- unless -- and when I
25 say Sentinel, I mean Sentinel Reinsurance Limited.

156

1          Did you ever put any investment or
2  funds into Sentinel Reinsurance Limited?
3      A   I don't know.
4      Q   You don't know?
5      A   I don't know. It could have been
6  capitalized in a way that I -- I personally did
7  not, no.
8      Q   Let's look at what's been marked as
9  Exhibit 77.
10         MR. CLUBOK: And Nate, when I call
11 these out, I know Mr. Ellington's got a hard copy,
12 but can you also put it up on the screen to make
13 it easy. We'll see it both ways.
14         REMOTE TECHNICIAN: Yes, sir. That was
15 77?
16         MR. CLUBOK: Yes, tab four.
17 BY MR. CLUBOK:
18     Q   This is a document that says, "Scott
19 Ellington Schedule of Certain Cash and Investments
20 and Accountant's Compilation Report, October 31st,
21 2018." Do you see that?
22     A   I do.
23 BY MR. CLUBOK:
24     Q   And the second page references an
25 entity called Seville Dodge and Company; do you

157

1  see that?
2     A  I do.
3     Q  Who are they?
4     A  An accounting firm.
5     Q  And they're your accounting firm.
6     A  They assist along with outside counsel
7  in tax preparation.
8     Q  Okay.  And in the end of 2018, they
9  compiled a schedule of certain cash and
10  investments of you as of October 31st, 2018;
11  correct?
12     A  That seems to be what 7359 is.
13     Q  Why did they do that?
14     A  I was applying for a Cayman banking
15  license, and this was requested by CIMA.
16     Q  Okay.  And so you had to make sure you
17  provided accurate information to CIMA?
18     A  Yes.
19     Q  And did Sevilla -- do you trust that
20  Sevilla accurately reported your cash and
21  investments as of October 31st, 2018?
22     A  I trust that they --
23     MS. SMITH:  Object to form.
24     THE WITNESS:  -- did their best to
25  accurately report, yes.

158

1  BY MR. CLUBOK:
2     Q  And on the second page it says,
3  "Investment in Sentinel Reinsurance Limited
4  11.8 million."
5     Do you see that?
6     A  Yes, I do.  And Sentinel Reinsurance
7  Limited, yes.
8     Q  Right.  And does that refresh your
9  recollection that you invested 11.8 million in
10  Sentinel Reinsurance Limited?
11     A  No, it does not.  I don't -- I don't
12  know what that's referencing.
13     I never invested personally $11 million
14  in anything?
15     Q  Was that -- was that a valuation of
16  your investment in Sentinel Reinsurance at the
17  time?
18     A  That's what my belief is, yes.
19     Q  And what was -- where -- did you -- did
20  you ensure that Sevilla Dodge and Company had
21  accurate information so they could make an
22  accurate representation of the value of your
23  investment in Sentinel Reinsurance at the time?
24     A  Yes.  But, I mean, I didn't provide any
25  valuation to them.  They -- I presume them or

159

1  other professionals did the valuation.
2     Q  Well, you caused this to be prepared so
3  that you could submit it to CIMA to get a banking
4  license; right?
5     A  At the request of CIMA, yes.
6     Q  Understood.  And did you -- are you
7  reasonably certain that it was accurate?
8     MS. SMITH:  Objection to form.
9     THE WITNESS:  I -- I don't have
10  enough -- I don't have enough expertise to
11  understand these type of valuations.  That's why I
12  hire professionals to do it.
13  BY MR. CLUBOK:
14     Q  Yeah, but do you -- did you take care
15  to ensure that you hired a professional that you
16  can rely on and that you provided that
17  professional with all the information reasonably
18  necessary to be accurate to the best of your
19  ability?
20     A  Myself or other -- those are other
21  entities because I couldn't provide information on
22  Sentinel.  The independent directors would have to
23  do that.
24     Q  Did you take any affirmative obligation
25  to do everything reasonably possible to ensure

160

1  that the information that's set forth in Exhibit
2  77 is as accurate as possible?
3     A  Yes, I provided any information I had
4  access to and requested that other entities that
5  were controlled by directors or others would
6  provide the information to Sevilla Dodge.
7     Q  And to the best of your -- do you feel
8  comfortable relying upon the work of Sevilla Dodge
9  and Company as of the date of Exhibit 77 as
10  reflected here?
11     A  They are a reputable accounting firm
12  with highly trained professionals, so I relied on
13  their expertise.
14     Q  And why would Matt DiOrio have a copy
15  of this?
16     A  I don't know.
17     MS. SMITH:  Objection to form.
18  BY MR. CLUBOK:
19     Q  Did you share this information
20  intentionally with Matt DiOrio?
21     A  Not that I recall, no.
22     Q  Does -- as far as you know is Matt --
23  when Matt DiOrio was at Highland, did he have any
24  need, as far as you know, to have access to this
25  document based on what you understood his job to

161

1 be?
2 **A It may have been a function, but I**
3 **don't know, I don't know why he would have it.**
4 Q Matt DiOrio at the time was reporting
5 to you before you were terminated?
6 **A Yes.**
7 Q And you have no idea why this would
8 have been found at his desk after he was
9 terminated?
10 MS. SMITH: Objection to form.
11 THE WITNESS: No, I don't. I mean,
12 this was generated four years ago, so any number
13 of things could have happened over that period of
14 time that I wasn't aware of.
15 BY MR. CLUBOK:
16 Q Did you ever suggest any business to
17 Sentinel -- strike that.
18 Did you ever suggest to Sentinel that
19 they engage in any particular business or issue
20 any particular policy?
21 **A No.**
22 Q Did you give -- did you have anything
23 whatsoever to do with Sentinel's decision-making
24 on whether to or circumstances surrounding the
25 issuance of any policy?

162

1 **A No.**
2 Q Did Sentinel issue any other ATE
3 policies ever, other than the one that was -- that
4 was issued in connection with the UBS litigation?
5 **A Not that I'm aware of.**
6 Q How much does Sentinel have in --
7 strike that.
8 What's the value of your investment in
9 Sentinel today, roughly?
10 **A I have no idea.**
11 Q Do you have any idea if it's 1 million
12 or 100 million?
13 **A I certainly don't think it's**
14 **100 million, but I don't know.**
15 Q Well, in 2018, your investment in
16 Sentinel was roughly two-thirds of your cash and
17 investments total; correct?
18 MS. SMITH: Objection to form.
19 THE WITNESS: According to this
20 accounts, roll up of assets, yes.
21 BY MR. CLUBOK:
22 Q And today is your investment in
23 Sentinel roughly two-thirds of your total net
24 worth?
25 **A I don't know.**

163

1 MS. SMITH: Objection to form.
2 BY MR. CLUBOK:
3 Q Is it roughly half? Is it roughly a
4 third?
5 **A I don't know.**
6 Q Yes, so Scott, let's take just one more
7 beat before you --
8 **A It's okay. Sorry.**
9 Q I think you can assume that Ms. Smith
10 will say "objection to form" to many questions.
11 **A Okay.**
12 Q So let her go ahead and say that if you
13 can before you jump in, though I do appreciate
14 that you are just trying to answer the questions,
15 and I appreciate that.
16 **A Thank you. Sorry again to everyone.**
17 Q It's okay. Let's try one more time.
18 As of 2018, you think it's reasonable
19 to conclude that your net worth was approximately
20 two-thirds -- strike that.
21 As of November 2018, it's true that
22 approximately two-thirds of your total net worth
23 was your investment in Sentinel Reinsurance;
24 correct?
25 MS. SMITH: Objection to form.

164

1 THE WITNESS: According to this
2 schedule of cash and investments, which I find it
3 interesting there is no liabilities reflected here
4 and then I don't know the valuation methodology
5 used, but that's what this looks like.
6 BY MR. CLUBOK:
7 Q And this is the document that you
8 trusted Sevilla Dodge and Company to do an
9 accurate job of reporting to the CIMA authority;
10 correct?
11 **A Yeah.**
12 Q Okay.
13 **A But, again, it's just -- its just a**
14 **schedule of certain cash investments, and it**
15 **doesn't reflect any liabilities.**
16 Q Yeah, it doesn't reflect liabilities.
17 **A I take net worth, I think the term**
18 **"net" nets out liabilities.**
19 Q Ah, okay, fair enough. So as of
20 November 2018, approximately two-thirds of your
21 total assets were your investment in Sentinel
22 Reinsurance; correct?
23 MS. SMITH: Objection to form.
24 THE WITNESS: According to this
25 document, yes.

---

165

1  BY MR. CLUBOK:
2      Q   Which you have no reason to dispute;
3  correct?
4          THE WITNESS:  I have no reason to
5  dispute.
6          MR. CLUBOK:  Objection to form.
7          THE WITNESS:  I have no reason to
8  dispute, but I don't know the methodology used.
9  BY MR. CLUBOK:
10     Q   And as of today, do you have any idea
11 whatsoever what the percentage of your total
12 assets your investment of Sentinel Reinsurance
13 constitutes?
14     A   No idea whatsoever.
15     Q   And when you say you have no idea
16 whatsoever, you mean you don't know if it's one
17 percent or 70 percent?
18     A   I don't, because this is the only time
19 I've ever seen a reflection of valuation as to,
20 quote, my portion of Sentinel.
21     Q   Have you ever received any dividends
22 from Sentinel?
23     A   No.
24     Q   Do you know if Sentinel still has the
25 assets that were transferred to it in August of

---

166

1  2017 with respect to the ATE policy?
2      A   To my knowledge, they still have
3  everything that was transferred to them.
4      Q   Do you believe that Sentinel could make
5  good on the -- on at least -- strike that.
6          Do you -- do you know whether -- do you
7  know how much of the policy limit remains
8  available on the ATE policy?
9      A   No.
10     Q   If something like 91 million remains
11 available, do you know whether or not Sentinel has
12 the financial ability to satisfy that?
13     A   No.
14     Q   Do you know whether or not Sentinel has
15 the financial ability to satisfy $50 million?
16     A   No.
17     Q   Do you know whether Sentinel has the
18 financial ability to satisfy $10 million?
19     A   No.
20     Q   Do you know anything whatsoever about
21 whether or not Sentinel has the financial ability
22 to satisfy any amount of liability it may have
23 with respect to the ATE policy?
24     A   No, I don't have any transparency into
25 Sentinel's balance sheet.

---

167

1      Q   When you had the idea to buy the ATE
2  policy, did you ever discuss that purchase with
3  any insurer other than Sentinel?
4      A   Did I?  No.
5      Q   Are you aware of anyone at Highland
6  ever trying to obtain an ATE policy with respect
7  to the UBS litigation from any entity other than
8  Sentinel?
9      A   No one at Highland that I'm aware of,
10 no.
11     Q   Are you aware of anybody, a broker, a
12 third party, anybody at all ever --
13     A   I recall -- I recall Beecher Carlson
14 going to the market to see if an ATE policy could
15 be achieved before it went to Sentinel.
16     Q   Who at Beecher Carlson did that?
17     A   I don't know their names.  I've never
18 spoken to them.
19     Q   And how did you learn about that?
20     A   Someone at the time told me.  I don't
21 remember who.  Someone internally at Highland.
22     Q   And what did they tell you about those
23 efforts?
24     A   That Beecher Carlson had put out, for
25 lack of a better term, bids to other known

---

168

1  reinsurers about an ATE policy.
2      Q   And...
3      A   That there were no takers or that the
4  premium they wanted was even higher than what was
5  being requested by CIMA.
6      Q   What was the ultimate premium requested
7  by CIMA for the ATE policy?
8      A   I don't recall.
9      Q   Roughly.
10     A   I really don't recall.
11     Q   You do recall, though, that it
12 ultimately matched exactly all of the assets that
13 were then remaining at CDO Fund, SOHC, HFP;
14 correct?
15     A   No.
16         MS. SMITH:  Objection to form.
17         THE WITNESS:  No.  As I stated many
18 times before, I was not involved in the process at
19 that point.  I didn't know what the final outcome
20 was.
21 BY MR. CLUBOK:
22     Q   Okay.  But you understood that the
23 ultimate premium was roughly equivalent to all of
24 the then remaining assets of HFP, CDO Fund and
25 SOHC; correct?

---

169

1    A   No.  I was --
2        MS. SMITH:  Object to form.
3        THE WITNESS:  I was aware it was a
4   substantial portion, but I didn't know the final
5   outcome.
6   BY MR. CLUBOK:
7    Q   Okay.  You -- you came to be aware at
8   some point that the ultimate premium for the ATE
9   policy equalled a substantial portion of all of
10  the remaining assets SOHC, HFP and CDO Fund;
11  correct?
12   A   That was my general awareness, yes.
13   Q   And when you say "substantial portion"
14  you mean more than 90 percent; correct?
15   A   I didn't know if it was 90 percent, but
16  I knew it was more than, say, 70 percent.
17   Q   In fact, you were specifically -- it
18  was specifically communicated to you at some point
19  that it would be all of the assets; isn't that
20  true?
21   A   I don't know --
22       MS. SMITH:  Objection to form.
23       THE WITNESS:  I don't know if I
24  specifically was communicated that to, no.
25  BY MR. CLUBOK:

170

1    Q   And do you know if -- well -- and do
2   you know if Beecher Carlson ever made an effort to
3   offer those same assets to another insurer to see
4   what kind of ATE policy it could get?
5    A   I don't know what --
6        MS. SMITH:  Objection to form.
7        THE WITNESS:  I don't know what Beecher
8   Carlson did.
9   BY MR. CLUBOK:
10   Q   You said that Beecher Carlson put out
11  bids and got no takers.  And that was all before
12  you turned to Sentinel Reinsurance; is that
13  correct?
14   A   That's my understanding.  But again, I
15  wasn't involved in the process at that point.
16   Q   And who set the price with Sentinel
17  Reinsurance, as far as you know, for the policy?
18   A   What do you mean set the price?
19   Q   Fair enough.  Who -- so -- well, we'll
20  come back to that.
21       MS. SMITH:  Andy, it's about 1:15.
22       Are you close to break time?
23       MR. CLUBOK:  Yeah, give me another ten
24  minutes and we'll take a break.
25

171

1   BY MR. CLUBOK:
2    Q   Did you have any role in deciding who
3   the directors of Sentinel would be?
4    A   None.
5    Q   Are you talking about -- well, let's
6   start with the independent directors.
7        You say you had absolutely no role in
8   the identifying any independent directors; is that
9   correct?
10   A   That's correct.
11   Q   Who made the decision about who would
12  be the independent directors?
13   A   I don't know.
14   Q   Okay.  But you did tell Matt DiOrio
15  that he would be a nonindependent director for
16  Sentinel; correct?
17   A   Yes.
18   Q   Why was he -- why did you make -- why
19  did you cause Matt DiOrio to be a director?
20       MS. SMITH:  Objection to form.
21  BY MR. CLUBOK:
22   Q   Strike that.  Why did you tell
23  Mr. DiOrio he had to be a director of Sentinel?
24   A   I didn't tell him he had to be
25  anything.

172

1    Q   Why did you tell him that you wanted
2   him to be a director of Sentinel?
3    A   It was an opportunity that I thought
4   fit his skill set.  It was something that he had
5   expressed an interest in learning.  And my
6   recollection is that CIMA said we needed to add
7   more members to the board.
8    Q   Was Mr. DiOrio compensated for his role
9   as director?
10   A   No.
11   Q   When did you learn that Matt DiOrio had
12  resigned from the Sentinel board?
13   A   I don't know that I had learned he had
14  resigned from the Sentinel board.
15   Q   Oh, did you know he resigned on
16  June 25th, this year?
17   A   No.
18       MS. SMITH:  Objection to form.
19  BY MR. CLUBOK:
20   Q   So as far as you knew until I just said
21  that, did you think he was still on the board?
22   A   I didn't know if he was on the board or
23  not.
24   Q   Do you know Andrew Dean?
25   A   No.

173

1  Q  Do you know Christopher Watler?
2  A  No.
3  Q  Do you know Lesley Thompson?
4  A  No.
5  Q  Do you know Dilip Masand?
6  A  Yes.
7  Q  Who is Dilip Masand?
8  A  He was a consultant that was retained
9  by, I believe, Highland Capital Management LP.
10  Q  To do what in connection with the
11  Sentinel?
12  A  I don't know that he was retained by
13  Highland Capital Management to do anything with
14  Sentinel.
15  Q  He was, though, named as a director for
16  Sentinel; correct?
17  A  I believe so, yes.
18  Q  And that was your decision; correct?
19  A  I do not think that was my decision,
20  no.
21  Q  You suggested him as a director.
22  A  I suggested him as a potential
23  director, yes.
24  Q  To whom?
25  A  To Mr. DiOrio and I believe to

174

1  Mr. Dondero, but I don't recall doing that.
2  Q  You told --
3  A  But I could have, possibly.
4  Q  You told Mr. Dondero about your
5  recommendations to make Mr. Masand and Mr. DiOrio
6  directors of Sentinel; correct?
7  MS. SMITH: Objection to form.
8  BY MR. CLUBOK:
9  Q  And he -- he could have said no if he
10  had wanted to; right?
11  A  Yeah, he could have said no if he
12  wanted to, but it's not his decision of who became
13  the directors; it's the other -- it's the
14  independent directors that approved. And CIMA has
15  to approve each individual director. So
16  Mr. Dondero's vote of "yes" or "no" is not the
17  ultimate arbiter.
18  Q  You -- you asked DiOrio and Sevilla to
19  identify new board members; is that correct?
20  A  At what time period?
21  Q  Some point prior to the bankruptcy.
22  A  No.
23  Q  Well, then, you asked DiOrio and
24  Sevilla to work together to identify directors
25  like Mr. Neveril?

175

1  A  You broke --
2  MS. SMITH: Objection, form.
3  THE WITNESS: You broke up, Andy. I'm
4  sorry.
5  BY MR. CLUBOK:
6  Q  Do you know who Jan Neveril is?
7  A  No, I do not.
8  Q  I don't know if Jan is a man or woman,
9  but -- or is that Jan?
10  A  That could possibly be Jan.
11  Q  Oh, someone named J-A-N Neveril, you
12  believe that may be Jan?
13  A  Potentially. I never knew his surname
14  or her surname.
15  Q  Was it -- was Jan a man or a woman?
16  A  Jan was a man?
17  Q  So -- and Jan -- was Jan Neveril still
18  a director during that bankruptcy matter?
19  A  As far as I know, yes.
20  Q  Do you know if Jan is still on the
21  board?
22  A  I do not.
23  Q  Did you know that Matt DiOrio
24  recommended Jan?
25  A  No, I have -- I have no idea who

176

1  recommended Jan.
2  Q  What about Damien Austin?
3  A  I don't know who that is.
4  Q  Casey McDonald?
5  A  Don't know who that is?
6  Q  Wade Kenny?
7  A  Don't know who that is.
8  Q  Okay.
9  MR. CLUBOK: Why don't we take a break.
10  THE VIDEOGRAPHER: We're going -- we're
11  going off the record at 2:18 -- 2:19 p.m. eastern
12  time.
13  MR. CLUBOK: Okay.
14  (Lunch Recess taken 2:19 p.m. to 3:16
15  p.m.)
16  THE VIDEOGRAPHER: Am I going on the
17  record, counsel, or waiting...
18  MR. CLUBOK: We don't need it
19  videotaped. We'll just -- the court reporter, you
20  can take this following thing down and we are not
21  going to count it on the videotape so go ahead --
22  and court reporter, if you don't mind, you can go
23  on the record. Ms. Smith will make her statement
24  and I will respond, and then we'll resume the
25  deposition.

**177**

1    Is that okay, Lisa? Tell us when
2  you're ready.
3    Go ahead, Ms. Smith. Make your
4  statement.
5    MS. SMITH: I understand that -- I
6  learned on the break that during the course of
7  this deposition, which is supposed to be a highly
8  confidential deposition, I learned on the break
9  that information that Mr. Ellington had disclosed
10  during his deposition in response to direct
11  questions from Mr. Clubok has been leaked to a
12  third party, who is not subject to a
13  confidentiality order or confidentiality
14  agreement.
15    And I want -- I want to go on the
16  record that his -- it appears that his
17  girlfriend's address or his father's address was
18  leaked to a third party when it is supposed to be
19  highly confidential.
20    MR. CLUBOK: All right. And Ms. Smith,
21  you know that that so-called recitation of the
22  facts leaves out some very important information
23  and paints a very distorted picture because you've
24  left out material information. Specifically --
25    MS. SMITH: Well, I'm not being deposed

**178**

1  here, Mr. Clubok.
2    MR. CLUBOK: Right. So specifically in
3  response to that, the issue here that we're
4  talking about is that over a month ago, we talked
5  about -- we are trying to serve Mr. Ellington, as
6  you know, in connection with proceedings that are
7  going on in New York.
8    Over a month ago, I asked you to tell
9  us -- to communicate with us whether or not
10  Mr. Ellington would accept service or not.
11    You promised -- you promised to get
12  that information for me. We asked you repeatedly
13  since then, you never did. Mr. Ellington came
14  back to the States.
15    You apparently, as of the time of this
16  deposition, you still had not asked him.
17    I asked again for you to tell me about
18  this. You -- you continued to refuse until just
19  moments ago, you finally told me, even though I'd
20  asked, frankly, that you tell me at the beginning
21  of the lunch break rather than waiting till 15
22  minutes past the lunch break, that you are not
23  going to accept service and you are going to make
24  us try to serve Mr. Ellington with process.
25    Now, the specific information that you

**179**

1  are claiming is supposedly highly confidential,
2  which by the way had never been designated highly
3  confidential at all, so that's also false, there
4  was a portion -- a very small portion of this
5  deposition that was designated highly
6  confidential, that was, as you know, in connection
7  with information that was supposedly subject to
8  some confidentiality agreement.
9    MS. SMITH: Are you saying, Mr. Clubok,
10  that the depositions that have been held in this
11  case are not confidential?
12    MR. CLUBOK: I asked you not to
13  interrupt me anymore than I refrained from
14  interrupting you, because the court reporter can
15  only get us one at a time.
16    So this deposition is going forward.
17  There is a protective order that governs the
18  treatment. There is certain aspects that can be
19  designated as "highly confidential." You made a
20  point of designating a particular portion as
21  highly confidential.
22    The address where Mr. Ellington lives
23  or currently is living is certainly not something
24  that we are not permitted to use if we need to
25  serve him in this matter or if we need to serve

**180**

1  him in connection with other matters. You moved
2  the court to limit the use of this deposition to
3  just this matter, and that was denied.
4    So we can -- you know, we have no
5  interest in doing what we had to do before. As
6  you know, Mr. Ellington dodged service for a long
7  period of time right up until the point where it
8  finally was accepted in connection with this
9  matter. That seems to be a pattern or practice
10  that Mr. Ellington apparently -- he's sitting
11  right here.
12    We asked for you all to voluntarily
13  accept service. You just disclosed to me after a
14  month of me asking that he apparently will not.
15  And so if knowing the address where he lives
16  allows us to serve him potentially -- I don't how
17  many efforts it will take or how much he'll dodge
18  it. I hope he does not. I hope you'll advise him
19  of his obligation.
20    By the way, Baker MacKenzie is on this
21  call, too. I hope everyone has advised their
22  clients about the obligations to not intentionally
23  dodge service. And, you know, but we are going to
24  have to, we have no choice that, and I told you
25  this a month ago, if he didn't voluntarily agree

181

1 to accept service, we have no choice but to try to
2 affect service through proper means. And then we
3 will certainly pursue our rights for the cost and
4 expense of repeated efforts to dodge service, if
5 that's what happens again in this case or in any
6 matter like it happened in this case.
7      Anyway, we've made our comments. You
8 are welcome to make as many comments as you want
9 to or I told you you could use this deposition or
10 this court reporter's time, if you need to make
11 it. But I also, by the way, said I couldn't stop
12 you, but I think this is wholly inappropriate to
13 be using a court reporter to try to make some
14 record, particularly given the recitation that you
15 made at the beginning to try to paint an -- I
16 think, misleadingly incomplete light.
17      Go ahead, Ms. Smith.
18      MS. SMITH: Well, in response,
19 Mr. Ellington has testified in unrelated to this
20 matter but in today's deposition, that he had no
21 email service while he was in Africa and that he
22 has been back in the country approximately 36 --
23 30 to 36 hours.
24      So as for repeatedly dodging service,
25 he has not done that.

182

1      This is a New York State matter. I am
2 not his counsel of record in New York, like I told
3 you at very beginning when you served me by snail
4 mail on this.
5      So I am fine with continuing with the
6 deposition.
7      MR. CLUBOK: Okay. And by the way,
8 when I did serve you and you had not opened your
9 mail, I told you at the time, of course I
10 understood, we were very professional and
11 courteous because you didn't -- and I understand
12 it's Covid and so you may not have seen your mail,
13 which we bent over backwards. You said you hadn't
14 opened your mail. I said, okay, professional
15 courtesy, so we will accept that representation
16 and just pick up from here. And I never got a
17 word back from you on this. We've asked you
18 multiple times and you kept refusing to tell us
19 about it until literally 15 minutes past our lunch
20 break even at the very end here. And so those are
21 the --
22      MS. SMITH: I did not refuse,
23 Mr. Clubok, and you know that.
24      I had not had an opportunity to confer
25 with my client.

183

1      MR. CLUBOK: Well, in any event, I
2 think we have sufficiently covered the waterfront
3 on this issue. And let's conclude this portion of
4 the transcript. And we'll take a -- we'll take a
5 one-minute break and I'll resume.
6      ---(Off-record discussion)
7      (Recess taken 3:23 p.m. to 3:25 p.m.
8      THE VIDEOGRAPHER: Going back on the
9 record at 3:25 p.m.
10 BY MR. CLUBOK:
11      Q   Mr. Ellington, what was -- so, I want
12 to talk about another entity that we briefly
13 mentioned, that's SAS. That's another entity that
14 I believe that you directly or indirectly have the
15 ultimate beneficial economic interest of roughly
16 30 percent in; correct?
17      A   As long as we're talking about your
18 characterization of SAS and related entities,
19 subs, affiliates as the SAS umbrella, directly --
20 or actually indirectly with entities associated
21 with SAS.
22      Q   And ultimately all the economics of
23 those SAS entities flow up to some -- either you
24 directly or some trust or other entity that you've
25 set up for your family's benefit; is that correct?

184

1      A   I don't really know how they flow, but
2 it would be something similar to that or generally
3 like that, yes.
4      Q   Okay. And SAS, what does that stand
5 for?
6      A   It stands for sword and shield.
7      Q   And who came up with that name?
8      A   Me.
9      Q   What does SAS do?
10      A   It provided litigation, financing
11 and/or claim purchasing.
12      Q   And whose -- and by the way, it's also
13 the case that Mr. Dondero, through entities that
14 he controls, has a 70 percent beneficial economic
15 interest in SAS; correct?
16      A   I don't know how Mr. Dondero holds any
17 of those equitable positions.
18      Q   Right. But Mr. Dondero had the right
19 to control 70 percent of the beneficial interest
20 in SAS in however he decided to allocate it or
21 hold it, etcetera; correct?
22      A   Yes, he could have done with those
23 shares as he chose. I don't know if he donated
24 them or what. I just don't know.
25      Q   And how are you involved in SAS?

185

1    A   I was one of the -- other than being an
2  indirect owner, for lack of a better term, with
3  more affiliated entities related to me, I was the
4  person that came up with the idea to form it and
5  provided services through related entities to it.
6    Q   Well, you were the CEO of SAS; right?
7    A   I don't know that that was ever a
8  title.  I just -- I don't know.
9    Q   If somebody called SAS, that call would
10 be routed to Highland Capital Management's phone
11 system and it would go to you, isn't that true?
12   A   Not that I'm aware of, no.  It may have
13 been that at some point, but certainly not in
14 years.
15   Q   Well, isn't it true that in the past,
16 that somebody called SAS, it would be routed to
17 HCM's office, and they could would press 1 and
18 speak directly to you?
19   A   Potentially.  I just don't remember
20 that being the case.
21   Q   And SAS used to share a phone number
22 with HCM?
23   A   No.
24   Q   Did SAS have its own bank accounts?
25   A   Yes.

186

1    Q   And your sister Marcia Maslow worked
2  for SAS?
3    A   No.
4    Q   Isn't it true she provided project
5  management consulting services?
6    A   Yes.  She provided some IT setup of --
7  of case management tracking devices.
8    Q   So she was paid by SAS for that work?
9    A   Yes.
10       MS. SMITH:  Objection, form.
11       THE WITNESS:  The consulting firm she
12 works for was paid, yes.
13 BY MR. CLUBOK:
14   Q   You still have access to your SAS
15 management.com email?
16   A   No.
17   Q   If we emailed to sellington at
18 sasmgt.com today, would it go through?
19   A   I have no idea.
20   Q   Do you know the directors of SAS?
21   A   No, I don't.
22   Q   Do you know who David Eggleshaw is or
23 John Collier (?)
24   A   No.
25   Q   Do you know Summit Management Limited?

187

1    A   Yes, I know Summit Management.
2    Q   What's Summit Management?
3    A   I believe they are a Cayman-based
4  fiduciary services company.
5    Q   And they provide directors for the
6  entities through which you own SAS or portions of
7  SAS and Sentinel; is that right?
8    A   I know they had in the past.  I don't
9  know if they are still the directors or not.
10   Q   Is SAS a client of Skyview?
11   A   No, not to my knowledge.
12   Q   Why would HCM employees ever work for
13 SAS?
14   A   There was --
15       MS. SMITH:  Objection to form.
16       THE WITNESS:  There was a culture that
17 existed before my tenure with Highland where
18 business ideas would be incubated and/or services
19 provided by Highland employees, and if those
20 various businesses ever got to a point of
21 substance and/or stability to stand on other own,
22 they would be spun out and the employees of
23 Highland would usually go and work for that new
24 entity, and there are several examples of that.
25 BY MR. CLUBOK:

188

1    Q   Did you ever get any distribution from
2  SAS?
3    A   No.
4    Q   Have you ever gotten any payments from
5  SAS at all?
6    A   No, other than expense reimbursement,
7  no.
8    Q   Expense reimbursement?
9    A   Yes.
10   Q   For what?
11   A   Where there would be marketing costs
12 and otherwise.  I mean, somebody has to be an
13 individual that pays, and very often that would be
14 me.
15   Q   What's the rough magnitude of that
16 expense or reimbursement?
17   A   I have no idea.  You're talking about
18 12 -- 12 plus years.
19   Q   You're saying you haven't gotten any
20 expense reimbursement for SAS in 12 plus years?
21   A   You're asking for --
22       MS. SMITH:  Objection to form.
23       THE WITNESS:  Sorry, Frances.  My
24 apologies.
25       MS. SMITH:  Object to form.

