

**Planet Depos**®

We Make It *Happen*™

# Transcript of Thomas Adamczak, 30(b)(6)

**Date:** April 12, 2022
**Case:** UBS Securities LLC, et al. -v- Highland Capital Management, L.P.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

```
1            UNITED STATES BANKRUPTCY COURT
                NORTHERN DISTRICT OF TEXAS
2
   IN RE:                    )
3                            )
   HIGHLAND CAPITAL          )
4  MANAGEMENT, L.P.          )
                             )
5  UBS SECURITIES, LLC       )
   and UBS AG LONDON         )
6  BRANCH,                   )
                             )
7         Plaintiff,         )
                             )
8      vs.         ) Case No. 19-34054-SGJ11
                             )
9  HIGHLAND CAPITAL   ) Chapter 11
   MANAGEMENT, L.P.,         )
10        Defendant. )Adv. Proc. No. 21-03020-SGJ
                             )
11                           )
12          VIDEOTAPED DEPOSITION OF
              THOMAS ADAMCZAK, 30(b)(6)
13
              Tuesday, April 12, 2022
14                  9:06 a.m.
15
16
17
18
19 Job No. 442674
20 Pages:  1 - 315
21 Reported by: Stephanie A. Battaglia, CSR, RMR,
   CRR
22
23
24
25
```

**Page 2**

```
1      SUPREME COURT OF THE STATE OF NEW YORK
                COUNTY OF NEW YORK
2
   UBS SECURITIES LLC and    )
3  UBS AG, LONDON BRANCH,    )
                             )
4      Plaintiffs,           )
                             )
5      vs.           ) Index No.:
                      ) 650097/2009
6                            )
7  HIGHLAND CAPITAL          )
   MANAGEMENT, L.P., HIGHLAND )
   CDO OPPORTUNITY MASTER    )
8  FUND, L.P., HIGHLAND      )
   SPECIAL OPPORTUNITIES     )
9  HOLDING COMPANY, HIGHLAND )
   FINANCIAL PARTNERS, L.P., )
10 HIGHLAND CREDIT STRATEGIES )
   MASTER FUND, L.P., HIGHLAND)
11 CRUSADER OFFSHORE PARTNERS,)
   L.P., HIGHLAND CREDIT     )
12 OPPORTUNITIES CDO, L.P.,  )
   and STRAND ADVISORS, INC., )
13                           )
       Defendants.           )
14
15          VIDEOTAPED DEPOSITION OF
              THOMAS ADAMCZAK, 30(b)(6)
16
17            Tuesday, April 12, 2022
                  9:06 a.m.
18
19
20
21
22
23
24
25
```

**Page 3**

```
1            I  N  D  E  X
2 WITNESS:                        PAGE:
3 THOMAS ADAMCZAK, 30(b)(6)
4 EXAMINATION BY:
5 Mr. Burt                      10, 311
6 Mr. Weldon                       307
7        E X H I B I T S
          (Retained by Latham)
8 Exhibit 112 Subpoena to Testify at      13
              a Deposition in a Bankruptcy
9             Case (or Adversary Proceeding)
10 Exhibit 113 Subpoena ad Testificandum   13
11 Exhibit 114 Letter                      22
              Re:  Sentinel Reinsurance,
12            Ltd. ("Sentinel"; License
              #642423) Request for Approval
13            - Change in Ownership
              (CIMA Follow Up Questions)
14            DISCSEN0000097 -
              DISCSEN0000139
15
16 Exhibit 115 E-mail                      26
              Subject:  FW:
17            Sentinel Re, Ltd CIMA requests
              DISCSEN0008408 -
18            DISCSEN0008410
19 Exhibit 116 E-mail                      36
              Subject:  RE:
20            Sentinel CIMA exam
              BC SEN0000076061 -
21            BC SEN0000076080
22 Exhibit 117 Management and Administrative 51
              Services Agreement
23            BC SEN0000361175 -
              BC SEN00000361183
24
25
```

**Page 4**

```
1 (Cont'd.):
2 Exhibit 118 E-mail                       73
              Subject:  RE:  [EXTERNAL] FW:
3             WinSure Yield Stack 2019
              Quota Share Reinsurance
4             BC SEN0000727319 -
              BC SEN0000727328
5
6 Exhibit 119 E-mail                       79
              Subject:  London
7             UBSPROD460936 -
              UBSPROD460948
8 Exhibit 120 E-mail                       89
              Subject:  FW:
9             Ellington - Request Reimbursement
              BC SEN0000663342 -
10            BC SEN0000663344
11 Exhibit 121 Letter                      95
              KL_000029 -
12            KL_000039
13 Exhibit 122 E-mail                      105
              Subject:  RE:
14            Expense Reimbursement
              BC SEN0000662367 -
15            BC SEN0000662368
16 Exhibit 123 2006 Tenuta San Guido       109
              Sassicaia Bolgheri
17            (No Bates Numbers)
18 Exhibit 124 E-mail                      114
              Subject:  Re:
19            Sentinel Expenses for Approval
              BC SEN0000074288 -
20            BC SEN0000074289
21 Exhibit 125 E-mail                      124
              Subject:  UBS - Privileged
22            Legal Liability
              Insurance Policy
23            (No Bates Numbers)
24
25
```

---

**5**

1  (Cont'd.):

2  Exhibit 126 E-mail                           136
3          Subject: Sentinel
          Reinsurance, Ltd. -
          Final Inspection Reports
4          BC SEN0000078777 -
          BC SEN0000078828
5
   Exhibit 127 E-mail                           138
6          Subject: RE:
          Draft ATE policy
7          BC SEN0000745902 -
          BC SEN0000745906
8
   Exhibit 128 E-mail                           146
9          Subject: FW:
          Sentinel Reinsurance -
10         ATE policy
          BC SEN0000062979 -
11         BC SEN0000745988
12  Exhibit 129 E-mail                          157
13         Subject: RE:
          Sentinel year-end
14         actuarial analysis
          BC SEN0000005065 -
          BC SEN0000005085
15
   Exhibit 130 Settlement Analysis              171
16         UBS vs. Highland
          HCMUBS005304 -
17         HCMUBS005321
18  Exhibit 131 E-mail                          177
19         Subject: Sentinel
          BC SEN0000046128 -
          BC SEN0000046129
20
   Exhibit 132 Letter                           184
21         BC SEN0000767181 -
          BC SEN0000767182
22
   Exhibit 133 Purchase Agreement               191
23         (No Bates Numbers)
24
25

---

**6**

1  (Cont'd.):

2  Exhibit 134 E-mail                           204
3          Subject: RE: Time to
          Schedule a Meeting for
4          Sentinel Re to have an
          "acquaintance" meeting
          Wednesday afternoon June 23
5
   Exhibit 135 E-mail                           217
6          Subject: RE: Sentinel -
          12/31 VRC Valuation
7          Source Docs
          BC SEN0000120230
8
   Exhibit 136 Excel Worksheet                  221
9          BC SEN0000064513
10  Exhibit 137 E-mail                          225
11         Subject: RE: Sentinel
          BC SEN0000707455 -
          BE SEN0000707459
12
   Exhibit 138 Policy with                      237
13         Endorsement 1 and 2
          MD_000010 - MD_000028
14
   Exhibit 139 E-mail                           248
15         Subject: Re:
          ATE Related Invoice
16         BC SEN0000641688 -
          BC SEN0000641689
17
   Exhibit 140 E-mail                           262
18         Subject: RE: Sentinel
          BC SEN0000585041
19
   Exhibit 141 E-mail                           267
20         Subject: Re:
          Sentinel ATE endorsement #2
21         BC SEN0000723353 -
          BC SEN0000723354
22
   Exhibit 142 E-mail                           271
23         Subject: Re: Sentinel
          Reinsurance Invoice Approval
24         BC SEN0000667053 -
          BC SEN0000667054
25

---

**7**

1  (Cont'd.):

2  Exhibit 143 Asset Transfer Agreement         276
          UBSPROD020567 -
          UBSPROD020576
3
4  Exhibit 144 E-mail                           282
5          Subject: Fw:
          Sebastian Clarke Ltd. - urgent
          BC SEN0000638649 -
6          BC SEN0000638662
7  Exhibit 145 E-mail                           304
8          Subject: Interesting to now
          learn that Matt had been
9          planning to also resign
          from Sentinel's board
          BC SEN0000108912
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**8**

1       THE VIDEOGRAPHER:  Here begins Disk No. 1
2  in the video deposition of Thomas Adamczak.
3       Today's date is April 12, 2022.  The exact
4  time on the video monitor is 9:06.
5       Would the court reporter please swear in
6  the witness.
7       (Witness sworn.)
8       MR. BURT:  Should we make appearances for
9  record?
10      On behalf of UBS Jason Burt along with
11 Katie George, and we have a number of colleagues
12 over Zoom, Danielle McCall, Shannon McLaughlin,
13 and Andy Clubok may join at points today.
14      MR. WELDON:  Chris Weldon as counsel for
15 Beecher and Brown & Brown and for the witness
16 30(b)(6) designee Thomas Adamczak.
17      MR. BURT:  And I am not sure if
18 Mr. Feinstein is able to -- if we figured out the
19 Zoom, but Robert Feinstein is also here on behalf
20 of the debtor and the trustee.
21      MR. FEINSTEIN:  Yes, I figured out the
22 Zoom.
23      Just for my purposes I see the witness
24 although the name on the box is not him, I assume
25 the court reporter, but the gentleman in the gray

9

1 shirt is the witness and I see Daniella, Katie and
2 Shannon, an 802 number, there is no picture
3 associated with that, who all is on that number
4 and where is that coming from?
5     MS. GEORGE: Rob, that just the phone, we
6 had to do the phone and the Zoom computer
7 different. The computer looking at the witness
8 does not have the audio, this phone number does
9 instead. It is just a conference line in the room
10 with us.
11     MR. FEINSTEIN: Okay.
12     And then who is doing the examination?
13     MR. BURT: Rob, I am doing it. This is
14 Jason.
15     MR. FEINSTEIN: And you are not on the
16 screen anywhere? Unless -- you are just on the
17 phone?
18     MR. BURT: No, I am here in person, only
19 the witness is on the zoom screen.
20     MR. FEINSTEIN: You are in the room with
21 the witness.
22     MR. BURT: I am.
23     MR. FEINSTEIN: Got it, okay, thank you.
24
25

11

1 they would if you were testifying in court?
2     A Yes.
3     Q From time to time I may ask a question
4 today that you might not understand. If that's
5 the case please just ask me to rephrase or tell me
6 you don't understand and I will do my best to do
7 that. If you do answer I will assume that you
8 understood my question. Is that fair?
9     A That's fair.
10     Q If you need a break at any point during
11 the deposition that's perfectly fine, just let us
12 know. I just ask that you answer the question
13 that has been asked before we take that break, is
14 that fair?
15     A Okay.
16     Q Your attorney may object to some of the
17 questions that I pose today. Unless your attorney
18 instructs you not to answer do you understand that
19 you are still obligated to answer the question?
20     A Yes.
21     Q Is there any reason, Mr. Adamczak, why you
22 can't be able to answer my questions fully and
23 truthfully today?
24     A No.
25     Q Throughout this deposition I am going to

10

1     THOMAS ADAMCZAK, 30(b)(6),
2 called as a witness herein, having been first duly
3 sworn was examined and testified as follows:
4     EXAMINATION
5     BY MR. BURT:
6     Q Mr. Adamczak, could you please state and
7 spell your full name for the record?
8     A The name is Thomas Patrick Adamczak,
9 T-h-o-m-a-s Patrick, P-a-t-r-i-c-k, Adamczak,
10 A-d-a-m-c-z-a-k.
11     Q Mr. Adamczak, who do you work for?
12     A I work for Brown & Brown formerly known as
13 Beecher Carlson.
14     Q Have you been deposed before?
15     A No.
16     Q I would like to go over just a few of the
17 ground rules, I am sure your counsel has described
18 some of these, just so that we can make a clear
19 record today. You understand you were just sworn
20 by the court reporter, and do you understand that
21 you are under oath and --
22     A Yes.
23     Q -- and obligated to tell the truth today?
24     A Yes.
25     Q And that penalties of perjury apply as

12

1 refer to Sentinel as a shorthand, and by that what
2 I mean is Sentinel Reinsurance Limited, is that
3 fair?
4     A That's fair.
5     Q And I may also refer to Beecher or Beecher
6 Carlson, and do you understand that unless I say
7 otherwise I mean Beecher Carlson Insurance
8 Services, LLC, and/or Beecher Carlson Cayman
9 Limited?
10     A That's fair.
11     Q You understand that you have been
12 designated as the corporate witness or
13 representative for Beecher Carlson for purposes of
14 this deposition, correct?
15     A That's correct.
16     Q And that your answers today are on behalf
17 of Beecher Carlson?
18     A Correct.
19     Q So if I ask -- if I say you in a question
20 I am referring not just to you, Mr. Adamczak, but
21 to Beecher Carlson as a whole.
22     A Correct.
23     Q I'd like to show you quickly two exhibits,
24 we will mark this, I think we are beginning at
25 112, so we will mark these as 112 and 113.

13

1    MR. WELDON:  Federal being 112, New York
2  being 113?
3    MR. BURT:  No.  They will both just be
4  112.  Excuse me, the same number for both cases,
5  it's just continuous in the adversary proceeding
6  and we won't mess with different exhibit labels.
7    MR. WELDON:  So Exhibit 112 are both
8  subpoenas?
9    MR. BURT:  Correct.
10    Exhibit 112 is the subpoena in the
11  adversary proceeding, Exhibit 113 is the exhibit
12  -- is the subpoena in the New York proceeding.
13    MR. WELDON:  That's what I said, okay.
14    MR. BURT:  Sorry, I got confused.
15    MR. WELDON:  No problem.
16  (Document marked Walther Exhibit 112 for
17    identification.)
18  (Document marked Walther Exhibit 113 for
19    identification.)
20  BY MR. BURT:
21    Q  Mr. Adamczak, referring to Exhibit 112 do
22  you recognize this as the subpoena issued in the
23  bankruptcy proceeding?
24    A  I do.
25    Q  And have you seen this document before?

14

1    A  I have.
2    Q  And have you had a chance to review the
3  topics listed in Attachment A?
4    A  I have.
5    Q  And you understand that you have been
6  designated to testify about these topics that are
7  listed in Attachment A, correct?
8    A  I have.
9    Q  Referring to Exhibit 113, do you see it is
10  a subpoena to testify in the New York proceeding
11  UBS versus Highland Capital Management and a
12  number of other parties, is that right?
13    A  Yes.
14    Q  And also listed in this subpoena in
15  Attachment A is a number of topics.  Have you had
16  a chance to review those topics?
17    A  I am seeing this for the first time now.
18    Q  And I will represent to you they are the
19  same topics that are listed --
20    A  I was going to ask.
21    Q  -- in the other subpoena.
22    MR. WELDON:  We may have just sent him the
23  attachment to it, but he's designated for both.
24    MR. BURT:  Perfect.
25

15

1  BY MR. BURT:
2    Q  So you understand you are designated to
3  testify on these topics in both proceedings?
4    A  Correct.
5    Q  Perfect.
6    Mr. Adamczak, when did you begin working
7  for Beecher Carlson?
8    A  In 2014.
9    Q  And when did you begin working on Sentinel
10  matters?
11    A  Probably shortly after I started with
12  Beecher.
13    Q  How did it come to be that you began
14  working on the Sentinel matters?
15    A  The person that I had replaced had
16  previously done work with Sentinel and it was my
17  designated client to work with.
18    Q  Who did you replace?
19    A  John, I don't remember his last name.
20    Q  And so Sentinel is one of
21  Beecher Carlson's clients, correct?
22    A  It is.
23    Q  How long has Sentinel been a Beecher
24  client?
25    A  Since its inception.

16

1    Q  And when you say that Sentinel is a
2  Beecher client, what precisely do you mean by
3  that?
4    A  Sentinel has an agreement with
5  Beecher Carlson to provide captive management
6  services consisting of financial statements,
7  preparation, coordination of board meetings,
8  corresponding with the regulators.
9    Q  Anything else that's involved in being a
10  captive insurance manager?
11    A  Interacting with the various service
12  providers that Sentinel would engage for audit,
13  actuarial, whatever.
14    Q  Do you know how it came to be that Beecher
15  was hired to be Sentinel's captive insurance
16  manager?
17    A  I believe Beecher had helped set up the
18  captive initially.
19    Q  On whose request?
20    A  Someone from Highland; whoever would have
21  contacted Beecher Carlson to perform the work.
22    Q  When you say Highland, who are you
23  referring to?
24    A  Highland Capital Management.
25    Q  Do you know who works -- or who worked at

17

1    the time for Highland Capital Management?
2       A  I believe it was J.P. Sevilla.  There were
3    a number of other employees as well that we worked
4    with, but he was I believe the one who had done
5    the initial work with Beecher in setting it up.
6       Q  Who else do you recall worked at that time
7    for Highland Capital Management?
8       A  Katie Irving.
9       Q  Anyone else?
10      A  At that time that it was set up that's all
11   that I am aware of.
12      Q  And over time did you correspond with
13   others at Highland Capital Management?
14      A  Yes.
15      Q  Who did you correspond with?
16      A  Matt DiOrio.
17      Q  Did you understand him to work for
18   Highland Capital Management?
19      A  Yes.
20      Q  Anyone else?
21      A  Isaac Leventon, but it was primarily
22   through Matt DiOrio that we worked with him and on
23   a very limited basis.
24      Q  Anyone else at Highland Capital Management
25   that you've worked with over the years?

18

1       A  Those are the only ones that come to mind.
2       Q  How about Stephanie Vitiello, does that
3    ring a bell?
4       A  I think I have seen the name.  I
5    understand that she had attended a meeting down in
6    the Cayman with a few other folks from Highland
7    Capital on behalf of Sentinel, but we have had no
8    interaction with her other than her awareness of
9    that meeting.
10      Q  I want to ask a question about something
11   you just said, that they attended a meeting from
12   Highland Capital on behalf of Sentinel.  Was it
13   common that employees of Highland Capital would do
14   things on behalf of Sentinel?
15      A  Well, a captive insurance company does not
16   generally have any employees, so all of the
17   employees are typically from a sponsoring
18   organization.  In this case it was Highland
19   Capital that was that sponsoring organization.
20      Q  And what exactly does sponsoring
21   organization mean?
22      A  They provide the direction, ideas for
23   insurance coverage, pretty much the concept for
24   the captive and why it came to be in the first
25   place.

19

1       Q  So on the one hand you have the sponsoring
2    organization and on the other you have the
3    insurance management which in this case was
4    Beecher?
5       A  Correct.
6       Q  How does the sponsoring organization or
7    Highland Capital work with the insurance manager
8    in Beecher, how did that happen?
9       A  So the captive managers like
10   Beecher Carlson are specialized in setting up and
11   helping to manage the captives.  We have all the
12   contacts, we being Beecher Carlson, has all the
13   contacts with regulators and the various service
14   providers, whether they are actuaries, attorneys,
15   claims handlers, investment bankers.
16      Q  And what does the sponsoring business do?
17      A  They have the understanding of the risks
18   that are being insured within the captive.
19      Q  This might be an overbroad question, but
20   let me ask it first.
21         Who makes the substantive decisions for
22   the captive insurance company?
23         MR. WELDON:  Objection.
24         Go ahead, you can answer.
25         THE WITNESS:  The directors.

20

1    BY MR. BURT:
2       Q  The directors of the insurance?
3       A  Of the insurance company.
4       Q  Who appoints the directors?
5       A  That's generally another director who
6    might be on the board or a parent organization.
7       Q  With respect to Sentinel do you know who
8    was making the decisions for Sentinel?
9       A  For his time that he was there Matt DiOrio
10   was.
11      Q  When you say the time that he was there,
12   what do you mean when he was where, at Highland
13   Capital Management?
14      A  Right, when he was -- when he had joined
15   Highland Capital he was appointed on the Sentinel
16   board and was our main contact at that point
17   forward.
18      Q  Do you know if he was making decisions on
19   his own?
20      A  I do not.
21      Q  We will come back to some of those topics.
22         We listed a few names, people who worked
23   at Highland Capital Management.  Let me throw out
24   another name and let me know if you recognize it.
25   Scott Ellington.

21

1    A I do.
2    Q Who do you understand Mr. Ellington to be?
3    A I understand that Scott Ellington was an
4 attorney with Highland Capital and also one of the
5 ultimate beneficial owners of Sentinel.
6    Q What does ultimate beneficial owner mean?
7    A They would be the individuals that
8 ultimately owned Sentinel.
9    Q Was there another ultimate beneficial
10 owner of Sentinel?
11   A There was.
12   Q Who was that?
13   A Jim Dondero.
14   Q Does he also go by James Dondero?
15   A James Dondero, yes.
16   Q So it's correct, is it not, that both
17 Mr. Ellington and Mr. Dondero with were the
18 ultimate beneficial owners of Sentinel?
19   A Correct.
20   Q How did you know that?
21   A We have been provided with organizational
22 charts from Highland Capital and were informed
23 that the two UBOs that sat at the top were
24 Mr. Dondero and Mr. Ellington.
25   Q Who provided you those documents of

22

1 Highland Capital?
2    A My recollection is Matt DiOrio and
3 J.P. Sevilla.
4    Q What is the role of an ultimate beneficial
5 owner?
6    A The ultimate person who would call the
7 shots for the captive.
8    Q Because they own it?
9    A Correct.
10   Q I would like to show you our next exhibit,
11 Tab 3, we will mark this as Exhibit 114. It looks
12 big but we are only going to look at a couple of
13 pages.
14      MR. WELDON: 114?
15      MR. BURT: 114.
16      (Document marked Exhibit 114 for
17      identification.)
18 BY MR. BURT:
19   Q Mr. Adamczak, for ease I am just going to
20 refer you to the letter that's the first and
21 second page, and then actually the very last page
22 of the exhibit. Feel free to flip through it, but
23 those are the two pages that I have questions
24 about.
25      Are you ready, Mr. Adamczak?

23

1    A Sure.
2    Q Looking at Exhibit 114, do you see that
3 this is a letter from Beecher Carlson Cayman
4 limited dated November 17, 2015, correct?
5    A Correct.
6    Q And it is signed by a Peter A. Kranz who
7 you list as the managing director of that Beecher
8 entity, correct?
9    A Correct.
10   Q What was Mr. Kranz's role?
11   A He is -- was the primary person that was
12 performing captive management duties with respect
13 to Sentinel.
14   Q Is he located in the Caymans?
15   A He is not.
16   Q Is he located here?
17   A He is located in Vermont.
18   Q In Vermont, okay.
19      I meant to ask earlier, does Beecher
20 Carlson -- is it still the captive insurance
21 manager for Sentinel?
22   A It is.
23   Q And are you still working on that account?
24   A I am.
25   Q Drawing your attention to the second page

24

1 of this letter, No. 7, it states that the
2 executive -- the executed representation from the
3 directors of Sentinel confirming that Messrs James
4 Dondero and Scott Ellington will remain as the
5 majority beneficial owners of Sentinel and that
6 both individuals will have the ultimate
7 responsibility of meeting capital and solvency
8 requirements under the proposed new structure, is
9 that what it says there?
10   A That is correct.
11   Q That was Beecher's understanding in 2015?
12   A Correct.
13   Q Has that been the case throughout
14 Sentinel's existence that Beecher has been
15 servicing Sentinel that Messrs Dondero and
16 Ellington are the ultimate beneficial owners?
17   A That is true.
18   Q And it is still true to this day?
19   A That is correct.
20   Q And is it true that both have always had
21 the responsibility of meeting capital and solvency
22 requirements for Sentinel?
23   A That is correct.
24   Q And that is true to this day as well?
25   A That is correct.

**25**

1  Q  You stated a moment ago that the ultimate
2  -- the role of an ultimate beneficial owner is
3  that they are the person who ultimately calls the
4  shots for the captive.  Is that true with respect
5  to Mr. Dondero and Ellington and Sentinel, that
6  they are the ones ultimately calling the shots for
7  Sentinel?
8      MR. WELDON:  Objection.
9  BY MR. BURT:
10     Q  You can answer.
11     MR. WELDON:  You may answer.
12     THE WITNESS:  To the best of our knowledge
13  that is correct.
14  BY MR. BURT:
15     Q  With Mr. Kranz did he report to you or did
16  you report to him or work together with the
17  Sentinel account?
18     A  I reported to Mr. Kranz.
19     Q  Is that that true to this day?
20     A  He has moved up to a different level, but
21  in an indirect way, yes, that's still true.
22     Q  Do you report to somebody else more
23  directly for the Sentinel account?
24     A  For the Sentinel account we have a
25  Clayton Price down in Cayman.  We actually opened

**26**

1  the Cayman office and have staff on hand in Cayman
2  and Clayton Price is in the Cayman and he is I
3  guess our main Cayman contact.
4      Q  Within Beecher Carlson though you were the
5  manager of the Sentinel account, is that right?
6      MR. WELDON:  Objection.
7       You can answer.
8      THE WITNESS:  The Beecher Carlson Cayman
9  entity for which Beecher Carlson Insurance
10  Services was contracted to provide services for
11  I was the manager.
12     (Document marked Exhibit 115 for
13      identification.)
14  BY MR. BURT:
15     Q  I would like to show you Tab 4, we will
16  mark it as Exhibit 115.  I apologize, these aren't
17  stapled.
18     MR. WELDON:  Can you grab a stapler?
19     MR. BURT:  Go off the record while he is
20  grabbing it.
21     THE VIDEOGRAPHER:  We are going off the
22  record, the time is 9:31.
23     (Recess taken.)
24     THE VIDEOGRAPHER:  We are back on the
25  record, the time is 9:33.

**27**

1  BY MR. BURT:
2      Q  So, Mr. Adamczak, I am showing you what's
3  been marked as Exhibit 115 an e-mail, it's an
4  organizational chart attachment.  Go ahead and
5  take a look at that and let me know when you are
6  ready.
7      A  Okay.
8      Q  So you see the top e-mail is a June, 2019
9  e-mail from Clayton price who you mentioned a
10  moment ago to a Leonna Saintvil at CIMA, is that
11  right?
12     A  Correct.
13     Q  I am probably mispronouncing the name
14  there, and it's regarding Sentinel Re CIMA
15  requests, do you see that?
16     A  I do.
17     Q  What was going on in the June-July, 2019
18  timeframe with respect to CIMA and Sentinel?
19     A  CIMA had performed its periodic inspection
20  of Sentinel and this was in response to a few
21  questions they had on that inspection.
22     Q  And looking at the first e-mail, which is
23  from CIMA to Clayton price, I see you are cc'd on
24  this, Question No. II is as follows, "Is USP1 and
25  USP2 individuals, if so please amend the

**28**

1  organizational chart."  Do you see that?
2      A  I do.
3      Q  And then in response in the front e-mail
4  from Mr. Price, No. 2 says, "USP1 and USP2 are
5  individuals, U.S. Person 1 and U.S. Person 2, who
6  are known to CIMA.  As referenced in my e-mail
7  with the org chart USP1 is Scott Ellington while
8  USP2 is James Dondero.  The org chart has been
9  revised to include their names." Do you see where
10  I was reading?
11     A  I do.
12     Q  Is the org chart that was attached here is
13  that the org chart that was presented to CIMA at
14  that time?
15     A  That is.
16     Q  In looking at this org chart you see at
17  the bottom where the branches come together the
18  first entity underneath that is Sentinel
19  Reinsurance Limited, is that right?
20     A  That is correct.
21     Q  Underneath that is SS Holdings, Limited.
22  Do you know what SS Holdings Limited was?
23     A  SS Holdings Limited was a subsidiary of
24  Sentinel Reinsurance.
25     Q  What function did it have?

29

1    A  To hold the investment in SeaOne.
2    Q  And what was SeaOne?
3    A  SeaOne is a limited partnership startup
4  company that was contributed to Sentinel back in
5  2014, I believe.
6    Q  And who contributed it to Sentinel?
7    A  James Dondero.
8    Q  Who runs SeaOne?
9    A  I do not know.
10   Q  Do you know if Mr. Dondero -- strike that.
11      How was Mr. Dondero affiliated with SeaOne
12 if you know?
13      MR. WELDON:  Objection.
14      THE WITNESS:  I do not know how he is
15 affiliated with SeaOne.
16 BY MR. BURT:
17   Q  Do you know why he transferred the SeaOne
18 interest to Sentinel?
19   A  As a capital contribution to increase the
20 capital in Sentinel.
21   Q  What form did that capital take, the
22 SeaOne interest, was it shares of shown ownership,
23 was it cash?
24   A  Shares of ownership.
25   Q  How did the shares of ownership increase

30

1  Sentinel's balance sheet or capital?
2    A  We understood that the cost basis of the
3  SeaOne ownership was $7 million so the $7 million
4  flowed down into Sentinel and increased its
5  capital base by 7 million.
6    Q  Is SeaOne -- does Sentinel still own that
7  SeaOne interest?
8    A  Sentinel does.
9    Q  Do you know what the value of it is today?
10   A  The latest valuation that was performed it
11 was upwards of 40 to 45 million, I believe.
12   Q  Who performed that valuation?
13   A  Valuation Research CORP.
14   Q  And they are referred to sometimes in the
15 documents as VRC?
16   A  Correct.
17   Q  When was that valuation?
18   A  2020.
19   Q  Do you know if Sentinel wholly owns SeaOne
20 or are there other owners of SeaOne?
21   A  There are several other owners.
22   Q  Do you know who they are?
23   A  I do not.  I have seen a document with all
24 of the listed shareholders, various individuals,
25 trusts, whatever.  There is a significant number

31

1  of investees other than Sentinel.
2    Q  Do you know if those investees involve
3  Mr. Dondero or Mr. Ellington?
4    A  I do not.
5    Q  Or trusts or other organizations that they
6  own or control?
7    A  I do not, no.
8    Q  So looking again at the org chart when you
9  have -- above Sentinel you have a split to the
10 right and a split to the left.  And the first
11 entity on the right that has 70% value and 91%
12 vote is Mainspring Limited, do you see that?
13   A  I do.
14   Q  What do you understand Mainspring Limited
15 to be?
16   A  A parent entity for Sentinel Reinsurance.
17   Q  And is it correct that Mr. Dondero
18 ultimately owns Mainspring?
19   A  That is correct.
20   Q  Is he the only owner of Mainspring?
21   A  I do not know that.
22   Q  As you follow up the org chart up to
23 Mr. Dondero the 70% value that went to Mainspring
24 95% of that value ultimately ends up with
25 Mr. Dondero, correct?

32

1    A  According to the org chart, correct.
2    Q  Do you have an understanding to the
3  contrary?
4    A  I do not.
5    Q  And then 9% of the vote goes to
6  Mr. Dondero and then 91% of the vote is split off
7  into Kind Holdings, Limited, do you see that?
8    A  I do.
9    Q  What is Kind Holdings?
10   A  An entity in the structure.
11      We really did not have any knowledge other
12 than what was presented in the org chart as far as
13 any of the entities above Sentinel.
14   Q  Was that something that Highland was
15 managing?
16   A  Correct.
17   Q  And was it Mr. DiOrio who most often
18 communicated to you about those issues?
19   A  Anything pertaining to the entities within
20 the Sentinel structure or the SAS structure as we
21 would refer to it would either be communicated by
22 Matt DiOrio, JP Sevilla, or Katie Irving.
23   Q  Got it.
24      Looking to the left branch above Sentinel
25 it states 30% of value and 9% of vote goes to

33

1  Montage Holdings, Limited do you see that on the
2  chart?
3     A  I do.
4     Q  Is Montage Holdings Limited owned by
5  Mr. Ellington?
6     A  According to the org chart.
7     Q  And you don't have an understanding
8  differently?
9     A  I do not.
10    Q  And then 99% of that value that went to
11  Montage ultimately flows up to Mr. Ellington
12  according to the chart, correct?
13    A  Correct.
14    Q  In the middle, for the it looks like
15  approximately 1.5% of value that does not go to
16  Mr. Dondero and Mr. Ellington it looks like it
17  flows ultimately to SAS Holdings/SPV Limited,
18  correct?
19    A  Correct.
20    Q  What do you understand that entity to be?
21    A  I do not have any knowledge of what that
22  entity represents.
23    Q  Do you know who owned it?
24    A  I do not.
25    Q  Do you know who controlled it?

34

1     A  I do not.
2     Q  And above that it states ITA Red Cross.
3  Do you know what that refers to?
4     A  To my knowledge there was a charitable
5  organization that was set up to have some partial
6  ownership.  And that's all I know, that's all we
7  were really told about.
8     Q  As far as the voting interests in Sentinel
9  where the majority of that goes to SAS Holdings
10  and then up to ITA, do you know what that meant in
11  practical terms, that the voting interests in
12  Sentinel went to SAS and then to ITA?
13    A  I do not know.
14    Q  No understanding at all?
15    A  I do not know, no.
16    Q  But ultimately, as you testified earlier,
17  you understood that Mr. Dondero and Mr. Ellington
18  were the ones calling the shots?
19    A  That is correct.
20    Q  Was there a corporate reorganization of
21  all of these entities that occurred around this
22  time in 2019?
23    A  There was some reorganization at the
24  request of CIMA.
25    Q  And do you know what that request was?

35

1     A  There were a few entities that CIMA
2  identified as not really adding any value to the
3  organization and they felt those entities confused
4  the purpose and the structure and they had
5  requested that those entities be removed,
6  simplified.
7     Q  Did they send that request to Beecher?
8     A  It was included within the inspection
9  report.
10    Q  We will come to that in a few minutes.
11       And in response to that there was a
12  simplification of the --
13    A  That is correct.
14    Q  -- the ownership structure.
15       Who carried out that reorganization?
16    A  The Sentinel directors and the folks at
17  Highland Capital along with their attorneys.
18    Q  But Beecher didn't have any role in that?
19    A  Other than communicating with CIMA that
20  was our role.
21    Q  Keep that handy, that org chart.
22       I do want to show you another exhibit.  We
23  will mark this mark this one as 116.  Fortunately
24  this one is stapled.
25

36

1        (Document marked Exhibit 116 for
2        identification.)
3  BY MR. BURT:
4     Q  If you can just look first at the e-mail
5  chain, Mr. Adamczak, I have a few questions about
6  that and then I will direct you to specific
7  attachments and you obviously can take your time
8  to look at the attachments when we go there.
9     A  Okay.
10    Q  So the beginning with the first-in-time
11  e-mail, it's from you dated February 5, 2019 to
12  Clayton, Mr. Price, regarding the Sentinel CIMA
13  exam.  You referred -- I think you referred to
14  that earlier.  Was that -- the CIMA annual exam,
15  was that going on in February of 2019?
16    A  So it's not an annual exam, it probably
17  occurs on whatever periodic schedule they might
18  have, but on average every five years is the
19  standard.
20       This time period I believe would have been
21  their initial notice of certain request items for
22  the examination maybe and these were items that
23  were being provided during the inspection.
24    Q  And you say here, "Clayton, here are the
25  items that have not been uploaded on account of

---

37

1  them being unavailable." If you recall, what did
2  you mean by that?
3  **A  Typically with the inspection is they will**
4  **send out a request list require by a certain date**
5  **these documents are provided. These documents**
6  **would have been either unavailable at a time**
7  **whether it was we had to obtain them from somebody**
8  **else or we were still searching for the applicable**
9  **documents that they were looking for.**
10  Q  So as we go through some of these
11  attachments I will ask you if these were ones that
12  you had to obtain from Highland or that Beecher
13  didn't have before then.
14  And it appears then that in early March,
15  about a month later, Mr. Price forwards these on
16  to CIMA and then CIMA confirms receipt, is that
17  right?
18  **A  That is correct.**
19  Q  The first -- and we see Alli in the top
20  e-mail, the last-in-time, there is four
21  attachments listed, right?
22  **A  Yes.**
23  Q  The first one I want to look at is
24  actually the third attachment, and I will point
25  you to that. There is advisory -- there is the

---

38

1  board of directors minutes, so skip that for now,
2  and then there is a number of pages of bullet
3  point notes from an advisory committee, so skip
4  that. And then Attachment 3, and you will see at
5  the bottom the number, the Bates number ends in
6  76075, do you see that?
7  **A  Yes, I do have it.**
8  Q  And, actually, while we are looking at
9  that Bates number you see it begins with BC SEN, a
10  number of 0s, and then 76075?
11  **A  I do.**
12  Q  And do you understand that those are
13  documents that Beecher Carlson produced pursuant
14  to subpoena?
15  **A  I do.**
16  Q  And documents that have the -- that
17  beginning with BC SEN or SEN, those were documents
18  that Beecher had in its possession, is that right?
19  **A  Correct.**
20  Q  And keeping these documents was part of
21  Beecher's normal business practices?
22  **A  That was the role of the captive manager,**
23  **correct.**
24  Q  And these documents would have been kept
25  in the ordinary course of that role, is that

---

39

1  right?
2  **A  Correct.**
3  Q  Now, okay, so looking at this document its
4  title is Resolutions of ITA Global Trust Limited,
5  the Trustee, of the Trust Declared Pursuant to a
6  Deed Dated 17 February 2015.
7  Now, to orient, that org chart that we
8  were looking at in the previous exhibit at the top
9  had ITA and then Red Cross, is that right?
10  **A  It does.**
11  Q  Do you know if this ITA Global Trust
12  Limited referred to in this exhibit refers to the
13  same ITA?
14  **A  I do not.**
15  Q  Okay. Are you familiar with ITA Global
16  Trust Limited?
17  MR. WELDON: Objection, asked and
18  answered.
19  You can answer it again.
20  THE WITNESS: I am sorry, I do not.
21  BY MR. BURT:
22  Q  You are not familiar?
23  **A  I am not familiar.**
24  Q  Is today the first time you have heard of
25  it?

