

# Transcript of James Seery, Jr.

**Date:** August 5, 2022
**Case:** UBS Securities LLC, et al. -v- Highland Capital Management, L.P.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

## 1

1    IN THE UNITED STATES BANKRUPTCY COURT

2    FOR THE NORTHERN DISTRICT OF TEXAS

3    DALLAS DIVISION

4    --------------------------------X

5    In re

6    HIGHLAND CAPITAL MANAGEMENT, L.P.,

7    Debtor,

8    --------------------------------X

9    UBS SECURITIES LLC and UBS AG
     LONDON BRANCH,
10           Plaintiffs,    : Chapter 11
                            Case No.:
11   vs.                    :
                            19-34054-SGJ11
12   HIGHLAND CAPITAL MANAGEMENT,    :

13   L.P.,                   :

14           Defendant.     :

15   --------------------------------X

16

17   REMOTE VIDEOTAPED Deposition of James Seery, Jr.

18           Friday, August 5, 2022

19               2:07 p.m.

20

21

22

23   Job No.: 458868

24   Pages 1-136

25   Reported by: Angela (Angie) Shaw-Crockett, CRR, RMR

## 2

1        REMOTE VIDEOTAPED Deposition of James Seery, Jr.,

2    held at:

3

4

5

6

7

8

9        Pursuant to Notice, before Angela (Angie)

10   Shaw-Crockett, CRR, RMR, Notary Public in and for the

11   states of New York, New Jersey and Connecticut.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## 3

1        A P P E A R A N C E S

2    ON BEHALF OF THE PLAINTIFFS, UBS SECURITIES

3    LLC:

4        ANDREW CLUBOK, ESQUIRE

5        SHANNON McLAUGHLIN, ESQUIRE

6        LATHAM & WATKINS LLP

7        555 Eleventh Street, NW

8        Suite 1000

9        Washington, District of Columbia  20004-1304

10       202-637-2200

11

12   ON BEHALF OF THE DEFENDANT, HIGHLAND CAPITAL

13   MANAGEMENT, L.P.,:

14       JOHN MORRIS, ESQUIRE

15       GREGORY DEMO, ESQUIRE

16       PACHULSKI STANG ZIEHL & JONES LLP

17       780 Third Avenue

18       34th Floor

19       New York, New York  10017-2024

20       212-561-7700

21

22   ALSO PRESENT:  Harold Rodriguez, Planet Depos Tech

23               Enrique Casas, The Videographer

24

25

## 4

1            I N D E X

2    Examination of:
     Page
3    James Seery, Jr.

4

5            C O N T E N T S

6    MR. CLUBOK                                    7

7            E X H I B I T S

8        (Retained by the Planet Depos)

9    DEPOSITION    EXHIBIT                    PAGE

10   Exhibit 69   UBS's First Request for Production   29
               of Documents to Debtor Highland
11             Capital Management, L.P.

12   Exhibit 149 Debtor's Motion for Entry of an   33
               Order Approving Settlement with UBS
13
     Exhibit 150 Highland's Amended Responses and   36
14             Objections to UBS's Requests for
               Admission
15
     Exhibit 151 an email chain with the top email   38
16             dated August 5, 2020, from Mr. Seery
               to Mr. Leventon, copying Scott
17             Ellington with the subject UBS
               Supplemental Information Request
18
     Exhibit 48  Settlement Analysis                44
19
     Exhibit 152 Letter to HFP from January 20, 2009   46
20
     Exhibit 153 February 4, 2009 letter to CDO   47
21             Opportunity Fund Investors

22   Exhibit 73  Email dated August 21, 2020        56

23   Exhibit 154 Email thread                       64

24   Exhibit 155 Letter dated September 16, 2020    77

25

**Page 5**

```
1           E X H I B I T S  (CONT'D)
2           (Retained by Planet Depos )
3  Exhibit 156 Email exchange around January 2021    83
4  Exhibit 57  Email exchange between Isaac          90
              Leventon and Chris Dunn
5
   Exhibit 2   Purchase agreement dated August 7,    100
6              2017
7  Exhibit 3   Memo from Shawn Raver to Rick         106
              Swadley regarding the policy
8
   Exhibit 157 Email from Jason Post to Sarah        109
9              Goldsmith that attaches a copy of
              the Highland Capital Management
10             Compliance Manual
11 Exhibit 158 Document October 2017                 113
12 Exhibit 159 Document dated January 10, 2020       114
13 Exhibit 160 Document dated January 8, 2021        116
14 Exhibit 161 April 28, 2021 letter                 118
15 Exhibit 162 First formal written response Mr.     121
              Seery received in response to his
16             demand
17 Exhibit 163 Letter that the director sent to      122
              James Seery personally and at
18             Highland Capital Management as
              opposed to CDO Fund
19
   Exhibit 164 A letter from Walkers                 125
20
   Exhibit 165 WALKERS two-page document             126
21
   Exhibit 167 Another email exchange that was in    127
22             early February 2021
23 Exhibit 166 Email exchange in late January of     128
              2021 with Matt DiOrio and Mr. Romey
24             and Mr. DiOrio
25
```

**Page 6**

1 PLANET DEPOS TECH: Thank you to everyone
2 for attending this proceeding remotely, which we
3 anticipate will run smoothly. Please remember to
4 speak slowly and do your best not to talk over one
5 another. Please be aware that we're recording this
6 proceeding for backup purposes. Any off-the-record
7 discussions should be had away from the computer.
8 Please remember to mute your mic for those
9 conversations. Please have your video enabled to help
10 the reporter identify who is speaking. If you are
11 unable to connect with video and are connecting via
12 phone, please identify yourself each time before
13 speaking. I apologize in advance for any
14 technical-related interruptions. Thank you.
15 THE VIDEOGRAPHER: Here begins disk number
16 one in the remote video deposition of James Seery,
17 Jr., in the matter of UBS Securities LLC, et al.,
18 versus Highland Capital Management, L.P., in the
19 United States Bankruptcy Court for the Northern
20 District of Texas, Dallas Division, case number
21 19-34054-SGJ11.
22 Today's date is August 5, 2022. The time
23 on the video monitor is 2:07 p.m. The remote
24 videographer today is Enrique Casas representing
25 Planet Depos. All parties of this video deposition

**Page 7**

1 are attending remotely.
2 Would counsel please voice identify
3 themselves and state who they represent.
4 MR. CLUBOK: On behalf half of UBS, this is
5 Andrew Clubok and Shannon McLaughlin from
6 Latham~&~Watkins LLP.
7 MR. MORRIS: And it's John Morris and Greg
8 Demo from Pachulski Stang Ziehl & Jones for Highland
9 Capital Management, L.P., and we're representing the
10 witness today, Mr. Jim Seery, in his individual
11 capacity.
12 THE VIDEOGRAPHER: The court reporter today
13 is Angie~Shaw representing Planet Depos.
14 Would the reporter please swear in the
15 witness.
16 James Seery, Jr., having been duly REMOTELY sworn,
17 testified as follows:
18 EXAMINATION
19 BY MR. CLUBOK:
20 Q Good afternoon. Could you introduce
21 yourself please.
22 **A Hi, my name is James Seery.**
23 Q Mr. Seery, you are a licensed attorney in
24 New York?
25 **A I am a licensed attorney. My registration**

**Page 8**

1 **is currently in hiatus or retirement or something like**
2 **that, but I do pay every year my annual fee.**
3 Q Okay. And are you currently employed?
4 **A I am, yes.**
5 Q By whom?
6 **A I am the CEO of Highland Capital Management**
7 **Limited Partnership.**
8 Q Can you very briefly walk through your
9 education and prior job experience, just a summary
10 version?
11 **A Undergraduate BA, JD. Started in real**
12 **estate restructuring as a paralegal in '88, prior to**
13 **graduating from law school in '90. I was a**
14 **restructuring finance attorney from 1990 to 1999. I**
15 **joined Lehman Brothers on the business side. At**
16 **Lehman Brothers, I ran a distressed -- ultimately**
17 **running the loan business globally, and then I --**
18 **after Lehman Brothers, we -- I went back to law for a**
19 **couple of years, and then I went to run the**
20 **restructuring business in New York. And then I went**
21 **to a hedge fund that we started with some Mexican**
22 **partners. And we were there from 2000 and --**
23 **beginning of 2012 until the end of 2017 or '18. And**
24 **then I was at Guggenheim Securities building a credit**
25 **business for a couple of years and became an**

**9**

1 independent director at Highland in January of 19 --
2 2020, mid 2020. The court approved me as a CEO of
3 Highland and Chief Restructuring Officer and took on,
4 through the bankruptcy, and now the CEO of the
5 reorganized entity.
6    Q  And what is the business of the reorganized
7 entity?
8    A  The reorganized entity is an asset manager,
9 but does own assets as well. And its business is part
10 of a liquidating trust of which I am the
11 liquidating -- or I am the claimant trustee. And in
12 that capacity, we are monetizing the assets that
13 Highland has in both its individual ownership capacity
14 as well as its management of certain funds.
15    Q  You mentioned that Highland Capital
16 Management is a limited partnership. Who is the
17 general partner?
18    A  It's a newly-formed general partner that is
19 owned by the claimant trust and all of the limited
20 partnership interest in Highland are also owned by the
21 claimant trust.
22    Q  And prior to the restructuring the general
23 partner of HCM was Strand Advisors?
24    A  That's correct.
25    Q  And what was your connection to Strand

**10**

1 Advisors?
2    A  Because it was a limited partnership, we
3 came in as independent directors who became
4 independent directors at Strand. Strand, as the GP,
5 had the ability to control and manage the limited
6 partnership of Highland Capital Management.
7    Q  Okay. And Highland Capital Management
8 filed for Chapter 11 relief in late 2019?
9    A  October 16, 2019.
10    Q  You I think said that you thereafter,
11 sometime in approximately January of 2020, became one
12 of three independent directors of Strand Advisors?
13    A  That's correct. January 9, 2020.
14    Q  What connection does Strand have to the
15 current entity?
16    A  None.
17    Q  Prior to 2020, had you ever done any work
18 for Strand or HCM?
19    A  No.
20    Q  Now your appointment as independent
21 director I think you said was approved by the court.
22 But that was the product of an agreement between the
23 committee of the unsecured creditors and Highland
24 Capital Management's then president and CEO, Jim
25 Dondero; is that correct?

**11**

1    A  That's correct. I should point out that
2 while I was at Lehman Brothers, Lehman Brothers did do
3 business with Highland Capital Management.
4    Q  Okay. Had you met Jim Dondero before?
5    A  Yes.
6    Q  When was the last time --
7    A  Before the bankruptcy, meaning before
8 this --
9    Q  Yeah, before the bankruptcy?
10    A  I think it would have been 2007 maybe once.
11    Q  Okay. So roughly a dozen years or so
12 before the bankruptcy?
13    A  Correct.
14    Q  Okay. As independent director, what were
15 your responsibilities?
16    A  As independent directors, the -- all three
17 were to manage the enterprise Highland Capital
18 Management in the bankruptcy, with Mr. Dondero having
19 been removed as CEO and president. He maintains
20 simply a portfolio management position, but we were
21 doing it remotely. So it would be incorrect to think
22 that we would have managed every aspect of Highland's
23 business at the time when it had shared offices with
24 Mr.~Dondero who was still on the premises running his
25 other businesses. And because of the shared service

**12**

1 arrangements, Highland Capital employees performed
2 numerous services for all of those other businesses.
3    Q  And who were -- were there anybody -- were
4 there any employees of Highland who reported to the
5 independent directors?
6    A  Directly or indirectly all of them did.
7    Q  Okay. And did that include Jim Dondero
8 while he stayed on?
9    A  Really, technically I think yes, but he was
10 a portfolio manager and he really didn't report to the
11 board effectively. I think technically he was
12 required to and the board could remove him, but he
13 really didn't take direction from the board.
14    Q  Okay. And I think you testified that your
15 role changed a little bit over time. You became the
16 CEO and Chief Restructuring Officer in mid 2020?
17    A  That's correct.
18    Q  And, again, the bankruptcy court approved
19 those appointments?
20    A  Yes.
21    Q  What led to your appointment of those
22 positions? Strike that.
23    What led to you being appointed to those
24 positions?
25    A  It was really a determination by the board

13

1 that a triamvirate was not the right way to try to
2 manage the business, particularly because of COVID.
3 We were working remotely and someone had to be the
4 point person. And based on my experience, I became
5 the de facto CEO and then appointed to the CEO and
6 chief restructuring role.
7     Q   And did your -- strike that.
8         I think you have testified in the past
9 about your duties and responsibilities as CEO and CRO.
10 I'm going to ask you if I have this list generally
11 correct.
12        Is it the case that as CEO and CRO, you
13 directed Highland Capital Management's day-to-day
14 ordinary course operations, oversaw Highland Capital
15 Management's personnel, made management decisions with
16 respect to HCM's training operations, directed HCM's
17 reorganization efforts, monetized HCM's assets,
18 oversaw the claims objection resolution process, and
19 led the process towards the confirmation of the
20 Chapter 11 plan?
21     A   That's correct, with the caveat that it was
22 done with the approval of the oversight board and
23 often in conjunction with the oversight board, as well
24 as with the management ex Mr. Dondero of Highland
25 Capital at the time.

14

1     Q   By the way, there was one other title that
2 I think you had. Foreign representative. Do you know
3 what that refers to?
4     A   I believe I was put in as foreign
5 representative so that I could also manage the foreign
6 entities that Highland had, to the extent that that
7 was required.
8         (Reporter interruption.)
9         MR. CLUBOK: Yeah, Jim, your voice was
10 fading out a little bit. When you moved closer, it
11 got better so if you could stay a little closer that's
12 much better.
13        THE WITNESS: All right.
14 BY MR. CLUBOK:
15     Q   So with respect to foreign representatives,
16 were there particular countries that that was relevant
17 to?
18     A   Highland had subsidiaries in a number of
19 different countries. Generally operate funds, not
20 necessarily operating companies. But those included
21 Caymans, Bermuda, indirectly Guernsey, Singapore; and
22 Brazil.
23     Q   Were there Highland employees who
24 specifically dealt with the foreign funds like the
25 Cayman's funds?

15

1     A   Typically, the legal department dealt with
2 the foreign funds. That didn't mean they were all
3 lawyers, but they worked in the legal department.
4     Q   In any of your roles in connection with
5 Highland, have you had any responsibilities with
6 respect to an entity that we've referred to as
7 Multi-Strat?
8     A   Yes.
9     Q   And can you describe that please?
10     A   Multi-Strat is a fund that Highland formed,
11 that Highland is the portfolio manager of. So as the
12 CEO at Highland, I would be responsible for directing
13 the efforts of Highland with respect to its role as
14 the manager of Multi-Strat.
15     Q   Did you rely on anybody at Highland to
16 assist you in managing Multi-Strat?
17     A   Yes. All of them, the management team at
18 Highland were involved in the day-to-day operations of
19 Highland.
20     Q   And would that also include the legal
21 department?
22     A   Yes.
23     Q   What about CDO Fund. What were your
24 responsibilities in connection with CDO Fund, if any?
25     A   CDO Fund, we really didn't have any

16

1 responsibilities. We believed that CDO Fund had no
2 assets and was simply a shell entity. And we believed
3 that, because that's what the legal department at
4 Highland told us. So we really didn't need to take up
5 any actions with respect to CDO Fund until
6 January 2021 when we discovered that what we'd been
7 advised was incorrect.
8     Q   Okay. Thank you. We'll come back to that
9 a little more. What about an entity that's referred
10 to as SOHC?
11     A   Similar. SOHC is a subsidiary of an entity
12 called HFP, Highland Financial Partners, which was
13 also a limited partnership. That entity, we actually
14 did not have control of, notwithstanding owning the
15 GP. So we had only -- certainly had all of the
16 ownership interest in that from the GP perspective
17 entity. The LPs were a mixture of various entities,
18 including complete third parties, but it had an
19 unusual structure with a board that was able to
20 control that entity completely.
21        Most of the case, we didn't have any
22 dealings because, again, HFP was described to us as
23 being a completely valueless entity that had had lost
24 all value during the financial crisis and with respect
25 to the judgments that UBS had against its

17

1   subsidiaries.  So there really was nothing to do until
2   we really found out more about what would happen in
3   January of 2021.  And then we realized we really
4   couldn't even control HFP because it was odd for its
5   structure.
6       Q   Does HFP still have a board?
7       A   It did have a board until relatively
8   recently.  It had one member which was Jim Dondero.
9   And ultimately he indicated he resigned.  And because
10  of the structure, we'd taken outside counsel's advice
11  on this.  It's -- it would be really difficult to try
12  to replace that board because you need the limited
13  partners, all of whom are long gone.
14      Q   I'm going back to this in more detail later
15  on in the deposition, but you've said a couple of
16  times with respect to CDO Fund and SOHC/HFP that you
17  were advised that these entities had lost all value
18  during the financial crisis and basically had no
19  remaining value.  Who advised you of that?
20      A   That would have been Mr. Leventon and
21  Mr. Ellington.  I'm not sure if Frank Waterhouse, the
22  CFO, was involved in those discussions either.  I'd be
23  guessing.  I just don't recall him specifically.  The
24  conversations with Ellington, Leventon were numerous
25  and specific.  And then other members of the legal

18

1   department were in and around those conversations and
2   those would include JP Sevilla, Matt DiOrio and Katie
3   Irving.
4       Q   Okay.  Thank you.  And, again, we'll come
5   back in a little more detail shortly.
6           I want to talk briefly about UBS's claim in
7   the bankruptcy, sort of why we're here.
8           You do recall that shortly after you were
9   appointed as independent director, the New York court
10  entered a judgment in UBS's favor for over a billion
11  dollars against CDO Fund and SOHC, correct?
12      A   Yes, I do.
13      Q   And did you -- were you aware that although
14  the judgment was entered February 10, 2020, there had
15  already been a decision that had been released, at
16  least to the parties, that anticipated that judgment
17  and that decision has been released in November of
18  2019?
19      A   I was aware of that, yes.
20      Q   So fair to say that by the time you
21  became -- or shortly after the time you became
22  appointed to the role of independent director, you
23  were aware of this impending judgment of over a
24  billion dollars?
25      A   Before I became appointed.

