

## Planet Depos®
### We Make It *Happen*™

<span style="color:darkred">**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**</span>

# Transcript of Katie Lucas Irving

**Date:** November 15, 2021
**Case:** UBS Securities LLC, et al. -v- Highland Capital Management, L.P.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

## Page 1

```
1          IN THE UNITED STATES BANKRUPTCY COURT

2          FOR THE NORTHERN DISTRICT OF TEXAS

3                    DALLAS DIVISION

4    ------------------------------------------------

5    IN RE:                §    Chapter 11

6
     HIGHLAND CAPITAL        §
7    MANAGEMENT, L.P.,       §    Case No. 19-34054-SGJ11

8         Debtor.           §

9    ------------------------------------------------
     UBS SECURITIES LLC AND  §
10   UBS AG LONDON BRANCH,   §

11                           §
                             §    Adversary Proceeding
12                           §    No. 21-03020-sgj
          Plaintiffs,        §
13                           §

14   vs.                     §
                             §
15   HIGHLAND CAPITAL        §
     MANAGEMENT, L.P.,       §
16                           §
          Defendant.         §
17   ------------------------------------------------

18     HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

19          VIDEOTAPED DEPOSITION OF

20             KATIE LUCAS IRVING

21            NOVEMBER 15, 2021

22           9:56 A.M. TO 7:09 P.M.

23

24      Reported By: Kari Behan, CSR, RPR, CRR

25
```

## Page 2

```
1             A P P E A R A N C E S

2    FOR UBS SECURITIES LLC AND UBS AG LONDON BRANCH:

3        JASON R. BURT, ESQ.
             - and -
4        SHANNON McLAUGHLIN, ESQ.
             - and -
5        SARAH A. TOMKOWIAK, ESQ. (REMOTELY)
             - and -
6        KATHRYN K. GEORGE, ESQ. (REMOTELY)
         LATHAM & WATKINS, LLP
7        555 Eleventh Street, N.W.
         Suite 1000
8        Washington, D.C. 20004-1304
         (202) 637-2200
9        jason.burt@lw.com
         shannon.mclaughlin@lw.com
10       sarah.tomkowiak@lw.com
         kathryn.george@lw.com
11

12   FOR KATIE LUCAS IRVING:

13       FRANCES A. SMITH, ESQ.
             - and -
14       ERIC SODERFUND, ESQ. (REMOTELY)
         ROSS & SMITH, PC
15       Plaza of the Americas
         700 N. Pearl Street
16       Suite 1610
         Dallas, Texas 75201
17       (214) 377-7879
         frances.smith@judithwross.com
18       eric.soderfund@judithwross.com

19

20       MICHELLE HARTMANN, ESQ.
             - and -
21       DEBRA A. DANDENEAU, ESQ. (REMOTELY)
         BAKER & MCKENZIE, LLP
22       1900 North Pearl Street
         Suite 1500
23       Dallas, Texas 75201
         (214) 978-3421
24       michelle.hartmann@bakermckenzie.com
         debra.dandeneau@bakermckenzie.com
25
```

## Page 3

```
1    APPEARANCES (CONTINUED):

2    FOR HIGHLAND CAPITAL MANAGEMENT, L.P.:

3        ROBERT J. FEINSTEIN, ESQ. (REMOTELY)
         PACHULSKI STANG ZIEHL & JONES
4        780 Third Avenue
         34th Floor
5        New York, New York 10017-2024
         (212) 561-7700
6        rfeinstein@pszjlaw.com

7

8    THE VIDEOGRAPHER:

9        Joseph McDermott

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 4

```
1                      - - -
                     I N D E X
2                      - - -

3    EXAMINATION OF KATIE LUCAS IRVING          PAGE

4

5    BY MR. BURT................................    9

6    CHANGES AND SIGNATURE...................... 391

7    REPORTER'S CERTIFICATION................... 392

8

9                  E X H I B I T S

10           (Retained by counsel)

11   Exhibit 93   E-mail dated April 21, 2021,    17
                  BC SENBC SEN0000065884
12
     Exhibit 94   E-mail dated 6/29/2021, BC      20
13                SEN00000000739

14   Exhibit 95   Amended Notice of Hearing       22

15   Exhibit 96   E-mail dated 6/24/2021, BC      27
                  SEN0000074288
16
     Exhibit 97   E-mail dated 4/16/2021,         49
17                DISCSEN0008612

18   Exhibit 98   LinkedIn Profile               61

19   Exhibit 99   Walkers Letter, dated May 24,   81
                  2021
20
     Exhibit 100  E-mail Exchange, dated         126
21                April 12th, 2019

22   Exhibit 101  CIMA Inspection Report,        142
                  BC SEN0000078777
23
     Exhibit 102  E-mail and Actuarial Reports,  160
24                dated December 31st, 2017

25
```

**5**

EXHIBITS (CONTINUED):

Exhibit 103    E-mail dated 6/20/2019,          171
               DISCSEN0008408

Exhibit 104    E-mail dated 10/3/2018,          184
               DISCSEN0006464

Exhibit 105    E-mail dated 10/22/2018,         199
               DISCSEN0007044

Exhibit 106    E-mail dated August 11th,        225
               2017, HCMUBS000565

Exhibit 107    Letter dated November 17,        242
               2015, DISCSEN0000097

Exhibit 108    E-mail dated 3/5/2019,           257
               BC SEN0000076061

Exhibit 109    Judgment filed February 10,      311
               2020

Exhibit 110    E-mail dated December 12,        331
               2017, HCMUBS002509

Exhibit 111    E-mail dated 5/9/2019,           346
               BC SEN0000005065

**6**

PREVIOUSLY MARKED EXHIBITS

EXHIBITS                                         PAGE

Exhibit 2.................................        286
    Purchase Agreement

Exhibit 3.................................        342
    E-mail dated September 12, 2018
    UBSPROD4837351

Exhibit 9.................................        325
    E-mail dated August 11, 2017,
    HCMUBS000574

Exhibit 14................................        328
    E-mail dated August 14, 2017,
    HCMUBS000853

Exhibit 28................................        106
    E-mail dated April 10, 2019,
    HCMUBS000123

Exhibit 48................................        335
    Settlement Analysis, USB vs. H,
    HCMUBS005304

Exhibit 53................................        318
    E-mail dated June 16, 2020,
    UBSPROD000118

Exhibit 55................................        294
    E-mail dated August 10, 2017,
    Hcmubs000349

Exhibit 57................................        275
    E-mail dated October 26, 2017,
    UBSPROD1973053

Exhibit 58................................        354
    Insurance Policy, MD_000010 through
    MD_000028

Exhibit 81................................        331
    Schedule A

Exhibit 84................................        368
    E-mail dated August 6, 2019,
    UBSPROD2572283

**7**

PROCEEDINGS:
(Monday, November 15, 2021, 9:56 a.m.)
THE VIDEOGRAPHER:  We are now on record.
The time is 9:56 a.m. on November the 15th, 2021.  This
action -- this case is action -- is entitled "UBS
Securities, LLC, et al versus Highland Capital Management,
L.P.," for the United States Bankruptcy Court for the
Northern District of Texas, Dallas Division, Case
No. 19-34054-SGJ11.  The deponent is Katie Irving.
        Counsel may identify themselves.  After
which, the court reporter will swear in the witness.
        MR. BURT:  Jason Burt on behalf of UBS; with
me is my colleague Shannon McLaughlin.
        MS. SMITH:  Frances Smith --
        MR. FEINSTEIN:  Robert Feinstein with -- I'm
sorry.  Go ahead.
        MS. SMITH:  Frances Smith with Ross & Smith
on behalf of Mrs. Irving.
        MS. HARTMANN:  Michelle Hartmann, Baker
McKenzie, on behalf of Mrs. Irving.
        MR. FEINSTEIN:  Robert Feinstein, Pachulski
Stang Ziehl & Jones, on behalf of Highland Capital
Management.
        KATIE LUCAS IRVING,
after having been first duly sworn by the above-mentioned

**8**

Certified Court Reporter, was examined and testified as
follows:
        MS. SMITH:  Do you mind if I make my couple
of announcements first?
        MR. BURT:  Please, go ahead.
        MS. SMITH:  This deposition is subject to
the confidentiality orders in the case, and we like the
whole deposition to be marked "Highly Confidential" and
"Subject to Protective Order."
        To the extent any privilege extends from
Mrs. Lucas to any third party who is present here, we will
rely upon the holder of the privilege to assert it.  We
want the record to reflect that Mrs. Lucas is still on her
unpaid medical leave, but in the spirit of cooperation and
to avoid further controversy, we have volunteered to
produce her upon certain agreed-upon conditions today.
        We agree to present her today for up to
three hours of deposition time, and she will be allowed
breaks, as necessary.  Counsel agreed.
        We agreed to move the deposition back to
10:00 a.m. to accommodate Latham's request for two hours
of prep time at Baker's office, and we had Baker attorneys
and staff available at 8:00.  Unfortunately, Latham did
not show up until 9:10.
        As far as the Zoom, we want everyone who is

**9**

1  not a party to the litigation to not appear, and we will
2  object to the presence of anyone who is not a party to the
3  litigation being on the Zoom.  To the extent they are on,
4  we ask that Latham abide by the terms of the
5  Confidentiality Agreement and not allow anyone who is not
6  a party access to the documents or the deposition
7  transcript.
8     And that's all my announcements.
9     MR. BURT:  And to complete that record, we
10  did agree up to three hours of deposition time today, up
11  to four hours deposition time tomorrow.  We spoke with the
12  witness prior to the deposition, and we will play it by
13  ear how long we will go today.
14     Is that right?
15     THE WITNESS:  Yes.
16     MR. BURT:  Okay.
17     EXAMINATION
18  BY MR. BURT:
19   Q.  Mrs. Irving, could you please state and spell
20  your full name for the record?
21   A.  Sure.  Katie, K-A-T-I-E, Irving, I-R-V-I-N-G.
22     MR. FEINSTEIN:  I'm sorry to interrupt.
23  It's Robert Feinstein.  I just wanted to make my
24  announcement before we got actually started and get into
25  other matters, as it relates to Frances's comment about

**10**

1  privilege.  As we have done in all prior depositions in
2  this adversary proceeding, Highland is not going to assert
3  the privilege when it comes to matters relating to the
4  core factual matters in the complaint to transfer assets
5  to Sentinel and so forth.
6     THE STENOGRAPHIC REPORTER:  I can't hear
7  him.
8     MR. FEINSTEIN:  And unless you hear from me,
9  you should assume that no privilege has been invoked.
10     MS. HARTMANN:  Rob -- Rob --
11     MR. FEINSTEIN:  Yes.
12     MS. HARTMANN:  -- the court reporter is not
13  hearing you at all.
14     MR. FEINSTEIN:  Okay.
15     THE STENOGRAPHIC REPORTER:  No.  It's hard
16  to hear him.
17     MS. SMITH:  It is muffled, yeah.
18     MR. FEINSTEIN:  I'll do my best.  I'm
19  working on, obviously, a webcam.
20     So let me just state it this way:  It is not
21  Highland's intention to invoke the attorney-client
22  privilege on matters that are the core subject matter in
23  the complaint, such as the transfer of assets to Sentinel,
24  and that unless you hear from me invoking the privilege,
25  you should assume that we are not asserting that.  And I'm

**11**

1  sure the deposition will proceed much more smoothly that
2  way instead of debating individual points or asking me:
3  Aren't you going to invoke the privilege?  So that's my
4  standing position.  Thank you.
5     MS. SMITH:  Did you get that?
6     THE STENOGRAPHIC REPORTER:  He's very
7  difficult.  He's -- he's going to speak a lot today?
8     MS. SMITH:  No.
9     THE STENOGRAPHIC REPORTER:  Okay.  All
10  right.  I'm ready.
11  BY MR. BURT:
12   Q.  Mrs. Irving, what is your address?
13     MS. SMITH:  I -- I'm going to object to
14  that.
15  BY MR. BURT:
16   Q.  Go ahead and answer.
17     MS. SMITH:  We -- we'll be happy to
18  stipulate to her address off the record.
19  BY MR. BURT:
20   Q.  I'd like the address on the record, please.
21   A.  I'm not comfortable to give that.
22   Q.  Okay.  You're required, Mrs. Lucas, to answer my
23  questions today, and I ask you to please state your
24  address for the record.
25   A.  I understand that.  I can ask -- I mean, I can

**12**

1  confer with counsel, but I'm not comfortable putting that
2  on the record.
3     MR. BURT:  Are you -- counsel, are you
4  instructing her not to answer?
5     MS. SMITH:  Yes.
6     MR. BURT:  On what basis?
7     MS. SMITH:  She has two high-risk babies at
8  home, and on a previous deposition, one of the deponents's
9  address was given out to someone not subject to the
10  confidentiality order.  So she is happy to give you her
11  address offline, off the record, but she does not want to
12  put it on the record.
13  BY MR. BURT:
14   Q.  Mrs. -- Mrs. Irving, have you been deposed
15  before?
16   A.  I have.
17   Q.  When was that?
18   A.  I don't recall exactly.  It's been several years
19  ago.
20   Q.  How many times have you been deposed?
21   A.  One.
22   Q.  Okay.  And what matter was that?
23   A.  It was related to a litigation funding case; it
24  was a patent case.
25   Q.  Okay.  And on whose behalf did you testify?

13

1      A. On the acquirer of the patent who was suing for
2  infringement matters.
3      Q. Okay. Did -- did that -- was it a company?
4      A. It was a company, but I was not a corporate
5  representative.
6      Q. So you testified in your individual capacity?
7      A. Yes.
8      Q. Do you recall what court that was in?
9      A. I don't.
10     Q. Have you ever provided testimony in court?
11     A. I have not.
12     Q. I'd like to go over just a couple of ground
13  rules. Since you've depos- -- been deposed before, none
14  of these should be new.
15         Mrs. Irving, if you don't understand any of
16  my questions today, please ask for clarification;
17  otherwise, I will assume that you understood the question.
18  Is that fair?
19     A. Yes.
20     Q. And we've seen this already. Counsel may object,
21  but unless you are instructed not to answer, you are
22  required to answer my question.
23         Do you understand that?
24     A. Yes.
25     Q. Okay. Do you understand that you have taken an

14

1  oath today and that you are testifying under oath?
2      A. Yes, I do.
3      Q. And that your testimony is the same as if it were
4  in front of a judge and jury?
5      A. Yes.
6      Q. And you understand that penalties of perjury
7  apply to your testimony today?
8      A. Yes, I do.
9      Q. Mrs. Irving, is there anything that would prevent
10  you from giving full and complete testimony today?
11     A. No.
12     Q. Going back to the -- the matter in which you were
13  deposed, did you testify -- was -- strike that.
14         Was HCMLP a party to that case?
15     A. It was not.
16     Q. Mrs. Irving, what did you do to prepare for
17  today's deposition?
18     A. I met with counsel last week, and that's
19  basically it.
20     Q. Okay. And to be clear, I'm not interested in the
21  content of those discussions.
22         But when you're referring to counsel, who,
23  specifically, are you referring to?
24     A. Deb, and Michelle and Frances.
25     Q. Okay. So Deb and Michelle, let's take them

15

1  first.
2         Are they attorneys with Baker & McKenzie?
3      A. Yes.
4      Q. Okay. And -- and Frances is attorney -- an
5  attorney with another firm; is that right?
6      A. Yes.
7      Q. Okay. And you met with all three?
8      A. I did.
9      Q. For how long did you meet with them?
10     A. I don't recall exactly, likely four or
11  five hours.
12     Q. Did you review documents with them?
13     A. I did.
14     Q. About how many documents did you review?
15     A. No, I didn't review documents actually. I didn't
16  review documents with them.
17     Q. So no documents were discussed?
18     A. No documents, no.
19     Q. Okay.
20     A. Well, I said no documents were reviewed;
21  documents were discussed but not reviewed.
22     Q. What's the distinction you're trying to make
23  there?
24     A. The distinction I'm trying to make is they would
25  say: Do you have any recollection of this? You know,

16

1  they may be referring to a note, but I didn't review
2  documents myself.
3      Q. So they showed you documents and asked if you had
4  a recollection?
5      A. No, they did not show me documents. That's the
6  distinction I'm making.
7      Q. I see.
8      A. Documents were discussed, but I didn't review
9  them in detail.
10     Q. So you didn't look at any documents?
11     A. I didn't, no, not that I recall.
12     Q. Mrs. Irving, do you know who is paying for your
13  counsel today?
14     A. I don't.
15     Q. You're not paying for them?
16     A. I'm not.
17     Q. Okay. And you don't have any idea who is paying
18  for them?
19     A. I do not know who is paying for the counsel.
20     Q. Do you know if you've ever been indemnified by
21  any entity --
22         MS. SMITH: Object.
23  BY MR. BURT:
24     Q. -- for your testimony today?
25         MS. SMITH: Object to the form of the

17

1  question.
2  BY MR. BURT:
3      Q. You can answer.
4      **A. Would you repeat that for me, please?**
5      Q. Have you been indemnified in any way for your
6  participation in this lawsuit?
7      **A. I don't know.**
8      Q. No knowledge one way or the other?
9      **A. I don't know.**
10     Q. Okay. I'd like to show you an exhibit.
11         MR. BURT: KL-46.
12         We'll mark this as No. 9- -- Exhibit 93.
13         (Exhibit 93 was marked for identification.)
14         (Off-record discussion.)
15         MS. SMITH: Shannon, can you upload the
16 exhibits in the chat, please, so that Deb can look at them
17 as well?
18         MS. MCLAUGHLIN: Yes.
19         MS. SMITH: And Eric is -- I think Eric is
20 joining. I'd like Eric to be able to look at them.
21 BY MR. BURT:
22     Q. Mrs. Irving, have you had the chance to look at
23 this document?
24     **A. Yes, I've just reviewed it.**
25     Q. Do you recognize it?

18

1      **A. No, I do not.**
2      Q. Okay. And you see there's a front and a back
3  page to this document?
4      **A. Yes.**
5      Q. Okay. And on the front page, is it correct that
6  there is an e-mail at the top with a heading -- or not a
7  heading, but a caption of Thomas P. Adamczak, CPA, from
8  Beecher Carlson?
9      **A. I see that on the page, yes.**
10     Q. Do you know who Thomas Adamczak is?
11     **A. I believe he is an employer of Beecher Carlson.**
12     Q. Have you worked with Mr. Adamczak?
13     **A. Not -- not that I recall specifically, but the**
14 **name is familiar to me.**
15     Q. And do you see below there is an e-mail from
16 gps@cibcfcib.com?
17     **A. I see that.**
18     Q. To Tom Adamczak, correct?
19     **A. Yes.**
20     Q. Dated April 21st, 2021?
21     **A. I see that.**
22     Q. Okay. And then looking at the second page, do
23 you see it's a Wire Transfer Debit Advice from
24 FirstCaribbean International Bank?
25     **A. I see that.**

19

1      Q. And at the top, it says "Sentinel Reinsurance,
2  Ltd.," correct?
3      **A. I see that.**
4      Q. All right. Now, drawing your attention to the
5  date, it's dated Ap- -- 21-4-2021, correct?
6      **A. I see that, yes.**
7      Q. And the currency and amount states $200,000; is
8  that right?
9      **A. I see that.**
10     Q. And the beneficiary is Ross & Smith IOLTA; is
11 that correct?
12     **A. I see that on the page, yes.**
13     Q. Do you know what firm Ross & Smith is?
14     **A. It's Frances's firm.**
15     Q. Okay.
16         MS. SMITH: Excuse me.
17         Shannon, can you please upload the document
18 to the chat?
19         MS. MCLAUGHLIN: It's being uploaded.
20         MS. SMITH: Okay.
21 BY MR. BURT:
22     Q. All right. And you see there below, the
23 Beneficiary Bank, there is another bank listed below, is
24 that right, with additional wire detail?
25     **A. I see additional details and a beneficiary bank**

20

1  noted on this page, yes.
2      Q. Okay. Do you know why Ross & Smith was paid
3  $200,000 in Sentinel?
4      **A. I don't.**
5      Q. Were you aware of that?
6      **A. No.**
7      Q. All right. I'd like to show you another exhibit,
8  please.
9         MR. BURT: We'll go ahead and mark this as
10 Exhibit 94.
11         (Exhibit 94 was marked for identification.)
12         THE WITNESS: Thanks.
13 BY MR. BURT:
14     Q. Mrs. Irving, have you had a chance to look at
15 this exhibit?
16     **A. Yes, I have.**
17     Q. Now, on the first page, we see, again, that it's
18 from gps@cibcfcib.com, correct?
19     **A. I see that.**
20     Q. To tomadamczak@beechercarlson.com?
21     **A. Yes.**
22     Q. And on the second page, do you see that there's
23 another Wire Transfer Debit Advice?
24     **A. I see that, yes.**
25     Q. From Sentinel Reinsurance, Ltd., correct?

**Page 21**

1    A. I see that.
2    Q. And the date here is 29-6-2021, correct?
3    A. I see that on the page, yes.
4    Q. And the amount is listed as $75,854, is that
5    right, and 90 cents?
6    A. Yes.
7    Q. The beneficiary, again, is Ross & Smith IOLTA,
8    correct?
9    A. I see that on the page, yes.
10    Q. And that's your counsel's firm; is that right?
11    A. Yes. That's Frances's firm.
12    Q. Do you know -- do you know why your counsel was
13    paid $75,000, approximately, in June of this year by
14    Sentinel?
15    A. I do not.
16    Q. Were you aware of that?
17    A. No.
18    Q. Were you aware in June of any motions practice in
19    the adversary proceeding regarding you?
20    A. Was I --
21        MS. SMITH: Object to the form.
22        THE WITNESS: Yeah. Could you repeat that,
23    please?
24    BY MR. BURT:
25    Q. Were you aware of any motions practice in the

**Page 22**

1    adversary proceeding which affected you and subpoenas
2    which had been issued to you?
3    A. I know that there were subpoenas issued. I don't
4    recall when it was.
5        As you're aware, I have been out on leave
6    for several months, and I -- I don't know the details.
7        MR. BURT: Let's do 49.
8        We can mark this, please, as 95.
9        (Exhibit 95 was marked for identification.)
10        THE WITNESS: Thank you.
11        MS. SMITH: Shannon, they're saying none of
12    the documents are showing up in the chat.
13        MS. MCLAUGHLIN: I'm being told that they
14    have been loaded into the chat.
15        MS. SMITH: Can you see them on the chat?
16        MS. MCLAUGHLIN: I'm not logged into Zoom
17    because I'm in the room.
18        MS. DANDENEAU: This is Deb Dandeneau. I --
19    I am logged in, and I don't see anything in the chat.
20        MR. BURT: Do you want us to go off the
21    record and get them in the chat before I --
22        MS. SMITH: Yes, please.
23        MR. BURT: Okay.
24        THE VIDEOGRAPHER: We are off record at
25    10:12 a.m.

**Page 23**

1        (Brief recess taken.)
2        THE VIDEOGRAPHER: Back on record at 10:14
3    a.m.
4    BY MR. BURT:
5    Q. Mrs. Irving, have you had a chance to look at the
6    exhibit marked 95?
7    A. Yes.
8    Q. Have you seen this exhibit before?
9    A. Not that I recall.
10    Q. All right. Do you see that it's an Amended
11    Notice of Hearing in the United States Bankruptcy Court
12    for the Northern District of Texas?
13    A. Yes, I see that.
14    Q. And up at the very top, you see there is a case
15    number, a doc number, and then there's a file; then it
16    says 05/26/21?
17    A. Yes, I see that.
18    Q. All right. And turning to the second page, it
19    states that -- well, actually, we have to go back to the
20    first page -- "Please take notice that the following
21    matter previously scheduled for hearing on Thursday,
22    July 29th, 2021, at 2:30 p.m. in the above-captioned
23    bankruptcy case has been rescheduled for Thursday,
24    June 24th, 2021, at 2:30 p.m."
25        Do you see that?

**Page 24**

1    A. Yes, I see that.
2    Q. Were you aware that a hearing had been set in
3    this case for June 24th, 2021?
4    A. Not that I recall.
5    Q. Okay. And below that, there's a Number 1, and it
6    says, "Motion of Former Employees to Quash Subpoenas and
7    Brief in Support..."
8        And it states, "The Hearing on the Motion
9    will be held before The Honorable Stacey G.C. Jernigan,
10    United States Bankruptcy Judge," and it goes on to list
11    her address.
12        You see that?
13    A. I see that, yes.
14    Q. Were you aware of the Motion to Quash subpoenas
15    that had been issued to you in this matter?
16    A. I believe I was aware of it, yes.
17    Q. Okay. What was your understanding of that
18    motion?
19    A. That counsel was handling whatever counsel needed
20    to handle. I wasn't intimately involved in any of this.
21    Q. Did you have any idea of what that motion was?
22        MS. SMITH: Objection to the extent it
23    requires her to give privileged information.
24    BY MR. BURT:
25    Q. I'm not asking for any privileged information;

25

1  I'm asking for your knowledge.
2      **A. Could you repeat that for me, please?**
3      Q. Did you have any understanding of what that
4  motion was?
5      **A. I -- I don't think I understand your question.**
6  **It was a Motion to Quash, right?**
7      Q. Right.
8          You had received a subpoena in this case,
9  correct?
10     **A. Yes.**
11     Q. The subpoena asked for you to produce documents,
12 correct?
13     **A. Yes.**
14     Q. It also asked for you to sit for deposition,
15 didn't it?
16     **A. I don't know.**
17     Q. You don't know that?
18     **A. I don't know.**
19     Q. Okay. And you're aware that your attorney had
20 filed a Motion to Quash that subpoena; is that right?
21     **A. Yes.**
22     Q. And was that attorney Ms. Smith, who is sitting
23 here today?
24     **A. I don't know.**
25     Q. You don't know if she was the attorney who moved

26

1  to quash?
2      **A. I don't know.**
3          **As you know, I've been out on leave, and I**
4  **-- I don't know the details of who filed what motion or**
5  **what the -- I mean, counsel handled this for me, and I**
6  **haven't spoken to counsel very much, honestly. I trust**
7  **that they'll handle it in a way that's appropriate.**
8      Q. Okay. And again, without revealing any contents
9  of what was discussed, did counsel -- did -- did you
10 discuss this motion with counsel?
11         MS. SMITH: Objection.
12         THE WITNESS: I don't recall.
13 BY MR. BURT:
14     Q. Okay. And when you're referring to "counsel,"
15 are you referring solely to Ms. Smith or also the
16 attorneys from Baker & McKenzie?
17     **A. My discussions have been with Ms. Smith**
18 **primarily.**
19     Q. All right. Now, "primarily." Totally or --
20     **A. Primarily because we met to prep for depo this**
21 **prior week.**
22     Q. Prior to meeting to prep for depo, had you had
23 any discussions with attorneys from Baker & McKenzie?
24     **A. I don't remember.**
25     Q. Okay.

27

1          MR. BURT: 49.
2  BY MR. BURT:
3      Q. Keep that exhibit handy.
4          MR. BURT: Mark this as 96?
5          THE STENOGRAPHIC REPORTER: 96.
6          (Exhibit 96 was marked for identification.)
7          THE WITNESS: Thanks.
8  BY MR. BURT:
9      Q. Mrs. Irving, let me know when you've had a chance
10 to review this exhibit.
11     **A. Okay. I will.**
12         (Witness reviews document.) Okay.
13     Q. Have you seen this e-mail chain before?
14     **A. No.**
15     Q. All right. Going to the second page, you see at
16 the very bottom, it's an e-mail -- this e-mail chain
17 begins with an e-mail from Gareth Pereira from Beecher
18 Carlson.
19         Do you know who Mr. Pereira is?
20     **A. I don't.**
21     Q. And it's sent to a cmc -- mcdonald@calderwood.ky,
22 and it looks like his name is Casey.
23         Do you know who that is referring to?
24     **A. I don't.**
25     Q. Do you know what Calderwood is?

28

1      **A. I believe it's a independent director firm in**
2  **Cayman.**
3      Q. Have you ever worked with Calderwood?
4      **A. Not that I recall, no.**
5      Q. Do you know what it did?
6      **A. I'm not understanding your question.**
7      Q. What business was Calderwood in?
8      **A. I believe it's a independent director business in**
9  **Cayman.**
10     Q. In addition to that, do -- do you know anything
11 else that it was doing?
12     **A. I don't.**
13     Q. All right. And it cc's here a stephenleontsinis@
14 collascrill.com.
15         Do you know who that is?
16     **A. Yes. Stephen Leontsinis is counsel at Collas**
17 **Crill in Cayman.**
18     Q. All right. Have you worked with him before?
19     **A. I have.**
20     Q. In what capacity?
21     **A. I worked with him on a Cayman bank liquidation.**
22 **He was counsel that assisted in -- assisted in the**
23 **bankruptcy insolvency case there.**
24     Q. He was counsel for whom?
25     **A. He was counsel for -- I'm trying to remember -- I**

---

**29**

1 don't remember exactly how he was engaged, but I worked
2 closely with him on some assets that were out of this
3 Cayman insolvency.
4     Q. Did he represent Highland Capital Management?
5     A. I don't -- not to my knowledge and not related to
6 the case I'm referencing.
7     Q. Did he represent -- do you know if he's ever
8 represented Highland Capital Management?
9     A. I don't know.
10     Q. Does he -- has he represented any of the SAS
11 entities?
12     MS. SMITH: Objection to form.
13     THE WITNESS: I don't know.
14 BY MR. BURT:
15     Q. How about Sentinel, has he represented Sentinel?
16     A. I don't know.
17     Q. The next person on this e-mail chain is Matt
18 DiOrio.
19     Who is that?
20     A. He was a colleague of mine.
21     Q. At which company?
22     A. He was employed by Highland Capital Management,
23 L.P.
24     Q. What was his job there?
25     A. He was a managing director.

**30**

1     Q. In what department did he work?
2     A. Legal.
3     Q. Is that the department you worked in as well?
4     A. Yes.
5     Q. You are not an attorney, are you?
6     A. I am not an attorney.
7     Q. Nor is Mr. DiOrio, correct?
8     A. He is not an attorney.
9     Q. All right. Then we see Mr. Adamczak again from
10 Beecher Carlson.
11     Moving to the e-mail that's just above
12 that -- you have to go to the first page to see where that
13 begins -- this is another e-mail from Gareth Pereira on
14 Thursday, the 24th of June, 2021; is that right?
15     A. I see it on the paper, yes.
16     Q. Okay. So referring back to Exhibit 94 -- excuse
17 me -- 95, the Amended Notice of Hearing.
18     A. Oh, yes.
19     Q. What was the date of that hearing, if you look at
20 the second page?
21     A. Looks like the hearing was rescheduled for
22 Thursday, June 24th, 2021, at 2:30 p.m.
23     Q. So the same day that Mr. Pereira was sending this
24 e-mail, correct?
25     A. It appears that --

---

**31**

1     MS. SMITH: Objection, form.
2     THE WITNESS: It appears that way.
3 BY MR. BURT:
4     Q. All right. And this e-mail was, again, to Casey
5 McDonald and cc's a number of people; is that right?
6     A. I see that, yes.
7     Q. Including Matt DiOrio; is that right?
8     A. I see him on the paper, yes.
9     Q. Okay. And he says, "Good morning, Casey.
10 Following on from last week, please can you provide your
11 approval through e-mail and also release the following
12 payments that have been set up in CIBC for Sentinel."
13     First one listed there is "Ross & Smith -
14 Legal expenses - $75,854.90."
15     Do you see that?
16     A. I see that.
17     Q. And if we go back to Exhibit 94, the second CIBC
18 wire instruction, do you see what amount is listed there?
19     A. I see it.
20     Q. And what amount is that?
21     A. $75,924.90 is the total cost, made up of two
22 components: $75,854.90 and a commission, which I assume
23 is a fee of $70 USD.
24     Q. Okay. So looking at the Wire Transfer Debit
25 Advice and the e-mail that Mr. Pereira sent on June 24th,

**32**

1 it appears that he's requesting approval for that
2 $75,854.90 legal expense to be paid; is that right?
3     MS. SMITH: Objection to form.
4     THE WITNESS: It appears that way.
5 BY MR. BURT:
6     Q. And if you see up above in the chain,
7 Mr. McDonald responds -- he says, "Thanks, Gareth. I can
8 go in and approve, but as Wade and I don't have any
9 visibility into the legal bill, I'd appreciate Matt
10 confirming it's all in order and should be settled. And
11 as it's for US counsel, am I right in thinking that it is
12 coming out of the prefunded risk mitigation balance? Or
13 is there any additional background we could get on this
14 expense?"
15     You see that?
16     A. I see it.
17     Q. And then looking at the top e-mail, you see that
18 it's an e-mail from Mr. DiOrio?
19     A. I see it.
20     Q. And it's to Casey McDonald, correct --
21     A. Yes.
22     Q. -- cc'ing, among others, Gareth Pereira and
23 Stephen Leontsinis at Collas Crill; is that right?
24     A. Among others, yes.
25     Q. And then Mr. DiOrio states, "This is an order and

33

1  should be settled. The company indemnified a group of
2  former employees, myself included, a while back, and it
3  relates to our defense with respect to today's hearing
4  that I mentioned."
5      Is that what Mr. DiOrio wrote?
6  **A. I see it, yes.**
7      Q. Okay. And "today's hearing," do you recall we
8  looked at Exhibit 95, the hearing scheduled for June 24th
9  relating to the Motion to Quash, correct?
10     MS. SMITH: Objection to form.
11     THE WITNESS: Sorry. Can you tell me what
12 you're asking me?
13 BY MR. BURT:
14     Q. Sure. Let's look at the exhibit.
15     Exhibit 95, the Amended Notice of Hearing,
16 do you see that? And we've looked now twice. On page 2,
17 there was the Hearing on the Motion to Quash Subpoenas of
18 Former Employees scheduled for June 24th, 2021; is that
19 right?
20 **A. Yes.**
21     Q. And on this same day in the e-mail, in
22 Exhibit 96, Mr. DiOrio is stating that "the company
23 indemnified a group of former employees, myself included,
24 a while back, and it relates to our defense with respect
25 to today's hearing that I mentioned;" is that right?

34

1  **A. Yes, I see that.**
2      Q. Okay. So it appears that Mr. DiOrio was
3  referring to the hearing on the Motion to Quash held on
4  June 24th, 2021?
5      MS. SMITH: Objection to form.
6      THE WITNESS: You would have to assume that.
7  I don't know.
8  BY MR. BURT:
9      Q. Was there any other hearing that you were aware
10 of?
11 **A. I don't know.**
12     Q. He states, "The company indemnified a group of
13 former employees."
14     Do you know what company he was referring
15 to?
16     MS. SMITH: Objection to form.
17     THE WITNESS: I don't. I would have to
18 assume.
19 BY MR. BURT:
20     Q. You would have to guess?
21 **A. Yes, I would have to assume.**
22     Q. Okay. And what is your guess as to what company
23 he was referring to?
24     MS. SMITH: Objection to form.
25     THE WITNESS: My sense is that it would be

35

1  related to the entity which is sending the wire here,
2  Sentinel Reinsurance, Ltd.
3  BY MR. BURT:
4      Q. So your -- your guess is that Sentinel was
5  indemnifying a group of former employees, himself
6  included?
7      MS. SMITH: Objection to form.
8      THE WITNESS: If you're -- if you're
9  referencing Sentinel Reinsurance, Ltd., you could infer
10 that from these documents, but I don't have knowledge of
11 it, other than the documents you've just presented to me.
12 BY MR. BURT:
13     Q. Have you ever been told that you have been
14 indemnified?
15 **A. By any company, ever?**
16     Q. In relation to this lawsuit, have you ever been
17 told that you were indemnified?
18 **A. I don't recall.**
19     Q. You don't recall ever having been told that?
20     MS. SMITH: Objection to form.
21     THE WITNESS: I don't.
22 BY MR. BURT:
23     Q. Okay. How is it that you're not paying for your
24 own legal -- your own counsel?
25 **A. I don't know.**

36

1      Q. Who told you that someone else would pay for your
2  counsel?
3      MS. SMITH: Objection to form.
4      THE WITNESS: I don't think I ever really
5  thought about it, honestly.
6  BY MR. BURT:
7      Q. You never thought about who would pay for your
8  attorneys?
9  **A. No.**
10     Q. Not once?
11     MS. SMITH: Objection to form.
12     THE WITNESS: I said no. No, I haven't
13 thought about it.
14 BY MR. BURT:
15     Q. You just assumed someone would pay for it?
16     MS. SMITH: Objection to form.
17     THE WITNESS: I haven't thought about it.
18 BY MR. BURT:
19     Q. Are you a former employee of Sentinel?
20 **A. No. I have not ever been an employee of**
21 **Sentinel.**
22     Q. Have you ever attended a board meeting of
23 Sentinel?
24 **A. Not that I recall.**
25     Q. Do you recall ever hav- -- I just want to be

**37**

1 clear on the record. You don't ever recall having
2 attending a board meeting for Sentinel?
3 **A. I've attended meetings for Sentinel; I don't know**
4 **if any were classified as a -- as a board meeting in**
5 **however you're defining a board meeting, but I don't**
6 **recall a specific board meeting that I was attending.**
7 Q. So you don't understand what I mean when I say
8 "board meeting"?
9 MS. SMITH: Objection to form.
10 THE WITNESS: No, I don't know what you're
11 -- what you're referencing, whether you're thinking of
12 another meeting. I've attended meetings for Sentinel, but
13 not that I can recall as a -- as a board meeting.
14 BY MR. BURT:
15 Q. Okay. Now, when I say "board meeting," I -- I'm
16 referring to a meeting of the board of directors of
17 Sentinel in its official capacity.
18 Do you have that definition in mind?
19 **A. I understand what you're saying, yes.**
20 Q. Okay. Now, with that definition in mind, do you
21 recall ever having attended such a meeting on behalf of
22 Sentinel or for Sentinel?
23 **A. I don't.**
24 Q. Okay. What meetings did you attend?
25 **A. I attended a meeting with CIMA, which is the**

**38**

1 **Cayman Islands Monetary Authority, in relation to**
2 **Sentinel, and I would ad hoc attend meetings either with**
3 **the administrator, or sometimes a board member would be**
4 **on.**
5 **I don't know if it was officially a board**
6 **meeting. I know there's certain corporate, you know,**
7 **oversights that have to be in place for it to be an**
8 **official board meeting. But I -- I have attended meetings**
9 **in relation to Sentinel, yes.**
10 Q. And why did you attend those meetings?
11 **A. Really just to run backup for -- for taking down**
12 **what requests were needed, what follow-ups were needed. I**
13 **had legacy knowledge of the structure for Sentinel in**
14 **various tax restructuring, tax matters. So it was helpful**
15 **sometimes for me to sit in.**
16 Q. How many meetings with CIMA did you attend?
17 **A. I believe two.**
18 Q. When were they?
19 **A. The one I remember was -- distinctly was in**
20 **August of 2019. And I believe there was another one, but**
21 **I can't recall when it was.**
22 Q. And what were these meetings all about with CIMA?
23 **A. The one in August of 2019 was in reference to**
24 **simplifying the Sentinel structure, the corporate**
25 **structure.**

**39**

1 Q. Did CIMA have a request that Sentinel do that?
2 **A. Yes.**
3 Q. And why is that?
4 **A. I don't know.**
5 Q. They never told you why they wanted you to do
6 that?
7 MS. SMITH: Objection to form.
8 THE WITNESS: My sense was they wanted it
9 simplified. I don't have any further knowledge as to any
10 motivation beyond that.
11 BY MR. BURT:
12 Q. At that meeting, CIMA never explained why they
13 wanted the -- the Sentinel structure simplified?
14 **A. They wanted it simplified. I assume they thought**
15 **it was too complex. I don't know.**
16 Q. So I'm just trying to understand what the
17 regulator in the Cayman Islands told Sentinel when it was
18 -- when it told it to simplify. I would -- I would guess
19 that they would have a reason for that, and I'm just
20 trying to get your best knowledge as to what that reason
21 was.
22 **A. My best knowledge is that CIMA wanted it**
23 **streamlined -- wanted the structure of Sentinel**
24 **Reinsurance, Ltd., streamlined or simplified. I don't --**
25 **I don't know why they wanted it simplified. You would**

**40**

1 have to ask someone at CIMA.
2 Q. Did CIMA ever provide a document that explained
3 what it wanted to Sentinel?
4 **A. Did it --**
5 MS. SMITH: Objection to form.
6 THE WITNESS: Could you repeat that? Sorry.
7 BY MR. BURT:
8 Q. Did CIMA ever provide a document, a letter, a
9 memo, anything like that, to Sentinel explaining why it
10 wanted it simplified?
11 MS. SMITH: Objection to form.
12 THE WITNESS: I believe there was
13 correspondence, but I wasn't directly involved in that.
14 BY MR. BURT:
15 Q. Did you ever see the correspondence?
16 **A. I don't recall specifically.**
17 Q. Did you ever have any follow-up tasks to respond
18 or do anything in -- in -- pursuant to a CIMA request?
19 **A. Yes.**
20 Q. What was that?
21 **A. I took a look -- utilizing my legacy knowledge of**
22 **the structure, I took a look to see if it was feasible to,**
23 **you know, liquidate certain entities or, in some way,**
24 **follow the direction of the regulator to simplify the**
25 **structure.**

41

1    Q. Is that all you did?
2    **A. I would speak with outside tax counsel. I don't**
3  **have direct knowledge of that. So I would talk to outside**
4  **tax counsel to see: Is this a possible option?**
5      **Obviously, we wanted to comply with the**
6  **request of the regulator in Cayman.**
7    Q. Do you know if Sen- -- if Sentinel ever provided
8  responses or any form -- or any letter back to CIMA for
9  following up on its requests?
10    MS. SMITH: Objection to form.
11    THE WITNESS: Presumably, but I don't know
12  for sure. That would be something likely handled by the
13  administrator at Beecher Carlson.
14  BY MR. BURT:
15    Q. Did you ever have any role in drafting anything
16  that went back to Sentinel -- or to CIMA?
17    MS. SMITH: Objection to form.
18    THE WITNESS: Not that I recall.
19  BY MR. BURT:
20    Q. Okay. Well, we're going to come back to that.
21      So looking back at Exhibit 96, were you
22  aware that Mr. DiOrio had been indemnified by a company?
23    **A. No.**
24    Q. And it states that it relates to our defense with
25  respect to today's hearing.

42

1      Did you ever have any discussions with
2  Mr. DiOrio about "our" defense?
3    **A. Not that I recall.**
4    Q. Have you ever spoken with Mr. DiOrio at all about
5  the bankruptcy proceeding?
6    **A. It's a very general question. We worked**
7  **together, you know, as Highland was in bankruptcy,**
8  **Highland Capital Management, L.P.**
9    Q. So the answer is "yes"?
10    **A. Could you maybe make your question a bit more**
11  **specific?**
12    Q. Well, see, I'm just asking a broad question
13  first, and then I'll drill down. Is that fair?
14    **A. Sure.**
15    Q. Okay. So my broad question is: Did you ever
16  have discussions with Mr. DiOrio about the bankruptcy
17  proceeding?
18    **A. Surely, I did.**
19    Q. Okay. And do you recall any of those
20  discussions?
21    MS. SMITH: Objection to form.
22    THE WITNESS: Not specifically.
23  BY MR. BURT:
24    Q. Okay. Did you ever discuss with Mr. DiOrio, for
25  example, the fact that you received a subpoena?

43

1    MS. SMITH: Objection to form.
2    THE WITNESS: Not that I recall, no.
3  BY MR. BURT:
4    Q. How about with Mr. Leventon, did you ever discuss
5  with him that you'd received a subpoena?
6    **A. No.**
7    Q. How about Mr. Sevilla?
8    **A. No, not that I recall.**
9    Q. How about Mr. Ellington, did you ever discuss
10  with him that you received a subpoena?
11    **A. No, not that I recall.**
12    Q. How about Mr. Dondero?
13    **A. No.**
14    Q. Did you ever speak with any of those individuals
15  that I just mentioned on the fact that you had been
16  subpoenaed for deposition?
17    **A. Not that I recall.**
18    Q. Okay. Has any one of those individuals -- for
19  the record, Mr. Ellington, Mr. Dondero, Mr. Leventon,
20  Mr. Sevilla, or Mr. DiOrio, has any one of those
21  individuals ever promised you anything in relation to this
22  -- to the bankruptcy proceedings and your testimony?
23    **A. No. No.**
24    Q. Or the documents that you produced?
25    **A. No.**

44

1    Q. Do you currently work for Mr. Ellington?
2    **A. I'm on unpaid leave with Skyview.**
3    Q. And does he own Skyview?
4    **A. I don't know.**
5    Q. Does -- does -- do you work for him -- do you
6  report -- when you go back, will you report to
7  Mr. Ellington at Skyview?
8    MS. SMITH: Objection to form.
9    THE WITNESS: I don't know. It hasn't been
10  decided to my knowledge; I don't know.
11  BY MR. BURT:
12    Q. Is Mr. Ellington affiliated with Skyview, to your
13  knowledge?
14    MS. SMITH: Objection to form.
15    THE WITNESS: I don't know what you mean by
16  "affiliated," but I think he is somewhat involved with
17  Skyview.
18  BY MR. BURT:
19    Q. Do you know if he owns it?
20    **A. I don't know, no. You asked me that earlier. I**
21  **don't know.**
22    Q. Do you know if Mr. Dondero owns it?
23    **A. I don't know.**
24    Q. Okay. So to be clear, you are not aware of ever
25  having been offered an indemnification in this case?

**45**

1  A. Not that I recall.

2  Q. And you have no knowledge of how it came to be

3 that someone else is paying for your legal counsel?

4  **A. Honestly, no. I'm not an attorney, and I haven't**

5 **really been in the nitty-gritty on this. I have been out**

6 **on unpaid leave.**

7  Q. Well, you're a CPA, aren't you?

8  **A. I am, yeah.**

9  Q. Okay. And you have a background in finance?

10  **A. Yes.**

11  Q. Who pays the bills of something that you, I

12 assume, care about as a CPA?

13  MS. SMITH: Objection to form.

14  THE WITNESS: Who pays the bills that I care

15 about as a CPA?

16 BY MR. BURT:

17  Q. Who pays the bills is something, I would think,

18 as a CPA you care about?

19  MS. SMITH: Objection to form.

20  THE WITNESS: I don't know who pays the

21 bills. For this matter, presumably, you're asking me

22 about, I don't know.

23 BY MR. BURT:

24  Q. So you didn't know that Sentinel was paying --

25  **A. No. I don't know.**

**46**

1  Q. -- for your representation in this adversary

2 proceeding --

3  **A. Now I know.**

4  Q. -- you didn't know that?

5  **A. You showed me documentation, but no.**

6  Q. So you know it now?

7  **A. Yes. You just showed me documentation of it.**

8  Q. And you don't have any reason to disagree that

9 Sentinel is paying for your representation in this

10 adversary proceeding --

11  MS. SMITH: Objection to form.

12  MR. BURT: Excuse me. Let me finish my

13 question.

14 BY MR. BURT:

15  Q. You don't have any reason -- now I'll have to

16 start over.

17  You don't have any reason to disagree that

18 Sentinel is paying for your representation in this

19 adversary proceeding, do you?

20  MS. SMITH: Objection to form.

21  THE WITNESS: Do I have a reason to

22 disagree?

23 BY MR. BURT:

24  Q. Yeah.

25  **A. I don't know.**

**47**

1  Q. You don't have any facts that would dispute what

2 we have looked at in these documents, do you?

3  MS. SMITH: Objection, form. She's

4 answered.

5 BY MR. BURT:

6  Q. You can answer.

7  **A. I don't really know what you're asking me.**

8  Q. You don't have any facts to give us today that

9 would dispute that Sentinel is paying for your

10 representation here today?

11  MS. SMITH: Objection, form; asked and

12 answered.

13  THE WITNESS: No. You've showed me

14 documentation here. I don't have other information about

15 it, no.

16  MS. SMITH: Katie, are you doing okay?

17  THE WITNESS: Yeah, I'm okay.

18  MS. SMITH: You need a break?

19  THE WITNESS: Thank you.

20  MR. BURT: Yeah. Whenever you need a break,

21 that's fine.

22  MS. SMITH: Let's take a break.

23  THE VIDEOGRAPHER: We are off the record at

24 10:38 a.m.

25  (Brief recess taken.)

**48**

1  THE VIDEOGRAPHER: Back on the record at

2 10:53 a.m.

3 BY MR. BURT:

4  Q. Mrs. Irving, do you have an engagement letter

5 with Ross & Smith?

6  **A. I don't know.**

7  Q. How about with Baker?

8  **A. I don't know.**

9  Q. You've never signed an engagement letter, to your

10 knowledge?

11  MS. SMITH: Objection to form.

12  THE WITNESS: I don't recall. But it hasn't

13 been really my highest priority. I have been out on -- on

14 leave, and I -- I don't know. I don't recall.

15 BY MR. BURT:

16  Q. And I understand that, and I'm just asking for

17 your best recollection.

18  And so what -- you don't recall ever having

19 signed an engagement letter?

20  **A. Correct. I don't recall.**

21  Q. Okay. And it is correct that you are not

22 personally paying for the representation?

23  MS. SMITH: Objection to form.

24  THE WITNESS: Correct, I'm not paying right

25 now, no.

---

**49**

1 BY MR. BURT:
2    Q. Okay. Do you have any knowledge why Sentinel is
3 paying the bills?
4    **A. I don't know.**
5        MS. SMITH: Objection to form.
6        MR. BURT: All right. We've marked the next
7 exhibit as 97.
8        (Exhibit 97 was marked for identification.)
9 BY MR. BURT:
10    Q. Go ahead and take a look at this e-mail chain,
11 and let me know when you're ready.
12    **A. (Witness reviews document.) Okay.**
13    Q. We've seen this name a couple of times, Thomas
14 Adamczak, that's on this e-mail, and I believe you
15 testified, and correct me if I'm wrong, that he is with
16 Beecher Carlson; is that right?
17    **A. Yes, I believe so.**
18    Q. And what is your understanding of the
19 relationship between Beecher Carlson and Sentinel?
20    **A. Beecher Carlson acts as the administrator for**
21 **Sentinel. I don't know if they currently do. At one**
22 **point, they acted as the administrator for Sentinel.**
23    Q. And at what point in time were you aware that
24 they were acting as the administrator?
25    **A. I don't recall specifically.**

---

**50**

1    Q. When you've referred to the administrator of
2 Sentinel in -- in prior testimony today, you were
3 referring to Beecher Carlson; is that right?
4    **A. Yes.**
5    Q. Okay. So looking at this e-mail chain, the
6 bottom of page 1 begins with an e-mail from an
7 mdiorio@blacklandassociates.com.
8        Do you know whether that refers to Matt
9 DiOrio?
10    **A. He signed the e-mail Matt DiOrio, so I would**
11 **assume so.**
12    Q. Okay. Do you know what Blackland Associates is?
13    **A. No.**
14    Q. You're not in any way affiliated with or working
15 for Blackland Associates?
16        MS. SMITH: Objection to form.
17        THE WITNESS: No. I recall I have an e-mail
18 with Blackland Associates. At one point it was a separate
19 business, but I don't recall what it is.
20 BY MR. BURT:
21    Q. You said you had an e-mail. You had an e-mail
22 account, is that what you meant?
23    **A. Yes.**
24    Q. Okay. And it was a separate business from what?
25 What was it separate from?

---

**51**

1    **A. From Highland or SAS.**
2    Q. Beyond that, do you have any knowledge of what
3 Blackland Associates did?
4    **A. I don't recall.**
5    Q. Did you ever use that e-mail address?
6    **A. I don't recall.**
7    Q. Was that prior to the bankruptcy of Highland or
8 post bankruptcy of Highland?
9    **A. Prior.**
10        MS. SMITH: Objection to form.
11 BY MR. BURT:
12    Q. Prior, okay.
13        So prior to the bankruptcy, you got an
14 e-mail address at Blackland Associates?
15    **A. (Witness nods head affirmatively.)**
16    Q. Okay. So looking at this e-mail Mr. DiOrio sends
17 on April 15th, 2021, again to Gareth Pereira at Beecher
18 Carlson and Tom Adamczak, along with another Beecher
19 employee, and in the e-mail, he says, "Please process the
20 three attached invoices. Wire instructions also attached.
21 Some at 3700; Collas Crill, 50,000; Baker McKenzie,
22 250,000;" is that right?
23    **A. I see it on this paper, yes.**
24    Q. And did you -- I believe you testified earlier --
25 and again, if I'm wrong, please correct me -- that Collas

---

**52**

1 Crill represented Sentinel in the Caymans; is that right?
2    **A. I don't know.**
3    Q. You don't know?
4        The name Stephen Leontsinis, was he an
5 attorney at Collas Crill?
6    **A. Yes. To my knowledge, Stephen Leontsinis is with**
7 **Collas Crill.**
8    Q. And I apologize for mispronouncing his name.
9        Okay. So to your knowledge, he was. And
10 did he do work on -- for Sentinel?
11        MS. SMITH: Objection to form.
12        THE WITNESS: I don't know.
13 BY MR. BURT:
14    Q. All right. Do you know whether Baker & McKenzie
15 represent Sentinel?
16        MS. SMITH: Objection to form.
17        THE WITNESS: I don't know.
18 BY MR. BURT:
19    Q. They represent you here today, correct?
20    **A. Yes.**
21    Q. On the first page of the exhibit, Tom responds,
22 "Thanks, Matt. What's the nature of the fees to Baker
23 McKenzie and Collas Crill? Are they related to the
24 Highland bankruptcy, settlement of that ATE matter, or
25 just general legal counsel costs? Thanks, Tom."

53

1         Do you know what he was referring to by
2    "settlement of the ATE matter"?
3         MS. SMITH:  Objection to form.
4         THE WITNESS:  I don't know.
5    BY MR. BURT:
6    Q.  Have you ever heard the term "ATE" before?
7    A.  Yes.
8    Q.  What's your understanding of what ATE is?
9    A.  ATE is likely referring to after the event, ATE,
10   after the event.  It's a -- yeah.
11   Q.  And do you know whether there's a type of
12   insurance policy that's called an ATE policy?
13   A.  Yes.
14   Q.  Okay.  Do you know whether Sentinel ever had or
15   issued ATE policies?
16   A.  Yes.
17   Q.  Okay.  Do you know how many they issued?
18   A.  I don't.
19   Q.  Are you aware of an ATE polishy -- policy issued
20   to the defendants in the New York litigation involving my
21   client UBS?
22        MS. SMITH:  Objection to form.
23        THE WITNESS:  I don't know.
24   BY MR. BURT:
25   Q.  You have no knowledge of that?

54

1         MS. SMITH:  Objection to form.
2         THE WITNESS:  Would you repeat the question?
3    BY MR. BURT:
4    Q.  Sure.
5         Are you aware of whether there was an ATE
6    policy issued by Sentinel to the defendants in the New
7    York action that was brought by my client UBS?
8         MS. SMITH:  Objection to form.
9         THE WITNESS:  I don't know.
10   BY MR. BURT:
11   Q.  Okay.  Have you ever heard the -- of the entity
12   CDO Fund?
13   A.  I've heard the name.
14   Q.  Okay.  Do you know whether they were ever
15   involved -- that entity and other related entities were
16   ever involved in the litigation against UBS in New York?
17        MS. SMITH:  Objection to form.
18        THE WITNESS:  I don't know.
19   BY MR. BURT:
20   Q.  Okay.  Do you have any knowledge of any of the
21   ATE policies issued by Sentinel?
22        MS. SMITH:  Objection to form.
23        THE WITNESS:  Could you repeat that?
24   BY MR. BURT:
25   Q.  Do you have any knowledge of any ATE policy

55

1    issued by Sentinel?
2         MS. SMITH:  Objection to form.
3         THE WITNESS:  Yes.
4    BY MR. BURT:
5    Q.  Okay.  So I believe you testified you don't know
6    how many at issue; is that right?
7    A.  Correct.
8    Q.  What knowledge do you have of any ATE policy that
9    Sentinel issued?
10   A.  I know of a -- I know Sentinel issued an ATE
11   policy.
12   Q.  Okay.  And to whom did it issue that policy?
13   A.  I don't know.
14   Q.  Do you know what amount it issued that policy?
15   A.  I don't.
16   Q.  Do you know anything about how the premium was
17   paid on that policy?
18   A.  Yes.
19   Q.  And what do you know?
20   A.  I know there were certain assets used to pay for
21   the policy.
22   Q.  Assets of whom?
23   A.  I don't know.
24   Q.  Do you know in what amount those assets were?
25   A.  I don't know.

56

1    Q.  And do you know -- after-the-event insurance
2    policy, do you understand that to be relating to a
3    litigation -- a litigation insurance policy?
4         MS. SMITH:  Objection to form.
5         THE WITNESS:  Generally, I believe ATE is,
6    yes, related to litigation.
7    BY MR. BURT:
8    Q.  So relating to the policy that you were just
9    discussing that you have knowledge of, do you know what
10   litigation it involved?
11   A.  I don't.  I'm not an attorney.  I don't know.
12   Q.  I understand; I'm just asking what you know.  And
13   if your testimony is you don't know what litigation it
14   involved, that's fine.
15   A.  Yeah, I don't know.
16   Q.  I just want to -- okay.
17        Looking back at this Exhibit 97, Mr. DiOrio
18   responds, "The Collas Crill invoice is ATE -related.  The
19   Baker invoice is general legal expense."
20        Do you know whether Collas Crill was working
21   on the litigation involved with that ATE policy?
22        MS. SMITH:  Objection to form.
23        THE WITNESS:  I don't know.
24   BY MR. BURT:
25   Q.  Do you know whether Baker & McKenzie was working

---

Page 57

1 on that litigation?
2     **A. I don't know.**
3     Q. How about Ross & Smith, do you know whether they
4 were?
5     **A. I don't know. I'm not copied on this e-mail; I**
6 **don't have any knowledge of this.**
7     Q. I understand. And I'm asking what your knowledge
8 is, and I understand that you might not know, but I'm
9 going to ask. Is that fair?
10     **A. Sure.**
11     Q. Okay. So you don't know whether Baker was
12 representing any entity involved with the ATE -- in the
13 litigation related to the ATE policy?
14     **A. I don't know.**
15     Q. How about Ross & Smith?
16     **A. I don't know.**
17     Q. Did you ever understand that Sentinel was paying
18 for general legal expenses?
19         MS. SMITH: Objection to form.
20         THE WITNESS: It would make sense to me that
21 Sentinel would pay for legal expenses, but I don't -- I
22 don't know.
23 BY MR. BURT:
24     Q. For what legal expenses? What would make sense
25 to you?

---

Page 58

1     **A. Legal -- legal expenses for the entity.**
2     Q. Related to the ATE policy?
3         MS. SMITH: Objection to form.
4 BY MR. BURT:
5     Q. Is that what you mean?
6     **A. I don't know.**
7     Q. So why would it make sense to you that Sentinel
8 would just pay general legal expenses?
9     **A. Likely would need legal advice on something or**
10 **involvement of an attorney.**
11     Q. So is -- so Sentinel paying for its own attorney?
12     **A. I don't know.**
13     Q. Okay. All right. Looking at the top e-mail,
14 Mr. Pereira says, "Gareth, I believe the retainer should
15 be recorded as prepaid until we know there are changes
16 that eat against it for which we can expense. The other
17 invoice, if it is ATE-related, should be a legal expense
18 against that policy."
19         Is that consistent with your understanding
20 of how ATE policies work?
21         MS. SMITH: Objection to form. You misread
22 that.
23         MR. BURT: Well, okay.
24 BY MR. BURT:
25     Q. To be clear, it states in the second line, "The

---

Page 59

1 other invoice, if it's ATE-related, should be a legal
2 expense against that policy."
3         Did I read that correctly?
4     **A. Is that a question for me?**
5     Q. Yes, it is.
6     **A. Yes, you read that correctly.**
7     Q. Okay. And is that consistent with your
8 understanding that for an ATE insurance policy, legal
9 expenses can be expensed against that policy?
10     **A. I don't know.**
11     Q. Okay. And he says, "Now that I think about it,
12 Matt may have gotten them backwards. I would add that a
13 retainer is to be used to help settle ATE claim, and there
14 was a lot of general legal expenses already incurred!"
15         Did I read that correctly?
16     **A. Yes.**
17     Q. Okay. Do you know, one way or the other, whether
18 Mr. DiOrio had gotten this backwards, as Mr. Adamczak
19 states?
20         MS. SMITH: Objection to form.
21         THE WITNESS: No idea. I don't know.
22 BY MR. BURT:
23     Q. Okay. So you have no knowledge whatsoever about
24 this?
25         MS. SMITH: Objection to form.

---

Page 60

1         THE WITNESS: No. This is the first time
2 I'm seeing this. I -- I don't know.
3 BY MR. BURT:
4     Q. And you didn't know before sitting here today
5 that Sentinel was paying Baker McKenzie?
6     **A. No.**
7     Q. And you don't know whether Baker McKenzie was
8 involved or related in any way to the entities -- to the
9 parties for which the ATE policy had been issued?
10     **A. I don't know.**
11         MS. SMITH: Objection to form.
12 BY MR. BURT:
13     Q. Okay. I wanted to actually follow up on one
14 question about what you did to prepare for today.
15         Did you review any prior deposition
16 transcripts?
17     **A. No.**
18     Q. Did you review any hearing transcripts?
19     **A. No.**
20     Q. And I believe you said you didn't look at any
21 documents?
22     **A. I did not look at documents, no.**
23     Q. Okay. All right, Mrs. Lucas.
24     I -- I think you testified today that you
25 are not a lawyer; is that right?

61

1    A.  Correct.
2    Q.  Could you describe, please, your educational
3  background?
4    A.  Sure.  I went to Texas A&M University.  My
5  undergrad is in accounting.  My master's is in finance.
6        MR. BURT:  I'll mark this as 98, I believe.
7        THE WITNESS:  Thanks.
8        (Exhibit 98 was marked for identification.)
9  MR. BURT:
10       Q.  Hopefully this document is a little more familiar
11 to you.
12       Do you recognize Exhibit 98?
13   A.  I recognize the information contained on this,
14 not the exact document, but yes.
15       Q.  Okay.  And is -- does it appear to be your
16 LinkedIn -- a printout of your LinkedIn bio?
17   A.  It does appear to be that, yes.
18       Q.  Okay.  So you mentioned -- and going down to
19 "Education" -- that you have an undergraduate degree in
20 accounting; is that right?
21   A.  Yes.
22       Q.  All right.  And then remind me, what was your
23 master's degree in?
24   A.  Finance.
25       Q.  And both of those from Texas A&M?

62

1    A.  Yes.
2    Q.  Now, looking up at -- under "Summary" at the top,
3  it states that you have specialties including that you're
4  a certified public accountant, right?
5    A.  Yes.
6    Q.  When did you get your CPA license?
7    A.  2007.
8    Q.  Was that here in Texas?
9    A.  Yes.
10       Q.  And you also list here a "Certified Insolvency
11 and Restructuring Advisor."
12       Can you describe what that is referring to?
13   A.  Sure.  It's a specialized credential,
14 essentially, that I obtained really just related to -- to
15 insolvency specifically.
16       Q.  How did -- what did you have to do to attain that
17 certification?
18   A.  There were several trainings and several exams.
19       Q.  And who issues -- or who -- who does the exam?
20 Who administers it?
21   A.  It's called "AIRA," Association of Insolvency and
22 Restructuring Advisors.
23       Q.  When did you do that?  When did you obtain that
24 certification?  Let me be more precise.
25   A.  I don't recall exactly but early in my career,

63

1  maybe 2009 or so.
2    Q.  Is it correct that you obtained both of those
3  certifications, the CPA and the certified insolvency,
4  prior to beginning work for Highland?
5    A.  Yes.
6    Q.  Now, listed at the bottom under your experience
7  is FTI Consulting.  Do you see that?
8    A.  Yes.
9    Q.  Very briefly, can you describe what you did
10 there?
11   A.  Sure.
12       I was -- I started my career at FTI
13 Consulting in 2007.  I was involved with multiple
14 bankruptcy matters, including subprime lending and -- and
15 several other type of clients.
16       Q.  Well, that was the time for it, wasn't it?
17   A.  Yes.
18       Q.  And is that why you got the Certified Insolvency
19 and Restructuring Advisor certification, because you were
20 doing that work for FTI?
21       MS. SMITH:  Objection to form.
22       THE WITNESS:  It was offered by FTI and
23 suggested that I attend the trainings and take the exams.
24 BY MR. BURT:
25       Q.  Uh-huh.

64

1        And you worked there for three years, right?
2    A.  Yes.
3    Q.  Next you went to Innovative Communications for
4  one year in the Virgin Islands.
5        What is Innovative Communications?
6    A.  Innovative ran all the telecomm in the USVI and
7  BVI.
8    Q.  What took you there?
9    A.  It was a client of FTI.  There was a
10 restructuring going on.
11       Q.  So you actually left FTI and went to this -- to
12 this other entity?
13   A.  I did.
14       Q.  Okay.  And you were there for one year.  Why just
15 a year?
16   A.  I didn't like my boss.
17       Q.  That's fair.
18       So you decided to -- to leave after a year,
19 and you went to Ernst & Young; is that right?
20   A.  Yes.
21       Q.  And you came back to Dallas?
22   A.  I did.
23       Q.  All right.  And what did you do at Ernst & Young?
24   A.  I worked in the restructuring group.
25       Q.  Okay.  So it appears that your -- your work

---

**65**

1  coming out of your degrees from 2007 to '13, at least
2  through that time period, was dealing mostly with
3  restructuring; is that fair?
4  **A. Yes.**
5  Q. Okay. And you stayed at Ernst & Young for
6  two years?
7  **A. Yes.**
8  Q. Did you have -- did you ever work in a legal
9  department at any of these entities?
10  **A. No.**
11  Q. Did they have specific restructuring departments
12  that you were in?
13  **A. For Ernst & Young, yes. For Innovative, I was in**
14  **the finance group. For FTI, yes, I was in the corporate**
15  **finance restructuring group.**
16  Q. All right. And then, in 2013, you leave Ernst &
17  Young, and that's when you first come to work for Highland
18  Capital; is that right?
19  **A. Yes.**
20  Q. Okay. What instigated that move from Ernst &
21  Young to Highland Capital?
22  **A. Highland was looking for someone to essentially**
23  **work on an incubator project related to litigation funding.**
24  **I thought it seemed like an interesting opportunity.**
25  Q. Did you have any involvement with litigation

**66**

1  funding prior to that?
2  **A. No.**
3  Q. Okay. What about this struck you as interesting?
4  **A. I met the team; I thought it was a very**
5  **entrepreneurial environment.**
6  Q. Who was the team?
7  **A. Scott Ellington and J.P. Sevilla.**
8  Q. Anybody else?
9  **A. Not that I recall.**
10  Q. Did this -- this litigation funding, did it have
11  its own entity that -- that it worked under separate from
12  Highland Capital or --
13  **A. Yes.**
14  Q. And what entity was that?
15  **A. SAS Asset Recovery.**
16  Q. Okay. Had SAS Asset Recovery already been
17  established before you went over to Highland Capital?
18  **A. Yes.**
19  Q. Did SAS Asset Recovery have anything to do with
20  restructuring?
21  MS. SMITH: Objection to form.
22  THE WITNESS: Insofar as Cayman
23  liquidations, which would touch restructuring, would
24  potentially have the need for litigation funding for
25  claims out of those estates.

**67**

1  BY MR. BURT:
2  Q. Was SAS Asset Recovery based in the Caymans?
3  **A. Yes.**
4  Q. And when you came over, did you work specifically
5  at SAS Asset Recovery or for Highland Capital Management?
6  MS. SMITH: Objection to form.
7  THE WITNESS: Highland Capital Management,
8  L.P., was my employer.
9  BY MR. BURT:
10  Q. And if we refer to that as "HCMLP," is -- will
11  you understand what I'm referring to?
12  **A. Yes.**
13  Q. Okay. So were you always paid out of HCMLP?
14  **A. Yes.**
15  Q. Never out of SAS Asset Recovery, Ltd.?
16  **A. Correct.**
17  Q. All right. It states in your LinkedIn that you
18  were a director of business development from 2013 to
19  February of 2020, for seven years.
20  Was that work all SAS Asset Recovery work?
21  **A. Not all of it, no.**
22  Q. Okay. What else did you do besides SAS Asset
23  Recovery?
24  **A. This really should be updated, honestly.**
25  **I worked -- my -- my role changed**

**68**

1  **significantly while I was there. I was there for a long**
2  **time.**
3  **So I worked on SAS Asset Recovery matters; I**
4  **worked on private equity matters, a lot of ad hoc matters.**
5  Q. The private equity matters, was that for a
6  different entity?
7  **A. That was for HCMLP.**
8  Q. That was for HCMLP?
9  **A. Managed funds and investments.**
10  Q. Aside from SAS Asset Recovery and HCMLP, what
11  other entities under the Highland umbrella did you work
12  for?
13  MS. SMITH: Objection to form.
14  THE WITNESS: Did I work for?
15  BY MR. BURT:
16  Q. Or with.
17  **A. I worked with NexBank on several matters. I**
18  **worked with NexPoint. That's all I can recall for now.**
19  Q. What was NexBank?
20  **A. NexBank is a -- essentially an affiliate bank of**
21  **Highland Capital Management, L.P. There's a Shared**
22  **Services Agreement.**
23  Q. Between HCMLP and NexBank?
24  **A. To my knowledge, yes.**
25  Q. And when you say it was an affiliate bank, did it

---

69

1  -- did NexBank fund HCMLP, or how --
2      **A. I don't know.**
3      Q. -- how were they affiliated?
4          MS. SMITH: Objection to form.
5          THE WITNESS: I don't know.
6  BY MR. BURT:
7      Q. You just know that they were affiliated in some
8  way?
9      **A. Yes.**
10     Q. What type of work did you do for NexBank?
11         MS. SMITH: Objection to form.
12         THE WITNESS: I worked on distressed real
13 estate matter. I also had an opportunity for some
14 deposits at NexBank.
15 BY MR. BURT:
16     Q. What is NexPoint?
17     **A. The real estate group.**
18     Q. And real estate group, was it -- was it also
19 affiliated with HCMLP?
20         MS. SMITH: Objection to form.
21         THE WITNESS: To my knowledge.
22 BY MR. BURT:
23     Q. Do you know whether a Shared Services Agreement
24 existed between those two entities?
25     **A. I believe so, but I don't know for certain.**

---

70

1          MR. BURT: One moment.
2  BY MR. BURT:
3      Q. So any other entities that you worked for during
4  these -- from 2013 to February 2020, other than HCMLP, SAS
5  Asset Recovery, NexBank, and NexPoint?
6          MS. SMITH: Objection to form.
7          THE WITNESS: I did not work for those
8  companies.
9  BY MR. BURT:
10     Q. Or worked with.
11     **A. Worked with.**
12     Q. Okay. Any others that you worked with?
13         MS. SMITH: Excuse me.
14         THE WITNESS: Not that I can recall.
15 BY MR. BURT:
16     Q. How about Sentinel?
17     **A. I did do ad woc [sic] -- ad hoc work for**
18 **Sentinel, yes.**
19     Q. Who asked you to do that?
20         MS. SMITH: Objection to form.
21         THE WITNESS: I don't know.
22 BY MR. BURT:
23     Q. When did you start doing that?
24     **A. I don't recall specifically.**
25     Q. Was it prior to HCMLP's bankruptcy?

---

71

1      **A. Oh, certainly, yes.**
2      Q. Two/three years prior? Five years prior? Any
3  way you can gauge how prior -- how --
4      **A. Likely close to the beginning of my employment.**
5      Q. Okay. So for most of the time that you were --
6  looking again at your LinkedIn, that you were at Highland
7  Capital Management, you were also doing work with, on an
8  ad hoc basis, Sentinel; is that fair?
9      **A. Yes.**
10     Q. Was it pretty consistent that ad hoc work?
11         MS. SMITH: Objection to form.
12         THE WITNESS: No.
13 BY MR. BURT:
14     Q. Did it get busier at times than others?
15     **A. Yes.**
16     Q. When was it a busy time doing ad hoc work for
17 Sentinel?
18     **A. If Sentinel was contemplating a ATE, issuing an**
19 **ATE policy.**
20     Q. And what would you do if they were contemplating
21 that?
22     **A. There's a lot of synergy between an opportunity**
23 **in litigation funding and ATE in commonwealth**
24 **jurisdictions. So there would be analysis related to**
25 **whether issuing an ATE policy would be a complimentary**

---

72

1  **business pitch to the litigation funding side.**
2      Q. How many times did you work on a contemplated ATE
3  for Sentinel?
4      **A. I don't know. More than five.**
5      Q. Do you know how many of those were actually
6  issued as policies?
7      **A. I don't recall.**
8      Q. Do you know whether all of them were issued as
9  policies?
10         MS. SMITH: Objection to form.
11         THE WITNESS: All of them were not issued as
12 policies.
13 BY MR. BURT:
14     Q. Do you know how many were?
15     **A. I do not know.**
16     Q. The one that we were referring to earlier that
17 you -- where you testified that certain assets were
18 transferred over to Sentinel, do you recall that
19 testimony?
20     **A. I do.**
21     Q. Okay. Is that one where you had done work
22 evaluating the ATE prior to the issuance of the policy?
23     **A. No.**
24     Q. You had not worked on that one?
25         MS. SMITH: Objection to form.

---

73

1          THE WITNESS:  I had not worked on that one,
2   that's the question?
3   BY MR. BURT:
4          Q.  Well, you've described work that you would do
5   when an ATE was being considered --
6          A.  Uh-huh.
7          Q.  -- correct?
8          Did you work on the consideration of that
9   ATE policy with your work?
10          A.  I did not.
11          Q.  Okay.  Do you know who did?
12          A.  I don't know.
13          Q.  Okay.  Moving up in your LinkedIn, above
14   "Director of Business Development," it says, "Managing
15   Director - Distressed" from February of 2020 through the
16   present.
17          Is that one of the areas you mentioned this
18   is outdated because you're no longer working --
19          A.  No.  I didn't realize that I had updated it.
20   Yes, that is -- it's outdated insofar as it still says
21   "Highland Capital Management, L.P.," and I'm not an
22   employee of Highland Capital Management, L.P., any longer.
23          Q.  I see.
24          What entity should be listed there?
25          A.  Skyview.

74

1          Q.  Skyview.
2          Have you worked for Skyview since February
3   of 2020?
4          A.  I have been on unpaid leave since my children
5   were born in February of 2021.
6          Q.  Was that 2021?
7          A.  This year.
8          Q.  This year, okay.
9          So from February 2020, the year prior, to
10   February of 2021 when your children were born were you
11   working for HCMLP or for Skyview?
12          A.  HCMLP.
13          Q.  Okay.  So when you went on -- on leave for your
14   children, up to that point, you had been an employee of
15   HCMLP?
16          A.  Yes.
17          Q.  I see.
18          And while you've been on unpaid leave, you
19   switched over to Skyview?
20          A.  Yes.  My employer changed while I was in the
21   hospital, actually.
22          Q.  That's bad timing.
23          A.  Yeah.
24          MS. SMITH:  Doing okay?
25          THE WITNESS:  (Witness nods head

75

1   affirmatively.)
2          MR. BURT:  At any time you need a break,
3   that's fine.
4          THE WITNESS:  Thank you.
5   BY MR. BURT:
6          Q.  Who informed you that you would now be working
7   for Skyview?
8          A.  I don't recall.
9          Q.  Do you need a break, Mrs. Irving?
10          A.  No.
11          Q.  And from -- from the time that your children were
12   born, up to this point, you've been on unpaid leave the
13   entire time?
14          A.  (Witness nods head affirmatively.)
15          Q.  Okay.  And so you -- is that a "yes"?
16          A.  Yes.
17          Q.  Sorry.  We need audible answers.
18          And you had -- so you haven't actually done
19   any work for Skyview?
20          A.  Correct.
21          Q.  I see.
22          When you were working for HCMLP, so prior --
23   from February 2021 moving back, were you paid by HCMLP
24   that entire time?
25          A.  Yes.

76

1          Q.  Okay.  So you were never paid out of an SAS Asset
2   Recovery account?
3          A.  Correct.
4          Q.  Or by Sentinel?
5          A.  Correct.
6          Q.  Did you ever rece- -- other than a paycheck, did
7   you ever receive anything of value from another one of the
8   entities that we've talked about?
9          A.  No.
10          MS. SMITH:  Objection to form.
11   BY MR. BURT:
12          Q.  At the point where you -- up to February 2021,
13   how much were you being paid?  What was your salary in the
14   last year of employment for HCMLP?
15          A.  I don't remember, honestly.
16          Q.  Okay.  Can you estimate it at all, about what it
17   was?
18          A.  The salary component was roughly -- I honestly
19   don't know.  There's -- there's a bonus structure, so I
20   don't -- I don't remember the bifurcation.
21          Q.  I see.
22          So you had a salary -- a base salary, and
23   then you had a bonus structure that you were also eligible
24   for?
25          A.  Yes.

HIGHLY CONFIDENTIAL
Transcript of Katie Lucas Irving
Conducted on November 15, 2021

77

1 Q. And that was -- the bonus structure was also out
2 of HCMLP?
3 A. Yes.
4 Q. Were those annual bonuses or more often than
5 annual?
6 A. They were annual bonuses paid over a two-year
7 period.
8 Q. And how did you become eligible for the bonuses?
9 MS. SMITH: Objection to form.
10 THE WITNESS: It was determined by your --
11 who you directly reported to.
12 BY MR. BURT:
13 Q. Okay. And who did you directly report to?
14 A. Scott Ellington.
15 Q. How long did you directly report to
16 Mr. Ellington?
17 A. The entirety of my time at HCMLP.
18 Q. So that was about eight years?
19 A. Yes.
20 Q. Was he the head of the legal department?
21 A. Yes.
22 Q. Do you know why when you came over to HCMLP you
23 were placed in the legal department?
24 MS. SMITH: Objection to form.
25 THE WITNESS: My sense is that's where this

78

1 incubator, you know, litigation-based business was
2 originating.
3 BY MR. BURT:
4 Q. Okay. Did you stay in the legal department the
5 entire time?
6 A. I did. And private equity, essentially, moved
7 beneath the legal department. So when my title changed,
8 "Managing Director - Distressed," it was still beneath
9 legal but also with private equity.
10 Q. Mr. DiOrio worked in the legal department as
11 well?
12 A. Yes.
13 Q. As did Mr. Leventon?
14 A. Yes.
15 Q. Mr. Sevilla as well?
16 A. Yes.
17 Q. Do you know whether there was a Shared Services
18 Agreement between HCMLP and Sentinel?
19 MS. SMITH: Objection to form.
20 THE WITNESS: I don't know.
21 BY MR. BURT:
22 Q. How about between Sentinel and SAS Asset
23 Recovery?
24 MS. SMITH: Objection to form.
25 THE WITNESS: I don't know.

79

1 BY MR. BURT:
2 Q. While you were at HCMLP, was your e-mail address
3 kirving@highlandcapital.com?
4 A. Yes. Or kirving@hcmlp.com.
5 Q. All right. Did you also have a
6 kirving@sasmgt.com e-mail?
7 A. Yes.
8 Q. All right. Any others?
9 A. The Blackland Associates's e-mail from very early
10 in my career. I don't know that it was ever used; I can't
11 access it.
12 Q. All right. Did you ever use your personal e-mail
13 address for work matters?
14 A. Generally not.
15 Q. But at times, did you?
16 A. Yes.
17 Highly Confidential
18
19 A. Yes.
20 Q. All right. Now, in responding to the subpoena
21 you received in this case, did you search your Gmail
22 account?
23 A. Yes.
24 Q. All right. You received a preservation notice in
25 March, I believe, of this year, is that right, about that

80

1 time frame?
2 A. I'll take your word for it.
3 Q. I understand that's -- that's right after your
4 children were born.
5 When did you search for documents in your
6 Gmail account?
7 A. I don't -- I don't recall.
8 Q. Do you recall how you searched for documents?
9 A. Not specifically. I believe I -- I believe I --
10 no, I don't really remember, honestly.
11 Q. You recall using search terms, for example,
12 within Gmail?
13 A. I believe so, yes.
14 Q. Do you have any recollection of what those terms
15 might have been?
16 A. "SAS," I believe, was a search term.
17 Q. Any others?
18 A. I can't recall. I don't know.
19 Q. Did you search for "Sentinel" in your Gmail?
20 A. I don't recall. I -- likely I did. I had a
21 discussion with counsel and then searched, you know,
22 according to counsel's advice, but I can't remember the
23 details.
24 Q. And without disclosing that advice, was that
25 Ms. Smith?

81

1      A. I don't -- I don't remember.
2          MR. BURT: I believe we're on 99.
3      Mark this as 99.
4          (Exhibit 99 was marked for identification.)
5  BY MR. BURT:
6      Q. While you're looking through that, Mrs. Irving,
7  I'll just draw your attention down at the very bottom on
8  the right-hand corner, there's something that says "KL_"
9  then has a bunch of zeros and two 9s.
10         Do you see that?
11     A. I do see that.
12     Q. You're probably familiar with this; we call that
13 the "Bates number." And I'll represent to you that this
14 is -- was produced to UBS by your counsel --
15     A. Okay.
16     Q. -- and so labeled --
17     A. Okay.
18     Q. -- as something that you had produced.
19     A. (Witness reviews document.) Okay.
20     Q. Do you recall finding these documents in your
21 Gmail?
22     A. I don't.
23     Q. You don't have any reason to dispute that you
24 produced these, do you?
25         MS. SMITH: Objection to form.

82

1          THE WITNESS: I don't know.
2  BY MR. BURT:
3      Q. Looking at the first document, a -- a letter
4  dated 24th of May, 2021, the -- at the very top, the
5  header is "Walkers."
6          Do you recall ever having -- before today,
7  reviewing this letter?
8      A. I don't recall.
9      Q. Do you know what Walkers is?
10     A. Yes.
11     Q. Do you know how you came to be in possession of
12 this document?
13     A. I don't know.
14     Q. Were you aware that on the 24th of May, Walkers
15 wrote to Sentinel Reinsurance making a demand on the legal
16 liability insurance policy for Sentinel Reinsurance, Ltd.?
17     A. No.
18         MS. SMITH: Objection to form.
19 BY MR. BURT:
20     Q. Before sitting here today, did you know that a
21 demand had been made on that policy?
22     A. No.
23     Q. Okay. Moving forward in this chain, you'll see
24 at the end the Judgment. There's a document that begins
25 on -- at the bottom, the Bates is KL_000036.

83

1      A. Okay.
2      Q. Do you see that this is a court document entitled
3  "Judgment"? Do you see that?
4      A. Yes.
5      Q. And it was filed February 10th, 2020, in the
6  County Clerk's Office in New York; is that right?
7      A. I see that here.
8      Q. Before today, sitting looking at it now, had you
9  ever seen this document before?
10     A. Not that I recall.
11     Q. All right. And looking over, we call it, the
12 "case caption" on the left-hand side in the Supreme Court
13 of the State of New York, there was a legal action by UBS
14 Securities, LLC, and UBS AG London Branch as Plaintiffs
15 against a number of Highland Entities.
16         Do you see that?
17     A. I see that here, yes.
18         MS. SMITH: Objection to form.
19 BY MR. BURT:
20     Q. And listed as the Defendants is Highland Capital
21 Management, L.P.; Highland CDO Opportunity Master Fund,
22 L.P.; Highland Special Opportunities Holding Company;
23 Highland Financial Partners, L.P.; Highland Credit
24 Strategies Master Fund, L.P.; Highland Crusader Offshore
25 Partners, L.P.; Highland Credit Opportunities CDO, L.P.,

84

1  and Strand Advisors, Inc.
2          Did I read that correctly?
3      A. I believe so.
4      Q. Are there any entities that I just read that
5  you've never heard of before?
6          MS. SMITH: Objection to form.
7          THE WITNESS: I don't know. Multiple
8  entities have very similar names. I've heard the names,
9  but I -- I don't know for certain.
10 BY MR. BURT:
11     Q. Okay. Highland Capital Management, L.P., that's
12 the Highland Capital Management we've been discussing, is
13 that right --
14     A. Yes.
15     Q. -- HCMLP?
16         Highland CDO Opportunity Master Fund, L.P.,
17 have you heard of that before?
18     A. I've heard the name, yes.
19     Q. Do you know anything about that entity?
20     A. No.
21     Q. Highland Special Opportunities Holding Company,
22 have you heard of that entity before?
23     A. I've heard the name, yes.
24     Q. Any knowledge of what it was?
25     A. No.

---

85

1    Q.  Highland Financial Partners, L.P., have you heard
2    of that entity before?
3    **A.  I've heard the name.**
4    Q.  Any knowledge of it?
5    **A.  No.**
6    Q.  Highland Credit Strategies Master Fund, L.P.,
7    have you ever heard of that?
8    **A.  Yes.**
9    Q.  Do you know what it did?
10   **A.  No.**
11   Q.  Highland Crusader Offshore Partners, L.P., have
12   you heard of that?
13   **A.  I don't know.  I don't know.**
14   Q.  Okay.  That one is a little less clear?
15   **A.  Yes.**
16   Q.  Highland Credit Opportunities CDO, L.P., how
17   about that one?
18   **A.  Yes, I've heard the name.**
19   Q.  Any knowledge of what it did?
20   **A.  No.**
21   Q.  How about Strand Advisors?
22   **A.  Yes.**
23   Q.  What is Strand Advisors?
24   **A.  If this is the same Strand Advisors, which I**
25   **don't know, I believe Strand Advisors was the GP of HCMLP.**

---

86

1    Q.  And by "GP," do you mean general partner?
2    **A.  Yes.**
3    Q.  Of HCMLP?
4    **A.  Yes.**
5    Q.  Do you know who owned Strand Advisors?
6    **A.  No.**
7    Q.  Do you know whether it was in any way affiliated
8    with Mr. Dondero?
9         MS. SMITH:  Objection to form.
10        THE WITNESS:  I don't know.
11   BY MR. BURT:
12   Q.  How about Mr. Ellington?
13        MS. SMITH:  Objection to form.
14        THE WITNESS:  I don't know.
15   BY MR. BURT:
16   Q.  Now, were you aware that there was a litigation
17   involving various Highland Entities against UBS while you
18   were employed at HCMLP?
19   **A.  I heard UBS mentioned, yes.**
20   Q.  In the context of a litigation?
21   **A.  Yes.**
22   Q.  And what -- what do you recall hearing?
23   **A.  I don't remember.  I just remember hearing UBS,**
24   **you know, in the legal department, but I don't recall**
25   **specifically.**

---

87

1    Q.  Do you know whether Mr. Ellington was working on
2    that litigation?
3         MS. SMITH:  Objection to form.
4         THE WITNESS:  I don't know.
5    BY MR. BURT:
6    Q.  Now, Mrs. Irving, drawing your attention back to
7    the ATE policy that you testified that you were aware of
8    where certain assets were transferred, do you know whether
9    that ATE policy had anything to do with the litigation
10   reflected here in Exhibit 99?
11   **A.  I don't know.**
12   Q.  Now, you testified that, as part of work that you
13   did on an ad hoc basis for Sentinel, you would do some --
14   and correct me if I'm wrong -- but some type of pre-policy
15   diligence on -- on -- on ATE opp- -- ATE possibilities; is
16   that right?
17   **A.  Yes.**
18   Q.  Do you recall ever doing that type of work or
19   diligence in relation to this litigation in an AT- -- in a
20   potential ATE policy?
21   **A.  No.**
22   Q.  In 2020, February 2020, did you have any
23   knowledge that a judgment had been issued in favor of UBS?
24   **A.  No.**
25   Q.  You never heard anything about that?

---

88

1    **A.  Not that I recall.**
2         MS. SMITH:  Objection to form.
3    BY MR. BURT:
4    Q.  Okay.  And if you look at page 2 of this
5    Judgment, in the paragraph that begins, "IT IS NOW HEREBY
6    ORDERED AND ADJUDGED..."
7         Do you see that in all caps; it's about in
8    the middle of the page?
9    **A.  Yes, I see that on the paper.**
10   Q.  Okay.  It states, "IT IS NOW HEREBY ORDERED AND
11   ADJUDGED that Plaintiffs UBS Securities, LLC," and then it
12   lists an address, "are granted a judgment of $519,374,149
13   and entitled to prejudgment interest in the amount of
14   9 percent simple interest per year from the date of the
15   breach, which the Court has determined is December 5th,
16   2008, for an overall judgment as of January 22nd, 2020, of
17   $1,039,957,799.44, with additional interest per day
18   thereafter of $128,065 until entry of judgment, to be
19   apportioned among Defendants as follows...," and then
20   there's an apportionment in the following paragraph.
21        Do you see where I just read?
22   **A.  I do.**
23   Q.  Did you have any knowledge of this $1 billion
24   judgment being entered against the Highland Entities?
25        MS. SMITH:  Objection to form.

---

89

1        THE WITNESS: Not that I remember.
2  BY MR. BURT:
3      Q. It was never discussed in the legal department
4  that there was a billion-dollar judgment --
5        MS. SMITH: Objection to form.
6  BY MR. BURT:
7      Q. -- against the Highland Entities?
8      **A. I don't know if it was discussed within the legal**
9  **department, but I don't recall this.**
10     Q. It was never discussed with you; is that fair?
11     **A. Not that I recall.**
12     Q. Okay. You reported directly to Mr. Ellington; is
13  that right?
14     **A. Yes.**
15     Q. Do you recall Mr. Ellington ever discussing that
16  a billion-dollar judgment had been entered against the
17  Highland Entities?
18        MS. SMITH: Objection to form.
19        THE WITNESS: Not that I recall.
20  BY MR. BURT:
21     Q. And do you recall ever being asked to do any work
22  in relation to that judgment?
23     **A. I don't recall that, no.**
24     Q. How about as it relates to Sentinel and an ATE
25  policy, do you recall that ever being discussed in the

90

1  context of a judgment against the Highland Entities?
2        MS. SMITH: Objection to form.
3        THE WITNESS: I don't know.
4  BY MR. BURT:
5      Q. You don't know, or you don't recall?
6      **A. I don't know.**
7      Q. Okay. All right.
8        All right. Well, we're going to come back
9  to that topic in a little bit. You can put that exhibit
10  to the side.
11        I was going to ask earlier, when we went
12  through your various e-mail addresses, Mrs. Irving, was
13  there -- how did you demarcate between using the Highland
14  Capital e-mail versus the SAS Management e-mail?
15     **A. Sure.**
16        **If it was a matter related to Highland or**
17  **any of the Highland funds, Highland-related assets, it**
18  **would be on the Highland e-mail.**
19        **If it were a purely Cayman-centric topic,**
20  **likely it would be on the SAS e-mail.**
21     Q. Any Cayman topic would be on SAS e-mail?
22        MS. SMITH: Objection to form.
23        THE WITNESS: I don't know that I can say
24  "any Cayman topic," but, generally, that was how it was
25  distinguished.

91

1  BY MR. BURT:
2      Q. Okay. And why did you distinguish it that way?
3      **A. The default would be SAS for Cayman matters,**
4  **unless it related to something Highland; then it would be**
5  **on the Highland e-mail.**
6      Q. Okay. And did you have -- so take a typical --
7  take -- take a typical workday. Did you have both e-mail
8  accounts open during a workday, and some e-mails it would
9  -- you were looking at Highland Capital, and other e-mails
10  you were looking at SAS? Is that how you would do it?
11     **A. Sometimes, yes.**
12     Q. Okay. How -- how did you do it at other times?
13     **A. Sometimes I would only have my Highland e-mail**
14  **and not access to the SAS e-mail.**
15     Q. Was SAS forwarded to your Highland account?
16     **A. No.**
17     Q. All right. And I believe you said that some
18  e-mails did go to your personal e-mail address.
19        MS. SMITH: Objection to form.
20  BY MR. BURT:
21     Q. Is that right?
22     **A. Yes. I -- I forwarded a few e-mails to my**
23  **personal e-mail.**
24     Q. And why would you do that?
25     **A. If I needed to print them or needed easier access**

92

1  to them for some reason.
2      Q. Before you -- I believe you testified that you
3  actually changed companies right in the middle of -- of
4  your children coming.
5        So it's -- it doesn't sound like you had an
6  opportunity to actually go in and clean out an office or
7  anything like that; is that right?
8      **A. I did collect some personal belongings while I**
9  **was very pregnant --**
10     Q. Right.
11     **A. -- from the HCMLP office.**
12     Q. Okay. So prior to giving birth, you were aware
13  that things were -- were switching?
14     **A. Yes. I -- well, I don't know if that's fair to**
15  **say I was aware things were switching. I don't know. But**
16  **I knew I wanted to get my personal items out. I wasn't --**
17  **I was on leave. I knew it was going to be limited on when**
18  **I could go back and get personal items.**
19     Q. Uh-huh.
20        Was -- was that the only reason you went to
21  get personal items, or was it also -- were you asked to
22  leave HCMLP?
23        MS. SMITH: Objection to form.
24        THE WITNESS: The reason I went to get my
25  personal items was because I was really pregnant, and I

93

1 didn't know when I would be back and able to get them.
2 BY MR. BURT:
3 Q. Right.
4 So I'm just asking: Were you asked to -- to
5 leave HCMLP?
6 MS. SMITH: Objection to form.
7 THE WITNESS: I suppose I was asked to leave
8 when I was terminated --
9 BY MR. BURT:
10 Q. Okay.
11 A. -- while I was in the hospital.
12 Q. And so you were terminated from HCMLP while in
13 the hospital?
14 A. I believe so, consistent with the other bulk
15 employee terminations.
16 Q. Okay. Since that time, since -- since being
17 terminated from HCMLP, have you had any communications
18 with Mr. Dondero?
19 A. No.
20 Q. How about with Mr. Ellington?
21 A. Yes. Really just to check in, personal matters.
22 Q. Other than personal-related communications, have
23 you had any communications with Mr. Ellington?
24 A. No. Only related to how I'm doing and, you know,
25 potentially, I intend to come back to work with him again.

94

1 Q. Okay. Apart from that, nothing else?
2 A. No.
3 Q. How about with Mr. Leventon?
4 A. No. General check-in.
5 Q. Nothing business-related?
6 A. No.
7 Q. How about with Mr. Sevilla?
8 A. Just personal.
9 Q. And Mr. DiOrio?
10 A. Personal.
11 Q. Nothing business-related?
12 A. No.
13 Q. Nothing related to the subpoenas?
14 A. No.
15 Q. How about with current HCMLP employees such as
16 David Klaus, have you had any communications with
17 Mr. Klaus?
18 A. I don't believe so.
19 Q. And do you know who Mr. Klaus is?
20 A. Yes.
21 Q. Okay. Who is he?
22 A. He was -- was the controller, essentially. I
23 don't know if that's his exact title, but function as
24 controller at HCMLP.
25 Q. Do you know what he is doing now?

95

1 A. I don't.
2 Q. How about Thomas Surgent, do you know who that
3 is?
4 A. Yes.
5 Q. And what did he do?
6 A. He was the head of compliance and the deputy
7 general counsel.
8 Q. Have you had any communications with him?
9 A. During what time period?
10 Q. Since leaving HCMLP. Excuse me.
11 A. No, not that I recall.
12 Q. Do you know -- in relation to Sentinel, do you
13 know whether either of those two gentlemen had anything to
14 do with Sentinel Reinsurance?
15 MS. SMITH: Objection to form.
16 THE WITNESS: Either David Klaus or Tom
17 Surgent --
18 BY MR. BURT:
19 Q. Correct.
20 A. -- had anything to do with Sentinel?
21 Q. Correct.
22 A. Thomas was well-aware of Sentinel as head of
23 compliance. I don't know about David Klaus.
24 Q. And you say he is "well-aware."
25 How did you know he was well-aware of

96

1 Sentinel?
2 A. I sat outside his office. In a trading-desk
3 environment, you hear a lot. I know that he, as head of
4 compliance, would have been involved and made certain
5 determinations related to affiliate or nonaffiliate for
6 various corporate disclosures.
7 Q. So you overheard things?
8 A. Yes.
9 Q. That Mr. Surgent was working on that related to
10 Sentinel?
11 A. Yes.
12 Q. How about related to an ATE policy, do you recall
13 that ever coming up, overhearing anything about that?
14 A. In relation to Mr. Surgent?
15 Q. Yeah.
16 A. I can't recall specifically; however, I do
17 believe hearing he was involved in it.
18 Q. And who told you that?
19 MS. SMITH: Objection to form.
20 THE WITNESS: It would just be general
21 hearing in the trading desk. It was all open. So you
22 would hear a lot of people on the phone. You would hear
23 people in meetings with doors open. It's quite a loud
24 environment.
25 BY MR. BURT:

97

1    Q. So in that general open environment with
2  overhearing a lot of things, you never once heard that
3  there was a billion-dollar judgment against Highland?
4        MS. SMITH: Objection to form.
5        THE WITNESS: Not that I recall.
6  BY MR. BURT:
7    Q. All right.
8        And the ATE policy, you overheard that, that
9  Mr. Surgent was discussing that?
10   A. Yes.
11   Q. Anything else specifically related to that ATE
12 policy that you recall overhearing?
13   A. I don't know.
14   Q. Mrs. Irving, do you need a break? I think we
15 might have been going for about an hour.
16   A. I'm -- I'm okay for now.
17       MS. HARTMANN: Yeah. Lunch is here, so why
18 don't -- I don't know if you're moving into another topic.
19       MR. BURT: I am about to move into another
20 topic. So if this is a --
21       MS. HARTMANN: So how long do you think
22 you'll need on the next topic?
23       MR. BURT: It'll be hefty. So if this -- we
24 can -- I'm perfectly fine to break for lunch here.
25       THE WITNESS: We can break if -- if you

98

1  think it makes sense.
2        (Off-record discussion.)
3        THE VIDEOGRAPHER: Off the record at 11:49
4  a.m.
5        (Lunch break taken.)
6        THE VIDEOGRAPHER: Back on record at 12:29
7  p.m.
8        MR. BURT: Following an example of
9  Ms. Smith, I -- I want to make a little bit of a record of
10 my own. Prior to this deposition, there were discussions
11 held between Mr. Clubok and Deb Dandeneau regarding
12 whether there would be any coaching of Ms. Smith during
13 this deposition by Baker attorneys, and it was represented
14 to Mr. Clubok that there would be absolutely no
15 interaction or coaching during the deposition, that there
16 would be no -- no note-passing, no kicking under the
17 table, anything of that sort.
18       What we have seen today is exactly the
19 opposite. There's been note-passing; there's been
20 communications, and it's directly contrary to the
21 representation that Ms. Dandeneau provided to Mr. Clubok,
22 and we ask that it stop.
23       MS. SMITH: There's been two notes passed,
24 and it was something personal.
25       MR. BURT: Well, we've seen notes passed;

99

1  we've seen verbal looks; we've seen a bunch of things that
2  we think is entirely inconsistent with what Ms. -- Ms.
3  Dandeneau -- if it was personal, would you mind providing
4  those notes to us?
5        MS. HARTMANN: It's about our client crying
6  during your deposition. And, no, we're not going to
7  produce it, because it's -- we have an attorney-client
8  privilege. I'm not coaching; I'm not kicking; I have not
9  said a word.
10       MS. SMITH: We're four feet away.
11       MR. BURT: We've seen it. We're making a
12 record of it.
13       MS. HARTMANN: What -- can you be specific?
14       MR. BURT: Yes. No -- additional notes
15 being passed, additional things.
16       MS. HARTMANN: What -- what notes?
17       MR. BURT: Ms. Smith constantly looks over
18 for direction on when to object. We ask that it stop.
19 It's in- -- it's inconsistent with what Ms. Dandeneau
20 said.
21       MS. HARTMANN: We'd like a video of me,
22 then.
23       MR. BURT: And we have -- well, that's fine,
24 if you want to be on the deposition for the rest of the
25 day.

100

1        MS. HARTMANN: Yeah. You can put the video
2  on me, because that is entirely wrong. I have not coached
3  a single time, and I -- I --
4        MR. BURT: And we --
5        MS. HARTMANN: -- I am against everything
6  you're saying right now with regard to --
7        MR. BURT: Well, that's fine.
8        MS. HARTMANN: -- it's not true. I have not
9  coached a single time.
10       MR. BURT: And we know that Baker is being
11 paid by Sentinel for this work. So we have that on the
12 record as well.
13       MS. HARTMANN: And I object to your
14 testimony. Would you like to be under oath?
15       MR. BURT: Well, we -- we have the witness's
16 testimony on that.
17       MS. HARTMANN: The witness did not say that.
18 You can video me --
19       MR. BURT: Well, the -- the record speaks
20 for itself.
21       MS. HARTMANN: You can video me the entire
22 time. I have not coached a single time. I can send a
23 note saying: My client is crying. Should we take a
24 break? Because your questioning made her cry.
25       MR. BURT: The record and the video speaks

---

**101**

1  for itself.
2         MS. HARTMANN: It does.
3         MR. BURT: Okay.
4  BY MR. BURT:
5     Q. Mrs. Irving, you -- I want to just follow up on a
6  couple of things before I move into a new topic.
7         You testified that the default was to use
8  your SAS e-mail for Cayman's related business; is that
9  right?
10    A. Yes.
11    Q. Why?
12    A. Because SAS is a Cayman company.
13    Q. Did somebody direct you to use SAS e-mails for
14  Cayman-related business?
15    A. Not that I recall.
16    Q. Were you aware that SAS e-mails resided on a
17  separate server from HCMLP e-mails?
18    A. Yes.
19    Q. And do you know why that is?
20    A. No.
21    Q. Do you know whether SAS e-mails have been
22  produced in this case?
23         MS. SMITH: Objection to form.
24         THE WITNESS: I don't know.
25  BY MR. BURT:

---

**102**

1     Q. You also talked about diligence you would do
2  for -- prior to ATEs being done at Sentinel, right; you
3  would some -- on an ad hoc basis do diligence related to
4  those ATEs; is that right?
5     A. Yes, sometimes.
6     Q. Okay. Who instructed you to do that?
7         MS. SMITH: Objection to form.
8         THE WITNESS: I don't recall.
9  BY MR. BURT:
10    Q. Did Mr. Ellington?
11    A. I don't recall.
12    Q. And your testimony was -- and if I'm wrong,
13  please correct me -- that you do not -- you did not do
14  that diligence for the ATE that you did recall where funds
15  were transferred over to Sentinel; is that correct?
16         MS. SMITH: Objection to form.
17         THE WITNESS: That's correct.
18  BY MR. BURT:
19    Q. All right. Do you know if anybody did diligence
20  for that ATE?
21    A. I don't know.
22    Q. And when you did diligence, what did you do?
23    A. I would take a look at the recoverability of the
24  plaintiff, have discussions around likelihood of success
25  on a case. It would be in compliment to the litigation

---

**103**

1  funding pitch.
2     Q. What else?
3     A. (No response.)
4     Q. That was all you did?
5         MS. SMITH: Objection to form.
6         THE WITNESS: Could you rephrase the
7  question?
8  BY MR. BURT:
9     Q. Well, I'm just trying to understand everything
10  that you did in relation to analyzing an ATE prior to an
11  ATE policy being issued by Sentinel. So that's what I'm
12  trying to understand, everything that you did.
13         So anything else in addition to what you've
14  just testified about?
15    A. My primary role was to look at recoverability.
16  Attorneys would diligence other matters that I wouldn't,
17  legal matters.
18    Q. And when you say "recoverability," what,
19  specifically, are you referring to?
20    A. Meaning if -- if there was an investment made
21  into a case, litigation funding or a ATE, would -- would
22  the business be able to get recoverability from whatever
23  the legal case was.
24    Q. Okay. And "the business" being the -- the
25  business that was -- that Sentinel was considering

---

**104**

1  insuring; is that right?
2     A. Sorry. Could you say that again?
3     Q. You said "the business," whether the business
4  could recover, and I'm just wondering: Is that the
5  business that Sentinel was considering insuring?
6     A. Which the business could recover, yes, and --
7  yes.
8     Q. Okay. So the business at issue in the
9  litigation, you would analyze whether it could recover and
10  whether it was -- did you do analysis of whether it made
11  financial sense for Sentinel to issue that policy?
12         MS. SMITH: Objection to form.
13         THE WITNESS: It was more diligence on the
14  underlying case that I performed.
15  BY MR. BURT:
16    Q. Okay. Looking at allegations in the underlying
17  case, for example?
18    A. More on the financial side, more on the financial
19  side.
20    Q. So how much was at issue in this case?
21    A. Yes.
22    Q. What damages could be?
23    A. Yes.
24    Q. Did you have --
25    A. Who's getting a piece of the recovery.

105

1　Q. Did you analyze the financial position of the
2　business that was seeking insurance?
3　A. Not that I recall, primarily because most of the
4　potential clients were insolvent estates.
5　Q. Okay. Were they -- were these potential clients
6　related in any way to HCMLP?
7　A. No.
8　Q. They were -- they were third-party entities with
9　no affiliation whatsoever with HCMLP?
10　A. That's -- I think that's right. I'm not
11　100 percent sure.
12　Q. Okay. Now, in the ATE policy that you are aware
13　of that was issued, do you know whether the insured in
14　that case was related in any way to HCMLP?
15　A. I can't say with certainty.
16　Q. All right. We'll come back to that.
17　　　And so -- again, so the record is clear,
18　you're not aware of whether diligence was conducted for
19　that ATE policy that you testified about?
20　A. I --
21　　　MS. SMITH: Objection to form.
22　　　THE WITNESS: I don't know.
23　BY MR. BURT:
24　Q. And you didn't do it?
25　A. I did not do it, no.

106

1　Q. Do you know when Sentinel was formed?
2　A. It was prior to my starting at Highland, so
3　pre-2013.
4　Q. Did you ever learn who decided to establish
5　Sentinel?
6　　　MS. SMITH: Objection to form.
7　　　THE WITNESS: I don't know.
8　BY MR. BURT:
9　Q. You don't know if you ever learned that?
10　A. I don't know if I ever learned that.
11　Q. Okay. This is -- this exhibit has been used in
12　prior deposition; it's No. 28.
13　A. (Witness reviews document.) Okay.
14　Q. Have you ever seen this before, Exhibit 28?
15　A. I don't recall specifically. Presumably I've
16　seen it, since it looks like I was the author on the
17　e-mail.
18　Q. Okay. So looking at the first page -- in fact,
19　there's two e-mails, and you're the author of both of
20　them, aren't you?
21　A. I -- I see that here on this paper.
22　Q. And it's from your SAS e-mail, it appears?
23　A. It appears that way, yes.
24　Q. Okay. And these -- both of these e-mails were
25　written in April of 2019, correct?

107

1　A. Yes.
2　Q. And it was dealing with -- the subject on both of
3　them is "Entity Restructure Sentinel," isn't it?
4　A. Yes.
5　Q. Were you aware, prior to seeing this just now,
6　that this exhibit had been used in a prior deposition?
7　　　MS. SMITH: Objection to form.
8　　　THE WITNESS: Not -- no, not that I recall.
9　BY MR. BURT:
10　Q. No one had ever shown you this exhibit?
11　A. I don't believe so.
12　Q. Had anybody read to you this exhibit?
13　A. Not that I remember.
14　Q. Okay. Now, you write from your e-mail -- the
15　first e-mail to Stephen Beck on April 10th, 2019.
16　　　Who was Mr. Beck?
17　A. He is tax counsel.
18　Q. Where does he work?
19　A. Meadows Collier.
20　Q. And where is that located?
21　A. I believe Steve's in Dallas.
22　Q. And he is tax counsel for whom?
23　A. I don't know.
24　Q. Was he tax counsel for Sentinel?
25　　　MS. SMITH: Objection, form.

108

1　　　THE WITNESS: I don't know the details on
2　the engagement letter, as to who their contracting entity
3　is.
4　BY MR. BURT:
5　Q. Well, why would you have been writing to him with
6　this information and these questions if he weren't tax
7　counsel for Sentinel?
8　　　MS. SMITH: Objection to form.
9　　　THE WITNESS: I don't know how his
10　engagement letter is structured, but he would advise
11　around these matters.
12　BY MR. BURT:
13　Q. Oh, okay.
14　　　So he might not have been engaged by
15　Sentinel, but he might have advised on Sentinel?
16　A. I don't know --
17　　　MS. SMITH: Objection to form.
18　　　THE WITNESS: I don't know where his
19　engagement letter sits.
20　BY MR. BURT:
21　Q. I understand. I'd ask you to listen to my
22　question.
23　　　He might not have been enga- -- been engaged
24　by Sentinel, but he would offer advice surrounding
25　Sentinel; is that right?

109

1    A. I don't know.
2    Q. Well, you sent him this e-mail.
3    A. Uh-huh.
4    Q. Why did you send him this e-mail if you don't
5 know?
6    A. Because he is a professional that would provide
7 tax guidance.
8    Q. To whom?
9    A. He would provide tax advice to Sentinel.
10    Q. Okay. So --
11    A. I don't know where his engagement letter sat
12 specifically.
13    Q. So he might have been engaged by another Highland
14 entity, by another HCMLP entity; is that fair?
15    A. No.
16    Q. Okay. So who --
17        MS. SMITH: Objection to form.
18        MR. BURT: Excuse me.
19 BY MR. BURT:
20    Q. So who would have engaged him if he were
21 providing tax advice for Sentinel?
22    A. It could have been someone else in the Cayman
23 structure. It would not have been HCMLP.
24    Q. Okay. So -- and when you refer to "Cayman
25 structure," are you referring to the Cayman structure of

110

1 Sentinel?
2    A. Yes.
3    Q. And that's on page 4 of this exhibit; is that
4 right?
5    A. Yes.
6    Q. Okay.
7    A. It appears that way, yes.
8    Q. So he might have been engaged by one of the
9 myriad of entities that is listed in this structure; is
10 that fair?
11    A. He could have been.
12        MS. SMITH: Objection to form.
13        THE WITNESS: He could have been. I don't
14 know. I don't know who his engagement letter was with.
15 BY MR. BURT:
16    Q. But what you do know is that he provided tax
17 advice for Sentinel?
18    A. Yes.
19    Q. Okay. Was it common that outside counsel would
20 provide advice for entities with whom they had no
21 engagement?
22        MS. SMITH: Objection to form.
23        THE WITNESS: I didn't say he had no
24 engagement; I said I don't know where the engagement
25 letter sat.

111

1 BY MR. BURT:
2    Q. Fair point. Let me be more precise.
3        Was it common that outside counsel would
4 provide advice for entities with whom they had no
5 engagement?
6    A. No.
7    Q. That was not common?
8    A. No.
9    Q. But that was happening here?
10        MS. SMITH: Objection to form.
11        THE WITNESS: No.
12 BY MR. BURT:
13    Q. It wasn't?
14    A. No.
15    Q. So did he have an engagement with Sentinel?
16    A. I don't know where his engagement letter sat. He
17 provided -- I think it says even in here: I appreciate
18 we'll need to address client for this matter.
19        I don't know exactly where the engagement
20 letter sat. It could have sat anywhere in this ownership
21 chain, which would have been impacted by advice where
22 Sentinel was involved.
23    Q. Well, see, and that was my question. Was that a
24 common thing, that outside counsel wouldn't be engaged by
25 the entity for which they were providing advice, but by

112

1 one of the other entities in the -- in the ownership
2 chain?
3        MS. SMITH: Objection to form.
4        THE WITNESS: I don't recall. I don't know.
5 BY MR. BURT:
6    Q. So you write: Hi, Steve. Further to entity
7 liquidations discussions last year, the Sentinel
8 Reinsurance, Ltd., regulator Cayman Islands Monetary
9 Authority (CIMA) is asking that the Sentinel structure be
10 simplified, page 2 of the attached org chart. CIMA
11 specifically called out Elderflower, Ltd.; Brave Holdings,
12 Ltd.; Nimitz, Ltd.; Patton, Ltd.; and Sentinel Re
13 Holdings, Ltd., in the report. I believe we discussed
14 some of these liquidations last year.
15        Okay. Now, earlier today in your
16 deposition, you talked meetings that you attended with
17 CIMA; is that right?
18    A. Yes.
19    Q. And I think you testified about an August 2019
20 meeting with CIMA?
21    A. I believe so, yes.
22    Q. And you -- I believe you testified -- and if I'm
23 wrong, please correct me -- that during that meeting CIMA
24 discussed simplifying the Sentinel structure; is that
25 right?

113

1    MS. SMITH:  Objection to form.
2    THE WITNESS:  From what I recall, yes.
3  BY MR. BURT:
4    Q.  What was the other meeting that you recall
5  attending with CIMA?
6    A.  I can't remember the details of the meeting, but
7  I believe there was another one.
8    Q.  When was it?
9    A.  I don't remember.
10   Q.  Was it before or after the August 2019 meeting?
11   A.  I don't remember.
12   Q.  What was discussed at that meeting?
13   A.  I don't recall specifically.
14   Q.  Do you know whether you discussed the
15  simplification of the Sentinel structure?
16   MS. SMITH:  Objection to form.
17   THE WITNESS:  I don't -- I don't remember.
18  BY MR. BURT:
19   Q.  You don't remember anything about that second
20  meeting?
21   MS. SMITH:  Objection, asked and answered.
22   THE WITNESS:  I don't.
23  BY MR. BURT:
24   Q.  Okay.  Other than those two meetings, were there
25  any other meetings with CIMA that you attended?

114

1    A.  I don't recall.
2    Q.  What were you referring to when you state -- when
3  you said you were talk -- you had discussed entity
4  liquidations last year?
5    A.  Likely that there were significant carrying costs
6  to the various entities.  So we constantly would review to
7  see how we could streamline to reduce carrying costs.
8    Q.  And by "carrying costs," what are you referring
9  to specifically?
10   A.  Registered office fees, directorship costs.
11  Those are the primary costs.
12   Q.  So expenses associated with the various entities?
13   A.  Yes.
14   Q.  Okay.  So you -- you had had discussions in 2018
15  about costs associated with the Sentinel structure?
16   A.  It looks like it, yes.
17   Q.  All right.  Now, looking back at page 4 of this
18  document on the last page, if you can turn to that,
19  please --
20   A.  (Witness complies.)
21   Q.  -- it says, "Sentinel structure as of 9th of
22  April 2019;" is that right?
23   A.  I see that.
24   Q.  Now, had any changes happened in the Sentinel
25  structure between 2018 and 2019?

115

1    MS. SMITH:  Objection to form.
2    THE WITNESS:  I don't know.
3  BY MR. BURT:
4    Q.  You would discuss entity liquidations.  Do you
5  know whether any entity liquidations actually occurred
6  between 2018 and 2019?
7    A.  I don't know.
8    Q.  Well, the last line of your first -- of the first
9  paragraph in this e-mail, you said:  I believe we
10  discussed some of these liquidations last year, apparently
11  referring to Elderflower, Brave Holdings, Nimitz, Patton,
12  and Sentinel Re Holdings, Ltd.; is that right?
13   A.  It appears so, yes.
14   Q.  Do you recall discussing the liquidations of
15  those specific entities in 2018?
16   A.  I don't recall it specifically, other than I see
17  it here on this paper.
18   Q.  And you have no reason to disagree that that's
19  what you wrote?
20   MS. SMITH:  Objection to form.
21   THE WITNESS:  This seems reasonable based on
22  this paper.
23  BY MR. BURT:
24   Q.  Okay.  And if we look at page 4, let's take,
25  first, Elderflower.

116

1    Do you see right under, at the top left,
2  "USP1," there's an entity called "Elderflower, Ltd.,"
3  listed?
4    A.  I see that.
5    Q.  So Elderflower still existed in April of 2019,
6  correct?
7    MS. SMITH:  Objection to form.
8    THE WITNESS:  I don't know.  I know that
9  this is a draft.  I don't know.
10  BY MR. BURT:
11   Q.  Well, this says, "Sentinel structure as of 9th of
12  April 2019," right?
13   A.  Yes.  And it says "Draft" on the bottom of the
14  page, and I don't know --
15   Q.  You don't know what?
16   A.  I don't know whether there was any change within
17  April of 2019.
18   Q.  Okay.  So let's say March 31st of 2019.
19   Is that the structure?  Was Elderflower in
20  the structure?
21   A.  It would appear that way.  I can't say for sure.
22   Q.  Brave Holdings, Ltd., do you see under "USP2,"
23  "Brave Holdings, Ltd., Cayman"?
24   A.  Yes, I do.
25   Q.  So as of at least the end of March 2019, Brave

117

1 Holdings, Ltd., appears to still have been an entity,
2 right?
3          MS. SMITH: Objection to form.
4 BY MR. BURT:
5     Q. In the Sentinel structure?
6     A. It appears that way, but I don't know for sure.
7     Q. So it appears that it was not liquidated in 2018,
8 pursuant to discussions you might have had with tax
9 counsel?
10    A. It appears still on this paper, which is marked
11 "Draft" in April 2019, so I would -- that's reasonable.
12    Q. Okay. Do you have any recollection of it being
13 liquidated in 2018 or 2019?
14    A. I don't recall.
15    Q. Do you recall after meeting with CIMA that there
16 actually was some liquidations of these entities?
17    A. Yes, I do.
18    Q. Okay. So you have a memory of that.
19       Other than that, do you recall any of these
20 entities being liquidated?
21    A. What do you mean by "these entities"?
22    Q. Listed here on page 4 of this document.
23    A. On page 4 or on page 1?
24    Q. Page 4 in the Sentinel structure.
25    A. The question is: Were any of these entities

118

1 liquidated?
2     Q. Other than the liquidation that happened pursuant
3 to what was going on with CIMA, do you have any
4 recollection of any of these other entities being
5 liquidated?
6     A. I don't know.
7     Q. And if we take Nimitz, Patton, and Sentinel Re
8 Holdings, Ltd., looking at -- looking at the structure, we
9 see, then, all three still listed: Nimitz, Ltd., at the
10 bottom; Patton, Ltd., both owners of Sentinel Re Holdings,
11 Ltd., correct?
12       MS. SMITH: Objection to form.
13       THE WITNESS: On this paper I see Nimitz and
14 Patton, Ltd., owning Sentinel Re Holdings, Ltd.
15 BY MR. BURT:
16    Q. And Patton held 70 percent?
17    A. Of value. That's what it says here.
18    Q. And 91 percent of the vote?
19    A. That's what it says here on this paper.
20    Q. And Nimitz held 30 percent value and 9 percent of
21 the vote?
22    A. That's what this paper says.
23    Q. Okay. Any reason to disagree with what this
24 paper says?
25       MS. SMITH: Objection to form.

119

1          THE WITNESS: Other than it's a draft, I --
2 I don't know.
3 BY MR. BURT:
4     Q. Is it consistent with your recollection of how
5 these entities were structured?
6          MS. SMITH: Objection to form.
7          THE WITNESS: I don't remember.
8 BY MR. BURT:
9     Q. Do you know who USB -- USP1 is?
10    A. No.
11    Q. How about USP2?
12    A. No.
13    Q. No knowledge whatsoever?
14    A. No.
15    Q. Okay. We'll come back to that.
16       You then state in your e-mail on page 1: We
17 have a five-year taint issue as Montage, Anthem, and
18 Mainspring used to be CFCs, de-CFC'D in October 2014.
19       What were you referring to there?
20    A. Three entities which used to be controlled
21 foreign corps, as classified by Deloitte, who was our tax
22 advisor. There was a restructure in 2014 referenced here,
23 de-CFC'd in October of 2014.
24    Q. What was that restructure?
25    A. It was -- it was to -- to remove those three

120

1 entities from controlled foreign corporation status, as
2 classified by the tax advisors.
3     Q. Did they stay within the Sentinel ownership
4 structure?
5          MS. SMITH: Objection to form.
6          THE WITNESS: They appear here on page 4.
7 BY MR. BURT:
8     Q. Okay. What was the "taint" issue that you're
9 referring to?
10    A. It's tax nomenclature.
11    Q. And what does it refer to?
12    A. I don't know exactly. I know there was some tax
13 issue where liquidating those entities would have caused a
14 tax burden.
15    Q. You said -- and I'm reading from the transcript
16 here -- "as classified by Deloitte, our tax" -- "our" tax
17 advisor. Is that what you said?
18    A. I don't have the transcript in front of me.
19    Q. Would you like me to have the court reporter read
20 your testimony back to you --
21    A. No.
22    Q. -- so we can confirm that's what you said?
23    A. It's okay.
24    Q. Okay. What did you mean by "our" tax advisor?
25    A. Deloitte advised across multiple Cayman entities

121

1  within the structure as shown here on page 3 and 4.
2      Q.  3 and 4.
3          So for both SAS and for Sentinel, Deloitte
4  advised?
5      A.  Deloitte advised.
6      Q.  Did Deloitte offer any other advice to any HCMLP
7  entities?
8      A.  I don't know.
9          MS. SMITH:  Objection to form.
10 BY MR. BURT:
11     Q.  Okay.  Do you know with whom Deloitte had an
12 engagement?
13         MS. SMITH:  Objection to form.
14         THE WITNESS:  I don't -- I don't know.
15 BY MR. BURT:
16     Q.  Was their advice solely related to Cayman
17 entities?
18     A.  I believe so.
19         MS. SMITH:  Objection to form.
20 BY MR. BURT:
21     Q.  You then state -- sorry -- going back to page 1
22 that you understood that this tax issue was prohibiting
23 liquidation of Elderflower and Brave Holdings, which you
24 will see on org chart.
25         Do you know why that was prohibiting

122

1  liquidation?
2      A.  Because it would cause a tax burden.  The taint
3  issue essentially relates to taxable -- tax liability.
4      Q.  So is it correct that it wasn't preventing it in
5  a legal sense, but more tax would be incurred if there
6  were liquidations?
7          MS. SMITH:  Objection to form.
8          THE WITNESS:  I don't know.
9  BY MR. BURT:
10     Q.  You then state:  We are looking to address these
11 issues with CIMA ASAP.  Could you please let us know when
12 you are able to discuss?
13         Why were you looking to address those issues
14 with CIMA ASAP?
15     A.  I'd have to -- I'd have to go back and look.
16 Presumably, there was something prompting this e-mail.
17     Q.  Do you recall what that was?
18     A.  Not specifically.
19     Q.  Okay.  How about generally, do you recall what
20 that was?
21     A.  Generally, CIMA requested simplification of the
22 structure as far back as I can recall.
23     Q.  Okay.  Was there anything else that CIMA was
24 requesting?
25     A.  I don't know.

123

1      Q.  The only thing -- so your testimony here today
2  is:  The only thing you recall about what CIMA was
3  requesting was simplification of the structure?
4      A.  Do you mean at any time that CIMA was a regulator
5  for Sentinel Reinsurance, Ltd.?
6      Q.  That's fair.  Let me be more specific.
7          So I'm talking about in this time period of
8  2019, first half -- let's say the first three quarters of
9  2019.
10         What were the issues that you're aware of
11 that CIMA was asking about or requiring?
12     A.  I recall there was an audit report.  CIMA did
13 some type of review and had a -- a laundry list of
14 queries, but it wasn't something that I handled directly
15 apart from this piece of simplification of the structure.
16     Q.  So your only involvement was with simplification
17 of the structure?
18     A.  From what I recall, yes.
19     Q.  Did you ever see that audit report?
20     A.  I believe so.
21     Q.  Okay.  Did you review it?
22     A.  Probably.
23     Q.  And did you do work -- any -- did you do any work
24 in response to that audit report?
25     A.  Related to the simplification of the structure.

124

1  That's all I recall.
2      Q.  Okay.  And aside from the simplification of the
3  structure, anything else that you might have done in
4  relation to the audit report?
5          MS. SMITH:  Objection, asked and answered.
6          THE WITNESS:  Not that I recall.
7  BY MR. BURT:
8      Q.  Who else worked on responding to the audit
9  report?
10         MS. SMITH:  Objection, form.
11         THE WITNESS:  Beecher Carlson, Matt DiOrio,
12 the other directors of Sentinel at the time.  I don't
13 recall who they were.
14 BY MR. BURT:
15     Q.  What did Matt do?
16         MS. SMITH:  Objection to form.
17         THE WITNESS:  I -- I don't know.  You have
18 to ask Matt.
19 BY MR. BURT:
20     Q.  Well, I'm talking specifically about this -- you
21 -- you testified he worked in re- -- on a response to the
22 CIMA audit report, and I'm asking:  Well, what did he do?
23 You understand the question?
24     A.  I understand the question.
25         I don't recall specifically what the laundry

125

1  list of items were from CIMA that needed to be rectified,
2  but Matt would have reviewed those and handled or raised
3  them for consideration to the other directors or to
4  Beecher.
5      Q.  Why -- why Matt?
6          MS. SMITH:  Objection to form.
7          THE WITNESS:  I don't know.
8  BY MR. BURT:
9      Q.  You don't know why Matt would have worked on
10 this?
11         MS. SMITH:  Objection to form.
12         THE WITNESS:  I don't recall if he was a
13 director at this stage or not.  He did work on Sentinel
14 matters within our team.
15 BY MR. BURT:
16     Q.  How long did he work on Sentinel matters for?
17         MS. SMITH:  Objection to form.
18         THE WITNESS:  I don't know.  I -- I don't
19 know with certainty.  I believe from the inception of his
20 employment, but I don't recall when that was.
21 BY MR. BURT:
22     Q.  Let me ask it this way:  The entire time that you
23 worked on Sentinel issues, did Matt also work on Sentinel
24 issues?
25     A.  From what I recall, yes, mostly.

126

1      Q.  It -- and is it correct that at one point he
2  became a director of Sentinel?
3      A.  Yes.
4      Q.  And you don't recall when that was, specifically?
5      A.  I don't.
6      Q.  Keep that exhibit handy.  I'm going to mark a new
7  exhibit.  I think this is our century-marked exhibit, 100.
8          (Exhibit 100 was marked for identification.)
9          THE WITNESS:  Is this -- so what number is
10 this one?  Because this one was 99.
11         MR. BURT:  That had been used previously.
12         THE WITNESS:  Okay.
13         MR. BURT:  And so we are going sequentially
14 with our exhibit numbering.
15         THE WITNESS:  Okay.
16         MR. BURT:  So we're not renumbering that
17 one.  I will refer to it as Exhibit 28.
18         THE WITNESS:  Okay.
19         MR. BURT:  Good question.  It's a little
20 confusing.
21         THE WITNESS:  (Witness reviews document.)
22 Okay.
23 BY MR. BURT:
24     Q.  All right.  So let's take a look at this e-mail
25 exchange.  It appear -- it's a long e-mail.  It's from

127

1  Matt DiOrio to Tom Adamczak -- oh, excuse me, I got that
2  backwards.  Strike that.
3      It's from Clayton Price to Matt DiOrio
4  cc'ing Tom Adamczak; is that right?
5      A.  That's what I see here, uh-huh.
6      Q.  And Mr. Adamczak and Mr. Price were both at
7  Beecher Carlson?
8          MS. SMITH:  Objection, form.
9  BY MR. BURT:
10     Q.  If you know?
11     A.  I don't know.
12     Q.  Well, Mr. Adamczak, we know, was.  I think we've
13 talked about that earlier; is that right?
14     A.  Yes.  It -- and it shows here.
15     Q.  Okay.
16     A.  I don't know about Mr. Price.
17     Q.  Okay.  You never worked directly with Clayton
18 Price?
19     A.  Not that I recall specifically, no.
20     Q.  Okay.  Have you ever seen this e-mail before?
21     A.  Not that I recall.  I note that I'm not included
22 on this e-mail either as a recipient or cc'd.
23     Q.  I understand.
24         You see that the date of this e-mail was
25 April 12th, 2019?

128

1      A.  I see that.
2      Q.  All right.  Now, looking at Exhibit 28, you see
3  that the date of the -- your e-mail is on -- in Exhibit 28
4  were April 10th, 2019?
5      A.  Uh-huh.
6      Q.  So this was two days later, is that right,
7  Exhibit 100?
8      A.  I see that here on the paper, yeah.
9      Q.  Okay.  All right.  So Mr. -- Mr. Price writes to
10 Mr. DiOrio:  Matt, I have advised Karen at GCS of the
11 desire to engage their services regarding the corporate
12 governance matters identified in the CIMA Inspection
13 Report and to provide input for a future AML template for
14 use with on-boarding with policyholders on a risk-based
15 approach.
16         So a couple of questions there.  Do you know
17 who Karen at GCS was?
18     A.  I don't.
19     Q.  How about the CIMA Inspection Report, do you know
20 what that was?
21     A.  Yes.  It's the report I referenced earlier.
22     Q.  Okay.  You called it an "audit report," but by
23 that --
24     A.  (Witness nods head affirmatively.)
25     Q.  -- you -- you -- it was an inspection report --

---

129

1  A.  Yes.
2  Q.  -- is that right?
3  A.  Yes.
4  Q.  Okay.  Do you know when CIMA inspected Sentinel?
5         MS. SMITH:  Objection to form.
6         THE WITNESS:  I don't.
7  BY MR. BURT:
8     Q.  And then he states in the next paragraph -- oh,
9  strike that.  I wanted to ask another question here.
10        He says:  To provide input for a future AML
11 template for use with on-boarding of policyholders.
12        Do you know what "AML" stands for?
13  A.  Yes.
14  Q.  What does it stand for?
15  A.  Anti-money laundering.
16  Q.  And do you know what he was referring to there as
17 a "future AML template"?
18        MS. SMITH:  Objection to form.
19        THE WITNESS:  I do not know.
20 BY MR. BURT:
21    Q.  Do you know if CIMA had found any issues
22 with anti-money laun-- any anti-money laundering issues
23 with Sentinel?
24        MS. SMITH:  Objection to form.
25        THE WITNESS:  CIMA had not found any issues

---

130

1  with AML, as far as I know.
2  BY MR. BURT:
3     Q.  Okay.  As far as you know, no issues with AML
4  identified by CIMA?
5   A.  In relation to Sentinel Reinsurance, Ltd., no.
6     Q.  Okay.  How about with respect to Sentinel Re
7  Holdings, Ltd.?
8   A.  No.  I'm not aware of any AML issues that were
9  identified.
10    Q.  And then Mr. -- Mr. Price says:  As we develop
11 our joint response to CIMA, there are areas that Tom and I
12 will need your input to varying degrees.  The following is
13 who I believe needs to be involved with each item and our
14 approach on where we should hold our ground versus
15 accepting CIMA's position.  I believe our approach should
16 demonstrate that Sentinel is a soundly funded,
17 well-managed captive.  They have no doubt, in my opinion,
18 treated Sentinel as if it were a commercial Class B,
19 romanette (iii), licensee writing open-market business.
20 And although we pointed out to them that Sentinel has yet
21 to write true third-party business, they were not going to
22 change their stance since they had advised of the
23 inspection.
24        So stopping there, drawing -- and drawing
25 your attention to the line "We pointed out to them that

---

131

1  Sentinel has yet to write true third-party business," were
2  you aware of that fact in 2019?
3         MS. SMITH:  Objection to form.
4         THE WITNESS:  I believe so.
5  BY MR. BURT:
6     Q.  Okay.  So what do you understand that to mean,
7  that Sentinel had not written any true third-party
8  business?
9         MS. SMITH:  Objection to form.
10        THE WITNESS:  My understanding was that
11 Sentinel had issued some captive D&O policies across
12 varying entities within this structure.  Sentinel didn't
13 have approval, as I remember, in a timely fashion to be
14 able to put forward any ATE to third parties.  There was a
15 timing delay in the need for litigation funding or ATE
16 policies being sold, essentially, and regulatory approval
17 on those policies.
18 BY MR. BURT:
19    Q.  I want to break that answer down a little bit.
20  A.  Okay.
21    Q.  So, first, let's start with the D&O policies you
22 just mentioned.
23  A.  Uh-huh.
24    Q.  So you're aware of Sentinel issuing captive D&O
25 policies across varying entities within the structure; is

---

132

1  that what you said?
2   A.  Yes.
3     Q.  What do you mean, first, by "captive D&O policy"?
4   A.  Meaning Sentinel Reinsurance, Ltd., would write
5  insurance for another -- another entity, either in the
6  structure chart you showed me previously --
7     Q.  Uh-huh.
8   A.  -- pages 4 and 3.
9     Q.  So let's just be clear on the record about that.
10        Looking at Exhibit 28, we've looked at
11 page 4, the Sentinel structure as of 9th of April 2019.
12        So -- and referring specifically to this
13 structure on page 4 --
14  A.  Okay.
15    Q.  -- is it correct that Sentinel would write
16 captive D&O policies to entities within this structure, as
17 reflected in Exhibit 28, page 4?
18  A.  Some of them.  I can't recall specifically which.
19    Q.  And these entities were not considered
20 third-party entities or third-party business, correct?
21        MS. SMITH:  Objection to form.
22        THE WITNESS:  It wasn't up to me to make
23 that classification.  I don't know.
24 BY MR. BURT:
25    Q.  Well, I understand.

133

1    But that's what the class-- -- that was what
2 Mr. Price was explaining here, right, that none of those
3 were actually true third-party business; is that correct?
4    MS. SMITH:  Objection to form.
5    THE WITNESS:  I don't know.
6 BY MR. BURT:
7    Q.  You don't recall whether that was the case?
8    A.  I don't know.
9    MS. SMITH:  Objection to form.
10    THE WITNESS:  That's not a piece I would
11 have handled.  I don't know.
12 BY MR. BURT:
13    Q.  What you know is that D&O policies were written
14 to entities within this structure, correct?
15    A.  Yes.
16    Q.  And then, looking at page 3 of Exhibit 28 -- and
17 for the record, this is the SAS structure as of 9th of
18 April, 2019 -- is it your testimony, Mrs. Irving, that
19 Sentinel would issue D&O policies to entities within this
20 structure as well?
21    A.  Some of them, yes, based on the advice of
22 Deloitte.
23    Q.  Do you recall which entities received those D&O
24 policies?
25    A.  I don't.

134

1    Q.  Do you know whether there was any -- whether
2 there ever came a time when Sentinel ceased writing D&O
3 policies to captured entities?
4    MS. SMITH:  Objection to form.
5    THE WITNESS:  I don't know.
6 BY MR. BURT:
7    Q.  Aside from the structures we see on pages 3 and 4
8 of Exhibit 28, were there any other Highland-related
9 entities or structures for which Sentinel was issuing D&O
10 policies?
11    A.  Not to my knowledge.
12    Q.  Were there any third parties, independent
13 entirely of these structures in Exhibit 28 or HCMLP, for
14 which Sentinel was writing D&O policies?
15    MS. SMITH:  Objection to form.
16    THE WITNESS:  Could you repeat that for me,
17 please.
18 BY MR. BURT:
19    Q.  Sure.  What I --- and I -- I want to be as precise
20 as I possibly can here.
21    So setting aside what we've seen in
22 Exhibit 28, these structures for SAS and Sentinel, and
23 setting aside HCMLP and any of its entities and related
24 entities, do you know whether Sentinel issued any other
25 D&O policies to independent third parties with no

135

1 affiliation whatsoever to these structures?
2    MS. SMITH:  Objection to form.
3    THE WITNESS:  I don't know.
4 BY MR. BURT:
5    Q.  There's no fact you could point me to today to
6 dispute what Mr. Price wrote here, that Sentinel has yet
7 to write true third-party business, is there?
8    MS. SMITH:  Objection to form.
9    THE WITNESS:  I don't know what Mr. Price
10 means by "true third-party business," how that's defined
11 by CIMA.  I -- I don't know.
12 BY MR. BURT:
13    Q.  Well, fair.  And I'm just asking you:  Can -- is
14 there any fact, anything you can point me to, to suggest
15 that Sentinel was writing D&O policies out on the open
16 market for -- for independent entities, companies that
17 would come out of the blue and say:  Hey, we need some
18 insurance?  Anything like that?
19    MS. SMITH:  Objection to form.
20    THE WITNESS:  I don't know.
21 BY MR. BURT:
22    Q.  So nothing you can point me to today?
23    MS. SMITH:  Objection to form.
24    THE WITNESS:  I don't know.  Not that I can
25 think of.  I don't know.

136

1 BY MR. BURT:
2    Q.  Now, earlier -- so setting the D&O policies
3 aside -- and I'm reading from the -- the draft transcript
4 here -- after you stated that Sentinel issued captive D&O
5 policies across varying entities within this structure,
6 you then stated:  Sentinel didn't have approval, as I
7 remember, in a timely fashion to be able to put forward
8 any ATE to third parties.  There was a timing delay in the
9 need for litigation funding for ATE policies being sold,
10 essentially, and regulatory approval on those policies.
11    Is that consistent with what you recall
12 testifying to?
13    A.  Yes.
14    Q.  Okay.  So you -- we've talked about one ATE
15 policy that you do recall being issued --
16    A.  Yes.
17    Q.  -- where funds came in to Sentinel.
18    Was that with a related entity?
19    A.  I don't know.
20    MS. SMITH:  Objection to form.
21 BY MR. BURT:
22    Q.  Well, you testified here that it never was able
23 to put forward to, ATE, the third parties.
24    A.  From what I recall and what I meant by that
25 statement is CIMA was reviewing, policy by policy, when we

137

1  would -- when the team would look at:  This is a good
2  litigation funding play.  It might have a good ATE
3  component as well.
4      That draft would go to Beecher -- would go
5  to CIMA for approval before we were able to -- before
6  Sentinel would be able to issue the policy, CIMA would
7  need to approve it on a policy-by-policy basis.
8      Q.  Uh-huh.
9      A.  At some point during my tenure, the policy
10  changed such that CIMA had -- CIMA had some approval --
11  and I'm not in the detail of the approval -- CIMA had some
12  approval which allowed ATE to be written with a
13  notification to CIMA and subsequent approval.  There was a
14  nuance in the timing to allow for more commercial business
15  timing.
16      Q.  I think I understand.
17      So to restate -- and if I get it wrong,
18  please let me know -- so it changed from requiring
19  preapproval by CIMA of an ATE policy to a situation where
20  Sentinel could issue the ATE policy, notify CIMA, and get
21  approval after the fact?
22      A.  That's my understanding.
23      Q.  All right.  And do you know when that change
24  occurred?
25      A.  I don't.

138

1      Q.  Do you know whether it affected any ATE policies
2  that were being considered at Sentinel?
3      MS. SMITH:  Objection to form.
4      THE WITNESS:  I don't recall specifically.
5  BY MR. BURT:
6      Q.  Regarding the one -- the policies that you were
7  doing diligence for, did that change in timing affect any
8  of those?
9      A.  The timing change would have made it more
10  commercially viable to -- to pitch the litigation funding
11  and the ATE together, knowing that there wasn't a caveat
12  pending CIMA approval in relation to the ATE side.
13      Q.  So were any ATE policies that you were doing
14  diligence on an issue because it was now more commercially
15  feasible?
16      MS. SMITH:  Objection to form.
17      THE WITNESS:  I don't recall specifically.
18  BY MR. BURT:
19      Q.  So aside from the one ATE that you do recall
20  where funding came in, aside from that, do you recall any
21  other ATE policy being issued?
22      A.  Many were contemplated, and I don't recall
23  specifically which, if any, were issued.
24      Q.  Okay.  How about generally?  I understand
25  specifics might be murky in memory.  But how about

139

1  generally?
2      MS. SMITH:  Objection to form.
3      THE WITNESS:  I just don't remember.
4  BY MR. BURT:
5      Q.  But you do recall the one?
6      A.  Yes.
7      Q.  Okay.  Going back to Exhibit 100 --
8      A.  Okay.
9      Q.  -- the last paragraph from Mr. Price in this
10  e-mail states:  It is my intention to hammer out as much
11  as possible this weekend as a first draft response.  As
12  such, if there is anything further than what you and Katie
13  have already advised Tom, then please don't hesitate to
14  send me an e-mail.
15      Do you see that?
16      A.  I do.
17      Q.  What had you and Mr. DiOrio already advised Tom
18  about?
19      MS. SMITH:  Objection to form.
20      THE WITNESS:  I don't recall specifically.
21  BY MR. BURT:
22      Q.  Do you recall any discussions with Mr. Adamczak
23  at Beecher Carlson regarding responding to CIMA?
24      A.  Not specifically, but generally, it would have
25  been in relation to the ability to simplify the Sentinel

140

1  structure, as requested by CIMA, without facing tax
2  issues.
3      Q.  Anything else you might have spoken with
4  Mr. Adamczak about?
5      MS. SMITH:  Objection to form.
6      THE WITNESS:  Not that I recall.
7  BY MR. BURT:
8      Q.  Do you have any knowledge of what Mr. DiOrio
9  might have spoken with Mr. Adamczak about?
10      MS. SMITH:  Objection to form.
11      THE WITNESS:  I would have to speculate.  I
12  don't know what they spoke about.
13  BY MR. BURT:
14      Q.  Any general understanding of what they spoke
15  of -- so, again, setting specifics aside.  But any general
16  understanding of what they might have spoken about?
17      MS. SMITH:  Objection to form.
18      THE WITNESS:  My sense is they would have
19  spoken about CIMA's inspection report.
20  BY MR. BURT:
21      Q.  How about you and Mr. DiOrio, what did you two
22  talk about in -- in regard to CIMA's inspection report?
23      MS. SMITH:  Objection to form.
24      THE WITNESS:  I'd have to speculate.
25  However, I know that we discussed overall structuring,

141

1  like I mentioned previously.
2  BY MR. BURT.
3      Q.  Uh-huh.  Okay.
4          Looking down in this e-mail chain,
5  there's -- there's bolded headings and then a bunch of
6  numbers underneath them.
7          Do you see that in this e-mail?
8      A.  I do.
9      Q.  And I understand, Mrs. Irving, that you are not
10 copied on this e-mail.  But I'm going to ask you a few
11 questions anyway to see if -- if you know anything about
12 it.
13         There's a section that states, "Introduction
14 to Findings, No Response."  Do you see that?  That's the
15 first heading.
16     A.  I see that, yes.
17     Q.  And then there's a heading that says,
18 "Inconsistent Representations and Inaccurate
19 Documentation."
20         Do you see that heading?
21     A.  I see it.
22     Q.  And then it says, "Acknowledge, Make Corrections,
23 and "Move Forward"; is that right?
24     A.  I see that here on this paper, yes.
25     Q.  All right.  And then, underneath that heading,

142

1  there's the number 5.2.2.1, and then A through H, correct?
2      A.  Yes, I see that.
3      Q.  And looking at E and F, it lists names.  E states
4  "Matt and Katie."  F states "Tom, Matt, and Katie."
5          Do you see that?
6      A.  I do.
7      Q.  What recollection do you have of any response you
8  might have worked on regarding inconsistent
9  representations and inaccurate documentation?
10         MS. SMITH:  Objection to form.
11         THE WITNESS:  I would have to reference the
12 underlying CIMA Inspection Report.
13 BY MR. BURT:
14     Q.  That's -- that's totally fair.  So let's do that.
15         MR. BURT:  Oh, that's right.
16         We'll mark this as Exhibit 101.
17         (Exhibit 101 was marked for identification.)
18 BY MR. BURT:
19     Q.  Now, I'm going to draw your attention to
20 specific -- this is a big packet, and I'm going to draw
21 your attention to specific portions.  Of course, if you
22 want to read a little before and after that to get
23 context, that is perfectly fine.
24     A.  Okay.
25     Q.  But for convenience sake, I'll draw your

143

1  attention to specific things.
2          First, starting with this cover e-mail,
3  looking at the top, it is from a -- and I am going to mess
4  this name up -- Sehliselo Dube, the Chief Analyst that
5  appears at CIMA, Cayman Islands Monetary Authority, to a
6  claytonprice@beechercarlson.com.
7          Do you see that?
8      A.  I do.
9      Q.  And in the cc line, there's a number of other
10 CIMA individuals cc'd, and also, Tom Adamczak at Beecher
11 Carlson is cc'd?
12     A.  Yes.
13     Q.  Now, looking at the top, you see "To:
14 claytonprice@beechercarlson.com."
15         Does that help refresh your recollection
16 about where he worked?
17     A.  Yes.
18     Q.  And can you say now that he did actually work at
19 Beecher Carlson?
20         MS. SMITH:  Objection, form.
21         THE WITNESS:  It appears so from this
22 documentation you handed me on 5/6/2019.
23 BY MR. BURT:
24     Q.  No reason to disagree with that or to dispute
25 that; is that right?

144

1          MS. SMITH:  Objection, form.
2          THE WITNESS:  I don't think it's
3  controversial from this document.
4  BY MR. BURT:
5      Q.  Okay.  Flipping to the next page, there is a
6  letter from CIMA to the directors at Sentinel Reinsurance,
7  Ltd., Care Of Beecher Carlson, and it states here, at the
8  top of the -- the first paragraph of the letter -- well,
9  strike that.
10         The subject of the letter is "Sentinel
11 Reinsurance, Ltd., Final Inspection Report"; is that
12 right?
13     A.  Yes.
14     Q.  And it states:  The Cayman Islands Monetary
15 Authority, the Authority, acknowledges receipt of
16 Clayton Price's e-mails dated 19 April, 2019, and 22nd
17 April, 2019, in response to the draft inspection reports
18 for Sentinel Reinsurance, Ltd., the Licensee.  The
19 comments have been duly noted and, where applicable, the
20 Authority's reports amended accordingly.
21         Do you see that?
22     A.  I do.
23     Q.  All right.  Now, keeping those dates in mind,
24 Clayton Price e-mails of 19 April, 2019, and 22nd April,
25 2019, do you recall e-mails going back to CIMA on those

145

1 dates or around that time in April of 2019?
2        MS. SMITH:  Objection, form.
3        THE WITNESS:  Not specifically.
4 BY MR. BURT:
5    Q.  Looking, again, at Exhibit 100 that we were just
6 looking at --
7    A.  Uh-huh.
8    Q.  -- you see that the date there was April 12th,
9 2019?
10   A.  I see that.
11   Q.  Okay.  And as we look -- if we look at
12 Exhibit 28 -- I know we're looking at a lot of exhibits,
13 but Exhibit 28, your e-mails to Mr. Beck and then to
14 others were on April 10th of 2019, correct?
15   A.  I see that.
16   Q.  So all around this same time -- time period,
17 right?
18   A.  It appears that way, yes.
19   Q.  And do you recall the work -- the e-mails that
20 you were sending in Exhibit 28 and the work that was being
21 referenced in Exhibit 100 related to responses to CIMA's
22 draft inspection report?
23       MS. SMITH:  Objection to form.
24       THE WITNESS:  I -- I believe so.  I believe
25 all of this work is related to CIMA's inspection report.

146

1 BY MR. BURT:
2    Q.  Okay.  Now, you can flip forward.  There's a
3 blue, sort of -- or maybe this is just mine.
4    A.  I don't have anything blue.
5    Q.  Yeah.  That's just in my mine.  It's called a
6 slip sheet.
7        But, again, if you flip forward two pages,
8 you'll get to a page that has the actual CIMA logo on it.
9    A.  Yeah.
10   Q.  Yeah.  Do you see that?
11   A.  Uh-huh.
12   Q.  And there it states:  It's the final Prudential
13 Inspection Report for Sentinel Reinsurance, Ltd.,
14 conducted on the 4th of March, 2019, to the 11th of March,
15 2019, issued on the 6th of May, 2019.
16       Do you see that?
17   A.  I do.
18   Q.  Does that help refresh your recollection of when
19 CIMA conducted the inspection of Sentinel?
20       MS. SMITH:  Objection to form.
21       THE WITNESS:  I see it here on this paper.
22 I don't recall, specifically, these dates, but I see it
23 here on the paper.
24 BY MR. BURT:
25   Q.  No reason to disagree that around that time

147

1 Sentinel conducted an inspection -- or -- excuse me --
2 strike that -- CIMA conducted an inspection of Sentinel?
3        MS. SMITH:  Objection to form.
4        THE WITNESS:  It appears that's true.
5 BY MR. BURT:
6    Q.  Okay.  Flipping to page 3, there's a Table of
7 Contents, and then page 3, there's an Executive Summary.
8        Do you see that?
9    A.  I do.
10   Q.  It states, in 1.1, that:  An on-site inspection
11 at the offices of Sentinel Reinsurance -- I should be
12 fulsome and read the whole thing.
13       So starting over:  The Cayman Islands
14 Monetary Authority, the Authority, conducted an on-site
15 inspection -- the on-site inspection at the offices of
16 Sentinel Reinsurance, Ltd., the Licensee, from 4 March,
17 2019, to 11 March, 2019; is that right?
18   A.  That's what the paper says.
19   Q.  Were you at the Sentinel offices during that
20 inspection at any time?
21       MS. SMITH:  Objection to form.
22       THE WITNESS:  I don't believe so.
23 BY MR. BURT:
24   Q.  So you never met -- you -- you mentioned two
25 meetings with CIMA, one in August of 2019.

148

1        Do you recall ever meeting with them at
2 Sentinel's offices?
3    A.  No.
4    Q.  Were you ever interviewed by CIMA?
5    A.  No.
6    Q.  1.2, the summary states:  The objective of the
7 on-site inspection was to assess the policies and
8 procedures, corporate governance structure, and internal
9 control environment of the Licensee.
10       You see that?
11   A.  I see that.
12   Q.  And were you aware that that was the objective of
13 the inspection?
14       MS. SMITH:  Objection to form.
15       THE WITNESS:  I don't know.
16 BY MR. BURT:
17   Q.  Did you have any understanding at the time of why
18 CIMA was inspecting Sentinel?
19   A.  Yes.
20   Q.  What was your understanding?
21   A.  That it was a routine inspection.  There was a --
22 a large amount of focus around AML in the Cayman Islands's
23 government and -- and regulatory bodies.  There were
24 general inspections that started as a result of that.
25   Q.  Had Sentinel ever been inspected prior to this

149

1  time?
2      A.  Not that --
3          MS. SMITH:  Objection to form.
4          THE WITNESS:  Not that I recall.
5  BY MR. BURT:
6      Q.  Okay.  But you recall CIMA being -- vigorously
7  investigating or inspecting regarding anti-money
8  laundering issues?
9          MS. SMITH:  Objection to form.
10          THE WITNESS:  Yes, but not specific to
11  Sentinel; it was a broader Cayman Islands's government
12  initiative.
13  BY MR. BURT:
14      Q.  I see.  So a general, sort of, focus on AML
15  issues --
16      A.  Yes.
17      Q.  -- with CIMA?
18      A.  Additional compliance measures put in place by
19  the regulators in Cayman.
20      Q.  Do you know when that was?
21      A.  I don't, but it will be public.
22      Q.  And did Sentinel make adjustments in light of
23  those new requirements?
24          MS. SMITH:  Objection to form.
25          THE WITNESS:  Sentinel made adjustments

150

1  based on the findings in the CIMA Inspection Report.
2  BY MR. BURT:
3      Q.  Okay.  So let's look at 1.3:  Results from the
4  on-site inspection revealed deficiencies in one,
5  corporate governance; two, business plan; three,
6  outsourcing; four, risk management framework; five,
7  solvency and accounting policies; six, nature,
8  accessibility and retention of records; and, seven,
9  internal controls, policies, and procedures.
10          Do you see that?
11      A.  I do see that.
12      Q.  Were you aware that CIMA had found deficiencies
13  in each one of those areas at Sentinel?
14          MS. SMITH:  Objection to form.
15          THE WITNESS:  I was aware insofar as I
16  recall seeing this document before.
17  BY MR. BURT:
18      Q.  Okay.  And when did you see this document?
19      A.  I can't recall specifically but, presumably, in
20  tandem with CIMA issuing the document.
21      Q.  Who provided it to you?
22      A.  I don't -- I don't know.  I don't know.
23      Q.  Was it Mr. DiOrio?
24      A.  I don't know.
25      Q.  Was it Mr. Adamczak?

151

1      A.  I -- I don't know.  It could have been either of
2  those.  I don't know.
3      Q.  Did you ever receive e-mails directly from CIMA?
4      A.  No, not that I recall.
5      Q.  So someone at either Beecher Carlson or
6  affiliated with Sentinel must have provided it to you?
7          MS. SMITH:  Objection to form.
8          THE WITNESS:  I believe so.
9  BY MR. BURT:
10      Q.  Do you know why you received a copy of it?
11      A.  Presumably because there was a question in
12  relation to the corporate structure we've talked about,
13  and as I recall, that was something CIMA wanted resolved.
14  So I was brought in to look at that.
15      Q.  Okay.  So they brought you in specifically to
16  look at the corporate restructuring?
17      A.  From what I recall, yes.
18      Q.  All right.  Do you recall that CIMA -- let's take
19  No. 1, corporate governance.  Do you recall that CIMA had
20  found deficiencies in corporate governance?
21      A.  I don't recall it, but I see it here on the
22  report.
23      Q.  And -- and you recall receiving this and reading
24  it at the time?
25          MS. SMITH:  Objection to form.

152

1          THE WITNESS:  This document's familiar to
2  me.  Yes, I remember seeing this before.
3  BY MR. BURT:
4      Q.  Did you speak about this document with
5  Mr. DiOrio?
6      A.  Presumably.
7      Q.  What do you recall talking with him about?
8      A.  Just general business matters.  This report was
9  received; a response will need to be drafted and handled
10  appropriately, things like that.
11      Q.  Okay.  How about with Mr. Ellington, did you ever
12  discuss this report with him?
13      A.  Not that I recall.
14      Q.  He was your direct report, though, wasn't he?
15      A.  Yes.
16      Q.  Wouldn't he have wanted to know about all these
17  issues that CIMA had found with Sentinel?
18          MS. SMITH:  Objection to form.
19          THE WITNESS:  Presumably, yes, he would want
20  to know about.  I just don't recall discussing it
21  with him specifically.
22  BY MR. BURT:
23      Q.  How about generally, any -- any conversations
24  with him at all --
25          MS. SMITH:  Objection to form.

153

1 BY MR. BURT:
2     Q. -- about this report, this --
3     A. He was aware of this report. My sense is Matt
4 DiOrio likely would have briefed him rather than me
5 briefing him.
6     Q. And why is that?
7         MS. SMITH: Objection to form.
8         THE WITNESS: Because he was taking the lead
9 around discussions with Beecher and rectifying any issue
10 that CIMA found.
11 BY MR. BURT:
12     Q. Mr. DiOrio was the lead in respond-- in working
13 with Beecher and responding to CIMA?
14     A. From our internal team, I would say, yes, that's
15 a fair statement. Beecher really, as the administrator,
16 is the one who is supposed to tie up most of these loose
17 ends.
18     Q. Okay. So it was the feeling among the team
19 internally that Beecher should really be leading out on
20 this; is that right?
21     A. Yes.
22         MS. SMITH: Objection to form.
23         THE WITNESS: Yes.
24 BY MR. BURT:
25     Q. And -- and so what was the feeling about the role

154

1 that Sentinel had --
2         MS. SMITH: Objection to form.
3 BY MR. BURT:
4     Q. -- in responding to this?
5     A. Sentinel was assisting Beecher, to my knowledge.
6 Beecher is the administrator and a hired professional for
7 a reason, and a lot of the reason is to make sure that
8 everything run at the company's compliance with CIMA's
9 requirements.
10     Q. Who was -- when you say Sentinel was doing
11 certain things, who -- who are you referring to? Who at
12 Sentinel was doing that?
13     A. The directors.
14     Q. Okay. Do you recall who those were?
15         MS. SMITH: Objection to form.
16         THE WITNESS: I don't recall at this
17 specific time who the directors were, no.
18 BY MR. BURT:
19     Q. All right. But it was the directors at Sentinel
20 who were -- who were working for Sentinel to -- to address
21 these issues; is that right?
22     A. Really, yes. Yeah.
23     Q. Okay. But you weren't a director?
24     A. I was not.
25     Q. So why were you working on it?

155

1         MS. SMITH: Objection to form.
2         THE WITNESS: Because I had knowledge it
3 would be helpful around making sure that everything was in
4 compliance with CIMA's requirements.
5 BY MR. BURT:
6     Q. So it was more than just the directors that were
7 working on this Sentinel response?
8     A. I believe you said who from Sentinel was working
9 on it, but yes. Yes, I worked on providing information to
10 Beecher to make sure Beecher could provide a robust
11 response.
12     Q. Who at HCMLP was working on a response aside from
13 you and Mr. DiOrio?
14         MS. SMITH: Objection to form.
15         THE WITNESS: I don't recall.
16 BY MR. BURT:
17     Q. How about at SAS Asset Recovery, Ltd.?
18         MS. SMITH: Objection to form.
19         THE WITNESS: SAS Asset Recovery, Ltd., did
20 not have employees.
21 BY MR. BURT:
22     Q. Okay. When you were doing this work -- you've
23 testified earlier that when you did Cayman's-related work
24 it was for SAS. You used your SAS e-mail, and it was
25 generally SAS-related, right?

156

1         MS. SMITH: Objection to form.
2 BY MR. BURT:
3     Q. Was that your testimony? I think it was.
4     A. Yes, that Cayman-related matters would be handled
5 on SAS e-mail.
6     Q. Okay. So were you -- when doing this work, were
7 you using your SAS e-mail?
8     A. I don't know.
9     Q. Well, why wouldn't you have been if you used that
10 for Cayman's matters?
11         MS. SMITH: Objection to form.
12         THE WITNESS: I just can't say with
13 certainty. I can guess, but I can't say with certainty.
14 I don't know.
15 BY MR. BURT:
16     Q. What's your guess?
17     A. What's my guess? My guess is that, yes, this
18 would have been on my SAS e-mail.
19     Q. Okay. Did you account for your time internally
20 any differently when you were working on an SAS-related
21 issue versus an HCMLP-related issue?
22     A. No.
23     Q. Okay. So SAS had no employees?
24     A. Correct.
25     Q. Everybody who worked on SAS-related issues was an

---

157

1   HCMLP employee; is that right?
2           MS. SMITH: Objection to form.
3           THE WITNESS: I don't -- no, I don't think
4   you can make that broad of a statement. There were HCMLP
5   employees who worked on SAS matters; there were also other
6   professionals who worked on SAS matters.
7   BY MR. BURT:
8       Q. And by "professionals," within HCMLP or --
9       A. No.
10      Q. -- other -- other entities, affiliated entities?
11      A. No.
12      Q. So third parties?
13      A. Non- -- unrelated to HCMLP, yes.
14      Q. I see.
15          So you might have hired outside counsel or
16  something?
17      A. Yes.
18      Q. I see. Yeah, fair enough.
19          Okay. Aside from you and Mr. DiOrio at
20  HCMLP, anybody else working on responding to the CIMA
21  issues here identified in this exhibit?
22      A. Perhaps J.P. Sevilla. Scott Ellington was aware
23  of it; I don't know his involvement as to the granularity
24  of responding to CIMA.
25      Q. Okay. So he's more high level?

158

1       A. Scott Ellington?
2       Q. Yeah.
3       A. Yes.
4       Q. Yeah. He didn't know the details as much; is
5   that what you're saying?
6           MS. SMITH: Objection to form.
7           THE WITNESS: I said he wouldn't have been
8   involved in compiling all the information for the response
9   to Beecher. But, yes, he is aware of this report.
10  BY MR. BURT:
11      Q. Would he have reviewed the response?
12          MS. SMITH: Objection to form.
13          THE WITNESS: I don't know. Probably, but I
14  don't know.
15  BY MR. BURT:
16      Q. Did you provide him your drafts?
17      A. I didn't draft a response. Beecher, as far as I
18  recall, drafted a response to CIMA.
19      Q. Okay. So looking again at Exhibit 100, where
20  Mr. -- this is the e-mail from Mr. Price --
21      A. Uh-huh.
22      Q. -- to Matt DiOrio, under "Inconsistent
23  Representations and Inaccurate Documentations" where he
24  listed you and Matt under two items --
25      A. Uh-huh.

159

1       Q. -- you don't respond -- do you recall whether you
2   provided that assistance? And we can look at that
3   specific -- 5.2.2.1, if you'd like.
4       A. Yeah. Let me take a look at this.
5       Q. It's on page 8 of 35.
6       A. Okay.
7       Q. And you'll see, when you get there, it has the
8   same heading, "Inconsistent Representations and Inaccurate
9   Documentation."
10      Q. Do you see that at the top?
11      A. I do.
12      Q. And then, just as in this e-mail, it has 5.2.2.1,
13  and then it has A, B, C, D through H, which goes on to
14  page 9, right?
15      A. (No response.)
16      Q. And you're listed under E. And E states -- this
17  is from the CIMA letter -- in the introductory remarks:
18  The actuarial report asserts that the Licensee is owned by
19  SAS Asset Recovery, Ltd., and its affiliated entities
20  (collectively SAS). SAS is not part of the Licensee's
21  organization structure.
22          Do you see that?
23      A. I see that.
24      Q. Do you recall working on a response to that
25  criticism by CIMA?

160

1           MS. SMITH: Objection to form.
2           THE WITNESS: I'm trying to get context for
3   what this is.
4   BY MR. BURT:
5       Q. Sure.
6       A. What introductory remarks are they referencing,
7   an actuarial report that I don't have in front of me?
8       Q. I can show you that, if you'd like.
9       A. Sure.
10          It reads to me that -- that someone said the
11  "Licensee," who is, presumably, Sentinel Reinsurance,
12  Ltd., is owned by SAS, and SAS is not a part of the
13  Licensee's organization structure.
14      Q. Okay. And my question was just: Do you recall
15  responding to that -- working on a response to that?
16      A. I don't recall responding to that.
17      Q. Okay.
18      A. It's -- this is CIMA's report, and CIMA is the
19  one saying "SAS is not a part of the Licensee's
20  organization structure."
21          MR. BURT: Are we on Exhibit 102?
22          THE STENOGRAPHIC REPORTER: (Nods head.)
23          MR. BURT: Mark this as 102.
24          (Exhibit 102 was marked for identification.)
25  BY MR. BURT:

161

1   Q.  So I've handed you Exhibit 102, which is an
2   e-mail and accompanying actuarial reports dated December
3   31st, 2017, for Sentinel Reinsurance, Ltd.
4       Do you see that?
5   **A.  Yes.**
6   Q.  And then, on page 3 of that report, in the
7   "Introduction," it states:  Risk International Actuarial
8   Consulting RA- --- (RIAC) has prepared this Actuarial
9   Analysis for Sentinel Reinsurance, Ltd., (Sentinel or the
10  Company), at the request of Mr. Tom Adamczak of Beecher
11  Carlson, the captive manager of Sentinel.  Sentinel is a
12  captive insurance company domiciled in the Cayman Islands
13  and owned by SAS Asset Recovery, Ltd.
14      You see that?
15  **A.  I see that.**
16  Q.  And that appears to be what CIMA was referencing
17  in its letter, right?
18  **A.  Yes.  CIMA is saying SAS is not part of a**
19  **Licensee's organization structure.**
20  Q.  Right.
21      And is that correct?
22  **A.  Yes.**
23  Q.  Okay.  And so you don't recall whether you
24  prepared or worked on a response to CIMA regarding that,
25  do you?

162

1   **A.  I don't recall.**
2   Q.  So let's flip in Exhibit 101, the CIMA letter, to
3   page 10, which is the "Management Comments and Response,"
4   and there's, under E, on page 10 right in the middle, it
5   states:  The Licensee acknowledges the inaccuracy within
6   the actuarial report regarding the structure and has
7   requested the appropriate correction within the actuary's
8   2018 report.
9   **A.  I see that.**
10  Q.  Did you work on that at all?
11  **A.  No.**
12  Q.  Did you have any conversations with the actuary?
13  **A.  No.**
14  Q.  Did you ever provide the actuary information?
15  **A.  Not that I recall.**
16  Q.  Did you ever review the actuarial reports?
17  **A.  Not that I recall.**
18      MS. SMITH:  Objection to form.
19  BY MR. BURT:
20  Q.  You can set the actuary report aside.
21  **A.  Okay.**
22  Q.  Then looking back, let's look at number F -- or
23  Item F on page 8 of the CIMA letter, under "Inconsistent
24  Representations and Inaccurate Documentation."
25  **A.  Okay.**

163

1   Q.  Here it states:  The Licensee's audited financial
2   statements and actuarial report for the year-ended
3   December 31st, 2017, state that the Licensee provides D&O
4   coverage to SAS Asset Recovery structure and its subsis-
5   -- its subsidiaries -- excuse me -- SAS.  As per the
6   Licensee's business plan, the Licensee was approved to
7   provide D&O coverage to entities within the SAS Asset
8   Recovery structure/Sentinel structure...
9       And I'm going to stop there.
10  Is that consistent with your recollection,
11  that that was the approval for Sentinel to issue D&O
12  coverage within SAS and Sentinel structures?
13      MS. SMITH:  Objection to form.
14      THE WITNESS:  Yes, that's consistent, and
15  consistent with what I've described previously.
16  BY MR. BURT:
17  Q.  Okay.  And then it states:  According to the
18  Authority's records, SAS and Sentinel structures are not
19  in the same organization structure.  The following
20  entities, which are part of the Sentinel structure, have
21  D&O policies issued by the Licensee:  Montage Holdings,
22  Ltd.; Greystone IV, Ltd.; Kind Holdings, Ltd.; Brave
23  Holdings, Ltd.; Loyal Holdings, L.P.; Anthem, Ltd.;
24  Mainspring, Ltd.; HAL Holdings, L.P.; Nimitz, Ltd.;
25  Patton, Ltd.  There is a clear contradiction between the

164

1   information on the business plan and that on the audited
2   financial statements and actuarial report for the
3   year-ended December 31st, 2017.
4       Did I read that correctly?
5   **A.  Yes.**
6   Q.  My first question is:  Does that refresh your
7   recollection about which Sentinel -- which entities within
8   the Sentinel structure received D&O policies?
9       MS. SMITH:  Objection to form.
10      THE WITNESS:  It does.  Insofar as this
11  exact timing, those were the policies CIMA, I guess, saw
12  on the audited financial statements and actuarial report,
13  as read from this document.
14  BY MR. BURT:
15  Q.  Right.
16      And did you work on a response to this in
17  CIMA's finding that there was a contradiction between the
18  information on the business plan and the audited financial
19  statements and actuarial report?
20  **A.  I don't recall specifically, but it's likely that**
21  **I would have assisted in differentiating CIMA's**
22  **designation of SAS Asset Recovery structure and its**
23  **subsidiaries from these other entities named.**
24  Q.  Okay.  So you would have helped with that, making
25  the points clear which entities are where --

165

1    A.  Yes.
2    Q.  -- and how -- how, if at all, they were related.
3  Is that fair?
4    A.  That's fair.
5    Q.  Okay.  So let's look at page 10 again, to
6  "Management Comments."
7    A.  Uh-huh.
8    Q.  Under F, it states:  The Licensee acknowledges
9  the Authority's comment related to the confusion
10  pertaining to the Sentinel structure versus the SAS
11  structure as both are different, although affiliated,
12  under common ownership.
13      I'm going to stop there.
14      Did you help draft that language?
15    MS. SMITH:  Objection to form.
16    THE WITNESS:  Not that I recall.
17  BY MR. BURT:
18    Q.  Okay.  Is that consistent with your
19  understanding, though, that Sentinel and SAS, although
20  different, are affiliated under common ownership?
21    MS. SMITH:  Objection to form.
22    THE WITNESS:  I can't say whether they are
23  affiliated.  I do believe there is some common ownership.
24  BY MR. BURT:
25    Q.  And do you know who that common -- or what that

166

1  common ownership is?
2    A.  Yes, but I'd need to look at the org chart.
3    Q.  You can look at the org chart.
4      By that, you're referring to Exhibit 28 and
5  the org chart's listed there, right?
6    A.  Yes.
7    MS. SMITH:  Objection to form.
8    THE WITNESS:  SAS Holdings/SPV, Ltd.,
9  appears on each -- page 3 and 4 in this Exhibit 28.
10  BY MR. BURT:
11    Q.  Okay.  So let's -- yeah.  So let's break that
12  down to make sure the record is clear.
13      Looking at page 3, the SAS structure, as of
14  9th of April 2019, right there at the top in the middle,
15  it says, "SAS Holdings/SPV, Ltd."; is that right?
16    A.  Yes.
17    Q.  Was that a Cayman's entities?
18    MS. SMITH:  Objection to form.
19    THE WITNESS:  Yes.  It's a Cayman Islands's
20  entity, to my knowledge.
21  BY MR. BURT:
22    Q.  And then if we look at page 4 under the Sentinel
23  structure, as of 9th April, 2019, it states:  SAS
24  Holdings/SPV, Ltd., and in paren, it says "Cayman"; is
25  that right?

167

1    A.  Yes, I see that.
2    Q.  Is that the same entity?
3    A.  To my knowledge, yes.
4    Q.  So when -- in the management response when it's
5  referring to common ownership, that may have been one
6  thing that it was referring to, the SAS Holdings/SPV,
7  Ltd.?
8    A.  Perhaps.
9    MS. SMITH:  Objection to form.
10  BY MR. BURT:
11    Q.  Okay.  Now, you'll see on -- on pages 3 and 4 of
12  Exhibit 28, there's USP's 1 and 2 are listed on both, and
13  I know before, I think regarding Sentinel, you stated you
14  didn't know who that was referring to.
15      Is that still your testimony?
16    A.  Yes.  I understand, generally, who it would be
17  referring to, but I don't have specifics around ownership
18  at that level.
19    Q.  Okay.  Generally, what is your understanding?
20    A.  Generally, USP1 and 2 would be domestic, meaning
21  U.S. entities, non-Cayman entities.
22    Q.  Uh-huh.
23    A.  Generally, it would be Mr. Ellington and
24  Mr. Dondero in theory, but I don't know where it's owned,
25  who a beneficiary is, any domestic -- I don't have any

168

1  domestic knowledge as to how it's held, how the economic
2  benefit flows or anything like that.
3    Q.  Understood.
4      But -- but, generally, the ownership somehow
5  goes up to Mr. Ellington on the one hand, and Mr. Dondero
6  on the other?
7    MS. SMITH:  Objection to form.
8    THE WITNESS:  At one time, yes.
9  BY MR. BURT:
10    Q.  Okay.
11    A.  At one time, yes.
12    Q.  And -- and we're talking about the Sentinel
13  structure, Exhibit 4 --
14    A.  Yes.
15    Q.  -- or -- excuse me -- Exhibit 28, page 4?
16      Now, with regards to the SAS structure, we
17  have USP1 and USP2.  Is that the same with regard to SAS
18  that USP1 and USP2 would refer in some way to ownership
19  rolling up somehow to Elling- -- to Mr. Ellington and
20  Mr. Dondero?
21    MS. SMITH:  Objection to form.
22    THE WITNESS:  I believe so.
23  BY MR. BURT:
24    Q.  Okay.  Now, also in the SAS structure, it lists
25  4 USPs.  Do you know who that is referring to?

169

1   A. I don't.
2       Q. Okay. We'll come back to that.
3       And so in addition to the common ownership
4   referred to in the management discussion in the CIMA
5   response, isn't it fair to say that part of that common
6   ownership was also that Mr. Dondero and Mr. Ellington had
7   ownership of both SAS and Sentinel?
8       MS. SMITH: Objection to form.
9       THE WITNESS: I don't know that that's fair
10  to say, because I don't know how the domestic entities are
11  held.
12  BY MR. BURT:
13      Q. Is it your testimony that USP1 and USP2 refers to
14  an entity, or could it refer to an individual?
15      MS. SMITH: Objection to form.
16      THE WITNESS: It could be either.
17      MR. BURT: One moment, please.
18      MS. SMITH: Is now a good time to take a
19  break?
20      MR. BURT: Sure.
21      THE VIDEOGRAPHER: Off the record at 1:43
22  p.m.
23      (Brief recess taken.)
24      THE VIDEOGRAPHER: Back on record at
25  2:00 p.m.

170

1       MR. BURT: So making a record, Counsel and I
2   spoke offline, and Counsel has represented to me, and I
3   accept her representation, that there were no substantive
4   notes passed between them. And so, again, I accept your
5   representation of that and make the record clear. We
6   thought we had seen it, but we believe you when you say
7   that it did not happen, so...
8       MS. HARTMANN: And just for the record,
9   Ms. Smith did pass me a note. I did not pass any note to
10  her with the -- writing on it.
11      MR. BURT: Okay.
12      MS. SMITH: And the note had nothing to do
13  with the substance of the deposition. It was one personal
14  comment.
15      MR. BURT: So we accept your representation
16  as officers of the Court and we will move on. We
17  appreciate that clarification.
18      MS. HARTMANN: Thank you.
19      MS. SMITH: Thank you.
20      MR. BURT: No problem.
21  BY MR. BURT:
22      Q. Okay. So Mrs. Irving, we were looking at a bunch
23  of documents, but we'll start again looking at Exhibit 28
24  that has the structures. And we were talking about USP1
25  and USP2. I'd actually like to show you another document

171

1   related to that that we will mark as 103, I believe.
2       (Exhibit 103 was marked for identification.)
3       MR. BURT: Is that right, 103?
4       THE STENOGRAPHIC REPORTER: Yes.
5       (Off-record discussion.)
6       THE WITNESS: Thanks.
7       (Witness reviews document.) Okay.
8   BY MR. BURT:
9       Q. Okay. So Exhibit 103, as you see, has
10  three pages, two pages of e-mail and then a chart, an
11  organizational chart, and I'd like to start with the first
12  e-mail in the chain that begins on page 1 from a Leonna
13  Saintvil, to Clayton Price at Beecher, cc'ing, a number of
14  other CIMA employees and Tom Adamczak. It says: Good
15  day, Clayton. Thank you for your e-mails --
16      And for the record, it's dated June 20th,
17  2019.
18      -- I have a few questions. Can you please
19  explain the purpose of the following businesses. And he
20  lists a number of businesses. And then number 2, he says:
21  Is USP1 and USP2 individuals? If so, please amend the
22  organizational chart.
23      So keeping number 2 in mind, Mrs. Irving,
24  and then going to the first page again, Mr. Price responds
25  to Leonna Saintvil, and says: Leonna, to answer questions

172

1   from earlier today... and then number two, he says: USP1
2   and USP2 are individuals. U.S. Person 1 and U.S. person
3   2, who are known to CIMA. As referenced in my e-mail with
4   the org chart, USP1 is Scott Ellington, while USP2 is
5   James Dondero. The org chart has been revised to include
6   their names.
7       Do you see that?
8       A. I see it.
9       Q. Do you recall this org chart being revised to
10  include their names?
11      MS. SMITH: Objection to form.
12      THE WITNESS: No.
13  BY MR. BURT:
14      Q. Okay. Does this help refresh your recollection
15  as to the identity of USPs 1 and 2 in the Sentinel
16  structure?
17      MS. SMITH: Objection to form.
18      THE WITNESS: I see at this point in time
19  this was a representation made by Beecher.
20  BY MR. BURT:
21      Q. And do you have any reason to disagree with that
22  representation?
23      MS. SMITH: Objection to form.
24      THE WITNESS: No.
25  BY MR. BURT:

173

1      Q. Well, it wasn't just a representation by Beecher.
2  It went to the regular -- the regulator in the Caymans,
3  right?
4          MS. SMITH: Objection to form.
5          THE WITNESS: As far as I can tell on this
6  paper, yes, that was what was communicated to the
7  regulator.
8  BY MR. BURT:
9      Q. Okay. Did you ever communicate that ownership of
10  Mr. Ellington and Dondero to Beecher?
11     A. I don't know.
12     Q. Okay. Let's look at the org chart that was
13  provided. This was the last page of this exhibit.
14         And it states: Sentinel structure following
15  entity eliminations as of 18th June, 2019. Note removal
16  of Sentinel Re Holdings, Ltd., is pending CIMA approval.
17         And up at the top now, in the more
18  streamlined structure on the left, it lists Scott
19  Ellington, and on the right, it lists James Dondero; is
20  that correct?
21     A. I see that here on this paper, yes.
22     Q. And in the middle, still, we have SAS
23  Holdings/SPV, Ltd.; is that right?
24     A. I see it here, yes.
25     Q. Now, tracing up from the bottom, the Sentinel

174

1  Reinsurance, Ltd., the ownership interests, do you see at
2  the bottom when it splits into a right and left,
3  70 percent of the value goes to the right to Mainspring,
4  Ltd.; 30 percent of the value goes to the left to Montage
5  Holdings, Ltd.
6          Is that right?
7      A. I see that here, yes.
8      Q. 91 percent of the vote goes to Mainspring; 9
9  percent of the vote goes to Montage Holdings. Is that
10  right?
11     A. Sorry. Could you repeat that, please?
12     Q. Sure.
13         I'm -- I'm talking specifically about the
14  voting interests.
15     A. Okay.
16     Q. And 91 percent of the vote -- voting interest in
17  Sentinel Reinsurance, Ltd., goes to Mainspring, Ltd., and
18  9 percent of the vote goes to Montage Holdings, Ltd.?
19     A. I see that.
20     Q. All right. Now, that 70/30 split between
21  Mainspring and Montage, was that consistent with your
22  understanding of the reorganization of the structures that
23  you've testified you worked on at this time?
24         MS. SMITH: Objection to form.
25         THE WITNESS: Yes.

175

1  BY MR. BURT:
2      Q. And moving up, looking at Mainspring, above it is
3  Loyal Holdings, L.P., and directly above Loyal Holdings is
4  James Dondero with 99.5 percent of the value and 9 percent
5  of the vote.
6          Do you see that?
7      A. I see it.
8      Q. So of the 70 percent of Sentinel Reinsurance and
9  its -- of the ownership that went to Mainspring,
10  99.5 percent of that ownership went to James Dondero,
11  correct?
12     A. I see --
13         MS. SMITH: Objection to form.
14         THE WITNESS: I see that here.
15  BY MR. BURT:
16     Q. Is that consistent with your memory?
17         MS. SMITH: Objection to form.
18         THE WITNESS: I don't recall.
19  BY MR. BURT:
20     Q. Well, you've testified that this is what you were
21  tasked with, with the structure of Sentinel and all of the
22  entities and taking entities out, correct; part of the
23  liquidation?
24     A. Yes.
25     Q. In fact, you were working on that in 2018, even

176

1  before the CIMA meetings, right?
2          MS. SMITH: Objection to form.
3          THE WITNESS: I was working on streamlining
4  the structure, yes.
5  BY MR. BURT:
6      Q. Yeah. So this was something that you worked on
7  for at least a year, the streamlining of the structure of
8  Sentinel; isn't that right?
9          MS. SMITH: Objection to form.
10         THE WITNESS: I wouldn't say I worked on it
11  for a year, but yes, it was -- it was known that we wanted
12  to simplify the structure.
13  BY MR. BURT:
14     Q. Okay. I mean, I'm not saying you worked on it
15  every day. But it was a project, an ongoing project that
16  lasted for at least a year until here, 18th of June 2019,
17  you can report to CIMA that Sentinel now has a new
18  organizational structure, correct?
19         MS. SMITH: Objection to form. She's not
20  reporting at all on this.
21  BY MR. BURT:
22     Q. Isn't that right?
23     A. Sorry. Could you repeat your question, please?
24     Q. What I was saying was, this organizational
25  structure is sent to CIMA, as we see in this exhibit, as

---

177

1    -- and it shows the Sentinel structure as 18th of June,
2    2019, right?
3        A. I see that here --
4        Q. And this --
5        A. -- yes.
6        Q. Excuse me.
7            And this is a project that you had worked
8    on, not every day, but an ongoing project for at least a
9    year; is that right?
10       A. That's -- that's fair. I worked on it in pieces
11   at various points in time, yes.
12       Q. And isn't it also fair, then, to say that you
13   knew that the 70 percent of value in Sentinel
14   Reinsurance that went to Mainspring, Ltd., that
15   ultimately was owned by Mr. Dondero?
16           MS. SMITH: Objection to form.
17           THE WITNESS: I don't know.
18   BY MR. BURT:
19       Q. You have no idea whether Mr. Dondero held that?
20   Is that your testimony under oath today?
21       A. No.
22           Could you read back your prior question that
23   I responded "I don't know" to.
24           MR. BURT: Madam Court Reporter, would you
25   mind reading it beginning at 14:09:13, 160-1.

---

178

1            (Requested material was read back.)
2            THE WITNESS: No. I wouldn't say that
3    that's fair, no.
4    BY MR. BURT:
5        Q. Okay. Why not?
6        A. Because I don't have knowledge of -- of what
7    happens, kind of, anywhere on the domestic side. And as
8    noted, these were two U.S. person individuals. I -- I
9    don't know.
10       Q. Well, I want to make sure I'm understanding that.
11   So are you saying that on the domestic side Mr. Dondero
12   might not have had 99 percent ownership in Loyal Holdings,
13   which owned Mainspring, Ltd.?
14           MS. SMITH: Objection to form.
15           THE WITNESS: My sense is, this is
16   represented to CIMA. I fully believe that the accurate
17   representation was presented to CIMA at the time.
18   BY MR. BURT:
19       Q. Okay. So then on left, of the 30 percent value
20   that goes to Montage Holdings, that's owned by HAL
21   Holdings, and 99 percent of that is owned by Scott
22   Ellington, correct?
23       A. I see that here on this chart, yes.
24       Q. Any reason to dispute that this was the corporate
25   structure of Sentinel on -- as of June 18th, 2019?

---

179

1            MS. SMITH: Objection to form.
2            THE WITNESS: No reason to dispute that.
3    BY MR. BURT:
4        Q. And so ultimately, SAS Holdings has -- if we're
5    looking at the left side, 1 percent of the value goes to
6    Greystone IV in the Cayman.
7            Do you see that?
8        A. I see it.
9        Q. 91 percent of the vote goes to Greystone IV in
10   the Cayman, right?
11       A. I see that here.
12       Q. So of the 30 percent that went to Montage and
13   then to HAL, 99 percent of that 30 percent went to Scott
14   Ellington, and 1 percent of that 30 percent goes to
15   Greystone, right?
16       A. That's what this chart says.
17       Q. And again, you don't have any reason to disagree
18   with this chart, do you?
19           MS. SMITH: Objection to form.
20           THE WITNESS: I -- I don't.
21   BY MR. BURT:
22       Q. And then on the right-hand side, 70 percent of
23   the ownership Sentinel goes to Mainspring, up to Loyal,
24   which owns Mainspring; 99.5 of that ownership goes to
25   Mr. Dondero; 5 percent of that goes to Kind Holdings,

---

180

1    Ltd., in the Caymans; is that right?
2        A. That's what this paper says.
3        Q. 91 percent of the vote goes to Kind Holdings, but
4    only 9 percent of the vote goes to Mr. Dondero; is that
5    right?
6        A. That's what the paper says.
7        Q. Why did -- why was it structured in such a way
8    that ownership and vote was different?
9        A. It was based --
10           MS. SMITH: Objection to form.
11           THE WITNESS: Sorry, Frances.
12           It was based on a structure set up by
13   Deloitte.
14   BY MR. BURT:
15       Q. When did Deloitte set that up?
16       A. I believe 2014.
17       Q. So Deloitte had set up a structure that split
18   ownership interests off from the same -- from -- from the
19   voting rights in Sentinel?
20       A. Yes.
21       Q. Do you know why Deloitte did that?
22       A. I don't know.
23       Q. Well, you're a CPA. Did you work with Deloitte
24   on that?
25       A. I did.

181

1          MS. SMITH:  Objection to form.
2    BY MR. BURT:
3      Q.  Okay.  So what did they tell you about that?
4      A.  That it was a tax-structuring suggestion.
5      Q.  To suggest what?
6      A.  It was their -- it was Deloitte's advice to set
7    the structure up in the way that you are seeing it.
8      Q.  So in some way, splitting off the -- the
9    percentage of vote that an entity had versus its ownership
10   interest was tax advice given to you -- or given to
11   Sentinel by Deloitte?
12         MS. SMITH:  Objection to form.
13         THE WITNESS:  Deloitte advised as to that,
14   yes.
15   BY MR. BURT:
16     Q.  Who at Deloitte gave that advice?
17     A.  I don't remember.
18     Q.  Do you recall any of the names at Deloitte that
19   you worked with at the time?
20     A.  I don't.
21     Q.  So in total, looking at the amount of ownership
22   in Sentinel that SAS Holdings has, it has, on the Montage
23   holding side, 1 percent of 30 percent, and on the
24   Mainspring side, .5 percent of 70 percent, correct?
25     A.  I see that here, yes.

182

1      Q.  Okay.  So as far as ownership goes, isn't it fair
2    to say that SAS Holdings SP, Ltd., had a -- a very small
3    percentage of the ownership of Sentinel Reinsurance, Ltd.?
4          MS. SMITH:  Objection to form.
5          THE WITNESS:  In terms of value as presented
6    on this chart, it's smaller, yes.
7    BY MR. BURT:
8      Q.  Does that --
9      A.  -- than the vote component.
10     Q.  Ex- -- excuse me.  Yeah.
11         Well, I'm not comparing it with the vote
12   component.  What I'm comparing it with is the ownership
13   interest that go to Mr. Ellington and Mr. Dondero.  And
14   isn't it fair to say that the percentage of ownership of
15   SAS Holdings SPV, Ltd., is much, much smaller than the
16   ownership interest of Mr. Ellington and Mr. Dondero in
17   Sentinel Reinsurance, Ltd.?
18         MS. SMITH:  Objection to form.
19         THE WITNESS:  The value is smaller as
20   presented here, yes.
21   BY MR. BURT:
22     Q.  Okay.  Does that conflict in any way with your
23   recollection of how this was structured?
24     A.  I don't recall.
25     Q.  Can you point me to any facts to suggest that

183

1    Mr. Dondero and Mr. Ellington, in fact, did not own the
2    ownership interests that are presented here on this -- on
3    this page?
4          MS. SMITH:  Objection to form.
5          THE WITNESS:  No.  As I -- as I stated
6    before, full disclosure would have been made to the Cayman
7    Islands Monetary Authority.
8    BY MR. BURT:
9      Q.  Okay.  Now, up above SAS Holdings SPV, Ltd., is
10   something called ITA, and then it says: - Red Cross.
11         Do you know what that is referring to?
12     A.  Yes.
13     Q.  What is that?
14     A.  ITA is the trustee.
15     Q.  The trustee of what?
16     A.  Of the SAS Holdings SPV, Ltd., shares.
17     Q.  So that corporation, SAS Holdings SPV, Ltd., had
18   shares and they were held in trust by ITA?
19     A.  That's my understanding.
20     Q.  Were they exclusively held by ITA, or were they
21   held by anyone else?
22         MS. SMITH:  Objection, form.
23         THE WITNESS:  My understanding was they were
24   held by ITA.
25   BY MR. BURT:

184

1      Q.  Okay.  And do you know who owned ITA?
2      A.  No.
3      Q.  Do you know whether Mr. Dondero and Ellington
4    were in any way affiliated with ITA?
5          MS. SMITH:  Objection, form.
6          THE WITNESS:  Not to my knowledge.
7          MR. BURT:  One moment.
8          All righty.  Apologies for the slight delay.
9          We'll mark this as Exhibit 104.
10         (Exhibit 104 was marked for identification.)
11         THE WITNESS:  Excuse me.  Thank you.
12   BY MR. BURT:
13     Q.  And just so you know, I'm actually not going to
14   ask -- other than to identify the e-mail, I'm not going to
15   ask you any questions about the substance of the e-mail,
16   but there's an attachment that I want to show you.
17     A.  Okay.
18     Q.  Of course, for context, you can see here there --
19   the e-mail is from Matt DiOrio -- the top e-mail, I should
20   say, is from Matt DiOrio to Tom Adamczak, cc'ing you,
21   Katie Irving.  I keep getting the to and froms mistaken; I
22   apologize.
23         It's from Jonathan Arbeit at Beecher Carlson
24   to Matt DiOrio and Alli Devins, cc'ing Tom Adamczak and
25   kirving@sasmgt.com, and it's dated October 3rd,

---

185

1  2018.
2      So this is prior to the reorganization that
3  we were just looking at; is that right?
4      **A.  It -- yes, it appears to be in October 2018.**
5      Q.  Okay.  And here Jonathan Arbeit at Beecher refers
6  to -- he says: "Hi, Matt, Katie, the capital rebalancing
7  schedule is attached.  Please let me know if you have any
8  questions." And there's an attachment, we can see, at
9  capitalbalancing.xls.
10     You see that?
11     First, who is Jonathan Arbeit at Beecher?
12     **A.  It looks like, from this e-mail signature, he's a**
13  **senior accountant.**
14     Q.  Do you recall having e-mails with him or
15  conversations?
16     **A.  Not specifically, no.**
17     Q.  All right.  All right.  And then turning to the
18  attachment of this, which is five pages in, it's an Excel
19  printout with some green and yellow on it, and at the top,
20  it says: Sentinel Reinsurance, Ltd., Rebalancing?
21     **A.  Does it say "1" at the bottom of the page?**
22     Q.  It says:  Sentinel Reinsurance, Ltd.,
23  Rebalancing.  It's the right one.  And then it has a
24  "Summary" box.
25     **A.  Okay.  I see that.**

---

186

1      Q.  All right.  And in the summary, it says:
2  Ellington contributes 2.624.509.33 in cash to Sentinel
3  Reinsurance, Ltd.  Sentinel Reinsurance, Ltd., loans --
4  and then it says: XXXX to Dondero Ellington -- excuse
5  me -- to Dondero Entity.  Effectively, 30 percent of loan
6  comes from Ellington.
7      Do you see that?
8      **A.  I see it.**
9      Q.  Do you recall Mr. Ellington contributing
10 $2.6 million to Sentinel Reinsurance?
11     MS. SMITH:  Objection to form.
12     THE WITNESS:  I don't recall.
13 BY MR. BURT:
14     Q.  Is this news to you as something you've never
15 heard of before today sitting here looking at this
16 document?
17     **A.  I just don't recall.**
18     Q.  All right.  Did you know that Mr. Ellington was
19 funding Sentinel in that way?
20     MS. SMITH:  Objection to form.
21     THE WITNESS:  I don't recall.
22 BY MR. BURT:
23     Q.  And as you look at -- looking at this
24 spreadsheet, underneath the "Summary" box on the right
25 side, it says: Dondero, 70 percent Patton; Ellington,

---

187

1  30 percent Nimitz.
2      Do you see that?
3      **A.  I see that.**
4      Q.  Okay.  So keeping your finger there, if we go
5  back to Exhibit 28, which is the structure before the
6  changes, on the last page, the Sentinel structure, do you
7  see that the Patent -- excuse me -- the Patton, Ltd.,
8  entity comes off the right of Sentinel Re Holdings, Ltd.,
9  and has 70 percent value.  Is that right?
10     **A.  I see -- I see that here.**
11     Q.  And, ultimately, it goes up -- the ownership up
12 to USP2 and to SAS Holdings/SPV, Ltd., right?
13     **A.  I see that here on the chart.**
14     Q.  All right.  And then, here, in Exhibit 104, it
15 lists:  Dondero, 70 percent Patton; is that right?
16     **A.  I see that.**
17     Q.  So isn't it fair to conclude from that that
18 Mr. Dondero is USP2, as reflected in Exhibit 28?
19     MS. SMITH:  Objection to form.
20     THE WITNESS:  You can conclude whatever
21 you'd like from these documents.
22 BY MR. BURT:
23     Q.  Well, I'm asking you:  Isn't it true that
24 Mr. Dondero was -- in fact, owned 70 percent of Sentinel,
25 as reflected in Exhibit 28, page 4, and as reflected in

---

188

1  Exhibit 104, identifying him as a 70 percent owner of the
2  Patton line of ownership?
3      MS. SMITH:  Objection, form.
4      THE WITNESS:  I don't think that's exactly
5  fair.
6  BY MR. BURT:
7      Q.  Why not?
8      **A.  Because -- because the 70 percent value, as you**
9  **referenced before, that flows to Patton on this chart that**
10 **you're showing me is further bifurcated above in the**
11 **ownership chain.**
12     Q.  Uh-huh.
13     **A.  So whereas this attachment on 104 exhibit says**
14 **"Dondero, 70 percent Patton," it's not technically**
15 **correct, as far as I would read it.**
16     Q.  Sure.  Well, let's look at how that ownership is
17 split up from Patton.
18     15.89 percent goes to Anthem, Ltd., right?
19     **A.  I see that here.**
20     Q.  84.11 percent goes to Mainspring, Ltd., correct?
21     **A.  I see that here.**
22     Q.  But then those combine back together into Loyal
23 Holdings, Ltd., right?
24     **A.  Uh-huh.**
25     Q.  Now, as part of the restructuring that happened

189

1  where you eliminated entities, is it true that you
2  eliminated that middle portion?
3      A. What middle portion?
4      Q. Of Anthem and Mainspring.
5          MS. SMITH: Objection to form.
6          THE WITNESS: From what I recall, there was
7  a -- a merger or something wherein Anthem and Mainspring
8  combined.
9  BY MR. BURT:
10     Q. Okay. So they combined into one entity, but
11 Patton was eliminated, right?
12     A. It appears so.
13     Q. And then Loyal Holdings is still there, both pre
14 and post restructuring, right?
15     A. I see that.
16     Q. All right. So, so far, 70 percent of the value,
17 if we're looking at pre-April 2019, is at Loyal Holdings,
18 and of that 70 percent, 99 percent goes to USP2, right?
19     A. I see that.
20         MS. SMITH: Objection to form.
21 BY MR. BURT:
22     Q. And -- and then there's a Kind Holdings, Ltd.,
23 and a Brave Holdings, Ltd., both in the Caymans, which
24 each -- which split the remaining .5 percent of value,
25 right?

190

1      A. They split the remaining 1 percent --
2      Q. 1 percent.
3      A. -- of value.
4      Q. You're right. Thank you for the correction.
5          And then on the Brave Holdings's side, that
6  .5 percent of value flows up to USP2, correct?
7      A. I see that here on the chart, yes.
8      Q. So 99.5 percent of the 70 percent goes to USP2;
9  isn't that true?
10     A. I see that from the chart.
11     Q. So is your criticism of Exhibit 104 that Beecher
12 should have been more precise that it's not 70 percent,
13 that it's 99.5 percent of 70 percent?
14         MS. SMITH: Objection to form.
15         THE WITNESS: I believe you asked me if I
16 thought it was accurate, and for me, no, that's -- that's
17 not an accurate depiction to put "Dondero, 70 percent
18 Patton. "
19 BY MR. BURT:
20     Q. So you want to be so precise, you would rather
21 that it say it's 99.5 percent of 70 percent of Patton is
22 owned by Dondero, because that's what would reflect what's
23 on the flow -- on the structure, right?
24     A. I think that would be a better depiction.
25     Q. So that would be -- those level -- that level of

191

1  detail is important to you?
2      A. Yes.
3          MS. SMITH: Objection to form.
4  BY MR. BURT:
5      Q. Okay. And then looking at the left-hand side,
6  30 percent of value of Nimitz, Ltd. -- of Sentinel Re
7  Holdings goes to Nimitz, Ltd., right?
8      A. Here on Exhibit 28?
9      Q. Yes.
10     A. Yes.
11     Q. And Nimitz, Ltd., is eliminated as part of the
12 restructuring, right?
13     A. I see that here, uh-huh.
14     Q. And then you -- looking at 28, rather than Mont-
15 -- excuse me -- then Nimitz goes to Montage Holdings,
16 which still exists after the restructuring, correct?
17     A. I see that.
18     Q. And that flows up on HAL Holdings, which exists
19 after the restructuring, correct?
20     A. I see that.
21     Q. And from there, 99 percent of the value flows to
22 Elderflower, Ltd., and then directly to USP1, correct?
23     A. I see that on Exhibit 28.
24     Q. All right. And the only difference between
25 Exhibit 28 and the -- and what's shown in the

192

1  restructuring is, after HAL Holdings, Elderflower is
2  eliminated?
3          MS. SMITH: Objection to form.
4  BY MR. BURT:
5      Q. In terms of where that 99 percent value goes?
6      A. Specific- ---
7          MS. SMITH: Objection to form.
8          THE WITNESS: Specifically, as related to
9  Elderflower, I see, yes, that Elderflower was eliminated
10 on the restructured chart, which was provided to CIMA.
11 BY MR. BURT:
12     Q. All right. And the 1 percent value that doesn't
13 go up to Elderflower and USP1, goes to Greystone the IV,
14 which is the same in both pre and post restructuring,
15 right?
16     A. I see that here.
17     Q. Okay. So of the 30 percent value that split off
18 from Sentinel Re Holdings that went to Nimitz, 99 percent
19 of that 30 percent went to USP1, ultimately, correct?
20         MS. SMITH: Objection to form.
21         THE WITNESS: I see that as represented on
22 these documents in front of me.
23 BY MR. BURT:
24     Q. All right. And then looking at Exhibit 104,
25 because we like to be precise here, you would have said:

193

1  99 percent of 30 percent is what Ellington's ownership
2  interest of Sentinel is, right?
3         MS. SMITH:  Objection to form.
4         THE WITNESS:  I -- I think it would be more
5  precise to not put "30 percent Ellington Nimitz."
6  BY MR. BURT:
7      Q.  But it would have been more precise to say
8  "99 percent of 30 percent Ellington Nimitz," correct?
9      **A.  Yes.  But I don't know -- I don't know if it's**
10 **accurate to put "Ellington/Dondero" in it.  I don't -- I**
11 **didn't put this together; I don't know what they're --**
12     Q.  Well, let's -- let's look --
13     **A.  -- referencing.**
14     Q.  -- let's look at Exhibit 103 again, and what was
15 -- what was represented to CIMA in the e-mail from Leonna
16 Saintvil.
17     **A.  Right.**
18     Q.  Number 2:  USP1 and USP2 are individuals, U.S.
19 Person 1 and U.S. Person 2, who are known to CIMA, as
20 referenced in my e-mail with the org chart, USP1 is Scott
21 Ellington, while USP2 is James Dondero.
22         That's what your administrator told CIMA,
23 the regulator, isn't it?
24     **A.  Right.  On June 20th, 2019.  Exhibit 104 is dated**
25 **October 3rd, 2018.**

194

1      Q.  And so you're saying that Beecher may have just
2  been totally wrong pre-2018, and that now Mr. Dondero and
3  Ellington weren't actually the owners; they were just
4  wrong here.  Is that your testimony?
5         MS. SMITH:  Objection to form.
6         THE WITNESS:  I'm not saying Beecher's
7  wrong; I'm saying they're not very precise in their
8  depiction on this paper that I'm looking at.
9  BY MR. BURT:
10     Q.  Okay.  So it's precision that you're -- that
11 you're quarreling with, not the actual fact that
12 Mr. Dondero owned 99.5 percent of Patton and Mr. Ellington
13 owned 90 percent -- 99 percent of the 30 percent of
14 Nimitz, right?
15        MS. SMITH:  Objection to form.
16        THE WITNESS:  I just think this could have
17 been a bit more clear.
18 BY MR. BURT:
19     Q.  You would have been clearer, right, if you had
20 put this together?
21     **A.  Probably.**
22     Q.  Okay.  I want to go back to, I believe -- it's
23 the CIMA letter.  I think it's 10- -- 101.  Thank you.
24     **A.  The CIMA Inspection Report?**
25     Q.  Yeah.  Thank you.  Yes, the CIMA Inspection

195

1  Report.
2      **A.  Okay.**
3      Q.  Just one moment, please.
4      **A.  Uh-huh.**
5      Q.  Apologies.
6         Okay.  I want to look at page 14 of the --
7  of the CIMA Inspection Report.  And bef- -- before we read
8  that -- actually, if you could pull out Exhibit 100 one
9  more time, which is --
10     **A.  Uh-huh.**
11     Q.  -- the e-mail that lists all of the various
12 sections and -- and who Beecher was recommending be
13 responsible for the response.
14        And on page 2 of that, there's -- there's a
15 section that says, "Successionship Planning."
16        Do you see that?
17     **A.  I do.**
18     Q.  And under 5.2.5.1, it states:  Matt -- and then:
19 Katie mentioned the two others, Jan and Damien, having
20 insurance knowledge.
21        Do you recall what that is referring?
22     **A.  Yes.  Jan and Damien were other directors of**
23 **Sentinel Reinsurance, Ltd.**
24     Q.  At what time?
25     **A.  I don't recall.**

196

1      Q.  So this e-mail is April of 2019.
2         Is it fair that they were directors around
3  that time, April of 2019?
4      **A.  I would assume so.**
5      Q.  Okay.  And is it Jan Neveril and Damien -- Damien
6  Austin?
7      **A.  Yes.**
8      Q.  Okay.  Were they -- were they located in the
9  Caymans, or did they live in Dallas?
10     **A.  No, they're in Cayman.**
11     Q.  Cayman?
12        And if we go now back to page 14 of the CIMA
13 letter --
14     **A.  Uh-huh.**
15     Q.  Well, actually, before I ask that, do you recall
16 having a conversation with Beecher about the directors, as
17 reflected here?
18        MS. SMITH:  Objection to form.
19        THE WITNESS:  Not specifically.
20 BY MR. BURT:
21     Q.  All right.  So under "Succession Planning" --
22 before I ask that, you said "not specifically."
23        How about generally, do you recall any
24 general discussions with -- with Beecher Carlson about the
25 directors?

197

1       A. No.
2       Q. So on page 14, "Succession Planning," 5.2.5.1,
3  the finding is:  The Licensee has a board comprising of
4  four directors.  Of the four directors, only one director
5  has direct insurance business expertise and experience.
6  However, the Authority observed that the Licensee's CGF
7  does not only lack a criteria for appointment of directors
8  and balancing of skills and experience on the board, but
9  it also does not entail a succession plan for those
10 currently serving as directors.  Should the single
11 director with insurance industry experience being
12 incapacitated, the board will not have sufficient
13 expertise to adequately provide oversight of management
14 and the Licensee's affairs.
15      Do you recall that criticism of CIMA?
16      A. I see it --
17      MS. SMITH:  Objection to form.
18      THE WITNESS:  I see it here.
19 BY MR. BURT:
20      Q. And do you recall having any conversations with
21 Beecher responding to that criticism?
22      MS. SMITH:  Objection to form.
23      THE WITNESS:  No.
24 BY MR. BURT:
25      Q. If you look at page 15, under "Management

198

1  Response," 5.2.5.4, it states:  The Licensee's board is
2  composed of four directors.  However, the Licensee has
3  two, not one, directors with direct insurance business
4  expertise and experience, Jan Neveril and Damien Austin,
5  rendering the statement inaccurate that the Licensee would
6  be left with insufficient expertise...
7       And it goes on.
8       Did you have any part in drafting that?
9       A. Not that I recall.
10      Q. But according to Exhibit 100, you had told
11 Beecher, at some point, that both Jan and Damien have
12 insurance knowledge, right?
13      MS. SMITH:  Objection to form.
14      THE WITNESS:  I don't know if I told Beecher
15 specifically, but --
16 BY MR. BURT:
17      Q. Well, it says:  Katie mentioned the two others.
18      A. Okay.
19      Q. Do -- do you recall that?
20      A. No, I don't recall that.
21      Q. Okay.  Mrs. Irving, was there ever a time when
22 you had authority to approve payments or
23 invoices?
24      A. No.
25      Q. Do you recall ever approving a payment or invoice

199

1  on behalf of Sentinel?
2       A. No.
3       MR. BURT:  Mark this as Exhibit --
4       THE STENOGRAPHIC REPORTER:  105.
5       MR. BURT:  -- 105.
6       (Exhibit 105 was marked for identification.)
7       MS. HARTMANN:  Jason, do you have another
8  one?  If not, that's okay.
9       MR. BURT:  Oh.  It's right here.
10      MS. HARTMANN:  Okay.  That's for you?
11      MR. BURT:  Yep.
12      MS. HARTMANN:  Okay.
13      MR. BURT:  That was a bad toss.
14      MS. SMITH:  I didn't get one.
15      MS. HARTMANN:  Oh, you didn't get one?
16      MR. BURT:  Like, a really bad toss.  Here
17 you go.
18      MS. SMITH:  105?
19      MR. BURT:  105, yes.
20      THE WITNESS:  (Witness reviews document.)
21 Okay.
22 BY MR. BURT:
23      Q. Okay.  Now we're going to look at a number of
24 e-mails in here, but I actually want to start with the
25 last two.

200

1       There's an e-mail on Monday, October 22nd,
2  2018 -- this is the second e-mail in the chain -- from Tom
3  Adamczak at Beecher to you, katieirving@sasmanagement.com,
4  cc'ing Matt DiOrio and Alli Devins.
5       And he states here:  Agreed -- and, again,
6  we'll look at the other e-mails in a moment.  He says:
7  Assuming that Beecher is to be the initiator on all
8  payments -- sorry.  I should state for the record, the
9  subject is:  RE:  Sentinel DSAs.
10      Agreed.  Assuming that Beecher is to be
11 initiated on all payments, perhaps something like the
12 following would be appropriate:  One, Beecher receives
13 invoices submitted for payment and verifies they have not
14 already been processed; two, Beecher obtains initial
15 approval to pay for Matt DiOrio, (alternatively, J.P. and
16 Katie, depending on availability or nature of the
17 invoice.)
18      Do you see that?
19      A. I do.
20      Q. And he goes on to explain what else happens.  And
21 he says:  Let me know if you have any comments or changes.
22 We can formalize this, or something like it, as policy, if
23 you want.  Tom.
24      You then respond on October 22nd, the same
25 day, in fact, just 14 -- 12, 13 minutes later, saying:

201

1  This looks okay to me.  Thank you.  Do you have the
2  necessary tokens log-in input info for CIBC?
3       So do you recall this e-mail exchange?
4       **A.  No.**
5       Q.  You don't recall approving that, in the
6  alternative, you and J.P. could provide initial approval
7  to pay Beecher Sentinel invoices?
8       MS. SMITH:  Objection to form.
9       THE WITNESS:  No.  J.P. and I did not have
10 authority to pay anything from Sentinel.  However, this
11 e-mail, if you read the balance of it, Items 3, 4, 5 and
12 6, this is mostly like a gut check so that the invoice
13 could be put forward to the directors, who would have the
14 authority to pay it.
15 BY MR. BURT:
16      Q.  So by "gut check," you mean when he states
17 "initial approval to pay"?  Is that the "gut check" that
18 you're referring to?
19      **A.  Yes.**
20      Q.  So Mr. DiOrio, Mr. Sevilla, or yourself would
21 provide a gut check on -- on the invoice that came in and
22 whether Sentinel should pay; is that fair?
23      MS. SMITH:  Objection to form.
24      THE WITNESS:  That's what Tom Adamczak is
25 suggesting in this e-mail.

202

1  BY MR. BURT:
2       Q.  Well -- and then you said, "This looks okay to
3  me," right?
4       **A.  Yes, I wrote, "This looks okay to me."**
5       Q.  You don't say anywhere:  Wait, I don't have
6  authority to -- to make an initial approval; I can't do
7  that.  You don't say that, do you?
8       **A.  I said --**
9       MS. SMITH:  Objection to form.
10      THE WITNESS:  -- "This looks okay to me.
11 Thank you."
12 BY MR. BURT:
13      Q.  Right.
14           And how many times did you provide that gut
15 check?
16      MS. SMITH:  Objection to form.
17      THE WITNESS:  I don't know.
18 BY MR. BURT:
19      Q.  Do you recall receiving invoices for Sentinel and
20 looking at them?
21      **A.  I would receive invoices like registered office
22 fees or, in this case, Director Service Agreements, DSAs.**
23      Q.  Uh-huh.
24           So you would receive those and look at
25 those?

203

1       **A.  Yes.**
2       Q.  And the directors were paid for their service --
3  services as Sentinel directors?
4       **A.  Yes.**
5       MS. SMITH:  Objection to form.
6  BY MR. BURT:
7       Q.  Was Mr. DiOrio paid for his services as a
8  Sentinel director?
9       MS. SMITH:  Objection to form.
10      THE WITNESS:  I don't know.
11 BY MR. BURT:
12      Q.  You -- you just testified that directors were
13 paid.  Would Mr. DiOrio have been an exception to that
14 when he was a Sentinel director?
15      **A.  I don't know.  I know the outside directors were
16 paid.**
17      Q.  So he was an inside director?
18      MS. SMITH:  Objection to form.
19      THE WITNESS:  No.  I know the -- I know that
20 Jan and -- well, I don't know if it's Jan and Damien.
21 There were directors based in Cayman who were paid.
22 BY MR. BURT:
23      Q.  And you saw some of those invoices?
24      **A.  I believe so, yes.**
25      Q.  Did you ever see an invoice to pay Mr. DiOrio

204

1  from Sentinel?
2       **A.  Not that I recall, no.**
3       Q.  So DSAs, some overhead expenses for Sentinel,
4  things like that, you would see those invoices?
5       **A.  Generally, yes.**
6       Q.  How about payments on policies, would you see
7  those?
8       MS. SMITH:  Objection to form.
9       THE WITNESS:  No.
10 BY MR. BURT:
11      Q.  So if Sentinel was paying out on a policy, you
12 wouldn't have seen that?
13      **A.  No.**
14      Q.  Did you have any knowledge of Sentinel ever
15 paying on one of the D&O policies that it had issued?
16      MS. SMITH:  Objection to form.
17      THE WITNESS:  Not that I recall.
18 BY MR. BURT:
19      Q.  Meaning you don't recall Sentinel ever having
20 paid on a D&O policy?
21      MS. SMITH:  Objection to form.
22      THE WITNESS:  Not that I recall, no.
23 BY MR. BURT:
24      Q.  On the ATE policy that you have testified about
25 today that you know did exist, do you recall Sentinel ever

205

1  paying on that?
2      A.  I don't know.
3      Q.  Okay.  Let's go back in this e-mail chain, and
4  if -- if we look at the first e-mail in the chain, it's --
5  which was on page 4, the Bates at the bottom has 7047.
6  And it's from you, katieirving@sasmanagement.com to
7  Lesley Thompson and Andrew Dean.
8          Who were they?
9      A.  I believe they were directors for Sentinel
10 Reinsurance, Ltd., at MaplesFS.
11     Q.  And you cc on this e-mail Dilip Massand.  Who was
12 he?
13     A.  Dilip Massand --
14     Q.  Yep.
15     A.  -- he -- he was a consultant, essentially, for
16 some SAS matters in the Middle East.
17     Q.  Why would you have cc'd him on a Sentinel DSA
18 e-mail?
19     A.  Presumably because he was going to be added as a
20 new director.
21     Q.  Okay.  Then you also add Matt DiOrio and
22 J.P. Sevilla, correct?
23     A.  I see them here.
24     Q.  Pete Kranz, who is that?
25     A.  He worked with Beecher Carlson.

206

1      Q.  And then Tom Adamczak, we know, was at Beecher,
2  right?
3      A.  (Witness nods head affirmatively.)
4      Q.  And Jonathan Arbeit, I believe, was at Beecher as
5  well?
6      A.  Correct.
7      Q.  And so you state:  Directors please see the
8  attached DSAs for new Sentinel directors and, subject to
9  review and approval, please provide countersigned copies.
10         Do you see that?
11     A.  I see that.
12     Q.  Do you recall participating in this process in
13 October of 2018 of bringing on new directors and old
14 directors stepping off Sentinel?
15         MS. SMITH:  Objection to form.
16         THE WITNESS:  Vaguely.
17 BY MR. BURT:
18     Q.  What do you recall about that?
19     A.  Just that it happened.  I recall the need for new
20 directors who had direct insurance knowledge.
21     Q.  So prior to that time, did -- when --
22 Mrs. Thompson and Mr. Dean, when they were serving as
23 directors, did they not have direct insurance knowledge?
24         MS. SMITH:  Objection to form.
25         THE WITNESS:  I'm sure they did have direct

207

1  insurance knowledge.
2  BY MR. BURT:
3      Q.  So why, then, did you just testify that there was
4  a need to bring on directors with direct insurance
5  knowledge?
6      A.  Because two directors were leaving who had direct
7  insurance knowledge, and there was a need for new
8  directors to have insurance knowledge.
9      Q.  Why were -- why were Lesley Thompson and
10 Andrew Dean leaving?
11         MS. SMITH:  Objection to form.
12         THE WITNESS:  I don't know.
13 BY MR. BURT:
14     Q.  Okay.  Mrs. Thompson responds to you:  Thanks for
15 sending these through.
16         She talks about board resolutions to approve
17 the appointment of Damien and Jan -- is it "Jan" or "Jan"?
18     A.  "Jan."
19     Q.  -- Jan and to accept the resignation of Andrew
20 and myself and to authorize or ratify the signing of the
21 DSAs.  Given that Andrew and I will be stepping down, the
22 DSAs may be best signed by either Matt or Dilip or the
23 shareholder if deemed more appropriate.
24         Do you see that?
25     A.  I do.

208

1      Q.  Who was she referring to when she says "or the
2  shareholder"?
3          MS. SMITH:  Objection to form.
4          THE WITNESS:  I don't know.
5  BY MR. BURT:
6      Q.  Were you aware that sha- -- a shareholder could
7  sign these types of board resolutions?
8          MS. SMITH:  Objection to form.
9          THE WITNESS:  Only insofar as she's telling
10 me this, and she is a director.  I don't know.
11 BY MR. BURT:
12     Q.  Did you ever have a shareholder of Sentinel sign
13 anything for Sentinel, a board resolution?
14         MS. SMITH:  Objection to form.
15         THE WITNESS:  Not that I recall.
16 BY MR. BURT:
17     Q.  All right.  She then says:  We should also take
18 the opportunity to update the authorized signatories for
19 both the CIBC and the Maples's client money account to
20 remove Andrew and myself and replace with others, as
21 appropriate.
22         What is the CIBC account she is referring
23 to?
24     A.  CIBC is a bank in Cayman.  So, presumably, it's a
25 bank account.

209

1    Q.  And do you know what that bank account was for
2  Sentinel?  Was it one of Sentinel's accounts?
3         MS. SMITH:  Objection to form.
4         THE WITNESS:  I don't know.
5  BY MR. BURT:
6    Q.  You don't recall if Sentinel had a CIBC account?
7         MS. SMITH:  Objection to form.
8         THE WITNESS:  I didn't think that was your
9  prior question.  From this document, it looks as though
10  there was a CIBC account.
11  BY MR. BURT:
12    Q.  And putting the document aside, what is your
13  recollection about the -- about Sentinel's banking with
14  CIBC?
15    A.  I believe there was an account at one time, and I
16  -- I don't know.  It's not something I managed.
17    Q.  Moving to page 3, moving up in the e-mail chain,
18  Mrs. Thompson e-mails with you and Andrew Dean on Tuesday,
19  October 16th.  She talks about following up on this.  What
20  is the anticipated date for meeting to record the change
21  in directors and signatories?  And she goes on.
22         Moving up from that, she then says, on
23  October 19th, three days later:  Dear All, we
24  haven't heard -- as we haven't heard any objections to the
25  below-proposed date, please note that Andrew and I will be

210

1  circulating our resignation letters, effective today,
2  later this afternoon.
3         Do you recall that?
4    A.  No.
5    Q.  And you respond then, on Friday, October 19th,
6  the same day, to Lesley Thompson and say:  Lesley, please
7  hold until Tuesday while we gather signatures, and please
8  instruct drafting the resolutions to approve the change.
9  We need a smooth transition on this, please.
10         Do you recall that e-mail?
11    A.  No.
12    Q.  Do you know why you said you needed a smooth
13  transition?
14         MS. SMITH:  Objection to form.
15         THE WITNESS:  Because sometimes things can
16  move very slowly, and we needed to make sure that there
17  was no lapse in directorship.
18  BY MR. BURT:
19    Q.  Was CIMA doing its investigation at this time
20  with Sentinel?
21         MS. SMITH:  Objection, form.
22         THE WITNESS:  I don't know.  I don't know.
23  BY MR. BURT:
24    Q.  You don't recall?
25    A.  I don't know.

211

1    Q.  Sitting here today, do you know whether the
2  change in directors had anything to do with the CIMA
3  investigation?
4         MS. SMITH:  Objection to form.
5         THE WITNESS:  It wasn't an investigation; it
6  was an inspection, a routine inspection.
7  BY MR. BURT:
8    Q.  Call it what you want.
9         Routine inspection, did this have anything
10  to do with the CIMA routine inspection?
11    A.  I don't --
12         MS. SMITH:  Objection to form.
13         THE WITNESS:  I don't know.  I don't know.
14  BY MR. BURT:
15    Q.  Did you gather the signatures on these board
16  resolutions?
17    A.  I don't know.
18    Q.  You don't recall doing that?
19    A.  I don't recall.
20    Q.  Was it common for you to -- to e-mail with board
21  members of Sentinel?
22         MS. SMITH:  Objection to form.
23         THE WITNESS:  It wasn't uncommon.
24  BY MR. BURT:
25    Q.  Okay.  And what would you typically e-mail about?

212

1    A.  Generally, it would be the mundane general
2  business OPEX, registered office fees or directorship fees
3  or something like that.
4    Q.  So to get their approval for those types of
5  things?
6    A.  Not --
7         MS. SMITH:  Objection to form.
8         THE WITNESS:  Not necessarily their
9  approval.  That's something Beecher would generally
10  obtain.
11  BY MR. BURT:
12    Q.  Uh-huh.
13    A.  But looping them in or something like that.
14    Q.  Okay.  Now, in this time period of -- of October
15  of 2018, the -- late part of October 2018, do you
16  recall ever attending a board meeting of Sentinel?
17    A.  I don't recall.
18    Q.  Moving up in the chain, Mrs. Thompson says:  Hi,
19  Katie, the 23rd is acceptable.  And then you respond:
20  Good morning, Lesley, confirming you've instructed
21  resolutions per below.
22         And then, at the very top of this page, and
23  -- and if you look at the -- page 1, you'll see it's an
24  e-mail from you on Monday, October 22nd, to
25  Lesley Thompson.  You state:  Matt and Dilip should not

213

1  have signing authority for bank accounts, only documents.
2      You see that?
3  **A. I see it.**
4      Q. Why did Matt and Dilip not have signing authority
5  for bank accounts?
6      MS. SMITH: Objection to form.
7      THE WITNESS: I don't remember.
8  BY MR. BURT:
9      Q. Well, this is e- -- this is an e-mail from you,
10 and you're giving that instruction.
11     You don't have any recollection of why it
12 was that Mr. DiOrio and Dilip should not have signing
13 authority for bank accounts?
14     MS. SMITH: Objection to form.
15     THE WITNESS: I don't remember. I can
16 speculate, but I don't remember.
17 BY MR. BURT:
18     Q. What's your general understanding of why they
19 couldn't have signing authority on a bank account for
20 Sentinel?
21     MS. SMITH: Objection to form.
22     THE WITNESS: Likely tax-related or
23 U.S.-person-related.
24 BY MR. BURT:
25     Q. What do you mean by "U.S.-person-related"?

214

1  **A. That it was more streamlined to have Cayman**
2  **signatories on the Cayman banking accounts.**
3      Q. Because Matt was in Texas here, right?
4  **A. Yes.**
5      Q. Where was Dilip?
6  **A. UAE.**
7      Q. In the UAE.
8      What did you mean by they should not
9  have signing -- when you said "only documents," what did
10 you mean by that? Did they have signing authority for
11 documents, like they could sign resolutions, things like
12 that?
13 **A. By "only documents," I really meant any nonbank**
14 **account authority that a director would have for signatory**
15 **authority.**
16     Q. Okay. So other than signing on bank accounts,
17 they had authority to sign whatever else was necessary for
18 Sentinel as a director?
19     MS. SMITH: Objection to form.
20     THE WITNESS: I don't know.
21 BY MR. BURT:
22     Q. Well, you wrote this.
23 **A. I did.**
24     Q. So I'm trying to get -- I'm trying to understand
25 what -- what it is that you meant by this.

215

1  **A. I meant sign -- they can sign documents and not**
2  **have authority over the bank accounts.**
3      Q. And by "documents," you meant other documents
4  that a Sentinel board member would be authorized to sign?
5  **A. Yes.**
6      Q. Tom then responds to you, and he -- he responds
7  just to you and cc's Mr. DiOrio and states: Katie, is it
8  your intention to require two directors to sign to release
9  payments? That might prove to be problematic if one is
10 out. Just my thoughts, Tom.
11     You then respond on the same day: No, one
12 director should be fine. We do need a clear process
13 between this team, Beecher, and CIBC for banking payments
14 from Sentinel.
15     Do you see that?
16 **A. I do.**
17     Q. Why is it that Beecher Carlson, "Tom," was asking
18 you about what your intentions for releasing payments at
19 Sentinel was?
20     MS. SMITH: Objection to form.
21     THE WITNESS: It's really just a checks and
22 balances, you know: Would this feel sufficient from a
23 treasury management perspective?
24 BY MR. BURT:
25     Q. And, here, you're instructing Beecher, the

216

1  administrator, on how many directors should sign on behalf
2  of Sentinel, right?
3      MS. SMITH: Objection to form.
4      THE WITNESS: I'm conveying one director
5  seems fine to me; I'm not instructing them.
6  BY MR. BURT:
7      Q. Did they have -- did Beecher ignore your advice
8  and say: Nah, we think two is required? Could they have
9  done that?
10 **A. Yes.**
11     Q. So you had no authority over Beecher?
12 **A. No.**
13     Q. Okay. How about Mr. DiOrio, did he have
14 authority over Beecher?
15     MS. SMITH: Objection to form.
16     THE WITNESS: I don't think so.
17 BY MR. BURT:
18     Q. Could you-all at HCMLP ultimately tell Beecher
19 what to do, and they would have to follow, or were they
20 instructing you what to do as -- as it pertained to
21 Sentinel?
22     MS. SMITH: Objection to form.
23     THE WITNESS: Beecher generally instructed
24 us what to do.
25 BY MR. BURT:

217

1    Q.  You said "generally."  Was that the rule:  We
2  accept the direction of Beecher, and we do what they say?
3        MS. SMITH:  Objection to form.
4        THE WITNESS:  As far as I recall.
5  BY MR. BURT:
6    Q.  So if that's the case, why is he asking you about
7  how many directors should be required to pay?
8        MS. SMITH:  Objection to form.
9        THE WITNESS:  I don't know why he's asking
10 me that.
11 BY MR. BURT:
12   Q.  Well, you don't tell him that.  You don't say:
13 Why are you asking me?  You're the administrator.
14       You direct him:  No, one is fine.  Don't
15 you?
16   A.  That's what the paper says, yes.
17   Q.  And then you instruct him further:  We do need a
18 clear process between this team, Beecher, and CIBC for
19 banking payments from Sentinel.
20       What did you mean by "this team"?
21       MS. SMITH:  Objection to form.
22       THE WITNESS:  Probably the team on the
23 e-mail.
24 BY MR. BURT:
25   Q.  Which was who?

218

1    A.  It appears here on the paper, me, Tom, and Matt.
2    Q.  Well, Tom was Beecher.
3    A.  Right.
4    Q.  So who is "this team"?
5    A.  Probably me and Matt.
6    Q.  Just you and Matt?
7        MS. SMITH:  Objection to form.
8        THE WITNESS:  I don't know.
9  BY MR. BURT:
10   Q.  Well, you wrote it, so I want to understand what
11 you meant by it.
12   A.  I don't know.
13   Q.  And, frankly, I have a hard time believing you
14 don't know.
15   A.  I don't know.  Matt and I are the only ones on
16 the e-mail.
17   Q.  So were you and Matt the Sentinel team at HCMLP?
18       MS. SMITH:  Objection to form.
19       THE WITNESS:  HCMLP didn't have a "Sentinel
20 team."
21 BY MR. BURT:
22   Q.  Well, then, why were you working on it?
23       MS. SMITH:  Objection to form.
24       THE WITNESS:  Because I was -- I was
25 instructed, or asked, to work on it.

219

1  BY MR. BURT:
2    Q.  And by whom?
3    A.  Probably my boss, Scott Ellington.
4    Q.  Okay.  He asked you to work on Sentinel, didn't
5  he?
6    A.  I think so.
7    Q.  And never, at any time, were you a Sentinel
8  employee, were you?
9    A.  I was not a Sentinel employee.
10   Q.  You were a HCMLP employee, weren't you?
11   A.  Yes, I was.
12   Q.  And you've been very clear about this in this
13 deposition, that you were only ever employed by HCMLP
14 until 2021, right?
15   A.  Yes.
16   Q.  And, yet, here you are as an HCMLP employee
17 directing Beecher what it should do as it pertains to the
18 Sentinel bank accounts, weren't you?
19       MS. SMITH:  Objection.  You're badgering
20 her.
21       MR. BURT:  This is not badgering.
22       THE WITNESS:  You're pointing at me a lot.
23       MR. BURT:  I'm holding my glasses.
24       THE WITNESS:  And pointing them at me a lot.
25       Beecher asked my comfort level here.

220

1  Beecher easily could have said:  We need two directors.
2  BY MR. BURT:
3    Q.  And that wasn't my question.
4    A.  Would you repeat your question, please?
5    Q.  Sure.  Let's go back.
6        Yet, here you are as an HCMLP employee
7  directing Beecher what it should do as it pertains to the
8  Sentinel bank accounts, weren't you?
9    A.  No.
10   Q.  Are you denying that that's what you were doing
11 here?
12       MS. SMITH:  Objection to form.
13       THE WITNESS:  I don't understand what you're
14 asking me here.
15 BY MR. BURT:
16   Q.  You don't?
17   A.  I just said I don't understand what you're asking
18 me.
19   Q.  Okay.  You don't understand that I'm asking you
20 why it is that you, as an HCMLP employee, can tell Beecher
21 what it should do as it respects the Sentinel bank
22 accounts?
23       MS. SMITH:  Objection to form.
24       THE WITNESS:  I don't know.
25 BY MR. BURT:

221

1      Q. Why did there have to be a clear process between
2 you and Mr. DiOrio, Beecher, and CIBC for banking payments
3 from Sentinel?
4      **A. Because Beecher, the administrator for Sentinel,**
5 **Beecher does all the accounting for Sentinel. CIBC was**
6 **the bank. So say, for example, I have a director fee or a**
7 **registered office fee that comes to my desk, I need to**
8 **know: Who do I send that to? Does it go direct to the**
9 **directors? Does it go through Beecher? How is Beecher**
10 **going to account for it? How is this going to be a**
11 **seamless process to make sure that everything is**
12 **completed.**
13     Q. Well, here is my question: Why is that coming to
14 you at all? You just said Beecher does all the
15 accounting.
16         MS. SMITH: Objection to form.
17 BY MR. BURT:
18     Q. Why does it come to you?
19     **A. It -- it could potentially come to me in a batch**
20 **of other invoices, or something. So say I get a large**
21 **batch with multiple entities, then the Sentinel ones would**
22 **be going to Beecher for their review.**
23     Q. So let's break that apart.
24         A batch of what, invoices?
25     **A. Yeah, like registered office.**

222

1      Q. So you get a batch and -- for -- for a bunch of
2 different entities, a bunch of invoices?
3      **A. I could, yes.**
4      Q. And those all come to you?
5      **A. They could, yes.**
6      Q. An HCMLP employee, right?
7      **A. Yes. We have established that I'm -- I was only**
8 **ever employed by HCMLP --**
9      Q. Right.
10     **A. -- up until my termination, yes.**
11     Q. And -- and then -- so but all of these various
12 entities and their invoices are coming to you at HCMLP,
13 right --
14         MS. SMITH: Objection, form.
15 BY MR. BURT:
16     Q. -- in a batch, to use your words?
17     **A. The Sentinel and SAS structure charts, which**
18 **you've shown me, entities on those charts could have bills**
19 **that would come to me in a batch, not HCMLP-related**
20 **invoices --**
21     Q. Okay.
22     **A. -- totally separate and apart from HCMLP.**
23         **Cayman entity -- Cayman-related invoices**
24 **would come to me. If it was Sentinel-related, I needed to**
25 **make sure the administrator was aware, there was a proper**

223

1 **notification process to the directors that payments were**
2 **made on time. That's what I mean by -- by the clear**
3 **process.**
4      Q. I see.
5         Was it just entities in the SAS structure
6 and the Sentinel structure for which you would receive
7 invoices?
8      **A. Yes.**
9      Q. No others?
10     **A. Not that I recall.**
11     Q. Okay. How about in relation to HCMLP entities,
12 did you receive invoices for them?
13         MS. SMITH: Objection, form.
14         THE WITNESS: Not that I recall.
15 BY MR. BURT:
16     Q. Okay. All right. That's helpful.
17         Okay. You can set that aside for a moment.
18         I believe -- correct me if I'm wrong -- I
19 just want to double-check something -- you're not aware of
20 there having been a -- a Shared Services Agreement between
21 HCMLP and Sentinel, right?
22         MS. SMITH: Objection to form.
23         THE WITNESS: I don't know.
24 BY MR. BURT:
25     Q. But you don't know if there was one?

224

1      **A. I don't know.**
2      Q. You never saw one?
3      **A. I don't know, no.**
4      Q. Listen to my question.
5         You never saw one?
6      **A. I don't know. I don't recall.**
7      Q. You don't recall ever seeing one?
8      **A. (Witness shakes head negatively.)**
9      Q. Okay. How about any other agreement between
10 HCMLP and Sentinel?
11     **A. I don't recall.**
12     Q. What percentage of your time would you say was
13 spent on Sentinel-related tasks?
14     **A. During which time period?**
15     Q. Well, I think you said that, from the time you
16 started until the time you left, you were working on
17 Sentinel ad hoc?
18     **A. Uh-huh.**
19     Q. So I'm just wondering: How much of your time,
20 during that entire time period, would you say you spent on
21 Sentinel?
22     **A. A very small amount.**
23     Q. Okay. And what do you mean by that?
24     **A. That I would work on Sentinel matters ad hoc, as**
25 **needed, but I -- I didn't spend a lot of time related to**

225

Sentinel.

Q. In addition to the CIBC account, do you know whether Sentinel had any other accounts?

MS. SMITH: Objection to form.

THE WITNESS: From the documentation that you showed me today, it appears there was a Maples's account of some type.

BY MR. BURT:

Q. Do you know what that was?

A. I don't recall.

Q. What was Maples?

A. Maples is a law firm in Cayman. MaplesFS is Maples Fiduciary Services, which is a fiduciary arm, essentially, in Cayman.

Q. Okay.

MR. BURT: I think we're on 106.

THE STENOGRAPHIC REPORTER: (Nods head.)

(Exhibit 106 was marked for identification.)

THE WITNESS: Thanks.

(Witness reviews document.)

BY MR. BURT:

Q. Mrs. Irving, when you're ready, my question for you is whether you recognize this document?

A. I -- I don't.

Q. All right. Looking at the bottom, on page 1 of

226

Exhibit 106, do you see there's an e-mail from you on Friday, August 11th, 2017, to carterchism@ highlandcapital.com, cc'ing Mr. Sevilla.

Who is Carter Chism?

A. He worked in the settlements group.

Q. And here you write: Sentinel wiring instructions for cash arising from transaction are below. Thank you.

Beneficiary Bank: Bank of New York Mellon at an address in New York, and it has the ABA number, SWIFT number. And on the back, it says, "Account Name: MaplesFS, Ltd.," with an account number. Reference: Sentinel Reinsurance, Ltd.

Do you see that?

A. Yes.

Q. What was -- what were the wiring instructions here that you were providing?

A. Sentinel Reinsurance, Ltd.'s wiring instructions.

Q. For its account at Bank of New York Mellon?

A. No; for its account at MaplesFS, Ltd. Bank of New York Mellon is a correspondent bank.

Q. Well, it says the account name is MaplesFS, Ltd., right?

A. Right.

Q. And that account was held at Bank of New York Mellon, which I'll refer to as "BONY." Is that fair?

227

A. Yes.

Q. All right. Did Sentinel ever have a BONY account?

MS. SMITH: Objection, form.

THE WITNESS: I don't know.

BY MR. BURT:

Q. So do you recall -- the transaction that you're referring to, do you recall what transaction that was?

A. Likely it was related to the ATE policy.

Q. All right. And so you're providing wiring instructions for cash arising from that transaction.

Do you recall the cash that was wired as part of the ATE policy?

A. No.

Q. But you don't disagree that cash was wired to Sentinel as part of that policy, do you?

MS. SMITH: Objection, form.

THE WITNESS: It appears so from this e-mail, the document you handed me.

BY MR. BURT:

Q. To an account name of MaplesFS, Ltd., located at BONY, right?

A. Yes.

Q. If it related to the ATE policy, that money was coming to Sentinel, wasn't it?

228

A. Yes.

Q. Because Sentinel was the insurer, providing the ATE --

MS. SMITH: Objection.

THE WITNESS: The insurer, yes.

BY MR. BURT:

Q. Right. That's what I said.

A. This is Sentinel's bank account. If the question is whether this is MaplesFS, Ltd., bank account, no. That's how this is structured. BONY is a correspondent bank, which holds an account for MaplesFS, Ltd., who is a fiduciary.

The fiduciary then holds the account for Sentinel Reinsurance, Ltd. So that's why you see this last line "Reference: FC" -- "FFC," for further credit, to Sentinel Reinsurance, Ltd., and then the client account number.

Q. Got it.

And then Mr. Chism, in the e-mail back to you on the same day, he says: Please confirm this serves as instructions to wire cash from all HFP funds and all CDO funds to the account listed in the instruction below.

Do you see that?

A. I see that. Yes, on this paper, yes, I see that.

Q. Is that consistent with your recollection that

---

229

1 all cash from HFP funds and all cash from CDO funds was
2 wired to Sentinel as part of the ATE transaction in August
3 of 2017?
4       MS. SMITH: Objection to form.
5       THE WITNESS: I don't know. I just provided
6 the wiring instructions. I don't know that.
7 BY MR. BURT:
8    Q. Well, he's asking you if -- he's asking you to
9 confirm if this serves as the instruction to wire cash
10 from all of these HFP funds and all of the CDO funds?
11       MS. SMITH: Objection to form.
12       THE WITNESS: Looks like there are a lot of
13 people on this e-mail chain. I didn't respond. I didn't
14 have authority to -- say that.
15 BY MR. BURT:
16    Q. Mr. Willmore, David Willmore, in the above
17 e-mail, who it lists as CPA Senior Manager Fund Analysis,
18 who is he?
19    A. He is a fund -- I think he is an accountant, a
20 fund accountant.
21    Q. Where does he work?
22    A. HCMLP.
23    Q. Okay. He says, on the same day: FYI, I've
24 entered wires to move all of CDO funds cash to Sentinel.
25 There were two wires: one for 7-million-some-odd money,

---

230

1 and one for 2-million-some-odd, right?
2    A. I see that here.
3    Q. And then, at the top, you e-mail -- you remove
4 everybody else from the chain and just e-mail J.P. Sevilla
5 and say: I called Willmore, and he advised the other cash
6 wires are in process, FYI.
7       What other wires, cash wires, were you
8 referring to?
9    A. I don't know.
10    Q. Why would you have called Will- -- Mr. Willmore
11 to ask that question?
12    A. I don't know.
13    Q. Do you recall asking him that question?
14    A. No.
15    Q. Do you recall being involved in -- in providing
16 these wiring details as part of this transaction in August
17 of 2017?
18       MS. SMITH: Objection, form.
19       THE WITNESS: I can see here that I provided
20 the wire details. I didn't recall providing them prior to
21 you showing me this document.
22 BY MR. BURT:
23    Q. Did someone ask you to provide the wire details?
24       MS. SMITH: Objection to form.
25       THE WITNESS: I don't remember.

---

231

1 BY MR. BURT:
2    Q. Would you have just done that on your own
3 initiative?
4    A. I don't remember.
5       MR. BURT: Give me one moment, please.
6       Okay. My apologies.
7 BY MR. BURT:
8    Q. You said -- I believe you said that you didn't
9 have any authority to confirm the wiring of all cash from
10 the HFP funds and all cash from the CDO funds, right; you
11 didn't have that authority?
12    A. Correct.
13    Q. Who did have that authority?
14    A. I don't know. That's above my pay grade. I
15 would note that there are other very, very senior people
16 here on this e-mail: Thomas Surgent, Cliff Stoops, Frank
17 Waterhouse. I -- I don't know.
18    Q. Would they have had that authority?
19    A. I don't know.
20    Q. Would Mr. Ellington have had that authority?
21    A. I don't know.
22    Q. Okay. As part of the transaction in August, do
23 you recall whether there were assets, other than cash,
24 that were transferred?
25    A. I believe there were assets other than cash, yes.

---

232

1    Q. What were those assets?
2    A. It was a -- it was an amalgamation of things from
3 what I recall.
4    Q. When did you first learn of this transfer?
5       MS. SMITH: Objection to form.
6       THE WITNESS: I don't know.
7 BY MR. BURT:
8    Q. Was it before August 11th, 2017?
9       MS. SMITH: Objection to form.
10       THE WITNESS: I don't know.
11 BY MR. BURT:
12    Q. I mean, did you learn of the transaction on the
13 day of that you were providing the wiring instructions?
14    A. I don't remember.
15    Q. Can you give me your best estimate of when you
16 first learned -- thinking back, when you first learned of
17 the transaction in the ATE policy at issue?
18       MS. SMITH: Objection to form.
19       THE WITNESS: My best guess would be I
20 learned sometime around the time of the transfer. I was
21 not involved in any meetings related before that, that I
22 can remember.
23 BY MR. BURT:
24    Q. So you didn't have anything to do -- and I think
25 you've testified, you didn't do any diligence on this ATE

---

233

1  policy, right?
2  **A. Correct.**
3  Q. Were there any other considered ATE policies for
4  which you did not do diligence?
5  MS. SMITH: Objection to form.
6  THE WITNESS: I don't know.
7  BY MR. BURT:
8  Q. Because you've talked about, I think you said
9  before, you recall around five or so for which you did do
10  diligence potential ATE policies, right?
11  **A. Yes, I do recall that.**
12  Q. Do you know whether there were any other -- so
13  I'm trying to be as precise as I can here.
14  So you testified about that, there were five
15  or so that you did do diligence on; you did not do
16  diligence on this one.
17  Were there any other considered ATEs for
18  which you did not do diligence?
19  MS. SMITH: Objection to form.
20  THE WITNESS: Possibly, but I can't recall.
21  BY MR. BURT:
22  Q. All right. What -- what would possibly have been
23  one?
24  **A. A litigation funding matter with a ATE coupled on**
25  **it that I wasn't as involved with.**

234

1  Q. Do you recall what that was?
2  **A. No.**
3  Q. Okay. So you're just speculating that there
4  might have been something like that?
5  **A. Yeah, it's possible. Yeah, I don't know.**
6  Q. Okay. Let's go back to the CIMA letter. I
7  believe it's Exhibit 101.
8  **A. I got it.**
9  Q. Is that 101?
10  **A. Uh-huh.**
11  Q. All right. And I want to go to page 17 of that
12  letter. And at the very bottom of 17, there's "Business
13  Plan" in 5.3, and then, 5.3.1, an "Insurance Program"
14  heading.
15  Do you see that?
16  **A. Yes.**
17  Q. 5.3.1.1 states: As per the updated business plan
18  provided to the Authority for the purpose of the on-site
19  inspection, the Licensee was approved to write directors &
20  officers liability ("D&O"); Industry Loss Warranty
21  Catastrophe Excessive Loss ("ILW"), and ATE coverages.
22  Currently, the Licensee issues D&O and ATE policies only.
23  The Authority noted the following violations of the
24  Licensee's business plan regarding the Licensee's
25  insurance programs...

235

1  So I'm going to stop there for a moment.
2  Do you know why no ILW policies were issued
3  by Sentinel?
4  **A. Yes.**
5  Q. Why is that?
6  **A. There was never a case there that made economic**
7  **sense for reinsurance.**
8  Q. Okay. So never made financial sense --
9  **A. Right.**
10  Q. -- for the company?
11  Did -- did Sentinel consider issuing those
12  policies to third parties, or were they always, in some
13  way, related parties?
14  **A. Third parties.**
15  Q. And those were never issued?
16  **A. Not to my knowledge.**
17  Q. Then, under A, it states: At the point of
18  approval of the current ATE cover, the Licensee
19  represented to the Authority that it initially expected to
20  write up to ten policies per year at an average premium of
21  $500,000 per policy. As per the Audited financial
22  statements for year ended December 31, 2017 ("the
23  financial statements"), the Licensee has only written one
24  ATE policy at a premium of U.S. 59 million.
25  And we'll stop there.

236

1  Did you know that Sentinel had only written,
2  at this time of this letter in 2019, only one ATE policy?
3  MS. SMITH: Objection to form.
4  THE WITNESS: I see it written here.
5  BY MR. BURT:
6  Q. Right.
7  My question is: Did you know that at the
8  time?
9  MS. SMITH: Objection to form.
10  THE WITNESS: I don't know.
11  BY MR. BURT:
12  Q. You don't know if you knew that?
13  **A. I don't know.**
14  Q. Did any -- you -- now, you testified you did
15  five -- there were about five instances of diligence on
16  other ATE policies that you did.
17  Isn't it fair to conclude that none of those
18  were actually issued?
19  MS. SMITH: Objection to form.
20  THE WITNESS: I'd say, yeah, it's fair to
21  conclude that.
22  BY MR. BURT:
23  Q. Then it states: Those charged with governance
24  could not explain how a product line that was initially
25  intended to generate circa U.S. 5 million per year from

237

1 ten policies ended up generating U.S. 59 million from only
2 one policy.
3 Did you know that the issuance of that
4 policy was so incon- -- was inconsistent with the business
5 plan?
6 MS. SMITH: Objection to form.
7 THE WITNESS: No.
8 BY MR. BURT:
9 Q. You didn't know that?
10 A. I don't think so.
11 Q. Had you ever seen the Sentinel business plan?
12 MS. SMITH: Objection to form.
13 THE WITNESS: I don't know.
14 BY MR. BURT:
15 Q. Did you know that it was the plan to issue up to
16 ten ATE policies per year?
17 MS. SMITH: Objection to form.
18 THE WITNESS: I don't know.
19 BY MR. BURT:
20 Q. You don't recall?
21 A. I don't recall.
22 Q. Do you know who would know that?
23 A. Who would know what?
24 Q. Who would know that Sentinel had initially
25 expected to write up to ten policies per year at an

238

1 average premium of 500,000 per policy?
2 A. Beecher Carlson would be the one that would
3 manage the business plan.
4 Q. They managed the business --
5 A. Uh-huh.
6 Q. So was it Beecher Carlson who said: Sentinel is
7 going to issue up to ten policies per year at a premium of
8 500,000 per policy? That was a Beecher Carlson decision;
9 is that right?
10 MS. SMITH: Objection to form.
11 THE WITNESS: No, I didn't say it was a
12 Beecher Carlson dec- -- decision; I said they would have
13 known because they managed the business plan. I don't
14 know who would know that -- what you're asking.
15 BY MR. BURT:
16 Q. How about who -- who made the decision at
17 Sentinel that this is what we want to do with ATE policy?
18 Who -- do you know who that would be?
19 A. I don't know.
20 Q. Then it states, at the very end of this page: As
21 per the financial -- turn over -- statements, the ATE
22 cover accounts for U.S. 59 million of the U.S. 60 million
23 written.
24 So what this is saying -- I believe, and
25 correct me if I'm wrong -- that the 59 million received

239

1 from this one ATE policy, according to the financial
2 statement, constituted $59 million of the $69 million in
3 policies that had been written on behalf of Sentinel.
4 Did you know that?
5 A. I see it here on this document. And you said "69
6 million."
7 Q. Excuse me. 59 million.
8 A. It's 59 million of the 60 million written is what
9 this document says.
10 Q. Right.
11 So from inception of Sentinel to the time of
12 this document in 2019, Sentinel had issued about
13 $60 million worth of policies, and 59 million of that was
14 from that one ATE policy; isn't that right?
15 MS. SMITH: Objection to form.
16 THE WITNESS: That's what this document is
17 saying.
18 BY MR. BURT:
19 Q. Do you have any reason to dispute that?
20 MS. SMITH: Objection to form.
21 THE WITNESS: No.
22 BY MR. BURT:
23 Q. And then it states: Being 98 percent of business
24 transacted that year. This gives the impression that
25 deliberately misleading information in terms of the number

240

1 and magnitude of expected transactions relating to the ATE
2 coverage was provided to the Authority at the time of
3 approval, only for the single transaction in that line of
4 business to be ballooned 118 times after approval.
5 Were you aware of that, that CIMA had found
6 that problem at Sentinel?
7 MS. SMITH: Objection to form.
8 THE WITNESS: I recall reading the
9 inspection report when it came out; I don't recall,
10 specifically, that point.
11 BY MR. BURT:
12 Q. Do you recall discussing that point with anybody?
13 A. No.
14 Q. Do you know whether that was a concern at
15 Sentinel?
16 MS. SMITH: Objection to form.
17 THE WITNESS: I don't know.
18 BY MR. BURT:
19 Q. Okay. Did it cause you any concern as a CPA --
20 and as we've seen -- as we've looked at financial
21 documents, you have a keen attention to detail.
22 Did it cause you any concern as a CPA that
23 Sentinel was running its business in this way?
24 A. No.
25 Q. No concern whatsoever?

241

1    A. I wouldn't be concerned about Sentinel's business
2 with -- with Beecher managing the business plan and
3 communicating with CIMA.
4    Q. So because of Beecher, you didn't have concerns?
5         MS. SMITH: Objection to form.
6         THE WITNESS: I didn't have concerns.
7 BY MR. BURT:
8    Q. None?
9    A. I said I didn't have concerns.
10    Q. Well, I just want -- I want the record to be
11 perfectly clear that, of the 60 million policies issued,
12 59 million of that came from a single transaction, that
13 one ATE, and that there was no other ATE policy ever
14 written, and that caused you no concerns?
15         MS. SMITH: Objection to form.
16         THE WITNESS: No. No.
17 BY MR. BURT:
18    Q. Okay. Great.
19         MR. BURT: Can we take a break? I
20 apologize. I think we've been going about an hour.
21         MS. SMITH: Been going, like, an hour and
22 20.
23         MR. BURT: Oh, so, yeah, we definitely need
24 a break.
25         THE VIDEOGRAPHER: Off the record at 3:20

242

1 p.m.
2         (Brief recess taken.)
3         THE VIDEOGRAPHER: Back on record at 3:44
4 p.m.
5         THE WITNESS: We were on break.
6         (Exhibit 107 was marked for identification.)
7 BY MR. BURT:
8    Q. Mrs. Irving, during the break, I had marked as an
9 exhibit, Exhibit 107, and I've handed that to you. Go
10 ahead and -- actually, just -- I'll, again, direct you to
11 specific pages. It's a long exhibit.
12         So just go ahead and look at the first
13 letter, actually, pages 1 and 2.
14    A. (Witness reviews document.) Okay.
15    Q. All right. Now, this is a letter of Beecher
16 Carlson to CIMA that goes back a few years, November 17th,
17 2015; is that right?
18    A. I see that on the paper, yes.
19    Q. Okay. And before seeing it here today, have you
20 ever seen this letter before?
21    A. Not that I recall.
22    Q. It's written by Mr. Peter Kranz at Beecher
23 Carlson.
24         Did you ever work with Mr. Kranz?
25    A. Yes, I believe I did.

243

1    Q. And what did you understand his role to be with
2 respect to Sentinel?
3    A. I think he is, like, the primary relationship
4 partner.
5    Q. From Beecher Carlson?
6    A. Yes.
7    Q. Got it.
8         And they're -- they're talking about, in May
9 of -- of 2017 -- or -- excuse me -- strike that.
10         They're talking about an inquiry from CIMA
11 in May of 2015, and he's responding in November of 2015,
12 about proposed changes to the ownership structure of
13 Sentinel.
14         Do you recall that in 2015?
15    A. I -- I don't recall.
16    Q. He says here under No. 1: Formal notification
17 regarding the reason behind the proposed changes to the
18 ownership structure of Sentinel. The ultimate beneficial
19 owners, UBOs, are unable to have day-to-day physical
20 presence in the Cayman Islands. UBOs feel that such
21 presence is crucial to Sentinel, and so they've made it a
22 priority for Sentinel to have a real tangible and physical
23 presence on the island. In that respect, Sentinel's
24 organizational structure was designed to maximize the UBO
25 strong relationships with highly respected business

244

1 partners on island in Grand Cayman.
2         Do you recall this, in 2015, developing
3 strong relationships with highly respected business
4 partners in Cayman?
5         MS. SMITH: Objection to form.
6         THE WITNESS: I don't recall specifically.
7 BY MR. BURT:
8    Q. Okay. How about generally, what do you recall
9 about this?
10    A. I don't know.
11    Q. Okay. I actually want to, while we're looking at
12 this, go back to exhibit -- our favorite exhibit -- we've
13 looked at it a lot -- the -- the structure of SAS and
14 Sentinel. I want to focus just for a moment on SAS --
15    A. Okay.
16    Q. -- in Exhibit 28.
17         And we've noted that there are -- at the top
18 of the -- of the structure there was USP1, 4 USPs, SAS
19 Holdings, S- -- SPV, Ltd., and USP2, right?
20    A. I see that here, uh-huh.
21    Q. And I believe I asked you if you knew who -- who
22 the 4 USPs were, and you said you did not?
23    A. No, I don't -- I don't remember.
24    Q. Okay. So let's look at this document a little
25 bit further.

245

1    On No. 3 -- and this is Exhibit 107; should
2  be more specific -- on Item 3 in the letter, it says:
3  Identity details of 4 USPs at the top of the ownership
4  structure.  Please see the attached -- please see attached
5  the Register of Directors and Officers for Rotunda V, or
6  Roman numeral V, Ltd., which reflects the names of the
7  four individuals each holding a 9.9 ownership interest and
8  the fifth individual holding a 14.3 percent ownership
9  interest.
10    Okay.  Do you see where I was reading there?
11  **A.  Yes.  Under No. 3?**
12  Q.  Yes.
13  **A.  Uh-huh.**
14  Q.  And so I want to turn now to -- it's the fourth
15  page in this exhibit with a register of members of
16  Rotunda.
17  **A.  Yes, I see it.**
18  Q.  And, here, you see there's column headings, "Name
19  of Member," "Address," "Date of Entry of Member," et
20  cetera, right?
21  **A.  Yes.**
22  Q.  And the first entity listed there is Maples
23  Corporate Services, Ltd., no -- no certificate issued; one
24  share acquired.  Is that right?
25  **A.  I see that here.**

246

1    Q.  Next -- it lists -- the next person or entity or
2  member listed is Scott Ellington, and the number of shares
3  acquired, it lists as 14.3 percent -- or -- excuse me --
4  14.3 shares; is that right?
5  **A.  I see that here.**
6  Q.  And as we refer back to the first page of this
7  document, under No. 3, you recall that Beecher Carlson is
8  providing information here about who the 4 USPs are; is
9  that right?
10  **A.  I -- I see it on the document.**
11  Q.  Right.
12    The next person listed is David Kramer with
13  9.9 shares acquired.  Do you see that?
14  **A.  I see it.**
15  Q.  Who is David Kramer?
16  **A.  I don't know.**
17  Q.  You've never heard that name before?
18  **A.  I may have heard the name, but I don't know who**
19  **he is.**
20  Q.  Do you recall anything at all about him?
21  **A.  No.**
22  Q.  Are you aware that he was one of the USPs listed
23  in the SAS structure?
24    MS. SMITH:  Objection, form.
25    THE WITNESS:  I don't know.

247

1  BY MR. BURT:
2    Q.  The next person listed is Matthew DiOrio; number
3  of shares acquired, 9.9.
4    Were you aware that he was one of the 4 USPs
5  listed in the SAS structure?
6  **A.  I don't remember.  I mean, this is a really long**
7  **time ago.  I don't remember.**
8  Q.  Did you ever have knowledge that Matt,
9  Mr. DiOrio, was a U.S. person in the ownership structure
10  of SAS?
11  **A.  I don't know.**
12  Q.  Next person listed is Brian Mitts.  Do you know
13  who that is?
14  **A.  Yes.**
15  Q.  Who is Mr. Mitts?
16  **A.  He works with NexPoint.**
17  Q.  What does he do with NexPoint?
18  **A.  I don't know.**
19  Q.  And can you remind me, please, of the
20  relationship between NexPoint and Sentinel or SAS.
21    MS. SMITH:  Objection to form.
22    THE WITNESS:  No relationship, to my
23  knowledge.
24  BY MR. BURT:
25  Q.  None at all?

248

1  **A.  I mean, no relationship to my knowledge.  I don't**
2  **know what you're asking, other than -- I don't know.**
3  Q.  Yeah.  Well, that's what I'm asking, if they are
4  at all affiliated or related in any way.
5  **A.  No.  Not to my knowledge, no.**
6  Q.  And then the last person issued -- or listed here
7  is Marcia Maslow with 9.9 shares acquired.
8    Do you know who that is?
9  **A.  Yes.**
10    MS. SMITH:  Objection to form.
11  BY MR. BURT:
12  Q.  Who is that?
13  **A.  That is Scott Ellington's sister.**
14  Q.  All right.  Were you aware that she was one of
15  the 4 USPs listed in the SAS structure?
16  **A.  I don't remember.**
17  Q.  So before sitting here today and seeing this
18  document, did you ever have any knowledge of any of these
19  individual that we just went through, that they were in
20  the SAS ownership structure, aside from Mr. Ellington, who
21  we've talked about before?
22  **A.  I just don't remember.  I mean, this is 2015.**
23  **I -- I -- I don't remember.  Actually, this says**
24  **January 2014.  There's been a lot -- a lot going on since**
25  **then.**

249

1    Q.  Fair enough.

2         The very last page of this -- of this

3  document -- so it has the Bates at the very bottom of --

4  that ends in 139, if you just go to the very last page.

5         This is a letter dated 13th of November,

6  2015, to CIMA from Christopher Wat- --- Watler and

7  Andrew Dean.

8         Do you see that --

9    **A.  Yes.**

10    Q.  -- who I'm referring to?

11        Who -- who are Christopher Wal- - Watler and

12  Andrew Dean?

13    **A.  They're independent directors with MaplesFS.**

14    Q.  Were they independent directors of Sentinel?

15        MS. SMITH:  Objection, form.

16        THE WITNESS:  I don't know.

17  BY MR. BURT:

18    Q.  I believe we saw -- didn't Mr. Dean resign the

19  same day as Mr. Lesley Thompson as a director of Sentinel?

20  Didn't we see that in a previous exhibit?

21    **A.  I believe you showed me a document, yes.**

22    Q.  Okay.  So Mr. Dean was a -- was, at one point at

23  least, a Sentinel director; is that fair?

24    **A.  Based on the documentation you showed me, yes.**

25    Q.  Do you have any independent recollection of that,

250

1  that he was a director?

2    **A.  Not -- no.**

3    Q.  But you do recall that these were both

4  independent directors of Maples?

5    **A.  That's what I recall.**

6    Q.  So let's look at this --

7    **A.  Sorry, MaplesFS.**

8    Q.  MaplesFS.

9        And -- and remind me what the FS stands for.

10    **A.  Fiduciary Services.**

11    Q.  All right.

12        And remind me what the relationship between

13  MaplesFS and Sentinel is, if any?

14    **A.  No relationship.  Maples is the law firm, though.**

15  **So when you say "Maples," it's -- it's counsel.  When you**

16  **say "MaplesFS," it's the fiduciary.**

17    Q.  Fiduciary to whom?  I just want to be clear on

18  that.

19    **A.  Whoever the client.**

20    Q.  Was Sentinel a client of Maples?

21    **A.  Insofar as these were the directors --**

22        MS. SMITH:  Objection to form.

23        THE WITNESS:  Insofar as they were

24  directors, yes.

25  BY MR. BURT:

251

1    Q.  So, here, the letter says:  Dear, sir, Sentinel

2  Reinsurance, Ltd., the Company, we have been asked to

3  certify that Scott Ellington and James Dondero are the

4  majority ultimate beneficial owners of the UBOs of the

5  Company.  In making this certification, we have reviewed

6  the current register of members of each of the subsidiary

7  companies listed in the attached structure chart, listed

8  as Appendix A.  It is our understanding that the UBOs

9  shall continue to exclusively manage all capital

10  contributions.

11        Do you see where I was reading there?

12    **A.  I see where you were reading, yes.**

13    Q.  What do you recall about Mr. Dondero and

14  Ellington exclusively managing all capital contributions

15  of Sentinel?

16        MS. SMITH:  Objection to form.

17        THE WITNESS:  I don't recall.

18  BY MR. BURT:

19    Q.  Did you know that they were exclusively managing

20  all capital contributions?

21        MS. SMITH:  Objection to form.

22        THE WITNESS:  I don't know.

23  BY MR. BURT:

24    Q.  Did you ever have a discussion with Mr. Ellington

25  about that?

252

1    **A.  Not that I recall.**

2    Q.  How about with Mr. Dondero?

3    **A.  No.**

4    Q.  And did you know that Mr. Ellington and Dondero

5  were the majority ultimate beneficial owners of the UBOs

6  of Sentinel?

7        MS. SMITH:  Objection, form.

8        THE WITNESS:  At what point in time?

9  BY MR. BURT:

10    Q.  Well, we're looking here at 2015.  Did you know

11  in 2015?

12    **A.  I don't recall.**

13    Q.  Did you know at any point in time?

14        MS. SMITH:  Objection, form.

15        THE WITNESS:  I don't know insofar as the

16  definition here of "ultimate beneficial owners."

17  BY MR. BURT:

18    Q.  You don't know what that means?

19    **A.  Not in this context, no.**

20    Q.  Okay.  And you've heard the term "UBO" before?

21    **A.  I have heard the term before, yes.**

22    Q.  And what's your understanding of the term?

23    **A.  Essentially that everything would roll up to that**

24  **person, but I don't know if it's -- but I don't know if**

25  **it's legal, tax.  I don't -- I don't know the detail**

253

1 behind it.
2 Q. Okay. But this is, again, a letter from Beecher
3 Carlson to CIMA representing that Messrs. Ellington and
4 Dondero are the UBOs of the company, right?
5 A. It appears, yes, that Beecher — no, this isn't
6 from Beecher. This is from —
7 Q. Excuse me. You're right.
8 A. — Christopher Watler and Andrew Dean.
9 Q. That's right.
10 A. And it's not signed in the MaplesFS capacity. I
11 don't know — there's no Exhibit A. I can't see what's
12 included there, but it looks like them personally. It's
13 not signed by MaplesFS.
14 Q. How do you know they were signing -- that they
15 were representing MaplesFS here?
16 MS. SMITH: Objection to form.
17 BY MR. BURT:
18 Q. Why would MaplesFS be communicating with CIMA
19 about the ownership of Sentinel?
20 A. Because MaplesFS was the employer of Christopher
21 Watler and Andrew Dean.
22 Q. The employer? I thought you testified that they
23 were independent directors.
24 A. Yeah. So MaplesFS can be an independent director
25 and — as a corporate director, or it can employ

254

1 individuals who operate in an individual capacity as
2 director -- independent director.
3 Q. And to be clear -- I didn't -- sorry. I didn't
4 mean to cut you off.
5 To be clear, they were the -- the
6 independent directors of Sentinel, right?
7 A. Yes.
8 Q. Okay. All right.
9 MR. BURT: Oh, thank you.
10 MS. HARTMANN: They are saying the power
11 went off.
12 MS. SMITH: Can you hear everyone?
13 MR. BURT: I guess if people on the Zoom
14 can't hear, they'll let us know.
15 MS. DANDENEAU: Hey, this is Deb. We can --
16 are we off the record? We can -- it's just Katie is
17 coming -- maybe we need to readjust the mic. Katie is
18 coming in a little bit weaker. We can hear everybody
19 else.
20 MR. BURT: I think we do need to go off the
21 record, because it looks like these are out of power.
22 So...
23 THE VIDEOGRAPHER: We are off the record at
24 3:58 p.m.
25 (Brief recess taken.)

255

1 THE VIDEOGRAPHER: Back on record at 3:59
2 p.m.
3 BY MR. BURT:
4 Q. In Exhibit -- I can't remember which exhibit it
5 was, but it showed the Sentinel reorganization. It was,
6 like, around 103 or 104. That's it, KL_3 --
7 MS. McLAUGHLIN: 103.
8 BY MR. BURT:
9 Q. 103. In Exhibit 103, we saw the -- the
10 reorganization of Sentinel, and at the very top, there was
11 an entity ITA.
12 A. Let me find what you're referencing.
13 Q. Yeah.
14 A. Hold on.
15 Q. Take your time. It's Exhibit 103.
16 MS. SMITH: Here you go.
17 THE WITNESS: Oh, thanks. Okay.
18 Yes, I see "ITA" at the top on this paper.
19 BY MR. BURT:
20 Q. Right.
21 And I believe you testified earlier, and if
22 I get this wrong, just let me know, that it was a -- a
23 trustee of the SAS Holdings/SPV, Ltd., shares; is that
24 right?
25 A. Yes. ITA is a Cayman trustee.

256

1 Q. Okay. So ITA is located in the Caymans?
2 A. Yes.
3 Q. Do you know who -- did ITA have any employees?
4 A. I don't know.
5 Q. Did you ever work with ITA?
6 A. Yes.
7 Q. In what capacity?
8 A. General, paying trustee fees, things like that.
9 Q. Because they were the trustee of SAS
10 Holdings/SPV?
11 A. Yes.
12 Q. Do you know whether ITA ever attended a Sentinel
13 board meeting?
14 MS. SMITH: Objection to form.
15 THE WITNESS: I don't know.
16 BY MR. BURT:
17 Q. Do you know whether ITA ever had any voter-ship
18 interest -- voting interest in Sentinel?
19 MS. SMITH: Objection to form.
20 THE WITNESS: It had voting interest in
21 Sentinel?
22 BY MR. BURT:
23 Q. Right. So let me strike that. That wasn't
24 precise.
25 So they are the trustee of the SAS

257

1 Holdings/SPV shares, right?
2    A. As far as I understand it, yes.
3    Q. And -- and we know that, from this -- from these
4 organization charts that most of the voting interest in
5 Sentinel went up to SAS Holdings, the majority of the
6 voting interest?
7       MS. SMITH: Objection to form.
8 BY MR. BURT:
9    Q. Is that -- is that correct?
10    A. That's what the charts have shown, yes.
11    Q. And do you know how SAS Holdings/SPV exercised
12 that voting interest in Sentinel?
13    A. I don't.
14    Q. Do you know whether ITA exercised the voting
15 interest on behalf of SAS Holdings and Sentinel?
16    A. I don't know.
17       MR. BURT: I'll mark this, I believe, as
18 108.
19       (Exhibit 108 was marked for identification.)
20 BY MR. BURT:
21    Q. And, again, this is a -- bigger one, so I'll
22 just -- I'll direct you to the portions that I have
23 questions about, and of course, if you want to review
24 other portions for context, please do.
25       So showing you what's been marked as

258

1 Exhibit 108, at the top, there is an e-mail from -- and
2 again, I'll get the name wrong, but Sehliselo Dube at CIMA
3 to Clayton Price dated March 5th, 2019.
4       Do you see that at the top there?
5    A. I see it on the paper, yeah.
6    Q. Yeah.
7       And -- and there's four attachments to this
8 e-mail listed here, right?
9    A. Okay.
10    Q. And I'll represent to you that we have attached
11 the four attachments as part of this exhibit. So all four
12 are there.
13       And the first thing I want to do is -- is
14 look at the -- I believe it's the third attachment. So
15 it's -- it has the heading "Resolutions of ITA Global
16 Trust, Ltd. (The "Trustee") of the Trust."
17    A. Okay. Hold on.
18    Q. It's -- the Bates ends in 76075.
19    A. Okay. Yes, I see it.
20    Q. All right. And -- so here at the top, it says,
21 "Resolutions of ITA Global Trust, Ltd., declared pursuant
22 to a Deed dated 17 February 2015." And in the
23 "Whereas" -- the first "Whereas" clause, it states: The
24 Trustee wishes to establish an Advisory Board to advise
25 the Trustee and guide the decision-making of the Trustee

259

1 of the ITA Trust in its role as an indirect shareholder in
2 Sentinel Reinsurance, Ltd.
3       All right. And we'll stop there. So that's
4 the first "Whereas" clause.
5       Do you see where I was reading there? You
6 see that text that I was reading, Mrs. Irving?
7    A. 1.1.1?
8    Q. No. It was above in the "Whereas" -- the first
9 "Whereas" clause.
10    A. Oh -- oh, yes, I see where you're reading at.
11    Q. Yeah.
12       Now, were you aware at any time that ITA
13 established an advisory board to advise ITA as its -- in
14 its role as an indirect shareholder of Sentinel?
15       MS. SMITH: Objection, form.
16       THE WITNESS: I don't recall.
17 BY MR. BURT:
18    Q. What knowledge, if any, do you have of there
19 being an advisory board to ITA?
20    A. I don't know.
21    Q. Have you ever heard of that before today?
22    A. Not that I recall.
23    Q. Did anyone ever mention to you that: Hey,
24 there's -- we have an -- ITA has an advisory board
25 advising on Sentinel issues?

260

1    A. I -- I don't recall.
2    Q. Do you know whether this advisory board ever
3 attended a Sentinel board of directors meeting?
4    A. I don't know.
5    Q. Do you know who was on this advisory board?
6    A. No.
7    Q. All right. Looking down under No. 1 -- well --
8 excuse me -- before we get to that, let's look at the
9 second "Whereas" clause to be complete: A form of Deed of
10 Amendment (the "Deed of Amendment") establishing the
11 Advisory Board of the ITA Trust ("the Advisory Board") was
12 approved and executed by the Trustee on the 10th of
13 August 2017.
14       Do you see that under the second "Whereas"
15 clause?
16    A. I see it.
17    Q. We'll look at that Deed of Amendment that was
18 executed on August 10th in just a moment.
19       But before we do, does -- the time frame,
20 the beginning of August 2017 in relation to Sentinel, does
21 that stand out in any way to you?
22       MS. SMITH: Objection, form.
23       THE WITNESS: Not that I recall.
24 BY MR. BURT:
25    Q. Do you recall looking earlier at wire

261

1  instructions that you ga- -- that you provided for cash
2  transfers to Sentinel as part of the AT- -- ATF [sic]
3  insurance policy?
4      **A. I recall looking at wire instructions I provided**
5  **on a prior exhibit.**
6      Q. Okay. I just want to make sure that we're clear
7  on dates here, which I'm trying -- so it's -- Exhibit 106
8  is what we looked at earlier where you had provided the --
9  the wiring instructions to Carter Chism.
10     **A. Yes, I see it.**
11     Q. And the date was August 11th, 2017, right?
12     **A. Yes, I see it.**
13     Q. And so on August 11th, 2017, it -- it appears
14 that there were some funds transferred into Sentinel as
15 part of the ATE policy?
16         MS. SMITH: Objection, form.
17         THE WITNESS: I don't know. I can only just
18 see what's on these papers.
19 BY MR. BURT:
20     Q. Do you have any reason to dispute what is here on
21 these papers?
22         MS. SMITH: Objection, form.
23         THE WITNESS: I don't know.
24 BY MR. BURT:
25     Q. Okay. Well, the day prior, August 10th, if we

262

1  can go back to Exhibit 108, the third attachment, the day
2  before, that you provided these wire instructions, an
3  advisory board was established at ITA to advise ITA in
4  respect to Sentinel.
5          Do you see that?
6      **A. I see, yes, here on the paper with that date,**
7  **yes.**
8      Q. And then, as -- as we look under No. 1, "Advisory
9  Board," it says, 1.1 -- well, first says: The undersigned
10 being the Trustee of the ITA Trust hereby resolves as
11 follows: 1, Advisory Board, that the Advisory Board be
12 and is hereby established in accordance with the Deed of
13 Amendment as follows: 1.1.1, the Advisory Board shall
14 consist of such number of members all being individuals as
15 the Trustee determines from time to time and shall
16 initially be two members; namely, Scott B. Ellington and
17 James D. Dondero.
18         Do you see that?
19     **A. I see it.**
20     Q. Is this the first time you're learning that
21 Mr. Ellington and Mr. Dondero made up the advisory board
22 advising ITA as to Sentinel matters?
23     **A. I don't --**
24         MS. SMITH: Objection to form.
25         THE WITNESS: I don't remember any of this.

263

1  BY MR. BURT:
2      Q. Okay. So this is all new today, as you look at
3  this?
4      **A. I just don't remember this.**
5      Q. If you flip to the next page, page 2 of this
6  resolution, I'm -- I'm just actually wondering who -- if
7  you can recognize the signature here, "For and on Behalf
8  of ITA Global Trust as Trustee."
9          Do you know whose -- who might have signed
10 that?
11     **A. No, I don't -- no, I don't recognize this.**
12     Q. It looks like there's two signatures.
13         So you don't recognize either of them?
14     **A. No.**
15         MS. SMITH: Objection, form.
16         THE WITNESS: No.
17 BY MR. BURT:
18     Q. All right. Do you have any independent knowledge
19 of who was a -- the trustee of the ITA trust?
20     **A. No.**
21     Q. Did you ever deal with the trustee of the ITA
22 trust?
23     **A. I don't know who the trustee was, so no.**
24     Q. If we look at the -- fourth attachment, which
25 is the actual -- the actual Deed, Deed of Amendment dated

264

1  10th of August 2017, again the day before you were issuing
2  the wire instructions, it states, on page 2 of the Deed,
3  that: It is made on the 10th day of August 2017 by ITA
4  Global Trust, Ltd., whose principal office is at
5  Suite 4210, 2nd Floor, Canella Court, Camana Bay, and then
6  gives the P.O. Box in the Grand Cayman.
7          Do you recognize that address?
8      **A. No.**
9      Q. Oh, I did want to come back to -- sorry.
10         A little unrelated, I think prior we were
11 talking about a Sentinel office in the Caymans. Is it
12 correct that Sentinel actually had a physical office in
13 the Caymans?
14         MS. SMITH: Objection to form.
15         THE WITNESS: I don't know.
16 BY MR. BURT:
17     Q. Okay. You don't know whether it did or not?
18     **A. I don't -- yeah, I don't know.**
19     Q. Did you ever go to the Caymans to do any Sentinel
20 business?
21     **A. I attended meetings of CIMA.**
22     Q. And where were those meetings held?
23     **A. CIMA's office.**
24     Q. Was there ever any time where you -- where you --
25 you went to an office that was told to you was a

265

1  Sentinel office?
2      A. I don't recall.
3      Q. All right. So I want to look down under No. 2,
4  Amendment, 2.2 specifically. It says: The following new
5  clause 3.5 shall be inserted following Clause 3.4. Quote
6  3.5: Power to establish an Advisory Board whose members
7  all being individuals shall be appointed by the Trustee.
8  The primary function of the Advisory Board is to advise
9  the Trustee and guide the decision-making of the Trustee
10 in its role as an indirect shareholder in Sentinel
11 Reinsurance, Ltd.
12      So that was language that we had seen in the
13 prior ex- -- prior attachment; is that right?
14     A. Yeah. May I stop you for a second?
15     Q. Sure.
16      THE WITNESS: I don't know if -- Deb, are
17 you there? I don't know if Deb is trying to dial back in
18 or something, but it says "Deb" on my screen. It doesn't
19 match that screen.
20      MR. BURT: Do we need to go off the record
21 for this?
22      MS. MCLAUGHLIN: I think yes, because we
23 have to figure out the sound again.
24      MR. BURT: Okay. Let's go off the record.
25      THE VIDEOGRAPHER: Off the record at 4:11

266

1  p.m.
2      (Brief recess taken.)
3      THE VIDEOGRAPHER: Back on record at 4:15
4  p.m.
5  BY MR. BURT:
6      Q. So, Mrs. Irving, looking at the last page of the
7  Deed of Amendment, I think it's the same two signatures as
8  the authorized signator. And I don't believe you
9  recognize those signatures?
10     A. I don't recognize that.
11     Q. Do you know on the -- the witness here is Shannon
12 Lather. Do you know who that is?
13     A. Nope.
14     Q. I want to look now at the second attachment to
15 this exhibit that begins on -- ends in Bates 76067. And
16 the top says: Sentinel Advisory Committee Discussions.
17 Do you see where I'm -- where I am in the document?
18     A. Yes, where it says: Q1 2017?
19     Q. Exactly.
20     A. Yes.
21     Q. So here, and over the next five or six page,
22 under the heading Sentinel Advisory Committee Discussions,
23 we see a number of entries. The first: "Q1 2017 -
24 2/2/2017. Discussion of potential ATE policy and
25 engagement of actuary. Review of investment returns."

267

1  And it's signed by Scott Ellington as the recording
2  member.
3      Do you see that?
4      A. I see it.
5      Q. Do you recognize Mr. Ellington's signature?
6      A. Yes.
7      Q. That is his signature?
8      A. Yes.
9      Q. Did you know that he was meeting as part of a
10 Sentinel Advisory Committee in February of 2017 to discuss
11 these issues?
12      MS. SMITH: Objection, form.
13      THE WITNESS: No, I don't know about this.
14 BY MR. BURT:
15     Q. All right. Looking at the second page: "Q2
16 2017. Disc- -- on May 4, 2017, "Discussion re: Audit."
17 Noth- -- no knowledge about that?
18     A. No.
19     Q. Page 3, "Q3 2017. 8/4/2017. Discussion of
20 potential ATE policy and engagement of actuary.
21 Discussions re audit."
22      Did you know about that?
23     A. I don't know about -- No, I don't know about any
24 of these.
25     Q. About none of those?

268

1      A. No.
2      Q. So you didn't know that Mr. Ellington and
3  Mr. Dondero were -- were meeting as an advisory committee
4  to discuss these issues?
5      A. No.
6      MS. SMITH: Objection, form.
7  BY MR. BURT:
8      Q. Looking at "Q4 2017," on November 7th, 2017, it
9  says: "Documentation of ATE policy and closing of same."
10 Is that right?
11     A. Sorry. Could you tell me which Bates number
12 you're looking at?
13     Q. Sure. 76070.
14     A. 76070. Okay. Quarter 4, 2017.
15     Q. Correct. The first bullet is: Documentation of
16 ATE policy and closing of same. The second bullet is:
17 "Settlement of transferred investment portfolio."
18      You see that?
19     A. I see it here on this page, yeah.
20     Q. What did you know about Mr. Ellington's
21 involvement with the ATE policy?
22      MS. SMITH: Objection, form.
23      THE WITNESS: I don't know.
24 BY MR. BURT:
25     Q. So separate -- setting this document aside, I'm

269

1  just asking you a broader question: What did you know, if
2  anything, about Mr. Ellington's involvement with the ATE
3  policy?
4        MS. SMITH: Objection, form.
5        THE WITNESS: I don't know.
6  BY MR. BURT:
7     Q. Did you have no knowledge whether he was involved
8  in it?
9     A. I would be guessing. I -- I don't know.
10    Q. So I -- you know, I'm asking as broadly as I can:
11  Any recollection about Mr. Ellington being involved in any
12  way with the ATE policy? I'm trying to ask that as broad
13  as I can, any recollections that you might have.
14    A. I would assume he would have been involved, but I
15  don't know to what level.
16    Q. And why would you assume that?
17    A. Because he was the head of legal and worked
18  closely with Thomas Surgent who was aware of this
19  transaction, based on prior e-mails. Thomas reported to
20  Scott.
21    Q. Okay. And Mr. Ellington -- is it correct that
22  Mr. Ellington never told you that he was part of an
23  advisory committee dealing with -- meeting and dealing
24  with these issues that we see in this exhibit?
25        MS. SMITH: Objection, form.

270

1        THE WITNESS: I don't recall.
2  BY MR. BURT:
3     Q. The second bullet is: "Settlement of transferred
4  investment portfolio."
5        Do you know when that refers to?
6     A. It seems to be related to the transaction. I --
7  I don't know.
8     Q. And is it correct that -- again setting the
9  document aside, is it correct that there was an investment
10  portfolio transferred to Sentinel as part of the
11  transaction?
12        MS. SMITH: Objection to form.
13        THE WITNESS: My sense was it was a bucket
14  of random assets.
15  BY MR. BURT:
16    Q. Okay. From -- from whom? Who were those assets
17  coming from?
18    A. The insured, but I don't recall who the insured
19  is.
20    Q. All right. And do you know which litigation it
21  involved?
22        MS. SMITH: Objection to form.
23        THE WITNESS: No, only -- only because you
24  showed me some documents today. I'd have to go back and
25  look. I don't know.

271

1  BY MR. BURT:
2     Q. Okay. Well, we'll come back to that.
3        Flipping to the page that ends in 76072,
4  under: Q2 2018, May 4th, 2018, the second bullet there
5  is: Discuss consolidating the banking relationship at
6  CIBC.
7        Were you aware that there were discussions
8  about Sentinel consolidating the banking relationship at
9  CIBC in 2018?
10    A. No.
11    Q. Going to page -- the next page, 76073: Q3 2018,
12  August 1st, 2018, it -- the first bullet is: "Audit
13  completed in July and approved by CIMA." So we've
14  discussed a lot about a 2019 in- -- inspection that CIMA
15  did.
16        Do you know what a 2018 CIMA audit was?
17    A. This says: "Audit completed in July and approved
18  by CIMA."
19    Q. Uh-huh.
20    A. Sentinel Reinsurance, Ltd., would have an
21  independent audit by independent auditors as required
22  under the Cayman regulation, every year. Very normal,
23  very regular, every year there were audited financials as
24  required under -- under the law.
25    Q. And who was -- who provided the audit?

272

1     A. I don't know.
2     Q. It then states: "Hear- ..." -- the second
3  bullet: "Hearing related to the ATE policy finished with
4  in resolution."
5        What does that refer to, if you know?
6        MS. SMITH: Objection to form.
7        THE WITNESS: I don't know what that means.
8  BY MR. BURT:
9     Q. Then it states: "No change in expectations of
10  the outcome."
11        Any knowledge of that?
12    A. No. I don't know.
13    Q. The final bullet is: "NOOR," N-O-O-R in all
14  caps, "account closure requested."
15        Do you know what the NOOR account was?
16    A. Yes. It was a -- it was either a bank or
17  investment account, some type of asset account.
18    Q. Of Sentinel's?
19    A. I don't know.
20    Q. On the last page of -- of this exhibit -- or this
21  attachment, 76074: "Q4 2018... Portfolio management with
22  respect to the increasing cash on hand required by CIMA
23  for the active ATE policy."
24        Now, do you see where I was reading there?
25    A. I see where you were reading.

273

1    Q. When -- in your work for Sentinel, did you ever
2 have any work dealing with increasing the cash on hand or
3 meeting req- -- CIMA cash requirements at Sentinel?
4    A. Not that I recall.
5    Q. And then second bullet is: Updated the actuary
6 report for anticipating -- for anticipated the outcome of
7 the underlying ATE litigation discussed. Expectation
8 largely unchanged.
9       Do you see that bullet?
10    A. I see it.
11    Q. And I believe you testified earlier that you --
12 you never had anything to do with the actuarial reports
13 related to Sentinel; is that right?
14    A. That's right. I don't recall anything related to
15 the actuary reports.
16    Q. And -- and you don't recall any discussions with
17 the actuary?
18    A. I don't.
19    Q. Or reviewing the reports at all?
20    A. I don't.
21    Q. All right. And then the last bullet is:
22 "Banking relationship moved to CIBC."
23       Were -- do you see that?
24    A. I see it.
25    Q. Were you aware at the time in November of 2018

274

1 that Sentinel moved its banking relationship to CIBC?
2       MS. SMITH: Objection to form.
3       THE WITNESS: Not that I recall.
4 BY MR. BURT:
5    Q. Okay. What do you recall about banking --
6 Sentinel's banking relationship in 2018?
7    A. Nothing. I -- I don't know.
8    Q. I think we've gone through -- we've listed a
9 number of accounts previously in the deposition that
10 Sentinel might have had, bank accounts, at CIBC. I think
11 we saw a BONY wiring instructions, and I think MaplesFS
12 was another account you mentioned.
13       Is that right, or am I getting that wrong?
14       MS. SMITH: Objection, form.
15       THE WITNESS: I don't recall a BONY account.
16 BY MR. BURT:
17    Q. Okay. Well, we looked at that document for --
18 with wiring instructions to a Sentinel BONY account, and I
19 think you explained that, actually.
20       Do you recall that?
21    A. I do. It's -- I would recharacterize what you're
22 saying. It was a MaplesFS account held at BONY --
23    Q. Okay.
24    A. -- for the benefit of Sentinel.
25    Q. For the benefit of Sentinel. Thank you for being

275

1 more precise. Okay.
2       Aside from those accounts, were you aware of
3 any other banking accounts that Sentinel -- bank accounts
4 that Sentinel might have had?
5    A. Only the NOOR account that was referenced in
6 here.
7    Q. Oh, so that was related -- that was a Sentinel
8 account?
9    A. I don't know if it was Sentinel Reinsurance, Ltd.
10    Q. Okay. Could it have been the other Sentinel
11 entity?
12    A. It could have, yeah. I don't know.
13    Q. All right. And what was the purpose of that
14 account?
15    A. I don't know.
16    Q. Do you know whether money ever went in and out of
17 that account for Sentinel?
18    A. I don't know.
19       MR. BURT: Pardon me. Just give me a moment
20 here.
21       THE WITNESS: Uh-huh.
22 BY MR. BURT:
23    Q. Okay. Switching topics a little bit here.
24       I want to show you a new exhibit, and this
25 has been previously marked in a deposition as Exhibit 57,

276

1 so we don't need to mark this one.
2       So starting just on the -- on the first
3 page, the e-mail in Exhibit 57, you see it's an e-mail
4 from Isaac Leventon to Chris Dunn, dated the 26th of
5 October 2017; is that right?
6    A. I see that.
7    Q. And it has attachment, UBS_ATE.PDF; is that
8 right?
9    A. I see that here.
10    Q. Do you know what "UBS_ATE" refers to?
11    A. No.
12    Q. All right. Mr. Leventon says -- to Mr. Dunn:
13 "Please see attached. Please label all communications
14 related to this project as Privileged as all documents are
15 being drafted at the request of the Legal Team."
16       Were you considered a member of the legal
17 team?
18       MS. SMITH: Objection, form.
19       THE WITNESS: Yes. I was on the legal
20 team -- well, I don't know how "legal team" is defined
21 here, but I worked in the legal department, if that's the
22 question you're asking.
23 BY MR. BURT:
24    Q. And Mr. Leventon here is listed as the assistant
25 general counsel, right?

277

1    A. I see that here.
2    Q. Yeah. Who is Chris Dunn?
3    A. He worked in either settlements or accounting.
4    Q. All right. Turning to the next page: Legal
5 Liability Insurance Policy. If you want, Mrs. Irving, go
6 ahead and take a moment to flip through this, and let me
7 know if you recognize this insurance policy.
8    A. (Witness complies.)
9    Q. And signature pages are at the back.
10    A. Yes, this is familiar.
11    Q. Okay. What do you recall about this document?
12    A. I just recall seeing it before.
13    Q. In what context did you see it?
14    A. I don't remember.
15    Q. Did you see it as a member of the legal team?
16       MS. SMITH: Objection, form.
17       THE WITNESS: No -- I don't know.
18 BY MR. BURT:
19    Q. Mr. Leventon's e-mail stated that: "All
20 documents are being drafted at the request of the Legal
21 Team."
22       Do you know if the legal team drafted this
23 legal liability insurance policy?
24    A. I don't know.
25    Q. You don't know who drafted it?

278

1    A. I don't. I don't recall.
2    Q. Did you ever see -- so looking, first, at page 16
3 of 16 with the Bates that ends in 3071, it's one of the
4 signature pages --
5    A. Okay.
6    Q. -- you see it as -- the insurer is listed as
7 Sentinel Reinsurance by Andrew Dean, Director, and there's
8 a signature there; is that right?
9    A. I see that.
10    Q. Do you recognize Mr. Dean's signature?
11    A. I don't.
12    Q. And then the insureds are listed as: Highland
13 CDO Opportunity Master Fund, By: Highland CDO Opportunity
14 Fund GP, L.P. -- it's general partner -- By: Highland CD
15 Op- -- CDO Opportunity GP, LLC, its general partner; By:
16 Highland Capital Management, L.P., its sole member; By:
17 Strand Advisors, Inc. its general partner; and then it is
18 signed by Mr. Dondero, correct?
19    A. I see that here.
20    Q. With the title of President listed; is that
21 right?
22    A. In one case, yes.
23    Q. That's right. With respect to the Highland CDO
24 Opportunity Master Fund, L.P., entities; is that right?
25    A. Yes, I see that here.

279

1    Q. And you -- and do you recognize Mr. Dondero's
2 signature?
3    A. No, but I haven't seen it a lot.
4    Q. The next entity below that is: Highland CDO
5 Holding Company, signed by James Dondero with a title of
6 Director; is that right?
7    A. I see it, uh-huh.
8    Q. And then: Highland Special Opportunities Holdings
9 Company, signed by James Dondero as its Director; is that
10 right?
11    A. I see that on this paper.
12    Q. Do you recall ever seeing a draft of this
13 document before it was signed?
14       MS. SMITH: Objection, form.
15       THE WITNESS: No.
16 BY MR. BURT:
17    Q. You don't recall or you did not see one?
18    A. I don't recall.
19    Q. Did you have anything to do with the preparation
20 of this document or the obtaining of signatures on this
21 document?
22    A. Not that I recall.
23    Q. Do you recall that this is related to the ATE
24 policy that we have been discussing today, that Sentinel
25 issue?

280

1    A. Yes, it looks like the policy.
2    Q. And as we saw in the CIMA letter, it was the sole
3 ATE policy that Sentinel issued, correct?
4       MS. SMITH: Objection, form.
5       THE WITNESS: You're asking me to -- tell
6 you what I read earlier on this CIMA report?
7 BY MR. BURT:
8    Q. I'm asking -- I'm asking you to confirm that it's
9 the sole insurance -- ATE insurance policy that Sentinel
10 issued, as we saw earlier in the CIMA report?
11       MS. SMITH: Objection, form.
12       THE WITNESS: I don't know. I only know
13 what you put forth here with these documents.
14 BY MR. BURT:
15    Q. Okay. You don't know if there was any other ATE
16 policies?
17    A. No, I don't know.
18    Q. Okay. You recall seeing this legal liability
19 insurance policy. Did you ever see any others related to
20 an ATE Sentinel policy?
21    A. I don't recall.
22    Q. Looking at page 17 -- well, I think it's a typo
23 at the bottom. It's Bates number that ends in 3070.
24    A. Okay.
25    Q. It's the schedule.

---

281

1    A. Yes, page 17 of 16.
2    Q. Yeah. That doesn't make much sense.
3        But we're looking at the same page, I
4 believe, the schedule page. It lists the insurer as
5 Sentinel Reinsurance, and the insured as Highland CDO
6 Opportunity Master Fund, L.P., Highland CDO Holding
7 Company, and Highland Special Opportunities Holding
8 Company, correct?
9    A. I see that here.
10   Q. And the date of commencement of period of the
11 insurance is August 1st -- 1st, 2017, right?
12   A. I see that here.
13   Q. Were you aware that this insurance policy
14 commenced on August 1st, 2017?
15       MS. SMITH: Objection, form.
16       THE WITNESS: I don't remember.
17 BY MR. BURT:
18   Q. And then it lists the Legal Action. And -- the
19 Legal Action begins with: UBS Securities, LLC, and UBS AG
20 London Branch versus various Highland Entities and Strand
21 Advisors; is that right?
22   A. I see that listed here, yes.
23   Q. Yeah. Does that refresh your recollection about
24 which legal action this ATE policy was issued for?
25       MS. SMITH: Objection, form.

---

282

1        THE WITNESS: It says here on the paper.
2 I'm reviewing the paper. Yes, I can read what it says
3 under Legal Action.
4 BY MR. BURT:
5    Q. Well, my question is whether that refreshes your
6 recollection about this ATE policy?
7        MS. SMITH: Objection, form.
8        THE WITNESS: No, not really.
9 BY MR. BURT:
10   Q. It does not?
11   A. No. I mean, I can read this here, but I don't
12 have any other knowledge of it.
13   Q. Setting aside -- or excuse me. Strike that.
14       Do you have any reason to dispute that this
15 policy was issued for this particular legal action?
16       MS. SMITH: Objection, form.
17       THE WITNESS: I don't know. I'm just
18 looking at this that you've handed me. I don't know.
19 BY MR. BURT:
20   Q. So setting this aside for a moment, the -- the
21 document, I just want to get your best testimony about
22 what you recall about this ATE policy.
23       Do you recall it being related to the UBS
24 litigation?
25   A. No. That's not something I recall.

---

283

1    Q. Okay. And do you recall ever discussing that
2 this ATE policy was related to the UBS litigation, with
3 anybody at Sentinel or HCMLP?
4        MS. SMITH: Objection, form.
5        THE WITNESS: Not that I recall.
6 BY MR. BURT:
7    Q. All right. So although you saw this document,
8 you don't have any recollection of considering or learning
9 what it was for?
10       MS. SMITH: Objection, form.
11       THE WITNESS: No, not -- no.
12 BY MR. BURT:
13   Q. Okay. You never asked: Hey, what's -- what's
14 this ATE policy? What's this legal action involved with?
15   A. I didn't ask about the underlying legal action.
16   Q. Okay. As part of the diligence you did on other
17 A- -- potential ATE policies, you did look at what the
18 underlying legal action was, didn't you?
19   A. Yes.
20   Q. But you weren't asked to do that with this one,
21 were you?
22       MS. SMITH: Objection, form.
23       THE WITNESS: I don't recall looking at the
24 underlying legal action here.
25 BY MR. BURT:

---

284

1    Q. My question is: You don't -- you were not asked
2 to look at the others --
3    A. I don't recall being asked to look at it.
4    Q. All right. Under Limit of Liability it states:
5 $100 million in aggregate.
6        Do you see that at the bottom there?
7        MS. SMITH: Objection, form.
8        THE WITNESS: I see it on this paper, yes.
9 BY MR. BURT:
10   Q. And the premium is listed as $25 million, right?
11   A. I see that here.
12   Q. Do those amounts stand out to you? Do you recall
13 those amounts as related to this ATE policy?
14   A. No.
15   Q. Do you have any knowledge or any idea,
16 Mrs. Irving, whose idea it was to issue this ATE policy?
17   A. No.
18   Q. Do you have any idea of the purpose of the
19 policy?
20   A. Only insofar it's -- as it's an ATE policy,
21 after-the-event insurance policy.
22   Q. Beyond that, what's plain on the -- on the text
23 of the insurance policy itself, do you have any knowledge
24 of what the purpose of issuing the policy was?

285

1    Q. Do you know who drafted the policy?
2    **A. I don't remember.**
3    Q. Do you know whether it came from the legal
4  department at HCMLP?
5          MS. SMITH: Objection, asked and answered.
6          THE WITNESS: I don't know.
7  BY MR. BURT:
8    Q. Do you know who negotiated the policy on behalf
9  of Sentinel?
10         MS. SMITH: Objection, form.
11         THE WITNESS: No, I don't know.
12 BY MR. BURT:
13   Q. How about on behalf of CDO -- Highland CDO
14 Opportunity Master Fund, L.P., do you know who negotiated
15 the policy?
16   **A. I don't know who negotiated the policy for any**
17 **party.**
18   Q. Okay. So you wouldn't know whether they were
19 arm's-length transactions or arm's-length negotiations?
20         MS. SMITH: Objection, form.
21         THE WITNESS: I don't know who negotiated
22 this.
23 BY MR. BURT:
24   Q. Okay. I want to show you -- you can set that
25 aside for a moment. I want to now show you another --

286

1  this has also been previously marked as -- this is
2  Exhibit 2, actually.
3    **A. (Witness reviews document.)**
4    Q. Now I'm showing you what's been marked as
5  Exhibit 2, which is a -- which is entitled a Purchase
6  Agreement.
7          Do you see that?
8    **A. I see it.**
9    Q. It states: This -- This Purchase Agreement (the
10 "Agreement") dated as of August 7, 2017 (the "Effective
11 Date), is entered into by Sentinel Reinsurance, Ltd., the
12 (Purchaser) and each of Highland CDO Opportunity Master
13 Fund, L.P., Highland CDO Holding Company and Highland
14 Special Opportunities Holdings Company (together,
15 "Sellers").
16         See that?
17   **A. I see it.**
18   Q. Now, you've testified that you are familiar, not
19 necessarily with the legal action that this ATE policy
20 related to, but with the fact that such an ATE policy
21 was -- ATF -- excuse me -- policy was issued, right?
22   **A. What do you mean by "ATF policy"?**
23   Q. An after-the-fact insurance policy?
24   **A. I've never heard --**
25   Q. Excuse me. ATE. I'm getting my numbers

287

1  confused.
2    **A. Okay.**
3    Q. It's getting later in the day.
4    **A. Okay.**
5    Q. An ATE policy, an after-the-event policy.
6          MS. SMITH: Objection, form. I'm sorry, I
7  didn't follow the question.
8          MR. BURT: I didn't either. So --
9          THE WITNESS: Good, 'cause I didn't either.
10 BY MR. BURT:
11   Q. You have testified that you did know that there
12 was an ATE policy and certain assets flowed into Sentinel,
13 right, in this deposition?
14         MS. SMITH: Objection, form.
15         THE WITNESS: I was aware of an ATE policy,
16 yes.
17 BY MR. BURT:
18   Q. Did you ever review the Purchase Agreement
19 associated with that policy?
20   **A. It seems familiar.**
21   Q. All right. So looking here at Exhibit 2, this
22 does seem familiar?
23   **A. Yes.**
24   Q. All right. When did you see this?
25   **A. I don't know.**

288

1    Q. Was it before or after it was executed?
2    **A. I don't know.**
3    Q. Did you have anything to do with drafting this
4  document?
5    **A. No.**
6    Q. Do you know who did?
7    **A. No.**
8    Q. Do you know whether it came from the legal
9  department?
10   **A. I don't know.**
11   Q. Did you have anything to do with helping to get
12 these -- this document signed?
13   **A. Not that I recall.**
14   Q. Looking at -- under the Recitals or underneath
15 Recitals, the first paragraph that begins with No. 1:
16 Payment of Premium, says: Purchaser agrees to accept the
17 assets listed in Schedule A hereto as 100 percent payment
18 of the Premium, including an as yet unpaid or contingent
19 financial proceeds or other benefits related thereto, with
20 the explicit undertaking that if anything of value is
21 received by the Sellers, such cash or other item of value
22 shall be held in trust for the Purchaser and promptly
23 remitted thereto (the "Transferred Interest). Sellers
24 undertake that immediately following signing this
25 Agreement, they will each take all such steps and execute

289

1 all such documents to vest legal and beneficial ownership
2 free from liens or encumbrances (as hereinafter defined)
3 in all of the Transferred Interest in the Purchaser.
4 You see that?
5 **A. Yes, I see that.**
6 Q. Were you aware of this Payment of Premium
7 provision in this document?
8 **A. Yes.**
9 Q. Okay. What do you recall about this?
10 **A. That the insured did not have cash to pay an**
11 **insurance premium, and as such, assets were purchased**
12 **under this Purchase Agreement, as consideration.**
13 Q. How did you learn that the insured did not have
14 cash?
15 **A. I don't remember.**
16 MS. SMITH: Objection, form.
17 THE WITNESS: I don't remember.
18 BY MR. BURT:
19 Q. But you were aware that the insured didn't have
20 cash to pay the premium?
21 **A. I believe so.**
22 Q. And who did you understand the insured to be at
23 the time?
24 **A. Some fund. I don't remember specifically.**
25 Q. Is it the entities we -- we see at the top in the

290

1 first paragraph?
2 MS. SMITH: Objection, form.
3 BY MR. BURT:
4 Q. The Highland CDO Opportunity Master Fund, the
5 Highland CDO Holding Company, and Highland Special
6 Opportunities Holding Company?
7 **A. That's what this paper says.**
8 Q. Any reason to dispute that?
9 MS. SMITH: Objection, form.
10 THE WITNESS: I don't know. All the -- all
11 the names blend together, and there are a trillion
12 entities, so I don't know.
13 BY MR. BURT:
14 Q. So in -- in lieu of cash, what did you understand
15 to be provided to -- in payment of the premium?
16 MS. SMITH: Objection, form.
17 THE WITNESS: Assets.
18 BY MR. BURT:
19 Q. Okay. Let's -- looking at -- drawing your
20 attention to Schedule A, which begins on the fifth page of
21 this document -- go ahead and look at that and let me know
22 if you've seen this schedule before.
23 **A. (Witness reviews document.) It seems familiar.**
24 Q. What, if anything, do you recall about this
25 schedule?

291

1 **A. That it was a listing of assets under the**
2 **Purchase Agreement.**
3 Q. Did you have anything to do with getting these
4 assets transferred to Sentinel?
5 MS. SMITH: Objection, form.
6 THE WITNESS: Yes, but I don't remember
7 specifically.
8 BY MR. BURT:
9 Q. All right. How about generally, what do you
10 recall about getting these assets transferred?
11 **A. Generally, I recall providing wiring**
12 **instructions, and there may have been some other kind of**
13 **blocking and tackling between connecting the proper people**
14 **from the Highland side and Maples.**
15 Q. Did you do any diligence whatsoever on the assets
16 listed in Schedule A?
17 **A. No.**
18 Q. Any valuation?
19 **A. No.**
20 Q. Do you know if such valuation or diligence was
21 conducted?
22 **A. No idea.**
23 Q. Do you know who would have compiled this list on
24 Schedule A?
25 **A. I don't.**

292

1 Q. Were -- so is it correct that you were never
2 asked at any time to review this schedule or provide any
3 input or correction to it?
4 MS. SMITH: Objection, form.
5 THE WITNESS: Not to my recollection, no.
6 BY MR. BURT:
7 Q. Do you know whether this schedule came through
8 the legal department at HCMLP?
9 **A. What do you mean by "came through"?**
10 Q. Did anybody within the legal department review
11 this schedule?
12 **A. I have no idea.**
13 Q. Now, Mr. Dondero, if you look at page 3, signs,
14 again on behalf of the seller, all of the selling
15 entities. What do you know, if anything, about his
16 diligence into these assets?
17 MS. SMITH: Objection, form.
18 THE WITNESS: I don't know about
19 Mr. Dondero's diligence.
20 BY MR. BURT:
21 Q. Okay. At Sentinel, do you know if anybody at
22 Sentinel reviewed this schedule prior to agreeing to issue
23 the policy?
24 **A. I don't know.**
25 Q. Who at Sentinel would have been responsible for

293

1  reviewing -- for performing diligence on this type of
2  transaction to ensure that these were actual assets --
3      MS. SMITH:  Objection, form.
4  BY MR. BURT:
5      Q. -- of value?
6      A. I don't know.
7      Q. Would the -- would the board have been
8  responsible for that?
9      A. I -- I don't know.
10     Q. How about the beneficial owners, would they have
11  been responsible for that?
12     A. I don't know.
13     MS. SMITH:  Objection, form.
14  BY MR. BURT:
15     Q. So regarding the governance at Sentinel and who
16  was responsible to ensuring the bona-- the bonafides of
17  the transaction, you don't know who at Sentinel would have
18  done that?
19     A. I don't know.
20     Q. But you didn't?
21     MS. SMITH:  Objection, form.
22     THE WITNESS:  I didn't what?
23  BY MR. BURT:
24     Q. You didn't perform diligence on behalf of
25  Sentinel regarding assets?

294

1      A. I did not.
2      Q. Do you know if Mr. DiOrio did?
3      A. I don't know.
4      Q. All right.
5          (Off-record discussion.)
6  BY MR. BURT:
7      Q. This has been previously marked as deposition
8  Exhibit 55.
9          Again, there's multiple pages here, and,
10  Mrs. Irving, I -- I have specific questions that I can
11  draw your attention to, but go ahead and if you would like
12  to take a moment to familiarize yourself, that's fine.
13     A. Okay. (Witness reviews document.)
14     MS. SMITH:  I need to take, like,
15  one minute.
16     MR. BURT:  Whatever you need.  We will go
17  off the record.
18     THE VIDEOGRAPHER:  We are off the record at
19  4:46 p.m.
20     (Brief recess taken.)
21     THE VIDEOGRAPHER:  We are back on the
22  record.  Time is 4:55 p.m.
23  BY MR. BURT:
24     Q. Mrs. Irving, we were just -- I was just pulling
25  the exhibit up again, Exhibit 2, the Purchase Agreement.

295

1  Just a couple of wrap-up questions about that and the
2  Schedule A that's listed there.
3      Were there any assets in this -- listed in
4  this Schedule A that were not successfully transferred to
5  Sentinel?
6      A. I don't know.
7      Q. Who would know that, if anyone?
8      A. I don't know.
9      Q. You don't know who was in charge of making sure
10  these assets were transferred over to Sentinel?
11     A. I don't.
12     Q. Were any of these transferred assets moved from
13  Sentinel after the transfer in 2017?
14     MS. SMITH:  Objection, form.
15     THE WITNESS:  I recall there being something
16  related to an audit, some type of worthless assets or --
17  there was some batch of assets, I believe, that were
18  transferred at CIMA or the auditor's direction.  I don't
19  remember which.
20  BY MR. BURT:
21     Q. When was that?
22     A. I don't remember.
23     Q. What entity were they transferred to?
24     A. I can't remember the name of the entity.
25     Q. Was it an SAS entity?

296

1      A. Yes.
2      Q. Was it Sebastian Clark?
3      A. Yes.
4      Q. Okay.  And what was Sebastian Clark?
5      A. It was -- it was just an empty entity.
6      Q. Was it a shell?
7      MS. SMITH:  Objection, form.
8      THE WITNESS:  What do you mean by "shell"?
9  BY MR. BURT:
10     Q. Just a -- a shell entity sitting out there with
11  no assets or employees?
12     A. Correct.
13     Q. Okay.  Do you know why it existed?
14     A. Yes.
15     Q. And why was that?
16     A. When -- SAS, when you're talking SAS as a brand
17  would have new, or potential new, litigation funding
18  cases, there would often be shell entities that could
19  contract with whoever the new plaintiff would be under NDA
20  or whatever.  There would be separate entities for various
21  litigation funding matters.
22     Q. And that's why the shells were set up underneath
23  the SAS structure, for that purpose?
24     A. Yes.
25     Q. Was Sebastian Clark used in that way?

297

1    A. It was a shell.
2    Q. Right.
3        But was it used in that way that you just
4  described?
5        MS. SMITH: Objection, form.
6        THE WITNESS: Not that I recall. I don't
7  know.
8  BY MR. BURT:
9    Q. But -- but assets from Sentinel were transferred
10  to Sebastian Clark?
11    A. From what I recall, yes.
12    Q. Okay. Was Sebastian Clark set up specifically to
13  receive assets from Sentinel?
14    A. No.
15    Q. So it was a shell entity available under the SAS
16  structure that was used to receive the worthless assets of
17  Sentinel?
18        MS. SMITH: Objection, form.
19        THE WITNESS: It received assets from
20  Sentinel, yes.
21  BY MR. BURT:
22    Q. I thought I heard you say that they were
23  worthless or an audit had determined they were worthless;
24  is that right?
25    A. I believe so, yes.

298

1    Q. Okay. What do you know about that audit?
2    A. Nothing.
3    Q. Do you know who performed it?
4    A. No.
5    Q. Any other transfers, aside from the transfer to
6  Sebastian Clark, that you're aware of from these assets
7  listed in Schedule A to the Purchase Agreement?
8    A. Not that I'm aware of.
9    Q. All right. I think I -- I had given you
10  Exhibit 55; is that right?
11    A. Yes.
12    Q. Okay. So let's take a look at Exhibit 55.
13        And this is an e-mail chain with attachments
14  in the June 2017 time frame moving forward to the
15  August 2017 time frame.
16        Do you see that in the e-mail chain?
17    A. I do.
18    Q. The first e-mail is on June 6th, 2017, from a Kim
19  Willey, or "Willey," @aswlaw.com.
20        Do you know who that was?
21    A. Nope.
22    Q. And she sends the e-mail to a
23  paulscrivener@solomonharris.com.
24        Do you know Mr. Scrivener?
25    A. I don't believe so.

299

1    Q. Okay. And moving up in the chain, drawing your
2  attention to the e-mail dated August 10th, 2017, from
3  Lesley Thompson right in the middle of the -- of that
4  page.
5        Do you see that, the Lesley Thompson e-mail
6  at 1701? We're on the --
7    A. Oh, I see it.
8    Q. -- the page that ends in Bates 350.
9    A. Okay. At the bottom or in the middle?
10    Q. In the middle --
11    A. Okay.
12    Q. -- there's an e-mail from Lesley --
13    A. Oh, yes, I see here. "Dear J.P. and Katie"?
14    Q. Exactly.
15        So, there, Mrs. Thompson says: Dear J.P.
16  and Katie, thank you for all the information and
17  supporting documentation to the recommendation regarding
18  the new ATE policy to be written by Sentinel Reinsurance,
19  Ltd.
20        You see that?
21    A. I see it.
22    Q. What information and supporting documentation had
23  you provided to Mrs. Thompson regarding the new ATE
24  policy?
25    A. I do not remember.

300

1    Q. Do you recall ever sending her information and
2  supporting documentation?
3    A. No.
4    Q. Do you know whether Mr. Sevilla did?
5    A. I don't know.
6    Q. Do you have any reason to disagree that
7  Mrs. Thompson somehow received, from either you or
8  Mr. Sevilla, information and supporting documentation?
9        MS. SMITH: Objection to form.
10        THE WITNESS: I don't know if she received
11  information. I don't know.
12  BY MR. BURT:
13    Q. Okay. And then Mrs. Thompson -- you -- so just
14  to be clear, you don't recall ever sending information and
15  supporting documentation to Mrs. Thompson; is that right?
16    A. I -- I don't remember.
17    Q. So this is August 10th, 2017, the day before you
18  issued the -- the wire instructions. And thinking back to
19  that time, do you recall any discussions or interactions
20  with Mrs. Thompson regarding the new ATE policy?
21        MS. SMITH: Objection, form.
22        THE WITNESS: I didn't issue any wiring
23  instructions; I provided them via the prior e-mail chain.
24  But do I recall --
25  BY MR. BURT:

301

1    Q. Fair.
2    A. -- speaking or giving her -- I don't recall
3    interactions with her, no.
4    Q. Okay. Then she -- you don't -- and you don't
5    recall receiving this e-mail?
6    A. I don't recall this, no.
7    Q. She states: One final question: Can you please
8    confirm that in the event of an adverse loss, which --
9    which exceeds the existing assets/equity of the Company,
10   the shareholders will inject the necessary capital in
11   order for the Company to meet its obligations and maintain
12   its solvency.
13       Do you recall that question coming from
14   Mrs. Thompson, one of the Sentinel directors?
15   A. No.
16   Q. Were you aware that shareholders were being asked
17   to inject necessary capital for the Company, Sentinel, to
18   meet its obligations?
19       MS. SMITH: Objection, form.
20       THE WITNESS: Could you repeat what you just
21   said, please?
22   BY MR. BURT:
23   Q. Do you recall that the shareholders of Sentinel
24   were being asked to inject necessary capital in order for
25   the Company, Sentinel, to meet its obligations and

302

1    maintain its solvency?
2        MS. SMITH: Objection, form.
3        THE WITNESS: They are not asked to inject
4    capital from what I'm reading here.
5    BY MR. BURT:
6    Q. Right.
7        In the event of an adverse loss, which
8    exceeds the existing assets/equity of the Company, she is
9    asking that you confirm that the shareholders will inject
10   the necessary capital in that scenario.
11       Did you know that she was asking that?
12   A. Did I know she was asking this? I mean, I got
13   the e-mail where she's asking. I don't recall anything
14   other than reading this e-mail.
15   Q. You don't recall any discussions after the fact
16   about this e-mail?
17   A. I don't.
18   Q. Did you ever speak with Mr. Sevilla and ask: Who
19   are the shareholders? What is she asking this for?
20   A. Not that I recall.
21   Q. Nothing?
22   A. Not that I recall.
23   Q. Don't recall anything?
24   A. (Witness shakes head negatively.)
25   Q. Okay. Mr. Sevilla then responds: Lesley, the

303

1    shareholders have made a fundamental commitment, both
2    fiscally and governance-wise, to Sentinel Reinsurance for
3    the long term, including in the situation of an adverse
4    loss.
5        Do you see that?
6    A. I see it.
7    Q. Do you see that you were cc'd on that e-mail?
8    A. Yes.
9    Q. And were you aware that the shareholders had made
10   this fundamental commitment?
11       MS. SMITH: Objection, form.
12       THE WITNESS: I see it here on the e-mail.
13   BY MR. BURT:
14   Q. In August -- early August of 2017, what was your
15   understanding of who the shareholders were?
16   A. I don't remember.
17   Q. Well, we've gone through all those organization
18   charts and looked at all that in detail today.
19   A. Yes. I'd have to check the dates on all the org
20   charts and go back and see this date and then see who the
21   shareholders were at that point.
22   Q. So was Sentinel constantly reorganizing its
23   ownership and who -- and who owned what?
24   A. No.
25   Q. Okay. And we saw earlier a Beecher Carlson

304

1    letter from 2015 listing Mr. Dondero and Ellington as the
2    ultimate beneficial owners of Sentinel. Do you recall
3    that?
4        MS. SMITH: Objection, form.
5        THE WITNESS: Yes, I recall that.
6    BY MR. BURT:
7    Q. And we've seen these organ- -- organization
8    charts in 2019 that listed Mr. Dondero and Ellington as
9    the USPs owning the majority -- the vast majority of the
10   shares of Sentinel.
11       Do you recall seeing that and talking about
12   that today in your deposition?
13   A. I do recall what you're talking about, yes.
14   Q. So do you have anything to offer that in 2017, at
15   the time of the transaction, that Mr. Dondero and
16   Ellington were not the shareholders being referred to
17   here?
18       MS. SMITH: Objection, form.
19       THE WITNESS: The shareholders would be
20   whoever owns at the time, not necessarily -- this doesn't
21   say "UBO." This doesn't say "USP." Doesn't say
22   "beneficial owner." It said "shareholders." I don't know
23   what J.P. was referring to here.
24   BY MR. BURT:
25   Q. You don't have any idea of how he was using the

305

1  term "shareholders" of Sentinel here?
2  **A. No.**
3  Q. Was that a term he didn't use usually?
4  MS. SMITH: Objection, form.
5  THE WITNESS: Could you rephrase that for
6  me, please?
7  BY MR. BURT:
8  Q. Is that not a term that he used to describe who
9  owned Sentinel? He didn't use the term "shareholders"?
10 **A. He would have used the term "shareholders," but**
11 **he would be specific around ownership chain.**
12 Q. Okay. Well, here, a director is asking him this
13 question, and he's stating that they've made a
14 fundamental -- the shareholders made a fundamental
15 commitment. Right?
16 **A. I see that on the paper, yeah.**
17 Q. And is it your testimony here under oath that you
18 have no idea who he was referring to when he said
19 "shareholders"?
20 **A. I don't know what J.P. is referring to. I don't**
21 **know what J.P. is drafting this for. You'd have to ask**
22 **him.**
23 Q. Okay. Can you point me to any facts that
24 suggests that it was not Mr. Dondero and Ellington who
25 were shareholders at this time? I'm just -- do you have

306

1  any facts to support that?
2  MS. SMITH: Objection, form.
3  THE WITNESS: Just my belief that those two
4  individuals were not the direct shareholders of --
5  BY MR. BURT:
6  Q. In August of 2017, they were not the direct
7  shareholders?
8  **A. Not directly, no.**
9  Q. Were they the ultimate beneficial owners?
10 MS. SMITH: Objection, form.
11 THE WITNESS: I don't know.
12 BY MR. BURT:
13 Q. Okay. Well, looking at the first page of this
14 document, after Mr. Sevilla's e-mail, Mrs. Thompson says:
15 Thanks, J.P. We will send the signature pages shortly.
16 And then Mrs. Thompson provides -- in the
17 next e-mail, she sends along the signed directors
18 resolution along with the signature pages for the ATE
19 policy and Purchase Agreement.
20 Do you see where I'm reading there?
21 **A. I do.**
22 Q. And then she says: Once the signature pages have
23 been collated, please can you send us a full copy for our
24 records? And you respond: Helen, request JD execution of
25 the attached, please. Thank you.

307

1  You see that at the top?
2  **A. I do.**
3  Q. So "Helen" refers to Helen Kim here?
4  **A. Yes.**
5  Q. So you were sending this e-mail to Helen Kim
6  requesting JD execute the attached; isn't that right?
7  **A. That's what it appears from this document.**
8  Q. Who is Ms. Kim?
9  **A. She is our paralegal.**
10 Q. Okay. And why were you sending this to Ms. Kim?
11 **A. Because she would handle execution, gathering**
12 **signatures, and other paralegal-type duties.**
13 Q. Okay. Now looking at the attachment to this --
14 that begins at page 4 -- you see the first attachment is
15 the Unanimous Written Resolution of the Board of Directors
16 of the Company, of Sentinel Reinsurance, Ltd.?
17 **A. I see that.**
18 Q. And, then, you see on the next pages there are
19 signature pages of Christopher Watler and Andrew Dean
20 dated August 10th, 2017?
21 **A. I see that.**
22 Q. Did you have anything to do with obtaining those
23 signatures?
24 **A. Not that I recall.**
25 Q. Why were you involved in getting Mr. Dondero's

308

1  signature?
2  **A. I believe J.P. was out of the office, and I was**
3  **helping him with anything he needed on this transaction.**
4  Q. And that was on August 10th of 2017, correct?
5  MS. SMITH: Objection, form.
6  BY MR. BURT:
7  Q. Looking at the date of the e-mail.
8  **A. This e-mail is dated August 10th, 2017, and I'm**
9  **asking Helen to please have this executed.**
10 Q. One moment.
11 Okay. I want to show you -- KL_53 -- a new
12 exhibit. And while she is getting that out, I actually
13 wanted to ask a question about Mr. Surgent. I think
14 you've mentioned his name a couple times, and we've seen
15 him on an e-mail or two today.
16 I think -- and correct me if I'm wrong. But
17 you've testified that Mr. Surgent knew about this
18 transaction, the APA and the ATE policy; is that right?
19 **A. Yes.**
20 Q. And -- and how is it that -- that Mr. Surgent
21 knew about the transaction?
22 **A. I don't know how he knew about it.**
23 Q. Okay. Why is it that you can testify here today
24 that you know that he did know about it?
25 **A. Because I sat outside of his office in a**

309

1  trading-desk environment, and he's quite loud.
2  Q. So it goes back to that, that you -- you
3  overheard him talking about this specific insurance
4  policy?
5  **A. Yes.**
6  Q. And you overheard him talking about the APA?
7  **A. I don't recall that specifically.**
8  Q. Okay. How about the ATE specifically and what it
9  was insuring, did you hear him talking about that?
10  MS. SMITH: Objection, form.
11  THE WITNESS: I don't recall those details.
12  BY MR. BURT:
13  Q. Okay. Do you re- -- did Mr. Surgent have
14  authority to approve the ATE or the APA?
15  **A. Approve for who?**
16  Q. Well, for any entity. Let's take Sentinel first.
17  Would he have had authority on behalf of
18  Sentinel?
19  **A. No.**
20  MS. SMITH: Objection, form.
21  BY MR. BURT:
22  Q. How about on behalf of the insureds, the CDO
23  entities and SOHC?
24  **A. I don't know the answer to that.**
25  Q. Okay. And he did not sign, on behalf of the

310

1  insureds, any of the documents related to the ATE,
2  correct?
3  **A. I saw -- yes. I saw that his signature was not**
4  **included in these documents.**
5  Q. Okay. When -- when you were sitting outside
6  overher- -- hearing Mr. Surgent talking about these issues
7  loudly, sounds like, did -- do you know who he was talking
8  to?
9  **A. No.**
10  Q. Would he have conversations with Mr. Ellington
11  about the ATE that you overheard?
12  **A. Not that I recall specifically.**
13  Q. Was it with members of the legal team that he was
14  having these discussions?
15  **A. I don't remember.**
16  Q. Okay. So you don't remember who the other party
17  on these conversations -- these very loud conversations
18  were?
19  **A. I don't.**
20  Q. All right. Yeah, let's show it.
21  So we've looked at this before, but I did
22  want to get it in as its own exhibit.
23  MR. BURT: I think 109 or 110.
24  MS. McLAUGHLIN: 109.
25  MR. BURT: 109.

311

1  (Exhibit 109 was marked for identification.)
2  THE WITNESS: Could I just add on the last
3  question that there are --
4  BY MR. BURT:
5  Q. Yeah.
6  **A. -- there are multiple people -- I mean, everyone,**
7  **I feel like, was involved in this transaction at Highland.**
8  **It was no secret. I mean, he could have been talking to**
9  **anybody.**
10  Q. And when you say "everyone," what -- is there,
11  like, a group, like legal department, or just, like,
12  everybody on the floor was talking about it?
13  **A. It was fairly general knowledge. So he could**
14  **have been speaking with whoever loudly in his office. I**
15  **don't know.**
16  Q. Right.
17  And -- and when you say it was gen- --
18  "fairly general knowledge," you're referring,
19  specifically, to Sentinel issuing the ATE policy was
20  fairly general knowledge?
21  MS. SMITH: Objection, form.
22  THE WITNESS: The ATE policy in general, I
23  feel like, was -- was not a secret at Highland.
24  BY MR. BURT:
25  Q. Okay. How about the APA and the assets that were

312

1  being transferred, is that something that was pretty
2  well-known too?
3  **A. Yes.**
4  Q. So that was something that HCML- -- HCMLP
5  employees were talking about on the floor, and they
6  overheard Mr. Surgent talking about it, something that was
7  just a normal part of business?
8  **A. Yes.**
9  Q. Okay. Now, again, I -- I've shown this to you
10  before, but now it's its own exhibit, just to tie this up.
11  See that this is the Judgment, again, from
12  the New York State Court in the UBS litigation against the
13  various Highland Entities, where we saw before the
14  Judgment had been entered in the amount of just over a
15  billion dollars.
16  Is that right? You see that?
17  MS. SMITH: Objection, form.
18  THE WITNESS: Is this a different document
19  than before?
20  BY MR. BURT:
21  Q. It -- it -- before we had looked at it as an
22  attachment to another exhibit. This is a standalone -- a
23  standalone document, but it's the same document that was
24  in the attachment.
25  **A. Okay.**

313

1    Q. All right. Now, what I'm interested in,
2 actually, here is -- is, again, dates and timelines.
3        So, here, we see that the date of this was
4 February 10th, 2020; is that right?
5    **A. I see that date here, yes.**
6    Q. Do you know whether HCMLP ever entered
7 bankruptcy?
8    **A. Yes.**
9        MS. SMITH: Objection, form.
10 BY MR. BURT:
11    Q. Which is what brings us together here today.
12        And when did it enter bankruptcy? No, I'm
13 not looking for a specific date, but approximately when,
14 to your knowledge.
15    **A. I believe it was in October 2019.**
16    Q. Okay. And so that would have been in relation to
17 this Judgment about four, or some odd -- about four months
18 prior to this Judgment, is that accurate, four or
19 five months?
20    **A. Sure.**
21    Q. Now, as part of bankrup- -- the bankruptcy
22 proceedings, are you familiar with an independent board
23 being placed in charge of HCMLP?
24    **A. Yes.**
25    Q. Okay. When did that occur, to your recollection?

314

1    **A. I really don't remember.**
2    Q. Did it follow close in time to the filing of
3 bankruptcy?
4        MS. SMITH: Objection, form.
5        THE WITNESS: I really don't remember when
6 the independent board was put in place.
7 BY MR. BURT:
8    Q. If I were to say early January, early 2020, would
9 that sound about right?
10    **A. I honestly don't remember.**
11    Q. Were they put in place prior to you being
12 terminated by HCMLP?
13    **A. Yes.**
14    Q. Okay. And, of course, it was after HCMLP
15 fired -- filed for bankruptcy; is that fair?
16    **A. Yes.**
17    Q. So sometime between October 2019 and
18 February 2021, the independent board was put in place?
19    **A. Yes.**
20    Q. Now, you just said that, you know, discussions of
21 Sentinel and the ATE policy, that was -- that was being
22 discussed on the floor, it was common knowledge, right,
23 normal part of business, pretty much everybody knew about
24 it? Is that right?
25    **A. It was -- it was common knowledge, I'd say, yes.**

315

1    Q. Did you ever discuss it with the independent
2 board?
3        MS. SMITH: Objection, form.
4        THE WITNESS: No. It was a transaction from
5 however long ago. No, I did not.
6 BY MR. BURT:
7    Q. Okay. Do you know whether these discussions on
8 the floor at Sentinel continued about -- regarding the ATE
9 policy and the Asset Purchase Agreement, do you know
10 whether these discussions continued on the floor and with
11 Mr. Surgent after the independent board had been put in
12 place?
13    **A. I don't know.**
14    Q. But your testimony here today is that you never
15 discussed the ATE policy with the independent board?
16    **A. I did not discuss the ATE policy with the**
17 **independent board.**
18    Q. And is there a reason why you didn't discuss it
19 with the board?
20    **A. I didn't --**
21        MS. SMITH: Objection, form.
22        THE WITNESS: I didn't really discuss
23 anything with the independent board.
24 BY MR. BURT:
25    Q. You had no discussions with the board?

316

1    **A. Maybe one one-off meeting with Judge Nelms, but,**
2 **no, that wasn't part of my day-to-day to discuss anything**
3 **directly with the independent board.**
4    Q. I see.
5        So we get -- looking at this exhibit, we get
6 the Judgment in February of 2020 relating to the case that
7 the ATE policy was issued to insure against.
8        What discussions, if any, occurred at
9 Highland regarding the ATE policy after the judgment came
10 down?
11        MS. SMITH: Objection, form.
12        THE WITNESS: I don't know.
13 BY MR. BURT:
14    Q. Did you have any discussions with anyone about
15 the policy -- the ATE policy after the judgment came down?
16    **A. No.**
17    Q. And there's a billion-dollar judgment that's just
18 come down against these Highland Entities; there's an ATE
19 policy to insure, as we saw, up to a hundred million, and
20 you don't recall any discussions about that after the
21 judgment comes down?
22    **A. I don't.**
23    Q. Did Mr. DiOrio ever dis- -- raise it with you?
24        MS. SMITH: Objection, form.
25        THE WITNESS: Not that I recall.

---

317

BY MR. BURT:

Q. Nothing like: Hey, I'm an independent director of Sentinel, and we ought to actually pay on this policy, nothing like that?

A. Not that I recall.

Q. How about Mr. Ellington? Did you ever discuss it with him? Did he ever ask: Hey, what are we doing about this ATE policy in light of the Judgment?

MS. SMITH: Objection, form.

THE WITNESS: Not that I recall.

BY MR. BURT:

Q. Mr. Leventon, no discussions with him either?

A. No, not that I recall.

Q. So did this ATE policy and the APA go from being widely discussed on the floor to, when the independent board comes in, no one's talking about it anymore?

A. No, it --

MS. SMITH: Objection, form.

THE WITNESS: -- the ATE policy was discussed when I overheard Thomas discussing it related to the timing of this transaction. When this -- at the time of this transaction, I would hear him talking about the transaction.

BY MR. BURT:

Q. Well, your testimony was broader than that, I

---

318

think. You said that it was fairly common knowledge; it was part of day-to-day business; everybody knew about the ATE policy; it was discussed, the APA. I think that's what you said earlier.

A. I sh-- -- yes. I should be more clear that at the time of the transaction, at the time these documents were signed, around this time, it was knowledge within the firm.

Q. Okay. Did those discussions cease after a certain period of time?

MS. SMITH: Objection, form.

THE WITNESS: I believe so.

BY MR. BURT:

Q. And when the judgment comes down, you never hear anyone say: Hey, there's a judgment for a billion dollars; we ought to look at that ATE policy?

MS. SMITH: Objection, form.

THE WITNESS: I just don't recall.

MR. BURT: KL_4.

BY MR. BURT:

Q. This has been previously marked as Deposition Exhibit 53.

Now, I -- actually, there -- there's a number of e-mails, and feel free to look at them, but what I'm interested in is actually just on the first page.

---

319

A. Let me just read this for context, please.

Q. Sure. Take your time.

A. (Witness reviews document.) Okay.

Q. All right. So at the very top, do you see that Mr. Leventon sends this e-mail chain to Mr. DiOrio, cc'ing you and Mr. Sevilla, on June 16th, 2020, right?

A. I see that.

Q. All right. And is that -- that's after the bankruptcy, right?

MS. SMITH: Objection, form.

THE WITNESS: June 16th, 2020, is after HCMLP filed for bankruptcy.

BY MR. BURT:

Q. Okay. And it's after the date of judgment that we looked at in the previous exhibit that was on February 10th, 2020?

A. June 16th, 2020, yes, is after the date on this paper, February 10th, 2020.

Q. Okay. So in the e-mail directly below from Lawrence Kemp to Isaac Leventon, he states: Hi, Isaac, hope all is well. I'm trying to wrap up the Sentinel Re audit for the year ended December 31, 2019, and I need your help with the following items: Can you give me a brief update on what happened during the year? The actuary has provided the following table with likely

---

320

outcomes of the case. Per their report, you have agreed that these estimates are reasonable.

Do you see that?

A. I see it on the paper, yes.

Q. And, again, I think you said you didn't have anything to do with the actuarial reports or the percentages in those reports, right?

A. Not that I recall.

Q. Okay. So -- and do you know who Lawrence Kemp is?

A. No.

Q. All right. So he's asking Mr. Leventon for an update on June 16th, 2020, four months after the judgment was entered, and then Mr. Leventon forwards this to DiOrio, cc'ing you.

Do you recall receiving this e-mail chain?

A. No.

Q. Do you know why he would have sent it to you?

MS. SMITH: Objection, form.

THE WITNESS: No.

BY MR. BURT:

Q. Was there ever any discussion that you were a part of with Mr. Leventon regarding the fact that a judgment had been entered in the UBS litigation?

A. Not that I recall.

---

321

1    Q.  Do you know whether Mr. Leventon ever told the
2  actuary that a judgment had been entered triggering the
3  ATE policy?
4        MS. SMITH:  Objection, form.
5        THE WITNESS:  I don't know what Mr. Leventon
6  told the actuary.
7  BY MR. BURT:
8    Q.  Okay.  No dis- -- and you had no discussions with
9  Mr. DiOrio or Mr. Sevilla either about the fact that a
10  judgment had been entered and what -- what the impact of
11  that was?
12    A.  Not that I recall.
13    Q.  So to your knowledge, there were no dis- -- from
14  what I'm learning -- and if I'm wrong, just let me know --
15  what I'm hearing is that there was no discussion at any
16  point, ever, that you were aware of regarding the ATE
17  policy after the UBS judgment was entered in February of
18  2020?
19        MS. SMITH:  Objection, form.
20        THE WITNESS:  I can't say never, ever, ever,
21  but I don't recall.
22  BY MR. BURT:
23    Q.  You don't recall any such discussion?
24    A.  I don't.
25    Q.  And I'm asking you as broadly as I can.

322

1    A.  I just don't recall.
2    Q.  One moment, please.
3        Do you know -- thinking back to the asset --
4  the APA itself, do you know whether any of the
5  transferring entities -- so the -- the entities that
6  purchased the insurance -- whether they had any assets
7  left after transferring the assets listed in Schedule A to
8  the APA?
9    A.  I don't know.
10    Q.  Do you know who might know that?
11    A.  I don't.
12    Q.  One moment.
13        If you could pull up the APA for me, I do
14  want to look at Schedule A again.
15    A.  Can you tell me the exhibit number?
16    Q.  Sure.  It's Exhibit 2.
17    A.  Okay.
18    Q.  Looking at Schedule A, which lists the assets
19  that were transferred, did you know at the time the value
20  of the assets that were transferred?
21    A.  No.
22        MS. SMITH:  Objection, form.
23  BY MR. BURT:
24    Q.  Were you ever part of a discussion where it was
25  discussed:  What is the value that were -- these funds

323

1  we're transferring to Sentinel?
2    A.  No.  And this didn't come to us in the litigation
3  funding capacity.  So, no, I didn't really look at the
4  value here as I would in, say, another ATE policy which
5  would be coupled with litigation funding.
6    Q.  So how did it come to you, then?  What was
7  different this time?
8    A.  I don't remember.  I don't know.
9    Q.  Who first told you about it?
10    A.  I don't know.
11    Q.  So you do know that it came to you in a different
12  way than the typical litigation funding ATE policy that
13  you would have done, right?
14    A.  It did, insofar as it didn't come from a Cayman
15  liquidator or one of the contacts that I was working for
16  business development purposes, but I don't recall who
17  specifically told me about this.
18    Q.  Okay.  And in addition to -- following up on who
19  specifically told you -- so again, more generally -- do
20  you have any recollection of -- in general, of who knew
21  about this and who brought it to your attention?
22        MS. SMITH:  Objection, form.
23        THE WITNESS:  I don't remember who brought
24  this to my attention.  It was common knowledge, like I
25  said before, at the time of the transaction at the firm.

324

1  The head of compliance knew about it.
2  BY MR. BURT:
3    Q.  Who was --
4    A.  -- Thomas Surgent.
5    Q.  Thomas Surgent, yep.
6    A.  Apparently, the other people listed on the
7  e-mails knew about it:  Cliff Stoops, Frank Waterhouse.
8  There were a lot of people on that e-mail chain.
9    Q.  Right.
10        Well, and you were on that e-mail chain too,
11  right?
12    A.  I was on the e-mail chain, yes.
13    Q.  Yeah.
14        So you knew about it as well at the time; it
15  was common knowledge, as you said?
16    A.  (Witness nods head affirmatively.)
17    Q.  Do you know whether it was the intent to transfer
18  all of the assets -- not just cash, but all of the assets
19  out of CDO fund and those other entities in Schedule A?
20        MS. SMITH:  Objection, form.
21        THE WITNESS:  Do I know if it was the intent
22  to transfer all assets?
23  BY MR. BURT:
24    Q.  Right.  To -- to take all of the assets of these
25  entities listed in Schedule A and transfer them to

325

1  Sentinel?
2  **A. I don't know.**
3  Q. You don't recall that being discussed?
4  **A. I don't.**
5  Q. Okay. This has been previously marked as
6  Deposition Exhibit 9.
7         MS. SMITH: Jason, give me a little bit more
8  of a scoot here.
9         MR. BURT: Oh, sorry. Oh, no, you're right.
10 Here you go.
11        THE WITNESS: (Witness reviews document.)
12 Okay.
13 BY MR. BURT:
14 Q. What I'm interested in -- this is actually a
15 further -- we've looked at some of these e-mails before,
16 and then there's more e-mails in the chain.
17        And what I'm interested in here is
18 Mr. Stoops's reference to "the list of securities not
19 eligible for DTC settlement and instructions for physical
20 delivery to BNY for all funds."
21        Do you see that at the top e-mail?
22 **A. I do.**
23 Q. What do you recall about the list of securities
24 not eligible for DTC settlement?
25 **A. I remember discussing briefly with the settlement**

326

1  **guys that some assets are on this DTC exchange, which I'm**
2  **not familiar with —**
3  Q. Okay.
4  **A. — really, and some assets were not on that**
5  **exchange, as far as I'm aware.**
6  Q. And when you're referring to "assets," you're
7  referring to assets listed on Schedule A to the APA?
8         MS. SMITH: Objection, form.
9         THE WITNESS: Yes, that's what I'm inferring
10 from this.
11 BY MR. BURT:
12 Q. Okay. And do you recall, without -- you know,
13 I'm not asking for the specific name of the security.
14        Do you recall anything about why certain
15 securities were not eligible for DTC settlement?
16 **A. No.**
17 Q. Okay. And do you recall that there was also
18 physical delivery of securities to BNY?
19        MS. SMITH: Objection, form.
20        THE WITNESS: I don't recall, but I see it
21 here on this e-mail you handed me.
22 BY MR. BURT:
23 Q. Right.
24        And what -- Mrs. Irving, what did you have
25 to do with the securities that were transferred? We've

327

1  seen the -- the wiring instructions that you provided.
2         What did you have to do with securities
3  being transferred?
4         MS. SMITH: Objection, form.
5         THE WITNESS: It looks like I provided an
6  address pursuant -- like, on this e-mail, it looks like I
7  provided an address, but other than that, I really don't
8  remember.
9  BY MR. BURT:
10 Q. Right.
11        And are you referring to the e-mail -- the
12 August 11th e-mail at 2:57 p.m.?
13 **A. I am.**
14 Q. And that's the address of Lesley Thompson?
15 **A. Yes.**
16 Q. And is that the address that physical security
17 should be sent to; do you know?
18 **A. I don't know.**
19 Q. Well, let's look at the e-mail right below that
20 from Clifford Stoops to you and others where he says: All
21 cash has been sent. Working on DTC securities. Still
22 waiting on delivery instructions for physicals from legal.
23 **A. So, yes, I'm responding to Cliff's e-mail.**
24 Q. Okay. So the physical securities were to be sent
25 to Lesley Thompson at Sentinel Reinsurance, Ltd., c/o

328

1  MaplesFS, 4th Floor, Boundary Hall, Cricket Square, again
2  Grand Cayman, Cayman Islands?
3  **A. I see that here.**
4  Q. And so that's the address you provided.
5         Do you know whether she received them?
6  **A. I don't know.**
7         (Off-record discussion.)
8  BY MR. BURT:
9  Q. All right. This has been previously marked as
10 Deposition Exhibit 14, another e-mail chain on August 10th
11 and 11th of 2017.
12 **A. (Witness reviews document.) Okay.**
13 Q. All right. Now, this begins, it appears, with a
14 missed call from -- that you missed from Carter Chism on
15 August 10th, 2017.
16        You see that at the bottom?
17 **A. Yes, I do.**
18 Q. And then you e-mail him on August 10th: Hey,
19 Carter, transaction should close shortly. Do you have
20 everything you need in order to push the button on
21 securities transfer, please?
22        Do you recall this e-mail to Mr. Chism?
23 **A. No.**
24 Q. Do you recall working with Mr. Chism on the
25 transfer of the Schedule A assets?

329

1    A. Yes.
2    Q. And what did Mr. Chism do?
3    A. He was the settlements op's guy.
4    Q. Did he deal with both securities and cash?
5    A. I don't know.
6    Q. All right. And then, the next e-mail up, you --
7    you state, again on August 10th: Hi, Carter, docs are
8    being counter-executed as we speak. We should be good to
9    go in relation to trade. Please get it rolling, and let
10   me know if you need anything from our side. Thank you.
11        You see that?
12   A. I see it.
13   Q. And you cc'd Mr. Sevilla on this, right?
14   A. Yes.
15   Q. Were you and Mr. Sevilla overseeing the
16   counter-execution of the APA and the ATE at this time?
17        MS. SMITH: Objection to form.
18        THE WITNESS: I don't remember.
19   BY MR. BURT:
20   Q. All right. Were you overseeing the -- the
21   transfer of the assets listed in Schedule A?
22        MS. SMITH: Objection to form.
23        THE WITNESS: No, we were not overseeing
24   that.
25   BY MR. BURT:

330

1    Q. Okay. But you were dealing with it?
2    A. Sure.
3    Q. Yeah. So I'm just trying to understand what,
4    exactly, was your involvement on August 10th and 11th with
5    respect to the transfer of the securities. You've pro- --
6    we've seen you providing instructions and addresses.
7        Anything else that you did with respect to
8    those transactions?
9    A. I don't believe I provided any instructions, but
10   let me know if you're referencing something specific.
11   Q. The wiring instructions --
12   A. Yes, I did --
13   Q. -- for cash.
14   A. I did send wiring instructions, and I did send
15   the address -- physical address of the director at
16   MaplesFS.
17   Q. But you had no say in what assets were being
18   transferred or how they were to be transferred --
19   A. No.
20   Q. -- anything like that?
21   A. No.
22   Q. Okay. Just one final -- well, it's two
23   documents, but one quick line of questioning to just wrap
24   this up about the transfer itself.
25        So we'll mark this as Exhibit 110, and then

331

1    this has been previously marked as Exhibit 81.
2        (Exhibit 110 was marked for identification.)
3        THE WITNESS: Thanks.
4        (Witness reviews document.)
5        Is this the attachment to this e-mail just
6    in color?
7    BY MR. BURT:
8    Q. Exactly.
9    A. Okay.
10   Q. That's correct. Exhibit 81 is just the color
11   attachment to Exhibit 110.
12   A. Okay.
13   Q. Do you recall following up with Mrs. Thompson
14   about the receipt of securities following -- the days
15   following the transaction?
16   A. I don't recall, but I see it in this e-mail
17   chain.
18   Q. Right.
19        Do you recall her sending you a Schedule A
20   marked in orange and green to signify certain securities
21   that have been -- that had been received?
22   A. I don't recall, but I see it -- see this document
23   you handed me, which has orange and green.
24   Q. Okay. So looking at that document, Exhibit 81,
25   prior to sitting here today looking at it, do you recall,

332

1    at any time, reviewing this document that Mrs. Thompson
2    provided to you?
3        MS. SMITH: Objection, form.
4        THE WITNESS: I don't really recall.
5    BY MR. BURT:
6    Q. Who tasked you with following up to ensure that
7    all assets were transferred and received by Sentinel?
8        MS. SMITH: Objection, form.
9        THE WITNESS: Could you break that question
10   apart for me, please?
11   BY MR. BURT:
12   Q. Sure. I'm just trying to understand why you were
13   doing this.
14        Did somebody ask you to follow up and ensure
15   that all transfers of the assets listed in Schedule A had
16   been received by Sentinel?
17        MS. SMITH: Objection, form.
18        THE WITNESS: I don't remember.
19   BY MR. BURT:
20   Q. So you don't know why you were doing -- you were
21   e-mailing with Mrs. Thompson about this and receiving
22   highlighted copies of Schedule A?
23   A. I don't remember who asked me to work on this.
24   Q. So, just in general, what do you recall about
25   this -- this work in following up with Mrs. Thompson on

333

1  these assets?
2       A. I was acting kind of as a point person between
3  Lesley Thompson and whatever else she needed related to
4  this -- a liaison, if you will -- with the Highland team.
5       Q. Okay. So you were sort of in the middle between
6  Mrs. Thompson and the Highland team to ensure that she was
7  getting what she needed?
8       A. I mean, as to these, kind of, administerial
9  requests, yes.
10      Q. Okay. And did -- and you don't recall whether
11  someone on the Highland team asked you to do that?
12          MS. SMITH: Objection, form.
13          THE WITNESS: I don't remember.
14  BY MR. BURT:
15      Q. Do you recall at any time in -- as these assets
16  are being transferred looking at the value of the assets
17  to ensure that the right amount had been transferred?
18      A. No, I don't remember that.
19      Q. Do you have any knowledge of any valuation that
20  was done of these assets after they were transferred?
21          MS. SMITH: Objection, form.
22          THE WITNESS: Not that I recall.
23  BY MR. BURT:
24      Q. So you don't recall that there was any valuation
25  of the assets, or you just don't recall whether it

334

1  happened?
2          MS. SMITH: Objection to form.
3          THE WITNESS: Yeah. Could you repeat that,
4  please?
5  BY MR. BURT:
6       Q. I'm trying to understand if -- if you don't
7  recall whether there was any valuation ever done? You
8  just don't remember; is that your testimony?
9       A. I don't remember asset valuation on these assets.
10      Q. I see. Okay.
11          So on -- at either Highland or Sentinel, you
12  don't recall?
13      A. I -- I don't.
14      Q. Okay. Was there a team at Highland or Sentinel
15  who -- who usually did this -- an asset valuation?
16          MS. SMITH: Objection, form.
17          THE WITNESS: I don't know.
18  BY MR. BURT:
19      Q. Was that with -- did legal -- was legal ever
20  tasked with valuing assets in a -- in an APA -- in any
21  APAs, anything like that?
22      A. I don't know.
23      Q. Was that work that you ever did?
24      A. Not that I recall.
25      Q. All right. This has been previously marked as

335

1  Deposition 48 -- Exhibit 48.
2          And, again, I -- I want to just draw your
3  attention to a couple of these slides. If you need to
4  review context, that's fine.
5          But you'll see it's a -- it's a slide deck,
6  "Settlement Analysis, UBS vs.," and then it has an "H"
7  within a shield.
8          Is that the Highland symbol, HCMLP symbol?
9       A. I don't know.
10      Q. All right. Have you ever seen this deck before?
11      A. Let me review it. But upon first blush, it's not
12  familiar to me.
13      Q. Okay.
14      A. (Witness reviews document.)
15          This is not familiar to me.
16      Q. Okay. So I just want to look at a -- a couple of
17  slides since it's not familiar and just ask you one or two
18  questions.
19      A. Okay.
20      Q. And it's a little tricky the way this was
21  printed, but Slide 8 is -- has the title "UBS Settlement:
22  Structure Summary."
23      A. Okay.
24      Q. And Step 1 says: HFP/CDO Fund buy $90 million AP
25  -- ATE policy from Sentinel.

336

1          Does that $90 million figure ring any bells
2  with you?
3       A. No.
4       Q. Then it states: ATE premium equals all assets in
5  HFP/CDO Fund.
6          Do you see that?
7       A. I see it.
8       Q. And were you familiar with the fact that the AT-
9  -- ATE premium was to consist of all assets of HFP and CDO
10  Fund?
11          MS. SMITH: Objection, form.
12          THE WITNESS: No, I was not familiar with
13  that.
14  BY MR. BURT:
15      Q. Do you know who would have been familiar with
16  that?
17      A. No.
18      Q. All right. Now going back, actually, to Slide 6,
19  it's if -- the title is "If Highland settles..."
20          Do you see that?
21      A. I see it.
22      Q. And No. 1 says: Sentinel controls HFP/CDO Fund
23  assets, currently $94 million.
24          Do you see that?
25      A. I see it written here, yeah.

337

1      Q.  Do you know how that figure, $94 million, was
2  arrived at?
3          MS. SMITH:  Objection to form.
4          THE WITNESS:  No idea.
5  BY MR. BURT:
6      Q.  Number 2 says:  Sentinel and HCMLP can use
7  HFP/CDO Fund assets to generate cash to pay UBS
8  settlement, Citi, and outstanding legal fees.
9          Do you see that?
10     A.  I see it.
11     Q.  Do you know why it would -- it states here that
12 Sentinel and HCMLP can use the HFP/CDO Fund assets to
13 generate the cash to pay a settlement?
14     A.  No idea.
15     Q.  All right.  Then, on Slide 10, just -- one final
16 slide, the title is "UBS Settlement:  Step 1 - ATE
17 Policy," and says, "Actor:  Scott's Team."
18         Did you know any Scotts at Highland -- at
19 HCMLP?
20     A.  Yes.
21     Q.  And who was that?
22     A.  My direct report, Scott Ellington.
23     Q.  Okay.  So the "Actor" here was Scott's team,
24 Mr. Ellington, and it states -- I'm looking at the text
25 that's over the arrows -- HFP/CDO Fund send all their

338

1  assets ($94m) as ATE premium to Sentinel.  In exchange,
2  Sentinel writes a $90 million ATE policy for UBS
3  liability.
4          Do you see that?
5      A.  I see it.
6      Q.  Were you involved, in any way, with the
7  discussions, as a member of Scott's team, that was
8  determining this strategy?
9          MS. SMITH:  Objection to form.
10         THE WITNESS:  Not that I recall.
11 BY MR. BURT:
12     Q.  How about the fact that HFP/CDO fund would send
13 all their assets?  Do you recall that ever having been
14 discussed in Scott's team?
15     A.  I don't.
16         MS. SMITH:  Objection to form.
17 BY MR. BURT:
18     Q.  And then, on the very last page of this deck,
19 there's a listing of HFP entities and CDO Fund entities
20 and various assets which they held.
21     A.  Sorry.  Which page are you on?
22     Q.  The very last page of the deck.
23     A.  Okay.
24     Q.  Yeah.
25         MS. SMITH:  5321?

339

1          MR. BURT:  That's right, yep.
2  BY MR. BURT:
3      Q.  Do you see that?
4      A.  I see it.
5      Q.  And total assets listed there is 94,057,547.
6          Do you see that listed in -- it's in black
7  there.
8      A.  I see it on this page, yes.
9      Q.  All right.  You had no knowledge at the time that
10 the asset -- the total assets were -- was being valued by
11 Scott's team at $94 million of these entities?
12         MS. SMITH:  Objection, form.
13         THE WITNESS:  I don't know who valued these.
14 I don't know.
15 BY MR. BURT:
16     Q.  You were never involved in such a valuation?
17     A.  No.
18     Q.  And, again, as -- as a member of Scott's team,
19 was there any member of Scott's team, that you were aware
20 of, who would have been involved in such a valuation?
21         MS. SMITH:  Objection, form.
22         THE WITNESS:  I don't know.
23 BY MR. BURT:
24     Q.  At any time, did members of Scott's team perform
25 these types of valuations of assets held by various HCMLP

340

1  entities?
2          MS. SMITH:  Objection, form.
3          THE WITNESS:  Could you repeat that?
4  BY MR. BURT:
5      Q.  Yeah.
6          So setting this aside, I'm just wondering:
7  In general, was it a task of Scott's team at any time to
8  value the assets of an HCMLP entity or entities?
9          MS. SMITH:  Objection, form.
10         THE WITNESS:  Not that I recall.
11 BY MR. BURT:
12     Q.  That was -- that would have been different teams
13 at HCMLP that would have done that?
14     A.  HCMLP had a dedicated valuation team.
15     Q.  Who was on that team?
16     A.  I can't remember.
17     Q.  But that was independent of Scott's team?
18     A.  It was -- it was a -- not legal team; it was a
19 valuation team separate from the legal team.
20     Q.  Okay.  Did you ever have anything to do with a
21 tax analysis of -- of the ATE policy?
22         MS. SMITH:  Objection, form.
23         THE WITNESS:  I remember some discussion
24 with counsel around -- I remember some discussion with
25 counsel around the in- -- income or something like that,

341

1 the ongoing -- any ongoing income from the assets and
2 whether it would be taxable.
3 BY MR. BURT:
4     Q. To Sentinel?
5     A. Yes.
6     Q. And what outside counsel are you referring to?
7     A. Steve Beck.
8     Q. Where was he at?
9     A. Meadows Collier.
10     Q. Was that -- remind me, was that a Cayman's entity
11 or a U.S. entity?
12     A. No. He's out of Dallas.
13     Q. Out of Dallas, okay.
14         So -- and he was outside counsel to Highland
15 -- to HCMLP?
16     A. No. He was outside counsel -- we talked about
17 this earlier at length. He was outside counsel to various
18 entities. I don't recall where the engagement letter
19 sat --
20     Q. Right.
21     A. -- but he provided guidance around the
22 Sentinel -- and taxes.
23         [Simultaneously speaking.]
24 BY MR. BURT:
25     Q. Excuse me.

342

1         It was that same outside counsel that we
2 discussed earlier --
3     A. Yes.
4     Q. -- who you are referring to? I see.
5         Do you know who Shawn Raver is?
6     A. That name seems familiar, but I don't know.
7     Q. I'm showing you what's been ar- -- what's been
8 previously marked as Deposition Exhibit 3.
9         Do you need a break, Mrs. Irving? Are
10 you --
11     A. No, I'm okay. Thank you.
12     Q. And we'll start just on this first page, and then
13 I'll -- I'll take you to the attachment.
14         You see this is from Shawn Raver to
15 Rick Swadley both with @highlandcapital.com e-mails?
16     A. I see that, uh-huh.
17     Q. And the date is 12th of September 2018, right?
18     A. I see that here, yes.
19     Q. And then there's an attachment that says,
20 "Tax_Compliance_Memo_(2017)_Sale_of_Assets_to_Sentinel."
21         Is that the attachment that's listed there?
22     A. I see that printed here, yes.
23     Q. Okay. Now, flipping to the next page -- and
24 just, at a very high level, do you recall ever having seen
25 this tax -- excuse me -- this memorandum?

343

1     A. No.
2     Q. Okay. You see it's a memorandum from Shawn Raver
3 to Tax Files on Highland Capital letterhead dated
4 June 30th, 2018. RE: Tax Consequences of Sentinel
5 Acquisition of HFP CDO Opportunity Assets.
6         Right?
7     A. I see that on this paper.
8     Q. Now, one question, looking at page 2 of this memo
9 at the bottom, and I'm just interested in amounts here.
10 It states: The aggregate purchase price
11 paid by Sentinel for the assets was $25 million. The
12 aggregate fair market value of the assets on the date of
13 the transaction was $105,647,679.
14         You see that?
15     A. I see the paragraph you're reading, yes.
16     Q. Okay. And I think we've established you didn't
17 have any knowledge of these amounts at the time; is that
18 fair?
19     A. No, I don't recall.
20     Q. It says: The document effectuating the
21 transition -- excuse me -- the transaction did not
22 allocate the purchase price among the assets acquired by
23 Sentinel.
24         See that?
25     A. I do see that.

344

1     Q. Now, was it -- in your dealings with Sentinel --
2 well, strike that.
3         I'm just wondering: As -- as a CPA, does it
4 make sense to purchase an insurance policy in which you
5 overpay by four times the amount of the premium?
6         MS. SMITH: Objection, form.
7         THE WITNESS: I wasn't acting as a -- as a
8 CPA. I'm not functioning as a CPA at all related to this
9 transaction.
10 BY MR. BURT:
11     Q. Right.
12         But I'm just wondering: From a financial
13 perspective -- and we've gone through your credentials --
14 whether you have any thoughts of giving assets that are
15 worth more; in this case, by four times, than the policy
16 coverage -- than the pre- -- excuse me -- than the
17 premium?
18         MS. SMITH: Objection, form.
19         THE WITNESS: You're asking my -- my
20 thoughts about this?
21 BY MR. BURT:
22     Q. Yeah.
23         Does that make sense to you?
24         MS. SMITH: Objection, form.
25         THE WITNESS: It would depend on the

345

1 circumstance.
2 BY MR. BURT:
3 Q. Okay. So it might make sense to overpay a
4 premium by four times to purchase an insurance policy?
5 MS. SMITH: Objection, form.
6 THE WITNESS: It could.
7 BY MR. BURT:
8 Q. And what would those circumstances be?
9 A. If -- I mean, we are just doing hypotheticals
10 here?
11 Q. Not a hypothetical. I'm looking at these numbers
12 in this memo.
13 I'm not asking you to testify as an expert;
14 I'm asking for -- as a lay witness, as a CPA, whether that
15 makes financial sense to you to overpay by four times?
16 A. I don't --
17 MS. SMITH: Objection, form.
18 THE WITNESS: I don't know in relation to
19 this transaction.
20 BY MR. BURT:
21 Q. Okay. Looking -- now turning to page 4 of this
22 memo, the last paragraph on page 4, the paragraph begins:
23 It is clear the transaction had economic substance.
24 Do you see that paragraph?
25 A. Yes.

346

1 Q. All right. Now, five lines down, there's a line
2 that begins: In addition, Sentinel is not related...
3 Do you see that?
4 A. I do.
5 Q. There it says: In addition, Sentinel is not
6 related to the seller entities, and each side to the
7 transaction was independent of the other. There are no
8 facts to indicate the transaction was not the result of
9 arm's-length negotiations.
10 Is that consistent with your understanding
11 of the transaction?
12 MS. SMITH: Objection, form. Oh, also calls
13 for a legal conclusion.
14 MR. BURT: I'm just asking whether it's
15 consistent with her recollection.
16 THE WITNESS: Sentinel was not related to
17 the seller entities, yes, agree.
18 BY MR. BURT:
19 Q. Okay. And the seller entities, we've looked --
20 are listed in Schedule A to the APA, right?
21 A. I -- yes, I believe so.
22 Q. Okay. We'll mark this as 111.
23 (Exhibit 111 was marked for identification.)
24 BY MR. BURT:
25 Q. And I'm only interested in this exhibit,

347

1 Mrs. Irving, in the e-mails. The attachment is one of the
2 actuarial documents, which you've testified you never saw,
3 so we won't worry about that.
4 A. Okay.
5 Q. So just looking at the e-mails, beginning on the
6 first page, in the middle, there's an e-mail from Tom
7 Adamczak to Jason Stubbs on May 9th, 2019.
8 You see that?
9 A. I see it.
10 Q. And I may have asked you this before: But do you
11 know who Jason Stubbs is?
12 A. I don't know who that is.
13 Q. And Risk International, no idea?
14 A. No idea.
15 Q. Okay. And Mr. Adamczak writes: I have a few
16 edits based on the recent examination. And so we're in
17 the May 2019 time period.
18 It says, page 3, first paragraph: Need to
19 recognize SAS and Sentinel structures, both different, as
20 CIMA made the point during exam.
21 Not -- do you see that, where I just read?
22 A. Yeah, I see it.
23 Q. Do you know what he is referring to there?
24 A. No.
25 Q. All right. The next bullet, page 3, third

348

1 paragraph, says: I want to get Matt to weigh in here as
2 it references the ATE coverage being provided to
3 unaffiliated entities. Yet, we keep making the point to
4 CIMA that all are related in some way. Sentinel UBO
5 ultimately controls the insureds.
6 Do you see that?
7 A. I see it.
8 Q. Were you involved in discussions with CIMA in
9 which that point was made to CIMA, that the Sentinel UBO
10 ultimately controls the insureds?
11 MS. SMITH: Objection to form.
12 THE WITNESS: I don't think this makes any
13 sense. So, no, since I don't think this makes any sense,
14 no, I wasn't discussing that with CIMA.
15 BY MR. BURT:
16 Q. What doesn't make sense to you?
17 A. I don't think it's very well written. It says:
18 We keep making the point to CIMA that all -- I don't know
19 what "all are related in some way. Sentinel UBO
20 ultimately controls insureds."
21 Q. Well, if you look at the first line, he states:
22 Want to get Matt to weigh in here as it references the ATE
23 coverage being provided to unaffiliated entities. And the
24 "ATE coverage," as we've examined at length today, related
25 to the litigation involving UBS, correct?

349

1    MS. SMITH:  Objection, form.
2    THE WITNESS:  You're saying the -- sorry.
3 Could you repeat that?
4 BY MR. BURT:
5    Q.  Sure.
6    The ATE coverage -- I'll ask it a different
7 way -- involved the entities on Schedule A transferring
8 assets to Sentinel -- Schedule A to the APA, transferring
9 assets to Sentinel --
10   A.  Okay.
11   Q.  -- and obtaining an insuran-- an ATE insurance
12 policy in exchange, right?
13   A.  My understanding, yes, that's right.
14   Q.  Okay.  And here he is stating "it," referring to
15 the audit -- the actuarial draft, references the coverage
16 being provided to unaffiliated entities.  Yet, "we" keep
17 making the point to CIMA that "all" are related in some
18 way.
19   MS. SMITH:  Objection, form.
20 BY MR. BURT:
21   Q.  Sentinel UBO ultimately controls insureds.  The
22 "insureds" being the CDO Fund and other entities we've
23 seen in prior exhibits, right?
24   A.  What's the question?
25   Q.  The "insureds" refers to the entities that

350

1 purchased the insurance?
2    A.  I agree the insureds is referring to the entities
3 which purchased the insurance, yes.
4    Q.  Do you disagree that the Sentinel -- Sentinel
5 UBO, ultimate beneficial owner, ultimately controls the
6 insureds?
7    MS. SMITH:  Objection, form.
8    THE WITNESS:  This whole sentence makes no
9 sense to me.
10 BY MR. BURT:
11   Q.  So back out.  Did you -- you've met with CIMA,
12 and you said at least twice, right?
13   A.  Yes, I have met with CIMA.
14   Q.  Okay.  Once was in August in 2019, and to the
15 best of your knowledge, you can't recall when the other
16 meeting was --
17   A.  Right.
18   Q.  -- is that right?
19   A.  That's right.
20   Q.  Both meetings were at CIMA's offices?
21   A.  Yes.
22   Q.  Did this ever come up, any representation to CIMA
23 that you remember, that Sentinel -- the owners of Sentinel
24 controls the insureds, the entities that are insured under
25 the ATE policy?  Do you ever recall that coming up in a

351

1 discussion with Sentinel -- or -- excuse me -- with CIMA?
2    A.  No.  I don't think this makes any sense, no.
3    Q.  So put the document down.  I am asking you a
4 question, whether you recall that topic ever being
5 discussed with CIMA during your meetings that you attended
6 with CIMA, that the Sentinel owners controlled the
7 insureds?
8    A.  I don't recall that.
9    Q.  You don't recall that coming up in your meetings
10 with CIMA?
11   A.  I don't.
12   MR. BURT:  Yeah.  Is it okay if we take
13 five?
14   MS. SMITH:  Yep.
15   MR. BURT:  I think we are probably at six --
16   THE VIDEOGRAPHER:  We are off the record at
17 6:01 p.m.
18   (Brief recess taken.)
19   THE VIDEOGRAPHER:  Back on record at 6:16
20 p.m.
21 BY MR. BURT:
22   Q.  Mrs. Irving, we were -- I just wanted to ask a
23 couple of wrap-up questions with respect to the -- the ATE
24 policy.
25   Did you ever work to determine the business

352

1 rationale for the ATE policy?
2    A.  No.
3    Q.  Do you know whether anyone did?
4    MS. SMITH:  Objection, form.
5    THE WITNESS:  I don't know.
6 BY MR. BURT:
7    Q.  You weren't involved in that at all?
8    A.  Not that I recall.
9    Q.  How about the Asset Purchase Agreement, did you
10 ever work to determine the business rationale for
11 transferring all of those assets out of CDO Fund to this
12 -- in those various entities?
13   MS. SMITH:  Objection, form.
14   THE WITNESS:  No.
15 BY MR. BURT:
16   Q.  Okay.  Do you know if Sentinel had the means to
17 pay out the policy in 2017 if the insureds had come asking
18 for payment?
19   A.  I don't know.
20   Q.  Who would know that?
21   A.  CIMA or the administrator.
22   Q.  So Beecher Carlson would know that?
23   A.  Maybe.
24   Q.  Anybody at HCMLP who was working on the ATE?
25   MS. SMITH:  Objection, form.

353

1    THE WITNESS: Sorry. Could you repeat that
2  whole question, please?
3  BY MR. BURT:
4    Q. Sure.
5       Was any -- would -- anybody at HCMLP, who
6  was working on the ATE or the Asset Purchase Agreement,
7  would -- would they know whether Sentinel had the means to
8  pay out on the policy in 2017?
9    A. I don't know.
10     MS. SMITH: Objection, form.
11 BY MR. BURT:
12    Q. How about in -- let me know if your answer is the
13 same in relation to the 2020 time period, whether Sentinel
14 had the means to pay out on the policy.
15    A. No idea.
16    Q. Okay. And with respect to who might know, would
17 your answer be the same: CIMA and, perhaps, Beecher
18 Carlson?
19    A. Yes.
20    Q. All right. Do you know who the creditors of
21 Sentinel are?
22     MS. SMITH: Objection, form.
23     THE WITNESS: What do you mean by
24 "creditors"?
25 BY MR. BURT:

354

1    Q. So what do you understand creditor to mean in the
2  context of -- you have an insurance company, Sentinel,
3  with creditors. You understand what a creditor would be?
4    A. Presumably would be someone who is owed money.
5    Q. Right. And maybe loaned to Sentinel, or loaned
6  assets, contributed capital?
7      MS. SMITH: Objection, form.
8      THE WITNESS: I don't know who the creditors
9  of Sentinel would be.
10 BY MR. BURT:
11    Q. Okay. All right. I'm going to hand you --
12 sorry. One moment. Let me find it in my own notes. Oh,
13 that's right, 34 -- no, I'm sorry. I'm confusing myself.
14     This is -- this has been previously marked
15 as Deposition Exhibit 58.
16     Now, the first pages of this document, MD_10
17 through MD_26 is the insurance policy that we've looked at
18 previously. So I'd like to go to MD_27 and look at both
19 this page and the next page; MD_27 having the "Sentinel
20 Reinsurance" heading at the top, and stating, "Endorsement
21 No. 1," and MD_28 having the "Sentinel" heading at the top
22 and stated "Endorsement No. 2."
23     Go ahead and take a look at that,
24 Mrs. Irving, and when you're ready, let me know if you
25 recognize these documents.

355

1    A. (Witness reviews documents.)
2       I don't recognize these at all.
3    Q. Okay. Okay. Understood.
4       So setting those aside, do you have any
5  knowledge of the insurance premium on the ATE being
6  adjusted at any time?
7    A. Not that I recall.
8    Q. So looking at Endorsement 1, it states: The
9  premium, as stated in the schedule, is adjusted to
10 $68,362,333.62 to include the total fair value of received
11 assets. Premium received consists of cash of 11 million
12 -- some-odd million, miscellaneous receivables of
13 1.753 million, and investment portfolio of 55.525 million
14 as measured at fair value on the transfer date.
15     Do you see that?
16    A. I see it, yes.
17    Q. And Lesley Thompson signs at the bottom as the
18 director, right?
19    A. Uh-huh.
20    Q. So you have no knowledge of this, the
21 readjustment of the premium?
22    A. That is not familiar to me.
23    Q. Okay. Or the values of -- the value of 68
24 million listed here in this?
25     MS. SMITH: Objection to form.

356

1    THE WITNESS: I -- I'm not familiar with
2  this.
3  BY MR. BURT:
4    Q. Okay. And is it -- is your answer the same with
5  respect to Endorsement 2, no knowledge of that either?
6    A. I'm not familiar with this.
7    Q. And, here, we see that the premium is reduced to
8  $59,362,333.62.
9       That's unfamiliar to you?
10    A. I'm not familiar with this, yeah.
11    Q. It states that: 9 million has been prepaid by
12 the insured --
13    A. Excuse me.
14    Q. -- to the insurer to cover risk mitigation costs,
15 which include, but are not limited to, legal defense
16 costs.
17     Do you recall or have any knowledge of
18 9 million being paid by the insured to the ATE policy?
19     MS. SMITH: Objection to form.
20     THE WITNESS: This 9 million is not familiar
21 to me.
22 BY MR. BURT:
23    Q. Okay. And then: The limit of indemnity is
24 reduced to 91 million in the aggregate to correlate with
25 prefunding the risk mitigation costs of 9 million.

357

1    Do you recall the -- the limit being reduced
2 from 100 million to 91 million?
3    **A. I don't.**
4    Q. Do you know who might know about this, aside from
5 Mrs. Thompson who signed?
6    **A. I don't.**
7    Q. Now, going back to something we discussed earlier
8 today -- what number is this --
9        MS. MCLAUGHLIN: 101.
10 BY MR. BURT:
11    Q. -- looking at Exhibit 101, the CIMA letters that
12 we've looked at earlier --
13        MS. MCLAUGHLIN: It's the one with the
14 orange tab at the top.
15        MR. BURT: Oh, yes, that's right.
16        THE WITNESS: Oh, thanks.
17 BY MR. BURT:
18    Q. All right. Now, I -- looking at that first page,
19 the very first e-mail from Mr. Price at Beecher Carlson to
20 CIMA, various CIMA individuals -- and we've looked at this
21 before. But there are four attachments, and I want to
22 look, specifically, at the third attachment, which is
23 Sentinel Reinsurance, Ltd., Final On-site Inspection
24 Report, AML-Specific Report.
25    **A. Okay.**

358

1    Q. Do you recall there being two reports being
2 issued by CIMA at this time in, approximately, May of
3 2019?
4    **A. No, I don't recall that.**
5    Q. All right. Let's flip to that. So it's the
6 third attachment.
7        MR. BURT: What's the Bates?
8        MS. MCLAUGHLIN: It's where the orange tab
9 is.
10        MR. BURT: Oh, it's where the orange tab is.
11        THE WITNESS: Oh, okay.
12 BY MR. BURT:
13    Q. And -- and the heading here -- again, it has the
14 CIMA, I guess, logo on it, and it states: Final AML-CFT
15 and Sanctions Inspection Report for Sentinel Reinsurance,
16 Ltd., conducted on 4th of March 2019 to the 11th of
17 March 2019 and issued on 6th of May 2019.
18    Do you see that?
19    **A. I see it.**
20    Q. And were you aware that CIMA, as part of its
21 inspection, was doing an AML inspection?
22        MS. SMITH: Objection, form.
23        THE WITNESS: I don't know.
24 BY MR. BURT:
25    Q. And I believe you testified earlier that you

359

1 understood "AML" to refer to anti-money laundering; is
2 that right?
3    **A. Yes.**
4    Q. Do you have an understanding of what "CFT" refers
5 to?
6    **A. No.**
7    Q. Okay. Well, let's look at this. I'll draw your
8 attention to just a few portions of this.
9    First, page 5 of 13, there under heading
10 5.2, "AML Findings" -- well, hold on. Excuse me just one
11 second.
12    Okay. Yeah. Drawing your attention to 5.2,
13 "AML Findings," on page 5 of 13, and under finding
14 5.2.1.1; do you see where I'm at?
15    **A. I do.**
16    Q. And it states there at the beginning: On
17 August 1st, 2017, the Licensee entered into an insurance
18 contract to provide ATE cover to Highland CDO Opportunity
19 Master Fund, L.P., Highland CDO Fund Holding Company, and
20 Highland Special Opportunities Holding Company, all
21 affiliates of SAS Asset Recovery.
22    Do you see that?
23    **A. I do.**
24    Q. And it says: The premium for the coverage was
25 initially set at 25 million with an indemnity limit of

360

1 100 million. Subsequently, an undated endorsement was
2 affected adjusting the premium cover -- for the coverage
3 to 68.3 million, consisting of U.S. 1 million cash, U.S.
4 1.8 million, and miscellaneous receivables, and U.S.
5 55.5 million in investment portfolio.
6    And do you see that?
7    **A. Yes. I think you said "1 million cash"; it says**
8 **"11 million cash."**
9    Q. Thank you for correcting me. You're absolutely
10 right, 11 million cash.
11    And do you recall -- we just looked at -- I
12 know you hadn't seen it before, but we just looked at that
13 endorsement?
14    **A. Yes, you just showed me an endorsement.**
15    Q. Okay. Further: Subsequently, another undated
16 endorsement was affected reducing the premium for the
17 coverage and the indemnity limit to U.S. 59.3 million and
18 U.S. 91 million respectively. U.S. 9 million was set
19 aside as prepaid fund -- to cover risk mitigation costs,
20 including, but not limited to, legal defense costs for
21 then ongoing case.
22    Do you see that?
23    **A. I see it.**
24    Q. And is that consistent with Endorsement No. 2
25 that we looked at? I understand that you had not seen

361

1 that before today.
2          MS. SMITH:  Objection to form.
3          THE WITNESS:  I'd have to review if it's
4 consistent, but you did show me a second endorsement, yes.
5 BY MR. BURT:
6     Q.  Okay.  Then it states:  Those charged with
7 governance could not explain why the premium was adjusted
8 from U.S. 25 million to U.S. 68.3 million without a
9 commensurate adjustment to the indemnity limit provided or
10 why the initial pricing for the policy was subsequently
11 deemed not sufficient.
12          My question is:  Were you aware of that?
13     **A.  Was I aware of what?**
14     Q.  This finding that I just read.
15          MS. SMITH:  Objection to form.
16          THE WITNESS:  I don't know.
17 BY MR. BURT:
18     Q.  Okay.  Looking down into the second paragraph --
19 I don't want to read the whole second paragraph, but about
20 five or six lines up from the bottom, there's a sentence
21 that begins with:  Those charged with the Licensee's
22 governance...
23          Can you tell me when you see that?
24     **A.  Yes, I see it.**
25     Q.  It states:  Those charged with the Licensee's

362

1 governance could not explain the basis upon which the
2 investments had been valued on or about August 1st, 2017,
3 for the purpose of premium settlement.  Also, they could
4 not explain the reason why the information that was relied
5 on to value the investments for the purpose of premium
6 settlement could not be readily provided to the auditors
7 upon request, considering that the policy inception and
8 the financial statements audit were only a few months
9 apart.
10          Okay.  Do you see where I was just reading?
11     **A.  I do see where you were just reading, yes.**
12     Q.  Did you have anything to do with what I just
13 read, the finding that the valuation could not be
14 explained to CIMA?
15     **A.  No.  I --**
16          MS. SMITH:  Objection to form.
17          THE WITNESS:  I have no idea about this.
18 BY MR. BURT:
19     Q.  Okay.  And I think you've testified, but just to
20 be clear:  You don't know who was involved in the
21 valuation of the assets, if anybody?
22     **A.  I don't know.**
23     Q.  Okay.  And then, in the next paragraph, it
24 states:  In addition, those charged with governance could
25 not explain where the ownership in the U.S. 68.3 million

363

1 in investments and cash vested prior to being transferred
2 to the Licensee for settlement of the ATE coverage
3 premium.
4          Did you have -- did you have any knowledge
5 about where the ownership in the 68.3 million had vested,
6 if it had vested prior to the transfer?
7     **A.  No.  I don't even know what this is talking**
8 **about.**
9     Q.  Okay.  And the finding -- ultimate finding is:
10 The above matters cast significant doubt on the economic
11 substance and business purpose of the transaction relating
12 to the ATE coverage.
13          Were you aware that CIMA had made that
14 finding with respect to the ATE?
15     **A.  Not that I recall.**
16     Q.  You don't recall having any discussions with
17 anybody at Sentinel or HCMLP or Beecher Carlson about this
18 finding?
19     **A.  I don't.**
20     Q.  Looking at page 7 of 13, there is a section that
21 begins with the title "Highland Multi-Strategy Credit
22 Fund, Ltd."
23          Do you see that?
24     **A.  I do.**
25     Q.  Are you familiar with that entity, Highland

364

1 Multi-Strategy Credit Fund, Ltd.?
2          MS. SMITH:  Objection, form.
3          THE WITNESS:  Not really.
4 BY MR. BURT:
5     Q.  What do you know about that entity?
6     **A.  I've heard the name before, but I -- I don't have**
7 **knowledge of the entity.**
8     Q.  Okay.  It states there in the first line:
9 Highland Multi-Strategy Credit Fund, Ltd. ("the Fund") is
10 a security held by the Licensee, a portion of which was
11 transferred in as premium on the ATE policy.
12          Do you see that?
13     **A.  I see it.**
14     Q.  Okay.  And were you aware, as part of the
15 Schedule A assets, that a portion of the -- of this fund,
16 the Multi-Strategy Credit Fund, was transferred over to
17 Sentinel?
18     **A.  I don't recall that specifically.**
19     Q.  Okay.  Do you know whether Sentinel ever redeemed
20 its interest in the multi-strat fund?
21     **A.  I don't remember.**
22     Q.  Is that something that you would have been
23 involved in, if there had been a redemption?
24     **A.  I don't know.**
25     Q.  Okay.  But sitting here today -- and I'm going to

365

1  ask this question broadly -- do you have any knowledge
2  whatsoever about whether Sentinel redeemed its interest in
3  the multi-strat -- Multi-Strategy Credit Fund?
4  **A. I don't remember.**
5  Q. Okay.
6  **A. I've been out for a long time. I haven't thought**
7  **about this or focused on this for quite some time.**
8  Q. I understand. And I'm just asking for your best
9  testimony, and I appreciate your efforts.
10  Looking at -- and you'll notice that this is
11  actually part of management -- if you look at page 6, this
12  comes under a heading of "Management Comments," actually.
13  Do you see that?
14  **A. Oh, yes, I see that.**
15  Q. Okay. And so the next heading, underneath
16  "Management Comments," is "Prior Ownership of the
17  Transferred Assets," right, on page 7?
18  **A. Okay. I see where it says, "Prior Ownership of**
19  **the Transferred Assets" on page 7.**
20  Q. Okay. And I want to look at the last paragraph
21  there. It states: The Licensee, Sentinel, acknowledges
22  that it had not undertaken documenting the ownership of
23  premiums prior to being transferred to the Licensee for
24  settlement of the ATE program. Furthermore, the Licensee
25  does not agree that it is out of compliance with

366

1  Section 1(C)(3) of the AML guidance notes. As the
2  policyholder is within a common financial group, as the
3  insured, is controlled by an individual who is also an
4  ultimate beneficial owner of the Licensee.
5  Do you see that?
6  **A. Uh-huh.**
7  Q. Okay.
8  **A. Yes.**
9  Q. So this is under "Management Comments" telling
10  CIMA that, right?
11  **A. Okay.**
12  Q. Were you aware that Sentinel was taking this
13  position, that it was not out of compliance with the AML
14  guidance note because the policyholder, being the
15  insureds -- the insured entities, is within a common
16  financial group, as the insured, is controlled by an
17  individual who is also an ultimate beneficial owner of the
18  Licensee? Were you aware of that fact?
19  MS. SMITH: Objection to form.
20  THE WITNESS: I was not aware Sentinel was
21  taking this position, no.
22  BY MR. BURT:
23  Q. Okay. Do you disagree with this position?
24  **A. There are too many nuances in here for me to**
25  **answer in an accurate way. I don't know what this**

367

1  **"Capital Financial Group" definition is under the AML**
2  **guidance notes. I don't -- I don't have enough context to**
3  **be able to answer this in an intelligent way.**
4  Q. So stepping back -- you can set that aside for a
5  minute.
6  Stepping back and talking at a higher level,
7  was it generally aware -- was it generally known that the
8  insured entities, as part of the ATE, were -- had a common
9  owner with Sentinel?
10  **A. Was it --**
11  MS. SMITH: Objection to form.
12  THE WITNESS: Was it commonly known by who?
13  BY MR. BURT:
14  Q. At HCMLP.
15  We've talked about the discussions that
16  people had about the ATE policy, about the APA. Was that
17  a generally known fact that the insureds were controlled
18  by an individual who was also the ultimate owner of
19  Sentinel?
20  **A. I don't know.**
21  Q. You didn't -- you weren't aware of that at the
22  time; is that fair?
23  **A. I don't know if I agree with the -- the summary**
24  **you're making.**
25  Q. Well, I'm just reading from what Sentinel told

368

1  the regulatory agency. This is what Sentinel said to
2  CIMA. Did Sentinel lie to CIMA?
3  MS. SMITH: Objection to form.
4  THE WITNESS: Certainly not.
5  BY MR. BURT:
6  Q. Okay. When you were working on answers or
7  assisting with certain answers to the CIMA follow-up, was
8  it important that accurate information was conveyed to
9  CIMA?
10  **A. Of course.**
11  MS. SMITH: Objection to form.
12  THE WITNESS: Of course.
13  BY MR. BURT:
14  Q. And -- and did people work hard to make sure the
15  -- the accurate information was provided to CIMA?
16  **A. Yes.**
17  Q. Did you ever hear anyone say: We want to be
18  dishonest with CIMA here?
19  **A. No, absolutely not.**
20  Q. Okay. I'm going to show you -- you can set that
21  aside -- what's been previously marked as Exhibit 30 --
22  Exhibit 84.
23  MR. BURT: I'm sorry. I didn't get that.
24  (Off-record discussion.)
25  BY MR. BURT:

369

1    Q.  Now, as you take a look at this exhibit, I'll
2  preface it with we -- we've talked about your August
3  meeting was with CIMA and that you do recall going to the
4  Cayman Islands to meet with CIMA in August of 2017 --
5  2019 -- excuse me -- is that right?
6    **A.  I recall meeting with CIMA in August of 2019.**
7    Q.  All right.  Now, looking at this e-mail, on
8  the -- on the -- that's -- the front page of this
9  Exhibit 84, it's from you at your Highland Capital e-mail
10  address to a Lauren Baker, cc'ing Mr. DiOrio and
11  Mr. Sevilla.
12         "Subject:  Privileged and Confidential -
13  Presentation," dated 6th of August, 2019.
14         Do you see that?
15    **A.  (Witness nods head affirmatively.)**
16    Q.  Who is Mrs. -- excuse - sorry, you just have to
17  --
18    **A.  Yes.**
19    Q.  Who is Ms. Baker?
20    **A.  She was an admin, I believe -- I don't want to**
21  **misspeak on that, she was an admin, and then began work on**
22  **the PR group.**
23    Q.  Do you recall having her print out ten bound
24  copies of this presentation?
25    **A.  No, I don't recall that.**

370

1    Q.  Do you re- -- so looking at the actual
2  presentation that follows -- go ahead and take a look at
3  it, and my question is whether you recall this
4  presentation?
5    **A.  (Witness reviews document.)  This seems familiar,**
6  **yes.**
7    Q.  What do you recall about it?
8    **A.  I mean, it just -- the document looks familiar.**
9  **I don't recall specifics of anything.**
10    Q.  Okay.  Did you help put it together?
11         MS. SMITH:  Objection, form.
12         THE WITNESS:  I don't know.
13  BY MR. BURT:
14    Q.  Do you know who would have put it together?
15    **A.  No, I don't.**
16    Q.  Who all from Highland Capital was at that meeting
17  in August of 2019?
18    **A.  I'm trying to remember.**
19    Q.  Would it help if I listed some names and you
20  could answer yes or no?
21    **A.  No.  I'm just trying to remember who -- who was**
22  **there.  I believe it was Scott Ellington, J.P. Sevilla and**
23  **Matt DiOrio.**
24    Q.  And yourself?
25    **A.  And me, yes.**

371

1    Q.  Okay.  And just - just by way of curiosity, how
2  did you get to the Cayman Islands?
3    **A.  We flew on a plane.**
4    Q.  Okay.  Was it a commercial flight?
5    **A.  I don't remember.**
6    Q.  Or was it a private plane?
7    **A.  I don't remember.**
8    Q.  You don't have any recollection of whether you
9  flew commercial or whether you flew on a private plane?
10    **A.  For the August 2019 meeting, I don't recall.**
11    Q.  Did you ever fly on a private plane to the
12  Caymans?
13    **A.  Yes.**
14    Q.  How many times?
15    **A.  I don't remember.**
16    Q.  Do you know who paid for that private plane?
17    **A.  I don't know.**
18    Q.  Do you know whether Sentinel paid for that
19  private plane?
20    **A.  I don't know.**
21    Q.  Okay.  So no one -- no one talked with you about
22  who's paying for the private planes to the Cayman Islands?
23    **A.  Not that I remember.**
24    Q.  Okay.  And you don't recall specifically in
25  August of 2019 whether you flew private or commercial to

372

1  meet with CIMA?
2    **A.  I don't remember.**
3    Q.  Where'd you stay?
4    **A.  At a rented house.**
5    Q.  Who was renting the house?
6    **A.  I don't know.**
7    Q.  Was it Mr. Ellington?
8    **A.  I -- I don't know who rented the house.**
9    Q.  No knowledge whatsoever?
10         MS. SMITH:  Objection; asked and answered.
11  BY MR. BURT:
12    Q.  You can answer.
13    **A.  Who rented the house?**
14    Q.  Yeah.  My question is:  You have no knowledge
15  whatsoever of who was renting the house?
16    **A.  In August of 2019?**
17    Q.  Yeah, where you stayed?
18    **A.  I don't know.**
19    Q.  How long did you stay?
20    **A.  I don't remember.**
21    Q.  Was it a day?  More than a day?  A week?
22    **A.  More than a day.  More than a day and less than a**
23  **week.**
24    Q.  Okay.  Okay.  Looking at this presentation to
25  CIMA, in August -- I want to look at -- it's the fourth

373

1   page -- excuse me -- fifth page with the Bates that ends
2   in 72287, and it states:  ATE Policy Timeline.
3        In June of 2017, it's listed that an:  ATE
4   opportunity arises.  Do you know what that's referring to?
5        **A.  Sorry.  Where are you on this document?**
6        Q.  It's the Timeline.
7        **A.  Okay.  I'm here.**
8        Q.  And I'm looking at June of 2017 the first entry
9   in the timeline that an:  ATE opportunity arises.
10        What do you know about that?
11       **A.  I don't know.  Could you give me a different**
12  **question or -- or a little more precise question?  I don't**
13  **know what --**
14       Q.  Well, I'm asking as broadly as I can whether you
15  have any knowledge of the ATE opportunity arising.
16       **A.  It arose, but other than that, I don't -- I don't**
17  **know.**
18       Q.  You don't know how it arose?
19       **A.  I don't.**
20       Q.  You don't know who brought it to the attention of
21  anybody at Sentinel?
22       **A.  I don't.**
23       Q.  Did any members -- did any board of directors of
24  Sentinel attend that meeting in -- in August of 2019?
25       **A.  I believe so, but I can't remember specifically.**

374

1        Q.  Was Mr. DiOrio a member of the board at that
2   time?
3        **A.  I don't know.**
4        Q.  How about anybody from Beecher Carlson, did they
5   attend that meeting?
6        **A.  I believe so.**
7        Q.  And who would that have been?
8        **A.  Clayton Price.**
9        Q.  He attended the meeting in August 2019?
10       **A.  I believe so.**
11       Q.  Okay.  In August of 2017, the next -- I'm not
12  looking at the July but the August, it states the:  Board
13  reviews the opportunity and diligence, resolves to move
14  forward; ATE policy executed and takes effect.
15        What do you know about the board reviewing
16  the opportunity and any diligence that the board did?
17       **A.  I don't know.**
18       Q.  You recall what was discussed with CIMA about
19  that, what was represented to CIMA at that meeting about
20  that?
21       **A.  No.**
22       Q.  In June of 2018, it says the:  Auditors and
23  actuary recommend that Board authorize adjusting the ATE
24  premium to $68 million to account for the value of the
25  underlying securities, outside counsel consulted.

375

1        You recall that being discussed at the
2   meeting with CIMA?
3        **A.  No.**
4        Q.  And you have no knowledge, other than looking at
5   this on the page here, about adjusting the ATE premium to
6   68 million; is that right?
7        **A.  Yes, that's right; I do not have knowledge about**
8   **adjustment of the premium.**
9        Q.  And is your answer the same with respect to later
10  in June of 2018, readjusting it down to 59 million?
11       **A.  Yes, my answer is the same.**
12       Q.  Okay.  One moment, please.
13        What was your role -- excuse me.  What was
14  your role specifically at the meeting?
15       **A.  From what I recall, I really just took notes and**
16  **listened in on anything related to CIMA's mandate to**
17  **simplify the structure that we've talked about earlier.**
18       Q.  Okay.  Did you actually speak at the meeting?
19       **A.  I don't remember.**
20       Q.  You don't remember whether you were responsible
21  for presenting any of the slides to CIMA?
22       **A.  I don't remember.**
23       Q.  Okay.  Looking at Slide 8, it says -- it has the
24  title of:  Investment Portfolio Roll-Forward Detail.
25        And there are -- it appears about the last

376

1   third -- just over a third of these investments, the
2   market value was listed as "N/A."
3        Do you see all those N/As at the bottom?
4        **A.  I do see the N/As at the bottom of this page,**
5   **yes.**
6        Q.  Do you recall at all why NA is listed for all of
7   those investments?
8        **A.  No idea.**
9        Q.  Do you recall what was said to CIMA about that at
10  that meeting?
11       **A.  No, I do not recall.**
12       Q.  Looking up higher in this, about five lines down
13  there's an entity that's called SeaOne, and my question
14  is:  Do you know what SeaOne is?
15       **A.  Yes.**
16       Q.  What is that?
17       **A.  SeaOne is an investment in a -- I think it's a**
18  **liquid natural gas company.**
19       Q.  And an investment by whom?
20       **A.  SS Holdings, Ltd., which is a subsidiary of the**
21  **regulated entity Sentinel Reinsurance, Ltd.**
22       Q.  Okay.  So S- -- what was it, SS Holdings?
23       **A.  Limited.**
24       Q.  All right.  And looking at the last page, just
25  so -- on the -- there's an org chart.

377

1    A. There is.
2    Q. There it is.  So SS Holdings, Ltd., underneath
3  Sentinel Reinsurance; is that right, on -- on this org
4  chart?
5    A. Yes, Sentinel Reinsurance, Ltd., owns SS
6  Holdings, Ltd.
7    Q. And it reflects here the SeaOne investment; it
8  appears under that?
9    A. It does on this page reflect that, yes.
10   Q. Was SeaOne relate- -- was it affiliated in any
11 way with HCMLP?
12   A. Not to my knowledge.
13   Q. How about other than being owned by -- strike
14 that.
15      Do you know whether Messrs. Dondero or
16 Ellington had anything to do with SeaOne?
17      MS. SMITH:  Objection, form.
18 BY MR. BURT:
19   Q. For example, was it a business venture that they
20 were pursuing?
21   A. I don't know.
22   Q. You don't know?  Okay.
23      For this meeting, did someone ask you to
24 attend the meeting, or did you -- did you ask to go?
25   A. I don't know.

378

1    Q. You don't recall Mr. Ellington, for example,
2  coming and saying:  Hey, Katie, I'd like you to come to
3  this meeting with me; we are meeting with CIMA?
4    A. I don't remember whether I asked or whether he
5  asked me.
6    Q. Would anybody else have asked you other than
7  Mr. Ellington, or if anybody asked, would it likely have
8  been him?
9      MS. SMITH:  Objection to form.
10     THE WITNESS:  If someone asked me to attend
11 the meeting, it would have been Mr. Ellington, yes.
12 BY MR. BURT:
13   Q. Did he do most of the talking at this meeting, or
14 Mr. DiOrio or Leventon do the talking; do you recall?
15   A. You said "Mr. Leventon."  I don't recall him
16 being at that meeting.
17   Q. Oh, Mr. Sevilla.  Excuse me.  You're right.
18   A. I -- I don't remember.
19   Q. And so we just looked at this, the very last
20 supplied, the CIMA-Approved Sentinel Structure.  And
21 recalling your testimony, that this is really where you
22 were involved, the structure of -- of Sentinel in all of
23 this, did you present this slide or discuss any of this
24 with CIMA at that meeting?
25   A. I don't remember if I presented it.  I don't

379

1  remember if I spoke at the meeting.  I -- I just don't
2  remember.
3    Q. Do you recall what the out- -- what the outcome
4  of that meeting was?  Did CIMA indicate anything to
5  you-all at the end of the meeting?
6    A. I don't remember.
7    Q. Looking at -- we've -- I need the exhibit number.
8  I think it's 108.
9    A. It's one I already have?
10   Q. It's one you already have, Exhibit 108.
11   A. What is it?
12   Q. It is an e-mail from Clayton Price -- excuse me,
13 from -- again, I can't pronounce this name -- Sehliselo
14 Dube to Clayton Price, cc'ing Tom Adamczak.  And this
15 contained the ITA Trust Deed that we looked at earlier.
16   A. You said it's Exhibit 108?
17   Q. 108.
18   A. Let me see.  I got it -- I got it in here
19 somewhere.
20   Q. I know you've got a lot over there.
21   A. Uh-huh.
22      MS. MCLAUGHLIN:  There's a bright pink stamp
23 on the back, if that helps.
24      THE WITNESS:  Got it.
25 BY MR. BURT:

380

1    Q. Okay.  Now, we've looked at -- there's one
2  exhibit left to this e-mail chain that I want to look at
3  that we hadn't looked at before.  It's the first
4  attachment, actually.  You see there's four attachments,
5  the first attachment being 18- -- 181217 BOD Meeting
6  Minutes DRAFT.
7      You see that?
8      MS. SMITH:  What's the Bates?
9      THE WITNESS:  Are you talking about an
10 attachment referenced here?
11 BY MR. BURT:
12   Q. Yes.  In the -- in the top e-mail, it's referring
13 to the first attachment --
14      THE WITNESS:  I think he's talking about
15 this (indicating).
16      MS. SMITH:  Oh.
17      MR. BURT:  Right.
18 BY MR. BURT:
19   Q. And the third -- the -- three pages in, if you go
20 three pages in, is the attachment with the title Sentinel
21 Reinsurance, Ltd., (the "Company"), at the very top.
22   A. Okay.  Bates 6063?
23   Q. That's correct.
24   A. Okay.
25   Q. Yep.

381

1    A.  I'm with you.
2    Q.  Now, here it states:  Minutes of the meeting of
3  the board of directors of the Company held via
4  teleconference on the 17th day of December 2018 at
5  1:00 p.m.  And then it lists who was in attendance:
6  Damien Austin, Director.
7        Do you -- do you know Mr. Austin?
8    A.  I know of him.
9    Q.  And were you aware that he was a director at the
10 time of Sentinel in -- in December of 2018?
11   A.  Yes, I would have been aware in 2018 that he was
12 a director.
13   Q.  And then Jan Neveril, who we've talked about;
14 Matt DiOrio is listed as a director there.
15       You see that?
16   A.  I see it.
17   Q.  And Dilip Massand is listed as a director.  And
18 he was the one in the UAE, right?
19   A.  Yes.  He was based out of the UAE.
20   Q.  And then it appears that you and Mr. Sevilla
21 attended on behalf of SAS Asset Recovery, Ltd.
22       You see that?
23   A.  I see that.
24   Q.  And then three individuals from Beecher Carlson;
25 is that right?

382

1    A.  I see that, uh-huh.
2    Q.  Do you recall attending this board of directors
3  meeting?
4    A.  No.
5    Q.  Do you recall attending any other board of
6  director meetings?
7    A.  No, I don't recall.
8    Q.  Do you have any knowledge of why it was
9  listing -- after you and Mr. Sevilla was listed -- listing
10 SAS Asset Recovery, Ltd. as the entity on whose behalf you
11 were attending?
12       MS. SMITH:  Objection, form.
13       THE WITNESS:  I don't know.
14 BY MR. BURT:
15   Q.  Do you know who would have prepared these
16 minutes?
17   A.  I don't know.
18   Q.  Do you know how frequently the board of directors
19 of Sentinel met?
20   A.  No, I don't know.
21   Q.  Number 3 here, it states:  The Directors reviewed
22 the prior Board of Directors Meeting Minutes and Unanimous
23 Written Resolutions since the 27th of October 2014 and
24 following a brief discussion it was resolved that, (a) the
25 Board of Directors Meeting Minutes of the 4th of

383

1  August 2016 and 8th of December 2017 be and hereby are
2  approved.
3        See where I'm reading?
4    A.  I do.
5    Q.  And then it states:  The Unanimous Written
6  Resolutions dated 6 October 2016, 26 June 2017, and it
7  lists a number of other dates, and says:  Were provided
8  with the board materials for Director review.
9        You see that?
10   A.  I see it here.
11   Q.  Do you know whether you received those materials?
12   A.  No idea.
13   Q.  Do you have any idea of what it's referring to?
14   A.  I don't know.
15   Q.  Now, during this board meeting, is it your
16 testimony that you recall nothing about this board meeting
17 whatsoever?
18   A.  I don't recall this board meeting specifically,
19 no.
20   Q.  On Number 4 on page 2, states that:  The
21 Directors briefly discussed recent updates issued in the
22 Guidance Notes by the Cayman Islands Monetary Authority
23 related to AML/Compliance matters.
24   Do you recall that being discussed at all?
25   A.  No.

384

1    Q.  All right.  When -- you can set that aside.
2        Going back to the post bankruptcy period at
3  HCMLP, do you recall the independent board ever asking any
4  questions about Sentinel?
5    A.  I don't remember.
6        MS. SMITH:  Objection to form.
7  BY MR. BURT:
8    Q.  How about any questions about the Greenbriar CLO?
9        MS. SMITH:  Objection to form.
10       THE WITNESS:  I don't know.
11 BY MR. BURT:
12   Q.  Okay.
13       MR. BURT:  I think we are almost done.  Can
14 I have three minutes off the record just to check my
15 notes?  We'll come back and I think we're -- we can wrap
16 it up.
17       THE WITNESS:  Okay.
18       THE VIDEOGRAPHER:  We are off record at 6:55
19 p.m.
20       (Brief recess taken.)
21       THE VIDEOGRAPHER:  We are back on record at
22 7:02 p.m.
23 BY MR. BURT:
24   Q.  If you could -- and, I apologize, one exhibit we
25 looked at earlier, I just do have a follow-up question.

385

1  It was Exhibit 104 in your pile.
2      And this was -- it begins with an e-mail
3  exchange, and it had the attachment we looked at with the
4  Dondero/Patton/Ellington/Nimitz percentages, do you recall
5  that, a few hours ago?
6      **A. Was it something prepared by Beecher?**
7      Q. That was prepared by Beecher, but there's an
8  e-mail that begins the exhibit --
9      **A. Okay. Hold on.**
10     Q. -- Exhibit 104.
11     **A. I don't have a very good system going on over**
12  **here.**
13         MR. BURT: There it is.
14         THE WITNESS: Oh, got it.
15  BY MR. BURT:
16     Q. Okay. So I -- there is -- there's an e-mail here
17  in the middle from Matt DiOrio on October 2nd, 2018, to
18  Jonathan Arbeit and Alli Devins both at Beecher Carlson,
19  cc'ing Mr. Adamczak and yourself,
20  katieirving@sasmanagement.com.
21         And Mr. DiOrio -- do you see where I'm
22  reading --
23     **A. I do.**
24     Q. -- there?
25         Mr. DiOrio writes: Thanks, Jon. Very

386

1  helpful. We are definitely aware of the cash need by
2  year-end and will not be entertaining any dividend
3  issuance while the ATE policy is active.
4      Now, are you aware of that -- what do you
5  know about that policy at Sentinel that there would be no
6  dividend issuance while the ATE policy is active?
7         MS. SMITH: Objection to form.
8         THE WITNESS: Yeah. I don't understand what
9  you're asking.
10  BY MR. BURT:
11     Q. So I -- I'm just asking about what he writes
12  here, that -- Mr. DiOrio writes that there would be no
13  dividend issuance at Sentinel while the ATE policy is
14  active.
15         What do you know about that?
16     **A. I don't, other than he -- he is making that**
17  **statement to Beecher, and I'm copied.**
18     Q. You don't recall that e-mail at all?
19     **A. I don't.**
20     Q. You don't recall that being a policy at all, that
21  Sentinel was not going to be making any dividends while
22  the ATE policy was active?
23     **A. I don't recall, no.**
24     Q. He then writes: I've copied Katie -- Katie
25  Irving in here as well who may have some additional color

387

1  to provide on the capital rebalancing.
2      Do you know what he is referring to there?
3      **A. I don't remember.**
4      Q. Were you involved at all with capital rebalancing
5  at Sentinel?
6         MS. SMITH: Objection to form.
7         THE WITNESS: I don't -- I don't remember.
8  BY MR. BURT:
9      Q. We've talked about how you were part of the --
10  the struc-- working on the structure and liquidating
11  certain entities and streamlining it for CIMA, right?
12     **A. Yes.**
13     Q. Did that involve capital rebalancing?
14     **A. I don't remember.**
15     Q. Do you remember whether you provided any
16  additional color to CIMA -- or -- excuse me -- to Beecher
17  Carlson on capital rebalancing?
18     **A. I don't remember. Capital rebalancing is**
19  **something Beecher would have handled. I don't know what**
20  **it is.**
21     Q. You didn't -- you don't -- you didn't have any
22  discussions with Beecher about capital rebalancing; is
23  that right?
24     **A. Not that I recall. Not that I recall. I don't**
25  **know.**

388

1      Q. Do you recall -- at Sentinel, was it -- was it a
2  concern that -- about the amount of cash on hand that
3  Sentinel needed to have in order to -- in order to
4  justify, you know, their reserve requirements as an
5  insurance company?
6         MS. SMITH: Objection to form.
7         THE WITNESS: Was who concerned with that?
8  BY MR. BURT:
9      Q. The individuals associated with Sentinel,
10  Mr. DiOrio or yourself. Was that a concern that you were
11  -- that you discussed or were aware of?
12         MS. SMITH: Objection to form.
13         THE WITNESS: I believe I was aware that
14  CIMA had certain requirements related to cash reserves.
15  It's complex related to the insurance business.
16  BY MR. BURT:
17     Q. And was there a concern that Sentinel did not
18  have enough cash at times to meet those requirements?
19         MS. SMITH: Objection to form.
20         THE WITNESS: Not that I recall.
21  BY MR. BURT:
22     Q. Did you ever work on getting cash infusions into
23  Sentinel in order to meet the reserves?
24     **A. Not that I recall.**
25     Q. Okay. Now, just a few final, sort of, broad

389

1  questions.  We've -- obviously, we've talked a lot about
2  Sentinel today.
3       Is there anything related to Sentinel that
4  we didn't discuss today that you know about that you think
5  might be important for us to know?
6       MS. SMITH:  Objection to form.
7       THE WITNESS:  Not that I can think of.
8  BY MR. BURT:
9    Q.  So as far as you're concerned, we have covered
10 all the topics about Sentinel, that you're aware of?
11      MS. SMITH:  Objection to form.
12      THE WITNESS:  I don't know how I can say
13 that we've covered all the topics.
14 BY MR. BURT:
15   Q.  Well, I just want to make sure that -- all the
16 facts that you know about Sentinel that we've asked about
17 them today.
18      Is there any other facts about Sentinel,
19 that you're aware of, that I haven't asked about today?
20      MS. SMITH:  Objection to form.
21      THE WITNESS:  I don't know how to answer
22 that.
23 BY MR. BURT:
24   Q.  Okay.  Well, regarding your knowledge about
25 Sentinel and its provision of the ATE policy in this case

390

1  that we've talked about today, are there any other facts
2  pertaining to that -- to Sentinel in that policy that we
3  have not discussed, that you're aware of, today?
4       MS. SMITH:  Objection to form.
5       THE WITNESS:  Not that I can think of.
6  BY MR. BURT:
7    Q.  So in order to provide a complete -- a complete
8  explanation of your understanding of Sentinel, you feel
9  like we've covered everything that you know about Sentinel
10 and the ATE policy; is that correct?
11   **A.  I feel like you're asking me the same question**
12 **over and over again.**
13   Q.  Would you answer the question, please?
14   **A.  I don't -- I can't think of anything else that --**
15 **right now.**
16   Q.  Okay.  Is there a reason why you can't think of
17 anything else?
18      MS. SMITH:  Objection to form.
19      THE WITNESS:  I just can't think of anything
20 else.
21 BY MR. BURT:
22   Q.  Okay.  Too many facts out there, and you can't
23 think of anything that we might not have covered?
24   **A.  You've covered a lot.**
25   Q.  I understand.  I just want to make sure there's

391

1  nothing missing that you would want to be clear about
2  Sentinel or the ATE policy later on that we haven't asked
3  about today?
4       MS. SMITH:  Objection to form.
5       THE WITNESS:  I feel like I keep giving you
6  the same answer:  No, I can't think of anything.
7       MR. BURT:  Okay.  All right.  We pass the
8  witness.
9       MS. SMITH:  Done.
10      THE VIDEOGRAPHER:  We are off the record at
11 7:10 p.m.
12      (Deposition concluded at 7:10 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

392

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION
-----------------------------------
IN RE:            §   Chapter 11
                  §
HIGHLAND CAPITAL  §
MANAGEMENT, L.P., §   Case No. 19-34054-SGJ11
                  §
      Debtor.     §
                  §
UBS SECURITIES LLC AND   §
UBS AG LONDON BRANCH,    §
                  §
                  §   Adversary Proceeding
                  §   No. 21-03020-sgj
      Plaintiffs, §
                  §
                  §
vs.               §
                  §
HIGHLAND CAPITAL  §
MANAGEMENT, L.P., §
                  §
      Defendant.  §
-----------------------------------
REPORTER'S CERTIFICATION
ORAL & VIDEOTAPED DEPOSITION OF
KATIE LUCAS IRVING
MONDAY, NOVEMBER 15, 2021

I, Kari J. Behan, CSR, RPR, CRR, and in and for the
State of Texas, do hereby certify that the facts as stated
by me in the caption hereto are true;

That there came before me the aforementioned named
person, who was by me duly sworn to testify the truth
concerning the matters in controversy in this cause;

And that the examination was reduced to writing by
computer transcription under my supervision; that the
deposition is a true record of the testimony given by the

393

1  witness.
2      I further certify that I am neither attorney or
   counsel for, nor related to or employed by, any of the
3  parties to the action in which this deposition is taken,
   and further that I am not a relative or employee of any
4  attorney or counsel employed by the parties hereto, or
   financially interested in the action.
5
       Given under my hand and seal of office on the 23rd of
6  November, 2021.
7
8
9      _____
10     KARI BEHAN, CSR, CCR, RPR, CRR
11     Texas CSR NO. 8564
12     Expiration Date: 7-31-2022
13
14
15
16
17
18
19
20
21
22
23
24
25