**189**

1        THE WITNESS:  You are asking me the
2  magnitude of that.  I wouldn't know how to gauge
3  that over an aggregate of 12 plus years.
4  BY MR. CLUBOK:
5     Q  How about in the last three years?
6     **A  No idea.**
7     Q  Is it tens of thousands, ones of
8  thousands, hundreds of thousands, millions?
9     **A  I would say you are probably in tens of**
10 **thousands to low hundreds of thousands.**
11    Q  For what?
12    **A  Travel.  Hotel rooms.  I would pay for**
13 **any and every one professional and otherwise that**
14 **were conducting business on behalf of SAS.**
15    Q  What's the relationship between SAS
16 management and SAS asset recovery.
17    **A  I'd have to look at an org chart.**
18    Q  What's the relationship between SAS and
19 Sentinel?
20    **A  There is no direct relationship.**
21    Q  But they have a common owner; correct?
22     MS. SMITH:  Objection, form.
23     THE WITNESS:  Again, I don't know how
24 Mr. Dondero owns them, either one of those
25 businesses, so I don't know about the commonality.

**190**

1  BY MR. CLUBOK:
2     Q  I'm going to hand you what's been
3  marked as --
4     Hold on a second.
5     What's Sebastian Clarke?
6    **A  I'd have to look at a org chart.  I**
7  **don't know.**
8     Q  You have no idea what Sebastian Clarke
9  is as you sit here today?
10    **A  No, I know -- I remember the entity**
11 **name, but I don't know what it's relative to.**
12    Q  You owned Sebastian Clarke, didn't you?
13    **A  I have no idea.**
14    Q  Let's take a look at Exhibit 39, which
15 is tab 8.  You should have it in front of you.
16    **A  I do.  Can I go ahead and open it,**
17 **Mr. Clubok?**
18    Q  Please do.
19     And I'm going to ask you to turn to
20 page 3 of Exhibit 39, which is the offshore fund
21 structure of SAS as of December 31st, 2017.
22     Do you see that?
23    **A  I see an org chart.  I do.**
24    Q  And do you see where it talks about USP
25 (inaudible)?

**191**

1    **A  Do I see where it says what?  I'm**
2 **sorry.**
3    Q  See there is a circle at the top on the
4 left that says USP1, and a circle on the top on
5 the right that says USP2.
6    **A  Yeah.**
7     MS. SMITH:  Can we have the exhibit on
8 the screen, please?
9  BY MR. CLUBOK:
10    Q  Yeah, we do have the exhibit.
11     Let's turn to -- oh, I'm sorry.
12 It's --
13     MR. CLUBOK:  Do I have control here,
14 Nate?
15 BY MR. CLUBOK:
16    Q  There is a org chart that I have up
17 now.  The Bates label ends in 85.
18     On the top left, you can see USP1 and
19 at the top right, you see USP2 in circles?
20    **A  Yes.**
21    Q  You recall that USP1 refers to you and
22 USP2 refers to Mr. Dondero?
23     MS. SMITH:  Objection to form.
24     THE WITNESS:  I don't know -- I don't
25 know what they refer to.

**192**

1     There is also a circle with four USPs,
2 so I don't know what refers to each.
3  BY MR. CLUBOK:
4     Q  Do you see where it says Sebastian
5 Clarke at the bottom right?
6    **A  Bottom right?  Yes, I do.**
7    Q  Does that ring a bell for you what
8 Sebastian Clarke is?
9    **A  No idea what it is.**
10    Q  There's a -- if you turn to the next
11 page, there's some notes.  Those are the -- do you
12 see where it says on the -- on the page that ends
13 in 85, AD1, AD2, AD3, AD4, 5?
14     And then the next page, those are the,
15 you know, footnotes basically that correspond to
16 those; do you see that?
17    **A  I do.**
18    **It says it corresponds to slide 1, but**
19 **I don't see what's labeled as slide 1.**
20 **BY MR. CLUBOK:**
21    Q  So if you look back at the slide that
22 ends with 85, for example, you see where it says
23 AD4 at the bottom left, next to Gray Royal
24 Limited?
25    **A  Yes.**

193

1 Q And if you go to the next page, you see
2 84, it says, "Sold from Sentinel structure in '17.
3 Details needed."
4 These notes appear to refer to this first
5 slide?
6 **A Yes.**
7 Q Okay?
8 **A That seems to be -- that's the**
9 **assumption, yes.**
10 Q Yep. So then I'm going to turn to the
11 next page, the next slide, slide 2. And this is
12 the -- CF -- it's entitled "CFC Restructure." And
13 it says, "Sentinel structure as of December 31st,
14 2017."
15 Do you see that?
16 **A I do.**
17 Q And it -- and it, again, has a
18 reference to USP1, and USP2.
19 Do you see that?
20 **A On the CFC restructure?**
21 Q Yes.
22 **A Yes.**
23 Q When you see how USP1 goes down to an
24 entity called Nimitz?
25 **A Yes, I do.**

194

1 Q At a 30 percent value?
2 **A Yes.**
3 Q And USP goes down ultimately to an
4 entity called Patton, which has a 70 percent
5 value?
6 **A I do.**
7 Q Although a 91 --
8 MS. SMITH: Excuse me, Mr. Clubok. I
9 don't want to interrupt you. But can you hold
10 this up so that the whole thing shows. It looks
11 like some of its cut off.
12 MR. CLUBOK: No, it's not really cut
13 off except the Bates number.
14 **A I can see -- I can see the whole thing**
15 **on the hard copy.**
16 **BY MR. CLUBOK:**
17 Q Yeah, you have a hard copy. And,
18 Ms. Smith, you should have a hard copy, too, or
19 you certainly have these exhibits. We've used
20 them in past depositions.
21 So with respect to getting back to this
22 exhibit, which, again, is Exhibit 39. And we are
23 on the page that ends in Bates number 37. There
24 is a chart that says, "CFC restructure, Sentinel
25 structure as of 12/31/17." It is marked "Draft

195

1 for preliminary discussion purposes only."
2 And it references Nimitz with a
3 30 percent value and with 9 percent vote, and
4 Patton with 70 percent value, 91 percent vote
5 above Sentinel Holdings Limited.
6 Do you see that?
7 **A I see that line.**
8 Q And we showed you earlier the document
9 that showed that Nimitz referred to your
10 beneficial owner of about 30 percent, whereas
11 Patton referred to Mr. Dondero's ownership of
12 about 70 percent?
13 **A I don't remember the document that you**
14 **are referring to. But if you go further in the**
15 **chart, it shows that there is foreign individuals**
16 **who have specific values. And like I said, this**
17 **is for a draft for preliminary discussions only.**
18 **This looks to be a proposed restructuring. And**
19 **furthermore, it's Mr. Dondero's international tax**
20 **questions from Deloitte, so I don't know that this**
21 **is relevant to me at all. And I don't know if**
22 **this was something that was put together for**
23 **discussion or actually got put in place. I have**
24 **no idea.**
25 Q Okay. So listen to my question.

196

1 **A Okay.**
2 Q Earlier today, I showed you a document
3 that was passed around that showed you -- it
4 showed Sentinel being held roughly 30 percent by
5 Nimitz and 70 percent by Patton with the
6 beneficial owners of each of those being
7 respectively you and Mr. Dondero.
8 Do you remember --
9 **A Can you refer to me what document that**
10 **was, Mr. Clubok, because we've looked at, as far**
11 **as I know, three exhibits.**
12 **If you are referring to the chart**
13 **prepared by SCI IC, again, I don't know where they**
14 **got that information. And it may be a general**
15 **summary, but it's not further reflected in this**
16 **chart. Because if you get behind Nimitz, it is**
17 **not 30 percent because there is a value that goes**
18 **to each individual on both sides of the chart.**
19 **And again, this is a proposed restructure, so I**
20 **don't know if this was put in place or how it was**
21 **handled because it is a conversation with Deloitte**
22 **about Mr. Dondero, Dondero TY17 international**
23 **questions.**
24 Q Yeah, you -- you are the hundred
25 percent beneficial owner of Nimitz, which has a

197

1 roughly 30 percent value in Sentinel Holdings;
2 isn't that true.
3   **A   I have no idea what the structure**
4 **looked like as of 12/31/17 or now.**
5   Q   Yeah.  You -- you say you have no idea
6 under a -- and I showed you previously Exhibit 26.
7   **A   Which again, is a summary from an**
8 **outside third party of what their records are.**
9     **It doesn't tell me that I'm the**
10 **30 percent owner of that.**
11   Q   Okay.  And so you are claiming, as you
12 sit here today, you have no idea -- you have no
13 idea whether or not you're a 30 percent owner of
14 Sentinel through an entity called Nimitz?
15   **A   I have no idea as of the structure of**
16 **today, no.**
17   Q   In any event -- but you do know that
18 you're roughly a 30 percent beneficial owner of
19 Nimitz through whatever organizations have been
20 set up of -- in the Sentinel chain and in whatever
21 organizations, tax planning or otherwise, have
22 been set up in your personal life; correct?
23   **A   I think normally, that's my**
24 **understanding, yes.**
25   Q   And when you look at this chart, you

198

1 say that you don't know whether or not the owners
2 of Sentinel that are reflectively identified as
3 30 percent and 70 percent refer ultimately to you
4 and Mr. Dondero.  You have no idea?
5   **A   I don't know what -- I don't know what**
6 **this is other than a preliminary discussion**
7 **purposes, and I just happened to glance at the**
8 **parties involved in it, Paul Broadest and the rest**
9 **seem to all be Deloitte employees, and it's about**
10 **Mr. Dondero.  I am not included in this**
11 **discussion, not CC'd on this discussion.  Until**
12 **you showed this to me, I had never seen this, as**
13 **far as I know, in my life.**
14   Q   Yeah.  And you've never seen in your
15 life anything that says that you ultimately own
16 30 percent of Sentinel through an entity called
17 Nimitz?
18   **A   Not that I recall.**
19     MS. SMITH:  Objection.  Objection to
20 form.
21     THE WITNESS:  Not that I recall.
22 BY MR. CLUBOK:
23   Q   Did you know that you had roughly a
24 9 percent vote, even though you have a roughly
25 30 percent economic interest in Sentinel?

199

1   **A   No, I did not.  Again, I don't know**
2 **this was ever implemented.  This, again, seems to**
3 **be something they're contemplating, especially**
4 **with the Sentinel slide 2, as you refer to it,**
5 **that's called restructure, meaning I think they're**
6 **proposing this as a structure.  I have no idea if**
7 **it was put in place or not.**
8   Q   Did -- did Katie Irving ever work on
9 SAS matters?
10   **A   Yes.**
11   Q   Did Katie Irving ever work on Sentinel
12 matters?
13   **A   I don't think she worked on Sentinel**
14 **matters at all.**
15   Q   I'm going to ask you to look at Exhibit
16 28.
17     MR. CLUBOK:  Which is tab 9, Nate.
18 BY MR. CLUBOK:
19   Q   Exhibit 28 is an email with an
20 attachment that's entitled "SAS and Sentinel Final
21 Structure as of 9 April 2019".
22     And the email --
23   **A   Can I open it, Mr. Clubok?**
24   Q   Yeah, please.  When I call it out, if I
25 don't say it, that --

200

1   **A   Okay.  Okay.  Sorry I just wanted to**
2 **make sure.**
3   Q   That's okay.  I appreciate it.
4     So we will put up Exhibit 28, the first
5 page, please.
6   **A   Okay.**
7     MR. CLUBOK:  Which is behind tab 9,
8 Nate.
9 BY MR. CLUBOK:
10   Q   And Exhibit 28 on the first page has an
11 email from Katie Irving to Stephen Beck, JP
12 Sevilla and Matt DiOrio, with subject "AB
13 Restructure Sentinel."
14     Do you see that?
15   **A   Invested do.**
16   Q   And Katie Irving writes to Steve Beck.
17     Do you know who Steve Beck is?
18   **A   I do know who Steve Beck is.**
19   Q   Who is he?
20   **A   Steve Beck is a tax attorney.**
21   Q   Who worked at Highland at the time?
22   **A   No, he's outside counsel.**
23   Q   Okay.  In what firm?
24   **A   Nettles Collier. (?)**
25   Q   And Ms. Irving was writing to him about

---

**201**

1  the entity restructure and just saying that,
2  further to any liquidation discussion, the
3  Sentinel Reinsurance Limited regulator CIMA was
4  asking that the Sentinel structure be simplified.
5      And they specifically called out
6  various entities, including Nimitz and Patton.
7      Do you see that?
8      **A   Let's let me read.  Yes, I see that,**
9  **along with other entities.**
10     Q   Yeah.  And she says, "I believe we
11 discussed some of these liquidations last year."
12     **A   Yes.  And from the two charts there's a**
13 **mixture of SAS-related entities and**
14 **Sentinel-related entities, too.**
15     Q   Right.  From the charts, it's clear
16 that Sentinel and SAS are connected in some way;
17 correct?
18     **A   No, I think Ms. Irving is talking about**
19 **overall what has CIMA's asked for and her primary**
20 **responsibilities on the SAS platform.**
21     Q   Okay.  She specifically talks about
22 responding to requests by the Sentinel Reinsurance
23 Limited regular in her email to Stephen Beck;
24 correct?
25     **A   Yes, I see that.  But again, I don't**

**202**

1  **know what that org chart looked like.  There's --**
2  **doesn't seem to be anything attached, other than**
3  **another attachment that says, "For Preliminary**
4  **Discussion Purposes Only," draft.**
5      Q   Right.  And then she -- she towards --
6  try to follow my questions, just answer my
7  question.
8      **A   Sure.**
9      Q   You said before that Ms. Irving had not
10 -- did not do work on Sentinel, as far as you
11 know?
12     **A   As far as I know, I don't know that she**
13 **did work on Sentinel.**
14     Q   And yet here is writing to Stephen Beck
15 specifically about Sentinel Reinsurance Limited in
16 the bottom email on page 28; correct?
17     MS. SMITH:  Objection to form.
18     THE WITNESS:  I think she's discussing
19 all of CIMA's instructions with Steve Beck.  And
20 then talks; about Montage Anthem and Mainstream
21 used to be CFC's Elderflower and Brave Holdings
22 which -- give me a second -- seemed to be related
23 to the SAS side, possibly describing to Steve Beck
24 part of the CFC restructuring, again, at CIMA's
25 request.

**203**

1  BY MR. CLUBOK:
2      Q   Yeah.  My question is much simpler.
3      **A   Okay.**
4      Q   He is -- said that she had discussed
5  liquidations that CIMA specifically called out
6  with respect to Sentinel Reinsurance; isn't that
7  true?
8      "Hi Steve.  Further to entity liquidation
9  discussions last year, the Sentinel Reinsurance
10 Limited regulator Cayman Islands Monetary
11 Authority, so they regulate that entity because it
12 is a regulated entity, which SAS is not, is asking
13 that the Sentinel structure be simplified.  CIMA
14 specifically called out ..." [As read.] And then
15 she lists the specific entities.
16     Q   Right.  And that's all --
17     **A   "Upon further discussion with Montage**
18 **Anthem Management."**
19     Q   Sorry, Mr. Ellington.  I'm asking you
20 about the second paragraph.
21     And as you noted, CIMA regulates
22 Sentinel and not SAS; right?
23     **A   Correct.**
24     Q   And so this email is in furtherance of
25 responding to Sentinel's regulator about the

**204**

1  Sentinel Reinsurance restructuring; correct?
2      **A   It is also in regards to Montage,**
3  **Elderflower, Brave --**
4      Q   Yep.
5      **A   Anthem and Main Spring, which are on**
6  **the SAS structure, so it looks like CIMA had --**
7  **had instructions to those.**
8      Q   I'm going to ask you, Mr. Ellington,
9  going forward, not to volunteer things like that
10 if I ask you a specific question.  I may do
11 follow-up.  And your lawyer may ask you about what
12 else this email covers.  But my specific question
13 to you is this email is specifically begins with a
14 furtherance of liquidation discussions about
15 Sentinel that were apparently initiated by
16 Sentinel's regulator in the Caymans; isn't that
17 true.
18     **A   That's true.  Maybe I'm mistaken.  I**
19 **thought your question was the email's in regards**
20 **to, and that's not all it's in regards to.**
21     Q   I didn't say that's all it's in regards
22 to.  I said --
23     -- (overspeaking) --
24     **A   Okay.  Maybe I made a mistake.**
25     Q   And then Katie passes this e-mail on to

205

1  Sam Dawson. Sam Dawson was the person that you
2  previously said was the lawyer who gave advice on
3  Sentinel?
4      **A  He gave advice on ATE policies on**
5  **Sentinel, yes.**
6      Q  And did he also give legal advice on
7  SAS?
8      **A  Yes, he did.**
9      Q  So -- and who is Dylan? Someone who
10 works with him?
11     **A  Yeah, I don't know who Dylan is, but it**
12 **seems from the e-mail address he works with Sam.**
13     Q  Right. And Katie is asking to discuss,
14 according to the attachments, SAS and Sentinel
15 final structure as of 9 April 2019. Do you see
16 that?
17     **A  Discussion from legal perspective,**
18 **I believe the impact of the GP structure, the**
19 **(indiscernible) previously. I don't know what her**
20 **nomenclature is there. "Understand option to move**
21 **away from existing trust structure." Again, I**
22 **don't know what that is, so I don't know what**
23 **she's really asking here.**
24     Q  Right. But her attachment that she
25 sends is entitled "SAS and Sentinel Final

206

1  Structure as of 9 April, 2019 PowerPoint;"
2  correct?
3      **A  Yeah, that's what that title says, yes.**
4  **But it's not just -- this isn't Sentinel, it's**
5  **also SAS structure as of 9th April, 2019. And I**
6  **find it interesting that if it's a final**
7  **structure, both are marked "draft."**
8      Q  Yeah. As I said, she sends on two
9  slides now with what looks to be compared to what
10 we previously saw simplified structures for SAS
11 and Sentinel.
12         MS. SMITH: Objection --
13 BY MR. CLUBOK:
14     Q  And it says as of 9 April, 2019, at the
15 bottom, it still says, "Draft for preliminary
16 discussion purposes only;" correct?
17     **A  On both slide 1 and 2 as you referred**
18 **to them as, and they do seem in terms of a number**
19 **of boxes more simplified.**
20     Q  Right. And on slide 2, which says the
21 Sentinel structure as at 9 April 2019, we now have
22 USP1 having 99 percent of value, 9 percent of
23 votes down through Nimitz simplified, these
24 foreigners and other US partners are all out.
25 We've now got a simplified structure that shows

207

1  30 percent for Nimitz above Sentinel Re and
2  70 percent for Patton above Sentinel Re; correct?
3      **A  Yes, it says 30 percent value, it says.**
4  **I don't know if that means shares or something**
5  **else.**
6      Q  Right. And does this refresh -- and by
7  -- who tasked Katie to do this work on behalf of
8  Sentinel and SAS?
9      **A  Again, I don't know whether she was t;**
10 **tasked to do anything on behalf of Sentinel. But**
11 **my assumption would be that the directors asked**
12 **her to do this.**
13     Q  The directors of what?
14     **A  Probably the directors of both since,**
15 **at least according to Katie, CIMA called out**
16 **entities that are related to both.**
17     Q  You think the independent directors
18 asked Katie to do this for Sentinel and SAS?
19         MS. SMITH: Objection to form.
20         THE WITNESS: I said I don't know. I
21 don't have any idea.
22 BY MR. CLUBOK:
23     Q  Did you expect Katie to respond to
24 requests related to Sentinel?
25     **A  No.**

208

1      Q  Was that -- she worked for you at the
2  time; right?
3      **A  Yes.**
4      Q  Was she acting outside of her
5  authority?
6         THE WITNESS: No.
7         MS. SMITH: Objection to form.
8  BY MR. CLUBOK:
9      Q  Was she authorized to do work on behalf
10 of Sentinel while she worked for you at Highland
11 Capital Management?
12         MS. SMITH: Objection to form.
13         THE WITNESS: I wouldn't authorize her
14 to do work for Sentinel or not. That would be up
15 to the directors.
16 BY MR. CLUBOK:
17     Q  That's up to Sentinel -- but she -- her
18 pay cheque at the time was coming from Highland
19 Capital Management; right?
20     **A  As far as I know, yes.**
21     Q  And you were her supervisor; correct?
22     **A  Correct.**
23     Q  Did you authorize her during -- and
24 this is during the work hour -- this is during the
25 work day, 2:59 p.m. on a Wednesday, that she's

209

1 doing this work on restructuring Sentinel and SAS.
2    Do you see that?
3    **A   I do see that.**
4    Q   Is that something she was authorized to
5 do during her employment with HCM?
6    **A   To work on SAS, absolutely.  To work on**
7 **Sentinel, I don't know that she is, because she**
8 **asked Sam and Dylan here about the GP structure**
9 **for these top coast previously.**
10   Q   Okay.
11   **A   It doesn't say Sentinel, it doesn't say**
12 **SAS.  You need to also understand the accounts**
13 **structure.  I don't know what she's referring to.**
14   Q   My question -- my question is: Was she
15 authorized to do work on company time for Sentinel
16 during April of 2019 while she was getting a pay
17 cheque from HCM and under your supervision?
18   **A   I didn't --**
19        MS. SMITH:  Objection to form.
20        THE WITNESS:  I didn't structure Ms.
21 Irving on what she worked on.
22 BY MR. CLUBOK:
23   Q   If you go down to the -- to SAS, to the
24 SAS slide on the page that has the Bates number
25 125, you see in the bottom right, Sebastian Clarke

210

1 Limited is still there?
2    **A   Yes.  Actually, it doesn't have a line**
3 **to it.  So it's on the chart, there is no line**
4 **connecting it to Flagstone Management Limited.**
5    Q   Right.  And that it just shows up there
6 in the bottom right in its own little box; right?
7    **A   Yes, it's in its own little box.**
8    Q   Do you have any idea what Sebastian
9 Clarke is based on this chart?
10   **A   No idea, no idea.**
11   Q   Do you know SAS R -- SAS AR Limited in
12 the left-most box or --
13   **A   No.**
14   Q   -- central box?
15   **A   No, I don't.**
16   Q   Do you know SAS Loan Services limited,
17 what that is?
18   **A   I recall that that, I believe, was used**
19 **as a loan servicing entity for an engagement that**
20 **SAS had.**
21   Q   Is that something you established?
22   **A   I don't believe I established it.  That**
23 **would have been done by Maples and Collier or**
24 **whoever counsel was at the time.**
25   Q   Did you have any role with that entity?

211

1    **A   I don't remember working -- oh, yes, I**
2 **did -- I did work on some matters relative to that**
3 **entity.**
4    Q   What do you mean?
5    **A   Pardon me?**
6    Q   What do you mean you worked on some
7 matters relative to that entity?
8    **A   Meaning that I worked on matters**
9 **relative to that entity.**
10   Q   Were you paid for that work?
11   **A   No, I was not paid for that work.**
12   Q   Why would you do work for SAS Loan
13 Service Limited for no compensation?
14   **A   Because Mr. Dondero instructed me as**
15 **the person paying my pay check to continue**
16 **incubating this business and see if I could get it**
17 **to a specific gravity and robust enough that it**
18 **could stand on its own.**
19   Q   So Mr. Dondero specifically directed
20 your work on SAS Loan Services Limited?
21   **A   No, on SAS structure --**
22        MS. SMITH:  Objection to form.
23        THE WITNESS:  Sorry.  On SAS structure
24 in general.
25 BY MR. CLUBOK:

212

1    Q   Oh, I see.  Mr. Dondero specifically
2 told you to work on the SAS structure to get it to
3 be profitable or in the money?
4    **A   See if it could be a standalone**
5 **business.**
6    Q   Did you achieve that?
7    **A   For a period of time, yes.**
8    Q   And what was that period of time?
9    **A   I would say from inception for about**
10 **the first four to five years.**
11   Q   Until when?
12   **A   Call it '14, '15.**
13   Q   And since then, it has not been a
14 successful standalone business?
15        MS. SMITH:  Objection to form.
16        THE WITNESS:  Since then, there has
17 been very little, if any, effort put onto this
18 platform, but-for managing legacy matters, which
19 I believe now there is only one.
20 BY MR. CLUBOK:
21   Q   Did you ever recover any value from
22 SAS?
23   **A   I don't understand your question.**
24   Q   Did you ever make any money on SAS?
25   **A   Me personally?**

---

213

1    Q    Yeah.
2    A    No.
3    Q    Did you lose any money on SAS?
4    A    Me personally?
5    Q    Yeah.
6    A    No.
7    Q    Did Mr. Dondero make any money on SAS?
8    A    Not that I'm aware of.
9    Q    Did anybody make any money from SAS, as
10 far as you're aware?
11   A    Outside counsel on a bunch of matters.
12   Q    Anybody else?
13   A    Not that I'm aware of, no.
14   Q    Do you know if Patton and Nimitz still
15 exist today?
16   A    I don't know.
17   Q    Is Sentinel -- would Sentinel be
18 considered a affiliate of Highland Capital
19 Management?
20   A    No.  An affiliate or non-affiliate is
21 the sole decision of the Chief Compliance Officer
22 Thomas Surgent, who, through date of inception of
23 Sentinel, through my date of termination, formally
24 declared is not an affiliate.
25   Q    What is the -- sorry, when was --

---

214

1  Sentinel was created in 2012; right?
2    A    Correct.
3    Q    And who was in charge of making a
4  decision at that point as to whether or not
5  Sentinel was an affiliate or not an affiliate?
6    A    I don't remember if it was Mr. Surgent
7  as chief compliance officer yet or not.  It may
8  have been his predecessor, but I'm not certain on
9  the date.
10   Q    And you're saying that the decision to
11 identify -- well, let's start with Sentinel.
12       As an affiliate or not an affiliate was
13 solely the decision of the head of compliance?
14   A    Yes, that's the only person that makes
15 that determination, and they don't have to answer
16 to anyone in that determination, other than
17 themselves.
18   Q    And does the general counsel have any
19 role whatsoever in assessing whether an entity
20 would be considered an affiliate for any purpose?
21   A    Zero.
22   Q    Did you ever weigh in in any way on
23 whether any entity was or was not an affiliate
24 with Highland?
25   A    No, and I had no right to.