---

40

1  **A  I have heard of it and seen this document,**
2  **but I do not know its significance with respect to**
3  **Sentinel.**
4  Q  This refers to an advisory board, if you
5  look at the whereas Clause A, "The Trustee wishes
6  to establish an advisory board to advise the
7  Trustee to guide the decision making of the
8  decision making of the ITA trust in its role as an
9  indirect shareholder in Sentinel Reinsurance," do
10  you see that last clause?
11  **A  I do.**
12  Q  Does that refresh your recollection at all
13  about ITA?
14  **A  It does not.**
15  Q  Okay.
16  And then on the first page under
17  Section 1.1.1, it states, "The advisory board
18  shall consist of such number of members all being
19  individuals as the Trustee determines from time to
20  time and shall initially be two members, namely
21  Scott B. Ellington and James Dondero," do you see
22  that?
23  **A  I do.**
24  Q  Were you familiar with this advisory board
25  at all?

41

1    A  I am familiar with the existence of it.
2    Q  What do you know about it?
3       MR. WELDON:  Objection, asked and
4    answered.
5       You can answer it again.
6       THE WITNESS:  Just that it existed and
7    that's really all I know about it.
8    BY MR. BURT:
9    Q  Going to the second attachment, right
10   after the board minute meetings, the board meeting
11   minutes, it talks about a Sentinel advisory
12   committee discussion, do you see that?
13   A  I do see it.
14   Q  Do you know what the Sentinel advisory
15   committee was?
16   A  My recollection is these were internal
17   discussions had by Mr. Ellington and Mr. Dondero
18   regarding the Sentinel structure.
19   Q  Did they call themselves the Sentinel
20   Advisory Committee?
21   A  I am not aware.
22   Q  You are aware that they were the ones who
23   were having these discussions?
24   A  That is correct.
25   Q  And you see that Scott Ellington signs

42

1    this as the recording member, is that right?
2    A  I do see that.
3    Q  Did Beecher -- when did Beecher get a copy
4    of these advisory committee discussion notes?
5    A  We would have obtained these at the
6    request of CIMA probably around the same time that
7    this was conducted.
8    Q  So that would have been in February
9    of 2019?
10   A  Correct.
11   Q  This committee discussion, the very first
12   one, says Q1 2017 and is dated February 2, 2017.
13   And it states, "Discussion of potential ATE policy
14   and engagement of actuary, review of investment
15   returns," do you see that?
16   A  I do.
17   Q  So this was not provided to Beecher in
18   February of 2017 but only two years later, is that
19   right?
20   A  That is correct.
21   Q  Did Beecher have any knowledge that in
22   February of 2017 Mr. Ellington and Mr. Dondero
23   were talking about a potential ATE policy?
24   A  No.
25   Q  Do you know if Messrs Dondero and

43

1    Ellington were reporting to the Sentinel board
2    that they were having discussions about the
3    potential ATE policy?
4    A  They never attended the board meetings.
5    Q  Do you know if copies of these advisory
6    committee discussions were provided to the board
7    for the board to review?
8    A  I am not aware of them being provided to
9    the board for review.
10   Q  And part of Beecher's role as the
11   insurance manager is to maintain the books and
12   records for the company, right?
13   A  That is correct.
14   Q  But these records were not provided to
15   Beecher at the time that they were actually
16   created?
17   A  That is correct.
18      MR. WELDON:  You are talking about, just
19   so we are clear, the Sentinel Advisory Committee
20   discussions?
21      MR. BURT:  Correct, yes.
22   BY MR. BURT:
23   Q  Do you know if the ITA Global Trust
24   resolution was provided to Beecher prior to
25   February, 2019 or was that only later as well?

44

1    A  I don't recall having seen it prior to
2    when it was provided to CIMA.
3    Q  In looking at your e-mail, what we first
4    looked at when you said they were unavailable, do
5    you recall who provided them to you in February
6    of 2019, these materials?
7    A  I believe they would have come from
8    Matt DiOrio.
9    Q  Looking back at the advisory committee
10   discussions, we have looked at the first page, the
11   second page is dated May 4, 2017, it says
12   discussion re audit, do you know what they were
13   referring to then, an audit in May of 2017?
14   A  The Sentinel annual audit, which would
15   have been conducted around that time period.
16   Q  And who conducted the audit?
17   A  In 2017 I believe that was Crowe.
18   Q  And were they one of the service providers
19   that Beecher are arranged?
20   A  That is correct.
21   Q  Then Q3 of 2017 it states there is a
22   discussion of potential ATE policy and engagement
23   of actuary and then another discussion re about
24   it.
25      Again, Beecher was not aware that this

45

1 committee of Mr. Ellington and Dondero were
2 discussing the potential ATE policy in August
3 of 2017, correct?
4     MR. WELDON: Objection.
5     THE WITNESS: Correct.
6 BY MR. BURT:
7     Q If you flip to the next page, Q4, 2017,
8 dated November 7, 2017, it states documentation of
9 ATE policy and closing of same.
10     And, again, Beecher was not aware that
11 Messrs Dondero and Ellington were speaking about
12 and documenting these discussions at that time,
13 correct?
14     MR. WELDON: Objection, you can answer.
15     THE WITNESS: That's correct.
16 BY MR. BURT:
17     Q It states that the closing of the ATE
18 policy -- I don't know if it states that it took
19 place around November -- strike that.
20     Let me just ask this way. When did the
21 ATE policy close or come into effect?
22     A I believe the ATE policy incepted in
23 August of 2017.
24     Q And then they discussed the settlement of
25 the transferred investment portfolio.

46

1     Again, that information that they were
2 discussing, that investment portfolio, that was
3 not conveyed to Beecher at the time, correct?
4     MR. WELDON: Objection.
5     You can answer.
6     THE WITNESS: So this time period here,
7 November of 2017, would have been after the ATE
8 policy had incepted and after the transfer of the
9 assets to Sentinel, so we were aware of the
10 portfolio as we were attempting to try and value
11 everything that was received.
12 BY MR. BURT:
13     Q Right.
14     And my question was that Beecher wasn't
15 aware that Mr. Dondero and Ellington as part of
16 this Sentinel Advisory Committee were having these
17 discussions.
18     A At no point until we --
19     MR. WELDON: Hold on, objection.
20     You can answer, go ahead.
21     THE WITNESS: At no point until we
22 received these summaries did we know of the
23 existence of these internal discussions.
24 BY MR. BURT:
25     Q We are going to talk about the asset

47

1 transfer in a little bit more detail in a bit, but
2 let me just ask this. Do you know when the
3 valuation of those assets took place?
4     A The valuations would have been performed
5 late in 2017, early 2018, but there would have
6 been valuations that were performed as of the date
7 that the assets were transferred in so that we had
8 a starting point and then another valuation as of
9 the 12/31/2017 year-end.
10     Q And were those valuations done by
11 valuation Resource Corp.?
12     A Research Corp., correct.
13     Q Research.
14     When did Beecher first become aware of the
15 possibility of an ATE policy for Sentinel?
16     A The business plan for Sentinel had
17 previously requested and approved from CIMA the
18 ability to write ATE coverage, and I believe there
19 were several different types of coverages that
20 were requested at the time. There were multiple
21 discussions between Pete Kranz and J.P. Sevilla to
22 discuss insurance coverages to put in to the
23 captive, and ATE was one concept that J.P. had
24 brought to the discussion.
25     The specific event that was ultimately

48

1 insured in the captive I believe it was in early
2 2017 that they were -- J.P. and Pete were
3 discussing it and started looking at moving it
4 forward and drafting the policy.
5     Q Were you involved in those discussions?
6     A I was not involved directly into
7 discussions, but I was provided with information
8 subsequently.
9     Q When did you get involved with that
10 particular ATE policy that was actually --
11     A For me it was primarily once the
12 accounting needed to be addressed.
13     Q When was that?
14     A Mid 2017.
15     Q The discussions that Mr. Kranz had with
16 J.P. in early 2017, what did those involve?
17     MR. WELDON: Objection, it misstates his
18 earlier testimony.
19 BY MR. BURT:
20     Q You can answer, and if I did it was
21 unintentional.
22     The discussions that Mr. Sevilla and
23 Mr. Kranz were having, I believe you said in early
24 2017, they began discussing the particular ATE
25 policy that was ultimately issued.

49

1    A  That's correct.
2    Q  Do you know what they were discussing
3  precisely?
4    A  They would have discussed limits, premium,
5  the nature of how the premium would be paid,
6  policy language.
7    Q  Who the insureds would be?
8    A  Who the insureds would be, the specific
9  event that was being covered.
10    Q  And what was the event that was being
11  covered?
12    A  It was the UBS litigation matter.
13    Q  And at that time what was Beecher's
14  understanding of who was involved in that UBS
15  litigation, who was UBS suing, in other words,
16  what was Beecher's knowledge?
17    A  Highland Capital and the particular funds.
18    Q  What did Beecher understand at that time
19  about who controlled and owned those funds?
20    A  Beecher's understanding was that the funds
21  were controlled by Highland Capital Management.
22    Q  Do you know which funds in particular were
23  at issue?
24    A  The funds that -- I don't know off the top
25  of my head, but it's the funds that are the

50

1  insureds.
2    Q  In the policy?
3    A  In the policy.
4    Q  Got it, okay.  We will come to that in a
5  moment.
6        Actually, let's -- I do want to show him
7  the policy.
8    MR. BURT:  Do you need a break, you good?
9    THE WITNESS:  I am good for now.
10    MR. BURT:  Usually we take a break about
11  every hour, but we can keep going for a few
12  minutes.
13    MR. WELDON:  Do you want water or
14  anything?  I will make it easy.
15    THE WITNESS:  Let's do that.
16    MR. BURT:  That's why you have an attorney
17  here, we will go off the record.
18    THE VIDEOGRAPHER:  This marks the end of
19  Disk No. 1 in the deposition of Thomas Adamczak,
20  the time on the video monitor is 10:00 o'clock --
21  10:05.
22    (Recess taken.)
23    THE VIDEOGRAPHER:  Here begins Disk No. 2
24  in the deposition of Thomas Adamczak, we are back
25  on the record, the time is 10:18.

51

1  BY MR. BURT:
2    Q  So I am going to show you another exhibit,
3  Mr. Adamczak, we are going to come back to the ATE
4  policy in just a moment.
5        You mentioned the management agreement
6  between Beecher and Sentinel, I just would like to
7  take a quick look at that.  We will mark this as
8  117.
9        (Document marked Exhibit 117 for
10        identification.)
11  BY MR. BURT:
12    Q  Showing you, Mr. Adamczak, what has been
13  Bates labeled BC SEN000361175, go ahead and take a
14  look at that and let me know when you are ready.
15    A  I am ready.
16    Q  Great.
17        So what do you understand this document to
18  be?
19    A  This is the agreement between Beecher
20  Carlson Cayman and Sentinel to provide captive
21  management services.
22    Q  And this is the agreement that governed
23  the relationship between Beecher and Sentinel, is
24  that right?
25    A  That is correct.

52

1    Q  And continues to do so to this day?
2    A  Correct.
3    Q  And the effective date of this agreement
4  is October 1, 2013, right?
5    A  That is correct.
6    Q  Which is just before you began at Beecher?
7    A  Correct.
8    Q  Flipping to the signature page, Page 4, do
9  you know who signed on behalf of Beecher Carlson?
10    A  Jason Flexbeard.
11    Q  Who is he?
12    A  Jason Flexbeard at the time was the leader
13  of the captive practice at Beecher Carlson.
14    Q  Who signed on behalf of Sentinel?
15    A  Kobi Dorenbush.
16    Q  It states director, is that a Mr. or Ms.?
17    A  Mr., I believe.
18    Q  Is he a director of Sentinel at the time?
19    A  He was a director of Sentinel and was with
20  Caledonian.  Caledonian was a company that had
21  provided outside director services to captives or
22  investment companies or whatever in the Cayman.
23    Q  Looking at Exhibit A to the agreement, do
24  you see the first section is the description of
25  services.  Is it correct, Mr. Adamczak, that this

**53**

1    section, Section 1, describes all of the services
2    that Beecher Carlson provides for Sentinel?
3        A   It describes all of the standard services
4    that are provided under the captive management.
5        Q   Are there any services beyond what's
6    listed here that Beecher provides?
7        A   No.
8        Q   So I just want to look at a couple of
9    these, the first, which is a little a, states
10   "Maintain copies of such records, ledgers, and
11   books of accounts as will constitute a complete
12   and current record of the financial condition of
13   Sentinel in accordance with establishing
14   accounting principles applicable to the business
15   of insurance and reinsurance as directed by
16   Sentinel's directors and officers," do you see
17   that?
18       A   I do.
19       Q   And is that something that Beecher
20   provides?
21       A   That is.
22       Q   B states "Prepare comprehensive quarterly
23   financial statements, including profit and loss
24   and balance sheet statements and information with
25   respect to Sentinel as may be required by law or

**54**

1    requested by Sentinel through Highland Capital,"
2    do you see that?
3        A   I do.
4        Q   And those are services that Beecher
5    provides?
6        A   That is correct.
7        Q   So one question about this, the last
8    clause states "requested by Sentinel through
9    Highland Capital." What did you understand or
10   what does that mean in the context of the services
11   agreement?
12       A   That would mean that Highland Capital
13   being the sponsoring organization that I described
14   earlier would be the one providing direction for
15   Sentinel and what Sentinel wanted to do.
16       Q   And does Highland Capital here refer to
17   Highland Capital Management?
18       A   I believe that is correct.
19       Q   And is that the same entity that is a
20   defendant in the UBS suit in New York?
21       MR. WELDON:  Objection.
22       THE WITNESS:  I believe that's correct.
23   BY MR. BURT:
24       Q   And so according to this Sentinel can
25   request through Highland Capital financial

**55**

1    statements, profit and loss and balance sheet
2    statements, to Beecher, is that right?
3        A   Correct.
4        Q   And is that how its actually been in
5    practice, that Highland Capital requests that
6    financial information?
7        A   That is correct.
8        Q   And has it mostly been J.P. Sevilla and
9    Matt DiOrio who requested that information?
10       A   That is correct.
11       Q   Has Katie Irving as well?
12       A   She was probably copied on the
13   correspondence when the financial statements were
14   sent out, but she wouldn't necessarily -- she
15   wouldn't necessarily provide the financial
16   direction requests.
17       Q   Those would come through Mr. Sevilla --
18   you say Sevilla?
19       A   Sevilla.
20       Q   -- Sevilla or Mr. DiOrio the direction?
21       A   Correct.
22       Q   And at times Mr. Leventon?
23       MR. WELDON:  Objection.
24       THE WITNESS:  No.
25

**56**

1    BY MR. BURT:
2        Q   Did Mr. Dondero or Mr. Ellington ever make
3    requests for this information?
4        A   Not directly to Beecher Carlson.
5        Q   Did they make it indirectly?
6        MR. WELDON:  Objection.
7        THE WITNESS:  I am not aware if they did
8    or not.
9    BY MR. BURT:
10       Q   The communications came from Mr. Sevilla
11   and Mr. DiOrio?
12       A   That is correct.
13       Q   Do you know at whose direction Mr. Sevilla
14   or Mr. DiOrio would request this type of
15   information?
16       A   I do not.
17       Q   The visibility sort of ended there for
18   Beecher Carlson at that level?
19       A   Yes.
20       Q   Have you ever spoken with Mr. Dondero or
21   Mr. Ellington directly?
22       A   I have not.
23       Q   Have you ever had e-mail communications
24   with them directly?
25       A   I have not.

**57**

1  Q Do you know if anyone at Beecher has?
2  A I believe that when the captive was set up
3  Beecher Carlson might have had a few initial
4  discussions with Scott Ellington, but it was only
5  initially and certainly hasn't been anything since
6  then. Everything has gone through Matt DiOrio and
7  J.P. Sevilla.
8  Q Is that typical that ultimate beneficial
9  owners don't have communications with Beecher?
10  MR. WELDON: Objection.
11  THE WITNESS: I think that's probably not
12  out of the ordinary. There is always going to be
13  somebody that may have -- maybe the risk manager
14  or somebody that's more involved with the risk
15  management program than, say, the ultimate
16  openers, so it's not out of the ordinary that it
17  wouldn't be the top dogs that we are dealing with.
18  BY MR. BURT:
19  Q You have also testified that Mr. Dondero
20  and Ellington were calling the shots for Sentinel.
21  Is it ordinary that the people who are actually
22  calling the shots for the captive don't
23  communicate with Beecher directly?
24  MR. WELDON: Objection.
25  THE WITNESS: It's difficult to say

**58**

1  because our contact was with J.P. and Matt and
2  they were the ones that would provide any
3  direction for what we were doing.
4  BY MR. BURT:
5  Q Looking down at E, referring back to the
6  management agreement, E states "coordinate and
7  attend Sentinel's annual meeting." What does that
8  refer to?
9  A There would be a requirement in the Cayman
10  for the captives to have periodic meetings to
11  discuss governance items typically on an annual
12  basis. As part of our role as captive managers we
13  would be preparing the board books, pulling all
14  documentation together, coordinating with anyone
15  that would be presenting and scheduling the
16  meeting.
17  Q How often did the Sentinel board have a
18  meeting?
19  A Approximately once a year.
20  Q Would Beecher schedule those?
21  A Beecher would.
22  Q And Beecher would attend those meetings?
23  A That is correct.
24  Q And is it also correct that Mr. DiOrio as
25  director of Sentinel would attend?

**59**

1  A Mr. DiOrio would as well as the other
2  directors.
3  Q Would Mr. Sevilla attend as well?
4  A He had attended some of them, but
5  typically once Matt was involved it was just Matt
6  from Highland.
7  Q How about Ms. Irving, did she attend?
8  A I think early on, but not the later
9  meetings.
10  Q Do you know why they attended?
11  A It was before Matt so J.P. was our main
12  contact at Highland at the time.
13  Q But he wasn't on the Sentinel board,
14  right?
15  A He was never on the board.
16  Q Is it common for the sponsoring company's
17  personnel to attend board meetings even if not on
18  the board?
19  A It is.
20  Q Item F here states "Facilitate the
21  investment of available funds in accordance with
22  written instructions from Sentinel through
23  Highland Capital." So did Beecher provide that
24  service for Sentinel?
25  A Yes.

**60**

1  Q And were those instructions for investing
2  funds did those come from Highland Capital?
3  A They did.
4  Q So Highland Capital made all decisions as
5  far as the investments of Sentinel assets, is that
6  right?
7  A That is correct.
8  Q Beecher wasn't making those decisions on
9  its own, correct?
10  A Beecher was not.
11  Q Wasn't authorized to make those decision
12  the?
13  A They were not. We may have been consulted
14  with and discussions, we can advise the directors
15  on how to or how we think that might make sense
16  given their situations, but we wouldn't ultimately
17  call the shots, that decision was either with the
18  directors.
19  Q Here it says actually that the
20  instructions come from Highland Capital, not the
21  directors, right?
22  A So at the time there were outside
23  directors that didn't have Highland's financial
24  interest in mind, I guess they would have been
25  focusing on Sentinel, so any direction would have

---

**61**

1  been at the request of Highland Capital.
2     Q  Let me break that down a little bit to
3  make sure I understand.
4        You said the directors didn't have
5  Highland's financial interest in mind, did I have
6  that right?
7        MR. WELDON:  Objection, for clarification,
8  outside directors.
9        MR. BURT:  The outside directors, thank
10 you.
11 BY MR. BURT:
12    Q  The outside directors didn't have
13 Highland's financial interest in mind?
14    A  At the time that's correct, they weren't
15 -- when the captive was originally set up I am not
16 sure.  We can back up.
17    Q  Let's back up and break it down.
18       So outside directors first, by that do you
19 mean directors who were not affiliated with
20 Highland?
21    A  That is correct.
22       So there was a requirement that there were
23 some outside independent directors that were
24 involved on the board for Sentinel, and up until
25 Matt DiOrio was -- had joined Highland Capital

---

**62**

1  there were only outside independent directors on
2  Sentinel's board and then Matt was appointed,
3  there was another individual from Highland Capital
4  that was added to the board, and so there were
5  four total directors, two outside independent
6  directors and two Highland Capital
7  representatives.
8     Q  Who was the other Highland Capital
9  director?
10    A  Dilip Massand.
11    Q  When did Mr. DiOrio join the board?
12    A  I believe it was 2018.
13    Q  Let's go back to the outside directors,
14 you said they didn't have Highland's financial
15 interests in mind because they weren't affiliated
16 with Highland, right?
17    A  They weren't affiliated with Highland but
18 they were appointed to act on behalf of Sentinel;
19 not necessarily what Highland's motives might be,
20 I guess.
21    Q  Why would it matter as far as Sentinel's
22 investments went whether the directors had
23 Highland's financial interests in mind?
24    A  I don't know that it necessarily mattered
25 other than they might -- they might be more

---

**63**

1  focused on liquidity on some of the investments
2  maybe, I don't know.
3     Q  Instructions for investments never came
4  from those outside directors, right, for the
5  Sentinel investments?
6     A  They wouldn't have initiated.  They would
7  have been brought in to discussions with the
8  Highland folks or J.P. and Matt and ultimately
9  made the decision at the end to invest in this
10 vehicle or that vehicle.
11    Q  They being the entire board?
12    A  The board of directors were ultimately
13 responsible for making those decisions.
14    Q  Do you know what -- if J.P. was overseeing
15 that or directing those decisions that the board
16 was making?
17    A  I believe so.
18    Q  Do you know if the board ever rejected
19 directions given by a Highland employee and did
20 something different?
21    A  I am not aware of anything.
22    Q  Moving down to J in the management
23 agreement, and then there is a bunch of sub
24 romanettes there, I will highlight a couple, J
25 states "Make withdrawals from time to time in

---

**64**

1  accordance with written authorization procedures
2  established by Sentinel from any bank account or
3  accounts established by Sentinel in order to pay
4  in a timely manner the necessary, reasonable, and
5  proper expenses of Sentinel." And then it lists
6  the expenses that are included but not limited to
7  and it lists a bunch, do you see that?
8     A  I do.
9     Q  Is that what Beecher does, it makes those
10 withdrawals for payments that come from Sentinel?
11       MR. WELDON:  Objection.
12       THE WITNESS:  That is a typical service
13 that is provided, but it is going to come with
14 proper authorization from the directors.
15 BY MR. BURT:
16    Q  And who would provide -- who would
17 actually provide authorization for payments to
18 Beecher?
19    A  The directors.
20       The way that the account was set up was
21 that Beecher would initiate the transactions in
22 the system at least as far as the current bank
23 account is Beecher would initiate the transactions
24 and the invoice and requests for processing and
25 request for approval would be sent to the

65

1  directors who would give their formal approval,
2  this is the outside directors, and they would
3  release the payments on the system.
4      Q  Where did Beecher -- who provided the
5  invoice in the initial request to Beecher?
6      A  The primary person to provide invoices to
7  Beecher, it was Matt DiOrio, unless it was a
8  service provider that Beecher worked closely with,
9  whether it was the audit firm or the actuary,
10  those would come directly to Beecher and then
11  Beecher would submit them to Matt, get his okay,
12  and then they would go to the outside directors
13  for their approval.
14      Q  So ultimately the outside directors had to
15  sign off on any expense payment by Sentinel?
16      A  That is correct.
17      Q  Did that always happen?
18      A  That is true, yes.
19      Q  Were any invoices from DiOrio -- that
20  DiOrio submitted were any not approved by the
21  directors?  The outside directors, let me be more
22  specific.
23      A  I don't believe there were any that
24  ultimately were not approved.
25      Q  Since Mr. DiOrio is no longer with

66

1  Highland Capital, where are the requests coming
2  from now?
3          MR. WELDON:  Objection.
4          Clarification, you are talking about where
5  the invoice is coming from now?
6          MR. BURT:  Right.
7  BY MR. BURT:
8      Q  So any requests for payment for Sentinel
9  to make a payment, where are those coming from?  I
10  understand some might be coming from service
11  providers.
12      A  Invoices that come from the service
13  providers still follow the same channel.  Any
14  invoices that would originate from the Highland
15  side will now or have been since the new directors
16  took over since the old directors and Matt
17  resigned are coming through to those directors and
18  then they submit them to us.
19      Q  The directors -- the new directors of
20  Sentinel?
21      A  The current independent directors, yes.
22      Q  So prior to Mr. DiOrio leaving the request
23  -- the Highland-related request, let's call them,
24  those were coming from an inside director from
25  Mr. DiOrio?

67

1      A  Correct.
2      Q  Now post-Mr. DiOrio leaving those
3  requests, the Highland requests, are coming from
4  the independent directors for Sentinel?
5      A  That is correct.
6      Q  You mentioned a Sentinel account and it
7  sounded like you said account in the singular, so
8  I just want to understand that.
9          Did Sentinel have a single account from
10  which payments were made for reimbursement or
11  expenses?
12      A  They have a single checking account and an
13  investment custodial account.
14      Q  Where is that checking account located?
15      A  CIBC in the Cayman.
16      Q  And they have a single you said investment
17  account?
18      A  Correct, custodial account with CIBC as
19  well.
20      Q  CIBC Caymans?
21      A  Yes.
22      Q  So help me understand the difference.
23          In the checking account there is cash, is
24  that right?
25      A  That is correct.

68

1      Q  And then in the investment, the custodial
2  investment account, what is located there?
3      A  There are the investments that were
4  registered in Sentinel's name are custodied with
5  that investment account.
6      Q  And we will get to this, but some of the
7  assets -- the assets that were transferred from
8  the Highland entities as part of the ATE policy,
9  would those be in the CIBC account?
10      A  Some of those are in the CIBC custody
11  account.
12      Q  Are there some located elsewhere?
13      A  Not all of the investments were
14  re-registered into Sentinel's name.
15      Q  So some never made it --
16      A  That is correct.
17      Q  -- in other words, all right.
18          Has that been true throughout the time
19  that Beecher has been managing Sentinel, that all
20  claims for reimbursement would come out of the
21  single checking account?
22      A  With the current checking account that is
23  accurate.  Prior to setting up that checking
24  account and while Maples served as the outside
25  directors Maples had a cash function and they

**69**

1 would process payments on their end.

2 　Q I want to ask about Maples, but let me ask

3 one question about the investments that never made

4 it.

5 　　Do you know where those investments are

6 that never made it to Sentinel?

7 　**A As far as I know they are still in the**

8 **name of the insureds.**

9 　Q And do you know which ones never made it?

10 　**A Any that are not in the custody account.**

11 　Q Sure.

12 　**A There is a number of them. I would**

13 **recognize them if I saw them.**

14 　Q Okay, all right. We will come back to

15 that.

16 　　You mentioned Maples, what is Maples?

17 　**A Maples, just like Caledonian, just like a**

18 **number of firms in the Cayman provided outside**

19 **independent director services to companies in the**

20 **Cayman. They also have a legal arm. They have a**

21 **corporate services arm.**

22 　Q And you said during the time that Maples

23 was providing directors they had a checking

24 account for Sentinel?

25 　**A They had a segregated account that they**

**70**

1 **held for Sentinel that was -- and they were able**

2 **to disperse payments on behalf of Sentinel**

3 **through.**

4 　Q During that time were all of the Sentinel

5 payments for reimbursement or expenses were they

6 coming out of the Maples account?

7 　**A That is correct.**

8 　Q What time period was that?

9 　**A 2015 through 2017.**

10 　Q After the Maples account was no longer

11 being used it's been since that time the single

12 checking account from Sentinel from which

13 reimbursements and expenses have been paid?

14 　**A That is correct.**

15 　Q Looking at the management agreement, one

16 of the expenses here -- we have claim payments

17 listed, Beecher Carlson management fees, other

18 fees, and then under romanette 8 at the bottom it

19 says "travel and entertainment costs incurred by

20 officers of Sentinel."

21 　　So is it a fair reading of that that out

22 of this single checking account that held cash the

23 travel and entertainment costs by Sentinel

24 officers were paid?

25 　**A To the extent that there were any, that's**

**71**

1 correct.

2 　Q Do you know, were there terms of

3 reimbursements what was authorized to be

4 reimbursed for these types of expenses, travel and

5 entertainment costs?

6 　**A As long as the directors approved it and**

7 **supported that it was in relation to Sentinel it**

8 **would be dispersed out of the account.**

9 　Q And we are going to talk about one of the

10 -- we believe what one of the things that happens

11 with the insurance policy is through the second

12 endorsement there is a risk mitigation fee that's

13 taken out of the policy, a $9 million risk

14 mitigation figure. Does that sound familiar?

15 　**A That does.**

16 　Q Was that 9 million was that held in this

17 checking account?

18 　**A The $9 million was carved out of the**

19 **premium and tracked separately.**

20 　　**As far as the specific cash dollars it**

21 **would have been commingled with any other cash**

22 **that Sentinel had.**

23 　Q And was all the cash held in the checking

24 account at CIBC?

25 　**A Correct.**

**72**

1 　Q In terms of if something was a risk

2 mitigation reimbursement or expense it would have

3 just been coded as such in a ledger but the cash

4 would have come from the same account --

5 　**A Correct.**

6 　Q -- as the cash?

7 　**A Correct.**

8 　　**When those invoices were provided to**

9 **Sentinel from Matt DiOrio if it wasn't explicitly**

10 **explained as being risk mitigation fees we would**

11 **inquire the nature of the fees just so that we had**

12 **a sense of how to account for it on the Sentinel**

13 **side.**

14 　Q Was there a standard or policy for what

15 constituted a risk mitigation fee versus what

16 should not be accounted for as such?

17 　**A If there were invoices that were coming in**

18 **in somebody else's name we would inquire whether**

19 **they were risk mitigation fees.**

20 　Q Do you know whether any travel and

21 entertainment expenses of Sentinel officers were

22 coded as risk mitigation?

23 　**A Of Sentinel officers? I don't believe**

24 **there were any travel or expense.**

25 　Q How about of Highland employees or

73

1  Highland personnel, were any of those risk
2  mitigation fees?
3      A  There were some travel costs that came
4  through and paid under the risk mitigation fees.
5      Q  And whose travel costs were those?
6      A  I believe those were Scott Ellington's.
7      Q  Do you know why those were paid out of the
8  risk mitigation fee?
9      A  We were informed that they related to the
10  defense of the UBS litigation matter.
11     Q  So that was the justification that was
12  given?
13     A  Correct.
14     Q  Who informed you of that?
15     A  Matt DiOrio.
16     Q  And did the outside directors approve
17  those expenses?
18     A  They did.
19     MR. BURT:  Let's look at a couple of those
20  while we are talking about risk mitigation.  Let
21  me just find the right tab here.  I believe it is
22  Tab 48.  118.
23     (Document marked Exhibit 118 for
24     identification.)
25

74

1  BY MR. BURT:
2      Q  So while you are looking at that just for
3  the record I am showing the witness the Bates
4  label BC SEN000727319, which is Beecher Carlson
5  e-mails and attachments.
6      A  Okay.
7      Q  I actually want to draw your attention to
8  the last two e-mails in time, it is on the first
9  page right in the middle, an e-mail from you dated
10  February 6, 2020, to Alli Devins.  Who is
11  Alli Devins?
12     A  Alli Devins is an employee with Beecher
13  Carlson.
14     Q  Does she work on your team?
15     A  She does.
16     Q  And does she work on the Sentinel account?
17     A  She did at the time.
18     Q  No longer?
19     A  We have since transitioned that work to
20  Gareth Pereira because he is in our Cayman office
21  with Clayton.
22     Q  And you write in this e-mail on
23  February 6, "We have a bunch of invoices for
24  Sentinel that are in need of processing.  Do you
25  have time to get approvals on those?"

75

1      Do you recall this timeframe, early 2020,
2  getting a bunch of invoices from Sentinel that
3  needed processing?
4      A  We get a lot of invoices from Sentinel so
5  it's not out of the ordinary that we would receive
6  a flurry of them.
7      Q  So early 2020 doesn't stand out in any
8  way?
9      A  No.
10     Q  And when you say that, Ms. Devins, "Do you
11  have time to get approval," what did you mean by
12  approval?
13     A  To seek approval from the directors to
14  process the invoices.
15     Q  So that was part of the process where you
16  had received them from Highland and -- from
17  Mr. DiOrio most likely and you were going to then
18  turn around and seek approval from the outside
19  directors?
20     A  That's correct.
21     Q  And then Ms. Devins responds in the top
22  e-mail --
23     MR. WELDON:  I want to note my objection,
24  you refer to Highland, but DiOrio was a director,
25  inside director for Sentinel.  To the extent that

76

1  he is receiving them, you are qualifying him, I
2  just want there to be a clarification.  He has
3  identified him as an inside director for Sentinel.
4  He does work as Highland but inside director for
5  Sentinel.
6  BY MR. BURT:
7      Q  Let me ask you, when you received these
8  types of expense requests for reimbursement for
9  Mr. DiOrio did you understand them to be providing
10  them in his role as an independent director -- as
11  a director of Sentinel or his role as a Highland
12  employee?
13     A  We understood the invoices to be coming
14  through Matt because they would have been provided
15  to Matt from somebody at Highland Capital or would
16  have been coming from somebody with his
17  connections at Highland Capital.
18     Q  So ultimately the requests were coming
19  from Highland Capital through Mr. DiOrio to
20  Beecher, is that right?
21     A  Correct.
22     Q  So looking back at this e-mail, Ms. Devins
23  says, "Yes" -- and this is on February 6, 2020,
24  "Yes, that was actually on my list to do today.  I
25  have them all pulled together, just need to send

**77**

1  them out. These are the three I have. Not sure
2  if you have any additional invoices."
3      And the first attachment states SEN 200206
4  Scott Ellington invoices for $176,334.77, it's a
5  PDF. Do you see that?
6  A I do.
7      Q And referring to that attachment which
8  begins the Bates ending 727324, do you see where I
9  am at?
10  A Yes.
11      Q And at the top it says Ellington expenses
12  London and Paris, total $78,841.93.
13  A Yes.
14      Q Do you know what these requests were for?
15  A It says risk mitigation fees, so I am not
16  certain the nature of what these travel expenses
17  related to.
18      Q So that information specifically how they
19  related to risk mitigation that was not provided
20  at the time?
21  A No.
22      Q And as you look at this, starting on
23  December 23, 2019, London Hilton Parklane is the
24  first expense for $388. The next expense is the
25  Novikov Bar and Grill in London for $1,397. Do

**78**

1  you see that?
2  A I do.
3      Q And then there is a payment at Claridge's
4  Hotel for $2006.29 right underneath that. Do you
5  see that?
6  A I do.
7      Q And you have no insight into what these
8  expenses actually were?
9  A I do not.
10      Q Looking down do you see a few rows down a
11  $15,000 expense at Browns Hotel in London?
12  A Yes.
13      Q Looking down a little bit more there is a
14  Four Seasons Hotel George V for $7900, do you see
15  that one?
16  A Yes.
17      MR. WELDON: 7978, is that what you are
18  referring to?
19      MR. BURT: $7,978.46.
20  BY MR. BURT:
21      Q A few lines after that Park Chinois -
22  London $4,000 expense, do you see that?
23  A I do.
24      Q There is some expense for $716 at Sexy
25  Fish London, do you see that?