19

1       Q   Okay.  So even -- I guess before you became
2   appointed, you did some due diligence and you met with
3   members of the unsecured committee maybe, did due
4   diligence, and folks met with you and discussed the
5   matters relating to the bankruptcy with you?
6           MR. MORRIS:  Objection to the form of the
7   question.
8       A   That's correct.
9       Q   Okay.
10          MR. CLUBOK:  Yeah, thanks, John.  Let me --
11  I'll ask it with slightly more English if I can.
12  BY MR. CLUBOK:
13      Q   So prior to being appointed as independent
14  director, fair to say you investigated some of the
15  facts relating to the bankruptcy and the potential
16  claims?
17      A   Yes.
18      Q   And in the course of those -- when did you
19  first start that conversation?
20      A   Very shortly before I was appointed, so
21  sometime in the week of -- the week of or right before
22  January 9.
23      Q   Okay.  And during those -- and during those
24  discussions, had you -- you spoke with members of the
25  creditors' committee?

20

1       A   I don't recall if I spoke to members.  I
2   certainly spoke to creditors' committee counsel, some
3   of the members' counsel.
4       Q   And did you also speak with representatives
5   of the debtor or --
6       A   Yes.
7       Q   And fair -- did you learn about the
8   billion-dollar judgment from representatives of the
9   debtor prior to becoming an independent director?
10      A   I don't recall from whom I learned it.
11      Q   Okay.  But it was well understood by you
12  that there was this impending billion-dollar judgment
13  even before you took on your role as independent
14  director?
15      A   Absolutely.  It was well understood by
16  everybody, meaning both the debtor representatives and
17  the committee representatives, as well as the
18  creditors' committee member representatives.
19      Q   Okay.  So once you assumed your role, fair
20  to say you -- one of your main responsibilities or
21  certainly a significant responsibility was to review
22  UBS's claim?
23      A   That's correct.  It was the entire
24  independent board, but there weren't that many claims.
25  And, obviously, there's two sides to the equation

---

21

1 here. There's the assets and then there's the
2 liabilities. And so understanding what the assets
3 are, were, and what they could be, versus what the
4 claim pool could be, was an essential and critical
5 role for the independent board, including myself.
6      Q   And just to situate this, UBS's claim is
7 ultimately filed on June 26, 2020. But fair to say
8 that the independent board's initial investigation of
9 that claim and the defenses and potential liabilities
10 of the debtor and its funds began at least as early as
11 January of 2020?
12     A   Absolutely. On January 9.
13     Q   As part of the effort to fully educate
14 yourself about UBS's bankruptcy claim, did you ask
15 people at Highland to provide you with detailed
16 information regarding the history of the dispute?
17     A   Yes.
18     Q   And who did you instruct specifically with
19 respect to gathering information so that you could
20 fully understand UBS's claims?
21     A   The main people, Mr. Ellington and
22 Mr. Leventon. Mr. Leventon's primary role, as far as
23 I could tell, at Highland for the previous number of
24 years, was dealing with the UBS claim.
25     Q   You came to understand that Mr. Leventon

---

22

1 had been the day-to-day point person for dealing with
2 all things related to the UBS claim?
3      A   Yes. Other than settlement discussions,
4 which were exclusive purview of Mr. Ellington at
5 direction and in coordination with Mr. Dondero.
6      Q   Speaking of Mr. Dondero, I take it that he
7 was also a source of information to the independent
8 board regarding the UBS dispute?
9      A   He was but not very much. He was just
10 dismissive of it and didn't provide any real detail.
11     Q   Did you --
12     A   At that time, in first half of 2020.
13     Q   Sure. And in the first half of 2020 while
14 Mr. Dondero was still -- during the first half of
15 2020, Mr. Dondero was still actively engaged with HCM
16 as portfolio manager?
17     A   The answer is yes. It's unclear exactly
18 what he was doing. And certainly managing for the
19 first quarter the select fund until that would -- with
20 Joe Sowin, of HCFMA, and (indiscernible) Rudolph. And
21 then I stepped in with Mr. Sowin to manage out of the
22 marching clauses with Jefferies. And I'm not sure
23 what else Mr. Dondero was precisely doing. But
24 Highland had -- Highland empire had two halfs. It was
25 the HCMLP half and then Mr. Dondero's other entities,

---

23

1 which were roughly 70 employees shy. And so once
2 COVID came in in March, most of the Highland employees
3 that were under -- HCMLP employees that were working
4 remotely, most of the time Mr. Dondero's other half
5 were coming in the office and Mr. Dondero was largely
6 in the office is what we've been told. I didn't go to
7 Dallas during the rest of that year.
8      Q   Fair to say that regardless of what
9 Mr. Dondero actually did, you expected him to be fully
10 engaged to assist in whatever ways you needed during
11 that first half of 2020?
12     A   Certainly. He was -- he had the most to
13 gain or lose by the bankruptcy and expected him to be
14 active in assisting in his resolution.
15     Q   And based on the -- is it fair to say that
16 the information that Mr. Ellington, Mr. Leventon, and
17 others at Highland, including Mr. Dondero to the
18 extent he provided some information about the UBS
19 claim, helped you form your opinion upon the merits of
20 that claim?
21     A   Certainly that was part of it. I did a
22 significant amount of independent work reviewing the
23 documents, how the transaction was structured, the
24 various margin calls, the restructuring of the
25 transaction. And then my analysis of the documents

---

24

1 was then further informed by Ellington, Leventon,
2 Sevilla, the rest of the team, including the detailed
3 presentations before COVID came in in the Highland
4 office. Also, we had -- obviously had outside counsel
5 involved in that analysis, as well.
6      Q   And in that first half of 2020, did you
7 have any reason to doubt the legitimacy or the
8 accuracy of the information that these former Highland
9 Capital Management employees were providing to you
10 regarding UBS's claims?
11     A   No. In fact, I was consistent with what
12 they said all. All of them said similar things. They
13 provided detailed structural information, they
14 provided PowerPoint presentations on how the
15 transactions worked, what the prior litigation history
16 had been for the last -- I guess at that point
17 seven-plus years. It's actually more like -- I think
18 it's closer to ten years. And there's no reason for
19 us to -- me or the rest of the board to doubt the
20 specifics of the details they were providing.
21     Q   And in reliance of the information they
22 provided you, along with the other work that you did,
23 did you form an initial opinion about the merits of
24 UBS's claim?
25     A   Yes.

---

**25**

1 Q And what was that?
2 A I didn't think it was a good claim against
3 Highland. When I say "Highland," I mean HCMLP, the
4 debtor.
5 Q And that would include taking into account
6 actions that Mr. Dondero may or may not have done on
7 behalf of Highland?
8 MR. MORRIS: Objection to the form of the
9 question.
10 A I'm not quite sure I understand.
11 BY MR. CLUBOK:
12 Q Okay. I'll ask again.
13 So you said you didn't think it was a good
14 claim against Highland. And in forming that opinion,
15 I take it you considered whether or not Mr. Dondero's
16 actions as the head of Highland -- to the extent you
17 understood what his actions had been -- sorry. I
18 think that was the end of the question, but I made it
19 seem like I was pausing, so let me ask it again.
20 A Okay. I got it.
21 Q Yeah, I'll ask the question.
22 A To the extent -- to the extent we were
23 familiar with what his actions were, so what we knew
24 of, meaning margin calls, trying to negotiate with
25 UBS, and failing to meet margin calls, some of the

---

**26**

1 transactions, intercompany transactions between
2 different affiliates and moving assets around, to some
3 degree to try to satisfy some of the requirements of
4 the structure, meaning the financing structure that
5 was in place with UBS, we had considered those
6 actions, yes.
7 And we didn't see them as negative to our
8 view of what the transaction documents required, what
9 the law would require, and what the validity of UBS's
10 claim was at the time.
11 Q And you understood that part of UBS's
12 claims included claims for breach of implied covenant
13 of good faith and fair dealing?
14 A That's correct.
15 Q And you also understood that UBS's claims
16 involved claims relating to alleged fraudulent
17 transfers?
18 A Yes.
19 Q And you understood that UBS's claims also
20 involved claims relating to alterego, specifically how
21 Mr. Dondero may have commingled assets or treated
22 different affiliates as one major affiliate for
23 purposes of dealing with UBS?
24 A Yes.
25 Q And with respect to all of those elements

---

**27**

1 of UBS's claims, you -- your opinion that UBS's claims
2 may lack merit was formed in large part because of the
3 information you received from the then Highland
4 Capital Management employees?
5 A Yeah. I would say material part. So the
6 documents obviously and our analysis of the law and
7 the pattern and practice in terms of dealing with
8 the -- with the structure of the transaction, as well
9 as our analysis of the ten years of litigation, which
10 largely came from Mr. Leventon. That certainly helped
11 form our opinion.
12 Q And it's fair to say that you later came to
13 learn more information that affected your view of the
14 potential merits of the UBS claims?
15 A That's fair, yes.
16 Q And what specifically caused your change in
17 the view about the merits of UBS's claims?
18 A Well, two things, and they evolved.
19 The first part was during a mediation in
20 the early fall of 2020 and just hearing a
21 third-party's perspective on some of the risks. In
22 particular, the risks related to Multi-Strat and the
23 fraudulent conveyance actions against Multi-Strat
24 certainly helped inform my opinion and my opinion as
25 well of the risks with respect to those claims.

---

**28**

1 And then in January of 2021, we learned
2 that, in fact, notwithstanding what we'd been
3 previously told, that the subsidiaries that you asked
4 about earlier had had somewhere between 100- and
5 $300 million of assets and those assets were secretly
6 moved out of those subsidiaries, even though they were
7 counterparts of UBS. And those were secreted into the
8 Cayman Islands in exchange for what we thought was a
9 very strange contractual arrangement.
10 Q And that information caused you to reassess
11 the potential merits of UBS's claims for breach of
12 implied covenant of good faith and fair dealing, its
13 alterego claims, and its fraudulent conveyance claims,
14 correct?
15 A Yeah. Certainly the board which was active
16 through the mediation. I think the other members of
17 the board, it would be fair to say, were more cautious
18 about the risks of the litigation perhaps than I was.
19 And I think that we moved towards a settlement based
20 upon those -- those views when we were in the process
21 of reaching a settlement which was acceptable to all
22 board members, including myself.
23 We learned of these other facts which we
24 then disclosed to UBS. And those certainly materially
25 changed our -- my view. I think with the risks that

---

**29**

1  we learned of in the mediation, it included some of
2  the things, perhaps, that we found later. But they
3  were more conjecture at that point as opposed to any
4  hard facts.
5      Q   Is it fair to say that members of Highland
6  Capital Management's legal team covered up, in your
7  opinion, critical information that would have allowed
8  you to fully assess the merits of UBS's claims?
9      A   I think I can now say that without any
10 equivocation at all. It was covered up and it was
11 coordinated and it involved several people, including
12 Mr. Dondero, Mr. Ellington, Mr. Leventon, Mr. Sevilla,
13 Ms. Irving. And it looks to me like Ms. Vitiello.
14     Q   Okay. Well, let's talk about that a little
15 more specifically. If you could turn in your binder
16 to Tab~1.
17         Tab~1 has Exhibit 69.
18         (Deposition Exhibit 69 was received and
19 marked for identification, as of this date.)
20 BY MR. CLUBOK:
21     Q   Exhibit 69 are UBS's First Request for
22 Production of Documents to Debtor Highland Capital
23 Management, issued in connection with the
24 restructuring. Do you see that?
25     A   Yes.

---

**30**

1      Q   And I want to draw your attention to
2  requests eight and nine, which start -- looks like the
3  pages may not may be not numbered, but you can flip
4  forward until you get to Request 8?
5      A   Yes, I'm there.
6      Q   Here we go. We've got it up on the screen
7  as well. And Request 8 asks for: All documents
8  pertaining to the assets and liabilities of HFP, CDO
9  Fund, and SOHC, including but not limited to -- and
10 then it lists a number of specific requests related to
11 this general request. Do you see that?
12     A   Yes.
13     Q   And you can see that it's clear that the
14 information sought was being sought -- historic --
15 being sought over a period that ranged from, you know,
16 about a dozen years prior through the present,
17 correct?
18     A   That's correct.
19     Q   And generally speaking, did you understand
20 that what UBS was asking for was the complete
21 financial picture of the assets of these funds -- HFP,
22 CDO Fund, SOHC -- from the time of the original
23 dispute through the present?
24     A   That's very clear, yes.
25     Q   And did you -- what did you do with these

---

**31**

1  requests?
2      A   Well, they came in through counsel and we
3  began trying to respond to them with outside counsel
4  and with the legal department.
5      Q   And is it true you tasked the in-house
6  legal team with coming up with the substantive
7  responses to UBS's discovery requests?
8      A   Certainly. I think the -- the specifics
9  are that this was in and around the time of the
10 mediation and it was a pretty voluminous request.
11         So we sought to hone it to get the most
12 critical information first and then we could expand
13 out from that. But it was with the legal department's
14 assistance that had been doing this with UBS for some
15 time and, obviously, familiar with what Highland's
16 systems and the information that's requested.
17     Q   And in words or substance without giving
18 the exact words, but the gist of what you conveyed to
19 the legal team was to prepare or provide information
20 that would paint an accurate picture of the finances
21 and the assets and liabilities of these funds dating
22 back to the original dispute through the present,
23 correct?
24     A   I don't know if that's fair. I would
25 have -- I would have just said this is voluminous.

---

**32**

1  It's critical. Let's get them the most important
2  stuff first, work with outside counsel on getting that
3  done. The most important things would have been what
4  I think are the obvious is the judgment debtor's CDO
5  Fund, SOHC, and any of those subsidiaries, and put
6  that information together and provide it.
7          I wouldn't have been the one looking
8  through each of items and then checking Highland's
9  computer system to see what's available on its files.
10     Q   Sure. But your direction then was to
11 provide the most important information as quickly as
12 possible that UBS is legitimately seeking in
13 connection with these requests?
14         MR. MORRIS: Objection to the form of the
15 question.
16     A   Yeah, better to say let's put together as
17 much as of the information as we can, give it to
18 outside counsel, and then let them determine what's
19 the appropriate thing we're supposed to do. But we're
20 going to have to produce some degree of information
21 that's requested. It would have been -- I would not
22 have thought there would have been in a way to say
23 (indiscernible).
24 BY MR. CLUBOK:
25     Q   Did you in words or substance instruct the

---

---

**33**

1  legal team to not provide anything that was being
2  requested?
3      A   No, never.
4      Q   Did you --
5      A   But I wouldn't have had them provide it
6  directly to UBS, to Latham.  I would have had them to
7  provide it to Pachulski.
8      Q   Okay.  Fair enough.  So let me maybe just
9  rephrase it.
10         You tasked the legal team with gathering
11 the information so that you could turn it over to your
12 outside counsel who would then figure out what was
13 appropriate to provide from what was gathered by the
14 in-house legal team?
15     A   Just to be very specific, I don't recall
16 the actual words or the conversation.  But I typically
17 would do and I believe I did in this instance was say
18 to an attorney at Pachulski and to Isaac Leventon,
19 take a look at this, start working on these docs,
20 we're going to need to prepare something.
21     Q   Let me -- actually, if you turn to Tab 52,
22 just to refresh your recollection.
23         (Deposition Exhibit 149 was received and
24 marked for identification, as of this date.)
25 BY MR. CLUBOK:

---

**34**

1      Q   This is the 9019 motion that the debtor
2  filed in connection with the settlement through UBS.
3          And I'd just refer you to paragraph 8.
4          MR. MORRIS:  I'm sorry.  Which exhibit are
5  you on?
6          MR. CLUBOK:  It's Tab~52.  It is the
7  Debtor's Motion for Entry of an Order Approving
8  Settlement with UBS.
9          MR. MORRIS:  Yes, thank you.
10         MR. CLUBOK:  It's 52 in your binder.
11         I guess -- do we have a deposition exhibit
12 number for this, Shannon?  We'll get the next number.
13 We'll find out the next exhibit number that we should
14 use and we'll mark it as such.
15 BY MR. CLUBOK:
16     Q   But for now, if you can look at the 9019
17 motion.
18         MR. CLUBOK:  Oh, it looks like Exhibit 149.
19 We'll mark this as Exhibit 149.
20 BY MR. CLUBOK:
21     Q   And Exhibit 149 is the Debtor's Motion for
22 Entry of an Order Approving the Settlement with UBS
23 Securities.
24         If you look at paragraph 8, page five.
25     A   Yes.