---

215

1    Q    Did you ever -- were you ever involved,
2  ever, in any discussion about whether an entity
3  was or was not properly characterized as an
4  affiliate in connection with any Highland entity?
5    A    Compliance, Mr. Surgent and his staff
6  and Mr. Surgent's predecessors would have asked
7  questions when having ownership and other relevant
8  information that they demanded and asked for.
9  They may ask questions.  Sometimes they didn't.
10 And the determination was made.
11   Q    Other than compliance asking you
12 questions, did you ever have any role whatsoever
13 in assessing whether any entity was or was not an
14 affiliate of another entity?
15   A    No and, again, my understanding is SEC
16 regs and the RAA, I have no right to do so.
17       MR. CLUBOK:  I'm sorry, Nate, could we
18 take this down?  I'm not sure how to do that
19 easily.  Ah, thank you.
20 BY MR. CLUBOK:
21   Q    So did you ever take a position during
22 your tenure as general counsel of Highland as to
23 whether or not any entity was or was not an
24 affiliate of any other entity?
25   A    No, other than repeating what

---

216

1  compliance's determination had been made when we
2  inquired upon.
3    Q    Did you -- and sorry, your
4  understanding of the relationship between Sentinel
5  and HCM is that it's not an affiliate?
6        MS. SMITH:  I'm sorry, Andy.  I'm
7  sorry, you went out.  I missed like three words of
8  that when you turned your head.  I'm sorry, I
9  didn't hear the question.
10       MR. CLUBOK:  That's okay.
11 BY MR. CLUBOK:
12   Q    Mr. Ellington, did you have any
13 understanding as to whether or not Sentinel could
14 be considered an affiliate of either HCM or Jim
15 Dondero?
16   A    Yes.
17   Q    And what was your understanding?
18   A    My understanding is it was not an
19 affiliate of HCM.
20       I don't know if a determination was
21 made it was affiliate of Jim Dondero.  And that
22 determination was made by the chief compliance
23 officer and continued to be the same determination
24 through my entire tenure.
25   Q    And was there a determination as to

---

217

1 whether or not Sentinel would be considered an
2 affiliate of you ever made?
3 **A   I don't know. I don't know if that**
4 **announcement was done or if it was required to be**
5 **done or not.**
6    Q   As general counsel, did you ever weigh
7 in on whether or not a transaction should be
8 considered a related party transaction?
9 **A   No, that's solely a compliance**
10 **function.**
11    Q   As general counsel, did you ever
12 analyze for any transaction whether it constituted
13 a fraudulent transfer?
14    MS. SMITH: Objection.
15    THE WITNESS: For any transaction in
16 what context?
17 BY MR. CLUBOK:
18    Q   In the context of a transaction. Prior
19 to -- let's say, prior to it being made, did you
20 ever do an analysis to determine or try to
21 determine whether or not a proposed transaction
22 would constitute a fraudulent transfer?
23 **A   No. Again, that would be a compliance**
24 **function.**
25    Q   Okay. So in the entire history of the

218

1 time that you worked at Highland Capital did you
2 ever, prior to a -- any transaction occurring,
3 make an assessment as to whether or not that
4 transaction could be characterized as a fraudulent
5 transfer?
6 **A   Yeah. But my assessment is irrelevant**
7 **because it is compliance's role and compliance's**
8 **sole purvey to make that determination, not mine.**
9    Q   Okay. So let's break that down.
10    You are saying you did make an
11 assessment during the time that you were at
12 Highland as to whether or not a particular
13 transaction was or was not a fraudulent transfer
14 prior to it being executed?
15 **A   Then I misunderstood your question. I**
16 **thought you said did I ever consider if something**
17 **was a fraudulent transfer. Again, if I was to**
18 **make a determination, my determination is not**
19 **relevant.**
20    Q   Right. So let's -- let me -- let me
21 say my question. I'll say it more slowly.
22 **A   Okay.**
23    Q   And let's break it down in different
24 pieces.
25    First, I'm going to ask you if you made

219

1 the assessment, and then we can talk about what
2 you did or didn't do when you made your
3 assessment. And I'm not asking you whether it was
4 relevant right just now. So please answer the
5 question that I ask.
6    So in the entire history of the time
7 you worked at Highland Capital, was there ever a
8 transaction that prior to its occurrence, you, as
9 general counsel, made an assessment as to whether
10 or not that transaction could constitute a
11 fraudulent transfer?
12 **A   Yes.**
13    Q   And did you make such an assessment in
14 connection with the purchase of the ATE policy?
15 **A   No.**
16    Q   Did you endeavor to analyze the
17 transaction that resulted in the purchase of the
18 ATE policy under a -- sorry, strike. Let me start
19 again.
20    Did you ever endeavor to analyze in any
21 way the transaction that resulted in the purchase
22 of the ATE policy that we've been discussing to
23 determine whether or not that transaction could be
24 characterized as a fraudulent transfer?
25    MS. SMITH: I'm going to caution you

220

1 not to respond to the extent it requires you to
2 disclose privileged information.
3    THE WITNESS: Thank you.
4    No, I did not, as it was a compliance
5 function in regards to this transaction with a
6 fulsome process that is run and overseen by
7 compliance. And ultimately the sole
8 decision-maker on that aspect and many others of
9 this transaction was Thomas Surgent, the chief
10 compliance officer.
11 BY MR. CLUBOK:
12    Q   Okay. Did you specifically ask Mr.
13 Surgent to analyze whether the transaction that
14 resulted in the purchase of the ATE policy could
15 be considered a fraudulent transfer, given all the
16 facts and circumstances?
17 **A   I didn't feel the need to because Mr.**
18 **Surgent is more than capable of identifying that**
19 **issue and analyzing.**
20    Q   Did you specifically ask anyone at
21 Highland to analyze whether or not the transaction
22 that could -- strike that.
23    Did you ask anyone at Highland to
24 analyze whether the transaction that results in
25 the purchase of an ATE policy could be considered

221

1 a fraudulent transfer given the facts and
2 circumstances?
3      A   No, because there is a process put in
4 place from SEC guidance and all codified in other
5 laws that it is a process that is run by
6 compliance.
7      Q   Did you ask any outside counsel to make
8 any analysis as to whether the transaction that
9 results in the purchase of the ATE policy could be
10 considered a fraudulent transfer given the facts
11 and circumstances at the time?
12      MS. SMITH:  I'm going to caution you
13 not to respond, to the extent it requires
14 disclosure of privileged information.
15      THE WITNESS:  Thank you.  No, because
16 that is, again, the process run by compliance who
17 chooses to go to outside counsel or not for that
18 analysis and other analyses.
19 BY MR. CLUBOK:
20      Q   And I appreciate that answer.
21      MR. CLUBOK:  By the way, I will say,
22 Ms. Smith, that the privilege that Highland had
23 for this which Mr. Ellington was -- may have had
24 while he was GC is now controlled by the current
25 board, represented by Mr. Feinstein is my -- my

222

1 understanding.  And your cautioning Mr. Ellington
2 on privilege related to Highland Capital
3 Management's privilege I think is inappropriate.
4      Mr. Feinstein, if I'm wrong about that,
5 you can correct me.
6      MR. FEINSTEIN:  Well, I was actually
7 going to jump in and say the same thing.
8      To the extent that the instruction is
9 don't reveal privileges of Sentinel's, that would
10 be one matter.  But to the extent that it is a
11 privilege of Highland, that is another.  And that
12 is our bailiwick and I have asserted privilege, so
13 maybe the question was just ambiguous.
14      MR. CLUBOK:  Okay.
15      MS. SMITH:  Well, I believe the
16 question, Mr. Clubok, referred to outside counsel
17 without specifying if it was Highland's outside
18 counsel or Sentinel's.
19      That was the purpose of my privilege
20 objection, if it was Sentinel's outside counsel.
21      MR. CLUBOK:  I appreciate that.  Well,
22 Mr. -- I believe Mr. Ellington answered no anyway.
23 But just to clear up the record, I'm going to just
24 ask it to be crystal clear.
25

223

1 BY MR. CLUBOK:
2      Q   You never asked -- when you were
3 general counsel for Highland, you never asked
4 anybody inside the organization or outside the
5 organization to conduct a analysis of whether or
6 not the ATE transaction could be considered a
7 fraudulent transfer on behalf of Highland Capital
8 Management; correct?
9      A   That is correct.  Due to the process
10 put in place, that was not my right or place to do
11 so.
12      Q   So let's talk about the process that
13 was put in place, because earlier you said that it
14 was a very fulsome process.
15      A   Yes.
16      Q   And there was a very fulsome process
17 specifically with respect to the purchase of the
18 ATE moil?
19      A   Yes, that's correct.
20      Q   And you understood that that what you
21 call a fulsome process involved a compliance
22 review and a review of whether or not that
23 transaction could constitute a fraudulent
24 transfer?
25      A   I'm not saying I knew that for a fact.

224

1 I'm saying I did not need to tell Mr. Surgent to
2 review that because he obviously, in my opinion,
3 would have spotted that issue and done a review as
4 part of his overall review of approving the
5 transaction.
6      Q   Well, did you spot -- did you believe
7 that the transaction was a fraudulent transfer or
8 did you think about it?
9      A   Yes, I thought about it.
10      I -- I didn't know.
11      Q   Did you ask anybody for their advice?
12      A   No, because again, I'm not supposed to
13 by design stick my nose into a compliance process.
14      Q   And you are prohibited from asking the
15 chief of compliance to specifically look into
16 whether a proposed transaction could be considered
17 fraudulent transfer if you have questions about
18 that?
19      A   Oh, I'm not prohibited from asking him.
20 It's just I'm not supposed to be involved in the
21 process and providing influence or input unless he
22 approaches me.
23      I could certainly go up and ask his
24 opinion.  But there were numerous people involved
25 and it went through the full process, to my

**225**

1  understanding of how these things are analyzed by
2  compliance.
3      Q   Yeah.  But you had questions in your
4  mind at the time as to whether or not the ATE
5  transaction could be considered a fraudulent
6  transfer; correct?
7      A   I considered it might be, yes.
8      Q   And you never specifically asked Anyone
9  like Mr. Surgent to specifically look into that
10  issue; correct?
11      A   No, Mr. Surgent had plenty of his plate
12  to handle running through this process.  He didn't
13  need me.
14      Q   Did you ever -- did you ever discuss
15  with Mr. Dondero, in any way, shape or form, your
16  concerns that perhaps this transaction could be
17  considered a fraudulent transfer?
18      A   Not that I recall.  Again, that's Mr.
19  Surgent's role in this set of circumstances.
20      Q   So you never raised any kind of yellow
21  flag or red flag or, hey, just FYI we should
22  wonder whether this transaction could be
23  considered fraudulent transfer with Mr. Dondero?
24      A   No.  Again, that's Mr. Surgent's role
25  in this set of circumstances.

**226**

1      Q   Describe -- you've testified there was
2  a fulsome process that Mr. Surgent specifically
3  went through with respect to the ATE policy.
4      A   That's my understanding and my
5  recollection, yes.
6      Q   And I'd like the basis for that
7  understanding or recollection by you describing in
8  as much detail as you can remember what you claim
9  was the, quote, Fulsome process with respect to
10  the ATE policy transaction.
11      A   The -- there was numerous meetings, as
12  we've discussed before, with a large group
13  consisting of people from finance, tax, fund
14  accounting, compliance, legal, trading and
15  settlement.
16          There were concerns raised by different
17  factions within those various groups.
18          Then compliance, Mr. Surgent and his
19  staff go through a process that, as far as I
20  understand is reviewed by a conflicts committee;
21  is reviewed generally for the kind of issues
22  you've discussed, is this a fraudulent transfer,
23  is this in some way within violation of the
24  codified law, is this in some way provide a risk.
25  And when it comes down to the determination, there

**227**

1  is one guy in an organization, like an RAA, that
2  makes that determination, and his word is final.
3          If Mr. Surgent at any point says we are
4  not doing this, the idea is dead.
5          The machinations of that are a
6  compliance function.  And I don't necessarily know
7  every little twist and turn, but to my
8  understanding, this is went on for weeks if not
9  months.
10      Q   Okay.  So let's talk very specifically
11  not what you understand is supposed to happen or
12  could happen with the transaction, but what you
13  know happened with this transaction.
14          First, you said there were numerous
15  meetings with a large group.  And you said
16  something like as we've discussed before.  But I
17  think the only -- I don't know if you've talked
18  about any meeting before other than the
19  five-minute discussion you had and maybe one other
20  meeting.
21          But when you say that you --
22      A   Let me -- let me stop there, Mr.
23  Clubok, because you asked me how many meetings
24  of -- with the whole large group did Isaac
25  Leventon attend, and I said after the first one or

**228**

1  two, he never attended again and was not part of
2  the process, to my knowledge.  So, you asked me
3  about meetings that either you knew existed or you
4  extrapolated from me, and that's what I thought.
5      Q   So let's talk about what you say are
6  there were numerous meetings with a large group.
7  How many?
8      A   I would say that I was personally
9  involved in?  Six.  And then I dropped out of the
10  process when it started going down the compliance
11  route, and the machinations of how this would take
12  place if it was approved by compliance.
13      Q   So let's start with, first, there were
14  six large group meetings that you were involved in
15  about the purchase of the ATE policy, or roughly
16  six; correct?
17      A   I'd say a minimum of four that I
18  personally attended at the genesis of the idea
19  until it started this compliance analysis.
20      Q   There was a minimum of four large group
21  meetings that you were personally involved with
22  about the purchase of the ATE policy?
23      A   Over a period of weeks, I would say
24  four is my recollection.  It could have been as
25  many as six, but more like four.

229

1    Q    And who specifically were in these four
2  to six meetings?
3    A    I may not remember every --
4    Q    Excuse me.  Name every human being that
5  you can remember who were in these national
6  compliance meetings.
7    A    I honestly cannot remember everyone
8  because we're talking about five years ago and
9  there were a lot of people on it, in my opinion.
10  Mr. Waterhouse, Mr. Stoops, representatives from
11  training -- I mean, from settlement, which would
12  have been Carter Chism, potentially other people
13  from his group.  I remember Hunter cavities being
14  in some, Mark Patrick, Mr. Surgent, Mr. Post,
15  maybe --
16    Q    Wait, wait, wait.  Hold on.  Slow down.
17    A    Sorry.
18    Q    Mr. Patrick?
19    A    Mr. Patrick.
20    Q    Yep.  Mr. Surgent?
21    A    Mr. Surgent.  Mr. Post.
22    Q    Yep.
23    A    And I'm talking about the initial
24  meetings I attended.  After that, I don't know who
25  attended.

230

1    Q    I understand.  You are talking about
2  the --
3    A    Mr. Surgent, Mr. Post, potentially
4  Ms. Thedford, Mr. Sevilla, myself.  That's all I
5  can recall with a decent degree of specificity.
6    Q    And Mr. Waterhouse was in all four or
7  six of those meetings with you?
8    A    I don't know if he was at all of them.
9  I remember him being in those initial meetings,
10  but there were members of his team that were --
11  that were there.
12    Q    Was Mr. Waterhouse in all those
13  meetings?
14    A    I don't -- I can't tell you if he was
15  in all of them.
16    Q    Was he in more than one?
17    A    Again, you are asking me to recall
18  something from five years ago.  I would assume he
19  would have been in more than one.
20    Q    But you don't remember him being in --
21    A    I do not remember.
22    Q    Do you remember Mr. Stoops being in
23  more than one such meeting?
24    A    I think I remember Mr. Stoops being
25  in -- again, you are really testing my memory

231

1  here -- at least a majority, if not all the ones
2  that I attended.
3    Q    Was Carter Chism in one meeting or a
4  majority of the meetings?
5    A    I don't recall.  I just remember either
6  him or other members of his team having a role
7  because they were would be, you know, mechanically
8  moving assets if they were inside of my compliance
9  where they were (inaudible).
10    Q    And you remember him or his team being
11  in four to six meetings?
12    A    I'm telling you I was in four to six.
13        You are asking me that -- sorry,
14  Mr. Clubok, I just can't recall all the members of
15  the meetings five years ago.
16    Q    Well, that's why I don't want you to
17  make up things.  I asked you --
18    A    So you asked who attended any or all
19  the meetings.  And you said every human being that
20  I could possibly recall which I tried to do that
21  for you.  I'm just telling you, I can't remember
22  if we had a 15-minute meeting and an update if
23  everyone showed up.  I don't -- I just don't know.
24    Q    How many total of these four to six
25  meetings -- you talked about Mr. Surgent being at

232

1  a five-minute meeting when you first came up with
2  the idea and you threw the idea out there.  After
3  that, how many meetings was Mr. Surgent in out of
4  these four to six that you -- that you
5  participated in?
6    A    I don't remember Mr. Surgent being in
7  any that I -- not being in every one that I -- in
8  other words, if I was in there, he was in there,
9  is my memory.
10    Q    So you remember Mr. Surgent also being
11  in four to six large group meetings during the
12  initial phases of this project after that
13  five-minute initial discussion; right?
14    A    The five-minute initial discussion was
15  an idea.  It was literally throwing out an idea
16  and there was very little banter about it at all.
17    Q    And then you remember Mr. Surgent being
18  at four to six of the large group meetings that
19  then discussed this idea?
20    A    If there was four to six, it included
21  the entire group.  There may have been meetings
22  that were a subset.  I was personally in my skill
23  set.
24    Q    Right.  But in the four to six that you
25  were in, you remember Mr. Surgent being in every

233

1   one?
2   **A   That's to the best of my recollection.**
3   **It could have been a subset meeting that I was in**
4   **and he wasn't, but since it was a compliance**
5   issue, I would (inaudible) he was there.
6   Q   And then you said -- and then how many
7   other additional meetings were there after that
8   you know about?  Not that you speculate or
9   guessing, but that you know occurred after that?
10  **A   I don't know.  Unless I was there, I**
11  **wouldn't know they occurred.**
12  Q   So you don't know if there were any
13  other large group meetings after the four to six
14  that you attended; correct?
15  **A   No, I don't, because I didn't attend**
16  **them.  Therefore I don't know for a fact that**
17  **(inaudible).**
18  Q   Okay, so then you said, the next step
19  was concerns raised by -- and I'm having a hard
20  time reading my handwriting, so maybe you can help
21  me.
22      Do you know what the next step was in
23  these so-called fulsome project after these
24  initial four to six meetings?
25  **A   I believe the next step -- and I'm not**

234

1   **certain of this -- would have been running it**
2   **through conflicts committee.**
3   Q   And what is a conflict committee?
4   **A   A committee of people that review**
5   **potential conflicts and make a decision based on**
6   **vote if they believe there's a conflict or not.**
7   Q   And here, because you and Mr. Dondero
8   owned Sentinel, and you were taking assets that
9   were owned by other funds that Highland was
10  responsible for, there is an obvious potential
11  conflict; correct?
12  **A   It's not my --**
13      MS. SMITH:  Objection to form.
14      THE WITNESS:  It's not my job to
15  analyze the conflicts.  That's compliance.  I
16  don't know what conflicts they saw and I don't
17  know what the conflicts committee -- fell on the
18  conflicts committee.
19  BY MR. CLUBOK:
20  Q   Well, as general counsel, did you
21  believe that you -- people all the time make a
22  decision where they recuse themselves from full
23  conversations because they see there's a conflict.
24  Lawyers make that determination all the time for
25  themselves and for clients.

235

1       When this transaction was being -- by
2   the way, let me take a step back, at what point --
3   was it -- at some point during these four to six
4   meetings that it was decided that the seller of
5   the policy would be Sentinel?
6   **A   No, this was the -- the meetings I was**
7   **involved in were based around could this be done,**
8   **period, as an idea.**
9   Q   Oh, okay, so during all the four to six
10  meetings you were on, it was never mentioned that
11  Sentinel would be the counter-party to sell the
12  ATE policy; is that correct?
13  **A   Oh, I don't know if it was never**
14  **mentioned.**
15      MS. SMITH:  Object.
16      THE WITNESS:  It's just that wasn't the
17  crux of the meetings.  The meetings were can this
18  be done as a concept, and people airing their
19  various concerns, issues, positives, negatives.
20      It was general discussion of can this
21  idea come to fruition, period.
22  BY MR. CLUBOK:
23  Q   And in this time, in those big group
24  meetings, was it -- was the concept being
25  discussed that Sentinel would sell the policy or

236

1   were you still waiting to hear from Beecher
2   Carlson as to whether or not they could get some
3   other insurer?
4   **A   At the time I was involved, I don't**
5   **even think anyone had discussed anything with**
6   **Beecher Carlson.**
7   Q   So, if that's the case, because what I
8   think you testified earlier that Beecher
9   Carlson -- first Beecher Carlson tried to find a
10  true independent third-party insurer.  Only after
11  they couldn't, that's when you moved on to
12  Sentinel.  Isn't that what your testimony was?
13  **A   That's --**
14      MS. SMITH:  Objection, form.
15      THE WITNESS:  That's my recollection.
16  But it doesn't mean that this process wasn't
17  occurring before that.
18      You were asking me more specifically,
19  did somebody go out and try to get another
20  reinsurer or insurer to (inaudible) policy.
21  BY MR. CLUBOK:
22  Q   No.  So during the --
23  **A   You didn't ask me about this process**
24  **at all.**
25  Q   I understand.  But you are saying

237

1 during these -- the four to six meetings that you
2 were on, the big group meetings when this was
3 first being discussed, at that point no one had
4 even talked to Beecher Carlson about trying to
5 identify a seller of the ATE policy; correct?
6 **A   I don't know because I'm not everybody**
7 **else. I never talked to Beecher Carlson about it.**
8     Q    Right.
9 **A   Do I know if every Highland employee**
10 **asked Beecher Carlson a question at what point? I**
11 **don't see how I could possibly opine on that.**
12     Q    As far as you're aware -- so you never
13 heard -- during the four to six meetings -- at
14 some point you were told that Beecher Carlson
15 was -- had tried but it failed to find a true
16 independent third-party insurer to sell this ATE
17 policy; correct?
18        MS. SMITH:  Objection to form.
19        THE WITNESS:  At some point, I was
20 informed of that generally, yes.
21 BY MR. CLUBOK:
22     Q    And were you informed of that before,
23 during or after these four to six large group
24 meetings that you've described?
25 **A   I don't recall. But I would -- my**

238

1 **recollection is it was after this because I was**
2 **already out of the process is my memory. But you**
3 **are asking me to remember week by week, day by day**
4 **five years ago.**
5     Q    No, I'm asking very specifically
6 because the real issue here is whether there was a
7 problem with Sentinel selling its policy. And
8 what I want a straight answer from you is there
9 were these four to six large group meetings you
10 say where you claim that Mr. Surgent was with you
11 in all them. And my simple question is: During
12 any of those meetings, was it discussed that
13 Sentinel would be the one issuing the policy, or
14 did these all take place before Beecher Carlson
15 informed you in words or substance that you
16 couldn't get an outside third-party insurance
17 seller?
18 **A   I don't know --**
19        MS. SMITH:  Objection to form.
20        THE WITNESS:  I don't know, because I
21 can't remember if -- when raised, can Sentinel do
22 this. But certainly, the meetings that I was
23 involved with had concluded as far as I know, what
24 you are asking me to now, you know, represent
25 everyone in the firm could have talked to Beecher

239

1 Carlson, I don't know the answer to that.
2        As far as I know -- from what --
3 BY MR. CLUBOK:
4     Q    No, no, no, that's not what I asked
5 you. That's not what I asked you at all.
6        MR. CLUBOK:  I will move to strike.
7        THE WITNESS:  Okay.
8 BY MR. CLUBOK:
9     Q    That's definitely not what I asked you
10 about everybody in the firm did. So listen to my
11 question --
12 **A   You said did anyone talk to Beecher**
13 **Carlson.**
14        -- (overspeaking) --
15     Q    I didn't. I didn't. I did not. Okay.
16 Just listen to my question. And I'm going to
17 repeat it again. I -- specifically, I want a
18 straight answer on this.
19        During the four to six large group
20 meetings that you claim Mr. Surgent was with you,
21 in any of those meetings, was it discussed that
22 Sentinel would be the one issuing the policy or
23 did all of these meetings take place before you
24 were informed that Beecher Carlson could not find
25 an outside third party to sell the insurance?

240

1        MS. SMITH:  Objection to form.
2        THE WITNESS:  Those are two questions.
3        Do you want me to answer both of them
4 or...?
5 BY MR. CLUBOK:
6     Q    You said -- okay. I'll break it into
7 two questions.
8        Number one: During the four to six
9 large group meetings that you claim Mr. Surgent
10 was with you, do you specifically remember it ever
11 being discussed that Sentinel would be the one
12 issuing the policy?
13 **A   No, I do not recall anyone raising**
14 **that.**
15     Q    Okay. And is it the case that it was
16 only after these four to six meetings that you
17 learned that Beecher Carlson had been unable to
18 identify a third-party insurer to sell the policy?
19 **A   That is my recollection, yes.**
20     Q    So, were you ever in any meeting with
21 Thomas Surgent in which it was specifically asked
22 whether there would be an issue if it was Sentinel
23 issuing the policy as opposed to just any
24 third-party insurer?
25 **A   No, because I was not a part of those**

241

1  meetings by design.
2      Q   And are you aware -- can you testify
3  here under oath, that a meeting took place in
4  which Mr. Surgent was specifically asked whether
5  or not there was a problem with Sentinel being the
6  one to issue the ATE policy?
7          MS. SMITH:  Objection, form.
8          THE WITNESS:  Whether a meeting took
9  place -- whether a meeting took place or not, Mr.
10 Surgent made the decision knowing that Sentinel
11 was the -- was the issuer of the policy.  So
12 whether it was a meeting, that he decided by
13 himself in the shower, he got a message from God,
14 I don't know what, but he decided it.
15         He's the only person that could decide.
16 BY MR. CLUBOK:
17     Q   Again, I'd like you to answer my
18 questions and not statements that you want to
19 make.
20         I'm doing this in pieces, okay?
21     A   Okay.
22     Q   And you objected to compound questions
23 and made me break it into pieces, so I'm going to
24 ask you to answer my pieces going forward and not
25 give me other answers to other things that I

242

1  haven't asked yet.  I will either ask you compound
2  questions and you can answer all at once or since
3  you objected, I'll ask in pieces.  I'm going to --
4      A   No, I have no objection to them.  I
5  just want to make sure I answer the question.
6      Q   Answer my piece, please.
7      A   Okay.
8      Q   Are you aware -- strike that.
9          Can you testify here under oath that
10 any meeting took place that you are aware of, even
11 if you weren't there, in which Mr. Surgent was
12 specifically asked whether or not there was any
13 potential problems given that Sentinel was the one
14 who was going to be issuing the ATE policy?
15     A   I don't know if any --
16         MS. SMITH:  Objection to form.
17         THE WITNESS:  I don't know if any
18 meeting like that took place.
19 BY MR. CLUBOK:
20     Q   Are you aware of any written
21 documentation about the ATE policy transaction
22 that was supplied to Mr. Surgent in connection
23 with what you call the fulsome process?
24     A   I do not have an awareness of what was
25 provided to Mr. Surgent as I am not part of the

243

1  process.
2      Q   So you have no idea if Mr. Surgent even
3  got one document related to this transaction;
4  correct?
5          MS. SMITH:  Objection to form.
6          THE WITNESS:  Me personally?
7  BY MR. CLUBOK:
8      Q   You personally.
9      A   Me personally, no.
10     Q   So just again, just as the double
11 negative thing, so let's just be clear.
12         As you sit here today, you have no
13 personal knowledge of Mr. Surgent receiving even
14 one document relating to the ATE transaction;
15 correct?
16     A   No, I do not have any personal
17 knowledge of what Mr. Surgent received, document
18 or otherwise, in his analysis.
19     Q   And I appreciate it.
20         The only problem is you started that
21 with a "No".  And I think the way I answered the
22 question, I think you meant yes with that no.
23     A   I'll try my best.
24     Q   It's okay.  If you mean no -- I'm not
25 trying to get you to change my answer.  I just

244

1  want to make sure that -- I think that was one of
2  those where you --
3      A   I'll restate my answer.  I'll restate
4  my answer to make the record clean.
5      Q   Yeah, let me just ask that question --
6      A   I do not know of anything Mr. Surgent
7  received, document or otherwise, to perform his
8  analysis.  I don't know.
9      Q   And the conflicts committee that you
10 say that you assume weighed in, who was on the
11 conflicts committee at the time or was it an ad
12 hoc committee for each transaction?
13     A   No, it was the set group of people that
14 served on it from time to time.
15         I don't know who they were at that
16 time.
17     Q   And so like at anyone time, there would
18 be a conflicts committee, and so anything that
19 came up that month, it would go to that group.  Is
20 that how it worked or do they just convene for
21 every individual transaction, a different
22 committee?
23     A   They convened on for -- as far as
24 I know, on every individual transaction or if
25 there was a set of things that weren't urgent,

245

1 they would convene and decide if there was a
2 conflict and then compliance dealt with
3 investigating those conflicts and ultimately the
4 chief compliance officer made a determination.
5    Q    And who was on the conflicts committee
6 at the time?
7    A    I don't know.
8    Q    How many members were there in the
9 conflicts committee?
10   A    I don't know.
11   Q    All right. Can you identify a single
12 member of the conflicts committee who was apprized
13 of the transaction with Sentinel?
14   A    No. But it would be -- it would be in
15 the debtor's records. I mean, it's a set
16 committee that they set over a period of time.
17   Q    But you have no personal knowledge of
18 the conflicts committee weighing in on the ATE
19 transaction; correct?
20   A    No, I don't. But it's standard
21 practice for them just to be involved.
22   Q    So it's correct, sir, that you have no
23 personal knowledge of the conflict committee
24 weighing in on the ATE transaction; right?
25   A    Correct.

246

1    Q    Is -- so, let me see if I have this
2 right. What you have personal knowledge as you
3 can testify to with respect to the ATE transaction
4 and the process that was followed is you know that
5 you were in four to six meetings with Mr. Surgent,
6 but you don't recall the fact that Sentinel would
7 be issuing the policy ever coming up; correct?
8    A    Correct.
9    Q    And you have no idea if Mr. Surgent
10 ever received any documentation about the
11 transaction; correct?
12   A    My personal knowledge, I have no idea
13 of what he received.
14   Q    And you don't know if any member of the
15 conflict committee was apprized of the Sentinel
16 transaction; correct?
17   A    Me personally? No.
18   Q    And you don't know whether Mr. Surgent
19 was ever specifically told that Sentinel would be
20 the one issuing the policy prior to its issuance;
21 correct?
22   A    I don't know that he --
23        MS. SMITH: Objection to form.
24        THE WITNESS: I don't know he
25 specifically told me he approved the transaction

247

1 to me, I don't know.
2 BY MR. CLUBOK:
3    Q    And when you say he approved the
4 transaction, the -- you mean a written approval?
5    A    I don't know what approval process he
6 has.
7        I would assume it's a written approval.
8 Maybe reflected in a compliance memo. I don't
9 know what process he has. Again, because of the
10 design, it got us to the SEC. I'm not involved in
11 compliance.
12   Q    Well, wait a second. When you say you
13 know that he approved the transaction, did he tell
14 you personally he was approving the transaction?
15   A    Yes.
16   Q    And what were the -- was this a later
17 meeting. Because you mentioned the four to six
18 meetings. And I -- maybe I should have asked this
19 question. After those initial four to six
20 meetings, did you ever discuss the transaction
21 with Mr. Surgent again?
22   A    Not that I recall until he said the ATE
23 policy is going forward to me in passing in the
24 hallway.
25        And again, he's the only person that

248

1 can approve that type of transaction.
2    Q    I'm sorry, he told you it -- so you had
3 those initial four to six meetings.
4    A    Yeah.
5    Q    You never had another meeting with Mr.
6 Surgent about the ATE policy. But he told you in
7 passing in the hallway that the transaction was
8 going forward?
9    A    Yes, that's my recollection.
10   Q    And did -- is that the only other
11 communication you had with Mr. Surgent, other than
12 what you've described thus far?
13   A    Yes, because by design compliance runs
14 its own process.
15   Q    And when Mr. Surgent in passing told
16 you it was going forward, did he say compliance
17 approved the transaction?
18   A    Yeah, he approved it. Compliance
19 doesn't approve it. The chief compliance officer
20 approves it.
21   Q    And he specifically told you -- and how
22 long was this conversation that you had in passing
23 in the hallway?
24   A    Ten seconds.
25   Q    And what specific -- what were the

---

249

1 exact words that Mr. Surgent used, to the best of
2 your recollection?
3    A   To the best of my recollection from
4 five years ago, he said the ATE thing is going
5 forward.
6    Q   That's it?
7    A   That's it.
8    Q   And other than that, you have no
9 personal knowledge of how any approval that Mr.
10 Surgent may have given would have been
11 memorialized anywhere at Highland?
12    A   No.  But Mr. Surgent is a very careful,
13 diligent guy, performed his duties at the highest
14 level.  I'm sure he did everything that was
15 required by law and by his approval.
16    Q   And so it is true that you have no
17 personal knowledge of how any supposed approval
18 that Mr. Surgent may have given with respect to
19 the ATE transaction would have been memorialized
20 anywhere at Highland; correct?
21       MS. SMITH:  Objection, asked and
22 answered multiple times.
23       THE WITNESS:  You're correct.
24 BY MR. CLUBOK:
25    Q   Did anybody else in the firm ever tell

---

250

1 you that Mr. Surgent had approved the transaction?
2    A   Umm... I don't recall if anybody else
3 ever told me.  But it took numerous people to
4 carry out the traction, to my understanding, so
5 obviously they wouldn't do it without the chief
6 compliance officer's approval, written or
7 otherwise.
8    Q   Did the ATE transaction implicate the
9 Adviser's Act?
10    A   I don't know.
11    Q   Did you -- sorry.  You don't know
12 whether or not -- I believe you said this, and I
13 apologize.  I think this might be the last
14 question on this subject, but I just want to make
15 sure I ask it.
16       So I apologize if I asked it before,
17 but if you could just answer, bear with me, I
18 appreciate it.
19       You don't know whether anyone
20 specifically brought to Mr. Surgent's attention
21 the ownership interest in Sentinel prior to the
22 transaction going forward; correct?
23    A   Untrue.
24    Q   Ah, okay.  So then please explain.
25    A   Mr. Surgent knew from inception or when

---

251

1 he took over the chief compliance role -- officer
2 role and had to declare over and over what was
3 affiliates and what wasn't, the ownership of
4 Sentinel when he declared it a non-affiliate.
5       So, he was infinitely aware for years
6 before this transaction, the ownership with
7 Sentinel.  And I'm sure, again, because Mr.
8 Surgent did his job very well, I'm sure he
9 confirmed the ownership with Sentinel as part of
10 his process.
11    Q   No, no, no, my question is slightly
12 different.
13       Do you have any specific personal
14 knowledge of information that was specifically
15 brought to Mr. Surgent's intent -- attention that
16 identified the ownership interest in Sentinel?
17    A   Me personally, no, because I was by
18 design, not part of the process.
19    Q   How did Mr. Surgent supposedly formally
20 declare Sentinel to be a non-affiliate?
21       MS. SMITH:  Objection to form.
22       THE WITNESS:  You'd have to ask Mr.
23 Surgent.
24 BY MR. CLUBOK:
25    Q   When did he do this?