**79**

1  A I do.
2      Q And then a $21,991 expense for Browns
3  Hotel in London, do you see that?
4  A I do.
5      Q And Beecher had no insight into what these
6  actually were, right?
7  A No.
8      If these were all under risk mitigation
9  they would have been -- our understanding is that
10  they would have been expenses related to the
11  insureds under the ATE policy and that all costs
12  related to the insureds were to be paid under
13  these risk mitigation fees.
14      Q So Beecher was relying on accurate
15  information to come from Highland through
16  Mr. DiOrio?
17  A That is correct.
18      (Document marked Exhibit 119 for
19      identification.)
20  BY MR. BURT:
21      Q Showing you we will mark our next exhibit,
22  keep that handy, that London trip from DiOrio, we
23  are going to do some comparison. This one I don't
24  think you have seen before, what I just handed
25  you, 119, is Bates labeled UBSPROD460936. And

**80**

1  it's a series of e-mails between Mr. Ellington and
2  Ms. Sarah Goldsmith.
3      Do you know who Sarah Goldsmith is?
4  A I have never heard of her.
5      Q And underneath that, you see this is dated
6  12th of December, 2019 at the top?
7  A Yes.
8      Q And underneath that -- on the attachment
9  it states London activities 2019 December PDF,
10  London dining 2019 December PDF, London festive
11  dining 2019 December. Do you see that?
12  A What page are you on?
13      Q Just at the very top of the first page,
14  the attachments listed.
15  A Sorry, yes.
16      Q And then as you go down the first e-mail,
17  this affidavit in the chain appears to be from a
18  Stephanie Archer to Mr. Ellington. Do you know
19  who Stephanie Archer is?
20  A I have never heard of her.
21      Q And her signature there as a licensed
22  Realtor at Allie, Beth, Allman & Associates in
23  Dallas, Texas, do you see that?
24  A Yes.
25      Q Now, underneath that we see an e-mail from

81

1    Stephanie Archer to Scott Ellington on
2    December 11, 2019, with the subject forward
3    London, do you see that?
4        A  I do.
5        Q  And she writes there, "For you to approve
6    or change I would like to do Matilda the 26th at
7    7:00 p.m., we leave for Paris the next morning, so
8    I thought we do room service that evening or
9    something simple after the play.  As for holiday
10   meals I would love to do Christmas dinner at
11   Claridges, Christmas Day lunch at Browns, New
12   Years dinner at Alain Ducasse at the Dorchester,
13   second sitting preferably.  I would love if
14   dinners are planned at 7:00 p.m. as they are all
15   incredibly long."  Do you see that?
16       A  I do.
17       Q  And Beecher had no insight into any of
18   this, right?
19       A  I have never seen this document before.
20       Q  At the top of the next page Ms. Archer
21   writes, "As far as other activities I have in mind
22   Tower of London for Jack to tour, London Bridge,
23   Hyde Park Winter Wonderland Market, Bond Street,
24   and Covenant Garden Christmas lights," and she
25   lists the other dining she would like to try as

82

1    well, do you see that?
2        A  I do.
3        Q  Again, none of this is familiar, correct?
4        A  That is correct.
5        Q  If you flip then to the next attachment
6    there is a couple of blank pages and then you see
7    there is a listing of London plays.
8            Sorry, before we get there, we do need to
9    look at the last e-mail in the chain, that will
10   provide content what follows.
11           The last e-mail in the chain is from Sarah
12   Goldsmith to Scott Ellington and Stephanie Archer.
13   It says, "Attached is the information I have put
14   together for your trip to London.  I will e-mail
15   you both the Paris information tomorrow, but I
16   wanted to break it up so I wasn't sending too much
17   information at once.  Please let me know if you
18   would like me to do any additional research, have
19   any questions, or would like me to make any
20   reservations," with Sarah Goldsmith listed as SAS
21   Asset Recovery, do you see that?
22       A  I do.
23       Q  So the first attachment is London plays,
24   she includes here a bunch of musicals, Wicked,
25   School of Rock, et cetera?

83

1        A  I do see that.
2        Q  On the next page, Christmas lights, she
3    lists a bunch of information and winter markets,
4    winter skating, a bunch of information for that.
5    And then on the next page London restaurants and
6    there is a calendar from 22nd December, 2019
7    through January 2, 2020.  Do you see that there?
8        A  I do.
9        Q  And then a bunch of restaurants, afternoon
10   tea is listed for the next few pages.  Do you see
11   all that?
12       A  I do.
13       Q  And to be absolutely clear, none of this
14   was provided to Beecher Carlson as part of the
15   request for reimbursement, correct?
16       A  This is the first time I am seeing any of
17   this.
18       Q  Now, looking at the calendar that we
19   looked at that had the 22nd of December through
20   January 1, keep that handy and let's look back at
21   the Ellington expense request in the previous
22   exhibit and compare dates.  According to the
23   calendar they would arrive in London on the
24   morning of the 22nd of December, and if you look
25   at the dates here the 22nd of December Scott's

84

1    London is listed and then on the 23rd London
2    Hilton Parklane, and the expenses begin there on
3    the 23rd and continue down through January 2, do
4    you see that?
5        A  I do.
6        Q  And that's what was submitted to
7    Beecher Carlson, correct?
8        A  Correct.
9        Q  And those are the exact same dates in this
10   itinerary that was provided to Ms. Archer and
11   Mr. Ellington, is that right?
12           MR. WELDON:  You ask whether the dates
13   correspond?
14   BY MR. BURT:
15       Q  Do the dates correspond?
16       A  The dates appear to correlate.
17       Q  And the locations appear to correlate as
18   well, London and Paris?
19       A  They do.
20       Q  Do you have any knowledge of whether
21   Mr. Ellington did any risk mitigation work in
22   London and Paris?
23       A  We were only provided with the direction
24   that the invoice was to be paid under the risk
25   mitigation fees.

---

**85**

1  Q  Did Ms. Archer to your knowledge have any
2  business with Sentinel?
3  A  I am not aware of who Ms. Archer is.
4  Q  Did she provide any services with regard
5  to the ATE policy to your knowledge?
6  A  I am not aware of who Ms. Archer is.
7  Q  So if you were to hear for the first time
8  today that she is Mr. Ellington's girlfriend would
9  that be news to you?
10  A  That would be news to me.
11  Q  And this was a personal trip that they
12  took to London and Paris?
13  A  That would also be news to me.
14  Q  And those would not have been appropriate
15  risk mitigation reimbursements --
16    MR. WELDON:  Objection.
17  BY MR. BURT:
18  Q  -- had Beecher known about it?
19    MR. WELDON:  Objection.
20  BY MR. BURT:
21  Q  You can answer.
22  A  Had Beecher known about it we would have
23  pushed that the expenses not be reimbursed under
24  the risk mitigation.  But if the directors had
25  approved it and that it was appropriate to pay

**86**

1  under it we would have had no choice other than to
2  follow the direction of the directors.
3  Q  Because ultimately Beecher didn't have the
4  authority one way or the other?
5  A  Beecher did not.
6  Q  And it was the outside directors who were
7  ultimately approving, right?
8  A  That is correct.
9  Q  Do you know if any of this information was
10  provided to the outside directors?
11  A  I am aware that the invoices themselves
12  would have been provided, but whether or not they
13  scrutinized it, I am not aware.
14  Q  And the e-mails back and forth between
15  Ms. Archer and Mr. Ellington, Beecher never had
16  those, correct?
17  A  Beecher never received those, so as to
18  whether or not they made it to the directors, I do
19  not know.
20  Q  If you look at -- looking at the exhibit
21  with the reimbursement requests, the Ellington
22  expenses, the next expense report included here is
23  for a Toronto trip from January 15 through
24  January 19, do you see that?
25  A  I do.

**87**

1  Q  A number of these are listed as risk
2  mitigation and then others are listed as business
3  development, is that right?
4  A  That is correct.
5  Q  Do you know what the distinction was
6  between risk mitigation and business development?
7  A  We were informed that anything business
8  development related to business opportunities that
9  Sentinel was looking into for future insurance
10  programs.
11  Q  And who informed you of that?
12  A  Matt DiOrio.
13  Q  And do you -- did Beecher have any
14  firsthand knowledge of what Mr. Ellington might
15  have been doing in terms of business development
16  efforts or only what was told to you by
17  Mr. DiOrio?
18  A  Only what was told to us by Mr. DiOrio.
19  Q  Here the first expense requested the
20  Shangri-La Toronto a $15,511 bill for risk
21  mitigation.  The other risk mitigations include a
22  $6,883 bill at Jacobs & Company Steakhouse on the
23  17th, do you see that?
24  A  I do.
25  Q  I skipped one, on the 14th another

**88**

1  Shangri-La Toronto for $2,637, do you see that at
2  the top?
3  A  I do.
4  Q  And then there is it looks like eight in a
5  row for the Shangri-La Hotel in various amounts,
6  do you see that?
7  A  I do.
8  Q  And, again, as before is it correct that
9  beyond what was included here and that you were
10  told that it was risk mitigation Beecher had no
11  insight into what was actually happening in
12  Toronto?
13  A  That is correct.
14  Q  And this -- Ms. Devins would have passed
15  this information that is here on to the
16  independent directors or the outside directors, is
17  that right?
18  A  That is correct.
19    I do remember speaking with Matt on this
20  particular invoice and he had indicated that the
21  Toronto trip had some involvement with the
22  litigation.
23  Q  Do you recall what he said precisely?
24  A  I don't remember other than that and it
25  was a conversation we had.

89

1    Q  And would that conversation have been
2  around the February, 2020 timeframe when this was
3  provided?
4    A  Yes.
5    Q  Most likely.
6      Mr. Adamczak, having now seen the
7  London/Paris itinerary and what was happening I am
8  just going to ask what's your reaction to that
9  sitting here today?
10     MR. WELDON:  Objection.
11     You can answer.
12     THE WITNESS:  I don't know what to say.
13 BY MR. BURT:
14    Q  It's news to you today sitting here?
15    A  It is.
16    Q  It was never disclosed to you at the time?
17    A  No, it was not.
18     (Document marked Exhibit 120 for
19       identification.)
20 BY MR. BURT:
21    Q  Showing you what's been Bates labeled BC
22 SEN0000663342 marked as Exhibit 120, go ahead and
23 take a look, a couple e-mails and an expense
24 report.
25    A  Okay.

90

1    Q  Looking at the bottom e-mail it is an
2  e-mail from Sarah Goldsmith to Matt DiOrio both at
3  SAS Management, cc'ing Connie and Scott Ellington
4  at SAS Management for subject Ellington request
5  reimbursement, do you see that?
6    A  I do.
7    Q  Let me ask while we are looking at e-mail
8  addresses, Mr. DiOrio is listed here as having an
9  SAS Management e-mail address.  Is that the e-mail
10 address he typically used in communicating with
11 you?
12    A  That is typically the e-mail address that
13 they would use.  We were told that any e-mails
14 that were coming from the Highland folks were
15 because it was a Cayman entity that they were
16 representing they had to use the Cayman e-mail
17 address, which was the sasmanagement.com e-mail
18 address.
19    Q  Did you at times receive e-mails from
20 their Highland Capital accounts as well?
21    A  We would.
22    Q  Even when it related to Sentinel business?
23    A  We would.  And then when I would reply I
24 would try to remember to put the SAS management
25 e-mail.

91

1    Q  To include all of them?
2    A  Right.
3    Q  Got it.
4      So here Ms. Goldsmith says, "Matt, as
5  discussed earlier I am submitting the attached
6  expense reimbursement on behalf of Scott Ellington
7  subject to review and approval by directors.
8  Please instruct reimbursement to Scott Ellington
9  for the attached travel expenses.  Total is
10 $318,938.  Please let me know if you have any
11 additional questions.  And then wire account
12 information is provided from Scott Ellington and
13 his bank account at Wells Fargo." Do you see
14 that?
15    A  Yes.
16    Q  And then in the e-mail above Mr. DiOrio
17 forwards it to you and Ms. Devins on Friday
18 December 20, 2019, so this appears to be about a
19 month and a half prior to the expenses that we
20 just looked at, the London and Paris?
21    A  Uh-huh.
22    Q  And he says, "Hi guys, please submit the
23 attached expenses for approval and reimbursement.
24 Just a heads up, settlement talks are cranking up
25 as we understand it so there will be an increase

92

1  in travel expenses over the next few months.
2  These are actually related to business development
3  as we try to plan for potential world post-ATE."
4    Q  Do you recall receiving that e-mail from
5  Mr. DiOrio and hearing about settlement talks and
6  potential world post-ATE in this timeframe?
7    A  I do.
8    Q  What do you remember about that?
9    A  I specifically had a discussion with him
10 relating to these invoices just to understand the
11 nature of business development costs and
12 Mr. DiOrio explained to me that there was a
13 convention in Las Vegas that was the type of
14 clientele that Highland Capital were looking at as
15 far as the next potential insurance programs that
16 they might be considering, so there was a lot of
17 wining and dining that went on in Las Vegas.
18    Q  Highland Capital was considering, is that
19 right?
20     MR. WELDON:  Objection.
21     THE WITNESS:  Highland Capital was
22 considering for Sentinel.
23 BY MR. BURT:
24    Q  For Sentinel in particular?
25    A  Correct.

**93**

1    Q  When he says post -- a potential world
2  post-ATE, did you discuss what he meant by that?
3    **A  It was understood at the time and it was**
4  **discussed in board meetings that because of the**
5  **magnitude of the ATE policy the potential exposure**
6  **that was there they didn't want to write any**
7  **additional policies through Sentinel until they**
8  **got on the other side of that UBS litigation.**
9    Q  And when you say the potential -- the size
10  of the policy and the potential exposure, describe
11  what you mean by that.
12    **A  Potential exposure $91 million of maximum**
13  **loss on the policy.**
14    Q  And did Sentinel have the assets to cover
15  that?
16    **A  They did.**
17    Q  And in terms of the potential settlement
18  that was being discussed, was it being discussed
19  that the ATE policy would cover that settlement?
20    **A  I do not know of any settlement talks**
21  **other than what Matt shared with us here.**
22    Q  Did Mr. DiOrio share with you that the
23  judge the prior month had issued a ruling finding
24  in favor totally for UBS?
25    **A  He did not.**

**94**

1    Q  Let's take a look at 55A.  We are going to
2  come back to that one so keep that handy.
3    **A  Are we done with the other ones?**
4    Q  You can set those ones aside for the
5  moment, yes.
6       MR. WELDON:  Is this a good place to take
7  a break?
8       MR. BURT:  We can, yes, sure.
9       THE VIDEOGRAPHER:  This marks the end of
10  Disk No. 2 in the deposition of Thomas Adamczak,
11  we are going off the record at 11:13.
12       (Recess taken.)
13       THE VIDEOGRAPHER:  Here begins Disk No. 3
14  in the deposition of Thomas Adamczak, we are going
15  back on the record at 11:27.
16  BY MR. BURT:
17    Q  So, Mr. Adamczak, before the break we were
18  looking at this e-mail that was forwarded to you
19  from Mr. DiOrio for expense reimbursements from
20  Mr. Ellington, and the date of that e-mail was
21  December 20, 2019.  Do you recall that?
22    **A  Yes.**
23    Q  Now, I believe I had asked you had
24  Mr. DiOrio informed you anything about a recent
25  court order in a UBS case finding in favor of UBS

**95**

1  and I believe your answer was no, is that right?
2    **A  That is correct.**
3       (Document marked Exhibit 121 for
4       identification.)
5  BY MR. BURT:
6    Q  So now looking at Exhibit 121, you can
7  actually flip to the fourth physical page, and you
8  will see a document that has a file stamp, it has
9  a case heading on it, do you see that?
10    **A  Yes.**
11    Q  And the Bates at the bottom of that is
12  KL_0000036.  And you see that this is a judgment
13  in the Supreme Court of the State of New York in
14  the case of UBS Securities, LLC and another UBS
15  entity plaintiffs against Highland Capital
16  Management, LLP and a number of Highland entities,
17  do you see that?
18    **A  I do.**
19    Q  And looking at that case caption are those
20  the -- is this the action that you understood to
21  be the event in the ATE policy?
22    **A  I believe so.**
23    Q  Now, looking at Page 2 of this order or
24  this judgment the second paragraph begins with
25  "and", do you see where I am?

**96**

1    **A  Yes.**
2    Q  It states, "And the Court having rendered
3  a final decision and order after trial on
4  November 14, 2019 in which it found in favor of
5  Plaintiffs UBS Securities, LLC and UBS AG London
6  Branch on their third and fourth causes of actions
7  against the counter-parties and dismissed
8  Defendant Highland Capital Management, LLP's
9  counterclaims with prejudice."
10    My question for you is did Mr. DiOrio make
11  you aware of the court order on November 14, 2019
12  finding in favor of UBS?
13    **A  I believe he had mentioned it and**
14  **indicated that there were appeals that were going**
15  **through.**
16    Q  When did he first mention it to you?
17    **A  I don't recall.**
18    Q  Looking at this December 20, 2019 e-mail
19  in the previous exhibit do you know whether he had
20  mentioned it to you around this time when he was
21  sending these expense reimbursements along?
22    **A  I don't believe so.**
23    Q  So --
24    **A  I don't recall.**
25    Q  But your best estimate probably would have

97

1  come sometime later?
2      MR. WELDON:  Objection.
3      THE WITNESS:  I don't recall.
4  BY MR. BURT:
5      Q  What did he say about appeals?
6      A  He didn't really have a lot of information
7  related to the process or where it was, but they
8  were trying to appeal.
9      Q  Do you know if appeals were ever taken?
10     A  I do not know.
11     Q  Did you ever speak with anybody else at
12  Highland about the judgment entered against them?
13     A  At the end of each year, probably sometime
14  in January to March, so post-year end, we would
15  have discussion with the actuary and include J.P.,
16  Matt, and Isaac Leventon to try to determine the
17  scenarios for the outcome of the case and with the
18  end goal being to determine what the loss,
19  ultimate loss, would end up being that Sentinel
20  would record in their financial statements.
21     Q  And did you engage in that process after
22  this judgment had come down?
23     A  We would have had a discussion in sometime
24  between January and March of 2020.
25     Q  Do you recall anything about that

98

1  discussion, what was discussed?
2      A  I don't, other than potential outcomes and
3  with the attempt to try and assign weights to that
4  for calculating the loss reserves.
5      Q  What if anything do you recall about what
6  Mr. Sevilla or Leventon said about the potential
7  outcomes?
8      A  I don't recall anything specific.
9      Q  Okay.
10     A  The discussion was really for the actuary
11  primarily.
12     Q  And what would the actuary do with that
13  information precisely?
14     A  The actuary would take those outcomes and
15  probabilities of each outcome and run it through
16  the models to try and determine the liability, the
17  ultimate loss liability.
18     Q  One moment.
19         Were those actuarial estimates were those
20  used for accounting purposes or how did they end
21  up being used?
22     A  For accounting purposes.
23     Q  And how specifically would they affect the
24  accounting?
25     A  So whatever the calculation by the actuary

99

1  was for loss reserves would be what the directors
2  approved to be recorded as a liability in
3  Sentinel's books.
4      Q  We will come back to that.  We will come
5  back to that in a couple of minutes.
6          So looking back at Exhibit I think it is
7  120, the expense reimbursement request, if we look
8  at the actual attachment, the expense report of
9  Mr. Ellington, dated December 19, 2019 for a total
10  of $318,934.88, here it doesn't have a listing of
11  risk mitigation or business development included
12  in this report.  Do you know how this would have
13  been accounted for?
14     A  This was explained to be all business
15  development expenses.
16     Q  And as we have discussed earlier, whether
17  it was risk mitigation or business development it
18  was coming out of the same Sentinel checking
19  account, right?
20     A  That is correct.
21     Q  So it was just for accounting purposes how
22  it was included in the ledger whether it was a
23  business development?
24     A  Correct.
25     Q  Or risk mitigation, okay.

100

1      MR. WELDON:  Objection.
2  BY MR. BURT:
3      Q  Is that right?
4      A  That is correct.
5      MR. WELDON:  Objection.
6  BY MR. BURT:
7      Q  Here if we look at these expenses you see,
8  for example, on December 12, 2019 a charge of
9  $152,000 at the Wynn Las Vegas Hotel, do you have
10  any insight on that charge what is listed here?
11     A  The only thing I know is what Matt DiOrio
12  explained that these were business development
13  expenses related to wining and dining
14  opportunities, potential future insurance
15  opportunities for Sentinel.
16     Q  Do you know if any of those insurance
17  opportunities ever came to fruition?
18     A  Sentinel has not written any policies
19  since the ATE policy.
20     Q  So none of this business development
21  resulted in any new ATE policy or other policy for
22  Sentinel?
23     MR. WELDON:  Objection.
24     THE WITNESS:  Not currently.
25

---

**101**

BY MR. BURT:

2  Q  There is charges at an Omnia Las Vegas.
3  Do you know what Omnia is?
4  A  No.
5  Q  No one ever told you what it was?
6  A  No.
7  Q  And if I were to represent to you that it
8  was a nightclub, would that be news to you?
9  A  No.
10  Q  Did you have an understanding?
11  A  I did not.  That wasn't one that I
12  particularly looked at.  I think I might have
13  looked at the Sapphire expense and questioned
14  that.
15  Q  And what do you understand Sapphire to be?
16  A  A typical Las Vegas strip club.
17  Q  Did you look at that at the time?
18  A  I did.
19  Q  And you asked Mr. DiOrio specifically
20  about that?
21  A  I did.
22  Q  And his answer was that it was business
23  development?
24  A  They were all business development, this
25  is how they do business.

---

**102**

1  Q  "They" being who?
2  A  Highland Capital.
3  Q  So he explained to you that Highland
4  Capital did business at strip clubs?
5      MR. WELDON:  Objection.
6      THE WITNESS:  He explained that this is
7  all of the events that took place in Las Vegas as
8  a whole related to the business development and
9  this is what they -- this is how they conduct
10  business.
11  BY MR. BURT:
12  Q  Please finish.
13  A  He didn't offer more than that.
14  Q  Did he explain whether anybody accompanied
15  Mr. Ellington to Las Vegas?
16  A  He did not.
17  Q  Now, looking at the e-mail at the very top
18  there is a To line to Alli Devins and the planner
19  this was produced to us, we don't know who the
20  from was, but it states, "Nice, what the hell is
21  going on with these expenses?  I question how much
22  business development is actually being done.  Did
23  you look at this?"
24      Was that -- did you write that e-mail to
25  Alli?

---

**103**

1  A  That is mine.
2  Q  And you recall sending that?
3  A  I do.
4  Q  And what raised your concern there?
5  A  The fact that there was $318,000 worth of
6  expenses at first, but there was a significant
7  amount of that seemed to be club-related.
8  Q  Was it after that that you had the
9  conversation with Mr. DiOrio?
10  A  Correct.
11  Q  So you tried to do some more diligence on
12  this?
13  A  I did.
14  Q  And the answer that you were given was --
15  A  Business development.
16  Q  Business development.
17      And then was this sent on to the directors
18  for approval?
19  A  It was.
20  Q  And do you know if the directors approved
21  it?
22  A  Ultimately they did, but they also
23  questioned it.
24  Q  What did they question?
25  A  They requested the nature of those

---

**104**

1  expenses as well and specifically inquired whether
2  all or both of the UBOs would be okay with running
3  these expenses through the captive as business
4  development.
5  Q  And who did they ask that question to?
6  A  Matt DiOrio.
7  Q  And what was the answer he gave?
8  A  That it was appropriate.
9  Q  So he -- did he tell them specifically
10  that both the UBOs, Scott Ellington and James
11  Dondero, were okay with running these types of
12  expenses through Sentinel?
13      MR. WELDON:  Objection.
14      THE WITNESS:  I don't specifically
15  remember.
16  BY MR. BURT:
17  Q  So what's your best memory?
18      MR. WELDON:  Objection.
19      THE WITNESS:  That it was appropriate to
20  include it as business development expense.
21  BY MR. BURT:
22  Q  So I guess what -- the distinction I am
23  trying to make sure I drill down on is it's
24  appropriate because the UBOs said it was
25  appropriate?

---

---

105

1    MR. WELDON:  Objection.
2    THE WITNESS:  To my knowledge, yes.
3  BY MR. BURT:
4    Q  I just want to look at one more of these
5  expense requests, give me one moment.
6    Mark this as 122.
7    (Document marked Exhibit 122 for
8      identification.)
9  BY MR. BURT:
10    Q  Showing what has been marked as
11  Exhibit 122 BC SEN000662367, are you ready,
12  Mr. Adamczak?
13    A  Yes.
14    Q  So the first-in-time e-mail here from
15  Matt DiOrio to you dated July 2, 2019, submitting
16  the below for approval and the below appears to be
17  a Sentinel expense reimbursement related to travel
18  for a CIMA meeting on June 25, 2019, do you see
19  that?
20    A  Yes.
21    Q  The amount being $4,615.90.
22    What CIMA meeting, if you recall, was
23  occurring in June of 2019?
24    A  So in connection with the CIMA inspection
25  CIMA specifically had questions related to the

---

106

1  investments and how they fit into Sentinel's
2  investment policy.  So this was a meeting at the
3  request of the directors with CIMA to specifically
4  cover the investments.
5    Q  And which directors attended?
6    A  I believe all of them had.
7    Q  Did Mr. Sevilla attend as well?
8    A  I believe he did as well.
9    Q  Did Ms. Irving attend?
10    A  I believe she did.
11    Q  Mr. Leventon?
12    A  I don't think so.
13    Q  Do you know if Mr. Dondero or Ellington
14  appeared?
15    A  I don't believe so.
16    Q  Now, do you recall this particular expense
17  reimbursement that Mr. DiOrio submitted?
18    A  I don't recall it, but this would have
19  been the expenses that Matt covered on that trip.
20    Q  Would that have come out of risk
21  mitigation?
22    A  This would have been travel expenses for
23  Sentinel, I believe.
24    Q  But the same one common bank account at
25  CIBC?

---

107

1    MR. WELDON:  Objection.
2    THE WITNESS:  Correct.
3  BY MR. BURT:
4    Q  Did Ms. Vitiello attend the meeting?
5    A  Who?
6    Q  Stephanie Vitiello.
7    A  I think she did, and that was the only
8  reference to her that I have seen.
9    Q  In regards to this CIMA meeting?
10    A  Her existence anywhere within Sentinel
11  operations.
12    Q  Do you know whether they traveled by
13  private jet?
14    A  I do not know.
15    Q  Are you aware of any instances in which
16  Highland employees traveled by private jet to the
17  Caymans?
18    A  To the Caymans?  Not necessarily.  But I
19  do know that they have had chartered flights for
20  other meetings.
21    Q  Did they seek reimbursement from Sentinel
22  for those?
23    A  Yes.
24    Q  What do you know about those flights?
25    A  I believe there was one flight, it might

---

108

1  have been the Toronto flight, that was --
2  actually, I don't even know that this one took
3  place.
4    There was a fee that came through for a
5  chartered flight that the trip ended -- never
6  ended up taking place so the funds were
7  reimbursed.
8    Q  In this e-mail Jonathan Arbeit also
9  appears.  Who is that?
10    A  He was an employee of mine.
11    Q  Working on the Sentinel account?
12    A  Correct.
13    Q  Is he still?
14    A  No.
15    Q  And on the same day, the second to last
16  e-mail, Mr. Arbeit e-mails you and says, the first
17  line says, I am not going to pronounce it right,
18  maybe someone knows, Sassiciaoa,
19  S-A-S-S-I-C-A-I-A-O-6, did you know what that is?
20    A  I do not.
21    Q  And then he has a URL there and it says
22  "looks like they overpaid a lot."
23    DO you recall that e-mail from Mr. Arbeit?
24    A  I do not.
25    Q  You responded to it on the same day "wow".

---

109

1    No recollection of that?
2        A  I don't.
3        Q  Do you recall if you clicked on the link
4    that you sent?
5        A  I don't remember.
6        (Document marked Exhibit 123 for
7        identification.)
8    BY MR. BURT:
9        Q  Handing you Exhibit 122 -- or 123.
10   I will represent to you, Mr. Adamczak,
11   this is the link that was clicked on or that was
12   included by Mr. Arbeit.  It is for a 2006 Italian
13   wine and it lists various prices for that.
14       Did you know that Mr. DiOrio was seeking
15   reimbursement for expensive bottles of wine?
16       A  Is that what this $4,000 is?
17       Q  Well, I am asking you.
18       A  I don't.  I don't remember, no.
19       Q  We are going off of what Mr. Arbeit
20   included here, it says "it looks like they
21   overpaid a lot" in the link.  That doesn't ring a
22   bell?
23       A  It does not.
24       Q  So you were not aware at the time that
25   they were seeking reimbursement for bottles of

110

1    wine in the thousands of dollars?
2        MR. WELDON:  Objection.
3        THE WITNESS:  No.
4    BY MR. BURT:
5        Q  They didn't tell you that?
6        A  No.
7        Q  There is one other type of expense I want
8    to briefly talk about.
9        What if anything, Mr. Adamczak, do you
10   know about Sentinel indemnifying former Highland
11   employees?
12       A  I know of an indemnification agreement
13   related to former Highland employees that worked
14   on Sentinel.
15       Q  Does Beecher have a copy of that
16   indemnification agreement?
17       A  I believe they do.
18       Q  And have you seen that?
19       A  I have.
20       Q  What does it provide?
21       A  I believe it's covering indemnification of
22   legal expenses for those employees.
23       Q  Legal expenses related to what?
24       A  Related to deposition subpoenas, court
25   proceedings related to the UBS litigation matter.

111

1        Q  Do you know how that indemnification came
2    to be?
3        A  I don't.
4        Q  What was told to you -- strike that.
5        When did you first learn about the
6    indemnification agreement?
7        A  Matt had mentioned it to us I think at the
8    time that they were putting that in place, but it
9    didn't -- it didn't -- I didn't see anything more
10   about it until months later when I actually saw a
11   copy of the agreement.
12       Q  What did Matt say when he first mentioned
13   it to you?
14       A  That they were putting this in place to
15   cover the expenses for the employees.  I don't
16   remember anything more than that.
17       Q  To cover the legal expenses in particular?
18       A  Legal expenses, yes.
19       Q  Which employees?
20       A  I believe the agreement specified which
21   employees, but I don't recall.
22       Q  Mr. DiOrio is covered?
23       A  He was on the list, yes.
24       Q  Was Mr. Sevilla?
25       A  I don't recall.

112

1        Q  Do you recall if -- if I go through names
2    would you be able to recall?
3        A  I would just be guessing.
4        Q  Okay.
5        MR. WELDON:  We don't want you to guess or
6    speculate.
7    BY MR. BURT:
8        Q  Do you know who approved the
9    indemnification agreement?
10       A  I believe the directors may have.
11       Q  Was Mr. DiOrio still a director at the
12   time?
13       A  He was.
14       Q  Who drafted it?
15       A  I don't recall.  I don't know that I knew.
16       Q  Are they being paid out of that same
17   Sentinel checking account at CIBC, the expenses
18   related to the indemnification agreement?
19       MR. WELDON:  Objection.
20       THE WITNESS:  There were no expenses paid
21   directly to the employees that I am aware of.  I
22   believe the only expenses would have come through
23   as legal fees, maybe a retainer.
24   BY MR. BURT:
25       Q  For various law firms and lawyers?

113

1    A Yes.
2    Q Do those invoices still come to Beecher
3 for processing?
4    A I haven't seen any recently.
5    Q When was the last time you saw one?
6    A I believe it was just a retainer upfront,
7 and I don't remember the name of the law firm.
8    Q That's the only request for reimbursement
9 or for payment that you have seen related to the
10 indemnification agreement?
11    A As far as I know.
12    Q As far as -- as the corporate
13 representative of Beecher as far as Beecher is
14 aware just the retainer?
15    A That is correct.
16    Q Do you -- was that paid, that retainer?
17    A Yes.
18    Q Was it classified as a risk mitigation
19 expense?
20    A I do not recall. I believe it would have
21 been, but I don't recall.
22    Q So if any of those -- if any further
23 expenses have been submitted and paid that would
24 have been -- Beecher would not have knowledge of
25 that? I just want to make sure I am understanding

114

1 that right.
2    A We have seen a lot of legal bills come
3 through Sentinel, so it's possible there could
4 have been some other ones that I am just not
5 remembering. There were a lot of legal bills.
6    Q Aside from the indemnification ones, what
7 other types of legal bills are coming from
8 Sentinel?
9    A There is the legal bills for Collas Crill
10 who is Sentinel's attorney, and then all the other
11 law firms that they have worked with, whether they
12 were related to the UBS matter or not.
13    Q And those continue to come to Beecher?
14    A I don't remember which ones we have seen
15 recently, but they do -- the only way that they
16 can be paid through Sentinel is if they come
17 through Beecher.
18    MR. BURT: 124 I believe.
19    (Document marked Exhibit 124 for
20     identification.)
21    THE WITNESS: Are we finished with these
22 documents?
23    MR. BURT: You can set those aside.
24 BY MR. BURT:
25    Q Showing you 124 Bates labeled BC SEN

115

1 0000074288, are you ready, Mr. Adamczak?
2    A Yes.
3    Q So what I actually want to look at is the
4 bottom e-mail on the first page from
5 Gareth Pereira dated the 24th of June, 2021 to
6 Casey McDonald. We have spoken about Mr. Pereira,
7 but who is Mr. McDonald?
8    A Mr. McDonald is one of the current
9 directors of Sentinel and he is an outside
10 independent director.
11    Q When was he appointed?
12    A Shortly before this e-mail.
13    Q So in the April, May timeframe?
14    A I want to say probably final approval came
15 through in early June maybe.
16    Q 2021?
17    A '21, yes.
18    Q Do you know who appointed him?
19    A Matt DiOrio as the current -- then current
20 remaining director on the Sentinel board.
21    Q Was he still a member of the Sentinel
22 board at that time?
23    A At the time that he was appointed, yes.
24 They didn't want to have all the directors resign
25 at the same time because that would leave the

116

1 company with no directors.
2    Q When did Mr. DiOrio leave the board,
3 resign from the board?
4    A It was probably early June. It would have
5 been right after the formal approval by CIMA of
6 the new directors.
7    Q Do you know if Mr. DiOrio was still
8 working for Highland at that time?
9    A He told us that he was no longer working
10 for Highland.
11    Q But was still a board member of Sentinel?
12    A Correct.
13    Q Do you know what diligence went into
14 finding Mr. McDonald?
15    A I do not.
16    Q It is a name that Mr. DiOrio presented?
17    A I don't remember who presented his name.
18    Q I think you testified earlier that DiOrio
19 appointed him as a director, is that right?
20    A I believe that is how it went.
21    Q Also included in the cc column in this
22 e-mail is a Kenny Wade at the same Calderwood
23 entity. Do you know what that is?
24    A He is another independent director.
25    Q When was he appointed?

117

1    A The same time that Mr. McDonald was.
2    Q Did Mr. DiOrio appoint him as well?
3    A He would have appointed both of them.
4    Q And then there is a Stephen Leontsinis at
5 Collas Crill. Do you know who that is?
6    A He is the attorney for Sentinel.
7    Q And Matt DiOrio at a gmail account, do you
8 recognize that to be his personal gmail account?
9    A That was the e-mail account that he was
10 using since he left Highland.
11    Q He no longer used an SAS account either?
12    A No.
13    Q And then there is a J.S. de Jager, CSI.
14 Do you know what that is?
15    A J.S. is the third independent director.
16 He was appointed shortly after Mr. McDonald and
17 Mr. Kenny were appointed.
18    Q Who appointed Mr. de Jager?
19    A I don't remember, but Mr. McDonald and
20 Mr. Kenny may have.
21    Q And then you and Mr. Price are also on
22 this e-mail, do you see that?
23    A Correct.
24    Q Here Mr. Pereira writes, "Good morning,
25 Casey. Following on from last week please can you

118

1 provide your approval through e-mail and also
2 release the following payments that have been set
3 up in CIBC for Sentinel. There is a Ross & Smith
4 legal expense for $75,854.90 and Q3 Beecher
5 Carlson Captive Management fee of 15,000, is that
6 right? And Risk International Actuarial expense
7 of 7500."
8    A Correct.
9    Q Do you recall this request coming from
10 Mr. Pereira?
11    A I do.
12    Q What do you remember about it?
13    A This is the typical expense request where
14 we would provide the invoices to the directors for
15 their approval and release in the CIBC system.
16    Q And then Mr. McDonald responds, "Thanks,
17 Gareth. I can go in and approve, but as Wade and
18 I don't have any visibility into the legal bill I
19 appreciate Matt confirming it is all in order and
20 should be settled. As it's for U.S. counsel am I
21 right in thinking it is coming out of the pre-fund
22 mitigation balance or is there any additional
23 background we can get on the expenses?" Do you
24 see that?
25    A I do.