---

**35**

1      Q   Is it fair to say that you tasked the
2  debtor's in-house legal team with providing the
3  responses to UBS's discovery requests, at least to
4  your outside counsel, so that they could then pass
5  them on to UBS?
6      A   That's correct.  I think that's consistent
7  with what I said.  It would have been the outside
8  working with the legal team.
9      Q   Right.  And who, in particular, did you
10 rely upon for providing the responses to UBS's
11 discovery requests?
12     A   Specifically Mr. Ellington and
13 Mr. Leventon.
14     Q   Was Stephanie Vitiello involved at all?
15     A   I don't recall her being specifically
16 involved.  I do see her on some of the emails and the
17 materials that I sent over which I took a skim of.
18     Q   Did you ever, in words or substance, tell
19 Mr. Leventon to -- only to identify the assets that
20 were in the funds in May of 2009 and answer the
21 question what happened to those assets and where are
22 they today.  Did you ever limit his task in that way?
23     A   No, that would be absurd.
24     Q   You came to believe -- well, after this
25 collection process and providing the documents to your

---

**36**

1  outside counsel, there was a production made to UBS
2  that I think was completed by -- about the end of
3  October 2020; is that correct?
4      A   That's my recollection.  I believe it was a
5  bit of a rolling production.
6      Q   Right.  And if you look at Tab~51, which --
7  or the requests, Highland's Responses and Objections
8  to UBS's Requests for Admission, we'll mark that as
9  Exhibit 150.
10         (Deposition Exhibit 150 was received and
11 marked for identification, as of this date.)
12 BY MR. CLUBOK:
13     Q   I think it's -- if you look at No. 33, at
14 least at some point whether you remember the date or
15 not, fair to say that Highland represented to UBS that
16 discovery was substantially complete in response to
17 this document request that's been identified as
18 Exhibit 69 [sic]?
19     A   I believe that's --
20         MR. MORRIS:  I apologize for interrupting,
21 but I just do want to point out that this particular
22 document is dated September 2021.  I don't know if you
23 want to think about your question at all, but this is
24 at least dated September 2021, which would have been
25 nine months after Mr. Ellington and Mr. Leventon left

---

---

37

1  Highland.
2       MR. CLUBOK: Right. I guess maybe my
3  question was unclear.
4  BY MR. CLUBOK:
5     Q   Back in October of 2020 while Ellington and
6  Leventon were still at Highland and had responded to
7  your tasking with respect to responding to the UBS
8  document production, isn't it true that based on what
9  they told you about the work they had done, Highland
10 represented to UBS that it was substantially complete
11 with its document production?
12    **A   I believe that's correct and it would have**
13 been we've done all we can do (indiscernible).
14      (Reporter clarification.)
15    **A   I believe what we would have said and what**
16 **I would have said and how counsel would have delivered**
17 **to UBS's counsel, is that based on information that we**
18 **received from Mr. Leventon and Mr. Ellington, we had**
19 **completed discovery. We'd found all we could get that**
20 **was responsive and that we had turned it over, to the**
21 **extent it wasn't otherwise protected. And I don't**
22 **recall whether there was any privilege or not.**
23 **BY MR. CLUBOK:**
24    Q   And fair to say that your view on whether
25 Highland had substantially completed a response to

---

38

1  UBS's discovery request changed after you got more
2  information in 2021?
3     **A   Yes.**
4     Q   And fair to say that you ultimately learned
5  that Mr. Ellington and Mr. Leventon's statements to
6  you about the completeness or the production were
7  false?
8     **A   Yes.**
9     Q   Okay. Let's talk about some other
10 misrepresentations that Mr. Ellington and Mr. Leventon
11 made. And I want to refer you to Tab~2, which is an
12 email chain with the top email dated August 5, 2020,
13 from you to Mr. Leventon, copying Scott Ellington,
14 with the subject UBS Supplemental Information Request.
15    **A   Give me that again?**
16    Q   It's Tab~2 and it will be Exhibit 151.
17      (Deposition Exhibit 151 was received and
18 marked for identification, as of this date.)
19      THE WITNESS: I'm going to try to switch
20 screens and see if that helps.
21 BY MR. CLUBOK:
22    Q   This one might be easier to deal with in
23 hard copy because you have to kind of read up, but
24 whatever it easiest for you, we'll try to make it.
25      THE WITNESS: Let me know for the audio, is

---

39

1  this one better?
2       MR. CLUBOK: Yes.
3       THE VIDEOGRAPHER: We just lost our video
4  image. Can we go off the record?
5       THE WITNESS: Hold on. Let me get that.
6       MR. CLUBOK: Yeah, let's go off the record.
7       THE VIDEOGRAPHER: Okay. Stand by. We're
8  going off the record. The time --
9       THE WITNESS: It says I have video.
10      MR. CLUBOK: I can see Jim. Enrique, you
11 can't see Jim?
12      THE VIDEOGRAPHER: Yes. But I just lost
13 him so I unpin --he was unpinned from the screen, so I
14 lost him for a second.
15      MR. CLUBOK: Ah, okay.
16      THE VIDEOGRAPHER: And since we're doing
17 video, I need to have him pinned.
18      THE WITNESS: Sorry about that on the fly.
19 Hang on one second. I'm just going to grab some
20 water.
21      MR. CLUBOK: Okay.
22      THE VIDEOGRAPHER: If you give me one
23 second, Counsel, I'm just sorting something out here.
24      Going back on the record. The time is
25 2:55 p.m.

---

40

1  BY MR. CLUBOK:
2     Q   Mr. Seery, I want you to look at
3  Exhibit~151, which is an email chain with the top
4  email being a August 5, 2020 email from you to Isaac
5  Leventon with a copy to Scott Ellington. Do you see
6  that?
7     **A   Yes.**
8     Q   And, you know, the way email works, you
9  have to go to the last page and work your way up.
10      So I want to go to the last page of
11 Exhibit 151. And you can see this chain starts with
12 an email from someone named James Romey, R-O-M-E-Y, to
13 Isaac Leventon, David Klos, with a copy to you and to
14 Bradley Sharp. And the subject is: UBS Supplemental
15 Information Request. Do you see that?
16    **A   Yes.**
17    Q   And who is James Romey?
18    **A   James Romey was an employee of DSI**
19 **Consulting who was the debtor's financial consultant.**
20    Q   And in this email to Mr. Leventon and
21 others, he says, Can you do a call this morning ASAP
22 with Jim to discuss status of these materials. This
23 is a high priority item. Do you see that?
24    **A   Yes.**
25    Q   And, in fact, you respond shortly

---

41

1  thereafter that you have another call at 11:00.
2       So you asked if the people would just get
3  on a call right then and there. It's 9:16 in the
4  morning. Do you see that?
5       A  Yes. The -- I'm going to guess -- and this
6  is a guess -- that he might have been in Chicago
7  because this came first and the 9:16 came after. But
8  one, we would have been working for me telling these
9  guys to get on the phone now.
10      Q  Okay. And in this -- later on in the email
11 chain, Isaac Leventon sends -- then he copies in Greg
12 Demo from your outside counsel, and he gives
13 information the about UBS's request for information.
14 Do you see that?
15      A  Yes.
16      Q  And among other things, Leventon -- and if
17 you go down to -- well, if you look in first bullet
18 point, he says some things and he says, UBS has all of
19 the documents to which the special master deemed it
20 was entitled. Do you see that?
21      A  Yes.
22      Q  Did Mr. Leventon ever tell you about a
23 discovery dispute relating to the financial condition
24 of the funds that was presented to special master
25 during the underlying UBS litigation?

42

1       A  Not that I recall, no.
2       Q  Did Mr. Leventon -- did you know what he
3  meant when he talked about this or just took him at
4  his word?
5       A  I believe we had some brief discussion
6  about it and it had to do with what types of discovery
7  you could get prejudgment and post judgment in
8  New York. At least that was sought by -- I'm not a
9  New York litigator. My perspective and direction,
10 both with respect to this matter and others, was
11 produce everything. Let's get this done.
12      Q  Okay. So Mr. Leventon then goes on to
13 reference HFP, which is the parent of SOHC and CDO
14 funds, having informed their investors in 2009 that
15 they had zero net asset value. Do you see that?
16      A  Yes.
17      Q  And then he says that he had been tracking
18 the assets through an SOHC and CDO fund and he was
19 putting together a report with supporting documents,
20 right?
21      A  I see that, yes.
22      Q  Did you take from this and from other
23 things that Mr. Leventon told you that he was working
24 diligently to provide a full picture of the assets at
25 SOHC, CDO Fund, HFP, from the time of their initial

43

1  transaction through the present?
2       A  Well, actually, initially, I took this as a
3  surprise, because I had previously been told that
4  there were no assets. So if there were assets, why do
5  we need to track them.
6       And then it evolved into, well, there had
7  been assets when there wasn't very much and we're
8  working our way through. And he was going to be
9  working hard and diligently to give us a schedule of
10 all of these assets and what happened to them.
11      But it was a surprise to me because the
12 prior representations were that they were shell
13 companies with no assets.
14      Q  So was this the first time you learned that
15 their actually were at least some assets?
16      A  Yes.
17      Q  Then?
18      A  Yes.
19      Q  Mr. Leventon also says here that HFP and
20 CDO Fund had informed their investors in 2009 they had
21 zero net asset value. Do you see that?
22      A  Yes.
23      Q  I want to show you an Exhibit that's at
24 Tab~36 that's been marked as Exhibit 48.
25      (Deposition Exhibit 48 was received and

44

1  marked for identification, as of this date.)
2  BY MR. CLUBOK:
3       Q  Have you seen this document before?
4       A  I have, yes.
5       Q  If you look at page three of this document,
6  this is a Settlement Analysis that Highland had done
7  long before you became involved, in which it talks
8  about the prospects for winning or losing the
9  litigation with UBS. Is that what you understand?
10      A  I'm familiar with the document, yes.
11      Q  Okay. And if you -- and basically in this
12 document that you've read before and you've seen that
13 they go through scenarios with respect to what would
14 happen if Highland wins its litigation with UBS or
15 loses its litigation with UBS, correct?
16      A  That's correct. We discovered this
17 document on Mr. DiOrio's desk after he was terminated
18 for cause. We then, obviously, analyzed it. This was
19 in 2021 in February. We analyzed it and it goes
20 through a number of scenarios that if it wins or loses
21 different litigations what could happen. And it talks
22 about using assets that were secreted into the
23 Caymans, which I referred to before out of Sentinel,
24 to use those assets to effectuate certain settlements.
25 And ultimately as a strategy to leave the redeemer

45

1 committee of the crusader fund, it basically -- I
2 think it says on an island or something to that effect
3 as its only defendant -- only material defendant if it
4 could effectuate settlements cheaply with other
5 litigants.
6     Q   Fair to say back in 2020 when Mr. Leventon
7 was providing you information about responding to
8 UBS's information request, he did not share any
9 version of this document that's been marked as
10 Exhibit 48 with you, correct?
11     A   Never saw this until long after
12 Mr. Leventon was terminated and Mr. Ellington was
13 terminated, and Mr. DiOrio was terminated. And then
14 we found it on Mr. DiOrio's desk, which then caused us
15 to search our computer system at Highland and found
16 it.
17     Q   And the specific -- we're going to come
18 back to this document in a bit. But the specific
19 question I wanted to focus on here was just with
20 respect to Mr. Leventon's telling you that HFP had
21 told its investors in 2009 that it had zero net asset
22 value, isn't it the case that Highland had concluded
23 it would have net zero -- zero net asset value only if
24 Highland lost its litigation with UBS. Because if it
25 won its litigation with UBS, HFP was going to have

46

1 positive value as it says on page three of Exhibit 48?
2     A   I'd forgotten about that section. It's
3 very clear that at the time this document was
4 completed, the belief that Highland had was that
5 Highland would have -- HFP would have positive value
6 if it wins the litigation and that would result in
7 massive tax liability for a number of individuals and
8 entities because they had already taken a material tax
9 loss.
10     Q   Okay. So now let's turn back to
11 Mr. Leventon's email exchange with you on August 5,
12 2020. And, again, he's telling you about this letter
13 that was sent by HFP and then another letter that was
14 sent by CDO Fund.
15         If you look at Tab~3, a document that we
16 have marked as Exhibit 152, is that letter to HFP from
17 January 20, 2009 that he's referring to. Do you see
18 that?
19     A   Yes.
20         (Deposition Exhibit 152 was received and
21 marked for identification, as of this date.)
22 BY MR. CLUBOK:
23     Q   Have you seen that before?
24     A   I have, yes.
25         (Deposition Exhibit 153 was received and

47

1 marked for identification, as of this date.)
2 BY MR. CLUBOK:
3     Q   And if you look at the next tab,
4 Exhibit 153, that is a February 4, 2009 letter to CDO
5 Opportunity Fund Investors. That is also what
6 Mr. Ellington refers to in Exhibit 151.
7     A   It appears to be. That document I don't
8 recall if I'd seen before.
9     Q   Okay. Well then turning back to the one
10 you do recall seeing before, Exhibit 152, if you look
11 at page four?
12         MR. MORRIS:  Mr.~Klubok, apologies. What
13 tab is that in the binder?
14         MR. CLUBOK:  Sorry. Tab~3.
15 BY MR. CLUBOK:
16     Q   So Tab~3 is Exhibit 152, and it's that
17 letter to HFP investors from 2009 that Mr. Leventon
18 referred to when he told you that HFP had net zero
19 asset value.
20         If you go down to -- if you look at the
21 letter that he's referring to and you see on the
22 bottom of page four, it talks about the CLO financing
23 facility and it refers to the transaction with UBS
24 that was the subject of the litigation. Do you see
25 that?

48

1     A   That's correct, yes.
2     Q   And then if you look at the next page --
3 and clearly as we know that that was a significant --
4 at least many hundreds of millions at that time
5 potential liability. That was one of the reasons why
6 they, I guess, were telling investors they might have
7 net zero asset value, correct?
8     A   Correct. But my experience — unless there
9 was a judgment of a certain loss, we wouldn't tell
10 your investors there was no net asset value because
11 you don't take a worthless security deduction unless
12 you're absolutely certain that the security is
13 worthless. So doing that and at the — and I only can
14 put this together now, doing that at the same time
15 while you're claiming that you don't owe UBS any money
16 is highly improper in my opinion.
17     Q   And that's because if they really didn't
18 owe UBS any money, they wouldn't have had a zero net
19 asset value, correct?
20     A   That's what that next deck says. And it
21 would have — it could have — anyone who followed
22 the — I don't know if it's advice, but the implicit
23 advice in this email and took a worthless security
24 deduction, would find themselves with a significant
25 tax problem. I'm not very familiar with it, but

---

**49**

1 familiar enough to know from my experience, you don't
2 take one unless you're certain it's worthless.
3     Q   And in the conclusion section of the letter
4 to HFP investors, it's been marked as Exhibit 152, in
5 the middle -- or the second paragraph says, "Due to
6 events and circumstances described in this letter,
7 we've concluded as of December 31, 2008, it's likely
8 that all future inflows of cash to HFP will be used to
9 pay creditors and there's no prospect of return to
10 holders of HFP units," correct?
11     A   Correct.
12     Q   Are you aware of HFP ever paying a single
13 penny to UBS with respect to the judgment that UBS has
14 obtained?
15     A   Not that I'm aware of, no.
16     Q   All right. So let's turn back to
17 Mr. Leventon's letter to you. After talking about
18 the -- and by the way, did Mr. Leventon bring any of
19 this information to your attention in any words or
20 substance regarding the true nature of HFP's assets
21 and how the UBS litigation very directly affected
22 that?
23     A   No, not at all and in fact quite the
24 opposite. It was -- the information that was brought
25 was that there -- there were no assets and that UBS's

**50**

1 claims were against shell companies with no assets.
2         In fact, the initial view description was
3 they never had any assets because they were all pushed
4 into the warehouse. And if they had some, it would --
5 it was only because they were transiting towards the
6 warehouse from the warehouse.
7     Q   And you later came to learn that was all
8 lies.
9     A   That's correct.
10     Q   If you look back at Mr. Leventon's email on
11 August 5, 2020, 2:54 p.m. his time, he says that he's
12 been tracking the assets through on SOHC and CDO Fund
13 and he was putting together a report with supporting
14 documents. Do you see that?
15     A   Yes.
16     Q   Now fair to say that you've come to learn
17 since, but didn't know then, that one of the
18 significant assets SOHC had at the time was a hundred
19 million dollar insurance policy?
20     A   That's correct, yes.
21     Q   Did Mr. Leventon in any way, shape or form
22 tell you anything about this insurance policy which
23 SOHC had a claim to?
24     A   Never.
25     Q   So Mr. Leventon gives you this -- rest of

**51**

1 this information in the bullet points here and
2 specifically with respect to SOHC, he says that it had
3 295,000 in cash and all since paid in legal fees. Do
4 you see that?
5     A   Yes.
6     Q   And then he says there are four worthless
7 securities and basically nothing else, correct?
8     A   Correct. Although there's this -- there's
9 a section there with the five assets remain in the
10 fund. Three with zero value as well as 11~million in
11 Greenbriar CLO equity, and some amount of Multi-Strat
12 equity. I'm trying to figure that out. That
13 raised -- that raised concerns.
14     Q   But that -- but that is -- and I was going
15 to turn to that next. That's CDO Fund. His next
16 bullet point he talks about what's in CDO Fund as
17 opposed to SOHC?
18     A   Correct, correct.
19     Q   Yeah. And for CDO Fund now, he tells you
20 that there were ten assets as of the end of 2011, plus
21 1.2 million in cash. Do you see that?
22     A   Yes.
23     Q   And he then says that some of the assets
24 were sold to pay legal fees. There's another asset
25 that's a claim in Lehman bankruptcy, the claims he's

**52**

1 trying to track down. And then he says there's five
2 assets remaining that -- three of which have zero
3 value and then the Greenbriar equity and some amount
4 of Multi-Strat equity. Do you see all of that?
5     A   Yes.
6     Q   Now did he tell you why -- when he says the
7 CDO Fund had ten assets as of the end of 2011, did you
8 take that to mean that there were no further assets of
9 CDO Fund post 2011? Is that a natural reading of
10 that?
11     A   I think that's a natural reading, but I was
12 more -- I recall getting this and talking with him and
13 saying what are you talking about. You told me these
14 were shell entities with no assets. And I took that
15 to mean back to 2009, which I had previously -- he had
16 previously told me was the case.
17     Q   I see.
18     A   And now you're telling me there were some
19 assets post 2009. What were they? What happened to
20 them? And I got this explanation about legal fees and
21 this is -- we treated SOHC and CDO Fund, as I did,
22 pretty much the same, they were jointly and severally
23 liable on the UBS obligation.
24         And then part of it was this Greenbriar.
25 And I wanted to know what the heck that was, as well

53

1 as what do you mean they had an interest in
2 Multi-Strat and do they still have.
3    Q   So before this, he had previously lied to
4 you by saying there just are no assets at all in
5 these --
6    A   Correct.
7    Q   -- correct?
8       Now he's admitting there are some assets.
9 Did he explain why he had previously said there were
10 no assets at this time?
11   A   No.  He's not somebody who's a clear
12 speaker.  I think that's often purposeful.
13   Q   Did he ever in words or substance ever say
14 that any CDO assets were used to procure an insurance
15 policy?
16   A   No, never.
17   Q   All right.  One sec.  If you'd move up the
18 email chain, you can see that on that same day several
19 hours later Leventon provides additional information
20 about CDO Fund and SOHC.  Do you see that?
21   A   Yes.
22   Q   And he now tells you that the current
23 assets are 32 million, comprised of 11 million in
24 Greenbriar and 21 million in Multi-Strat.  Do you see
25 that?