---

252

1    A   Either at the -- I can't remember if he
2 was chief compliance officer in 2012 when it was
3 formed or not.  But either he did so as taking
4 over from his predecessor or he did so when it was
5 formed.  I just don't recall if he was the CCO or
6 not.
7    Q   You talked -- you talked with
8 Mr. Leventon about whether or not Sentinel should
9 be considered a affiliate investor; correct?
10    A   Mr. Leventon?
11    Q   Yeah?
12    A   Not that I recall having Mr. Leventon's
13 opinion about that.  It's not really relevant.  It
14 is solely compliance.
15    Q   Did you ever talk to Mr. DiOrio about
16 whether Sentinel would be considered an affiliate
17 of any other entity?
18    A   Not that I recall.  Again, that
19 determination would only be me repeating what is
20 determined by compliance.
21    Q   Did you ever have any conversation with
22 Mr. Sevilla about whether or not Sentinel should
23 be considered an affiliate of any other entity?
24    A   I don't recall.
25    Q   Did you ever consider whether Sentinel

---

253

1  was an affiliate of Multi Strat?
2     **A   Did I?   No.**
3     Q   Did you ever discuss with anybody
4  whether Sentinel should be considered an
5  affiliated investor with respect to its Multi
6  Strat ownership interest?
7     **A   Not that I recall.**
8        MS. SMITH:  Objection.
9        THE WITNESS:  But again, that analysis
10  is done by compliance and determined by a chief
11  compliance officer.
12  BY MR. CLUBOK:
13     Q   If a question came up as to whether or
14  not Sentinel should be treated as an affiliate for
15  any other entity that Highland was involved with,
16  would it have been the appropriate process to
17  maybe turn that over to compliance?
18     **A   Yes.  They would inquire to compliance**
19  **about their determination.**
20     Q   And you would never have any role in
21  that assessment?
22     **A   No, other than repeating what**
23  **compliance had decided, I had no role.**
24     Q   Would you -- okay.  Do you consider
25  Sentinel to be an affiliate of yours?

254

1     **A   I don't --**
2        MS. SMITH:  Objection to form.
3        THE WITNESS:  I don't know what that
4  analysis entails.  I would say it's an affiliated
5  entity -- to entities that I am involved with, I
6  don't know enough about how to analyze something
7  that's affiliated by law.
8  BY MR. CLUBOK:
9     Q   Did you ever ask anybody to talk to you
10  specifically about whether or not Sentinel was an
11  affiliated investor without going first to
12  compliance?
13     **A   Please repeat that.  I want to make**
14  **sure I understand what you're asking.**
15     Q   Did you ever ask anybody at Highland to
16  speak with you directly about whether or not
17  Sentinel should be labeled an affiliated investor
18  without first speaking to compliance?
19     **A   Not to my knowledge.  No, again,**
20  **compliance is the ultimate arbiter.**
21     Q   Did you ever yell at anybody for, in
22  your view, improperly labelling Sentinel as an
23  affiliated investor?
24     **A   Yell at anyone?  Not that I recall.**
25     Q   Do you ever yell at work?

255

1     **A   Yes.**
2        MS. SMITH:  Objection.
3  BY MR. CLUBOK:
4     Q   Would you say your management style was
5  to frequently yell at people?
6     **A   In the past, yes.**
7     Q   How about in the 2017 timeframe?
8     **A   I wouldn't say frequently.  I would say**
9  **more infrequently, but yes, I did it.**
10     Q   Did you ever yell at Taylor Colbert
11  about his use of the phrase "affiliated investor"
12  with respect to Sentinel?
13     **A   I don't recall who Taylor Colbert is.**
14     Q   Did you ever yell at Trey Parker about
15  that?
16     **A   I don't ever remember yelling at Trey**
17  **Parker.**
18     Q   Did you ever yell at Carter Chisholm or
19  Chris Dunn with respect to this subject?
20     **A   I don't think I've ever yelled at**
21  **Carter Chism, and I don't know who Chris Dunn is.**
22     Q   Let's take a look at Exhibit 61.
23        It is an email chain with an
24  attachment.  And I'm going to just focus you first
25  on the email cover before we look at the

256

1  attachment.  And it's an email exchange that at
2  the bottom starts with an email from Taylor
3  Colbert to a number of folks and eventually works
4  up to an email from you to Isaac Leventon and JP
5  Sevilla.
6        Do you see Exhibit 61?
7     **A   I've got Exhibit 61.**
8  BY MR. CLUBOK:
9     Q   And you can see here that -- if we go
10  down to the -- you have to read backwards on the
11  email.
12     **A   Okay.**
13        MR. CLUBOK:  And Nate, if you can give
14  me that.  Thank you.
15  BY MR. CLUBOK:
16     Q   The email starts with Taylor Colbert
17  saying, "Hi, Trey.  Please see the attached for
18  cash projection, distribution, allocation as
19  requested.  There are several estimates in the
20  file that we will continue to sharpen over the
21  next couple of days."
22        And the subject is "Multi Strat Cash
23  Projection."
24        Do you see that?
25     **A   I do.**

---

257

1   Q    And then if you work up the chain, you
2   will see Taylor then sending another email to Trey
3   and this time he copies some additional people,
4   including Thomas Surgent.  And Taylor says, "Trey,
5   as discussed, please see the updated file with
6   Sentinel being presented as an affiliated
7   investor.  Please let me know if you would like to
8   see any changes made."
9        Do you see that?
10  A    Yes.
11  Q    And then Mr. Surgent forwards to you
12  and says "Let's discuss."
13  A    Yes.
14  Q    Did you discuss this with him ever?
15  A    I'm sure I did.  If he asked me to
16  discuss something, I almost always discussed it
17  with him.  I can't think of any instance where I
18  didn't.
19  Q    And that same day, it looks like about
20  50 minutes after Thomas Surgent sent you that
21  email, you forward it to Isaac Leventon and JP
22  Sevilla and said, "See below and attached and call
23  me tomorrow on this."
24       Do you see that?
25  A    I do.

---

258

1   Q    Do you remember this exchange?
2   A    Not at all.
3   Q    You said before you don't know why
4   Isaac Leventon would be involved at all in
5   affiliate investor determination.
6        Do you remember that?
7   MS. SMITH:  Objection to form.
8   THE WITNESS:  And I don't -- from this,
9   I don't see that he is.
10       Mr. Surgent involved me.
11  BY MR. CLUBOK:
12  Q    Right.  But then you immediately sent
13  an email to -- to Leventon and Sevilla and say,
14  "Let's" -- you know, "call -- call tomorrow on
15  this."
16       Do you see that?
17  A    I do.
18  Q    You brought Leventon and Sevilla into
19  this exchange, didn't you?
20  A    I didn't bring them in into any
21  exchange.  I asked them to call to discuss -- to
22  call me on this tomorrow.
23  Q    You brought Mr. Leventon and
24  Mr. Sevilla into this subject of whether or not
25  Sentinel should be presented as an affiliated

---

259

1   investor with respect to Multi Strat; isn't that
2   true?
3   A    No, that's not true.  I don't know what
4   I'm -- I may have received instructions from
5   Mr. Surgent.  I don't recall anything about this.
6        They were my two most senior guys.
7   Very often I would have them handle things, so
8   very easily Mr. Surgent could have given me
9   instructions.  But I said okay, I'll have JP and
10  Isaac handle it.  I just don't recall what
11  happened here, but the characterizing is I drug
12  them into the determination of what's an
13  affiliated investor is, I'm sorry, that's silly
14  because that determination is exclusively Mr.
15  Surgent's.
16  Q    What was the discussion you had with
17  Mr. Surgent when he forwarded this to you?
18  A    I have zero recollection of this.
19  Q    So, Mr. Surgent -- okay.  You have zero
20  recollection of what you guys discussed; is that
21  correct?
22  A    You are asking me to remember a phone
23  conversation from five years ago.  No, I don't
24  know.  Or four years ago, sorry.
25  Q    If you look at the attachment and the

---

260

1   first page, you can see that it identifies
2   entities in shade if they are non-affiliated and
3   not in shade if they are affiliated.
4        Do you do see that?
5   A    I see shaded and non-shaded entities.
6        Where do you get the key that the
7   shaded are non-affiliates?
8   Q    Oh, I'm sorry.  Well, you can see the
9   percent of non-affiliate?
10  A    Okay.
11  Q    Right?  And you can see where the
12  percentage of non-affiliate, for example, Master
13  Fund, Highland Credit Opportunities Fund adds up
14  to 100 percent with three different entries.
15       Do you see that?
16  A    Okay.
17  Q    And then for the Highland Credit
18  Opportunities Fund, the same thing.  You can see
19  the one's that are shaded add up to 100 percent
20  for -- sorry, add up to -- there's percentages
21  associated with non-affiliated entities and there
22  is no percentages associated with the others, for
23  non-affiliate.
24       Do you see that?
25  A    I do.

261

1    Q   So with -- and this one -- and this is
2  the attachment that was forwarded by Taylor when
3  he says, "As discussed, please see the updated
4  file with Sentinel being presented as an
5  affiliated investor."
6        Do you see that in the cover email?
7    A   I do.
8    Q   And so we look here and we see that
9  fore -- and by the way, Highland credit
10 Opportunities Fund, that's an entity that we now
11 call Multi Strat; correct?
12   A   I don't recall that -- I mean, that
13 could be, I just don't remember.
14   Q   Okay.  But does it -- do you recall --
15 there was -- because we were involved in New York
16 litigation where we named an entity called Credit
17 Opportunities.
18   A   Mm-hmm.
19   Q   At some point, it changed its name to
20 Multi Strat.
21       Do you -- does that ring a bell?
22   A   It does ring a bell.  I just -- I just
23 don't want to say 100 percent I remember that, but
24 that sounds right to me.
25   Q   Okay.  So with respect to Credit

262

1  Opportunities, it shows Sentinel having a what's
2  called a Highland Nav, and it's being, as
3  Mr. Colbert mentioned, presented as an affiliated
4  entity; do you see that?
5    A   He can he put on here anything.  It is
6  not his determination.
7    Q   This whole --
8    A   If Mr. Surgent said let's discuss and
9  it was right, I have to doubt he would have needed
10 to discuss anything with me.
11   Q   Do you recall -- do you recall --
12 sorry.  I'm sorry, Nate, can you pull this off the
13 screen?
14       There's got to be a way for me to do it
15 easily, but-for some reason I can't figure it out.
16       THE WITNESS:  Another thing that is
17 very interesting is Mark O'Connor and the Dugaboy
18 Investment Trust in the same table, which as far
19 as I know is a trust that somehow is related to
20 Mr. Dondero, but it's Mark O'Connor as an
21 individual is not considered as -- sorry, is
22 considered an affiliated investor, yeah, but,
23 again, I don't know why Mr. Surgent would even
24 include me on something that was just simply
25 correct.

263

1    Q   Sorry, you don't know why he would
2  include you on what?
3    A   In other words, this table prepared by
4  Mr. Colbert to -- I don't know what his goal
5  was -- oh, a fund analyst.  Sorry, I just saw his
6  signature block.  If it was correct, why would Mr.
7  Surgent say "Let's discuss."
8        It's Mr. Colbert's determination,
9  again, who had zero relevance in determining what
10 was an affiliated investor or not.  If that was
11 correct, why would Mr. Surgent need to discuss
12 something with me.
13   Q   And you don't remember what you did
14 discuss after this?
15   A   No, I don't.  But I just find it
16 interesting that, you know, at 6:00 o'clock at
17 night, he needs to discuss with me on something
18 that is correct.  Usually people don't say, hey,
19 use this table.  It's correct.
20   Q   Do you remember after raising this
21 issue with Mr. Surgent yelling at somebody about
22 the fact that you believed they should not list
23 Sentinel as an affiliated investor?
24   A   No, I don't.
25       MS. SMITH:  Objection to form.

264

1        THE WITNESS:  And I didn't raise the
2  issue with Mr. Surgent.  He contacted me to talk
3  to him.
4  BY MR. CLUBOK:
5    Q   Sorry, after discussing this issue with
6  Mr. Surgent, do you believe -- do you recall ever
7  yelling at anyone on this --
8    A   No, no, unless Mr. Surgent told me to
9  remind people that it -- they don't need to be
10 making determinations for what affiliated
11 investors are or not.  I just don't remember the
12 circumstances.
13       Furthermore, if I yelled at somebody ad
14 nauseam, it doesn't change Mr. Surgent's
15 determination.
16   Q   At some point, Sentinel was referred to
17 as an affiliate; correct?
18   A   Not to my knowledge.
19       MS. SMITH:  Objection to form.
20       THE WITNESS:  Again, from inception to
21 the end of my tenure, it had always been a
22 compliance officer as a non-affiliate.
23 BY MR. CLUBOK:
24   Q   It was brought to your attention that
25 in emails various people had referred to Sentinel

265

1 as an affiliate; correct?
2    **A  Were any of those people Mr. Surgent?**
3    Q  That's -- that's not my -- I'm the one
4 who gets to ask the questions.
5    So --
6    **A  When you said people, I was just trying**
7 **to understand...**
8    Q  -- isn't it true that it was brought to
9 your attention that in emails, various people had
10 referred to Sentinel as an affiliate?
11    MS. SMITH: Objection, form.
12    THE WITNESS: I don't recall.
13 BY MR. CLUBOK:
14    Q  Well, that was specifically brought to
15 your attention, wasn't it?
16    **A  I don't recall.**
17    Q  It was specifically brought to your
18 attention by Isaac Leventon, wasn't it?
19    **A  I don't recall.**
20    MS. SMITH: Objection, form.
21 BY MR. CLUBOK:
22    Q  Let's draw your attention to tab 13,
23 and I think we can mark it as Exhibit 87.
24    (Deposition Exhibit 87 was marked for
25 identification.)

266

1    THE WITNESS: I'm sorry, which -- which
2 exhibit? I'm sorry --
3 BY MR. CLUBOK:
4    Q  We're going to put it up on the screen.
5 Exhibit 87.
6    MS. SMITH: We haven't seen that, so
7 please put that in the chat. Thank you.
8    MR. CLUBOK: Will do.
9    REMOTE TECHNICIAN: Yes. And you said
10 tab 13?
11    MR. CLUBOK: Yep, tab 13 should be
12 Exhibit 87. So there's an email and attachment.
13 Let's just mark it collectively as Exhibit 87. We
14 don't need the slip sheet. But let's mark that --
15 Exhibit 87 is going to be a four-page document,
16 which is a two-page email from Isaac Leventon to
17 Scott Ellington, copying Matt DiOrio and JP
18 Sevilla.
19    And it attaches a two-page document
20 that is a -- marked as a timeline and it
21 identifies a number of emails, some of which
22 mention Sentinel. Do we have Exhibit 87 up, Nate?
23    REMOTE TECHNICIAN: Yes. One moment,
24 please.
25

267

1 BY MR. CLUBOK:
2    Q  Okay. You can see this email --
3    MR. CLUBOK: Nate, you will give me the
4 controller? Yeah.
5 BY MR. CLUBOK:
6    Q  There originally was an email from
7 Isaac Leventon to Scott -- sorry, an email from
8 Isaac Leventon to Scott Ellington on September 9,
9 2019 re NREF.
10    What's NREF?
11    **A  I believe it is a fund managed by**
12 **NexPoint Advisors.**
13    Q  And what did -- what was Highland's
14 connection to it?
15    **A  Connection to it? Highland was a**
16 **sub-adviser to NexPoint Advisors and provided**
17 **shared services.**
18    Q  Okay. And you see how they're talking
19 about repurchases in 2019, and it identifies
20 Sentinel Reinsurance Ltd.?
21    **A  I do.**
22    Q  And then Isaac -- do you remember Isaac
23 sending you this information?
24    **A  No, I don't.**
25    Q  And why would Isaac Leventon have been

268

1 sending you this information and copying Matt
2 DiOrio and JP Sevilla?
3    **A  Well, I can't see the whole email chain**
4 **so I don't even understand that -- if there is**
5 **emails further down that I'm not being shown.**
6    Q  Okay. So I'll go all the way down to
7 the bottom. You can see the bottom is just Isaac
8 sending you an email and it says subject NREF.
9 But there is no content that we have.
10    **A  Okay.**
11    Q  I don't know if that was deleted or
12 not. But the way it was produced to us, that is
13 it?
14    **A  It obviously -- that obviously has**
15 **context?**
16    Q  It may have been a premature sending,
17 who knows?
18    **A  Okay.**
19    Q  A little bit later, he sends an email
20 and he has content in it. And this time he says,
21 "Repurchases from June of 2019. We cannot get
22 behind the Schwab Omnibus account." And it
23 identifies a number of entities, including
24 Sentinel Reinsurance Limited 695,000.
25    Do you see that?

---

269

1    A   Yes.
2    Q   And then if you go up, he sends the
3  same group an email to you and DiOrio, Sevilla,
4  slightly revised timeline with added 7/31 "Form 4"
5  emails and with certain key emails highlighted,
6  "as I discussed with Dio a few minutes ago."
7       Do you see that?
8    A   I do.
9    Q   Who's Dio?
10   A   He is referring to Mr. DiOrio. That's
11 his nickname.
12   Q   Okay. And if we go down and look at
13 the timeline, the attachment --
14      MR. CLUBOK: And Nate, did you make it
15 the other page part of Exhibit 87?
16      REMOTE TECHNICIAN: I'll merge the
17 documents after the deposition.
18 BY MR. CLUBOK:
19   Q   So again, 87 should be the cover email
20 and the attachment. And Nate is going to put it
21 back up here in a second.
22      We are now on the attachment. And the
23 attachment --
24      MR. CLUBOK: You will give me control
25 over here, Nate?

---

270

1  BY MR. CLUBOK:
2    Q   It is a two-page document that at the
3  top starts; with -- it is a two-page Excel
4  spreadsheet. It contains information. The top is
5  an entry dated June 6, 2019, from DiOrio Fuentes.
6       And then if you scroll down, it
7  chronologically goes forward in time until
8  ultimately December 6th, 2019, which is the last
9  entry.
10      Do you see that?
11   A   I do.
12   Q   So if you look here -- if we go back to
13 the first page on June 25th, 2019 at 10:07 a.m.,
14 there's an email that says, "Who at the Sentinel
15 Reinsurance Limited is the Governance Re, 12
16 percent of the fund is 2 million redemption that
17 day." Do you see that?
18   A   I do.
19   Q   And at 6/25/2019 after another -- I'm
20 skipping one email. But at 10:11, someone writes
21 back -- it's from Fuentes to Norris, copying
22 Hakemack, Thedford, Klos and it says, it's my
23 understanding that this is an affiliate Highland
24 account; do you see that?
25   A   I do.

---

271

1    Q   And Isaac has highlighted that in the
2  email he sent you.
3       This is not highlighting we put on.
4  This is something that Isaac put on to draw your
5  attention to it pursuant to is email where he says
6  said certain emails are highlighted as I discussed
7  with Dio; do you see that?
8    A   I do.
9    Q   So, he highlights something where
10 Fuentes says, "It's my understanding this is an
11 affiliate Highland account." And he highlights
12 another email that says, "Sentinel tried to get a
13 little over 2 million out, and will get less than
14 790,000 out," do you see that?
15   A   Yes.
16   Q   And does this ring a bell that Mr.
17 Leventon specifically brought this issue to your
18 attention?
19   A   Yes.
20   Q   And what happened?
21   A   What do you mean what happened?
22   Q   Okay. Do you remember anything else or
23 just that he brought this issue to your attention?
24 Was there any resolution?
25   A   Was there any resolution?

---

272

1    Q   Yeah.
2    A   To what?
3    Q   What was the issue he was raising?
4  What was he -- what did he bring here --
5       He said, "Look at these emails."
6  Presumably he had to have a discussion with him
7  about it?
8    A   No, I instructed Mr. Leventon to
9  construct this timeline.
10   Q   Oh. Why?
11   A   Because Mr. McGraner who is the
12 portfolio manager for the funds managed by
13 NexPoint Advisors, had asked me to understand why
14 Sentinel had put in a redemption request. And I
15 said I wasn't aware that they had.
16   Q   And the reason that that mattered was
17 because Sentinel was not an independent investor,
18 but was -- it could be considered an insider, and
19 that might have consequences for them putting in a
20 redemption; correct?
21      MS. SMITH: Objection to form.
22      THE WITNESS: Not at all.
23 BY MR. CLUBOK:
24   Q   Not at all?
25   A   No, not at all.

273

1    Q   That was certainly a concern, wasn't
2  it?
3    A   No, it was not.
4       MS. SMITH:  Objection to form.
5  BY MR. CLUBOK:
6    Q   Let's look at the next page, July 24th,
7  2019, an email from Hollister to Goetz, copying
8  Norris, Noel.  He says, "Investors are concerned
9  about redemption capacity.  'Do we know how that
10 big internal redemption is going to look to people
11 who look at such reports'."?
12      Do you see that?
13   A   Which one are you referring to?
14   Q   The one right above the yellow
15 highlighting, where Hollister at NexPoint
16 Securities says, "Investors are concerned about
17 redemption capacity.  'Do we know how that big
18 internal redemption is going to look to people who
19 look at such reports'."?
20   A   Okay.
21   Q   And in response, McGraner writes, "Our
22 reinsurer -- our reinsurer held the position and
23 had to redeem to manage its own cash needs.  Not
24 sure if that helps but that's the reason."
25   A   Okay.

274

1    Q   And then Hollister says, "Reinsurer?
2  Like our health insurance fund or just a
3  well-known third party"?
4       McGraner then writes back:  "We have an
5  offshore reinsurance company that has several
6  investments in our funds.  It writes D&O policies,
7  property, etc."
8       To which Hollister responds:  "Just
9  know that if a fund maxes out its redemptions,
10 that's seen as a massive red flag unless there is
11 a story to go along with it."
12      Then asks if there is an explanation to
13 give outside investors.  Okay.
14   A   So, it was a concern that Sentinel's
15 redemption could be considered as a problem for
16 outside investors, given its status as an insider;
17 correct?
18      MS. SMITH:  Objection to form.
19      THE WITNESS:  No.  No, you're wrong.
20 This is an email exchange with real estate
21 analysts and a portfolio manager.  Their knowledge
22 of what's an affiliate or Form 4 filer, etcetera
23 is utterly irrelevant because they have no
24 training in this.
25      They could have written, "UBS is our

275

1  redeemer;" it doesn't mean they are.  Furthermore
2  if you go down to Lauren Thedford, who is the
3  compliance person "Is Sentinel a Form 4 filer for
4  NXRT?" "Nope..." meaning they are not an affiliate
5  and not an insider.  So your assumptions are based
6  upon what a bunch of real estate guys think.
7    Q   Right.
8    A   For the reason I had Mr. Leventon build
9  this, is when it came to my attention from
10 Mr. McGraner he said what's going on.  CIMA is the
11 one that told us to redeem out of this fund.  Told
12 Sentinel, when I refer to "us."
13      Mr. McGraner didn't understand that and
14 he goes, that's not what I understand, so I had
15 Mr. Leventon build this timeline, so I could
16 discuss it with Mr. McGraner.  This is the
17 resolution.
18 BY MR. CLUBOK:
19   Q   CIMA told you --
20   A   -- (overspeaking) --
21   Q   I'm sorry, CIMA told you to redeem out
22 of this fund on behalf of Sentinel?
23   A   Yes.  In their annual portfolio review
24 they instructed the independent directors to
25 redeem out of this fund.

276

1    Q   Yeah and  -- (overspeaking) --
2    A   If you look at the 7/31/2019 email from
3  Lorne Thedford.  So, Mr. DiOrio, who's not a
4  compliance professional says "Is Sentinel a Form 4
5  filer for NXRT?"  The compliance person says,
6  "Nope, just under 1% and not included in JD's
7  group, so Sentinel is good."
8       The only email that matters on this
9  whole thing is hers.  She's the only person
10 qualified to make that determination.
11   Q   Right.  And so there was a
12 determination that with respect to -- there was a
13 determination that Sentinel would not be a Form 4
14 Filer for NXRT, right?
15   A   Yes, and also she is the compliance
16 person on any of these chains.  I haven't looked
17 them all because you guys were scrolling up and
18 down.  She says, "Nope, just under 1 percent."
19 Now, what's really important, "and not included in
20 JD's group," presumably referring in to Jim
21 Dondero, meaning it's not a affiliate, so Sentinel
22 was good.
23      What these real estate guys think is
24 about as important as is if we went and got a man
25 off the street to make that determination.

277

1  Q   And when you say Sentinel is good, does
2  that mean you and Jim Dondero are free to make any
3  transactions you want with Sentinel, without
4  regard to whether or not you are -- they are
5  related entities to you?
6  A   Absolutely not.
7      MS. SMITH:  Objection to form.
8      THE WITNESS:  Absolutely not.  It means
9  compliance makes the decision, which on
10 7/31/2019 at 12:14 p.m. Lorne Thedford, the
11 compliance professional makes the determination.
12 BY MR. CLUBOK:
13     Q   And is there a written determination
14 with respect to the Sentinel transaction on the
15 ATE policy in any writing anywhere that you are
16 aware of?
17     A   My personal knowledge, I don't know but
18 here is hers in writing.  Sentinel is good, not
19 part of JD's group.  Not an affiliate.
20     If you look up above, this actually got
21 Mr. Surgent and Mr. Post on 6/26/2019.  The
22 "NexPoint Repurchase Event," along with
23 Ms. Thedford and Mr. Surgent and Mr. Post, the
24 three most senior people in compliance, including
25 the chief compliance officer.

278

1  Q   Did Highland Capital Management have a
2  protocol for non -- for trades -- strike that.
3      Did Highland Capital Management have a
4  compliance review protocol for trades that were
5  not implicated by the Investment Advisors Act?
6      MS. SMITH:  Objection to form.
7      THE WITNESS:  I don't understand the
8  question.
9  BY MR. CLUBOK:
10     Q   There is a compliance process to
11 approve trades that you described, and I take it
12 that applied to any transaction involving a fund
13 that Highland was managing for outside investors?
14     A   Yes, and the 33 Act, 34 Act, 40 Act,
15 the RAA, other codified laws, SEC letter rulings,
16 etcetera.
17     Q   Okay, and do any of those rules or
18 compliance reviews under those rules apply to a
19 transaction between CDO Fund, SOHC, HFP on the one
20 hand and Sentinel Insurance on the other hand or
21 do you know?
22     A   I do not know.  That's a question for
23 Mr. Surgent and his staff.
24     Q   Was -- did -- was there a -- was there
25 a compliance process that was required to be

279

1  followed for CDO Funds during this timeframe?
2      A   Yes, for anything that's --
3          -- (overspeaking) --
4      MS. SMITH:  Objection to form.
5      THE WITNESS:  -- Highland and because
6  Highland, is my understanding, was the GP of that
7  entity, it would have been, like all funds,
8  governed by the same compliance process.  But
9  again, that's a question for Mr. Surgent and his
10 staff.
11     Q   Okay, so it would be Mr. Surgent who
12 would know whether or not the process for trades
13 out of CDO Fund, SOHC and HFP at the time, would
14 be subject to a compliance process that was
15 established?
16     A   Yes, and again my experience with
17 working with Mr. Surgent for 15 years, he was
18 incredibly diligent, incredibly careful CCO.
19     Q   Is Mr. Surgent honest?
20     A   In my opinion, yes.
21     Q   Does Mr. Surgent -- have you ever --
22 strike that.
23     Have you ever heard of him being
24 accused of being dishonest?
25     MS. SMITH:  Objection to form.