119

1    Q And so then Mr. DiOrio -- yes, Mr. DiOrio
2 responds at the top e-mail, it says, "This is an
3 order and should be settled. The company
4 indemnified a group of former employees, myself
5 included, a while back and it relates to our
6 defense with respect to today's hearing that I
7 mentioned." Do you see that?
8    A I do.
9    Q Do you know what hearing he was referring
10 to?
11    A I do not.
12    Q And is this the indemnification agreement
13 that we have been discussing?
14    A I believe that's correct.
15    Q Now, Mr. McDonald had requested if this
16 comes out of the pre-fund mitigation risk balance.
17    It doesn't appear that Mr. DiOrio directly
18 responded to that question, but is it your
19 understanding that that is where the
20 reimbursements are coming from?
21    MR. WELDON: Objection.
22    THE WITNESS: I don't recall.
23 BY MR. BURT:
24    Q Do you know specifically what matter these
25 former employees were indemnified for?

120

1    A I assumed it related to the UBS
2 litigation.
3    Q Are you aware of any directions from CIMA
4 that are currently in place regarding payments of
5 expenses and things of that nature?
6    A CIMA had requested that Sentinel refrain
7 from making any payments and disposing of any of
8 the assets.
9    Q When did CIMA make that request?
10    A I don't remember the date.
11    Q Was it in 2021?
12    A I believe it was in 2021.
13    Q Was it before these requests for
14 reimbursement came in?
15    A I don't believe so, but I don't remember.
16    Q Are you aware of CIMA issuing a retraining
17 notice or restraint on Sentinel from dispersing
18 any funds whatsoever?
19    A Yes, that's what I was referring to.
20    Q That's what you were referring to, okay.
21    A Yes.
22    Q And to your knowledge has Sentinel adhered
23 to that since receiving it?
24    A Beecher sought clarification from CIMA
25 whether they intended us to not pay any service

121

1 providers and let everything lapse or if they
2 wanted to at least continue the operations and
3 they specified that we could continue paying
4 normal business expenses.
5    Q Was that in a written response to Beecher?
6    A I believe so, yes.
7    Q Would that have come to --
8    A Clayton.
9    Q Clayton, all right.
10      Would indemnification reimbursement
11 expenses fall within those types of payments that
12 are still being paid?
13    A I don't recall this being before that
14 cease and desist, whatever you termed it as.
15    Q The restraint?
16    A The restraint.
17    Q Setting this document aside, just in
18 general after receiving that restraint and
19 receiving the clarification about paying sort of
20 the normal course payments to service providers,
21 would legal expense reimbursements for the
22 indemnified employees fall within that category of
23 expenses that could still be paid?
24    A I don't know.
25    Q Beecher doesn't know one way or the other?

122

1    A It would be up to the directors to make
2 that call.
3    Q What types of expenses are on hold and
4 restrained that Sentinel is not making?
5    A Sentinel is not disposing of any of the
6 assets currently, so any -- where they had
7 originally planned on selling some of the
8 securities or liquidating securities they have
9 foregone any decisions to do that in the near
10 term.
11    Q Who had made the decision to liquidate
12 securities?
13    A The directors had originally.
14    Q At what time was that decision made?
15    A Sometime in the summer of 2021.
16    Q So it was the new directors?
17    A The new directors.
18    Q Who wanted to liquidate certain assets?
19    A Correct.
20    Q But that's on hold?
21    A Correct.
22    MR. WELDON: Good place to stop?
23    MR. BURT: One more question.
24 BY MR. BURT:
25    Q Are you aware of any connection or

123

1 relationship between any of the current or former
2 Sentinel independent directors and Mr. Dondero and
3 Mr. Ellington?
4    A The independent directors?
5    Q Uh-huh.
6    A No.
7    MR. BURT: We can take a break.
8    THE VIDEOGRAPHER: We are going off the
9 record, the time is 12:05.
10    (Lunch recess taken.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

124

1    A F T E R N O O N   S E S S I O N
2    THE VIDEOGRAPHER: We are going back on
3 the record, the time is 1:01.
4    (Document marked Exhibit 125 for
5      identification.)
6 BY MR. BURT:
7    Q I am showing you, Mr. Adamczak,
8 Exhibit 125, which is produced by Highland Capital
9 Management and has an e-mail and attachment. Go
10 ahead and take a look at that.
11    A I am all set.
12    Q What do you recognize the attachment to
13 be?
14    A This is the ATE policy.
15    Q Now, we have been talking a lot about ATE
16 policy. Can you describe what an ATE policy is?
17    A ATE is after the event, it's a legal
18 liability insurance policy covering a negative
19 outcome on a particular matter.
20    Q Does Beecher have any other clients that
21 issue ATE policies?
22    A No.
23    Q Sentinel is the only one?
24    A The only one that I am aware of.
25    Q And how many ATE policies did Sentinel

125

1 produce?

2     **A** **Just one.**

3     Q And it's this one we are looking at here?

4     **A** **Correct.**

5     Q I believe you testified earlier that the

6 event referred to in this policy is the UBS

7 litigation against Highland Capital and the

8 various Highland entities?

9     **A** **Correct.**

10     Q And you are familiar with this document,

11 you have seen it before?

12     **A** **I have.**

13     Q Let's flip to the schedule of this

14 document near the very end, the last two pages is

15 what I am going to look at, and listed here is the

16 schedule of the ATE policy and the insurer is

17 listed as Sentinel Reinsurance Limited, correct?

18     **A** **Correct.**

19     Q The insured are three entities, Highland

20 CDO Master Fund LP, Highland CDO Holding Company,

21 and Highland Special Opportunities Holding

22 Company, do you see that?

23     **A** **Yes.**

24     Q Do you know how it was decided that these

25 three entities should be the insured?

126

1     **A** **At the direction of J.P. Sevilla.**

2     Q What direction specifically did he give?

3     **A** **That these would be the insureds on the**

4 **policy.**

5     Q When did he give that?

6     **A** **When the policy was drafted.**

7     Q Which was when?

8     **A** **Prior to August 1, 2017.**

9     Q Did he ever mention that there were other

10 entities involved in the UBS -- other Highland

11 entities involved in the UBS litigation that would

12 not be insured?

13     **A** **Not to my knowledge.**

14     Q Did he represent that these three entities

15 were all in the litigation?

16     **A** **Could you clarify?**

17     Q Sure.

18     So it lists three entities. Did

19 Mr. Sevilla tell Beecher that these three

20 entities, the insureds, are all part of the UBS

21 litigation?

22     **A** **That's our understanding, yes.**

23     Q Did Beecher ever check to see if that was

24 correct?

25     **A** **No.**

127

1     Q If you look down in the legal action row,

2 do you see that?

3     **A** **Yes.**

4     Q It lists the title of the legal action and

5 the case number, and if you look at the entities

6 whom UBS is suing it includes Highland Capital

7 Management, LP, which is not an insured, correct?

8     **A** **Correct.**

9     Q It includes Highland Special Opportunities

10 Holding Company, which is an insured, correct?

11     **A** **Correct.**

12     Q It includes Highland Financial Partners,

13 LP, which is not an insured, correct?

14     **A** **Correct.**

15     Q And it includes Highland CDO Opportunity

16 Master Fund LP, which is an insured, correct?

17     **A** **Correct.**

18     Q It includes Highland Credit Opportunities

19 CDO, LP and Strand Advisors, neither of which are

20 insureds, correct?

21     **A** **Correct.**

22     Q Not listed in that legal action was

23 Highland CDO Holding Company, the middle of the

24 three insureds up above, do you see that?

25     **A** **Yes.**

128

1     Q Was that known to Beecher at the time?

2     **A** **It may have been, but it would have -- if**

3 **we asked we would have assumed or been under the**

4 **assumption that it was part of the affiliation of**

5 **those entities whether a subsidiary of those**

6 **entities or some relation that was covered under**

7 **that.**

8     Q And that would have been told to you by

9 Mr. Sevilla?

10     **A** **Correct.**

11     Q Now, I want to actually talk about that

12 for a moment.

13     The affiliation of these entities, what

14 was Beecher's understanding of how all these

15 entities were related?

16     **A** **They were either subsidiaries of Highland**

17 **Capital Management or funds that Highland Capital**

18 **Management managed.**

19     Q That was known to Beecher, that fact that

20 these were all affiliated?

21     **A** **That was our understanding.**

22     Q Based on what Mr. Sevilla told you?

23     **A** **Correct.**

24     Q So from Beecher's perspective it wouldn't

25 make any difference to the efficacy of the policy

129

1  that one of the insured's was not part of the
2  event in the after the event policy?
3  **A  I don't know.**
4     Q  Let me rephrase it.
5        Because it was an affiliated entity with
6  the other Highland entities it was not of a
7  concern to Beecher at the time that it wasn't
8  named as a defendant in the event, the litigation?
9        MR. WELDON:  Objection.
10        THE WITNESS:  I don't believe so.
11  BY MR. BURT:
12     Q  Did Beecher ever ask why -- ever ask
13  Mr. Sevilla why the other defendants weren't being
14  included as insureds?
15  **A  Not to my knowledge.**
16     Q  Why not?
17  **A  I don't know.**
18     Q  Would it be fair to say that Beecher was
19  just following what Mr. Sevilla told it to do?
20        MR. WELDON:  Objection.
21        THE WITNESS:  I don't know.
22  BY MR. BURT:
23     Q  The court in which this case is pending is
24  the Supreme Court of the State of New York, lists
25  the opponent, and then it lists the limit of

130

1  indemnity, and that is listed as $100 million in
2  the aggregate, do you see that?
3  **A  Yes.**
4     Q  Payment date for premium is listed as
5  August 31, 2017 and the premium is listed as
6  $25 million, do you see that?
7  **A  Yes.**
8     Q  And I want to come back to how both of
9  those figures were arrived at, but before we do,
10  looking at the next page the signature page for
11  the insurer and the insureds, first, insurer,
12  Andrew Dean signed for Sentinel, is that right?
13  **A  Correct.**
14     Q  And is it correct that he was a director
15  of Sentinel at the time?
16  **A  Correct.**
17     Q  Did he work for one of those agencies or
18  groups that provided --
19  **A  Maples.**
20     Q  He worked for Maples.
21        How long did Mr. Dean serve as a director?
22  **A  From 2015-ish to 2018.**
23     Q  What role to your knowledge or to
24  Beecher's knowledge did Mr. Dean have in putting
25  this policy together?

131

1  **A  None.**
2     Q  Did any of the directors -- did any of the
3  outside directors have any role in putting the
4  policy together?
5  **A  At the time that this policy was put in
6  place there were only outside directors.**
7     Q  And none of them had any role in putting
8  it together?
9        MR. WELDON:  Objection.
10        THE WITNESS:  No.
11  BY MR. BURT:
12     Q  The insureds are listed as, again, as we
13  just read, the three Highland entities, and each
14  of them is signed for by James Dondero as
15  president or director, do you see that?
16  **A  I do.**
17     Q  What was Beecher's understanding at the
18  time of Mr. Dondero's role with respect to those
19  Highland entities?
20  **A  That he had authority to act on each of
21  those entities as president or CEO or whatever his
22  role was with Highland Capital.**
23     Q  Who told you that?
24  **A  I don't believe anyone told us, it was
25  probably assumed.**

132

1     Q  Mr. Sevilla didn't explain why Mr. Dondero
2  was signing?
3  **A  He may have.  I don't remember.
4     We have seen Mr. Dondero's name on a
5  number of documents so it's not uncommon to see
6  him related to Highland Capital.**
7     Q  So the understanding of Beecher at the
8  time -- let me make sure I get this right.
9        With Highland Capital Management, LP was
10  it Beecher's understanding that of that entity
11  Mr. Dondero was the CEO or president?
12        MR. WELDON:  Objection.
13        THE WITNESS:  Yes.
14  BY MR. BURT:
15     Q  And that as president or CEO of that
16  entity, the Highland Capital Management, LP, he
17  had authority to sign for the various Highland
18  entities underneath it?
19        MR. WELDON:  Objection.
20        THE WITNESS:  Yes.
21  BY MR. BURT:
22     Q  Did Beecher have any understanding --
23  strike that.  I will come back to that.
24        Let's talk about for a moment the
25  $100 million limit of indemnity.  Could you

133

1   describe how that figure was arrived at?
2       A  It was actuarially -- sorry, the 100
3   million?
4       Q  The 100 million limit of indemnity.
5       A  It was the figure that Mr. Sevilla had
6   given us.
7       Q  Had he ever provided other figures that he
8   was considering?
9       A  80 million and I believe I have seen 120
10  million.
11      Q  When did Mr. Sevilla start providing these
12  possible limits of indemnity figures?
13      A  At the time that they were discussing
14  writing the policy.
15      Q  And thinking back to before lunch, was
16  that in early 2017?
17      A  Early 2017.
18      Q  And that was when Mr. Kranz and
19  Mr. Sevilla were talking about it?
20      A  Correct.
21      Q  Do you know or did Beecher know where
22  these numbers were coming from, why these amounts?
23      A  I think it was based on the premium that
24  they were willing to pay and the exposure that
25  they were willing to put into the captive.

134

1       Q  When you say exposure willing to put in,
2   what does that mean?
3       A  Exposure, risk that Sentinel could
4   potentially be on the hook for.
5       Q  I see.  So the exposure to Sentinel.
6       A  Yes.
7       Q  And Mr. Sevilla was providing those
8   figures to Mr. Kranz?
9       A  I don't know.
10      Q  Did you or Mr. Kranz ever offer your own
11  figures or provide feedback to the figures that
12  Mr. Sevilla was giving?
13      A  I don't know that.
14      Q  Let's let me ask about the premium figure,
15  the 25 million.  How was that figure arrived at?
16      A  The premium was actuarially determined
17  based on a set of outcomes and their probabilities
18  of secession.
19      Q  Who was the actuary you were using?
20      A  Jason Stubbs of International Risk.
21      Q  Is it correct to say that Mr. Stubbs
22  arrived at the $25 million figure?
23      A  He arrived at the $25 million figure in
24  discussions with Pete and J.P.
25      Q  What were those discussions about?

135

1       A  The assumptions that were used in the
2   model.
3       Q  Were the assumptions provided to
4   Mr. Stubbs by Mr. Kranz and Mr. Sevilla?
5       A  Correct.
6       Q  So is it correct to say that -- let me ask
7   it this way.
8          Is it right that the amount of the premium
9   depended on the assumptions provided?
10      A  The way that the actuarial modeling worked
11  was whatever the outcomes were and the exposure
12  and the probability of secession that would factor
13  in to the calculation to determine the ultimate
14  premium that would be paid.
15      Q  And those calculations were done by
16  Mr. Stubbs?
17      A  Correct.
18      Q  Do you recall this issue of how the
19  premium was set being raised by CIMA in their 2019
20  audit of Sentinel?
21      A  In what way?
22      Q  Did they have questions about it, how the
23  premium was determined?
24      A  They may have.  I don't remember.
25      Q  I will show you a document that maybe will

136

1   refresh.  Mark this as 126.
2          (Document marked Exhibit 126 for
3          identification.)
4   BY MR. BURT:
5       Q  I have handed you, Mr. Adamczak, what's
6   been marked as Exhibit 126, Bates BC
7   SEN00000078777, which is an e-mail from a CIMA
8   employee to Clayton price, cc'ing amongst others
9   yourself, and then it has four attachments,
10  including CIMA final reports.
11      A  Yes.
12      Q  Are you familiar with this?
13      A  Yes.
14      Q  And you recall receiving these reports in
15  May of 2019 from CIMA?
16      A  Yes.
17      Q  I want to look at one page in particular,
18  I know they are very lengthy, bear with me one
19  moment.  It is actually on Page 8 of the AML
20  report, the Bates at the bottom will end in 78822,
21  and it is Section 5.2.1.4 under Authorities
22  Response, do you see that?
23      A  I do.
24      Q  And in here CIMA writes on April 4, 2019,
25  "The authority held a telephone interview with

137

1  Mr. Jason D. Stubbs of Risk International, the
2  licensee's actuary.  During the interview
3  Mr. Stubbs informed the authority that he was not
4  involved in the determination of premium pricing
5  for the licensee to any extent at all but rather
6  his role was limited to technical reserving.  He
7  added that his involvement arose after premium
8  decisions had been finalized by the licensee.  The
9  authority notes with concern that the management's
10  assertion that the ATE policy premium of U.S.
11  25,000,000 was established based on a pricing
12  study conducted by the licensee's actuary
13  contradicts the actuary's position."
14        Were you aware of that finding of the
15  authority?
16     A  It states here that that is the case, so I
17  was aware.
18     Q  Do you disagree with that finding?
19     A  I disagree with the fact that there were
20  discussions with Mr. Stubbs and Mr. Kranz and
21  Mr. Sevilla regarding pricing analysis.  The
22  pricing analysis was never formally finalized, so
23  from the standpoint of Mr. Stubbs response maybe
24  that's true because it wasn't formalized.
25     Q  I guess what I am trying to understand is

138

1  the timing in arriving at the figure.  Did that
2  figure come prepackaged by Mr. Sevilla to
3  Mr. Stubbs say I want a policy with around a
4  premium of 25 million, make it work, or did
5  Mr. Stubbs arrive at that figure independently?
6     A  I was not part of those discussions so I
7  do not know.
8     Q  Well, how about Beecher, as Beecher's
9  corporate representative do you know?
10     A  I do not know.
11     Q  Let's look at a few other documents maybe
12  that will help here.
13        (Document marked Exhibit 127 for
14         identification.)
15  BY MR. BURT:
16     Q  I am showing you what's been marked as
17  Exhibit 127 Bates number BC SEN00007459020.  And
18  I'd like to draw your attention first to the
19  second-in-time e-mail which is on the third page,
20  it's an e-mail from Paul Scrivener to Neil Horner,
21  cc'ing J.P. Sevilla, Pete Kranz, and Robert
22  Humphries.
23        First, do you know what Paul Scrivener is?
24     A  He was an attorney with Solomon Harris.
25     Q  And who was Neil Horner?

139

1     A  I have never heard of Neil Horner.
2     Q  And what role did Paul Scrivener play in
3  the June, 2017 timeframe with respect --
4     A  Hold on, let me catch up.
5     Q  Sure.
6     A  We are on Page 3 or 2?
7     Q  Page 3, the June 12, 2017 e-mail.
8     A  Yes, I am with you.
9     Q  The subject of this e-mail is the draft
10  ATE policy, and my question is what role
11  Mr. Scrivener played with that, with the ATE
12  policy.
13     A  What was the question again?
14     Q  No problem.
15        The question was what role did
16  Mr. Scrivener play with respect to the ATE policy?
17     A  I believe we had contacted Solomon Harris
18  along with a number of legal firms to provide
19  guidance in terms of drafting the ATE policy.
20     Q  Around here in the third paragraph that
21  begins with "the insurer here", do you see that?
22     A  Yes.
23     Q  It says, "The insurer here, Sentinel
24  Reinsurance Limited, or Sentinel, is a Cayman
25  licensed insurer and is affiliated with both a

140

1  litigation funding business and a U.S. hedge fund
2  management company."  Do you see that?
3     A  Yes.
4     Q  And that's consistent with Beecher's
5  understanding as well, correct, that Sentinel was
6  affiliated with both the litigation funding
7  business and the U.S. hedge fund management
8  company or Highland?
9     A  Directly affiliated with litigation
10  funding business through the Sentinel structure
11  and affiliated with the U.S. hedge fund management
12  company through common ownership.
13     Q  And that was Highland Capital was the U.S.
14  hedge fund company, right?
15        MR. WELDON:  Objection.
16        THE WITNESS:  Correct.
17  BY MR. BURT:
18     Q  And the common ownership being
19  James Dondero and Scott Ellington?
20     A  Correct.
21     Q  So James Dondero and Scott Ellington are
22  the owners of the U.S. hedge fund management
23  company or Highland Capital Management, correct?
24        MR. WELDON:  Objection.
25        THE WITNESS:  I don't know to what extent

141

1 they own Highland Capital Management.
2 BY MR. BURT:
3    Q  I believe you just testified when I asked
4 the common ownership being James Dondero and
5 Scott Ellington and you said correct.
6    **A  I don't know how much ownership they had**
7 **of it, but it was our assumption that they had**
8 **some ownership.**
9    Q  Of Highland?
10   **A  Yes.**
11   Q  And did Mr. Sevilla ever tell you that?
12   **A  No.**
13   Q  How about Mr. DiOrio?
14   **A  No.**
15   Q  No one from Highland ever told you that?
16   **A  Maybe did it, I don't remember.**
17   Q  So then he says, "Sentinel in the
18 litigation funding business are existing clients
19 of Solomon Harris, I understand that this policy
20 will be the first third-party business written by
21 Sentinel with Sentinel initially set up to insure
22 or reinsurer certain group risks."
23      Do you know what he meant by third-party
24 business written by Sentinel?
25   **A  Third-party business being not the parent**

142

1 **risks.**
2    Q  I am not sure I understand that, what do
3 you mean by that?
4    **A  It is not -- if it is in a direct line**
5 **with the ownership, the parents, it would be**
6 **affiliated risk.  If it's a sister company or some**
7 **distant relationship it would fall under the**
8 **third-party risk.**
9    Q  I see.
10      So the fact that it had common ownership
11 didn't mean that it was first-party business it
12 could still be called third-party business?
13   **A  Correct.**
14   Q  Then he writes in the next paragraph, "The
15 insureds under this policy will be Cayman and
16 Bermuda hedge funds that are currently embroiled
17 in well-advanced litigation as defendants.  The
18 matter is set down for trial in August/September
19 of this year.  The total potential exposure in the
20 litigation is in the order of U.S. 500 million and
21 the total assets of the funds have an NAV of
22 around U.S. 100 million."
23      I will stop there.  Do you understand NAV
24 to mean net asset value?
25   **A  Yes.**

143

1    Q  Is that consistent with Beecher's
2 understanding at the time that the total assets of
3 the funds to be insured have an NAV of around
4 100 million?
5      MR. WELDON:  Objection.
6      THE WITNESS:  No.
7 BY MR. BURT:
8    Q  What was Beecher's understanding?
9    **A  That the fair value was undetermined.**
10   Q  So in June of 2017 it was unknown as far
11 as Beecher was aware of --
12   **A  Correct.**
13   Q  -- of the value?
14      Do you have any idea where Mr. Scrivener
15 may have gotten that figure?
16   **A  I don't know.**
17   Q  And he says here that -- strike that.  All
18 right.
19      He says, "There is scope for a settlement
20 still, the deal that Sentinel has reached with the
21 funds is that for a premium of U.S. 20 million
22 Sentinel will provide cover of up to 85 million on
23 either, one, judgment against the funds or, two,
24 settlement being reached."
25      So here we see him talking about a premium

144

1 of 20 million and a cover of up to 85 million.  Is
2 that consistent with Beecher's understanding in
3 June of 2017 that those were the figures being
4 considered?
5      MR. WELDON:  Objection.
6      THE WITNESS:  Yes.
7 BY MR. BURT:
8    Q  And where did those figures come from?
9    **A  Through the discussions with the actuary.**
10   Q  So Beecher's testimony would be that the
11 actuary had provided both the $25 million figure
12 and the $85 million figure?
13   **A  I know there was a discussion between**
14 **J.P., Pete, and Jason Stubbs to prepare the**
15 **premium pricing model, and that was the outcome of**
16 **the draft premium pricing model that was provided.**
17   Q  And, again, the assumptions that went into
18 that model were provided by Mr. Sevilla and
19 Mr. Kranz?
20   **A  That is my understanding.**
21   Q  It then says, "Cover includes any legal
22 costs payable to the plaintiffs but not the fund's
23 own legal costs."  And we have seen that is
24 actually not how the policy ended up being
25 written, is that right?

145

1      MR. WELDON:  Objection.
2      THE WITNESS:  Correct.
3   BY MR. BURT:
4      Q   Then it says, "The U.S. 20 million premium
5   will be satisfied in kind by the funds
6   transferring their investment portfolios to
7   Sentinel.  There will be an actuarial assessment
8   of the portfolio assets."  Do you see that, do you
9   see where I was reading?
10     A   Yes.
11     Q   Was it Beecher's understanding that the
12  plan was for the premium to be satisfied by the
13  transfer of the entire investment portfolios of
14  the funds?
15     A   Yes.
16     Q   So that was always understood?
17     A   Always.
18     Q   Where did that idea come from?
19     A   J.P.
20     Q   And he says, "Again, in future tense there
21  will be an actuarial assessment of the portfolio
22  asset."
23     That gets back to my question about timing
24  whether the actuarial assessment happened after
25  the figures had been arrived at or was informed by

146

1   these figures.
2      A   I don't know what he is referring to in
3   terms of an actuarial assessment of the portfolio
4   assets.
5      Q   Let's look at -- keep that handy, I am
6   going to show you another exhibit along these
7   lines.
8      MS. REPORTER:  It will be 128.
9      (Document marked Exhibit 128 for
10     identification.)
11  BY MR. BURT:
12     Q   This is a somewhat lengthy e-mail
13  exchange, feel free to take a look at it, but I
14  also can draw your attention to specific portions.
15  I will state for the record it is Exhibit 128
16  Bates label BC SEN0000662979.
17     Mr. Adamczak, let me know when you are
18  ready.
19     A   I am ready.
20     Q   The first e-mail, it is hard to see
21  because of all of the disclaimers that appear at
22  the end, it is the end of page, 1, 2, 3, 4, 5, 6,
23  at the bottom there is an e-mail from J.P. Sevilla
24  to a Jason Stubbs at Bartlett Actuarial Group
25  dated June 12, 2017?

147

1      A   Yes.
2      Q   Do you see that?
3      Cc'd on that are Pete Kranz and Isaac
4   Leventon.
5      So just to level set in terms of timing,
6   this e-mail is dated June 12 and I believe the
7   last e-mail that we have been looking at from
8   Mr. Scrivener was also dated June 12, 2017.
9      A   Okay.
10     Q   Do you see that?
11     A   I do.
12     Q   So here Mr. Sevilla writes to Jason
13  Stubbs, "Jason, I will be speaking to your GC
14  later this afternoon and I anticipate we will
15  finalize the NDA then."  Do you know what NDA
16  refers to?
17     A   Nondisclosure agreement, or something like
18  that, I don't know.
19     Q   Was that part of retaining or bringing on
20  Bartlett Actuarial to provide work?
21     A   Nothing that I am involved with.
22     Q   You are not involved with that at all, all
23  right.
24     And then they have a few back and forth
25  about setting up a time to have a call and getting

148

1   the NDA signed.
2      If you look at the next page that ends in
3   Bates 662983, it is about almost halfway up,
4   J.P. Sevilla's e-mail on June 13 to Jason Stubbs
5   and says, "I have it signed and ready to go,
6   referring to the NDA, I just don't know how to
7   fill in the first blank describing our company."
8   Excuse me, that was an e-mail from Mr. Stubbs to
9   Mr. Sevilla and then Mr. Sevilla responds that can
10  be left blank, do you see that?
11     A   Yes.
12     Q   And then Mr. Stubbs sends an executed copy
13  of the NDA and at the top of this e-mail chain is
14  an e-mail from Jason Stubbs to J.P. Sevilla on
15  June 16, 2017 regarding the ATE policy, do you see
16  that?
17     A   Yes.
18     Q   And this actually includes, if you look at
19  the bottom of the next page, responses from
20  J.P. Sevilla to Jason Stubbs in all caps, do you
21  see that, J.P. writes, "thanks, Jason please see
22  my comment in caps.  Isaac, please weigh in."
23     A   Okay, I do see that.
24     Q   So if you go to the next e-mail --
25     A   I see, yes.

---

149

1    Q  In that e-mail you see the all capped
2 comments from Mr. Sevilla.  So Mr. Stubbs writes
3 on Friday June 16, "I seem to have confused
4 myself.  In the original dialogue I thought
5 Sentinel would be writing a policy to the
6 plaintiff, UBS, to cover legal costs for the
7 defendant CB and HFP and affiliates in case UBS
8 lost the suit.  But the call clarified that the
9 insurance would be for damages, not legal costs,
10 so the policy would really be for CDO and HFP and
11 affiliates," and then in all caps it says, "YES,
12 THAT IS CORRECT," do you see that?
13    A  I do.
14    Q  So it appears that Mr. Stubbs was learning
15 about what this proposed policy would be around --
16 at or around June 16, 2017, is that right?
17    A  Yes, correct.
18    Q  So that's after those figures that
19 Mr. Scrivener had given in that June 12 e-mail,
20 right?
21    A  I see, yes.
22      MR. WELDON:  Objection.
23 BY MR. BURT:
24    Q  It very much appears that those figures
25 had been arrived at prior to Mr. Stubbs providing

150

1 any analysis, is that right?
2    A  Yes.
3    Q  Then Mr. Stubbs says, "Isaac said UBS's
4 case is strong and the defense's strategy would be
5 to contest the amount of damages," and then in all
6 caps it says, "NOT ENTIRELY, part of the strategy
7 is trying to settle and of course part of the
8 strategy would be to win."  And Mr. Stubbs writes,
9 "So if I am thinking about this correctly Sentinel
10 is going to write a policy for 80 million and it
11 is likely that the policy will pay some or all of
12 that limit," and then it says, "that is
13 incorrect."  And Mr. Stubbs asks further, "Is
14 there any chance of post judgment interest in
15 addition to the limit?"
16    Do you know why Mr. Sevilla would have
17 written that it's incorrect that Sentinel was
18 going to write a policy for 80 million to cover
19 some or all of that limit?
20    A  I do not know.
21    Q  If you go up we see on pages -- beginning
22 on Page 2 and going into Page 3 of the e-mail we
23 see -- feel free to take your time to look at it,
24 three scenarios that Mr. Stubbs is working up, and
25 I think he calls them going from pessimistic to

151

1 optimistic scenarios, do you see that?
2    A  Correct.
3    Q  Do you recall him doing that type of work,
4 providing three scenarios?
5    A  Yes.
6    Q  And when you testified earlier about the
7 actuarial analysis that Mr. Stubbs was doing, is
8 this what you were referring to?
9    A  Yes.
10    Q  So he would have done this based on
11 information provided to him by Mr. Sevilla and
12 Mr. Leventon and Mr. Kranz?
13    A  Correct.
14    Q  And in fact if you look at the second page
15 there is an e-mail from Isaac Levenson to Jason
16 Stubbs on June 22, where he says, "Jason, please
17 take a look at my modifications in red below.
18 Please run the scenarios based on these
19 assumptions and then let's determine if it is
20 appropriate to go to a final letter."  And we see
21 that the red that Mr. Levenson added reflects
22 probability, he was adjusting probabilities, do
23 you see that?
24    A  Yes.
25    Q  And then the same day Mr. Stubbs responds,

152

1 he says, "Using the new probabilities you
2 suggested here are the following expected results,
3 Scenario 1, pessimistic, loss of 28.5 million;
4 Scenario 2, moderate, profit of 1.0 million;
5 Scenario 3, optimistic, profit of 3.5 million."
6 It says, "These all still assume a premium of
7 20 million and a policy limit of 80 million."  Do
8 you see that?
9    A  Yes.
10    Q  It appears that his scenarios were
11 assuming the premium and policy limit that
12 Mr. Scrivener had described on June 12?
13    A  Not really.  He said 20 million and 85
14 million of coverage.
15    Q  Fair enough.
16    So instead of 85 million he says the
17 assumption is the policy limit of 80 million?
18    A  Sure.
19    Q  But otherwise the same premium is used,
20 correct?
21    A  Correct.
22    Q  Were you aware at the time in June of 2017
23 about these scenarios in the loss and profits that
24 Mr. Stubbs was calculating?
25    A  Yes.

153

1    Q  What did you understand about those
2  calculations?
3    A  That there was -- these were the
4  calculations that were going to determine the
5  ultimate liability that was attached to the policy
6  as well as the premium.
7    Q  Mr. Kranz, if we go to Page 16 of the
8  e-mail chain, Mr. Kranz writes to Mr. Stubbs,
9  "Jason, are you comfortable with the probabilities
10  in providing a letter outlining the conclusions
11  below?  Is it common to request an actuarial
12  letter in these types of situations when premiums
13  and policies are being determined?"
14    A  Yes.  There has got to be some kind of
15  support for how the premium is determined.
16    Q  Then Mr. Stubbs responds on June 22 again
17  and he says, "I just realized I had some wayward
18  numbers in my analysis related to ultimate limits
19  I have been looking at.  It only affected Scenario
20  2.  Instead of profit of a million in this
21  scenario it should have been a loss of
22  12.5 million.  My most sincere apologies for the
23  error."
24       Were you aware that he miscalculated first
25  on Scenario 2?

154

1    A  Yes.
2    Q  So under this sort of not pessimistic/not
3  optimistic but under the moderate scenario his
4  actuarial analysis was that this policy would
5  result in a loss of 12.5 million to Sentinel, is
6  that right?
7       MR. WELDON:  Objection.
8       THE WITNESS:  It would appear so.
9  BY MR. BURT:
10    Q  And then in his next e-mail, he says,
11  Mr. Stubbs says, "I spoke too soon, both Scenario
12  2 and Scenario 3 were affected.  Using the
13  probabilities provided by Isaac there would also
14  be a loss in the third scenario of 0.5 million.
15  Apparently I was in favor of looking at lower
16  limits and forgot to reset the assumptions back to
17  what I provided originally."
18       Here he is saying that even under the most
19  optimistic scenario given the probabilities and
20  assumptions that have been provided the scenario
21  was a loss on the policy of 0.5 million, correct?
22    A  That's what it states.
23    Q  So even under the most optimistic view of
24  the policy the actuarial analysis was it would
25  result in a loss to Sentinel?

155

1    A  That's what it would state.
2    Q  Did Beecher understand that at the time?
3    A  Yes.
4    Q  Was Beecher concerned about that, that
5  this policy would result in a loss to Sentinel
6  even under the most optimistic?
7    A  I don't --
8       MR. WELDON:  Objection.
9       THE WITNESS:  I don't recall.
10  BY MR. BURT:
11    Q  You recall being aware of it but you don't
12  recall whether it was a concern?
13       MR. WELDON:  Objection.
14       THE WITNESS:  I don't.
15  BY MR. BURT:
16    Q  Let's look at the letter that ends up
17  being submitted on June 27, I think it's the last
18  few pages of that exhibit.  Do you see where I am
19  looking at that letter?
20    A  Yes, I am with you.
21    Q  Okay, perfect.
22       And here it is the June 27 letter to
23  Mr. Kranz from Bartlett Actuarial Group.  Now, in
24  the background section it says in the first
25  paragraph, "Sentinel is a captive insurance

156

1  company domiciled in the Cayman Islands and owned
2  by SAS Asset Recovery Limited.  Sentinel was
3  incorporated on March 1, 2014 to provide directors
4  and officers liability coverage to SAS Asset
5  Recovery Limited and its affiliated entities.
6  Sentinel would to provide" -- looks like there is
7  a typo there -- "ATE insurance company to
8  unrelated parties, Highland Special Opportunities
9  Holding Company and codefendants, collectively
10  Highlands, related to a lawsuit that has been
11  filed against Highlands."
12       Do you know where he got the idea that the
13  parties were unrelated?
14    A  Either through discussions with Beecher
15  Carlson or J.P. Sevilla.
16    Q  As we have discussed the parties had
17  common ownership though, right?
18       MR. WELDON:  Objection.
19       THE WITNESS:  Yes.
20  BY MR. BURT:
21    Q  And in that sense were related parties?
22       MR. WELDON:  Objection.
23       THE WITNESS:  Not entirely the way that I
24  would see it.
25

157

1  BY MR. BURT:
2      Q  And how is that?
3      A  Because we were talking about from an
4  insurance standpoint affiliated risks were those
5  in the direct line of the parent, whereas the
6  unrelated risks would be more distant cousins or
7  other entities not closely related to Sentinel.
8      Q  So it's that distinction that you had made
9  before?
10     A  Correct.
11     Q  Is that a distinction that when you were
12  discussing with CIMA that you made that -- did you
13  make that same distinction?
14     MR. WELDON:  Objection.
15     THE WITNESS:  Yes, I believe so.
16     MR. BURT:  One moment, please.
17     (Document marked Exhibit 129 for
18      identification.)
19     MR. BURT:  Keep that prior exhibit handy,
20  but we will look at this one.
21  BY MR. BURT:
22     Q  Handing you what's been marked as
23  Exhibit 129, Bates BCS EN a bunch of 0s, 5065.
24  Let me know when you are ready.
25     A  I am ready.