54

1    A   Yes.
2    Q   And he talks about an asset list from 2009
3 to 2011.  And then he talks about cash from 2012 to
4 2015.  Do you see that?
5    A   Yes.
6    Q   And its claimed that from 2012 to 2015, the
7 fund had 12.5 million in cash and then they paid out
8 16.6 million in legal fees.  Do you see that?
9    A   Yes.
10   Q   Again, any information at all about any
11 other assets the CDO Fund had post 2011?
12   A   No.  And this led to discussion because it
13 was quite shocking that there had been that much cash
14 there spent for legal fees defending -- being
15 defensible, frankly, with respect to CDO Fund and
16 SOHC.  And while I believe Highland's defenses had
17 merit, that cause should have been borne by Highland,
18 not these two counterparties.
19       And then I wanted to know what the heck
20 they were talking about with 11 million Greenbriar CLO
21 and 21 million Multi-Strat and where was it.
22   Q   And what, if anything, did he tell you
23 about Greenbriar CLO?
24   A   They had to look.  He wasn't sure.  They
25 couldn't find it listed as an asset of these entities,

55

1 and they were going to dig into it and come back to
2 me.
3    Q   And what, if anything, did he tell you
4 about the Multi-Strat asset?
5    A   Very similar.  It used to be there.  We
6 started to trying to look to see was it an ownership
7 interest in one of the feeder funds or an ownership
8 interest in a subsidiary of Multi-Strat.  Because it
9 wasn't listed as a limited partner at Multi-Strat,
10 meaning CDO Fund.
11   Q   You've come to learn that by approximately
12 2016 or early 2017 there were roughly 300 million
13 face-value assets with a valuation of over 100 million
14 of market value spread amongst CDO Fund and the SOHC
15 HFP family of funds, correct?
16   A   That's correct, yes.
17   Q   That information was clearly omitted from
18 Mr. Leventon's reports to you, correct?
19   A   Yes.
20   Q   Is that kind of information the kind of
21 information you fully expected Mr. Leventon to have
22 disclosed to you had you known about it?
23   A   Not only would I have expected it, it would
24 have been his duty as a senior lawyer for the company.
25   Q   He was -- he was a lawyer for the company

56

1 at that time.  Do you feel like he made material
2 omissions to you regarding the state of CDO Fund and
3 SOHC's assets?
4    A   Clearly.
5    Q   If you could turn to Tab~5.  We have
6 deposition Exhibit 73.
7       (Deposition Exhibit 73 was received and
8 marked for identification, as of this date.)
9 BY MR. CLUBOK:
10   Q   And this is another email he sends to you
11 a couple of weeks later, copying Scott Ellington and
12 Greg Demo and James Romey.
13      And in the email at the top he says, "All,
14 I do not want to include this in the UBS package until
15 we discuss, but please see attached showing the
16 Multi-Strat position being written off."  Do you see
17 that?
18   A   Yes.
19   Q   And if you look at -- there may be a blue
20 sheet, but we're going to mark -- but there's --
21 there's an attachment to this email.  Actually there's
22 two attachments to this email that we've got behind
23 blue sheets in your binder.
24      And these are attachments that he included
25 with his cover email that's been marked as Exhibit 73.

---

**57**

1  Do you see that?
2      A  Yeah, I recognize it.
3      Q  And if you look at the first attachment,
4  this purports to show that -- and by the way, what
5  we've been calling Multi-Strat used to be called
6  Highland Credit Opportunities CDO, correct?
7      A  That's correct. And Multi-Strat is a
8  number of feeder funds with similar confusing names
9  but also subsidiaries where it's held certain assets.
10      Q  But when Leventon in his cover e-mail talks
11  about Multi-Strat and then he gives you documents
12  showing activity and credit opportunities, you all
13  have a shared understanding. You're talking about the
14  same entity, correct?
15      A  That is the same entity, correct.
16      Q  Okay. So with respect to the first
17  attachment to Exhibit 73, that purports to show -- and
18  it's may be hard to read. We've tried to give you a
19  bigger version.
20      A  That's okay. I got it.
21      Q  And Shannon can try to blow it up on the
22  screen. But that purports to show that all of the
23  interest in credit opportunities/Multi-Strat were
24  written off in August 11, 2017. Do you see that?
25      A  That's correct.

**58**

1      Q  Now those -- you know, you knew at the time
2  that that quantity of interest in Multi-Strat actually
3  had pretty significant value, correct?
4      A  Yes.
5      Q  And did Mr. Leventon give you any
6  explanation as to why the CDO Fund quote would have,
7  quote, written off that valuable asset back in August
8  of 2017?
9      A  Not that I recall. The -- it was with
10  specificity. The discussion was that there must have
11  been some kind of mistake. It would have -- if they
12  had been an owner of Multi-Strat, it would have been
13  clearly set forth in -- in the log or ledger that we
14  had with respect to who are the LPs of Multi-Strat.
15  It wasn't there.
16      This email engendered -- it was -- it came
17  from the prior set of emails that he's talking about
18  we have this interest in Multi-Strat, found it. Where
19  is it? Because if CDO Fund had an interest in
20  Multi-Strat, that might help us facilitate a
21  settlement with UBS. Because right now we're offering
22  nothing.
23      Couple of weeks -- I forget the exact dates
24  from the last email, but it took a little time to come
25  back to me and say, Oh, we've hunted it down and it's

**59**

1  gone. It was written off. And the only explanation
2  that I recall was something along the lines of it was
3  an improper entry. And what it shows is in the next
4  exhibit that it was traded. But it was -- and we had
5  discussion about well, was it actually traded, no.
6  That's just the way we wrote it off. It was
7  improperly listed as their asset.
8      And that obviously -- or maybe not
9  obviously, but to me that engendered a lot of
10  questions. And so I pressed them on how this could
11  actually be the case. I even raised this to Dondero,
12  who told me that the Greenbriar interest -- this is
13  the Multi-Strat interest. So this one is different.
14      The Multi-Strat interest was just a -- some
15  kind of mistake, that it shouldn't have been there.
16  And so it shows that a trading entry, that is just a
17  way to write it off and it says that there's no
18  counterparty basically.
19      Q  By the way, you're looking at the second
20  attachment --
21      A  Correct.
22      Q  -- to the email that Leventon sent you
23  which we've marked as Exhibit 73?
24      A  Yes.
25      Q  And that's a document from WSOWeb?

**60**

1      A  Yes.
2      Q  Is that Highland's trading system?
3      A  That was one of the systems. So this is
4  the Wall Street office, which was the system that
5  Highland had.
6      Q  And so this would have been a document that
7  was prepared back in it says August 21, 2020. Well I
8  don't know -- maybe that was the day it was printed
9  out. Was that the day it was printed out?
10      A  I believe that's the day it was printed
11  out. It says the entry is from August 11, 2017.
12      Q  Okay. So back in August 11, 2017, Highland
13  used its trading system to record a supposed writeoff
14  of this significant interest in Multi-Strat, right?
15      A  Correct.
16      Q  And by the way, by significant, I think
17  that interest today is somewhere in the high 20 low
18  30 million-dollar range, correct?
19      A  All -- and including all distributions on
20  it, it would have been somewhere in the 20s I believe.
21      Q  Somewhere in the 20 million-dollar range?
22      A  But I don't know what it would have been
23  worth in 2017.
24      Q  Sure. You've come to learn that, in fact,
25  this interest wasn't just written off because it was

61

1  some mistaken fiction, correct?
2  **A   Correct.**
3      Q   You've come to learn that in fact this
4  interest that CDO Fund held in Multi-Strat was
5  purportedly transferred to Sentinel as part of the
6  overall effort to purchase an insurance policy for the
7  UBS litigation, correct?
8  **A   Yeah, we learned that in first quarter of**
9  **'21.**
10     Q   Right.  So not until months after
11 Mr. Leventon is telling you this is just a writeoff
12 because of a mistake, correct?
13 **A   Oh, yeah.  Even after Mr. Leventon was**
14 **fired, he never shared this information with us.  He**
15 **shared the information in his email, but it's clearly**
16 **wrong if not fraudulent.**
17     Q   Fair to say it was a material omission --
18 to put it mildly -- for Mr. Leventon to not explain --
19 strike that.
20         I think this is actually a lie to represent
21 that the CDO interest in Multi-Strat had been written
22 off as opposed, used as part of a purchase of an
23 insurance policy.  Is that fair?
24 **A   I think that's a fair characterization.  If**
25 **one creates a description of something that is**

62

1  **materially false and knowingly does so, whether --**
2  **whether -- without disclosing the actual events, I**
3  **think that that description could be fairly**
4  **characterized as a lie.**
5      Q   And by the way, Mr. Leventon has copied
6  Mr. Ellington on this, correct?
7  **A   Yes.**
8      Q   Mr. Ellington, you've come to learn, is a
9  part owner, an ultimate beneficial owner of Sentinel,
10 correct?
11 **A   That's correct.**
12     Q   And when Mr. Ellington was copied on this
13 email where Mr. Leventon provides you this false
14 information about the Multi-Strat interests that were
15 previously held by CDO Fund, did Mr. Ellington in any
16 words or substance correct Mr. Leventon's
17 misrepresentations?
18 **A   No.  And Mr. -- I don't recall the specific**
19 **conversations.  Maybe something will trigger that,**
20 **something you show me may trigger that.  But**
21 **Mr. Ellington was involved in these discussions.**
22     Q   And he certainly never in words or
23 substance told you that CDO Fund's interest in
24 Multi-Strat and other assets had been, in fact,
25 transferred or tried to be transferred to Sentinel

63

1  back in August of 2017?
2  **A   That's fair.  We'd never been -- and I had**
3  **never been informed of any such transfers or even the**
4  **existence or name of Sentinel until the first quarter**
5  **of '21 when we found it on our own.**
6      Q   Did you ever -- strike that.
7          Had you known about what really happened to
8  CDO Fund's interest in Multi-Strat, would you have
9  told UBS about it at the time?
10 **A   Yes.**
11     Q   And by the way, is it your understanding
12 that those interests, that are identified here as
13 supposedly being written off, are the same interests
14 that are now being restrained pursuant to the
15 temporary injunction that's been issued by this court?
16 **A   Yes.  These interests are worth north of**
17 **$20 million.**
18     Q   And these interests, which instead of being
19 written off were purportedly transferred to Sentinel,
20 are now only being restrained because of this court's
21 actions, correct?
22 **A   That's correct.**
23     Q   Otherwise, is it fair to say that without
24 the court's injunction, you might be required to
25 redeem the interest in Multi-Strat by turning over the

64

1  value of the restrained interest to Sentinel?
2  **A   Yes, we have the full amount of cash**
3  **necessary to redeem this interest and redeem all**
4  **similar interest.**
5      Q   Okay.  Let's turn to Tab~6, which has been
6  marked as Exhibit 153 [sic].
7          (Deposition Exhibit 154 was received and
8  marked for identification, as of this date.)
9  BY MR. CLUBOK:
10     Q   And this is another email thread that the
11 top thread is August 21, 2020 from Mr. Leventon to you
12 and others including your outside counsel and copying
13 Scott Ellington.  Do you see that?
14 **A   Yes.  This is the same day as the prior set**
15 **of emails, but it's in the morning.**
16     Q   It's in the morning, okay.
17         And if you go again to the first email in
18 the chain, which you have to go to the end of the
19 documents, you can see that Mr. Romey had sent an
20 email to Mr. Leventon which he puts importance,
21 "high."
22         And he says, "Before we give anything to
23 UBS today, we need to track down what the Highland
24 Credit Opportunities CDO Limited partner [sic]
25 interest in Multi-Strat means and how it's accounted

**65**

1 for in Multi-Strat's books, i.e., whether it's part of
2 the existing redemption group or it has -- or how it
3 has any remaining interest in the fund. Or if I'm
4 misunderstanding something, please let me know ASAP."
5 Do you see that?
6 　A.　Yes.
7 　Q.　And if you go up the chain, you see an
8 email from Greg Demo where -- this is at the bottom of
9 the page that Bates labeled 38893.
10 　　You see Mr. Demo says, "The confusion that
11 we're having is that the assets shown on the
12 worksheets we got from Isaac says that Highland's CDO
13 Opportunity Master Fund has a 21.5 million limited
14 partner interest in Multi-Strat." Do you see that?
15 　A.　Yes.
16 　Q.　And he goes onto say, "So the issue you
17 raise exactly the issue we're trying to figure out.
18 Going off the org chart, I thought this entity was
19 100 percent owned by MSCF. We're trying to figure out
20 what the 26 million-dollar asset on CDO Fund's books
21 means." Do you see that?
22 　A.　Yes.
23 　Q.　And Isaac then responds to that by saying
24 "Dave, I will call you to figure this out." Do you
25 see that?

**66**

1 　A.　Yes.
2 　Q.　And Mr. Romey asks for a status check and
3 Leventon then says there's no prerequisite to deliver
4 materials to UBS in satisfaction of their concerns.
5 And then --
6 　　MR. MORRIS:　I'm sorry.　Where is that
7 email?
8 　　MR. CLUBOK:　Sorry.　I'm working my way up
9 the chain.　So there's an email on August 6, 2020,
10 5:05 p.m., where Leventon basically says that this is
11 isn't a prerequisite to delivering materials to UBS.
12 　　And Scott Ellington responds at 6:08 p.m.,
13 saying "Isaac and me were instructed by Jim Seery to
14 get this UBS deliverable handled." He says, "I was
15 just on the phone with Isaac when this email came
16 through.　Don't see how this is urgent, especially
17 relative to UBS request.　We'll get to this when it is
18 a priority." Do you see that?
19 　A.　Yes.
20 BY MR. CLUBOK:
21 　Q.　And then Mr. Demo, on August 15, writes to
22 Scott and Isaac and he says, "I spoke to Jim about
23 this issue this morning.　It is a high priority at
24 this point and we need to do what we can to push to
25 conclusion." Do you see that?