280

1      THE WITNESS:  I'm sure somebody's
2  accused him of being dishonest over the years.
3  BY MR. CLUBOK:
4      Q   Did he have a reputation for honesty
5  around Highland Capital Management?
6      A   I don't know what his reputation was,
7  but I would assume he did.
8      Q   Did you have a reputation for honesty
9  around Highland Capital Management?
10     A   I believe so.
11     Q   Did Isaac Leventon have a reputation
12 for honesty?
13     A   Yes.
14     MS. SMITH:  Now that we've established
15 everyone's honest, is now a good time for a break?
16 BY MR. CLUBOK:
17     Q   Almost.  Did Jim Dondero have a
18 reputation for honesty in the community, as far as
19 you know.
20     A   What community?
21     Q   The business world that he dealt in.
22     MS. SMITH:  Objection to form.
23     THE WITNESS:  I haven't run any polls;
24 I don't really know.
25 BY MR. CLUBOK:

281

1   Q   I understand.  We're talking about
2 reputation.  You certainly know and have
3 acknowledged in the past that Mr. Dondero did not
4 have a reputation for honesty, correct?
5   **A   I know that people --**
6       MS. SMITH:  Objection to do form.
7       THE WITNESS:  I know there's certain
8 people that have that belief, yes.
9       MR. CLUBOK:  Okay, let's take a break.
10      THE VIDEOGRAPHER:  We're going off the
11 record at 5:09 p.m.
12      (Recess taken 5:09 p.m. to 5:33 p.m.)
13      THE VIDEOGRAPHER:  We are going back on
14 the record at 5:34 p.m.
15 BY MR. CLUBOK:
16      Q   We've put up as an exhibit and it is a
17 cover letter from Leventon to Sevilla, dated
18 April 19th, 2017 with attachment "UBS settlement
19 structure, (9) and there's a PowerPoint.  You're
20 not copied on that email, but I believe you've
21 seen whether this version or different versions of
22 this document, it was a settlement analysis
23 between UBS vs Highland and it talks about, in the
24 first substantive page:  If Highland does not
25 settlement and UBS wins or Highland wins, bottom

282

1 line there's no upside going to trial in either
2 matter.
3      Do you recall this analysis that was done in
4 connection with the decision to purchase the ATE
5 policy?
6   **A   No.  I do not recall seeing this,**
7 **period, much less relative to the ATE policy.**
8 **BY MR. CLUBOK:**
9      Q   Okay, I'm going to flip through it?
10  **A   Okay.**
11      Q   And whether or not you saw this
12 specific version or there was like nine or ten
13 different ones, some with slightly different edits
14 but it talks about if Highland wins, it losses
15 because there's going to be a big tax liability.
16      It says if Highland doesn't settle, UBS
17 could appeal.
18      It says if Highland doesn't settle and
19 this was when CITI was still potentially in the
20 mix what would happen.  It says:  If Highland
21 Settles... Sentinel would control HFP/CDO Fund
22 assets currently $94 million.  See slide 10.
23 Sentinel and HCMLP can use HFP/CDO Fund assets to
24 generate cash to pay UBS settlement, $50 million
25 tax liability avoided.  Residual assets stay at

283

1 Sentinel.  Potential to repair UBS
2 distribution/relationship, etcetera.
3      Do you recall seeing this analysis,
4 even if it wasn't this exact version, something
5 like this?
6   **A   No, I don't.**
7      Q   It goes on and has a UBS settlement
8 structure.  Where step 1 was HFP/CDO Fund buy
9 $100 million ATE policy from Sentinel.  And the
10 premium is all the assets in HFP/CDO Fund; do you
11 see that?
12  **A   I do.**
13      Q   And then step 2, was going to be
14 negotiate settlement with UBS; do you see that?
15  **A   I do.**
16      Q   Are you aware of this settlement
17 structure that was being considered prior to the
18 purchase of the ATE policy?
19  **A   No.**
20      Q   You had no idea about this?
21  **A   I've never seen this.  To my**
22 **recollection, I've never seen this.**
23      Q   Did you know about the steps that are
24 outlined on the page -- it's slide 8.
25  **A   Do I know about these steps?  Obviously**

284

1 **I understand the steps, but I don't know who**
2 **drafted these or where they came up with these**
3 **steps.**
4      Q   Well, on slide 8 of Exhibit 47, there
5 is a plan that's entitled "UBS settlement
6 Structure Summary."
7   **A   Yep.**
8      Q   And it goes through step 1, HFC/CDO
9 buying a $100 million ATE policy from Sentinel.
10  **A   Yeah.**
11      Q   Then it continues to a conclusion where
12 "Sentinel keeps net assets (could be up to
13 $50 million).  Do you see that?
14  **A   I'm sorry, you broke up.  Are you**
15 **talking about the conclusion?**
16      Q   Yep.
17  **A   You already asked me that.  Yes.**
18      Q   There's step 1 through step 6 and then
19 the conclusion; do you see that?
20  **A   I do.**
21      Q   Did you know about this settlement
22 structure proposal in connection -- well, did you
23 know about this proposal?
24  **A   I've never seen this.  I didn't -- I**
25 **had no knowledge of this.**

285

1    Q    Even though you never saw this
2  document, did you know there was at some time a
3  plan that's consistent with what you see here on
4  page 8 of Exhibit 47?
5    **A    I certainly didn't know this was the**
6  **plan because I never saw this. I was never told**
7  **of this. I don't know who drafted it. I don't**
8  **know who the audience was. No idea.**
9    Q    Did you know that there was a plan to
10 buy $100 million ATE policy from Sentinel by HFP
11 and CDO Fund?
12      MS. SMITH: Objection to form.
13      THE WITNESS: I knew there was a plan
14 at some point to buy a policy from Sentinel by the
15 ultimate insureds. I didn't know what they were
16 paying for that policy.
17 BY MR. CLUBOK:
18    Q    And you know that it was ultimately a
19 $100 million policy that was purchased from
20 Sentinel; correct?
21   **A    I don't think I ever knew the policy**
22 **amount. I don't even know that I've ever seen the**
23 **policy.**
24   Q    You are a 30 percent owner in Sentinel
25 and you never knew what the policy amount was?

286

1      MS. SMITH: Objection to form.
2      THE WITNESS: I don't think I ever knew
3  the final policy amount, no.
4  BY MR. CLUBOK:
5    Q    Did you ever hear it being discussed as
6  being a roughly $100 million ATE policy?
7    **A    Best of my recollection it was a number**
8  **lower than that, but no, I never knew the final**
9  **amount.**
10   Q    What was the number, best of your
11 recollection, it was?
12   **A    I thought was around 80 million, but**
13 **obviously I was wrong.**
14   Q    All right. After the policy was
15 purchased -- well, strike that.
16      You know the policy was purchased
17 sometime in approximately August of 2017; correct?
18   **A    I knew that that was roughly the**
19 **timeframe, yes.**
20   Q    And by the way, you had a meeting with
21 CIMA about this policy two years later, right?
22   **A    I had a meeting with CIMA about the**
23 **litigation; not about this policy.**
24   Q    Well, you specifically discussed the
25 ATE policy during that 2019 meeting, isn't that

287

1  true?
2      MS. SMITH: Objection to form.
3      THE WITNESS: No, I didn't discuss
4  anything with CIMA because I don't think I spoke
5  in the meeting.
6  BY MR. CLUBOK:
7    Q    It was discussed in a meeting where you
8  were present with CIMA -- strike that, the ATE
9  policy was specifically discussed in a meeting
10 that you were present with the CIMA
11 representatives?
12   **A    It was generally discussed when Jan was**
13 **discussing the litigation.**
14   Q    There was actually a PowerPoint
15 presentation presented by your colleagues in that
16 meeting; isn't that true?
17   **A    I don't recall.**
18   Q    In any event, did you know that there
19 was a $100 million --
20      When is the first time that you learned
21 that the ATE was a $100 million face value?
22   **A    I don't remember.**
23   Q    How long ago?
24   **A    I don't know. A couple of years ago,**
25 **maybe longer.**

288

1    Q    Okay, so after the policy you found --
2  after the purchase and --
3    **A    I still don't recall it being**
4  **100 million. I thought it was less, but obviously**
5  **my memory is faulty with that.**
6    Q    Sorry, did you ever know it was
7  100 million?
8    **A    I can't recall.**
9    Q    All right. You knew that the premium
10 was going to equal all the assets in the HFP and
11 CDO Fund, correct?
12      MS. SMITH: Objection to form.
13      THE WITNESS: No, as I've testified
14 numerous times today, I don't know what was
15 finally transferred.
16 BY MR. CLUBOK:
17   Q    Well, you knew that the cash from all
18 those entities were transferred; correct?
19      MS. SMITH: Objection to form.
20      THE WITNESS: I did not know what was
21 transferred.
22 BY MR. CLUBOK:
23   Q    Okay, you knew that all of the cash
24 from CDO Fund was transferred as part of the
25 overall consideration for the ATE policy that was

289

1 purchase and sent to Sentinel; correct?
2    **A   Not true.  I don't know what was**
3 **transferred.**
4    Q   You certainly knew that all the cash
5 from the HFP -- strike that.
6       You knew that the all the cash in the
7 accounts associated with HFP was transferred to
8 Sentinel as part of a consideration for purchasing
9 the ATE policy in August of 2017, correct?
10       MS. SMITH:  Objection, asked and
11 answered.
12       THE WITNESS:  You can ask it 100
13 different ways.  I don't know what was transferred
14 from any entity to Sentinel as part of the premium
15 or all the premium or a subset of the premium.  I
16 don't know.
17 BY MR. CLUBOK:
18    Q   You were specifically told that all the
19 cash from these funds, HFP and CDO Fund was being
20 transferred to Sentinel as partial payment for the
21 policy, weren't you?
22       MS. SMITH:  Objection, form.
23       THE WITNESS:  No, I don't recall that.
24 BY MR. CLUBOK:
25    Q   Did you ever in words or substance,

290

1 discuss the concept of substantially all of the
2 assets in HFP and CDO Fund being transferred to
3 satisfy the premium for the ATE policy?
4    **A   I never had a discussion with anybody**
5 **about what's being transferred because I wasn't**
6 **involved with that process and had no knowledge of**
7 **what was FINALLY transferred.**
8 **BY MR. CLUBOK:**
9    Q   Were you responsible for ever reviewing
10 Sentinel's financial statements?
11    **A   No.**
12    Q   Did you ever look at any Sentinel
13 financial statement ever?
14    **A   Never.**
15    Q   Were you ever asked to weigh in on the
16 likelihood of UBS prevailing at trial, after the
17 issuance of the ATE policy, but before the result?
18    **A   By whom?**
19    Q   By anyone?
20    **A   I'm sure somebody asked me.**
21    Q   Who?
22    **A   I don't -- I don't recall who.**
23 **Mr. Dondero, I know, asked me several times.  I**
24 **can't tell you when.  I was asked one time by the**
25 **retail fund board out of curiosity they wanted to**

291

1 **know what was going on with the case, even though**
2 **they had no involvement.**
3    Q   You were -- there was a -- this
4 settlement analysis PowerPoint that I'm showing
5 you here, that's been marked -- this version of it
6 that's been marked as 47, isn't it true that you
7 tasked Isaac Leventon and Ms. Vitiello to prepare
8 this?
9       MS. SMITH:  Objection to form.
10       THE WITNESS:  Not that I remember.
11 BY MR. CLUBOK:
12    Q   Isn't it true that you had discussions
13 in April of 2017 and tasked them with preparing
14 the UBS settlement structure PowerPoint?
15    **A   Not that I recall and I don't recall**
16 **ever seeing this, so if I tasked them with it,**
17 **it's strange, they never sent it to me.**
18    Q   Who, on behalf of CDO Fund, negotiated
19 the terms of the ATE policy?
20    **A   I don't know.**
21    Q   Do you have any idea -- can you
22 identify a single human being who was tasked with
23 considering CDO Fund's interest in connection with
24 the purchase of the ATE policy?
25    **A   No idea.**

292

1    Q   Can you identify a single person who
2 was tasked with considering SOHC's interest in
3 connection with the purchase of the ATE policy?
4    **A   No, I cannot.**
5    Q   Can you identify a single person who
6 was tasked with considering Highland Financial
7 Partners or HFP's interest in connection with the
8 purchase of the ATE policy?
9    **A   No I cannot.**
10    Q   Did Mr. Dondero sign off on the ATE
11 policy purchase?
12       MS. SMITH:  Objection to form.
13       -- (overspeaking) --
14 BY MR. CLUBOK:
15    Q   Sorry, what's the form objection to
16 that?
17       MS. SMITH:  He's testified multiple
18 times that it's compliance that signed off on it.
19 BY MR. CLUBOK:
20    Q   Okay.  Scott, did Mr. Dondero approve
21 the purchase of the ATE policy?
22    **A   I don't know.**
23    Q   Do you know if Mr. Dondero knew about
24 the purchase of the ATE policy before it was
25 consummated?

293

1    A   Yes, I do.
2    Q   How do you know that?
3    A   I'm the one that told him. After
4  Surgent told me it was going through, I was
5  walking towards Mr. Dondero's office and said
6  Surgent told me it's going through.
7    Q   And had you -- and was that the last
8  time you had spoken to Mr. Dondero about the ATE
9  policy?
10   A   No, I think I spoke to him about it
11 infrequently after that, but it wasn't very often.
12   Q   What did he say since then about it?
13   A   Since when?
14   Q   Since that -- you just said that after
15 you saw Mr. Surgent and he said it's going to
16 through or whatever the words you used --
17   A   Yeah.
18   Q   I might have changed the words.
19   A   Yeah.
20   Q   And then you went to Mr. Dondero and
21 what were the exact words you said to him about
22 the ATE policy?
23   A   Surgent just told me that he greenlit
24 or approved, I don't remember what I said,
25 something to that effect, the ATE policy.

294

1    Q   And what did Mr. Dondero say?
2    A   I don't remember. I don't remember
3  exuberance or anything; it just seems like it was,
4  you know, due course.
5    Q   And then at some point after that -- at
6  various points after that you tried to talk
7  Mr. Dondero into settling the UBS litigation;
8  correct?
9    A   Many, many times.
10   Q   Did you ever remind him during those
11 discussions about the existence of the ATE policy
12 that could be used to help settle the case?
13   A   I don't remember specifically saying
14 that, but I mean that was a known fact. I didn't
15 know that I had to remind him.
16   Q   Well, did you ever generally raise or
17 remind him or -- strike that.
18       Did you ever generally bring up the
19 existence of the ATE policy that could help
20 facilitate a settlement you were trying to
21 convince him to enter into with UBS?
22   A   I don't recall specifically or
23 generally bringing it up after that time period.
24   Q   So, did you ever talk to Mr. Dondero
25 again about the ATE policy after that passing on

295

1  that Mr. Surgent -- what Mr. Surgent said to you
2  in the hallway?
3    A   I think I mentioned earlier today that
4  I remembered Mr. Dondero oddly asking me if it was
5  still in place a couple of years after it was put
6  in place.
7    Q   And that's the only conversation you
8  recall ever having with him?
9    A   That I remember with any kind of
10 specificity. I remember talking to him countless
11 times about trying to settle with you guys.
12   Q   How was it determined -- strike that.
13       Who negotiated with Sentinel on the
14 other side of Sentinel on behalf of any entity
15 that purchased price of the ATE policy?
16   A   I don't know.
17   Q   Who negotiated on behalf of Sentinel
18 the purchase for the ATE policy?
19   A   I don't know.
20   Q   Who negotiated on behalf of Sentinel,
21 any term in the policy?
22   A   I don't know.
23   Q   Who negotiated on behalf of any party
24 that had any connection to the ATE policy?
25   A   I had absolutely zero transparency to

296

1  that process. I don't know.
2    Q   Do you know who would know?
3    A   Directors of Sentinel.
4    Q   The only people who would know who
5  negotiated the terms of the ATE policy you can
6  think of are the independent directors of Sentinel
7  or all the directors of Sentinel?
8    A   Well, the independent directors, I
9  believe, were the only people that were the
10 directors at the time this was put in place and
11 I -- you had asked me who may know. I would
12 assume, being the directors, they would know, but
13 you asked me to speculate.
14   Q   Who were the independent directors at
15 the time that the policy was issued?
16   A   I don't recall.
17   Q   Does it ring a bell, Andrew Dean and
18 Christopher Watler?
19   A   Doesn't ring a bell. I want to say it
20 was people at Maples FS, but I could be wrong.
21   Q   Other than believing those two people
22 would know who negotiated the terms, is there
23 anybody else that you can think of in the world
24 who would know how -- how the terms -- strike
25 that. Would know anything about the negotiations

297

1  of the terms of the ATE policy other than --
2        -- (overspeaking) --
3      **A   Maybe Mr. Surgent. Since he was the**
4  **final approver of the transaction, maybe he knows.**
5      Q   All right.  And you think Mr. Surgent
6  might -- you think Mr. Surgent might know how the
7  price and other terms of the ATE policy were set?
8      **A   Potentially.  You know, again, you are**
9  **asking me to speculate.  I just I learned it**
10 was -- (inaudible).
11        -- (overspeaking) --
12     Q   Is there anybody that you would expect
13 in the legal department to know?
14       MS. SMITH:  Objection to form.
15       THE WITNESS:  I don't know.  I don't
16 know if it was done through counsel.  I don't know
17 if the firm retained counsel.  I just don't know
18 how it was done.  I literally have no idea.
19 BY MR. CLUBOK:
20     Q   So Mr. Leventon sent this email to JP
21 Sevilla in -- (overspeaking) -- of 2019 --
22       -- (overspeaking) --
23     **A   Yes.**
24     Q   -- 2017  This is several months before
25 the policy is purchased, right?

298

1      **A   Yes.**
2      Q   And in it he says that that the plan is
3  to buy a $100 million ATE policy.
4      **A   Correct.**
5      Q   And he said --
6      **A   And you said that "he said."  I don't**
7  **know that Mr. Leventon drafted this document.**
8      Q   Okay.  In the presentation that Mr.
9  Leventon forwards to JP Sevilla it states that
10 step one was for HFP and CDO Fund to buy
11 $100 million ATE policy from Sentinel, right?
12     **A   Correct.**
13     Q   And in fact $100 million ATE policy was
14 purchased from Sentinel; correct?
15     **A   I'll take your word for it.  I'd have**
16 **to look at the policy to tell you the amount, but**
17 **if that's what you say it is, okay.**
18     Q   And Mr. Leventon, in this email -- in
19 the document that he sends to Mr. Sevilla, also --
20 strike that.
21       In the document that Mr. Leventon sends
22 to Sevilla, it also anticipates that the premium
23 for the ATE policy will be all the assets in HFP
24 and CDO Fund, right?
25       MS. SMITH:  Objection to form.

299

1        -- (overspeaking) --
2        THE WITNESS:  -- sorry, in the
3  structure summary, yes.
4  BY MR. CLUBOK:
5      Q   And, in fact, the premium did turn out
6  to be all or virtually all of the assets in HFP
7  and CDO Fund, correct?
8        MS. SMITH:  Objection to form.
9        THE WITNESS:  I just don't know.
10 BY MR. CLUBOK:
11     Q   Did you ever make any effort to
12 consider whether or not HFP and CDO Fund would
13 retain the sufficient ability to satisfy a future
14 judgment that might be awarded against them by --
15 in favor of UBS?
16       MS. SMITH:  Objection to form.
17       THE WITNESS:  No, that was a process
18 that compliance ran.  I was not part of that
19 process.
20 BY MR. CLUBOK:
21     Q   Compliance ran a process specifically
22 to consider what ability HFP would have to satisfy
23 a potential future judgment in UBS's favor?
24     **A   Compliance ran the process of approving**
25 **this transaction, which I'm assuming would be the**

300

1  analysis of that.
2      **I certainly didn't do that analysis nor**
3  **would I have the skills to analyze what these**
4  **securities would be worth at some point in the**
5  **future.**
6  **BY MR. CLUBOK:**
7      Q   Did you ever test -- do you have any
8  idea what the total assets in HFP and CDO Funds
9  were worth at the time of the ATE transaction?
10     **A   No idea.**
11     Q   Do you have any idea if there was a --
12 strike that.
13       Do you know what the premium was for
14 the policy?
15     **A   No, I don't.  I'd have to look at the**
16 **policy.**
17     Q   Do you have any idea if the assets that
18 were used to purchase the policy were a fair
19 equivalent value for the amount of premium that
20 was due to pay for the policy?
21       MS. SMITH:  Objection, calls for a
22 legal conclusion.
23       THE WITNESS:  No, I didn't have the
24 skills to analyze that.
25 BY MR. CLUBOK:

301

1    Q   Did you ask anyone to specifically look
2  into the question of whether or not the assets
3  that were being used to purchase the ATE policy
4  represented fair value for the purchase of the
5  policy?
6    **A   No, again, that would be part of, I**
7  **would assume, compliance's process and not my job.**
8    Q   And do you know -- you say you would
9  assume, but did you do anything to determine
10  whether or not a analysis had been run to see if
11  the assets being transferred to Sentinel were fair
12  value in light of the policy that was obtained in
13  exchange?
14    **A   No and, again, because of SEC guidance**
15  **that's not my position or right or obligation or,**
16  **by design, I'm not supposed to be there asking**
17  **those questions.**
18    Q   SEC -- what SEC guidance prohibits you
19  from engaging in an analysis as to whether or not
20  that transaction constituted a fraudulent
21  transfer?
22    **A   It's supposed to be the sole**
23  **responsibility of compliance and not due to**
24  **outside influence.**
25    Q   What SEC guidance says that?

302

1    **A   You'd have to ask Mr. Surgent. I've**
2  **been told that 20 times. Compliance deals with an**
3  **arbiter. Then they do their analysis, their own**
4  **due diligence and they come to a determination.**
5  **If they want information from me, they come and**
6  **ask me for it.**
7    Q   You were told 20 times by Mr. Surgent
8  that SEC guidance prohibited you from considering
9  whether or not the ATE transaction constituted a
10  fraudulent transfer?
11    **A   No, Andy, you asked me if I went and**
12  **asked anybody to perform that analysis.**
13    **SEC guidance, to my understanding, that**
14  **that is solely the responsibility of compliance**
15  **and others don't go and do their own analysis.**
16    Q   No, my specific question was: You said
17  that there was SEC guidance that you were told 20
18  times, that supposedly prohibited you from
19  engaging in an analysis of whether or not a
20  transaction like the one involving the ATE policy
21  constituted a fraudulent transfer?
22    **A   Solely responsibility of compliance, it**
23  **is not me to generate that analysis.**
24    Q   And you are saying that you were told
25  by Mr. Surgent that there is SEC guidance that

303

1  specifically prohibited you from engaging in a
2  fraudulent transfer analysis with respect to the
3  ATE policy?
4    **A   No, from me interfering in the process**
5  **he runs as the Chief Compliance Officer, so if I**
6  **was going to get my own analysis that, by**
7  **definition, is interfering.**
8    Q   Okay, I want to be very specific in the
9  question that you are answering, okay.
10    I asked -- you said -- I specifically
11  want to ask you about an analysis of a transaction
12  like the one that was done to purchase the ATE
13  policy with respect to whether or not it
14  constitutes a fraudulent transfer.
15    And my question is whether you were
16  ever told, in words or substance, that SEC
17  guidance prohibited you as the general counsel
18  from considering that question?
19    **A   Yes, solely compliance. You can ask it**
20  **a thousand times. Solely compliance.**
21    Q   Okay, and Mr. Surgent told you that
22  there was such SEC guidance.
23    **A   Mr. Surgent told everyone compliance**
24  **runs their own process. If they want knowledge**
25  **from you or analysis from you, they'll come and**

304

1  ask you.
2    Q   Do you know anything more specific
3  about what Surgent supposedly told you about this
4  supposed SEC guidance?
5    MS. SMITH:  Objection to form.
6    THE WITNESS:  You need to ask Mr.
7  Surgent.
8  BY MR. CLUBOK:
9    Q   No, I'm asking if you know anything
10  more -- if you can say anything more specific
11  about what Mr. Surgent supposedly told you, other
12  than what you've just said?
13    **A   When Mr. Surgent --**
14    MS. SMITH:  Objection to form.
15    THE WITNESS:  When Mr. Surgent defined
16  a process that had to do with compliance, I
17  adhered to what he said.
18  BY MR. CLUBOK:
19    Q   Move to strike as nonresponsive.
20    I am just asking: Did he tell you
21  anything more specific about the supposed SEC
22  guidance that you've described, other than what
23  you've --
24    **A   No.**
25    Q   -- testified here?

305

1      A   No.  He didn't given training seminars
2   on SEC guidance.
3      Q   Did you have any idea of the rough
4   value of the assets in CDO Fund and SOHC, and HFP
5   at that time frame?
6          MS. SMITH:  Objection to form.
7          THE WITNESS:  No.
8   BY MR. CLUBOK:
9      Q   Have you ever known about the value of
10  the assets in HFP since -- strike that.
11         At some point HFP was declared
12  insolvent; right?
13     A   I don't know.
14     Q   You'd know that there was an insolvency
15  letter sent with respect to HFP, right?
16         MS. SMITH:  Objection to form.
17         THE WITNESS:  I don't know what letters
18  were sent to the investors of HFP.
19  BY MR. CLUBOK:
20     Q   You knew that HFP had been -- had told
21  its investors that was insolvent, correct?
22     A   No, I don't know what it told its
23  investors.  I'm not an HFP investor.
24     Q   You knew that there would be tax
25  consequences if it turned out that HFP were

306

1   solvent because it were to -- strike that.
2          You specifically knew that if HFP were
3   to prevail against UBS and retain assets after
4   2016 that it would create a tax liability for
5   Mr. Dondero and others, correct?
6          MS. SMITH:  Objection to form.
7          THE WITNESS:  I knew that generally,
8   yes.
9   BY MR. CLUBOK:
10     Q   And you knew that because you
11  understood in HFP that all those investors,
12  including Mr. Dondero had taken what was called a
13  worthless stock deduction with respect to their
14  interest in HFP; correct?
15         MS. SMITH:  Objection to form.
16         THE WITNESS:  I don't know what
17  deductions they took.
18  BY MR. CLUBOK:
19     Q   Okay, you knew that there had been
20  deductions taken by Mr. Dondero and others
21  including yourself, I believe, with respect to the
22  supposed worthlessness of their investment
23  interest in HFP; right?
24         MS. SMITH:  Objection to form.
25         THE WITNESS:  I would only know about

307

1   myself and I was never an investor in HFP and
2   never took the deduction with them.
3   BY MR. CLUBOK:
4      Q   No, you specifically in settlement
5   discussions mentioned that you knew that HFP had
6   been declared insolvent and that they would have
7   tax liability if there were assets left after the
8   UBS litigation; isn't that true?
9      A   Oh, absolutely.  I informed you that I
10  had been told, that there were people that took
11  tax deductions, and if HFP had value past some
12  date certain it would unwind those tax deductions.
13         What you asked me if I knew -- if I
14  knew a letter was sent to those investors, of what
15  deductions they took, I have no knowledge of any
16  of that.
17     Q   Did you ever tell Mr. Seery or the
18  Pachulski firm anything about the likelihood that
19  SOHC would be proven to have been insolvent?
20     A   No, I don't remember having that
21  discussion with Mr. Seery or Pachulski, no.
22     Q   Did you know that a position was taken
23  by the debtor in the bankruptcy court, that
24  suggested that there was uncertainty as to whether
25  or not insolvency could be proven with respect to

308

1   HFP, SOHC and CDO Fund?
2      A   I don't know what the debtor decided to
3   make a determination of those entities.  I know
4   they did their own analysis.
5      Q   Did you ever provide any information to
6   assist debtor's counsel to determine whether or
7   not UBS would be likely able to show insolvency
8   with respect to HFP, CDO Fund and SOHC?
9      A   Me personally, no.  I believe they did
10  an evidence and document-based search and did
11  their own analysis is my understanding.
12     Q   Did you ever explain to anyone your
13  knowledge with respect to the worth -- did you
14  ever explain to anyone your knowledge about the
15  tax deductions that had been taken with respect to
16  SOHC and HFP and CDO?
17         MS. SMITH:  Objection to form.
18         THE WITNESS:  I remember telling Mr.
19  Seery what I discussed with you in settlement
20  discussions prior to Mr. Seery's involvement, that
21  various individuals, including Mr. Dondero had
22  taken these tax deductions, and that I understood
23  that -- and again this was just told to me, that
24  if there was value after a date certain, that it
25  could jeopardize those tax deductions.

---

**309**

1 BY MR. CLUBOK:
2　　Q　Did you ever tell Mr. Seery that HFP,
3 CDO Fund and SOHC were ghost funds?
4　　　　MS. SMITH: Objection to form.
5　　　　THE WITNESS: Well, that's namesake
6 that the offshore community uses with funds with
7 no directors so, yes, I told him that.
8 BY MR. CLUBOK:
9　　Q　You told him that because they had no
10 directors. Did you ever tell them -- strike that.
11　　　　Do you know whether or not the ATE
12 policy would be considered an asset of the
13 insureds?
14　　A　I have no idea. I don't know -- I
15 don't have any training in how to assess that.
16　　Q　Did you make any effort to get an
17 answer to whether or not the ATE policy could be
18 considered an asset of the insureds?
19　　　　MS. SMITH: Objection to form.
20　　　　THE WITNESS: No.
21 BY MR. CLUBOK:
22　　Q　Let's look at Exhibit 2. It is a
23 seven-page document entitled "Purchase Agreement
24 dated August 7th, 2017."
25　　　　Have you ever seen this document

---

**310**

1 before?
2　　　　MS. SMITH: Objection, asked and
3 answered.
4　　　　THE WITNESS: I don't believe I have.
5 BY MR. CLUBOK:
6　　Q　You see on the third page where
7 Mr. Dondero signs on behalf of CDO Fund, CDO
8 HoldCo, SOHC and CDO Opportunity Master Fund?
9　　A　CDO master, opportunity -- yes I do.
10　　Q　And do you see where he also signed on
11 behalf of the next page, HFC and HFP?
12　　A　Yes.
13　　Q　And did Mr. Dondero negotiate the terms
14 of all of these entities?
15　　A　I don't know.
16　　Q　Did you advise Mr. Dondero on behalf of
17 any of these entities that he signed on behalf of?
18　　A　No.
19　　Q　Did you act in any way on behalf of any
20 of these entities that Mr. Dondero signed his name
21 on behalf of?
22　　A　No, I was not involved in this process
23 at all.
24　　Q　Can you identify a single human being
25 from the Highland organization who acted on behalf

---

**311**

1 of any of the entities for which Mr. Dondero
2 signed his name to this agreement?
3　　　　MS. SMITH: I'm sorry, Andy, can you
4 repeat the question? You kind of went out on me.
5 I'm sorry.
6 BY MR. CLUBOK:
7　　Q　No problem. Mr. Ellington, can you
8 identify a single human being from anywhere in the
9 Highland organization, who acted on behalf of any
10 of the entities for which Mr. Dondero signed his
11 name to this agreement?
12　　A　I was not involved in this process.
13 I had no transparency in the process and the
14 answer is no.
15　　Q　And sorry, you said you'd never seen
16 this before today?
17　　A　I said I don't recall seeing it. I
18 don't believe I ever have.
19　　Q　If you take a look at Schedule A, you
20 see all the assets listed.
21　　A　I'm sorry, take a look at what?
22　　Q　Schedule A.
23　　A　Yes, Schedule A, sorry.
24　　Q　You see where it lists assets of the
25 various entities.