158

1      Q  So looking at the first page here, this is
2  in the May, 2019 period and you have -- second
3  e-mail down is from you to Mr. Stubbs, again, on
4  May 9, 2019, do you see that?
5      A  Yes.
6      Q  And this regards the Sentinel year-end
7  actuarial analysis, right?
8      A  Yes.
9      Q  Did you testify before, and I apologize if
10  I misunderstood, that he did a yearly actuarial
11  analysis?
12     A  Correct.  That's for determining the loss
13  reserves.
14     Q  Understood.  Okay.
15     So here you write, "I have a few edits
16  based on the recent examination."  What
17  examination were you referring to?
18     A  This is the inspection that CIMA conducted
19  in early 2019.
20     Q  The first bullet, we will skip that.
21     The second bullet, Page 3, third
22  paragraph, you write, "I want to get Matt to weigh
23  in here as it references the ATE coverage being
24  provided to unaffiliated entities," and you have
25  unaffiliated in quotes, "yet we keep making the

159

1  point to CIMA that all are related in some way,
2  Sentinel UBO ultimately controls the insureds."
3  Do you see that?
4      A  Yes.
5      Q  Do you recall telling CIMA that fact, that
6  the Sentinel UBOs ultimately controls the
7  insureds?
8      A  I don't recall.
9      Q  Do you recall writing that at the time in
10  2019?
11     A  Yes.
12     Q  Why did you tell that to Mr. Stubbs?
13     A  I don't recall.
14     Q  Is it -- were you correct that the
15  Sentinel UBO ultimately controls the insureds, was
16  that Beecher's understanding?
17     A  The insureds of the ATE?
18     Q  Correct.
19     A  Correct.
20     Q  So not only did -- the Sentinel UBOs we
21  have established are Mr. Dondero and
22  Mr. Ellington, correct?
23     A  Correct.
24     Q  So not only did they own at least part of
25  the Highland, Highland Capital and its entities,

160

1  but you state also they controlled those insureds
2  as well, correct?
3      A  Yes.
4      Q  And that was Beecher's understanding?
5      A  Yes.
6      Q  And if you actually -- if you actually
7  look at this draft report, and we look at Page 3,
8  it is actually the attachment that Mr. Stubbs sent
9  back, it says, "Hi Tom, here is the revised draft
10  report."  And if we go to the third paragraph on
11  Page 3 we will see that it's taken out the
12  affiliated language so it states, "As of August 1,
13  2017, Sentinel began providing after the event
14  insurance coverage.  Sentinel has currently
15  written one ATE policy to Highland Special
16  Opportunities Holding Company and codefendants,
17  collectively Highlands, relating to a lawsuit that
18  has been filed against Highlands."  Do you see
19  that?
20     A  Yes, I do see that.
21     Q  So Mr. Stubbs followed your edited and
22  took the affiliate out?
23     A  Yes.
24     Q  Do you recall that?
25     A  Yes.

161

1    Q  Let's go back to the June 27, 2017 letter
2  that Mr. Stubbs wrote.  In the last paragraph on
3  the first page under background it states, "The
4  plaintiff in the lawsuit is seeking damages of
5  over 680 million from Highlands.  Sentinel is
6  proposing to write a policy to cover Highlands
7  liability to the plaintiff up to a limit of 80
8  million and they have suggested a premium of 20
9  million."  Do you see that?
10   A  I do.
11   Q  So Mr. Stubbs here is saying it appears
12  that Sentinel has suggested that the premium be 20
13  million, right?
14   A  That would appear to be the case.
15   Q  And that would be consistent also with
16  what CIMA found in that report that we already
17  looked at about how the premium was arrived, do
18  you recall that?
19   A  I don't recall that.
20   Q  We can come back to that in a moment.
21      It states, "The policy would cover pre and
22  post judgment interest within the limit and would
23  pay in the event of a judgment against Highlands
24  or pretrial settlement between the parties to the
25  lawsuit.  Legal expenses would not be covered.

162

1  The court has set a trial date of September,
2  2017."  Okay.
3      On Page 2 we see Scenarios 1 and 2 that we
4  looked at in the e-mail exchange, and I just want
5  to make sure I am understanding these right.
6  Under Scenario 1, and I think he said this was the
7  pessimistic outcome.
8   A  Yes.
9   Q  He has here a pretrial settlement, the
10  probability is 5% and the expected payout would be
11  10 million on that probability, is that right?
12   A  That's what it says.
13   Q  Do you know how he arrives at the expected
14  payout number based on the probability?
15   A  I believe those were numbers that were
16  provided in the discussion with Isaac and J.P.
17   Q  The next line is judgment in favor of
18  Highlands, so the defendant, probability 15% and
19  then in that case there would be zero payout,
20  right, because they won?
21   A  Correct.
22   Q  And then judgment in favor of plaintiff,
23  the full liability, 686 million plus pre and post
24  judgment interests probability 40% expected payout
25  80 million, is that right?

163

1   A  That's what it says.
2   Q  Again, that was information provided by
3  Mr. Leventon and Mr. Sevilla?
4   A  Correct.
5   Q  Liability reduced in judgment 40%
6  probability, 40 million expected payout.  The
7  total -- so the probability totals to 100% and the
8  expected payout totals to 48.5 million.
9      Do you know how he arrives at the
10  48.5 million?
11   A  Math?
12   Q  Is it just an average?
13   A  I think it is the average based on the
14  probabilities.
15   Q  So a weighted average?
16   A  Yes.
17   Q  Then he lists the premium there of 20
18  million and then so the profit loss in the
19  pessimistic scenario based on the probabilities
20  and the weighted average would be negative
21  28.5 million the way the policy is written, right?
22   A  Correct.
23   Q  So I don't want to belabor, Scenario 2,
24  the same analysis, this is the moderate scenario,
25  he calculates the profit loss at negative

164

1  12.5 million, correct?
2   A  Correct.
3   Q  And Scenario 3, the next page, again, same
4  analysis, this time this is the optimistic
5  scenario and he calculates the profit loss on the
6  policy negative 0.5 million, is that right?
7   A  Correct.
8   Q  Is it common to write policies when the
9  actuary has determined that under any scenario
10  there will be a loss on the policy?
11   A  No.
12   Q  Do you know why this one was written even
13  though that's what the actuary found?
14   A  I do not.
15   Q  Did Beecher have any involvement in making
16  the final determination to issue the policy?
17   A  Sorry, say that again?
18   Q  It might not have been clear.
19      Did Beecher have any involvement in the
20  decision to actually end up issuing the policy?
21   A  No.
22      MR. WELDON:  Objection.
23  BY MR. BURT:
24   Q  Who would have made that decision
25  ultimately to issue the policy?

---

165

1    A  The directors ultimately approved the ATE
2  policy.
3    Q  And at the time was it outside directors
4  or was there also Highland directors?
5    A  It was outside directors at that time.
6    Q  Does Beecher have any insight into how the
7  directors decided to issue the policy despite this
8  actuarial analysis that had been done?
9    A  This wouldn't have been the final premium
10  that was contemplated.  The premium actually
11  jumped up to 25 million, I don't know how it would
12  have affected this.
13    Q  One moment, please.
14       I guess my next question is how that
15  decision was made or how it came to be that the
16  premium did jump up by the 5 million.
17    A  I don't know.
18    Q  Did Beecher have any involvement with
19  that?
20    A  I do not know.
21    Q  Sorry, let's go back to, I lost track of
22  the exhibit, it is the e-mails with Paul
23  Scrivener, see if this will help refresh your
24  memory, it is Exhibit 127.
25       So the next -- we have looked at that

---

166

1  June 12 e-mail.  The next-in-time e-mail is from
2  J.P. Sevilla to Paul Scrivener on August 4, 2017.
3       I do have a question about that date, the
4  August 4 date.  If you look at the policy itself
5  on the schedule that we were looking at, the date
6  of commencement of period of insurance is
7  August 1, 2017.
8    A  Yes.
9    Q  How is it that the date of insurance could
10  begin before the drafts of the policy were
11  finalized?
12    A  I don't think it's uncommon that the
13  policy language might be finalized shortly after
14  the policy accepts.
15    Q  So it applies retroactively back to a
16  date?
17    A  In this case, yes.
18    Q  And that's not uncommon?
19    A  It happens.
20       MR. WELDON:  Off the record, I just -- I
21  will point you to the --
22       MS. REPORTER:  We are still on the record
23  we have video.
24  BY MR. BURT:
25    Q  Mr. Sevilla writes, "We are ready to move

---

167

1  forward with these, can you please give a final
2  review and add signature pages and any other final
3  cleanups, we will enter the correct signature
4  blocks.  Below are the names of the insureds.
5  There will be two separate policies, one for each
6  of the below entities.  We will handle filling out
7  the schedule and final numbers."  And then he
8  lists Highland CDO Opportunity Fund and Highland
9  CDO Holding Company.
10       That is what Mr. Sevilla said on
11  August 14, right?
12       Were you aware -- sorry, you need to
13  answer audibly.
14    A  Yes.
15    Q  Were you aware there was two policies
16  being considered at that point?
17    A  Yes.
18    Q  What was your understanding for the
19  reasons why?
20    A  Well, I personally wasn't aware so I
21  don't know --
22    Q  But Beecher was generally?
23    A  Beecher would have been because Pete was
24  copied on these.
25    Q  And so Beecher was aware.

---

168

1       Did you ever have discussions with
2  Mr. Kranz about that at the time?
3    A  About there being two policies, no.
4    Q  Or the reasons why it eventually ended up
5  as just one?
6    A  No.
7    Q  And then the next e-mail Mr. Sevilla
8  writes, "One more point, Paul, can you please add
9  language into the policy that specifies that the
10  insurance policies will cover the insured's own
11  costs and expenses as of the effective date, thank
12  you."  Do you see that?
13    A  I do.
14    Q  So we had seen before that it would not
15  fund the legal costs, here Mr. Sevilla changes
16  that to the policy would cover the insured's own
17  costs, right?
18    A  Yes.
19    Q  Does Beecher know the reasons why the
20  switch?
21    A  I don't know particularly related to the
22  legal costs, but I understand from J.P. that upon
23  payment of the premium there were no funds to be
24  able to pay any business costs or legal costs or
25  whatever within the insureds so those costs would

169

1  be borne by Sentinel under this own costs
2  provision.
3      Q  And that was because the whole idea was to
4  transfer all of the assets out of the insureds?
5      A  Correct.
6      Q  Going to the first page of this e-mail,
7  Mr. Sevilla has some final changes on August 8,
8  2017, this is the second to last e-mail in the
9  chain, here he says, number one, he would like to
10  consolidate the policies into one policy with
11  three insureds, all of whom are codefendants with
12  equal liability, do you see any issue in doing so,
13  do you see that?
14      A  I do.
15      Q  Do you recall we walked through the
16  schedule?
17      A  I do.
18      Q  One of them is not a defendant, right?
19      A  Correct.
20      Q  Would that have affected this because one
21  of the defendants would not share an equal
22  liability, would that have affected the policy?
23      A  I don't know.
24      Q  And then he says the policy limit is 120
25  million and the premium will be 30 million, so

170

1  here we are on August, 2017, we get new policy
2  limit numbers and new premium numbers.  Was
3  Beecher aware of that at the time?
4      A  As Pete Kranz was copied on this we would
5  have been aware.
6      Q  Any knowledge about why the change from 80
7  to 120?
8      A  I do not know.
9      Q  Or from 20 to 30 million on the premium?
10      A  I do not know.
11      Q  It was Beecher's understanding, was it
12  not, that these changes were coming from
13  Mr. Sevilla?
14      A  Correct.
15      Q  And then No. 3, I want to look at, I have
16  a question about, it says, "Finally, please remove
17  the clause that says in Section 3 that it's an
18  exclusion if insured does not have funds to
19  prosecute the action."
20      So my first question is what is an
21  exclusion in an insurance policy?
22      A  An exclusion is a clause that identifies
23  scenarios that would not be covered under that
24  policy.
25      Q  So it appears that the draft had as an

171

1  exclusion if the insureds didn't have any funds to
2  prosecute the action then the policy wouldn't
3  cover it and that was removed, does that appear
4  correct?
5      A  That is what it would appear.
6      Q  And to the best of your understanding, is
7  that because all of the funds again were being
8  transferred out of the insureds to Sentinel?
9      A  I don't know.
10      Q  You don't know that one, okay.
11      That was your -- that was Beecher's
12  understanding --
13      MR. WELDON:  Objection.
14  BY MR. BURT:
15      Q  -- that all the assets were to be sent to
16  Sentinel?
17      A  That is.
18      Q  Pete Kranz then responds at the very top
19  and he says, "I see no issues with one policy," so
20  Beecher Carlson at the time had no issue combining
21  the two into one, it appears?
22      A  Correct.
23      (Document marked Exhibit 130 for
24      identification.)
25

172

1  BY MR. BURT:
2      Q  Mr. Adamczak, I have handed you what has
3  been marked as Exhibit 130 with the Bates label
4  HCMUBS005304, and I understand this was not
5  produced by Beecher.  So my question for you is
6  whether you have ever seen this before.
7      A  This does not look familiar to me.
8      Q  If we look at Page 6, and I will represent
9  to you this is a document that Highland Capital
10  produced in litigation, if we look at Page 6 it
11  says if Highland settles," and then it says
12  "Sentinel controls HFP CDO fund assets currently
13  94 million and Sentinel and HCM LP can use HFP CDO
14  assets to generate cash to pay UBS settlement city
15  and outstanding legal fees."  And it talks about a
16  tax liability being avoided and then it states
17  that residual assets up to 50 million would stay
18  at Sentinel.
19      My question for you is did Beecher have
20  any role in this settlement analysis or these
21  considerations?
22      A  No.
23      Q  And then on -- if you flip to Page 8, so
24  we will skip Slide 7, and it states "UBS
25  settlement structure summary, Step 1, HFP/CDO fund

173

1  buys 90 million ATE policy from Sentinel. ATE
2  premium equals all assets in the HFP/CDO fund," do
3  you see that?
4    A  I do.
5    Q  Again, the question is did Beecher have
6  any knowledge that this was the consideration
7  going on internally at Highland at the time?
8    MR. WELDON:  Objection.
9    THE WITNESS:  This being?
10 BY MR. BURT:
11   Q  That the ATE premium would be all assets
12 and that the policy of HFP CDO fund and the policy
13 would be a $90 million policy?
14   MR. WELDON:  Objection.
15   THE WITNESS:  Is HFP CDO fund the insureds
16 in the policy?
17 BY MR. BURT:
18   Q  Well, let's look at the policy.  I think
19 you have it right there.
20   MR. WELDON:  Exhibit 125.
21   THE WITNESS:  Okay.
22 BY MR. BURT:
23   Q  So HFP is not listed as an insured,
24 correct?
25   A  Well, I don't know what the acronym is

174

1  there.
2    Q  If you look under legal action do you see
3  there is an entity about halfway down called
4  Highland Financial Partners, LP?
5    A  Yes.  But that's taking the assumption
6  that HFP stands for Highland Financial Partners,
7  but I see where you are going.
8    Q  You never heard as Highland Financial
9  Partners referred to as HFP?
10   A  I have.
11   Q  And it is not listed as one of the
12 insureds above in the schedule, Highland Financial
13 Partners?
14   A  Correct.
15   Q  So, again, the question is did Beecher
16 have any involvement with these discussions
17 regarding a potential settlement structure and
18 policy?
19   MR. WELDON:  Objection, asked and
20 answered.
21   THE WITNESS:  No.
22 BY MR. BURT:
23   Q  And then the conclusion you see on that
24 slide is that Sentinel keeps the net assets, could
25 be up to $50 million, do you see that?

175

1    A  I do.
2    Q  I assume your answer is the same, you are
3  not aware at the time of those discussions to end
4  up in a scenario where Sentinel would keep
5  $50 million worth of assets?
6    MR. WELDON:  Objection, asked and
7  answered.
8    THE WITNESS:  I was not.
9  BY MR. BURT:
10   Q  Real quick, back on Slide 6, I neglected
11 to ask, they state here that the fund -- that
12 Sentinel controls the HFP CDO fund assets
13 currently 94 million.  Do you have any knowledge
14 about how that value was arrived at?
15   A  I do not.
16   Q  And it was -- your knowledge -- it was
17 Beecher's knowledge at the time that was yet to be
18 determined?
19   MR. WELDON:  Objection.
20   THE WITNESS:  I don't know the timeframe
21 that this was prepared.
22 BY MR. BURT:
23   Q  I am talking about the May/June 2017
24 timeframe those e-mails we were looking at.
25   A  We knew nothing of the fair value of the

176

1  assets that would be received.
2    Q  So looking at Slide 6 and 8, they value,
3  it appears, the assets at 94 million and wanted to
4  purchase a $90 million ATE policy.  Do you see
5  that?
6    A  Yes.
7    Q  And that all the assets would fund the ATE
8  premium, so the 94 million under this scenario
9  would fund the premium.
10   MR. WELDON:  Objection.
11 BY MR. BURT:
12   Q  Is that right?
13   A  It was the understanding at the time that
14 the ATE policy was issued that all funds or assets
15 within the insureds would transfer to Sentinel to
16 pay premium.
17   Q  You can set that exhibit aside.
18   A  Are we going to need a lot of these?
19   Q  I would keep the policy, that one -- you
20 can set the other ones aside.
21   MR. BURT:  Why don't we take a break, we
22 only have a few minutes left on the disk.
23   THE VIDEOGRAPHER:  This marks the end of
24 Disk No. 3 in the deposition of Thomas Adamczak,
25 we are off the record at 2:10.

---

**177**

1     (Recess taken.)
2     THE VIDEOGRAPHER: Here begins Disk No. 4
3 in the deposition of Thomas Adamczak, we are back
4 on the record at 2:17.
5     (Document marked Exhibit 131 for
6 identification.)
7 BY MR. BURT:
8     Q Mr. Adamczak, showing you what's been
9 marked as Exhibit 131 with the Bates BC
10 SEN0000046128. Go ahead and take a look at that
11 and let me when you are ready.
12     **A I am ready.**
13     Q This is an e-mail to you David A. Roberts
14 at Crowe Horwath on May 23, 2017, is that right?
15     **A Correct.**
16     Q Who is David Roberts?
17     **A David Roberts is a partner in an audit**
18 **firm that we typically work with.**
19     Q And is that from -- you referred to them
20 as Crowe?
21     **A Crowe Horwath, shortened their name to**
22 **Crowe.**
23     Q Are they located in Burlington?
24     **A They have an office in Burlington.**
25     Q I saw their building over there.

---

**178**

1     And did he work on the Sentinel auditing
2 for --
3     **A No.**
4     Q He did not?
5     **A No.**
6     Q Why did you e-mail him at this time?
7     **A Just to touch base with him regarding**
8 **investment valuation if there were any**
9 **recommendations that they might have for firms**
10 **that we could reach out to engage.**
11     Q So here you write, "Dave, do you have a
12 few minutes to discuss an item on Sentinel."
13     Did he know who Sentinel was?
14     **A I think we bounced some things off him**
15 **before.**
16     Q It says, "It is not an audit issue yet,
17 but I would like to pick your brain so it doesn't
18 become an issue after next year. I have attached
19 a list of investments that Sentinel is looking to
20 receive as premium payment on the new after the
21 event coverage they will begin writing shortly.
22 Since these investments are not readily marketable
23 my concern is with valuation. Pete indicated you
24 might be able to provide suggestions on firms we
25 can engage to assist in valuing these with the

---

**179**

1 expectation it will limit issues/concerns with the
2 future audit."
3     And that -- you ended up hiring Valuation
4 -- what was the name?
5     **A Valuation Research Corporation.**
6     Q Did David Roberts recommend them?
7     **A I think that might have been a**
8 **recommendation coming from him.**
9     Q Now, in the May -- on May 23, 2017 you
10 knew that Sentinel was looking to receive these
11 assets as premium on an ATE policy, right?
12     **A We were provided with a list of assets**
13 **from J.P. I do not know if these were the assets**
14 **that ultimately came in or the value of them**
15 **coming in.**
16     Q So that was -- you answered my next
17 question, which was where did this come from, it
18 was from J.P. Sevilla.
19     MR. WELDON: Objection.
20 BY MR. BURT:
21     Q Is that right?
22     **A That is correct.**
23     Q Although Beecher was holding books and
24 records for Sentinel at the time as its captive
25 insurance manager, these were not at the time part

---

**180**

1 of anything that Sentinel owned, is that right?
2     **A Correct.**
3     Q How did you know that they were not
4 readily marketable at the time?
5     **A Based on discussions with J.P.**
6     Q When did J.P. first raise this with you?
7     **A When they were talking about writing the**
8 **policy. I believe it was always known or conveyed**
9 **to us from J.P. that the investments would -- that**
10 **they did not have enough cash to pay and the**
11 **premium would come in the form of assets, on**
12 **liquid assets.**
13     Q Is that common with insurance policies
14 that premiums come not in cash but through other
15 types of assets?
16     **A It can happen. It doesn't happen**
17 **frequently but it can happen.**
18     Q How about with the types of assets that
19 were ultimately transferred here, is that a unique
20 situation?
21     **A This was a unique situation.**
22     Q You had never seen this type of transfer
23 before?
24     **A I have not.**
25     Q And how many different insurance policies

181

1 would you say you have worked on or managed over
2 the years?
3    A  In all of my years?
4    Q  Yes.
5    A  Thousands.
6    Q  And you have never seen anything like
7 this?
8    A  It doesn't mean that it is not possible to
9 happen.
10    Q  What about it stands out as unique, what
11 happened with these transfers?
12    A  Rephrase the question.
13    Q  So you said it was unique.
14    A  Unique in that the premium was in the form
15 of non-marketable securities.
16    Q  So referring back to this exhibit, beyond
17 just a list that was provided by J.P., did Beecher
18 have any knowledge whatsoever about these assets
19 at the time or what they were or their value?
20    A  No, we did not.
21    Q  Did you do anything further with this list
22 that J.P. gave you?
23    A  No.
24    Q  You can set that one aside.
25        I did -- I actually lied, there is one

182

1 that I told you you could set aside, there was one
2 further thing I wanted to ask you in 127.
3        Before I ask that I have one more question
4 as I am thinking about unique, were they unique
5 also in that the value of the assets would be
6 greater than the amount of the premium?
7        MR. WELDON:  Objection.
8        THE WITNESS:  The value of the assets was
9 unknown at the time because there was no valuation
10 done, so there was a risk that it could be a
11 windfall to Sentinel and there was also a risk
12 that everything could be worthless.
13 BY MR. BURT:
14    Q  So looking very quickly at Exhibit 127, I
15 actually wanted to look at the first-in-time
16 e-mail from Paul Scrivener to J.P. Sevilla and
17 cc'ing Pete Kranz on June 2, 2017.  Do you see
18 where I am looking?
19    A  Yes.
20    Q  And we can skip down until the last figure
21 paragraph that begins with "by the way", do you
22 see that?
23    A  Yes.
24    Q  And here Mr. Scrivener states, "By the
25 way, I was thinking further about the idea that

183

1 the premium will be satisfied by the transfer of
2 the hedge fund's investment portfolios.  Has any
3 thought been given to the legal validity of such a
4 transfer bearing in mind that these assets will
5 then be put beyond the reach of the plaintiffs in
6 the U.S. litigation against the funds.  Obviously
7 the last thing that you want to find is that the
8 premium has to be returned or is set aside as some
9 unlawful reference or similar.  Obviously an issue
10 for U.S. counsel, but just thought that I would
11 raise it."  Do you see that?
12    A  I do.
13    Q  Do you know if that was ever raised with
14 U.S. counsel by Sentinel or by Highland?
15    A  I do not.
16    Q  Did Beecher ever discuss that issue with
17 Highland or Sentinel?
18    A  Not to my knowledge.
19    Q  In your experience working on insurance
20 matters have you ever seen a similar situation
21 where all of the assets of an entity in litigation
22 is transferred to pay for an insurance premium?
23    A  I have not.
24    Q  Now you can really set that one aside.
25        Now, we have talked a lot about the

184

1 Sentinel side of the policy and we saw in the
2 policy that Mr. Dondero signed for the Highland
3 entities.  Are you aware of who the authorized
4 representative was for the Highland entities that
5 were insured?
6    A  I am not.
7    Q  Did that ever come up?
8    A  It did not.
9    Q  I would like to show you Tab 24.
10        (Document marked Exhibit 132 for
11        identification.)
12 BY MR. BURT:
13    Q  For the record showing you what's been
14 marked Exhibit 132 Bates label BSSEN00007678181.
15 The first page appears to be an e-mail from
16 J.P. Sevilla to Pete Kranz dated November 20, 2017
17 with an attachment untitled and then the second
18 page has the title Highland CDO Opportunity Master
19 Fund, LP, do you see that?
20    A  Yes.
21    Q  Have you seen this document before today?
22    A  I have.
23    Q  When did you first see it?
24    A  A while back, a couple years ago.  I don't
25 know.

185

1    Q  So this was something that was produced
2  out of the Beecher files and something that you
3  are familiar with?
4    A  Correct.
5    Q  So here on November 20, 2017 it states,
6  "To whom it may concern, this will confirm that as
7  of today's date we have appointed Beecher Carlson
8  as our exclusive representative with respects the
9  following coverage, after the event insurance.
10  This appointment of Beecher Carlson rescinds all
11  previous appointments and the authority continued
12  herein shall remain in full force until canceled
13  in writing." Then authorizes Beecher Carlson "to
14  negotiate on our behalf directly with any
15  interested company with respect to a quote for our
16  coverage." And at the bottom you see is listed
17  Highland CDO Opportunity Master Fund with a number
18  of Highland entities and Strand advisors as
19  partners and members, do you see that?
20    A  I do.
21    Q  And do you know whose signature that is?
22    A  I do not.
23    Q  I know you have a big pile, but
24  Exhibit 116 I want to look at so we can look at
25  the signature to refresh what it is.  These are

186

1  the Sentinel Advisory Committee discussions of
2  Mr. Ellington and Mr. Dondero that we looked at
3  earlier, it is Exhibit 116.  The front page would
4  be a CIMA e-mail actually.
5    A  Yes okay, yes.
6    Q  So looking at those Sentinel Advisory
7  Committee discussions, do you see Mr. Ellington's
8  signature there?
9    A  Yes, I do.
10    Q  And if you look at that signature and the
11  signature that is in Exhibit 132 they appear to be
12  the same, do they not?
13    MR. WELDON:  Objection.
14    MR. BURT:  I am not asking for expert
15  opinion.
16    THE WITNESS:  In my opinion they look
17  similar, but I am not an expert on signatures.
18  BY MR. BURT:
19    Q  Right.
20      Were you aware or -- did Beecher have any
21  knowledge that Mr. Ellington had signed such a
22  document at the time appointing Beecher as the
23  representative of the insureds?
24    A  I don't know.  I didn't recognize the
25  signature, so.

187

1    Q  Was Beecher aware or was this document
2  provided to Beecher?
3    A  Yes.
4    Q  And it was aware then beginning in
5  November of 2017 that it also represented the
6  insureds, is that right?
7    A  Yes.
8    Q  So explain that to me how Beecher is the
9  captive insurance manager could also be the sole
10  representative of the insureds?
11    A  This is for the broker brokerage deal on
12  the after the event insurance policy, so this is
13  separate, separate work that was performed here
14  from the captive management.
15    Q  So what was the broker deal?  I am not
16  familiar with that.
17    A  So it is not uncommon for Beecher Carlson
18  to serve in a brokerage capacity as well as
19  captive management capacity with a number of our
20  clients.  We have a brokerage arm that handles a
21  lot of policy issuance and that's separate from
22  the captive management.
23    Q  So here it was brokering the policy for
24  the insureds on the ATE policy?
25    A  That's what it would look like.

188

1    Q  After -- beyond just brokering the policy
2  did it do anything else as the sole
3  representative, did Beecher Carlson do anything
4  else as the representative?
5    A  Once the policy is issued there is no more
6  additional work that would need to be done.
7    Q  So in terms of filing a claim on the
8  policy, things like that, that wouldn't have been
9  part of what Beecher Carlson was authorized to do
10  in this document, is that right?
11    A  The policy generally defines how the claim
12  should be filed.
13    Q  Right, I understand.
14      But was Beecher Carlson, was it part of
15  its responsibilities under this agreement or this
16  confirmation that it needed to, for example,
17  monitor the litigation and file a claim on the
18  policy if the event arose to file a claim.
19    A  I don't know.
20    Q  Who would know that at Beecher, who is
21  dealing with this particular aspect of the
22  Beecher's work?
23    A  I am not sure.
24    Q  You said there was a separate brokerage
25  arm at Beecher that handles these types of things?

189

1  A  There is, and I don't know if they were
2  the ones that had put this together or who was
3  involved with it.
4     Q  So it is important for us to understand if
5  Beecher did anything else beyond just brokering
6  under this agreement and as the 30(b)(6) witness
7  is that something that you could take a break and
8  call somebody or get information on, would that be
9  hard to find out?
10  A  I don't know that there was any additional
11  work that was done after the policy was issued.
12     Q  No, I understand.
13        And getting that confirmation is something
14  that is important for us.  Is that something that
15  could easily be confirmed on a short break?
16  A  I don't -- maybe.  I don't know.
17     Q  Maybe at our next break you can discuss
18  with counsel, we would appreciate it, we don't
19  want to hold it open for that, but if it's an easy
20  answer that would be helpful.
21  A  And you are looking just to confirm
22  whether there was any additional work that was
23  done?
24     MR. WELDON:  Under the broker agreement.
25     MR. BURT:  Under this.

190

1     MR. WELDON:  I understand where you are.
2     MR. BURT:  Perfect.
3  BY MR. BURT:
4     Q  Okay, great.
5        I was just going to ask on the broker
6  agreement did J.P. or any of the other Highland
7  employees did they present this as an opportunity
8  or did they just say they want you to do this, how
9  did this come to pass?
10  A  I don't remember how that came up.
11     Q  Maybe if you could add that to the list of
12  how it was presented.
13     MR. WELDON:  I got it.
14  BY MR. BURT:
15     Q  Do you know whether any conflicts can
16  arise in this type of situation where Beecher on
17  the one hand is doing the brokerage here and on
18  the other hand is the captive insurance manager?
19  A  I am not aware of any conflicts, and as I
20  explained this is not uncommon to have the same
21  entity represent them from a captive management
22  standpoint and a brokerage standpoint.
23     Q  Let's look next at the purchase agreement
24  that accompanied the policy, that is Tab 30.
25     MR. WELDON:  Are you done with that one or

191

1  coming back to that one?
2     MR. BURT:  To the extent we can get those
3  answers, yes.
4     THE WITNESS:  All set with the other
5  documents?
6     MR. BURT:  Keep the policy handy, that is
7  a key one.
8        (Document marked Exhibit 133 for
9        identification.)
10  BY MR. BURT:
11     Q  Handing you 133 Bates labeled BC
12  SEN00000614525, which is the purchase agreement.
13        Mr. Adamczak, are you familiar with this
14  document?
15  A  I am.
16     Q  And what is your understanding of what it
17  is?
18  A  This was the document that controlled the
19  assets that were transferred as premium under the
20  ATE policy.
21     Q  Looking first at the signature pages here,
22  it's the third and fourth pages, you see that
23  Mr. Dondero signed on behalf of all the Highland
24  entities, is that right?
25  A  That is correct.

192

1     Q  And that would have been consistent with
2  Beecher's understanding that at least he was a
3  part owner and controller of these entities,
4  correct?
5  A  Correct.
6     Q  Then looking at let's turn to Schedule A
7  of the policy, now, we had looked at the
8  Exhibit 131 where you had been provided by
9  J.P. Sevilla a list of assets that was -- had come
10  from Highland and you were unfamiliar with, do you
11  recall that?
12  A  Yes.
13     Q  And now we are looking here at Schedule A,
14  the actual assets that were included as part of
15  the APA.
16        What role did Beecher have in arriving at
17  or determining which assets should appear on
18  Schedule A?
19  A  None.
20     Q  Who made those decisions?
21     MR. WELDON:  Objection.
22  BY MR. BURT:
23     Q  If you know.
24  A  This was provided by J.P. as part of the
25  assets that would be transferred in.

193

1    Q  Do you know when he first provided that to
2  Beecher?
3    A  Sometime in -- sometime after the policy
4  was incepted, so after August 1.
5    Q  You have used that -- I want to make sure
6  I am understanding insurance terminology
7  correctly.  You have used the term incepted for
8  the policy, does that just mean the beginning?
9    A  Yes.
10    Q  We are not talking about the movie or
11  anything.
12    A  No.
13    Q  So the beginning of the policy.  So after
14  the policy is signed Beecher is provided the
15  Schedule A assets?
16    A  Correct.
17    Q  Do you recall whether the purchase
18  agreement was signed after the policy was
19  incepted?
20    A  I believe it was, but I don't fully
21  recall.
22    Q  Now, J.P. provided it.  Did he provide it
23  in the context of --
24    MR. WELDON:  Just for the record, I mean,
25  the purchase agreement says August 7, 2017, the

194

1  policy was August 1.
2    MR. BURT:  Right, that's a fair point.
3  The policy is August 1 and the purchase agreement
4  is dated August 7, 2017.
5    MR. WELDON:  And I think there was
6  something that this has already been addressed,
7  that the payment was due by August 30th.
8    MR. BURT:  Premium payment.  That is in
9  the policy, that's right.
10  BY MR. BURT:
11    Q  So my question is, so J.P. provided this
12  list to Beecher.  Now, what I want to understand,
13  and see if you can help me, it seems like J.P.
14  wears a number of hats.  We have talked about him
15  a lot today in the context of communications he
16  had on behalf of Sentinel, right, where he would
17  communicate to Beecher on Sentinel issues.  And we
18  have seen him on a lot of e-mails to that extent
19  as well, is that right?
20    A  Yes.  It's not uncommon for any one of our
21  captives for us to have only one contact that we
22  are dealing with at the sponsoring organization or
23  parent entity.
24    Q  No, and that's fine.
25    And my question is, again, just trying to

195

1  understand Mr. Sevilla's hats that he was wearing,
2  was he providing the Schedule A assets to Beecher
3  as working for the insureds on that side or just
4  J.P. would send us everything?
5    A  I don't know.
6    Q  So he was just the point of contact.
7    A  He was the point of contact.
8    Q  And whether it related to Highland or
9  whether it related to Sentinel J.P. was the point
10  of contact?
11    A  He was the point of contact.
12    Q  Would that be the same for Matt DiOrio, he
13  was the point of contact whether it related to
14  Highland or Sentinel?
15    A  Correct.
16    Q  So looking first at the assets listed
17  under Highland CDO Opportunity Master Fund, LP, we
18  see at the very bottom cash is listed in the
19  amount of 7.779 million.
20    Are you familiar with these other assets
21  that are listed?
22    A  I am.
23    Q  Now, I think you testified earlier that
24  some assets did not actually end up being
25  transferred, is that right, to Sentinel, they were

196

1  intended to be but weren't transferred?
2    A  No.  I said the assets were not registered
3  in Sentinel's name.
4    Q  Were they registered in someone else's
5  name?
6    A  Whoever they were registered in before.
7  It wasn't like they were registered in anyone
8  else's name -- the intention was that when the
9  assets were transferred in they would be put into
10  Sentinel's name.  That to my knowledge never took
11  place.  Whether somebody transferred into somebody
12  else's name, I am not aware of.
13    Q  But you are aware that some assets were
14  intended to go to Sentinel but they were never
15  registered in Sentinel's name?
16    A  All of the assets were intended to go to
17  Sentinel.
18    Q  I want to make sure I am not
19  misunderstanding, are you saying also that all of
20  the assets are not registered in Sentinel's name
21  or just some of them were not registered in
22  Sentinel's name?
23    A  Some of them were not registered in
24  Sentinel's name.
25    Q  Got it, thanks.  I apologize if I was slow

197

1  on the uptake there.
2       So let's just look at some of these
3  assets.
4       So the first asset here is Aberdeen LN FDG
5  LTD PFD. Do you know if that was an asset that
6  was registered in Sentinel's name?
7       A I don't believe it was.
8       Q Do you know who owned it prior to
9  Sentinel?
10      A According to the schedule Highland CDO
11 Opportunity Master Fund, LP.
12      Q To the best of Beecher's knowledge if it
13 wasn't registered in Sentinel's name Beecher's
14 knowledge is it would still be a Highland CDO
15 opportunity?
16      A That is correct.
17      Q How about the next two Southforks,
18 Southforks CLO Ltd PFD 144A and then the Southfork
19 underneath that. Were those registered in
20 Sentinel's name?
21      A I believe they were.
22      Q Are we going through these asset by asset?
23      A Yes.
24      Q This is actually a really important piece
25 for UBS to understand where these assets are so,

198

1  yes, we do need to. And if there is some you
2  don't know and need to check that's fine, we can
3  take a break and have you check.
4       MR. WELDON: Is there a list that's
5  provided relative to what assets have been
6  registered, is that what you are asking?
7       MR. BURT: We want to understand which
8  assets were registered at Sentinel and which
9  assets were not registered in Sentinel's name.
10 That is a really important piece for us.
11      MR. WELDON: I understand the importance
12 of it.
13      My issue more is are you saying that you
14 don't have a list in your document production that
15 identifies the ones that were listed ultimately in
16 the name of the --
17      MR. BURT: Katie can correct me, but I
18 don't think that was something that was produced,
19 no.
20      THE WITNESS: I am pretty sure it existed.
21 BY MR. BURT:
22      Q If that's a document that Beecher has --
23      A It was probably an Excel schedule and it
24 would also be identified by looking at what's held
25 in the custody account.