**67**

1 　A.　Yes.
2 　Q.　And that's where Mr. Ellington then sends a
3 pretty lengthy email.　And this may have been what you
4 were referring to when you said you remember him
5 weighing in.　And I'll you take a minute to look at
6 Mr. Ellington's response.
7 　A.　Yeah, he made it on the 6th as well.　And
8 I'm familiar with the response.　So he was active in
9 these discussions.
10 　Q.　And he, again, is pushing back on an actual
11 call about this to get it sorted out.　Do you see
12 that?
13 　A.　Yes.
14 　Q.　And he claims that "we are searching for
15 documents and records that were created as far as back
16 as 15 years ago," right?
17 　A.　Yes.
18 　Q.　And then there's a lot of statements
19 that -- fair to say were designed the make you believe
20 that he's doing everything possible and trying his
21 best but it's just too hard to figure this all out?
22 　A.　Correct.　And that he's -- he's the one who
23 has expertise and he's digging in and he's talked to
24 UBS about it, he's talked personally to you about it,
25 he's talked to KPMG about it and it's a ton of work

**68**

1 and he's spent -- he and Isaac have spent over 100
2 hours trying to work on this and get it right.　And it
3 seemed that my request that when we provide discovery
4 to UBS, we actually know what the heck we're giving
5 was a real challenge to Mr. Ellington and
6 Mr. Leventon.　Obviously, that's all false.
7 　Q.　He claims this project is a herculean task.
8 Do you see that?
9 　A.　Yes.
10 　Q.　That's false, correct?
11 　A.　They knew the answer clearly based upon
12 what we know now.　It was this is all -- the herculean
13 task was how to obfuscate it.
14 　Q.　And in fact, very specifically, he reminds
15 you that he's personally discussed at length, with the
16 head of KPMG Cayman Islands, the situation.　And he
17 expressed to Mr. Ellington, supposedly, that there are
18 currently more than 6,000 ghost funds that -- such as
19 these target entities, stemming from the 2008 crisis,
20 that do not have directors, custodians,
21 administrations, bank accounts, that sit dormant and,
22 in all caps, "NO ONE" knows what they truly retain, et
23 cetera.　Do you see that?
24 　A.　Yes.
25 　Q.　And then he says "I know that UBS is aware

69

1  of the situation and I know Andy Clubok knows of the
2  situation, because I, Scott Ellington, have personally
3  discussed it with him several dozen times, including
4  as recently as this year." Do you see that?
5      A   Yes.
6      Q   Fair to say Mr. Ellington used this phrase
7  "ghost funds" to make it appear that there was just no
8  way to track these assets and where they had gone and
9  what Cayman entity had them or what was the status.
10 Is that fair?
11         MR. MORRIS:  Object to the form of the
12 question.
13     **A   I'd say that is fair and this was not the**
14 **first time he had used a term.  It was a term he liked**
15 **to use to indicate that if there were funds**
16 **pre-financial crisis down from Caribbean**
17 **jurisdictions, it would be impossible to get**
18 **information about them which, obviously, was not true**
19 **with respect to funds that Highland had the**
20 **information itself.**
21 **BY MR. CLUBOK:**
22     Q   And, in fact, Sentinel, which at that time
23 had ownership in the Multi-Strat -- specific in the
24 Multi-Strat asset.  There was a specific subject of
25 this back and forth -- Sentinel had directors at that

70

1  time, right?
2      **A   Correct.**
3      Q   And Sentinel had bank accounts at that time
4  that were not dormant, correct?
5      **A   That's what we now know, yes.  We didn't**
6  **know about or at least the independent board, myself,**
7  **Pachulski, our outside counsel or DSI had no awareness**
8  **of the existence of Sentinel at this time.  We didn't**
9  **learn of that existence, as I said earlier, until Q1**
10 **'21.**
11     Q   So when Mr. Ellington talks about ghost
12 funds that don't have directors or custodians or bank
13 accounts and sit dormant and no one know what they
14 truly retain, he failed to tell you that none of those
15 things applied to Sentinel, correct?
16     **A   That's correct.  And further, one of the**
17 **directors at Sentinel was a direct report to**
18 **Mr. Ellington, and that was Matt DiOrio.  And Matt**
19 **DiOrio worked in the legal department but was not a**
20 **lawyer.  He had been brought into the legal department**
21 **because he was Mr. Ellington's friend.**
22     Q   And, in fact, Mr. Ellington was one of the
23 two ultimate beneficial owners of Sentinel at the time
24 he was claiming that he just didn't have any more
25 information about what happened to the Multi-Strat

71

1  assets, correct?
2      **A   That's correct.  And we now know even more**
3  **that in June of 2020, he and several members of the**
4  **legal department were quite aware of the existence of**
5  **the entity that he ultimately beneficial owned,**
6  **Sentinel, because they got an indemnity from Sentinel**
7  **which they signed and executed.  And they certainly**
8  **started to look for that around the time that we were**
9  **starting to do work around the UBS claim and litigate**
10 **with UBS.**
11     Q   At the time Mr. Ellington was making these
12 representations to you, you were his ultimate boss?
13     **A   Direct boss.**
14     Q   You were his direct boss?
15     **A   Correct.**
16     Q   And you expected him to give you true and
17 accurate advice?
18     **A   Yes.  He was both a direct report and the**
19 **general counsel of the company, as well as an officer.**
20     Q   Did you count on him having fiduciary
21 duties when he gave you advice or made statements to
22 you?
23     **A   I would say that he certainly had fiduciary**
24 **duties.  He was supposed to do that.  Did I count on**
25 **him?  I think it would be fair to say that at certain**

72

1  **times I didn't have other avenues to get information**
2  **so I had to rely on him.  I wouldn't say that I was**
3  **naive to what often were inconsistent and strange,**
4  **both statements and behavior.**
5      Q   Well, whether or not he complied with his
6  fiduciary duties, fair to say that in your position,
7  you expected someone in his position to comply with
8  fiduciary duties in providing you information?
9      **A   Absolutely.**
10     Q   And did he?
11     **A   We now know clearly not.**
12     Q   Mr. Ellington concludes by assuring you
13 that Isaac and him are actively working on this and
14 speak literally daily about it.  Do you see that?
15     **A   Yes.**
16     Q   Did Mr. Leventon ever --
17     **A   That -- that statement by the way may be**
18 **true.**
19     Q   Yeah, I would assume it is.
20         Mr. Ellington and Mr. Leventon, as far as
21 you knew, were working very closely on everything
22 they -- correct?
23     **A   Absolutely, yes.**
24     Q   And they shared your experience directing
25 and -- directing their activities, you found them to

73

1  share information with each other freely?
2      A  Well, Leventon reported to Ellington.
3  Ellington reported to me.  They certainly shared
4  information as evidenced by the inclusion of each
5  other on -- as a cc on many of the emails.  And where
6  they're not cc'd, eventually they're often blind
7  copied.
8      Q  So do you think that -- well, did
9  Mr. Leventon ever in words or substance say that he
10 disagreed with anything that Mr. Ellington told you in
11 this email that's been marked as Exhibit 153?
12     A  No, not in the least.  And my recollection
13 is from conversations is that he agreed with it.
14     Q  Mr. Leventon is testifying in this case
15 that he thinks he did tell someone he disagreed with
16 Ellington with respect to this email.
17         Does that -- is that true as far as you
18 know?
19     A  I have no -- there's no chance that -- he
20 never said anything to me.  He never said anything
21 with respect to anybody who would have reported it to
22 me.  Anybody who would have heard that who was in my
23 line of either direct report or my outside lawyers or
24 consultants would have told me.  That -- that
25 statement doesn't ring true at all.

74

1      Q  Did Highland Capital Management rely on
2  Mr. Ellington's statements in this email?
3      A  We certainly believed that he and
4  Mr. Leventon were unable to get the information that
5  we were requesting.  And it's hard to say "relied"
6  because of what we now know about Mr. Ellington and
7  Mr. Leventon and to some degree some of the concerns
8  that may have been in the back of our minds at the
9  time.
10         However, because CDO Fund and SOHC had a
11 judgment against them for north of a billion dollars,
12 if there were assets in CDO Fund or SOHC, finding them
13 and delivering them and using them to settle with UBS
14 would have been to the advantage of HCMLP.  The only
15 reason it turns out it wasn't to the advantage of
16 certain people who weren't HCMLP, i.e., Dondero and
17 Ellington, is because those assets had been secretly
18 stripped and sent over to them.
19         When we're reading an email like this or
20 when I was reading an email like this, there was no
21 benefit to Ellington being deceptive or from Leventon
22 being deceptive.  Because if these funds were still
23 down in CDO Fund or SOHC, giving them to UBS to help
24 facilitate an overall deal would have been great for
25 Highland.  We just didn't know anything about Sentinel

75

1  existing and there being ultimately -- ultimate
2  beneficial owners who were Dondero and Ellington.  We
3  didn't know anything about that whole secret ploy,
4  meaning the structure of what they were trying to do,
5  and these emails -- hiding those assets as opposed to
6  trying to uncover them.
7      Q  So --
8      A  The long way of saying when we read this,
9  we took it at face value, not the hyperbole that
10 Ellington was engaging in about a herculean task and
11 these hundreds of hours.  I'd be challenged to think
12 that he worked 100 hours on any one matter that I
13 could think of during my time at Highland.  But -- and
14 I mean cumulatively.
15         But it didn't make sense for them to hype
16 this.  And now it makes a lot of sense now that we
17 know about the whole Sentinel structure on the side.
18     Q  No question that it would have been to
19 HCM's advantage to identify every single possible
20 asset that CDO Fund, SOHC or HFP had a claim to,
21 correct?
22     A  Absolutely.  It would have helped
23 facilitate the deal with UBS.
24     Q  And by hiding that information,
25 affirmatively hiding that information from you, it

76

1  damaged HCM, correct?
2      A  Hugely.  It led us down a path which we had
3  started in the first half of 2020 and then into the
4  second half of 2020 of fighting hammer and tong with
5  UBS.  Because my perspective after the work that we
6  had done analyzing the transaction and working with
7  counsel and working with in-house legal team about the
8  facts and the prior litigation was that Highland
9  hadn't done anything wrong and these two shell
10 entities had liability.  And the liability was limited
11 to the shells.  There was no dispute from early on,
12 even from 2017 with the summary judgment motion that
13 UBS prevailed on, that those entities were going to be
14 found liable.  And the only question was did they have
15 any assets.
16         The perspective was they never had any
17 assets.  That perspective was developed because that's
18 what Ellington and Leventon told me and told the rest
19 of the board.  The reason that we fought so hard was
20 we didn't want to create liability.  We didn't think
21 there was appropriate liability for Highland, the
22 debtor, to have to be on the hook for that judgment.
23 If there were assets in the subsidiaries, CDO Fund and
24 SOHC and their subsidiaries, getting them to UBS would
25 only help facilitate the deal to relieve Highland, the

77

1  debtor, of any either litigation risk or costs to keep
2  fighting with UBS. We spent millions and millions of
3  dollars on that fight.
4      Q   Fair to say that by hiding the information,
5  it also damaged UBS?
6      A   UBS had to -- yes. I think UBS had to do a
7  similar thing and had to defend itself.
8      Q   Tab~6 should be 154. I think I messed up.
9  So the email dated August 21, 2020, that we've been
10 discussing, in which Mr. Ellington refers to ghost
11 funds, is Exhibit 154.
12      And I want to turn now to 155, which is
13 Tab~7.
14      (Deposition Exhibit 155 was received and
15 marked for identification, as of this date.)
16 BY MR. CLUBOK:
17      Q   Exhibit 155 is a letter that I sent to your
18 outside counsel on September 16, 2020, in which UBS --
19 I pass on that UBS is demanding full satisfaction of
20 the judgments it then had against CDO Fund and SOHC.
21 Do you see that?
22      A   Yes.
23      Q   And at that time, you certainly believed
24 that -- that judgment was largely uncollectible
25 because of the lack of assets in those funds that you

78

1  understood, based on the information that
2  Mr. Ellington and Mr. Leventon others had provided
3  you, correct?
4      A   Largely. I think at that point though I
5  was concerned about the Greenbriar asset that had been
6  referred to earlier in one of the emails. My concern
7  about that asset was that while it wasn't listed as an
8  asset owned by CDO Fund, I had concern because nobody
9  could give me an explanation as to what had happened
10 to it that was satisfactory.
11      Dondero had said to me, Oh, that's nothing.
12 We participated that asset out a long time ago. I
13 was -- that struck me as a very odd -- this was in and
14 around the mediation time. That struck me as a very
15 odd remembrance for him because a participation of a
16 small asset like that from ten years ago, while his
17 memory is very sharp, it was very unusual that
18 somebody would remember that specific asset if there
19 had been numerous other assets and the warehouse had
20 had so much -- so many assets in it that were
21 ultimately foreclosed upon. So that always just stuck
22 in the back of my mind.
23      But to your question, largely
24 uncollectible. But that this asset of Greenbriar that
25 could have been worth 8- to 10 million, we were

79

1  concerned about -- I was certainly concerned about
2  where that asset was. And also then could I somehow
3  use that to facilitate a deal with UBS.
4      Q   By the way, you said that Mr. Dondero told
5  you with respect to the Greenbriar asset that it had
6  been participated out. What did you understand that
7  phrase to mean?
8      A   It's a common phrase in finance. You can
9  sell an asset if you're able to transfer it. If for
10 some reason transferring the asset is difficult, you
11 can essentially transfer the financial attributes of
12 that asset to somebody else by entering into what's
13 referred to as participation agreement. In a
14 participation agreement, the participant, which in
15 that case would be the counterparty to CDO Fund,
16 Highland, never gets whatever flows are generated off
17 of that -- of that asset. The recipient, if it was in
18 Highland's name, the CDO Fund's name, would receive
19 proceeds and then it would be required to turn them
20 over to the participant.
21      Q   And did you come to learn that in fact that
22 was not true?
23      A   Yes.
24      Q   Did you come to learn that Greenbriar was
25 another asset that CDO Fund had or the folks who then

80

1  controlled CDO Fund had attempted to transfer to
2  Sentinel as part of this whole insurance policy
3  situation?
4      A   Yes. We found out in the first quarter of
5  '21 and I don't recall if it was January or February,
6  but that was our first learning and starting to
7  uncover this issue after we terminated Mr. Leventon.
8      I came to understand that that asset had
9  been part of the transfer to Sentinel but somehow got
10 lost in the transfer. And so the asset, meaning the
11 preferred shares in Greenbriar, were never
12 reregistered in Sentinel's name and remained in CDO
13 Fund's name.
14      But I believe on Highland's books, they
15 actually had been eliminated because the Highland
16 group, Leventon, Ellington, Sevilla, who
17 orchestrated -- Katie Irving who orchestrated this
18 transfer, removed it from Highland's books, but then
19 it never made it to Sentinel. So from the trustee's
20 perspective, that asset remained with CDO Fund. I
21 think I said Highland but CDO Fund.
22      Q   So with respect to this asset, that group
23 attempted to fraudulently transfer it but were just
24 incompetent in their execution; is that fair?
25      A   Yeah. I mean however you want to

**81**

1 characterize the transfer, it didn't get -- whether
2 it's fraudulent, not fraudulent, it didn't get done.
3      Q   Okay.  Fair to say that when Mr. Dondero
4 talked about participation, based on what you now know
5 but didn't know then, it's fair to say that
6 Mr. Dondero was lying to you?
7      A   I think it's fair to say that -- I don't
8 know if it was ...
9      Q   Let me rephrase the question.
10      A   He certainly -- he certainly didn't know --
11 it certainly hadn't been participated.  It was
12 certainly an odd recollection.  And it -- I don't know
13 what he was trying to do.
14      Q   Fair to say that to the extent Mr. Dondero
15 knew anything about the Sentinel transaction, but when
16 you talked about Greenbriar, he omitted vaguely about
17 participation, that he omitted key facts you would
18 have expected him to disclose if he was being truthful
19 to you; is that correct?
20      A   We weren't looking at a -- at a document.
21 I think it just -- it came up in a conversation where
22 I said if we can find this Greenbriar asset and use
23 that, that could help facilitate a deal with UBS.  And
24 he said, Oh, there's nothing -- there's nothing --
25 something to the effect of there's nothing there with

**82**

1 Greenbriar.  That asset's participated a long time
2 ago.
3      Q   Okay.  So in substance, he told you there
4 was no value associated with Greenbriar that could be
5 used for CDO Fund to satisfy the judgment that UBS had
6 against it?
7      A   That's fair, yes.
8      Q   And that was not true, correct?
9      A   It turns out that's not true, yes.  I don't
10 know what he knew or didn't know.
11      Q   Do you know what SAS Management is?
12      A   I do, yes, now.
13      Q   What is it?
14      A   I've been told that it was called sword and
15 shield.  It was a secret company that the legal
16 department and a guy named Dilip Nissan (phonetic) who
17 were involved with -- it was owned by either Dondero
18 or some related entity.  Certainly related to
19 Highland.  It was operated out of Highland's office --
20 offices.  It's unclear to me what it really did.  It
21 showed up in one litigation, I believe, with Grupo
22 Mexico.  And we've -- we tried to figure out -- what
23 get to the bottom of what it is but we don't have a
24 great understanding.
25           It certainly was connected to, we now know,

**83**

1 the offshore activities of Dondero and Ellington as
2 ultimate beneficial owners.  And that shows up in some
3 of the documents that we found in our system related
4 to Cayman activity.
5      Q   I think you mentioned that Dondero was a
6 owner of -- have you also come to learn now that Scott
7 Ellington is at least a partial owner of SAS?
8      A   I believe so.  I'd have to go back and
9 look.  I think that's the case.
10      Q   If you look at the next tab, Tab~8 it's
11 been marked as Exhibit 156.
12           (Deposition Exhibit 156 was received and
13 marked for identification, as of this date.)
14 BY MR. CLUBOK:
15      Q   This was an exchange involving various
16 folks that you can see on the email.  Oops, I'm sorry.
17 That's the wrong document.
18           Exhibit -- skip that Tab~8 to Tab~9.
19           Exhibit 156 is Tab~9, which is an email
20 exchange around late 20 -- January 2021, amongst you
21 and others including Katie Irving and Stephanie
22 Vitiello and others.  Do you see that?
23      A   Yes.
24      Q   In particular, there's an email where -- in
25 the chain where Greg Demo, who is one of your outside

**84**

1 counsel, sends to Katie Irving and asks for complete
2 list of the parties who worked on SAS or on SAS
3 emails, et cetera, et cetera.  And then notes in big
4 bold letters, This request is not limited to Katie.
5 If anyone else knows the answers to these questions,
6 tell us.  Do you see that?
7      A   Yes.
8      Q   Did Katie Irving ever provide the
9 information that Mr.~Demo is requesting?
10      A   No, she did not.
11      Q   Did she explain why?
12      A   No.  And in looking at this email chain
13 starting from the bottom, it was Jack Donahue who
14 initiated the request.  Jack is an associate with DSI
15 and he started hitting people up with an email, Can
16 you tell me anything about SAS Management.  And Helen
17 Kim says, no, don't know anything.
18           And then Jack, because he's dogged, says,
19 do you know what it stands for?  Anybody know anything
20 about this?  Any contracts?  And Stephanie Vitiello,
21 who's also an attorney says, No.
22           And then Jack doesn't give up.  So he asks
23 again and they keep saying "no."  And then Vitiello
24 says "I'm not aware of any contracts."
25           So his question is do you know anything

85

1  about SAS. And she says, "I'm not aware of any
2  contracts." So that is a strange response --
3  nonresponsive response.
4        Then it goes to -- Jack doesn't give up.
5  So eventually he involves Demo. Demo then, I think,
6  pushes on the group again. And Katie Irving says
7  there's no -- there's no info. First she says that to
8  Jack, no info, nondebtor, Summit Management are
9  directors. And then it goes a little later. I think
10  I sent an email on the third page of this exhibit
11  because I had been copied at some point by Demo and
12  basically was tired of the nonsense and said, you
13  know, who is this entity and who's got the docs? I'm
14  told it's alive. Where is it?
15        And I get a specific response from Katie
16  Irving that isn't a non answer or nonresponsive. It's
17  a direct deceitful response that say, I'm not sure how
18  advised you. It is totally incorrect. It's not a
19  known entity. That's false. Legacy claims funding
20  platform, maybe, maybe not. Wholly unrelated to the
21  debtor. Completely untrue since debtor employees are
22  the ones who did all the work on it without
23  compensation.
24        And then it continues with very
25  nonresponsive responses and ultimately JP Sevilla, all

86

1  of these folks we now know had an SAS email address.
2  And JP Sevilla says it's -- deceptively says this was
3  litigation. The litigators did all of the substantive
4  work. They're all gone.
5     Q  And you mentioned they had emails with an
6  SAS email address. What do you mean by that?
7     A  They had an SAS -- I don't know if it was
8  SAS -- I think it was sasmanagement.com. I stumbled
9  across it when I terminated Elling -- Leventon and
10  went to send his termination letter to him and
11  Microsoft Outlook in a very friendly way popped it up
12  as one of the alternate addresses.
13        I don't recall ever seeing it. It must
14  have been in some trail of emails and that's how it
15  did it. And that got us looking as to what this thing
16  was. And that would have been the genesis is my
17  belief. That would have been genesis of the original
18  inquiry from Donahue.
19     Q  Did Ms. Irving ever tell you in words or
20  substance that she was originally hired by Highland to
21  work on SAS tasks among other things specifically?
22     A  No.
23     Q  Do you know that Scott Ellington hired her?
24     A  I don't. I don't know. That wouldn't
25  surprise me.