---

**312**

1　　A　I do.
2　　Q　Including cash in some cases.
3　　A　Yes.
4　　Q　Did you know that all these assets were
5 consideration for the purchase agreement?
6　　A　I see that now.
7　　　　MS. SMITH: Objection, calls for legal
8 conclusion.
9　　　　THE WITNESS: I mean, I see it in the
10 document. Obviously, I knew there was some assets
11 as part of a premium, but these specific assets,
12 I had zero knowledge of these specific assets.
13 BY MR. CLUBOK:
14　　Q　Remember the settlement document that I
15 showed you earlier?
16　　A　The what document?
17　　Q　The settlement structure document that
18 I showed you earlier.
19　　A　Oh, the PowerPoint presentation?
20　　Q　Yeah.
21　　A　Yes.
22　　Q　Was there any version of that that you
23 ever told -- strike that.
24　　　　Did you ever have a discussion with
25 Stephanie Vitiello about any UBS settlement

---

313

1 structure in April of 2017, around the time of
2 that document?
3 **A   Not that I recall, no.**
4     Q   Let's show you what's behind tab 24.  I
5 don't think you have this and we'll call it
6 whatever the next exhibit is.  Could you put that
7 up.
8         What's the number, Shannon?
9         (Deposition Exhibit 88 was marked for
10 identification.)
11 BY MR. CLUBOK:
12     Q   So Exhibit 88 is an email from
13 Stephanie Vitiello to Isaac Leventon.  Previously
14 we showed you a document that had been marked
15 as -- that had a UBS settlement structure.
16         I think it was like version 9 at that
17 point.
18         This one which is a few days earlier,
19 it says, "UBS settlement structure (SV) maybe that
20 stands for Stephanie Vitiello.
21         And it says: "Thanks for sending.
22 Based on our discussion with Scott, I started
23 updating the first few slides.  I will be in by 8
24 tomorrow so we can edit before we meet with Scott
25 if you would like."

314

1         MS. SMITH:  Objection.  I would like a
2 copy of the exhibit before you start questioning
3 him and giving him...
4 BY MR. CLUBOK:
5     Q   Yeah, sorry, do you have any -- does
6 this refresh your recollection that you had
7 discussions with Stephanie and Isaac about a UBS
8 settlement structure in April of 2017?
9     **A   No.**
10     Q   Do you recall ever discussing with them
11 a plan to start a new company to issue the ATE
12 policy?
13         MS. SMITH:  Objection as to form.  I'd
14 like to see the exhibit, please.
15 BY MR. CLUBOK:
16     Q   Do you recall ever discussing with them
17 a plan to start a new company to issue the ATE
18 policy?
19     **A   No.**
20     Q   Do you consider yourself to have a good
21 memory?
22     **A   Depends.**
23     Q   Do you consider yourself to have a good
24 memory?
25     **A   It depends on what we're talking about**

315

1 **and how long ago, but I have a pretty good memory.**
2     Q   Do you remember less than an hour ago
3 when I asked you if you were ever told that cash
4 was transferred from HFP funds and CDO Funds to
5 Sentinel with respect to the ATE policy?
6     **A   I do.**
7     Q   Do you remember saying that you're
8 certain you never knew that?
9     **A   That's not what I said.  I said I don't**
10 **recall.**
11     Q   Okay, I'm going to -- I'm going to show
12 you what's been marked as Exhibit 89, which is
13 behind tab 30.
14         (Deposition Exhibit 89 was marked for
15 identification.)
16 BY MR. CLUBOK:
17     Q   This is a one-page document that starts
18 with Katie Irving sending an email to Carter Chism
19 and JP Sevilla with the subject "Sentinel wiring
20 info." That gets forwarded by Carter Chism to a
21 number of people and JP Sevilla then forwards it
22 to you.
23     **A   Okay.**
24     Q   And we'll have it up here in a second.
25         It's Exhibit 89.  I am going to make it

316

1 bigger here in a second, if Nate let's me.  That
2 is probably too big.
3         I'll go down to the bottom email in the
4 chain.  As I mentioned, it is wiring instructions.
5         It says: "Sentinel wire instructions
6 for cash arising from transaction below."
7         And it's the subject of Sentinel wiring
8 info and it's dated August 11, 2017.  Do you see
9 that?
10     **A   I do.**
11     Q   And then there's an email that Carter
12 sends to a bunch of people not including you and
13 it says:
14         "Please confirm this serves as instruction
15 to wire cash from all HFP funds and all CDO Funds
16 to the account listed in the instructions below."
17 Referencing it's Sentinel.
18         Do you see that?
19     **A   I do.**
20     Q   And this is money that's all wired to
21 Bank of New York Mellon; correct?
22     **A   That's what it looks like, yes.**
23     Q   And the account name is MaplesFS
24 Limited.
25     **A   Correct.**

317

1    Q   And it is for Sentinel reinsurance
2   Limited, correct?
3    A   Correct.
4    Q   And that is all the cash from HFP funds
5   and all CDO Funds, according to this, correct?
6       MS. SMITH:  Objection to form.
7       THE WITNESS:  No, it actually says:
8   "Please confirm this serves as instructions to
9   wire cash from all (the funds) and all CDO Funds."
10  BY MR. CLUBOK:
11   Q   Okay.
12   A   Also you've asked me over and over if
13  Mr. Surgent knew that Sentinel involved in the
14  transaction; he's on this email.
15  BY MR. CLUBOK:
16   Q   Right.
17   A   And he didn't know if it was Sentinel.
18  That clears that up.
19   Q   And then this email's forwarded to you
20  by JP Sevilla and it says "FYI," do you see that?
21   A   I did.
22   Q   You just started shouting a little
23  bit --
24   A   I didn't shout; I was speaking.
25   Q   Well, we have an audio, so we'll see

318

1   that you raised your voice there.
2    A   I also leaned in closer to the
3   microphone, maybe that was the issue.
4    Q   Yeah, well this confirmed the
5   instruction to wire cash from all HFP funds and
6   all CDO Funds; do you see that?
7    A   Yeah, I see that.
8    Q   And it's sent to you, so you certainly
9   were aware of that, correct?
10   A   I was aware of it?  I don't even know
11  that I read it.
12      MS. SMITH:  Objection, that
13  mischaracterizes this.  That first email was not
14  sent to him.
15      THE WITNESS:  Also you asked me if I
16  knew all the cash was sent and that's not even
17  what this email said.  Wire cash from all HFP
18  funds and all CDO.
19  BY MR. CLUBOK:
20   Q   Right, first of all --
21   A   There's no schedule of what was
22  said.  It doesn't say "all the cash" so you
23  mischaracterized or your question was different.
24   Q   Okay.
25   A   And, again, Mr. Surgent is on this

319

1   before I am, and Cliff Stoops and Frank Waterhouse
2   and many others.
3    Q   Right.  Is there a -- all right.
4    A   It also says "wiring info," if you
5   noticed that.
6       It doesn't say anything -- unless you
7   read down in the chain of what is being wired, so
8   I highly doubt if I saw "Sentinel wiring info"
9   that I would go and ... (inaudible) into what I
10  received.  I don't remember this at all.
11   Q   Right, so you get this email that says
12  "Privileged and Confidential, Sentinel wiring
13  info."
14   A   Yes.
15   Q   And scrolling down just a little bit it
16  says:
17      "Please confirm this serves as instruction
18  to wire cash from all HFP funds and all CDO Funds
19  to the account listed in the instructions below."
20      It's not a long email; it's one sentence
21  under a subject that says in big bold caps,
22  "Privileged and confidential" and then says in
23  bold "Sentinel wiring info."
24   A   It's not one sentence.  It is further
25  on in the chain and it supposedly has an

320

1   attachment and furthermore, I got at this time
2   period, between 400 and 500 emails a day, so when
3   I saw something that is wiring info and, again,
4   you kept asking, I knew, I knew, all the cash,
5   that's not even what this says.  This is wire
6   cash.  That could be $5.  I don't know.  There's
7   nothing on this email that even says how much cash
8   is being sent.
9    Q   Looking at this email, it's forwarded
10  to you and it says FYI.
11      Then there is an email that is
12  forwarded to you that has one sentence that says,
13  "Please confirm" etc; isn't that true?
14   A   That is not true because then there's
15  from Katie Irving.
16   Q   Sorry -- just --
17      -- (overspeaking) --
18   A   Chism and JP Sevilla was on the same
19  chain.  And it is "Sentinel wiring instructions
20  from cash arising from transaction..."  Doesn't
21  say what transaction.  "...are below, thank you."
22      So, no, what you're saying is not true.
23   Q   Right, but the -- I'm sorry, when you
24  are forwarded an email that has one sentence that
25  says, "Confirm this serves as instructions to wire

321

1 cash from all HFP funds and all CDO Funds
2 etcetera..."
3      Then if you scroll down, you see that
4 it's Sentinel wiring info and simply the
5 instructions for how to wire the money to
6 Sentinel.
7      That's the entirety of the substance of
8 this email.
9    A   Totally agree.  It doesn't have an
10 amount of what was wired or anything or cash -- I
11 don't know if they said $100 or I don't know if
12 they sent it all.  It is completely
13 non-informative of what's being sent, other than
14 cash, generally.
15    Q   You were well aware that there was a
16 plan to transfer virtually all of the assets from
17 CDO Fund and SOHC and HFP to Sentinel with respect
18 to the ATE policy; isn't that true?
19    A   No, I do not know what was transferred.
20 I do not know what was contemplated to be
21 transferred in the process.
22    Q   Okay.
23    A   As you can tell, when the mechanics
24 were being put here, I'm not included by anyone.
25 JP decides to send me an FYI, which certainly

322

1 doesn't say I need to take action or approve
2 anything.
3    Q   You are the 30 percent -- you own
4 30 percent of the economic interest of whatever
5 cash was transferred to Sentinel; correct?
6    A   Of the ultimate beneficial ownership
7 of entities I'm associated with.
8    Q   Have you ever received any compensation
9 in any form from Sentinel?
10    A   No.
11    Q   Have you ever had a valuation done of
12 Sentinel since the one we looked at?
13    A   No.
14    Q   You are aware that one of the interests
15 that was transferred from CDO Fund to Sentinel in
16 August 2017 to pay for the insurance policy, was
17 its interest in a Multi Strat fund?
18       MS. SMITH:  Objection to form.
19       THE WITNESS:  No, I don't know what was
20 transferred.
21 BY MR. CLUBOK:
22    Q   You know that there was a redemption
23 purportedly by Sentinel with respect to Multi
24 Strat; correct?
25       MS. SMITH:  Objection to form.

323

1       THE WITNESS:  I do.
2 BY MR. CLUBOK:
3    Q   And Mr. Dondero knew about this too,
4 right?
5       MS. SMITH:  Objection to form.
6       THE WITNESS:  Mr. Dondero knew about
7 what?
8 BY MR. CLUBOK:
9    Q   Mr. Dondero knew that Sentinel had
10 tried to redeem an interest in Multi Strat;
11 correct?
12    A   I don't know what Mr. Dondero knew and
13 when he knew it?
14    Q   Did you ever refer to the interest in
15 Multi Strat being owned by SAS, as opposed to
16 Sentinel in any document, internally?
17    A   I'm sorry, you broke up.  Did I ever
18 what?
19    Q   Do you know if at Highland it was ever
20 record recorded that the interest in Multi Strat
21 with respect to Sentinel was identified as being
22 with respect to SAS?
23    A   No, not that I'm aware of.
24    Q   Would that be a mistake if it was
25 listed that way?

324

1    A   I believe it would be a mistake because
2 SAS certainly never owned it to my knowledge.
3    Q   Do you know anything about -- well,
4 does Sentinel today own any interest in Multi
5 Strat, as far as you know?
6    A   I don't know what Sentinel owns in
7 Multi Strat today.
8    Q   So, you have no idea one way or the
9 other as to whether Sentinel has any right to any
10 redemption interest it may have claimed with
11 respect to Multi Strat, correct?
12       MS. SMITH:  Objection to form.
13       THE WITNESS:  I have no opinion, one
14 way or the other.  I don't know what Sentinel
15 owns, that redemption right as to Multi Strat.
16 BY MR. CLUBOK:
17    Q   You had Mr. Leventon working -- strike
18 that.
19       Did you ever tell Isaac Leventon that
20 the ATE policy was Mr. Dondero's idea?
21    A   Not that I recall, no.
22    Q   Did you ever -- in July of 2020, do you
23 recall a time when you and Mr. Leventon were
24 involved with supposedly trying to find
25 information about the assets of HFP, CDO Fund and

325

1    SOHC?
2        A   Yes.
3        MS. SMITH:  Objection to form.
4    BY MR. CLUBOK:
5        Q   And at that time did you discuss the
6    ATE policy with Isaac Leventon as to whether or
7    not it would be relevant to the -- to that task?
8        A   Not that I recall.
9        Q   Did you and Isaac Leventon do
10   everything you possibly could to create a true and
11   accurate document-based record of what happened at
12   HFP, SHOC and CDO Fund with respect to their
13   assets since 2009?
14       MS. SMITH:  Objection to form.
15       THE WITNESS:  We did everything we
16   could to fulfill the request of DSI, Pachulski,
17   Mr. Seery, etcetera as defined to us.
18   BY MR. CLUBOK:
19       Q   Please listen to my question and answer
20   my question and not yours.
21       Is it true that you and Mr. Leventon
22   did everything you could do to create a true and
23   accurate document-based record of what happened at
24   HFP, SOHC and CDO Fund?
25       MS. SMITH:  Objection to form, asked

326

1    and answered.
2        THE WITNESS:  As we were tasked, yes.
3    BY MR. CLUBOK:
4        Q   Did you ever speak to Dondero about how
5    to spend Sentinel's cash when it had cash
6    available?
7        A   No.
8        Q   Did you craft the ATE policy?
9        A   No.
10       MS. SMITH:  Objection to form.
11   BY MR. CLUBOK:
12       Q   Did you describe the ATE policy fully
13   to Mr. Dondero?
14       A   What do you mean by that?
15       Q   Did you explain the ATE policy in any
16   detail to Mr. Dondero?
17       A   No, because I didn't know the detail of
18   the ATE policy.
19       Q   Did you make any efforts to get the ATE
20   policy through the compliance process?
21       A   No.
22       MS. SMITH:  Objection to form.
23   BY MR. CLUBOK:
24       Q   Can you answer the question, please?
25       A   No.

327

1        Q   Were you responsible for managing
2    Sentinel reinsurance and monitoring it?
3        A   Managing its portfolio?
4        Q   Let's break that down.  Were you
5    responsible -- strike that.
6        Were you responsible for monitoring
7    Sentinel reinsurance for you and Mr. Dondero?
8        A   No.
9        Q   Were you responsible for managing
10   Sentinel reinsurance in any way?
11       A   No.
12       Q   Did you negotiate on behalf of HFP with
13   respect to the purchase agreement that I showed
14   you?
15       A   No, I was not involved in the purchase
16   agreement at all.
17       Q   Did you ever direct SOHC's legal
18   strategy?
19       A   Objection to form.
20       MS. SMITH:  Objection to form.
21       THE WITNESS:  No.
22   BY MR. CLUBOK:
23       Q   After Sentinel reinsurance sold the ATE
24   policy, did you ever -- did Sentinel ever direct
25   the legal strategy of the insureds?

328

1        A   Of the insureds?  That would have been
2    coming from the directors.  I don't know what they
3    did.
4        Q   Did you provide any legal advice with
5    respect to the Sentinel transaction?
6        A   No.
7        Q   Did you give any advice on behalf of
8    HCM in any way, in connection with the Sentinel
9    transaction?
10       A   No, I wasn't involved in the process
11   other than the idea.
12       Q   Did you give legal advice any party
13   at all with respect to the Sentinel transaction?
14       A   No, other than the idea and the initial
15   couple, three meetings, I wasn't involved.
16       Q   Were there any lawyers that you are
17   aware of who gave advice with respect to the
18   Sentinel transaction?
19       A   I don't know because I wasn't involved.
20       Q   Mr. Surgent is not a lawyer; correct?
21       A   Mr. Surgent is a lawyer.
22       Q   Oh, Mr. Surgent is a lawyer.  Was Mr.
23   Surgent giving legal advice in his role as chief
24   of compliance?
25       A   I don't know what Mr. Surgent was doing

329

1  because I wasn't privy to what he was doing.
2      Q   Okay, I'm going to show you what's been
3  marked as Exhibit 82. It's tab 36. And I just
4  want to show you the third page of the document
5  which is an attachment to the cover email and just
6  see if you recognize it.
7          That one you should have, I hope.
8      A   Yes, I do have it.
9      Q   And you will see the attachment is a
10 request for redemption of shares, sent by Multi
11 Strategy Credit Fund, care of SEI Investments,
12 which we talked about earlier and it purports to
13 redeem all the Sentinel's reinsurance business in
14 Multi Strat; do you see that?
15     A   I'm sorry, which page?
16     Q   It's the third page of Exhibit 82.
17 It's the attachment to the email. It's a document
18 that's got some handwriting on it and it says
19 "Request for Redemption of Shares." Do you see
20 that?
21     A   Yes, I do see it. Sorry; they were
22 stuck together.
23     Q   And have you ever seen this before?
24     A   I do not believe I have.
25     Q   Do you see that it's not signed, if you

330

1  go to the next two pages. There's no signatures
2  at all.
3      A   Yes, I do.
4      Q   Do you know whose handwriting that is?
5      A   I do not.
6      Q   Do you know whether Sentinel ever
7  redeemed its -- tried to redeem its interest, if
8  any, in Multi Strat?
9          MS. SMITH: Object to the form.
10         THE WITNESS: I believe that it did.
11 BY MR. CLUBOK:
12     Q   Why do you believe that, on what basis?
13     A   Because I think it was listed as a
14 redeemer at some point.
15         I think I saw on a table or something
16 it was listed as a redeemer.
17     Q   You saw on a table that Sentinel was
18 listed as a redeemer of Multi Strat.
19     A   I recall that, but I don't have
20 certainty of where I saw it, but I thought maybe I
21 was told they were a redeemer.
22     Q   Sorry, you say you saw a document or
23 you were told; which is it?
24     A   I'm sorry, Andy, I don't remember.
25     Q   And was this while you were still

331

1  working for Highland, you mean?
2      A   Yes.
3      Q   And you don't remember anything else at
4  all about that?
5      A   No.
6      Q   Do you remember who told you?
7      A   No.
8      Q   Do you remember who you ever discussed
9  that issue with, if anyone?
10     A   I don't remember discussing it with
11 anyone?
12     Q   Where -- who made the recommendation to
13 the directors to purchase the ATE policy, as far
14 as you know?
15         MS. SMITH: Objection to form.
16 BY MR. CLUBOK:
17     Q   I'm sorry, who made the recommendation
18 to the directors of Sentinel to issue the ATE
19 policy, if you know?
20     A   Don't know.
21         MS. SMITH: Andy, I don't know about
22 the witness, but I would like to take a break.
23 BY MR. CLUBOK:
24     Q   Sure, we're getting pretty close to the
25 end so this is a good time to take a break and I

332

1  will try to look through my notes and we'll come
2  back for one final session.
3      A   How long a break?
4          MR. CLUBOK: Well, let's make it 15
5  minutes and then we'll come back in 15 minutes, if
6  that's enough time.
7          MS. SMITH: Fine. 5:45.
8          MR. CLUBOK: And then we'll call it a
9  day after that.
10         THE WITNESS: Perfect. Thank you.
11         THE VIDEOGRAPHER: We're going off
12 record at 6:30 p.m. Eastern Time.
13         (Break taken from 6:30 p.m. to 6:48
14 p.m.)
15         MR. CLUBOK: Next Exhibit is 90. And
16 the next exhibit will be 38, tab 34.
17         (Deposition Exhibit 90 was marked for
18 identification.)
19         THE VIDEOGRAPHER: One moment please.
20 We're going back on the record at 6:48 p.m.
21 BY MR. CLUBOK:
22     Q   Mr. Ellington, I've got up on the --
23 strike that, Mr. Ellington we're looking at
24 Exhibit 38, which is asset transfer agreement
25 dated December 31st 2019; do you see that?

**333**

1    A  I do.
2    Q  And December 31st, 2019 was after the
3  bankruptcy had already started, right?
4    A  Yes.
5    Q  And after the bankruptcy there's an
6  asset transfer agreement between Sentinel
7  Reinsurance and an entity called Sebastian Clarke;
8  do you see that?
9    A  I do.
10    Q  And you -- were you aware of this
11  transaction?
12    A  No, I was not aware of this transaction
13  that I recall.
14    Q  Well, turn to the last page. Do you
15  see where it's signed by Matt DiOrio on behalf of
16  Sentinel Reinsurance?
17    A  I do.
18    Q  And how come Matt DiOrio signed this,
19  as opposed to any of the independent directors?
20    A  You broke up Andy, how come what?
21    Q  Why did Matt DiOrio sign this as
22  opposed to any of the independent directors.
23    A  I don't (inaudible)...
24    Q  What's that?
25    A  I don't know.

**334**

1    Q  Did you run this transaction by anyone
2  at compliance?
3        MS. SMITH: Objection to form.
4        THE WITNESS: Not that I'm aware of.
5  BY MR. CLUBOK:
6    Q  Sebastian Clarke is an entity that you
7  have beneficial ownership interest in, correct?
8        MS. SMITH: Objection to form.
9        THE WITNESS: I would have to see the
10  documents dated as at the time period 31 December,
11  2019 to see if I did.
12  BY MR. CLUBOK:
13    Q  Well, we previously looked at the SAS
14  structure that listed, I believe, Sebastian
15  Clarke.
16    A  I could be wrong but wasn't those
17  draftings from Deloitte from 2017?
18    Q  It's true. So, in December of 2017 you
19  have no idea whether you had any economic stake in
20  Sebastian Clarke as at the time of this transfer?
21    A  No, I don't.
22    Q  Do you know if Mr. Dondero did?
23    A  I don't.
24    Q  Do you have any idea -- well, do you
25  know if this transaction was identified to the

**335**

1  independent directors in Sentinel?
2    A  I don't.
3    Q  Do you know if the compliance group at
4  Highland was advised about this transaction?
5    A  I don't, but since they're not
6  regulating or the compliance group of Sentinel or
7  SAS, I don't think they would have been, but I
8  don't know.
9    Q  Do you know who Summit Management
10  Limited is?
11    A  Again, that's a fiduciary services
12  group in Cayman, as far as I know.
13    Q  Do you know if they -- if somebody on
14  behalf of them signed this transfer agreement?
15    A  No, all I've seen is what you've shown
16  me and it does not look like anyone signed.
17    Q  Do you know if there was any analysis
18  done with respect to this transaction as to
19  whether or not it constituted a fraudulent
20  transfer?
21        MS. SMITH: Objection to form.
22        THE WITNESS: No, I don't. I didn't --
23  I don't even know that I ever knew this took
24  place. I have no memory of this.
25  BY MR. CLUBOK:

**336**

1    Q  Matt DiOrio, do you have any idea how
2  Matt DiOrio came to be involved with this --
3    A  No I don't.
4    Q  Did you tell -- did you ever tell
5  anybody about this transaction?
6        MS. SMITH: Objection to form.
7        THE WITNESS: No, I didn't have any
8  knowledge about it, so I didn't have an ability to
9  tell.
10  BY MR. CLUBOK:
11    Q  You had no knowledge whatsoever that
12  assets of Sentinel were transferred to Sebastian
13  Clarke at any time?
14    A  Not that I recall, no.
15    Q  Do you know -- do you know that
16  Sentinel, as part of the purchase of the ATE
17  policy obtained a note from the DAF that CDO Fund
18  generally held?
19    A  Yes I was --
20        -- (overspeaking) --
21        MS. SMITH: Objection to form.
22        THE WITNESS: -- I was generally aware
23  of that, yes.
24  BY MR. CLUBOK:
25    Q  Who told you about that?

337

1    A    I believe Mark Patrick told me about it
2  after the fact, that it had been part of the
3  assets transferred, but I can't say that with
4  certainty.
5    Q    And do you know the economic status of
6  the DAF today?
7    A    No, I do not.
8    Q    Do you know if that note -- do you know
9  how DCO fund came to hold a note from the DAF?
10    A    No idea.
11    Q    Do you know if any assets were ever
12  transferred to the CDO Fund to the DAF in exchange
13  for that note?
14    A    I do not.
15    Q    Who would have been responsible for
16  monitoring that between 2009 and 2017?
17    A    Monitoring what?
18    Q    Monitoring what happened with CDO
19  Fund's assets?
20    A    Oh, I don't know.
21    Q    Is a note from the DAF worthless?
22    MS. SMITH: Objection to form.
23    THE WITNESS: I don't have any idea of
24  what the DAF can pay or not pay. I don't know.
25  BY MR. CLUBOK:

338

1    Q    Whose idea was it to include the DAF as
2  part of the assets that were transferred to
3  Sentinel?
4    MS. SMITH: Objection to form.
5    THE WITNESS: I think you meant the DAF
6  note?
7  BY MR. CLUBOK:
8    Q    Yes, the DAF note. Sorry.
9    A    I don't know who came up with any of
10  the assets to be transferred to Sentinel.
11    Q    Who had the economic interest in the
12  DAF, as far as you know?
13    A    Charities, but from what I understand,
14  that's a DAF donor-advised fund, so there was some
15  type of contribution made and then it's managed, I
16  believe, by outside entities and then the monies
17  were given away, donated to qualifying charities.
18    Q    Did Sentinel ever communicate to CDO
19  HoldCo about a promissory note that it held?
20    MS. SMITH: Objection to form.
21    THE WITNESS: I don't know.
22  BY MR. CLUBOK:
23    Q    When you found out that the DAF note
24  had been transferred, did you take any action?
25    A    No.

339

1    Q    Is Sebastian Clarke, do you have any
2  idea if Dondero has any economic interest in the
3  Sebastian Clarke at all?
4    A    I do not. Let's look at Exhibit 55
5  which also happens to be tab 55, by a happy
6  coincidence. That is -- I think you have that in
7  the binder in front of you. Hold, please. I do
8  have 55.
9    Q    Okay, 55 is an email exchange and
10  attaches a unanimous written resolution of the
11  board of directors of Sentinel Reinsurance with
12  respect to the ATE policy. I want you to look at
13  the last email on the chain which ends with Bates
14  number -51.
15    A    Okay.
16    Q    And this is an email from Kim Willey to
17  Paul Scrivener and Neil Horner; do you see that?
18    A    Paul Scrivener and Neil Horner, yes.
19    Q    Do you know any of those people?
20    A    I don't know any of those people.
21    Q    Okay, and then they forwarded -- Paul
22  Scrivener forwards this to JP Sevilla, Lesley
23  Thompson and a number of other people identified
24  at the bottom of the page that starts with or ends
25  in Bates -50; do you see that?

340

1    A    I do.
2    Q    And this is August 10th:
3    "As requested by JP, please see in email
4  below the advice followed by ASW."
5    Do you see that?
6    A    Yes.
7    Q    And Lesley Thompson then writes to JP
8  and Katie and that would have been Katie Irving;
9  correct?
10    A    Umm...
11    MS. SMITH: Objection to form.
12    THE WITNESS: Let's see -- well, it
13  doesn't -- it just so -- it doesn't say who it is
14  written to. And above that, JP only responds to
15  Lesley. I don't know which Katie it is.
16  BY MR. CLUBOK:
17    Q    Was there another Katie that worked
18  with JP in August of 2017, with respect to the ATE
19  policy that you are aware of?
20    A    No, but I don't know that there may be
21  a Katie at these other entities. I just don't
22  know.
23    Q    Okay, and Lesley says: "Thank you for
24  all the information and supporting documentation
25  to the recommendation regarding the new ATE policy

341

1  to be written by Sentinel Reinsurance." [As read.]
2      Do you see that?
3    **A  Yes.**
4      Q  And you see one final question: Can
5  you please confirm that in the event of an adverse
6  loss which exceeds the existing assets equity of
7  the company, the shareholders will inject the
8  necessary capital in order for the company to meet
9  (sic) its obligation and maintain its solvency."
10      Do you see that?
11   **A  I do.**
12     Q  And now Mr. Sevilla writes back:
13     "Lesley, the shareholders have made a
14  fundamental commitment both fiscally and
15  governance-wise to Sentinel reinsurance for the
16  long term, including in the situation of an
17  adverse loss."
18      Do you see that?
19   **A  I do.**
20     Q  And that -- he does copy Katie Irving
21  on it; do you see?
22   **A  Oh, yeah, yeah.  I see it now, yes.**
23     Q  Okay, and that's the subject is
24  "Sentinel Reinsurance Proposed ATE policy," right?
25   **A  Yes.**

342

1      Q  This is August of 2017, shortly before
2  the policy is entered into; right?
3    **A  Yes.**
4      Q  Now, Mr. Sevilla then talked to you
5  about how to respond to Lesley Thompson, didn't
6  he?
7      MS. SMITH:  Objection to form.
8  BY MR. CLUBOK:
9      Q  Didn't he?
10   **A  Not that I recall, no.**
11     Q  When Mr. Sevilla said the shareholders
12  made a fundamental commitment in this -- and this
13  word she used, that was based on you authorizing
14  him to make that statement, wasn't it?
15   **A  Not that I recall.**
16     MS. SMITH:  Objection to form.
17  BY MR. CLUBOK:
18     Q  Did you have any -- reading this, does
19  it refresh your recollection in any way that you
20  discussed the ATE policy with Mr. Sevilla shortly
21  before it was entered into?
22   **A  No.**
23     Q  Did you authorize Mr. Sevilla to make
24  that statement?
25   **A  Not that I recall.**

343

1      Q  Is that an accurate statement?
2    **A  Yeah, that's an accurate statement.  I**
3    **don't recall having this conversation with JP**
4    **about a fundamental commitment of the shareholders**
5    **both physically and governance-wise, no.**
6      Q  No, no, no.  Is the statement that Mr.
7  Sevilla makes to Lesley Thompson --
8    **A  Yeah, that's what I'm reading.  "The**
9    **shareholders made a fundamental commitment both**
10   **physically and governance-wise to Sentinel**
11   **Reinsurance for the long-term, including the**
12   **situation of adverse loss.  Many thanks."  [As**
13   **read.]**
14       **No, I don't remember having that**
15   **conversation with him.**
16     Q  And my question is:  Notwithstanding
17  that you don't remember having that conversation,
18  my question is:  Is what he is saying here true?
19  Is it correct that the shareholders for Sentinel
20  Reinsurance had made a fundamental commitment,
21  both physically and governance-wise to settle
22  reinsurance for the long-term, including in the
23  situation of an adverse loss?
24   **A  He could have talked to other**
25   **shareholders.  I do not remember talking to him**

344

1    **about this, but we surely had a commitment**
2    **long-term to the reinsurer.**
3      Q  Okay, you were a shareholder of
4  Sentinel Reinsurance at the time through entities
5  you controlled; correct?
6    **A  Yes, correct.**
7      Q  And Mr. Dondero was a shareholder at
8  the time, right?
9    **A  Yes.**
10     Q  And can you identify one other single
11  human being in the planet who was a shareholder
12  that you know of at Sentinel Reinsurance at the
13  time?
14   **A  No, but if the shareholders are**
15   **entities at directors and trustees, he could have**
16   **talked to them and not me.  He also could have**
17   **talked to Mr. Dondero who had the controlling**
18   **70 percent shares either directly or indirectly**
19   **held through entities associated with him, and**
20   **that would be plenty for him to make this**
21   **assessment without ever speaking to me.**
22     Q  Right.  I didn't ask you for any of
23  those things you just answered.
24     MS. SMITH:  Objection.
25  BY MR. CLUBOK:

345

1    Q    In the final time -- few minutes,
2  please listen to my question so I don't have to go
3  beyond the time.
4    A    Okay.
5    Q    Are you aware of any other human being
6  who was a shareholder in Sentinel, through any
7  entity they controlled, other than you and
8  Mr. Dondero as of August 10th, 2017?
9    A    You asked me entities who had human
10 beings either as directors or trustees that he
11 could have spoken to, not -- (overspeaking) --
12 (inaudible) Mr. Dondero.
13   Q    Is there a human being you can name
14 right now who is a shareholder of -- an ultimate
15 shareholder, like you and Mr. Dondero were, of the
16 economic interest or other than you and
17 Mr. Dondero, that you can name?
18       Is there another human being that you
19 can name? Is there another human being you can
20 name who was a shareholder?
21   A    Me, personally, but I don't have any
22 transparency of who -- how Mr. Dondero could have
23 (inaudible) this.
24   Q    I didn't ask you that question, okay?
25 And this is where -- like, we're in the last --

346

1  hopefully the last hour and I don't want to have
2  to ask you questions that you don't answer them
3  and then I will take more time.
4        -- (overspeaking) --
5    A    I'm trying my best to answer. That I
6  personally know of, no.
7        -- (overspeaking) --
8        MS. SMITH:  Mr. Clubok, you are
9  starting to yell at the witness.
10 BY MR. CLUBOK:
11   Q    Mr. Ellington --
12   A    Yes.
13   Q    -- can you name a human being that
14 you're aware of who was a shareholder of Sentinel
15 as of August 10th, 2017 other than you and
16 Mr. Dondero?
17   A    That I know of?  No.
18   Q    Okay.  And do you know of any person
19 that Mr. Sevilla actually spoke to, other than
20 speculated who he might have spoken to?
21   A    I can only say he didn't speak to me,
22 to my recollection, about any of this.
23   Q    If Mr. Sevilla -- is Mr. Sevilla an
24 honest person?
25   A    I find him to be, yes.