199

1       Q And --
2       A The CIBC investment custody account. So
3  anything that was in that custody account of the
4  assets that were transferred in that made their
5  way into Sentinel would be in that custody
6  account. They couldn't hold anything in that
7  custody account that was not in Sentinel's name.
8       MR. BURT: Maybe can we go off the record
9  for just a second?
10      THE VIDEOGRAPHER: We are going off the
11 record, the time is 2:44.
12      (Recess taken.)
13      THE VIDEOGRAPHER: We are going on the
14 record, the time is 2:57.
15 BY MR. BURT:
16      Q So, Mr. Adamczak, I want to go back, I
17 believe during the break you were able to run down
18 some answers on Exhibit 132, which was the
19 document appointing Beecher Carlson as the
20 authorized representative of the insureds.
21      So with respect to the services that were
22 provided under the agreement, this authorization,
23 what were you able to find?
24      A There were no additional services, it was
25 just the work that was initially done on the ATE

200

1  policy.
2       Q So in brokering the ATE policy?
3       A Correct.
4       Q That was it, nothing further.
5       A Correct.
6       Q So the $50,000 fee, was that a one-time
7  payment to Beecher Carlson?
8       A One-time.
9       Q For Beecher, just so I am clear, what did
10 -- what does brokering the agreement mean?
11      A It's part of the process of pulling the
12 policy together, finalizing it, I guess. I am not
13 familiar with that side of the operations.
14      Q I guess just lining up times here, the
15 policies dated retroactive to August 1 as we see
16 and this is dated November 20, 2017.
17      A Yes.
18      Q So how does that line up, can you just
19 explain that?
20      A I think there was a delay in filing this
21 document. I think it was something that came in
22 after the fact to complete the files.
23      Q Did Beecher understand at the time the
24 policy was being put together that it was
25 brokering for the insureds?

201

1   A Yes.
2   Q And so you can't give me any details about
3   the work that was -- that Beecher did as far as
4   brokering for the insureds?
5   A I wasn't a part of that work so I don't
6   know how much or what specifically was done.
7   Q Going back to -- we were looking at
8   Schedule A, I want to ask -- we were going list by
9   list, I want to ask you a few high-level questions
10  just to confirm a few points.
11      So the assets that were not registered in
12  Sentinel's name to Beecher's knowledge remained in
13  the accounts under the entity listed on Schedule
14  A, so, for example, the Aberdeen in the first
15  line, not registered in Sentinel's name, would
16  have remained at the Highland CDO Opportunity
17  Master Fund, LP account, is that right?
18  A I don't know, but that's my understanding.
19  Q Do you know what bank Highland CDO
20  Opportunity Master Fund, LP was using?
21  A I don't necessarily know that there is a
22  custody account that these investments would sit
23  in.
24  Q Where would they be located?
25  A I don't know.

202

1   Q Would Beecher have access to that
2   information?
3   A No.
4       MR. WELDON: Just so we are clear, you are
5   talking about accounts where they are coming from?
6       MR. BURT: Where they are coming from.
7       MR. WELDON: We know where they went, they
8   went with the account they were in.
9   BY MR. BURT:
10  Q If they were not sent over in Sentinel's
11  names, the originating account, Beecher does not
12  have access to that information?
13  A No.
14  Q I believe that Beecher has financial
15  statements for Sentinel that would show
16  definitively which accounts or which of these
17  assets were transferred and registered in
18  Sentinel's name, is that right?
19  A We wanted to keep track of each investment
20  and in particular which ones needed to have the
21  re-registration done.
22  Q And would that be reflected in the audited
23  financial statements, for example?
24  A The audited financial statements, no. But
25  it would have been in our financial statement

203

1   records, the interim financial statement records.
2   Q So the interim financial statement records
3   of Beecher would show which of these assets ended
4   up at a Sentinel account at CIBC?
5   A Correct.
6   Q And the CIBC account, we talked about the
7   checking account. Would this be the other CIBC
8   account?
9   A This is the investment custody account.
10  Q All of the assets that ended up being
11  registered to Sentinel went to that CIBC
12  investment custody account?
13  A Correct.
14  Q And so if we looked at that and we did not
15  see one of the Schedule A assets on that account
16  it would -- we can conclude that that was not
17  successfully registered in Sentinel's name, is
18  that right?
19      MR. WELDON: Objection.
20      THE WITNESS: Either it wasn't registered
21  in Sentinel's name or it has been since disposed
22  of either through bankruptcy proceedings or
23  whatever liquidation or whatever would have
24  happened with the asset.
25

204

1   BY MR. BURT:
2   Q Well, right. But I am talking just about
3   the Sentinel record because Sentinel hasn't gone
4   into bankruptcy or liquidation.
5   A I am talking about the investments, each
6   particular investment though.
7   Q So it's possible that it could have been
8   disposed of another way through bankruptcy of the
9   investment vehicle or the CLO that it was in?
10  A Yes.
11  Q Let's actually go to this. I actually do
12  want to ask about that. Keep that Schedule A
13  handy. I want to look at another financial
14  statement that's in another exhibit.
15      (Document marked Exhibit 134 for
16      identification.)
17  BY MR. BURT:
18  Q Before we look at that, let me -- you can
19  set that down for just a second.
20      Does Sentinel receive distributions from
21  assets that were not re-registered in Sentinel's
22  name?
23  A Yes.
24  Q How does Sentinel get those distributions?
25  A I am not 100% sure on the process, but it

205

1  involves a letter that the directors send to State
2  Street or whoever the custodian was that was
3  holding those assets or funds.
4      Q  And that letter says essentially send the
5  distributions to Sentinel?
6      A  I believe, yes.
7      Q  Even though they are not registered in
8  Sentinel's name?
9      A  Correct.
10      If they were registered in Sentinel's name
11  the funds would flow automatically.
12      Q  Do you know if they are first deposited
13  into the account of, for example, Highland CDO
14  Opportunity Fund?
15      A  I do not know.
16      Q  Do you know what the originating bank of
17  those transfers is that transfers over?
18      A  I do not know.
19      Q  And so the director's -- again, I am just
20  trying to understand, the directors contact State
21  Street or another entity financial entity to tell
22  them these distributions need to come to us?
23      A  I believe so.
24      Q  And are those distributions ongoing?
25      A  With respect to the CLO investments they

206

1  will typically pay out a distribution quarterly.
2      Q  And when is the next distribution set to
3  hit?
4      MR. WELDON:  You are talking about the
5  ones outside or the ones inside Sentinel?
6      MR. BURT:  The ones that are not
7  registered in Sentinel's name.
8      MR. WELDON:  Do you understand the
9  question?
10      THE WITNESS:  I do.
11      So if we are talking just the CLOs the
12  next distribution would be May 1.
13  BY MR. BURT:
14      Q  Now, regarding the CLOs in particular are
15  there certain CLOs that were registered in
16  Sentinel's name and others that were not?
17      A  That is true.
18      Q  But all of the CLOs will be distributing
19  on May 1?
20      A  Typically the distributions occur on
21  May 1.
22      Q  And so for those -- even for those that
23  are not registered in Sentinel's name Sentinel
24  will get a distribution on May 1?
25      A  It doesn't come to Sentinel, it sits out

207

1  with the trustee or wherever it is and Sentinel
2  has to go out and grab that through this process.
3      Q  Of sending a letter?
4      A  Of sending a letter signed by somebody on
5  behalf of Sentinel.  I am not part of that
6  process.
7      Q  Does Beecher receive copies of those
8  letters?
9      A  I have seen copies of it in the past.
10      Q  And the new directors that were appointed
11  in the June, 2021 timeframe are they continuing to
12  do that, send those letters to give those
13  distributions?
14      A  That has not been done since before Matt
15  resigned.
16      Q  So to your knowledge -- Beecher's
17  knowledge CLO distributions that were not
18  registered in Sentinel's name Sentinel has not
19  received distributions since Matt resigned?
20      A  That is correct.
21      Q  So all of that money is sitting with the
22  CLO trustee or whomever?
23      A  Correct.
24      Q  And if we were to look at a list of the
25  CLOs would Beecher know who the trustee was or

208

1  what account was used?
2      A  No.
3      Q  That is beyond Beecher's knowledge?
4      A  That is correct.
5      Q  Do you know who would know that?
6      A  I do not know.
7      Q  Would the directors know that?
8      A  They may.
9      Q  I may have some follow-up, we are checking
10  with our team on some of that information to see
11  if we have some of those financial documents, I
12  may have follow-up on that, but let's look in the
13  meantime at the exhibit that I gave you, 134.
14      Now, this is -- at the top it appears that
15  Gareth Pereira sends to Clayton Price and Casey
16  McDonald a bunch of financial documents, and this
17  takes place in June of 2021 I think around the
18  time of those new directors coming on.  Does that
19  sound right?
20      A  Okay, sorry.
21      Q  No, that's fine.
22      A  What was the question?
23      Q  So the question was to confirm that these
24  financial documents were provided to the new
25  directors last June, 2021.

209

1    A  Correct.
2    Q  And was that part of their onboarding
3  process to help them come up to speed?
4    A  I believe so.
5    Q  If you look at the management discussion
6  and analysis, it's Page 4, I believe, this is part
7  of a packet you sent to Mr. DiOrio if you look at
8  the previous page on December 10, 2020.
9    A  Yes.
10    Q  So in this management an analysis states
11  that overall for the 11 months ending November 30,
12  2020 Sentinel recognized net income of 169,000,
13  11 months ended November 30, 2019 Sentinel
14  recognized net income of 3.2 million.  Capital and
15  surplus November 30, 2020, 2019 was 118.7 million
16  and 77.2 million respectively.  The increase in
17  surplus is a result of the SeaOne valuation that
18  was recorded in the books in 2019, although pushed
19  back to 2018 as an audit restatement.  Do you see
20  that?
21    A  I do.
22    Q  You are familiar with these financial
23  statements, right?
24    A  Correct.
25    Q  This is really the core of what Beecher

210

1  does for Sentinel?
2    A  Correct.
3    Q  So looking at the balance sheet here and
4  comparing 2019 to 2020, do you see why cash
5  decreased by 7 million year over year?
6    A  There would have been a dividend payment
7  of 6.4 million.
8    Q  And where do we see that in the financial
9  statements?
10    A  I am seeing that on the cashflow Page 3 of
11  the document.
12    Q  Got it.
13       And that's listed under cashflow from
14  financing activities dividend paid 6.4 million and
15  it shows up as a negative on the statement of
16  cashflows?
17    A  Correct.
18    Q  What was the nature of that dividend?
19    A  Dividend up to the parent company of
20  Sentinel.
21    Q  Was it Mainspring and Montage that it was
22  paid to on the org chart?
23    A  I believe so.
24    Q  Ultimately owned by Mr. Dondero and
25  Ellington, correct?

211

1    A  Correct.
2    Q  Do you know who made the decision to pay
3  that dividend?
4    A  The directors of Sentinel.
5    Q  Were there outside directors involved in
6  that decision at the time?
7    A  All of the directors resolved to pay the
8  dividend.
9    Q  Do you know why?
10    A  I don't know why.
11    Q  Then looking back at the balance sheet the
12  investments fair market value go from 36 million
13  to 84.5 million in November, 2020.  Was that all a
14  result of SeaOne valuation?
15    A  Correct.
16    Q  So SeaOne increased almost by 50 million
17  in value?
18    A  That's correct.
19    Q  And who provided -- was that Valuation
20  Resource Group or Research Group who did that?
21    A  Valuation Research Corp., yes.
22    Q  And did they do that valuation under
23  Beecher's direction?
24    A  It was under the direction of the
25  directors.

212

1    Q  Do you know the basis of increasing the
2  value so significantly in SeaOne over that year?
3    A  The investment had been carried at
4  historical cost and the appreciation over that
5  time resulted in the valuation.  This was the
6  first valuation that was done on it.
7    Q  Is it true that SeaOne is an ongoing
8  concern with active business going and growing?
9    A  That's my understanding.
10    Q  Based on the valuation?
11    A  Yes.
12    Q  Once the dividend is paid does Beecher
13  track what happens to that money at the next level
14  after it gets up to the first level?
15    A  No.
16    Q  Under shareholders equity under retained
17  earnings increases by about 50 million, is that
18  also to account for the SeaOne valuation?
19    A  Yes.
20    Q  So the end -- looking at the statement of
21  cashflows, the end of 2020 or November, 2020, cash
22  on hand is $27,076,000?
23    A  Correct.
24    Q  Do you know what the current state of cash
25  is at Sentinel?

213

1    A  I want to say it is still around 30
2  million.
3    Q  If we look into the supplemental
4  schedules, so just flip forward a few pages, and I
5  want to look actually at Page 9 of that, you will
6  have to flip the exhibit, it is investment holding
7  statement of Sentinel Reinsurance.  And this goes
8  back, I think, to some of the questions we have
9  about what does Sentinel actually hold.
10    I have a number of questions about these
11  investments, the first one being if you know when
12  these were actually transferred to Sentinel and if
13  they were registered in Sentinel's name.  For
14  example, on the first one, the Aberdeen LN Funding
15  Ltd. PFD, do you know when that was transferred to
16  Sentinel?
17    A  There is a column referencing acquisition
18  date, that would have been the date that Sentinel
19  acquired those assets, so everything reflecting
20  8/11/2017 was part of the ATE premium that was
21  paid in.
22    Q  Got it, okay.
23    So the next three lines then are all -- it
24  is a 2014 acquisition date, a 2013, and a 2014 for
25  Eastland, Greyson and Greenbriar CLO interests, is

214

1  that right?
2    A  Correct.
3    Q  Were those successfully transferred and
4  registered in Sentinel's name?
5    A  Those are -- I believe two of those are in
6  Sentinel's name and one is not.
7    Q  Do you know which two are?
8    A  I don't know.  There is another one down
9  below with a 1/7/2014 date.  Two of those
10  investments are in Sentinel's name and two of them
11  are not.
12    Q  Is that something that you could easily
13  confirm on a break?
14    A  What is it you need me to confirm?
15    Q  Which ones are registered in Sentinel's
16  names and which aren't.
17    A  I can.
18    Q  That would be great.
19    The Valhalla CLO Limited at the bottom,
20  was that registered to Sentinel successfully?
21    A  I don't believe so.
22    Q  Now, the pre-ATE transfers, the 2014s and
23  the 20 -- the one 2013, do you know what the
24  circumstances of those transfers were?
25    A  Yes.  Those were investments that Sentinel

215

1  had from the beginning and when they were being
2  registered into Sentinel's name two of the
3  original share certificates were lost so were
4  unable to be re-registered and somebody from
5  Highland needed to assist with that process and it
6  hasn't happened yet.
7    Q  So I guess that was my next question.
8    Would those -- did those transfers
9  originate from Highland entities?
10    A  I don't know where they came from.
11    Q  But you said someone from Highland would
12  have to re-register?
13    A  Someone from Highland needed to help with
14  the process because I believe they were
15  investments that they were familiar with and would
16  have the means to be able to obtain original
17  certificates so that they could register them in
18  Sentinel's name.
19    Q  The information about where those -- the
20  2013 and the three 2014 transfers where those
21  originated, would Beecher have that information
22  somewhere or is that outside Beecher's knowledge?
23    A  I believe that is outside Beecher's
24  knowledge.
25    Q  If you could just confirm on a break the

216

1  two that were registered and the two that were
2  not.
3    A  Yes.
4    Q  That would be great.
5    So the Aberdeen I think we confirmed was
6  not registered in Sentinel's name, and then
7  looking at the ATE transfers the next one is the
8  Greenbriar CLO, again, 8/11/2017, was that
9  successfully registered in Sentinel's name?
10    A  I don't believe so.
11    Q  How about the two Southforks?
12    A  I believe those were.
13    Q  Those were.
14    And then the Stratford CLO -- no, sorry,
15  strike that, that was 2014.
16    Okay, those were the CLOs.
17    Looking at the Governance Re limited
18  promissory note, second from the bottom, does
19  Beecher have any knowledge about whether and if
20  that note can be paid on?
21    A  It is our understanding that it can be
22  paid.
23    Q  Has yet to be paid on?
24    A  It has not been paid off, but our
25  understanding is that it is collectable.

217

1    Q You can set that document aside.
2        Give me just one moment. This is a small
3  exhibit here.
4        (Document marked Exhibit 135 for
5        identification.)
6  BY MR. BURT:
7    Q This is Exhibit 135 Bates BC
8  SEN00000120230. This is just it appears,
9  Mr. Adamczak, a back and forth that you had with
10  Allison Borman at Crowe.
11    A Uh-huh.
12    Q Do you see that?
13    A Yes.
14    Q From June of 2018, so after the ATE. And
15  the subject is the Sentinel 12/31 BRC valuation
16  source docs. And Allison writes to you and
17  Ms. Devins, "I just spoke with Lisa and she
18  mentioned you'd discussed some of our open items,
19  one of which I wanted to follow-up on. We do
20  still need the source docs of information sent to
21  BRC to value the CLOs as of 12/31."
22        Let me stop there first of all. Who is
23  Lisa?
24    A Lisa worked for the audit firm of
25  Sentinel, Crowe.

218

1    Q So she was a colleague of Allison's?
2    A Correct.
3    Q And this open item was to get the source
4  docs that you all had sent to BRC as part of the
5  CLO valuation, right?
6    A Correct.
7    Q Do you recall what source document she was
8  referring to?
9    A There were some reports detailing the
10  underlying loans that were part of the CLOs, so
11  any details on outstanding balances, defaulted
12  balances, anything that was maybe payment
13  schedules, whatever they needed to support their
14  valuation.
15    Q And when did VRC perform the valuation of
16  the CLOs?
17    A After December 31, 2017, that was for the
18  12/31 valuations.
19    Q Do you recall when that valuation came in,
20  was it springtime, 2018?
21    A It was sometime between spring to -- yes,
22  sometime in the spring.
23    Q And she then says in the next line, "When
24  we spoke yesterday I think that the only support
25  pieces needed for this were the State Street 12/31

219

1  monthly reports, unless there was anything else
2  submitted to VRC which we don't already have."
3        You mentioned State Street before and I
4  just want to get your testimony about what your
5  understanding of State Street is.
6    MR. WELDON: Object.
7        You mean in reference to --
8    MR. BURT: In reference to the role it was
9  playing here with respect to the CLOs.
10    THE WITNESS: I don't know if it is the
11  same reference to State Street, but State Street,
12  I believe, had some custodial relationship with
13  the CLOs.
14  BY MR. BURT:
15    Q With all of them?
16    A I don't know.
17    Q You can set that aside.
18        Now, the policy -- after the policy was
19  enacted there were two endorsements to the policy
20  that were made, is that right?
21    A That is correct.
22    Q What is your understanding of the reasons
23  for the endorsements?
24    A The first was to adjust the premium to
25  reflect the fair value of assets received.

220

1        And the second was to adjust the limits in
2  premium to segregate the risk mitigation fee that
3  was funded, pre-funded.
4    Q Why was it necessary to adjust the
5  premium?
6    A For the fair value of the assets?
7    Q Right. Endorsement number one.
8    A That was a suggestion by the auditors.
9    Q Did they provide a rationale for that
10  suggestion?
11    A They indicated that without adjusting the
12  premium to match it would require additional
13  disclosures in the audited financial statements.
14    Q And was that a problem to provide
15  additional disclosures?
16    A It was going to be time consuming and take
17  away from the content of the financial statements.
18    Q So the auditor had a suggestion to do
19  that. Did they provide that suggestion to you?
20    A They provided it to me. We had a
21  discussion with the auditors and the directors and
22  it was ultimately decided to amend the policy to
23  reflect the actual fair value of the assets
24  received.
25    Q Which directors were involved in that?

221

1      A  This was the two independent directors.
2  This is prior to Matt DiOrio.
3      Q  Is this something that you have done
4  before on other policies, change the premium to
5  reflect assets transferred?
6      A  This is the first situation like this that
7  we have seen where there were assets that were
8  taken in as opposed to cash.
9      Q  And have you ever seen anything like it
10  since?
11      A  I have not.
12      Q  I actually -- we have been talking about
13  all sorts of investment vehicles.  Was it
14  difficult to account for these and keep track of
15  them and figure out what best to do for accounting
16  for them and how they affected everything?
17      A  That is why we chose to hire the
18  independent valuation consultants to help
19  determine and value.
20      (Document marked Exhibit 136 for
21       identification.)
22  BY MR. BURT:
23      Q  We only have one copy of the cover sheet
24  that produced as native, this is the same
25  document.  That will be our official copy.

222

1      Go ahead and look at it, please.
2      MR. WELDON:  Do you have it?
3      MR. BURT:  I have it.
4  BY MR. BURT:
5      Q  Go ahead, take your time and take a look
6  at it.
7      Showing you Exhibit 136, there should be a
8  sheet that shows an Excel sheet and then some
9  metadata off to the side about when it was created
10  and then there should be a clean copy of the Excel
11  sheet which is clearer.  Is that included there?
12      A  This?
13      Q  Yes.
14      That's the sheet that has on the right
15  side that's from the document metadata that shows
16  the creator, the author, which is listed as you,
17  and then the date, the file date 12/5/2017, and a
18  time as well, do you see that?
19      A  Sure.
20      Q  And then the Excel sheet is just a clean
21  copy of what is -- so it is easier to read.  But
22  it is the same sheet.
23      So this appears to be based on the
24  metadata a sheet that you created on December 5,
25  2017.  Take a look at that and let me know if you

223

1  recall this sheet.
2      A  Okay.
3      Q  Do you recall this sheet?
4      A  I don't.
5      Q  Do you have any reason to dispute you did
6  not create it?
7      A  No.
8      Q  Looking at -- so it appears here listed as
9  a number of Beecher clients and the reviewer and
10  responsibility with various information, due
11  dates, and then comments on the last column.
12      A  Sure.
13      Q  Right?
14      So looking at Sentinel Reinsurance Limited
15  the reviewer is listed as you.  Do you know what
16  reviewer means in this context?
17      A  The person responsible for reviewing the
18  financial statements.
19      Q  And then responsibilities listed is Alli?
20      A  That would be the person preparing
21  financial statements.
22      Q  And in the comments to Sentinel it states,
23  "Can't really do financials, lots of crazy
24  investments and special project, tons of follow-up
25  and when they need something it's needed quickly."

224

1  Do you recall that at the time?
2      A  That sounds like something I would put,
3  yes.
4      Q  And why would you have put that regarding
5  Sentinel's investments?
6      A  At the time this is prior to having any of
7  the valuations so we were still figuring out how
8  to handle those investments.
9      Q  And you called them crazy investments.
10  Were they new types of investments?
11      MR. WELDON:  Objection.
12      THE WITNESS:  Out of the traditional
13  investment portfolios of our captives.
14  BY MR. BURT:
15      Q  Are all of these listed here are they
16  captive insurance companies?
17      A  I believe so.
18      Q  You had one other Caymans entity, BHC-LTC
19  Insurance Limited, and it's -- you state there it
20  is a standard normal account.  So that was just a
21  straightforward one?
22      A  Correct.
23      Q  No real comparison to what Sentinel is
24  doing?
25      A  Correct.

225

1    Q  When the valuations took place did that
2  help bring things somewhat in order?
3    **A  Yes.**
4    Q  As far as putting the financials together?
5    **A  Yes.**
6    Q  Valuation Research Group, Corp., are they
7  completely independent from Sentinel and Highland?
8    **A  Yes.**
9    Q  And is it correct that Beecher hired them?
10    MR. WELDON:  Objection.
11    THE WITNESS:  Sentinel hired them.
12  BY MR. BURT:
13    Q  Sentinel hired them on Beecher's
14  recommendation?
15    MR. WELDON:  Objection.
16    THE WITNESS:  Correct.
17    (Document marked Exhibit 137 for
18     identification.)
19  BY MR. BURT:
20    Q  Going back to the endorsements, and we can
21  mark this as our next exhibit, showing you
22  Exhibit 137 Bates labeled BC SEN000707455, if you
23  are ready, Mr. Adamczak, I can direct you to the
24  e-mail.
25    **A  Sure.**

226

1    Q  It is the first-in-time e-mail from you
2  actually, and I want to just drill down on this,
3  the reasons for Endorsement No. 1.  So you write
4  to J.P. and Matt, cc'ing Alli Devins on June 5,
5  2018, "I just spoke with Lisa, senior manager at
6  Crowe, regarding the Sentinel audit and the one
7  particular area that is causing them issues, it
8  relates to the gain that we have recognized on the
9  transfer of securities into Sentinel as premium."
10    So I want to stop there and really like
11  get the benefit of your knowledge about how this
12  all works.
13    So when those securities are transferred
14  in to Sentinel how are they accounted for?
15    **A  We had VRC prepare valuations on each of**
16  **the securities that they could and those**
17  **valuations were used in the financial statements.**
18    Q  And were they listed as assets then?
19    **A  They were listed as assets.**
20    Q  Do you know when those VRC valuations were
21  done?
22    **A  They were -- they would have been done**
23  **sometime at or around year-end and after year-end**
24  **for the 12/31 valuations.**
25    Q  And you mention a gain that had been

227

1  recognized.  What is the gain that you are
2  referring to?
3    **A  I believe on the initial recording of the**
4  **policy the premium was assumed to be the stated**
5  **25 million so that's what we recorded as premium**
6  **collected, and should the investments come in**
7  **lower we would have had a loss, should they come**
8  **in higher we would have had a gain, so that was**
9  **just the recording of the fair value of the**
10  **assets.**
11    Q  Got it, okay.
12    In the balance sheet that shows up as an
13  asset.
14    Let's say that 25 million of cash had been
15  paid for the premium and it was a $25 million
16  policy and it was paid for in cash, there would be
17  no need to adjust later on the accounting for that
18  premium, right?
19    **A  Correct.**
20    Q  So the need to adjust in the financial
21  statements comes from the fact that a bunch of
22  securities had been transferred of unknown value?
23    **A  Correct.**
24    Q  Was there a way to account for them other
25  than as premium as just somehow another gain to

228

1  Sentinel?
2    **A  That was how we initially recorded them**
3  **and it was at the suggestion of the auditors that**
4  **be reflected as premium.**
5    Q  And where did you originally record them,
6  where in the financial statements?
7    **A  As an investment gain.**
8    Q  Got it, okay.  All right.
9    So going back to this e-mail, you then
10  state, "The value of securities we have
11  transferred in amounted to just over 40 million as
12  valued by VRC on CLOs and other sources."  So that
13  appears that VRC had said, okay, these investments
14  are worth $40 million, around there, is that
15  right?
16    **A  At the time, that's correct.**
17    Q  And then you state, "The problem is that
18  the premium is only 25 million creating a gain on
19  the transaction."
20    You have used gain twice and I guess I
21  want to understand what you meant by that.  So any
22  payment of premium would be a gain, wouldn't it,
23  like that 25 million in cash to pay a 25 million
24  premium, that would be a gain to the insurer that
25  would be listed as a new asset, a cash asset?

229

1    A  Not true.
2    Q  It is not, okay.  How is that wrong?
3    A  So there is -- with the recording of a
4  premium on a policy you are also going to have an
5  offsetting loss to go along with it, and that loss
6  is reflective in how the actuarial analysis plays
7  out.
8    Q  So the insurance company on its financials
9  records a gain in the payment in and a loss for
10  the risk that's been taken on?
11    A  Correct.
12    Q  So it's pre-booking the risk, in other
13  words, for the potential loss?
14    A  Yes.
15    Q  Did that 40 million valuation that was that
16  just the CLOs and other sources or did it include
17  the cash that was also transferred in?
18    A  The 40 million would have reflected at
19  that time the net assets that were received.
20    Q  Inclusive of cash?
21    A  Inclusive of cash.
22    Q  So the gain that you are referring to
23  here, the problem is that the premium was only
24  25 million creating a gain.  You are referring to
25  there would have been no offset for that, like

230

1  there would have been for just the 25 million
2  cash?
3    A  We were talking about an investment gain,
4  we were talking about premium at that time, so.
5    Q  And then you say because there is no
6  return of overpayment of premium it gives rise to
7  the question is this an arm's length transaction,
8  what did you mean by that?
9    A  So the policy although stated that the
10  premium was 25 million the intention with the
11  transaction since there was no -- there wasn't
12  sufficient cash to be able to pay the premium all
13  of those assets were to go into Sentinel.
14       Should there be an appreciation in value
15  or a found improvement in the value of the assets
16  received there would be no return of premium above
17  the 25 million to the insureds.
18    Q  But isn't the reality that really wasn't
19  an arm's length transaction, right, you had
20  J.P. Sevilla organizing on both sides?
21       MR. WELDON:  Objection.
22       THE WITNESS:  I don't know.
23  BY MR. BURT:
24    Q  But that's the fact, right, you have
25  testified about it earlier today, J.P.'s role in

231

1  both for Highland and for --
2       MR. WELDON:  Objection.
3       THE WITNESS:  I can't say.
4  BY MR. BURT:
5    Q  You can't say.
6       So sitting here now -- strike that.
7       You then say, "Essentially Sentinel has
8  been overpaid by approximately 15 million.
9  Although there doesn't appear to be anything in
10  GAAP preventing the recording of the gain it does
11  create a significant amount of question as well as
12  a ton of additional disclosures in the audit
13  report."
14       I get the point that you made that there
15  is a bunch of work that would have had to have
16  been done, but nothing from -- you say here
17  nothing from GAAP or accounting principles would
18  preclude recording that as an investment gain, the
19  delta between the premium and the valuation,
20  right?
21    A  Whether it was recorded as a gain or
22  additional premium wouldn't have changed the fact
23  that there wasn't going to be premium going back
24  to the insureds.
25    Q  Is that the dispositive point for why you

232

1  felt like it needed to be reported as premium?
2    A  We had the discussion with the auditors
3  and then with the directors and the directors
4  chose to have the policy amended.
5    Q  You state in the next paragraph,
6  "Alternatively, if we can adjust the premium to
7  40 million it would resolve the issue on there,"
8  so that appears to be the suggestion the auditors
9  made that was adopted?
10    A  Correct.
11    Q  Mr. Sevilla asks, "How much cash will
12  Sentinel have to hold per CIMA if the premium is
13  40 million assuming the term is two years."
14       Is the term that he's referring to is
15  the term over which the risk is accounted for?
16    A  Correct.
17    Q  And you respond, "J.P., cash is still fine
18  under the proposed option, Sentinel's maintained
19  cash is required" -- I think you meant to be at
20  least -- "at least be equal to 100% of reserves
21  which are not affected by this option."
22       Stopping there, what are the reserves that
23  you are referring to?
24    A  That would be the loss reserves per the
25  actuarial analysis.

233

1    Q  And what does CIMA require specifically?
2    A  It's not necessarily a CIMA requirement,
3  but it was a requirement per the investment policy
4  that Sentinel had sought approval from CIMA.  The
5  investment policy stated that at any time cash
6  reserves would be held at least equal to the loss
7  reserves.
8    Q  And the loss reserves were determined how?
9    A  Actuarially as I stated previously.
10    Q  Was that Jason Stubbs who was determining
11  that?
12    A  That's correct.
13    Q  Was that reflected in his actuarial
14  analysis that we looked at earlier?
15    A  That was the pricing study.
16    Q  So he performed separate work to determine
17  the amount of loss reserves that should be kept?
18    A  Correct.  I believe I said that earlier as
19  well.
20    Q  Okay.  Thank you for clarifying.
21      Then you state, "Additionally, CIMA's
22  surplus requirements are that Sentinel must
23  maintain surplus in excess of 125% of the greater
24  of, one, minimum capital requirements, 200K; or,
25  two, prescribe capital requirements 15% of earned

234

1  premium.  Because earned premium would increase
2  there would be a great minimum surplus under this
3  option."
4      So help me understand what you are saying
5  here.
6    A  CIMA requirements state that capital has
7  to be maintained at a certain level for each
8  captive, depending on the class of insurance
9  licensee.
10    Q  And you state at 12/31/17, "This would
11  only increase the surplus requirement by about
12  600K, not a concern for Sentinel as the surplus
13  would be about 32 million or 30 million in excess
14  of the requirement."  Is that right?
15    A  Correct.
16    Q  Looking at your e-mail on the next page,
17  June 6, 2018, you respond to J.P. that the
18  auditors are comfortable with this and then say,
19  "So originally at the time the ATE policy was
20  written the trial was to be scheduled in mid 2018
21  with everything wrapping up including appeal in
22  2019.  This fits into the 24-month policy term.
23  Now if the projection is to go through end of
24  2019/early 2020 I don't think we can change policy
25  term."  Why was that?

235

1    A  So at the time that the policy was written
2  and we were working on accounting for it we had
3  discussions with J.P. and Isaac regarding the
4  expected -- what was the term -- the expected risk
5  period, and it was determined based on the
6  schedule that was estimated that it would be a
7  two-year period so the premium was being earned
8  over that two-year period.  And this was
9  indicating if there was a delay in that should we
10  extend the policy period and I said that, no, that
11  wasn't appropriate to do that.
12    Q  And you write here in the next line, "This
13  would cause more concern with whether it is an
14  arm's length transaction."  What did you mean that
15  time?
16    A  That if there was manipulation of the
17  policy term to extend the risk period that it
18  could cause concerns of whether it being an arm's
19  length transaction.
20    Q  At like the CIMA level?
21    A  At the CIMA level, yes.
22    Q  If you go to the first page here, the
23  question is asked by J.P. whether the insureds
24  need to sign on the amendment or could it -- I
25  think he is referring to the endorsement or could

236

1  it be more of an internal memo, and you reply on
2  June 6, "Based on the fact that they signed the
3  original policy I would say the insured should
4  sign the endorsement.  You could run that question
5  by legal to see what they say, but I suspect it
6  would be the same as my feeling."
7      So we know that -- we have talked about
8  Beecher brokering for the insureds as part of the
9  ATE.  Was Beecher brokering as part of the
10  endorsement as well for the insureds?
11    MR. WELDON:  Objection.
12    THE WITNESS:  I don't believe so, but I
13  don't know.
14  BY MR. BURT:
15    Q  Is that something that you could find out
16  quickly like you did with the other ones, just
17  whether Beecher was representing the insureds on
18  the endorsement as well as the broker?
19    A  I can ask, but I don't know that it will
20  matter.
21    Q  Well, if you could ask that would be
22  great, yes.
23    A  Okay.
24    Q  So let's go to the endorsement.  Let's go
25  to the end.

237

1      (Document marked Exhibit 138 for
2      identification.)
3  BY MR. BURT:
4      Q  So handing you what's been marked as
5  Exhibit 138, Bates MD_00000010, it's towards the
6  very end, you will find the two endorsements
7  there, Endorsements 1 and 2.
8      So first of all, do you know when
9  Endorsement 1 actually was signed?
10     A  I think it was signed in June, 2018.
11     Q  Around the time of your e-mails --
12     A  Yes.
13     Q  -- that we just looked at?
14     A  Yes.
15     Q  So Endorsement 1, it states that the
16  premium is stated in the schedule as adjusted to
17  $68,362,333.62 to include the total fair value of
18  the received assets consists of cash of 11 million
19  and miscellaneous receivables of $1,753,000 and an
20  investment portfolio of $55,525,000 as measured at
21  fair value on the date of the transfer.
22     So in the e-mails we had just looked at we
23  had seen a 40 million all-in figure.  How did we
24  go from that figure to the 68 million that's in
25  Endorsement 1?