87

1     Q  With respect to those emails, have you been
2  able to recover the SAS emails from that server?
3     A  No. We determined that SAS was not on the
4  Highland server platform. It was separate.
5     Q  Did SAS separately pay the Highland
6  employees from a different fund for the work they did
7  with -- in connection with SAS as far as you know?
8     A  Not to our knowledge, no.
9     Q  Was Katie Irving --
10     A  Certainly Highland did not get paid or
11  reimbursed for the work that Highland employees did
12  working for SAS.
13     Q  Yeah. Did you know -- when was the first
14  time you learned about -- strike that.
15        When was the first time you learned that
16  any Highland employees were actually doing work for
17  SAS?
18     A  That would have been in the first quarter
19  of '21, 2021.
20     Q  Did you ever hear of SAS referred to as a
21  project related to litigation funding?
22     A  I don't -- I've heard that since, but I
23  think it was claims buying. I never heard of it as
24  litigation funding to my knowledge. I don't recall
25  that.

88

1     Q  Ms. Irving -- are you aware of the
2  following testimony by Ms. Irving.
3        'Question: What instigated your move from
4  Ernst & Young to Highland Capital?
5        "Answer: Highland was looking for someone
6  to essentially work on a incubator project related to
7  litigation funding. I thought it seemed like an
8  interesting opportunity.
9        "Question: What about this struck you as
10  interesting?
11        "Answer: I met the team. I thought it was
12  a very entrepreneurial environment.
13        "Question: Who was the team?
14        "Answer: Scott Ellington and JP Sevilla.
15        "Question: Did this litigation funding
16  have its own entity that worked under separate from
17  Highland Capital?
18        "Answer: Yes.
19        "Question: What entity was that?
20        "Answer: SAS Asset Recovery."
21  BY MR. CLUBOK:
22     Q  Had you heard about this testimony?
23     A  No.
24     Q  To the extent that it's true, as Ms. Irving
25  testified to in her deposition in this matter, that

89

1  she was hired from the beginning to work on the SAS
2  project or SAS Asset Recovery, is that consistent with
3  what she told you?
4      A  I just never have heard anything like that.
5  I never inquired of her who hired her and what her
6  specific role was.  She was assigned to the Highland
7  legal team even though she wasn't a lawyer and she
8  worked on the UBS matter, she worked on Cornerstone.
9  But, frankly, she didn't have a lot to do that I knew
10 of.  But she was -- as far as I knew -- exclusively a
11 Highland employee and was a full-time employee at
12 Highland and paid that way.  She was paid well.
13     Q  When you say she worked on the UBS matter,
14 you mean she supported Mr. Leventon's day-to-day
15 oversight of UBS litigation?
16     A  That's my recollection.  I don't know that
17 she was day-to-day, but she certainly had involvement
18 is my recollection.
19     Q  Okay.  This email exchange that we've been
20 looking at, Exhibit 156, was late January of 2021.
21        Fair to say shortly after that, you
22 disclosed to UBS that you had learned about the
23 significant transfer of assets from the judgment to --
24 debtors to UBS to Sentinel to purportedly purchase an
25 insurance policy, correct?

90

1      A  Yeah, it was in and around this time.
2      Q  And when did you first become aware of that
3  transfer of assets in connection with the acquisition
4  of an insurance policy?
5      A  Again, I don't have the exact dates in
6  front of me.  I'd have to be refreshed on it.  But it
7  was in and around this time.  Leventon was fired --
8  was fired at the beginning of January 2021; DiOrio was
9  fired at the end of -- the end of February 2021.  When
10 we fired Leventon, we didn't know anything about SAS
11 or Sentinel or any of these transfers.  When we fired
12 DiOrio, we definitely knew about it.  So it was in
13 that time frame.
14     Q  Okay.  If you turn to Tab~10, which is
15 Exhibit 57.
16        (Deposition Exhibit 57 was received and
17 marked for identification, as of this date.)
18 BY MR. CLUBOK:
19     Q  There's a email exchange between Isaac
20 Leventon and Chris Dunn.  Subject is UBS privilege, he
21 says, from October of 2017.  And he attaches something
22 called the UBS ATE PDF.  Do you see that?
23     A  Yes.
24     Q  And the attachment is the so-called Legal
25 Liability Insurance Policy that's been executed

91

1  according to the signature pages at the end that that
2  we've been referring to loosely as the insurance
3  policy, correct?
4      A  That's correct, yes.
5      Q  And did Mr. Leventon ever tell you about
6  what he called the UBS ATE during -- ever?  Did he
7  ever tell you about it?
8      A  Never.
9      Q  ATE stands for After the Event; is that
10 your understanding?
11     A  That's my understanding, yes.
12     Q  And in a nutshell, what this policy does is
13 it says okay, you've already got a litigation or
14 there's already been an event that you might have
15 liability for.  And knowing that, we're going to now
16 issue a policy to satisfy a judgment in case you lose
17 the litigation over that event.  Is that a fair
18 summary of --
19     A  That's what it looks to do.
20     Q  Yeah.  And Mr. Leventon -- by the way, who
21 is Chris Dunn?
22     A  I don't know.
23     Q  Mr. Leventon says, "Label all communication
24 related to this project as privileged as all documents
25 are being drafted at the request of the legal team."

92

1  Do you see that?
2      A  Yes.
3      Q  But the document that's attached is an
4  insurance policy, right?
5      A  Correct.
6      Q  That wouldn't be a privileged document,
7  correct?
8         MR. MORRIS:  Objection to the form of the
9  question.
10     A  Not in my experience.
11 BY MR. CLUBOK:
12     Q  You've not claimed privilege over this
13 document, correct?
14     A  That's correct.
15     Q  And as far as you know, was this document
16 ever provided to UBS prior to February of 2021?
17     A  Not to my knowledge, no.
18     Q  Do you remember specifically how you --
19 does looking at it ring a bell as to how you found it
20 or who first told you we've got this?
21     A  It's a bit of a convoluted story, but it
22 goes very much along the lines of when Microsoft
23 Outlook graciously gave me the SAS Management email
24 for Leventon at some point.  I asked our team to start
25 looking to figure out what SAS was.  And when they

**93**

1 were doing that, they came across -- and when I say
2 "our team," I meant DSI and outside counsel. When
3 they were doing that, they came across Sentinel. When
4 they came across Sentinel, the aforementioned
5 Mr. Romey recalled that Sentinel was a redeemer out of
6 the Multi-Strat fund. And that got us looking in the
7 system for anything related to Sentinel. And that
8 then brought us to the policy.
9         But before that, we had no idea who Sent --
10 Sentinel was not something on my radar screen. We had
11 no idea who they were. If they showed up as a
12 redeemer on a list I got, I wouldn't have thought they
13 were a related party.
14     Q    Now that you've had a chance to look at it
15 in your role as overseeing Highland's assets and
16 liabilities and the assets/liabilities of the funds
17 that may affect Highland, fair to say that this
18 insurance policy, if it was valid, would have been
19 very material to UBS?
20     A    Not only to UBS. UBS is a pretty big
21 business so materiality for them I'm not quite sure
22 about. But certainly material to Highland. Highland
23 controlled CDO Fund was -- purportedly from
24 the Highland legal team had no assets. And it turns
25 out that it had one very material asset which is this

**94**

1 insurance policy.
2     Q    As part of the work you've been doing at
3 Highland, you had control over CDO Fund, correct?
4     A    That's correct, yes.
5     Q    And at some point --
6     A    Through the general partner.
7     Q    Right. And you understood from the get-go
8 even before you took your job as independent director
9 that CDO Fund owed UBS over $500 million, correct?
10     A    That was from the original decision prior
11 to the judgment. And it looked to us like that was
12 going to be a pretty sound ruling with respect to CDO
13 Fund and SOHC.
14     Q    If you had known that CDO Fund had an
15 insurance policy for $100 million, would you have
16 hesitated at all to tender that as at least partial
17 satisfaction of the over 500 million-dollar judgment
18 against CDO Fund?
19     A    No. We would have done it right away. I
20 would have saved months and months, years and
21 countless dollars, tens of millions.
22     Q    If you turn to the page -- the page that's
23 marked 17 of 16, oddly. It's Bates labeled 3070 at
24 the bottom, Exhibit 57. It may have a different
25 numbering system in the Caymans.

**95**

1         You could see the previous page was page 16
2 of 16 and then this one for whatever reason is called
3 page 17 of 16. I guess it's an add-on page after all
4 the signature pages that were all 16 of 16.
5         I just want to refer you to this just to
6 make sure we all understand what we're talking about.
7 And this is a schedule that's part of the legal
8 liability insurance policy that we sometimes called
9 the insurance policy or the ATE policy that's attached
10 by Mr. Leventon to his email that's been identified as
11 Exhibit 57. Are you with me?
12     A    Yes.
13     Q    So on that schedule, it refers to the
14 insurer and the insurer here is Sentinel Reinsurance
15 Limited, correct?
16     A    Yes.
17     Q    And the insureds were Highland CDO
18 Opportunity Master Fund, L.P., Highland CDO Holding
19 Company, and Highland Special Opportunities Holding
20 Company, correct?
21     A    Yes.
22     Q    And you understand that Highland Special
23 Opportunities Holding Company is a -- the entity that
24 we've been called SOHC, correct?
25     A    That's correct.

**96**

1     Q    It talks about a legal action. Do you see
2 that in the middle of the schedule?
3     A    Yes.
4     Q    And that legal action it specifically
5 references was the underlying UBS litigation with the
6 High -- with Highland and the related funds that
7 had -- that still is pending in New York, correct?
8     A    That's correct.
9     Q    And that's the very -- we talk about the
10 UBS litigation with Highland or the New York action.
11 That's all the same as what's captioned here on this
12 schedule?
13     A    That's my understanding, yes.
14     MR. MORRIS:  Mr. Clubok, I don't mean to
15 interrupt, but I just want to point out that it's
16 almost 4:15 and I just want to remind you that I have
17 a hard stop at 5:00 and I understood you did as well.
18     MR. CLUBOK:  Yeah, I understand.
19 BY MR. CLUBOK:
20     Q    So, Mr. Seery, this ATE by the way as an
21 asset of the funds would have been responsive to UBS's
22 discovery request we previously looked at that were
23 marked as Exhibit 69, correct?
24     A    I don't know specifically, but I believe it
25 would have been. Certainly would have been an asset

97

1 and part of the requests were assets of CDO Fund and
2 SOHC. So probably would have been responsive to both.
3     Q   You would have turned this over immediately
4 had you been aware of it, correct?
5     A   Absolutely.
6     Q   And, in fact, once you became aware of it,
7 you turned it over, you know, almost immediately or
8 shortly after you found it, correct?
9     A   Within -- within a day or two. Yeah, I say
10 within a day or two. As soon as we figured out what
11 it was, and we were very quick to get this to UBS.
12 And the reason for that is we had a pending settlement
13 with UBS. And my view and obviously my co-directors
14 at the time agreed we could not go forward with the
15 settlement until we figured this out. And we needed
16 to do that with UBS to tell them. We couldn't just
17 say we're not going forward with the settlement. We
18 had to say we're not going forward with the
19 settlement.
20     UBS, obviously, was taken back by that and
21 so we have to divulge some things to you that have --
22 they previously asked for in discovery and we've now
23 found and it may change the dynamic of our
24 discussions. So we really did need to get that
25 quickly because we were actively working on a

98

1 settlement agreement at the time.
2     Q   You felt like given the status of the
3 restructuring and the disputes that existed between
4 UBS and Highland both in New York and in the
5 restructuring, that it was just the obligation of HCM
6 to provide this information to UBS, correct?
7     A   Absolutely. We're -- we're certainly
8 entitled to litigate -- litigate hard, be aggressive
9 to protect the interest of the estate. We're not
10 entitled to defraud creditors and lie to them about
11 the situations.
12     Q   And an active effort to not provide this
13 information to UBS that's set forth in Exhibit 57
14 would be an effort to defraud UBS, correct?
15     MR. MORRIS: Objection to the form of the
16 question.
17     MR. CLUBOK: Sorry. Let me ask that -- let
18 me rephrase it then.
19 BY MR. CLUBOK:
20     Q   If there was an active effort to hide
21 Exhibit 57 from UBS, it would have been a fraud on
22 UBS, correct?
23     MR. MORRIS: Objection to the form of the
24 question.
25     A   If it's a legal conclusion, I guess that

99

1 might be the objection. It's certainly improper. And
2 I think in my opinion it would have been fraudulent.
3 BY MR. CLUBOK:
4     Q   In your role that -- you know -- strike
5 that.
6     In the roles that you have had with respect
7 to managing HCM and the related entities' affairs, you
8 would consider it fraudulent to actively conceal
9 Exhibit 57 from UBS, correct?
10     A   I would, yes. The debtor -- during the
11 case, the debtor is a trustee under the bankruptcy
12 code. Trustees are fiduciaries to the estate. Each
13 of the creditors have a interest or potential interest
14 in the estate. Not dealing with them fairly and
15 openly I believe to be against the requirements of the
16 person who manages that fiduciary, i.e., the debtor.
17     Q   And would you believe that if you had a
18 legal team that was tasked with helping you and they
19 actively concealed Exhibit 57 and other information
20 like it that they would be engaging in fraud?
21     MR. MORRIS: Objection to the form
22 question.
23     A   I think that's probably fair. What we've
24 come to learn is that there was personal interest that
25 would take this well beyond the scope of what normally

100

1 would, in my view, be the scope of their employment.
2 And folks were acting contrary to the interest of
3 the -- of the debtor and the estate, notwithstanding
4 their fiduciary duties as lawyers for the debtor in
5 possession.
6 BY MR. CLUBOK:
7     Q   Okay. We've talked about the insurance
8 policy that could have been used to satisfy at least
9 some of the judgment against CDO Fund. I want to talk
10 about the way that policy was acquired and I want to
11 ask you to turn to Tab~11, where we have Exhibit 2,
12 which is a purchase agreement dated August 7, 2017
13 between CDO Fund, CDO Hold Co and SOHC. Do you see
14 that?
15     A   Yes.
16     (Deposition Exhibit 2 was received and
17 marked for identification, as of this date.)
18 BY MR. CLUBOK:
19     Q   And by the way, I should point out if you
20 look at the signature page, fair to say that
21 Mr. Dondero signed on behalf of every so-called seller
22 entity?
23     A   That's correct, yes.
24     Q   And just to confirm, if you'd look back at
25 Exhibit 57, which was the insurance policy, you see

101

1 that also Mr. Dondero signs for all of the funds,
2 correct?
3     A   That's correct.
4     Q   And in both cases, the countersignator is
5 Andrew Dean, who was identified as a director of
6 Sentinel Reinsurance at the time.  Do you see that?
7     A   That's correct.
8     Q   So the purchase agreement, you -- you have
9 seen this before, right?
10     A   I have, yes.
11     Q   And if you turn to Exhibit A, is it your
12 understanding that this is a list of the assets that
13 were purportedly used to acquire the ATE policy?
14     A   That's correct, yes.
15     Q   Now the ATE policy, we looked at that
16 schedule a moment ago if you'd flip back to
17 Exhibit 10, you'd see there were three insureds
18 listed, right?  CDO Fund, CDO Hold Co and SOHC?
19     A   Yes.
20     Q   And those were the three entities that
21 signed the insurance policy, correct?
22     A   That's right.
23     Q   But in this purchase agreement, there are
24 six different sellers?
25     A   Yes.