347

1    Q    If he testified under oath as to who he
2  spoke to after receiving this email, was that
3  something that you would expect to rely upon?
4    A    I don't know if Mr. Sevilla has a
5  perfect memory, but I -- I would not say that he
6  would purposely not tell the truth.
7    Q    If Mr. Sevilla said that he was
8  authorized by you to make this statement, would
9  that be true or false, as far as you know?
10   A    Solely me?
11   Q    Solely you.
12   A    I don't see how he could be bound by
13 me, since Mr. Dondero or his related entities
14 owned twice what I did.
15   Q    Okay, let's forget about "solely".
16 Maybe he asked both you and Mr. Dondero.  But
17 would it be true if Mr. Sevilla testified that you
18 did authorize him to make this statement on your
19 behalf?
20   A    I would say that that's true to Mr.
21 Sevilla's memory.  I do not have a memory of ever
22 speaking to him about this issue.
23   Q    Okay, in August of 2017 had you made a
24 fundamental commitment, both physically and
25 governance-wise to Sentinel Reinsurance for the

348

1  long-term, including in the situation of an
2  adverse loss.
3    A    No, I've not made a commitment to
4  adverse loss, which is the question she'd answered
5  at the bottom and I don't know if Mr. Sevilla even
6  answered her question because he doesn't say,
7  "We'll inject the necessary --"  If he had that
8  conversation with Mr. Dondero, that certainly
9  didn't (inaudible) to my knowledge.
10   Q    Again, I'd like to you answer the
11 question that I've asked you.  You just added a
12 lot of information that may or may not be useful,
13 but I'm going to ask you carefully to listen to my
14 question, please, and just answer my question.
15   A    Okay.
16   Q    Is it true that as of August 10th,
17 2017, you had made a fundamental commitment both
18 physically and governance-wise to Sentinel
19 Reinsurance for the long-term, including in a
20 situation of an adverse loss, true or false?
21   A    No.  No.
22   Q    And then Katie Irving, if you go to the
23 top of this email chain, then forwards on the
24 Sentinel Reinsurance proposed ATE policy to Helen
25 Kim and requests JD execution of the attached; do

349

1  you see that?
2     A  I do.
3     Q  And JD means Jim Dondero; right?
4        MS. SMITH: Objection to form.
5  BY MR. CLUBOK:
6     Q  People call Jim Dondero "JD" in emails
7  like this, right?
8     A  Yes, just like they call people other
9  shorthand, yes.
10    Q  Yes, and we see that the -- we know the
11 attached does bear Mr. Dondero's signature --
12 strike that.
13       We saw another document where
14 Mr. Dondero had signed the purchase agreement on
15 behalf of a number of entities; correct?
16    A  Yeah, but this entity is not signed by
17 Mr. Dondero, only by the directors or a director.
18    Q  Yeah.
19    A  Sorry, the directors, my apologies.
20    Q  And any -- was there any final --
21 strike that.
22       In around this timeframe, was there any
23 final discussion with you and Mr. Dondero about
24 the policy or the purchase agreement?
25    A  No.

350

1     Q  Are you as sure of that as you were
2  that you didn't have a -- strike that.
3        Are you saying you don't remember that
4  or you're sure you didn't have that conversation?
5     A  I don't recall any conversation with
6  Mr. Dondero about the purchase agreement or the
7  policy. Again, I wasn't involved in this process,
8  so I wouldn't even have anything to talk to him
9  about.
10    Q  Okay, and are you sure -- strike that.
11 Are you just saying you don't recall one way or
12 the other or are you pretty certain you did not
13 talk to Mr. Dondero in this timeframe?
14    A  I don't recall one way or the other.
15    Q  And same thing with Mr. Sevilla, are
16 you saying that you are pretty sure you didn't
17 give him authority to make that statement on your
18 behalf or are you saying you don't remember, one
19 way or the other if you did it?
20       MS. SMITH: Objection to form.
21       THE WITNESS: I do not have any
22 recollection nor do I believe that I would have
23 given him a guarantee of a situation of adverse
24 loss, but, again, if Mr. Dondero gave him that,
25 what I said was irrelevant.

351

1  BY MR. CLUBOK:
2     Q  Okay, but you don't remember giving him
3  authority to make the statement that he made to
4  Lesley Thompson in the email that's 4:18 p.m
5  August 10, 2017 in Exhibit 55; correct?
6     A  No, but, again, if Mr. Dondero gave him
7  that my approval or (inaudible) --
8        MS. SMITH: Objection.
9  BY MR. CLUBOK:
10    Q  Stop, stop, stop. Two things. Number
11 one, I didn't ask you about Mr. Dondero, so I just
12 move to strike and I'm going to ask you one more
13 time, please for the remaining hour, just answer
14 my question. And the judge has repeatedly --
15 you've been there in court when the judge has
16 stopped people from doing that, and I'm going to
17 ask you now please do not do that for the short
18 remaining time we have left.
19       Second of all, this is one where you
20 said "no" and I think you meant "yes," so please
21 just listen to my question. You were so quick to
22 jump in with the Dondero thing, that that's one of
23 the reasons why I think you said "no" instead of
24 just answering my question, so I'm going to jut
25 ask you, please, listen to my question and just

352

1  answer this.
2        Is it true that you did not give Mr.
3  Sevilla authority to make the statement he made on
4  your behalf in an email that's time-stamped
5  4:18 p.m. to Lesley Thompson as reflected in
6  Exhibit 55?
7     A  Well, first of all, Mr. Clubok, I don't
8  know whether he makes it on my behalf. He doesn't
9  say my name, so I think that, in itself, I don't
10 agree with. He doesn't say I said it.
11    Q  No, Mr. --
12       -- (overspeaking) --
13    A  You said made on my --
14       -- (overspeaking) --
15    Q  -- Mr. Ellington --
16       -- (overspeaking) --
17    A  Sorry, I'm still speaking.
18       -- (overspeaking) --
19    Q  Stop that. That's --
20       -- (overspeaking) --
21    A  -- on my behalf. He doesn't make --
22       -- (overspeaking) --
23    Q  Hold on. I didn't ask what the email
24 says about whether he --
25       -- (overspeaking) --

353

1    A   Yeah you did.  You asked me --
2    Q   No, no, no.
3        -- (overspeaking) --
4    A   -- if the statement which Mr. Sevilla
5    made to Lesley was a true statement on my behalf,
6    made on my behalf.
7    Q   No, listen to my question one more
8    time, okay.  We can all see the statement that Mr.
9    Sevilla made, the words that he made on 4:18 p.m
10   August 10, 2017 to Ms. Thompson, as reflected in
11   Exhibit 55.  You see that -- those words, without
12   me repeating them again, correct?
13   A   I do.
14   Q   My simple question is this:  Did you
15   authorize Mr. Sevilla to make that statement on
16   your behalf?
17   A   No.
18   Q   Thank you.  Are you sure about that or
19   is it just you don't remember one way or the other
20   whether you authorized that?
21       MS. SMITH:  Objection to form.  Asked
22   and answered.
23       THE WITNESS:  I've answered you twice.
24   I'll answer you again.  No.  Certain of it.
25   BY MR. CLUBOK:

354

1    Q   Okay.  Did Mr. Sevilla have the
2    authority to make that statement on your behalf
3    without checking with you?
4        MS. SMITH:  Objection to form.  Asked
5    and answered.
6        THE WITNESS:  No.
7    BY MR. CLUBOK:
8    Q   Did you ever give anyone authority to
9    speak on your behalf with respect to what, if any
10   commitments you were going to make Sentinel
11   Reinsurance?
12   A   No.
13   Q   Let's turn to Exhibit 69, which is tab
14   44.  These are UBS's first request for document
15   production for debtor Highland Capital Management.
16   It's the first formal document request that was
17   made dated September 28th, 2020.  Do you see that?
18   A   Number 69?  Oh, yes I see it.  Sorry.
19   Q   Yeah, Exhibit 69 is a copy of what's
20   titled "UBS's first request for production of
21   documents to debtor Highland Capital Management."
22   Do you see that?
23   A   I do.
24   Q   Did you receive a copies of those
25   requests ever?

355

1    A   No.
2    Q   You never looked -- you've never seen
3    this request before today; is that what you're
4    saying?
5    A   No, but the request that you and others
6    made would go to presumably Pachulski and then
7    they were tasked to the Highland employees to try
8    to meet those requests but we were never given the
9    direct document request.
10   Q   Whose the "We" in that statement?
11   A   The Highland employees.
12   Q   You say Isaac Leventon never saw this
13   document either.
14   A   I don't know if Isaac saw it or not but
15   very commonly we were told what to go and retrieve
16   or search for without the actual document request.
17   Q   Okay, but you just said "we" were never
18   given this request.
19       Are you saying that no one in the
20   Highland legal department ever received this
21   request for production of documents?
22   A   I don't know because I never reviewed
23   all their emails.
24   Q   Were you aware of this request?
25   A   No.

356

1    Q   Were you given any task in connection
2    with responding to the document request that's
3    been identified as Exhibit 69?
4    A   I'd have to read the entire request and
5    remember if I was ever tasked with any of these
6    items.
7    Q   Well, in September 2020 do you remember
8    going forward until the end of the -- your
9    tenure with Highland?  Do you remember ever being
10   tasked with helping to respond to request for
11   production of documents to Highland Capital?
12       MS. SMITH:  Objection to form.
13       THE WITNESS:  Dozens upon dozens of
14   requests from Pachulski, DSI, the creditor's
15   committee, individual creditors, yes.
16   BY MR. CLUBOK:
17   Q   Well, let's look specifically at
18   request number 8, which is all documents
19   pertaining to the assets and liabilities of HFP,
20   CDO Fund and SOHC, including but not limited to."
21       And it is a whole series of sub-parts.
22   Do you see that request?
23   A   I do.
24   Q   It's request number 8 and it's on page
25   -- starts on the bottom of the unnumbered page,

357

1  but you see the request which very simply says:
2  "All documents pertaining to the assets and
3  liabilities of HFP CDO Fund and SOHC and then it
4  is including but not limited to and it gives
5  specific examples, right?
6  **A   Yes, for a 12-year period, yes.**
7  Q   Yes, do you remember making an effort
8  to identify or help identify all documents
9  pertaining to the assets and liabilities of HFP
10  CDO Funds and SOHC over the period from 2007
11  through 2019?
12  **A   I do.**
13  Q   And what efforts did you make to comply
14  with this request, if any?
15  MS. SMITH:  Objection to form.
16  THE WITNESS:  We were told about this
17  request or at least I was by, I believe, Mr. Seery
18  potentially, not Mr. Seery, maybe Pachulski or
19  DSI, I can't remember because there were so many
20  requests.  And myself, Isaac, Ms. Vitiello and
21  Mr. Klos, I remember at least us as the working
22  group, and maybe others were involved, I just
23  don't know, started (inaudible) documents as far
24  back as 2007, which was past the seven-year
25  retention requirements of an RA and it was very

358

1  difficult to start constructing from that far
2  back.
3  BY MR. CLUBOK:
4  Q   Okay, but how about just going back to
5  prior seven years to 2012.  That would -- those
6  documents would have been available, right?
7  **A   Yeah, but that's not what's asked for.**
8  **It's asking starting with seven.**
9  **You can't just start mid stream and**
10  **fulfill these, in my opinion.**
11  Q   And I'm sorry, you had been at
12  litigation with UBS since 2009 over HFP, CDO Fund
13  and SOHC; correct?
14  **A   Correct, correct.**
15  Q   Was there a document hold?  You were
16  the general counsel of the company during that
17  time.  Did you cause a --
18  -- (overspeaking) --
19  **A   No, I was not.  No, Michael Colvin was**
20  **at the beginning of the litigation.**
21  Q   At the beginning of the litigation.  At
22  what point did you become general counsel?
23  **A   It was, I believe in either '10 or '11.**
24  **I can't remember.**
25  Q   And in 2010 or '11, all the documents

359

1  would have been still been in existence under the
2  seven-year retention; correct?
3  **A   In '11, sure, yes.  But this request**
4  **was made in '20 so the documents aren't**
5  **necessarily on the system; they've been put on**
6  **backup tapes and moved to offsite storage.**
7  Q   Sorry.  Was there a document retention
8  hold put in place with respect to the UBS
9  litigation that covered documents going back to
10  2007 with respect to assets of HFP, CDO Fund and
11  SOHC?
12  MS. SMITH:  Objection to form.
13  THE WITNESS:  I do not know for certain
14  but I would strongly assume there was.
15  BY MR. CLUBOK:
16  Q   Well, as GC at least from 2011 forward,
17  did you take responsibility for ensuring that a
18  document hold was put in place to preserve all
19  these documents going back to cover the time
20  period asked for in this request?
21  MS. SMITH:  Objection to form.
22  THE WITNESS:  Yes, but the document
23  hold would have been issued by Michael Colvin and
24  -- before I was the GC, and then those document
25  holds would have been in perpetuity through the

360

1  end of this period.
2  BY MR. CLUBOK:
3  Q   Did you make any effort to refresh the
4  document hold or to affirm that it was being
5  maintained once you became GC, going forward?
6  **A   No, that's not common practice.  The**
7  **document hold is it in place until it is**
8  **terminated.**
9  Q   And so when you -- you started
10  answering this question by saying this was
11  difficult because there is a seven-year retention
12  period, is it fair to say that that normal
13  seven-year retention period should not have
14  applied at all to HFP, CDO Fund and SOHC in light
15  of the litigation that was pending since 2009;
16  correct?
17  MS. SMITH:  Objection to form.
18  THE WITNESS:  Correct, but in the
19  latter part of my answer, I said that they had
20  been moved to backup tapes and/or offsite storage.
21  BY MR. CLUBOK:
22  Q   But were they?
23  **A   That's the difficulty.  Is getting --**
24  **and also, the document holds aren't necessarily**
25  **some of these items, mapping a trial balance of**

361

1  account and requested items. Some of these things
2  you requested, from what I understand, never
3  existed in the first place.
4       Second of all, they were in offsite or
5  backup tape storage and there was essentially one
6  person that -- or including Ms. Vitiello, two, so
7  Mr. Leventon and Ms. Vitiello, that could search
8  for these and we had competing agendas that were
9  being assigned to us by the independent board,
10  Pachulski and others, so it wasn't the only
11  request we were working on.
12      Q   Did you -- as GC, did you ever endeavor
13  to keep information about HFP, SOHC and CDO Fund's
14  assets in readily available form during the
15  pendency of the litigation?
16      MS. SMITH: Objection to form --
17      -- (overspeaking) --
18      THE WITNESS: -- available form.
19      (Court reporter clarification.)
20      MR. CLUBOK: Okay.
21      THE WITNESS: I don't know what you --
22  I'm sorry, ma'am. I don't know what you mean by
23  "readily available form."
24  BY MR. CLUBOK:
25      Q   Did you -- okay. So my question is:

362

1  Did you make any effort to preserve the documents
2  relating to HFP, CDO Fund and SOHC's assets in a
3  way that they'd be readily accessible?
4       A   I don't run the IT system and there is
5  a finite amount of space for physical documents,
6  so readily available I believe is subjective.
7       Q   Okay. Move to strike as
8  non-responsive. I didn't ask if you ran the IT
9  system, I didn't ask you about space.
10      I just want you to please listen to my
11  question and answer my question directly.
12      Did you, as general counsel, once you
13  became general counsel, take any steps to ensure
14  the preservation of documents relating to the
15  assets of HFP, CDO Fund and SOHC in a manner that
16  they would be readily accessible?
17      MS. SMITH: Objection to form.
18      THE WITNESS: I did not take any
19  affirmative steps other than make sure the
20  documents were preserved as to the litigation hold
21  and, if I'm not mistaken, this is after the trial,
22  Phase I of the trial so I assumed that those
23  documents had been stored in a way that was
24  readily available under the constraints of IT and
25  physical space.

363

1  BY MR. CLUBOK:
2       Q   Okay. You say -- you did not take any
3  affirmative steps other than to make sure the
4  documents were preserved.
5       What specific steps did you take to
6  make sure the documents were preserved with
7  respect to the assets of HFP --
8       -- (overspeaking) --
9       A   There's protocols in place where
10  nothing is destroyed in -- (inaudible)
11      -- (overspeaking) --
12      (Court reporter clarification)
13      A   There's protocols in place that nothing
14  is destroyed and that's why they were moved to
15  backup tapes and put into secure offsite storage
16  so they are readily available.
17      Q   When did you do that or cause that to
18  be done?
19      A   I didn't cause it to be done. There's
20  protocols in place that were put in place by
21  compliance. Compliance is who oversees how these
22  documents are handled.
23      Q   Where is the asset information now
24  related to HFP and CDO Fund and SOHC dating back
25  to 2007?

364

1       A   I have no idea. I don't work there.
2       Q   Is there any -- at the time you left
3  how would it have been readily accessible if you
4  had wanted to obtain it?
5       A   It was stored by Iron Mountain.
6       Q   And did you make any efforts to
7  retrieve the asset information from Iron Mountain
8  relating to HFP, CDO Fund and SOHC?
9       A   I believe that was absolutely done.
10      Q   Did you personally make any efforts to
11  do that?
12      A   No, me personally, no --
13      MS. SMITH: Objection to form.
14      THE WITNESS: -- because the request of
15  Iron Mountain is an IT function.
16  BY MR. CLUBOK:
17      Q   Did you take any efforts to cause it to
18  happen?
19      A   Yes.
20      Q   What --
21      A   Yes.
22      Q   What exactly did you personally do to
23  try to meet these requests from --
24      -- (overspeaking) --
25      A   -- the head of IT and Mr. Leventon, who

365

1 runs the discovery efforts, and said pull back
2 anything you need to fulfill these requests that
3 we are being asked for from the board and
4 Pachulski.
5    Q   Okay.  And what you did know at the
6 time was that there had been a significant
7 transfer of assets from these funds to Sentinel in
8 August of 2017; correct?
9    A   Correct.
10   Q   And did you mention that in any way in
11 response to these document requests, to anybody?
12   A   No, I did not.
13   Q   Did you cause that to be communicated
14 in any way to Mr. Seery or the debtor's counsel,
15 once you knew about this request for documents
16 pertaining to the assets and liabilities of HFP,
17 CDO Fund and SOHC?
18   A   I did not.
19   Q   Okay.  We're going to turn to
20 Exhibit 70, which is tab 45.
21      Oh, strike that.  Sorry, one more thing
22 on this exhibit before we turn it...
23      Sorry, that's fine.  Let's go to
24 Exhibit 70, tab 45.
25   A   Okay.

366

1    Q   That is an email from Scott Ellington
2 to Greg Demo, copying Mr. Leventon, Mr. Romey,
3 Mr. Klos and Mr. Seery; do you see that?
4    A   Mr. Klos and Mr. Seery, yes, I do.
5    Q   That's the top email and that is a
6 response to a long chain that goes on for several
7 pages and begins with an email that starts on the
8 page marked 17 at the end; do you see that?
9    A   117, yes, I do.
10   Q   And this is: "UBS diligent request
11 about Highland credit opportunities, CDO Ltd.
12 Importance: High." And this is from August 2020
13 before those formal requests were sent; do you see
14 that?
15   A   Let's see.  I don't know the date of
16 when your formal request was sent.
17   Q   Well, we just looked at the document
18 that was dated September 2020.
19   A   Oh, yeah, I see that now, yes, we
20 looked at it before.
21   Q   Right.  So the previous -- the formal
22 requests were dated September 28th, 2020.
23      These -- this information request was
24 called UB -- I assume they mean UBS diligence
25 request, came in to prior to August 6th, 2020;

367

1 correct?
2    A   Let's see, hold on here.  Thursday,
3 August 6.  August 6.
4      The farthest back I see is August 6the,
5 so...
6    Q   Right.  And on August 6th they're
7 talking about giving stuff to UBS today and before
8 they do that, they have to track down some more
9 information, so fair to say that the request came
10 in certainly no later than August 6th?
11   A   Yeah, that's fair to say.
12   Q   Okay, and Romey sends this email to
13 Leventon and copies some other folks, and then the
14 email gets forwarded -- there is an exchange that
15 continues and if you flip the page, we're going to
16 try to find the first time that you get introduced
17 into it, and it looks like it is on the page
18 that's marked Bates number 115 and Isaac Leventon
19 says in response to an email that Greg Demo sent:
20   'Guys, I don't think this is a prerequisite
21 to delivering materials to UBS in satisfaction of
22 our concerns.  I am prepping the documents set for
23 delivery tomorrow.  Has has not worked on this,
24 so I will just call Greg and James.  However, this
25 is the current status."

368

1      Do you see that?
2    A   Yes.
3    Q   And all of this was about -- before
4 they're trying to figure out what's the assets on
5 CDO Fund's books with respect to an interest in
6 Multi Strat.  That was the subject of the previous
7 emails.  And Greg says:
8      "Scott and Isaac, I spoke to Jim about this
9 issue this morning.  It is a high priority at this
10 point and we need to do what we can to push to
11 conclusion.
12      I understand that it is going to take some
13 work.
14      Can we schedule a time Wednesday morning to
15 discuss progress and where we're at.  I am
16 generally available so whatever works for you will
17 work for me."
18      Do you see that?
19   A   I do.
20   Q   And that's August 15th, 2020; correct?
21   A   Yes.
22   Q   And in response you then write your
23 email that starts with:
24      "I don't think there is any need for a call.
25 I can tell you where we are currently."

---

369

1  Do you see that?
2  **A   Yes.**
3  Q   And you say how documents were created
4  as far back as 15 years ago, and records and
5  storage practices were different in 2005; do you
6  see that?
7  **A   I do.**
8  Q   And you say in the middle here:
9  "As I'm sure you are aware, and I know UBS
10  is aware, that the document retention policy of
11  the SEC is that the RIAs are required to maintain
12  documents for seven years."
13  Do you see that?
14  **A   I do.**
15  Q   And you intimated or told various
16  people, like you intimated at the beginning of our
17  conversation, that there just might not be
18  documents available prior to seven years because
19  of the supposed retention policies of the SEC.
20  Correct?
21  MS. SMITH:  Objection to form.
22  THE WITNESS:  That's not what I said
23  at all.  I said we were required to retain them
24  for seven years.  To your point, there was a
25  litigation hold here, but the difficulty it had

---

370

1  been sent off site.
2  Furthermore -- furthermore, we did not
3  have a document request from you.  This is a
4  general request that came in from Pachulski and
5  DSI who asked us to go back to 2005 and look for
6  very specific information in regards to -- CDO
7  Opportunity Master Fund that we then discovered
8  had changed names to where they are confused
9  themselves.  This was a specific search at this
10  point relayed to us by Pachulski and DSI, not a
11  document request like you showed me.
12  BY MR. CLUBOK:
13  Q   You say that there's a document
14  retention policing of seven years.  You do not say
15  anywhere words to the effect of: Oh, but we have a
16  litigation hold so we have the documents, or words
17  to that effect.  You don't say anything about
18  that, do you?
19  MS. SMITH:  Objection to form.
20  THE WITNESS:  No, and I don't say we
21  don't have the documents.
22  BY MR. CLUBOK:
23  Q   But you mention a seven-year document
24  retention policy but you don't mention anything
25  about what, if any, efforts you've taken to comply

---

371

1  with the litigation hold requirements; correct?
2  MS. SMITH:  Objection to form.
3  THE WITNESS:  What does that have to do
4  with anything?  I said what we --
5  -- (overspeaking) --
6  BY MR. CLUBOK:
7  Q   Sir, I --
8  **A   I'm giving an update here, Andy.  If**
9  **you are going to ask me a question I'd like the**
10  **opportunity to answer.  I am giving a full update**
11  **here to Mr. Demo, and this is an update about how**
12  many requests (inaudible) want.  Jim Seery has
13  been copied on all of these and I spoke to Jim
14  Seery about what was priorities and what I find
15  super-interesting is that this thing was highly
16  urgent on August 6th, Greg Demo, in his infinite
17  urgency, doesn't even write me back until
18  August 15th.  He wants to schedule a call on
19  August 19th.
20  So 13 days later is when he even wants
21  to discuss it.  I'd say by any anybody's
22  estimation that is not highly urgent, especially
23  after Mr. Seery, who was the person that did have
24  the authority to prioritize all these various
25  document requests told me to work the best we

---

372

1  could on this, but other things were more
2  important at the time.
3  Q   My question to you was:  In this email
4  you mentioned a seven-year document retention
5  policy?
6  **A   Yes.**
7  Q   You don't mention anything about what,
8  if any, efforts you've taken to comply with
9  litigation hold requirements with respect to UBS;
10  isn't that true?
11  MS. SMITH:  Objection.  Asked and
12  answered --
13  -- (Overspeaking) --
14  THE WITNESS:  -- about litigation hold
15  requirements.  I'm giving an update:  Here's where
16  we are currently.  I'm letting Mr. Demo know that
17  there is a seven-year hold on all these documents.
18  Some of the things they were asking for, I don't
19  think were even subject to the litigation hold
20  with UBS because it is before the transaction,
21  Andy.  They were asking us stuff as far back as
22  2005, which is before the transaction with UBS.
23  So it wouldn't be subject to the litigation hold.
24  BY MR. CLUBOK:
25  Q   Okay.  Move to strike as

373

1  non-responsive.
2  **A   No, you asked me if I addressed the**
3  **litigation hold, so it is responsive in my**
4  **opinion.**
5     Q   My question to you, and I'd like a
6  direct answer to this question, is: In this email
7  you mention a seven-year document retention policy
8  but you don't mention anything about what, if any,
9  efforts you've taken to comply with litigation
10  hold requirements with respect to UBS; isn't that
11  true?
12    **A   Yes.**
13         MS. SMITH:  Objection to form.
14  BY MR. CLUBOK:
15    Q   Okay.  Continuing on this email, you
16  say that -- when you talk about ghost funds you
17  don't simply say that they don't have directors or
18  officers.  You also say they don't have bank
19  accounts.  They sit dormant and in all caps:
20         "No one knows what they truly retain,
21  etc."
22         Correct?
23         THE WITNESS:  Yes, it's about the 6,000
24  ghost funds in totality, digital description of
25  the situation, of various 6,000 ghost funds that

374

1  KPMG came and told me about.  Yes.
2  BY MR. CLUBOK:
3     Q   But there were people at Highland who
4  specifically did know that substantially all of
5  the assets of these funds had been transferred to
6  Sentinel on or about August 2017; correct?
7     **A   Yes, I'm not talking about just**
8  **Sentinel.  I'm talking about 6,000 funds and the**
9  **commonalities they have.**
10    Q   Right.  But with respect to HFP, CDO
11  Fund, and SOHC, with respect to those three
12  specific funds, there were lots of people, you
13  said before, at HCM who fully knew that
14  substantially all of the assets of those three
15  funds had been transferred to Sentinel Reinsurance
16  in August 2017; correct?
17    **A   Essentially true and right before the**
18  **break you showed me an email with a bunch of those**
19  **people copied showing wires out of Sentinel -- I**
20  **mean to Sentinel.**
21    Q   And you were one of those people who
22  knew that; correct?
23    **A   Correct.**
24    Q   And Mr. Leventon was another one of
25  those people who knew that; correct?