238

1      A  I believe there was another investment
2  that we were unaware of what it represented and
3  were able to get more information related to the
4  fair value of that, which bumped it up from
5  40 million to the 68 million.
6      Q  So that investment alone was worth
7  28 million?
8      A  Yes.
9      Q  What was that investment?
10     A  It was the Highland Multi-Strategy Credit
11  Fund.
12     Q  What form was that investment, was that a
13  CLO, was that a promissory note?
14     A  That is a limited partnership that
15  Highland managed.
16     Q  And Sentinel obtained the interest in?
17     A  Correct.
18     Q  So when you wrote that e-mail about the
19  40 million --
20     A  That was prior to.
21     Q  Prior to that, neither Beecher nor the
22  auditor fully understood or was able to value that
23  multi-strat interest?
24     A  Correct.
25     Q  Did the valuation company did they perform

239

1  the valuation on multi-strat?
2      A  No.
3      Q  How did that go, how is that valuation
4  performed?
5      A  That fund is audited and carries a net
6  asset value so it is easily determined.
7      Q  Whatever portion of ownership interest
8  Sentinel has, is that portion of the assets of the
9  fund?
10     A  Yes.
11     MS. REPORTER:  What are you saying,
12  valuation on the multi-strat?
13     MR. BURT:  He said multi-strategy.  We
14  sometimes shorten to multi-strat, S-T-R-A-T.
15  BY MR. BURT:
16     Q  Do you refer to it as multi-strat?
17     A  Multi-strat, yes.
18     Q  Did anyone at the insureds agree with the
19  policy premium could increase by three times
20  without increasing the coverage amount?
21     A  I am not aware if that was presented to
22  the insureds.
23     Q  Because the coverage amount stayed the
24  same, the 100 million --
25     A  Correct.

240

1      Q  -- in Endorsement 1.
2      A  But at the time of the inception of the
3  policy there was a risk that the assets received
4  would increase but there was also a risk that
5  those assets would decrease.
6      Q  And what's the significance of that, the
7  risk on both sides?
8      A  It's a risk that they were -- that
9  Sentinel was taking when they accepted a basket of
10  unmarketable securities as premium --
11     Q  Okay.
12     A  -- with only 11 million being in cash.
13     Q  Are you mentioning that to make the point
14  that there was no problem with not increasing the
15  coverage amount by a comparative amount with the
16  increase in the premium?
17     A  The understanding was that the premium --
18  sorry, the investments could be worth
19  significantly more than 25 million or they could
20  be significantly less than 25 million.
21     Q  But the coverage would be 100,000,000
22  Either Way?
23     A  Correct.
24     Q  And who was that understanding shared by?
25     A  That was based on discussions with J.P.

241

1    Q  Do you know how CIMA -- when CIMA learned
2  of Endorsement 1 how CIMA reacted to it?
3    **A  I don't recall how their reaction was.**
4    Q  Okay.
5      In your pile, the CIMA, the big thing of
6  CIMA reports, it is Exhibit 126, so I want to look
7  at the page, it is part of the AML report towards
8  the back, it ends in Bates 78819, do you see there
9  there is AML findings and then the first finding
10  is 5.2.1.1?
11    **A  Yes.**
12    Q  So the second full paragraph under that
13  finding begins with the U.S. dollar 68.3 million,
14  do you see where I am?
15    **A  Yes.**
16    Q  So it states there, "The U.S. 68.3 million
17  stemming from the transaction described above
18  increased the licensee's investment portfolio from
19  U.S. 12 million as of December 31, 2016, to U.S.
20  86 million as of -- as at December 31, 2017.
21  Included in the U.S. 86 million is approximately
22  U.S. 37 million being funds invested in Highland
23  Multi-Strategy Credit Fund Limited," which is what
24  you mentioned?
25    **A  Correct.**

242

1    Q  "A hedge fund affiliated to Highland
2  Capital Management, LP."
3      "The U.S. 37 million is part of the
4  U.S. 55.5 million transferred to the licensee in
5  part fulfillment of the premium payment for the
6  ATE cover.  The audit opinion on the financial
7  statements for the year ended December 31, 2017
8  was qualified partly on the basis that the
9  investment in Highland Multi-Strategy Credit Fund
10  Limited could not be valued.  Those charged with
11  the licensee's governance could not explain the
12  basis upon which the investments have been valued
13  on or about August 1, 2017 for the purpose of
14  premium settlement.  Also, they could not explain
15  the reason why the information was relied on to
16  value the investments for the purpose of premium
17  settlement could not be readily provided to the
18  auditors upon request considering that the policy
19  inception and the financial statements audit were
20  only a few months apart."
21      Then states, "In addition, those charged
22  with governance could not explain where the
23  ownership in the U.S. 68.3 million in investments
24  and cash vested prior to being transferred to the
25  licensee for settlement of the ATE coverage

243

1  premium.  The above matters cast significant doubt
2  on the economic substance and business purpose of
3  the transactions relating to the ATE coverage.  Do
4  you recall receiving that from CIMA?
5    **A  I do.**
6    Q  And what was Beecher's reaction to that?
7    **A  Sorry, what was the question now?**
8    Q  My question is what was Beecher's reaction
9  when informed by CIMA that there was significant
10  doubt on the economic substance and business
11  purposes of the transaction relating to the ATE
12  coverage?
13    **A  Beecher discussed with the directors and**
14  **formulated the response here under management's**
15  **comments to explain the process as far as how the**
16  **premium was determined and the assets coming in.**
17    Q  And did you help draft that?
18    **A  I have reviewed and helped edit the**
19  **document.**
20    Q  Do you know who was the primary drafter?
21    **A  I think it was a combination of the**
22  **directors and Beecher.**
23    Q  Which directors in particular?
24    **A  All of them.**
25    Q  Do you recall working with Matt DiOrio and

244

1  Katie Irving on developing responses to the CIMA
2  reports?
3    **A  I did.**
4    Q  Did they play a role in developing these
5  responses?
6    **A  I believe Matt did.**
7    Q  I see the management comments on Page 6
8  and 7 of the AML report on Page 8 the authority
9  responds, and we have already read part of that
10  regarding Jason Stubbs where they noted he was not
11  involved in premium pricing but just in
12  calculation of loss reserves, and then skipping
13  the long paragraph, the second paragraph from the
14  bottom, states, "In addition, in any case to amend
15  an insurance policy to artificially inflate the
16  premium amount to equal the value of the
17  investments transferred to the licensee without
18  any justifiable business purpose in economic
19  substance is at the very least questionable."
20      So that was CIMA's ultimate determination
21  with regards to Endorsement 1, wasn't it?
22    **A  That is how it would appear, yes.**
23    Q  I can't recall, I believe you testified
24  you have not done this with any other insurance
25  policy in your career working on insurance

245

1  policies, done such an endorsement?
2      MR. WELDON:  Objection.
3      THE WITNESS:  I think that's correct.
4  BY MR. BURT:
5      Q  So sitting here today and looking back,
6  would you agree with CIMA that this was a
7  questionable thing to do to adjust the premium in
8  this manner?
9      MR. WELDON:  Objection.
10     THE WITNESS:  I understand the reasons for
11  why it was done and I don't know what else I can
12  say on that.
13  BY MR. BURT:
14     Q  Let's look at Endorsement 2, it's not in
15  the CIMA report, but I think you have it right
16  there underneath.
17     So how long after Endorsement 1 did
18  Endorsement 2 happen?
19     A  Within a short period of time.
20     Q  Like what does short mean in this context?
21     A  A week, maybe two weeks.
22     Q  And describe what the problem was that was
23  trying to be addressed in Endorsement No. 2.
24     A  The risk mitigation fees that had been
25  paid to this point under the view of the auditors

246

1  indicated that a claim had occurred and if a claim
2  had occurred the liability would need to be
3  recorded upfront in its full liability of the
4  actuarially-determined ultimate loss.
5      Q  Rather than spread out?
6      A  Rather than earning the premium out over
7  the entire risk period and then accruing that
8  liability for the reserves over that risk period.
9  That would have posed a problem with the
10  investment policy which stipulated that cash had
11  to be maintained at or equal to the loss reserves,
12  and that would have run afoul with CIMA.
13     Q  So there wouldn't have been enough cash,
14  in other words, in the account?
15     A  Correct.
16     Q  If a claim had been made on the policy?
17     A  Correct.
18     Q  That would have immediately brought from
19  an accounting perspective both the premium and
20  loss the entire amounts immediately?
21     A  Correct.
22     Q  And is that just an issue of pure
23  accounting, that is just how you account for these
24  things if the claim is made you have got to
25  recognize the premium, you have got to recognize

247

1  the loss?
2      A  Yes.
3      Q  Endorsement 2 we see that the premium is
4  reduced to 59,362,000 and that 9 million has been
5  prepaid by the insured to the insurer to cover
6  risk mitigation costs which include but are not
7  limited to legal defense costs and the limited
8  indemnity is reduced to 91 million in the
9  aggregate.
10     So essentially is it correct that
11  9 million is taken out of what had been booked as
12  premium and put as risk mitigation or prepaid risk
13  mitigation?
14     A  Correct.
15     Q  Was that really just an accounting
16  transaction that happened or was money actually
17  moved in any accounts?
18     A  There was no money being moved there, that
19  was just the recording of a liability for that
20  pre-funded balance.
21     Q  And that -- so that 9 million showed up as
22  a liability on Sentinel's books?
23     A  Correct.
24     MR. BURT:  So let's do Tab 35.
25

248

1      (Document marked Exhibit 139 for
2      identification.)
3      MR. WELDON:  What number is this?
4      MS. REPORTER:  139.
5      MR. BURT:  Another short one.
6  BY MR. BURT:
7      Q  Showing you 139 Bates BC SEN0000641688, an
8  e-mail from Matt DiOrio to you sending an
9  ATE-related invoice on July 25, 2018, and he asks
10  you to arrange payment for the invoice and you
11  reply the same day that "these are no longer
12  covered under the ATE policy but are merely risk
13  mitigation fees" and then you are asked "do you
14  still need Beecher to formally approve them and
15  can they go directly to Lesley." And Lesley was a
16  director at that time, right?
17     A  I don't know that she was a director at
18  that point in time, but she worked for Maples and
19  interacted with the directors that were there.
20     Q  I see, okay.
21     And do you recall why this was not -- why
22  this request for payment was not covered under the
23  ATE policy but was risk mitigation?
24     A  I do not.
25     Q  And I realize there is not a lot of

249

1  context there. But looking up, Mr. DiOrio
2  actually asks the question "why are these not
3  covered under the ATE policy," and you respond
4  "they are the defense costs that we had to pull
5  out of the policy on account of there being an
6  audit issue with paying defense costs under the
7  policy with no claim. If we left them under the
8  policy it would have required us to earn all the
9  premium upfront and record the full actuarial
10  ultimate. This would have triggered cash
11  deficiencies in Sentinel." So that appears to be
12  the explanation that you gave.
13  A That's correct.
14  Q If you file a claim for accounting reasons
15  you have got to record the premium and the full
16  actuarial ultimate.
17  A Correct.
18  Q And if you do that there is not enough
19  cash so now you are in a cash problem and CIMA
20  gets triggered in essence?
21  A Correct.
22  Q Is there a way that this is typically done
23  where if defense costs are being paid out of the
24  policy claims are made on the policy?
25  A If there are defense costs there is a

250

1  claim that has been made.
2  Q And is that the way that it typically
3  works?
4  A Yes.
5  Q But here with these defense costs there
6  was -- claims were not being made, right, on the
7  policy?
8  A Correct.
9  Q Have you ever done it this way in any
10  other policy?
11  A I think the issue here is that these were
12  ongoing expenses that were being paid under that
13  own cost clause in the policy or the risk
14  mitigation fees.
15  Q So I want to make sure I know what clause
16  you are talking about. Do you have the policy
17  handy there?
18  A I do.
19  Q Can you direct me to the provision you are
20  thinking of?
21  A 9.1.7.
22  Q Okay.
23  A Own costs means all costs and expenses of
24  the representative and other service providers in
25  the normal course, including related tax, which

251

1  are incurred during the conduct of legal action on
2  behalf of the insured.
3  Q So that is the definition of own costs.
4  Where is -- is there another provision that
5  explains how those are to be treated under the
6  policy?
7  A That is the only one that I understand of
8  the policy.
9  Q So here -- and I am not aware of it
10  showing up anywhere else in the policy, if it does
11  and you recall if you can just point me to it,
12  here you are saying there is this definition of
13  own costs which refers to the cost and expenses of
14  the representative and other service providers in
15  the normal course, including related tax, which
16  are incurred during the conduct of the legal
17  action on behalf of the insured. So all of those
18  costs are defined as own costs.
19  So what is the significance -- tie that
20  together for me, what is the significance of that
21  to how you all chose to account and do Endorsement
22  No. 2?
23  MR. WELDON: Objection, asked and
24  answered.
25

252

1  BY MR. BURT:
2  Q You can answer.
3  A So the discussions that we had with J.P.
4  under the understanding that all assets were being
5  paid as premium to Sentinel the insureds had no
6  means of being able to pay normal business costs
7  going forward, so they would be covered under the
8  own cost clause which we had broken out as the
9  pre-funded risk mitigation fees.
10  Q Right, I understand that.
11  But you also testified when defense -- on
12  other policies when defense costs are being paid
13  there's been a claim made on the policy, I think
14  that's what you said, right?
15  A That is correct.
16  Q So is it correct that this is the only
17  instance in which you are aware in which those
18  costs could be paid without making a claim on the
19  policy?
20  A These were classified as risk mitigation
21  fees which were differentiated from defense
22  claims, defense claims fees.
23  Q Right.
24  But ultimately they were to pay for the
25  defense of the case, right, that's what these

253

1  were?
2  **A  They were -- sure.**
3      MR. WELDON:  Objection.
4      THE WITNESS:  But it's not --
5      MR. BURT:  Chris, you can laugh at this,
6  it never happened in any other policy, you do an
7  accounting trick so you don't have to make a
8  claim.  I am trying to understand this.  I don't
9  know what is funny about it, Chris.
10     MR. WELDON:  Well, I think you
11 misunderstand what he is saying.  There was an
12 accounting auditor that came in and looked at the
13 policy.  His testimony is pretty clear.  And
14 auditor came in and said he had to adjust it
15 because this isn't going to be covered under the
16 policy.
17     MR. BURT:  That was Endorsement 1, I
18 haven't heard anything about an auditor on
19 Endorsement 2.
20     THE WITNESS:  This was all raised by the
21 auditors and in terms of how the loss reserves
22 would end up needing to be recorded on Sentinel's
23 books as of year-end if there was a claim and it
24 was made clear to us that the triggering of the
25 claim would be the judgment against the insureds.

254

1  BY MR. BURT:
2      Q  Just so we are absolutely clear, yes or
3  no, this has never been done on any other policy
4  you have worked on, correct?
5      MR. WELDON:  Objection.
6      THE WITNESS:  I have not seen it done
7  before.
8      MR. BURT:  Why don't we go ahead and take
9  a break.
10     THE VIDEOGRAPHER:  This marks the end of
11 Disk No. 4 in the deposition of Thomas Adamczak,
12 we are off the record at 4:16.
13     (Recess taken.)
14     THE VIDEOGRAPHER:  Here begins Disk No. 5
15 in the deposition of Thomas Adamczak, we are back
16 on the record at 4:41.
17 BY MR. BURT:
18     Q  Mr. Adamczak, we are going to take a
19 little detour and go back to Schedule A of the
20 asset purchase agreement to walk through quickly
21 the various investment instruments just to get for
22 the record whether they were transferred and
23 registered at Sentinel.
24     **A  Okay.**
25     Q  Do you have a copy of Schedule A in front

255

1  of you?
2      **A  I do.**
3      Q  Terrific.
4      I think we have gone through the first
5  three, Aberdeen was not registered at Sentinel and
6  the two Southforks were, is that right?
7      **A  Correct.**
8      Q  The next is another Aberdeen LN FDG
9  Limited PFD.
10     First of all, do you know what difference
11 between that one is and the first Aberdeen?
12     **A  I don't.**
13     Q  Was this investment transferred to
14 Sentinel?
15     **A  It is not in Sentinel's name.**
16     Q  The next one is GSC ABS CDO 2006-4U LT CUM
17 PFD 144A.  Is that registered in Sentinel's name?
18     **A  I don't believe it is.**
19     Q  And so to the best of Beecher's knowledge
20 if they were not transferred and registered at --
21 to the best of Beecher's knowledge, if not
22 registered at Sentinel would they still be at
23 Highland's CDO Opportunity Master Fund, LP?
24     MR. WELDON:  Asked and answered.  I
25 already said he doesn't know where they are before

256

1  they came.
2  BY MR. BURT:
3      Q  You can answer.
4      **A  That's correct.**
5      Q  What your counsel testified to?
6      MR. WELDON:  I wasn't testifying, what his
7  answer, his answer was --
8      THE WITNESS:  I don't know where they are
9  held/custodied.
10 BY MR. BURT:
11     Q  The next one is Greenbriar CLO LTD PFD
12 144A.
13     **A  Sorry, which one, the Greenbriar?**
14     Q  The Greenbriar CLO LTD PFD 144A.
15     **A  That one was not transferred in.**
16     Q  Next is Highland FINL Partners LP.
17     **A  The 615,733 was.**
18     Q  And below that another Highland FINL
19 Partners LP NPV?
20     **A  Was not.**
21     Q  Then we have Longstreet CDO I -- I think
22 it is an I LTD PFD 144A.
23     **A  It is not.**
24     Q  Then Nexpoint C COM USD0.001 (POST REV S)?
25     **A  That one was.**

257

1  Q  Next is PAM CAP FDG LP 0.001MAY13 144A.
2  A  That one was not.
3  Q  Then is TOUSA INC 8.0 PFD 144A?
4  A  This one was not.
5  Q  Next is Valhalla CLO LTD 0.0 01AUG23 144A?
6  A  That was not.
7  Q  Next is Vertical ABS CDO 2 0.0 09MAY46
8  144A?
9  A  That was not.
10  Q  Just so I am clear, when you say it is
11  not --
12  A  Not transferred into Sentinel.
13  Q  At any time, it was never registered in
14  Sentinel's name?
15  A  Correct.
16  If I indicate that one was transferred in
17  it is either in Sentinel now or it was transferred
18  in and has since paid out and closed or sold.
19  Q  Or been moved?
20  A  Right.
21  Q  And we will talk in a minute about
22  Sebastian Clark and assets that were transferred
23  to Sebastian Clark, I think that is one of the
24  things you are referring to as far as transferring
25  out of Sentinel.

258

1  A  Yes, but those are back in Sentinel.
2  Q  I see, okay.  We will get to that in a
3  moment.
4  Then we have Highland Credit Opportunities
5  CDO LTD Partnership interest?
6  A  That is in Sentinel.
7  Q  Next is Nexpoint Multifamily Capital
8  Trust?
9  A  That is.
10  Q  Then we have Nexpoint Real Estate Strat-Z
11  Highland Gemini Program (Pollux).
12  A  I think you just read off two.
13  Q  Did I?  You are right I did.
14  The next is just Nexpoint Real Estate
15  Strat-Z.
16  A  That one is.
17  Q  Then we get to Highland Gemini Program
18  (Pollux) Promissory Note - Highland Capital
19  Management.
20  A  That one is not -- it is a promissory note
21  so it is not in Sentinel's name, but it had -- I
22  believe it had paid out interest to Sentinel at
23  some point.
24  Q  Is it still paying interest to Sentinel?
25  A  I think it is delinquent.

259

1  A  And then underneath that is CAMBR 5X
2  Floating - 12/2045.
3  A  That was not.
4  Q  And then the cash of 7.779 was
5  transferred, correct?
6  A  All of the cash was transferred in.
7  Q  So that would apply to the next cash under
8  Highland CDO Opportunity Fund Limited, correct?
9  A  Correct.
10  Q  Then we get to Highland CDO holdings,
11  company, the first is HFT REAL EST 3.33867 25NOV5
12  144A F.
13  A  That was transferred.
14  Q  Then is Nexpoint C Com USD0.001 (POST REV
15  S)?
16  A  That was transferred in.
17  Q  Then is Nexpoint R Com USD0.001 'WI'?
18  A  That was transferred in.
19  Q  Next is Stratford CL 3.16956 01NOV21 144A
20  F.
21  A  That was transferred in.
22  Q  Then is Highland Park C4.93867 25NOV51
23  FRN?
24  A  That was not transferred in.
25  Q  Then is another promissory note CLO Holdco

260

1  limited 12/23/2025?
2  A  Again, the promissory note so it is not
3  being transferred in or re-registered in
4  Sentinel's name, and I believe it had paid
5  interest but is currently delinquent.
6  Q  And we have cash that was paid.
7  A  Correct.
8  Q  And then the last is Capital Management
9  LP?
10  A  So that's the dividends receivable from
11  Highland Capital Management, and I believe that
12  was collected.
13  Q  All right, almost done.
14  The next is Highland Special Opportunities
15  Holding Company.
16  The first listed there is Delphi Corp. DEL
17  7.125 01May29.
18  A  I believe that one was transferred in.
19  Q  And we have Delphi Corp. DEL 6.55 15JUN06
20  USD?
21  A  I believe that one was transferred in as
22  well.
23  Q  Longstreet CDO I LTD PFD 144A?
24  A  That was not transferred in.
25  Q  TOUSA INC 8.0 PFD 144A?

261

1    A  That was not transferred in.
2    Q  Vertical ABS CDO 2 0.0 09MAY46 144A?
3    A  That was not transferred in.
4    Q  And then cash that was transferred,
5  correct?
6    A  Correct.
7    Q  And then under Highland Financial Corp.,
8  cash that was transferred, correct?
9    A  Correct.
10    Q  And then there is Capital Management --
11  tax refund receivable at Highland Capital
12  Management, LP.
13       Was that cash transferred or collected?
14    A  Only in part.  That was a refund from the
15  IRS that when the refund came in it was in the
16  name of I am assuming Highland Financial Corp.,
17  and as such could not be deposited into Sentinel's
18  account.  So Matt DiOrio had opened an account in
19  that name, deposited the check, and then
20  transferred the majority of the funds into
21  Sentinel's account.
22       MR. WELDON:  I think you had him testify
23  about that check earlier today.
24  BY MR. BURT:
25    Q  Then we have Highland Financial Partners

262

1  LP cash of 29,000 that was transferred, correct?
2    A  Correct.
3    Q  Thank you.
4       I don't have a question about
5  transferring, just a question on actually the
6  entity description itself, under the -- in the
7  first big box there for Highlands CDO Opportunity
8  Master Fund, the third from the bottom, the
9  Highland Gemini program that's listed as Pollux,
10  do you know whether that actually came from
11  Dugaboy?
12    A  I do not, no.
13       MR. BURT:  I think I gave the next
14  exhibit.
15       MR. WELDON:  140.
16       MR. BURT:  140.
17       (Document marked Exhibit 140 for
18       identification.)
19  BY MR. BURT:
20    Q  Showing, Mr. Adamczak, Exhibit 140, which
21  is BC SEN0000585041, e-mails between you and
22  Mr. Kranz in July of 2018, do you see that?
23    A  I do.
24    Q  Now, I am going to back now from our
25  detour back to Endorsement No. 2, so your e-mail

263

1  to Mr. Kranz on July 2 you write, "Pete, I just
2  spoke to Lisa.  We have a potentially bigger issue
3  than the investments.  Lisa just informed me they
4  feel the ATE premium and ultimate loss should all
5  be recorded immediately and not earned pro rata
6  over a period."  So I will stop there.
7       Who is the Lisa that you are referring to?
8    A  This is Lisa, the auditor with Crowe.
9    Q  And so here Lisa said that the premium and
10  ultimate loss should be recorded immediately,
11  right?
12    A  Based on what we previously discussed if
13  there was a claim payment it would indicate that
14  there is a claim and the claim should be recorded
15  all upfront.
16    Q  And you write here, "The primary reason is
17  that the loss event is known and, therefore, they
18  feel this more like retroactive coverage, similar
19  to an LPT or a novation."  What is an LPT or a
20  novation?
21    A  Loss portfolio transfer.
22    Q  What does novation refer to?
23    A  A transfer of risk off your balance sheet
24  to somebody else.
25    Q  Lisa even went back to Art and discussed

264

1  with him and he agreed.  Who is Art?
2    A  Art is a partner at Crowe.
3    Q  They then -- you then say "They are pretty
4  sure this" -- I think you meant to say is -- "how
5  it should be accounted for unless there is
6  something/events that the policy covers that
7  is/are unknown other than the value of the loss.
8  I know this is going to require us to revise/amend
9  the investment policy because we do not have
10  nearly enough cash as of year-end.  Had this been
11  known how it would need to be accounted for we
12  would have needed all premium in cash (or at least
13  the much larger portion).  Cash at year-end is
14  only $11.4 million while the ultimate on the ATE
15  policy $33.4 million."
16       Ultimate there being the actuarial loss
17  that was being --
18    A  The actuarial determined loss projection.
19    Q  Is this what triggered what led to
20  Endorsement 2?
21    A  Correct.
22    Q  So you hadn't yet decided -- the idea to
23  do the risk mitigation expense to pull out the
24  $9 million --
25    A  Correct.

265

1    Q  -- as a prepaid balance.
2        That was decided after Lisa had raised
3  this issue with you?
4    **A  Correct.**
5    Q  And you discussed that idea with Lisa?
6    **A  I did.**
7    Q  And she signed off on it?
8    **A  The idea of --**
9    Q  Of doing a pre-funded 9 million risk
10 mitigation prepaid litigation balance.
11   **A  We discussed with internally at Beecher**
12 **and with the directors and determined that the**
13 **policy -- sorry, the claim -- the triggering event**
14 **of the claim would be the judgment, an unfavorable**
15 **judgment against the insureds.  And because there**
16 **was no judgment there could not be a claim so all**
17 **of these expenses would be risk mitigation outside**
18 **the actual indemnity payment.**
19   Q  So Lisa actually wasn't involved in that
20 decision it sounds like?
21   **A  Lisa is an auditor for Sentinel, she**
22 **wouldn't be making any decisions.**
23   Q  Which directors did you discuss that with?
24   **A  This would have been discussed with Andrew**
25 **Dean and Lesley Thompson.**

266

1    Q  Was Mr. DiOrio involved in that?
2    **A  Mr. DiOrio had not yet -- actually, I**
3  **don't remember when he joined, if he joined and**
4  **was a director at that point we would have**
5  **involved him in, but I don't remember when he came**
6  **in.**
7    Q  So if he had -- if he were a director he
8  would have joined in that discussion?
9    **A  Absolutely.**
10   Q  How about J.P. Sevilla, was he involved in
11 that decision making?
12   **A  He may have been.  He may have been**
13 **involved in the discussion, but I don't recall.**
14   Q  Looking back at this exhibit Pete's
15 response to you is "this could get us fired by the
16 client."  Why did he say that, do you know?
17   **A  Just because of the magnitude and the**
18 **adjustment that this would require related to --**
19 **well, the issue with not having enough cash on**
20 **hand as of year-end to satisfy the investment**
21 **policy requirement.**
22   Q  Could it have unwound the ATE policy if it
23 had been accounted for this way and there wasn't
24 sufficient cash?
25   **A  I don't believe so.**

267

1    Q  What would CIMA -- what is CIMA's remedy
2  in that situation where the cash is insufficient
3  to meet the loss reserve requirement?
4    **A  You would probably have to have a**
5  **corrective action immediately and bringing the**
6  **cash balances up in line with what the loss**
7  **reserves were.**
8    Q  So a lot more cash would have to be
9  infused immediately?
10   **A  Absolutely.**
11   Q  And that was something it appears the
12 directors including Mr. DiOrio wanted to avoid
13 having to do?
14      MR. WELDON:  Objection.
15      THE WITNESS:  The nature of the
16 investments were such that would -- in order to
17 sell off they would have ended up recognizing
18 substantial losses and they wanted to avoid that.
19      MR. BURT:  I gave you the wrong exhibit.
20 I take that back.
21      (Document marked Exhibit 141 for
22      identification.)
23 BY MR. BURT:
24   Q  Showing you Exhibit 141 Bates label BC
25 SEN0000723353.  Are you ready, Mr. Adamczak?

268

1    A  Yes.
2    Q  So at the bottom is an e-mail from you, it
3  appears to a number of directors including Lesley
4  Thompson Matt DiOrio and Andrew dean and a
5  D. Massand, who I believe you mentioned was with
6  Highland, right?
7    **A  Correct.**
8    Q  Dilip Massand?
9    **A  Dilip Massand.**
10   Q  You write here cc'ing J.P. Sevilla, "All,
11 mentioned yesterday, the auditors noted an issue
12 with defense costs being paid through the policy
13 without their actually being a claim (claim
14 trigger event is an unfavorable settlement or
15 court awarded judgment).  To correct, an
16 endorsement was prepared to include the pre-funded
17 risk mitigation defense costs of an estimated $9
18 million from premium and establish an escrow on
19 the balance sheet to pay those costs from.  The
20 endorsement also reduces the aggregate limit to
21 $91 million from $100 million."
22      Is this when the directors -- when you
23 first raised the issues with the directors I guess
24 the call that you had?  Strike that.
25      Did you have a call with the directors the

269

1  day before this e-mail to discuss this issue?
2  **A  We would have had a discussion with them.**
3  Q  Here you are following up and in the
4  e-mail above from you to Lesley Thompson you
5  attach the unanimous consent form with respect to
6  Endorsement No. 2.  Was that the consent form
7  needed from the directors?
8  **A  Correct.**
9  Q  Is that different than the Endorsement No.
10  2 we have been looking at?
11  **A  The unanimous consent form would have been**
12  **the formal governance document where the directors**
13  **signed off approving the Endorsement 2.**
14  Q  And then Lesley responds with a couple of
15  questions and the last question, the last bullet
16  is the one I want to focus on, and she asks, "Can
17  you explain the rational for changing the limits
18  on the policy?  The original premium was $25
19  million, changed to $68 million (to represent the
20  fair value of the assets) and now dropped to $59
21  million.  If the company was willing to write the
22  risk at the original deemed premium level why is
23  it now changing?  As such I believe the company
24  should keep the liability limits at the original
25  agreed level."

270

1  Do you recall that concern from
2  Ms. Thompson?
3  **A  I don't recall.**
4  Q  Do you recall responding to that, to this
5  e-mail?
6  **A  I don't recall.**
7  Q  Do you know whether her concern was ever
8  resolved?
9  MR. WELDON:  Objection.
10  THE WITNESS:  As the directors had
11  ultimately agreed and signed off on the
12  endorsement and the unanimous consent I believe
13  the concern was addressed.
14  BY MR. BURT:
15  Q  To do something like this did all the
16  directors have to unanimously agree?
17  **A  Yes.**
18  Q  One thing I want to clarify, so the $9
19  million in risk mitigation that is set aside, is
20  it -- one use of that money was to pay for legal
21  defense costs as part of the UBS litigation for
22  the Highland entities, is that right?
23  **A  We were directed to process invoices by**
24  **the directors under the risk mitigation fees.**
25  Q  So -- that's not precisely my question.

271

1  I am really just genuinely trying to
2  understand, were the legal defense costs for the
3  litigation being paid out of that $9 million
4  pre-funded balance?
5  **A  I am not exactly sure the nature of the**
6  **legal fees that that were instructed to be**
7  **processed under the risk mitigation fees.**
8  Q  Were fees paid to continue to the run the
9  insureds since they had transferred all of their
10  assets, were there normal operating expenses being
11  paid for out of those risk mitigations?
12  **A  Yes.**
13  Q  So unrelated to the mitigation, just a
14  filing requirement for CDO fund or an expense that
15  they incurred in the normal course?
16  **A  Yes.**
17  Q  And were those expenses that Highland was
18  submitting to Beecher for payment?
19  **A  Yes.**
20  (Document marked Exhibit 142 for
21  identification.)
22  BY MR. BURT:
23  Q  Showing you Exhibit 142, this is Bates BC
24  SEN0000667053, starting in the first-in-time
25  e-mail on the second page, Mr. Adamczak, you send

272

1  an e-mail to Jan Neveril, Damien Austin, Onson
2  Mukwedeya, and cc Matt DiOrio and Alli Devins.
3  And there you say, Jan and Damien, attached please
4  find an invoice for Sentinel to be submitted to
5  Maples Paying Agency for disbursement.  The
6  invoice is for Risk Mitigation fees for ATE
7  policy.  Please approve and respond to all with
8  instructions to disburse funds from the Sentinel
9  Reinsurance Account 677670."
10  Is that Sentinel Reinsurance account the
11  checking account at CIBC?
12  **A  No.**
13  Q  What account is that?
14  **A  This is when Maples served as directors,**
15  **they had the cash account that they managed.**
16  Q  So this was the Maples account?
17  **A  Correct.**
18  Q  Understood.
19  The Onson Mukwedeya name is new, who is
20  he?
21  **A  Somebody at Maples.**
22  Q  In response Damien Austin, who I believe
23  is a director, is that right?
24  **A  Correct.**
25  Q  He responds to you and Matt, "Before I

273

1  authorize this for payment I wanted to check with
2  you how we go about determining that it should be
3  paid by Sentinel. I see that the invoice is
4  addressed to HCM and is related to Highland v.
5  UBS. How is Highland related to Sentinel? I
6  don't think I have a full organizational chart, do
7  you have one you can send to me please?" And he
8  goes on.
9      Now, my first question about this is why
10 was it, if you know, that Mr. Austin didn't know
11 that Highland was related to Sentinel?
12     A This may have been their first exposure to
13 any of the risk mitigation fees.
14     Q The fact that Highland and Sentinel have
15 common ownership, that wasn't hidden from
16 directors, right?
17     A It wasn't hidden, no.
18     And I believe Jan and Damian were new
19 directors at this point as well.
20     Q I see.
21     Then you respond to Damian and Jan and
22 say, "The invoice I previously sent is covered by
23 the ATE policy as it relates to defense costs on
24 the insured event."
25     Does that refresh your recollection about

274

1  whether legal defense costs were paid out of the
2  pre-funded balance?
3      A So it looks like those legal fees were
4  being paid under the risk mitigation fee.
5      Q "These defense costs have been pre-funded
6  9.0 million set aside from ATE premium and are
7  being tracked separately by us, to date prior to
8  this invoice we have reimbursed $5,438,351 of
9  these 'Risk Mitigation Fees'", do you see that?
10     A I do.
11     Q In between the Endorsement 2, which was
12 established I think you said sometime in late June
13 or early July of 2018, in between that time and
14 November 20, 2018, over $5 million had been
15 reimbursed out of that risk mitigation pool, is
16 that right?
17     A To date 5 -- yes, 5 million was reimbursed
18 out of the risk mitigation fees.
19     Q And do you know what the majority of those
20 funds were being used for, what the expenses were?
21     A I do not.
22     Q So how much was for legal versus how much
23 was to run the insureds, you couldn't say?
24     A The directors had requested that we
25 process the invoices and reimburse them through

275

1  the risk mitigation fees.
2      Q You then write, "I hope this helps. Matt
3  might be able to provide more specifics on the
4  relationship or engagement letters if needed, but
5  there wouldn't be any connection between Sentinel
6  and the payees other than the fact that these are
7  to be covered under the ATE policy."
8      What did you mean when you said there
9  wasn't any connection between Sentinel and the
10 payees?
11     A There was no relationship between Sentinel
12 and the entities that were performing the
13 services, the services were not paid or were not
14 provided to Sentinel directly.
15     Q Now, you just mentioned a moment ago that
16 the directors had requested that Beecher process
17 the invoice and assist with making sure the
18 payments are made. Which directors specifically
19 have specifically requested that?
20     A All of the invoices that related to the
21 risk mitigation fees came through our contact at
22 Highland.
23     Q Which was Matt DiOrio?
24     A In this case Matt DiOrio.
25     Q At other times did they come from

276

1  J.P. Sevilla?
2      A It would have come from J.P., I believe.
3  I don't recall.
4      Q You can set that aside. Just give me one
5  second.
6      MR. BURT: Mark this as 143.
7      (Document marked Exhibit 143 for
8        identification.)
9  BY MR. BURT:
10     Q Showing you, Mr. Adamczak, Exhibit 143
11 Bates labeled UBSPROD020567. Go ahead and take a
12 look at that and let me know if you recognize the
13 document.
14     A I do.
15     Q What do you understand this document to
16 be?
17     A This document was a sales agreement to
18 transfer certain securities that we were told to
19 be worthless to remove them from the balance sheet
20 of Sentinel.
21     Q Who told you that they were worthless?
22     A That direction would have come from
23 Matt DiOrio.
24     Q As part of the valuation services that --
25 the Valuation Research Corp. had done had they

277

1  determined that those -- these assets were
2  worthless?
3  **A They had not been engaged to perform**
4  **valuations on those investments and it was**
5  **discussed that if those investments were worthless**
6  **there was no point in obtaining a valuation.**
7  Q Were these investments on Schedule A to
8  the purchase agreement any of them?
9  **A Yes, they should all be on that schedule.**
10 Q So Schedule A investments certain of those
11 investments were not actually valued by
12 Valuation Research Corp.?
13 **A Correct.**
14 Q Who made the decision which one should be
15 valued and which one should not be valued?
16 **A That was the directors on discussions with**
17 **Beecher Carlson.**
18 Q Were you involved in those discussions?
19 **A From the standpoint of what made sense to**
20 **perform a valuation on, yes.**
21 Q Which directors in particular were
22 involved in those discussions?
23 **A Matt DiOrio in particular and then the**
24 **other directors were probably informed of it.**
25 Q But weren't involved in the discussions

278

1  themselves?
2  **A They may have been involved in the**
3  **discussions, but I don't recall.**
4  Q But you do recall Matt DiOrio being
5  involved?
6  **A Definitely.**
7  Q And -- okay.
8  So in consultation with Mr. DiOrio the
9  decision is made the Valuation Research Corp. do
10 some valuations on certain investments but not
11 others.
12 How does this asset transfer agreement
13 come to be, whose idea was it to transfer these
14 off the balance sheet?
15 **A I don't recall.**
16 Q Was that something that Beecher would have
17 initiated or was that beyond Beecher's
18 responsibilities?
19 **A It was beyond Beecher's responsibilities.**
20 Q Would it have been a director, perhaps?
21 **A Perhaps.**
22 Q But specifically you don't recall?
23 **A I don't recall, no.**
24 Q And who works on this asset transfer
25 agreement in putting it together and organizing

279

1  the transfer?
2  **A I am not recalling how that came about.**
3  Q The parties listed are Sentinel Reinsurance
4  Ltd., I think that is a typo, and then Sebastian
5  Clark, Ltd., which states as an exempted company
6  incorporated in the Cayman Islands.
7  What did you understand Sebastian Clark to
8  be?
9  **A My understanding is that Sebastian Clark**
10 **is a Cayman entity that provides director services**
11 **for other Sentinel-related entities.**
12 Q Do you know who owns Sebastian Clark?
13 **A I do not.**
14 Q Do you know whether Sebastian Clark had
15 any assets prior to the asset transfer agreement?
16 **A I do not.**
17 Q On page -- excuse me, on Schedule 1 of the
18 asset purchase agreement it lists that the
19 purchase price -- the total purchase price is $3,
20 do you see that?
21 **A You said Page 1.**
22 Q Schedule 1, it looks like it is Page 5.
23 **A Yes.**
24 Q Do you recall how that purchase price was
25 come to?