102

1     Q   Including Highland Financial Partners,
2 which was the -- then -- of which SOHC was a
3 subsidiary of, correct?
4     A   Correct.
5     Q   By the way, you understand that -- are you
6 aware that UBS has now obtained a judgment that holds
7 HFP to be the alter ego of SOHC and therefore
8 responsible for the same judgment that SOHC is
9 responsible for?
10     A   I don't know if I was aware of that or not.
11 I just don't know.
12     Q   Okay.  I'll just represent -- I'll
13 represent to you and we'll provide to your counsel
14 after this that there was a recent court order in
15 New York that issued a judgment against HFP as the
16 alter ego of SOHC and holding them accountable for the
17 same judgment as SOHC.
18         Do you have any idea why these six entities
19 would have transferred assets to pay for insurance
20 policy that was supposedly covering three entities?
21     A   No idea other than as directed by
22 Mr. Dondero to move all of the assets.  The idea of
23 taking virtually all of your assets, when you're a
24 putative judgment debtor or a potential judgment
25 debtor, and using all of them to buy an insurance

103

1 policy equal to some portion of the value of the
2 assets doesn't make any sense anyway.  Meaning if I
3 have $100 and I'm a potential judgment debtor, what
4 value do I get out of buying a $100 insurance policy.
5 I should hold onto the $100 and if I lose, just lose
6 that.
7     Q   Yeah.  And, in fact, the ultimate value of
8 the assets transferred proved to be even more than
9 $100 million according to Highland's calculations,
10 correct?
11     A   That's our estimate, yes.
12     Q   You understand that CDO Hold Co, like SOHC,
13 was a wholly-owned sub of HFP?
14     A   I think it was an indirect wholly-owned
15 sub.
16     Q   And same with HFC?  Also in the HFP family?
17     A   I don't recall where HFC sat exactly, but
18 it would have been in that family.
19     Q   Okay.  You know back in 2017, Highland was
20 claiming that HFP was not an alter ego of SOHC and
21 they should not be held liable as such.  You're aware
22 of that?
23     A   Yes, yeah.
24     Q   And yet you see here that all of the assets
25 of HFP and its subs are being pooled to buy insurance

104

1 purportedly for -- not for HFP, but for SOHC and the
2 two others identified, correct?
3     A   That's what it does, yes.
4     Q   And then of course Dondero signs on behalf
5 of all of the funds, right?
6     A   Correct.
7     Q   Do you know whose idea it was to create the
8 purchase agreement?
9     A   I've looked at a lot of documents on it.  I
10 don't recall specifically.
11     Q   You filed a declaration in connection with
12 this motion to withdraw the answer and consent to
13 judgment.  And I'm not going to go through your
14 declaration with you, but I take it you stand by your
15 declaration, everything you said in it?
16     A   I believe so, unless there's something in
17 there that has now proved incorrect.
18     Q   Yeah, let me put it another way.
19         You're not aware of any changes to your
20 declaration as far as you sit here today?
21     A   Yeah.  If something changed, I would
22 forthrightly admit I was wrong and identify what it
23 was.
24     Q   Yeah.  And, again, I'm just trying to save
25 a little time here.

---

105

1    A    Yep.
2    Q    But I think in your declaration you said
3  that you understood the transferred assets conveyed to
4  Sentinel had a face value of more than 300 million and
5  a market value at the time of transfer of over
6  100 million?
7    A    That's our estimate, yes.
8    Q    Okay.  And that as far as you know, that's
9  correct, those numbers?
10   A    Yes.
11   Q    Obviously, that's much greater than
12 $25 million, which was supposed to be the premium
13 price, correct?
14   A    That's correct, yes.
15   Q    And indeed, it's even greater than the
16 total coverage that's supposedly being provided by the
17 policy which was only $100 million, correct?
18   A    That's correct, yes.
19   Q    Based your experience, is there any good
20 faith justification for transferring over $100 million
21 in assets to buy an insurance policy with this sort of
22 purported coverage?
23   A    Not a good faith one, no.
24   Q    Fair to say that had you known about this
25 purchase of assets and transfer of assets in

---

106

1  connection with the insurance policy, you would have
2  also promptly provided all of that information to UBS?
3    A    Yes.  And when we did discover, we did so.
4          (Deposition Exhibit 3 was received and
5  marked for identification, as of this date.)
6  BY MR. CLUBOK:
7    Q    If you turn to Tab~12, we've got Exhibit 3
8  there.  That is a memo from Shawn Raver to Rick
9  Swadley regarding the policy?
10   A    Yes.
11   Q    And it attaches a tax compliance memo
12 regarding sale of assets to Sentinel.  Do you see
13 that?
14   A    Yes.
15   Q    You've seen this memo now before today,
16 correct?
17   A    I have, yes.
18   Q    And this is another one that you had not
19 seen until you sort of uncovered all of the events in
20 connection with the insurance policy?
21   A    Yes.
22   Q    Fair to say that when this memo was written
23 in 2018, HCM had recorded the market value of those
24 assets that were transferred in connection with the
25 insurance policy as approximately 105 million?

---

107

1    A    I believe that's correct, yes.
2    Q    You understand that all of the work --
3  strike that.
4          I think you testified earlier that you came
5  to learn that Matt DiOrio, who was a Highland employee
6  at the time, had been one of the directors at
7  Sentinel, correct?
8    A    That's correct, yes.
9    Q    Are you aware that Sentinel had three
10 directors but no employees that directly were paid by
11 Sentinel?
12   A    I've come to learn that, yes.
13   Q    And have you come to learn that all of the
14 business of Sentinel was done by various people who
15 were being paid by Highland largely, or maybe
16 entirely, in the legal department?
17   A    Yes, that's correct.  And I think all of
18 the business of Sentinel was on behalf of Highland or
19 Highland-related entities.
20   Q    Were you -- so -- and have you come to
21 learn that work done on behalf of Sentinel continued
22 after the bankruptcy filing?
23   A    I have come to learn that, yes.
24   Q    And that work was done by Mr. Ellington,
25 Mr. Leventon, Mr. Sevilla, Mr. DiOrio, Ms. Irving and

---

108

1  Ms. Vitiello?
2    A    Certainly what I've seen evidence of, and I
3  would put work in quotes, I see evidence that
4  Mr. Ellington, Mr. DiOrio, and I believe Mr. Leventon.
5  But certainly the first two and perhaps Mr. Sevilla
6  were actively involved in working on Sentinel matters
7  post petition.
8    Q    Prior -- strike that.
9          Did any of those individuals ever tell you
10 that they were working for Sentinel on Highland
11 Capital Management time?
12   A    No.  And I -- they were full-time employees
13 of Highland.
14   Q    Highland Capital Management has a code of
15 ethics in effect today?
16   A    That's correct.
17   Q    And when did that policy take affect?
18   A    It's been in effect as long as I've known
19 about it.  I would think it goes back to -- I don't
20 know exactly.  It's been around as long as -- I think
21 that they've always had a code.
22   Q    It's applied throughout the whole time that
23 you've been involved with Highland, correct?
24   A    Absolutely, yes.
25   Q    Now, if you look at Exhibit -- Tab~13,

109

1 which is Exhibit No. 157, I hope.
2     (Deposition Exhibit 157 was received and
3 marked for identification, as of this date.)
4 BY MR. CLUBOK:
5     Q   Exhibit 157 is an email from Jason Post to
6 Sarah Goldsmith that copies a -- or attaches a copy of
7 the Highland Capital Management Compliance Manual. Do
8 you see that?
9     A   Yes.
10    Q   And this says that it was updated in
11 October of 2019. But presumably there was another
12 version of this before that. But this was the
13 operative one when you took over, correct?
14    A   That's my understanding. I don't know that
15 it was updated after that during the case. I don't
16 recall it being so. Post exit we've updated it.
17    Q   Yeah, I guess to be precise, I note on the
18 first page it says revised March 1, 2019?
19    A   Yes.
20    Q   Okay. But it was circulated, looks like,
21 at least in this exhibit, Exhibit 157, in October of
22 2019?
23    A   Yes, correct.
24    Q   And when was the bankruptcy?
25    A   October 16, 2019.

110

1     Q   So this would have been recirculating the
2 compliance manual after the restructuring?
3     A   That's correct, yes.
4     Q   And fair to say that if you turn to page 23
5 of 36, which I think ends in Bates No. 65, is page 23
6 of the exhibit that is?
7     A   Yes.
8     Q   Bates labeled ends at 65, there's a whole
9 section on outside business activities and private
10 transactions. Do you see that?
11    A   Yes.
12    Q   And it says employees have to obtain the
13 approval of chief compliance officer prior to serving
14 as a director, officer, general partner or trustee or
15 consultant to any business, et cetera, et cetera. Do
16 you see that?
17    A   Yes.
18    Q   And also before accepting a second job, a
19 part-time job of any kind or engaging in any other
20 business outside the company. Do you see that?
21    A   Yes.
22    Q   Who was the chief compliance officer?
23    A   Thomas Surgent.
24    Q   Highland's Code of Ethics would have
25 required employees working for Sentinel to disclose

111

1 that to Mr. Surgent, correct?
2     A   Correct.
3     Q   As far as you know, was there any
4 disclosures made since the bankruptcy about the work
5 that was being done by the individuals you've
6 identified on behalf of Sentinel?
7     A   Not to my knowledge.
8     Q   Was there ever a disclosure that Matt
9 DiOrio was actually acting as a director of Sentinel?
10    A   No.
11    Q   Are you aware that even after the -- are
12 you aware that Mr. DiOrio directed transfers of funds
13 that were purportedly owned by Sentinel even after the
14 bankruptcy?
15    A   Yes. I am now aware of that, yes.
16    Q   Did you have any idea about that during the
17 time it was happening?
18    A   No. I learned that through -- very
19 recently through the discovery that UBS did in this
20 litigation.
21    Q   Can you briefly describe what your
22 understanding -- the understanding you've come to have
23 about Mr. DiOrio's movement of assets?
24    A   Sure. As I said earlier, if we had known
25 that CDO Fund had this asset as an insurance policy,

112

1 we would have certainly zealously guarded it and tried
2 to recover on it for the benefit of the UBS which
3 would have -- we would have expected to reduce
4 exposure on the loss that the UBS had against CDO
5 Fund, SOHC, and included Highland.
6         What we've come to learn is that Mr. DiOrio
7 was involved, and perhaps others, with transferring
8 assets from Sentinel to other subsidiaries in the
9 ultimate beneficial ownership universe of Mr. Dondero
10 and Mr. Ellington, including significant amounts of
11 notes owed by CLO Hold Co to -- originally owed to CDO
12 Fund and then they had been transferred to Sentinel
13 and they moved those to, I believe, Bray Royale and
14 then another board note as well, purportedly moved
15 because they were worthless, which we know, in fact,
16 to be untrue, at least in terms of the assets that
17 those entities have.
18        But there were other diminutions of the
19 policy including extensive approvals by Mr. DiOrio for
20 completely -- what appear to be completely out of the
21 ordinary course of expenditures by Mr. Ellington in
22 significant and embarrassing numbers.
23    Q   If you could look at Tab~18. That is an
24 exhibit that we're marking 158.
25    (Deposition Exhibit 158 was received and

113

1 marked for identification, as of this date.)
2 BY MR. CLUBOK:
3    Q    Is this a document you had seen before UBS
4 had uncovered it in discovery?
5    **A    I don't recall unless I just looked at it**
6 **in connection with this -- preparing here that --**
7 **there's a similar one that DiOrio sends with respect**
8 **to a different asset. But this looks to be on the**
9 **Greenbriar asset.**
10    Q    Yeah, if you look at the bottom of page
11 three, you see in July -- let's see.
12    **A    2017.**
13    Q    Actually I'm looking at the October 2017,
14 you see Chism is -- Carter Chism is working with
15 Lesley Thompson and JP Sevilla is copied on these
16 documents, as is Matt DiOrio. Do you see that?
17    **A    Yes.**
18    Q    If you work your way up now, up the email
19 towards present and just take a quick look through,
20 you could see that there's references to wire
21 transfers, wire instructions, et cetera. Do you see
22 that?
23    **A    Yes.**
24        (Deposition Exhibit 159 was received and
25 marked for identification, as of this date.)

114

1 BY MR. CLUBOK:
2    Q    If you go to the next Tab~19, which is
3 Exhibit 159, you see a document dated January 10,
4 2020. It says it's from M88O@hcmlp.com do you know
5 who that is?
6    **A    That's a copier.**
7    Q    Okay. So from a copier --
8    **A    Yeah, you'd scan the document and send it**
9 **to yourself.**
10    Q    Okay. And the document that -- then
11 Mr. DiOrio at this time was still employed by Highland
12 Capital Management?
13    **A    Yes. This is -- you know, in the first**
14 **quarter of '20, it's a case he works in the legal --**
15 **it's post petition. He works in the legal department.**
16    Q    And you could see on the next page, it
17 appears to be -- he talks about how there's August and
18 November '19 distributions on Valhalla CLO due to our
19 purchase of the notes from BONY. Do you see that?
20    **A    Yes.**
21    Q    And Sentinel Reinsurance is sending this
22 document. And it's signed by Matt DiOrio. Do you
23 see?
24    **A    Yes.**
25    Q    Do you have any idea what this is about?

115

1    **A    This is a CLO interest, preferred interest**
2 **in the CLO Valhalla that was transferred from either**
3 **SOHC or CDO Fund to Sentinel. And I think this is one**
4 **of the ones that had some difficulty in completing the**
5 **transfer. And he is making the claim on distributions**
6 **that would have been made to Valhalla. Here it's**
7 **$1300 on behalf of Sentinel.**
8    Q    Does Mr. DiOrio tell you anything at all
9 about this work he was doing with -- you know, with
10 the HCML copier in connection --
11    **A    This would have been completely secret and**
12 **kept from the directors, certainly from me, from**
13 **anybody on the legal team at Pachulski or from the DSI**
14 **folks. This alerted us to this whole Sentinel**
15 **situation.**
16    Q    Is there any obvious problem with Matt
17 DiOrio authorizing wire transfers from this account to
18 Sentinel during the bankruptcy?
19    **A    I think it's -- I think it's a significant**
20 **problem, yes.**
21    Q    Can you explain why?
22    **A    Well, to the extent that this policy is an**
23 **asset that is controlled by the estate, this is**
24 **something the estate is supposed to be made aware of.**
25 **This policy would have benefited the estate by**

116

1 **having -- have assets with which to satisfy the**
2 **subsidiary obligations to UBS and wouldn't have dug a**
3 **continuing deeper hole for Highland employees hiding**
4 **those assets.**
5    Q    If you turn to Tab~21, which is a document
6 we'll mark as Exhibit 160.
7        (Deposition Exhibit 160 was received and
8 marked for identification, as of this date.)
9 BY MR. CLUBOK:
10    Q    You could see this is dated January 8,
11 2021. Do you see that?
12    **A    Yes.**
13    Q    And you see there's still transfers being
14 made. It says Ordering Customer: Highland Financial
15 Corp. Did you know anything about this transfer?
16    **A    No.**
17    Q    Did you authorize it in any way?
18    **A    I did not, no.**
19    Q    Would this be problematic if somebody at
20 Highland had authorized this?
21    **A    Yeah. This was -- you know, as we were**
22 **continuing to -- this is even -- this is even after we**
23 **have -- maybe right before we settled with UBS, but we**
24 **were certainly in the plan process and trying to**
25 **figure out how we were going to resolve claims with**

117

1  UBS. I don't believe we'd actually settled yet. This
2  is extremely problematic and it's for material amounts
3  of money.
4      Q   And by the way, Highland Finance Corp. is
5  100 percent subsidiary of Highland Financial Partners,
6  correct?
7      A   That's my recollection. I don't remember
8  if it's direct or indirect.
9      Q   If you want to glance just refresh your
10 recollection, Tab~42, you can just look behind the
11 blue sheet, there's an org chart. This was an
12 attachment to emails that were circulated at Highland
13 in May of 2020. And just to refresh your
14 recollection, take a look at HFP org chart. Go down.
15     A   It appears to be a direct subsidiary.
16     Q   Okay. So it's certainly the information
17 that was provided to you was that HFC was a direct
18 subsidiary, fully owned subsidiary of HFP, right?
19     A   Yes.
20     Q   Along with SOHC?
21     A   Correct.
22     Q   This information about this transfer from
23 Highland Financial Corp. to Sentinel would have been
24 very material to UBS, correct?
25         MR. MORRIS: Objection to form.

118

1          MR. CLUBOK: Strike that.
2  BY MR. CLUBOK:
3      Q   It would have been very material to the
4  litigation dispute between UBS and Highland, correct?
5      A   It certainly would have been a significant
6  issue.
7      Q   And it certainly --
8      A   And then post judgment are transferring
9  amounts of this size out of their bank accounts to
10 Sentinel.
11     Q   This information that's reflected in
12 Exhibit 160 should have been provided to UBS
13 unquestionably, correct?
14     A   In my opinion, yes.
15     Q   And had you known about it, you would have
16 insisted it be provided to UBS, correct?
17     A   Oh, absolutely, yes.
18     Q   But it was kept from you at the time it
19 happened, correct?
20     A   Correct.
21     Q   The funds -- you've known about the UBS
22 judgment since even before you took over as
23 independent director, right?
24     A   Well, the UBS decision I think which
25 predated the actual judgment.

119

1      Q   Thank you. You've known about the decision
2  and the impending UBS judgment, correct?
3      A   That's correct.
4      Q   Did the funds ever make a claim on the
5  policy after the judgment was entered?
6      A   Yes.
7      Q   Approximately when did it do that?
8      A   In 2021 at the -- sometime in the first or
9  second quarter, end of the first, beginning of second.
10 After we left, we didn't know about the policies, so
11 it's good to learn about it, look at it, make sure we
12 weren't going to somehow hurt the ability to draw on
13 it and then be able to use the funds to satisfy the
14 obligations to UBS.
15     Q   The only reason you didn't make a claim on
16 the policy until the time that you did was because it
17 was actively concealed from you, correct?
18     A   That's correct, yes.
19         (Deposition Exhibit 161 was received and
20 marked for identification, as of this date.)
21 BY MR. CLUBOK:
22     Q   If you look at Tab~24, you'll see
23 Exhibit 161, which is the April 28, 2021 letter that
24 you wrote on behalf of CDO Fund officially making a
25 claim under the policy. Do you see that?