375

1     **A   Correct.**
2     Q   And Mr. Sevilla was another person who
3  knew that; correct?
4     **A   Correct.**
5     Q   And Mr. DiOrio was another person who
6  knew that; correct?
7     **A   Correct.  Mr. Surgent, Mr. Waterhouse,**
8  **Carter Chism, Cliff Stoops, we could list them**
9  **all.**
10    Q   You say then:
11         "Isaac and myself have spent in excess of a
12  hundred hours trying to piece together everything
13  we can to create a true and accurate
14  document-based record of what happened with these
15  target entities."
16         So is it true that you and Isaac together
17  spent in excess of 100 hours trying to piece
18  together everything you could to create a true and
19  accurate document-based record of what happened
20  with CDO Fund's assets?
21    **A   Yes.**
22         MS. SMITH:  Objection to form.
23         THE WITNESS:  Yes, starting in 2005,
24  which we were tasked to do, as you can see in my
25  second paragraph.

376

1  BY MR. CLUBOK:
2     Q   But you knew completely that all of CDO
3  Fund's assets had been transferred, or
4  substantially all of them had been transferred in
5  August 2017 to Sentinel Reinsurance; correct?
6     **A   I did not --**
7         -- (overspeaking) --
8         MS. SMITH:  Objection, asked and
9  answered.
10        THE WITNESS:  I did not -- sorry.  I
11  did not know they had been transferred and that's
12  not what we were asked to do.
13        We were asked to start back in 2005, as
14  you can see in the email chain and specifically
15  give information on CDO Opportunity Master Fund,
16  which became MSCF or MBCDO, and go through that,
17  from 2005.  That's where we were told to start by
18  Mr. Seery.
19  BY MR. CLUBOK:
20    Q   You knew when you wrote this email that
21  substantially all of CDO Fund's assets had been
22  transferred in August 2017 to Sentinel
23  Reinsurance; correct?
24    **A   I knew that something was transferred**
25  **and it was a substantial portion.**

377

1     Q   And there were lots of people that you
2  could have identified to Mr. Demo and others who
3  could have told them exactly what was transferred
4  in 2017 to Sentinel Reinsurance from CDO Fund,
5  SOHC, and HFP; correct?
6     A   Correct, but we were not tasked with
7  anything but starting in 2005 and Mr. Seery was
8  very clear that we -- that he did not want
9  anything that was guess work, that he wanted a
10 chain of custody in that entity starting in 2005.
11    Q   Well, actually, you told him that a
12 large majority of your efforts was based in
13 educated "guess work." You --
14    A   Yes, starting --
15    Q   -- you specifically said that that is
16 what you were doing; isn't that right?
17    A   Yes, starting in 2005 because no one
18 was hardly left from that time period and the
19 document storage was -- was not up to par, let's
20 put it that way.
21    Q   Sorry, Mr. -- you are telling Mr. Demo
22 that a large majority of your efforts was
23 supposedly based on educated guess work?
24    A   Yes.
25    Q   That was only possible due to your long

378

1  tenure with the debtor; correct?
2     A   Yes, because we knew, anecdotally,
3  things that people had told us about what went on
4  in 2005.
5     Q   And you're claiming that Mr. Seery,
6  though, specifically told you not to engage in any
7  educated guess work?
8     A   (Witness reads document
9  unintelligibly.)
10       And if you look at the top, Mr. Seery
11 is copying me on the email. Do you think if I
12 made an assertion that Jim Seery had told me to do
13 something and he was copied that he wouldn't have
14 corrected it?
15    Q   Did Mr. Seery tell you not to engage in
16 educated guess work?
17    A   Exactly. He said I want documented
18 evidence. I don't care what you guys think you
19 know, I want documented evidence.
20    Q   And you were aware that there was --
21 that the email that you were copied on showing
22 cash transfers to Sentinel, you were aware there
23 was documented evidence showing exactly what
24 happened with every one of these funds in 2017;
25 correct?

379

1        MS. SMITH:  Objection to form --
2  BY MR. CLUBOK:
3     Q   Correct?
4     A   This task was starting from 2005, go
5  from there.
6     Q   Sorry, you keep answering over
7  Ms. Smith's objections and I --
8     A   My apologies.
9     Q   -- think the court reporter could not
10 get your answer.  So I'm going to say it again.
11    A   Okay.
12    Q   When you sent this email you were aware
13 that there was documented evidence showing exactly
14 what happened with CDO Fund, SOHC and HFP's assets
15 in 2017; correct?
16    A   Correct.
17    Q   And you did not mention that in any way
18 to Mr. Demo, Mr. Seery or anybody else; correct?
19    A   Correct.
20    Q   And you did not cause that information
21 to be shared with them by any of your colleagues
22 at HCM; correct?
23    A   Correct, and I didn't stop anyone from
24 sharing it either.
25    Q   Okay.  And is it true that you did --

380

1  that you were trying to create a true and accurate
2  document-based record of what happened with --
3  well, strike that.
4        You also knew specifically that
5  Sentinel Reinsurance had obtained a redemption
6  interest in Multi Strat from CDO Fund; correct?
7        MS. SMITH:  Objection to form.
8        THE WITNESS:  I became aware of that at
9  some point.
10 BY MR. CLUBOK:
11    Q   And that awareness came before you sent
12 this email; correct?
13    A   I don't know.
14    Q   Okay.  When you did become aware of
15 that did you pass that information on to Mr. Demo
16 or to anyone else connected with him or Mr. Seery?
17    A   I did not pass it on.  I believe that
18 at some point it was put in a presentation to you
19 that there was a redemption.
20    Q   At some point was there a presentation
21 provided to me that showed that Sentinel
22 Reinsurance had made a redemption; was that ever
23 provided to me?
24    A   I don't know what was provided to you
25 in terms of that.

381

1    Q   Sorry, you just said that at some point
2  there was a presentation made to me that there had
3  been a redemption?
4    **A   Yeah, that there had been a redemption**
5  **but --**
6        -- (overspeaking) --
7    Q   -- redemption --
8        -- (overspeaking) --
9    **A   -- I think that was prepared by**
10  **Mr. Klos and I believe given to you by**
11  **Mr. Dondero.**
12    Q   Did that presentation show that
13  Sentinel Reinsurance had made a redemption?
14    **A   I don't know. I'd have to see it.**
15    Q   Okay. Did that -- did Mr. Dondero ever
16  communicate in words or substance that the
17  redeemers were unaffiliated with him?
18        MS. SMITH: Objection to form.
19        THE WITNESS: I wasn't on your
20  communications with Mr. Dondero.
21  BY MR. CLUBOK:
22    Q   What -- how do you know that a
23  presentation was made regarding the subject? Who
24  told you?
25    **A   Mr. Dondero wrote an email to me**

382

1  **wanting to put something together for a phone call**
2  **with you and he had already asked David Klos for**
3  **it and David Klos produced it before I was**
4  **involved.**
5    Q   And --
6    **A   Or maybe he called me, I can't**
7  **remember, but -- I think he called me, now that I**
8  **remember, but he had already tasked Klos with it.**
9    Q   Where does David Klos work now?
10    **A   Highland, as far as I know.**
11    Q   What's that?
12    **A   As far as I know. I don't know if he's**
13  **still there or not.**
14    Q   Did David Klos at the time that he made
15  that presentation know your connection with SAS?
16    **A   Yes.**
17    Q   Did he know Mr. Dondero's connection
18  with SAS?
19    **A   Yes.**
20    Q   Did he know SAS's connection with
21  Sentinel?
22        MS. SMITH: Objection to form.
23        THE WITNESS: I assume that he did.
24  BY MR. CLUBOK:
25    Q   Did -- has SAS made any redemption in

383

1  Multi Strat?
2    **A   Absolutely not that I'm aware of.**
3        MS. SMITH: And while Mr. Clubok is
4  formulating his next question, can I ask the court
5  reporter how much time is left.
6        MR. CLUBOK: Let's go off the record.
7        THE VIDEOGRAPHER: We're going off the
8  record at 7:39 p.m.
9    (Recess taken from 7:39 p.m. to 7:53 p.m.)
10        THE VIDEOGRAPHER: We're going back on
11  the record at 7:53 p.m.
12        (Deposition Exhibit 90 was marked for
13  identification.)
14  BY MR. CLUBOK:
15    Q   We have an exhibit that's been marked
16  as Exhibit 90. Exhibit 90 is the same cover email
17  that we previously showed and Ms. Smith had
18  objected because at the time we didn't have the
19  attachment. We've now created a document, which
20  is Exhibit 90, that has both this cover email,
21  where Stephanie Vitiello sends to Isaac Leventon
22  an attachment, it's a PowerPoint, and she says:
23  "Thanks for sending. Based on our
24  discussion with Scott, I started updating the
25  first few slides. I'll be in by 8 tomorrow ..."

384

1        Presumably referring to August 12th, 2017:
2        "... so we can edit before we meet with
3  Scott if you would like."
4        And this is an email that she sends at
5  6:28 p.m. on Tuesday April 11th, 2017.
6        Do you see that, Mr. Ellington?
7    **A   Yes.**
8    Q   Okay. And before we didn't have the
9  attachment so I'm hoping that seeing the
10  attachment will refresh your recollection that you
11  had had a discussion with Stephanie and Isaac that
12  led to them creating this document.
13        And if I go down to the next page -- if
14  Scott gives me the ability, you can see an early
15  version of this settlement analysis. And it says
16  "UBS Settlement: Introduction" and it talks about
17  what we should say upfront, and "Here's why we
18  should settle."
19        Do you see where -- and it looks like
20  an early draft.
21    **A   I see the words on the page.**
22    Q   Yeah, and it's clearly an early draft
23  of whatever's being written; right? It just
24  describes things like "brief intro" instead of
25  laying out an actual intro?

385

1    A   Sure.
2        MS. SMITH:  Objection to form.  I'm
3  also objecting to the continuation of the
4  deposition to the extent it goes past the
5  five-minute mark.  We understood from the court
6  videographer that we were over time and we agreed
7  to give you, as a courtesy, professional courtesy,
8  an extra five minutes.
9        Also, I still don't have these exhibits
10  in the chat.
11       MR. CLUBOK:  Let's go off the record.
12       THE VIDEOGRAPHER:  We're going off the
13  record at 7:55 p.m.
14  (Recess taken from 7:55 p.m. to 7:59 p.m.)
15       THE VIDEOGRAPHER:  We're going back on
16  the record at 7:59 p.m.
17  BY MR. CLUBOK:
18    Q   Mr. Ellington, I'm referring you to
19  Exhibit 90, the page that ends Bates number 433,
20  there's a UBS settlement structure that
21  contemplates:
22       "NewCo Cayman controls HFP/CDO Fund
23  assets in (what"); and ..."
24       Et cetera, and as set forth on this
25  page; do you see this?

386

1    A   Yes.
2    Q   And this, again, is an email that was
3  sent or a PowerPoint attached to an email sent by
4  Stephanie Vitiello to Isaac Leventon on the
5  evening of August -- I'm sorry, April 11th, 2017
6  where she says based on discussion with Scott she
7  started updating the first few slides, and then
8  she'll be "in by 8 tomorrow so we can edit before
9  we meet with Scott."
10       Does seeing this refresh your
11  recollection that you discussed a UBS settlement
12  structure with Ms. Vitiello and Mr. Leventon about
13  potentially starting a new company in Cayman that
14  would control the HFP, CDO Fund assets and would
15  be part of a UBS settlement structure?
16    A   No.
17    Q   Do you deny that you had that
18  discussion or you just say you don't remember one
19  way or the other?
20    A   I don't remember having this discussion
21  at all.
22       (Deposition Exhibit 91 was marked for
23  identification.)
24       MR. CLUBOK:  Okay.  We're going to look
25  at now Exhibit 91.  Exhibit 91 is an email from

387

1  the next day, April 12th.
2        Let's put up Exhibit 91.
3  BY MR. CLUBOK:
4    Q   Okay.
5        Remember Ms. Vitiello says that she's
6  coming in at 8 so they can edit with Mr. Leventon
7  before they meet with you, Mr. Ellington.
8        Now we look at Exhibit 91, and this is
9  an email from 3:26 the next day, and Stephanie
10  sends it to Isaac and says:
11       "Started making updates ..."
12       In response to an email that Isaac had
13  sent her at 11:30 a.m. that morning; do you see
14  that?
15    A   I do.
16    Q   And now we're up to settlement
17  structure version 4, according to Stephanie's
18  attachment; do you see that?
19    A   Yeah, I do but the subject line says
20  "UBS Settlement Structure v2."
21    Q   Well, that's what Isaac said at 11:30,
22  but this email where Stephanie responds at
23  3:26 says version 4; correct?
24    A   I see that now in the attachment.
25  Okay.

388

1    Q   Okay?
2    A   Yes.
3    Q   So she sends her attachment and the
4  attachment -- I'm going to go down, if I have
5  control here, and I'm going to go down to the page
6  that Bates-labeled 508.
7        I am going to rotate my screen here.
8        And on the page that says 508 it now
9  says "If Highland settles" and it still talks
10  about:
11       "NewCo Cayman controls HFP/CDO Fund
12  assets (currently $94 million) ..."
13       So that's new information that's been
14  added to this version on April 12th; do you see
15  that?
16    A   I do.
17    Q   And it still talks about the NewCo and
18  HCMLP using "HFP/CDO Fund assets to generate cash
19  to pay UBS settlement, Citi, and outstanding legal
20  fees."
21       Do you see that?
22    A   I do.
23    Q   And it talks about this allowing HCMLPs
24  to avoid a $50 million-plus tax liability.
25    A   Yes.

389

1    Q    And how residual assets up to 50
2  million will stay at this NewCo Cayman which will
3  controlled by Highland, according to this slide;
4  do you see that?
5    A    I do.
6    Q    Do you remember having a discussion
7  with Mr. Leventon and Ms. -- I won't say her name
8  right -- how do you pronounce her name?
9    A    Ms. Vitiello.
10    Q    -- Ms. Vitiello that is reflected in
11 Exhibit 91 on the page that ends in 508.
12    A    Yes.
13    Q    Okay.
14    A    Stop.  Did you ask if it refreshed my
15 recollection; is that your question?
16    Q    Yes.
17    A    No, it does not.
18    Q    Oh, but you remember having that
19 discussion?
20    A    No, I do not.
21    Q    Oh, I'm sorry, what did you say "Yes"
22 to?
23    A    I thought you were asking me if I saw
24 the language in number 5.
25    Q    I see.  Okay.  So you see this slide

390

1  but seeing this doesn't refresh your recollection
2  that you actually met with Ms. Vitiello and
3  Mr. Leventon that day and this reflects that
4  meeting; is that what your testimony is?
5    A    No.
6    Q    And again, are you saying it didn't
7  happen or are you saying you don't remember one
8  way or the other?
9    A    I don't remember it happening.
10    Q    Okay.  Do you remember -- so, are you
11 saying you do not believe it happened or are you
12 saying you don't remember if it did or not?
13    A    I don't recall that it happened.
14    Q    Are you saying you don't recall whether
15 or not it happened or are you saying that as far
16 as you recall it did not happen?
17      MS. SMITH:  Objection to form.  Asked
18 and answered.
19      THE WITNESS:  I have no memory of the
20 meeting.  I don't know how else to answer the
21 question.
22      (Deposition Exhibit 92 was marked for
23 identification.)
24 BY MR. CLUBOK:
25    Q    Okay.  So the last exhibit in this

391

1  chain I want to point you to is Exhibit number 92.
2  That ends [sic] in Bates number 593.
3      MS. SMITH:  Are we on Exhibit 2 now --
4  Exhibit 92?
5      MR. CLUBOK:  We're on Exhibit 92 and it
6  ends [sic] in Bates number 593.
7      MS. SMITH:  Begins at 593?
8      MR. CLUBOK:  Yes.
9      (Ellington Exhibit 92 was marked for
10 identification.)
11 BY MR. CLUBOK:
12    Q    Yes, and you can see that Mr. Leventon
13 has sent Ms. Vitiello at 7:49 p.m. a document he
14 calls appendix 1, which is entitled "UBS -
15 Settlement Assets" with an Excel spreadsheet, and
16 in response, at about 7:56 p.m., Ms. Vitiello is
17 sending Mr. Leventon on April 12th a document
18 where we are up to version 6 of the UBS settlement
19 structure; do you see that?
20    A    Yes.
21    Q    And this is all happening -- this is
22 all -- approximately 24 hours has passed, or less,
23 since we saw that first email when she said that
24 she was updating the slide based on conversation
25 and would meet with you tomorrow, which was

392

1  Exhibit 90; is that correct?
2    A    Yes.
3    Q    So if we go down Exhibit 92, we now see
4  that -- that it looks a lot more like the final
5  version that we looked at later.  It's got this
6  first page that says "UBS vs. Highland," like a
7  more -- I think it was version 9 that we talked
8  about earlier.  Do you see that on page 1?
9      Did Mr. Ellington freeze again?  Did we
10 lose him?
11    A    I only see half of a cover page.
12    Q    Scott, I'm sorry, you froze for a
13 second or maybe it was me.
14    Q    Do you see --
15    A    Oh no, it's me.  It says my internet
16 connection is unstable.  Is it back to normal?
17    Q    Okay, yes, you are back to normal.  So
18 close to being done so let's try to get this last
19 one?
20    A    Okay.
21    Q    We are on Exhibit 92.  I've scrolled
22 down and you can see that Exhibit 92, which I
23 think is version 6 according to Ms. Vitiello, is
24 looking a lot more like the version 9 that we
25 talked about earlier today?

393

1    A    I apologize, Mr. Clubok, I can still
2    only see the cover page.
3    Q    Yeah, I'm only showing that one slide
4    right now.
5    A    Okay.
6    Q    So right now I'm -- I'll just make it a
7    little smaller so you can see it.
8    A    Okay.
9    Q    I just looked, showing -- this first
10   slide -- "Settlement Analysis," that looks
11   familiar to you, right?
12   A    Correct.
13   Q    That was the version that we looked at
14   later --
15   A    Yes.
16   Q    -- earlier today, I mean?
17   A    Yes.
18   Q    So now I am going to scroll down and
19   now it's got more of this detailed information
20   like we saw in the version 9.  It says:
21       "If Highland does not settle ..."
22       And what happens if UBS wins or
23   Highland wins.  And it has got that:
24       "Bottom line:  There is no upside to go
25   to trial in either matter."

394

1        On the page that ends at 595 for
2    Exhibit 92; do you see that?
3    A    Yes.
4    Q    And if we continue, it's got specific
5    information filled in about resulting tax
6    liability and in particular, it's got more than
7    50 million for Dondero?
8    A    Yes.
9    Q    And then small amounts for other people
10   who were affiliated at one point with Highland,
11   like Todd Travers and Pat Daugherty and some
12   others?
13   A    Correct.
14   Q    So when you talk about 50 million plus
15   tax liability for HCMLP, most of that is
16   Mr. Dondero's tax liability?
17       MS. SMITH:  Objection to form.
18   Objection to form.
19   BY MR. CLUBOK:
20   Q    Sorry.  When the document refers to
21   50 million plus tax liability later, it -- most of
22   that tax liability is associated with Mr. Dondero
23   with respect to the HCM-affiliated individuals;
24   correct?
25   A    Yes.

395

1    Q    And then we've put it down, and you can
2    see a lot of these pages are more similar and now
3    we get to slide 6 and now -- and this is
4    August 12th, the day after that slide show she
5    talked about NewCo, now all of a sudden we're
6    talking about Sentinel controlling the assets,
7    "the HFP/CDO Fund assets (currently $94 million)."
8        Do you see that?
9    A    I do.
10   Q    And now it says:
11       "Sentinel and HCMLP can use HFP/CDO
12   Fund assets to generate cash to pay UBS settlement
13   ..."
14       Right?
15   A    Yes.
16   Q    And it talks about HCMLP's $50 million
17   tax liability but almost all of that is actually
18   Jim Dondero's personal tax liability; right?
19       MS. SMITH:  Objection to form.
20       -- (overspeaking) --
21       THE WITNESS:  I don't know if there was
22   an additional HCMLP tax liability.
23   BY MR. CLUBOK:
24   Q    Well, if you look here on the list of
25   tax liabilities, it has got 50 million-plus for

396

1    Dondero and then it has some unaffiliated
2    entities, Crusader, Goldman, and then it has got
3    some individuals that have collectively a couple
4    of million.
5        So, fair to say that HCMLP's
6    50 million-plus tax liability means Jim Dondero's
7    primarily?
8    A    I can see why that assumption would be
9    made but I don't know if they're the same.
10   Q    Okay.  And then it talks about residual
11   assets now up to 50 million staying at Sentinel;
12   right?
13   A    Yes.
14   Q    So you see over the course of 24 hours,
15   roughly, the proposal has changed from a NewCo in
16   the Caymans that would obtain the assets and
17   somehow settle things, to Sentinel controlling the
18   assets and using the assets to generate cash to
19   settle; do you see that?
20   A    Yes.
21       MS. SMITH:  Objection to form.
22   BY MR. CLUBOK:
23   Q    And in fact on page 8 we now see that
24   the settlement structure now specifically talks
25   about HFP and CDO Fund to buy a $100 million ATE

---

**397**

1 policy from Sentinel in exchange for all the
2 assets in HFP/CDO Fund; do you see that?
3    A   Yes.
4    Q   And in the span of this 24 hours, did
5 Ms. Vitiello have any discussions with the
6 independent directors of Sentinel as far as you
7 know?
8    A   I don't know.
9    Q   Was Ms. Vitiello authorized to call the
10 independent directors of Sentinel and discuss this
11 matter with them on this day?
12    A   She could easily have done that.  I
13 don't know.
14    Q   Did you authorize her to do that?
15    A   Not that I recall, no.
16    Q   Did you authorize Mr. Leventon to have
17 any discussions with the independent directors of
18 Sentinel to see if they were good with this
19 proposed settlement structure reflected on page --
20 that ends in Bates number 601 for Exhibit 92?
21    A   Did I authorize Mr. Leventon?  Not that
22 I'm aware of, no.
23    Q   Did you authorize anybody anyone to
24 reach out to the independent directors on or about
25 April 11th or 12th to see if they would be willing

---

**398**

1 to sell a $100 million ATE policy in exchange for
2 all the assets in HFP and CDO Fund?
3    A   Did I authorize anyone to do that?  No.
4    Q   Who came up with these numbers in the
5 span of 24-hour period between when Ms. Vitiello
6 tells Isaac Leventon she spoke to you and they're
7 going to have a meeting with you tomorrow at the
8 end of the day, April 12th; do you know?
9    A   No idea if this is again during the
10 timeframe where obviously all these ideas were
11 being bandied about in large group and subsets of
12 the groups.  There could have been numerous inputs
13 of the list.
14    Q   Was there a large group that met on
15 April 12th on this subject?
16    A   I cannot remember what times people
17 met.
18    Q   Did you ever meet --
19    A   It was four years ago.
20    Q   Did you ever meet just in a small group
21 with Mr. Leventon and Ms. Vitiello to discuss this
22 structure?
23    A   Not that I remember.
24    Q   If either of them said you did, would
25 they be lying?

---

**399**

1    MS. SMITH:  Objection to form.
2    THE WITNESS:  No, if their memory is
3 better than mine, I don't think they'd be lying.
4 BY MR. CLUBOK:
5    Q   Okay.
6    A   It also -- they could have had limited
7 input from me.  They may have been asking me how
8 to organize the slides, if they did meet with me.
9 It doesn't mean they asked me for the input of
10 numbers.  I wouldn't even have known what numbers
11 to put in there.
12    Q   Who came up with the idea to make the
13 proposed settlement structure as reflected in the
14 page that ends Bates number 601 of Exhibit 92 as
15 opposed to the original settlement structure that
16 we saw from the day before?
17    A   I didn't know.
18    Q   It was you, wasn't it?
19    A   No, it wasn't me.  I don't remember
20 coming up with this structure.  It could have been
21 compliance.
22    Q   It could have been who at compliance?
23    A   If compliance -- part of the process
24 was examining various structures of what was
25 possible.

---

**400**

1    Q   You are just totally speculating about
2 that, you have no memory of talking to compliance
3 at this time about --
4    A   I didn't say I talked to compliance.
5 You asked me who they talked to or who gave the
6 input to this and I told you I don't know.  And
7 you said, "It was you, wasn't it," and I said,
8 "No."
9    Q   But you were certainly involved with
10 the proposal that's reflected on the page that
11 ends 601 for Exhibit 92; correct?
12    MS. SMITH:  Objection to form.
13    THE WITNESS:  I have no memory of this
14 at all, period.
15    MR. CLUBOK:  Okay, that's all that
16 I have, I believe.
17    Thank you very much.  I will say, I
18 guess, since we're done with the deposition, just
19 to briefly respond, because I don't want to get
20 these arguments on the record.
21    MS. SMITH:  We are on the record.
22    THE VIDEOGRAPHER:  We are not off the
23 record.
24    MR. CLUBOK:  We can stay on the record,
25 I just don't want to have this -- we can go off

---

**401**

1  the video of the deposition. The court reporter
2  can continue.
3  　　　　Let's shut the deposition down and the
4  court reporter can continue.
5  　　　　THE VIDEOGRAPHER: This marks the end
6  of the video deposition of Scott Ellington. We
7  are going off the video record at 8:14 p.m.
8  　　　　MR. CLUBOK: Just so we don't get into
9  a debate about this. I didn't want to respond to
10  everything that Ms. Smith said either in her last
11  comment or even before, frankly, about the other
12  issues. But, you know, we had a misunderstanding,
13  perhaps, a discrepancy in the time that the
14  videographer believed was left versus the time
15  that we had calculated and I don't know if
16  Ms. Smith had calculated a third time, but in any
17  event, as promised, I kept my questioning time to
18  I think just a few minutes, if you take out the
19  pauses and the time it took to get the exhibits up
20  and the objections and so forth, but hopefully
21  that was satisfactory and, in any event, I think
22  we, you know, I think that's all that needs to be
23  said about that.
24  　　　　We would like to serve Mr. Ellington.
25  We would like him not to dodge service of the

**402**

1  matter that's pending in New York. We'd like him
2  to --
3  　　　　MS. SMITH: You need to go off the
4  record if you are going to be talking about other
5  stuff now.
6  　　　　MR. CLUBOK: Well, you brought it up
7  before on the record so I am just going to
8  continue on the record now and say we would very
9  much like Mr. Ellington to simply accept service
10  and not dodge it and not make it difficult for us
11  to serve him.
12  　　　　MR SODERLUND: She brought up your
13  violation of the confidentiality of the deposition
14  is what she brought up, Andy.
15  　　　　-- (overspeaking) --
16  　　　　MS. SMITH: That's Eric Soderlund from
17  my office.
18  　　　　MR. CLUBOK: Yes, it's unhelpful. I
19  believe.
20  　　　　In any event, I passed on that request.
21  I want to make it clear that --
22  　　　　-- (overspeaking) --
23  　　　　MR. CLUBOK: I want to make it clear
24  that I have made that request very clearly to
25  avoid the necessity of trying to serve

**403**

1  Mr. Ellington if he either -- or if either of you
2  counsel, or if he's got other counsel that he can
3  refer us to for that matter would accept service
4  and avoid the expense of trying to achieve
5  service, which -- the experience we had in this
6  case on that was not pleasant and I'm hoping that
7  we don't have that same experience in this other
8  matter.
9  　　　　MS. SMITH: I don't want the perception
10  that he's dodging service when he has been in
11  town, you know, 36 hours or 30 hours and now he's
12  been sitting for your deposition. So, how could
13  he be dodging service when he's sitting for your
14  deposition?
15  　　　　MR. CLUBOK: Well, we are asking right
16  now through you, that he just simply accept
17  service of these papers. We have a process server
18  who will attempt to serve him beginning, perhaps,
19  tonight and continuing through tomorrow.
20  　　　　We hope we do not have to do that. It
21  is very simple. If we can just get an agreement
22  to accept service of those materials then it will
23  save everyone cost and expense and I hope that
24  that's just agreed upon. It is very simple.
25  　　　　It will be -- we'll be able to serve

**404**

1  him but it will be a considerably unnecessary
2  expense, if the last time is the guide.
3  　　　　And I would hope that you and the
4  lawyers from Baker McKenzie are advising him not
5  to put us through that. That's all I can do. And
6  if Mr. Ellington has other counsel that are
7  representing him in that matter, then we'd ask
8  through you, Ms. Smith, to alert us to the names
9  of those people so we can avoid and we can move
10  cooperatively in that matter instead of --
11  eventually we'll get service one way or the other,
12  no doubt, although we may have to go to the court
13  for it and we hope that that is not necessary.
14  　　　　MS. SMITH: Are we done?
15  　　　　MR. CLUBOK: Yes. Thank you.
16  　　　　If you -- if Mr. Ellington, will accept
17  service, if you could please just talk to him
18  after this, please call me back any time and
19  hopefully we can save everybody that trouble.
20  　　　　MS. SMITH: I'll talk to my client.
21  　　　　MR. CLUBOK: Thank you very much.
22  　　　　HOUSEKEEPING
23  　　　　MS. SMITH: Ms. Barrett, I would like a
24  draft, please, Frances Smith.
25  　　　　MS. McLAUGHLIN: We'll take the draft

405

1  too and then the final in ten days.
2      MR. CLUBOK:  Thank you so much.  Thank
3  you Nate, and Lisa and Robert Leonard for sticking
4  around this late.
5      REMOTE TECHNICIAN:  I just wanted to
6  confirm as far as the exhibits go, do you just
7  want the new exhibits, 86 through 92, attached to
8  this transcript?
9      MR. CLUBOK:  That's a great question.
10 (Deposition concluded at 8:20 p.m. EST)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

406

1      REPORTER'S CERTIFICATION
2      I, Lisa M. Barrett, the officer before
3  whom the foregoing deposition was taken, do hereby
4  certify that the foregoing transcript is a true
5  and correct record of the testimony given; that
6  Said testimony was taken by me stenographically
7  and thereafter reduced to typewriting under my
8  direction; that reading and signing was requested;
9  and that I am neither counsel for, related to, nor
10 employed by any of the parties to this case and
11 have no interest, financial or otherwise, in its
12 outcome.
13      IN WITNESS WHEREOF, I have hereunto set
14 my hand this 10th day of August, 2021.
15
16
17  _____
18  LISA M. BARRETT, RPR, CRR, CRC
19  NOTARY PUBLIC IN AND FOR
20  THE STATE OF MARYLAND
21
22
23
24
25