280

1  **A A nominal value.**
2  Q And who made that decision?
3  **A I am not sure.**
4  Q It was somebody outside of Beecher?
5  **A It was not Beecher that determined that**
6  **price.**
7  Q If we look at Schedule 2 it lists the
8  assets that are being transferred, and two I want
9  to look at, the Dugaboy Investment Trust
10 Promissory Note acquired 8/11/2017, and it says
11 under the Par/Face column $2,399,996.
12 Do you recall if that was the value on the
13 Dugaboy promissory note at the time?
14 **A That was probably the face value at the**
15 **time that that security was sold.**
16 Q And Mr. DiOrio had determined that it was
17 a worthless asset?
18 **A It was not paying interest anymore.**
19 Q But the note was still valid, right, it
20 hasn't expired or anything like that, it was still
21 a valid promissory note?
22 **A I don't remember what the terms were. It**
23 **was probably delinquent at that point.**
24 Q And then in the next row, the CLO Holdco
25 Ltd., Promissory Note for a face value of

**281**

1  $32,801,593, what do you understand about that
2  promissory note?
3      A  The same as the Dugaboy Investment Trust
4  promissory note.
5      Q  Were these the assets that Beecher
6  discussed with Mr. DiOrio in determining what to
7  value and what not to value?
8      MR. WELDON:  Objection.
9      THE WITNESS:  We discussed with Mr. DiOrio
10  the valuation of all investments in the portfolio.
11  BY MR. BURT:
12     Q  Right.
13         And certain investments were determined --
14  you all determined not to have value, is that
15  right?
16     MR. WELDON:  Objection.
17     THE WITNESS:  It was not determined by
18  Beecher that any investments had no value, that
19  was something that was told to us by Matt DiOrio.
20  BY MR. BURT:
21     Q  Did Beecher do anything independent to
22  confirm that they were worthless?
23     A  We had no way of confirming anything.
24     Q  So, no, no documents or information had
25  been provided from Sentinel or from any of the

**282**

1  transferring entities?
2      A  Sentinel had no documents.
3      Q  Do you know who controls Dugaboy
4  Investment?
5      A  I do not.
6      Q  How about CLO Holdco?
7      A  I do not.
8      Q  Let's look in conjunction with this,
9  Exhibit 144?
10        (Document marked Exhibit 144 for
11        identification.)
12  BY MR. BURT:
13     Q  Showing you Exhibit 144, Bates BC
14  SEN0000638619, which is a series of e-mail and
15  then another attachment of the asset transfer
16  agreement.
17         I'd like to show you the first-in-time
18  e-mail from J.P. Sevilla on December 31, 2019.
19  And he e-mails here, John Cullinane, David
20  Egglishaw, cc'ing Matt DiOrio and Katie Irving
21  regarding Sebastian Clark Ltd. - Urgent.
22         Do you know who John Cullane and
23  David Egglishaw were?
24     A  I do not know them personally.  But my
25  understanding is they were independent outside

**283**

1  directors that were directors of some of the
2  Sentinel structure entities.
3      Q  But not Sentinel itself?
4      A  No.
5      Q  Were they directors of Sebastian Clark?
6      A  I have no idea.
7      Q  Here Mr. Sevilla writes, "Gentlemen, are
8  you available to review a matter for approval
9  today?  The matter relates to certain securities
10  held at Sentinel Reinsurance Ltd., a Cayman
11  Islands registered captive insurance company, that
12  Sentinel currently marks at zero and which
13  Sentinel would propose to transfer to Sebastian
14  Clark for minimal consideration.  My colleague
15  Matt DiOrio, copied, is a director of Sentinel and
16  will provide more detail in a subsequent e-mail."
17         In this timeframe, the end of 2019, is
18  that about when Beecher also learned of the
19  potential transfer to Sebastian Clark?
20     A  I don't think we were aware of this until
21  after it happened.
22     Q  Oh, until after the transfer had been
23  finalized?
24     A  Or at least until after the effective date
25  of the transfer.

**284**

1      Q  And if you look at -- if you just flip one
2  page further, the copy of the asset transfer
3  agreement, it is dated as of 31, December, 2019,
4  which is the same date of J.P. Sevilla's e-mail,
5  is that right?
6      A  Yes.
7      Q  The next e-mail up in the chain
8  Matt DiOrio responds to the same individuals and
9  says, "These securities mentioned have been marked
10  at zero since acquisition in August, 2017.  We
11  tried to have them valued by a third party but
12  could not provide enough information to do so as
13  most are crisis era instruments that have been
14  worthless for close to a decade.  Sentinel needs
15  them off the books to avoid a qualified opinion on
16  its audit as CIMA has informed us it will no
17  longer accept such an opinion.  Information for
18  the worthless positions is listed below."
19         What's a qualified opinion on an audit?
20     A  It's a type of audit opinion that is not
21  clean.
22     Q  Meaning what exactly?
23     A  That its modified for certain items
24  generally considered to be negative as far as from
25  the viewpoint of anyone reviewing the financial

285

1  statements.
2      Q  Do you know why having these assets on
3  Sentinel's books would have led to a qualified
4  opinion?
5      A  Because the investments could not be
6  valued whether favorably or unfavorably the
7  auditors were unable to opine that the assets were
8  fairly stated and therefore they caused
9  qualifications to the audit report.
10     Q  And Mr. DiOrio says that "CIMA has
11  informed us that it will no longer accept such an
12  opinion," was that part of the CIMA review that
13  had taken place in 2019 where they had said that?
14     A  That is correct.
15     Q  If you go to the first page of the e-mail
16  chain on the same day David Egglishaw writes back
17  to Matt saying, "On behalf of Sebastian Clark Ltd
18  we hereby consent to the transfers listed below."
19      And then a month later Matt DiOrio sends
20  along the signed APA and it says please execute on
21  the Sebastian Clark side at your convenience and
22  Mr. Cullinane responds with the attached fully
23  executed agreement, and then -- which we can see
24  here in the attachment on the last page.  Do you
25  see that?

286

1      A  Yes.
2      Q  The last e-mail in time in this e-mail
3  exchange is to you and Alli Devins on March 19,
4  2020, and Matt DiOrio says, "Not sure if I ever
5  sent this to you guys.  Sale of worthless assets
6  agreement."
7      Is that the first that you learned of
8  Sebastian Clark?
9      A  It could be.
10     Q  These assets, I believe you testified,
11  have been sent back to Sentinel now, is that
12  right?
13     A  That is correct.
14     Q  When did that happen?
15     A  That happened at some point in later 2021,
16  I think the effective date may have been November,
17  2021.
18     Q  Why were they transferred back to
19  Sentinel?
20     A  Based on the discussions that the new
21  directors had with counsel and others, I am not
22  sure who, but the determination was that they
23  would try to recover those assets in anticipation
24  of the outcome of the discussions with UBS.
25     Q  Are these assets that have been

287

1  transferred back from Sebastian Clark do they have
2  a value now?
3      A  Not to my knowledge.
4      Q  They have not been valued by anyone?
5      Do you know how they show up --
6      MS. REPORTER:  I didn't get an answer, you
7  shook your head.
8      THE WITNESS:  Sorry, no, they do not have
9  any value assigned to them.
10 BY MR. BURT:
11     Q  And no valuation has been done on them?
12     A  That is correct.
13     Q  Where do they show up in the financial
14  statements?
15     A  We haven't completed financial statements
16  for November, 2021 yet.
17     Q  Do you have an idea of where they will
18  show up, how they will be accounted for?
19     A  They will show up in the asset holding
20  schedule.
21     Q  And will values be assigned to them?
22     A  They will have a value of 0 assigned to
23  them unless we know otherwise.
24     Q  Is Beecher trying to obtain a valuation of
25  the assets?

288

1      A  I do not know.  That's the call of the
2  directors whether they obtain any valuations going
3  forward.
4      Q  Thank you, Mr. Adamczak.
5      I wanted to actually -- it's related to
6  what the directors can do now, post Mr. DiOrio
7  leaving the board and now with the new independent
8  directors and now with the Highland entities in
9  bankruptcy, we looked at the management services
10  agreement of Beecher Carlson back at the beginning
11  of the day, and we saw in a number of places where
12  Highland Capital was providing direction about
13  investments, for example, do you recall that?
14     A  Yes.
15     Q  And we can look at it, I don't want to put
16  words -- make things up here.  What exhibit is
17  that?  Let's look at the management agreement.
18  117.  Many documents ago.
19      We saw that in looking at Exhibit A that
20  Highland Capital could request comprehensive
21  quarterly financial statements, et cetera, and
22  also could facilitate the investment of available
23  funds, that Beecher would facilitate the
24  investment of available funds in accordance with
25  written instructions from Sentinel through

289

1 Highland Capital, right?

2 **A Correct.**

3 Q Is that still how the management agreement

4 works with Highland Capital now in bankruptcy and

5 now a trustee overseeing it?

6 **A The captive management agreement has not**

7 **been amended to this date.**

8 Q Does Beecher have any correspondence with

9 the trustee overseeing Highland Capital?

10 **A Beecher Carlson has no correspondence with**

11 **anyone from Highland Capital.**

12 Q If the trustee were to provide, for

13 example, written instructions about the investment

14 of available funds, would Beecher be obligated to

15 do that, that the trustee --

16 **A Beecher would have to send that on to the**

17 **directors and it would be ultimately up to the**

18 **directors to determine how investments should be**

19 **handled.**

20 Q Was that the case prior to the bankruptcy

21 as well, would requests like that from Highland

22 Capital have to get passed on to directors?

23 **A That's correct.**

24 Q How about something like paying on the

25 policy, if the trustee were to come and say on

290

1 behalf of Highland Capital I want you to pay on

2 the policy, what would Beecher do, would they have

3 to run that by the directors or could Beecher --

4 **A As Beecher doesn't make any payments**

5 **themselves everything has to go through the**

6 **directors for final approval.**

7 Q Another way back in time exhibit,

8 Exhibit 116, if we can pull that up, this was the

9 e-mail that attached advisory -- excuse me, the

10 board minutes and the advisory committee

11 discussions. The front of it is an e-mail from

12 Clayton price to CIMA.

13 The first attachment there, and we looked

14 briefly at it, but I do have a few questions about

15 it, the board of directors minutes, you see that

16 these are minutes of a meeting held on the 17th of

17 December, 2018?

18 **A Correct.**

19 Q And here it appears that Damien Austin and

20 Jan Neveril are appointed to be chairman and

21 secretary of the board, is that right?

22 **A That is correct.**

23 Q Under No. 3, prior meeting minutes and

24 resolutions, it states that the directors reviewed

25 the prior board of directors meeting minutes and

291

1 unanimous written resolutions since 27 October

2 2014 and following a brief discussion it was

3 resolved that the board of directors meeting

4 minutes of 4th of August 2016 and 28 December 2017

5 be and are hereby approved.

6 So my question on that is why in this

7 meeting in December of 2018 were four years worth

8 of minutes and resolutions discussed and approved?

9 **A It's actually two years, and there was**

10 **probably no formal approval in the December, 2017**

11 **meeting of the prior year August 4, 2016 meeting**

12 **minutes, so this was a catch-up approval.**

13 **It's not uncommon to formally approve the**

14 **board minutes at the following meeting, the prior**

15 **meeting minutes.**

16 Q I was getting the four-year number from

17 this line that the meeting minutes and unanimous

18 written resolution since 27 October 2014, so the

19 time between 27 October 2014 and December 17,

20 2018. So -- maybe that's just referring to the

21 unanimous written resolutions.

22 But do you know why those hadn't been

23 discussed over a period of four years with the

24 board?

25 MR. WELDON: Objection.

292

1 THE WITNESS: I don't know that they

2 weren't discussed with the board, but there were

3 new directors at this point. This is the first

4 meeting that Jan, Damian, Matt, and Dilip had all

5 attended so it would have made sense to present

6 some of the former resolutions to review and have

7 -- so they could have the background on.

8 BY MR. BURT:

9 Q On the next page there is a litigation

10 update under 4A, and it states the chairman

11 requested that all parties advise if they are

12 aware of any litigation matters which may impact

13 the company. All the participants confirmed that

14 they were not aware of any litigation that

15 involved the company.

16 Was this just referring to specific

17 litigation involving Sentinel itself?

18 **A I would assume that to be true.**

19 Q Right.

20 Because obviously the UBS litigation

21 involving the ATE policy was ongoing at that time?

22 **A Right. But Sentinel was not named in any**

23 **of that litigation.**

24 Q Under 8, acts of directors, states the

25 directors having been apprised of the business

293

1 transactions and affairs of the company since the
2 last meeting of the directors on the 4th of August
3 2016 accordingly who's resolved that all acts of
4 the directors and agents of the company taken on
5 behalf of the company since 4 August 2016 being
6 hereby and are hereby approved and ratified.
7 So here it states that the directors
8 hadn't met since the 4th of August, 2016 which is
9 inconsistent with what it says on the first page
10 that there was an 8 December 2017 meeting. Do you
11 know what was going on there?
12 **A I do not know or recall what the**
13 **December 8, 2017 meeting reviewed. It may have**
14 **been a brief meeting that may not have covered all**
15 **of the items and had the catchall resolution to**
16 **approve all prior acts since the last meeting.**
17 Q Did Beecher write the minutes for the
18 meetings?
19 **A Beecher as part of its captive management**
20 **role would typically take minutes for the meetings**
21 **and draft and then send those minutes to directors**
22 **for review and commentary.**
23 Q On the first page in attendance
24 J.P. Sevilla and Katie Irving for SAS Asset
25 Recovery are in attendance. Do you know why they

294

1 are in attendance?
2 **A As members of Highland and knowledgeable**
3 **members of the activities centering around**
4 **Sentinel.**
5 Q They would attend board meetings?
6 **A Correct.**
7 Q They didn't have a vote?
8 **A No.**
9 Q Is that right?
10 **A No.**
11 Q What did they do at the board meetings, if
12 you recall?
13 **A I don't, unless it was specifically**
14 **identified in the minutes. They could have just**
15 **been observing.**
16 Q Going back to Sentinel as it exists today,
17 do you know who the creditors of Sentinel are if
18 it has any?
19 **A In what way?**
20 Q So entities that have loaned Sentinel
21 money, for example, if there were to be a
22 liquidation of Sentinel would there be various
23 organizations that are owed money by Sentinel?
24 **A Not to my knowledge.**
25 Q In other words, Sentinel hasn't issued any

295

1 debt that is owed by a creditor?
2 **A Not to my knowledge.**
3 MR. BURT: Christian, we are getting
4 really close, let us take five minutes to organize
5 things.
6 MR. WELDON: Yes.
7 MR. BURT: If we can.
8 THE VIDEOGRAPHER: We are going off the
9 record, the time is 5:42.
10 (Recess taken.)
11 THE VIDEOGRAPHER: We are on the record,
12 the time is 5:53.
13 BY MR. BURT:
14 Q Mr. Adamczak, we are just about done here,
15 a few final mop-up questions.
16 Looking at Exhibit 140 -- 134, I wasn't
17 even close, 134, Page 9 of the investment holding
18 statement for Sentinel Reinsurance from
19 November 30, 2020, we had looked earlier in the
20 day that there were four investments that were
21 prior to the 2017 ATE transfers and those are
22 listed there, the Eastland, there was a
23 Greenbriar, there was a Greyson CLO, and then the
24 Stratford CLO, is that right?
25 **A That's correct.**

296

1 Q And I believe you were able during a break
2 to confirm some information about those transfers,
3 is that right?
4 **A That is correct.**
5 Q What were you able to learn?
6 **A The Eastland and Greyson CLOs are not**
7 **transferred into Sentinel's name and the other two**
8 **are.**
9 Q And is it correct that just as with the
10 Schedule A assets those pre-ATE transfers Beecher
11 don't have any insight into where -- who the
12 transferor was, who those came from?
13 **A Correct.**
14 Q You mentioned earlier in the day that I
15 believe I asked you about whether the current
16 assets of Sentinel are sufficient to cover a
17 potential payment on the ATE policy, and I believe
18 you testified that, yes, they are, is that
19 correct?
20 **A That's correct.**
21 Q And I am wondering if you could explain
22 how you know that, how the assets have been
23 valued.
24 **A As of what date are we talking about?**
25 Q As of today, so the latest valuation of

297

1 those assets.
2   **A The latest valuation that we have on any**
3 **of the investments was as of December 31, 2020.**
4   Q 2020, so two years ago -- a year and a
5 half ago?
6   **A Yes.**
7   Q Is the 2021 those statements are being
8 worked on now?
9   **A The directors have not concluded whether**
10 **they want to obtain valuations as of December 31,**
11 **2021.**
12   Q Do you know why?
13   **A I do not. They have been -- they have**
14 **been having discussions with the audit firm and**
15 **the auditors did not require it as they were**
16 **likely disclaiming an opinion anyway.**
17   Q So as of the end of December, 2020 when
18 they were valued, what valuations were done on the
19 assets at that time?
20   **A The same valuations that they had done on**
21 **the investments in prior years.**
22   Q Done by the same service providers?
23   **A Valuation Research Corp.**
24   Q And that valuation at the end of 2020
25 yielded an amount sufficient to satisfy the entire

298

1 premium, is that right?
2   **A Say that again?**
3   Q That was a poor -- very poorly worded
4 question.
5       The valuation at that time, in December
6 of 2020, yielded an asset value at Sentinel that
7 was sufficient to cover the ATE policy?
8   **A Correct.**
9   Q So $91 million?
10   **A Correct.**
11   Q And how are those assets held, do you know
12 in what forms?
13   **A There is CLOs, there is promissory notes,**
14 **there is limited partnerships, basically whatever**
15 **is left of the investments that weren't previously**
16 **sold.**
17   Q And there is cash still?
18   **A There is still cash.**
19   Q And the SeaOne investment is still there,
20 for example?
21   **A The SeaOne investment is owned by**
22 **SS Holdings, which is a subsidiary of Sentinel.**
23   Q And is it counted towards the assets of
24 Sentinel?
25   **A It is in the consolidated financials for**

299

1 Sentinel.
2   Q We have talked today about very clear
3 testimony about all of the assets of the insureds
4 were transferred over to pay the premium.
5       Did anyone at Highland ever say why
6 Highland decided to transfer all of those assets?
7       MR. WELDON: Objection.
8       THE WITNESS: It was our understanding
9 they did not have the cash to be able to pay the
10 premium so in lieu of receipt of premium in cash
11 they informed us that all of the assets would be
12 transferred.
13 BY MR. BURT:
14   Q Right.
15       And that's -- I guess that's where the
16 rubber hits the road, because as we have gone
17 through the amount of premium was a little bit in
18 flux and it was later amended in Endorsement 1 to
19 match the assets transferred, and so that decision
20 to transfer all the assets, did they ever say why
21 Highland wanted to transfer all of the insured's
22 assets?
23   A I don't recall.
24   Q You don't recall any discussions, for
25 example, with J.P. Sevilla about that?

300

1   **A The only discussions that I recall were**
2   **that there was going to be a risk in taking these**
3   **investments so there had to be some reward for**
4   **taking on that risk and that reward was in the**
5   **form of a potential windfall should the**
6   **investments prove to be worth more than nothing.**
7   Q And that's what Mr. Sevilla told you?
8   **A I don't remember if that was specifically**
9   **his words, but that was our understanding.**
10   Q And that was Beecher's understanding?
11   **A That was Beecher's understanding.**
12   Q And is it fair to say that Beecher was not
13 involved in the decision to transfer all the
14 assets, that was made by Highland, right?
15   **A Beecher was not involved in that decision.**
16   Q And all of the reasons for transferring
17 those assets were not -- Beecher was not made
18 privy to, is that right?
19   **A Beecher was not aware that there was any**
20 **information that was withheld from them.**
21   Q Now, is Beecher aware that through the
22 trustee now that CDO Fund has made a claim on the
23 policy?
24   **A That's correct.**
25   Q And when did Beecher become aware of that?

301

1    A  When the demand came through in early
2  2021.
3    Q  Has Beecher had conversations with the
4  directors about that?
5    A  We have had limited conversations with the
6  directors regarding it.
7    Q  What have those conversations been?
8    A  That there had been no resolution in the
9  discussions, the settlement discussions or
10  negotiations, with UBS.
11    Q  And did the directors tell Beecher that
12  that was a reason to not pay on the policy
13  pursuant to the demand?
14    A  They haven't given us a reason why there
15  has been no payment on the policy.
16    Q  Does Beecher take a position one way or
17  another on whether the policy should be paid?
18    A  Beecher is contracted with Sentinel to
19  provide the management services and financials.
20  We are available to be consulted with should there
21  need, we have had no consultation requests from
22  the directors.
23    Q  So Beecher -- is it fair to say that
24  Beecher is not aware of any reason why the claim
25  has not been paid to date?

302

1      MR. WELDON:  Objection.
2      THE WITNESS:  Beecher is not aware of any
3  reasons why the claim has not been paid to date.
4  BY MR. BURT:
5    Q  We have seen some documents today that
6  reference Sentinel's management.  Do you know who
7  those -- whose referred to as Sentinel management
8  or the officers of Sentinel that would refer to?
9    A  In what way?
10    Q  So we talked about the directors, right --
11    A  Yes.
12    Q  -- on one hand, and there has been other
13  references to the management at Sentinel.
14      Have you ever heard that term that
15  Sentinel has management?
16    A  Yes.  But I would take it to mean that the
17  management refers to those decision makers.
18    Q  Being whom?
19    A  The directors of Sentinel.
20    Q  And ultimately Dondero and Ellington?
21      MR. WELDON:  Objection.
22      THE WITNESS:  I have not been requested by
23  them to make any or to direct any payments so I
24  can't say that they are the ones calling any
25  shots.

303

1  BY MR. BURT:
2    Q  Well, that contradicts what you testified
3  to earlier where you said they were the ones
4  ultimately calling the shots as ultimate
5  beneficial owners.
6      MR. WELDON:  Objection, misstates earlier
7  testimony.
8      THE WITNESS:  I don't remember what I
9  said.
10  BY MR. BURT:
11    Q  But you were testifying truthfully
12  earlier, right?
13      MR. WELDON:  Objection.
14      THE WITNESS:  I have been testifying
15  truthfully the entire time.
16  BY MR. BURT:
17    Q  Do you know what Peak Ventures is?
18    A  I have never heard of Peak Ventures.
19    Q  Referring to Dilip Massand, do you happen
20  to know why he resigned from the board?
21    A  We were not informed of the reasons why he
22  resigned.
23    Q  Did that resignation come suddenly?
24    A  It was sudden.
25    Q  And no one explained why?

304

1    A  I believe the explanation that we had was
2  that he was no longer affiliated with Highland
3  Capital.
4      MR. BURT:  One final document, this is the
5  final one and the shortest one.
6      (Document marked Exhibit 145 for
7      identification.)
8  BY MR. BURT:
9    Q  So this is an e-mail from Clayton Price to
10  you, Mr. Adamczak, in the end of April last year,
11  2021.  And the subject is Interesting to now learn
12  that Matt had been planning to also resign from
13  Sentinel's board.  Then he states, "And they
14  previously appointed counsel other than Dylan at
15  Carey Olsen...  my instinct tell me Matt likely
16  knew/knows more about this demand now being
17  served."  Do you recall this e-mail?
18    A  I do.
19    Q  What was the context of this e-mail?
20    A  This was at the time that the then current
21  directors were asked to resign from Sentinel.
22    Q  And why was it interesting to learn that
23  Matt had been planning to resign?
24    A  Because through previous discussions that
25  we had with him he had given us no indication that

**305**

1  he was going to be resigning until that point.
2  Q  Do you know who asked the directors to
3  resign?
4  A  I do not.
5  Q  What did you make of Clayton price's line
6  that his instincts tells me Matt likely knows more
7  about the demand for payment on the claim now
8  being served?
9  A  Say that again?
10  Q  What did you take from Mr. Price's
11  statement that his instincts told him Matt knew
12  more about the demand for claim payment that was
13  being served?
14  A  I would just be speculating if I --
15  Q  Did you share those instincts that Matt
16  knew more than he was letting on?
17  A  Yes.
18  Q  Why is that?
19  A  Because it just seemed peculiar.
20  Q  What seemed peculiar?
21  A  That he was resigning.
22  Q  Last set of questions, in preparing for
23  this deposition did you have any contact with
24  Sentinel's counsel?
25  A  No.

**306**

1  Q  So that would be counsel at Foley Lardner
2  or Collas Crill?
3  A  Correct.
4  Q  How about with any of the former Highland
5  employees, Matt DiOrio?
6  A  No.
7  Q  Or J.P. Sevilla?
8  A  No.
9  Q  Just worked with Mr. Weldon here to
10  prepare?
11  A  That's correct.
12  MR. BURT:  Chris, I think there are still
13  a few documents that weren't produced to us over
14  on the redaction, waiting to get.
15  MS. GEORGE:  There is at least 30
16  invoices, not including --
17  MR. WELDON:  I know they are being worked
18  on, just follow-up on them.
19  MR. BURT:  We will follow-up on them.  And
20  for that reason though I am just going to need to
21  hold the deposition open pending --
22  MR. WELDON:  I don't agree it is open I
23  think we are close to the seven hours, but I
24  understand your position.
25  MR. BURT:  Okay.

**307**

1  MR. WELDON:  And I understand your
2  request.  I have only a couple questions.  If you
3  are done -- I asked Mr. Feinstein, I don't think
4  he has any, I am not aware of anyone else so I am
5  going to ask questions.
6  EXAMINATION
7  BY MR. WELDON:
8  Q  If you could look at Exhibit 137, I think
9  they are in order.  And then 128 is the other one
10  I will need.  If you guys want so you know what I
11  am looking at.  We are going to do 137 first.
12  You testified about UBO, can you tell me
13  what that term means again?
14  A  Ultimate beneficial owner.
15  Q  And you understood that UBOs in the
16  corporate structure diagram to be who on those
17  two?
18  A  James Dondero and Scott Ellington.
19  Q  Have you ever had any discussions with
20  Dondero or Ellington?
21  A  Me personally, no.
22  Q  Are you aware of any document that you
23  have seen today or do you have a document where
24  you have seen that Dondero or Ellington made any
25  decisions about anything relative to Sentinel

**308**

1  directly that you saw on a decision making basis?
2  A  I have not.
3  Q  On one -- on Exhibit 137, if you look at
4  the top, you see Matt DiOrio's e-mail there.
5  A  Yes.
6  Q  It says sasmgt.com, and you explained why
7  you understood that e-mail to be utilized in that
8  fashion.
9  Do you know who Matt -- aside from being
10  an internal director, which you testified about
11  with Sentinel, do you know who Matt DiOrio
12  specifically worked for and got paid by relative
13  to his work?
14  A  Not with certainty, no.
15  Q  In regards to all the testimony you
16  provided today are you aware of Matt DiOrio acting
17  as anything but an internal director on his
18  direction to you?
19  A  On his direction to us, it was in his
20  capacity as an internal director.
21  Q  Because we have used the term coming from
22  Highland Capital, do you have any direct knowledge
23  on how information got from Highland Capital to
24  Matt DiOrio specifically?
25  A  I do not.

309

1    Q  I want to look at Exhibit 128.
2        We talked about these scenarios that Jason
3    Stubbs had put together.
4    A  Yes.
5    Q  And there were scenarios in these
6    scenarios -- in these three -- there were
7    situations in these three scenarios in which
8    Sentinel took the premium places policy they would
9    have a favorable outcome in the premium they took
10   and a beneficial benefit to the company, is that
11   correct?
12   A  That's correct.  In each of the scenarios
13   there were two options that would have resulted in
14   very little payout or no payment.
15   Q  So in that regard, only that regard, I am
16   not talking about any other aspect of it, was the
17   policy any different than any other policy when
18   you get scenarios when you have this actuary done
19   in regards to how that policy was going to respond
20   and whether it was a policy that should be placed.
21   A  No.  This is similar to many policies that
22   we have seen in the past.
23   Q  Was there any action that Beecher took in
24   regards to what it has done for Sentinel
25   throughout its time as the captive manager that

310

1    wasn't at the direction of the directors?
2    A  No.  Beecher did not have the capacity to
3    be able to do that.  Everything was approved and
4    directed by the directors, whether independent or
5    internal.
6    Q  When you talk about internal, the internal
7    directors that you dealt with over the time was
8    DiOrio?
9    A  Matt DiOrio and Dilip Massand.
10   Q  J.P. was not an internal director to your
11   knowledge?
12   A  J.P. was never a director of Sentinel.
13   Q  That report that CIMA did and asked for a
14   number of things that were needed to be done by
15   Sentinel, are you aware of anything that hadn't
16   been met at CIMA's request following that
17   inspection report?
18   A  No.
19       Sentinel followed through with all of
20   their requests compliant with every piece of
21   documentation so that they could continue with a
22   clean bill of health to continue operating.
23   Q  And there is that order, that restraining
24   order that came out?
25   A  Yes.

311

1    Q  Do you know what the basis of that
2    restraining order is?
3    A  I do not.
4    Q  But there was some clarification on what
5    could be paid?
6    A  Correct.
7    Q  Is that correct?
8    A  Correct.
9    Q  And you looked -- is it fair to say you
10   looked to the directors, the current directors of
11   Sentinel, to understand their interpretation of
12   that clarification?
13   A  The current directors are aware of that
14   restraining order and would direct us to pay
15   invoices or to process invoices so that they could
16   release them as deemed appropriate.
17   Q  Okay.
18       MR. WELDON:  I don't have any other
19   questions at this point.
20       MR. BURT:  Just a little redirect.
21
22          FURTHER EXAMINATION
23          BY MR. BURT:
24   Q  Your counsel, Mr. Adamczak, just asked you
25   a few questions about the UBOs, the ultimate

312

1    beneficial owners of Sentinel.  Do you recall
2    those questions?
3    A  Yes.
4    Q  I am going to read to you from the
5    transcript from earlier today at Pages 17, line --
6    Page 17, Line 14 through Page 18 Line 1, quote --
7        MR. WELDON:  Let me just get it up, give
8    me a second.  What is the line?
9        MR. BURT:  Page 17, Line 14.
10   BY MR. BURT:
11   Q  I did a search in the realtime, you can
12   scroll up.
13       MR. WELDON:  Go ahead.
14   BY MR. BURT:
15   Q  "Q You stated a moment ago that the
16   ultimate -- the role of an ultimate beneficial
17   owner is that they are the person who ultimately
18   calls the shots for the captive.  Is that true
19   with respect to Mr. Dondero and Ellington and
20   Sentinel that they are the ones ultimately calling
21   the shots for Sentinel?"
22       "MR. Weldon:  Objection."
23       "MR. BURT:  You can answer."
24       "MR. WELDON:  You may answer."
25       "THE WITNESS:  To the best of our

313

1  knowledge that is correct."
2       That was the question that you were asked
3  and that was the answer that you gave earlier
4  today, isn't that right?
5     A  That's correct.
6     Q  And you also said that you hadn't seen any
7  documents where Messrs Dondero and Ellington were
8  making decisions.
9       I would like to pull up Exhibit 116 again
10 and go to the second attachment, which is the
11 Sentinel Advisory Committee discussions signed by
12 Mr. Ellington, recording member, do you see that?
13    A  I do.
14    Q  Do you recall seeing this document earlier
15 today?
16    A  I do.
17    Q  And do you recall testifying that these
18 committee discussions were never provided to
19 Beecher?
20    A  That is correct.
21    MR. BURT:  That's all I have.
22    MR. WELDON:  I am done.
23    THE VIDEOGRAPHER:  This marks Day 1 of the
24 deposition of Thomas Adamczak, we are going off
25 the record at 6:19 p.m.

314

1       (End of videotaped proceedings.)
2       MS. REPORTER:  You are getting a rough
3  draft and five-day delivery.
4       MR. BURT:  Yes.
5       MR. WELDON:  And we will read and sign,
6  right?
7       MS. REPORTER:  Do you get a rough draft as
8  well?
9       MR. WELDON:  They are paying.
10      MR. BURT:  I just don't know.
11      MS. REPORTER:  My office will contact
12 you.
13      (WHICH WERE ALL OF THE PROCEEDINGS HAD OR
14      TAKEN PLACE IN THE ABOVE-ENTITLED MATTER.)
15
16
17
18
19
20
21
22
23
24
25

315

1  STATE OF ILLINOIS)
2       ) SS.
3  COUNTY OF DUPAGE )
4       I, STEPHANIE A. BATTAGLIA, CSR and
5  Notary Public in and for the County of DuPage and
6  State of Illinois, do hereby certify that on
7  April 12, 2022, at 9:06 a.m., at 156 College
8  Street, Suite 301, Burlington, Vermont the
9  deponent THOMAS ADAMCZAK, 30(b)(6) personally
10 appeared before me.
11      I further certify that the said THOMAS
12 ADAMCZAK, 30(b)(6) was by me first duly sworn to
13 testify and that the foregoing is a true record of
14 the testimony given by the witness.
15      I further certify that the deposition was
16 terminated at 6:19 p.m.
17      I further certify that I am not counsel
18 for nor related to any of the parties herein, nor
19 am I interested in the outcome hereof.
20      In witness whereof, I have hereunto set
21 my hand and seal of office this  of April,
22 2022.
23
24            Notary Public
25 CSR No. 084-003337 - Expiration Date: 5/31/2023