120

1      A   That's correct.
2      Q   And this was as early as you reasonably
3  could do after learning about the policy and getting
4  your arms around what had happened here; is that fair?
5      A   That's right, yep. I'm just standing up.
6      Q   That's okay. And you sent that letter
7  expecting that -- strike that.
8          You sent that letter with the demand that
9  Sentinel would pay under the policies so that you
10 could in turn pay that money to UBS?
11     A   Yeah, looking at it, the first demand was
12 actually a couple of pages in. That's March 19th.
13 And we didn't get a satisfactory or any response to my
14 knowledge. So the first is an actual demand. So
15 that's almost starts the end of the first quarter.
16 And then the second letter is actually a reiteration
17 of our demand.
18     Q   Thank you. So Exhibit 161 is a reiteration
19 of a demand you had made previously in March of 2021
20 seeking coverage under the policy on behalf of CDO
21 Fund, correct?
22     A   Correct, and includes the -- a copy of the
23 judgment.
24         MR. MORRIS: Andy, not to be a pest.
25 Fifteen minutes.

121

1        MR. CLUBOK:  Yeah.
2  BY MR. CLUBOK:
3      Q   I see.  And if you turn to the back of
4  Exhibit 161, you'll see a copy of that original demand
5  that's dated March 19, 2021, but may have been sent on
6  or about March 24, 2021; do you see that?
7      **A   I'd be surprised if it wasn't sent on the**
8  **day that it's dated.**
9      Q   I think if you just look at the first page
10  of 161, it says on March 24th, you sent the formal
11  demand.  So maybe it was over a weekend or some delay?
12      **A   Yeah, perhaps.  It may have had to be**
13  **done -- oh, because it was certified mail.**
14      Q   Oh, okay.  So you did the demand but you
15  had to organize it to be sent by certified mail and
16  all of that?
17      **A   Correct.**
18      Q   Got it.
19      **A   And I assume that's because it was a policy**
20  **requirement.**
21      Q   Right.  And if you turn to the next tab,
22  you see Exhibit 162.
23          (Deposition Exhibit 162 was received and
24  marked for identification, as of this date.)
25

122

1  BY MR. CLUBOK:
2      Q   That's the response you -- the first formal
3  written response you received in response to your
4  demand; is that correct?
5      **A   Yes.**
6      Q   So that was the initial response,
7  Exhibit 162, correct?
8      **A   Yes, I believe so.**
9      Q   And now if you turn to next document, you
10  see Exhibit 163, behind Tab~26.
11      **A   Yes.**
12          (Deposition Exhibit 163 was received and
13  marked for identification, as of this date.)
14  BY MR. CLUBOK:
15      Q   This is a letter that the director sent to
16  you personally and at Highland Capital Management as
17  opposed to CDO Fund, correct?
18      **A   Correct.**
19      Q   And it says here, "We understand that
20  you're the person responsible for keeping up-to-date
21  records and inventory of the assets which are owned by
22  Sentinel and to which Highland Capital Manager [sic]
23  acts as a manager."  Do you see that?
24      **A   Yes.**
25      Q   Did you know that Highland Capital

123

1  Management was acting as a manager of Sentinel?
2      **A   That's incorrect.  I did not know it**
3  **because it's not something that was true.**
4      Q   Well, it's not officially the case that
5  Highland Capital Management was acting as manager for
6  Sentinel.  Is that what you mean?
7      **A   I only deal in things that are official.**
8      Q   But you do know that employees of Highland
9  Capital Management, who you've since fired, were
10  effectively managing Sentinel?
11      **A   I know that now, yes.**
12          MR. MORRIS:  Object to form of to question.
13  BY MR. CLUBOK:
14      Q   There was never an investment management
15  agreement though with Sentinel, correct?
16      **A   That's correct.**
17      Q   Or with SAS?
18      **A   I don't know.**
19      Q   Was there a shared service agreement with
20  those two entities as far as you know?
21      **A   Oh, did Highland have one with SAS?  Not to**
22  **my knowledge.  Definitely didn't have one with**
23  **Sentinel.  And to my knowledge, no agreements with --**
24  **shared service or any other type of agreement with SAS**
25  **or -- or Sentinel --**

124

1      Q   Do you see --
2      **A   -- other than of course the policy.**
3      Q   Do you see on Exhibits [sic] 163 where it
4  says, "Consequently, attached as Schedule 1 to this
5  letter is list of assets owned by Sentinel, which we
6  understand to be managed by HCM"?
7      **A   Yes.**
8      Q   Did you -- did you know that -- or did you
9  believe that HCM was supposed to be managing those
10  assets on behalf of Sentinel?
11      **A   It's just certainly not the case.**
12      Q   It was not the case for you, but --
13      **A   Correct.**
14      Q   -- you have seen evidence that other
15  employees of HCM, the ones that you've identified
16  previously and have been fired, had been managing
17  these assets in various ways; is that fair?
18          MR. MORRIS:  Object to the form.
19      **A   They certainly were involved in dealing**
20  **with different aspects of the assets.  I don't know if**
21  **you call managing them or reporting on them or**
22  **transferring them.**
23  BY MR. CLUBOK:
24      Q   If you look at Tab~28, a document that's
25  been marked as Exhibit 164.

125

1    (Deposition Exhibit 164 was received and
2 marked for identification, as of this date.)
3 BY MR. CLUBOK:
4    Q   You see a -- another letter from Collas
5 Crill, which was the -- I'm sorry.  A letter from
6 Walkers that was Highland's counsel, back to the
7 counsel representing Sentinel, correct?
8    A   Yes.
9    Q   And in this letter -- I assume you
10 authorized this letter before it went out?
11    A   I don't recall it specifically, but that
12 would be the typical procedure.  Not a lot goes out
13 without me authorizing it.
14    Q   You see in the third or fourth paragraph,
15 it notes that John Dondero and Ellington were
16 understood to be the beneficial owners of Sentinel?
17    A   Yes.
18    Q   And that's -- and that's certainly what you
19 understood at the time and continue to understand,
20 correct?
21    A   Correct.
22    Q   In this letter, it advises Sentinel that
23 there was a TRO, the TRO that's been entered in this
24 case, correct?
25    A   That's correct, yes.

126

1    Q   And your lawyers ask Sentinel to -- if it
2 believes its entitled to receive any amounts, then
3 effectively provide you with the information to
4 support that, correct?
5    A   That's correct.
6    Q   Did Sentinel ever respond by providing any
7 information that justifies their claim over the assets
8 that are currently being restrained by the court?
9    A   Not that I recall.  We certainly gave them
10 a lot of information about values over time and it
11 worked out -- what we believed to be with UBS a
12 satisfactory resolution of issues related to the
13 policy.  But they never could justify that the
14 demanded assets were theirs, that they otherwise
15 hadn't been transferred to them.
16    Q   If you turn to Tab~29, Exhibit 165.
17    (Deposition Exhibit 165 was received and
18 marked for identification, as of this date.)
19 BY MR. CLUBOK:
20    Q   You see another letter from your lawyers to
21 Sentinel's lawyers in which you note, at the bottom of
22 paragraph one, you say -- your lawyers say, "In
23 circumstances where the event covered by the policy is
24 plainly crystallized and CDO Fund and Sentinel were
25 effectively under common control at the time that the

127

1 policy was written, it's hard to conceive of any
2 proper basis for denial of coverage." Do you see
3 that?
4    A   Yes.
5    Q   Fair to say that based on information
6 you've uncovered, you believed that CDO Fund and
7 Sentinel were effectively under common control in
8 approximately August of 2017 when the policy was
9 written?
10    A   Yes, no doubt.
11    Q   And that common control was ultimately Jim
12 Dondero?
13    A   Ultimately, yes.  And Ellington.  He was
14 ultimately a beneficial owner, material amounts.
15    Q   Yes.  With Jim Dondero having the
16 controlling interest in the control group that he
17 formed with Ellington?
18    A   And Ellington worked for Dondero.
19    Q   Yeah.  If you could turn to Tab~35.
20    A   (Witness complies.)
21    (Deposition Exhibit 167 was received and
22 marked for identification, as of this date.)
23 BY MR. CLUBOK:
24    Q   Tab~35 is another email exchange that was
25 in early February 2021.  Do you see that?

128

1    A   Yes.
2    Q   And this is when you were trying to have
3 Matt DiOrio help you figure out what was going within
4 with the Greenbriar shares we talked about before?
5    A   Yes, yep.
6    Q   If you look at page three, the page that
7 ends -- sorry.  Tab 30.  Did I mark that one as an
8 exhibit?  No.  We're going to go back to Tab~34, and
9 I'll mark that one as Exhibit 166.
10    (Deposition Exhibit 166 was received and
11 marked for identification, as of this date.)
12 BY MR. CLUBOK:
13    Q   And in Exhibit 166, you can see on page
14 three -- Do I have the right document here?
15    Yeah, on page three -- sorry.  So
16 Exhibit 166 is an email exchange in late January of
17 2021 with Matt DiOrio and Mr. Romey and Mr. DiOrio.
18 And you see where Mr. DiOrio on page three says he
19 doesn't know the details about the account for CDO
20 Fund that had been receiving cash distributions for
21 Greenbriar.  Do you see that?
22    A   Yes.
23    Q   But Mr. DiOrio at the time was director of
24 Sentinel who knew all about the transaction for
25 Sentinel, correct?

129

1    A    We know that now, yes.
2    Q    So this was another example of a false
3 statement being made to people -- at least to people
4 who were working for you who would try to get
5 information from Mr. DiOrio, correct?
6    A    That is undoubtedly correct.
7    Q    And now if you turn to Tab~35, Exhibit 167.
8 You'll see where Mr. -- if you look at the bottom, the
9 first email, like at the last page.
10    A    (Witness complies.) Yep.
11    Q    There's emails that refer to DiOrio working
12 on tracking down the physical certificate of
13 Greenbriar shares.  Do you see that?
14    A    Yes.
15    Q    And you can continue up and there's lots of
16 questions.  And then on page that's been Bates labeled
17 3373, it says, finally -- DiOrio says, "My
18 understanding is they were" -- who is the intended
19 recipient of the transfer initiated by Carter?  This
20 is all talking about Greenbriar.  It says, "My
21 understanding is they were transferred to Maples FS in
22 Cayman as custodian for Sentinel Reinsurance Limited.
23 When delivery of the shares was not taken by Maples,
24 the certificates seemed to have been lost which is
25 what we were working with State Street to remedy." Do

130

1 you see that?
2    A    Yes.
3    Q    And if you go to next email up the chain
4 turn the page to 3372, Mr. Demo says to Mr. DiOrio,
5 "Do we have any visibility into who Sentinel
6 Reinsurance is?  Who owns them, what do they do?" Do
7 you see that?
8    A    Yes.
9    Q    January 27, 2021, right?
10    A    Yes.
11    Q    And Mr. DiOrio responds, "It's a
12 non-debtor, non-affiliate reinsurance company and I do
13 not know who or how it's owned." Do you see that?
14    A    Yes.
15    Q    Mr. DiOrio was a director of Sentinel at
16 the time he's telling you this, right?
17    A    That's correct.
18    Q    And he's a lawyer who is working for you at
19 Highland Capital Management?
20    A    **Actually, he's not a lawyer.  He worked in**
21 **the legal department and he was Ellington's friend.**
22 **And he worked in the legal department, but he was not**
23 **lawyer.**
24    Q    Okay.  But Mr. DiOrio was working in the
25 legal department for you at Highland Capital

131

1 Management?
2    A    Yes.
3    Q    January 2021?
4    A    Yes.
5    Q    And when he's point blank asked about
6 visibility in the Sentinel Reinsurance, who owns them,
7 what do they do, et cetera, he flatly lies to you,
8 correct?
9    A    To Greg Demo, my lawyer, yes.
10    Q    Or yeah, let me say that again.
11       So Mr. Demo, who is your lawyer, and
12 Mr. Klos are asking Mr. DiOrio in this email exchange
13 point blank if he has any visibility in the Sentinel
14 Reinsurance and who owns them what they do, et cetera,
15 correct?
16    A    **I think it would be more fair to say that**
17 **Demo and Romey -- because we were really using --**
18 **relying on outside counsel and outside consultants to**
19 **do this digging.  Because when we started coming**
20 **across this, we wanted to make sure we left no stone**
21 **unturned.  And we didn't blindly trust anybody, so we**
22 **were working through the Highland staff.**
23       **But I think it would be more fair to say**
24 **Demo and with the assistance of Romey were doing this**
25 **investigation.**

132

1    Q    Okay.  So Mr. Demo, who is your outside
2 counsel, at your request, was trying to figure out
3 what Sentinel Reinsurance was, right?
4    A    That's correct.
5    Q    And he was emailing with Mr. DiOrio who was
6 then a director of Sentinel Insurance [sic] and a
7 friend of Mr.~Ellington's, correct?
8    A    That's correct, yes.
9    Q    And Mr. DiOrio at time worked in the
10 Highland Capital Management legal department and
11 ultimately reported up to you, correct?
12    A    Correct.
13    Q    And in this email exchange that we've
14 marked as Exhibit 167, Mr. DiOrio simply lies about
15 what he knows about Sentinel Reinsurance, correct?
16    A    That's correct.
17    Q    Okay.  All right.
18       MR. CLUBOK:  Let's go off the record.
19       THE VIDEOGRAPHER:  Stand by.  We are going
20 off the record.  The time is 5:00 p.m.
21       (At 5:00 p.m. a recess was taken.)
22       (At 5:04 p.m. the deposition resumes.)
23       THE VIDEOGRAPHER:  We're going back on the
24 record.  The time is 5:04 p.m.
25

133

1  BY MR. CLUBOK:
2  Q  Mr. Seery, it's true that Highland Capital
3  Management has control of Multi-Strat by virtue of its
4  two roles; one, the indirect 100 percent owner of
5  Multi-Strat's general partner; and two, as
6  Multi-Strat's investment manager, correct?
7  A  I believe that's fair.  Certainly as
8  investment manager give basically full control over
9  Multi-Strat, yes.
10  Q  And Highland Capital Management has control
11  of CDO Fund as a director and direct owner of CDO
12  Fund's general partner, correct?
13  A  Yes, CDO Fund, yes.
14  Q  So you are, obviously, aware that there's a
15  TRO that's currently in place that we're asking the
16  Court to extend, correct?
17  A  Yes.
18  Q  If the Court had not entered that
19  injunction, it's fair to say that Highland Capital
20  Management would have made or caused to make
21  additional transfers to Sentinel of assets that we
22  know were related to this ATE policy we've been
23  discussing?
24  A  Yeah, I think that's fair.  Certainly the
25  redeemed interests out of Multi-Strat would have been

134

1  paid in full.  I don't believe any -- there would have
2  been any assets transferred out of CDO Fund, certainly
3  not without my -- the ones that we saw earlier by
4  Mr. DiOrio were without my knowledge.  We wouldn't
5  have transferred out of -- out of CDO Fund because we
6  wouldn't have had an obligation to.  But on the
7  redeemed funds, we would have had an obligation to.
8  Q  Okay.  So to be clear, absent the TRO,
9  Highland Capital Management would have caused the
10  funds that are currently being restrained by the TRO
11  to have been transferred to Sentinel, correct?
12  A  Yes.
13  Q  And it is only with a continuing injunction
14  preventing that unless there's a further order by the
15  Court -- strike that.
16  It is only the continuing injunction that
17  prevents Highland Capital Management from being forced
18  to transfer those assets to Sentinel, correct?
19  A  I think at least in part that that's
20  correct.  In other part, we've also made a demand on
21  behalf of CDO Fund for the policy.  And it has not
22  been paid.  So while the transfer from Multi-Strat is
23  not from CDO Fund, it certainly would have caused me
24  pause that I'd be turning over money to Sentinel when
25  Sentinel is not paying on the policy.

135

1  Q  And that's because your understanding is
2  UBS has a claim to whatever is owed under the policy,
3  correct?
4  A  Well, UBS has a claim against CDO Fund that
5  exceeds the policy limit and the policies should have
6  been paid.
7  Q  Okay.  Thank you very much.
8  MR. CLUBOK:  I appreciate the additional
9  time.  That's -- we do have some additional questions
10  that relate to the New York action and, pursuant to
11  the discussions that John and I have had, we'll pick
12  up and conclude that deposition another time.
13  MR. MORRIS:  Okay.  Thank you very much.
14  THE VIDEOGRAPHER:  Okay.  Let's go off the
15  record.
16  MR. CLUBOK:  Thanks.
17  THE VIDEOGRAPHER:  This marks the end of
18  the deposition of James Seery, Jr.  We're going off
19  the record at 5:07 p.m.
20  THE COURT REPORTER:  Counsel, your orders
21  for the record.
22  MR. MORRIS:  Regular delivery is fine, no
23  rough draft.
24  MR. CLUBOK:  Daily, Rough draft, Realtime.
25  (Time noted:  5:07 p.m.)

136

1  CERTIFICATE
2  STATE OF NEW YORK )
3  : ss
4  I, Angela M. Shaw-Crockett, a Certified
5  Court Reporter, Certified Realtime Reporter,
6  Registered Merit Reporter and Notary Public within and
7  for the States of New York, New Jersey and
8  Connecticut, do hereby certify:
9  That JAMES SEERY, JR., the witness whose
10  deposition is herein before set forth, was duly sworn
11  by me and that such deposition is a true record of the
12  testimony given by such witness; that reading and
13  signing was not discussed.
14  I further certify that I am not related to
15  any of the parties to this action by blood or marriage
16  and that I am in no way interested in the outcome of
17  this matter.
18  In witness whereof, I have hereunto set my
19  hand this 8th day of August, 2022.
20
21
22  ---------------------------------------
    ANGELA M. SHAW-CROCKETT, CCR, CRR, RMR, CSR
    LICENSE NO. XI00218400
23
24
25